IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON-PILOT LIFE INSURANCE CO., | ) : | CASE NO. C-1-02-479 |
| Plaintiff, | ) : | JUDGE SPIEGEL |
| | | Magistrate Judge Hogan |
| vs. | ) : | DEFENDANT'S MEMORANDUM |
| CHRISTOPHER L. KEARNEY, | ) : | IN OPPOSITION TO MOTION |
| | | FOR PROTECTIVE ORDER |
| Defendant. | ) | |

This is an insurance bad faith case. For the reasons discussed below, this Court should deny plaintiff's Motion For Protective Order. The requested depositions and areas of inquiry should proceed.[1]

I.  *Undisputed Facts Relevant To Plaintiff's Motion For Protective Order.*

   A.  **The Purchase Of The Insurance Policies.**

In 1990 and 1991, Mr. Kearney purchased 2 separate disability insurance policies from the plaintiff-insurer (the "Policies"). (*See*, *Exhibit 1, Declaration of Chris Kearney*). With each Policy, Mr. Kearney also purchased: (i) a Residual Disability benefits rider; (ii) a 7% Increase In Benefits (the "COLA") rider; and (iii) a Social Security Supplement ("SSS") rider. *Id*. Mr. Kearney then became disabled in 1993. *Id*.

---

[1]  Plaintiff's motion is governed by Fed. R. Civ. P., Rule 26(C) which provides in pertinent part that: "Upon motion . . . accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute . . . and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ."

B.      **Plaintiff's 10-year Payment Of Residual Disability Benefits.**

For the last approximately 10 years, the plaintiff has paid Residual Disability benefits to Mr. Kearney pursuant to the Policy and the Residual Disability Rider Mr. Kearney purchased. Through today, these payments have included payment of the SSS benefit that Mr. Kearney purchased through the SSS Rider. Id. In addition, on May 6th of each year from 1994 through 2001, the plaintiff increased Mr. Kearney's monthly benefit checks (1 for each policy purchased) by 7% - pursuant to the COLA Rider Mr. Kearney purchased. Id.

It is undisputed that plaintiff did not deny any COLA payments to Mr. Kearney prior to May 6, 2002. Id.

On May 6, 2002, another annual 7% COLA adjustment was required under the Policies. Id. The plaintiff, however, **for the first time** in the parties' 10 year relationship, denied Mr. Kearney that benefit. Id. To this day, plaintiff issues 2 Residual Disability checks monthly to Mr. Kearney in the May 6, 2001, adjusted amounts. But plaintiff has denied Mr. Kearney the 7% COLA adjustment for May 6, 2002, May 6, 2003, and May 6, 2004.

C.      **The Lawsuit.**

Plaintiff first denied benefits to Mr. Kearney on May 6, 2002. Id. And on July 1, 2002, approximately 2 months later, the plaintiff filed this suit. (*See*, *Complaint*). In the letter notifying Mr. Kearney of the lawsuit, the plaintiff-insurer's counsel confirmed that she believed the Policies at issue to be ambiguous. She wrote:

> "**it does not appear** that you are entitled to cost-of-living adjustments. In order to resolve [our] **difference in policy interpretation**, Jefferson-Pilot has [filed suit]."
> (*Exh. 2*)(*emphasis supplied*).

2

Mr. Kearney filed a counterclaim alleging *inter alia* bad faith.  Presently pending before this court are cross-motions for summary judgment.  Each party contends that the insurance contracts and relevant Riders unambiguously support their respective interpretation of the Policies.  Mr. Kearney only further contends that if the Policies and Riders do not unambiguously provide him with the right to annual 7% COLA adjustments (and SSS benefits and waiver of premium) while Residually Disabled, the Policies are ambiguous on this point and, therefore, should be construed in his favor.

II.     *Legal Analysis*.

  A.    **Discovery To Date.**

To date, several depositions have been taken in this action.  Information learned – and information *not* learned - during the course of those depositions has generated the present discovery dispute and plaintiff's motion for protective order.  The following facts are material:

- Eight (8) months before plaintiff denied any benefits to Mr. Kearney and ten (10) months prior to the initiation of this action, two employees of DMS, Robert Mills and William Hughes, scheduled a meeting for October 11, 2001, with Mr. Kearney's counsel, whose office was located in Southern Florida; (*See*, Exhibit 3, Excerpts of Mills Depo., p. 20);[2]

- According to Mr. Mills, while in Florida on October 11, 2001 (while having coffee with his boss, William Hughes waiting for the meeting with Mr. Kearney's counsel to begin), he stumbled upon the revelation that plaintiff and DMS had for over seven (7) years been misinterpreting Mr. Kearney's *unambiguous* Policies and Riders; (*Id., ps. 38-39)*; and

- Between, October 11, 2001, and May 6, 2002, the date that plaintiff first denied benefits to Mr. Kearney, Messrs. Mills and Hughes (for DMS) engaged in many 2 and 3 way written and oral communications with Ms. Farabow (a representative of plaintiff, Jefferson-Pilot), and Mr. William

---

[2]    In 2001, Mr. Kearney retained counsel to assist him in his dealings with Disability Management Services. Inc. ("DMS"), a company retained by plaintiff in 1997 to administer the claim. *(Exh. 1)*

3

Dempsey (a representative of the reinsurer of the Policies, Employers Reinsurance Corporation); (*Id., ps. 67, 70-92*);

- According to Mr. Mills, he did not seek the counsel of DMS' 7-lawyer general counsel's office. (*Id., ps. 80-81*); and

- In December 2001, Mr. Dempsey, at least, engaged in several telephone conferences with Attorney Geraldine Johnson and obtained her legal opinion concerning the Policy interpretation. (*See, Exhibit 4*).[3]

B.  **Under Ohio Law, JP's request to Quash the Deposition Notices of Ms. Farabow, Ms. Johnson,[4] and Mr. Dempsey Must Be Denied.**

Although there existed no conceivable 3-way attorney-client relationship between Messrs Mills and Hughes (the non-lawyer claim representatives of DMS) and *their clients*, representatives of the plaintiff, Jefferson Pilot (Ms. Farabow), and representatives of plaintiff's reinsurer, Employers Reinsurance Corporation ("ERC") (Ms. Dempsey), even if such an attorney-client relationship existed (as no doubt did between Attorney Geraldine Johnson and ERC in December 2001), the communications between the relevant players prior to May 6, 2002, are not privileged. The discussions and associated documents which were shared with or created by Mr. Dempsey, Ms. Farabow, and Ms. Johnson prior to May 6, 2002 (the date that plaintiff first denied benefits to Mr. Kearney), are not exempt from discovery under the attorney-client privilege or work-product doctrine.

---

[3]    In December 2001, Mr. Dempsey on behalf or ERC sought the opinion of outside counsel, Attorney Geraldine Johnson, as to coverage issues on Mr. Kearney's policies and ambiguities in those policies. In Ms. Johnson's December 2001 Opinion letter to Mr. Dempsey she wrote: "In order to ***strip*** Mr. Kearney of the ability to allege bad faith or at least best position ourselves to defend such a claim, it is my recommendation that we continue to pay Mr. Kearney the monthly amount we have been paying under a full reservation of rights contemporaneous with our pursuit of a declaratory judgment action."

[4]    Mr. Kearney desires to take Ms. Johnson's deposition only if Ms. Johnson believes that her health permits. Mr. Kearney does, however, require the full production of Ms. Johnson's file, e-mails and notes in her possession regardless of her health.

4

1.   *The Ohio Supreme Court's Decision in: Boone v. Vanliner Ins. Co.*

In 2001, the Ohio Supreme Court decided the case of *Boone v. Vanliner Ins. Co.* 744 N.E.2d 154, 91 Ohio St.3d 209, 213-214, 2001-Ohio-27 (Ohio 2001).  In *Boone*, the Ohio Supreme Court held unequivocally that:

> "in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage." *Boone*, *at 213-214*.

This rule applies equally to claims of work product.  *Garg v. State Auto. Mut. Ins. Co*. 800 N.E.2d 757, 155 Ohio App.3d 258, 2003-Ohio-5960 (2nd Dist. 2003).

Under *Boone* "the critical issue in evaluating the discoverability of otherwise privileged materials is not whether the attorney-client communications related to the existence of coverage but, rather, whether they may cast light on bad faith on the part of the insurer." *Id*. Under *Boone*, neither attorney-client privilege nor the work-product doctrine protects materials in a claims file, created prior to the denial of the claim that may cast light on whether the insurer acted in bad faith in handling an insured's claim." *Id. at 265-266*.

In this action, there is solid evidence of bad faith.  As an example (in addition to the secret strategy designed to "strip" Mr. Kearney of the ability to claim bad faith demonstrated in Exhibit 4 attached), plaintiff strategically misrepresented the terms of the Policy to Mr. Kearney.  Attached as Exhibit 5 is a June 8, 2002, draft letter plaintiff produced in this action which is bates labeled 0557-0560 (*Exh. 5*).  The third page of that letter (0559), which was designed to be delivered to Mr. Kearney prior to the filing of this suit contains handwritten comments of some unknown and unidentified supervisor.  The original author of the draft letter suggests that JP/DMS deal honestly

5

with Mr. Kearney by advising him that JP/DMS "agreed" that the Policies provide "lifetime" benefits should Mr. Kearney's condition not improve and he lives past the age of 65. The supervisor editing the letter, however, deleted this appropriate admission and wrote in the margin: "we are willing to look at this issue as part of a global settlement of other policies." <u>Id</u>. Additionally, the supervisor's language appeared in the final version of the letter mailed to Mr. Kearney on June 18. (*Exh.* 6). Clearly, plaintiff intended to withhold the truth from Mr. Kearney and intended to negotiate a compromise based on its lie.

Under Ohio law and the holding of *Boone* and *Garg*, plaintiff cannot avoid the discovery of the testimony of Mr. Dempsey, Ms. Farabow, and Ms. Johnson and refuse to produce the notes, memorandum, and documents (including emails) created by or provided to counsel for JP/DMS/ERC or outside counsel on the basis of privilege. Plaintiff's arguments in its motion for protective order are meritless.

        **(a).**    <u>**Evidence Rule 501.**</u>

Plaintiff's primary argument in an effort to avoid the holding of *Boone* is plaintiff's contention that "Ohio law does not apply, *Boone* is not applicable to the privilege issue in this case." (*Motion, p. 6*). This is a patent misstatement of the law.

Plaintiff chose to file its Complaint in this Court asserting jurisdiction based on diversity. (<u>See</u>, *Complaint ¶ 3*). No federal question is raised in any claim, counterclaim, or defense. For this reason, Ohio's law regarding attorney-client privilege applies. *Federal Rules of Evidence Rule, 501.* Federal Rules of Evidence Rule 501, provides:

> "Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government,

6

> State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

In this diversity based civil action where Ohio law supplies the rule of decision, the nature of plaintiff's asserted attorney-client privilege shall be determined under Ohio law, which means the Ohio Supreme Court's holding in *Boone.* While Evid. Rule 501 is unambiguous, the discussion in *Moore's Federal practice, Third Edition, Volume 6 (2004)* confirms this rule: "the question of what matters are privileged in federal court must be decided in light of Rule 501 of the Federal Rules of Evidence . . . in federal cases in which only state claims and defenses have been raised, privilege is governed by state law." *Id., §26.47[4], p. 26-152.*

### (b)     Plaintiff Has Denied Coverage!

Plaintiff next argues that *Boone* does not apply because plaintiff "has not denied coverage under Mr. Kearney's disability policy." (*Motion, p. 7*). This argument is factually incorrect. As indicated above and as set forth in the attached Affidavit, beginning on May 6, 2002, plaintiff has denied Mr. Kearney the 2002 COLA adjustment, the 2003 COLA adjustment, and 2004 COLA adjustment benefits. There has undoubtedly been a denial of coverage and it began on May 6, 2002. On May 6 of each year prior to 2002 plaintiff paid Mr. Kearney a 7% annual increase in benefits (COLA). On May 6, 2002, for the very first time, plaintiff denied Mr. Kearney the COLA increase and has withheld coverage for that benefit since.

Moreover, if this Court accepted plaintiff's assertion that it "has not denied coverage" then under *Boone*, Mr. Kearney's entitlement to the discovery of documents and communications with

counsel would be <u>unlimited</u>. Counsel for the plaintiff apparently misunderstands that under *Boone* the denial of coverage date is the date that *Boone* cuts off an insured's ability to gain discovery of communications with counsel. But if plaintiff desires to stand by its counsel's argument that coverage has never been denied, then Mr. Kearney requests the discovery of all communications with counsel from October 2001 through the present.

> 2. *There was no 3-way attorney-client relationship between ERC, DMS, and Plaintiff.*

Messrs. Hughes and Mills, the DMS representatives who had extensive dialogue with Mr. Dempsey and Ms. Farabow from October 2001 through May 2002, had at their disposal at DMS seven (7) in-house attorneys experiencing in insurance contract interpretation with whom they would generally seek counsel on legal issues. According to Mr. Mills, however, he and Mr. Hughes did not seek in-house DMS counsel input on the Kearney file between October 2001 and May 2002. (*Ex. 3, p. 80*). Rather they engaged in communications with their <u>client</u> contacts, Ms. Farabow and Mr. Dempsey. Just because Mr. Dempsey and Ms. Farabow attended law school, however, does not make those communications privileged.

There was no 3-way attorney client relationship between DMS, JP, and ERC. The communications simply are not protected. The 3-way communications between: (i) Mills and Hughes (nonlawyers from DMS); (ii) Farabow (in-house counsel of JP) and (iii) Dempsey (in house counsel of ERC) are not protected by attorney-client privilege. Attorney Farabow's client is JP, not DMS: DMS has its own in-house legal staff of 6-7 lawyers to whom Messrs. Mills and Hughes look for legal advise. Farabow is not the lawyer for DMS, ERC, Hughes, or Mills. Furthermore, Attorney Dempsey's client is his employer, ERC, not JP, DMS, Mills, or Hughes.

8

C. <u>Jefferson-Pilot's Deposition</u>.

This Court has ordered plaintiff to produce its witnesses in Cincinnati for deposition. Nonetheless plaintiff refuses and filed the Motion For Protective Order. That request must be denied consistent with this Court's prior order. *Doc. 49.*

After the Court ordered the conduct of depositions in Cincinnati, in order to convenience the other parties, Mr. Kearney agreed to take some depositions in North Carolina on May 6 and 7 and some depositions in Massachusetts on May 13 and 14.

On May 6, 2004, as its 30(B)(6) designee, the plaintiff produced an attorney/employee who formerly worked as a insurance defense lawyer for a private practice firm, Valarie Loftin. By her own admission, prior to the night before her deposition, Ms. Loftin knew nothing about Mr. Kearney, his claim, or the litigation. She also knew <u>nothing</u> about the other specific issues identified in the 30(B)(6) Notice of Deposition. (*Exh. 7*).

According to Ms. Loftin's testimony, her complete knowledge of the matter was gleaned from a cursory review of some pleadings the night before her deposition while caring for her children. (*Exh. 8, Loftin Depo., p. 116*). Ms. Loftin testified that:

 (i) she had never reviewed the claim file (*Id., p. 11*);

 (ii) she was not involved in the administration of Mr. Kearney's claim *Id.*;

 (iii) she does not know who responded to the discovery requests in the case. *Id.*;

 (iv) she has no information or knowledge of the DMS handling of Mr. Kearney's claim;

 (v) the only thing she knows about the claim is what she gleaned from reading some of the pleadings the night before her deposition (*Id. at 54*); and

>    (vi) she has never spoken to anyone at DMS about the purported overpayment and/or request for declaratory judgment regarding Mr. Kearney. (*See, Loftin Depo., filed pp. 10, 98, and 101*).

Mr. Kearney has, therefore, renoticed the deposition of a JP 30(B)(6) witness for Cincinnati, and demands a recovery of his costs and expenses (including attorney fees) incurred with the charade of Ms. Loftin's deposition.

Ms. Loftin knew nothing about the issues set forth in the 30(B)(6) notice and neither she nor plaintiff's counsel will identify who is the right person or even execute the verification to plaintiff's purported interrogatory responses. (*Id., at 11 and 117*).

>    **D.    Depositions Of Messrs. Mills and Hughes Should Occur In Cincinnati as Ordered and Noticed.**

On May 14, 2004, Mr. Kearney's counsel intended to take 2 depositions.  Mr. Mills' deposition was begun at 8:30 a.m. on May 14, 2004, and lasted 5 hours 15 minutes, but was not completed.  It was suspended at 4:00 p.m. on Friday afternoon to allow plaintiff's counsel to catch the last flight out which would return him to Cincinnati before 1 a.m. (*Exh. 3, p. 229*).

The reasons that Mr. Kearney's counsel could not complete both Mr. Mills' deposition and take Mr. Hughes' deposition on May 14 were: (i) plaintiff's withheld documents sought 1 year ago until the morning of the depositions (this extended the planned length of Mr. Mills' deposition)(*Exh. 3, pp. 4-11*); and (ii) on well over 60 occasions, Mr. Mills requested that simple straightforward examination questions be repeated.  Mr. Kearney's counsel was also denied testimony concerning Mr. Mills' dialogue with Mr. Dempsey, Ms. Farabow, and Ms. Johnson.

As a result, Mr. Kearney's counsel required more time of Mr. Mills than anticipated and after returning to Cincinnati, consistent with this Court's order, *Doc. 49*, Mr. Kearney noticed the

10

continuation of Mr. Mills' Deposition and the conduct of Mr. Hughes' deposition for Monday, May 24, 2004. As indicated above, Mr. Hughes' deposition was noticed for May 14 but time did not provide for its taking and it was apparent that plaintiff's counsel would instruct Mr. Hughes to not answer questions concerning communications with Ms. Farabow and Mr. Dempsey.

Plaintiff refused to produce Mr. Mills and Mr. Hughes on May 24 as noticed and now refuses to produce them in Cincinnati. Plaintiff's motion on this point should be denied. Moreover, these witnesses should be instructed to answer questions concerning their communications with Mr. Dempsey, Ms. Farabow, and Ms. Johnson.

## Conclusion

Mr. Kearney needs all of the requested information and depositions to fairly prosecute his claim and asks that the Court deny the request for a protective order. The Ohio Supreme Court has unambiguously determined that the information plaintiff seeks to conceal may not be concealed.

Respectfully submitted,

| | |
|---|---|
| OF COUNSEL | /s Michael A. Roberts |
| | Michael A. Roberts, Esq. (0047129) |
| GRAYDON HEAD & RITCHEY LLP | GRAYDON HEAD & RITCHEY LLP |
| 1900 Fifth Third Center | 511 Walnut Street, Suite 1900 |
| 511 Walnut Street | Cincinnati, Ohio 45202 |
| Cincinnati, Ohio 45202 | (513) 629-2799 |
| (513) 621-6464 | (513) 651-3836 (fax) |
| | email:mroberts@graydon.com |

## CERTIFICATE OF SERVICE

The foregoing was electronically filed and thereby served on William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 11th day of June, 2004.

/s Michael A. Roberts