IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. C-1-02-479

JEFFERSON-PILOT LIFE INSURANCE CO., )
                              Plaintiff )
                                        )
v.                                      )
                                        )
CHRISTOPHER L. KEARNEY,                 )
                              Defendant )

DEPOSITION OF: ROBERT MILLS, taken before

Sharon R. Roy, Notary Public Stenographer, pursuant

to Rule 30 of the Massachusetts Rules of Civil

Procedure, at the law offices of ACCURATE COURT

REPORTING, 1500 Main Street, Springfield,

Massachusetts on May 14, 2004 commencing at 8:38 p.m.

A P P E A R A N C E S :

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

---

A P P E A R A N C E S :

FOR THE PLAINTIFF:

WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491
513-852-6000
     BY:  WILLIAM R. ELLIS, ESQ.

FOR THE DEFENDANT:

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45201
513-621-6464
     BY:  MICHAEL A. ROBERTS, ESQ.

Also Present:

Adam E. Formus

Joanne Yacavone, Videographer

---

3

I N D E X

----------------------------------------
WITNESS        EXAMINATION            PAGE
----------------------------------------
Robert Mills    Direct by Mr. Roberts    11

                Cross by Mr. Ellis      228


EXHIBITS:                              PAGE:

Exhibit 42: Privilege log ....................... 10

Exhibit 43: Compilation of material ............. 131

Exhibit 44: Binder marked "Exhibit" ............. 131

---

4

1       THE VIDEOGRAPHER:  The caption of

2   the case is Jefferson-Pilot Life Insurance

3   Company, plaintiff, versus Christopher L.

4   Kearney, case number C-1-02-479.  Would the

5   court reporter please swear in the witness.

6

7       ROBERT MILLS, Deponent, having

8   first been duly sworn, deposes and states as

9   follows:

10

11      MR. ROBERTS:  This is Mike Roberts,

12  counsel for the defendant, and we are here on

13  Friday morning, May 14, 2004 at 8:40.  This

14  deposition was to begin at 8:30 in the

15  morning.  Since 8:30 two procedural issues

16  have arisen in the case.

17      First, to describe the scene, we're

18  in the court reporter's office conference

19  room in Springfield, Massachusetts.  At the

20  table is the videographer, court reporter,

21  Mr. Ellis, counsel for the plaintiff, the

22  witness, and myself.  In the corner of the

23  room is a lawyer named Adam Formus who is

24  in-house counsel for DMS.  Yesterday during

1   the course of two depositions Mr. Formus sat
2   away from the table in the corner of the room
3   taking down on his laptop every word that was
4   said in the room. That's not a problem. The
5   problem is he was connected to the Internet
6   and connected to his office during
7   yesterday's proceedings.
8            I took one long deposition
9   yesterday of Mr. Ditmar, and at the second
10  deposition I asked the witness if he had any
11  communications regarding the conduct of the
12  proceeding. It was my understanding from the
13  testimony that Mr. Formus's Internet
14  connection back to the office and his
15  word-for-word transcription of the day's
16  proceedings were communicated to Mr. Bonsall.
17  For that reason this morning when I arrived I
18  requested that Mr. Formus, if he desired to
19  take down every word that is spoken today in
20  addition to the court reporter doing so, he
21  could do so on his laptop and save that
22  information to his laptop either on a disc or
23  not to a disc, he could save it to the hard
24  drive on the laptop. That was unacceptable

1   to Mr. Formus. He said, "No, I'm not going
2   to do it. I'm going to be connected to the
3   Internet." So there is reason to suspect
4   that these proceedings are being transmitted
5   back to DMS's office contemporaneous with the
6   proceedings. I have to take still two more
7   depositions this afternoon and I've asked
8   Mr. Formus for his courtesy in not being
9   connected to the Internet, not being
10  connected to his network back at the office
11  and he refuses.
12           The second procedural issues that
13  arose, is for approximately 15 months the
14  defendant has been seeking the privilege log
15  be provided. The privilege log due in the
16  case from the plaintiff was due approximately
17  15 months ago and there has been more than a
18  dozen requests for the privilege log. We are
19  now beyond the discovery cut-off. I am here
20  on my last day of depositions of DMS
21  employees. I've taken the depositions I
22  intend to take of the Jefferson-Pilot
23  employees. I've told Mr. Ellis that I need
24  the privilege log before the conclusion of

1   the depositions. Mr. Ellis handed to me at
2   8:30 this morning or 8:32 a fax that purports
3   to be from a woman named Christie Zerges,
4   from the law firm of Wood & Lamping, who I
5   understand to be Mr. Ellis's paralegal. The
6   fax was transmitted, according to the fax
7   transmittal line, at 4:18 May 13, 2004, and
8   the fax is specifically directed to the
9   Springfield Marriott, Guest Michael Roberts.
10  I stayed at the Springfield Marriott
11  yesterday. The total number of pages is six.
12  And the note written by Christie Zerges is,
13  "Mike, attached, please find the privilege
14  log which was completed today in the above
15  case."
16           Apparently, Mr. Ellis intercepted
17  this fax before I could receive it at the
18  Marriott yesterday and I was not provided it
19  prior to the conduct of this deposition.
20  Perhaps that was because he didn't desire me
21  to be able to review it before the
22  deposition.
23           Nonetheless, the third procedural
24  issue, actually, is that the privilege log

1   itself is woefully insufficient. The rules
2   specifically require that the privilege log
3   contain the dates of the communication, the
4   author of the communication by name, the
5   recipient, and the substance of the
6   communication. The purpose for that is
7   obvious. It's for the Court to be able or
8   the lawyer to be able to determine whether in
9   fact there is an appropriate designation of
10  privilege.
11           Notwithstanding those very
12  unambiguous obligations, Mr. Ellis's office
13  has prepared a list of the 86 pages, I knew
14  what 86 pages they were, I knew what the
15  Bates numbers were, and all he has done is
16  recited the Bates number of those pages and
17  said "privileged communication." Some said
18  "privileged communication from counsel to
19  client," some said "privileged communication
20  between counsel." Otherwise there is no data
21  provided in the alleged privilege log that
22  complies with the rule or offers the opposing
23  party the opportunity to explore whether or
24  not it's an appropriate exercise or assertion

1 of privilege. And for that reason I'll be
2 filing a motion with the Court, but all these
3 depositions will be convened in progress
4 since the defendant has still not complied
5 with its very clear and unambiguous
6 discovery obligations.
7 Are you ready, Mr. Mills?
8 THE WITNESS: Yes.
9 MR. ELLIS: Excuse me, we'll
10 respond.
11 MR. FORMUS: As in-house counsel for
12 Disability Management Services I categorically
13 deny and reject Mr. Roberts' statement that I
14 shared any information whatsoever with either
15 Mr. Bonsall or Mr. Ditmar at any time
16 yesterday either personally and/or via the
17 Internet that's connected to the hard drive in
18 my office. The laptop is for purposes of
19 saving my notes with regards to yesterday's
20 depositions directly to my hard drive. I
21 neither communicated directly or indirectly
22 with Mr. Bonsall yesterday. Therefore,
23 Mr. Roberts' allegation was patently false.
24 MR. ELLIS: With regard to the

1 privilege log --
2 MR. ROBERTS: We'll mark the
3 privilege log as Exhibit 42, for the record.
4 (Exhibit 42, marked)
5 MR. ELLIS: Are you finished?
6 MR. ROBERTS: Yeah, go ahead.
7 MR. ELLIS: With regard to the
8 privilege log, which was prepared by my office
9 in my absence at Mr. Roberts' request, I don't
10 know about 15 months or 12 requests for it in
11 the past because I have not had an opportunity
12 to determine the accuracy of those statements.
13 I've told Mr. Roberts that I received the
14 privilege log by fax. I received a copy and
15 there was a copy for him. It was in one
16 envelope at the hotel. I didn't intercept it
17 or attempt to intercept it. I opened the
18 envelope at 10:30 last night. I found both
19 faxes in it. I didn't call him at 10:30 last
20 night, I gave it to him this morning. The
21 privilege log, if inadequate in any way, will
22 be amended to comply with whatever
23 requirements there are with regard to the
24 privilege log as quickly as possible and I

1 have no objection if he wants to continue
2 these in progress based upon the privilege
3 log, although none of the witnesses here are
4 party to any of the privileged documents.
5 MR. ROBERTS: It's curious how the
6 Marriott could determine from a fax directed
7 to Mike Roberts, with a special note to Mike
8 Roberts on the cover sheet, that I was in any
9 way affiliated with Bill Ellis. But
10 regardless, Mr. Mills, are you ready to begin?
11 THE WITNESS: Yes.
12
13 DIRECT EXAMINATION BY MR. ROBERTS:
14 Q. Could you state your residence address for
15 the court reporter, please?
16 A. I don't feel comfortable giving my personal
17 information.
18 Q. Okay. Are you comfortable giving it to
19 Mr. Ellis and authorizing him to accept a subpoena on
20 your behalf?
21 A. Yes, I am.
22 Q. Whether or not you're still employed by DMS
23 before the conclusion of this litigation, you are
24 willing and you're authorizing Mr. Ellis on this

1 record to accept service of a subpoena on your
2 behalf?
3 A. Yes, I am.
4 Q. Okay. How old are you?
5 A. I'm 34.
6 Q. Do you have a college degree?
7 A. Again, I don't feel comfortable giving out
8 personal information.
9 MR. ELLIS: You can tell him whether
10 or not you have a degree.
11 A. Yes, I do have a college degree.
12 Q. Where did you attend college or where did
13 you receive your degree from?
14 A. I have a degree from the University of New
15 Haven in Connecticut, undergraduate, and I also have
16 a master's degree from Western New England College,
17 Springfield.
18 Q. When did you receive your bachelor's?
19 A. I received my bachelor's in 1991.
20 Q. And what is your master's in?
21 A. My master's is a general business program.
22 Q. An MBA?
23 A. Correct.
24 Q. When did you receive your MBA?

---

**Page 17**

```
1   still be the truth today?
2       A.   Well, is your question is it true at that
3   time or is Mr. Midghall my supervisor today?
4       Q.   No, my question is not is Mr. Midghall your
5   supervisor today.  I don't know how you understood
6   that from the question I asked, but let me be clear.
7   If in 2001 you told someone under oath that in '96
8   and '97 Mr. Midghall was your supervisor, and if it
9   was true then, that's true now, that he was your
10  supervisor back in '96 and '97?
11      A.   Well, yes, then, if I said that, he would
12  have been in '96 and '97 my supervisor, that was my
13  testimony.
14      Q.   I mean, the past can't change, right?
15      A.   Obviously not.
16      Q.   And then your supervisors in sequence were
17  Ms. Sweeney, Mr. Ditmar, and Mr. Hughes, right?
18      A.   To the best of my recollection, my
19  supervisors would have been in that order that you
20  mentioned.
21      Q.   Is Mr. Hughes your supervisor today?
22      A.   Yes, Mr. Hughes is.
23      Q.   On what block of business did you work in
24  January of 2000?
```

---

**Page 18**

```
1       A.   I worked -- part of January of 2000 I
2   worked on Travelers Insurance Company, New York Life,
3   Mutual Benefit, Monarch, MassMutual, Connecticut
4   Mutual.  I think there was a Woodmen of the World.
5   That's best I can recall.
6       Q.   You worked on all those blocks while
7   employed at DMS?
8       A.   No, I did not work on all those blocks
9   while employed at DMS.
10      Q.   Which of those blocks did you work on not
11  at DMS?
12      A.   The blocks that I worked on not at DMS
13  would have been Monarch, Connecticut Mutual,
14  MassMutual.  I think that would be it.
15      Q.   What block of business do you work on
16  today?
17      A.   The block of business I work on today would
18  be Equitable Life Insurance.
19      Q.   Was there a period of time you worked on
20  the Jefferson-Pilot block of business?
21      A.   Yes, there was a period of time I did work
22  on the Jefferson-Pilot.
23      Q.   What period of time was that?
24      A.   The period of time would have been January
```

---

**Page 19**

```
1   of 2000 up until probably around the time that these
2   proceedings commenced.
3       Q.   When is your judgment of the commencement
4   of these proceedings?
5       A.   I believe that was sometime -- my
6   understanding, sometime last year, 2003.
7       Q.   Do you recall when in 2003 that you were no
8   longer responsible for the Jefferson-Pilot block of
9   business?
10      A.   Best I recall is probably end of 2003.
11      Q.   Have you ever received a spot bonus?
12      A.   No, I don't recall ever receiving a spot
13  bonus.
14      Q.   Mr. Kearney's policy with Jefferson-Pilot
15  was designated as a WJ576A policy, do you recall
16  that?
17      A.   I recall the policy.
18      Q.   Was his claim under the WJ567A policy the
19  only claim that you administered while handling the
20  Jefferson-Pilot block of business that required you
21  understand the WJ576A policy?
22           MR. ELLIS:  Objection.
23      A.   As I sit here today, I don't recall whether
24  there were other WJ576As.  I would imagine that there
```

---

**Page 20**

```
1   were a number of other claims that I handled that had
2   the similar policy.
3       Q.   Well, there were between three and five
4   hundred claim files transmitted from Jefferson-Pilot
5   to DMS in or about January of 2000.  Are you mindful
6   of that?
7       A.   What I'm mindful of is that there was a
8   number of cases that were transferred from
9   Jefferson-Pilot to DMS.  I wouldn't specifically know
10  the number of those cases.
11      Q.   How many people were working on that block
12  of business simultaneous to you in the year 2000?
13      A.   Can you repeat the question?
14      Q.   How many other people worked like you on
15  the Jefferson-Pilot block of business in 2000?
16      A.   To the best of my recollection, there were
17  three other individuals other than myself.
18      Q.   Okay.  Do you know if the workload on the
19  Jefferson-Pilot block of business was distributed
20  fairly evenly between the four of you?
21      A.   I have no idea how they were distributed.
22      Q.   Do you know how many claim files that you
23  were administering in 2000 for Jefferson-Pilot?
24      A.   Again, as of today, I mean, I don't recall
```

1   words, but I know we talked about some of the
2   difficulties in the case and the differences both,
3   you know, the company had as well as the differences
4   of opinions that Mr. Kearney had. I recall Bill --
5       Q.   Bill Hughes?
6       A.   Bill Hughes starting the meeting by
7   apologizing that he needed to tell him that we had
8   recently, just in a matter of minutes, uncovered an
9   error in the payment of benefits.
10          Bill Hughes discussed with him settlement
11  options. I remember at one point Attorney Spiegel
12  asked us to leave and have lunch, that he needed to
13  speak with Mr. Kearney.
14          I recall returning from lunch waiting in
15  Attorney Spiegel's waiting room for a while for him
16  to come out of his office. I recall him coming out,
17  because he had not talked with Mr. Kearney for a
18  while. I recall him talking to us about University
19  of Miami, University of Miami football. I recall him
20  getting the phone call from Mr. Kearney. He walked
21  back into his office and talked with him, I presume.
22  At some point he came back out of the office and told
23  us that our meeting was essentially over and we could
24  get back on our plane and go home.

1       Q.   So there wasn't any substantive dialogue
2   after the lunch hour, you were just waiting and then
3   finally you were told to go home?
4       A.   I remember there was a lot of waiting, we
5   waited a while.
6       Q.   Was there any substantive dialogue after
7   the lunch hour?
8       A.   I mean, what do you mean by substantive
9   dialogue?
10      Q.   You told me you talked about the University
11  of Miami football team, and we can go into that a
12  little later, but did you discuss Mr. Kearney's claim
13  with Mr. Spiegel after the lunch hour?
14      A.   I don't recall specifically if we talked
15  any further details at that point in time. The best
16  I can recall, it was a general conversation.
17      Q.   How long was the morning meeting?
18      A.   I don't remember the exact time frames of
19  the meeting. Going to Florida, we probably would
20  have had an early morning flight. I believe we met
21  sometime early morning, 9, 9:30 maybe, then we broke
22  for lunch at some point.
23      Q.   You said recently, in a matter of minutes,
24  we uncovered an error in the payments. Are you

1   saying the error in the payments, the alleged error
2   in the payments to Mr. Kearney was uncovered by
3   somebody minutes before the meeting with Spiegel?
4       A.   Yeah, several minutes before the meeting
5   with Attorney Spiegel, Bill Hughes and I were in a
6   Cuban coffee shop, I believe, and I uncovered the
7   mistake, the Jefferson-Pilot mistake in paying the
8   increase in benefits.
9       Q.   Was it a Jefferson-Pilot mistake or was it
10  a Jefferson-Pilot mistake and a DMS mistake?
11      A.   It was a Jefferson-Pilot mistake that, you
12  know, I unfortunately continued for quite some time.
13      Q.   You got control of the file in January of
14  2000, and this meeting with Spiegel occurred in
15  October 2001?
16      A.   I got the file around January 2000, and I
17  believe you're correct, because it was, again, it was
18  shortly after 9/11.
19      Q.   Mr. Hughes was going on the trip
20  because he had working knowledge of the file prior to
21  the Cuban coffee revelation, right?
22      A.   He had knowledge of the file, and I believe
23  the file would also reflect that he had some
24  communications with Mr. Kearney.

1       Q.   And Mr. Ditmar worked on Mr. Kearney's file
2   in the late '90's, right?
3       A.   I know I handled it from January of 2004.
4   I don't know the extent of what Mr. Ditmar -- I'm
5   sure you spoke with him about that yesterday.
6       Q.   You're not mindful from your knowledge of
7   the claim file that he had involvement in the claim
8   file in the '97 and '98 time frame, at least?
9       A.   I'm sure that the file reflects that.
10      Q.   Is he good at his job?
11      A.   I would imagine that he's good at his job.
12      Q.   Does he have difficulty understanding
13  disability insurance policies, as far as you know?
14      A.   I don't necessarily know the man and all
15  his capacities, but he seems to be a pretty
16  knowledgeable guy.
17      Q.   He was your supervisor for disability
18  claims for several months or years, right?
19      A.   He was my supervisor, I don't know, I can't
20  recall how long that was.
21      Q.   And is Mr. Hughes a knowledgeable fellow?
22      A.   I would view Mr. Hughes as a knowledgeable
23  fellow.
24      Q.   With regard to disability claims and

65

1  investigators, and persons performing IMEs?

2      A.   Can you repeat the question.

3      Q.   What's your practice of taking notes of

4  those important phone calls with clients,

5  investigators, and persons performing IMEs?

6      A.   I don't have any particular practice. I

7  may scribble down a note if I need to know a date and

8  time of an examination that's scheduled, and as that

9  information is written up and sent along to the

10  insured, I wouldn't need that note. It's not

11  something that I do every time or necessarily on

12  every case.

13      Q.   If there are no notes in the claim file of

14  any communication you ever had with Jefferson-Pilot,

15  does that mean you didn't have any communications

16  with Jefferson-Pilot?

17      A.   Can you repeat the question?

18      Q.   If there are no notes in the claim file of

19  any communication you had with Jefferson-Pilot, does

20  that mean you had no such communication?

21      A.   I think this claim file reflects that there

22  had been communication with Jefferson-Pilot, if I had

23  communication with them, and not necessarily

24  everything is going to be written up as a note that I

66

1  spoke with them.

2      Q.   Can you testify under oath that you ever

3  had any communication with anyone at Jefferson-Pilot

4  about Mr. Kearney?

5      A.   Can you repeat the question?

6      Q.   Can you testify under oath that you ever

7  had any communication with anyone at Jefferson-Pilot

8  about Mr. Kearney?

9      A.   I've had communication with Jefferson-Pilot

10  over a number of their cases. I can't say

11  specifically I spoke directly about his case.

12      Q.   Did you ever discuss with Jefferson-Pilot

13  the WJ576A policy?

14      A.   Yes, I did.

15      Q.   When was the last time you had a

16  conversation with someone at Jefferson-Pilot about

17  that policy?

18      A.   Best of my recollection, that would have

19  been a communication with their in-house counsel, I

20  believe, last year just prior to these proceedings.

21      Q.   These proceedings began in June of 2002,

22  are you mindful of that?

23      A.   I don't know when exactly it started.

24      Q.   Well, it wasn't last year. So did you have

67

1  your communication last year or was it in 2002?

2      A.   I don't recall a specific time, if it was

3  last year. It was just, I think, prior or after we

4  had come across the incorrect amount of benefit. We

5  conversed with their legal department to seek their

6  guidance if this was what we believed it to be. So

7  whenever that happened, I don't remember.

8      Q.   Who did you speak to?

9      A.   I remember speaking to an in-house

10  counselor by the name of Stephanie Fairbough.

11      Q.   And that was shortly after your Cuban

12  coffee revelation?

13      A.   I don't know the exact date and time that

14  conversation happened, but I think it would be fair

15  that it was around that time.

16      Q.   Okay, was that a phone call?

17      A.   I would imagine it was. I don't remember

18  specifically. I don't believe I was down in that

19  area at that time.

20      Q.   Have you ever met with her personally?

21      A.   I believe I have met with her once.

22      Q.   When?

23      A.   I don't remember the time.

24      Q.   Before or after your Cuban coffee

68

1  revelation?

2      A.   My recollection is that it would have

3  happened before.

4      Q.   Okay. Before the Cuban coffee revelation

5  you had a meeting with Ms. Fairbough. Was that about

6  the WJ567A policy?

7      A.   That's such a long time ago, I don't even

8  recall if we even talked about claims. I don't

9  know --

10      Q.   What would have been the purpose of your

11  meeting with her the one time you met with her?

12      A.   I just remember being down there to visit

13  their offices. I was introduced to a number of

14  people. I can't say that I really had a one-on-one

15  meeting, per se. It might have been a quick

16  conversation. I just don't recall, it's a while ago.

17      Q.   So that meeting had nothing to do with Mr.

18  Kearney or the interpretation of the WJ576A policy,

19  is that right?

20      A.   To my knowledge, yeah, that would have been

21  before.

22      Q.   So --

23          THE WITNESS:   Is it okay to take a

24  break at this point?

1    MR. ELLIS:  Sure.

2         THE VIDEOGRAPHER:  Going off record

3    at 10:30 a.m.

4              (A recess was taken)

5         THE VIDEOGRAPHER:  Back on record at

6    10:37 a.m.

7    Q.   (By Mr. Roberts) Mr. Mills, you're still

8    under oath, you understand that?

9    A.   Yes, I do.

10   Q.   We were talking about a meeting that you

11   once had with -- down in Greensboro with

12   Jefferson-Pilot folks, and during the course of that

13   meeting you were met or introduced to Stephanie

14   Fairbough, a lawyer at JP, right?

15   A.   Yes, I met her, and I wouldn't necessarily

16   say it was a meeting.  I was introduced to a number

17   of people, one of which was her.  I think we had a

18   few words, but I don't think we talked anything in

19   particular about cases.

20   Q.   It had nothing to do with Mr. Kearney's

21   claim or his policy, right?

22   A.   Not to my knowledge, yes.

23   Q.   And then you went down to Miami and you had

24   this revelation with Mr. Hughes, right?

ACCURATE COURT REPORTING (413) 747-1906

---

1    A.   Down in Miami, yes, came to the realization

2    that the benefits were being incorrectly paid.

3    Q.   Okay.  And did you speak to Jefferson-Pilot

4    that day?

5    A.   I don't recall.

6    Q.   What was the next communication with

7    Jefferson-Pilot that you can recall regarding Mr.

8    Kearney or the WJ576A policy and/or its riders?

9    A.   I remember a phone conversation at some

10   point after our return trip apprising them of our --

11   Jefferson-Pilot's counsel, of our findings and sought

12   their guidance on the matter.

13   Q.   And what was their guidance?

14   A.   They agreed that there was an overpayment.

15   Q.   What was their guidance?

16   A.   Their guidance was that our findings were

17   correct.

18   Q.   Okay.  So then what happened in your

19   communications with Jefferson-Pilot?

20   A.   Can you repeat the question, please?

21   Q.   What then happened with the communications

22   with Jefferson-Pilot?

23   A.   You know, I don't recall specifically what

24   happened at that juncture.

ACCURATE COURT REPORTING (413) 747-1906

---

71

1    Q.   There's nothing you can recall from that

2    moment in time through today of any communication or

3    dialogue or any interaction you had with

4    Jefferson-Pilot on that issue?

5    A.   There was, to the best of my memory, a

6    conversation with Jefferson-Pilot's counsel.  I know

7    that --

8    Q.   The same conversation you've already told

9    me about?

10        MR. ELLIS:  Excuse me --

11   Q.   (By Mr. Roberts) I want to know if it's

12   the same conversation you've already talked about or

13   something additional.

14   A.   My recollection is that it would have been

15   a subsequent conversation.

16   Q.   Okay.  Tell me about that conversation.

17   A.   The best that I can recall is that it was a

18   discussion of what steps that they wished to take at

19   that juncture.

20   Q.   Who was involved in the first phone

21   conversation besides you and Stephanie?

22   A.   My recollection is that Bill Hughes would

23   have been involved in that call and Bill Dempsey.

24   Q.   Bill Dempsey with Employers Reinsurance

ACCURATE COURT REPORTING (413) 747-1906

---

72

1    Company?

2    A.   Yes.

3    Q.   Okay, who else?

4    A.   That's all I can recall.

5    Q.   Are you mindful of any notes that exist of

6    this call taken by anyone?

7    A.   Not to my knowledge.

8    Q.   Were you here in Springfield on a

9    conference call?

10   A.   I believe that was the circumstances.

11   Q.   Were you in Mr. Hughes's office with him?

12   A.   I don't recall specifically where in our

13   offices that conference call originated for us.

14   Q.   Were you with him?

15   A.   My recollection is that I was.

16   Q.   Were either one of you taking notes during

17   the call?

18   A.   I don't recall taking any notes.  I don't

19   know if he did.

20   Q.   Did either one of you prepare any documents

21   in anticipation of the call or in preparation for the

22   call?

23   A.   Not to my knowledge.  We conveyed our

24   findings verbally over the phone.

ACCURATE COURT REPORTING (413) 747-1906

1  Q.  Did you tell Ms. Fairbough or Mr. Dempsey
2  why it is you wanted to have the conference call?
3  A.  I don't recall if we specifically notified
4  both of those individuals ahead of time of the
5  purpose of the call, but that was obviously discussed
6  during the conversation.
7  Q.  Based on your memory of the call, did they
8  have an understanding of what the call would be
9  about, or did you convene this call and they were
10 surprised about the nature of the content?
11 A.  Can you repeat the question, please?
12 Q.  Based on your memory of the call, was it a
13 surprise to Ms. Fairbough or Mr. Dempsey about the
14 nature or the issue to be discussed during the call?
15 A.  I don't recall what their knowledge of the
16 situation was going into the telephone call.  I don't
17 know how to characterize their response.
18 Q.  How long after your return from Florida was
19 this call?
20 A.  I don't recall when that telephone call
21 took place.
22 Q.  Was it within days or weeks or months of
23 the Florida trip?
24 A.  That was quite some time ago.  I don't know

1  exactly when it would have taken place.
2  Q.  Would it make sense and be logical that you
3  would communicate that type of finding to
4  Jefferson-Pilot relatively soon after its discovery?
5  A.  Well, it would make sense to obviously
6  communicate that to them in a timely fashion.
7  Q.  And is that something that you generally
8  do, communicate important information to clients in a
9  timely fashion?
10 A.  Well, we do as best we can to respond
11 timely and promptly.
12 Q.  Okay.  Are you good at that?
13 A.  I think I'm very good at that.
14 Q.  Excellent.  Is there a Cuban coffee
15 revelation memo somewhere?
16 A.  Can you phrase that question another way?
17 Q.  Did you understand it?
18 A.  No, I didn't.
19 Q.  On your return trip from -- this is a
20 relatively significant discovery at the Cuban cafe,
21 wasn't it?
22 A.  It was a discovery in a coffee shop that
23 had some bearing on the case going forward.
24 Q.  It had extraordinary bearing on the case

75

1  going forward, didn't it?
2  A.  Yes, it did.
3  Q.  Wouldn't it be appropriate within the
4  policies and procedures at DMS to document some
5  extraordinary fact that implicates a claim?
6  A.  Well, if I recall correctly, that
7  information was communicated to Mr. Kearney's counsel
8  at that time as well as follow-up letters.
9  Q.  So the only -- the only memorialization of
10 the Cuban coffee revelation is that as stated in the
11 October 22, 2001 letter to Mr. Spiegel from
12 Mr. Hughes?
13 A.  I would have to look back at the file.  I
14 know we sent a letter.  I'm assuming that's what
15 you're referring to.
16 Q.  Right.
17 A.  That was my recollection following that
18 meeting that the letter summarizing the situation in
19 the meeting was sent to his prior counsel, Spiegel.
20 Q.  So I understand your testimony correctly,
21 this extraordinary revelation is uncovered drinking
22 Cuban coffee in Miami, Florida nearly ten years after
23 the erroneous payments began, allegedly, and there
24 does not exist any document anywhere that sets forth

76

1  your extraordinary revelation other than the letter
2  that was sent to Mr. Spiegel?
3  A.  Can you repeat the question, please?
4  Q.  You and Mr. Hughes are having Cuban coffee
5  in October 2001.  You're reviewing or preparing for a
6  meeting about a claim that's been existing for eight
7  years, right; Mr. Kearney's claim was eight years old
8  at that point?
9  A.  2001; yeah, it's probably about eight
10 years.
11 Q.  And the two of you, while sipping your
12 coffee, come upon this extraordinary revelation that
13 Mr. Roberson, who has 38 years of experience, didn't
14 know about, Mr. Shelton, who has 38 years of
15 experience, didn't know about, Mr. Maxwell, who has
16 20 years of experience, didn't know about,
17 Ms. Harden, who has 31 years of experience, didn't
18 know about, Jefferson-Pilot, who authored the policy
19 and administered it for seven years, didn't know
20 about, you, who worked on the policy for a year and
21 eight or nine months, didn't know about, Mr. Ditmar,
22 who you reported to for a year, didn't know about,
23 and Mr. Hughes, who you reported to for another nine
24 or ten months, didn't know about, this extraordinary

77

1  revelation occurs and it's your testimony, sir, that
2  there is not an internal document at DMS or a
3  document DMS shared with Jefferson-Pilot or a
4  document DMS shared with Employers Reinsurance which
5  discusses this great revelation; the only document
6  that exists is the letter that went to Spiegel after
7  the meeting? Is that your testimony under oath?
8      A.    I don't know if there is any other
9  document. To my knowledge, there is the letter that
10  was communicated to the insured. If there's other
11  letters that were prepared, I know there was counsel
12  involved and there were letters that were back and
13  forth on that material through -- I believe it was
14  prior counsel on this case, and Mr. Ellis. I'm sure
15  there's stuff out there, I may have seen something,
16  but I can't a hundred percent say that it said this,
17  this, and that; it's been a while.
18      Q.    You didn't tell Mr. Hughes that you would
19  do a memo that discusses this Cuban coffee
20  revelation, and he didn't ask you to prepare a memo
21  discussing the Cuban coffee revelation, right?
22      A.    My recollection is in that Cuban coffee
23  revelation that you refer to, is that I discovered
24  the error, you know, the error that JP had made and

ACCURATE COURT REPORTING (615) 742-1906

78

1  that I perpetuated over the time, and I made him
2  aware of that.
3          I don't recall any point other than being
4  embarrassed about it that he was critical of me or
5  said, "Prepare a document." I just don't recall
6  that.
7      Q.    You don't recall him asking you to prepare
8  a document detailing and summarizing this
9  extraordinary revelation, and you didn't offer to do
10  that; is that your testimony under oath?
11      A.    To my recollection, I don't recall him
12  asking me to do something. If it was prepared or
13  not, I don't -- as I sit here today, a lot of time
14  has passed, I don't remember what was prepared on
15  that at that point in time.
16          MR. ROBERTS:   We're going to change
17  tapes. We'll be right back to this.
18          THE VIDEOGRAPHER:   Going off record
19  at 10:53 a.m.
20          (Off the record)
21          THE VIDEOGRAPHER:   Back on record at
22  10:57 a.m.
23      Q.    (By Mr. Roberts) Mr. Mills, you're still
24  under oath, you understand that?

ACCURATE COURT REPORTING (615) 742-1906

79

1      A.    Yes, I do.
2      Q.    We're talking about whether or not you have
3  any recollection of any memorandum being prepared
4  that discusses in details the Cuban coffee
5  revelation, and as I understand your testimony,
6  you're not mindful sitting here today that any such
7  memorandum existed?
8      A.    I think what I've said is I remember there
9  was a letter in the file following the meeting with
10  Attorney Spiegel that I believe Mr. Hughes wrote to
11  him outlining the situation I don't specifically
12  recall any other type of memorandum, you know, as I
13  sit here today.
14      Q.    Is there any memorandum that you can recall
15  sitting here today that's been prepared subsequent to
16  the letter that went to Attorney Spiegel on this
17  Cuban coffee revelation?
18      A.    Can you repeat the question, please?
19      Q.    Is there any such memorandum that you're
20  mindful of that was prepared subsequent to the
21  responsive letter to Attorney Spiegel in October of
22  2001?
23      A.    To my knowledge, a lot of this stuff has
24  been handled between the lawyers. I don't

ACCURATE COURT REPORTING (615) 742-1906

80

1  specifically recall preparing anything myself.
2      Q.    You don't have a memory of authoring
3  anything in writing after that revelation, that
4  extraordinary revelation at the Cuban coffee house?
5      A.    I'm trying to, as I best remember -- to the
6  best of my memory, I didn't do anything, but I
7  just -- I don't remember. It's been a period of time
8  now.
9      Q.    Was there anybody on the DMS in-house legal
10  team consulted about your Cuban coffee revelation?
11      A.    Not to my knowledge.
12      Q.    Was Adam Formus, the lawyer that's sitting
13  in the room here, responsible for the Jefferson-Pilot
14  block of business in October 2001, as far as you
15  know, within the legal department at DMS?
16      A.    You know, I really don't know what Adam's
17  full responsibilities are, quite frankly. He's in
18  the room, you can ask him.
19      Q.    Okay. I probably will at some point under
20  oath. Did you have any discussions with Adam about
21  your extraordinary Cuban coffee revelation prior to
22  June of 2002, which would be nine months after you
23  came upon the revelation?
24      A.    I don't recall having conversations with

ACCURATE COURT REPORTING (615) 742-1906

1  Adam Formus prior to that time.
2      Q.   Do you have a recollection of any
3  conversation you've had with Mr. Formus, or Attorney
4  Formus, about the revelation?
5      A.   I don't recall having any conversation with
6  him pertaining to the revelation, as you phrase it.
7      Q.   The revelation, as I phrase it, is the way
8  that you came upon interpreting the contract at the
9  Cuban coffee house?
10         MR. ELLIS:   Objection.
11      A.   That would be my understanding of what you
12  mean by revelation.
13      Q.   Okay, good.  So sitting here today, you
14  don't have any recollection of any communication
15  you've ever had with Mr. Formus about your
16  interpretation of the policy as you began to
17  interpret it that morning?
18      A.   Can you repeat the question, please?
19      Q.   Sitting here today, you don't have a
20  recollection of any conversation you've ever had with
21  Attorney Formus about the interpretation of Mr.
22  Kearney's policy which you came upon that day,
23  October 2001, whenever it was?
24      A.   I believe your prior questions were about

1  my knowledge of my conversations with Adam at that
2  juncture of June of 2002, I believe you said.  I have
3  had conversations with Adam Formus subsequently about
4  the revelation, as we understand it, about the
5  application of the policy.
6      Q.   When were those discussions?
7      A.   I had at least recently the discussion with
8  him on Wednesday when I met with him.
9      Q.   Okay, take me the other way in chronologic
10  order.  When's the first one you can discuss, and I
11  guess that one would be the most recent you can
12  discuss.
13      A.   I don't recall having any conversations
14  with him about the revelation, really, until I met
15  with him on Wednesday.
16      Q.   Okay, so the only conversation you can
17  recall having with Adam about the revelation is the
18  one you had two days ago in Mr. Ellis' presence?
19      A.   The only conversation I can recall having
20  with Adam Formus on the revelation was on Wednesday,
21  and the second part of that Mr. Ellis was present at
22  that time.
23      Q.   Prior to Wednesday had you had discussions
24  about the revelation with any other in-house counsel

83

1  at DMS?
2      A.   Can you repeat the question, please?
3      Q.   Prior to Wednesday, had you had discussions
4  about the revelation with any other in-house counsel
5  at DMS?
6      A.   Yes.
7      Q.   Who?
8      A.   I spoke with Andrew Cohen.
9      Q.   When was the first time you spoke with
10  Andrew Cohen about the revelation?
11      A.   The only time I remember speaking with him
12  was about a week or so, a couple weeks ago.
13      Q.   Other than the recent conversation with Mr.
14  Formus, the recent conversation with Mr. Cohen, have
15  you had any discussions with any other in-house
16  counsel at DMS about the revelation?
17      A.   Can you repeat the question, please.
18      Q.   Other than Mr.'s Formus and Cohen, have you
19  had any other discussions with any other in-house
20  counsel at DMS about the revelation?
21      A.   To the best of my knowledge, I don't recall
22  prior conversations.
23      Q.   With anyone?
24      A.   With any other in-house DMS counsel.

84

1      Q.   On how many occasions have you spoken to
2  counsel at Jefferson-Pilot about the revelation?
3      A.   Can you repeat the question, please?
4      Q.   On how many occasions have you spoken to
5  counsel at Jefferson-Pilot about the revelation?
6      A.   I don't recall the exact number of times.
7  I think we've already talked a couple times already.
8  I know I've been a part of a phone call during these
9  proceedings and other times with our counsel.
10      Q.   Your answer was "I think we've already
11  talked about a couple times"; we haven't.  We talked
12  about one communication you had with Fairbough; it
13  had nothing to do with Kearney or the policy when you
14  went to Greensboro.  And then we had a discussion
15  earlier about a communication you had, a conference
16  call, between Hughes, yourself, Fairbough, and
17  Dempsey.  Other than that conversation with
18  Fairbough, have you had any other discussions about
19  the Kearney policy with in-house counsel at
20  Jefferson-Pilot?
21      A.   I've been part of subsequent conversations
22  that weren't initiated by me, conferenced in between
23  Stephanie Fairbough, prior counsel on this case,
24  Geri -- I forget her last name right now, so there's

1    been that type of conversation.
2        Q.    How many of those were there?
3        A.    I don't know how many conversations I've
4    had. I've been involved in a couple of those
5    conversations, not all of them.
6        Q.    Were those before the lawsuit was filed or
7    after?
8        A.    I don't recall when those conversations
9    necessarily took place in the time frame of all this
10    stuff that's gone on since then.
11        Q.    Did you take any notes of those phone
12    calls?
13        A.    No, I did not.
14        Q.    Did you author any memorandum before or
15    after those phone calls relative to the issue of the
16    phone call?
17        A.    Can you repeat the question, please?
18        Q.    Did you author any memorandum relative to
19    those phone calls or the issues raised in those phone
20    calls?
21        A.    As I sit here now, I don't recall if I
22    authored any memorandum, notes, in regards to those
23    phone calls.
24        Q.    Who participated in those phone calls other

1    than you and Ms. Fairbough and Ms. Geraldine Johnson?
2        A.    Johnson was the last name of the other
3    attorney. I don't recall specifically, but I believe
4    the other parties to that conversation would have
5    been Bill Hughes and Bill Dempsey.
6        Q.    You spoke in the singular, that
7    conversation. Were there multiple conference calls
8    with some or all of those players or was there just
9    one that you can recall?
10        A.    I remember multiple conversations with
11    those individuals. I don't know exactly the exact
12    number of conferences that would have been involved
13    with those individuals.
14        Q.    Do you recall from the substance of those
15    conversations whether the persons were speaking in
16    the context of a lawsuit having already been filed,
17    or in anticipation of potential legal action, or
18    both?
19        A.    Can you repeat the question, please?
20        Q.    Can you recall, based upon the context of
21    those calls, whether people were speaking in terms of
22    a lawsuit having already been filed, or whether there
23    was discussions about the issue and the potential for
24    future litigation?

87

1        A.    I really don't recall precisely all those
2    conversations and the time frame of those calls
3    happening along the lines of these proceedings. A
4    lot of that stuff was just handled by the attorneys.
5    I had a limited knowledge of what was going on at
6    that point.
7        Q.    Did these calls take place over several
8    months or a couple days?
9        A.    These calls didn't take place over a couple
10    days. I don't know the period of time, the length of
11    time that these calls took place.
12        Q.    Greater than one month's time?
13        A.    That seems to be a fair calculation.
14        Q.    Are there any notes that exist anywhere
15    including indications on a calendar you may keep of
16    when these calls may have occurred?
17        A.    I don't recall specifically writing that
18    down. I could have put it down on my calendar that I
19    have on my desk.
20        MR. ROBERTS:    We'll request a copy
21    of that, Counsel.
22        Q.    (By Mr. Roberts) Go ahead, I'm sorry.
23        A.    But I don't keep a type of running calendar
24    on the computer system or anything like that.

88

1        Q.    During the course of those discussions was
2    it ever discussed that it would be wise to strip Mr.
3    Kearney of his ability to allege bad faith by
4    continuing to pay him allegedly erroneously?
5        MR. ELLIS:    I will object to the
6    question and direct the witness not to answer
7    anything specific about the subject of those
8    conversations. They are both privileged as
9    attorney/client as and work product.
10        MR. ROBERTS:    They're not privileged
11    nor are they work product.
12        MR. ELLIS:    You will follow my
13    advice and not respond to any question
14    concerning the substance of those
15    conversations.
16        MR. ROBERTS:    Boone vs. Van Liner
17    cannot be more unambiguous on this point.
18        Q.    (By Mr. Roberts) I understand your counsel
19    is directing you not to answer, so we'll simply have
20    to get the documents that have not been produced and
21    reconvene this deposition and continue it in
22    progress.
23        Are you aware of anybody
24    taking any notes of these calls or anybody authoring

---

1  any documents to memorialize these calls?
2       A.   Again, not to my knowledge. I don't recall
3  any individuals authoring documents. Obviously, in
4  speaking with them, they would probably know better
5  than I.
6       Q.   Did you ever send or receive any e-mails
7  relative to these discussions and the issue of the
8  Cuban coffee revelation?
9       A.   I don't recall sending any e-mails
10 specifically pertaining to the Cuban coffee
11 revelation finding.
12      Q.   What do you mean specifically pertaining
13 to?
14      A.   Addressing that question or issue
15 exclusively.
16      Q.   Do you recall ever sending or receiving an
17 e-mail to or from anyone that discusses the way the
18 policy began to be interpreted after the Cuban coffee
19 meeting with you and Hughes?
20      A.   I recall communicating via e-mail with
21 our -- with the prior counsel on this case, Geri
22 Johnson.
23      Q.   Okay. Anyone else?
24      A.   I just recall e-mails that went to

---

1  Ms. Johnson. There might have been other people that
2  were cc'd on that, but I don't recall who those
3  individuals were.
4       Q.   Did she send you e-mails?
5       A.   I believe she did. She did send me
6  e-mails.
7       Q.   Did Ms. Fairbough send you e-mails or copy
8  you on e-mails relating to the issue?
9       A.   I do recall being copied in on e-mails from
10 Ms. Fairbough.
11      Q.   Did Bill Dempsey send to you, or copy you;
12 or did you send to him, or copy to him, e-mails on
13 the issue?
14      A.   Can you repeat the question, please?
15      Q.   Did you send to Mr. Dempsey, receive from
16 Mr. Dempsey, copy from Mr. Dempsey, or did you copy
17 to Mr. Dempsey any e-mails relating to this issue
18 we're discussing?
19      A.   Again, as I sit here today, I don't
20 remember specifically whether or not I was the author
21 of an e-mail where I had communicated directly to him
22 or cc'd him on that e-mail.
23      Q.   Do you recall receiving from him an e-mail
24 or being copied on an e-mail he sent?

---

91

1       A.   I don't remember that specifically. Since
2  we've talked about him being involved in this
3  process, my guess is that he had been cc'd on a lot
4  of those, but I don't know, you'd have to speak with
5  him about it.
6       Q.   Do you delete e-mails you receive?
7       A.   Do I delete e-mails that I receive? Yes, I
8  do.
9       Q.   What's the process you undertake to delete
10 your e-mails?
11      A.   Can we take a break right now?
12           MR. ELLIS:  After you answer the
13 question.
14      A.   Can you repeat the question, please?
15      Q.   What's the process you undertake to delete
16 your e-mails?
17      A.   The process that I undertake to delete my
18 e-mails is, depending on what the e-mail is, I delete
19 it that day. All the ones I delete, you know, at
20 some point in time, I don't have any specific
21 guidelines where if I have an e-mail for a week, a
22 month, a year, that I necessarily delete it. A lot
23 of times my in basket is filled up enough that the
24 technological folks will ask you to clean a number of

---

92

1  documents out.
2       Q.   Do you have Microsoft?
3           MR. ELLIS:  He did ask for a break,
4  he answered your question. Go ahead.
5           THE WITNESS:  Thank you.
6           THE VIDEOGRAPHER:  Going off record
7  at 11:21 a.m.
8                 (A recess was taken)
9           THE VIDEOGRAPHER:  Going back on
10 record at 11:30 a.m.
11      Q.   (By Mr. Roberts) Mr. Mills, you're still
12 under oath. You understand?
13      A.   Yes.
14      Q.   Have we exhausted your knowledge, sitting
15 here today, of all the phone conversations, e-mail
16 communications, and written documents that you're
17 aware of sitting here today that exist commenting on,
18 referring to, or relating to the Cuban coffee
19 revelation?
20      A.   I would have to say yes, as a lot of that
21 stuff was handled by the attorneys and really taken
22 out of my hands at that point.
23      Q.   Do you use Microsoft Outlook?
24      A.   Yes, I believe that's what we use.

93

1   Q.   And when you get an e-mail that you want to
2   save, do you put it in a file folder or do you just
3   leave it in your in box?
4   A.   I usually leave it in my in box.
5   Q.   Do you have any file folders for your
6   e-mails?
7   A.   I think I've probably saved two or three
8   e-mails, that I recall. I don't keep a specific
9   folder to maintain any e-mail; I just don't delete
10  it.
11  Q.   If you get an e-mail and you want to delete
12  it immediately or you don't see any reason to keep
13  it, you just push "delete," and is that all you do to
14  get rid of the e-mail, or is there something else you
15  do?
16  A.   I would delete the e-mail if I didn't need
17  it. I think there's like a wastebasket that it goes
18  into. I think that's where, after a period of time,
19  there's a number of them, they ask you to delete a
20  number of them. We've gotten a lot of viruses so
21  we've had to delete a number of e-mails to get rid of
22  that.
23  Q.   Okay, so, if you go back to your office
24  today, you'll have some e-mails and you might decide

94

1   to push the "delete" button on them, and you'll do
2   that, right, you'll push "delete" on an e-mail?
3   A.   Yeah, I guess that's the process.
4   Q.   And then your understanding is it goes to
5   the trash bin?
6   A.   I don't know the specific terminology. I'm
7   not a Microsoft technician. It's a wastebasket,
8   deleted items. I don't know where it goes.
9   Q.   Do you ever go into the wastebasket of the
10  deleted items or the trash bin and perform an
11  additional function to delete the e-mail?
12  A.   Yes, I would do that.
13  Q.   How frequently do you do that?
14  A.   I think it varies. If I'm given, from our
15  technological folks because it's overloaded and I
16  need to delete some, I'll do that. If we have
17  viruses that come in and we delete those, I delete
18  them again and make sure it's not going to affect our
19  system. Periodically I delete the e-mails that are
20  received and sent because of the waste basket filled
21  up. I don't do it every day, I don't do it every
22  month, but periodically.
23  Q.   You don't do it every month. You do it
24  every quarter?

95

1   A.   To be honest with you, Mr. Roberts, I don't
2   really have any specific time frame. I might do it
3   once a month, semi-annually, I can't remember.
4   Q.   You've been advised, though, that the
5   wastebasket will get to some capacity and you have to
6   go in there and delete things to create more
7   capacity?
8   A.   I recall receiving communications that
9   there's a large volume of e-mails that are deleted in
10  the wastebasket and we need to ...
11  Q.   Are those communications from in-house
12  counsel or from the IT team at DMS?
13  A.   My recollection, those would be from our
14  technological unit.
15  Q.   Have you ever received any instruction or
16  counsel from the general counsel's office at DMS to
17  delete e-mails on a periodic basis?
18  A.   No, I've not received any such
19  communication.
20  Q.   Do you use Word?
21  A.   Yes, I use Microsoft Word.
22  Q.   And Excel?
23  A.   I do use Excel periodically.
24  Q.   If you create a word document or Excel

96

1   document on a particular claim, do you always print
2   up the document and put it in the claim file?
3   A.   Can you repeat the question, please?
4   Q.   If you create a word document or an Excel
5   spread sheet on a particular claim, do you always
6   print up the document and then put it in the claim
7   file?
8   A.   I wouldn't necessarily always put whatever
9   was on the Word document or Excel, print it and put
10  it in the file. I imagine a good portion of those
11  letters do go into the file.
12  Q.   Whether they go into the file or not, do
13  you maintain them somewhere on the network or on your
14  hard drive?
15  A.   I save letters on our hard drive or network
16  drive.
17  Q.   All letters?
18  A.   No, I don't save all my letters.
19  Q.   You don't save all of your claimant-related
20  letters to the network or hard drive?
21  A.   No, I don't.
22  Q.   Would the same be true about the Excel
23  spread sheets that you might prepare, some of them
24  might get into the claim file, some might not, some

1    whose forms they were to Mr. Kearney.

2         MR. ROBERTS: Objection. That isn't

3    the only portion of the transcript. The

4    transcript goes on for six or seven pages

5    about Mr. Kearney's concern about whose form

6    it is. So what Counsel is asking Mr. Mills to

7    do is not the full transcript. The full

8    transcript will be submitted to the Court. Go

9    ahead.

10      A. What was the question again?

11      Q. Was your statement that these were

12    Jefferson-Pilot forms, or forms submitted that all

13    Jefferson-Pilot people were paying submitted through

14    you?

15         MR. ROBERTS: Objection.

16      A. This was forms that everyone at

17    Jefferson-Pilot was completing through us sending

18    them out.

19      Q. Thank you.

20         MR. ELLIS: That's all the questions

21    I have.

22         Oh, I have one other.

23      Q. (By Mr. Ellis) To your knowledge, was

24    Mr. Kearney's benefit ever cut off?

---

1         MR. ROBERTS: Objection.

2      A. No, Mr. Kearney's benefit was never cut

3    off.

4         MR. ELLIS: Thank you. That's all I

5    have.

6         MR. ROBERTS: We'll continue in

7    progress.

8         THE VIDEOGRAPHER: Going off record

9    at 3:59 p.m.

10           (Witness excused)

11           (Deposition concluded at 3:59 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

---

ERRATA SHEET

To be signed by deponent and returned to counsel.

I, the undersigned, ROBERT MILLS, do hereby
certify that I have read the foregoing transcript of
my testimony given in the matter of JEFFERSON-PILOT
v. KEARNEY and to the best of my knowledge, said
transcript is true and accurate with the exception of
the corrections listed below:

PAGE   LINE    CORRECTION

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DEPONENT'S SIGNATURE _____

DATE OF SIGNING _____

5.14.04 /sr

---

COMMONWEALTH OF MASSACHUSETTS

Hampden

     I, Sharon R. Roy, a Notary Public in and for the
Commonwealth of Massachusetts, do certify that
pursuant to notice, there came before me on the 14th
day of May, 2004, at the law offices of ACCURATE
COURT REPORTING, 1500 Main Street, Springfield,
Massachusetts the following named person, to wit:
ROBERT MILLS, who was by me duly sworn to testify to
the truth and nothing but the truth as to his
knowledge touching and concerning the matters in
controversy in this cause; that he was thereupon
examined upon his oath and said examination reduced
to writing by me; and that the deposition is a true
record of the testimony given by the witness, to the
best of my knowledge and ability.

     I further certify that I am not a relative or
employee of counsel or attorney for any of the
parties, nor a relative or employee of such parties,
nor am I financially interested in the outcome of the
action.

     Witness my hand, this 4th day of June, 2004.


          --------------------------
          Sharon R. Roy


My commission expires:

April 28, 2011