FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO    04 JUN 23 PM 4: 47
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON-PILOT LIFE INSURANCE COMPANY, | : | Case No. C-1-02-479 |
| | : | |
| Plaintiff, | : | (Judge Spiegel) |
| | : | (Magistrate Judge Hogan) |
| vs. | : | |
| | : | **MOTION FOR SANCTIONS** |
| CHRISTOPHER L. KEARNEY, | : | |
| | : | |
| Defendant. | : | |

Now come Plaintiff Jefferson-Pilot Life Insurance Company and DMS, by and through

their counsel, and ask that the Court sanction Defendant's new co-counsel, Michael A. Roberts,

for his conduct both in recent depositions and with regard to his general dealings with opposing

counsel. Mr. Roberts' on and off-the-record comments, his behavior toward witnesses and

opposing counsel and his continued disregard for Court Orders, including his knowing violation

of a protective order entered in another case, demands the extreme sanction of the reimbursement

of all additional costs incurred by Plaintiff in participating in these depositions and responding to

Defendant's numerous and unfounded accusations. Plaintiff requests that any other depositions

be conducted in the presence of a magistrate at full cost to Defendant. A Memorandum in

Support of this Motion is attached.  Due to the sensitive nature of these accusations, this Motion

is being hand filed.

Respectfully submitted,

William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2409
(513) 852-6000

Trial Attorneys for Plaintiff
Jefferson-Pilot Life Insurance Company

## MEMORANDUM IN SUPPORT

### I.     Introduction

This Motion is directed at the behavior of counsel for Mr. Kearney, Mr. Michael Roberts. Both Mr. Roberts and Mr. Ellis were opposing counsel in a previous case in which DMS was one of the defendants.[1]  In the current case, Mr. Roberts has used documents from the previous case in violation of a Protective Order as well as a Motion to Seal the case, which was sought by Mr. Roberts himself.  Mr. Roberts has also revealed the terms of the settlement on the record in depositions and misrepresented the truth of the proceedings in that case in a clear attempt to influence the witnesses being deposed.  In addition, Mr. Roberts' behavior toward Mr. Ellis has become so uncivil that it has impacted both parties' ability to resolve the issues in the current case and has dramatically increased the cost of resolving the litigation.  This behavior should not be tolerated by the Court and should not have to be endured by opposing counsel.

Before Mr. Roberts' entry into the case, when Mr. Gene Matan was sole counsel, these issues were not apparent.  During the course of this case however, and despite the fact that Mr. Matan is still listed as co-counsel, Mr. Roberts has advised Mr. Ellis that he is lead counsel and all communications are to go through him. This has created an untenable situation given Mr. Roberts' behavior.  Plaintiff requests that if Mr. Roberts remains in the case, all further depositions take place in front of a Magistrate and that all costs associated with those depositions be charged to Defendant.  Plaintiff also requests reimbursement of the excess fees expended in filing both this Motion for Sanctions and in resolving the myriad of discovery disputes needlessly raised by Mr. Roberts.

---

[1] *Jeffries v. Centre Life Insurance Company, et al.*, Case No. 02-351, U.S. District Court, Southern District of Ohio.

## II.    Argument

### A.    Mr. Roberts Has Knowingly Violated A Protective Order.

During the deposition of Todd Ditmar, Mr. Roberts attached the performance reviews of John Midghall, Lance Faniel, Brian Wentworth, John Graff and Bill Gelardi as Exhibit 30 to Mr. Ditmar's deposition. *See* Exhibit A, Deposition of Todd Ditmar ("Ditmar Depo.) at pp. 66-67. The exhibit contained documents bates numbered DMS 025-031, 047-049, 050-051, 060-061, and 077-086. Messers. Midghall, Faniel, Wentworth, Graf and Gelardi are all employees of DMS but they were not involved in the administration of Mr. Kearney's claim. Nonetheless, Mr. Roberts violated an explicit order of this Court by attaching these performance reviews to Mr. Ditmar's deposition.

In the case of *Jeffries v. Centre Life Insurance Company, et al.*, Case No. C-1-02-351 in the U.S. District Court for the Southern District of Ohio, defendant DMS had filed a Motion to place the employment review of John Midghall under seal. The Court granted this Motion on March 23, 2004. Mr. Roberts had not opposed Defendant's Motion. In granting the Motion to place the employment review of Mr. Midghall under seal, the Court stated that "the exhibit contains information from the personnel file of one of Defendant's employees. The Court finds such information to be protected from public inquiry and Plaintiff's failure to take issue with this fact to be sensible." *See* Exhibit B. By entering the employment review of Mr. Midghall in Mr. Ditmar's deposition, Mr. Roberts has acted in knowing violation of the Court's Order to place the employment review under seal.

Mr. Roberts has further violated both the spirit of the Protective Order entered with regard to Mr. Midghall and the letter of a subsequent Protective Order when he introduced the employment reviews of John Graff, Lance Faniel, Bill Gelardi and Brian Wentworth. Although

these employment reviews were not specifically part of the Motion to seal since they had not been publicly filed in the *Jeffries* case, the spirit of the Court's Order is that personnel files of DMS employees, or any corporate employee, is information that should be protected from public inquiry. Although Mr. Roberts explicitly violated the Order with regard to Mr. Midghall's review, his violation is implicit with regard to the other reviews. All are sanctionable.

Mr. Roberts will likely argue that the employment reviews of the employees other than Mr. Midghall were not protected because he attached redacted copies. This is incorrect. The employment reviews of DMS personnel in both their redacted and unredacted form are subject to a protective order entered later in the *Jeffries* case. When the personnel files were first produced, DMS redacted some sensitive information. Mr. Roberts objected on behalf of his client and the Court ordered that unredacted copies of the personnel files be produced pursuant to a Protective Order. The Stipulated Protective Order signed by Judge Hogan on April 2, 2004 explicitly stated that "This Order applies to . . . previously redacted 'performance evaluations'." *See* Exhibit C. Mr. Roberts' submission of these personnel reports in any form during Mr. Ditmar's deposition violated the Court's Order.

Mr. Roberts cannot claim ignorance. He was the opposing counsel in the *Jeffries* case. He was bound by and clearly aware of the Motion to place the employment reviews under seal and the Protective Orders declaring confidential both the redacted and unredacted employment reviews as well as DMS' financial information. His knowing violation of these Orders should be sanctioned.

In addition to introducing confidential documents in violation of a Protective Order, Mr. Roberts also made public the terms of the confidential settlement agreement in the *Jeffries* case, an agreement which he himself sought to be confidential. In so doing, Mr. Roberts again

demonstrated his knack for restating information in his own belief.  For example, at pages 8 and

9 of Mr. Ditmar's deposition, Mr. Roberts revealed the amount of the settlement reached in

*Jeffries*' case and incorrectly claimed that the settlement resulted from a bad faith jury

determination:

> MR. ROBERTS:  The issues are what you decide they are, is that right, regardless of what the other party thinks?
>
> MR. ELLIS:  Are you finished?
>
> MR. ROBERTS:  No, I'm not finished with you, I'd just like a direct answer to a direct question.
>
> MR. ELLIS:  The issue in the case is whether this gentleman is entitled to COLA and Social Security or not.  You know it, I know it, that's what the Court's going to decide May 26.
>
> MR. ROBERTS:  What about bad faith, is that an issue?  Or is this like Geoffries where bad faith isn't an issue until you pay a $2 million settlement?
>
> MR. ELLIS:  Mr. Geoffries got what the contract provided, period.
>
> MR. ROBERTS:  Okay.  What about the jury's decision that it was bad faith; was bad faith an issue once the jury decided it was bad faith?
>
> MR. ELLIS:  Are you talking about the summary jury?
>
> MR. ROBERTS:  The jury that was impaneled had determined that it was in bad faith.  Did bad faith become an issue once the jury decided it was bad faith?
>
> MR. ELLIS:  The jury that was impaneled was the one for the trial which you elected not to proceed with.
>
> MR. ROBERTS:  Because you caved in. By the way, I didn't have any witnesses to go that afternoon.
>
> MR. ELLIS:  Whatever version you have.
>
> MR. ROBERTS:  Are you ready, Mr. Ditmar?

*See* Ditmar Depo. pp. 8-9.

Mr. Roberts makes reference to the decision of summary jury but implies that the recommendation of the summary jury was made by the actual jury impaneled for trial. *See id.* at p. 9. The summary jury was done for purposes of effecting settlement, which did not occur as a result of the summary jury recommendation, and was in no way a binding bad faith determination. Mr. Roberts' intentional misstatement was a clear attempt to influence the witness being deposed. It was also in clear violation of the confidentiality agreement that he claims began April 19, 2004. *See* Exhibit D, e-mail dated 6/16/04 from M. Roberts to A. Cohen. This is not the case and another example of Mr. Roberts' blatant misrepresentations.

**B.    Abusive Behavior During Depositions.**

Mr. Roberts' conduct deteriorated even further during the depositions of the witnesses in this case. During the deposition of John L. Roberson, the following exchanges were made:

Mr. Ellis:  No, you didn't.  Don't worry about it.

Mr. Roberts:  Don't worry about it.  I'm Big Brother.

See Exhibit I, Roberson Deposition ("Roberson Depo.") at p. 86.  Later in the deposition when Mr. Roberson was explaining the terms of the policy in response to Mr. Roberts' question, Mr. Ellis asked that the witness be allowed to finish his explanation.

Mr. Ellis:  Wait a minute.  Let him finish.

Mr. Roberts:  Sorry, Big Brother.

*Id.* at p. 89.

Despite Mr. Ellis' attempts to accommodate Mr. Roberts, he was often met with sarcasm.  After Mr. Roberts had complained that Mr. Roberson might have the benefit of

Mr. Ellis' notes, Mr. Ellis offered to use a clean copy.  In response to this gesture,

Mr. Roberts responded sarcastically to Mr. Ellis and mocked Mr. Roberson:

> Mr. Roberts:   Do you want him to read from the document you have marked up with some notes?  Can I see it before the witness reads from the document that is marked up?
>
> Mr. Ellis:  I'm sorry, we'll use yours.  I don't care.  I'm just trying to be -- can I have Exhibits 3 and 4, please.
>
> Mr. Roberts:  Typical Bill.
>
> Mr. Ellis:  He certainly doesn't need my annotations
>
> * * *
>
> Mr. Roberts:  He knew how to pay the policy until you told him otherwise two days ago so apparently he does need your annotations.[2]
>
> The witness:  I still know how to pay the policy, but I made a mistake.
>
> Mr. Roberts:  300 mistakes.

*See id.* at p. 96.

During Ms. Loftin's deposition, Mr. Roberts went so far as to refer to Mr. Ellis

derogatorily to his witness.  He questioned Ms. Loftin:

> Q:      Who have you spoken to about Mr. Kearney?
>
> A:      Our internal counsel.
>
> Q:      Okay.  And Mr. Big Brother, outside counsel?
>
> A:      Yes.
>
> Q:      Anyone else?
>
> Mr. Ellis:  For the record, my name is Ellis.

---

[2] This is another example of  Mr. Roberts' practice of altering testimony to his own interpretation.  He is well aware that the discovery that Mr. Kearney's benefits were being overpaid occurred more than two years before Mr. Ellis joined this case.

*See* Exhibit J, Loftin Deposition at p. 102. In response to Mr. Ellis' objection that he had

exceeded the scope of the 30(b)(6) notice, Mr. Roberts simply responded "Whatever, Big

Brother." *See id.*, p. 172.

Later on in the deposition, and again in front of his client, Mr. Roberts again

insulted Mr. Ellis. When questioning Ms. Loftin about the applicability of the social

security rider he asked:

> A.    That the Social Security Supplement Benefit might not be applicable.
>
> Q.    If you don't purchase that rider, correct?
>
> A.    I don't know.
>
> Q.    Okay. That could be one interpretation?
>
> A.    I don't know.
>
> Q.    It's a logical interpretation.
>
> Mr. Ellis:    Hardly.
>
> Mr. Roberts: Listen. I'm not looking to you for logic, buddy. I'm talking to
> somebody who actually went to law school and took an oath.

*Id.* at p. 132.

Mr. Roberts is smart enough to make his more offensive remarks and actions

off-the-record and then deny they occurred. During the deposition of Mr. Shelton, Mr. Ellis

asked that Mr. Roberts "Let [the witness] answer one question at a time and don't throw the

finger at me again." *See* Exhibit K, Shelton Depo. at p. 23. During Mr. Ditmar's deposition,

Mr. Ellis asked Mr. Roberts not to make faces. *See* Ditmar Depo. at p. 85. Both times

Mr. Roberts denied any improper behavior.

When Mr. Ellis refuses to go off the record, the true flavor of Mr. Roberts' demeanor is

captured. For example, at one point during Mr. Loftin's deposition Mr. Ellis asked:

Mr. Ellis:  Is that a question or a speech?

Q:  -- so that --

Mr. Roberts:  Can we go off the record for a second?

Mr. Ellis:  No.  Stay on the record.

Mr. Roberts:  We're going to go off the record.

Mr. Ellis:  No.

Mr. Roberts:  Okay.  Shut up.

Loftin Depo. at p. 164.  Mr. Roberts then attempted to cover up the fact that he had just

acted inappropriately on the record and said:

> Mr. Roberts:  Bill, I won't say shut up if you do what you are supposed to do and
> simply say "objection" to preserve the objection for determination by a judge later
> in the case.  Anything you say after the word "objection" -- this is like the 80th
> time I've told you this -- anything that comes after the word "objection" is
> improper coaching of the witness, and you know it, and you are sitting there like a
> Cheshire cat smiling with your arms above your head like you know something
> that I don't know, and what we both know is that you don't follow procedure.
>
> In fact, Judge Beckwith said to you three weeks ago, Mr. Ellis, you have filed five
> false declarations in a lawsuit.
>
> Mr. Ellis:  Are you finished?  Judge Beckwith never said it, you did.
>
> Mr. Roberts:  She said yeah, you have.  What about that?
>
> Mr. Ellis:  No, I don't believe you are right.
>
> Mr. Roberts:  It was recorded.
>
> Mr. Ellis:  Good.  Bring it up.  Now are you finished or do you want to keep
> going?
>
> Mr. Roberts:  No.  Do you have any lawsuits going on?  I want to add as
> co-counsel in whatever case you have.

Id. at p. 165.

It is clear that Mr. Roberts harbors extreme animosity toward Mr. Ellis stemming from the result in their last case together. In fact, at one point during this deposition, he even misspoke and referred to his client, Mr. Kearney by the name of his previous client. *Id.* at pp. 10-11. His sarcastic and inappropriate remarks to both counsel and the witnesses serve only to complicate and delay this case increasing costs for both sides.

###     C.    Mr. Roberts' Unprofessional Conduct During Depositions Is Sanctionable.

During the depositions in Springfield, Massachusetts, Mr. Roberts used inappropriate and at times profane language directed at Mr. Ellis and the witnesses. He also intentionally misstated information to witnesses and created unnecessary roadblocks and delays. For example, at one point Mr. Ditmar sought to answer Mr. Roberts' questions:

A.    I was trying to answer your question and you interrupted me.

Q.    I'm going to talk over you because I'm not going to let you control this deposition.

A.    I'm not trying to.

Q.    It's her that you're inconveniencing, sir. This is the question.

A.    I was trying to answer your question.

Q.    This is the question.

MR. ELLIS:   If you're not going to permit him to answer the question - -

MR. ROBERTS: Listen, don't talk over me. Listen, I will talk over you and make her life hell.

Ditmar Depo at pp. 79-80.

Mr. Roberts' use of inappropriate language during the Massachusetts depositions occurred both on and off the record. The Affidavits of Adam Formus and Todd Ditmar confirm that Mr. Roberts used profanity to refer to both Mr. Ditmar and Mr. Ellis. In a blatant attempt to

disparage Mr. Ellis and demean his reputation in front of his client, Mr. Roberts referenced his

other case with Mr. Ellis and DMS and said "You could have saved your client a million bucks

but for you being a *expletive*." *See* Exhibit L, Affidavit of Adam Formus ("Formus

Affidavit") at ¶6.   He also called Mr. Ditmar a different profane name. *See id.*; *See also* Exhibit

M, Affidavit of Todd Ditmar ("Ditmar Affidavit").

The fact that Mr. Roberts used profanity to refer to both Mr. Ellis and Mr. Ditmar was

addressed with the Court during the course of Mr. Ditmar's deposition.  Mr. Roberts stated to the

Court that he never used profanity during his off-the-record statements to both Mr. Ellis and

Mr. Ditmar.  This is untrue.  As the Affidavit of Mr. Formus confirms, Mr. Roberts'

off-the-record statements were profane and extremely inappropriate.  *See* Formus and Ditmar

Affidavit.  Moreover, Mr. Roberts went so far as to apologize to both Mr. Formus and Mr.

Ditmar for his use of profanity.  This directly contradicts his blatant misstatement to the Court

that he did not use profanity.  One must question why he would apologize for something he

claims he did not do.

Another issue that arose during the Massachusetts depositions was Mr. Formus' use of a

laptop and internet connection during the depositions.   Despite Mr. Roberts' contention,

Mr. Formus did not make a word-for-word transcription of the proceedings.  As Mr. Formus

stated in response to Mr. Roberts' allegations:

> As in-house counsel for Disability Management Services I categorically deny and
> reject Mr. Roberts' statements that I shared any information whatsoever with
> either Mr. Bonsall or Mr. Ditmar at any time yesterday either personally and/or
> via the internet that is connected to the hard drive in my office.  The laptop is for
> purposes of saving my notes with regard to yesterday's depositions directly to my
> hard drive.

*See* Exhibit N, Mills Deposition at p. 9.  Mr. Roberts' willfully misrepresented the fact of this

internet connection during the depositions of Mr. Bonsall and Mr. Mills.  Mr. Roberts asked

Mr. Bonsall:

> Q. Sir, have you gotten any reports today about Mr. Ditmar's testimony throughout the
> day?
>
> A.  Reports, you mean --
>
> Q. Written reports or oral reports.  A gentlemen in your general counsel office has been
> sitting over here connected to the internet taking copious notes, and I am curious whether
> or not you have been receiving directly from him or through some intermediary reports of
> the testimony that we just undertook for the last six or seven hours.
>
> A.  The only thing that I am aware of, there are two things, I guess, that there was some
> discussion about name calling and some discussion about things being -- Mr. Ditmar
> being asked about things that did not pertain to this matter, pertaining to another matter.
>
> Q. Those are the only two things that have been shared with you about his six hours of
> testimony?
>
> A. Yes.

*See* Exhibit O, Deposition of Robert Bonsall ("Bonsall Depo.") at pp. 6-7.  Mr. Roberts took

Mr. Bonsall's unequivocal response and from that attempted to create an admission of wrong-

doing by DMS.    At the beginning of Mr. Mills' deposition Mr. Roberts stated:

> I took one long deposition yesterday of Mr. Ditmar, and at the second deposition,
> I asked the witness if he had any communications regarding the conduct of the
> proceeding.  It was my understanding from the testimony that Mr. Formus'
> internet connection back to the office and his word-for-word transcription of the
> day's proceedings were communicated to Mr. Bonsall.

*See* Mills Deposition at p. 5.  Mr. Roberts asked Mr. Bonsall whether he received any

information.  Mr. Bonsall answered no, other than Mr. Roberts' name-calling and use of

irrelevant and potentially confidential information.  Despite this clear answer, Mr. Roberts makes

the blatant misstatement that Mr. Bonsall received a word-for-word transcription and claims to

base this understanding on Mr. Bonsall's testimony. This is not only incredible, it serves to increase costs unnecessarily. These costs should be awarded to Plaintiff.

### D.    Mr. Roberts Inappropriately Contacted A Former Employee Of Plaintiff.

Mr. Roberts often makes reference to what he perceives as Mr. Ellis' lack of ethics. This perception stems from an earlier dispute between Mr. Ellis and Mr. Roberts in a completely unrelated case. During this case, however, Mr. Roberts has proven that his vendetta against Mr. Ellis continues and that he himself has little regard for the ethical canons.

On May 6 and 7, 2004, Mr. Ellis and Mr. Roberts were in North Carolina deposing current and former employees of Jefferson-Pilot. One of the former employees Mr. Roberts asked to depose was Robert Maxwell. Mr. Maxwell has been retired from Jefferson-Pilot for over 10 years due to disability. Mr. Maxwell is homebound, wheelchair bound, losing his sight and has a significantly impaired memory. For this reason, Mr. Ellis advised Mr. Roberts that Mr. Maxwell would not be physically able to provide a deposition. Mr. Roberts apparently did not believe this representation and took it upon himself to contact Mr. Maxwell directly. Although there is nothing in the ethical canons that would prevent Mr. Roberts from contacting a former Jefferson-Pilot employee, there are guidelines which he must follow. Mr. Roberts admitted in Mr. Roberson's deposition that he did not follow these guidelines. Specifically, Mr. Roberts never advised Mr. Maxwell that he represented a party adverse to Mr. Maxwell's former employer.

On May 6, 2004, Mr. Roberts contacted Mrs. Maxwell by phone. Mr. Roberts admits that he did not inform Mrs. Maxwell who he represented. During Mr. Roberson's deposition, this issue was discussed between Mr. Roberts and Mr. Roberson. Mr. Roberts' comments are made following the Q. He stated:

Q:     As long as you want to discuss this on the record, I can tell you exactly what my conversation was. I called his phone number yesterday. I spoke to his wife, whose name is Mary, as you probably know. I said, Mrs. Maxwell, my name is Mike Roberts, I am a lawyer, I am in Greensboro taking some depositions relating to a Jefferson-Pilot matter. I understand that your husband is not well and I am calling to ask if it would be an imposition if I spent an hour with him tomorrow in a deposition, and I understand that if he cannot do it for medical reasons, we won't go through with it, but I called to simply ask, and she told me, I don't think there is a problem with that, and then she left the phone for a minute, she came back and said, I spoke to him, he says it is not a problem. . . .

A:     She told --

Q:     I know nothing about his medical condition. I don't know anything about him. But I called and said, I'll do it if it is not an imposition, I won't do it if it is. So I'm basing my decision to take his deposition later today on his confirmation that it would be okay.

A:     By Mr. Roberson. She understood you to be representing Jefferson-Pilot Life Insurance Company and was doing it as a favor to his company which he was retired to. She did not understand that you were a plaintiff's attorney.

Q:     Well, I'm not a plaintiff's attorney.

A:     Well,

A:     --

Q:     I'm a lawyer, I graduated from the University of Notre Dame, I'm the best lawyer in the State of Ohio. . . .

Q:     <u>What difference does it make if he can give a deposition whether it is at the request of a lawyer representing a plaintiff or a lawyer representing a defendant</u>? By the way, I am not a plaintiff's attorney. I'm the defendant in this case.

*See* Roberson deposition at pp. 37-39 (emphasis added).

Contrary to Mr. Roberts' clear misunderstanding of Ohio law and the Rules of Ethics governing attorneys, and despite his apparent belief that he is the best lawyer in the State of Ohio, it does make a difference which party he represents when he contacts the former employee himself. Mr. Roberts implied to Mrs. Maxwell that he was an attorney for Jefferson-Pilot. Setting aside the semantics of whether he advised that he wanted to take a deposition or simply

have a conversation, it is clear that he did not advise that he represents a client adverse to

Mr. Maxwell's former employer. The Ohio Supreme Court has issued advisory opinion 96-1

which confirms that attorneys are not prohibited from contacting former employees of a

represented corporation. There are however clear guidelines for contacting these employees.

These are:

(1)    An attorney may communicate on the subject matter of the representation with
       former employees of the corporation without notification or consent or corporate
       counsel;

(2)    An attorney may not communicate *ex parte* if a former employee is represented
       by his own counsel in the matter, unless that counsel consents;

(3)    An attorney may not communicate *ex parte* if a former employee has asked the
       corporation's counsel to provide representation in the matter, unless that counsel
       consents;

(4)    An attorney must obtain the consent of the former employee to the interview;

(5)    An attorney must inform the former employee not to divulge any communications
       that the former employee may have had with corporate or other counsel;

(6)    **An attorney must fully explain to the former employee that he or she
       represents a client adverse to the corporation**.

(7)    An attorney may not give advice to the unrepresented former employee other than
       advice to seek counsel in the matter.

*See* Exhibit P. Contrary to Mr. Roberts' question of what difference it makes whether he

represents the plaintiff or the defendant, it makes a very big difference. Mr. Roberts implied to

Mrs. Maxwell that he was counsel for Jefferson-Pilot. He never fully explained that he

represents a client adverse to Mr. Maxwell's former employer. Moreover, there is some question

as to whether Mr. Roberts asked simply for a conversation or a deposition. There are clear

differences between an interview and the rigors of a deposition. This is especially true in the

case of Mr. Roberts whose deposition practice is to taunt and belittle both the deponent and

opposing counsel.

### E.    Mr. Roberts' Hostility Toward Mr. Ellis Is Sanctionable.

Canon 7 of the Code of Professional Responsibility requires that:

> In adversary proceedings, clients are litigants and though ill feeling may exist
> between clients, <u>such ill feeling should not influence a lawyer in his conduct,</u>
> <u>attitude, and demeanor towards opposing lawyers.  A lawyer should not make</u>
> <u>unfair or derogatory personal reference to opposing counsel.</u>  Haranguing and
> offensive tactics by lawyers interfere with the orderly administration of justice
> and have no proper place in our legal system.

E.C. 7-37 (emphasis added).

Mr. Roberts and Mr. Ellis had one prior case during which there was obvious acrimony

occasioned by Mr. Roberts' insulting behavior.  It is clear that Mr. Roberts has no respect for

Mr. Ellis and Canon 7.  Mr. Roberts will no doubt respond that he feels free to violate the ethical

Canons because of his opinion of Mr. Ellis.  Mr. Roberts' opinion of Mr. Ellis notwithstanding,

one does not justify the other.  This is especially true here where the parties are involved in a

new case and Mr. Ellis has repeatedly offered to work from a clean slate.

Mr. Roberts' unprofessional conduct is readily apparent in his communications to

Mr. Ellis and other members of Wood & Lamping LLP.  In particular, Mr. Roberts has the

unprofessional habit of referring to Mr. Ellis in a derogatory manner.  The pattern of

unprofessionalism is apparent in the e-mail exchanges between Mr. Roberts, Mr. Ellis and other

members of Wood & Lamping LLP.

A common theme for Mr. Roberts is to refer to Mr. Ellis as "Big Brother."  *See* Exhibit E

at p. 1, e-mail dated 4/27/04 10:32 AM.; *See also* Exhibit F at p. 1, email dated 4/28/04 10:19

AM.  This salutation is derogatory and sarcastic and serves no purpose other than to antagonize

Mr. Ellis and create an unprofessional atmosphere for the litigation.  Mr. Ellis attempted to

resolve this animosity and return to civility when he wrote:

> Mr. Roberts, it is apparent that you have some emotional difficulties in dealing
> with me on these cases.  <u>I would appreciate you addressing me in some
> professional manner as opposed to the telephonic name calling and written
> sarcasm.</u>

*See* Exhibit E at p. 1, e-mail dated 4/27/04 10:28 AM.  Mr. Roberts responded and continued his

pattern of behavior by again calling Mr. Ellis "Big Brother" both in his salutation and within the

body of the e-mail.  *See id.*, e-mail dated 4/27/04 10:32 AM.  He again was sarcastic in his

signing of the e-mail.

Mr. Roberts' conduct is not reserved solely for Mr. Ellis.  At one point during the course

of this litigation, Mr. Roberts asked an associate attorney in Mr. Ellis' law firm to send a copy of

Mr. Ellis' law school transcript to verify he had gone to law school.  *See* Exhibit G at p. 1, e-mail

dated 2/5/04 11:53 AM.

> I went to law school.  And ethics are paramount in the legal
> profession.  I'm completely disgusted by your firm's complete
> disregard of the rules of procedure and ethics, which has been
> apparent since March 2002.  It's almost as if Ellis didn't go to law
> school (please send me his law school transcript for confirmation).

*Id.*  At that point, Mr. Ellis attempted to return the communications between the attorneys to a

civil tone:

> If you wish to continue this senseless tactic on matters unrelated to
> the issues in a case, I cannot stop you, however it seems to me that
> to do so is to do a disservice to both of our clients and to the
> profession. The choice is yours.
>
> &#42;        &#42;        &#42;
>
> I am willing to attempt to get along with you and deal with the
> issues in the case, agreeing when possible and agreeing to disagree,
> without insult or accusation, when necessary, however, I will not
> engage in trading insults. I feel it is unprofessional and serves no

> purpose other than to increase the costs and decrease the
> professional civility in the case. I hope you take this E-mail in the
> spirit it is intended. I would very much like to proceed with these
> cases in an efficient and professional manner.

*See id.*, e-mail dated 2/5/04 1:31 PM.

Mr. Ellis tried to return communications to a professional level several times. In fact,

when Mr. Ellis began to refer to Mr. Roberts by his surname as opposed to his given name in an

attempt to improve the relationship between the parties, Mr. Roberts sarcastically mocked that as

well. *See* Exhibit F, p. 2, e-mail dated 4/28/04 9:50 AM. "Do you now call me Mr. Roberts

because of the Jeffries outcome? Your pal, Mike." *Id.* In that same exchange, Mr. Roberts

persisted in his objection to deposition notices issued by Mr. Ellis and continued the insults. In

fact, he responded to Mr. Ellis stating "if you still do not understand these simple points call me

and I will explain them to you more slowly." *Id.* at p. 1, email dated 4/28/04 10:44 AM. Again,

Mr. Roberts' behavior is completely unacceptable despite Mr. Ellis' polite request that they treat

each other with civility.

As a final example of Mr. Roberts' sanctionable behavior, he openly defames Mr. Ellis in

an e-mail titled "Is it incompetence?" *See* Exhibit H, e-mail detailed 5/18/04 10:01 a.m. It is

apparent that nothing short of the Court's action will stop this abusive and unprofessional

behavior by Mr. Roberts.

## III.    Conclusion

Mr. Roberts clearly continues his tactic of abusive behavior toward opposing counsel and

its clients. Mr. Roberts is required by the Ohio Rules of Ethics to set aside this history and act

professionally and with civility. He has demonstrated his inability to do this. His behavior is

detrimental to both parties and the resolution of this case. Plaintiff respectfully requests that the

extraordinary costs incurred by Plaintiff as a result of Mr. Roberts' actions be awarded as a

sanction. Plaintiff further requests that all future depositions take place in front of a magistrate

and that all costs associated with those depositions be charged to Defendant.

Respectfully submitted,

William R. Ellis (0012279)
Peter M. Burrell (0044139)
Amy Gasser Callow (0063470)
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2409
(513) 852-6000

Trial Attorneys for Plaintiff
Jefferson-Pilot Life Insurance Company

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served upon the following by regular U.S. Mail, this **23** day of June 2004.

Michael A. Roberts, Esq.
Graydon, Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202-3157

209195.2