IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. C-1-02-479

JEFFERSON-PILOT LIFE INSURANCE CO., )
                              Plaintiff )
                                        )
v.                                      )
                                        )
CHRISTOPHER L. KEARNEY,                 )
                              Defendant )

DEPOSITION OF:  TODD DITMAR, taken before

Sharon R. Roy, Notary Public Stenographer, pursuant

to Rule 30 of the Massachusetts Rules of Civil

Procedure, at the law offices of ACCURATE COURT

REPORTING, 1500 Main Street, Springfield,

Massachusetts on May 13, 2004 commencing at 9:29 a.m.

A P P E A R A N C E S:

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

ACCURATE COURT REPORTING  (413) 747-1806

8

| | |
|---|---|
| 09:33:10 | MR. ELLIS:  Not an issue, as far as |
| 2 | I'm concerned. |
| 09:33:14 | MR. ROBERTS:  Will you tell me what |
| 4 | the issues are in the case so I'm set |
| 5 | straight? |
| 09:33:18 | MR. ELLIS:  If you don't know, |
| 7 | Counsel, I can't help you. |
| 09:33:21 | MR. ROBERTS:  The issues are what |
| 9 | you decide they are, is that right, regardless |
| 10 | of what the other party thinks? |
| 09:33:31 | MR. ELLIS:  Are you finished? |
| 09:33:32 | MR. ROBERTS:  No, I'm not finished |
| 13 | with you, I'd just like a direct answer to a |
| 14 | direct question. |
| 09:33:37 | MR. ELLIS:  The issue in the case is |
| 16 | whether this gentleman is entitled to COLA and |
| 17 | Social Security or not.  You know it, I know |
| 18 | it, that's what the Court's going to decide |
| 19 | May 26. |
| 09:33:43 | MR. ROBERTS:  What about bad faith, |
| 21 | is that an issue?  Or is this like Geoffries |
| 22 | where bad faith isn't an issue until you pay a |
| 23 | $2 million settlement? |
| 09:33:54 | MR. ELLIS:  Mr. Geoffries got what |

ACCURATE COURT REPORTING  (413) 747-1806

9

|       |                                                      |
|-------|------------------------------------------------------|
| 1     | the contract provided, period.                       |
| 09:33:57 | MR. ROBERTS:  Okay.  What about the               |
| 3     | jury's decision that it was bad faith; was bad       |
| 4     | faith an issue once the jury decided it was          |
| 5     | bad faith?                                            |
| 09:34:04 | MR. ELLIS:  Are you talking about                 |
| 7     | the summary jury?                                    |
| 09:34:06 | MR. ROBERTS:  The jury that was                   |
| 9     | impaneled had determined that it was in bad          |
| 10    | faith.  Did bad faith become an issue once the       |
| 11    | jury decided it was bad faith?                       |
| 09:34:12 | MR. ELLIS:  The jury that was                     |
| 13    | impaneled was the one for the trial which you        |
| 14    | elected not to proceed with.                         |
| 09:34:21 | MR. ROBERTS:  Because you caved in.               |
| 16    | By the way, I didn't have any witnesses to go        |
| 17    | that afternoon.                                       |
| 09:34:25 | MR. ELLIS:  Whatever version you                  |
| 19    | have.                                                 |
| 09:34:26 | MR. ROBERTS:  Are you ready,                      |
| 21    | Mr. Ditmar?                                           |
| 09:34:28 | THE WITNESS:  Yes.                                |
| 09:34:29 | MR. ROBERTS:  Let's swear you in.                |
| 09:34:29 | THE VIDEOGRAPHER:  The caption of                |

ACCURATE COURT REPORTING  (413) 747-1806

66

|   |   |
|---|---|
| 1 | as Exhibit 30 several documents all combined into one |
| 2 | exhibit which we'll call 30.  The first two pages of |
| 3 | Exhibit 30 are 2001 Yearly Performance Plan and |
| 4 | Review of Lance Faniel, which is Bates labeled DMS |
| 5 | 018 and DMS 019. |
| 11:13:35 | MR. ELLIS:  Do you have copies of |
| 7 | these for me, Counsel? |
| 11:13:38 | Q.  (By Mr. Roberts)  The next three pages are |
| 9 | 2002 Yearly Performance Plan and Review of John |
| 10 | Midghall marked DMS 047, DMS 048, and DMS 049. |
| 11:13:49 | The next document is 2001 Yearly |
| 12 | Performance Plan and Review of John Midghall marked |
| 13 | DMS 050 and DMS 051. |
| 11:14:02 | The next is 2001 Yearly Performance Plan |
| 15 | and Review of Brian Wentworth marked DMS 025 and 026. |
| 11:14:13 | The next is Yearly Performance Plan and |
| 17 | Review, Brian Wentworth, signed by John Midghall, |
| 18 | labeled DMS 027 and DMS 028. |
| 11:14:29 | The next is Yearly Performance Plan and |
| 20 | Review of Brian Wentworth marked DMS 029, 030, and |
| 21 | 031. |
| 11:14:40 | The next is John Graff Yearly Performance |
| 23 | Plan and Review marked DMS 060 and DMS 061. |
| 11:14:53 | The next is marked DMS 077, 78, 79, 80 and |

ACCURATE COURT REPORTING  (413) 747-1806

**Ditmar, Todd**                                      **Page 66**

67

1    81, which is the 2001 Yearly Performance Plan and

2    Review of a Bill Gelardi.

11:15:09        The next is Mr. Gelardi's review marked DMS

4    082 and 83.  And also pertaining to Mr. Gelardi, DMS

5    084, 85, and 86, which we'll have as Exhibit 30.

11:15:48            MR. ROBERTS:  Do you want a copy?

11:15:49            MR. ELLIS:  Yes.

11:15:51            MR. ROBERTS:  Okay, why don't we go

9    off the record so Mr. Ellis can have a copy.

11:15:54            THE VIDEOGRAPHER:  Going off the

11    record at 11:15 a.m.

11:27:09                (A recess was taken)

11:27:09            THE VIDEOGRAPHER:  Back on record at

14    11:26 a.m.

11:27:13            MR. ELLIS:  For the record, Counsel

16    has just identified Exhibit 30, which contains

17    a number of documents he identifies as parts

18    of the personnel files of Mr. Faniel,

19    Mr. Midghall, Mr. Wentworth, Mr. Graff, and

20    Mr. Gelardi, all of which are the subject, as

21    Counsel knows, to a protective order issued in

22    the Geoffries case.  I will object to his use

23    of them as being in violation of that order.

24    I also object on the basis that they're beyond

ACCURATE COURT REPORTING  (413) 747-1806

79

11:41:22     Q.   I asked you the question, sir.  Is

2       resolving --

11:41:22     A.   I was --

11:41:23     Q.   We can't talk at the same time, out of

5       courtesy to her.

11:41:26     A.   I was trying to answer your question.

7       You're --

11:41:28     Q.   You weren't answering the question.  The

9       question was this -- and let's make sure we

10      understand each other --

11:41:32              MR. ELLIS:  Mr. Roberts --

11:41:32     Q.   (By Mr. Roberts) -- as a courtesy to the

13      court reporter.  Is the concept --

11:41:34     A.   I was trying to answer your question and

15      you interrupted me.

11:41:38     Q.   I'm going to talk over you because I'm not

17      going to let you control this deposition.

11:41:40     A.   I'm not trying to.

11:41:41     Q.   It's her that you're inconveniencing, sir.

20      This is the question.

11:41:45     A.   I was trying to answer your question.

11:41:45     Q.   This is the question.

11:41:46              MR. ELLIS:  If you're not going to

24      permit him to answer the question --


ACCURATE COURT REPORTING  (413) 747-1806


**Ditmar, Todd**                                    **Page 79**

80

11:41:48                 MR. ROBERTS:  Listen, don't talk

2          over me.  Listen, I will talk over you and

3          make her life hell.

11:41:56                 MR. ELLIS:  This deposition's over.

11:41:57                 MR. ROBERTS:  No, that is wrong.

6          Let's get on the phone right now.

11:41:59                 MR. ELLIS:  Do what you want, Mike.

8          Unless you let the witness answer the

9          question --

11:42:02                 MR. ROBERTS:  He's not answering the

11         question.  That wasn't the question.  Here's

12         the question.  Let's go back on the record.

13         Here's the question.  We're still running

14         videotape, right?

11:42:09                 MR. ELLIS:  He's entitled to finish

16         answering what you asked him.

11:42:12                 MR. ROBERTS:  That wasn't what I

18         asked him, Counsel.  Here is the question,

19         plain and simple again.

11:42:19       Q.   (By Mr. Roberts)  Is the concept of

21    resolving claims something that is a mission or

22    business philosophy of DMS?

11:42:30       A.   Can you have her read back the question

24    that you started to ask me four minutes ago and I can

ACCURATE COURT REPORTING  (413) 747-1806

85

11:48:12          Do you have an understanding personally of

2     what any DMS claims settlement process may be?

11:48:18          A.   No, I do not.

11:48:20          Q.   Have you ever heard anyone prior to today,

5     prior to this deposition, say in your presence that

6     there is some kind of DMS claim settlement process?

11:48:34          A.   No, I have not.

11:48:43          Q.   Can you turn to DMS 0078.  And if you look

9     at 0077 you'll see that this is a 2001 Yearly

10    Performance Plan and Review on Bill Gelardi by

11    Maureen Cleary.  Do you know who she is?

11:49:01          A.   No, I do not.

11:49:06          Q.   Do you know who Bill Gelardi is?

11:49:09          A.   No, I do not.

11:49:10          Q.   You've never heard his name before?

11:49:12          A.   No, I haven't.

11:49:13               MR. ELLIS:  In which case I object

18         still further on this particular document.  He

19         has no familiarity with the people or the

20         document.

11:49:21               You don't have to make faces, Mike.

11:49:23               MR. ROBERTS:  I'm not making a face

23         at you.  I don't know why you would say that

24         on the record.  Well, I do know why you would

ACCURATE COURT REPORTING  (413) 747-1806

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ERIC JEFFRIES,
     PLAINTIFF

VS.

CENTRE LIFE INSURANCE
COMPANY,
     DEFENDANT

CASE NO. 1:02-CV-351
(BECKWITH, J.)
(HOGAN, M.J.)

### ORDER

As has become a familiar pattern in this case, there are again multiple discovery disagreements which have taken an inordinate amount of this Court's time and attention. These disputes were the subject of an informal hearing in chambers on March 22, 2004. The hearing was not on the record, but the parties' arguments are memorialized in the various motions, memoranda in opposition and reply briefs previously filed.

### THE TESTIMONY OF DRS. GARB AND REED

First before the Court is Plaintiff's Emergency Motion to Exclude Drs. Garb and Reed (Doc. 170), Defendant's Memorandum in Opposition (Doc. 177) and Plaintiff's Reply (Doc. 179). It was represented to this Court that Dr. Garb was retained by Defendant to assist it in making various decisions relative to Plaintiff's disability claim. Dr. Reed is one of Plaintiff's treating physicians. The trial deposition of Dr. Garb was noticed by Defendant for March 24, 2004 in Boston, Massachusetts. Dr. Reed's deposition was noticed for April 14th, presumably in Cincinnati. Plaintiff seeks both to exclude the trial testimony of these two doctors and to preclude their depositions because: (1) the deadline for identifying fact witnesses was November 29, 2002 and neither doctor was identified as a fact witness, (2) the deadline for identifying expert witnesses was December 5, 2003 and neither doctor

was identified as an expert witness, (3) if the testimony was allowed, Plaintiff would be prejudiced, and (4) if the testimony was not permitted, Defendant would not be prejudiced because Defendant has other witnesses to testify.

Plaintiff has offered to stipulate to both the authenticity and admissibility of all reports and documents by either or both doctors to the extent that these reports and documents are contained in the Claims File. Because Judge Beckwith precluded Defendant from adding to its expert witness list, Plaintiff theorizes that Defendant is attempting to elicit expert testimony as fact testimony in an effort to circumvent Judge Beckwith's earlier ruling. (See Doc. 140).

Defendant argues that the November, 2002 deadline for the identification of lay witnesses was vacated and never reset and that both doctors would be testifying as lay and not expert witnesses. Defendant represents that Dr. Reed would be asked to testify about the dates he treated Plaintiff, his examination of the Plaintiff and his findings. Defendant represents that Dr. Garb will be asked to testify about his participation in the claim review process.

One of the issues in this case is the alleged bad faith of Defendant, as exhibited by its handling of Plaintiff's claim for disability coverage. It is important for the fact finders to understand what Defendant did and why it did it. In the jury's consideration of the "why" component, Defendant should be permitted to describe its reliance upon medical experts. On the same topic of "why," the Plaintiff should be permitted to explore Defendant's motivation for the claims decision. Neither inquiry is governed by Evidence Rule 702, et seq. In other words, a treating physician, although an expert witness qualified to voice a professional opinion within his/her field of expertise, is not the type of retained expert contemplated by the Rules. The Court does not accept the Plaintiff's theory that Defendant is attempting to circumvent Judge Beckwith's ruling that Defendant may not now add to its expert witness list. Both the disputed witnesses may well be called as fact witnesses, not subject to the deadline set for expert disclosures.

A more difficult problem is Defendant's failure to honor the deadline set for the disclosure of fact witnesses. Although this Court probably should have extended that deadline in accordance with previous calendar extensions, it was inadvertently overlooked and never addressed by either counsel until the present dispute developed. The second consideration is that a videotaped trial deposition is fundamentally different than a discovery deposition and not subject to discovery deadlines. Although

professional courtesy, if not required civility, would dictate that trial depositions not take place during the countdown to trial, experience with this case should have dictated that a deadline for trial depositions be set as well. The issue really should be decided on a prejudice basis. Plaintiff's offer to stipulate both the authenticity and admissibility of both doctor's records does not completely wipe out any potential prejudice to Defendant, since issues of credibility cannot be assessed from a printed record. On the other hand, Plaintiff's attention to the preparation of his case would be diverted by a trip to Boston and the planning of such a journey. A factor to be considered is whether Plaintiff complied with the original deadline for the disclosure of fact witnesses and Plaintiff's admission that he did not. An equally important consideration is the likelihood of surprise. It is presumed that both counsel know all about both doctors' involvement in this case and what the thrust of their testimony would be.

On balance, the Court does not find that either deposition should be precluded. In order to insure that the doctors are testifying about factual issues, Defendant shall supply the Court with all records, reports and documents authored by either of them three days prior to the summary jury trial. In addition, because of the late timing of the notices, Defendant shall pay for Plaintiff's counsel's trip to Boston.

## DEFENDANT'S MOTION TO SEAL EXHIBIT 3

Defendant's Motion to Place Exhibit 3 Under Seal (Doc. 174) is unopposed and hereby granted. The exhibit contains information from the personnel file of one of Defendant's employees. The Court finds such information to be protected from public inquiry and Plaintiff's failure to take issue with this fact to be sensible.

## FINANCIAL INFORMATION

Before the Court is Plaintiff's Emergency Motion to Compel Production (Doc. 171), Defendant's Memorandum in Opposition (Doc. 176) and Plaintiff's Reply (Doc. 178). The Plaintiff's Motion details several of Defendant's failures to make required disclosures. For organizational purposes, our approach is to resolve these on an individual basis. The first is Plaintiff's argument that Defendant owes it previously requested financial information, both on the issues of bad faith and

punitive damages.  Specifically, Plaintiff requested: (1) annual and/or consolidated financial statements for the period 1999 to the present, (2) all financial reports exchanged between DMS and Defendant from 1999 to the present, and (3) all budgets and financial reports relating to DMS' Centre Life block of business from 1999 to the present.  Plaintiff argues that *United States v. Matusoff Rental Co.*, 204 F.R.D. 396 (S.D. Ohio 2001) compels the disclosure of the information Plaintiff seeks.

Defendant also cites the *Matushoff Rental Co.* case for the proposition that when financial information is required to be disclosed, the trial should be bifurcated.  The decision whether to bifurcate the trial is non-dispositive, but so intricately related to the trial itself, that the better practice is to defer to the District Judge on this issue.  However, since a summary jury was ordered by the District Judge and since it makes no sense to deprive a summary jury panel of  information relevant to the punitive damage, bad faith issues, the requested financial information must be disclosed, but under a Protective Order preventing its publication or communication to those who are not participants in the trial of this case.

## BACK-UP TAPES

The Court previously ordered the Defendant to search its back-up computer tapes and the procedure understood by the parties was that Plaintiff, distrustful of Defendant, would send its computer expert to oversee the information retrieval process.  Plaintiff has now concluded that he cannot afford to send a computer expert and must, of necessity, trust Defendant to carry out its Court-ordered duty with honesty.  Defendant does not wish to proceed in the absence of Plaintiff's expert because it fears that Plaintiff will ultimately accuse it of some form of dishonesty if its search produces nothing of substance.  That Plaintiff cannot or chooses not to oversee the retrieval operation does not excuse non-compliance with a Court Order.  The retrieval should be made immediately and Defendant's in-house counsel shall certify to its integrity.

## ADMINISTRATIVE SERVICES AGREEMENT

Plaintiff seeks a copy of the contractual agreement between Defendant and DMS, the company hired to administer disability claims under Defendant's policies.  Plaintiff's claim of bad faith is based, in part, on financial incentives paid to DMS which, Plaintiff claims, reflect more than the cost of doing

business and a reasonable profit. Defendant denies that fact and asserts that its business contracts are privileged information. The Court concludes that any fact finder would want to see the contract itself before it reached any conclusion about improper incentives. Defendant's concern is legitimate only with respect to the prying eyes of other business competitors. Thus, this Court finds that the document can be introduced as part of the evidence base in the summary jury trial, but that any trial decisions on the admissibility of evidence should properly be decided by the trial judge. In either event, the document should be protected from any distribution or communication to others not participants in this trial.

## FOLLOW UP TO PERFORMANCE EVALUATIONS

There were certain redactions made from the performance evaluations of certain of Defendant's employees. These redactions relate, according to Plaintiff, to performance goals of DMS for Centre Life's business and how these goals were exceeded. Defendant argues that the redactions refer to "other blocks of business and other individuals not involved in the Plaintiff's claim." If Plaintiff is correct, the information is extremely relevant; if Defendant is correct, the information was properly redacted. The only way to get at the truth is to order the disclosure of the redacted material and make it subject to a Protective Order and that is the path this Court takes.

## SUBPOENAED MATERIALS

Plaintiff seeks copies of materials that Defendant obtained via third-party subpoenas. Plaintiff says that Defendant complied with reference to two subpoenas and then ceased further disclosures. Defendant does not address Plaintiff's argument and therefore, it is unopposed. Being unopposed, Plaintiff's argument carries the day and his Motion is hereby granted.

## MISCELLANEOUS ITEMS

Plaintiff previously requested surveillance materials, a verification page and a list of 6th Circuit cases in which Defendant and DMS have been sued for bad faith. These items appear to be moot in light of representations made by Defendant. Defendant suggests that it reproduce copies of surveillance materials, but that if it has previously done so, Plaintiff be ordered to pay the costs. The Court adopts Defendant's plan for duplication of the surveillance tapes with reluctance, because the

Court does not wish to be drawn into a controversy centering on whether or not Defendant previously produced the tapes or not.

**IT IS THEREFORE ORDERED THAT:**

Plaintiff's Emergency Motion to Exclude the Testimony of Drs. Garb and Reed (Doc. 170) is denied. Defendant's Motion to Place Exhibit 3 Under Seal (Doc. 174) is granted. Plaintiff's Emergency Motion to Compel Production (Doc. 171) is granted in part and denied in part in accordance with this decision.

March 23, 2004                        _____s/Timothy S. Hogan_____
                                      Timothy S. Hogan
                                      United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ERIC L. JEFFRIES,                        :
                                         :    Case No. C-1-02-351
                    Plaintiff,           :
                                         :    (Judge Beckwith)
vs.                                      :    (Magistrate Judge Hogan)
                                         :
CENTRE LIFE INSURANCE COMPANY,           :    **STIPULATED PROTECTIVE**
et al.,                                  :    **ORDER PURSUANT TO**
                                         :    **MAGISTRATE JUDGE HOGAN'S**
                    Defendants.          :    **MARCH 23, 2004 ORDER**

1.      Pursuant to Magistrate Judge Hogan's March 23, 2004 Order ("3/23/04 Order"), a copy of which is attached and incorporated by reference, the following documents and information ("Confidential Information"), which are subject to the terms of the 3/23/04 Order, shall be made available to Plaintiff's counsel and other "Qualified Persons" (as defined in paragraph 3 below) who shall be bound by this Order and who shall not permit disclosure of such Confidential Information to anyone who is not also a Qualified Person hereunder.

2.      This Order applies to the financial information referenced in the 3/23/04 Order, the Administrative Services Agreement and previously redacted "performance evaluations."

3.      The term "Qualified Persons" as used in this Order shall include only the following:  (a) the parties to this action including their employees and consultants; (b) counsel of record for the parties to this action, and all other attorneys, paralegals, stenographic and clerical employees of the law firm of such counsel of record assisting in the preparation for trial of this action; (c) experts who are assisting counsel of record in this action; (d) the judge, and any court personnel and reporters assigned to this action and (e) any jurors selected to participate in the summary jury trial of this action.

4.    All Confidential Information shall be designated or labeled in the following manner: there shall be placed clearly on the face of such Confidential Information the designation "Confidential — Subject to Court Protective Order." If such Confidential Information consists of a document that has multiple pages, it shall be adequate to place the foregoing endorsement on only the first page of the document. If any Confidential Information is filed with the Court for any reason, it shall be placed in a sealed envelope, or other appropriate sealed container, which shall bear a similar endorsement referring specifically to this Order. Any envelope or container bearing such designation shall not be released to or opened by any person not a "Qualified Person," as defined in Paragraph 3 above.

5.    Confidential Information in the possession, custody or control of the parties and/or Qualified Persons, including all copies thereof, which are subject to this Order, shall be returned to defense counsel without any copies of the foregoing being retained by persons to whom Confidential Information was disclosed at the conclusion of the jury trial of this matter or sooner in the event Judge Beckwith determines the Confidential Information produced in accordance with the 3/25/04 Order is not relevant or admissible at the trial of this matter.

6.    It shall be the responsibility of each counsel of record who made any Confidential Information subject to this Order available to a Qualified Person hereunder to make sure that such Qualified Person understands and complies with this Order, including but not limited to, the obligation to return all such tangible confidential material to defense counsel.

Dated: 4/2/2004

_____
Timothy S. Hogan
Judge

Seen and Agreed By:


Michael A. Roberts
Graydon, Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45202-3157

Attorney for Plaintiff


William R. Ellis
Wood & Lamping LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491

Attorney for Defendants

203103.1

- 3 -

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Tuesday, June 15, 2004 5:03 PM
To: Andy Cohen
Cc: Michael Roberts
Subject: Re: Release

Andy

Before I begin looking at these, can you tell me what you mean by "previously disclosed to
Third parties.'  Are you talking about discussions with third parties before or after
April 19?  Our deal on the record on April 19 required confidentiality from that point
forward.  Has your client and outside counsel complied?

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com
Assistant Name: Tammy Gozdiff
Assistant Phone: (513) 629-2743
Assistant E-Mail: tgozdiff@graydon.com

## V. Brandon McGrath

**From:** Michael Roberts [mroberts@Graydon.com]
**Sent:** Tuesday, April 27, 2004 10:32 AM
**To:** William R. Ellis
**Cc:** ckrudy@aol.com; Michael Roberts; ematan@mgwlaw.com
**Subject:** RE: Overdue Discovery and Depositions


BIG BROTHER;

I AM LEAVING THE OFFICE NOW FOR AN ENGAGEMENT AT MY DAUGHTER'S SCHOOL.  I WILL RETURN AT 1 P.M.

I DO HAVE LITTLE REGARD FOR LAWYERS THAT HAVE NO REGARD FOR PROFESSIONALISM, ETHICS, OR THE TRUTH.  IF THAT MEANS TO YOU THAT I HAVE "EMOTIONAL DIFFICULTIES" WITH YOU SO BE IT. ALL LAWYERS I KNOW CALL ME BEFORE THEY SCHEDULE DEPOSITIONS IN CALIFORNIA ON 7 DAYS NOTICE.  ALL LAWYERS I KNOW PROVIDE DISCOVERY.

AND THIS CASE IS NOT GOING TO BE RESOLVED ON MOTIONS.  YOUR CLIENT HAS IN BAD FAITH DENIED BENEFITS IT OWES BY CONTRACT.  WE INTEND TO PROCEED WITH DISCOVERY AS ALL PARTIES AND COUNSEL PREDATING BIG BROTHER'S INVOLVEMENT AGREED TO DO.

YOUR PAL,
MIKE

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/27/04 10:28AM >>>
Mr. Roberts, It is apparent that you have some emotional difficulties in dealing with me on these cases. I would appreciate you addressing me in some professional manner as opposed to the telephonic name calling and written sarcasm. I am willing to work with you in attempting to resolve the discovery issues in a manner which is both fiscally responsible and practically achievable. As I told you on the phone and as I told Mr. Matan, I filed the notice of the expert's deposition solely to preserve my right to take him and would be happy to work with both of you on an alternative date. Per your advise, I am now advised that you are the lead counsel on this case and that all communication is to be accomplished through you. I will adhere to that policy unless advised otherwise.
    I would also suggest that this is a case of contract interpretation currently pending cross motions for Summary Judgment. The ruling of the court on these motions will probably end this matter and I believe that it is in the best interests of both of our clients to withhold spending tons of money on discovery and discovery issues prior to the ruling. The purpose of our function, as I see it, is to resolve disputes with the least expense to our clients. In this matter, the issue is clearly one of law and the courts ruling should resolve any outstanding dispute between our respective clients.
    As to your notices of 12 depositions of people from Massachusetts, North Carolina and Missouri, all set for your office on one to three days notice is obviously impossible. I will be happy to work with you to arrange any appropriate depositions in a way that is fiscally responsible to all concerned.
    Per your instructions I have called Judge Hogan's chambers to request a conference today to resolve the  issue of the depositions.

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Tuesday, April 27, 2004 9:35 AM
To: Peter M. Burrell; William R. Ellis
Cc: Michael Roberts

Subject: Overdue Discovery and Depositions


Big B:

Attached is our letter concerning long overdue discovery and depositions that have been
sought for months.  Where is the privilege log?  Also, ensure that your client produces
all electronically stored information on harddrive and tapes from back-up.

All my best, Mike

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

## V. Brandon McGrath

**From:** Michael Roberts [mroberts@Graydon.com]
**Sent:** Wednesday, April 28, 2004 10:44 AM
**To:** William R. Ellis
**Cc:** Michael Roberts; ematan@mgwlaw.com
**Subject:** RE: Jefferson-Pilot v. Kearney


Why do you need dozens of emails to understand our position.  Let me be clear:

1.  We require that the depositions we've requested take place before a summary judgment hearing.  The information you've refused to provide and which we have requested pursuant to Civil Rule 30, 33, and 34 is material parol evidence on the question which is the subject of that hearing - in addition to being material evidence on Mr. Kearney's claims. If we cannot accomplish the depositions I've requested by May 15, the hearing must be continued.

2.  Under NO circumstances will you be unilaterally entitled to depositions prior to the hearing and not provide Mr. Kearney with the Rule 30, 33, and 34 testimony and information he has requested.

If you still do not understand these simple points call me and I'll explain them to you more slowly.

Mike
>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/28/04 10:36AM >>>
Mr. Roberts, I can not state any more clearly that I am not denying you depositions. I am trying to accommodate you by arranging those depositions upon which we can agree. Not being all powerful I can only do what is possible to do. I have called the client and we are seeing what arrangements can be made. If there is still a problem with Miller and Kearney let's talk with Judge Hogan.

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Wednesday, April 28, 2004 10:19 AM
To: William R. Ellis
Cc: Michael Roberts; ematan@mgwlaw.com
Subject: RE: Jefferson-Pilot v. Kearney


Big Brother:

We need to hear today, otherwise neither Miller's deposition or Kearney's deposition will proceed.  Counsel - you can't take expect to be able to demand depositions and at the same time deny an opposing party from taking depositions.  If I am wrong on this point show me the Rule.


Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/28/04 10:22AM >>>
I will contact the client and get back to you today.

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Wednesday, April 28, 2004 10:13 AM

1

To: William R. Ellis
Subject: RE: Jefferson-Pilot v. Kearney


You have my offer: give me times to take the depositions I've requested by May 15 and proceed with Miller.  What is your answer?

>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/28/04 10:09AM >>>
Mr. Roberts, The notice of deposition of Mr. Miller stands. I will be willing to delay the deposition upon your written agreement that the deposition can be taken out of time. I have a court order permitting me to take the deposition of Mr. Kearney by the 10th and you advised me that that date was acceptable and notice has been sent. Unless ordered otherwise or by agreement of counsel to take the depositions at another time I have no option but to proceed. I would prefer the agreement.

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Wednesday, April 28, 2004 9:50 AM
To: William R. Ellis
Cc: ckrudy@aol.com; Michael Roberts; ematan@mgwlaw.com
Subject: RE: Jefferson-Pilot v. Kearney


We intend to proceed with the depositions before the hearing because I strongly suspect we will discover information material to the hearing.

Also where are my documents?  They too are likely relative to the hearing.

Without this documentary information and testimony, we will likely require a continuance on the hearing date.  My client's interests require that he have all information discoverable and proper before his rights are determined by a court.  Parol evidence is appropriate since the agreement does not unambiguously exclude COLA, SSS, premium waiver, or lifetime benefits.

Provide me with dates to depose the witnesses.

Do you now call me Mr. Roberts because of the Jeffries outcome?

Your pal, Mike

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/28/04 09:18AM >>>
Mr. Roberts, Productive means that the purpose of the discussion, i.e. to resolve whatever matters are at issue in a professional manner designed to expedite the process and to be fiscally responsible to our clients. I have from the beginning offered to adjust the dates of the California deposition to a convenient date, preferably after the motions for Summary Judgment have been ruled upon. The only reason for the notice and the date set was to insure that  would be able to get the deposition taken at all.
       I am aware of the time spent on the last case and the inability on both of our parts to move this case forward during the last two months. I am only trying to protect my ability to do discovery on this one. I will be agreeable to setting up a meaningful deposition schedule with you to accomplish these goals, but had no reason to believe that this could be done due to the refusal to even extend the time to respond to your motion or take the plaintiff's deposition. My objection to the notice you sent was a practical one. I could not arrange the people to be deposed on 24 hours notice. It was not related to the argument date, although, as I have suggested, it makes more sense to do the discovery, if needed, after the ruling.

2

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Tuesday, April 27, 2004 8:07 PM
To: William R. Ellis
Cc: mroberts@Graydon.com
Subject: RE: Jefferson-Pilot v. Kearney


** PRIVATE **

What does productive mean to you?  Does it mean I must capitulate to your demand that I
revise my schedule on 7 days notice to accommodate your unilateral request to take
depositions in California after the discovery cutoff while I must also continue to be
denied depositions which have been requested for 8 months?

Do you see anything asymmetrical in that?

How about my allowing you to take depositions before a MSJ hearing and you not permitting
me that courtesy - anything asymmetrical about that?

Your pal, Mike

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/27/04 06:07PM >>>
Mr. Roberts, I have or will in the next few minutes file a motion for protective order as
to the depositions you sought. I cannot agree to the proposal you made because I would
then not be able to object to some of the witnesses who only seem to be named for the
purposes of increasing costs or harassing the clients. As for the abrupt end to the phone
call I am too old and too tired to listen to abuse from anyone nor do I wish to bill my
clients for the time spent listening to you rant and rave. I will spend whatever time you
want on the phone or in person as long as the conversation is civil and productive.

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Tuesday, April 27, 2004 5:44 PM
To: William R. Ellis
Cc: Michael Roberts; ematan@mgwlaw.com
Subject: RE: Jefferson-Pilot v. Kearney


Big B

This confirms your call to me following my delivery of the email below:

I now understand that neither you nor your witnesses will appear at the depositions we
have sought for 8 months and noticed for this week: (i) even though you did not receive a
protective order or even file a motion for a protective order; and (ii) even though you
are unwilling to enter the agreement I outlined below.

After advising me of this you unilaterally and abruptly terminated our call.

As a result, the depositions we intended to permit you to proceed with
(Messrs. Miller and Kearney) too cannot go forward.

Regards, Mike

3

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> Michael Roberts 04/27/04 05:17PM >>>
Big Brother taking up the sword of civility?   How about
professionalism, ethics, and the truth, too while your at it since you have no regard for
those either!!

I have filed proper notices of deposition and expect to see you and your witnesses here
tomorrow, absent the entry of a protective order or other agreed arrangement.  Any agreed
arrangement must at minimum include firm dates to depose all requested witnesses in
Cincinnati (including Geraldine Johnson since any privilege has been waived: Doc. 29, Exh.
6) so that their depositions are concluded by May 15.

We simply will NOT proceed with Mr. Miller's deposition or Mr. Kearney's deposition absent
such an agreement.  I will absolutely NOT allow you to proceed with the depositions of
Messrs. Miller and Kearney prior to the MSJ hearing (and after the discovery deadline) and
also allow you to delay depositions I have requested of JP and DMS until after the hearing
or decision which could be months from now.  The court and all counsel involved in this
case agreed to a discovery schedule - Big Brother can't unilaterally change it.

We have not and do not agree to produce Mr. Miller and won't produce him absent this
agreement.  Accordingly, before you waste a trip to California, I suggest you show up
tomorrow or finally give us dates for these depositions which have only been sought for 8
months.

Your pal,
Mike

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "William R. Ellis" <WREllis@WoodLamping.com> 04/27/04 05:03PM >>>
Mr. Roberts, I will set up the deposition of Mr. Kearney for the 10th per your schedule. I
will oppose the deposition of trial counsel for the plaintiff for the obvious reasons. She
is not a witness to this case and should not be noticed for deposition. If I have missed
something that makes her a witness, please advise and I will discuss the issue with her.
Thank you for your cooperation. I am still willing to work with you an the depositions you
wish to take, however, I will object to those witnesses whose deposition is inappropriate
such as Mr. Dempsey, Mr. Bonsal, and anyone whose involvement ended over 4 years ago. I
have called the client and am awaiting their reply as to the involvement of the listed
witnesses and their current status and availability. We have the time to do this even
after the argument on the motions for Summary Judgment and doing so may save both of our
clients a significant amount of money and time relative to any possible remaining claims.
Please give this idea some consideration. I see that the idea of civility is still
something that is still of no interest to you, but I again request that you consider
amending your approach so that neither client suffers greater expense than is necessary.

-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Tuesday, April 27, 2004 4:25 PM
To: Christy L. Zerges
Cc: Michael Roberts; ematan@mgwlaw.com; William R. Ellis

4

Subject: Re: Jefferson-Pilot v. Kearney


Tell Big Brother that the 6th and 7th are out, but I can do the 10th. Also provide me with a date to take Geraldine Johnson's deposition before May 15.  If I do not receive a response concerning Ms. Johnson, I
will issue a notice for Friday.   Sincerely, Mike

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "Christy L. Zerges" <CLZerges@WoodLamping.comave> 04/27/04 10:50AM
>>> >>>
Mr. Roberts,

Per the request of Bill Ellis we would like to check dates of availability for the deposition of Christopher Kearney.  Please let us know if the dates of May 6 or 7, (any time), or May 10th after 1:30 p.m. will work for you and your client.  If we do not receive a response we will issue a notice for one of the above-mentioned dates.

Sincerely,

Christine L. Zerges

## V. Brandon McGrath

| | |
|---|---|
| **From:** | Amy Gasser Callow |
| **Sent:** | Tuesday, June 15, 2004 11:55 AM |
| **To:** | V. Brandon McGrath |
| **Subject:** | FW: Motion for extension of time |

```
-----Original Message-----
From: William R. Ellis
Sent: Thursday, February 05, 2004 1:31 PM
To: 'Michael Roberts'
Cc: Amy Gasser Callow
Subject: RE: Motion for extension of time
```

Mike, I understand that your interpretation of ethical behavior is to make as many allegations as you can dream up against your fellow attorneys. You and Mr. Matan both advised me that your client would not reschedule his deposition because it had been rescheduled several times in the past. This same statement was contained in a letter to the former counsel. If you wish to continue this senseless tactic on matters unrelated to the issues in a case, I cannot stop you, however it seems to me that to do so is to do a disservice to both of our clients and to the profession. The choice is yours.

As to your claim that your request to extend time to respond to the Jeffries MSJ was done as a courtesy to our firm, I can only point out that we filed our response on time. Two days past the due date you asked Peter for an extension of time to file yours and even threatened him by telling him that "the court doesn't like me already" and your motion for extension would only enhance the judges disfavor unless Peter agreed to the extension. I fail to see how permitting you to respond to our motion out of time is to our benefit.

I don't know if this is just your style of practice or if I have somehow offended your sense that no one should ever disagree with the way you interpret the real world. In either case it seems to me that both cases which we have at this time would be more easily and less expensively resolved by either settlement or litigation if you would stick to the issues and trade the insults for an argument on the merits of the case.

I am willing to attempt to get along with you and deal with the issues in the case, agreeing when possible and agreeing to disagree, without insult or accusation, when necessary, however, I will not engage in trading insults. I feel it is unprofessional and serves no purpose other than to increase the costs and decrease the professional civility in the case. I hope you take this E-mail in the spirit it is intended. I would very much like to proceed with these cases in an efficient and professional manner.

```
-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com]
Sent: Thursday, February 05, 2004 11:53 AM
To: Amy Gasser Callow
Cc: William R. Ellis
Subject: Re: Motion for extension of time
```

I went to law school. And ethics are paramount in the legal profession. I'm completely disgusted by your firm's complete disregard of rules of procedure and ethics, which has been apparent since March 2002. It's almost as if Ellis didn't go to law school (please send me his law school transcript for confirmation).

During the phone call with Ellis 2 days ago, Gene Matin and I offered to reschedule the deposition of Kearney for a date prior to the MSJ cutoff. Ellis even thought out loud about an alternative date. His self-serving letter and the motion completely misstates that part of the call. Also, it was a courtesy to your firm that I offered Peter the opportunity to join me in the extension motion in the Jeffries case. The letter mistakenly suggests it was for plaintiff's benefit. As for your claim that it was intended that I get a copy of the letter but it was an oversight, let's simply say that your explanation in not credible.

I request that you amend the motion to accurately reflect the call and correct the false

statement in the self-serving letter attached.  Absent an amendment, the pleading
misstates the facts which is sanctionable, and which I will raise with the Court.  Let me
know by 4 p.m. which direction you will take.

Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

>>> "Amy Gasser Callow" <AGCallow@WoodLamping.com> 02/05/04 11:13AM >>>

Mike -- Bill Ellis forwarded your e-mail to me.  You should have been cc'd on the letter
to Mr. Matan and Bill and I thought you had been. The secretary who sent the letter was
unaware that you were involved in this case as well.  This was simply an oversight and it
has been corrected.  I assume you now have a copy of the letter.

As for the rescheduling of Mr. Kearney's deposition, it was my understanding that we could
not reach agreement as to rescheduling. That is in part why we filed the motion.  If this
is not the case, and we can reach an agreement on rescheduling his deposition, please let
me know.

Finally, please note that my name appears on the pleading with which you take issue.  Bill
did not file this and your accusations toward him are unfounded.  I do not believe it is
necessary to file an amended pleading.  The letter simply advises the court of our
attempts to resolve this matter extra-judicially.

Amy Gasser Callow

-----Original Message-----
From: William R. Ellis
Sent: Thursday, February 05, 2004 9:44 AM
To: Amy Gasser Callow
Subject: FW: Activity in Case 1:02-cv-00479-SAS Jefferson-Pilot Lifev. Kearney, et al
"Motion for Extension of T



-----Original Message-----
From: Michael Roberts [mailto:mroberts@Graydon.com
<mailto:mroberts@Graydon.com> ]
Sent: Thursday, February 05, 2004 8:27 AM
To: William R. Ellis
Cc: Michael Roberts
Subject: Fwd: Activity in Case 1:02-cv-00479-SAS Jefferson-Pilot Lifev. Kearney, et al
"Motion for Extension of T



Ellis

As I have demonstrated several times in the Jeffries' case, your standard practice is to
lie in pleadings and letters.  Until yesterday, I had assumed that your improper behavior
was limited to the Jeffries case.  It isn't.

I have filed a notice of appearance in the Kearney case but you refuse to send me even
courtesy copies of letters you send to Mr. Kearney's
out-of town counsel.    I know why: your Feb 3 letter falsely claims that
we would not accommodate you with a date to take Mr. Kearney's deposition before the
summary judgment cutoff date.

You have then compounded your lie in your recent pleading by advising the Court that you
sent your Feb 3 letter to me.  That is false.  Let me know by noon if you will amend your

2

pleading or require that I advise J Spiegel of your initial file with your initial pleading in this case and your manner of practicing law as demonstrated in the Jeffries' case.

Your friend, Mike


Amy Gasser Callow
agcallow@woodlamping.com

Confidentiality Notice
The information contained in the E-mail message is attorney privileged and confidential information intended only for the use of the individual or entity names above.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us at 513-852-6000.

## V. Brandon McGrath

**From:** Michael Roberts [mroberts@Graydon.com]
**Sent:** Tuesday, May 18, 2004 10:01 AM
**To:** William R. Ellis
**Cc:** Michael Roberts
**Subject:** Is it incompetence?


Bill:

Yesterday your paralegal sent me a letter saying that the enclosed videotapes were the
tapes missing from the surveillance materials you provided on May 10.  They, however, were
not.  I still do not have any videotapes identified in the surveillance reports you
provided on May 10.  Yesterday, your paralegal gave me videotapes of Mr. Kearney at a May
2003 conference - but you have not given me the surveillance reports from that activity.
These are the same shenanigans you pulled in the Jeffries case.

Today I expect to receive: (i) the videotapes detailed in previously provided surveillance
reports; (ii) the surveillance reports that go with yesterday's videotapes; and (iii) all
surveillance reports and videotapes.

Finally, don't you think J Spiegel will think it odd and inconsistent with your position
in the case that you would conduct surveillance 9 months after filing a declaratory
judgment action???  Thanks for the help!

Regards, Mike



Michael A. Roberts
Graydon Head & Ritchey LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202-3157
Direct Dial (513) 629-2799
Fax (513) 651-3836
mroberts@graydon.com
www.graydon.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY,    )
                                      )
                       Plaintiff,     )
                                      )
        vs.                           )    CASE NO.
                                      )    C-1-02-479
CHRISTOPHER L. KEARNEY,               )    (Judge Spiegel)
                                      )
                       Defendant.     )

COPY

The deposition upon oral examination of JOHN L.

ROBERSON, being taken pursuant to Order and in accordance

with the Federal Rules of Civil Procedure before Rebecca J.

Huddy, Notary Public, at the Marriott, 304 North Greene

Street, Greensboro, North Carolina, on the 7th day of May,

2004, beginning at 8:40 a.m.

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Jefferson Pilot Insurance Company vs. Christopher L. Carney                        C-1-02-479
John L. Roberson                                                                                                5/7/2004

Page 37

```
 1    Q.    Well, they employed you for 38 years and they're still

 2          paying you.

 3    A.    I thought so, yes.

 4    Q.    Was Mr. Maxwell good at his job?

 5    A.    Yes.

 6    Q.    Mr. Shelton?

 7    A.    Yes.

 8    Q.    Ms. Harden?

 9    A.    Yes.

10                 Incidentally, with Mr. Maxwell, I understand

11          you're going to depose him, and I'm appalled that you

12          would do that to a man who is house-confined.  He's

13          confined to a chair.  He can hardly see.  I mean, he

14          didn't recognize me when I came in his house last

15          night, and he's a sick man.  He almost died last year,

16          three months in the hospital and -- you know, it's --

17    Q.    As long as you want to discuss this on the record, I

18          can tell you exactly what my conversation was.  I

19          called his phone number yesterday.  I spoke to his

20          wife, who's name is Mary, as you probably know.  I

21          said, Mrs. Maxwell, my name is Mike Roberts, I'm a

22          lawyer, I'm in Greensboro taking some depositions

23          relating to a Jefferson-Pilot matter.  I understand

24          that your husband is not well and I'm calling to ask

25          if it would be an imposition if I spent an hour with
```

Page 38

1          him tomorrow in a deposition, and I understand that if

2          he can't do it for medical reasons, we won't go

3          through with it, but I called to simply ask, and she

4          told me, I don't think there's a problem with that,

5          and then she left the phone for a minute, she came

6          back and said, I spoke to him, he says it's not a

7          problem.

8                    So sir, I am not trying to inconvenience

9          anybody you care for.  I called.  I told her that I

10          don't intend to do it if it's an imposition.  He told

11          me it would be okay.

12    A.    She told --

13    Q.    I know nothing about his medical condition.  I don't

14          know anything about him.  But I called and said, I'll

15          do it if it's not an imposition, I won't do it if it

16          is.  So I'm basing my decision to take his deposition

17          later today on his confirmation that it would be okay.

18    A.    She understood you to be representing Jefferson-Pilot

19          Life Insurance Company and he was doing it as a favor

20          to his company which he was retired to.  She did not

21          understand that you were a plaintiff's attorney.

22    Q.    Well, I'm not a plaintiff's attorney.

23    A.    Well, a --

24    Q.    I'm a lawyer, I graduated from the University of Notre

25          Dame, I'm the best lawyer in the state of Ohio.

Jefferson Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 39

```
 1   A.   Okay.

 2   Q.   What difference does it make?

 3   A.   Okay.

 4   Q.   I called and asked --

 5   A.   She would not have agreed to it if she had not known

 6        you were --

 7   Q.   Why not?  Why would --

 8   A.   Because she didn't want to put him through that

 9        process.

10   Q.   What difference does it make if he can give a

11        deposition whether it's at the request of a lawyer

12        representing a plaintiff or a lawyer representing a

13        defendant?  By the way, I'm not a plaintiff's

14        attorney.  I'm the defendant in this case.

15             Is there anything else you want to criticize

16        me for about mistreating people?

17   A.   I think I've expressed my opinion with regards to

18        Mr. Maxwell, yes.

19   Q.   Thank you.

20             And if a payment requires a -- if a monthly

21        payment is over a certain threshold, you have to as a

22        quality control make sure each monthly payment is

23        actually payable, right?

24   A.   Yes.

25   Q.   And what is the threshold?
```

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889      Fax (704) 372-4593

Jefferson Pilot Insurance Company vs. Christopher L. Garney    C-1-02-479
John L. Roberson    5/7/2004

Page 86

```
 1   Q.   Very well.

 2   A.   And information can be found on the policy form.

 3   Q.   All right.  And the same people that --

 4   A.   Policy Form 576.

 5   Q.   And the same people that prepared the policy are the

 6        ones that prepared the proposal, Jefferson-Pilot,

 7        correct?

 8   A.   No.  The policy is prepared -- is designed in the

 9        Actuarial Department.  The Actuarial Department does

10        not have anything to do with the proposal.

11   Q.   I thought you told me you didn't know who has input on

12        the proposal.  Your testimony now under oath, your

13        sworn testimony is, the Actuarial Department has

14        nothing to do with the creation of the proposal?

15   A.   It's done in the Marketing Department.  Actuarial

16        would not.

17   Q.   Okay.  You told me earlier that Actuarial was --

18   A.   If I did --

19   Q.   Your testimony is your testimony.

20             MR. ELLIS:  No, you didn't.  Don't worry

21        about it.

22             MR. ROBERTS:  Don't worry about it.  I'm Big

23        Brother.

24   Q.   Thank you.  Where in the proposal or the policy or any

25        rider does it say you don't get the Social Security
```

**Reported By: Rebecca J. Huddy**

Huseby, Inc. An Affiliate of Spherion,  1230 W.  Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
John L. Roberson    5/7/2004

Page 89

1        period in the residual disability rider?

2    A.   You asked for a limitation.  The difference --

3    Q.   I asked about the definition of maximum benefit

4         period.  Where is that defined in the residual

5         disability rider?

6    A.   In the third paragraph it appears --

7    Q.   What does it say?

8    A.   It says total disability and residual -- during period

9         of residual disability Jefferson-Pilot will continue

10        to pay the residual disability monthly benefit for

11        each month you are residually disabled until the

12        combination of total disability and residual

13        disability benefits equal to the maximum benefit

14        period.

15   Q.   Okay.  Where is the maximum --

16             MR. ELLIS:  Wait a minute.  Let him finish.

17             MR. ROBERTS:  Sorry, Big Brother.

18   A.   However, the residual benefit will not be payable for

19        longer than 24 months if you are age 55 or older when

20        the period of disability began and the residual

21        disability is not preceded by at least 180 days of

22        total disability.  So there is that limitation in the

23        residual benefit for age 55 or older.  I may have said

24        45 earlier.

25   Q.   Okay.  That doesn't apply here, okay?  Mr. Kearney

Jefferson Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                       5/7/2004

Page 96

1                    MR. ROBERTS:  Objection.

2    A.   No, sir.

3    Q.   Looking at the riders, what is required before someone

4         becomes eligible for residual disability?

5                    MR. ROBERTS:  Do you want him to read from

6         the document you have marked up with some notes?  Can

7         I see it before the witness reads from the document

8         that's marked up?

9                    MR. ELLIS:  I'm sorry, we'll use yours.  I

10        don't care.  I'm just trying to be -- can I have

11        Exhibits 3 and 4, please.

12                   MR. ROBERTS:  Typical Bill.

13                   MR. ELLIS:  He certainly doesn't need my

14        annotations.

15                   MR. ROBERTS:  Say again.

16                   MR. ELLIS:  He certainly doesn't need my

17        annotations.

18                   MR. ROBERTS:  He knew how to pay the policy

19        until you told him otherwise two days ago, so

20        apparently he does need your annotations.

21                   THE WITNESS:  I still know how to pay the

22        policy, but I made a mistake.

23                   MR. ROBERTS:  300 mistakes.

24                   MR. ELLIS:  If that's the number.  I didn't

25        make -- well, okay.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY,    )
                                      )
                          Plaintiff,  )
                                      )
            vs.                       )   CASE NO.
                                      )   C-1-02-479
CHRISTOPHER L. KEARNEY,               )   (Judge Spiegel)
                                      )
                          Defendant.  )

COPY

The deposition upon oral examination of VALERIE

LOFTIN, being taken pursuant to Order and in accordance

with the Federal Rules of Civil Procedure before Rebecca J.

Huddy, Notary Public, at the Stratis Business Center, 7800

Airport Center Drive, Greensboro, North Carolina, on the

6th day of May, 2004, beginning at 11:00 a.m.

**Reported By: Rebecca J. Huddy**

Huseby, Inc. An Affiliate of Spherion,  1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 10

```
 1          Jefferson-Pilot Financial Insurance Company.

 2   Q.     Okay.  So how many different corporate entities are

 3          there for which there would be individual claims under

 4          the Jefferson-Pilot umbrella?

 5   A.     There would be three.

 6   Q.     The three you've mentioned?

 7   A.     Yes.

 8   Q.     Okay.  How many people are employed by Jefferson-Pilot

 9          Life Insurance Company?

10   A.     I can't give you that figure off the top of my head.

11   Q.     Is it more or less than a thousand?

12   A.     It's more than a thousand.

13   Q.     Okay.  Who owns the stock of Jefferson-Pilot Life

14          Insurance Company?

15   A.     The holding company, Jefferson-Pilot Financial --

16          Jefferson-Pilot Corporation.  The brand name is

17          Jefferson-Pilot Financial.

18   Q.     Okay.  Is that a publicly traded company?

19   A.     Yes, it is.

20   Q.     JP Financial is the name of the holding -- the

21          corporate name of the holding company?

22   A.     Jefferson-Pilot Corporation is the legal name.  The

23          brand name is Jefferson-Pilot Financial.

24   Q.     Do you have any personal knowledge of the

25          administration of Mr. Jefferies' claim?
```

Page 11

```
 1                   MR. ELLIS:  Mr. Who?

 2    Q.   Excuse me, Mr. Kearney's claim?

 3    A.   I have not reviewed the claim file and I was not

 4         involved in the administration of Mr. Kearney's claim.

 5    Q.   You haven't reviewed anything about the claim file?

 6    A.   No.

 7    Q.   You haven't reviewed any of the pleadings in the

 8         litigation?

 9    A.   I have reviewed the pleadings.  I have not reviewed

10         the claim file.

11    Q.   Okay.  Who is it that on behalf of the plaintiff

12         responded to the discovery request in the case?  Was

13         that you?

14    A.   No.

15    Q.   Do you know who it was that provided the interrogatory

16         responses?

17    A.   I don't know.

18    Q.   It's never been identified, they're not verified.

19         It's not you, though?

20    A.   It's not me.

21    Q.   You have no idea who it might be?

22    A.   No.

23                   MR. ROBERTS:  Bill, on that Notice of

24         Deposition -- we'll make this Exhibit 1.

25
```

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion,  1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 102

1    Q.    Okay.  And Mr. Big Brother, outside counsel?

2    A.    Yes.

3    Q.    Anyone else?

4          MR. ELLIS:  For the record, my name is Ellis.

5    A.    No, it would just be our internal counsel and

6          Mr. Ellis.

7    Q.    Someone at DMS has interpreted your policy contrary to

8          the way that Jefferson-Pilot's people interpreted for

9          nine or ten years.  That triggered the filing of a

10         lawsuit by Jefferson-Pilot.  DMS has been brought into

11         the lawsuit.  You're responsible for the DMS

12         relationship, and your sworn testimony is that you've

13         never had any dialogue, e-mail, written

14         correspondence, phone call with anyone at DMS about

15         this lawsuit or Mr. Kearney's claim?

16         MR. ELLIS:  Objection, misstates the

17         evidence.

18   A.    Not that I recall.  I don't recall specific

19         conversations with anyone at DMS about Mr. Kearney's

20         claim or e-mails or correspondence.

21   Q.    Do you recall nonspecific conversations?

22   A.    I don't recall talking to anyone at DMS about Mr.

23         Kearney's claim.

24   Q.    And do you recall speaking to anyone at DMS about the

25         issues involved in Mr. Kearney's claim, that is, the

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
Valerie Loftin                                                       5/6/2004

Page 132

 1                    MR. ELLIS:  Hardly.

 2                    MR. ROBERTS:  Listen, I'm not looking to you

 3           for logic, buddy.  I'm talking to somebody who

 4           actually went to law school and took an oath.

 5    Q.     "If applicable" could mean if you purchased that

 6           additional Social Security Supplement benefit rider,

 7           that's what "if applicable" could mean, couldn't it?

 8    A.     (No response)

 9    Q.     Yes?  Why are you delaying in answering that question?

10                    MR. ELLIS:  Excuse me.  Give her a chance to

11           think about your question and answer.

12    A.     I don't understand the question.

13    Q.     Okay.  If you don't understand the question and that's

14           what your sworn testimony is, go ahead.

15                    MR. KEARNEY:  How do you think I feel?

16                    MR. ROBERTS:  Chris, stop it.

17    Q.     Tell me if I read the example correctly.  See where it

18           says Example two paragraphs down there?  "Example:  If

19           your monthly earned income during residual disability

20           is 60 percent of your pre-disability earnings, you

21           have a 40 percent loss of earnings.  During the first

22           six months of residual disability only,

23           Jefferson-Pilot will pay you a minimum benefit equal

24           to 50 percent of your benefit for total disability.

25           Thereafter it would be equal to 40 percent of your

Jefferson Pilot Insurance Company vs. Christopher L. Kearney                    C-1-02-479
Valerie Loftin                                                                              5/6/2004

Page 164

1   Q.   -- so that --

2            MR. ROBERTS:  Can we go off the record for a

3        second?

4            MR. ELLIS:  No.  Stay on the record.

5            MR. ROBERTS:  We're going to go off the

6        record.

7            MR. ELLIS:  No.

8            MR. ROBERTS:  Okay.  Shut up.

9   Q.   Okay.  Ready?

10  A.   Yes, sir.

11  Q.   We've already established that everything on the

12       schedule -- and there's a whole bunch of things on the

13       schedule that apply to residual disability -- and

14       everything in the policy -- and there's a whole bunch

15       of things in the policy, like elimination period,

16       monthly benefit -- we went through this -- that,

17       although couched in terms of total disability, apply

18       to residual disability, so that doesn't make a

19       difference here.  Is there anything on this rider that

20       says Social Security Supplement is not payable if

21       you're residually disabled?

22  A.   I think the contract speaks for itself.

23  Q.   Okay.

24           MR. ROBERTS:  Bill, I won't say shut up if

25       you do what you're supposed to do and simply say

Jefferson Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
Valerie Loftin                                5/6/2004

Page 165

1          "objection" to preserve the objection for

2          determination by a judge later in the case.  Anything

3          you say after the word "objection" -- this is like the

4          80th time I've told you this -- anything that comes

5          after the word "objection" is improper coaching of the

6          witness, and you know it, and you're sitting there

7          like a Cheshire cat smiling with your arms above your

8          head like you know something that I don't know, and

9          what we both know is that you don't follow procedure.

10                 In fact, Judge Beckwith said to you three

11         weeks ago, Mr. Ellis, you have filed five false

12         declarations in a lawsuit.

13                 MR. ELLIS:  Are you finished?  Judge Beckwith

14         never said it, you did.

15                 MR. ROBERTS:  She said yeah, you have.  What

16         about that?

17                 MR. ELLIS:  No, I don't believe you're right.

18                 MR. ROBERTS:  It was recorded.

19                 MR. ELLIS:  Good.  Bring it up.  Now are you

20         finished or do you want to keep going?

21                 MR. ROBERTS:  No.  Do you have any lawsuits

22         going on?  I want to add as cocounsel in whatever case

23         you have.

24                 (Defendant's Exhibit No. 15 was marked for

25         identification by Mr. Roberts.)

Page 172

```
 1          scope of the 30(b)(6) Notice.

 2                MR. ROBERTS:  It has to do with the

 3          administration of the claim.  I asked for the person

 4          who had knowledge of the administration of the claim.

 5                MR. ELLIS:  Didn't (inaudible) JP that has

 6          that that you're not already getting.

 7                MR. ROBERTS:  Whatever, Big Brother.

 8   Q.     I'm going to read to you a sentence and I want your

 9          judgment of what it may mean in the context of this

10          case.  On the second page, the second paragraph,

11          halfway through in the middle of the line, the ninth

12          line, there's a sentence that says, "In order to strip

13          Mr. Kearney of the ability to allege bad faith or at

14          least best position ourselves to defend such a claim,

15          it's my recommendation that we continue to pay Mr.

16          Kearney the monthly amount we have been paying under a

17          full and complete reservation of rights

18          contemporaneous with our pursuit of a declaratory

19          judgment action."  Is that why Mr. Kearney's benefits

20          have continued at the June 2001 level through the

21          course of this lawsuit?

22                MR. ELLIS:  Objection.

23   A.     Is what why?

24   Q.     In order to strip Mr. Kearney of the ability to allege

25          bad faith or at least best position the company to
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY,    )
                                      )
                    Plaintiff,        )
                                      )
         vs.                          )   CASE NO.
                                      )   C-1-02-479
CHRISTOPHER L. KEARNEY,               )   (Judge Spiegel)
                                      )
                    Defendant.        )

COPY

         The deposition upon oral examination of HAROLD

SHELTON, being taken pursuant to Order and in accordance

with the Federal Rules of Civil Procedure before Rebecca J.

Huddy, Notary Public, at the Marriott, 304 North Greene

Street, Greensboro, North Carolina, on the 7th day of May,

2004, beginning at 12:20 p.m.

Page 23

```
 1      schedule?

 2             MR. ELLIS:  Let him answer one question at a

 3      time, and don't throw me the finger again.

 4             MR. ROBERTS:  What are you talking about?

 5  A.  Question again, please.

 6  Q.  The residual disability rider -- you went from the

 7      policy and I asked you where is the residual

 8      disability definition for monthly benefit, and you

 9      turned to residual disability rider and it says

10      monthly benefit is the amount shown in the schedule,

11      right?  Towards the bottom of the first column, the

12      residual disability rider, there's a paragraph that

13      says Residual Disability Monthly Benefit, do you see

14      that?

15  A.  I'm looking at that.

16  Q.  The sentence above that says "'Monthly Benefit' is the

17      amount shown in the schedule as such."  That's the

18      language of the rider.  Can you turn to -- we need

19      then to turn to the schedule to determine what the

20      residual disability monthly benefit definition is,

21      right?

22  A.  The monthly benefit is the amount shown in the

23      schedule as such.

24  Q.  Okay.  So we went from the policy to the rider and the

25      rider tells us to go to the schedule.  Let's go back
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEFFERSON-PILOT LIFE INSURANCE    :
COMPANY,    :    Case No. C-1-02-479
    :
    Plaintiff,    :    (Judge Spiegel)
    :    (Magistrate Judge Hogan)
vs.    :
    :    **AFFIDAVIT OF ADAM FORMUS**
CHRISTOPHER L. KEARNEY,    :
    :
    Defendant.    :


COMMONWEALTH OF MASSACHUSETTS    )
    ) ss:
COUNTY OF HAMPDEN    )

I, Adam Formus, being first duly cautioned and sworn, state as follows:

1.    I am employed by Disability Management Services, Inc. as in-house counsel.

2.    On May 13 and 14, 2004, I observed the depositions of DMS employees Todd Ditmar, Robert Bonsal and Robert Mills in Springfield, Massachusetts.

3.    The attorney taking these depositions was Mike Roberts. I had never met Mr. Roberts before these depositions.

4.    During the course of these depositions, I observed Mr. Roberts treating opposing counsel, Mr. Ellis, in an extremely rude and condescending manner. I observed Mr. Roberts using foul and inappropriate language directed both toward Mr. Ellis and Mr. Ditmar.

5.    In particular, at one point off the record, Mr. Roberts used profane terms to describe Mr. Ellis and Mr. Ditmar.

6.    Some of the inappropriate phrases that I recall being uttered by Mr. Roberts were:

"Dick."

"Bill you are an asshole."

"Okay Big Brother."

"I could line up all the lawyers in town describing you as being an asshole."

"You could have saved your client a million dollars but for you being a asshole."

7.    During the phone conference with the Court, Mr. Roberts categorically denied making any of the above statements or calling anyone names. I believe Mr. Roberts lied to the Court.

8.    I am employed in the insurance industry and as such have participated in contentious depositions. That being said, I have never observed the extreme rudeness and disrespect for the judicial system that I observed during these depositions on the part of Mr. Roberts.

9.    After the telephone conference with the Court during which he denied any impropriety and in the presence of no other persons, Mr. Roberts apologized to me for using inappropriate language toward Mr. Ditmar.

Further affiant sayeth naught.



CAROL M. PORTELADA
Notary Public
Commonwealth of Massachusetts
My Commission Expires Jan 21, 2005

Adam Formus

Sworn to and subscribed in my presence this _4th_ day of ___JUNE___ 2004.

Notary Public

208482.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON-PILOT LIFE INSURANCE COMPANY, | : | Case No. C-1-02-479 |
| | : | |
| Plaintiff, | : | (Judge Spiegel) |
| | : | (Magistrate Judge Hogan) |
| vs. | : | |
| | : | **AFFIDAVIT OF TODD DITMAR** |
| CHRISTOPHER L. KEARNEY, | : | |
| | : | |
| Defendant. | : | |

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS | ) |
| | ) ss: |
| COUNTY OF HAMPDEN | ) |

I, Todd Ditmar, being first duly cautioned and sworn, state as follows:

1.    I am employed by Disability Management Services, Inc. ("DMS")

2.    On May 13, 2004, I appeared pursuant to a deposition notice to give my deposition in the above-captioned case.  I also served as a 30(b)(6) witness for DMS.

3.    The attorney taking my deposition was Mike Roberts.  I had never met Mr. Roberts before this deposition.

4.    During the course of my deposition, I observed Mr. Roberts treating opposing counsel, Mr. Ellis, in an extremely rude and condescending manner.  I observed Mr. Roberts using foul and inappropriate language directed both toward Mr. Ellis and myself.

5.    In particular, at one point off the record, Mr. Roberts used a vulgar term to describe myself.  In another off the record conversation, he used a different vulgar term to describe Mr. Ellis.

6.    During the phone conference with the Court, Mr. Roberts denied any impropriety or name calling.  I believe Mr. Roberts lied to the Court.

7.    After the phone conference with the Court during which Mr. Roberts denied using profanity, and in the presence of no other persons, Mr. Roberts apologized to me for referring to me in a vulgar manner.

Further affiant sayeth naught.



Todd Ditmar

Sworn to and subscribed in my presence this 4th day of June 2004.

PAMELA D. CULVER
Notary Public
Commonwealth of Massachusetts
My Commission Expires Apr 14, 2006

Notary Public

208443.1

- 2 -

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION

 3

 4                                  Case No. C-1-02-479

 5    JEFFERSON-PILOT LIFE INSURANCE CO., )
                               Plaintiff )
 6                                       )
      v.                                 )
 7                                       )
      CHRISTOPHER L. KEARNEY,            )
 8                          Defendant )

 9

10

11           DEPOSITION OF:  ROBERT MILLS, taken before

12    Sharon R. Roy, Notary Public Stenographer, pursuant

13    to Rule 30 of the Massachusetts Rules of Civil

14    Procedure, at the law offices of ACCURATE COURT

15    REPORTING, 1500 Main Street, Springfield,

16    Massachusetts on May 14, 2004 commencing at 8:38 p.m.

17

18

19    A P P E A R A N C E S:

20    (See Page 2)

21

22

23                   Sharon R. Roy
                Certified Shorthand Reporter
24           Registered Professional Reporter
```

5

1      the course of two depositions Mr. Formus sat

2      away from the table in the corner of the room

3      taking down on his laptop every word that was

4      said in the room.  That's not a problem.  The

5      problem is he was connected to the Internet

6      and connected to his office during

7      yesterday's proceedings.

8           I took one long deposition

9      yesterday of Mr. Ditmar, and at the second

10     deposition I asked the witness if he had any

11     communications regarding the conduct of the

12     proceeding.  It was my understanding from the

13     testimony that Mr. Formus's Internet

14     connection back to the office and his

15     word-for-word transcription of the day's

16     proceedings were communicated to Mr. Bonsall.

17     For that reason this morning when I arrived I

18     requested that Mr. Formus, if he desired to

19     take down every word that is spoken today in

20     addition to the court reporter doing so, he

21     could do so on his laptop and save that

22     information to his laptop either on a disc or

23     not to a disc, he could save it to the hard

24     drive on the laptop.  That was unacceptable

9

1          of privilege.  And for that reason I'll be

2          filing a motion with the Court, but all these

3          depositions will be convened in progress

4          since the defendant has still not complied

5          with its very clear and unambiguous

6          discovery obligations.

7                    Are you ready, Mr. Mills?

8                    THE WITNESS:  Yes.

9                    MR. ELLIS:  Excuse me, we'll

10         respond.

11                   MR. FORMUS:  As in-house counsel for

12         Disability Management Services I categorically

13         deny and reject Mr. Roberts' statement that I

14         shared any information whatsoever with either

15         Mr. Bonsall or Mr. Ditmar at any time

16         yesterday either personally and/or via the

17         Internet that's connected to the hard drive in

18         my office.  The laptop is for purposes of

19         saving my notes with regards to yesterday's

20         depositions directly to my hard drive.  I

21         neither communicated directly or indirectly

22         with Mr. Bonsall yesterday.  Therefore,

23         Mr. Roberts' allegation was patently false.

24                   MR. ELLIS:  With regard to the

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION

 3

 4                                   Case No. C-1-02-479

 5    JEFFERSON-PILOT LIFE INSURANCE CO., )
                             Plaintiff )
 6                                       )
      v.                                 )
 7                                       )
      CHRISTOPHER L. KEARNEY,            )
 8                          Defendant )

 9

10

11              DEPOSITION OF:  ROBERT BONSALL, taken before

12    Sharon R. Roy, Notary Public Stenographer, pursuant

13    to Rule 30 of the Massachusetts Rules of Civil

14    Procedure, at the law offices of ACCURATE COURT

15    REPORTING, 1500 Main Street, Springfield,

16    Massachusetts on May 13, 2004 commencing at 3:55 p.m.

17

18

19    A P P E A R A N C E S:

20    (See Page 2)

21

22

23                      Sharon R. Roy
                   Certified Shorthand Reporter
24               Registered Professional Reporter
```

6

 1    20 percent to an entity affiliated with Zurik

 2    Financial Services so that you and Mr. Anderson each

 3    owned 30 percent and that entity affiliated with

 4    Zurik owned 40 percent, is that right?

 5         A.   You got the percentages right.  The name of

 6    the entity, I think it's all within the Zurik family

 7    of companies, if you will, so I think essentially

 8    it's correct.

 9         Q.   It's like Center Bermuda Solutions Limited,

10    or something like that?

11         A.   Center Reinsurance Limited Bermuda, or

12    something like that.  Close.

13         Q.   Sir, have you gotten any reports today

14    about Mr. Ditmar's testimony throughout the day?

15         A.   Reports, you mean --

16         Q.   Written reports or oral reports.  A

17    gentleman in your general counsel office has been

18    sitting over here connected to the Internet taking

19    copious notes, and I'm curious whether or not you've

20    been receiving directly from him or through some

21    intermediary reports of the testimony that we just

22    undertook for the last six or seven hours.

23         A.   The only thing that I'm aware of, there are

24    two things, I guess, that there was some discussion

7

1    about name calling and some discussion about things

2    being -- Mr. Ditmar being asked about things that

3    didn't pertain to this matter, pertaining to another

4    matter.

5        Q.   Those are the only two things that have

6    been shared with you about his six hours of

7    testimony?

8        A.   Yes.

9        Q.   When did you first receive -- what is your

10   memory of the first time you ever heard about a

11   claimant named Chris Kearney?

12       A.   It was recently.  I think it's when I was

13   informed that I was to be deposed in connection with

14   the case, the first I heard of it.

15       Q.   Prior to Mr. Kearney's counsel seeking your

16   deposition in this action, you have no memory that

17   his claim ever reached your level?

18       A.   The name is not familiar to me and I don't

19   have any -- I had no prior knowledge of it.

20       Q.   Have you ever had a discussion with anyone

21   regarding the existence of ambiguities in policies

22   issued by Jefferson-Pilot?

23       A.   I don't believe so, no.

24       Q.   Would you condone your employees'

Westlaw.

OH Adv. Op. 96-1                                                        Page 1
(Cite as: 1996 WL 92872 (Ohio Bd.Com.Griev.Disp.))


The Supreme Court of Ohio
Board of Commissioners on Grievances and Discipline


*1 Opinion Number 96-1
February 2, 1996


SYLLABUS:

While representing a client in a matter adverse to a corporation, an attorney may
communicate on the subject matter of the representation with former employees of
the corporation without notification or consent of corporate counsel. Such
communication would not violate DR 7-104(A)(1) when conducted within the
boundaries set forth. An attorney may not communicate ex parte if a former
employee is represented by his or her own counsel in the matter, unless that
counsel consents. An attorney may not communicate ex parte if a former employee
has asked the corporation's counsel to provide representation in the matter,
unless that counsel consents. An attorney must obtain the consent of the former
employee to the interview. An attorney must inform the former employee not to
divulge any communications that the former employee may have had with corporate or
other counsel. An attorney must fully explain to the former employee that he or
she represents a client adverse to the corporation. Under DR 7-104(A)(2), an
attorney must not give advice to the unrepresented former employee other than
advice to seek counsel in the matter.


OPINION:


  This opinion addresses ex parte communications between attorneys and former
employees of a corporation.
      While representing a client in matters adverse to a corporation, is it proper
  for an attorney to communicate on the subject matter of representation with
  former employees of the corporation without notification or consent of
  corporate counsel?

  Ex parte communication with current and former employees was addressed by this
Board in Opinion 90-20. In Opinion 90-20 the Board advised that
      [I]t is our opinion that when litigation against a corporation is contemplated
  or after a lawsuit is filed, a lawyer representing an interest adverse to the
  corporation must notify the corporation's counsel when seeking to interview
  management employees, employees who can "speak for" or bind the corporation,
  employees whose opinions form the basis of management decisions and employees
  whose act or omission in connection with the controversy may be imputed to, or
  an admission of, the corporation. Most other present employees and most former
  employees, who are not themselves represented by counsel, may be interviewed ex

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

parte. However, notification of the corporation's counsel may be required
before interviewing former employees who were privy to privileged
communications with the corporation's counsel or employees whose conduct gives
rise to the claim against the corporation. In all instances, a lawyer
conducting interviews must carefully avoid misleading the interviewees.
[Emphasis added].

Thus, the Board's restrictions as to ex parte communication with current
employees were clearly defined in Opinion 90-20. Attorneys were required to notify
the corporate counsel when seeking to interview current employees in any of the
following categories: management employees, employees who "speak for" or bind the
corporation, employees whose opinions form the basis of management decisions, and
employees whose act or omission in connection with the controversy may be imputed
to or be an admission of the corporation.

*2 However, the Board's restrictions as to ex parte communication with former
employees were less clear. Because the Board said notification "may" be required
to interview certain former employees, there has been uncertainty as to when
notification is required and whether notification also implies that consent is
needed. For this reason, the Board reconsiders the issue of ex parte communication
with former employees of a corporate employee.

The ethical rule that governs communication with adverse parties is DR 7-104 of
the Ohio Code of Professional Responsibility.


DR 7-104 COMMUNICATING WITH ONE OF ADVERSE INTEREST

    (A) During the course of his [her] representation of a client a lawyer shall
not:
       (1) Communicate or cause another to communicate on the subject of the
       representation with a party he [she] knows to be represented by a lawyer in
       that matter unless he [she] has the prior consent of the lawyer representing
       such other party or is authorized by law to do so.
       (2) Give advice to a person who is not represented by a lawyer, other than
       the advice to secure counsel, if the interests of such person are or have a
       reasonable possibility of being in conflict with the interests of his client.

An explanation of the underlying purpose of DR 7-104 is found in EC 7- 18: "The
legal system in its broadest sense functions best when persons in need of legal
advice or assistance are represented by their own counsel. For this reason a
lawyer should not communicate on the subject matter of the representation of his
[her] client with a person he [she] knows to be represented in the matter by a
lawyer, unless pursuant to law or rule of court or unless he [she] has the consent
of the lawyer for that person."

The ABA Model Rule 4.2 is similar to DR 7-104(A), with the exception that in
August 1995 the word "party" was replaced by the word "person."


RULE 4.2 Communication with Person Represented by Counsel

    In representing a client, a lawyer shall not communicate about the subject of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the representation with a person the lawyer knows to be represented by another
lawyer in the matter, unless the lawyer has the consent of the other lawyer or
is authorized by law to do so.

The Comment to this rule sets forth categories of employees within an
organization with whom ex parte communication would be improper, but makes no
reference to former employees. In pertinent part, the Comment states that
    In the case of an organization, this Rule prohibits communications by a lawyer
    for another person or entity concerning the matter in representation with
    persons having a managerial responsibility on behalf of the organization, and
    with any other person whose act or omission in connection with that matter may
    be imputed to the organization for purposes of civil or criminal liability or
    whose statement may constitute an admission on the part of the organization.

**3** Twice, the ABA ethics committee has advised that Model Rule 4.2 does not
prohibit contacts with former employees of a represented corporation, even if
those former employees were in one of the categories in which communication was
prohibited while employed. See ABA, Comm. on Ethics and Professional
Responsibility, Formal Op. 95-396 (1995) f.n. 47 and Formal Op. 91-359 (1991).
Albeit, these opinions preceded the change in the rule's language from "party" to
"person." But if a former employee was not considered a "party" represented by
corporate counsel under the old rule, it follows that the former employee would
not be considered a "person" represented by corporate counsel under the new rule.

Similar to the ABA approach, some states permit contact with all former employees
of a corporation without the permission of corporate counsel, but most add
cautionary language that it is proper so long as the former employee is not
represented in the matter by counsel and the attorney does not inquire into
matters that may be privileged. See Alaska Bar Ass'n, Op. 91-1 (1991); Nebraska
State Bar Ass'n, Op. 94-5 (undated), Oregon State Bar, Op. 1991-80 (1991);
Philadelphia Bar Ass'n, Op. 93-9 (1993). One state cautions that the former
employee must consent to the interview after the lawyer has fully explained the
lawyer's purpose. State Bar of Georgia, Op. 94-3 (1994). Other states caution that
a lawyer may not state or imply that he or she is disinterested. Maryland State
Bar Ass'n, Op. 90-29 (1990), Mississippi State Bar, Op. 215 (1994), State Bar of
North Dakota, Op. 92-13 (1992), Ethics Advisory Panel of Rhode Island SupCt, Op.
91-74 (1991).

In contrast, other states maintain the view that there is a category of former
employees with whom ex parte contact is improper. These states prohibit ex parte
communication with former employees whose acts or omissions in connection with the
matter may be imputed to the corporation. Kansas Bar Ass'n, Op. 92-7 (1992),
Advisory Comm. of Professional Ethics, New Jersey SupCt, Op. 668 (1992) (advising
that it is also improper if the former employee has access to litigation
confidences), South Carolina Bar, Ops. 94-25 (1994) and 92-31 (1992).

In Ohio, the issue has received attention from two federal courts. In  Kitchen v.
Aristech Chemical, 769 F. Supp. 254 (S.D. Oh. 1991), the court rejected
defendant's motion to disqualify plaintiff's counsel for ex parte communication
with the former employee of a defendant chemical company, but the court did not
resolve the issue of whether the communication violated DR 7- 104 because in the
court's view the conduct was not so egregious to warrant disqualification, even

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

OH Adv. Op. 96-1                                                            Page 4
**(Cite as: 1996 WL 92872 (Ohio Bd.Com.Griev.Disp.))**

assuming arguendo that it did violate the rule. Kitchen, 769 F. Supp at 258. In
Summers v. Rockwell International Corp., No. C-2-92-301, slip op. at 6 (U.S.D.C.,
S.D. Ohio Apr. 9, 1993), the magistrate chose a case-by-case approach, rejecting
the defendant's request for adoption of a "bright-line" test prohibiting ex parte
contact with all former employees. Instead, the magistrate permitted ex parte
contact with former employees under conditions that the plaintiff's counsel would
provide written notice making certain disclosures to former employees in advance
of the interview and obtain the employees' consent. Summers, slip op. at 6-11.

  *4 In construing DR 7-104(A), this Board's view is that notification and consent
of corporate counsel is not required prior to interviewing a former employee of a
corporation. A former employee is no longer part of the corporation and no longer
speaks for the corporation. A former employee may have interests that differ from
the corporation. A former employee may have obtained his or her own counsel in the
matter or may have chosen to represent himself or herself. For these reasons, a
former employee of a corporation is not considered a party for purposes of the
rule.

  Therefore, this Board is modifying the view expressed in Opinion 90-20 that
notification may be required before interviewing former employees who were privy
to privileged communications with the corporation's lawyers and former employees
whose conduct gives rise to the claim against the corporation. Such advice leaves
uncertainty among the bar and may at times unnecessarily impede discovery in legal
matters. It is the Board's view that ethical concerns are better addressed by
establishing the proper boundaries within which the communication may occur.

  In conclusion, this Board advises that while representing a client in a matter
adverse to a corporation, an attorney may communicate on the subject matter of the
representation with former employees of the corporation without notification or
consent of corporate counsel. Such communication would not violate DR 7-104(A)(1)
when conducted within the boundaries set forth. An attorney may not communicate ex
parte if a former employee is represented by his or her own counsel in the matter,
unless that counsel consents. An attorney may not communicate ex parte if a former
employee has asked the corporation's counsel to provide representation in the
matter, unless that counsel consents. An attorney must obtain the consent of the
former employee to the interview. An attorney must inform the former employee not
to divulge any communications that the former employee may have had with corporate
or other counsel. An attorney must fully explain to the former employee that he or
she represents a client adverse to the corporation. Under DR 7-104(A)(2), an
attorney must not give advice to the unrepresented former employee other than
advice to seek counsel in the matter.

  Advisory Opinions of the Board of Commissioners on Grievances and Discipline are
informal, nonbinding opinions in response to prospective or hypothetical questions
regarding the application of the Supreme Court Rules for the Government of the Bar
of Ohio, the Supreme Court Rules for the Government of the Judiciary, the Code of
Professional Responsibility, the Code of Judicial Conduct, and the Attorney's Oath
of Office.

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works