IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON-PILOT LIFE INSURANCE CO., | ) : | CASE NO. C-1-02-479 |
| Plaintiff, | ) : | JUDGE  SPIEGEL<br>Magistrate Judge Hogan |
| vs. | ) : | REPLY MEMORANDUM |
| CHRISTOPHER L. KEARNEY, | ) : | SUPPORTING DEFENDANT'S<br><u>SECOND MOTION TO COMPEL</u> |
| Defendant. | ) | |

This Court should sustain Mr. Kearney's Second Motion To Compel. The information sought from but withheld by the plaintiff, Jefferson Pilot Life Insurance Company ("JP"), and the third-party defendant, Disability Management Services, Inc. ("DMS")(collectively "JP/DMS") is relevant and discoverable.

I.      *Repeated Misstatements Of Plaintiff's Counsel*.

Throughout his 40-page memorandum opposing Mr. Kearney's Second Motion To Compel, JP/DMS' counsel repeatedly misrepresents two significant points in this action.

First, JP/DMS' counsel argues that the only issue in dispute is plaintiff's claim – as if plaintiff's counterclaims and third-party claims simply do not exist.  Clearly, JP/DMS' counsel's understanding is incorrect.  JP/DMS' counsel's description of Mr. Kearney's bad faith claim as a "Johnny come lately" claim is: (i) irrelevant; and (ii) wrong.  For many months prior to the filing of this suit by JP, Mr. Kearney complained about JP/DMS' bad faith.  (*See, Examples of Mr. Kearney's charges, attached as Exhibit 1*).  JP/DMS' counsel's argument that only plaintiff's claim is valid or worthy of discovery is meritless.

1

Second, JP's counsel repeatedly contends that plaintiff has not "denied benefits" to Mr. Kearney. This is nonsense. On May 6, 2002, JP/DMS denied Mr. Kearney a 7% monthly increase in his disability benefits. (*See, Declaration Of Kearney attached as Exhibit* 2). On May 6, 2003, JP/DMS denied Mr. Kearney an additional 7% increase in benefits. *Id.* And on May 6, 2004, JP/DMS denied Mr. Kearney a third 7% increase in benefits. *Id.* As a result of these multiple denials the sum of the checks Mr. Kearney receives from JP/DMS monthly is approximately $1,000 less than it should be. *Id.* Mr. Kearney is denied this level of benefits each month. *Id.* JP/DMS' counsel's contention that JP/DMS has not denied benefits is a transparent and unwarranted attempt to circumvent Ohio law and the holding of **Boone v. Vanliner.**

As discussed below, each of JP/DMS' counsel's arguments in opposition to the Second Motion To Compel are meritless.

II.     Issue One: Requested and Refused Electronic Discovery.

In 2004, electronic discovery is a commonplace staple of civil litigation. JP/DMS' counsel, however, does not believe it is ever necessary. He is mistaken.

In its opposition to the Second Motion to Compel, JP/DMS contends that: (i) it was not requested to produce electronically stored information; (ii) any such information is irrelevant; and (iii) it would be overly expensive to produce.

First, in his Discovery Requests, Mr. Kearney expressly requested that JP/DMS produce all electronically stored information whether stored on laptops, desktops, mainframes, back-up tapes, harddrives, or other media. (*See, Exhibit 3, pp. 2-3, Instructions No. 3 and 5*).[1] Mr. Kearney also

---

[1] For example, Instruction 5 defines documents to include electronic mail and electronic files. And Instruction 3 requests the printing and producing of any information "stored electronically (i.e., by

2

requested that JP/DMS disclose whether any previously stored electronic information had been destroyed. (*Id., Instruction 4, p. 2*). Contrary to JP/DMS' first argument, Mr. Kearney's request for electronic discovery could not have been more discrete or comprehensive.

Second, despite these commonplace, discrete, and relevant requests, JP/DMS not only did not produce any electronically stored information – JP/DMS <u>made no effort to even locate such information</u>. (*Exh. 4, p. 32*). JP/DMS simply concludes (without any search of its electronic files) that any information which could be produced would be irrelevant. Putting aside the fact that refusing to search its files is a blatant violation of JP/DMS' obligations under the discovery requests and the Federal Rules of Civil Procedure, and also putting aside the ridiculous conclusion that nothing discovered could be relevant, there has been testimony developed in the case that the principal claims representative would as a practice prepare documents and not print them and place them in a claimant's claims file. (*Exh. 4, Depo. Excerpt of Robert Mills, 89-100*). Mr. Mills also testified that he had email communications with his boss and others concerning Mr. Kearney's claim. (*Id., pp. 65-90*). Those emails were not preserved by placing them in the claims file. *Id.* For this reason JP/DMS must comply with their commonplace duties under Civil Rule 26 and 34 and search for and produce any requested information stored electronically. JP/DMS cannot decide without even looking that anything they would discover would be irrelevant.

In a prior action involving trial counsel for these parties, this Court conducted many conferences and analyzed many, many motions and pleadings concerning DMS' resistance to comply with electronic discovery. (*See, Case No. C-1-02-351*). At every stage of that action, the

---

electronic computer(laptop, desktop or mainframe), word processing system, data base, "email," scanner, or storage, etc)"

Court required DMS to comply with its obligation to produce electronically stored information. At one point the District Court Judge found that JP/DMS' counsel had in the Court's judgment "intentionally misunderstood" the Court's clear directive on the issue. Nearly two years after the plaintiff in that action (the "*Centre Life* Case") made his request, JP/DMS' counsel finally complied. JP/DMS' counsel now suggests that the 500+ electronically stored and delinquently produced documents in the *Centre Life* Case were all irrelevant. He is absolutely wrong on this point. In fact <u>2 principal trial exhibits</u> for the *Centre Life* Case were produced only through the request for electronic records.

    JP/DMS' counsel's argument that requiring JP/DMS to comply with its discovery obligations would be an "exercise in futility" is improper as well as incorrect – as shown by the testimony cited above, which is already developed in the case.

    Third, as he does here, JP/DMS' counsel argued extensively in the *Centre Life* Case that the cost of electronic discovery was prohibitive and, therefore, his client should be exempt from doing what is commonplace in civil litigation – participating in electronic discovery. The Court dismissed this argument. The Court in this action should dismiss this re-run argument as well. The cost of JP/DMS' production of the electronic information should not prohibit Mr. Kearney from obtaining documents he may very well need to defend himself in an action filed by his insurer and to present his claims. Especially since the Claims representative primarily responsible has testified that he had email communications that he did not pout in the claims file and he doesn't always place Word or Excel documents in claims files.

    Moreover, it is inconceivable that if DMS already spent $47,000 (which was not in the District Court's view in the *Centre Life* Case extraordinary) to purchase equipment to enable it to

4

comply with the Court's electronic discovery Orders in the *Centre Life* Case that it would have to duplicate that expense in this action.  The computer equipment allegedly purchased by DMS to comply with the Court's order in the *Centre Life* Case can now be used so JP/DMS can comply with its obligations in this matter.

Finally, JP/DMS' counsel also suggests that Mr. Kearney's bad faith claim is simply retaliatory.  While that argument is irrelevant, it is also false.  (*See, Exhs. 1 and* 2).  As JP/DMS' counsel recognizes in his opposing memorandum, Mr. Kearney had retained counsel to interact with JP/DMS in 2001, months <u>before</u> JP/DMS began interpreting the Policies in the manner they now desire the Court to rule and months before this action was filed.  *Id.*  And Mr. Kearney advised JP/DMS that he felt they were acting in bad faith many, many times before JP/DMS filed the complaint.  *Id.*  JP/DMS simply beat Mr. Kearney to the punch by filing suit.  Mr. Kearney's claim is not as JP/DMS' counsel suggests a "Johnny Come Lately" bad faith claim.

### III    Issue Two: The Privilege Log

Mr. Kearney requested that JP/DMS produce documents in June 2003 and requested that any privilege log of withheld documents be produced in July 2003.  (*See, Exh.* 3).  JP/DMS resisted producing any version of a privilege log for the next full year.  Finally, a document titled "Privilege Log" was finally produced to Mr. Kearney on May 14, 2004.  (*See, Exh. 4, pp. 6-10*).  The document, however, does not comply with Rule 26.  (*See, Exh. 5*).

JP/DMS must – but refuses to - produce a Privilege Log which identifies the "information withheld with sufficient particularity to enable defendant to evaluate the appropriateness of the privilege claim under the circumstances." *FRCP, Rule 26(B)(5).*  A Privilege Log that complies with Rule 26 must be produced.

5

Also, under Ohio law, there is no protection for an insurer's documents prepared by or shared with a lawyer which predate an insurer's denial of benefits in a bad faith case. *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 91 Ohio St.3d 209, 213-214, 2001-Ohio-27 (2001). As identified unmistakably in Exhibit 2 attached, JP/DMS first denied benefits to Mr. Kearney on May 6, 2002. (*Exh. 2*).

A legally compliant Privilege Log must be produced, and as discussed below in further detail, JP/DMS must produce any and all communications with counsel or graduates of law school which predate May 6, 2002.

**IV.    Issue Three: Information From or Shared With Attorneys.**

As JP/DMS concedes, under the Ohio Supreme Court's decision in *Boone v. Vanliner Ins. Co.*, 744 N.E.2d 154, 91 Ohio St.3d 209, 213-214, 2001-Ohio-27 (2001) an insurer's communications with counsel prior to the insurer's denial of benefits are discoverable. At page 16 of its opposing memorandum, JP/DMS' counsel writes: *"the Ohio Supreme Court held that attorney-client communications regarding coverage . . . are not protected prior (sic) to the date of the denial of coverage. Id. at syllabus."*

JP/DMS' many arguments that *Boone* does not apply here are meritless. JP/DMS must produce (through documents and deposition) all communications with lawyers which predate JP/DMS' denial of benefits to Mr. Kearney (i.e., all communications up to May 6, 2002). An increased COLA benefit was due to Mr. Kearney on May 6, 2002, and JP/DMS refused to pay it. That was the first date that benefits were denied.

JP/DMS' May 2002 decision to pay partial benefits only to Mr. Kearney and deny him increased COLA benefits from that point forward is unmistakably evidence of bad faith. Attached

6

is a letter of Attorney Johnson advising JP/DMS that - in order *to "strip"* Mr. Kearney of the ability to claim bad faith, JP/DMS should pay partial benefits to Mr. Kearney. (*Exh. 6*).

Moreover, in spite of its attempt to argue otherwise, JP/DMS' statements <u>confirm</u> the fact that the documents they are withholding are subject to production under *Boone*:

- JP/DMS argues that the communications it is withholding (which are dated between October 10, 2001 and May 6, 2002) are: "conversations and documents between counsel address[ing] whether an overpayment had been made and what should be done about any overpayment. The question of extent of coverage was, therefore, part and parcel of the question of what should be done." (<u>*See*</u>, *Opposition, p. 17*).

This is <u>precisely</u> the type and nature of communications that are not protected under *Boone*. Using JP/DMS' description *Boone* requires that these materials be produced. JP/DMS' contention that, from the date of an insurer's very first thought or consideration of the extent of coverage under an insurance policy, that and all subsequent communications are exempt from the rule of *Boone* because they would necessarily be made in "anticipation of litigation" is meritless. That interpretation is not the holding of *Boone*.

JP/DMS' argument is what *Boone* expressly rejects. If JP/DMS' argument were the accurate interpretation of *Boone*, then *Boone* would have no effect whatsoever – since, under JP/DMS' interpretation, all discussions between a claims representative and a graduate of law school would be protected.

In *Boone*, the Ohio Supreme Court held unequivocally that: "in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage." *Boone, at 213-214 (emphasis added)*. This description of discoverable information is

7

exactly the description JP/DMS uses to identify the information it withholds. There can be no mistake, therefore that the withheld information is discoverable and should be produced forthwith. And this rule applies equally to claims of work product. *Garg v. State Auto. Mut. Ins. Co*. 800 N.E.2d 757, 155 Ohio App.3d 258, 2003-Ohio-5960 (2nd Dist. 2003).

Under *Boone* "the critical issue in evaluating the discoverability of otherwise privileged materials is not whether the attorney-client communications related to the existence of coverage but, rather, whether they may cast light on bad faith on the part of the insurer." Under *Boone*, neither attorney-client privilege nor the work-product doctrine protects materials in a claims file, created prior to the denial of the claim that may cast light on whether the insurer acted in bad faith in handling an insured's claim." *Id. at* 265-266.

For the reasons identified above, Mr. Kearney is permitted to take and has noticed the depositions of Ms. Farabow, Mr. Dempsey, and Ms. Johnson (if her health permits) and further seeks copies of all documents including notes and electronically stored documents shared with counsel or authored by counsel concerning Mr. Kearney.[2]

IV.     **Other Depositions.**

   A.     **Robert Maxwell.**

Mr. Kearney no longer seeks the deposition of Mr. Robert Maxwell. So the dispute about his deposition is moot. It bears mentioning, however, that JP/DMS' falsely represents the facts of

---

[2]     During the conduct of Mr. Mills' deposition he revealed that the position that JP/DMS seeks to advance in this case was first uncovered or developed on October 10, 2001. Mr. Mills testified that between October 10, 2001, and May 6, 2002, the date that JP/DMS denied benefits to Mr. Kearney, Messrs. Mills and Hughes participated in numerous telephone conferences with: (i) Ms. Farabow (an employee and in-house counsel with JP); and (ii) William Dempsey (an employee and in-house counsel at Employers Reinsurance Corporation, a reinsurer of JP's liability to Mr. Kearney on the subject disability insurance policies). Mr. Mills also testified that several emails were exchanged among this group and that he also may have participated in conferences with Geraldine Johnson.

efforts to take Mr. Maxwell's deposition in May 2004.[3]

B.  **Janet Beattie.**

Mr. Kearney no longer seeks the deposition of Ms. Beattie. So the dispute about her deposition is moot.

C.  **Jefferson Pilot – 30(B)(6).**

As its 30(B)(6) designee, JP produced an attorney/employee who formerly worked as an insurance defense lawyer for a private practice firm, Valarie Loftin. Ms. Loftin's knowledge of the claim and the issues in the Deposition Notice were limited to what she gleaned from a cursory review of some pleadings the night before her deposition. (*Exh. 7, Loftin Depo., p. 10-11, 54, 98, 101, and 116*).

Because he had no real opportunity to depose JP on the relevant issues, Mr. Kearney has renoticed the JP deposition for Cincinnati, and demands a recovery of his costs and expenses (including attorney fees) incurred with the charade of Ms. Loftin's deposition. This Court has

---

[3] On May 5, 2004, the day of Mr. Maxwell's requested deposition, Mr. Roberts inquired of Mr. Ellis as to when Mr. Maxwell would arrive. Only after seeking that information (at about 11:30 a.m.) did Mr. Ellis share with Mr. Roberts that Mr. Maxwell would not be available purportedly because Mr. Maxwell's health did not allow it. As recited in the deposition transcript of J. L. Roberson repeated in Mr. Ellis' motion for sanctions, during the lunch recess which followed, Mr. Roberts phoned Mr. Maxwell's home. Mr. Maxwell's wife answered. Mr. Roberts advised her of who he was. Mr. Roberts told Mrs. Maxwell that he desired to take Mr. Maxwell's deposition on the following day but had learned that he was not feeling well. Mr. Roberts stated unequivocally that he did not intend to take Mr. Maxwell's deposition if his health did not permit it. Mrs. Maxwell stated that she would put the phone down and ask Mr. Maxwell if he was feeling up to a deposition. Mrs. Maxwell returned to the phone a short time later and relayed to Mr. Roberts that Mr. Maxwell was feeling "o.k." and felt that he could accommodate a deposition. Mr. Roberts terminated the call after telling Mrs. Maxwell that she should expect to receive a call from counsel for JP later that day advising Mrs. Maxwell of the arrangements for the deposition the following day. Mr. Roberts did nothing unethical or improper in contacting Mrs. Maxwell (who was never an employee of plaintiff) to confirm Mr. Ellis' claim that her husband could not accommodate a deposition. And, at no surprise, upon making that contact Mr. Roberts learned that Mr. Ellis had not been honest about Mr. Maxwell's capacity to be deposed. Now in a great irony, Mr. Ellis accuses Mr. Roberts of unethical behavior with regard to this exchange. Mr. Ellis' scurrilous claim is groundless.

9

ordered JP to produce its corporate 30(B)(6) witness(es) in Cincinnati for deposition and Mr. Kearney has noticed that deposition. *Doc. 49.* JP refuses. It must now be compelled to produce that person who has the information requested in the notice.

    D.    <u>**Mills and Hughes**</u>

On May 14, 2004, Mr. Kearney's counsel intended to take 2 depositions: Mr. Mills and Mr. Hughes. Mr. Mills' deposition began at 8:30 a.m. and lasted 5 hours 15 minutes, but was not completed. Mills' deposition was suspended at 4:00 p.m. on Friday afternoon to allow plaintiff's counsel to catch the last flight out which would return him to Cincinnati before 1 a.m. The reasons that Mr. Kearney's counsel could not complete both Mr. Mills' deposition and take Mr. Hughes' deposition on May 14 were: (i) JP/DMS' counsel had withheld documents until the morning of the depositions (this extended the planned length of Mr. Mills' deposition); and (ii) on well over 60 occasions, Mr. Mills requested that simple straightforward examination questions be repeated. Mr. Kearney's counsel was also denied testimony concerning Mr. Mills' dialogue with Mr. Dempsey, Ms. Farabow, and Ms. Johnson. As a result, Mr. Kearney's counsel required more time of Mr. Mills than anticipated and after returning to Cincinnati, consistent with this Court's order, *Doc. 49*, Mr. Kearney noticed the continuation of Mr. Mills' Deposition and the conduct of Mr. Hughes' deposition for Monday, May 24, 2004.

JP/DMS' counsel's argument that Mr. Kearney should now pay JP/DMS' expenses for the continuation of Mr. Mills' deposition and the conduct of Mr. Hughes' deposition because Mr. Kearney's counsel chose to return home to his family on Friday evening May 14, rather than staying the weekend in Springfield is meritless. Because of JP/DMS' own improper conduct, time did not provide for the full completion of Mr. Mills' and Mr. Hughes' deposition and it was apparent that

10

JP/DMS' counsel would improperly continue to instruct both Mr. Mills and Mr. Hughes to not answer discoverable inquiries under *Boone*. Accordingly, even if Mr. Kearney's counsel stayed the weekend, the depositions would not have been completed.

JP/DMS must be again ordered to produce Mr. Mills and Mr. Hughes in Cincinnati for deposition at JP/DMS' own cost.

These witnesses must also be directed to answer questions concerning their communications with Mr. Dempsey, Ms. Farabow, and Ms. Johnson which predate May 6, 2002.

VI.     **Supplementation.**

JP/DMS argues that it need not supplement its discovery responses.[4] However, it must. Below is a table setting forth the discovery requests at issue, JP/DMS' argument, and Mr. Kearney's analysis.

| Document Request ("DR") Interrogatory ("Int") | JP/DMS Objection | Analysis Of Mr. Kearney |
| --- | --- | --- |
| **DR 2:** Everything in JP/DMS' possession that relates to Kearney | "counsel believes that all . . . correspondence relevant . . . and not privileged is part of the claim file and has been produced." | As indicated above, neither: (i) electronic information; or (ii) communications with Farabow, Dempsey, Newkirk, and Johnson have been produced. |
| **DR 3 / Int 7:** The JP/DMS contracts and related documents | Overbroad, privileged, proprietary, and irrelevant. | The contract(s) setting forth the relationship between JP and DMS must be produced just as it was in the *Centre Life* Case. So too must all communications between the 2 concerning Mr. Kearney and/or his policies. |
| **DR 5:** Documents reflecting on criteria of case referrals from JP to | No documents | The contract(s) setting forth the relationship between JP and DMS must be produced just as it was in |

---

[4]     Notably, JP/DMS' new counsel, Mr. Ellis, apparently disagrees with JP/DMS' prior counsel in this case concerning the discoverability of many documents and information now at issue. (*See, Exhibit 8*).

11

| DMS | | the *Centre Life* Case. So too must all communications between the 2 concerning Mr. Kearney and/or his policies. |
|---|---|---|
| **DR 6 / Int 11:** Documents relating to sanctions imposed on JP/DMS by Insurance Commission or officials. | Irrelevant, overbroad, and alternatively, should apply only to Ohio. | These documents are relevant under Rule 26 and must be produced. |
| **DR 10(b)** Documents describing procedures for claim handling | Attorney client privilege. | These are absolutely relevant and are not attorney-client protected materials. *Boone*, supra. |
| **DR 11:** Marketing materials of JP/DMS. | Irrelevant | These are absolutely relevant. |
| **DR 14 and 22:** Claims handling training materials or guidelines and noted from seminars and/or conferences | Overbroad, confidential, proprietary, irrelevant, and privileged | These are absolutely relevant, are not overbroad or confidential, and are not attorney-client protected materials. *Boone*, supra. |
| **DR 15** Manuals, materials, and documents used during the handling of Mr. Kearney's claim. | Attorney-client privilege and/or work product doctrine. | These are not attorney-client protected materials or work product materials. *Boone*, supra. |
| **DR 17:** Notes and the calendars of claims persons with responsibility for Mr. Kearney's claim. | Irrelevant and inadmissible | These are absolutely relevant. For example, as JP/DMS' counsel knows, over his objection, these were ordered produced in the *Centre Life* Case. |
| **DR 20/21 and Int 9/10:** Complaints filed by JP/DMS or against JP/DMS for breach of contract or bad faith | Irrelevant, unreasonable for JP/DMS to "disgorge data about other individuals," and privacy of third party "former litigants." | Copies of the complaints filed by or against JP/DMS are not irrelevant. Nor is it unreasonable for JP/DMS to produce these materials. JP/DMS' argument that privacy rules and rights of others must be considered is meritless: each requested complaint would necessarily be a public record. The materials must be produced. |
| **Int 2:** Who suggested new interpretation of contracts in 2001? | The policies. | JP/DMS' response to this request and its objection is pointless and illogical. JP/DMS must answer the question under oath. |
| **Int 4:** Identify | We've asked DMS to look and | A sworn response to this |

12

| | | |
|---|---|---|
| investigators retained. | see if they have more videotapes. | interrogatory should have been given one year ago.  JP/DMS' counsel's explanation that after the filing of the Second Motion To Compel he asked his client for the information (which is still not produced) is insufficient. |
| **Int. 5:** State when, by whom and why Mr. Kearney's claim was referred by JP to DMS.  Also state what documents relate to referral. | Mr. Kearney's only apparent problem is that we did not provide documents from Mr. David Newkirk, which are protected by attorney client privilege. | JP/DMS misstates "Mr. Kearney's only problem" with JP/DMS response.  The Interrogatory must be answered under oath and communications with Mr. Newkirk must be disclosed.  ***Boone*** |
| **DR 15:** State the reserve on Mr. Kearney's policy and identify any changes made to the reserve. | Irrelevant. | This is not irrelevant and must be answered. |

VII.   **JP/DMS' Bifurcation Request Is Meritless**

JP/DMS' effort to block discovery has been Herculean and includes, *inter alia*: (i) withholding documents and information for over 1 year; (ii) refusing to verify its written discovery responses; (iii) refusing to produce a valid privileged log; (iv) misrepresenting Mr. Maxwell's capacity to be deposed; (v) filing motions for protective order; (vi) filing a motion for sanctions, designed to avoid discovery; (vii) filing a motion to bifurcate; (viii) refusing to produce many witnesses for deposition; (ix) refusing to produce *Boone* materials; and (x) requesting an expedited merits hearing to place that before discovery.

Now, JP/DMS argues that Mr. Kearney should not be permitted to any information until the Court decides JP/DMS' claim because JP/DMS argues that discovery only relates to Mr. Kearney's counterclaim of bad faith.  JP/DMS is wrong.

First, Mr. Kearney's discovery requests go to the issue of his affirmative claim of bad faith

13

and Mr. Kearney's defense of JP/DMS' claim against him.  As counsel for the parties have already argued to the Court when JP/DMS attempted to block the conduct of depositions, the discovery goes to both claims.  The Court can and will consider evidence outside the Policies if the Court determines that the Policies are ambiguous.  This is another argument that JP/DMS previously presented and previously lost.  It is meritless and wasteful for JP/DMS to argue this pointless argument again.

Second, JP/DMS says that its production of these discoverable *Boone* materials "would inhibit the insurer's ability to defend on the underlying claim."  JP/DMS' argument is essentially that it should not be required to produce the discoverable attorney-client communications before the court hears argument on the pending motions for summary judgment because if the Court sees those materials, JP/DMS' argument would be prejudiced.  This is not a valid excuse to discovery.

Reading between the lines, it is obvious what JP/DMS is saying: as suspected the withheld communications dated between October 2001 and May 6, 2002, reveal that JP/DMS does not disagree with Mr. Kearney – those documents likely show that JP/DMS has determined that the policies entitle Mr. Kearney to benefits unambiguously and/or the policies are ambiguous, **also** entitling Mr. Kearney to benefits.  JP/DMS cannot withhold discoverable documents simply because its meritless claim will be revealed if it must perform its discovery obligations.

Third, discovery cannot and should not be bifurcated because JP/DMS waived any request for bifurcation by not seeking bifurcation prior to the discovery deadline for all claims in the case, which passed several weeks ago.

A more complete response to this issue is contained in Mr. Kearney's opposition to JP/DMS' Motion To Bifurcate.

14

## Conclusion

JP/DMS' discovery conduct in this case has been extraordinary. Mr. Kearney needs all of the requested information to fairly defend himself and to prosecute his claim. Mr. Kearney, therefore, asks that the Court order its production forthwith.

|  | Respectfully submitted, |
|---|---|
| OF COUNSEL | /s Michael A. Roberts |
|  | Michael A. Roberts, Esq.  (0047129) |
| GRAYDON HEAD & RITCHEY LLP | GRAYDON HEAD & RITCHEY LLP |
| 1900 Fifth Third Center | 511 Walnut Street, Suite 1900 |
| 511 Walnut Street | Cincinnati, Ohio 45202 |
| Cincinnati, Ohio 45202 | (513) 629-2799 |
| (513) 621-6464 | (513) 651-3836 (fax) |
|  | email:mroberts@graydon.com |

### CERTIFICATE OF SERVICE

The foregoing was electronically filed and thereby served on William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 26th day of June, 2004.

/s Michael A. Roberts