Case 1:02-cv-00479-MRB   Document 70-8   Filed 06/26/2004   Page 1 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin                                                   5/6/2004

```
              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NORTH CAROLINA
                     WESTERN DIVISION


JEFFERSON-PILOT INSURANCE COMPANY,  )
                                    )
                        Plaintiff,  )
                                    )
              vs.                   )   CASE NO.
                                    )   C-1-02-479
CHRISTOPHER L. KEARNEY,             )   (Judge Spiegel)
                                    )
                        Defendant.  )
```

COPY

The deposition upon oral examination of VALERIE LOFTIN, being taken pursuant to Order and in accordance with the Federal Rules of Civil Procedure before Rebecca J. Huddy, Notary Public, at the Stratis Business Center, 7800 Airport Center Drive, Greensboro, North Carolina, on the 6th day of May, 2004, beginning at 11:00 a.m.

Case 1:02-cv-00479-MRB   Document 70-8   Filed 06/26/2004   Page 2 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin                                                   5/6/2004

Page 10

1  Jefferson-Pilot Financial Insurance Company.
2  Q. Okay. So how many different corporate entities are
3     there for which there would be individual claims under
4     the Jefferson-Pilot umbrella?
5  A. There would be three.
6  Q. The three you've mentioned?
7  A. Yes.
8  Q. Okay. How many people are employed by Jefferson-Pilot
9     Life Insurance Company?
10 A. I can't give you that figure off the top of my head.
11 Q. Is it more or less than a thousand?
12 A. It's more than a thousand.
13 Q. Okay. Who owns the stock of Jefferson-Pilot Life
14    Insurance Company?
15 A. The holding company, Jefferson-Pilot Financial --
16    Jefferson-Pilot Corporation. The brand name is
17    Jefferson-Pilot Financial.
18 Q. Okay. Is that a publicly traded company?
19 A. Yes, it is.
20 Q. JP Financial is the name of the holding -- the
21    corporate name of the holding company?
22 A. Jefferson-Pilot Corporation is the legal name. The
23    brand name is Jefferson-Pilot Financial.
24 Q. Do you have any personal knowledge of the
25    administration of Mr. Jefferies' claim?

Page 11

1      MR. ELLIS: Mr. Who?
2  Q. Excuse me, Mr. Kearney's claim?
3  A. I have not reviewed the claim file and I was not
4     involved in the administration of Mr. Kearney's claim.
5  Q. You haven't reviewed anything about the claim file?
6  A. No.
7  Q. You haven't reviewed any of the pleadings in the
8     litigation?
9  A. I have reviewed the pleadings. I have not reviewed
10    the claim file.
11 Q. Okay. Who is it that on behalf of the plaintiff
12    responded to the discovery request in the case? Was
13    that you?
14 A. No.
15 Q. Do you know who it was that provided the interrogatory
16    responses?
17 A. I don't know.
18 Q. It's never been identified, they're not verified.
19    It's not you, though?
20 A. It's not me.
21 Q. You have no idea who it might be?
22 A. No.
23     MR. ROBERTS: Bill, on that Notice of
24 Deposition -- we'll make this Exhibit 1.
25

Page 12

1      (Defendant's Exhibit No. 1 was marked for
2  identification by Mr. Roberts.)
3      MR. ROBERTS: The 30(b)(6) Notice issued to
4  plaintiff's counsel, Mr. Bill Ellis, on April 26
5  requested that Jefferson-Pilot Life Insurance Company
6  make available the person with knowledge -- the person
7  with the greatest knowledge on behalf of the plaintiff
8  of Jefferson-Pilot's Complaint, Affirmative Defenses,
9  Answers to Interrogatories, and Production of
10 Documents in this action. Do you know who that is,
11 Bill?
12     MR. ELLIS: No, I don't.
13     MR. ROBERTS: Any chance that maybe you're
14 going to comply with the Notice and produce that
15 person as opposed to someone who knows nothing about
16 it?
17     MR. ELLIS: I gave you the person that fit
18 the most categories we could find.
19     MR. ROBERTS: No, you know, Counsel, quite
20 well, and the other lawyer who's with you probably
21 does, too, under 30(b)(6) it's not one person. If it
22 takes multiple people to answer the different
23 questions, you produce multiple people.
24     Who is the person you're going to produce
25 under Rule 30(b)(6) pursuant to the Notice that can

Page 13

1  give me the information that I've requested
2  specifically?
3      MR. ELLIS: I don't know.
4      MR. ROBERTS: Let's call the judge. We'll
5  keep this on the record. Do you know how to dial out
6  of here?
7      (Phone call placed by Mr. Roberts)
8      MR. ROBERTS: Barb, it's Mike Roberts.
9      BARBARA: Hi, Mike, just the person I need to
10 talk to.
11     MR. ROBERTS: Really.
12     BARBARA: Yeah, I got some paperwork that
13 needs to be picked up.
14     MR. ROBERTS: On what case?
15     BARBARA: The Jefferies case.
16     MR. ROBERTS: Okay. I'm in North Carolina.
17 I'll get back as soon as I can and come right there to
18 get it unless you want me to send a runner over.
19     BARBARA: Either way is fine with me.
20     MR. ROBERTS: Okay. Now that I've done you
21 that favor, will you do me one?
22     BARBARA: What's up?
23     MR. ROBERTS: I'm on another case with Bill
24 Ellis and we're in a deposition.
25     BARBARA: Uh-huh.

4 (Pages 10 to 13)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 70-8    Filed 06/26/2004    Page 3 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

### Page 54

1  If you'd take a look at Exhibit 5, this
2  refers at the bottom left-hand corner to WJ2244. Is
3  that another policy number, do you know?
4  A. I don't know.
5  Q. It says Revised September of 1992, do you see that?
6  A. Yes.
7  Q. Do you know if the residual disability riders that
8  Jefferson-Pilot Life Insurance Company was selling
9  were revised in the fall of 1992?
10 A. I don't have personal knowledge of that, no.
11 Q. How would I find that out?
12 A. I don't know.
13 Q. Okay. Can you turn to the second page of Exhibit 5.
14    Do you understand in the litigation it's been
15    contended by Mr. Kearney that he's not obligated to
16    pay premiums while he's on residual disability? Do
17    you understand that?
18 A. I reviewed the pleadings and I saw the allegation in
19    the pleadings.
20 Q. Okay. You understand that's an assertion he's made?
21 A. I understand, excuse me, what?
22 Q. That Mr. Kearney has asserted that the policy does not
23    obligate him to pay premiums while he's on residual
24    disability?
25 A. That was what I saw in the pleadings, yes.

### Page 55

1  Q. Okay. On this revision September 1992 of the
2     Jefferson-Pilot residual disability rider, the first
3     paragraph on the second page says Waiver of Premium.
4     "If you become eligible for a residual disability
5     benefit for a continuous period of at least three
6     months, or immediately following a period of total
7     disability during which premiums have been waived, we
8     will waive premiums that come during the disability,
9     and (2) refund any payments made for premiums due
10    during the disability period."
11    Do you understand -- I read that and that's a
12    much more concrete and express way of saying that the
13    premiums during residual disability, payment of them
14    are waived --
15    MR. ELLIS: Objection.
16 Q. -- right?
17    MR. ELLIS: Objection to the relevance. This
18    is not a part of the policy sold to Mr. Kearney.
19 Q. He's wrong on the relevance, but go ahead.
20 A. I'd have to say that the policy speaks for itself.
21 Q. Okay. How would I understand why it was that
22    Jefferson-Pilot revised the residual disability rider
23    in September 1992?
24 A. I don't know.
25 Q. Is there any repository of information at the company

### Page 56

1  that would give somebody a place to start to
2  understand why it is they thought it was essential to
3  revise this particular rider in 1992?
4  A. I don't know.
5  Q. You would agree that the policy speaks for itself on
6     the termination provision here where it says in the
7     second column, "This rider will terminate on the
8     premium due date next following your 65th birthday"?
9  A. I would agree that the policy speaks for itself.
10 Q. Right. It expressly doesn't allow lifetime residual
11    disability benefits, correct?
12 A. I would agree that the policy speaks for itself.
13 Q. That the policy speaks for itself, okay. Who was it
14    that was in charge of clarifying ambiguities in riders
15    back in 1992?
16    MR. ELLIS: Objection.
17 A. I don't know.
18 Q. Okay. How can I find out who had that role?
19    MR. ELLIS: Same objection.
20 A. I don't know.
21 Q. Are you ready?
22 A. (Witness nods head)
23 Q. Okay. Back in the Claims Assessment Agreement we were
24    talking about paragraph 2-A Roman numeral iv and it's
25    required that the company give DMS policy coverage

### Page 57

1  information, and your testimony is that only means the
2  policy?
3  A. My testimony is, I believe that that means that we
4     would transfer a copy of the policy if it was part of
5     the claim file when we transferred the files to DMS.
6  Q. Why doesn't it just say policy then? Why does it say
7     policy coverage information?
8  A. I don't know.
9  Q. Can I direct your attention to another -- do you need
10    to get ahold of something in your purse there?
11 A. I was looking for my glasses, but never mind.
12 Q. Go ahead, take your time.
13 A. No, I can't find them.
14 Q. I thought I saw a little arm of a glass sticking out
15    of there.
16 A. Those were sunglasses. They won't help.
17 Q. Section 4-C of the agreement, section 4 is titled
18    Consideration, which means money, right? I mean, that
19    describes how much money DMS is going to be paid,
20    right?
21 A. Consideration, yes.
22 Q. Okay. In the Consideration section, subsection C
23    says, "The parties agree that they will every twelve
24    months during the term of this agreement commencing
25    December 31, 2000, negotiate in good faith the amount

15 (Pages 54 to 57)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MRB   Document 70-8   Filed 06/26/2004   Page 4 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney   C-1-02-479
Valerie Loftin   5/6/2004

**Page 98**

1  Q. Okay. Do I understand correctly that when DMS was
2     retaining secret surveillance folks to follow Mr.
3     Kearney, hiring doctors to perform IMEs, investigating
4     him internally, those were all things they were doing
5     without any input from or counsel to or information
6     provided to Jefferson-Pilot?
7         MR. ELLIS: Objection to form.
8  A. I don't have any information or knowledge of the DMS
9     handling of Mr. Kearney's claim.
10 Q. Why are you here today?
11 A. Because I'm the Vice President of Claims.
12 Q. I didn't ask for Vice President of Claims to be
13    deposed.
14 A. And I am the person at Jefferson-Pilot who has the
15    most knowledge of the DMS relationship, because the
16    relationship comes under my supervision.
17 Q. But no knowledge of Mr. Jefferies' claim -- Mr.
18    Kearney's claim other than what you learned last night
19    reading a couple pleadings, right?
20 A. That's correct.
21 Q. Could you turn to interrogatory number 2. The second
22    sentence in the answer says, "Robert Mills identified
23    this erroneous payment shortly before DMS
24    representatives met with Attorney Spiegel in October
25    2001."

**Page 99**

1     Other than somebody's providing that factual
2     information, are you mindful at all about Mr. Mills'
3     revelation in 2001 or 2002 about how this policy
4     really should be read?
5  A. Could you repeat the question.
6         MR. ROBERTS: Could you read it back to her.
7     (The last question was read back by the court
8     reporter.)
9  A. I can't answer that question.
10 Q. Is Mr. Kearney's claim and maybe now Mr. King's claim
11    the only two claims that you can recall on which this
12    revelation about how the policy should be read
13    resulted in a request to the policyholder that they
14    pay money back to Jefferson-Pilot?
15        MR. ELLIS: Objection, misstates facts.
16 A. I'm not aware of any other outstanding litigation
17    involving overpayment of the Social Security --
18 Q. I didn't ask you about --
19 A. -- benefit.
20 Q. I didn't ask you about outstanding litigation. Are
21    you aware of any other policyholders being advised by
22    Jefferson-Pilot or DMS that the way Mr. Mills reads
23    the contract suggests that Jefferson-Pilot when they
24    were handling the claim file resulted in an
25    overpayment?

**Page 100**

1  A. No, I am not.
2  Q. Turn to the next page of interrogatories,
3     interrogatory response 5. There's a gentleman's name
4     there, Mr. David Newkirk, fifth line, associated with
5     Employers Reinsurance Corporation. Have you ever had
6     any communications with him?
7  A. No.
8  Q. Anyone ever mention his name to you prior to five
9     seconds ago?
10 A. No.
11 Q. Ever seen his name copied on an e-mail?
12 A. Not that I recall.
13 Q. Have you ever received any general type of marketing
14    information concerning DMS describing their services?
15 A. I don't think so. I don't remember.
16 Q. Are you mindful of any that you may or may not have
17    received?
18 A. I'm not remembering any. I'm not saying that there
19    might not have been at some point, but not that I can
20    remember specifically.
21 Q. Do you know of any case in which a summary jury or
22    final jury has concluded that Jefferson-Pilot has
23    engaged in bad faith?
24 A. No, I don't have personal knowledge.
25 Q. Are you mindful of any summary jury trial conducted

**Page 101**

1     where a jury concluded that DMS was responsible for a
2     bad faith action?
3  A. No, I'm not.
4  Q. Any final trial verdict of a jury regarding DMS?
5  A. Not that I'm aware of, no.
6  Q. Your counsel hasn't advised you that DMS was
7     determined to have been engaged in bad faith by a
8     summary jury just a month ago?
9         MR. ELLIS: Objection.
10 A. No.
11 Q. Under -- in Ohio, under Ohio law?
12 A. I don't have that information.
13        MR. ELLIS: If she didn't know, she certainly
14    didn't know it was in Ohio.
15 Q. Have you spoken with Mr. Hughes at all about the
16    purported overpayment to Mr. Kearney?
17 A. Mr. Hughes? I'm sorry?
18 Q. William Hughes? He's at DMS?
19 A. Not that I recall.
20 Q. Have you ever spoken to anyone at DMS about the
21    purported overpayment and/or request for declaratory
22    judgment regarding Mr. Kearney?
23 A. No.
24 Q. Who have you spoken to about Mr. Kearney?
25 A. Our internal counsel.

26 (Pages 98 to 101)

Case 1:02-cv-00479-MRB   Document 70-8   Filed 06/26/2004   Page 5 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney   C-1-02-479
Valerie Loftin   5/6/2004

Page 114

1  Q. You don't know, okay. If Mr. Hughes of DMS on behalf
2     of Jefferson-Pilot extended to Mr. Kearney an offer of
3     settlement in October of 2001 in the amount of
4     $280,000, that settlement offer, the amount, based on
5     your knowledge of the relationship between JP and DMS,
6     would have necessarily required JP's authority?
7  A. Yes.
8  Q. Okay. In the fall of 2001, who at Jefferson-Pilot
9     would have interacted with DMS to provide that
10    authority?
11 A. I believe it would have been Clyde Honaker.
12 Q. Is he still employed by the company?
13 A. No.
14 Q. He's the guy in Lexington?
15 A. Yes.
16 Q. I'll see him on my way back. What was his position at
17    that time?
18 A. He was Vice President of Claims.
19    (Defendant's Exhibit No. 13 was marked for
20    identification by Mr. Roberts.)
21 Q. I've marked as Exhibit 13 a copy of a letter from Mr.
22    Kearney's prior counsel in October of 2001 and a
23    response of William Hughes three days later on October
24    22, 2001. Have you seen these letters previously?
25 A. Not that I recall, no.

Page 115

1  Q. On the first page of the first letter in that
2     compilation, the last sentence, first paragraph says,
3     "Mr. Kearney was not interested in making a
4     counteroffer to your offer to him of $280,000." Is
5     this the first occasion that it's been represented to
6     you that there was a settlement offer made to Mr.
7     Kearney back in 2001?
8     MR. ELLIS: I'll object and ask for a
9     continuing objection under Rule 408.
10    MR. ROBERTS: It's not Rule 408, buddy.
11 Q. Go ahead.
12 A. I don't know.
13 Q. You don't know if it's the first time you've heard
14    about that?
15 A. I don't know any of the particulars surrounding DMS's
16    handling of Mr. Kearney's --
17 Q. That wasn't my question. My question was, is right
18    now the first time that you've understood or someone
19    has shared with you an offer made to Mr. Kearney in
20    the fall of 2001?
21 A. I don't remember.
22 Q. Have you ever reviewed the proposal provided to Mr.
23    Kearney before he decided to accept the proposal and
24    buy the insurance from your company?
25 A. Yes, I did.

Page 116

1  Q. When did you do that?
2  A. Last night.
3     MR. ROBERTS: Let's go off the record for one
4     second.
5     (Discussion off the record)
6  Q. You reviewed the proposal last night?
7  A. Not the whole thing. I think I may have looked at
8     some pages of the proposal, and there were references
9     to it in one of your motions for summary judgment.
10 Q. The one you weren't persuaded by?
11 A. Yes, the one I wasn't persuaded by.
12 Q. It's a small group you're in.
13    (Defendant's Exhibit No. 14 was marked for
14    identification by Mr. Roberts.)
15 Q. Were you with anybody last night when you were
16    conducting this review or were you by yourself?
17 A. Well, if you count my three kids.
18 Q. How old are they?
19 A. Seven, ten, and fourteen.
20 Q. Did you ask for their input?
21 A. No.
22 Q. I've handed to you what has been Bates labeled as 0635
23    through 0642, and then there is 0642-A and 0643. Also
24    attached to this exhibit are 0633, 0633-A, and 0634.
25    Do I understand correctly that a disability

Page 117

1     insurance company such as Jefferson-Pilot sells its
2     policies to the public through various agents?
3  A. Yes, sir.
4  Q. Okay. Are the agents given information to provide to
5     their prospective policyholder that educates the
6     policyholder on what their rights may be if they
7     purchase this product?
8  A. The agents are given marketing material that
9     summarizes provisions in the proposed contracts but
10    does not spell out all of the particulars of a
11    contract.
12    MR. ROBERTS: Let's stop there.
13    (Lunch recess)
14 Q. Were you able to make that call to see who provided
15    the information, the sworn factual information --
16 A. I spoke with in-house counsel and was advised that the
17    information came from our Legal Department's
18    conversations with DMS examiners who had handled the
19    file.
20 Q. Who's going to verify the responses?
21 A. (Indicating)
22 Q. Who's going to swear to the truth of the responses?
23 A. I don't know, someone from our Legal Department.
24 Q. They don't have any factual knowledge. So we're just
25    not going to get sworn responses?

30 (Pages 114 to 117)