## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JEFFERSON PILOT LIFE INSURANCE CO.,** | ) | **CASE NO. C-1-02-351** |
| | : | |
| **Plaintiff,** | ) | **JUDGE  SPEIGEL** |
| | : | **Magistrate Judge Hogan** |
| **v.** | ) | |
| | : | |
| **CHRISTOPHER L. KEARNEY,** | ) | |
| | : | |
| **Defendant.** | ) | |

### MEMORANDUM OPPOSING MOTION FOR SANCTIONS

Plaintiff's counsel's motion for sanctions is based almost entirely on accusations Mr. Ellis knows to be false.  The Motion should be denied.  While it is true that counsel for the parties in this action do not enjoy the most harmonious professional relationship, the accusations Mr. Ellis makes in the motion are baseless.  Mr. Kearney submits that there are 2 reasons why Mr. Ellis has filed the motion, and neither relates to alleged improper behavior of defendant's counsel:

(i)   **Personal Vendetta:**  Counsel for the parties in this action recently concluded a highly contested dispute (the "*Centre Life* Case") in which Mr. Ellis was repeatedly sanctioned by the Court for improper behavior.[1]  (*See Declaration of Counsel attached as Exhibit 1*).  *Id.*  In the *Centre Life* Case, Mr. Roberts exposed Mr. Ellis' repeated improper behavior.  The Court in the *Centre Life* Case concluded at various points that Mr. Ellis had, *inter alia*: (a) "intentionally misunderstood" the Court's discovery Order; and (b) had filed in the action (or caused to be filed) at least five false declarations.  At one point, Mr. Ellis accused the District Court of bias and demanded that she recuse herself.  *Id.*  The *Centre Life* Case concluded with a jury verdict of bad faith and a $2 million agreed settlement to be paid by Mr. Ellis' client.  As evidenced by his latest motion, Mr. Ellis remains affected by the result he achieved for his client in the *Centre Life* Case.

---

[1]    Mr. Ellis never paid any of the Court ordered sanctions.  He demanded that those be forgiven.  (*See, Transcript of Settlement, Case No 02-351, Doc. 253:* "the offer was that the $2 million includes plaintiff's waiver of sanctions ordered by the Court, which have gone unpaid by the defendant.  And we would agree to waive the right to request that those sanctions be paid on top of the $2 million.").

(ii)   **Strategic:**  The second purpose for Mr. Ellis' motion is strategic.  He senses that this Court does not have the highest regard for him following the *Centre Life* Case and desires, therefore, to sling mud at Mr. Kearney's counsel with the hope that by disparaging Mr. Kearney's counsel the Court's judgment of the merits of the dispute or Mr. Ellis' discovery abuses will be swayed.

For the reasons discussed herein, Mr. Ellis' motion should be denied.

**I.**     *Mr. Ellis' Incivility Towards Mr. Roberts.*

Prior to the *Centre Life* Case, Mr. Ellis and Mr. Roberts did not know each other.  (*Exh. 1*). Mr. Roberts' first letter to Mr. Ellis in the *Centre Life* Case contained a welcome and invitation to resolve the matter civilly.  *Id.*  Within a short time, however, Mr. Roberts was required to spend extraordinary time addressing improper conduct by Mr. Ellis.  *Id.*

The relationship between Mr. Ellis and Mr. Roberts suffered a substantial decline when Mr. Ellis falsely accused Mr. Roberts in March 2003 of "hacking into [Mr. Ellis'] computer" and criminally stealing electronic files.  *Id.*  Mr. Ellis made this false and defamatory statement not only to Mr. Roberts but also apparently to Mr. Ellis' law firm's managing partner who then phoned the managing partner of Graydon Head & Ritchey LLP in March 2003 to discuss the charge.  *Id.*

If Mr. Roberts has violated EC 7-37, as plaintiff's counsel argues, then defendant requests that this Court also find that Mr. Ellis has also violated EC 7-37.  There can be no debate that Mr. Ellis' false accusation made to Mr. Roberts and others (that Mr. Roberts had criminally stole electronic files by hacking into the Wood & Lamping computer system) is a prohibited "unfair or derogatory personal reference to opposing counsel."

Mr. Ellis' incivility towards Mr. Roberts continued beyond March 2003.  *Id.*  As another example, in October 2003, Mr. Roberts attempted to open settlement dialogue with Mr. Ellis in the *Centre Life* Case.  *Id.*  Mr. Roberts sent Mr. Ellis a 7-page analysis of the case, the facts developed

during discovery, and the relevant legal thresholds. *Id.* Mr. Roberts concluded the letter with an invitation to discuss settlement professionally. *Id.* Mr. Ellis responded by telling Mr. Roberts that he was not Mr. Ellis' equal as a lawyer. *Id.*

And as this Court is aware, in Court proceedings throughout the ***Centre Life*** Case Mr. Ellis treated Mr. Roberts with great disdain and animosity. *Id.*

While Mr. Roberts does not contest the conclusion that, <u>as a reaction</u> to Mr. Ellis' improper behavior and tactics (some of which were acknowledged by this Court and others of which were never raised by Mr. Roberts), Mr. Roberts has been just a participant in a 2-party relationship that does not comport with the highest ideals of professionalism. *Id.* However, no conduct undertaken by Mr. Roberts is sanctionable or unethical.

Mr. Roberts declares on his oath as an officer of this Court that his future dealings with Mr. Ellis will comport with the highest ideals of professionalism – regardless of Mr. Ellis' future behavior. *Id.* Any judgment by the Court that an admonition is appropriate notwithstanding this commitment must be directed at counsel for each party since any incivility has been mutual.

## II. *False Accusations Of Mr. Ellis.*

As identified below, most of Mr. Ellis' accusations are simply false.

### A. Mr. Roberts Has Not Improperly Revealed Terms of a Confidential Settlement Agreement From the *Centre Life* Case

Mr. Ellis falsely accuses Mr. Roberts of violating confidentiality by revealing terms of the settlement agreement reached in the ***Centre Life*** Case. Neither Mr. Roberts nor his client agreed to be bound by any confidentiality covenant. Rather, it was agreed that Mr. Roberts and his client could elect to keep the terms of the ***Centre Life*** Case settlement confidential as they saw fit

(however, there was no confusion on Mr. Ellis' part that he and his client were from April 19 forward, bound by strict confidentiality).[2]

The following is the relevant extent of the Confidentiality covenant reached in the *Centre Life* Case in the United States District Court on April 19, 2004, as transcribed by Mary Ann Ranz, court reporter to Judge Beckwith:

> **THE COURT:**  Thank you, folks.  Please be seated.  Probably the easiest thing to do is ask Mr. Roberts to place upon the record his understanding of the settlement, and then if there are any additions or corrections or refinements, I'll look to Mr. Ellis to fill in the blanks."  . . .
>
> **MR. ROBERTS:**  Thank you, Your Honor.  Prior to the trial, the defendant offered to pay to the plaintiff $2 million in exchange for a return of the disability policy, the return of confidential documents, and <u>left</u>

---

[2]        The following reveals that Mr. Ellis understood that he was bound to strict confidentiality from April 19, 2004 forward (a promise which it is believed Mr. Ellis has already breached):

> "**MR. ELLIS**:  . . . I will agree and we will agree to keep Mr. Jeffries' file and any part of it completely confidential, unless there is a subpoena. . . We will in either event agree to keep that confidential at the plaintiff's request . . . .
>
> **MR. ELLIS**:  -- . . . The documents will be kept under seal, and Mr. Roberts will have advanced notice if anybody subpoenas it.  I'm willing to work with Mr. Roberts as far as this issue's concerned.  I've already told him I will protect this file.  I know I can do that, keep it confidential, put it into the settlement agreement that that file will be confidential and not a paper out of it and will include everything through the litigation . . . I will keep it confidential at plaintiff's request.  I will not give it up, nor will my clients, unless there is an order of Court . . . .
>
> **THE COURT**:  Well, can you agree with the interim position that the defendant will guarantee the confidentiality of plaintiff's various personal information will be maintained in the absence of any specific order of a court of competent jurisdiction to the contrary, with the possibility that those records will be released either to the plaintiff or to this Court for safekeeping?
>
> **MR. ELLIS**:  . . . if there's any kind of a regulatory agency or anybody wants to look at this thing, we'll certainly let Mr. Roberts know and we'll certainly keep it confidential.  We won't voluntarily produce it to anybody or -- shy of a court order or an order of somebody who can regulate us and shut us down . . .  I don't know what the concern is of the plaintiff, but I'll guarantee you this stuff is not going anywhere.
>
> **MR. ELLIS**:  We'll keep it confidential.  That's the best I can do for them today." (*Case No 02-351, Doc. 253*).

<u>to the plaintiff an election on confidentiality provisions relating to the case and the settlement.". . .</u>

**MR. ELLIS:** <u>Your Honor, the offer that was made is accurately stated</u>". . .

**THE COURT:** <u>And the confidentiality is at the option of the plaintiff; is that correct</u>?"

**MR. ROBERTS:** <u>Yes</u> . . .

**THE COURT:** <u>Okay.</u>

**MR. ELLIS:** <u>It's not an issue for us, Your Honor</u>. (*Case No 02-351, Doc. 253, emphasis added*).

Later, consistent with the parties' agreement, the Court sought Mr. Jeffries' consent only to

disclose the settlement terms to the jury (without seeking any input from Mr. Ellis):

**THE COURT:** Ladies and gentlemen, I'm sorry for keeping you waiting. . . <u>it's plaintiff's call whether this is a confidential settlement</u> or whether I can share it with you all. I'll ask . . .

**JUROR NO. 1:** May we hear the settlement terms?

**THE COURT:** Mr. Roberts, how does your client feel about it?

**MR. ROBERTS:** He probably thinks their interest is piqued and doesn't care if you share with them.

**THE COURT:** All right. Well, a little background, folks. . . . the parties agreed in the interest of a complete, final, total settlement to -- for <u>the defendant to pay the plaintiff $2 million</u>, and that would be all-inclusive. No further issue of any future payments, no issues about back payments, no issues about bad faith, no issues about punitive damages, no issues about attorneys' fees, no issues about expenses. Two million dollars paid to the plaintiff, and it's up to the plaintiff to decide how to manage that money for his and his family's future benefit. Have I fairly grasped the concept here, Mr. Ellis?

**MR. ELLIS:** Yes, Your Honor. (*Case 02-351, Doc. 253, emphasis added*).

For Mr. Ellis (a participant in the above discussions) to now seek sanctions against Mr.

Roberts on the patently (and knowingly) false claim that Mr. Roberts breached a confidentiality

agreement is not *another* simple oversight or error by Mr. Ellis. It is another blatant

misrepresentation by Mr. Ellis to this Court. Presumably, under Mr. Ellis' new reading of the

settlement agreement the District Court Judge in the *Centre Life* Case also breached the confidentiality provision of the settlement because she shared the settlement terms with eight 3rd-party jurors. What's equally bizarre is that Mr. Ellis accuses Mr. Roberts of breach and seeks sanctions because Mr. Roberts disclosed the *Centre Life* Case settlement to employees of DMS -- a party to the *Centre Life* Case and the entity which represented Centre Life at trial and negotiated the Settlement Agreement! *Id.*

Mr. Ellis' accusation that Mr. Roberts "made public the terms of the confidential settlement agreement" is utterly false. Mr. Ellis must be sanctioned for even raising the accusation. And Mr. Kearney should not have had to pay his counsel to respond to such patently false claims. Mr. Kearney requests the reimbursement of his fees in this regard.

B.    **Mr. Roberts Has Not "Misrepresented" Proceedings Of The *Centre Life* Case.**

Mr. Ellis' second false accusation is that Mr. Roberts "attempted to influence the witness being deposed" by improperly "impl[ying] that the recommendation of the summary jury was made by the actual jury impaneled for trial." This accusation is incorrect on two levels: (i) Mr. Roberts wasn't attempting to influence Mr. Ellis' client (nor would that be a sanctionable issue); and (ii) there was no "implication" concerning which jury rendered the verdict. (*Exh. 1*). Moreover, the occasion of this colloquy between counsel was generated by Mr. Ellis' improper interruption of a deposition. Mr. Ellis' argument on this point is baseless. Again, Mr. Kearney should be compensated for having to respond to such petty, untrue allegations.

C.    **Mr. Roberts Has Not Improperly Used Any Documents From the *Centre Life* Case**

Mr. Ellis' third false accusation concerns his assertion that Mr. Roberts has "violated an explicit order" entered in the *Centre Life* Case. Specifically, Mr. Ellis contends that Mr. Roberts violated an Order in the *Centre Life* Case by introducing at a deposition in this action documents,

Mr. Ellis provided to Mr. Roberts in <u>August 2003</u> without any confidentiality request or reference (the "Unprotected Evaluations"). (*Exh. 1*). Mr. Ellis' accusation is incorrect, <u>and has already been rejected by this Court</u>. (*Docs. 51 and 55*). Mr. Ellis knows well that the Court has already rejected his claim, and it is frivolous for him to raise the issue again in a plea for sanctions.

At no time prior to May 15, 2004, did Mr. Ellis seek confidentiality with respect to this set of August 2003 Unprotected Evaluations. (*Exh. 1*).

In March 2004, seven months after the Unprotected Evaluations were provided to Mr. Roberts, Mr. Ellis requested that one Unprotected Evaluation which had <u>already</u> been filed in the *Centre Life* Case be sealed. *Id.* It was so ordered without objection. *Id.* That Order has not been violated.

In March 2004, also seven months after Mr. Ellis gave redacted and Unprotected Evaluations to Mr. Roberts (and long after Mr. Roberts shared the content of those Unprotected Evaluations with his client in this action, Mr. Kearney), the Court ordered Mr. Ellis to provide Mr. Roberts with unredacted copies of the evaluations. *Id.* The Court's Order states: "the only way to get at the truth is to order the disclosure of the redacted material <u>and make it</u> subject to a protective order and that is the path this court takes." (*Case No. 02-351, Doc. 197, emphasis added*). By its Order, the Court made subject to protection <u>only</u> the unredacted versions of the evaluations to be produced after March 23, 2004.

Mr. Ellis then undertook the effort of drafting a Protective Order which was ultimately agreed to by Mr. Roberts and entered by the Court. In Mr. Ellis Protective Order he too limited the definition of "Confidential Information" subject to protection to unredacted evaluations to be produced. Mr. Ellis wrote:

"Pursuant to Magistrate Judge Hogan's 3/23/04 Order [above] . . . the following documents and information ("Confidential Information") *which are subject to the terms of the 3/23/04 Order* shall be made available to plaintiff's counsel . . . ." (*Case No. 02-351, Doc. 197, Section 1, emphasis added*).

Mr. Ellis further unambiguously provided in his Protective Order that he would label discreetly the documents on which he desired protection. Mr. Ellis' Protective Order reads:

"All Confidential Information **shall** be designated or labeled in the following manner: there shall be placed clearly on the face of such Confidential Information the designation "**CONFIDENTIAL – SUBJECT TO COURT PROTECTIVE ORDER**." (*Id., emphasis added*).

Only after this order drafted by Mr. Ellis was executed by the Court and filed in the ***Centre Life*** Case did Mr. Ellis produce documents subject to the Protective Order. Mr. Ellis produced unredacted evaluations which as required under the Protective Order, for security to attach, were stamped, "Confidential." *Id.* Mr. Roberts has at all times kept confidential that set of materials stamped "Confidential," as promised. *Id.* In fact, as he committed to do, Mr. Roberts has returned to Mr. Ellis all copies of documents produced in the ***Centre Life*** Case which Mr. Ellis produced and marked "Confidential."[3] *Id.*

Mr. Roberts' use of the August 2003 Unprotected Evaluations in depositions in this case does not, as this Court has already concluded, violate any order or covenant of confidentiality.

In apparent recognition that there has been no breach of any Order or promise, Mr. Ellis defaults to arguing that in his judgment Mr. Roberts "violated the spirit" of orders entered in the ***Centre Life*** Case. Mr. Roberts disputes this argument, but nonetheless, it is admitted by Mr. Ellis

---

[3]     Mr. Ellis agreed to return all but one copy of the Jeffries' Claim File, but he has not done so. (*Exhs. 1*).

that there was no violation of any Order, and accordingly, it is admitted by Mr. Ellis that there is no basis to sanction Mr. Roberts and no basis for Mr. Ellis' motion.

Mr. Ellis could have easily requested that all of the previously provided materials, including the August 2003 redacted Unprotected Evaluations, be subject to the Protective Order entered in the *Centre Life* Case 8 months later - but Mr. Ellis chose not to seek protection of those materials. The blame for the neglect and failure to protect his clients' records falls squarely on Mr. Ellis' shoulders. Again, Mr. Kearney should not be required to incur legal fees for Mr. Ellis' false accusations.

**D.     Mr. Roberts Did Not Violate a "Motion To Seal" in the *Centre Life* case.**

Mr. Ellis' fourth false accusation is his claim that Mr. Roberts violated a "Motion To Seal" made in the *Centre Life* Case. This accusation simply makes no sense – an attorney cannot violate a motion. And the Court in the *Centre Life* Case has not sealed the *Centre Life* record. (*Exh. 1*). Hence there is no violation of any order. Ironically, the reason that the Court has not sealed the *Centre Life* Case record is because Mr. Ellis objected. *Id.*

Mr. Ellis claims Mr. Roberts breached a Motion To Seal! Does this make any sense? Should Mr. Kearney be required to pay a lawyer to respond to such ridiculous charges? Are Mr. Ellis' false accusations not sanctionable?

**E.     Mr. Roberts Did Not Improperly Contact A Former JP Employee**

Mr. Ellis' fifth false allegation is his assertion that Mr. Roberts improperly contacted a former employee of plaintiff. But as Mr. Ellis well knows, Mr. Roberts NEVER spoke to a former employee of JP. Mr. Ellis' contrary accusation is intentionally false and frivolous.

Prior to May 5, 2004, the Court ordered Mr. Ellis to make Mr. Maxwell available for deposition, and Mr. Roberts noticed Mr. Maxwell's deposition for May 5. *Id.* On May 5, Mr.

Roberts asked Mr. Ellis when Mr. Maxwell would arrive. *Id.* Only after seeking that information (at about 11:30 a.m.) did Mr. Ellis share with Mr. Roberts that Mr. Maxwell would not be available purportedly because his health did not permit it. *Id.*

As recited in the J. L. Roberson deposition transcript repeated in Mr. Ellis' motion at page 15, during the lunch recess which followed, Mr. Roberts phoned Mr. Maxwell's home. *Id.* Mr. Maxwell's wife answered. *Id.* Mr. Roberts advised her of who he was. *Id.* Mr. Roberts told Mrs. Maxwell that he desired to take Mr. Maxwell's deposition on the following day but had learned that he was not feeling well. *Id.* Mr. Roberts stated unequivocally that he did not intend to take Mr. Maxwell's deposition if his health did not permit it. *Id.* Mrs. Maxwell stated that <u>she</u> would ask Mr. Maxwell if he was feeling up to a deposition. *Id.* Mrs. Maxwell returned to the phone a short time later and relayed to Mr. Roberts that Mr. Maxwell was feeling "o.k." and felt that he could accommodate a deposition. *Id.*

Mr. Roberts terminated the call after telling Mrs. Maxwell that she should expect to receive a call from counsel for Jefferson Pilot later that day advising Mrs. Maxwell of the arrangements for the deposition. *Id.*

Mr. Roberts did nothing unethical or improper in contacting <u>Mrs</u>. Maxwell to investigate Mr. Ellis' claim that Mr. Maxwell's health could not accommodate a deposition. *Id.* And, at no surprise, upon making that contact Mr. Roberts learned that Mr. Ellis had not been <u>truthful</u> about Mr. Maxwell's capacity to be deposed as the Court had ordered. *Id.* Now in a great irony, Mr. Ellis accuses Mr. Roberts of unethical behavior with regard to this exchange. Mr. Ellis' scurrilous claim is groundless. This is undisputed. Mr. Roberts <u>never</u> spoke to Mr. Maxwell.

In addition, despite plaintiff's counsel's suggestion, Mr. Roberts never "implied" to Mrs. Maxwell that he was an attorney for Jefferson Pilot. *Id.* In fact, Mr. Roberts advised Mrs. Maxwell that an attorney for Jefferson Pilot would call her later that day to arrange the logistics. *Id.* If Mr. Roberts had hidden his role from Mrs. Maxwell, there would have been no need to advise Mrs. Maxwell that an attorney from JP would be calling her.

Since Mr. Ellis <u>knows</u> that Mr. Roberts has <u>never</u> spoken to Mr. Maxwell, Mr. Ellis' assertion that Mr. Roberts engaged in unethical conduct by speaking to Mr. Maxwell is groundless. Mr. Ellis is simply upset that Mr. Roberts caught him in an untrue statement about Mr. Maxwell's capacity to be deposed. Regardless, Mr. Kearney should be awarded the recovery of the fees incurred in responding to Mr. Ellis' false claim.

### F.    Mr. Roberts Did Not Use A Derogatory Word To Refer to A Witness.

Sixth, Mr. Ellis falsely contends that Mr. Roberts used inappropriate language in referring to a witness. Mr. Roberts never referred to any witness in any manner other than by their proper name. *(Exh. 1).* As Mr. Roberts explained moments after the comment was made, an unflattering comment directed at Mr. Ellis was purportedly incorrectly interpreted by a witness as directed at the witness. *Id.* When Mr. Roberts learned of this misinterpretation he immediately made it clear to the witness that the comment was not directed at him. *Id.* Mr. Roberts even apologized for the confusion created. *Id.* And Mr. Ellis knows, based on his relationship with Mr. Roberts, that the comment was not directed at the witness, but was rather directed at Mr. Ellis.

III.    <u>Civility/Deposition Behavior</u>

    A.    "<u>Big Brother.</u>"

      In the *Centre Life* Case, Mr. Roberts learned that Mr. Ellis' clients at DMS refer to him as "Big Brother." *Id.* Mr. Ellis also referred to himself as "Big Brother" to the jury impaneled in the *Centre Life* Case. *Id.* Mr. Ellis now correctly reports that Mr. Roberts has, like Mr. Ellis' clients and Mr. Ellis himself, referred to Mr. Ellis from time to time as "Big Brother." Although somewhat surprised, Mr. Roberts now understands that Mr. Ellis does not care for this moniker. Accordingly, Mr. Roberts will no longer refer to Mr. Ellis as "Big Brother."

    B.    <u>Incivility.</u>

      The one true assertion in Mr. Ellis' motion is that Mr. Roberts did as a reaction to Mr. Ellis' improper conduct over 2+ years - and Mr. Ellis' separate improper conduct in the May5/6 and May14/15 depositions - refer to Mr. Ellis in unkind terms. *Id.* Mr. Roberts apologized to Mr. Ellis at the recess following that exchange. *Id.* Mr. Roberts has not and will not again be dragged by Mr. Ellis to that level of professionalism. *Id.*

      A lengthy recitation of Mr. Ellis' improper and unethical conduct (some of which is evidenced above) experienced by Mr. Roberts over the past 2+ years isn't necessary to explain the backdrop which led Mr. Roberts to, in the heat of the moment and in direct reaction to additional unprofessional conduct by Mr. Ellis, allow his temper to get the best of him. As this memorandum is being written, the Vice President of the United States is also taking heat for a similar slip and human reaction. From this point, Mr. Roberts will respond to Mr. Ellis' tactics with only the greatest professionalism which is reserved for deserving members of the Bar.

## Conclusion.

Mr. Ellis desires an Order that all future depositions occur in front of the Magistrate, with all costs associated with those depositions being charged to Mr. Kearney.  Although this requested procedure is completely unnecessary, since Mr. Kearney believes that depositions of the JP/DMS representatives before the Magistrate will be very beneficial to Mr. Kearney and his case, there is no opposition to the conduct of the depositions before the Magistrate in Cincinnati.  But there is no basis for Mr. Kearney to bear any costs other than what he would normally incur.

Mr. Ellis' request for the recovery of "additional costs incurred" and the "excess fees expended in filing both this Motion For Sanctions and in resolving the myriad of discovery disputes needlessly raised by Mr. Roberts" is baseless.  As identified above, with one exception, all of Mr. Ellis' accusations are patently false.  And JP/DMS continuing refusal to provide discovery cannot be excused because Mr. Ellis claims to have been offended by heat of the moment unflattering characterizations triggered by Mr. Ellis' own improper behavior.

Mr. Ellis' motion should be denied.

Respectfully submitted,

OF COUNSEL

/s Michael A. Roberts
Michael A. Roberts, Esq.  (0047129)

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202
(513) 621-6464

GRAYDON HEAD & RITCHEY LLP
511 Walnut Street, Suite 1900
Cincinnati, Ohio 45202
(513) 629-2799
(513) 651-3836 (fax)
email:mroberts@graydon.com

## CERTIFICATE OF SERVICE

The foregoing was electronically filed and thereby served on William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 14th day of July 2004.

/s Michael A. Roberts_____

392554.1