IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON PILOT LIFE INSURANCE CO., | ) : | CASE NO. C-1-02-351 |
| Plaintiff, | ) : | JUDGE SPEIGEL |
| v. | ) : | Magistrate Judge Hogan |
| CHRISTOPHER L. KEARNEY, | ) : | |
| Defendant. | ) | |

## DECLARATION OF COUNSEL

Pursuant to 28 U.S.C. § 1746, Michael A. Roberts makes the following statement based upon personal knowledge, unless otherwise indicated:

1.      My name is Michael A. Roberts. I am an attorney at law licensed to practice in the State of Ohio and am presently in good standing. I am a partner in the law firm of Graydon Head & Ritchey LLP. I serve as the Trial Attorney for the defendant in the above matter.

2.      Counsel for the parties in this action recently concluded a highly contested dispute (the "*Centre Life* Case") in which Mr. Ellis was repeatedly sanctioned by the Court for improper behavior. The Court in the *Centre Life* Case concluded at various points that Mr. Ellis had, *inter alia*: (a) apparently "intentionally misunderstood" the Court's discovery Order; and (b) had filed in the action (or caused to be filed) at least five false declarations. At one point, Mr. Ellis accused the District Court of bias and demanded that she recuse herself. The *Centre Life* Case concluded with a jury verdict of bad faith and a $2 million settlement to be paid by Mr. Ellis' client.

3.      Prior to the *Centre Life* Case, Mr. Ellis and I did not know each other. My first letter to Mr. Ellis in the *Centre Life* Case contained a welcome and invitation to resolve the matter civilly. Within a short time, however, I was required to spend extraordinary time addressing improper conduct by Mr. Ellis.

4.      The relationship between Mr. Ellis and I suffered a substantial decline when Mr. Ellis falsely accused me in March 2003 of "hacking into [Mr. Ellis'] computer" and criminally stealing electronic files. Mr. Ellis made this false and defamatory statement not only to me but also apparently to Mr. Ellis' law firm's managing partner who then phoned the managing partner of Graydon Head & Ritchey LLP in March 2003 to discuss the charge.

5. In October 2003, I attempted to open settlement dialogue with Mr. Ellis in the *Centre Life* Case. I sent Mr. Ellis a 7-page analysis of the case, the facts developed during discovery, and the relevant legal thresholds. I concluded the letter with an invitation to discuss settlement professionally. Mr. Ellis responded by telling me essentially that I was not Mr. Ellis' equal as a lawyer.

6. Throughout the *Centre Life* Case Mr. Ellis treated me with great disdain and animosity.

7. In his Motion For Sanctions, Mr. Ellis falsely accuses me of violating confidentiality by revealing terms of the settlement agreement reached in the *Centre Life* Case. Neither I nor my client agreed to be bound by any confidentiality covenant. It was agreed that I and my client could elect to keep the terms of the *Centre Life* Case settlement confidential as we saw fit. And consistent with the parties' agreement, the Court sought Mr. Jeffries' consent only when the jury requested information concerning the *Centre Life* Case settlement – which the Court then offered.

8. I have not violated any Order in the *Centre Life* Case. In August 2003, Mr. Ellis provided me with unprotected evaluations. At no time prior to May 15, 2004, did Mr. Ellis seek confidentiality with respect to this set of August 2003 Unprotected Evaluations.

9. In March 2004, seven months after the Unprotected Evaluations were provided to me, Mr. Ellis requested that one Unprotected Evaluation which had <u>already</u> been filed in the *Centre Life* Case be sealed. It was so ordered without objection. I have not violated that order.

10. In March 2004, also seven months after Mr. Ellis gave redacted and Unprotected Evaluations to me and long after I shared the content of those Unprotected Evaluations with my client in this action, the Court ordered Mr. Ellis to provide me with unredacted copies of the evaluations. The Court's Order states: "the only way to get at the truth is to order the disclosure of the redacted material <u>and make it</u> subject to a protective order and that is the path this court takes." (*Case No. 02-351, Doc. 197, emphasis added*). By its Order, the Court made subject to protection <u>only</u> the unredacted versions of the evaluations to be produced after March 23, 2004.

11. Mr. Ellis then undertook the effort of drafting a Protective Order which was ultimately agreed to by me and entered by the Court. In Mr. Ellis' Protective Order he too limited the definition of "Confidential Information" subject to protection to unredacted evaluations to be produced. Mr. Ellis wrote: "Pursuant to Magistrate Judge Hogan's 3/23/04 Order [above] . . . the following documents and information ("Confidential Information") <u>which are subject to the terms of the 3/23/04 Order</u> shall be made available to plaintiff's counsel . . . ." (*Case No. 02-351, Doc. 197, Section 1, emphasis added*).

12. Mr. Ellis further unambiguously provided in his Protective Order that he would label discreetly the documents on which he desired protection. Mr. Ellis' Protective Order

2

reads: "All Confidential Information **shall** be designated or labeled in the following manner: there shall be placed clearly on the face of such Confidential Information the designation "**CONFIDENTIAL – SUBJECT TO COURT PROTECTIVE ORDER.**" (*Id., emphasis added*).

13.     Only after this order drafted by Mr. Ellis was executed by the Court and filed in the *Centre Life* Case did Mr. Ellis produce documents subject to the Protective Order. Mr. Ellis produced unredacted evaluations which as required under the Protective Order, for security to attach, were stamped, "Confidential." I have at all times kept confidential that set of materials stamped "Confidential," as promised and ordered. In fact, as I committed to do, I have returned to Mr. Ellis all copies of documents produced in the *Centre Life* Case which Mr. Ellis produced and marked "Confidential."[1]

14.     My use of the August 2003 Unprotected Evaluations in depositions in this case does not, <u>as this Court has already concluded</u>, violate any order or covenant of confidentiality.

15.     Mr. Ellis could have easily requested that all of the previously provided materials, including the August 2003 redacted Unprotected Evaluations, be subject to the Protective Order entered in the *Centre Life* Case 8 months later - <u>but</u> Mr. Ellis chose <u>not</u> to seek protection of those materials. The blame for the neglect and failure to protect his clients' records falls squarely on Mr. Ellis' shoulders. Again, Mr. Kearney should not be required to incur legal fees for Mr. Ellis' false accusations.

16.     Mr. Ellis has falsely accused me of violating a "Motion To Seal." A lawyer simply cannot violate a motion. And the Court in the *Centre Life* Case has not sealed the *Centre Life* record because Mr. Ellis objected to the sealing of the record when Mr. Roberts requested that it be sealed. Mr. Ellis now wants me sanctioned for disclosing information about that case even though that case was not sealed at Mr. Ellis' demand!?

17.     As Mr. Ellis well knows, I NEVER spoke to a former employee of JP.

18.     Prior to May 5, 2004, the Court ordered Mr. Ellis to make Mr. Maxwell available for deposition, and I noticed Mr. Maxwell's deposition for May 5. On May 5, I asked Mr. Ellis when Mr. Maxwell would arrive. Only after seeking that information (at about 11:30 a.m.) did Mr. Ellis share with me that Mr. Maxwell would not be available purportedly because his health did not permit it. During the recess which followed, I phoned Mrs. Maxwell. I advised her of who I was. I told Mrs. Maxwell that I desired to take Mr. Maxwell's deposition on the following day but had learned that he was not feeling well. I stated unequivocally that I did not intend to take Mr. Maxwell's deposition if his health did not permit it. Mrs. Maxwell stated that <u>she</u> would ask Mr. Maxwell if he was feeling up to a deposition. Mrs. Maxwell returned to the phone a short time later and relayed to me that Mr. Maxwell was feeling "o.k." and felt that he could accommodate a deposition. I terminated the call after telling Mrs. Maxwell that she

---

[1]     Mr. Ellis agreed to return all but one copy of the Jeffries' Claim File, but has not.

3

should expect to receive a call from counsel for Jefferson Pilot later that day advising Mrs. Maxwell of the arrangements for the deposition. I did nothing unethical or improper in contacting Mrs. Maxwell to investigate Mr. Ellis' claim that Mr. Maxwell's health could not accommodate a deposition.

19. I never referred to any witness in any manner other than by their proper name. As I explained moments after the purportedly misinterpreted comment was made, an unflattering comment directed at Mr. Ellis was purportedly incorrectly interpreted by a witness as directed at the witness. When I learned of this misinterpretation I immediately made it clear to the witness that the comment was not directed at him. I even apologized for the confusion created. And Mr. Ellis knows, based on our relationship, the comment was not directed at the witness, but was rather directed at Mr. Ellis.

20. In the *Centre Life* Case, I learned that Mr. Ellis' clients refer to him as "Big Brother." Mr. Ellis also referred to himself as "Big Brother" to the jury impaneled in the *Centre Life* Case. I have, like Mr. Ellis' clients and Mr. Ellis himself, referred to Mr. Ellis from time to time as "Big Brother." Although somewhat surprised, I now understand that Mr. Ellis does not care for this moniker. Accordingly, I will no longer refer to Mr. Ellis as "Big Brother."

21. I did as a reaction to Mr. Ellis' improper conduct over 2+ years - and Mr. Ellis' separate improper conduct in the May5/6 and May14/15 depositions - refer to Mr. Ellis in unkind terms. I apologized to Mr. Ellis at the recess following that exchange. I have not and will not again be dragged by Mr. Ellis to that level of professionalism. A lengthy recitation of Mr. Ellis' improper and unethical conduct (some of which is evidenced above) experienced by me over the past 2+ years isn't necessary to explain the backdrop which led me to, in the heat of the moment and in direct reaction to additional unprofessional conduct by Mr. Ellis, allow my temper to get the best of me. From this point, I will respond to Mr. Ellis' tactics with professionalism reserved for deserving members of the Bar.

I declare the foregoing to be true and correct to the best of my knowledge and belief, upon penalty of perjury.

/s Michael A. Roberts_____
Michael A. Roberts, Esq.

## CERTIFICATE OF SERVICE

The foregoing was electronically filed and thereby served on William R. Ellis, Esq., Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, Ohio 45202, this 15th day of July 2004.

/s Michael A. Roberts_____

392554.1