UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

| | | |
|---|---|---|
| ERIC L. JEFFRIES, | . | CIVIL ACTION NO. C-1-02-351 |
| | . | |
| Plaintiff, | . | Cincinnati, Ohio |
| | . | |
| - v - | . | Monday, April 19, 2004 |
| | . | Afternoon Session |
| CENTRE LIFE INSURANCE CO., | . | |
| et al., | . | |
| | . | **Terms of the Settlement and** |
| Defendants. | . | **Discharging of the Jurors** |

. . . . . . . . . . . . . . . . . . . . . . . . . . .

EXCERPTS OF TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, JUDGE
TRANSCRIPT ORDERED BY:  Counsel for the Parties

APPEARANCES:

For the Plaintiff:        GRAYDON, HEAD & RITCHEY, LLP
                          BY:  Michael A. Roberts, Esq.
                          511 Walnut Street
                          Cincinnati, Ohio   45202

For the Defendants:       WOOD & LAMPING, LLP
                          BY:  William R. Ellis, Esq.
                          and  Amy Gasser Callow, Esq.
                          600 Vine Street, Suite 2500
                          Cincinnati, Ohio   45202


Also Present:             Ms. Carrie Barnes (Center Life's Rep.)
                          Mr. and Mrs. Jeffries

Law Clerk:                Patrick F. Smith, Esq.

Courtroom Clerk:          Mary C. Brown

Court Reporter:           Mary Ann Ranz

- - -

1                        MONDAY, APRIL 19, 2004

2                    AFTERNOON SESSION        (2:02 p.m.)

3  BEFORE THE COURT

4        THE COURT:  Thank you, folks.  Please be seated.

5  Probably the easiest thing to do is ask Mr. Roberts to place

6  upon the record his understanding of the settlement, and then

7  if there are any additions or corrections or refinements,

8  I'll look to Mr. Ellis to fill in the blanks.

9        MR. ROBERTS:  Thank you, Your Honor.  Prior to the

10  trial, the defendant offered to pay to the plaintiff

11  $2 million in exchange for a return of the disability policy,

12  the return of confidential documents, and left to the

13  plaintiff an election on confidentiality provisions relating

14  to the case and the settlement.

15     On April 18th, Andrew Cohen, on behalf of the defendant,

16  expressed an additional covenant to allow Mr. Jeffries to

17  direct some, or any amount, or all of that amount to an

18  assumptive reinsurance agreement, and also stated that that

19  direction of the monies that Mr. Jeffries elected to have

20  Centre Life direct to an assumptive reinsurance agreement

21  would remain open for Mr. Jeffries to perform or request that

22  Centre Life do over time.

23     Today it was expressed that Mr. Jeffries would have one

24  year from the date of settlement to make that direction of

25  the monies to an assumptive reinsurance agreement.  And

1  during that period of time, that Centre Life would hold the

2  amount of money -- and the amount of money to be sent to an

3  assumptive reinsurance agreement is going to be between zero

4  and $2 million.  Mr. Jeffries will identify that amount

5  within 30 days.  Within 30 days, Mr. Jeffries will identify

6  the amount of money that he wants Centre Life to hold for

7  future direction to an assumptive reinsurance agreement.

8      During the period of time that Centre Life is holding the

9  money at Mr. Jeffries' request and prior to its direction of

10  that money to an assumptive reinsurance agreement, Centre

11  Life will credit Mr. Jeffries with six percent annual simple

12  interest on that monies -- on those monies.

13      (Messrs. Roberts and Jeffries conferred privately.)

14          MR. ROBERTS:  Any other terms of the agreement that

15  are necessary to be finally documented I suspect will be

16  negotiated.  There might be other issues, but no other

17  monetary issues.

18          THE COURT:  What's your understanding, Mr. Roberts,

19  regarding the costs that may be taxed in this case?

20          MR. ROBERTS:  Well, the offer was that the

21  $2 million includes plaintiff's waiver of sanctions ordered

22  by the Court, which have gone unpaid by the defendant.  And

23  we would agree to waive the right to request that those

24  sanctions be paid on top of the $2 million.

25          THE COURT:  Do you anticipate that there will be any

1  costs taxed beyond the original filing fee in this matter?
2  We do have jury fees.

3          MR. ROBERTS:  I don't know what those would be, Your
4  Honor.

5          THE COURT:  Mr. Ellis?

6          MR. ELLIS:  Your Honor, the offer that was made is
7  accurately stated to the extent I thought that we were asked
8  to provide half up front and half in this agreement.  I don't
9  know if that makes a big difference.

10          MS. BARNES:  I don't think it would, Your Honor.

11          THE COURT:  I was using that as an example,
12  without --

13          MR. ELLIS:  All right.  So, that's not a problem.
14  He can tell us within 30 days.  The six percent is not a
15  problem; however, the $2 million was all-inclusive.  That is
16  the last dollar.  So, each party's going to bear their own
17  costs in this thing.  There will be no further monies
18  exchanging hands between Centre Life, DMS, my office,
19  Mr. Roberts' office or anybody else.  This is the total
20  dollar.

21          MR. ROBERTS:  We agree that plaintiff is responsible
22  for the costs he's incurred, but I don't think we have an
23  agreement or discussion about what the Court might direct one
24  party to do in the way of court costs.

25          (Messrs. Roberts and Jeffries conferred privately.)

5

1      MR. ELLIS:  I think Your Honor understands that

2   we're trying to get a set, fixed dollar with nothing beyond

3   that.  That's what we have always discussed with them.

4        (Mr. Ellis and Ms. Barnes conferred privately.)

5        (Messrs. Roberts and Jeffries conferred privately.)

6        MR. ELLIS:  Your Honor, with regard to the Court's

7   issue that the Court raised regarding jury costs, we

8   will agree to split the jury costs with the plaintiff.

9        THE COURT:  Is that acceptable, Mr. Roberts?

10        (Messrs. Roberts and Jeffries conferred privately.)

11        MR. ROBERTS:  That's fine, Your Honor.

12        THE COURT:  All right.  Are there any other issues

13   outstanding that we need to cover on the record as far as the

14   settlement?

15        MR. ROBERTS:  I'm sure that, you know, with six

16   lawyers involved, the final settlement agreement's going to

17   say some stuff that we haven't articulated.  But I can't

18   imagine that there's anything further we need to discuss on

19   the record today.

20        MR. ELLIS:  That's fine, Your Honor, as long as

21   there aren't financial additions --

22        MR. ROBERTS:  There's not going to be anything

23   that --

24        MR. ELLIS:  -- I don't think there would be.  We

25   would like a return of the confidential documents over

1    Mr. Roberts' signature within a reasonable period of time.

2    What, two weeks is good enough, Mike?  Or do you want --

3            MR. ROBERTS:  I'm pretty busy over the next two

4    weeks.  I can accommodate that.

5            MR. ELLIS:  I appreciate it.

6            THE COURT:  Okay.

7            MR. ELLIS:  Is it clearly understood the return of

8    documents, you don't keep copies; right?  Any documents are

9    shredded?

10           MR. ROBERTS:  I won't keep anything.

11           MR. ELLIS:  I appreciate it.

12           THE COURT:  And the confidentiality is at the option

13   of the plaintiff; is that correct?

14           MR. ROBERTS:  Yes.  I think that we'll need to take

15   a hard look at that.

16           THE COURT:  Okay.

17           MR. ELLIS:  It's not an issue for us, Your Honor.

18           MR. ROBERTS:  Your Honor, the only thing I would add

19   is that there is an extraordinary amount of personal

20   information -- financial, health -- in this record.  We may

21   come to the Court with a request that it be sealed.

22           THE COURT:  Any objection?

23           MR. ELLIS:  Your Honor, with the settlement -- and

24   there's a lot of stuff from both parties.  As far as sealing

25   the whole record in this case, that is fine with us, or

1    returning it.  It makes no difference to us.  We would, of

2    course, ask for the information Mr. Roberts found concerning

3    us be sealed, the same with regard to Mr. Jeffries.  No

4    problem.

5         MR. ROBERTS:  May we get back with you on that

6    specifically?

7         THE COURT:  All right.  Any other issues?

8       (Mr. Roberts and Mr. and Mrs. Jeffries conferred

9    privately.)

10        MR. ROBERTS:  We'd like the surveillance tapes, all

11   that exist, returned to the Jeffries.

12        THE COURT:  Any problem with that?

13        MR. ELLIS:  I'm sorry; returned to?

14        MR. ROBERTS:  Well, given to, I guess.  Ms. Jeffries

15   is a little uncomfortable with a videotape of her in her

16   pajamas out there somewhere.

17        MR. ELLIS:  I don't think there are any of those,

18   but hang on a second.

19      (Mr. Ellis and his colleagues conferred privately.)

20        MR. ELLIS:  I'll guarantee you there's none of

21   those.

22        MR. ROBERTS:  Maybe we got the only copy of that.

23      (Mr. Ellis and his colleagues conferred privately.)

24        MR. ELLIS:  Your Honor, what we prefer to is just --

25   they can be sealed.  If you're concerned about the other

1    insurance companies subpoenaing them or getting them from us,

2    you know, they'll have to issue a subpoena and then come to

3    Your Honor saying, "I've been subpoenaed."  I can't --

4          MR. ROBERTS:  We would just like them given to us.

5    Can't we get that?

6          MR. ELLIS:  Well, the originals are still with the

7    investigators.  I have a copy and now the Court has a copy,

8    so I think that's all there is.

9          MR. ROBERTS:  Is there an objection to us gathering

10   all those in our possession?

11         MR. ELLIS:  I don't know how to answer the question,

12   to be honest with you.  I certainly don't want to stand in

13   the way, and there's no real value to us at this point with

14   this being done.  As long as there's no objection to do it

15   from on high, I don't have a problem with it.

16     Do you have an issue?

17         MS. BARNES:  I just thought it would be easier to

18   just have them sealed instead of rounding them all up myself.

19         MR. ELLIS:  I don't want to fall short, Your Honor,

20   and miss a tape or anything and be -- say, "You held

21   something back" kind of thing.

22         MR. ROBERTS:  It doesn't sound like Mr. Ellis has an

23   objection to returning all that he can put his hands on to

24   us, and that is what we would like.

25         THE COURT:  Good faith effort?

1    MR. ELLIS:  That's fine.  We'll do the best we can,

2    Your Honor, and give them everything that we've got on tape.

3    THE COURT:  Okay.  And there is no other

4    litigation --

5    MR. ELLIS:  We're talking about surveillance tapes;

6    right?

7    MR. ROBERTS:  Right, and the tapes that might be in

8    the possession of their vendees.

9    THE COURT:  Agents?

10    MR. ROBERTS:  Private investigators.

11    MR. ELLIS:  I've never had the request before, Your

12    Honor.  I don't think that there's a problem.  I don't want

13    to run into one with the surveillance people if they keep

14    copies of stuff.  I have no control over them.  But I will

15    make the good faith effort to certainly give Mr. Roberts and

16    Mr. Jeffries everything back, or give to them anything that

17    we have, which are copies of what they have.

18    THE COURT:  But if I say just in my own notes

19    defendant will surrender originals and copies of the video

20    surveillance tapes and make a good faith effort to acquire

21    any remaining in the possession of the surveillance agency or

22    surrender to the plaintiff --

23    MR. ROBERTS:  Agencies, in the plural.

24    THE COURT:  Agencies.  There's no lawsuit pending on

25    any other same or similar policy, so I don't think there

1   could be any issue about spoliation, if you get those tapes

2   and give them a decent burial somewhere.

3           MR. ELLIS:   That's Mr. Roberts' issue because

4   Prudential, as I understand, still has him on claim.  Is that

5   right?  And I don't care.  That's their business, not mine.

6           MR. ROBERTS:   We would also like the written

7   surveillance reports returned as well, copies of all written

8   surveillance reports.

9           MR. ROBERTS:   Kind of -- kind of removes a lot of

10  information from our claim file.  I will agree to this --

11  that I don't want to take the claims file apart.  What I will

12  agree is that any such materials will not be voluntarily

13  surrendered absent a subpoena.  And if it's a subpoena,

14  you'll be notified in advance to try and stop it.

15          MR. ROBERTS:   Defendant doesn't have a claim

16  anymore.  They have no interest in it.  I can't understand

17  why it is, if they have no interest in retaining that

18  information, that they can't make a good faith effort to

19  produce it.

20          MS. BARNES:   Your Honor, if I might?  I'm sorry to

21  interrupt.  (To Mr. Roberts)  I couldn't hear if you were

22  done talking.

23      But our files are often closed or not, subject to DOI

24  review.  And if the Department of Insurance of Ohio or

25  another state comes in to want to audit our files, they're

1  gonna want to see a full and complete file, or an explanation

2  of why certain parts of the file are missing.

3       MR. ROBERTS:  I think a court order in place of

4  those might suffice the DOI.

5       MR. ELLIS:  Well, if I thought Your Honor controlled

6  the DOI and Massachusetts or somewhere else, I would be happy

7  to do so.  My concern, I just don't want to run afoul of a

8  regulation, Judge, trying to do this.

9       I will agree and we will agree to keep Mr. Jeffries' file

10  and any part of it completely confidential, unless there is a

11  subpoena, at which point we will (A) notify Mr. Roberts, and

12  (B) make sure that nothing is produced until there's been an

13  opportunity for him to present the issue to the Court.

14       Other than that, we really do have to keep a copy for the

15  insurance department or Department of Insurance, for the

16  auditors, and I don't want to run afoul of anything that I

17  don't currently understand as I stand here, because I haven't

18  reviewed all the insurance regulations of the various states

19  that may want to do an audit.

20       MR. ROBERTS:  I'd like the opportunity, Your Honor,

21  to get the opinion that that's not essential.  And if it's

22  not something that the law requires in Ohio, as Mr. Jeffries

23  lives in Ohio and his claim is here, that we'd like the right

24  to recover all that information.

25       MR. ELLIS:  As I said, Your Honor, if it's possible,

1    I don't have a problem with it.  But I don't -- it's just not

2    Ohio that can audit our files.  It's Massachusetts and a lot

3    of other states.  And I don't want to be in a position where

4    I am afoul of an insurance department somewhere by an

5    agreement I made in ignorance of what their requirements may

6    be in an audit.

7        We will agree to keep that file sealed and produce

8    nothing from it absent an order of a court of competent

9    jurisdiction.

10        (Messrs. Roberts and Jeffries conferred privately.)

11            MR. ELLIS:  And we'll put in a sheet of paper saying

12    the actual videotapes supporting this have been released to

13    the plaintiff pursuant to your order, Your Honor.

14            THE COURT:  I suppose I don't really see a

15    distinction between the tapes and the written reports.

16            MR. ELLIS:  There really isn't, except that one or

17    the other has to exist in that file, should it be audited.

18    We can give up the tapes, if that's the concern that the

19    tapes would be published.  That's not as big a problem as

20    giving up the actual investigation and the reports that were

21    submitted with them, because the report outlines what occurs

22    on the videotape, and the auditor can review that and say,

23    "Okay, this is what you had."  That's the concern.

24            MR. ROBERTS:  Your Honor, I'm not persuaded by

25    Mr. Ellis' argument that they need to be retained for the

1  auditors.  And should -- I'm certainly going to look.  And if

2  it's not required that they be maintained by law, then I'd

3  like the understanding that everything will be returned.

4        MR. ELLIS:  My only problem, Your Honor, is

5  Mr. Roberts doesn't understand that the Departments of

6  Insurance audit files for whatever's in there, factual or

7  otherwise.  It may not be a legal requirement that you keep

8  every surveillance in your file, but if you audit the file

9  and it's not there and you did something based upon that, or

10  it had some impact on the decisions that were made either in

11  handling the case or resolving the case, I don't want an

12  insurance auditor saying, "Where is it?"  I said, "Sorry.  We

13  destroyed it," or, "We gave it to the plaintiff and he

14  destroyed it."

15    Insurance is a highly regulated business, and I don't

16  want to run a foul of something that I don't know as I stand

17  here.  That's all.  I just don't want to run afoul of some

18  insurance auditor coming in, saying, you know, "This file is

19  incomplete and you didn't do your job" and so forth.

20        THE COURT:  Well, --

21        MR. ROBERTS:  If you have, instead of a claim file,

22  a notarized affidavit from the policyholder that it has the

23  claim file and it doesn't have any problem with the insurance

24  company not maintaining the claims file, I don't know who

25  would have a stake in that game.  I mean, if the policyholder

1    is willing to sign an affidavit that the insurance department

2    would look at -- but my point is, I would simply like the

3    opportunity to research and potentially come to the

4    conclusion that it doesn't need to be kept, or if in its

5    place an affidavit from Mr. Jeffries can sit there, that we

6    would require the return of it.  And if it's something that's

7    not going to run afoul of the Department of Insurance, then I

8    would hope that the defendant would agree to return it.

9            MR. ELLIS:  Like I said, as long as 50 Departments

10   of Insurance are satisfied, I don't care.  I just don't want

11   to be audited and have a file that I was working on audited

12   and have the Department of Insurance from any of the states

13   come down on me because there were things that weren't there

14   to explain our actions.

15           THE COURT:  Well, Mr. Cohen is General Counsel;

16   correct?

17           MR. ELLIS:  He is the General Counsel for DMS, yes,

18   and he would have to have approval from Centre Life.

19           THE COURT:  Okay.  So, presumably between

20   Mr. Roberts, Mr. Cohen, and some person who is counsel for

21   Central Life, they might be able to reach a conclusion that

22   these reports can be released to the plaintiff, and an

23   affidavit or statement from the plaintiff acknowledging

24   receipt might be substituted without deciding the question at

25   this point?

1    MR. ELLIS:  As long as that question isn't decided

2 at this point, Your Honor.  Like I said, it's no -- it's no

3 issue to me.  I just -- you know, I was offering the simpler

4 solution of just sealing it.  And if anybody dares asks for

5 anything from Mr. Jeffries, we'll notify Mr. Roberts and he

6 can get whatever protections the Court would award him, and

7 that way we don't have any risk of running afoul of one of

8 the Departments of Insurance or an audit by Centre Life, or

9 Centre Life sells to another company and is audited by that

10 company.

11    THE COURT:  I can understand the plaintiff wanting

12 to know that he has the sole and exclusive possession of

13 those things if it's possible, without placing the defendant

14 at risk.

15    MR. ELLIS:  That's my only concern, Your Honor.  As

16 long as my client's not at risk, it doesn't matter to me when

17 the case is over.  But it matters to me if my client is

18 putting itself unwarily at risk because Mr. Roberts or Mr.

19 Jeffries wants control of information.

20   We will in either event agree to keep that confidential

21 at the plaintiff's request and notify plaintiff or his

22 counsel should anyone ever ask for information from the

23 Jeffries' file by subpoena.  If they ask it any other way,

24 we'll send it back saying, "It's confidential.  You'll have

25 to subpoena it."  If they subpoena it, we'll notify

1  Mr. Roberts with ample time for him to do something about it.

2  THE COURT:  Okay.  So, am I recording this

3  correctly:  The defendant will surrender all copies of

4  written surveillance reports if not required by Department of

5  Insurance regulations in any of the states in which Centre

6  Life does business; or, in the alternative, the defendant

7  will seal the file subject to giving the plaintiff advanced

8  notice of the receipt of any subpoena from a court of

9  competent jurisdiction for the contents of the file?

10  MR. ELLIS:  Your Honor's correct on the second part.

11  On the first part of it, as I said, audits can come from the

12  Department of Insurance; they can come from any number of

13  different sources.  And I can't --

14  THE COURT:  Okay.

15  MR. ELLIS:  -- I can't take a file and put my client

16  at risk for some audit by -- Suppose Centre Life sells the

17  block of business to someone else, they come in and audit

18  files:  We've got to be able to justify what we did.  And we

19  just can't say, "Well, we gave it to the plaintiff."

20  I'm willing to work with, as best I can, but I'm not

21  going to put my client at risk so that Mr. Jeffries can have

22  a printed document.  The documents will be kept under seal,

23  and Mr. Roberts will have advanced notice if anybody

24  subpoenas it.

25  MR. ROBERTS:  I want to define the globe of what

1   we're talking about here.  On August the 9th, 2002, the claim

2   file was produced to me.  I think Friday or today the

3   defendant filed the claim file with the Court.  That's what

4   we're talking about.  And I'm willing to look into the law

5   and protect the defendant from releasing that claim file.

6   There's other information, though, that isn't in the claim

7   file that we want returned, anything that's not in that -- on

8   that CD that is the claim file -- it's never been represented

9   to me there's anything other than that in the claim file --

10  we will want returned.

11          MR. ELLIS:  Please the Court, anything that isn't in

12  the CD, the original claims file, doesn't mean it wasn't part

13  of this claim.  This litigation, as the Court recalls,

14  initiated before the claim was decided by over a year.  And

15  that information that was developed during the lawsuit and

16  all of the information that was available to claims adjustors

17  when they made the decision is, you know, is a matter of --

18  just fine what we did up to that point in making that

19  decision.  Beyond that point, the settlement of this case

20  depends again upon information that was developed between

21  that time and the current day.  If our file is audited and

22  they see a two million dollar settlement, they're going to

23  want to know what we did and why we did it.  And I think we

24  have to be able to protect ourselves from that kind of an

25  audit and we can't predict what the Departments of Insurance

1  are going to do, or what the subsequent purchasers of the

2  block are going to do, or anybody else that has the

3  opportunity to audit our files.

4          THE COURT:  What if these matters were filed with

5  the Court under seal so that nothing could be released from

6  the Court's files without my order?

7          MR. ROBERTS:  I was going to suggest some escrow --

8  I mean, Mr. Ellis is now expanding the scope of what the

9  claims file is, and I don't think he can tell us exactly what

10  he believes the claim file to be.  But the claims file was

11  filed here.  I mean, I asked Mr. Burrell on Friday if he was

12  going to file the CD.  He said yes.  I don't have an

13  understanding that there's anything else in there.  And I'm a

14  little uncomfortable by the lack of clarity about what is or

15  is not within the claim file.  But if someone came looking

16  for the claim file, governmental auditor, if it exists

17  somewhere, then that person can go there -- whether that's

18  here or whether it's in a safety deposit box at Fifth Third

19  Bank.  I mean, I'm getting -- I'm getting more uncomfortable

20  as this dialogue continues about what is or is not in the

21  claim file and what is or isn't subject to retention by the

22  defendant.

23          MR. ELLIS:  Well, my concern, Your Honor, as I stand

24  here, number one, it's the first time I've ever had this kind

25  of a request.  But the second issue is, I don't know the

1    answer and I cannot commit my client because Mr. Roberts

2    tells me it's not a problem, because Mr. Roberts doesn't have

3    to answer if it becomes a problem down the road.  I do.  Or

4    Carrie Barnes does.

5        I'm willing to work with Mr. Roberts as far as this

6    issue's concerned.  I've already told him I will protect this

7    file.  I know I can do that, keep it confidential, put it

8    into the settlement agreement that that file will be

9    confidential and not a paper out of it and will include

10   everything through the litigation.  Not a paper out of it,

11   not a document will be presented except by subpoena, and

12   subpoena only if Mr. Roberts has had an opportunity to go to

13   court and say they can't have this and the court order says

14   they can't have it.  I won't give it up without a court

15   order.

16       MR. ROBERTS:  I don't know why everything in the

17   litigation needs to be within this argument.  That I'm still

18   not persuaded by -- the claim file has to be retained by --

19   for the Hawaii Department of Insurance.

20       MR. ELLIS:  Because you've never had to answer to

21   them, Mike.

22       MR. ROBERTS:  What I would be willing to agree to is

23   they can keep under seal anything that's legally required.

24   And anything that isn't legally required should be returned

25   or be provided to the Jeffries.

1    MR. ELLIS:  I understand what counsel wants, Your
2    Honor.  I'd love to help him out.  Here's my concern:
3    Supposing I run into a Mike Roberts down the way who says, "I
4    want to see all the stuff that you did that fits a certain
5    category," and a court says, "Give it to him regardless of
6    cost and expenses and just give it to him," and I say, "This
7    was destroyed."  Where am I?  I am probably in deep trouble
8    with that particular judge.  I don't want to go there.  I
9    will seal this file.  And as long as a court doesn't tell me
10   to give it up, I won't give it up.  But if a court tells me
11   to give it up, I'm not going to end up in contempt and I'm
12   not going to expose my client to destroyed documents, and I'm
13   not going to risk a potential audit of these files that I
14   can't predict at this point.  If I knew better, I would be
15   happy to say what I could say to the Court, but I don't know.
16        MR. ROBERTS:  This is a litigation concern.  All you
17   have to do is give whatever you possess.  If you don't
18   possess it, you don't have to produce it --
19        MR. ELLIS:  Well --
20        MR. ROBERTS:  -- or Mike Roberts in the case --
21        MR. ELLIS:  We know that doesn't work, Judge.
22        THE COURT:  Well, I find it hard to believe that a
23   Federal District Court Judge's order enforcing a settlement
24   would not be accepted by any Department of Insurance.  And I
25   would anticipate that any judge in the future, if you have a

1 claimant who wants information on similarly situated

2 insureds, is going to get records that are not redacted in

3 terms of names and Social Security numbers and identifiers.

4          MR. ELLIS:  I hope not.

5          THE COURT:  So --

6          MR. ELLIS:  It would put me in a very difficult

7 position, Your Honor, and my client if we were to make such a

8 commitment today without full knowledge of what the

9 ramifications could be down the road.  This is not your

10 normal request.  We've had confidentiality agreements where

11 we've kept things sealed unless demanded by a court order.  I

12 think that's pretty darn safe.  But I can't expose my client

13 to potential risks from federal judges who have a different

14 view of this situation, or from Departments of Insurance, or

15 from other companies who end up auditing these claims and

16 suggesting one thing or the other to either Centre Life, our

17 client, or others.  It's just beyond the scope of what I can

18 imagine at this point and I can't take that risk.

19     I'm not trying to get this stuff to publish.  I don't

20 want it.  I want the file closed forever.  But, I can't

21 control judges and Departments of Insurance and auditors in

22 50 states.  I just can't do it.

23          THE COURT:  Then --

24          MR. ELLIS:  If this is sealed, I'll say, "This is

25 sealed, it's confidential, unless you get me a subpoena or a

1    court order." And if any time someone suggests they're going

2    to, the first call we make is to Mr. Roberts.

3            THE COURT:  Does Centre Life do business in all 50

4    states?

5            MS. BARNES:  It does, Your Honor.

6            THE COURT:  Okay.

7            MR. ELLIS:  I'd love to have it resolved today, Your

8    Honor.  I don't know enough to do it.

9        (Messrs. Roberts and Jeffries conferred privately.)

10            THE COURT:  Well, it just comes back to -- it occurs

11    to me that if the materials were deposited in this court

12    under seal subject to my further order, that things would

13    still remain somewhat under control and we wouldn't have the

14    potential slipup that some well-intentioned clerk says, "Oh,

15    here's the file.  Have a rummage.  Enjoy yourself," to some

16    person who ought not have it.

17            MR. ELLIS:  Your Honor, this would mean that any

18    time that someone would audit this file, or whatever would

19    happen, they would be coming to Ohio to this court to seek

20    it.  I just can't make a commitment without knowing the

21    repercussions, Your Honor.  The repercussions are too

22    widespread for me to deal with at this point.

23        I think what we can do is this:  Today we will agree to

24    confidentiality of all materials relating to Mr. Jeffries'

25    claim, and it will not -- it will not be surrendered

1    without an order of the Court, and that Mr. Roberts will

2    receive notice if anyone suggests they're going to seek it by

3    subpoena or court order, and we will leave it at that today.

4        If there are no repercussions when we look at the thing

5    in the broad spectrum, then I don't care.  But if there are

6    potential repercussions of either the surrender or

7    destruction of this information, I can't move beyond where I

8    am today.

9        I will keep it confidential at plaintiff's request.  I

10   will not give it up, nor will my clients, unless there is an

11   order of Court.  We get a subpoena, we'll let Mr. Roberts

12   know if we would get one, and we would have Mr. Roberts have

13   the opportunity to say, "No, you can't have it," and we'll

14   stay out of it.  We don't want anything more to do with it.

15            MR. ROBERTS:  I'm struggling with the argument on

16   the one hand, your order, the order of this Court that it be

17   put under seal in this court isn't adequate, but if some

18   other court orders it be produced, it will be produced,

19   subject to me being able to file a motion to quash.  I can't

20   imagine that the Chief Judge in the Southern District of Ohio

21   signing an order that that file is here and maintained under

22   seal here would somehow run afoul of some insurance

23   regulator.

24            MR. ELLIS:  I don't know the answer.  I don't know

25   the regulations for the insurance industry in all 50 states,

1   Your Honor, nor do I know what another judge may think of

2   what this judge ordered me to do.  I don't think it's fair to

3   ask my client to step into that position.  I have no

4   interest, nor does my client, in publishing anything in this

5   file.  For our purposes, it could be closed, sealed, sat on,

6   whatever.  But I don't want to have to face a court order

7   that says we destroyed or we gave it back to the plaintiff,

8   and I don't want to face an Insurance Commission that said,

9   "What did you do?"

10       I don't know the repercussions, Your Honor.  I'd be happy

11   to give Mr. Roberts whatever he wants with regard to this

12   information, because it's of no value to us.  We're getting

13   our policy back.  But I can't take that risk.  I think it's

14   unfair to ask it of me.

15       MR. ROBERTS:  Maybe the ancillary, nonmonetary

16   issues won't be so routine.

17       THE COURT:  Well, can you agree with the interim

18   position that the defendant will guarantee the

19   confidentiality of plaintiff's various personal information

20   will be maintained in the absence of any specific order of a

21   court of competent jurisdiction to the contrary, with the

22   possibility that those records will be released either to the

23   plaintiff or to this Court for safekeeping?

24       MR. ELLIS:  I apologize, Your Honor.  The issue of a

25   regulatory agency who can shut us down in a heartbeat if we

1   don't comply with what they tell us to do is an issue that

2   Ms. Barnes has brought to my attention.  Again, if there's

3   any kind of a regulatory agency or anybody wants to look at

4   this thing, we'll certainly let Mr. Roberts know and we'll

5   certainly keep it confidential.  We won't voluntarily produce

6   it to anybody or -- shy of a court order or an order of

7   somebody who can regulate us and shut us down.

8       We are responsible to all these different regulatory

9   agencies both nationally and state.  And I just -- I don't

10  know those regulations in order to say that I can tell them

11  no, whether my client can tell them no if they came in to see

12  a file and audit it and see the contents of it.  I don't know

13  what the concern is of the plaintiff, but I'll guarantee you

14  this stuff is not going anywhere.

15          THE COURT:  What, if anything, Mr. Ellis, do you

16  know about the records retention policy of Centre Life?

17          MR. ELLIS:  I can find out.

18      (Mr. Ellis and Ms. Barnes conferred privately.)

19          MS. BARNES:  Are you asking with regard to a claim

20  closed file -- or closed claim file?

21          MR. ELLIS:  Yes.

22          MS. BARNES:  They are kept for a statutory period,

23  according to what state the file is closed in, and then

24  destroyed.

25          MR. ELLIS:  Whatever the Ohio statutory requirement

1  is for maintaining a claim file, that's how long it would be

2  there.

3          THE COURT:  And no one in this room knows the answer

4  specifically to that question?

5          MR. ELLIS:  I wasn't thinking about destroying the

6  file.  It wasn't an issue that came to the forefront of my

7  mind.

8          THE COURT:  Well, I was just trying to figure out if

9  there's a point at which Centre Life would be free to destroy

10  the file and, therefore, as an alternative, could give the

11  file to the plaintiff, so that the plaintiff then has

12  possession of it to do as he see fits, because --

13          MS. BARNES:  Your Honor, I don't know the exact

14  year, but we are talking years.

15          THE COURT:  Well, I would imagine it's something in

16  the vicinity of five years maybe.

17          MS. BARNES:  I'm thinking between seven and ten for

18  whatever state we're talking about.

19          MR. ELLIS:  Whatever it is, it is, Judge.  We'll

20  keep it confidential to that point in time, and if he wants

21  it back, fine; if he wants it destroyed, fine.

22          THE COURT:  Just a thought.

23          MR. ELLIS:  See, normally what happens when the file

24  reaches their destruction age, it just happens.  There's

25  people down there that say, "Okay, this group goes."  Blupp,

1    it's gone.

2        MR. ROBERTS:  To me, it's still an open question

3    whether or not the law requires it.  But we're still talking

4    about two globes of information:  The globe of information

5    that may theoretically be required to be maintained, and the

6    globe of information which isn't.  And we'd like the

7    immediate return of the globe of information which isn't.

8    And a single copy of what must apparently or conceivably be

9    required to be maintained by law should be kept under seal

10   and confidential.

11       MR. ELLIS:  Counsel's suggestion, Your Honor, makes

12   great sense in the abstract; however, it's not a question of

13   the law all the time.  It's a question of how a regulator

14   audits our files.  It's a question of how the company may

15   audit our files.  I don't know enough to concede what the

16   plaintiff wants me to concede at this point, and I can't put

17   my client in a compromised position.

18       I know we can keep it confidential absent a court order

19   or the demand of a regulatory agency.  I know we can do that.

20   Beyond that, I've never had this issue raised before in 30

21   years.  So, I don't know the answer to it.

22       MR. ROBERTS:  The more we talk about this, the more

23   it sounds like there's some other agenda.  I can't imagine

24   that another lawyer isn't willing to agree that anything that

25   they're not legally obligated to maintain can come back.

1    It's really simple.

2         MR. ELLIS:  I would not advise my client in the

3    absence of knowledge that I'm not compromising their status

4    with regulatory agencies, other auditors, and/or statutes in

5    any of the 50 states.  I just don't know enough to do it,

6    Judge.  I'm sorry.  I'm not that bright.

7         MR. ROBERTS:  I'm not asking him to tell us what the

8    law is.  Anything outside what's legally required should --

9         MR. ELLIS:  I don't know what's legally required,

10   Judge.  I don't know what the auditors look at.

11        MR. ROBERTS:  It might not be anything.  It might be

12   a lot.  I'm not asking to hedge on the law.  Anything outside

13   the law.

14        THE COURT:  Is there a problem in securing an

15   opinion letter of counsel from Centre Life regarding what

16   needs to be retained?

17        MS. BARNES:  In a situation where we're dealing with

18   a regulatory agency, Your Honor, I think that it would be

19   better advised to probably get an opinion letter from each of

20   the Departments of Insurance of the 50 states that this issue

21   might come up in.

22        MR. ELLIS:  We can express the request of the

23   plaintiff in this case to identify the information in a

24   generic sense and have them tell us whether we're permitted

25   to destroy or return.  But that's an expensive proposition,

1    I'm sure, to go out and get 50 opinion letters.  But I don't

2    see an option.

3            THE COURT:  Well, are you willing to do that?

4            MR. ROBERTS:  Of course it's expensive, Your Honor.

5    I'm not persuaded that's required.  But I guess as far as --

6            MR. ELLIS:  I don't know what to tell you, Mike.  I

7    don't know the answer.

8            MR. ROBERTS:  I can't imagine another lawyer isn't

9    willing to agree to return what's not legally required.  I'm

10   not asking you to say that there's even a single document

11   that is not legally required to be retained.  I just want the

12   understanding that if there's information out there that

13   isn't legally required to be maintained, it gets returned.

14           MR. ELLIS:  Perhaps I can give the Court an example.

15   It is not legally required for a towboat to maintain a log.

16   Not required by any regulation or the law.  But a federal

17   judge will smack them if they don't have one for improper

18   operation, and so forth.  And the Coast Guard may jump in and

19   say, "We agree.  Whether it's required or not is common, good

20   seamanship to do it."  That's a situation where logs aren't

21   required by law, but the absence of them could be

22   problematic.  I don't want -- I don't know enough about this

23   situation in order to say to my client, "Don't worry about

24   not maintaining your log."

25           MR. ROBERTS:  Mr. Jeffries will give you an

1   affidavit that he has the possession of those things, that

2   they did exist at one point in time.  After the file was

3   closed, the litigation ended, he obtained possession.  I

4   don't see that that's a big problem.

5           MR. ELLIS:  Because you don't have to answer for it.

6           MR. ROBERTS:  Well, we will.  We'll maintain it.

7   I'll maintain it in my escrow account at Fifth Third Bank,

8   and if anybody needs to see it, I can give it to them.

9           MR. ELLIS:  Your Honor, I'm not going there.  I

10  can't give up possession of a claim file to a plaintiff's

11  attorney and tell the Department of Insurance from whatever

12  state that wants to audit certain files, or whatever

13  plaintiff wants to get, you know, certain discovery, that he

14  has to call Mike Roberts in Cincinnati, Ohio, because the

15  Departments of Insurance aren't going to be too thrilled with

16  that answer I don't believe.

17          THE COURT:  Well, I find it hard to believe that you

18  don't have someone in-house who knows what the obligations

19  are to all 50 Departments of Insurance, because obviously you

20  need someone in-house who can advise the employees as to what

21  to do with various bits of information.

22          MR. ELLIS:  Your Honor, I have no -- I have no doubt

23  that Mr. Cohen can probably accomplish most of that.  The

24  problem is this:  We're being asked to gut and destroy a

25  claim file that we're required to, by law, to keep for a

1   certain period of time.  The repercussions of that I don't

2   think anybody knows, because I don't think this issue has

3   ever come up before, at least not in my experience.

4           THE COURT:  Well, maybe Mister --

5           MR. ELLIS:  We'll keep it confidential.  That's the

6   best I can do for them today.

7           THE COURT:  Well, today.

8           MR. ELLIS:  He can talk to Mr. Cohen about it.

9           THE COURT:  That's what I would suggest:  Talk to

10  Mr. Cohen and see what, if anything, you can work out.  And

11  maybe it might involve the plaintiff guaranteeing that he

12  will maintain these items and not destroy them for a

13  statutory period of time.  I don't know.  I don't know what

14  Mr. Cohen's going to say.

15      But, Mr. Roberts, do you think you can work this out with

16  Mr. Cohen?

17          MR. ROBERTS:  I might have a little bit more success

18  there.  I'm sensing that Mr. Ellis isn't going to commit to

19  anything further on this, so I think we've reached the end of

20  this topic for today.

21          THE COURT:  Is there anything outstanding other than

22  that?

23          MR. ROBERTS:  I would like for the Court to retain

24  jurisdiction of this just in guess issues like this that

25  should have been answered and easily resolved aren't in this

1    settlement documentation process.

2            THE COURT:  Ordinarily, I would maintain

3    jurisdiction at least for 30 days until things are final.

4    And I think the discussion is that you and Mr. Jeffries will

5    work out how you want to allocate the settlement within 30

6    days.  Maybe we should keep it open for 45 or 60 days, just

7    in the event that there's something that comes up that nobody

8    anticipated that has to be resolved.  Is that --

9            MR. ELLIS:  Actually, Your Honor --

10           THE COURT:  -- reasonable?

11           MR. ELLIS:  -- I would agree with the Court, except

12   for I think we probably should maintain jurisdiction until

13   Mr. Jeffries' election and the accomplishment of the other --

14   whatever money's returned --

15           THE COURT:  Okay.

16           MR. ELLIS:  -- because I don't want there to be a

17   problem there with, you know -- as I said, in the assumptive

18   reinsurance, we've got to sell this to another insurance

19   company, and we can't guarantee how they're going to react to

20   him.  We're sure we can accomplish the goal, but I think the

21   Court should retain jurisdiction just in case.

22           THE COURT:  For a year or 18 months, something like

23   that?

24           MR. ELLIS:  One year is the limit, Judge.

25           THE COURT:  Well, I can see --

1          MR. ELLIS:  It would have to be done within that

2  time.  Right?

3          MR. ROBERTS:  I don't know what the law is on that.

4  But at least a year.

5          THE COURT:  All right, one year.  And then I would

6  typically have language in there that it could be extended by

7  agreement of the parties or should circumstances require.

8          MR. ELLIS:  That's fine.

9          MR. ROBERTS:  Your Honor, thank you.

10         THE COURT:  Okay.  Have we thrashed it out, folks?

11         MR. ELLIS:  I'm sorry, Your Honor?

12         THE COURT:  Have we thrashed out all the problems as

13  best we can?

14         MR. ELLIS:  I hope so.

15         MR. ROBERTS:  The only ones that I could foresee

16  today.

17         THE COURT:  Okay.  Is it safe to bring down the jury

18  and thank and excuse them?

19         MR. ROBERTS:  Please.

20         MR. ELLIS:  Yes, ma'am.

21         MR. ROBERTS:  Thank you.

22         THE COURT:  This may take a couple minutes, I

23  suspect -- (to the Clerk) Or do you think?

24         THE CLERK:  They're right upstairs.

25         THE COURT:  Okay.

1  BEFORE THE JURY                              (2:48 p.m.)

2          THE CLERK:  Please be seated.

3          THE COURT:  Ladies and gentlemen, I'm sorry for

4  keeping you waiting.  But as I indicated to you before, quite

5  often while you're waiting, we're working, and in fact we

6  have been working diligently ever since you left the

7  courtroom, and I hope you'll be pleased to know that the case

8  has been settled to the parties' mutual satisfaction.

9      There's nothing like having a jury in the jury box to

10  focus everybody's attention on the potentialities for

11  settlement.

12      So, we give you back two weeks of your lives and you go

13  with our appreciation.  If you want to stay around and talk

14  to anyone about the case, you're welcome to do that.  I can

15  come up and talk to you.  I'm not sure, it's plaintiff's call

16  whether this is a confidential settlement or whether I can

17  share it with you all.  I'll ask.  But if there's anything

18  you want to tell me about your experiences and things we

19  could do differently to benefit other juries in the future,

20  I'd be happy to hear that.

21      The attorneys are, by local rule, prohibited from calling

22  any of you to ask you what you would have done, what you

23  thought up to this point, what you might have decided.

24  Obviously, you haven't heard very much about the case, and I

25  doubt that they would even try to do that.  But they are

1  prohibited by local rule.  It doesn't mean that you can't

2  pick up the phone and say something to them about what you

3  thought of the small portion of the case that you heard up to

4  this point.  But, your patience is rewarded, I hope, that we

5  have, as I said, settled the case, and you've done your duty.

6          JUROR NO. 1:  May we hear the settlement terms?

7          THE COURT:  Mr. Roberts, how does your client feel

8  about it?

9          MR. ROBERTS:  He probably thinks their interest is

10 piqued and doesn't care if you share with them.

11         THE COURT:  All right.  Well, a little background,

12 folks.  Had you been called upon to decide this case, you

13 would have had to decide whether plaintiff was entitled to

14 any back payments that had not been made.  And if he was not

15 entitled to those because he was mentally suffering from a

16 mental disorder, then you would have to decide was the

17 insurance company entitled to be reimbursed.

18    As you can observe, Mr. Jeffries is a young man.  The

19 policy would have paid through age 65.  He would not have

20 been entitled in this lawsuit, at this time, to have received

21 the full value of the insurance policy.  There were other

22 claims, as you know, outstanding for bad faith and there were

23 claims for punitive damages and claims for attorneys' fees.

24    The parties agreed in the interest of a complete, final,

25 total settlement to -- for the defendant to pay the plaintiff

1    $2 million, and that would be all-inclusive.  No further

2    issue of any future payments, no issues about back payments,

3    no issues about bad faith, no issues about punitive damages,

4    no issues about attorneys' fees, no issues about expenses.

5    Two million dollars paid to the plaintiff, and it's up to the

6    plaintiff to decide how to manage that money for his and his

7    family's future benefit.

8         Have I fairly grasped the concept here, Mr. Ellis?

9         MR. ELLIS:  Yes, Your Honor.  I think it's probably

10   good for the jury to understand, if they haven't already, the

11   amount of the monthly benefit that was to be paid should Mr.

12   Jeffries have established physical disability.

13        THE COURT:  Ah.  The policy was for -- correct me if

14   I'm wrong -- $25,000 per month?

15        MR. ELLIS:  No, Your Honor.  It was 12,133 per

16   month.  The second policy paid the other portion.

17        THE COURT:  Ah, okay.  That's where I'm getting that

18   figure.  So $12,000 per month, plus a little bit.  And Mr.

19   Jeffries is 38 at the present time, yes?

20        MR. ROBERTS:  At one point in time he was.  He's now

21   43.

22        THE COURT:  Forty-three.  Ah, time flies.  But 43.

23   And it would have paid to age 65.  So that is the settlement.

24        JUROR NO. 1:  Thank you.

25        THE COURT:  Any other thoughts or questions that you

37

1    care to express?

2        (No response.)

3            THE COURT:  Thank you very much.  Couldn't have been

4    done without you, I think.

5            MR. ELLIS:  Thank you.

6            THE CLERK:  All rise.

7        (At 2:53 p.m., the jury was discharged.)

8    BEFORE THE COURT

9            THE CLERK:  Please be seated.

10           THE COURT:  Any parting thoughts, folks?  Has

11   everyone expressed themselves to the point that they are

12   empty of thought?

13       (No response.)

14           THE COURT:  Okay.  Well, thank you.  I hope that

15   things will go well for the Jeffries and for counsel

16   henceforth.

17           MR. ROBERTS:  Thank you.

18           MR. ELLIS:  Thank you, Your Honor.

19           MR. JEFFRIES:  Thank you.

20           THE CLERK:  This court is now adjourned.  (2:54 p.m.)

21                    -  -  -

22                 PROCEEDINGS CONCLUDED

23                    -  -  -

24

25

C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____
Mary Ann Ranz
Official Court Reporter