Case 1:02-cv-00479-MRB   Document 89-6   Filed 08/24/2004   Page 1 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                C-1-02-479
John L. Roberson                                                             5/7/2004

```
            UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NORTH CAROLINA
                  WESTERN DIVISION


JEFFERSON-PILOT INSURANCE COMPANY,    )
                                      )
                  Plaintiff,          )
                                      )
       vs.                            )   CASE NO.
                                      )   C-1-02-479
CHRISTOPHER L. KEARNEY,               )   (Judge Spiegel)
                                      )
                  Defendant.          )
```

COPY

The deposition upon oral examination of JOHN L. ROBERSON, being taken pursuant to Order and in accordance with the Federal Rules of Civil Procedure before Rebecca J. Huddy, Notary Public, at the Marriott, 304 North Greene Street, Greensboro, North Carolina, on the 7th day of May, 2004, beginning at 8:40 a.m.

*[Handwritten notes:]* P.5? lot of stuff dot'ng added
P.62 ct gets it on Monthly B+ill

Case 1:02-cv-00479-MRB    Document 89-6    Filed 08/24/2004    Page 2 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                       5/7/2004

Page 4

APPEARANCES:
For the Plaintiff: Mr. William R. Ellis
                  Wood & Lamping, LLP
                  600 Vine Street, Suite 2500
                  Cincinnati, Ohio 45202

                  Ms. Stephanie Farabow
                  Jefferson-Pilot Life Insurance Company
                  100 North Greene Street
                  Greensboro, North Carolina 27401
For the Defendant: Mr. Michael A. Roberts
                   Graydon, Head & Ritchey
                   511 Walnut Street
                   1900 Fifth Third Center
                   Cincinnati, Ohio 45202
                   * * *

INDEX
By                          Page
EXAMINATION     Mr. Roberts        3 - 91
EXAMINATION     Mr. Ellis          91 - 103
FURTHER EXAMINATION  Mr. Roberts   104 - 112
FURTHER EXAMINATION  Mr. Ellis     112 - 114

EXHIBITS

Number      Description             Page
Defendant's 19  Roberson correspondence   31
"   20   Disability Claim 10-31-94   58
"   21   Correspondence '93-'95      64
"   22   Handwritten calculations    111
         * * *

1  A.  Yes.
2  Q.  Okay. How long have you been in retirement?
3  A.  Seven years.
4  Q.  Do you know when it was that you last worked, day,
5      month?
6  A.  March 31, 1997.
7  Q.  Okay. Do you know whether or not you had
8      responsibility for Mr. Kearney's claim through the
9      date of your retirement?
10 A.  Yes.
11 Q.  Did you supervise someone that had a more principal
12     role in administering his claim?
13 A.  Yes.
14 Q.  Okay. Someone reported up to you?
15 A.  Yes.
16 Q.  Okay. I'm sure you've given a deposition before, I
17     suspect you have. You need for me to finish my
18     question before you give an answer even if you know
19     where I'm going, okay?
20 A.  Okay.
21 Q.  Okay. Who was it that reported up to you and had
22     primary responsibility for Mr. Kearney's claim prior
23     to your retirement?
24 A.  There would have been several persons: Phyllis
25     Harden, Bob Maxwell, and Harold Shelton.

Page 3

1       The witness, JOHN L. ROBERSON, being first
2  duly sworn, was examined and testified as follows:
3
4  EXAMINATION (by Mr. Roberts):
5
6  Q.  Mr. Roberson, we just met briefly. We're here in
7      Greensboro, North Carolina, to take your deposition.
8          Could you please tell the jury your name and
9      home address, please.
10 A.  My name is John L. Roberson. I reside at 3816 Kirby
11     Drive, Greensboro, North Carolina. I go by the
12     initials JL.
13 Q.  How would you like for me to refer to you, sir?
14 A.  JL.
15 Q.  Okay. I feel uncomfortable doing that.
16 A.  Pardon?
17 Q.  You're too much my senior for me to feel comfortable
18     calling you by your first name. I'll call you Mr.
19     Roberson.
20         Mr. Roberson, you've been called to give
21     testimony here today because you've had some
22     experience administering a claim for disability filed
23     by Chris Kearney; isn't that right?
24 A.  That's correct.
25 Q.  Okay. Are you presently retired, sir?

Page 5

1       (Mr. Kearney entered the hearing room.)
2  Q.  Could you help me understand the chain of command or
3      hierarchy between the four of you during the '93-'97
4      time frame.
5  A.  Phyllis and Bob were claims analysts. Harold Shelton
6      was the manager of the Claims area.
7  Q.  How many Jefferson-Pilot Life Insurance Company claims
8      analysts were there during the last five years of your
9      employment?
10 A.  In what division are you talking about?
11 Q.  What are the divisions?
12 A.  Well, there was the Life divisions -- I have no idea
13     how many were there. In the Individual Health
14     Insurance Division, there would have been three
15     analysts.
16 Q.  Is that the division that Ms. Harden and Mr. Maxwell
17     were in?
18 A.  Yes.
19 Q.  Okay. Who would have been the third analyst?
20 A.  Kim Brann.
21 Q.  When you retired, were all three of those analysts
22     still employed at Jefferson-Pilot?
23 A.  No. Bob Maxwell was retired.
24 Q.  He'd retired prior --
25 A.  He retired prior to me on disability.

2 (Pages 2 to 5)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 89-6    Filed 08/24/2004    Page 3 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                       5/7/2004

Page 6

1  Q. Okay. Did he have a disability policy with
2     Jefferson-Pilot?
3  A. How would I know?
4  Q. He filed a claim and it came under your hierarchy.
5  A. No, it would not have.
6  Q. All right.
7  A. If he had disability with us, it would have been with
8     the Group Division. I had no responsibility for that.
9  Q. Okay. Very well. Were Kim Brann and Ms. Harden still
10    employed with Jefferson-Pilot when you retired?
11 A. Ms. Harden was. Kim Brann is no longer with the
12    company and when she left, I don't recall.
13 Q. Did she leave prior to you or subsequently?
14 A. I don't recall.
15 Q. How do you know she left?
16 A. She wrote me a note and told me that she was working
17    with another company.
18 Q. Do you know where?
19 A. Yes.
20 Q. Where?
21 A. The Center for Creative Leadership.
22 Q. Do you know where that is located?
23 A. It's in Greensboro, North Carolina.
24 Q. When was the last time you spoke to her?
25 A. I can't recall.

Page 7

1  Q. Would it have been several years ago?
2  A. At least.
3  Q. At least several years ago? Was Mr. Maxwell replaced
4     when he went out on disability?
5  A. No.
6  Q. So when you retired, there were just two claims
7     analysts in the department?
8  A. As far as I recall, yes.
9  Q. And Mr. Shelton was their supervisor and he reported
10    to you?
11 A. That's correct.
12 Q. And did anybody else report to you directly?
13 A. Yes. I had the responsibilities for underwriting,
14    policy issue, policy service and claims, and there
15    would have been several underwriters reporting to me,
16    supervisor of policy service in addition to the Claims
17    area.
18 Q. But the only claims personnel that reported to you are
19    Mr. Shelton and Mr. Maxwell, Ms. Harden and Ms. Brann?
20 A. That's correct.
21 Q. What does underwriting policy issue mean?
22 A. Underwriting and policy issue. Underwriting is the
23    process of approving a rating of applicants. Policy
24    issue is the issue of a policy.
25 Q. Tell me about the functions performed by the Policy

Page 8

1     Issue persons who reported to you.
2  A. Entered the information from the application into our
3     computer system and physically issued the policy and
4     mailed it when it was approved.
5  Q. Okay. So they take information of potential or
6     prospective policyholders and if those persons choose
7     to purchase a policy, they handle the mechanics of
8     that; is that right?
9  A. Do you want to state that again. I'm not sure I
10    understood.
11 Q. Do I understand correctly that the persons who work in
12    the Policy Issue Department or Division or Group that
13    reported to you would intake the data of a prospective
14    policyholder who desired to purchase a policy and they
15    would perform the mechanics to accomplish that?
16 A. Generally, yes.
17 Q. Okay. Did they have any responsibility for actually
18    drafting, creating, or authoring the actual policy or
19    policies or riders?
20 A. No.
21 Q. Where was that function performed when you were
22    working at Jefferson-Pilot?
23 A. Do you want to go over that again.
24    MR. ROBERTS: Could you read him the question
25    again.

Page 9

1     (The last question was read back by the court
2     reporter.)
3  A. Primarily in the Actuarial Department.
4  Q. How long did you work at Jefferson-Pilot?
5  A. Thirty-eight and a half years.
6  Q. Did you ever have any responsibility or role in the
7     Actuarial Department?
8  A. No.
9  Q. Do you know anything about how policies are created or
10    were created by Jefferson-Pilot during your tenure?
11 A. Do you want to state that again.
12 Q. Do you know anything about how policies were created
13    at Jefferson-Pilot during your 38 and a half years
14    there?
15 A. Disability policies, yes.
16 Q. Okay. What can you tell me about what you know about
17    the creation of disability policies?
18 A. What do you want to know about it?
19 Q. Educate me about the process, what you can recall,
20    start to finish in the creation of a disability
21    policy.
22 A. Well, the ideas generally came from the Marketing
23    Department. It was discussed with the Underwriting
24    Department and the Actuarial Department. The decision
25    was made for the type of benefits to be placed in the

3 (Pages 6 to 9)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MRB   Document 89-6   Filed 08/24/2004   Page 4 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson
C-1-02-4
5/7/200

Page 10

1  policy. The Actuarial Department wrote the policies,
2  rated them. They were reviewed by myself and the
3  Marketing Departments, agreed upon, printed, filed
4  with the Insurance Departments, and then marketed.
5  Q. Thank you. What was your role in -- you mentioned
6  that you would have to review and agree upon them with
7  the Marketing Department. What exactly was your role
8  or responsibility in that process you just laid out
9  for me?
10 A. I would have reviewed the policies' wording for my
11 opinion on if they were worded correctly or in
12 accordance with my knowledge of disability income
13 insurance.
14 Q. Who else would perform a similar function to you, and
15 not necessarily names of the individuals but, you
16 know, the capacities? Would the Marketing Department
17 also evaluate the actual language and provide input in
18 the language to be used?
19 A. They would suggest language or provisions that were
20 compatible with the competition, yes.
21 Q. And the Actuarial Department would draft language as
22 well and comment on language used in a disability
23 policy?
24 A. I didn't understand you.
25 Q. The Actuarial Department would also offer language to

Page 11

1  be used in a proposed disability insurance policy?
2  A. Yes, and the Legal Department would be involved also,
3  yes.
4  Q. Legal Department? Anyone else?
5  A. I can't think of anyone else.
6  Q. So would there be an initial draft of a policy that
7  would be shared with these respective departments and
8  the person who sent that proposal or draft of a policy
9  out would be asking for comments from the different
10 areas of the company?
11 A. Yes.
12 Q. And then people would provide their comments and
13 ultimately through a series of drafts, you'd come to a
14 final draft that would be approved and that's what
15 would be sent to the State Insurance Department?
16 A. That's correct.
17 Q. And would the same process apply for riders?
18 A. Do you mean benefit riders?
19 Q. Correct.
20 A. Yes, yes.
21 Q. During your tenure how many disability insurance
22 policies were ultimately created?
23 A. I have no idea. I couldn't tell you exactly.
24 Q. Dozens?
25 A. At least.

Page 12

1  Q. Okay. Why would there be so many different disability
2  insurance policies created?
3  A. Well, in 38 and a half years the industry changed
4  considerably.
5  Q. Okay. Was Jefferson-Pilot out of the industry of
6  selling disability insurance policies when you
7  retired?
8  A. Yes.
9  Q. Do you know why it is that they ceased engaging in
10 that business line?
11 A. It was a management decision.
12 Q. Is it one you agreed with?
13 A. Yes.
14 Q. Why?
15 A. The disability income field is a very difficult line
16 of business and it's highly specialized and unless you
17 were willing to commit the resources, it would be
18 difficult to have a viable line, and it was highly
19 competitive and one of the very minor parts of the
20 Jefferson-Pilot organization, so I thought it was a
21 good decision.
22 Q. Was it profitable for Jefferson-Pilot prior to ceasing
23 the business line?
24 A. Yes.
25 Q. Did there ever come an occasion where a policy was

Page 13

1  created, filed with the State Insurance Department,
2  accepted by the State Insurance Department and then
3  sold to the public, and then after those sequence of
4  events occurred, the company decided to tweak the
5  language of the policy, modify it at all?
6  A. Only if we came out with a new policy would there be
7  changes in benefits, didn't tweak the policies that
8  were already out there, no.
9  Q. Well, once you sell the policy, you can't change it;
10 that's a contract that you can't just go out and
11 change, but did the company ever issue policies -- are
12 you mindful that the company used -- strike that,
13 start over. Are you mindful that the company used
14 letters and numbers to identify different versions of
15 policies?
16 A. Yes.
17 Q. Okay. Did there ever come an occasion where the
18 company stopped selling the XYZ policy and started
19 selling the TUV policy?
20 A. Yes.
21 Q. What would drive that kind of decision?
22 A. Primarily change in the marketplace, new product
23 innovations.
24 Q. Was it ever identified that there was problems with
25 the language of a policy and therefore the policy

4 (Pages 10 to 13)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MRB  Document 89-6  Filed 08/24/2004  Page 5 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney  C-1-02-479
John L. Roberson  5/7/2004

Page 14

1  was -- sale was discontinued?
2  A. Not that I recall.
3  Q. Were policies that were sold ever discontinued from
4    being sold?
5  A. Yes.
6  Q. And were they replaced by new policies?
7  A. Well, what do you mean by were they replaced by new
8    policies, those that had been issued or for marketing
9    purposes?
10 Q. What does that mean, those that had been issued or for
11   marketing purposes?
12 A. Well, you said to replace a policy.
13 Q. Right.
14 A. I mean, I didn't understand what you meant by replace
15   it.
16 Q. Did it ever come to be that the company decided, We're
17   going to stop selling policy A, we're going to start
18   selling policy B?
19 A. Yes.
20 Q. Did there come a point in time when the company said,
21   We're going to stop offering benefits rider for COLA,
22   that person we're going to offer a new version for
23   future policy sales? COLA is just an example.
24 A. Yes, uh-huh.
25 Q. That happened? Do you recall the company in the early

Page 15

1    '90s creating a new version of a residual disability
2    rider to sell and discontinuing the use of an old
3    form?
4  A. I don't remember the date, but it was done, yes.
5  Q. Okay. Do you recall why that decision was made to do
6    that?
7  A. Most likely due to competitive reasons and
8    marketplace.
9  Q. Are you speculating or do you know factually?
10 A. I'm speculating.
11 Q. Okay. Was it to improve upon the language of the
12   rider?
13 A. No.
14 Q. Did anyone ever advise you that a policy that was out
15   for sale in the marketplace needed to be discontinued
16   because it was ambiguous?
17 A. No.
18 Q. Are you mindful of the way courts read insurance
19   policies in construing ambiguities?
20 A. Yes.
21 Q. What's your understanding?
22 A. Courts have interpreted language differently in
23   various jurisdictions, if that's what you mean.
24 Q. No. Are you mindful that courts construe ambiguities
25   against the drafter of the insurance policy?

Page 16

1  A. Yes.
2  Q. Okay. Was that commonly known within Jefferson-Pilot
3    while you were there?
4  A. I can only speak for myself.
5  Q. Okay. Did you ever discuss that concept with anybody
6    while you were at Jefferson-Pilot?
7  A. I don't specifically recall specifically doing it, no.
8  Q. Did you meet with Mr. Ellis last night?
9  A. Yes.
10 Q. Did you discuss your deposition today?
11 A. That I was going to give one, yes.
12 Q. And did you discuss -- did he talk with you about the
13   actual policy document that is Mr. Kearney's policy?
14 A. I think we discussed the policy provisions, yes.
15 Q. And he pointed out the provisions to you while you
16   were sitting having dinner or drinks?
17 A. He may have asked me about my opinion about some
18   provisions, yes.
19 Q. Did he direct your attention to certain portions of
20   the policy?
21 A. We certainly didn't discuss every provision there, no.
22 Q. But he directed your attention to certain sections of
23   the policy he wished to discuss with you?
24 A. Yeah.
25 Q. And he also shared with you the pay history on Mr.

Page 17

1    Kearney's claim?
2  A. No.
3  Q. That was a document that you two discussed, wasn't it?
4  A. Last night is what you were asking, wasn't it?
5  Q. Yes.
6  A. No.
7  Q. Wasn't that on the table right in front of you as you
8    were drinking?
9  A. I don't recall everything that was on the table.
10 Q. Okay. Are you mindful that insurance agents in the
11   field would provide prospective policyholders with
12   proposals?
13 A. Yes.
14 Q. Do you know who authored the proposals that those
15   folks shared with prospects?
16 A. I don't recall.
17 Q. Were they authored within Jefferson-Pilot or were
18   agents out in the field creating whatever they wanted
19   to create for a proposal?
20 A. Basically it came from Jefferson-Pilot.
21 Q. Do you know what department created those proposals?
22 A. It was out of the Marketing Department, I think.
23 Q. The same department that comments on policy language
24   before a policy is issued?
25 A. Yes.

5 (Pages 14 to 17)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MRB   Document 89-6   Filed 08/24/2004   Page 6 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney  C-1-02-47
John L. Roberson  5/7/2004

Page 18

1  Q. The people who create those proposals, are they
2     mindful of the actual provisions of policies?
3  A. Yes.
4  Q. And does Jefferson-Pilot train its marketing folks and
5     claims analyst folks about how the policies that are
6     issued are interpreted?
7  A. (No response)
8  Q. There's a long pause in your answer. Is there a
9     reason for that? Did you understand the question?
10 A. I didn't fully understand it, no. Do you want to --
11 Q. Okay. To me it could go one way or the other. You
12    have a company with a whole bunch of employees, the
13    company sells policies, and either you leave it up to
14    everybody to come to their own understanding of what
15    the policy means -- and hopefully it's the same
16    understanding -- or the company gives direction or
17    provides some education about what the policy says.
18    Which one of those was it at Jefferson-Pilot?
19 A. We would review new policies with the claims analysts
20    and with the underwriting personnel.
21 Q. Who is we?
22 A. Myself primarily for our department.
23 Q. So who would -- for the marketing folks who prepare
24    these proposals, did they obtain any training or
25    education about what the actual policies provide, or

Page 19

1     if a new marketing person was hired on a given day, to
2     create a proposal, was he or she just supposed to come
3     up with their own understanding of what the policy
4     means?
5  A. Proposals were standardized. I think they were on
6     some type disk. I don't remember, fully remember the
7     process.
8  Q. So the head of the Marketing Department with input
9     from someone in Actuarial and Legal would create the
10    proposal?
11 A. I think that's correct.
12 Q. Okay. The company just didn't leave to each
13    employee's own determination what the policy says or
14    means; the company provided education and training to
15    its employees about what the policies say or provide,
16    right?
17 A. Correct.
18 Q. Okay. And based on that education and training and
19    input from other departments, the persons responsible
20    for developing the proposals would create those
21    proposals, and I guess you suggested there was some
22    kind of template form of a proposal that was blessed
23    by the company; is that right?
24 A. Yes.
25 Q. Did you ever see a proposal that misstated what the

Page 20

1     policy provides?
2  A. I don't recall one.
3  Q. Are you mindful of a proposal ever having to be
4     scrapped because it was wrong and a new template of a
5     proposal was created for distribution to the agents in
6     the field?
7  A. Not that I recall.
8  Q. Do you receive any retirement income from
9     Jefferson-Pilot?
10 A. Yes.
11 Q. Still today?
12 A. Yes.
13 Q. Have you ever spoken to anyone at Disability
14    Management Services?
15 A. No.
16 Q. Do you know what company that is that I refer to?
17 A. No.
18 Q. Are you mindful from speaking to counsel or anyone
19    else that they were engaged to administer claims on
20    behalf of Jefferson-Pilot?
21 A. I was advised of that, yes.
22 Q. Okay. But you've never spoken to anybody there?
23 A. No.
24 Q. And you're not aware of them being engaged to assist
25    in the administration of any claims prior to your

Page 21

1     retirement?
2  A. They were not, I can tell you that, no.
3  Q. Okay. Do you know when it was that Jefferson-Pilot
4     made the business decision to stop selling disability
5     insurance policies?
6  A. Well, the line was discontinued I think July 1, 1996,
7     and the decision would have been made sometime prior
8     to that. As I said before, it's a management
9     decision, or I should say it was a management
10    decision, not is a management.
11 Q. Was Clyde Honaker employed by the company when you
12    retired?
13 A. I don't recall.
14 Q. He was an employee of the company at some point,
15    though, right?
16 A. He was with Kentucky Central, who was purchased by
17    Jefferson-Pilot. He subsequently came to Greensboro
18    to head up the Ordinary Claims Department. I only met
19    Clyde for a short period after I retired, so I don't
20    recall when he came here.
21 Q. He arrived in Greensboro after you retired; is that
22    what you're saying?
23 A. As far as I know.
24 Q. Okay. What's ordinary claims refer to? What's that
25    nomenclature mean?

6 (Pages 18 to 21)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889      Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney  C-1-02-479
John L. Roberson  5/7/2004

Page 22

1  A. Life insurance claims primarily.
2  Q. Is disability in there, too?
3  A. It wasn't when I was there, no.
4  Q. Okay. Did Paul Swink work at Jefferson-Pilot while
5     you were there?
6  A. Yes.
7  Q. What was his role?
8  A. He was in the Ordinary Claims Department.
9  Q. In what capacity?
10 A. I don't recall.
11 Q. What type of training did Jefferson-Pilot provide to
12    its claims analysts?
13 A. Well, we had one-on-one training, one-on-one training
14    with experienced analysts, if you're talking about a
15    new analyst coming in. They were encouraged to enroll
16    in the International Claims Association program which
17    had three separate books, I think it was, and if you
18    completed that course, you received a designation of
19    International Health Claims Associate or something to
20    that decree, and also they were encouraged to enroll
21    in LOMA, Life Office Management Association courses.
22    Basically that was it. Now, that's the claims people
23    that I had responsibility for. The others I can't
24    attest to.
25 Q. Did they maintain at their desk or office any kind of

Page 23

1     booklets or handouts or memos about the process of
2     handling claims, disability claims?
3  A. At one time there was a memo about processing claims
4     that was developed back when we were Pilot Life
5     Insurance Company. I don't recall specifically what
6     was in it.
7  Q. What time frame was that?
8  A. Probably goes back 25 years.
9  Q. Okay. Prior to, say, the past three weeks, when was
10    the last time you spoke with anyone about Chris
11    Kearney or Chris Kearney's claim?
12 A. Not since I was retired. I don't recall specifically
13    talking about it.
14 Q. Sometime prior to your retirement?
15 A. Yes.
16 Q. So sometime prior to your retirement you had
17    discussions about Chris Kearney, but then you retired
18    and it wasn't until these past two or three weeks, and
19    we're in May of 2004; is that right?
20 A. Let's make it the last two or three days.
21 Q. Okay. Do you have any independent recollection of the
22    handling of Mr. Kearney's claim?
23 A. Yes, once it was brought to my attention, I recalled
24    some of it, yes.
25 Q. When someone mentioned his name or when you had the

Page 24

1     opportunity to actually look at some historical
2     documents?
3  A. When I had the opportunity to look at some documents.
4  Q. Okay. What documents did you look at?
5  A. Some parts of the claim file, the actual claim file
6     itself --
7  Q. You were given the entire claims file to review?
8  A. No, I don't think I was, no.
9  Q. Okay. Do you recall what documents that are in the
10    claim file that you did -- were given to review?
11 A. I looked at a claims worksheet which had benefit
12    payments. I looked at one or two of the actual proofs
13    of loss that were submitted. I did not review the
14    whole claim file.
15 Q. Okay. We've discussed earlier that you had the
16    opportunity to review at least sections of the actual
17    policy?
18 A. Yes.
19 Q. That policy bears the designation WJ576A. Are you
20    mindful of that?
21 A. Yes.
22 Q. Okay. Do those numbers and letters have any meaning?
23    Did WJ stand for anything?
24 A. WJ was the form number assigned to the Individual
25    Health Insurance Division, like W was the initial of

Page 25

1     the individual health and then the J was added after
2     the merger between the two companies.
3  Q. Okay. The merger between the two companies, you're
4     talking about the Kentucky company?
5  A. No, I'm talking about Jefferson Standard Life
6     Insurance Company and Pilot Life Insurance Company.
7  Q. Okay. When did that take place?
8  A. I can't -- I don't remember the specific day.
9  Q. Was it during your tenure?
10 A. Yes.
11 Q. Was it in the '70s or --
12 A. Oh, no. It was maybe 1987.
13 Q. Okay.
14 A. Perhaps, in that area.
15 Q. Okay. So would the WJ576A policy have been created
16    post merger of Jefferson and Pilot, since it has those
17    two letters on it?
18 A. I don't recall.
19 Q. Okay. Do you know whether that particular policy was
20    something that Jefferson-Pilot had success in selling,
21    question mark?
22 A. Depends on what you mean by success.
23 Q. Were there a lot of those form policies sold?
24 A. I can't tell you how many. It was the prime
25    non-cancellable disability policy for some time. I

7 (Pages 22 to 25)

Case 1:02-cv-00479-MRB    Document 89-6    Filed 08/24/2004    Page 8 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

Page 26

1  don't remember how many policies. Unfortunately I
2  don't have those figures in my head.
3  Q. Okay. When you say it was the prime non-cancellable
4  disability insurance policy for some time, meaning it
5  was something that you sold -- something that the
6  agents, whoever is in the field selling them, sold
7  more of than other of the disability insurance
8  policies that could be purchased from Jefferson-Pilot;
9  is that it?
10 A. Probably, yes.
11 Q. Okay. And would it also be true to say that it's one
12 that was administered by your department more than
13 other disability insurance policies that were sold by
14 Jefferson-Pilot?
15 A. No, it wouldn't be true to say that.
16 Q. Okay. There were other disability insurance policies
17 on which claims were made more frequently than this
18 particular version?
19 A. Yes.
20 Q. How many others were claims more frequently made
21 under?
22 A. I can't tell you specifically. I know that we had a
23 franchise policy, disability policy which was sold on
24 a payroll deduction basis. The volume of policies and
25 claims far exceeded any other policy that we had.

Page 27

1  Q. It was -- there was more sales of those because --
2  A. Yes.
3  Q. -- they was sold to companies and offered to the
4  companies' employees?
5  A. Well, it was sold to the employees of the companies on
6  a payroll deduction basis, yes.
7  Q. Was that covered by ERISA, those policies?
8  A. I don't recall. I don't think so. I think ERISA was
9  applicable to group insurance where you had the
10 contract with the employer as opposed to the
11 individual employee.
12 Q. Did your department handle ERISA and non-ERISA claims
13 or was ERISA handled by a different function in the
14 company?
15 A. Well, ERISA applied primarily to group insurance. We
16 may have had some policies that the employer was
17 paying a hundred percent of the premium, which may
18 have been subject to ERISA. I don't recall
19 specifically. We did have some group conversion
20 hospital policies that were considered under ERISA
21 because they were a conversion from an ERISA group
22 policy.
23 Q. So your department did handle some ERISA matters?
24 A. Yes.
25 Q. Other than those franchise disability policies, would

Page 28

1  this WJ576A have been the most reviewed policy by your
2  department because of the volume of claims being made
3  under it?
4  A. I don't recall.
5  Q. Well, Mr. Kearney's claim wasn't the only claim made
6  under that policy?
7  A. No.
8  Q. Okay. There were hundreds of claims made under that
9  policy?
10 A. I said I didn't know the volume, so I can't say there
11 were hundreds. I don't know how many. I just don't
12 recall.
13 Q. Okay. You can't approximate for me whether it's more
14 than a hundred or less than a hundred claims were made
15 under that policy?
16 A. On that specific policy, I can't speculate on that.
17 That's been a long time.
18 Q. It has been. Were you advised in the past week that
19 the company now asserts that it made a mistake in the
20 way it paid Mr. Kearney?
21 A. Yes.
22 Q. Did that issue ever come to your attention prior to
23 this past week?
24 A. No.
25 Q. No one ever suggested that to you prior to this past

Page 29

1  week?
2  A. On Mr. Kearney's claim?
3  Q. Yes, sir.
4  A. No.
5  Q. You said that some of your memory about Mr. Kearney --
6  you said that you do have some memory based on being
7  refreshed by these documents about Mr. Kearney's
8  claim. What can you recall sitting here today about
9  the administration of Mr. Kearney's claim?
10 A. I'm not sure what you're -- in the administration of
11 his claim to what extent?
12 Q. You had suggested earlier that you didn't have a
13 memory of the claim until you saw some documents and
14 then your memory was refreshed; is that --
15 A. That's correct.
16 Q. Okay. I'd like for you to tell me everything you
17 recall from memory about Mr. Kearney's claim.
18 A. I recall that it was a difficult claim to administer
19 primarily because Mr. Kearney was a self-employed
20 manufacturer's representative and in his claim for
21 residual disability benefits, it was difficult to
22 obtain the verification of prior and current income,
23 and that's the extent that I recall.
24 Q. Do you recall anything else about the claim from
25 memory, not from looking at documents with Mr. Ellis.

8 (Pages 26 to 29)

Case 1:02-cv-00479-MRB   Document 89-6   Filed 08/24/2004   Page 9 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                       5/7/2004

Page 30

1  A. No.
2  Q. Do you recall that when asked, Mr. Kearney would
3     immediately provide you with copies of his tax
4     returns?
5  A. I don't recall that he did, no.
6  Q. You don't recall either way?
7  A. No.
8  Q. Do you recall either way? I asked you a negative
9     question, you gave me a negative response, so I want
10    to clean it up on the record while we're here. Do you
11    recall one way or the other about whether or not Mr.
12    Kearney would give you copies of his tax returns when
13    he was asked to do so?
14 A. I don't recall specifically, no.
15 Q. Do you recall whether he gave you the name and address
16    and phone number of his accountant when he was asked
17    to do so?
18 A. I don't recall that either.
19 Q. Do you recall whether the company contacted his
20    accountant directly to get his financial data?
21 A. I don't recall that, no.
22 Q. Do you recall whether or not while you were employed
23    with the company you or folks in your department
24    seeking an independent medical evaluation of Mr.
25    Kearney?

Page 31

1  A. I don't recall specifically, no.
2  Q. How about surveiling him?
3  A. I don't recall it specifically, no.
4  Q. Did your company use surveillance as a tool during
5     your employment?
6  A. Yes.
7  Q. And you would investigate claimants in other ways by
8     getting Equifax reports or other -- using other
9     investigative tools as well, correct?
10 A. Yes.
11        MR. ROBERTS: I don't think I have a whole
12    bunch more, but why don't we take a couple minute
13    break so I can get situated, okay?
14        THE WITNESS: Sure.
15    (Brief recess)
16    (Defendant's Exhibit No. 19 was marked for
17    identification by Mr. Roberts.)
18 Q. Mr. Roberson, I've gone through the claim file and
19    tried to compile those letters that bear your name or
20    reference to some degree and I've marked them --
21    marked some of them as Exhibit 19. Why don't you take
22    a few seconds to familiarize yourself with them and
23    then we'll go through them one at a time relatively
24    quickly.
25 A. (Witness reviews document)

Page 32

1  Q. Are you ready?
2  A. Yeah.
3  Q. Okay. You've had the opportunity to review those ten
4     or twelve pages that I've compiled from the claims
5     file, and for the record, let me indicate what pages
6     we're talking about. This is a series of
7     chronological letters from the claim file. The first
8     is Bates labeled 2804, then 2796, 2788, 2840, 2821,
9     2817, 2818, 2920, 2895, 2896.
10        Mr. Roberson, did you frequently get involved
11    in writing letters to individual policyholders in your
12    capacity as Vice President?
13 A. Yes.
14 Q. Did I get your capacity correct, you were Vice
15    President of the company during the '90s?
16 A. Yes.
17 Q. Was it a specific title, Vice President blank or --
18 A. Vice President of Individual Health Insurance.
19 Q. And who did you report to?
20 A. I reported to Bill Luper.
21 Q. Who was in what capacity?
22 A. He was the Senior Vice President of both the Home
23    Service Division and the Individual Health Division.
24 Q. But you were the senior officer over the disability
25    insurance product; is that right?

Page 33

1  A. Yes, but I reported to him.
2  Q. Okay. He had other functions of the company reporting
3     up to him, didn't he, other than just disability
4     insurance claims?
5  A. Yes, he had the Home Service Division also.
6  Q. Did you believe you had a good handle on the
7     disability insurance contract rights given to
8     policyholders while you were working at
9     Jefferson-Pilot?
10 A. I'm not sure I understand what you mean by the
11    contract rights.
12 Q. Did you feel while you were serving in that capacity
13    as Vice President with Claims that you had a good
14    understanding of the disability insurance contracts?
15 A. Yes.
16 Q. Would you review the contracts when making
17    determinations or judgments about a particular claim?
18 A. If it was necessary.
19 Q. Would you review the policy riders as well?
20 A. If it was necessary.
21 Q. When would it be necessary?
22 A. If someone raised a question about a provision, I
23    would review it, but generally speaking, I kept in my
24    head the provisions of the policies.
25 Q. From your 38 years in your role as Vice President, you

9 (Pages 30 to 33)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889     Fax (704) 372-4593

Case 1:02-cv-00479-MRB  Document 89-6  Filed 08/24/2004  Page 10 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney  C-1-02-4
John L. Roberson  5/7/200

Page 34

1  felt you had a fairly good recollection of the policy
2  provisions based on memory in your daily work with the
3  policies?
4  A. Well, I wasn't a Vice President all that time, but
5  yes, I had a good knowledge of the policies.
6  Q. Okay. How long were you a Vice President?
7  A. Well, there are various stages of Vice President. I
8  think there there was an Assistant Vice President, a
9  Second Vice President, then a Vice President. Yeah, I
10  don't recall those dates.
11  Q. Okay. How long was Mr. Maxwell at the company before
12  he was required to leave?
13  A. I don't remember specifically, but I'd say in excess
14  of 20 years.
15  Q. And do you know what portion of that time was in the
16  Claims area?
17  A. When he was first employed, he worked as an
18  underwriter for a period of time, a couple years
19  perhaps. Then he moved to the Claims Department and
20  stayed there for the remainder of his time.
21  Q. Okay. So would he, too, in your judgment, since he
22  reported up through you, have a good working knowledge
23  of the policies, the disability insurance policies and
24  the riders?
25  A. In general, yes.

Page 35

1  Q. This first page of Exhibit 19 purports to be a letter
2  from Mr. Kearney to you, February 8, 1995, and I think
3  that's your handwriting to Bob Maxwell "What is he
4  talking about? star."
5  A. Right.
6  Q. That's your handwriting?
7  A. Yes.
8  Q. Do you know one way or the other about any dialogue
9  you had with anybody on Mr. Kearney's claim prior to
10  this date? Do you know whether or not your
11  involvement in Mr. Kearney's claim predated February
12  of '95 or not? It's not a trick question. I'm not
13  going to pull something out that shows it earlier,
14  but --
15  A. I'll assume I did, yes, because I reviewed all the
16  claims that were paid initially and then I reviewed
17  all claims that were paid monthly that were over
18  certain amounts of money, so yes, I would have seen
19  the claim prior to that time, yes.
20  Q. Okay. Tell me about that. You said you reviewed all
21  claims paid initially. Is that regardless of the
22  amount of money being paid out?
23  A. I think so, yes.
24  Q. So that was just a procedure or protocol in place that
25  the claims analysts, when reviewing a claim and

Page 36

1  determining that this needs to be paid or this one
2  qualifies for payment, before that first check is
3  sent, you perform some quality control of the
4  decision?
5  A. That's correct.
6  Q. And the procedure in place is that the claims analyst
7  as a first matter reviews the information that's been
8  provided from the claimant and whoever else, reviews
9  the policy and makes a judgment about the payment and
10  the amount?
11  A. Well, they review the information that they receive.
12  I don't know that they go back and specifically review
13  the policy, but they would have general knowledge of
14  the policy. But yes, they would do that, determine
15  the benefits payable.
16  Q. Okay. And then in the initial payment regardless of
17  size, it's the procedure that it goes to you for you
18  to perform the same review; is that accurate?
19  A. I didn't do the in-depth review that the analyst
20  would, but yes, I did review and approve the claim.
21  Q. You insured on the company's behalf that based on the
22  policy provisions that the payment was appropriate?
23  A. Tried to, yes.
24  Q. Okay. Were you good at your job?
25  A. That's a matter of opinion. I thought so, yes.

Page 37

1  Q. Well, they employed you for 38 years and they're still
2  paying you.
3  A. I thought so, yes.
4  Q. Was Mr. Maxwell good at his job?
5  A. Yes.
6  Q. Mr. Shelton?
7  A. Yes.
8  Q. Ms. Harden?
9  A. Yes.
10  Incidentally, with Mr. Maxwell, I understand
11  you're going to depose him, and I'm appalled that you
12  would do that to a man who is house-confined. He's
13  confined to a chair. He can hardly see. I mean, he
14  didn't recognize me when I came in his house last
15  night, and he's a sick man. He almost died last year,
16  three months in the hospital and -- you know, it's --
17  Q. As long as you want to discuss this on the record, I
18  can tell you exactly what my conversation was. I
19  called his phone number yesterday. I spoke to his
20  wife, who's name is Mary, as you probably know. I
21  said, Mrs. Maxwell, my name is Mike Roberts, I'm a
22  lawyer, I'm in Greensboro taking some depositions
23  relating to a Jefferson-Pilot matter. I understand
24  that your husband is not well and I'm calling to ask
25  if it would be an imposition if I spent an hour with

10 (Pages 34 to 37)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889  Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 89-6    Filed 08/24/2004    Page 11 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney  C-1-02-479
John L. Roberson  5/7/2004

Page 38

1  him tomorrow in a deposition, and I understand that if
2  he can't do it for medical reasons, we won't go
3  through with it, but I called to simply ask, and she
4  told me, I don't think there's a problem with that,
5  and then she left the phone for a minute, she came
6  back and said, I spoke to him, he says it's not a
7  problem.
8      So sir, I am not trying to inconvenience
9  anybody you care for. I called. I told her that I
10  don't intend to do it if it's an imposition. He told
11  me it would be okay.
12 A. She told --
13 Q. I know nothing about his medical condition. I don't
14  know anything about him. But I called and said, I'll
15  do it if it's not an imposition, I won't do it if it
16  is. So I'm basing my decision to take his deposition
17  later today on his confirmation that it would be okay.
18 A. She understood you to be representing Jefferson-Pilot
19  Life Insurance Company and he was doing it as a favor
20  to his company which he was retired to. She did not
21  understand that you were a plaintiff's attorney.
22 Q. Well, I'm not a plaintiff's attorney.
23 A. Well, a --
24 Q. I'm a lawyer, I graduated from the University of Notre
25  Dame, I'm the best lawyer in the state of Ohio.

Page 39

1  A. Okay.
2  Q. What difference does it make?
3  A. Okay.
4  Q. I called and asked --
5  A. She would not have agreed to it if she had not known
6     you were --
7  Q. Why not? Why would --
8  A. Because she didn't want to put him through that
9     process.
10 Q. What difference does it make if he can give a
11    deposition whether it's at the request of a lawyer
12    representing a plaintiff or a lawyer representing a
13    defendant? By the way, I'm not a plaintiff's
14    attorney. I'm the defendant in this case.
15       Is there anything else you want to criticize
16    me for about mistreating people?
17 A. I think I've expressed my opinion with regards to
18    Mr. Maxwell, yes.
19 Q. Thank you.
20       And if a payment requires a -- if a monthly
21    payment is over a certain threshold, you have to as a
22    quality control make sure each monthly payment is
23    actually payable, right?
24 A. Yes.
25 Q. And what is the threshold?

Page 40

1  A. I don't recall what it was.
2  Q. Mr. Kearney's claim exceeded the threshold?
3  A. Yes.
4  Q. And so every month you determined as a second matter
5     whether or not the payment Mr. Kearney was receiving
6     between 1993 and your retirement was properly payable,
7     right?
8  A. I reviewed the analysts' work. I didn't go back and
9     completely review the whole claim every time, no.
10 Q. Okay. Exhibit 9 is a document you discussed with Mr.
11    Ellis last evening and it is the Disability Claims
12    Worksheets on the two policies Mr. Kearney purchased,
13    correct?
14 A. As I said before, I do not recall having discussed
15    this particular form with Mr. Ellis last night.
16 Q. Well, it was sitting before you. Anyway, your
17    initials run down the left-hand margin, correct?
18 A. That's correct.
19 Q. And you're initialing the propriety of each monthly
20    payment on each of those pages with every initial,
21    correct?
22 A. That's correct.
23 Q. And in addition to your initials, there's the initials
24    of Phyllis Harden and perhaps Mr. Maxwell and Mr.
25    Shelton as well from time to time?

Page 41

1  A. That's correct.
2  Q. And so with every -- there was two checks issued every
3     month because he had two policies, right?
4  A. That's correct.
5  Q. So each check or in this case both checks every month
6     were reviewed for propriety of payment by the claims
7     analyst as a first matter and you as a second matter?
8  A. What do you mean by propriety of payment?
9  Q. The appropriateness of the payment.
10 A. Yes.
11 Q. Okay. I'm not sure you answered my question, the
12    second question --
13 A. Okay, because in this particular case we made an error
14    in the payment.
15 Q. Who told you that?
16 A. Who told me that? I can tell by looking at it.
17 Q. Okay.
18 A. I'm familiar with the policy and the riders and the
19    benefits were not payable as we paid them.
20 Q. Okay. Prior to your retirement did you come to that
21    conclusion?
22 A. No.
23 Q. Okay. Prior to -- today is May 7 of 2004. Prior to
24    April 30 of 2004, had you come to that conclusion?
25 A. Today is what?

11 (Pages 38 to 41)

Case 1:02-cv-00479-MRB   Document 89-6   Filed 08/24/2004   Page 12 of 12

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney  C-1-02-4?
John L. Roberson  5/7/2004

Page 42

1  Q. May 7.
2  A. May 7? Prior to April 30?
3  Q. Of 2004?
4  A. No, I wasn't even familiar with this case. I wasn't
5     involved at that time.
6  Q. Okay. So when did the payments begin?
7  A. July of 1993 is the first one.
8  Q. Okay. So from July of '93 -- and you retired in July
9     of '97?
10 A. April of '97.
11 Q. April of '97. So '94, '95, '96, '97. If it was four
12    years, it would be 48 months, so you'd retired three
13    or four months short of four years, right, so 45
14    months, correct?
15 A. Yes, sir.
16 Q. Over the course of 45 months, each month you reviewed
17    and determined that two checks going to Mr. Kearney
18    were proper and appropriate under the facts of his
19    claim, the terms of his policy, and the provisions of
20    his riders, and your testimony today is after meeting
21    with Mr. Ellis last night that you made 90 different
22    mistakes?
23 A. Yes.
24 Q. Okay. You worked at the company for 38 years, you
25    were the Vice President, you were head of the Claims

Page 43

1     Department, and Mr. Ellis educated you yesterday about
2     your four years of errors?
3        MR. ELLIS: Objection. Go ahead.
4  A. Mr. Ellis did not educate me at all.
5  Q. Okay. I wouldn't suspect he could. So February 8 of
6     1995, this first letter of Exhibit 19, would not have
7     been your first contact with the Kearney claim,
8     correct?
9  A. That's correct.
10 Q. Are you mindful that Mr. Maxwell told Mr. Kearney in
11    1995 that his residual disability benefits were
12    payable for only two years?
13 A. I was after looking at this letter.
14 Q. Is that accurate or was that a misrepresentation by
15    Mr. Maxwell?
16 A. That was a mistake by Mr. Maxwell.
17 Q. It wasn't a misrepresentation, it was a mistake?
18 A. Yes.
19 Q. And you determined it was a mistake because you went
20    back and reviewed the policy and came to that
21    conclusion or did you just know because you have --
22    you're mindful of the policy provisions?
23 A. I'm mindful of the policy provisions.
24 Q. Okay. Tell me, sir, if the policy expressly and
25    unambiguously did not allow Mr. Kearney to receive

Page 44

1     COLA and Social Security Supplement, how did you get
2     it wrong 90 times?
3  A. It was a residual disability claim for which he
4     qualified for the full residual benefit and except for
5     the payment of Social Security and the COLA, the
6     benefits were correct.
7  Q. You didn't answer my question. If you're so mindful
8     of these policies and if it's unambiguous that he's
9     just not entitled to COLA or Social Security, how did
10    you get it wrong for four years on 90 different
11    occasions?
12 A. I don't know how, but we did.
13 Q. Okay. Not only you got it wrong, but your subordinate
14    got it wrong on 90 different occasions, and I'm
15    confused. If the policy language is express, it's
16    unambiguous, there's no doubt about it, he's not
17    entitled to those benefits, how did the two of you get
18    it wrong 180 times over four years?
19 A. We made a mistake.
20 Q. Okay. You made 180 mistakes, right?
21 A. If that's the number of payments, yes.
22 Q. Up to your retirement, and then another 180 mistakes
23    were made after your retirement; you're mindful of
24    that?
25 A. Apparently once it got on the track, it just continued

Page 45

1     running.
2  Q. Well, it didn't get on a track. You reviewed it every
3     month. Your initials appear every single month for
4     four years, right?
5  A. My initials are there, but you don't go back and look
6     at every aspect of the claim every month. You don't
7     have time to do it.
8  Q. Okay. So your company -- has your company ever before
9     made over 300 individual independent mistakes when the
10    language is so unambiguous, anyone could conclude that
11    it's a mistake? Has that ever happened before?
12 A. I don't have any independent knowledge of it
13    happening, but I'm sure that it's possible.
14 Q. 300 mistakes? That's possible? With someone who's
15    worked at the company for 38 years, Vice President?
16    Is that possible when the language is unambiguous?
17 A. Not only is it possible, it apparently happened in
18    this case.
19 Q. Okay. How come you didn't pick it up in four years?
20    If Mr. Ellis can pick it up and share it with you last
21    night, why couldn't you pick it up in four years?
22        MR. ELLIS: Objection.
23 Q. You can answer.
24 A. Here again, Mr. Ellis didn't share that with me last
25    night.

12 (Pages 42 to 45)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889   Fax (704) 372-4593