Jefferson-Pilot Insurance Company vs. Christopher L. Kearney        C-1-02-479
Harold Shelton                                                      5/7/2004

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY, )
                                   )
                        Plaintiff, )
                                   )
vs.                                )   CASE NO.
                                   )   C-1-02-479
CHRISTOPHER L. KEARNEY,            )   (Judge Spiegel)
                                   )
                        Defendant. )



The deposition upon oral examination of HAROLD SHELTON, being taken pursuant to Order and in accordance with the Federal Rules of Civil Procedure before Rebecca J. Huddy, Notary Public, at the Marriott, 304 North Greene Street, Greensboro, North Carolina, on the 7th day of May, 2004, beginning at 12:20 p.m.

Case 1:02-cv-00479-MRB    Document 89-8    Filed 08/24/2004    Page 2 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney            C-1-02-47\
Harold Shelton                                                          5/7/2004

Page 4

```
 1   A.  No.
 2   Q.  Okay.  Did you just retire from Jefferson-Pilot and
 3       take on other employment or do you --
 4   A.  No, I just retired, yes.
 5   Q.  Okay.  So from your retirement date through at least
 6       two weeks ago, you didn't have any discussion in any
 7       way about Mr. Kearney?
 8   A.  No.
 9   Q.  Prior to your retirement date, did you ever discuss
10       with anyone the thought that Jefferson-Pilot had
11       mistakenly paid Mr. Kearney benefits?
12   A.  Not that I recall.
13   Q.  Okay.  Two days ago or within the past week Mr.
14       Roberson called you and shared that with you, correct?
15   A.  No.
16   Q.  He testified this morning that you and he spoke within
17       the past two days and you discussed the subject that
18       Mr. Kearney, according to Jefferson-Pilot or somebody
19       else they employ, made a mistake for eight or nine
20       years?
21   A.  Well, we had missed -- we were in a meeting several
22       days ago, but he did not call me.
23   Q.  Very well.  Who was at the meeting?
24   A.  I believe it was he, myself, Mr. Ellis, and
25       Ms. Farabow.
```

APPEARANCES:
For the Plaintiff: Mr. William R. Ellis
                   Wood & Lamping, LLP
                   600 Vine Street, Suite 2500
                   Cincinnati, Ohio  45202

                   Ms. Stephanie Farabow
                   Jefferson-Pilot Life Insurance Company
                   100 North Greene Street
                   Greensboro, North Carolina  27401
For the Defendant: Mr. Michael A. Roberts
                   Graydon, Head & Ritchey
                   511 Walnut Street
                   1900 Fifth Third Center
                   Cincinnati, Ohio  45202
                           * * *

                     I N D E X
                  By            Page
EXAMINATION       Mr. Roberts   3 - 68
EXAMINATION       Mr. Ellis     69 - 84
FURTHER EXAMINATION  Mr. Roberts  84 - 93
FURTHER EXAMINATION  Mr. Ellis    93 - 95

                   E X H I B I T S

Number        Description              Page
Defendant's 23   Shelton correspondence    13
     "      24   Handwritten notes         65
     "      25   Statement 10-31-94        66
     "      26   Message                   68

                           * * *

Page 3

```
 1       The witness, HAROLD SHELTON, being first duly
 2       sworn, was examined and testified as follows:
 3
 4       EXAMINATION (by Mr. Roberts):
 5
 6   Q.  Mr. Shelton, my name is Mike Roberts.  I'm a
 7       defendant's lawyer.  I represent the defendant in this
 8       lawsuit, Mr. Chris Kearney.  He's been sued by
 9       Jefferson-Pilot and we're here to find out why.
10       Did you work on Mr. Kearney's claim?
11   A.  I think at some point during those years that I was
12       involved in it at some point, but -- you know, just
13       sort of in and out depending on what the circumstances
14       were and if Mr. Roberson was not available or if I was
15       needed in that case.  The answer is yes.
16   Q.  Okay.  Prior to two weeks ago -- let's forget about
17       two weeks ago till today -- when was the last time you
18       spoke to anyone about the Chris Kearney claim?
19   A.  I really don't know.
20   Q.  Okay.
21   A.  Over five years, I would think, since I retired.
22   Q.  When did you retire?
23   A.  December 31, 1999.
24   Q.  I hope you didn't wear a tie and tie clip today,
25       because Mr. Ellis and I did not.
```

Page 5

```
 1   Q.  Stephanie?  When did the meeting take place?
 2   A.  I believe it was Wednesday.
 3   Q.  Where did it take place?
 4   A.  At Jefferson-Pilot.
 5   Q.  Okay.  And was Mr. Ellis conducting the meeting?
 6   A.  Yes.
 7   Q.  And he's the one that informed you that the mistake
 8       had been made?
 9   A.  Yes.
10   Q.  Very well.  Was that news to you?
11   A.  Yes.
12   Q.  How long did you work at Jefferson-Pilot?
13   A.  I was with Pilot Life, which was a subsidiary at the
14       time, from 1960, December 1960 to 1990, at which time
15       the two companies combined and I came here -- came to
16       Jefferson-Pilot downtown and I worked for the two for
17       a total of 38 years.
18   Q.  I bet you didn't work just in disability insurance
19       claims that whole time.
20   A.  I was started in the Group Division in 1960, worked
21       there for --
22   Q.  Pre-ERISA?
23   A.  Yes -- for about 20 years, and then I transferred to
24       the Individual Health Division.
25   Q.  Okay.  And when you were doing the pre-ERISA and
```

2 (Pages 2 to 5)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593



Case 1:02-cv-00479-MRB    Document 89-8    Filed 08/24/2004    Page 3 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney        C-1-02-479
Harold Shelton                                                       5/7/2004

Page 6

1  post-ERISA group claims, were those disability claims
2  included in --
3  A. Yes, to some extent, but primarily health insurance.
4  Q. Okay. And in 1980 or thereabouts when you switched
5     over to individual, did your focus on disability
6     insurance claim administration increase?
7  A. Yes, even though we also had hospital claims,
8     accidental death -- I was more or less involved in all
9     of that, hospital and disability.
10 Q. Did you feel comfortable and competent in reviewing
11    disability insurance policies to ascertain their
12    meaning?
13 A. Yes, I think so.
14 Q. Throughout your 38-year career?
15 A. Yes.
16 Q. What was the position you held prior to the merger of
17    Pilot and Jefferson?
18 A. I was supervisor of Claims, Group Claims, then
19    became -- I was Assistant Vice President and then when
20    we combined the two, I was manager of policy service
21    and claims in the Individual Health Division, and then
22    when we came downtown, they changed the focus and I
23    became a manager in lieu of Assistant Vice President.
24    The title was changed only.
25 Q. Manager of the individual?

Page 7

1  A. Health, yes.
2  Q. So throughout the '90s you were doing -- overseeing
3     claim analysts in the disability insurance claim
4     field?
5  A. And hospital, yes.
6  Q. And hospital. Were there a lot of mistakes being made
7     because the department was overloaded?
8  A. I felt with the volume of work that was there, our
9     folks did a great job. I think, you know, we were
10    constantly concerned about the welfare of the insured.
11    Whatever this may appear, our major concern was that
12    we get the folks their benefits, that we pay the
13    claims according to the contracts, and that was our
14    primary focus. I do feel that we had -- the reason I
15    got involved in the claim and JL got involved in the
16    claim was because of the staffing, we just needed all
17    the help we could get in those situations.
18 Q. Are you talking about Mr. Roberson when you refer to
19    JL?
20 A. Yes, JL Roberson.
21 Q. Within the past -- well, at your meeting with
22    Mr. Ellis when he conducted and shared with you the
23    revelation that you had made a mistake, did he give
24    you the opportunity to look at the policy?
25 A. We did briefly review the policy and provisions of the

Page 8

1  contract.
2  Q. Sections that he pointed out to you or did you spend
3     time independently reading the whole policy on your
4     own?
5  A. Just reading through -- there were some areas pointed
6     out, but just reading through, just reviewing them,
7     because it's been a long time.
8  Q. I hope to forget everything about my career when I
9     retire.
10 A. Well, I try to, even though I enjoyed my 38 years with
11    the company, very fulfilling.
12 Q. I enjoy some of mine. Some things I don't enjoy.
13        Did Mr. Ellis allow you to sit down by
14    yourself with the policy and review it cover to cover?
15 A. Not particularly that I recall.
16 Q. Okay. But you know what policy we're talking about,
17    you know, some fancy nomenclature, WJ576A or something
18    like that, right?
19 A. Yes.
20 Q. Was that version of policy one that your department in
21    the '90s had sufficient experience with? I mean, it
22    wasn't just Mr. Kearney's claim?
23 A. Yes.
24 Q. And the residual disability rider and the Social
25    Security Supplement rider and the increase in

Page 9

1  additional benefits rider, were those also provisions
2  that Jefferson-Pilot sold that you had a comfort level
3  with through the '90s?
4  A. Yes, I think so. The residual was one that did not
5     come up very often. It was the one that -- most
6     people were totally disabled and not able to go back
7     to work.
8  Q. Okay. When a residual situation arose, did that
9     require that you concentrate a little more closely on
10    the actual policy rights?
11 A. I think so.
12 Q. Okay. Mr. Shelton, have you ever met Mr. Kearney
13    before?
14 A. No, I have not. When he came out, he introduced
15    himself when I was outside, yes. That's the first
16    time I'd met him.
17 Q. You and he have spoken on the phone many times --
18 A. Yes.
19 Q. -- over the course of several years?
20 A. Yes.
21 Q. And you have corresponded with him?
22 A. Yes.
23 Q. Okay. Do you recall the period of time when
24    Jefferson-Pilot sought some assistance with Mr.
25    Kearney's claim from a company called DMS?

3 (Pages 6 to 9)

Reported By: Rebecca J.Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 89-8    Filed 08/24/2004    Page 4 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney     C-1-02-479
Harold Shelton                                                   5/7/2004

Page 46

1  on receipt?
2  A. That's possible, yes.
3  Q. At the third paragraph of that January 13 letter from
4     Mr. Kearney, the last three sentences say --
5  A. I'm sorry, what was that -- which one is this?
6  Q. You're on the right page right now, the third
7     paragraph.
8  A. Okay.
9  Q. January 13 letter from Mr. Kearney. The last three
10    sentences say, "Enclosed is a line card listing
11    principals (blacked out) from '95. Jefferson-Pilot
12    may put me in an unfavorable position with those
13    principals if you contact them. I have only two left
14    and the office in Toledo is closed."
15        Was that the first time that Mr. Kearney had
16    expressed that concern, as far as you know?
17 A. No, I do not know.
18 Q. Turn to the letter dated January 19, '98, Bates 2990.
19 A. Okay.
20 Q. It's a letter from Mr. Kearney a week after you had
21    that conference where you did a -- do you see your
22    memo about your January 13 discussion with him?
23 A. (No response)
24 Q. Sir?
25 A. I'm sorry?

Page 47

1  Q. Do you see the memo -- as we go through the
2     chronology, there was a January 13 memo from you to
3     the file concerning a call you had with Mr. Kearney.
4  A. Yes, here. This is 2992.
5  Q. That's your memo, and then his letter, his two-page
6     letter also references that lengthy call you had on
7     the 13th, right?
8  A. Yes.
9  Q. I guess the fax to Ditmar could have been either your
10    memo or Chris's letter, since they're both two pages?
11 A. Yeah.
12 Q. Both relate to January --
13 A. I'm not sure what was forwarded.
14 Q. Okay. And then a week later or on January 19, Mr.
15    Kearney sends you a letter memorializing -- I'm
16    talking about 2990 now -- "When we talked last week,
17    you told me that residual disability benefits were
18    subject to the same terms that are listed in the total
19    disability section." Did you tell him that?
20 A. Not unless it was in my -- this memo to file.
21 Q. If it's not in your two-page -- how long was the phone
22    call?
23 A. I can't say, must have been 10 to 15 minutes anyway.
24 Q. Is there things you talked about that aren't -- were
25    there words transferred between the two of you that

Page 48

1  aren't captured in your memo?
2  A. I can't say. I would try to include everything in the
3     memo.
4  Q. Okay. But it's his memory within a week of the call
5     that you told him that residual disability benefits
6     were subject to the same terms that are listed in the
7     total disability section. Are you saying that that
8     never happened, you never said that to him?
9  A. I can't -- no, I am not saying that, because I don't
10    know.
11 Q. Okay. Earlier we saw a '93 question, 1993 question by
12    Mr. Kearney about whether or not waiver of premium
13    applies to him under residual disability and he raises
14    the issue again here in 1998, right?
15 A. Yes, he does, in the second paragraph, January 19, '98
16    letter.
17 Q. Your responsive letter on the next page, 2982, dated
18    January 28, '98, the second paragraph, in response to
19    his question about whether or not waiver of premium
20    applies, you say, the middle of the second paragraph,
21    "In reviewing the waiver of premium provision, it
22    appears that is applicable only if benefits are being
23    paid under the total disability provision of the
24    policy."
25        You would agree with me that that is not

Page 49

1  necessarily an equivocal explicit statement that you
2  know that they don't apply. You're suggesting that it
3  appears to you, correct?
4  A. I used the word "appears."
5  Q. Okay.
6  A. It also states premiums would continue to be due,
7     so --
8  Q. Because it's your assumption that it appears that that
9     is the case?
10 A. Yes.
11 Q. Okay. And you apologized to him for any misleading
12    statement that may have been made in the January 13
13    phone call, right?
14 A. Yes.
15 Q. What day of the month were benefits payable to Mr.
16    Kearney?
17 A. Not any specific day. We didn't have a specific day
18    that we paid benefits. When the claim form came in,
19    it was matched with the file and if everything is in
20    order, it was paid at that time. He may have been
21    paid generally in the same time of the month, but
22    could have been different days, say, early in the
23    month or -- but primarily it's when the claim form was
24    received that we would start the process.
25 Q. How long does the process take? Would it be the same

13 (Pages 46 to 49)

Case 1:02-cv-00479-MRB   Document 89-8   Filed 08/24/2004   Page 5 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton
C-1-02-4?
5/7/2004

Page 58

1  Q. Mississippi?
2  A. Yes.
3  Q. Did you testify at trial in that case?
4  A. No.
5  Q. You settled on the eve of trial?
6  A. (Witness nods head)
7  Q. Was DMS involved in that matter, too?
8  A. I do not recall that they were.
9  Q. Have you ever given any depositions relating to your
10    work at Jefferson-Pilot that also related to DMS's
11    involvement?
12 A. Well, I think the King case was one that they had --
13    they were processing at the time, DMS.
14 Q. That's correct. Your memory is correct. Any other
15    cases?
16 A. Not that I recall.
17 Q. Did you review with Mr. Ellis over the past couple
18    days the disability claim worksheet in Mr. Kearney's
19    file?
20 A. I believe I just glanced at it.
21 Q. Okay. Do you know if your initials appear as
22    approving payment?
23 A. Not very often, but I think there was --
24 Q. There was some?
25 A. -- some. It would be HS.

Page 59

1  Q. What's the procedure that the company requests or
2     requires before you put your initials on a payment
3     authorization?
4  A. You would have the claim form in front of you and the
5     examiner would look at it. If it's over their limit,
6     then we would review the same thing they had reviewed.
7  Q. Okay. So in this case Phyllis Harden and/or Bob
8     Maxwell would have been the claims examiners because
9     Mr. Kearney's claim was above a certain threshold?
10 A. Yes.
11 Q. Either you or JL would have to sign it as well?
12 A. Right, that's correct.
13 Q. And what did the company require of you before you put
14    your initials down?
15 A. That the payment be correct.
16 Q. Okay. And did you undertake to make certain of that
17    when you --
18 A. Yes, I tried very hard to do that.
19 Q. Okay. Did you ever have any conversations with DMS of
20    length about the substance of Mr. Kearney's claim or
21    did you just simply send them the file and leave them
22    be?
23 A. No, I think primarily we were just trying to get all
24    the information, make sure that, you know, he was
25    getting the benefits he's entitled and we were paying

Page 60

1     what we should be paying and that we were getting all
2     the information we needed to properly consider the
3     claim. That would have been our objective.
4  Q. So there wasn't any one- or two-hour conference calls
5     to educate DMS on --
6  A. No.
7  Q. Was Phyllis Harden good at her job?
8  A. Yes.
9  Q. How about Mr. Maxwell?
10 A. Yes.
11 Q. We decided not to take his deposition today, by the
12    way.
13 A. Good, I'm glad. His health is not all that good.
14 Q. I asked before I requested. He said it wouldn't be an
15    imposition.
16 A. He did say?
17 Q. His wife said it wouldn't and then she went and
18    confirmed it with him and that's what she told me.
19 A. Yeah, yeah.
20 Q. So maybe he's doing better.
21 A. I'm sure he's willing to cooperate.
22 Q. Thank you. Have you ever testified at trial?
23 A. No, I have not.
24 Q. Do you want to?
25 A. No.

Page 61

1  Q. I might have asked you this earlier. Are you mindful
2     that DMS continued to pay the claim in the same manner
3     that your company did for at least four years after
4     the referral to --
5  A. I assume that they have been.
6  Q. What I mean in the same manner is, they kept adjusting
7     it for COLA every May and they kept paying Social
8     Security Supplement until sometime in 2002. Are you
9     mindful of that?
10 A. No, I was not. I wasn't aware of how they were paying
11    the claim.
12 Q. After 2000?
13 A. Yeah.
14 Q. Did you ever seek advice of legal counsel during the
15    time that you were at Jefferson-Pilot with regard to
16    Mr. Kearney's claim?
17 A. Not that I recall. We probably would have had
18    something in the file if we had.
19 Q. Under what circumstances would you use the general
20    counsel office of Jefferson-Pilot?
21 A. I think only if there was some legal question about --
22    while the claim payment is being made, normally we
23    would not have to refer to them. It might just depend
24    on whether there's a complication or not.
25 Q. Did you ever seek their input when there's confusion

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889      Fax (704) 372-4593