1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


- - -


JEFFERSON-PILOT LIFE          .  CIVIL ACTION NO. C-1-02-479
INSURANCE COMPANY, et al., .
                              .
         Plaintiffs,          .  Cincinnati, Ohio
                              .
     - v -                    .  Tuesday, August 17, 2004
                              .  3:00 p.m. Hearing
CHRISTOPHER L. KEARNEY,       .
                              .  Cross-Motions for Summary
         Defendant.           .  Judgment
.............................

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE S. ARTHUR SPIEGEL, JUDGE
TRANSCRIPT ORDERED BY:  William R. Ellis, Esq.

APPEARANCES:

For the Plaintiffs:   WOOD & LAMPING
                      BY:  William R. Ellis, Esq.
                      and  Amy Gasser Callow, Esq.
                      600 Vine Street
                      Suite 2500
                      Cincinnati, Ohio   45202

For the Defendant:    GRAYDON, HEAD & RITCHEY
                      BY:  Michael A. Roberts, Esq.
                      511 Walnut Street
                      Cincinnati, Ohio   45202

Also Present:         Mr. Christopher Kearney

Law Clerk:            Keith Syler, Esq.

Courtroom Clerk:      Kevin Moser

Court Reporter:       Mary Ann Ranz

- - -

```
 1                    TUESDAY, AUGUST 17, 2004

 2                    P R O C E E D I N G S        (3:03 p.m.)

 3              THE CLERK:  Please be seated.  Your Honor, the

 4    matter before the Court this afternoon is Jefferson-Pilot

 5    Life Insurance Company versus Christopher Kearney, et al.,

 6    Civil Action C 1 02-479.

 7              THE COURT:  Are we ready to proceed?

 8              MR. ROBERTS:  On behalf of Mr. Kearney, I am, Your

 9    Honor.

10              THE COURT:  All right.  It's a motion for partial

11    summary judgment.  So, your motion?

12              MR. ROBERTS:  Thank you, Your Honor.  Your Honor,

13    I'm going to be making good use of some demonstratives here

14    and some excerpts of documents on the -- on the easels.  I've

15    made copies for the Court --

16              THE COURT:  Okay.

17              MR. ROBERTS:  -- and Mr. Ellis.

18              THE COURT:  Thank you.

19              MR. ROBERTS:  Thank you.  May it please the Court.

20    On behalf of Mr. Kearney, Mike Roberts; law firm of Graydon,

21    Head & Ritchey.

22         Your Honor, we're here on Document 19, which is Mr.

23    Kearney's motion for summary judgment; Doc. 30, which is in

24    opposition; Doc. 33, which is the reply.  I'm also going to

25    be arguing contemporaneous in opposition to the plaintiffs'
```

1    motion for summary judgment, which is Document 31, Mr.

2    Kearney's opposition's Document 34.

3        At first blush this is a pretty crazy issue, Your Honor.

4    For ten years Mr. Kearney was receiving benefits under an

5    insurance contract without dispute.  He was receiving

6    Residual Disability, two checks every month; he was receiving

7    a COLA adjustment and two checks every month; and he was

8    receiving a Social Security Supplement Benefit with two

9    checks every month.  Every single month for nearly ten years

10   those three benefits were rolled up into two separate checks

11   and there was no dispute that he was entitled to them.

12       Now Mr. Kearney is the subject of a lawsuit by an

13   insurance company.  His insurance company says it's

14   unambiguous that he's not entitled to the COLA or the Social

15   Security Supplement.  So, it's -- the analogy that I have,

16   it's like after a trial, one party winning directed verdict

17   because things can only go their way, it's not ambiguous, and

18   then there being a change of heart and saying, "No, the other

19   party gets directed verdict."

20       For ten years it was not ambiguous and there was no

21   contest.  Now the plaintiff is saying that it's unambiguous

22   that they made a mistake.  And I'll show the Court by going

23   through the documents that that's simply not true.

24       It's unambiguous that Mr. Kearney has been correctly

25   receiving benefits for ten years under Residual Disability.

1   The problem is, and it's a primary problem in the case,

2   the --

3          THE COURT:  I think you'd better use the microphone.

4   Take the mike -- (To the Clerk) Have you got a portable mike

5   over there?

6          THE CLERK:  Yeah, it's over here.

7          MR. ROBERTS:  Thank you.  Is this better, Your

8   Honor?

9          THE COURT:  Yeah.  Go ahead.

10          MR. ROBERTS:  The principal problem with this case

11   is that the defendant -- excuse me -- the plaintiffs sold my

12   client a Total Disability insurance policy.

13      The Court will note that in the very opening sentence,

14   "Jefferson Pilot hereby insures you against loss due to Total

15   Disability."  Now --

16          THE COURT:  How do you identify this exhibit?  I

17   presume it's attached to the pleading somewhere.

18          MR. ROBERTS:  It is.

19          THE COURT:  Is this a copy of the policy?

20          MR. ROBERTS:  It's attached to the Complaint and

21   it's attached to both motions for summary judgment.

22          THE COURT:  Is this part -- actual copy of the

23   policy?

24          MR. ROBERTS:  This?

25          THE COURT:  Yeah.

1          MR. ROBERTS:  Yes.  Bill, do you know what exhibit

2     it is to your brief?

3          THE COURT:  Okay.  Go ahead.

4          MR. ROBERTS:  It's Exhibit C to the plaintiffs'

5     motion for summary judgment.  But, Your Honor, what is

6     important to note is that in the six-page -- now, I'm going

7     to speak in the single about "policy," but there's really two

8     policies that were sold to Mr. Kearney.  They're identical.

9     He bought one in 1990 and he bought one in 1991.  But the

10    policies are identical.  And they're about six pages each.

11    There is not one reference to Residual Disability in the core

12    policies.  All references are to Total Disability.  But, the

13    company decided they would also sell a Residual Disability

14    Benefit.  And the problem in the case becomes trying to

15    figure out when the core policy only refers to Total

16    Disability; the problem in the case becomes figuring out how

17    that applies to Residual Disability.  And to the extent

18    there's an ambiguity, that's where it arises.  But it's our

19    principal contention that it's not ambiguous, the policies

20    clearly allow increased COLA, Cost of Living Adjustment, and

21    Social Security Supplement to Mr. Kearney.  And I want to

22    focus the Court's attention on my handout demonstrative, Your

23    Honor, I have under Roman numeral I Policy, item No. 2.

24        Now, at page 3 of each policy, there's a section called

25    Definitions, and there's a section called Benefit Provisions.

6

1   And I have both those sections broken out in this handout.

2   There are definitions for Elimination Period -- and

3   Elimination Period is captured in terms of Total Disability

4   only.  There's definitions for Maximum Benefit Period,

5   Monthly Benefit, and Period of Disability.  All four of those

6   definitions are very important in a disability insurance

7   case.  All four of those definitions are referenced in terms

8   of Total Disability only.  The words "Total Disability" are

9   used in the definition for each one.  But it is not disputed,

10  Your Honor, that the Elimination Period, which speaks in

11  terms of Total Disability, as it's defined, applies in the

12  case of Residual Disability.  The parties don't dispute that.

13      It's undisputed, Your Honor, that the Maximum Benefit

14  Period, even though defined in terms of Total Disability,

15  applies in Residual Disability.

16      It's undisputed that the Monthly Benefit, although

17  defined in terms of Total Disability, applies in Residual

18  Disability.  And it's undisputed that the term Period of

19  Disability, although defined as Total Disability, applies in

20  Residual Disability.

21      Now, the second section here, Benefit Provisions, the

22  same thing applies.  All of these benefit provisions are

23  described and referenced in terms of Total Disability, but

24  they apply in Residual Disability.

25      Injury Due to Total Disability, that applies in Residual

1    Disability.  Those benefits are available.

2        Sickness for Total Disability, that applies in Residual

3    Disability.  And then we come to the first issue of dispute

4    in the case:  The definition in the policy of Increase in

5    Benefits.  Like all the other definitions I just referenced

6    and those here on the handout, it is described by using the

7    words Total Disability.  But just like all the other

8    definitions, it applies in Residual Disability, as I'll show

9    the Court.

10       When a person applies -- purchases and pays a premium for

11   Residual Disability and then they apply for Residual

12   Disability, to make sense of the rider in this policy --

13   because the way the policy was written, it doesn't mention

14   Residual; you have to take the rider and then go back for the

15   policy and apply these definitions as if it's Residual.  Just

16   like it's undisputed for Elimination Period, Maximum Benefit

17   and Monthly Benefit, even those described as Total, they

18   apply in Residual and so does Increase in Benefits, as we'll

19   get to in a second.

20       Now, the language of Increase in Benefits says, "After

21   you've received benefits for Total Disability for 12

22   consecutive months."  As I'll show you, because of the

23   Residual Disability rider and the claim for residual, when

24   residual is the issue, it should be read, "After you've

25   received benefits for Residual Benefits for 12 months."  The

8

1    criteria of 12 months is simply a notification that it's an

2    annual deal.  It's a COLA adjustment.  It's a cost of living

3    increase annually.  So, every 12 months that you're applying

4    for benefits and getting benefits, in that 12th month, you

5    get this increase.  The fact that it says Total, like all the

6    other definitions, does not mean it doesn't apply in

7    Residual.

8        The Benefit Provisions continue on page 4 of the policy.

9    And again, Recurring Disabilities is a definition as defined

10    in terms of Total Disability, but it applies in Residual.

11        A surgical transplant, that could cause Residual

12    Disability.  It's defined in terms of Total, but if that's

13    the Residual Disability causing event, it would apply in

14    Residual.

15        Then we get to Waiver of Premium.  This is another issue

16    in the case.  The issues in the case are:  The application of

17    the COLA adjustment; the application of the Social Security

18    adjustment; whether or not Mr. Kearney has been entitled to

19    Waiver of Premium while on Residual; and whether or not these

20    benefits, should his disability continue as is, are lifetime.

21        We discussed the first -- we've covered the first one in

22    COLA.  At least we identified initially what the issue is.

23    Within that same section, Benefit Provisions, there's a

24    Waiver of Premium.  And again --

25            THE COURT:  What do you refer to as the COLA again?

1          MR. ROBERTS:  It's called Increase in Benefits of

2     the policy on the page 3 at the bottom.  It's entitled

3     Increase in Benefits.  It's essentially a COLA adjustment.

4     What the policy says is every 12 months, you get a 3 percent

5     increase.  But in this case --

6          THE COURT:  Is that the 3 percent -- 3 percent, is

7     that based on cost of living, or just assumed it's going to

8     be at 3 percent?

9          MR. ROBERTS:  Flat.  Flat.  Contractual 3 percent.

10          THE COURT:  The COLA is 3 percent.

11          MR. ROBERTS:  Well, what Mr. Kearney did, is he

12     exercised a right that was given to him and he paid

13     additional premium to make that 3 percent 7 percent.

14          THE COURT:  He did pay?

15          MR. ROBERTS:  Yes.  And that's uncontested.  So, in

16     fact, in this case, the Increase in Benefits provision is

17     actually a 7 percent adjustment annually.

18      If we hone in on that definition in the policy at page 4,

19     the policy says, "The Monthly Benefit."  And I'll show you,

20     Your Honor, where the Monthly Benefit -- capitalized term,

21     Monthly Benefit -- is the Residual Disability Benefit in Mr.

22     Kearney's case.

23      It says:  "The Monthly Benefit paid for each separate

24     Period of Total Disability" -- and again that's changed to

25     Residual when you're on Residual -- "...will be an amount of

1    Monthly Benefit shown in the Schedule" -- Your Honor, we'll

2    get to a point here in a second where I will show you the

3    Residual Disability Benefit is the Monthly Benefit shown in

4    the Schedule.  "...subject to the increases for that Period

5    as indicated above."

6        So, what the Increase in Benefits provision that you

7    asked about, what it means is, every year, if you have 12

8    consecutive months, at the end of the 12th month you get a 7

9    percent bump, in Mr. Kearney's case because he paid that

10   additional premium.  And I'll come back to that as we

11   progress here, but right now I'm just focused on the terms of

12   the policy.

13       Again within the Benefits Provision section of the policy

14   there's a Waiver of Premium provision.  Like everything else

15   in the policy, it's defined in terms of Total Disability.

16   But that's not determinative when someone applies for

17   Residual.

18       The next section of the position is Limitations and

19   Exclusions.  It, too, Your Honor, is discussed in terms of

20   Total Disability only.  The only Limitations and Exclusions

21   in the base policy relate to Total Disability.  They don't

22   relate to Residual, yet I'll read to you in a moment here the

23   testimony of the claim representative where he concedes,

24   Yeah, that those probably do apply; those limitations and

25   exclusions do apply in residual.  So, even though they're

11

1    couched in terms of "Total Disability," when the issue is

2    Residual, they, too, apply.

3        As you can see on the handwritten note of the agent and

4    attached to the policy here, Mr. Kearney did purchase the

5    option to increase benefits, which means he purchased the 7

6    percent COLA adjustment.

7        Also on this agent's statement, it affirms that Mr.

8    Kearney was given an applica -- was given the outline of

9    coverage, or the proposal.

10        So, the Court's mindful there's really three, four

11    documents that need to be understood and merged together to

12    understand Mr. Kearney's rights in this case.  The first

13    document is the policy.  The second documents are the riders

14    to the policy, and there's three of them:  Residual

15    Disability rider; the Social Security rider; and that 7

16    percent COLA adjustment rider.  So, the riders are the second

17    item.

18        The third item are the Schedules to the policy.  The

19    Schedules actually set out exactly what you're entitled to.

20        And the fourth item in this case that's important -- and

21    both sides have attached to their motions for summary

22    judgment -- is the proposal that Mr. Kearney was given,

23    because it helps understand what the policy means.

24        Now, I'm on, I believe, the fifth page of that handout I

25    handed Your Honor.  But it's the Schedule to the policy, and

12

1    this is very important because the Residual Disability rider

2    refers back to the Schedule.  Maybe we should go to the

3    Residual Disability rider which is two pages further down the

4    way.

5         And I have had some red boxes, five red boxes,

6    highlighted here.  Now, the plaintiff insurance company

7    contends that the Increase in Benefit provision has nothing

8    to do with Residual Disability.  I will show you right now

9    that that contention is not true.

10        The first -- the number one, the red number one in the

11   left-hand margin, I have a box checked there.  It says, "The

12   'Prior Monthly Income' will be adjusted at the same time and

13   by the same percentage as the 'Increase in Benefits' or

14   'Increase in Benefits for Total Disability' provision,

15   whichever's applicable, of this policy."

16        What does that mean?  Okay, let's break it down.  First

17   of all, we're on the Residual Disability rider and there's a

18   formula down there on the fourth box about how to calculate

19   Residual Disability Benefit.  And one of the factors in the

20   formula is Prior Monthly Income.  So, above that fourth box

21   you have a whole bunch of definitions.  And in defining what

22   Prior Monthly Income means, the insurance company made

23   specific reference to a Total Disability provision, or Total

24   Disability language.  It says, "Your Prior Monthly Income,"

25   what you were making before you became disabled, "...we're

1  gonna adjust that at the same time."  Okay, what does that

2  mean?  What does "at the same time" mean?  It means something

3  else is going to get adjusted, too.  "...and by the same

4  percentage."  So, this Prior Monthly Income is being adjusted

5  at the same time that something else is.  What is the

6  something else that's being adjusted?  It's the Monthly

7  Benefit, which I'll show you in a second.

8      The Prior Monthly Income gets adjusted at the same time

9  and by the same percentage as the Increase in Benefits.  This

10  Increase in Benefits language, Your Honor, that's the COLA

11  adjustment.  And you're not going to hear a dispute from my

12  colleague, Mr. Ellis, that in Mr. Kearney's case he purchased

13  the 7 percent COLA adjustment.  So, if he gets the COLA

14  adjustment, it's 7 percent.  And right here we have very

15  unambiguous language that his Prior Monthly Income and the

16  Residual Disability calculation is tied to that 7 percent

17  increase.  And the Prior Monthly Income is multiplied by 7

18  percent at the same time as the Monthly Benefit, which I'll

19  show you here in a second.

20      Now, the second box is also very important and not

21  disputed.  To do the Residual Disability formula here at the

22  bottom, one of the factors in the equation is Loss of Monthly

23  Income.  And it says, "Loss of monthly income of more that 75

24  percent will be deemed to be a hundred percent."

25      In this case, since 1994, Mr. Kearney has had between 75

1    percent and a hundred percent loss of monthly income.  So by

2    this contract, it's deemed to be a hundred percent, and

3    that's not disputed by Mr. Ellis.

4        Now, the last factor in our equation is Monthly Benefit.

5    Monthly Benefit is the amount shown in the Schedule as such.

6    Okay?  Now, if we flip back two pages, this may be one of the

7    most important things about the case.  On the Schedule,

8    there's a Monthly Benefit under the heading Total Disability.

9    There is no Monthly Benefit for Residual Disability.  So in

10   the Residual Disability rider --

11          THE COURT:  Residual Disability acquired at the same

12   time?

13          MR. ROBERTS:  I'm sorry?

14          THE COURT:  Did he get the Residual Disability at

15   the same time the Schedule was prepared?

16          MR. ROBERTS:  He did, Your Honor, yes.  And that's

17   referenced right here.  The Schedule was given to him when he

18   purchased the policy and it tells him, Hey, here's the

19   benefit you purchased.  You purchased the Monthly Benefit,

20   and the premium you're paying gives you this much a month,

21   and you purchased the 90-day elimination period instead of

22   the hundred and eighty.  And hey, if you get sick before

23   you're 45, your benefits are lifetime.

24        And then it says down in the middle, "Additional Benefits

25   Included."  "Hey, Mr. Kearney, here's what else you

1    purchased:  Social Security Supplement, Residual Disability,

2    and Cost of Living Increase."

3         So, he was sold all these items, he agreed to purchase

4    these items, and then this is the statement saying, Here's

5    what you got.  Okay?  But for our purposes today in

6    calculating what the Residual Disability Benefit is, the

7    Residual Disability rider, as I just showed you, referred us

8    back to the Schedule.  And it says when you do the math for

9    the Residual Disability rider, you use the Monthly Benefit

10   that's shown in the Schedule.  Well, the only Monthly Benefit

11   in the Schedule is a Total Disability one.  There is no

12   Residual Monthly Benefit here.

13        So again, as I've been saying all afternoon, when you get

14   Residual Disability, because of the way this policy's

15   written, you've got to use the definitions that are couched

16   only in terms of Total.  In this case, that's Monthly

17   Benefit.

18        But look what the Monthly Benefit is.  Okay?  The Monthly

19   Benefit on the Schedule, which we just got referred back to

20   by the Residual Disability rider itself, the Monthly Benefit

21   has these add-on benefits of Cost of Living Increase and

22   Social Security Supplement, because he purchased those to add

23   on to his Monthly Benefit.  So, the Monthly Benefit

24   represented here is inclusive of those.

25        So, that's -- if we go back to the Residual Disability

1    rider, we have in box No. 1 our first reference to the fact

2    that when you're residually disabled, you get COLA.  That's

3    in box 1.  And box 3, it says, "Your Monthly Benefit in our

4    calculation is one shown on the Schedule."  That's inclusive

5    of COLA.  So again we have another reference to COLA.

6        And then let's do this calculation.  Let's figure this

7    out.  And I have this on this other handout, Your Honor.  I

8    called this case the four P's:  The proposal, the purchased

9    riders -- excuse me -- the policy, the purchased rider, the

10   proposal and payment.

11       We've been through all of this down to the bottom here.

12   And I've just read you this No. 2 at the bottom on this

13   handout.  It says The Formula.  Now, any loss of monthly

14   income of greater than 75 percent shall be deemed to be a

15   hundred.  In this case, Mr. Kearney's loss is deemed a

16   hundred.  Therefore, the formula becomes, okay, loss of

17   monthly income --

18            THE COURT:  Uh-huh.

19            MR. ROBERTS:  -- loss of monthly income, well,

20   that's his Prior Monthly Income and it's a hundred percent.

21   So, this becomes -- his loss is his Prior Monthly Income:  A

22   hundred percent.  So, your equation becomes Prior Monthly

23   Income divided by Prior Monthly Income.  We all know that's

24   1.  One divided by 1, 3 divided by 3 -- any number divided by

25   itself equals 1.  So, in every instance in Mr. Kearney's

1    case, this formula becomes Prior Monthly Income divided by

2    Prior Monthly Income, which is 1, times the Monthly Benefit

3    equals his Residual Disability Monthly Benefit.

4        So, in every instance in this case, because Prior Monthly

5    Income divided by Prior Monthly Income is 1, his Monthly

6    Benefit Residual Disability equals the Monthly Benefit -- the

7    Monthly Benefit on the Schedule.

8        Now, the most important thing in the case, I think, is

9    this language, "Prior Monthly Income will be adjusted at the

10    same time and by the same percentage."  What else gets

11    adjusted by that COLA?

12        On the Residual Disability rider, it says two things:

13    Prior Monthly Income -- what else?  The other thing that gets

14    adjusted when Prior Monthly Income does, according to

15    Residual Disability rider, is the Monthly Benefit.

16        Residual Disability rider says he gets the Monthly

17    Benefit.  And because his loss is greater than 75 percent, he

18    gets the whole thing.  And the Residual Disability rider says

19    in two spots that's inclusive of Cost of Living Increase

20    because two things get adjusted by that 7 percent at the same

21    time and by the same percentage.  It's unambiguous.

22        Now, you have to put the policy together with the

23    Schedule with the rider.  That's not Mr. Kearney's fault.  He

24    didn't write the policy.  The insurance company wrote the

25    policy in terms of Total Disability only.  And then it

1  becomes a little tortured to figure out what Residual

2  Disability Rights means.  But when you break it down, it's

3  absolutely clear.

4      Now, there is on the Residual Disability rider a

5  Limitation section.  Nowhere in that Limitation section does

6  it say, Hey, even though we referred back here in box 1 to

7  Increase in Benefits, you don't get the COLA adjustment.  It

8  doesn't say that.  And it doesn't say, Even though the

9  Schedule says you get the COLA, you don't get that for

10 Residual Disability.  And it doesn't say, Even though we

11 talked about Social Security Supplement, you don't get it.

12     The company went to the effort of laundry listing

13 explicitly what was limited on a Residual Disability rider,

14 and it said nothing about this increase in behalf.  It didn't

15 further define Monthly Benefit.  It didn't say, "Monthly

16 Benefit in the amount as shown on Schedule, except you don't

17 get the Cost of Living Adjustment which goes to Monthly

18 Benefit on the Schedule."  It doesn't say that.  Those are at

19 worst ambiguities that need to be construed against the

20 insurance company.  But this is clear that he gets the COLA.

21     Now, the other two riders that I mentioned he

22 purchased -- he had three riders.  The next one he purchased

23 was Social Security Supplement Benefit.  And right out of the

24 box it says, "Monthly Benefit."  Capital M, capital B is

25 everything in this case.  Social Security Supplement says,

1  "The Monthly Benefit of this policy will be increased by the

2  amount of the Social Security Supplement."

3           THE COURT:  I don't understand what that means.

4           MR. ROBERTS:  The Social Security Supplement is --

5  if you look back to the Schedule, it's probably the easiest

6  way to explain it.  There's two Schedules.  The first

7  Schedule talks about a Monthly Benefit for Total Disability

8  of $2,125.00.  Are you on that page?

9           THE COURT:  Yeah.

10          MR. ROBERTS:  2000.  And what Mr. Kearney was told,

11 he was told that, you know, sometimes people don't qualify

12 for Social Security.  So, "If you pay us more premium, in the

13 event you're not getting Social Security for what's disables

14 you, we'll pay you another amount every month."  So --

15          THE COURT:  This is it what he would get because he

16 doesn't get Social Security?

17          MR. ROBERTS:  Correct, $625.00.

18          THE COURT:  That's an additional amount?

19          MR. ROBERTS:  On top of twenty-one twenty-five.

20          THE COURT:  Unless he was getting Social Security,

21 then it wouldn't be applicable?

22          MR. ROBERTS:  Right.  This is a fail-safe.

23          THE COURT:  What's that?

24          MR. ROBERTS:  It's a fail-safe.

25          THE COURT:  Okay.

1          MR. ROBERTS:  So --

2          THE COURT:  The Social Security is of a similar

3    amount or that; right?

4          MR. ROBERTS:  Correct.

5          THE COURT:  Okay.

6          MR. ROBERTS:  You either get the Social Security --

7    and if you don't qualify for Social Security, this is what

8    you get.

9        And then the second Schedule, same thing:  The Monthly

10   Benefit is 1375.  "If your disability doesn't qualify for

11   Social Security and you've paid us this additional premium

12   that we sold you, we'll give you 225."  Okay?

13       So, the Social Security Supplement rider that he

14   purchased says the Monthly Benefit of this policy will be

15   increased.  When again, Monthly Benefit is our primary term

16   here and it applies, according to the Residual Disability

17   rider, and this rider says that that benefit will be

18   increased by the Social Security Supplement.  And Mr. Kearney

19   meets all the requirements of that rider.  And he was

20   properly paid that benefit for nearly ten years, Your Honor.

21       The third rider --

22          THE COURT:  Did he pay an extra premium for that?

23          MR. ROBERTS:  He did, yeah.  He was quoted premiums,

24   you know, for the core policy --

25          THE COURT:  Okay.

1      MR. ROBERTS:  -- add-on premium for each rider that

2   he purchased, and he's paid those premiums.

3      The next rider is the additional Increase in Benefits

4   rider.  And this rider doesn't say anything about Total

5   Disability or Residual Disability.  It doesn't reference

6   either one.  It just says, Hey, if you have paid us this

7   additional premium to get the 7 percent, it applies.  Let's

8   see what it says:  "In consideration of the increased premium

9   for this rider, the policy referred to above" -- which is the

10  policy bought with a rider residual, "...is hereby amended by

11  changing from 3 percent to 7 percent, the percentage shown in

12  the Benefit Provision."  It doesn't say the Total Disability

13  Benefit Provision.  It just says the Benefit Provision.  And

14  as I've argued and analyzed here with you, Your Honor, that

15  applies to Residual Disability.

16     Now, when I was talking about the Residual Disability

17  rider a moment ago, I was pointing out to you where it

18  doesn't say the COLA doesn't apply, and doesn't say the

19  Social Security Supplement doesn't apply.  This next document

20  is a 1992 revised Residual Disability rider.  And there's

21  been a dispute in this case about whether Waiver of Premium

22  applies in Mr. Kearney's case.  The Residual Disability rider

23  says nothing about it.  But what it does say is he gets the

24  Total Disability Monthly Benefit.  The Total Disability

25  Monthly Benefit includes the ability to waive premium.  It's

1  part of the benefits you get.  If you're on Total Disability

2  and you're getting the Monthly Benefit for Total Disability,

3  you not only get that cash, you get the right to refrain from

4  continuing to pay the premium.  That's part of the benefit.

5      And Mr. Kearney, in getting the Residual Disability

6  Benefit that is the Total Disability Monthly Benefit as we

7  just analyzed, means, necessarily, that he gets the premium

8  waived.  And there's lots of correspondence going back and

9  forth between these parties going back ten years about that

10  debate.

11      But 1992, after Mr. Kearney purchased the policy, the

12  company came out with a new Residual Disability rider that

13  clarified that ambiguity.  It says expressly --

14          THE COURT:  Is this a noncancellable policy?

15          MR. ROBERTS:  Yes, sir.

16          THE COURT:  What does that mean?  They can't cancel

17  the policy so long as he tenders the premium for the policy

18  that was agreed upon at the time that he took the policy out?

19          MR. ROBERTS:  Right.  They can't say since we did --

20          THE COURT:  Change the terms of the policy?

21          MR. ROBERTS:  They can't change them.

22          THE COURT:  Noncancellable.  Does the insurance

23  company have the right to change the terms of the policy?

24          MR. ROBERTS:  It doesn't.  I'm not suggesting they

25  did here.  I'm just suggesting they have another rider that

1    -- they revised the Residual Disability rider later, not that

2    it applies to Mr. Kearney.

3         THE COURT:  Excuse me.  He took this policy out with

4    a Residual rider and all that in 1991?

5         MR. ROBERTS:  One in 1990, one in 1991.

6         THE COURT:  All right.  I see this particular thing

7    down at the bottom left-hand corner indicates it was revised

8    in January of 1992.

9         MR. ROBERTS:  Right, and let me clarify.  This rider

10   doesn't apply in this case --

11        THE COURT:  Then why do we have it here?

12        MR. ROBERTS:  -- directly.  It applies to make a

13   point.  The company knew how to write an unambiguous policy.

14   They revised the rider after Mr. Kearney's, and this applies

15   to other people.  But the point is this:  There is no waiver

16   of premium language in Mr. Kearney's Residual Disability

17   rider.  We're left to guess, Does it apply?  Does it not

18   apply?  Is it part of the Monthly Benefit or not?  The

19   company knew how to write an unambiguous rider and it did

20   that in 1992.  It said, Yeah.  When you're on Residual

21   Disability, you do get the waiver of premium.

22     So my point is twofold.  Number one, Mr. Kearney gets it

23   because it's part of the Monthly Benefit.  But number two, if

24   he doesn't get it because it's part of the Monthly Benefit,

25   it's ambiguous and the company had the ability, the

1  obligation, to make it ambiguous, and here they did the next

2  year.  They said, Yeah, you do get it.  I'm not suggesting,

3  Your Honor, that this disability rider controls the case

4  other than to say Mr. Kearney's, I think, provides him with a

5  waiver of premium; if it doesn't, it's ambiguous.  And the

6  company shows it was ambiguous by clarifying the ambiguity

7  later.

8          THE COURT:  I think I understand.

9          MR. ROBERTS:  Thank you.  Now, I want to -- there is

10  some deposition testimony in the case that's very relevant.

11  So the Court understands, Jefferson-Pilot is the insurance

12  company.  They sold Mr. Kearney the policy in '90, '91, and

13  they administered the policy for Mr. Kearney until the year

14  2000.  And they paid all these benefits that are now subject

15  to dispute.

16      In 2000, Jefferson-Pilot outsourced the work on that

17  claim.  They gave it to a company called Disability

18  Management Services.  And Disability Management Services has

19  had it since the year 2000.

20      But stepping back, from  '90 to 2000, when Mr. Kearney

21  had the policy with Jefferson-Pilot, he filed a claim in '93.

22  There were four people in the Claim Department that handled

23  his claim.

24          THE COURT:  Four people did what?

25          MR. ROBERTS:  Four people in their Claim Department

25

1   handled his claim.  J.L. Roberson was a Vice President of the

2   company.  His deposition testimony has been filed.  He worked

3   for the company for 38 years.  He was involved in the process

4   of developing the language for policies, and he was also

5   involved in the back-end in the claim area.  Three people

6   worked under him:  Howard Shelton, he, too, was at the

7   company for 38 years; Robert Maxwell was at the company for

8   over 20 years; and I think Ms. Harden, the fourth person, was

9   there for over 30 years.  We had four seasoned claim

10  examiners at the company that developed the policy.  And the

11  company that developed what I'm going to now, the proposal,

12  they knew what these policies provided.

13      And in Mr. Shelton's deposition, I asked him all about

14  these definitions and these benefit provisions.  And at pages

15  18 to 27 and pages 85 to 92 of his deposition, I intended to

16  read it, but I don't want to belabor the point, he conceded

17  that, Yeah, those definitions in the core policy, although

18  termed in words of Total Disability, apply in Residual.

19      And I've also filed the deposition transcript of

20  Mr. Roberson, and at pages 87 to 90 of his deposition

21  transcript, he, too, concedes many of these points about

22  these Total Disability definitions applying and Residual

23  Disability.

24      Now the point on this proposal.  Mr. Kearney, in 1990,

25  he's testified in the case -- I don't know if his

1    deposition's been filed -- but he met with an agent.  The

2    agent gave him a proposal.  And the proposal's attached to

3    both parties' motions for summary judgment.  And I want to

4    read from Mr. Roberson's deposition, pages 17 to 20 regarding

5    that process.  Okay?  One of the most important documents in

6    the case is this proposal.  This is, Hey, let us explain to

7    you what it is you're buying so you understand what this

8    policy provides.  And it's a Jefferson-Pilot document created

9    by Jefferson-Pilot.  It's attached to both parties' motion

10   for summary judgment.  Now, here's what Mr. Roberson says

11   about the creation of policies, and this is at page 17

12   beginning at line 14.  I asked him:

13       "Do you know who authored the proposals that those folks

14   shared with prospects?"

15       Answer:  "I don't recall."

16       Question:  "Were they authored within Jefferson-Pilot, or

17   were agents out in the field creating whatever they wanted to

18   create for a proposal?"

19       Answer:  "Basically it came from Jefferson-Pilot."

20       Question:  "Do you know what department created the

21   proposals?"

22       Answer:  It was out of the Marketing Department, I

23   think."

24       Question:  "The same department that comments on policy

25   language before a policy is issued?"

1    Answer:  "Yes."

2    Question:  "The people who create the proposals, are they

3    mindful of actual provisions of the policies?"

4    Answer:  "Yes."

5    And then at the bottom of the page 18, he says:

6    "We would review the new policies with the claim analyst

7    and with the underwriting personnel."

8    "Who is we?"

9    "Myself primarily for our department."

10   THE COURT:  Let me ask you a fundamental question.

11   It seems to me before you said you didn't think the policy's

12   ambiguous and the insurance company does think it's

13   ambiguous.  It could be you turn that on its head.  Generally

14   it's the claimant, who in a situation where there's an

15   ambiguous policy, the Court's obligated to interpret it to

16   favor the insured.  What's your position with regard to that?

17   MR. ROBERTS:  My position is what I stated at the

18   outset:  This is a crazy case.  It was unambiguous for ten

19   years that he's entitled to this.  Now they're saying it's

20   unambiguous that he's not.  My primary position in the case

21   is it's unambiguous.

22   THE COURT:  -- they did it wrong.  Wasn't it they

23   just made a mistake?

24   MR. ROBERTS:  It wasn't a mistake.  It was every two

25   months two people --

1          THE COURT:  Isn't there a doctrine of waiver in

2     insurance law?

3          MR. ROBERTS:  Well, there is.  But to answer your

4     question, I'm arguing first it's unambiguous in Mr. Kearney's

5     favor.  I'm arguing second, if it's not, it is ambiguous,

6     therefore, it's in his favor.

7          THE COURT:  Is there a third doctrine about waiver?

8     Whether waiver --

9          MR. ROBERTS:  There's waiver, there's equitable

10    estoppel.

11         THE COURT:  If they pay a claim continuously for a

12    number of years, they waive any right to claim that they made

13    a mistake?  It's like an account stated; isn't it?

14         MR. ROBERTS:  Your Honor, it's like playing --

15         THE COURT:  Like an account stated?

16         MR. ROBERTS:  Your Honor, it's like playing Name

17    That Tune:  I can name that tune in two notes.  I can win

18    on --

19         THE COURT:  What?

20         MR. ROBERTS:  -- you know, it's not ambiguous.  I

21    think we win on the fact that it's unambiguously in Mr.

22    Kearney's favor.  I think we win because it's ambiguous.  I

23    think we win as a third argument because of waiver.  I think

24    we win as a fourth argument because of equitable estoppel.

25    They essentially misrepresented to him in the policy what

1   they're now contending --

2        THE COURT:  All right.

3        MR. ROBERTS:  -- in the proposal, excuse me.

4        THE COURT:  Anything more you want to tell me?

5        MR. ROBERTS:  I do, Your Honor.  This is -- this

6   proposal is very important.  Okay?  This is given to him to

7   buy benefits.  And it says -- this is page 2 of the proposal

8   which I think is Exhibit 3 or 4 to Document 34.  This is

9   telling Mr. Kearney Residual Disability -- okay?  It's

10  telling him what Residual Disability is.  "Residual

11  Disability pays a percentage of basic benefits and Social

12  Security Supplement."  It can't be any more clear.  Residual

13  Disability pays you the Social Security Supplement.  And it

14  pays you the Basic Benefit.  It says it pays a percentage,

15  but in this case the percentage is a hundred percent because

16  it's not contested that his loss has always been greater than

17  75 percent.

18      Now, Basic Benefit is a defined term.  Capital B, capital

19  B.  What does it mean?  Page 2 is broken into two sections.

20  There's the Basic Benefit section and there's the Additional

21  Benefit section.  There are four items that come with capital

22  B Basic, capital B Benefits.  The first item is the Monthly

23  Benefit for Total Disability.  The second item is the

24  Elimination Period.  There's no doubt that he gets both of

25  those.  There's no contest.  The third item is Benefit Period

1   for Total Disability, and for many years there was a fight

2   about what that is.  I think now it's conceded that Mr.

3   Kearney's circumstance, his Benefit Period, is lifetime.  So,

4   in the first three items of Basic Benefits, there's no

5   dispute anymore.

6       In Residual Disability, as it says down here, pays you

7   the Basic Benefit.

8       The fourth item of Basic Benefit on this document is

9   percentage Increase in Benefits during Total Disability.  The

10  3 percent.  Well, Mr. Kearney purchased 7.  But the point is

11  this:  The proposal he was given on which he's paid premiums

12  for now 15 years says if you give us money for disability

13  benefits, we're going to give you -- in this case a hundred

14  percent -- of the Basic Benefit, which is all of this.  The

15  Basic Benefit includes the COLA adjustment.

16          THE COURT:  What's the -- what does the insurance

17  company want him to do?

18          MR. ROBERTS:  Presently?

19          THE COURT:  Yeah.

20          MR. ROBERTS:  The insurance company --

21          THE COURT:  They brought this lawsuit.

22          MR. ROBERTS:  They want you to hold, Your Honor,

23  that this proposal is wrong.  That Residual Disability,

24  although it --

25          THE COURT:  I just -- what's the relief they want?

```
 1          MR. ROBERTS:  They want not to recover money that's

 2   been paid to Mr. Kearney, apparently.  They want you to

 3   decide that beginning in September of 2004, he doesn't get

 4   the Basic Benefit and he doesn't get the Social Security

 5   Supplement that they told him he would be getting in this

 6   proposal and as I showed you in the policy and the riders he

 7   gets.  They want to cut him back from about a $7,000 benefit

 8   today.

 9          THE COURT:  Was this claim made by the insurance

10   company or made by somebody that they outsourced to manage

11   the claim?

12          MR. ROBERTS:  Interesting question.  My

13   understanding, Your Honor, from this case and another case I

14   had is DMS, this third-party administrator, controls

15   litigation.  So, DMS is the one that came up with this new

16   interpretation of the contract, even though they didn't write

17   it.  You know, all these people who had all this

18   experience --

19          THE COURT:  Where did the impetus for the lawsuit

20   come from?  Did it come from the insurance company or from

21   the manager?

22          MR. ROBERTS:  That information's been withheld from

23   me to date.  I suspect that the third-party administrator is

24   driving the ship.

25          But to answer your question what do they want in the
```

1   lawsuit, they want you to conclude that this unambiguous

2   language here in the proposal is wrong; that you don't get

3   the Social Security Supplements on a residual, and you don't

4   get the Basic Benefit, because the Basic Benefit includes

5   COLA.

6           THE COURT:  All right.

7           MR. ROBERTS:  I see that you want me to move on,

8   Your Honor, but there are some --

9           THE COURT:  Let's move on.  Let's get on.

10          MR. ROBERTS:  -- important points for Mr. Kearney.

11  In this proposal, again unambiguous, there's an example on

12  page 5 of, you know, If you don't understand what we're

13  telling you, here's an example.  Okay?  We'll spell it out

14  for you.  Example:  If you have a 40 percent loss, the first

15  six months we'll pay you 50 percent.  Kind of like a little

16  premium the first six months.  But thereafter it would be

17  equal to 40 percent of your benefit for Total Disability.

18      If the loss of earnings is at least 75 percent -- this is

19  the last sentence of their example which is applying here

20  every month -- if the loss of earnings is at least 75

21  percent, the full benefit for Total Disability will be

22  payable.

23          THE COURT:  Excuse me just a minute.  What's this

24  require out of the policy?  That the policyholder must -- has

25  to advise monthly the insurance company what its earnings

1   were for the previous month?

2          MR. ROBERTS:  On Residual Disability there's a

3   monthly form, and Mr. Kearney has filled them out dutifully.

4          THE COURT:  Okay.

5          MR. ROBERTS:  So, what they tell him, If your

6   earnings are at least 75 percent "the full benefit for Total

7   Disability will be payable."  The full benefit for Total

8   Disability is Waiver of Premium, COLA, Social Security

9   adjustment.  There's no -- there's no debating that.  Again,

10  Residual Disability, the amount of your Residual Disability

11  Benefit will be the percentage of your Basic Benefit and

12  Social Security Supplement.  Again, they restated it in the

13  proposal.

14     This is a pretty important sheet as well.  This is the

15  payment history on his claim.  Every row is a month of time,

16  and there's two of these:  One for each policy, because

17  there's really two policies.  But as you can see, every month

18  from '93 through sometime in 2000 -- 2000, when Mr. Kearney

19  was issued a check, two checks, by the insurance company in

20  North Carolina, two people -- there's two sets of initials --

21  confirmed that the payment was correct.  Two people, every

22  month, two checks a month.  That's four reviews a month times

23  7 or 8 years in the '90s.  It's hundreds of reviews.  Every

24  month he got the COLA; every month he got the Social Security

25  Supplement.

1      On this pay history, it says --

2           THE COURT:  What does C A stand for?

3           MR. ROBERTS:  C A?

4           THE COURT:  Somebody's initial on the first column.

5           MR. ROBERTS:  The big swoop?

6           THE COURT:  No, the first column.

7           MR. ROBERTS:  That's somebody's --

8           THE COURT:  Initials.

9           MR. ROBERTS:  Phyllis Harden, I think.  P.H.,

10   Phyllis Harden.

11          THE COURT:  Is that somebody that just administered

12   the policy?

13          MR. ROBERTS:  She's like the claim person.  But

14   because of the amount of this benefit -- and this is

15   Mr. Roberson's deposition; I'll get the cite if you want --

16   but Mr. Roberson was the Vice President.  He's the guy that

17   helped create the policies and helped administer the claims.

18      Because the benefit was so great -- this was a big

19   liability, a big indemnity for the company -- he had to

20   approve every month's payment.  So, the big swooping J is

21   J.L. Roberson, the Vice President of the company.

22      And there's other people's initials:  Howard Shelton --

23   he was with the company for 40 years.  He was the manager

24   over Phyllis.  Then there's another gentleman named Bob

25   Maxwell.

1        But the second page of the pay history that I have here,

2    you'll see in this Remarks column it specifically says the

3    claim's residual, and it also says COLA each 5-6.  Every May

4    6th.  That was his anniversary date.  Going back to 1994,

5    every May 6th until the year 2002, they went -- I mean, it

6    wasn't flying, you know, with no one looking at it.  It

7    wasn't under the radar screen.  They were looking at it.

8    Every May they would calculate the 7 percent.  Two people

9    would sign off on two checks every month.  These were the

10   people that created the policy.  They knew what they were

11   doing.

12       Now, as I mentioned, Your Honor, you asked some pretty --

13   you asked some good questions about who's driving litigation.

14   But this company called Disability Management Service was

15   hired in 1997.  The insurance company wanted help with Mr.

16   Kearney's claim, because there's so much money going out the

17   door.  They hired this special company, Disability Management

18   Services.  Jefferson-Pilot's in North Carolina.  They farm

19   this all the way up to Boston or Springfield, Massachusetts.

20   So, they start paying the claim to Mr. Kearney.  And they

21   were looking at it hard.  They were having their in-house

22   lawyers look at his contracts.  They were looking at it very

23   hard, as I'll show you in a second.  But this letter, Bates

24   stamp 3064, it's in the claim file, dated August 11 of 2000,

25   written by Mr. Mills who's the person responsible for Mr.

1    Kearney's claims, says, "Thanks for your letters of July 3,

2    2000 and July 28, 2000."  Mr. Kearney was writing and saying,

3    "Where's my COLA adjustment?"  Two letters.

4        August 11, he gets a letter back saying, "We're sorry.

5    We made a -- here it is.  You get the COLA.  I apologize for

6    this oversight."  They were looking at the claim hard.  They

7    were hired to find a way to pay less money and they

8    apologized for not having paid the COLA.  They did that after

9    looking --

10           THE COURT:  Where are you looking at?

11           MR. ROBERTS:  This August 11, 2000 letter, Your

12    Honor.  It's Bates 3064.  It's the first letter after these

13    payment histories.

14           THE COURT:  I'm trying to find out where the apology

15    is.

16           MR. ROBERTS:  Second paragraph.  "Under separate

17    cover, you should receive two checks reflecting the increase

18    under the cost of living adjustment rider for both of your

19    policies that became effective May 6, 2000.  I apologize for

20    this oversight."  The second paragraph of the letter.

21           THE COURT:  Oh, yes, I see it now.

22           MR. ROBERTS:  Okay.  Now, I want to highlight

23    something to the Court.  There's 45 deposition exhibits that

24    were filed yesterday.  Deposition Exhibit 44 is the

25    Gestetner-bound document.  This is very important.  It

1    answers some of your questions earlier:  Why is the insurance

2    company doing this to Mr. Kearney?  This is a chronology of

3    everything they tried to do to Mr. Kearney.  In '94, they did

4    some investigation.  In '96, they hired an accountant to

5    examine him.  'Ninety-seven, they hired someone named

6    Yugalich (phonetic) to take a look at his mental condition.

7    'Ninety-eight they hired Beatty to do it.  'Ninety-eight they

8    hired Newell to do it.  'Ninety-eight they did an

9    investigation of him.  'Ninety-nine they did another

10   surveillance of him.  2000 they made records requests.

11   January 2000, they hired a surveillance company called C S

12   Claims.  Again, three times in the year 2000.  In  '90 --

13   excuse me.  In 2000, they hired a gentleman named Pasterzick

14   (phonetic) to perform an accounting review.  April 2000, they

15   hired a Ph.D. to look at his mental condition.  His Residual

16   Disability is severe chronic depression.  And this is what

17   they're doing to him:  They hire all kinds of surveillance.

18   This Exhibit 44 goes through chronologically everything they

19   did to Mr. Kearney, including hiring guys to do IMEs, some

20   doctors.  They all come back, Yeah, he's disabled.  They were

21   doing everything they could to find a way to limit their

22   liability on this.  After all of these efforts failed, they

23   start paying him -- they started paying him benefits under

24   reservation of rights, meaning, We don't think we really owe

25   you this, but we're giving it you now in October of 2000.

1      Then all of a sudden, after all those efforts fail,

2   Exhibit 44, they write him a letter in October 2001 saying --

3   well, excuse me.  They meet with him in October 2001.  They

4   fly down to see his lawyer in Miami.

5            THE COURT:  This a letter from John Spiegel?

6            MR. ROBERTS:  John Spiegel at that time, late 2001,

7   was Mr. Kearney's lawyer.  His office is in Miami.  Two guys

8   fly from Massachusetts to meet with Mr. Spiegel, October

9   2001.  In that meeting, they explained to him --

10           THE COURT:  He's no relation as far as I know.

11           MR. ROBERTS:  Let the record reflect.

12      In that meeting, these two claim consultants say, Hey,

13   we've got news for you.  We've been making mistakes for eight

14   or nine years.  The policy is unambiguous.  Mr. Kearney does

15   not get COLA or Social Security Supplement.  And they offered

16   to pay $280,000.00 to make the claim go away for life.  So,

17   the policy went from being unambiguous on those points for

18   eight or nine years --

19           THE COURT:  I can't consider that.  That's an offer

20   in settlement.  Is that proper?

21           MR. ROBERTS:  There's no lawsuit at that point.

22           THE COURT:  Huh?

23           MR. ROBERTS:  They just flew down to tell him that.

24   There is no lawsuit.  There is no dispute of any sort.  He

25   was getting monthly benefits.

1          THE COURT:  Sure, there's a dispute.  They want to

2     cut it back and he doesn't want to cut it back, so they offer

3     him a lump-sum supplement.

4          MR. ROBERTS:  Your Honor, if you choose not to

5     consider that, that's fine.  The point is, there was a

6     meeting in October where Mr. Kearney --

7          THE COURT:  You can't use that as evidence in a case

8     like this of the wrongful actions on the part of the other

9     side because they made an offer in settlement.

10          MR. ROBERTS:  I'll strike the reference to that.

11          THE COURT:  Huh?

12          MR. ROBERTS:  I'll strike the reference to that if

13     that's your opinion about Rule 408.

14          THE COURT:  I want the other side to have a chance

15     to tell me what they believe.

16          MR. ROBERTS:  Okay.  But October 2001, Mr. Kearney's

17     advised that -- or his lawyer is, that, "You know what?  It's

18     unambiguous; we've been making all these mistakes for all

19     these years."

20      They write back to Mr. Kearney's lawyer, and the

21     President -- Vice President, William Hughes, says to Mr.

22     Kearney's counsel, second page of this letter, which is Bates

23     stamped 0646, "I did not note anything in the 'proposal'

24     documents that are contrary to what the policies state."

25      We just went through the proposal documents.  The

1   proposal documents could not be more clear that COLA and

2   Social Security Supplement apply.  Mr. Hughes confirms that

3   that's consistent with the policy.

4         THE COURT:  Okay.

5         MR. ROBERTS:  Your Honor, the last couple pages of

6   this exhibit are documents that reflect debate over the years

7   about the Waiver of Premium.  In January of '98, Mr. Shelton,

8   who is the manager over claims, says that at that point he

9   thinks it appears that the Waiver of Premium is inapplicable.

10   Sounds like he's making an admission that it's not

11   unambiguous.  He's reading it as an appearance that it

12   doesn't apply.

13     I want to stress, Your Honor, that this was not a claim

14   that fell under anyone's radar screen.  There were four

15   examiners at Jefferson-Pilot that reviewed it because of its

16   high-dollar value for many, many years.  These examiners had

17   between 20 and 40 years of experience.  One of the persons,

18   the Vice President, helped develop the language of the

19   policy.  There were two checks issued each month.  Each check

20   was affirmed by two people.  There were eight separate COLA

21   adjustments from '95 to 2001.  There were reviews by CPAs.

22   There's another party in this case that's not technically a

23   party, is the reinsurer, a company called Employer's

24   Reinsurance Corporation.  They would come out to

25   Jefferson-Pilot to audit files.  The testimony, according to

1    Mr. Shelton and Mr. Roberson, is -- Mr. Roberson's deposition

2    page 58 -- but this reinsurer audited Mr. Kearney's file in

3    the '90s.  They didn't come up with this huge mistake going

4    from unambiguous on one side to unambiguous on the other

5    side.

6        They then got DMS involved in 1997.  It wasn't for

7    another five years, until October 2001 -- four years -- that

8    DMS came up with this new way of reading the contracts.

9        They hired IME; did occupational analysis.  And

10    Mr. Shelton testified -- now, he was the manager of the

11    claims -- he testified at page 9 of his deposition that in

12    Residual Disability claims, he concentrated more closely on

13    understanding the policy language and applying it.  He did

14    that for seven years.  And he paid the claim consistent with

15    our theory of the case, inconsistent with what his company's

16    now saying.

17        The last point:  Mr. Roberson testified at page 25 that

18    this particular type of policy was the primary,

19    noncancellable disability insurance policy sold by

20    Jefferson-Pilot.  It's not something that Jefferson-Pilot in

21    the '90s didn't have knowledge of, experience in dealing

22    with.  They did.  They created it.  They administered it with

23    four people.  They paid the checks every month.  It wasn't

24    something that fell on the radar screen.  This was a new

25    argument created.

1    The language and the law of Ohio about ambiguity, Your

2    Honor, is in the brief.  Again, based on the policy and the

3    rider and the Schedule, it's unambiguous that Mr. Kearney's

4    entitled to these benefits, and the motion for summary

5    judgment should be sustained.

6    When you add in the proposal in Mr. Hughes's admission

7    that the proposal doesn't conflict with the policy, the

8    proposal's even more unambiguous that these benefits are

9    payable, and we'd ask the Court sustain defendant's motion

10    for summary judgment.

11        THE COURT:  Thank you.  All right.  I'll hear from

12    the other side.

13        MR. ELLIS:  Good afternoon, Your Honor.

14        THE COURT:  Good afternoon, Mr. Ellis.

15        MR. ELLIS:  How are you this afternoon?

16    I'd like to start just briefly with just giving the Court

17    a flavor for the quotations that have been cited to the

18    Court.

19    In looking at page 9, this was just quoted from

20    Mr. Shelton's deposition, and in answer to his question

21    Mr. Roberts read his answer, "Yes, I think so," with regard

22    to the question whether Residual and Social Security increase

23    were also provisions that we sold during the '90s.  He said,

24    "Yes, but residual was one that did not come up very often.

25    It was one that most people were totally disabled and not

1    able to go back to work.  It didn't work with residual very

2    often."

3        Likewise, Mr. Roberson was quoted concerning the

4    Employer's Reinsurance, reviewing the file specifically.  And

5    the question actually was, "Did you correspond with him?" --

6    meaning the individual from the Employer's Reinsurance about

7    Mr. Kearney's file --

8        MR. ROBERTS:  What page?

9        MR. ELLIS:  On page 58, as you cited.

10       And the answer was, "I don't recall.  He visited the

11   office occasionally and would review claims that were

12   reinsured, so he could have seen this file."

13       The important testimony about what was happening for nine

14   years is in Mr. Shelton's deposition at page 83 when I asked

15   him about what was going on in the Claims Department.  The

16   Court can read pages 83 and 84.  Rather than me reading them

17   to you, I'll summarize quickly.

18       What happened was you had five people in the Claims

19   Department at Jefferson-Pilot in '93.  One of them,

20   Mr. Maxwell, retired in '94 prior to any consideration of

21   COLA in this, but did write on the side of the payment sheet

22   -- one of which was not presented to you, but they're

23   exhibits to our brief -- said this is residual, no COLA.

24       You'll find in other payment sheets references to, This

25   is residual, no COLA, and then a counterpoint that would say,

1  Well, we're paying Total Disability, so COLA applies.  The

2  problem was, they were confused between whether they were

3  paying Total or Residual because the amount was the same.

4          THE COURT:  Mr. Ellis, is that a problem for the

5  insured or is that a problem for the insurance company?

6          MR. ELLIS:  That is a problem for the insurance

7  company, and it is because of that problem that they're not

8  asking for any money back.  They are taking responsibility

9  for this overpayment and they are swallowing without recourse

10  the overpayment that they made.

11    What they're asking the Court to do in this case is to

12  take a look at the policy, declare what benefits are

13  appropriate to continue paying in the future.  Our

14  position is --

15          THE COURT:  Don't you find it sort of anomalous in

16  this case for -- You're asking the Court to reinterpret a

17  policy that the insurance company had been interpreting for a

18  number of years a certain way and now they have a change of

19  heart and want to interpret it another way to the detriment

20  of the policyholder and you're asking the Court to join in

21  that second interpretation.  If that's the case, isn't the

22  policy ambiguous at least?

23          MR. ELLIS:  Your Honor, there was never an

24  interpretation of the policy inconsistent with the position

25  that's being taken right now.  Mr. Robert argues to you --

1          THE COURT:  I didn't see that.

2          MR. ELLIS:  -- that there was --

3          THE COURT:  They paid the money for a number of

4   years, which must indicate that they interpret it a certain

5   way to include these benefits, and now they want to interpret

6   it a different way to exclude the benefits.

7          MR. ELLIS:  The reason --

8          THE COURT:  Am I missing something?

9          MR. ELLIS:  Yes, Your Honor, you are.  The reason I

10  was quoting to the Court from the Shelton deposition, he

11  explained that by the time the first issue came up as to

12  whether or not COLA would be paid on this policy, there were

13  three people in Jefferson-Pilot's Claims Department who were

14  handling 1,000 claims a month.  I asked him:

15          "Did you have time to review each claim each month

16          as the payment requests came in?"

17          His answer:  "No, I doubt it.  I think that that was the

18          shortcoming:  Was not being able to be -- to dig a little

19          deeper into all the claims when they were being

20          processed.  Primarily we were concerned about getting the

21          benefits out."

22          The problem was, they were overloaded, and that was the

23  reason that in 2000, these were outsourced to Disability

24  Management Systems who could handle the --

25          THE COURT:  How does the doctrine of waiver apply in

1    this case?

2         MR. ELLIS:  The doctrine of waiver, if it applies at

3    all, would apply to the insurance company, Jefferson-Pilot,

4    having waived its right to recover the money that they paid

5    without reservation of rights.

6         THE COURT:  How about reinterpreting the policy to

7    -- they buy a policy, they rely on what's in the Schedule and

8    rely on what the company's been paying them, and suddenly the

9    company wants to change what they're doing.

10        MR. ELLIS:  There is no interpretation.  There was

11   never an --

12        THE COURT:  There was no reinterpretation because

13   they made a mistake for ten years?

14        MR. ELLIS:  That's correct.  They made a mistake --

15        THE COURT:  I'm asking you that when they make a

16   mistake for ten years and keep repeating it, doesn't that

17   constitute a waiver?

18        MR. ELLIS:  Your Honor, the Ohio law is very clear

19   on that issue.

20        THE COURT:  Does Ohio law decide this case?

21        MR. ELLIS:  Pardon me?

22        THE COURT:  Does Ohio law decide this case?

23        MR. ELLIS:  It does in fact, Your Honor.

24        THE COURT:  Okay.

25        MR. ELLIS:  And the Ohio law is very clear.  It says

1    you cannot use waiver to increase the coverage in the

2    insurance policy for which there was never coverage to start

3    with.  And what we're suggesting to the Court is, the

4    simplest reading of this policy will tell the Court that

5    there was no right to the COLA or the Social Security

6    benefit.

7         THE COURT:  It sounds to me the way he interpreted

8    it, it sounded quite reasonable.

9         MR. ELLIS:  Well, Your Honor, if you jump all over

10   and take things out of context like that, anything can be

11   interpreted to sound reasonable.  But you have to read, as

12   the Court, the simple, direct language of the policy.  And

13   I'd like to make reference specifically to the provision that

14   was cited to you setting up the, for example, the Cost of

15   Living increase Benefit.  This is what we refer to as a COLA

16   in the policy.  It's identified as Increase in Benefits.  In

17   a different form, it's listed as Increase in Benefits for

18   Total Disability.  Just depends on the caption, which is why

19   you'll see later there's a reference to either/or.

20   The first sentence in the Increase of Benefits says:

21   "After you have received benefits for Total Disability" --

22   capital T, capital D, a defined term -- "..for 12 consecutive

23   months, your" -- capital M, B -- "..Monthly Benefit will be

24   increased during the continuance of the period of

25   disability."

1      Now, it is undisputed in this case that at no time did

2   Mr. Kearney suffer Total Disability for a period of 12

3   months.  He fails to meet the first prerequisite for the

4   applicability of this benefit.

5      Mr. Roberts argues to you that you should read into this

6   not Total Disability, but Residual Disability.  There is

7   nowhere in the policy that says you should change these

8   words.  There is nothing in the Residual Disability rider

9   that says you should change these words.  The policy says

10  what the policy says.  And a prerequisite to the Cost of

11  Living increase is receiving -- is being totally disabled for

12  12 consecutive months.  And then it goes on to say that you

13  have to continue to be totally disabled for 12 consecutive

14  months in order to continue getting the increases.  Mr.

15  Kearney was never --

16         THE COURT:  But it strikes me two fine lawyers can

17  look at a document and each one come up with an entirely

18  different interpretation of it and each one's absolutely

19  certain that his interpretation is correct.  And a third

20  party having to pass judgment on something like this, throws

21  his hands up in the air and says, "Well, if neither of you --

22  if you can't agree on what it means, it must be ambiguous."

23         MR. ELLIS:  Your Honor, I suggest to the Court that

24  that is not your role, is to throw up your hands.  Your role

25  is to read this policy as written and apply Ohio law as

1  written --

2          THE COURT:  Fair enough.

3          MR. ELLIS:  -- to define what benefits are or are

4  not included.

5      Now, Mr. Robert's interpretation jumped all over the

6  policy, but never read the language in it.

7          THE COURT:  Terms of the policy --

8          MR. ELLIS:  I'm sorry, Your Honor?

9          THE COURT:  The policy is the thing that has to be

10 interpreted.

11         MR. ELLIS:  There is no -- Ohio law says that you

12 don't interpret if it's clear language.  Plain, simple

13 language.  You can't get more simple than saying, "After you

14 have received the benefits for Total Disability for 12

15 consecutive months, your Monthly Benefit will be increased."

16 After.

17         THE COURT:  Why were they paying him Total

18 Disability then?

19         MR. ELLIS:  Your Honor, the claim was made for

20 Residual Disability.  All right?  Under the Residual

21 Disability, you have what -- you have a formula that

22 determines what your Monthly Benefit is, which is why when

23 Mr. Robert argues to you there is no Monthly Benefit for

24 Residual Disability, that's not right.  There is a percentage

25 of the Monthly Benefit shown in the Schedule.  If you look at

1    that Schedule, it says Monthly Benefit and a specific amount.

2    It's a known amount.  And Residual Disability is that

3    percentage of the known amount that comes out when you

4    perform the formula.  It is also a provision in this policy

5    that if you lose 75 percent or more of your income, then that

6    amount, the Prior Monthly Income over the Current Monthly

7    Income, is considered to be a hundred percent, instead of 75

8    percent.  They said, you know, You lost 75 percent of your

9    income; we will give you the total Monthly Benefit.

10           THE COURT:  Seems to me that your company may have

11   waived the requirement for him to establish -- for the

12   policyholder to establish his Total Disability, as you define

13   it, if he didn't establish it, because the Schedule provides

14   it's going to pay a certain amount of money for Total

15   Disability, $2125.00.  And you say he has to advise the

16   company monthly what his earnings are --

17           MR. ELLIS:  That's correct, Your Honor.

18           THE COURT:  -- and apparently he did that.

19           MR. ELLIS:  Yes, sir.

20           THE COURT:  And so there was an assumption, I guess

21   when doing that, that he was totally disabled during that

22   period.

23           MR. ELLIS:  That was the mistake that was made.

24   Because the amounts were the same and because of the volume

25   of cases, when they saw the amount, they just read it as

1    Total Disability, when in fact it was not.

2            THE COURT:  Who says?

3            MR. ELLIS:  Mr. Shelton, for one.

4            THE COURT:  Who is Mr. Shelton?  He's an insurance

5    company employee; isn't he?

6            MR. ELLIS:  He was one of the claims people that was

7    involved in this case, as was Mr. Roberson.  And every one of

8    them said, "Look.  We made a mistake."

9        When the case went to DMS in 2000, not '97, in 2000 when

10   this claim along with two hundred others went to DMS, it took

11   them a while to get up to speed on each and all of the

12   claims.  And it wasn't until, in point of fact, a demand for

13   a copy of the policy by Mr. Spiegel, counsel for the

14   defendant, it wasn't until he demanded a certified copy of

15   the policy that someone actually looked at it, and that's in

16   the testimony of Mr. Mills.

17       When they looked at it, they realized that they had been

18   paying COLA and Social Security benefit riders, which are not

19   by their terms applicable to this case.  You cannot use

20   waiver under Ohio law to increase or provide additional

21   benefits under a policy that were not there to begin with.

22   And these policy provisions are very clear.

23       If you look, for example -- the best way to approach

24   this, Your Honor, is if we deal with the Cost of Living

25   Increase, if you look at the Residual Disability rider, the

1    actual one that was used, not subsequent one that a year

2    later created an additional benefit which was not sold to Mr.

3    Kearney.  If you look at the one that was actually used and

4    you look at the part that was highlighted by counsel as to

5    the formula -- I'm sorry, as to the Prior Monthly Income, his

6    box number 1, you will see -- keeping in mind that the Cost

7    of Living Increase or the Increase in Benefits is designed to

8    offset the effects of inflation on your benefits.  All right?

9    Residual Disability alters monthly, depending upon what

10   income is, unless it's always below 75 percent or above --

11          THE COURT:  Can I ask you a question?  I'm looking

12   at the Schedules in the application.  There's a second page

13   to the Schedule which talks about a Total Disability Benefit

14   of $1375.00 and a Social Security Disability of 225.  Was

15   this for a different person or same insured?

16          MR. ELLIS:  Your Honor, the insured had --

17          THE COURT:  Huh?

18          MR. ELLIS:  The insured had two separate policies.

19   One --

20          THE COURT:  Oh.

21          MR. ELLIS:  -- had a Monthly Benefit of the

22   twenty-one twenty-five.

23          THE COURT:  That's all right.  So they were

24   identical.

25          MR. ELLIS:  The second had a Monthly Benefit of the

1   -- what was that other amount?  Thirteen -- I'm sorry --

2        THE COURT:  When did the insured become totally

3   disabled?

4        MR. ELLIS:  Just a little over two years after he

5   bought the policy.  Well, he claimed to be disabled, but he

6   never claimed Total; he claimed Residual throughout.

7      If we can, Your Honor, I was trying to point out that the

8   Cost of Living Increase provided in Total Disability,

9   increases your benefits so that the effects of inflation are

10  lessened over the life of policy.

11       THE COURT:  When he became totally disabled, was

12  there -- how did the insurance company -- how was it

13  determined?  I see it's lumbosacral diagnosis, age 40.

14  Lumbosacral spine sprain with a suspicion of disk

15  involvement.

16       MR. ELLIS:  That was the initial claim.

17       THE COURT:  Okay.  And they indicate a reinstatement

18  date -- monthly indemnity Elimination Period, so forth.  I'm

19  looking at the Disability Claims Worksheet.

20       MR. ELLIS:  If I can get with you, Your Honor.  Tell

21  me:  Is that in part of what Mr. Roberts just gave you?

22       THE COURT:  Yeah, what he was referring to.  It's

23  towards the -- it's in the middle of the thing that's got the

24  policy, the Jefferson policy.

25      All I'm trying to figure out, he takes out a disability

1  policy.  It's got a bunch -- scheduled a number of benefits.

2  And then at some point it's determined by some medical

3  authority, I presume, that he's totally disabled and your

4  company agrees to it and pays him a Total Disability benefit

5  and continued to do it.  I presume he had to update what his

6  situation was, and I guess the way they determined that is by

7  what his earnings were, or lack of earnings.

8        MR. ELLIS:  Your Honor, the mistake that the Court

9  is making is that he was not totally disabled.  He was

10 residually disabled and continued to work throughout.

11       THE COURT:  But he got a percentage of his Total

12 Disability benefit if he didn't make -- what was it?  If he

13 made less than 75 percent or he made less than 25 percent?

14       MR. ELLIS:  If he made less than 25 percent of his

15 Prior Monthly Income, they consider it 100 percent residually

16 disabled.  What that means is, and what the policy clearly

17 says, is that if you have more than 75 percent loss of

18 income, you get the full Monthly Benefit.  The full Monthly

19 Benefit is the amount identified in that Schedule, the

20 twenty-one twenty-five on the one policy and the 1600 in the

21 other.

22       THE COURT:  Does he get residual benefits when you

23 don't get Total Disability?

24       MR. ELLIS:  The two benefits, Your Honor, are

25 mutually exclusive by the terms of the Residual rider.  It

55

1    says you cannot get Residual Disability if you are totally

2    disabled or receiving Total Disability benefits.  You can

3    only get -- you can't be totally and residually disabled at

4    one in the same time.  So, he was getting Residual Disability

5    benefits, which means by mutual exclusivity he was not

6    getting Total Disability benefits.

7         THE COURT:  What were the calculations in the

8    residual benefits -- what should have been based on the

9    policy?

10        MR. ELLIS:  He should have been getting --

11        THE COURT:  Totally disabled --

12        MR. ELLIS:  Pardon me?

13        THE COURT:  He wasn't totally disabled during this

14   period --

15        MR. ELLIS:  Correct.

16        THE COURT:  -- which you have no basis to say.  But

17   you're just assuming the company decided that --

18        MR. ELLIS:  No, I'm not assuming anything, Your

19   Honor.  Those were his claim forms and his doctor's forms

20   that said he was partially or residually disabled.  I'm not

21   assuming a thing.

22        THE COURT:  Was that -- Mr. Ellis, was that

23   insurance language or was that doctor's language?

24        MR. ELLIS:  It's both.  He filed a claim form that

25   said, "I'm still working.  I'm residually disabled."  And his

1    doctor said, He can't do everything he used to do, but he can

2    work.  That's, by definition, Residual Disability.

3         THE COURT:  Okay.  So, but -- though he's still

4    working, he only makes a percentage.  If he doesn't make a

5    percentage that's required, then he's entitled to the Total

6    Disability benefit?

7         MR. ELLIS:  He's entitled to the Monthly Benefit.

8         THE COURT:  Of the Total Disability.

9         MR. ELLIS:  For Total Disability.  That's one

10   number, a specific number.  Counsel argues that he's entitled

11   to all of the benefits, and that's not true.

12        THE COURT:  Well, excuse me.  Wouldn't that also

13   include the COLA benefit that he paid for?

14        MR. ELLIS:  No, it does not, Your Honor.

15        THE COURT:  Why?

16        MR. ELLIS:  Because the COLA benefit is -- that's

17   what I was trying to get to before.  The COLA benefit's

18   designed to offset inflation.  That's it.  If you are totally

19   disabled, the only way to offset inflation is to increase

20   your benefit amount.  If you're residually disabled, however,

21   you're still working.  All right?  You're earning income that

22   then is applied in the formula to determine what part of that

23   Total Disability benefit you get.  All right?  If inflation

24   occurs, your income keeps going on but your Prior Monthly

25   Income is set.  So your benefit would get smaller.

1    So, if you look at the Residual Disability rider, it says

2    the way we're going to deal with this is this:  At the same

3    time, once a year on your anniversary, and at the same amount

4    -- either 3 percent or 7 if you bought the rider -- we

5    increase the Prior Monthly Income artificially, so that the

6    gap never closes.  And it may even widen, if you bought the 7

7    percent.  That's how they deal with inflation in residual.

8    It affects the formula, not the dollar amount.  The dollar

9    amount's affected by the ultimate calculation.

10    So, if you look at the Residual rider, it says very

11    specifically, We will adjust the Prior Monthly Income.  That

12    which we're using as a deviser to determine what your loss

13    is, we're going to increase that.  So if your income stays

14    the same, we keep increasing that, then, you know, your

15    percentage is going to keep getting bigger, to the point

16    where you'll hit 75 percent.  If your earnings are going up

17    and your pre-disability income is being artificially

18    inflated, you will stay at a proper percentage of your

19    benefit.

20    The difference is that Mr. Roberts argues that it says

21    you get the full Total Disability benefits.  And that's not

22    what it says.  If you read it, it says you get the full Total

23    Disability benefit, singular.  And it says the Basic Benefit,

24    singular.

25    The Basic Benefit is the Monthly Benefit -- by definition

1   in both the proposal and the policy -- and that's the dollar

2   amount, the twenty-one twenty-five on the one policy and

3   whatever the dollar amount is on the second policy.  That's

4   clear.  It doesn't say you get all of the benefits, plural,

5   including COLA and Social Security, and so forth.

6        COLA, or the increase in benefits, and the Social

7   Security each by definition require Total Disability for a

8   period of time as a condition precedent to them being paid.

9        Now, this company made mistakes -- and in answer to the

10  Court's question, it was not the manager; it was the

11  insurance company for whom we are working on this case and

12  who initiated the lawsuit.

13       The benefit that we're talking about is the Monthly

14  Benefit in the Schedule.  It's very clear.  Yes, a lot of the

15  definitions are adopted in Residual Disability, but they're

16  adopted by reference in the Residual Disability rider.

17  Nowhere in that rider does it say that we will increase your

18  Residual Disability benefits by a COLA provision.  Nor does

19  it say that you get Social Security.  It says your basic

20  Monthly Benefit, plus Social Security benefits, if

21  applicable.  If applicable, you have to look at the benefit

22  to see whether it is or is not applicable.  The benefit

23  requires you to be totally disabled for 12 months, which he

24  never was by his own admission.

25       Now, the policy is very simply stated.  There are no

1  complex words.  There's no dancing around.  It's very

2  straightforward.  The Court can read that policy

3  straightforward.  If he gets this benefit, has he met the

4  prerequisite?

5         THE COURT:  Has this been interpreted by any other

6  court?

7         MR. ELLIS:  Your Honor, I would guess that there has

8  been an interpretation of the language in this policy by

9  other courts.  However --

10        THE COURT:  But this particular dispute?

11        MR. ELLIS:  I know of no case in which anyone

12  receiving Residual Disability under a 576A policy has

13  demanded or received COLA or Social Security rider.  I take

14  that back:  There was one case --

15        THE COURT:  You make a mistake when you say

16  "demanded."  The company was paying it.

17        MR. ELLIS:  Yeah, you're right.

18        THE COURT:  Isn't there something about relying on

19  what an insurance company does?

20        MR. ELLIS:  There was one case, and now that I think

21  about that, I had heard about, and I don't know the facts,

22  but it dealt with the Social Security, whether that was

23  applicable to residual or not, and I believe that case

24  resolved prior to any ruling by the court.

25      In this case, the Court's job under Ohio law is to take a

1    look at the policy.  And if as we say this policy can be read

2    in plain, simple English, the Court doesn't interpret

3    anything.  It applies.

4          THE COURT:  If it was so simple, why didn't the

5    insurance company figure it out in the beginning rather than

6    create this monster?

7          MR. ELLIS:  The reason is this, Your Honor:  When

8    the claim began, it began as a disability and there was going

9    to be a payment of the maximum residual benefit, which is the

10   same amount as a Total Disability benefit.  For an entire

11   year it would stay that way.  During that year, Mr. Maxwell

12   retired.  Mr. Roberson stayed on, but there were now only

13   four people, then three, handling a thousand claims.  They

14   were -- as Mr. Shelton said in his deposition, "We couldn't

15   possibly manage the volume.  Our main goal was to just get

16   the benefits out."

17        And if you look at the exhibits attached to our motion,

18   you will see where there was actually some discussion -- you

19   know, "This is residual; there shouldn't be COLA."  The

20   answer was, "Well, we're paying Total."

21        So the confusion was, the amount was the same for both

22   because he was more than 75 percent loss of income.  Somebody

23   read that we're paying him total and applied the COLA and it

24   just continued that way, because they never had time to look

25   at it again.  They just kept paying it.  And when it went to

1   DMS, they get 200 claims all at once.  They have an

2   obligation in good faith to the insureds to make payments

3   every month.  So, their first priority is, Let's get the

4   payments out.

5      Counsel's suggestion that this was given to somebody to

6   look harder at because of the gross amount.  This Court's

7   been with me on a number of other cases; you know that 1600 a

8   month and 2100 a month or even twice that is not a big amount

9   in disability policies.  There are policies of 20,000 a month

10   and higher where there's no contest whatsoever if it's clear.

11   In this case, they're accepting the fact that this

12   gentleman's claim forms and doctor's reports supported

13   Residual Disability.  But they made a mistake and started

14   paying him --

15         THE COURT:  Is he totally disabled now?

16         MR. ELLIS:  No, he's residually disabled.  He's

17   still working.  He has never contended nor has he ever

18   submitted a claim form that says, "I'm totally disabled."

19   And if he's residually disabled, he gets the benefits

20   provided for in the rider.

21      Now, counsel has argued that the rider doesn't say you

22   don't get these benefits.  Well, the rider never says what

23   you don't get.  It doesn't say we're going to give him a new

24   car every year either, but I don't think he's entitled to

25   that as part of the policy.

1      What it does say is what you will get:  You will get up

2   to a hundred percent of the Monthly Benefit, depending upon

3   the percentage of income loss.  And to keep that loss

4   appropriate during periods of inflation, we will artificially

5   increase the Prior Monthly Income --

6           THE COURT:  Don't you see a problem if they're

7   measuring something by total Monthly Benefit and you're

8   paying an extra benefit to get an addition to that total

9   Monthly Benefit to cover both the COLA and the Social

10  Security, that one would consider that that's what you'd be

11  getting?  You'd get a benefit equal to the total of the

12  three?

13          MR. ELLIS:  No, Your Honor.  That's not the way it

14  works.  The policy --

15          THE COURT:  It may not be way the insurance company

16  wants it to work, but isn't it open to interpretation?

17          MR. ELLIS:  It's not the way it works in the real

18  world, nor is it a reasonable interpretation of the simple

19  language in this policy.  And the reason is this, Judge:  You

20  pay a premium for the COLA.  Actually, the COLA was already

21  part of the policy, the 3 percent.  You paid a premium to

22  increase that to 7.  What benefit does he get from that?

23  Well, in a Total Disability, he gets 7 percent increase

24  annually.  In a Residual Disability, what he gets is the

25  Prior Monthly Income being affected by 7 percent, so that he

1  maintains the gap between Current Monthly Income and Prior

2  Monthly Income.  And Current Monthly Income, if it's affected

3  by inflation, so's his priors so the gap stays the same.

4  That's the benefit he gets from a Residual Disability on-look

5  to this particular benefit, the COLA benefit.

6       As to the Social Security, the only way one could be

7  entitled to Social Security and be residually disabled --

8  that is, still working -- is if he is beyond the age of 65

9  and is entitled to some Social Security benefits when he

10  becomes residually disabled and he doesn't get them.  Then

11  the benefit kicks in until he does get them.  The same with

12  Total.

13       So, he does get these benefits.  It's just they're not

14  applicable as counsel wants them to be in a situation where

15  Social Security nor COLA have met the preliminary requirement

16  of being totally disabled for 12 months.

17       They do have some impact on the Residual, but the

18  Residual rider tells you how.  You can't interpret the policy

19  as counsel did by dancing around and saying, "Well, you've

20  got to change Total Disability to Residual Disability."  If

21  you have to change the language, you're not interpreting the

22  policy; you're rewriting it.

23            THE COURT:  What does -- what does it mean when it

24  says, "The pre-disability monthly income will be adjusted at

25  the same time and by the same percentage as the increase in

1  benefits provision of the policy?"  What's the increase in

2  benefits provision of the policy?

3          MR. ELLIS:  All right, Your Honor.  Let's go through

4  that one.  If you look at the policy itself, and specifically

5  on page 3 of the policy form WJ-576A.  Bottom right.  It

6  says, "Increase in Benefits."  Are we together?

7          THE COURT:  Not yet.

8          MR. ELLIS:  Okay.  It's actually the second page, I

9  think, of what counsel gave you.

10          THE COURT:  Which one is it again?

11          MR. ELLIS:  This is the --

12          THE COURT:  Bottom left?

13          MR. ELLIS:  Bottom right on WJ-576A, page 3.  It's

14  the second page of the handout that counsel gave you, which

15  is the policy.

16          THE COURT:  I see Benefit Provisions.

17          MR. ELLIS:  Under Benefit Provisions where it says

18  Increase in Benefits.  Are we there?

19          THE COURT:  Uh-huh.

20          MR. ELLIS:  It says:  "After you've received Total

21  Disability for 12 consecutive months, your Monthly Benefit

22  will be increased during the continuance of that period of

23  disability up to your 65th birthday.  The increase will be 3

24  percent of the monthly benefit shown on the Schedule for each

25  successive 12-month Period of Total Disability after the

1    first...The benefit payable will not be increased after 65."

2    All right?  It sets out the time:  Annually this will be

3    reviewed and there will be an increase.  Counsel pointed out

4    annually in this case was May 6th.

5        So, if you look at the Residual, every May 6th would be

6    the same time, and 7 percent would be the same amount as the

7    Increase in Benefits provision in this policy, as amended by

8    the rider.

9        So, the Prior Monthly Income, as I was trying to describe

10   to the Court, will go up 7 percent every May 6th.  That way

11   if his earnings are going up at the same time because he can

12   now charge more for whatever he does, he would ultimately --

13   if that Prior Monthly Income stayed the same, he would close

14   the gap to where he'd be getting no benefit at all.

15       However, if you artificially increase the Prior Monthly

16   Income by that percentage, then the formula keeps the gap and

17   he continues to get the similar percentage of loss of income.

18       Are we okay with that now, Judge?

19            THE COURT:  I think so.  I'm not sure.  I'm just

20   gonna have to take this matter under advisement and think

21   about it.

22            MR. ELLIS:  What we're suggesting to you --

23            THE COURT:  Bothersome.

24            MR. ELLIS:  -- to simplify --

25            THE COURT:  You could simplify it by working out an

1    arrangement between the parties before the Court decides

2    something where you're going to have some sort of a ruling

3    that will go one way or the other and nobody will be happy.

4         MR. ELLIS:  What were looking -- and that would be

5    fine, Your Honor; we would be happy to discuss the issue.

6    However, the policy provisions are so --

7         THE COURT:  Are the policies -- are these policies

8    still in existence?

9         MR. ELLIS:  Yeah, absolutely.  Absolutely, Your

10   Honor.  And what I'm suggesting to the Court is the language

11   could not be simpler.  You actually have to -- as Mr. Roberts

12   urged the Court to do -- substitute words for other words and

13   jump from here to there to somewhere else in order to

14   interpret the policy the way he does.  What I suggest to the

15   Court is, you could read this policy as if you were reading

16   the funny papers, and it would be clear as to what must be

17   accomplished or what must be claimed in order to receive

18   benefits and which benefits are payable when.

19        THE COURT:  Thank you.

20        MR. ELLIS:  Thank you, Judge.

21        THE COURT:  Have you got any response?  Make it

22   brief.

23        MR. ROBERTS:  Thank you, Your Honor.  First, I

24   don't think --

25        THE COURT:  Is it true your client was receiving

1   benefits on the Residual benefits, not for Total Disability?

2        MR. ROBERTS:  That's factually incorrect.

3        THE COURT:  What?

4        MR. ROBERTS:  That's factually incorrect.  In 1993,

5   Mr. Kearney began receiving Total Disability benefits for a

6   period of time.

7        THE COURT:  Well, you say --

8        MR. ROBERTS:  In 1993, when he first made his claim,

9   he was receiving Total Disability benefits for a period of

10  time.  That was his claim --

11        THE COURT:  Getting Total Disability benefits as a

12  totally disabled individual under the policy?

13        MR. ELLIS:  Excuse me, Your Honor.  So that we're

14  clear on this, I've just checked:  That's correct, there were

15  four months.  The first four months he claimed Total

16  Disability.  After that it was Residual.  So, there was a

17  four-month period of time when he claimed Total.

18        Are we in agreement on that, Mike?

19        MR. ROBERTS:  Yeah.

20        MR. ELLIS:  Okay.

21        MR. ROBERTS:  Your Honor, as I -- as I mentioned --

22        THE COURT:  He received Total Disability benefits as

23  being totally disabled under the terms of the policy?

24        MR. ROBERTS:  Everybody concedes that he was totally

25  disabled under the policy for a period of time to begin this

1   benefit period.

2           MR. ELLIS:  Four months, I believe is accurate.

3           MR. ROBERTS:  And then it converted to Residual.

4   Your Honor, it can't be overstated that the reason there's a

5   lawsuit is because the insurance company wrote the policy

6   the way they did:  A six-page policy that says nothing about

7   Residual.

8       Now, Mr. Ellis says that I'm doing a slight of hand and

9   contorting things.  I'm not.  I gave you pages from the

10  policy.  I have them blown up for you.  The problem with the

11  case is the insurance company's problem.  They wrote a policy

12  that's six pages, start to finish, and doesn't use the word

13  "Residual Disability" anywhere.

14      Because of their decision on how to write the policy,

15  they begot ambiguities, or terms that need to be substituted.

16          THE COURT:  You say he was being paid Total

17  Disability benefits for four months.  What was the occasion

18  that -- did the amount of the check change when -- when at

19  some point he was considered not to be totally disabled?

20          MR. ROBERTS:  Factually, no.  He was receiving Total

21  Disability benefits for the Total Disability amount.  He then

22  was able --

23          THE COURT:  He got the same benefits --

24          MR. ROBERTS:  Right.

25          THE COURT:  -- for a much longer period of time, but

1    he was not considered totally disabled under -- after four

2    months.  Is that what you're saying?

3          MR. ROBERTS:  Correct.  He returned to work

4    minimally.  They sent him Residual Disability forms.  He

5    filled out the forms they sent him.  But his benefit didn't

6    change and every year he got an increase.  But the principal

7    issue to understand in the case is the policy doesn't say

8    Residual --

9          THE COURT:  Your argument is that those benefits he

10   got after he was not considered to be totally disabled were

11   the appropriate benefits to be received as a Residual

12   Disability.

13         MR. ROBERTS:  Or total.  Or total.  Either one.

14   Because he had a greater than 75 percent loss, he was deemed

15   to be totally disabled or entitled to the Total Disability

16   benefit.

17      What Mr. Ellis says is, he concedes -- in fact, he said

18   it overtly that, yeah, for the Elimination Period, the Total

19   Disability, that really means Residual in Residual.  And,

20   yeah, he concedes that maximum benefit, when they use Total

21   Disability, that was Residual.  Use Residual.  All of these,

22   when it's Residual, you change Total to Residual.

23         THE COURT:  I'm trying to understand something.  How

24   was it determined that he was not totally disabled?  Was

25   there a finding, a determination, or what?

1          MR. ROBERTS:  Mr. Kearney has never said he's not.

2    His -- I mean, he's always had greater than 75 percent loss.

3    He works two hours a week.  They send him Residual Disability

4    forms to fill out.

5          THE COURT:  What's the definition of totally

6    disabled?  Is the definition of totally disabled under the

7    policy that he's got to be a hundred percent disabled, or

8    what?

9          MR. ROBERTS:  It's here at the top of page 3:

10   "Unable to perform the substantial and material duties of

11   your occupation; and you are not actually engaged in any

12   other occupation."  And they have to be unable to "perform

13   the duties of any occupation for which you're qualified...

14   with due regard to your earnings before disability started."

15   Well, with due regard to his earnings before disability

16   started --

17         MR. KEARNEY:  Mike, there's a rider.

18         THE COURT:  So by definition, if he was advising the

19   insurance company that he was working a certain period of

20   time but not to the percentage which would penalize him, it

21   still meant that he was not totally disabled; is that right?

22         MR. ROBERTS:  He was filling out the Residual

23   Disability forms that they gave him.

24         THE COURT:  All right.  But -- whatever you want to

25   call it, the insurance company.  From that point of view, an

1   admission on his part if he was filling out the Residual

2   Disability forms, that he was not totally disabled.

3           MR. ROBERTS:  He was filling out the forms they gave

4   him, Your Honor.  His loss has always been greater than 75

5   percent, which entitles him to the full Monthly Benefit.

6       But Mr. Ellis concedes that all of these references to

7   Total Disability in the policy mean Residual Disability when

8   residual's the issue.  And then he says but it's wrong to

9   interpret the Increase in Benefits provision, Total

10  Disability reference, to mean Residual.  All the other ones

11  you can do that, but not this one, according to Mr. Ellis'

12  new interpretation of the agreement.

13      What it says is, the Increase in Benefits, the COLA,

14  "After you've received benefits for 12 consecutive months,

15  your Monthly Benefit" -- singular; I never talked plural --

16  "...your Monthly Benefit will be increased."  That's

17  important, because the rider --

18          THE COURT:  I'm listening to your argument but I've

19  also got another idea.  I want to ask you a question.  The

20  argument that -- from the insurance company's point of view

21  that he's not entitled to the increase in benefits on Total

22  Disability -- which include the COLA, the waiver, and the

23  Social Security benefits -- that they do not apply to the

24  residual benefits.  Is that right?

25          MR. ROBERTS:  That's their argument.

1      THE COURT:  Well, what about the excess premium --

2  the premium that was being paid and accepted by the company

3  during all these years for those -- those things?

4      MR. ROBERTS:  Every month since 1990 he's paid a

5  premium for all four of those benefits.  But the Increase in

6  Benefits provision that Mr. Ellis wants to focus your

7  attention on says the Monthly Benefit -- singular -- is

8  increased by COLA.  Then you go to the Residual Disability

9  rider and it says unambiguously Monthly Benefit is the amount

10  shown in the Schedule as such.

11      THE COURT:  I don't know where I'm going to come out

12  on this, but I think I'd better take the matter under -- take

13  it under advisement at this point.  So, I think I have sort

14  of a handle on what the issue is in this case.

15      MR. ROBERTS:  Your Honor, could I address a few

16  things that I didn't in my presentation that Mr. Ellis

17  addressed in his opposition, and that is this overloaded

18  argument that I didn't address?

19      THE COURT:  Go on.

20      MR. ROBERTS:  There is Exhibit 26 in the documents I

21  filed yesterday, Bates label 2846, a 1996 request by Mr.

22  Kearney to look into the COLA.  Now, Mr. Ellis argues -- and

23  I don't think there's any evidence to support his argument --

24  but he says they were too overloaded to understand Mr.

25  Kearney's policy for ten years.

1     Mr. Kearney wrote to them in '96 and said, "Please check

2     to see if my yearly increase in benefits is due."  He

3     directed them specifically to the issue in '96.  In '97, July

4     '97, this is Bates label 2892, Jefferson-Pilot, this is the

5     reference to Disability Management Services.  It's Bates

6     label 2892 and I think it's in Exhibit 23 filed yesterday.

7     His wasn't one of thousands of claims.  His was one of three

8     claims that they focused on to refer to DMS.  And it says --

9          THE COURT:  Did they pay the increase in benefits

10    after he notified them?

11         MR. ROBERTS:  Yes.

12         MR. ROBERTS:  In that year, '96, and every year till

13    2002.  But in -- so that was in '96.  In '97, they focused on

14    his claim and two others and they say, Hey, DMS.  These are

15    cases that you're going to investigate for us to see what can

16    be done either to settle these claims in an equitable manner

17    to both the reinsurer and Jefferson-Pilot, or to give us

18    further advice on where to proceed.  They asked DMS.  DMS

19    responds and says, "As Mr. Kearney has refused

20    Jefferson-Pilot's request for information, please forward a

21    copy of Mr. Kearney's policy to us so we may have it reviewed

22    by our legal counsel."  September '97.  Legal counsel at DMS

23    reviewed the policy.  I don't know that there is any evidence

24    that they were overloaded.

25         And this overloaded argument, the proposal that both

1   sides attached to their brief says without any ambiguity that

2   COLA and Social Security Supplement are paid.  I didn't hear

3   Mr. Ellis argue that they were so overloaded when they

4   created the policy that they got it wrong.

5       This overloaded argument isn't supported by the evidence.

6   In fact, it's contradicted by the evidence.  Counsel for DMS,

7   DMS, the manager, the Vice President of Jefferson-Pilot, the

8   people who created the proposal, all of those people for

9   years and year and years reviewed and specifically looked at

10  -- Mr. Kearney directed them to the issue:  "Take a look at

11  my policy.  Figure out if I get COLA."  And they looked and

12  they paid it.  There is no overwhelmed or overloaded.   Thank

13  you, Your Honor.

14          THE COURT:  Okay, folks.  I'll take the matter under

15  advisement.  Thank you.

16          MR. ELLIS:  If the Court please, Your Honor, there

17  is a cross-motion for summary judgment, which would have been

18  my motion.

19          THE COURT:  Well --

20          MR. ELLIS:  Obviously, I have not had much

21  opportunity to argue for -- before the Court today.  Mr.

22  Roberts has taken up most of the Court's time.  But I would

23  again stress that the Court look at, for purpose of our

24  summary judgment, the Court's role here on these

25  cross-motions is to look at the policy, one -- and that's the

1    only document; two, determine if the Court can read the

2    policy in plain English and apply it to a person who

3    admittedly is residually disabled, because he continues to

4    work; and three, determine if the Court cannot apply that

5    policy, then determine if there is an ambiguity.  And it

6    would be most helpful if the Court could tell us where the

7    ambiguity might be.  For purposes of this summary judgment

8    and for purposes of this case, what --

9           THE COURT:  You say if I find that there's an

10   ambiguity, what I -- what I can, which I don't believe I can

11   do and can't do?

12          MR. ELLIS:  Pardon me?

13          THE COURT:  If it's ambiguous, then isn't the

14   interpretation that the Court has to place on the policy

15   that that favors the insured over the insurance company?

16          MR. ELLIS:  A reasonable interpretation.

17          THE COURT:  A reasonable interpretation.

18          MR. ELLIS:  Yes, that's correct, Your Honor.

19   However, in order to do that, the Court may not necessarily

20   be able to come to a conclusion as to whether these benefits

21   are or are not payable to Mr. Kearney.  Remember, the Court

22   doesn't begin to interpret a policy, unless in reading the

23   policy the Court finds that there's some language that the

24   Court can't understand or can't apply.  Our contention is

25   these six pages are very, very simple and very, very clear.

1    And Mr. Robert's arguments to the contrary that you just keep

2    substituting Residual for Total, doesn't read the policy or

3    the rider.  If you read the rider, it specifically refers to

4    which parts of the policy are affected or are applicable to

5    the Residual Disability, which he admits is his client's

6    condition.

7          THE COURT:  I recognize that you haven't had an

8    opportunity to really argue your motion for summary judgment.

9    You want me to continue this so that you can?  I don't want

10   to it at this late hour.  It's almost 5 o'clock.

11         MR. ELLIS:  Yes, Your Honor, I would like to argue

12   that motion, because perhaps I can make this a little more

13   clear if I have some time.

14         THE COURT:  I'll give each side -- For the purposes

15   of both this argument and that one, you can file -- we'll try

16   and give you a date -- I don't know when it can be -- to

17   finish up and with a post-argument brief.  Brief -- spelled

18   with a capital B.

19         MR. ELLIS:  Yes, sir.

20         THE COURT:  I think I understand -- I understand the

21   issues, but I'm not quite sure.  But I think it's only fair

22   that the insurance company should have the same rights as the

23   defendant on the cross-motion for summary judgment to argue

24   in chief.  It would be unfair otherwise.

25         MR. ELLIS:  Thank you, Your Honor.

1           THE COURT:  So, we'll try to find a date and notify

2   you, and we'll put on an order to the effect that -- At this

3   point, if you want to file -- if you want to file a

4   post-trial -- post-argument brief --

5           MR. ROBERTS:  I'm confused.

6           THE COURT:  -- on your position opposing -- seeking

7   summary judgment --

8           MR. ROBERTS:  I'm confused.  Are you contemplating

9   another oral hearing at another --

10          THE COURT:  Another oral --

11          MR. ELLIS:  Your Honor?

12          THE COURT:  So Mr. Ellis to have his shot.  You had

13  taken up -- your argument's taken about two hours.

14          MR. ROBERTS:  I would like the opportunity at the

15  next oral hearing to address some of the points he raised.

16          THE COURT:  So, he's entitled to have the same --

17  similar treatment in court on his motion.

18          MR. ROBERTS:  Your Honor, we have a November 16th

19  trial date, for personal reasons.

20          THE COURT:  What's that?

21          MR. ROBERTS:  We have a November 16th trial date

22  that for personal reasons needs to be preserved.

23          THE COURT:  November or September?

24          MR. ROBERTS:  November.

25          THE COURT:  Well, this argument -- I think probably

1    this case can go out on -- if we find there's some factual

2    issues, then, of course, it won't go out on summary judgment.

3    But if I find I don't think there are any factual issues,

4    it's just a question of interpretation, then, well -- well,

5    it might require that -- to determine what the -- how the

6    case should be ultimately decided, it may require a trial.

7           MR. ELLIS:  Let me -- let me suggest, Your Honor, to

8    simplify this, and to preserve the trial date that

9    Mr. Roberts wants to preserve, that we will waive the oral

10   argument upon the Court's stated condition that we can file a

11   post-argument brief, which hopefully will clarify the issue

12   of both motions for summary judgment for the Court.

13          THE COURT:  I would prefer that.

14          MR. ELLIS:  That will be fine.

15          THE COURT:  We'll stay on track.

16          MR. ELLIS:  That will be fine, Your Honor.  We'll do

17   that.

18          THE COURT:  Respond in about a week's time.

19          MR. ELLIS:  Within a week?

20          MS. CALLOW:   That's fine.

21          MR. ELLIS:  Can I have ten days?

22          THE COURT:  You can respond within a week, and then

23   I'll be -- then everything will be ready.

24          MR. ELLIS:  Your Honor, because we have

25   cross-motions and because of the circumstances, can we file

1  these briefs simultaneously?

2          THE COURT:  What's that?

3          MR. ELLIS:  Rather than a response brief, just

4  post-argument briefs simultaneously filed --

5          THE COURT:  Okay.

6          MR. ELLIS:  -- all right?  And we can do that --

7          THE COURT:  Both of you file what you want.  I just

8  want to read one document from you and one document from

9  Mr. Roberts.  And I know there's been a lot of hostility --

10  animosity in this case, from reports I've gotten from others.

11  I expect it no longer to occur.

12          MR. ELLIS:  There is none from this side, Your

13  Honor.

14          THE COURT:  All right.

15          MR. ELLIS:  We will -- we will file simultaneous

16  briefs.  Are you in agreement?

17          MR. ROBERTS:  That's perfectly all right.

18          THE COURT:  You have a week to get something in on

19  however you want to frame it.  You've got a week to respond,

20  however you want to frame it, and that's the end of the

21  briefing.

22          MR. ROBERTS:  Thank you.

23          THE COURT:  Okay?

24          MR. ELLIS:  I'm sorry, Your Honor.  It's the

25  response problem that I'm concerned about.  What I'd like to

1  do, if we file simultaneous briefs -- no response, no reply,

2  we just each state our case to the Court in a brief --

3          THE COURT:  No, you don't have -- He's not going to

4  your -- Well, okay.  Both of you -- Put it this way:  Both of

5  you file your briefs within a week's time.

6          MR. ELLIS:  That's fine, Your Honor.  Tuesday next.

7          THE COURT:  Both sides.  And that's all the briefing

8  I want to see on this.  And I'll consider your brief on the

9  papers and what has been said on cross-motion for summary

10  judgment and what was argued here today.

11          MR. ELLIS:  That's fine, Your Honor.  Both briefs

12  will be filed next Tuesday.  Agree, Mike?

13          THE COURT:  Simultaneous.

14          MR. ROBERTS:  Very well.

15          THE COURT:  Thank you.

16          MR. ELLIS:  Thank you, Judge.

17          MR. ROBERTS:  Thank you.

18          THE CLERK:  All rise.                (4:51 p.m.)

19                          -  -  -

20                  PROCEEDINGS CONCLUDED

21                          -  -  -

22

23

24

25

81

C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


s/Mary Ann Ranz
Official Court Reporter