**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JEFFERSON-PILOT LIFE** | ) | **CASE NO. C-1-02-479** |
| **INSURANCE CO.,** | : | |
| | ) | **JUDGE BARRETT** |
| **Plaintiff** | : | **Magistrate Judge Hogan** |
| | ) | |
| **vs.** | : | |
| | ) | |
| **CHRISTOPHER L. KEARNEY,** | : | |
| | ) | **MEMORANDUM CONCERNING** |
| **Defendant.** | : | **REMAINING DISCOVERY** |
| | ) | |
| **vs.** | : | |
| | ) | |
| **DISABILITY MANAGEMENT** | : | |
| **SERVICES, INC.** | ) | |
| | : | |
| **Third-party Defendant** | ) | |

## I.    The Remaining Claims.

The claims remaining in this action are: (a) breach of contract; (b) bad faith; (c) intentional infliction of emotional distress; (d) civil conspiracy; (e) breach of fiduciary duty; and (f) invasion of privacy.

## II.    Overview.

Without having filed a Fed. R. Civ. P. Rule 26 Motion for Protective Order, the plaintiff and the third party defendant, Jefferson Pilot ("JP") and Disability Management Services, Inc. ("DMS"), have challenged Mr. Kearney's right to discovery pursuant to Fed. R. Civ. P. Rule 26, 30, 33, and 34.

Despite JP/DMS' challenges, Mr. Kearney is entitled to the remaining discovery he seeks and in large part has been seeking since 2003.  Because the merits of the Remaining Claims have not been briefed by Mr. Kearney, it is important for the Court to first be fully aware of the history of this dispute in assessing the Discovery Requests.

A.    ***History of The Case.***

Mr. Kearney purchased two disability insurance policies from JP in 1990 and 1991, respectively.

Mr. Kearney became "disabled" in 1993 and began to receive benefits under the Policies in March 1993.

Over the next nine (9) years, disputes between Mr. Kearney and JP/DMS percolated resulting in lawsuits (this action) filed by JP and Mr. Kearney, respectively.

Numerous elements of the nine-year brewing dispute were repeatedly raised: **(i)** beginning in September 1993 ~ and continuing through the present ~ Mr. Kearney directly questioned JP/DMS about the parties' rights and obligations under the Policies (*See e.g., Claim File 2690, 2804, 2857*);[1] **(ii)** the parties regularly debated what information was required for "proof of loss" (*Id., 2684-2687*); **(iii)** Mr. Kearney repeatedly complained that JP/DMS was not keeping his private information private and was intentionally causing him emotional distress; and **(iv)** through approximately thirty (30) overt and covert intrusive investigations into the medical, financial, occupational, and private aspects of Mr. Kearney's life and his claims, JP was unable to conceive of any legitimate basis to terminate Mr. Kearney's claims ~ its goal.

These numerous investigations included, chronologically:

1)    In February 1994, in addition to its own investigations, JP engaged Equifax to investigate and secretly surveil Mr. Kearney (*Id., 2734-52*);

2)    In January 1995, JP retained a CPA to review Mr. Kearney's claim information (*Id., 2803*);

3)    In February 1995, JP "kicked-up" the review and administration of Mr. Kearney's claim to the supervisor level and additionally misled

---

[1]    All claims file documents referred to in this Memorandum are collected in numerical order, as Exhibit 1 attached.

Mr. Kearney by advising him that his residual disability benefits would cease after 24 months (as opposed to lifetime) (*Id., 2799 and 2804*);

4)   On February 24, 1995, JP advised Mr. Kearney that JP was auditing the Claim (*Id., p. 2790, 2793*);

5)   On August 20, 1996, JP advised Mr. Kearney that JP was **again** auditing the Claim (*Id., p. 2830*);

6)   In November 1996, JP retained an outside accounting firm that works almost exclusively for disability insurers, Callaghan and Nawrocki, to investigate Mr. Kearney's claims (*Id., p. 2812-24*);

7)   In November 1996, JP engaged PDC, Inc. to investigate Mr. Kearney (*Id., 2863-70*);

8)   Also in November 1996, JP engaged Equifax to investigate Mr. Kearney (*Id., 2821*);

9)   **Importantly,** in July 1997, at the behest of Employers Reinsurance (the reinsurer of Mr. Kearney's claim), JP sent Mr. Kearney's file (and 2 other files) to DMS for "investigation." (*2892*).  JP requested that DMS "investigate for [JP] to see what can be done either to settle [Mr. Kearney's claim] in an equitable manner ... or to give [JP] further advice on where to proceed." *Id.*;

10)  In April 1998, JP/DMS **again** retained PDC, Inc. to conduct a medical review of Mr. Kearney's claim (during which the medical examiner explored settlement of the claim with Mr. Kearney) (*0572-78*);

11)  In July 1998, JP/DMS retained IHI investigation services to secretly surveil Mr. Kearney (*2937, 2940*);

12)  In December 1999, a surveillance team (ICS) was retrained to investigate and secretly surveil Mr. Kearney (*2999*, *3009*, *3103*);

13)  In January 2000, JP/DMS retained CS Claims Group, Inc. to secretly surveil Mr. Kearney (*3095, 3101, 3105-09, 3111-12, 22*);

14)  In April 2000, JP/DMS retained another outside accountant to audit Mr. Kearney (*3084*) ;

15)  In April 2000, JP/DMS retained a clinical psychologist to review Mr. Kearney's medical records (*0079-0081*);

16)  In June 2000, JP/DMS **again** retained CS Claims Group, Inc. to secretly surveil Mr. Kearney (*3068-3075*);

17)    In November 2000, JP/DMS examined its agent in a non-medical investigation of Mr. Kearney (*3035-3036, 3041-42*);

18)    In December 2000, JP/DMS performed its own internal non-medical investigation of Mr. Kearney (*3018-19*);

19)    In January 2001, JP/DMS **for the third time** retained CS Claims Group, Inc. to secretly surveil Mr. Kearney (*1543-46, 3357, 3366-68*);

20)    In January 2001, JP/DMS retained another outside accountant to investigate Mr. Kearney (*3196-3220, 3251-54, 3265, 3276-98, 3311-12, 3323, 3328-30, 3364*);

21)    In January 2001, JP/DMS retained yet another investigation firm, NWI Investigative Group, Inc., to conduct secret surveillance of Mr. Kearney (*3331-36, 3358*);

22)    In January 2001, JP/DMS retained an internal psychologist, Dr. Benander, to review Mr. Kearney's medical information (*0323-24, 3348*);

23)    In January 2001, JP/DMS requested that Mr. Kearney undergo IME's by doctors selected by JP/DMS (*0003-0038, 0147-0178, 3248, 3257, 3260, 3338, 3350, 3352*);

24)    In February and June 2001, JP/DMS investigated Mr. Kearney through IRS documents (*3331-36, 3358*);

25)    In March 2001, JP/DMS again performed an internal investigation of Mr. Kearney non-medical information (*3267, 3270-73*);

26)    In April 2001, JP/DMS again performed an internal investigation of Mr. Kearney's non-medical information (*3259, 3268-69*);

27)    In May 2001, JP/DMS retained a new psychologist within PDC, Inc., Dr. Green, to review Mr. Kearney's medical records (*3221, 3242*);

28)    In April – June 2001, JP/DMS **for the fourth time** retained CS Claims Group, Inc. to this time review lawsuits and other non-medical information regarding Mr. Kearney (*1547-52, 3132, 3208, 3247*); and

29)    In June 2001, JP/DMS retained a rehabilitation consulting firm, Baker & Baris, to review the claim (*0617-0618, 3224, 3230, 3232, 3236-38*).

**B.**   ***Unable To Terminate The Claim After These Intrusive Medical, Financial, Occupational, And Private Life Investigations, JP/DMS Turned To Other Means Of Terminating Mr. Kearney's $2,000,000+ <u>Claim</u>.***

The extraordinary resources JP/DMS exhausted between February 1994 and June 2001 to terminate Mr. Kearney's claim failed to uncover any basis to contest the medical, financial, or occupational legitimacy of Mr. Kearney's claims!  We know this because (1) that was the goal of the numerous over and covert investigations; and (ii) JP/DMS has not at any time - *in this action or earlier* – suggested that it can deny Mr. Kearney's claim on these bases.

During the course of JP/DMS' 8 year overt and covert examination of Mr. Kearney's  private affairs, as repeatedly expressed by Mr. Kearney in a multitude of correspondence,  JP/DMS had engaged in bad faith, intentionally inflicted emotional distress on Mr. Kearney, and unlawfully intruded into Mr. Kearney's private affairs.

In 1995, Mr. Kearney first advised JP that he may need to engage a lawyer to combat JP's bad faith, invasion of privacy, and intentional infliction of emotional distress.  (*Id., p. 2754*).  Mr. Kearney also felt it necessary to copy counsel on correspondence in 1997, 2000, and 2001 (*2917, 3102, and 0626*).  Although Attorney Spiegel's letter to DMS on August 10, 2001, made it clear that the matter was headed to litigation over *inter alia* JP/DMS' bad faith, intentional infliction of emotional distress, and invasion of privacy (*0626*), JP/DMS actually knew much earlier that these disputes were reasonably likely to result in litigation.  For example: in November 2000, DMS and the JP agent responsible for Mr. Kearney's policies discussed the fact that the matter was "headed to litigation" (*3041*); in February 2001, DMS' claim representative responsible for Mr. Kearney's claim, Robert Mills, and Mr. Kearney had a discussion

during which Mr. Mills threatened Mr. Kearney with litigation (*Exh. 2, p. 2-3*); and in May and June 2001 ~ *ironically or not, contemporaneous with JP/DMS final pre-suit investigation of Mr. Kearney outlined above* ~ Mr. Kearney wrote DMS scathing letters accusing JP/DMS of bad faith, invasion of privacy, intentional infliction of emotional distress, and punitive conduct (*Claim File 0612-0618, 3227, 3234*).

After "striking out" in its 1994-2001 effort to terminate Mr. Kearney's claim, and knowing that Mr. Kearney's claim was potentially "lifetime" (and, therefore, worth well over $2,000,000 – *Doc. No. 110, Exh. 1, Affidavit of Stephen Rice CPA, attached as Exhibit 3*) JP/DMS chose another avenue to terminate Mr. Kearney's claim.

JP/DMS' new endeavor was to place severe emotional distress on Mr. Kearney (who JP/DMS knew to be severely depressed and severely emotionally distressed) by: (i) manufacturing a new interpretation of the Policies; and (ii) at the same time threatening Mr. Kearney with the termination of benefits if he did not accept a less than 10% settlement offer immediately.

First, JP/DMS wrote Mr. Kearney on July 13, 2001, and advised him that JP/DMS "was not questioning whether or not [Mr. Kearney] has a medical condition for which he is receiving treatment" but would nonetheless continue its relentless examination of every aspect of Mr. Kearney's private life. (*3632-3634*). After advising Mr. Kearney that the relentless investigations would continue, JP/DMS stated that "it occurs to us that exploring a compromise settlement of this claim might be in the best interest of both parties." *Id.* JP/DMS concluded by saying, if Mr. Kearney was not interested in settlement on JP/DMS' terms, "further evaluation" would continue. *Id.* And JP/DMS invited Mr. Kearney to retain counsel. *Id.*

On August 10, 2001, less than a month later, Mr. Kearney's lawyer at that time, John Spiegel, contacted JP/DMS.  (*0626-0627*).  Attorney Spiegel expressed his opinion that JP/DMS had substantially "abused and harassed" Mr. Kearney.  *Id.*

Then, on October 11, 2001, a meeting occurred between a Vice President of JP/DMS, William Hughes, and Attorney Spiegel at Attorney Spiegel's offices in Florida. (*3136-3137*).  The meeting began and ended with JP/DMS' threat to reduce Mr. Kearney's monthly benefits by at least 50% if Mr. Kearney did not accept a lump-sum settlement of $280,000 on what JP/DMS valued at over $2,000,000 (*Id., also See, Exh. 3 attached*).

One week later, Attorney Spiegel advised JP/DMS that the lowball settlement proposal laced with intimidation was "bad faith and retaliatory."  (*3154-55*).  Attorney Spiegel separately wrote JP/DMS and stated that JP/DMS' "intimidation" and "threats" were unacceptable.  (*3136-3137*).  Attorney Spiegel asked JP/DMS to refigure their settlement offer on the basis of *inter alia* "lifetime benefits."  *Id.*

On October 23, 2001, JP/DMS delivered copies of the exchange of correspondence to Mr. Bill Dempsey of Employers Reinsurance, the reinsurer of Mr. Kearney's claim and the entity who directed JP to first retain DMS.  (*0644*).  JP/DMS and/or Employers Reinsurance at that time - or earlier - had retained outside counsel regarding Mr. Kearney.  *Id.*

On December 21, 2001, outside counsel, Geraldine Johnson of Roetzel & Andress, wrote to Bill Dempsey of Employers Reinsurance regarding Mr. Kearney's claim and offered her opinion on terminating Mr. Kearney's benefits.  (*0628-0629*).  Atty Johnson expressed her opinion that the "polices provide lifetime benefits" and JP/DMS "will most probably need to resort to legal action."  *Id.*  She counseled further that "in order to

strip Mr. Kearney of the ability to allege bad faith or to at least best position ourselves to defend such a claim" JP/DMS should "continue to pay Mr. Kearney the monthly amount we have been paying under a full and complete reservation of rights contemporaneous with our pursuit of a declaratory judgment action." *Id.*

*Contrary to Atty Johnson's counsel to Employers Reinsurance,* JP/DMS did not continue making the same monthly payments to Mr. Kearney as it had been doing since 1993. Instead, beginning in June 2002, JP/DMS began to underpay Mr. Kearney each month for 47 months. (*See, the JP/DMS "Underpayment calculation, attached as Exh. 4*).

Attorney Johnson concluded her December 21, 2001, letter with an "ancillary" reference to Mr. Kearney's medical condition. She writes: "with regard to the medical/psychiatric side of this claim, the [IMEs] seem to suggest that Mr. Kearney is psychologically impaired and indeed his condition has worsened since his initial receipt of benefits." (*0628-0629*).

On March 11, 2002, *notwithstanding* Attorney Johnson's internal concessions regarding Mr. Kearney's medical/psychiatric condition, JP/DMS again threatened Mr. Kearney with overt and covert "investigation" of his claim if he did not "continue (settlement) dialogue." (*3689-3690*).

On April 8, 2002, Mr. Kearney, representing himself, expressed his continuing concerns with JP/DMS' threats. (*3675-3676*). He also questioned why JP/DMS continued to refuse to concede the availability of "lifetime benefits." *Id.* And separately Mr. Kearney expressly asked JP/DMS to *inter alia* "provide a written explanation of his policies to include length of [his] benefits." (*3667*).

Rather than answering this and the other 4 questions contained in Mr. Kearney's April 10, 2002, letter, JP/DMS responded on April 25, 2002, with another onerous request for additional information!  (*3652-3653*).  Understandably, on May 16, 2002, Mr. Kearney expressed disbelief that JP/DMS would not answer his simple questions about the policy, including *inter alia* the issue of benefit duration (lifetime of age 65). (*3641*).

In June 2002, sill having not answered Mr. Kearney's straightforward questions from April and May 2002, JP/DMS underpaid benefits to Mr. Kearney on both policies. (*3624*).

On June 18, 2002, after receiving Mr. Kearney's June 10, 2002, letter complaining of the underpayment of benefits, JP/DMS finally responded to some of the questions posed by Mr. Kearney in his April 10 and May 16, 2002, letters.  (*3628-3630*). With regard to the benefit duration issue, JP/DMS referred to and reaffirmed a January 1998 letter (*2982*) advising Mr. Kearney  (in response to his letter – *2990*) that "residual disability ... benefits will be payable to age 65."  *Id.*

The June 8, 2002, draft of what ultimately became JP/DMS' June 18, 2002, letter to Mr. Kearney <u>contemplated</u> advising Mr. Kearney that:

- "we are unable to find where [your] policy actually cites the age 65 (residual benefit) limitation;"

- "therefore, in the absence of such language, **we would have to agree with your assessment** that the benefit period for residual disability benefits, for a disability that begins before age 45 (such as yours), would be the same as the benefit period for Total Disability, i.e., life;"

- "We have discussed this with JP, and they ... have stated that ... **they will** resolve the matter in your favor;" and

- "The (settlement) offer we made (in October 2001) was based on the belief that Residual Disability benefits were only payable to age 65. Based on a lifetime benefit period, the company is now willing to increase their offer to _____." (*0557-0560*).

But none of these concessions were included in the final June 18 letter sent to Mr. Kearney, nor was an increase in the October 11 offer based on lifetime benefits ever made (which Attorney Spiegel requested in his October 19, 2001, letter). Instead of freely conceding these undeniable points to the policyholder ~ to whom they owed a duty of good faith ~ JP/DMS offered that they <u>may</u> potentially consider the benefit duration question (age 65 or life) as part of a global settlement.

On July 1, 2002, JP sued Mr. Kearney. (*Doc. 1, 3398*). And *despite Atty Johnson's December 2001 medical conclusions,* the investigations of Mr. Kearney continued beyond the filing of the Complaint. (*3484, 3532, 3535, 3543, 3548*).

## C.    ***History of Discovery Dispute.***

In deciding Mr. Kearney's 2 Motions to Compel (*Docs. 43 and 54*) the Court made rulings at a discovery conference (*Docs 48 and 49*) and issued two orders (*Docs. 76 and 83*). JP/DMS filed "objections" (*Doc. 81*) to Doc. 76.

Most recently, JP/DMS filed a 28 page memorandum (*Doc. 123*) contesting each of Mr. Kearney's remaining discovery requests (*Doc. 120*). The limitations JP/DMS seek to have this Court order with regard to the Remaining Discovery Requests, however, are inconsistent with the Federal Rules, and JP/DMS make a number of misstatements in support of their requests.

<u>**Misstatement #1**</u>: "*There has not been a claim denial.*"

There has in this case been at least 48 claim denials.  And ~ in DMS' words ~ there has been an "underpayment" of benefits that was not remedied until March 2006.  (*Exh. 4*).

The first claim denial came in the form of JP and DMS' intentional concealment from Mr. Kearney that JP/DMS "**would have to agree with your assessment**" that his policies did indeed provide for "lifetime" benefits.  (*Exh. 1, Compare 0557-0560 and 3628-3630*).

The next 47 claim denials (monthly from May 2002 thru March 2006), came when JP/DMS failed to pay Mr. Kearney a sum of benefits tied to the four (4) independent and compounding adjustments due Mr. Kearney, but denied, on May 6, 2002, May 6, 2003, May 6, 2004, and May 6, 2005.  Each year, JP should have – but did not – increase (compoundingly) Mr. Kearney's monthly disability benefits by 7%.  As Atty Johnson counseled in December 2001, by reducing the monthly benefits it had historically paid to Mr. Kearney, JP/DMS subjected itself to a claim of bad faith (and, accordingly, JP/DMS did not succeed in "stripping" Mr. Kearney of a bad faith claim).

Moreover, the Magistrate Judge has already determined that these monthly underpayments were in fact "denials."  In Doc. 76 the Magistrate concluded:

> "*The Court finds that the <u>Boone</u> case applies to a situation where a carrier continues the base coverage, but denies the add-ons, such as cost of living increases and social security supplements. <u>See</u> <u>Boone v. Vanliner Ins. Co.</u>, 91 Ohio St. 3d. 209 (Ohio, 2001) wherein the Ohio Supreme Court said: 'in an action alleging bad faith denial of insurance coverage, the insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage.' (Emphasis supplied). <u>Garg v. State Auto Mut. Ins. Co.</u>, 155 O. App.3d 258 (₂11d Dist. 2003) extended the <u>Boone</u> ruling to work product materials.  <u>In the instant case, Plaintiff denied coverage to the extent that it stopped payment for cost of living increases and social security supplements.</u>" (*Doc. 76, page 3, paragraph 2, emphasis added*).

Accordingly, contrary to JP/DMS' premature Rule 56 arguments on the bad faith issue, their was ~ as Judge Hogan recognized ~ a denial which in Ohio subjects JP/DMS to a claim of bad faith.  Additionally, Ohio courts recognize the existence of bad faith claims even where benefits have been paid.  (*See, Beever v. Cincinnati Insurance*, *Exhibit 5 attached*).

**Misstatement #2:** *"Mr. Kearney has been overpaid."*

Mr. Kearney has clearly not been "overpaid."  In the early 1990s, JP promised Mr. Kearney certain discreet benefits with his purchase of 2 policies.  (*See, Order Doc. 105*).  Then for close to 10 years Mr. Kearney was for the most part paid the benefits he was promised.

In the Summer of 2002, JP unilaterally decreased the benefit payments ~ contrary to the promises it had made Mr. Kearney and contrary to its approximately 10 year history of paying the claim.  *Id.*  In the Summer of 2002 JP also asked the Court to "declare" that its unilateral decrease was appropriate.

The Court in January 2006, "declared" that the decrease was inappropriate and concluded that JP had <u>underpaid</u> Mr. Kearney.  *Id.*  That decision triggered a payment from JP to Mr. Kearney for "the underpayment" ~ that is, JP sent a check to Mr. Kearney with a spreadsheet titled "Underpayment of Benefits." (*Exh. 4, attached*).

Accordingly, despite JP/DMS' repeated mantra, Mr. Kearney has not been overpaid.  By JP/DMS' own admission ~ Exhibit 4 ~ he was "underpaid" for 4 years.

**D.     *DMS' "Claims File" Defense*.**

In a disability case, the "Claims File" are those documents that the insurer unilaterally *chooses* to place in a hard copy file over time.  It is JP/DMS' contention now that all Mr. Kearney is entitled to in discovery is the documents that JP/DMS chose

unilaterally to call the "Claims File" regardless of whether there exist other documents that concern, relate to or refer to Mr. Kearney or which are otherwise relevant to the claims and defenses in this action.

This is particularly troublesome on its face for the reasons Judge Hogan has already pointed out. That is, on July 26, 2004, in the Order designated Document 76 the Court stated:

> *"Plaintiff responds as if merely refraining from filing said material in the 'claims file' or filing it elsewhere insulates a party from making appropriate discovery. The only difference between traditional paper discovery and electronic discovery is the cost of retrieval.* **The Court is not convinced that the cost of retrieval is a significant burden for Jefferson-Pilot and/or its claims administrator to bear."[2]**

Moreover, JP/DMS' "claims file" defense is further troublesome because during the course of depositions that have been taken in this action, important witnesses have acknowledged that not all documents are placed in the Claims File. Specifically, electronic communications are not always placed in the Claims File. That is why the Magistrate Judge has already concluded that such information must be produced at JP/DMS' cost. (*Doc. 76*).

Putting aside the fact that JP/DMS' refusal to search its files is a blatant violation of JP/DMS' obligations, testimony in the case of the principal claims representative confirmed that he would as a practice prepare documents and not print them and place them in a claimant's claims file. (*Exh. 6, Depo. Excerpt of Robert Mills , 89-100*). Mr. Mills also testified that he had email communications with his boss and others concerning Mr. Kearney's claim. (*Id., pp. 65-90*). Those emails were not preserved by placing them in the claims file. *Id.* For this reason JP/DMS must comply with their

---

[2] At that juncture of the proceeding, JP/DMS relied on sworn testimony that it would cost $26,600 to retrieve the requested information. Judge Hogan's conclusion is presumably the trigger for JP/DMS to now state that the cost is greater.

commonplace duties under Civil Rule 26 and 34 and search for and produce any requested information stored electronically.    JP/DMS cannot decide without even looking that anything they would discover would be irrelevant.

**E.**    ***Fed. R. Civ. P. Discovery Obligations***.

Fed. R Civ. P. Rule 26(b)(1) provides:

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

And this rule is to be accorded liberal treatment.  *Laufman v. Oakley Bldg. & Loan Co.*, 72 F.R.D. 116 (D.C. Ohio 1976).[3]   The purpose of the pre-trial-deposition-discovery procedure is to obtain discovery of facts relevant to the subject matter of the action or to unearth leads as to where evidence may be located.  *H. K. Porter Co. v. Bremer*, 12 F.R.D. 187 (D.C. Ohio 1951).  Fed. R. Civ. P. Rule 26(b)(2) provides:

The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. The court may act upon its own initiative after reasonable notice or pursuant to a motion under Rule 26(c).

---

[3]        Although Mr. Kearney is not on a "fishing" expedition, it is noteworthy that Courts recognize that the discovery rules are to be so liberally construed that they do not preclude even "fishing" for evidence.  *Golden v. Arcadia Mut. Cas. Co.*, E.D. Ill. 1942, 3 F.R.D. 26. Nor is discovery necessarily limited to issues raised by the pleadings, for discovery itself is designed to help define and clarify the issues. *Oppenheimer Fund, Inc. v. Sanders*, U.S. N.Y. 1978, 98 S.Ct. 2380, 437 U.S. 340, 57 L.Ed.2d 253 See, also, *Financial Bldg. Consultants, Inc. v. American Druggists Ins. Co.*, N.D. Ga. 1981, 91 F.R.D. 59.

"Good cause" for a protective order is not established solely by showing that discovery may cause inconvenience and expense. _U.S v. American Optical Co_ 39 FRD 580 (ND Cal. 1966). And a discoveree cannot avoid a proper discovery request by utilizing record keeping which conceals rather than discloses. _Alliance to End Repression v Rockford_ 75 FRD 441 (ND Ill 1977); _Kozlowski v. Sears_ 73 FRD 73 (D. Mass. 1976).

**F.**    **_The Boone vs. Vanliner Rule Set By The Ohio Supreme Court._**

In _Doc. 76_ the Magistrate Judge ordered the production of written materials shared with attorneys relative to Mr. Kearney which predate June 6, 2002 ~ the date that the Magistrate Judge has already determined that there was a benefit denial.

The Ohio Supreme Court rule in _Boone v Van Liner_, 91 Ohio St 3d 209 (2001) is the authority which led the Court to make its ruling.

Under _Boone_, Mr. Kearney as an insured is entitled to discover claims file materials containing attorney-client communications related to the issue of coverage that were created prior to the denial of coverage. These documents have not been provided.

And with due respect to Judge Hogan's procedural handling to the _Boone_ documents, it is Mr. Kearney's position that _Boone_ mandates that Mr. Kearney or his counsel be entitled to review the _Boone_ documents to determine their relevance and/or interplay with the thousands of other documents relevant to this dispute. An _in camera_ inspection without direct production is not contemplated or required by _Boone_ and may cause Mr. Kearney to be denied relevant and discoverable material.

Moreover, the documents that Judge Hogan reviewed _in camera_ are only the documents that were included in the Claims file as "bates stamped." They did not

include all of the alleged attorney client communications predating June 2002 and which are contained in the files of outside counsel and in-house counsel of Employers Reinsurance, JP, and DMS. All of those files must be produced directly to Mr. Kearney under *Boone*, but if not directly, at least *in camera.*

During the conduct of Mr. Mills' deposition he revealed that the position that JP/DMS seeks to advance in this case was first uncovered or developed on October 11, 2001, the morning of DMS' Miami, Florida meeting with Attorney Spiegel.

Mr. Mills testified that between October 10, 2001, and June 6, 2002, the date that JP/DMS denied benefits to Mr. Kearney, Messrs. Mills and Hughes participated in numerous telephone conferences with: (i) Ms. Farabow (an employee and in-house counsel with JP); and (ii) William Dempsey (an employee and in-house counsel at Employers Reinsurance Corporation, a reinsurer of JP's liability to Mr. Kearney on the subject disability insurance policies). Mr. Mills also testified that several emails were exchanged among this group and that he also may have participated in conferences with Attorney Geraldine Johnson. These files and the related documents are all discoverable now under *Boone*. As are any attorney client communications which predate October 10, 2001.

**G.**    ***Analysis Of The Remaining Requests***

**1.**    ***DR 2*: Everything in JP and DMS' respective possession that relates to, refers to, or concerns Mr. Kearney.**

Having waged a decade-plus long battle with JP and DMS for the benefits (snippets of which are outlined above) he is entitled to under the policies of insurance he purchased from JP, Mr. Kearney is entitled – *consistent with Fed. R. Civ. P. Rule 26* – to all information in the possession of JP and DMS and Employers Reinsurance that

relates to or concerns Mr. Kearney.  The Federal Rules require JP and DMS to fully perform this request.

JP and DMS have already no doubt spent well over $25,000 fighting against that portion of this request that requires JP and DMS to provide Mr. Kearney with: (i) electronically maintained information; and (ii) communications JP and DMS had with Ms. Farabow, Mr. Dempsey, Mr. Newkirk, and Ms. Johnson.

With regard to the electronically stored information request, JP has offered no evidence to support its apparent claim that it cannot produce these materials or that such an exercise would be too expensive.[4]

For DMS' independent part, although it has promised to produce information stored on "hard drives and emails" (*Doc. 81, Exh. 1*) it has not done so.  Also, although it complains about the cost of this request previously, the Magistrate has already decided that the cost to DMS was not a sufficient reason to continue to withhold evidence: "*The Court is not convinced that the cost of retrieval is a significant burden for Jefferson-Pilot and/or its claims administrator to bear.*" (*Doc. 76*).

Mr. Mills testified that the following events occurred after the "Cuban Coffee House Revelation" of October 11, 2001 (just prior to Messrs Hughes and Mills meeting with Atty Spiegel):

> **Q.**    Do you recall ever sending or receiving an e-mail to or from anyone that discusses the way the policy began to be interpreted after the Cuban coffee meeting with you and Hughes?

> **A.**    I recall communicating via e-mail with our -- with the prior counsel on this case, Geri Johnson.

> **Q.**    Okay.  Anyone else?

---

[4]    Disturbing  to Mr. Kearney is news that Jefferson-Pilot was fined $125,000 for e-mail retention violations.  (See, Exhibit 7).

**A**.     I just recall e-mails that went to Ms. Johnson.  There might have been other people that were cc'd on that, but I don't recall who those individuals were.

**Q.**     Did she send you e-mails?

**A.**     I believe she did.  She did send me e-mails.

**Q.**     Did Ms. Farabow (of JP) send you e-mails or copy you on e-mails relating to the issue?

**A.**     I do recall being copied in on e-mails from Ms. Farabow.

**Q.**     Did Bill Dempsey (of Employers reinsurance) send to you, or copy you; or did you send to him, or copy to him, e-mails on the issue?

**A.**     Can you repeat the question, please?

**Q.**     Did you send to Mr. Dempsey, receive from Mr. Dempsey, copy from Mr. Dempsey, or did you copy to Mr. Dempsey any e-mails relating to this issue we're discussing?

**A.**     Again, as I sit here today, I don't remember specifically whether or not I was the author of an e-mail where I had communicated directly to him or cc'd him on that e-mail.

**Q.**     Do you recall receiving from him an e-mail or being copied on an e-mail he sent?

**A.**     I don't remember that specifically.  Since talked about him being involved in this process, my guess is that he had been cc'd on a lot of those, but I don't know, you'd have to speak with him about it.

**Q.**     D you delete e-mails you receive?

**A.**     Do I delete e-mails that I receive?  Yes, I do.

**Q.**     What's the process you undertake to delete your e-mails?

**A.**     Can we take a break right now?

**MR. ELLIS**:  After you answer the question.

**A.**     Can you repeat the question, please?

**Q.**     What's the process you undertake to delete your e-mails?

**A.**    The process that I undertake to delete my e-mails is, depending on what the e-mail is, I delete it that day.  All the ones I delete, you know, at some point in time, <u>I don't have any specific guidelines</u> where if I have an e-mail for a week, a month, a year, that I necessarily delete it.  A lot of times my in basket is filled up enough that the technological folks will ask you to clean a number of documents out.  (*Exh.* 6 page 89-91).

Mr. Mills also testified that there is no policy about what any respective representative is to put in a claim file.  (*Id., p. 43*).

Mr. Mills' admissions that DMS has no formal e-mail retention policy and that he deletes emails daily after creation or receipt makes the investigation into DMS' electronic files now necessary.  Mr. Kearney need not accept (from an entity that in the January 2006 Order was found to have misrepresented matters to Mr. Kearney, and which misrepresented to Mr. Kearney his entitlement to "lifetime" benefits) at face value DMS' assertion that it places in the claim file "*any relevant or important communications.*"  Magistrate Hogan himself expressed certain skepticism at this claim.

Another troubling aspect of DMS' complaint is the fact that *effective this very week* entities such as JP and DMS are subject to the new Federal Rules of Procedure regarding electronic discovery.  Moreover, prior cases involving DMS (02-351 in this Court and 04-843 in the Stark County Court Of Common Pleas) also resulted in the Court ordering DMS to produce electronic information.  It can only be assumed that DMS intentionally continues to have a purportedly cumbersome retrieval process  to interfere in a policyholder's ability to recover discoverable information.

Finally, the assumptions made by Ms. Lyons in the Affidavit she executed (*Doc. 123, Exh. E*) to make the argument about "undue" costs are flawed.  She "assumes" that

the Court required in Doc. 76 that all emails be recovered from February 2002 through October 2006. That is not the case ~ yet.

For purposes of Mr. Kearney's suit, JP and DMS must produce all electronically stored information predating the lawsuit. If Ms. Lyons Affidavit is accurate, and there exists no ability to recover information predating February 2002, then the period for recovery is February 2002 - June 2002 for DMS. That would reduce DMS' retrieval obligation from 112 tapes to just 10 tapes. This 11:1 disparity on a pro rata basis reduces the tape retrieval cost (¶4 of Affidavit) from $2,000 to approximately $200; reduces the "formatting" labor cost (¶10 of Affidavit) from $33,600 to approximately $3,000; and reduces the "searching" labor cost (¶10 of Affidavit) from $6,000 to $600. With these adjustments to Ms. Lyons Affidavit, there can be no argument that any "undue" expense must be borne by DMS.

JP makes no "undue" expense argument regarding its IT system.

It also bears mentioning again (as discussed above) that DMS and JP knew by late 2000 that Mr. Kearney's bad faith, emotional distress, and invasion of privacy claims were all headed to litigation. Accordingly, JP and DMS had an affirmative obligation by late 2000 to preserve evidence. This duty to preserve relevant evidence commences prior to the filing of the action, once the defendant reasonably anticipates an action may be forthcoming. *See, Beck v. Haik*, 377 F.3d 624, 641 (6th Cir. 2004) ("A trial court has the authority . . . to sanction a party for failing to preserve evidence that it knows or should know is relevant before litigation is commenced"). Accordingly, it would be unfair to even contemplate shifting a burden or expense for the production of information that JP and DMS had a duty to preserve.

2.    **DR 3 / Int 7:  The contracts that exist between JP and DMS and the contracts between JP and/or DMS and Employers Reinsurance, including all amendments through November 2006.**

These contracts are discoverable within the scope of Rule 26.  In fact, they have been ordered produced previously in this Court (*Case 02-351, involving DMS and another of its clients, Massachusetts Casualty Life*).  Mr. Kearney is happy to receive them subject to protective orders regarding confidentiality.

3.    **DR 5:  Documents reflecting on criteria or elements of case referrals from JP to DMS and all related documents; and Int. 5:  State when, by whom and why Mr. Kearney's claim was referred by JP to DMS.  Also state what documents relate to referral.**

As indicated above, beginning in 1997, JP ~ at Employers' Reinsurance behest ~ hand selected Mr. Kearney's claim and file for "review" by DMS.  Since the evidence outlined above shows that JP has been attempting multiple mechanisms (legal and otherwise) to terminate their liability to Mr. Kearney, any documents reflecting on the referrals of cases from JP to DMS are clearly within the scope of Fed. R. Civ. P. Rule 26.

4.    **DR 6 / Int 11:  Documents relating to sanctions and or fines imposed on JP/DMS by any state Insurance Commission or officials.**

If JP and DMS have not been sanctioned or fined by any state insurance commission or official, then a simple "None" answer would resolve this request.  However, if there have been fines or sanctions levied by the bodies that govern an insurer's conduct, then Mr. Kearney is entitled to such information so that he may examine the circumstances of those cases.  Information directly or indirectly gleaned from this discovery may have a direct impact on the liability of JP and DMS here, but

will clearly be relevant to a punitive damage assessment by a jury since one element of a

punitive damage evaluation is what amount of money is required to modify behavior.

     **5.**      **<u>DR 10(b), 14, and 22</u>:**    **Documents describing procedures for claim handling; claims handling training materials; handouts; guidelines; notes from all in-house claim administration or policy interpretation seminars or conferences.**

Mr. Kearney is clearly entitled to the documents which describe the JP/DMS'

procedures for claims handling, whether such documents are in a binder titled "Claims

Manual" or whether they exist otherwise. This request can, therefore be answered by

either: (i) the production of all such documents which have ever existed during the

period of Mr. Kearney's claim administration; or (ii) by officers of DMS and JP

respectively (who have knowledge of the issue) who execute sworn statements that there

exist no documents whatsoever which in any way describe procedures or policies for

claims handling.

     **6.**      **<u>DR 11</u>:**  **All marketing materials of DMS and specifically any materials provided to JP or Employers Reinsurance by DMS to solicit or secure the business for administering claims (both entire blocks of claims and individual claims).**

In the mid-1990s DMS was founded. Since that time it has grown to over 200

employees and has been able to secure the claim administration business of many of the

largest disability insurers in the United States. Within the permitted scope of Fed. R.

Civ. P. Rule 26, Mr. Kearney is entitled to learn what inducements, promises, or

representations were being made by DMS to solicit the business of Employers

Reinsurance (the company that reinsures Mr. Kearney's JP claim and which convinced

JP to send Mr. Kearney's claim to DMS in 1997), DMS, and other companies ~ as such

promises and inducements impact DMS' treatment, evaluation, and investigation of a

policyholder's claim.  Those documents not only may have a direct relevant impact on

Mr. Kearney's claims but will clearly impact the jury's punitive damage assessment.

      7.      **DR 17**:  **Notes and the calendars of claims persons with responsibility for Mr. Kearney's claim.**

Within the permitted scope of Fed. R. Civ. P. Rule 26, Mr. Kearney is entitled to

these documents.  Despite the contention now that Mr. Mills does not retain his desk

calendars past the end of the year, Mr. Mills' calendar was promised by counsel for JP

(*Exh. 8*).  Mr. Mills was also asked to produce this again at his deposition.

      8.      **DR 20/21 and Int 9/10**: **Copies of all complaints filed by JP for declaratory judgment against its insureds and copies of complaints filed against either JP or DMS for breach of contract or bad faith.**

If JP and DMS have not been involved in litigation regarding the ambiguities of

its policies (of the type sold to Mr. Kearney) or claims that it caused a mentally

disturbed person emotional distress and invasion of privacy then a simple verified

response to that effect would resolve this request.  However, if there have been other

similar suits (especially any that may have predated the alleged October 2001 discovery

of a new interpretation of the Policy) then Mr. Kearney is entitled to such information so

that he may examine the circumstances of those cases.  Information directly or

indirectly gleaned from this discovery may have a direct impact on the liability of JP and

DMS here, and will clearly be relevant to a punitive damage assessment by a jury since

one element of a punitive damage evaluation is what amount of money is required to

modify behavior.

      9.      **Int 2**:  Who suggested new interpretation of contracts in 2001?

Mr. Kearney is entitled to this answer as that event forms one of the

significant factors of his inter alia emotional distress claim.

10. **Int 4: Identify (and provide all documents relative to) investigators retained and produce all videotapes, audio tapes, photographs and investigative reports and notes.**

Mr. Kearney is entitled to this answer given the basis of his privacy and emotional distress and conspiracy claims.

11. **DR 15:    State the reserve on Mr. Kearney's policy and identify any changes made to the reserve.**

Mr. Kearney is entitled to this answer as the "lowball" settlement offer of October 2001 forms one of the significant factors of his inter alia emotional distress and bad faith claims.

12. **Files of Farabow, Johnson, Newkirk, and Dempsey predating June 6, 2002.**

As detailed above, these records are directly and expressly discoverable under ***Boone v. Vanliner***.

13. **Financial statements and Annual Reports of Jefferson Pilot through 2006.**

These materials are relevant and discoverable on the multiple punitive damage claims.

14. **Copies of any and all privacy policies for protecting the personal, private information of policyholders.**

These materials are relevant and discoverable on the privacy and emotional distress claims.

15. **Copies of all training materials and policies regarding privacy (including the Gramm-Leach-Bliley Financial Modernization Act, 15 U.S.C. §6700, et seq. and the Health Insurance Portability and Accountability Act, PL104-191).**

These materials are relevant and discoverable on the privacy and emotional distress claims.

### 16.    Annual Personnel reviews of Mills, Hughes, and Ditmar since 1995.

These materials are relevant and discoverable on the privacy, bad faith, and emotional distress claims and further were ordered to be produced by this Court in Case 02-351.

### 17.    DMS organizational Chart.

These materials are relevant and discoverable on the privacy, bad faith, and emotional distress claims and further were ordered to be produced by this Court in Case 02-351.

### 18.    Documents identified in "Privilege Log" up to June 6, 2002 (attached as Exhibit 1).

As indicated above, these materials are discoverable under *Boone v Van Liner* 91 Ohio St 3d 209 (2001).  These documents have not been provided.

### 19.    Supplement all prior responses/requests.

There can be little debate that this is required of JP and DMS.  Fed. R. Civ. P. Rule 26(e).

### 20.    Claims File documents for the period 2002-today.

There can be little debate that this is required of JP and DMS.  Fed. R. Civ. P. Rule 26(e).

### 21.    Depositions.

The requested depositions and continuation of suspended depositions should all proceed forthwith:

- <u>Mills</u>:  Mr. Mills was Mr. Kearney's claim for several years.  His deposition was continued in progress and Mr. kearney requires an additional 2 hours of examination of Mr. Mills;

- <u>Hughes:</u>  Mr. Hughes was centrally involved in Mr. Kearney's Claim in 2000-2002.  His deposition has not yet been conducted but was ordered to be conducted by Judge Hogan;

- <u>Jefferson-Pilot 30(b)(6)</u>:  The JP deposition is required on the following subject matters at least: (i) other suits regarding ambiguities in the type of Policy purchased by Mr. Kearney; (ii) JP's exercise of oversight over its agent DMS; (iii) the role of Employers Reinsurance in the claim of Mr. Kearney; (iv) privacy protections JP affords its policyholders; (v) JP's email and electronic document retention practices; and (vi) the substance of JP's agreement and relationship with DMS;

- <u>DMS 30(b)(6)</u>.  The DMS deposition is required on the following subject matters at least: (i) other suits regarding ambiguities in the type of Policy purchased by Mr. Kearney; (ii) DMS' interaction with JP and Employers Reinsurance; (iii) the role of Employers Reinsurance in the claim of Mr. Kearney; (iv) privacy protections DMS affords the policyholders of its clients; (v) DMS' email and electronic document retention practices; and (vi) the substance of JP's agreement and relationship with DMS;

- <u>The JP and DMS Privacy officers</u> (to the extent they are not produced by way of the 30(b)(6) request.  This is required to investigate the invasion of privacy claim and determine whether JP and DMS adhered to their own policies;

- <u>Employers Reinsurance/William Dempsey</u>.  This non-party deposition(s) is required since it appears that Employers Reinsurance drove or at least participated in the strategy developed to deny Mr. Kearney's claims;

- <u>Stefanie Farabow</u>.  She is employed by JP and was also involved in Mr. Kearney's claim.  (<u>*See*</u>, *Footnote 8 of Doc. 120*);

- <u>Investigation Firm depositions</u>.  These are not contested.

Despite JP/DMS' attempt to mischaracterize prior Orders, Mr. Kearney is not responsible for JP/DMS' attorney fees and costs in the future conduct of these depositions.

22.    **Verification Of Discovery Responses.**

Although JP and DMS have never verified under oath their prior discovery responses, there can be little debate that this is required of JP and DMS.  Fed. R. Civ. P. Rule 26(g).

## <u>Conclusion</u>

This Court should order JP and DMS to comply fully and forthwith with each of the above requests.  Only then can Mr. Kearney receive the discovery he is entitled to by the liberally construed Federal Rules and only then may the trial of this matter be decided based on a full and complete record.

Respectfully submitted,

<u>s/ Michael A. Roberts</u>
Michael A. Roberts, Esq.
GRAYDON HEAD & RITCHEY LLP
511 Walnut Street, Suite 1900
Cincinnati, OH 45202
(513) 629-2799
(513) 651-3836 - fax
mroberts@graydon.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing has been filed electronically with the court and thereby  served this 28th day of November, 2006, upon William R. Ellis, Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, OH 45202.

<u>s/ Michael A. Roberts</u>

1243518.1