IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Vicky J. Beever, | : | |
| Plaintiff-Appellant, | : | Nos. 02AP-543 and 02AP-544 |
| | : | (C.P. C. Nos.00CV-2226 and 97CV-11090) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Cincinnati Life Insurance Company, | : | |
| Defendant-Appellee. | : | |

O P I N I O N

Rendered on June 10, 2003

*Lamkin, Van Eman, Trimble, Beals & Rourke*, and *Timothy L. Van Eman*, for appellant.

*Arter & Hadden*, and *Nancy Manougian*; *Litchfield & Cavo, Daniel G. Litchfield* and *Matthew D. Walker*, for appellee.

APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶1} This is an appeal by plaintiff-appellant, Vicky J. Beever, from a judgment of the Franklin County Court of Common Pleas, granting summary judgment in favor of defendant-appellee, Cincinnati Life Insurance Company.

{¶2} On March 13, 2000, plaintiff filed a complaint against defendant, alleging bad faith on the part of the insurer for failing to pay life insurance proceeds owing to plaintiff following the death of her spouse, David C. Beever. Plaintiff's complaint alleged that defendant sold her spouse a $100,000 term life insurance policy, issued and effective on December 19, 1995; that David Beever died on

January 9, 1996; and that defendant had wrongfully denied plaintiff's claim for life insurance benefits. Plaintiff sought compensatory and punitive damages from defendant.

{¶3} In March of 2000, defendant paid plaintiff the $100,000 contractual claim, together with statutory interest. On May 31, 2000, plaintiff filed an amended complaint, alleging that defendant's failure to pay the life insurance proceeds under the subject policy for a period of more than four years was done maliciously, intentionally, and in bad faith. Plaintiff further alleged that she incurred legal expenses, including attorney fees and litigation costs, as a result of defendant's four-year refusal to pay the life insurance proceeds.

{¶4} On October 12, 2001, plaintiff and defendant both filed motions for summary judgment. By decision and entry filed April 2, 2002, the trial court sustained defendant's motion for summary judgment and overruled plaintiff's motion for summary judgment.

{¶5} On appeal, plaintiff sets forth the following assignment of error for review:

{¶6} "The trial court erred in denying Plaintiff Vicky Beever's Motion for Summary Judgment and in granting Defendant Cincinnati Life Insurance Company's Motion for Summary Judgment."

{¶7} In *Bailey v. Ohio Dept. of Motor Vehicles*, Franklin App. No. 02AP-378, 2002-Ohio-7361, this court set forth the standard of review for summary judgment as follows:

{¶8} "* * * Civ. R. 56(C) states that summary judgment shall be rendered forthwith if:

{¶9} " '* * * [T]he pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * *'

{¶10} "Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is

entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. * * * '[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.' * * * Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial. * * * Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. * * *

{¶11} "Appellate review of summary judgment is de novo. * * * We stand in the shoes of the trial court and conduct an independent review of the record. As such, we must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. * * *" Id. at ¶¶'s 21-24. (Citations omitted.)

{¶12} The following background facts are basically undisputed. On December 19, 1995, defendant, through its agent John D. Poston, issued a $100,000 life insurance policy to decedent, David C. Beever (hereafter "decedent"). The policy, described by Poston as a "field issued term policy," did not require the applicant to undergo a physical examination. (Poston Depo., at 20.) Instead, the agent performed field underwriting based upon answers given by the applicant on the application form.

{¶13} Section 7(c)(2) of the application asked the applicant, "[h]ave you ever been treated for or had any known indication of * * * [a]lcoholism * * *." The applicant marked the box designated "no" on the application.

{¶14} On December 31, 1995, decedent, age 52, was admitted to St. Ann's Hospital ("St. Ann's"). Dr. William F. Emlich, a specialist in gastroenterology and hepatology, treated decedent at the time of admission. According to Dr. Emlich, decedent presented what appeared to be an acute gastrointestinal bleed. The patient also had a "Mallory-Weiss" tear of his esophagus, a condition commonly caused by severe vomiting.

{¶15} Decedent died on January 9, 1996. The death certificate listed the following under cause of death: "pneumonia," "acute respiratory distress syndrome," and "chronic liver disease." Various hospital notes from decedent's treatment at St. Ann's contained references to alcohol use by decedent, including statements that decedent "used to drink quite a bit," that he was a heavy alcohol abuser in the past, that he had "significant alcohol use history," and that he suffered "multiple medical problems, most stemming from alcoholism."

{¶16} Shortly after his death, decedent's widow, Vicki Beever, presented claims to defendant under three separate life insurance polices issued on her husband. Defendant did not contest the payment as to two of those policies; however, on April 18, 1996, defendant rescinded life insurance policy No. YA109731, the $100,000 term life policy issued on December 19, 1995. Richard Arlen, defendant's manager of life and health claims, made the decision to rescind the policy based upon a review of decedent's medical records from St. Ann's. Arlen stated in his deposition that his decision "was based on the records indicating that he [decedent] had a significant alcohol abuse problem." (Arlen Depo., at 35.) Arlen specifically listed the following factors: "The fact that he was disabled 12 days after the application was taken; the fact that he had a significant history of alcohol abuse; the fact that he had endstage cirrhosis of the liver; the fact that he had severe depression; the fact that he had a colonoscopy." (Arlen Depo., at 27.) Arlen believed that decedent knew he was an alcoholic at the time of the application because of the facts related in his social history that "came from either him or his wife." (Arlen Depo., at 78.)

{¶17} The trial court, in granting summary judgment in favor of defendant, found that the insurer was reasonably justified in denying the claim. Specifically, the court held that, although plaintiff provided deposition testimony of individuals close to decedent who claimed he did not have known indications of alcoholism, plaintiff provided no medical records to support such a conclusion. The court also found that there were times decedent met with physicians completely alone, with no family members present. Thus, the court held that, in viewing the evidence

most favorable to plaintiff, defendant's actions were reasonable and not arbitrary or capricious.

{¶18} Plaintiff asserts there is no evidence in the record to indicate that decedent, at the time he filled out the application, had known indications of alcoholism or that he was aware of such indications. Plaintiff contends that defendant acted in bad faith in failing to conduct a meaningful investigation before denying the claim and that, even after being faced with litigation, defendant failed to interview key witnesses who would be in the best position to judge whether decedent had any "known indications of alcoholism." Plaintiff further argues that defendant failed to determine the reliability of the last illness records from St. Ann's by not consulting a physician before denying the claim.

{¶19} Regarding the trial court's finding that plaintiff failed to produce any records to support a finding that decedent had no known indications of alcoholism, plaintiff argues that, because decedent was never treated for alcoholism, no such records exist. Plaintiff also challenges the trial court's finding that plaintiff failed to comply with defendant's request for additional medical records. Plaintiff points to her affidavit, and the affidavit of her attorney, in which both aver that plaintiff submitted medical documentation, including both a proof of death and a signed medical authorization to defendant in January 1996. Plaintiff argues that she confirmed no colonic procedure was ever performed on her husband, despite defendant's request for information regarding such a procedure.

{¶20} Under Ohio law, an insurer has a duty to act in good faith in the processing and payment of valid claims of its insured. *Petrone v. Grange Mut. Cas. Co.*, Summit App. No. 20909, 2002-Ohio-3746. If an insurer improperly refuses to pay a valid claim, such failure may amount to insurance "bad faith." *Stefano v. Commodore Cove E., LTD.* (2001), 145 Ohio App.3d 290, 293. An insurance company's refusal to pay a valid claim is not conclusive of bad faith, but if the insurer bases its refusal on a belief that there is no coverage for a particular claim, such belief may not be arbitrary or capricious. *Petrone,* supra, at ¶12. Further, an insurer's failure to pay a claim need not involve bad intent or malice in order to constitute "bad faith." Id. In *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio

St.3d 552, paragraph one of the syllabus, the Ohio Supreme Court held that "[a]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor."

{¶21} The evidence before the trial court on summary judgment included the deposition testimony of decedent's wife, Vicky Beever, and various acquaintances of decedent. Vicky Beever testified that she and decedent were married on August 20, 1988; decedent owned a consulting business, Meridian Companies, which he operated out of his home. He was also a member of the New Albany Country Club. Beever stated that her husband's health was "fine" prior to his death. (Aug. 18, 1998 Beever Depo., at 29.) Decedent had, however, suffered a permanent back injury in an automobile accident, resulting in constant headache pain.

{¶22} According to Beever, her husband would consume "a drink a day" of Scotch, and he might also have a glass of wine with dinner. She acknowledged that on some occasions he would consume more than one glass of Scotch or wine. During a typical week, decedent would have the Scotch and wine on four days. Beever never suspected that her husband had a drinking problem; he never appeared to be drunk, and did not engage in binge drinking. She further stated that her husband had never been treated for alcohol abuse, nor did he ever express a need for treatment.

{¶23} Beever did not recall physicians at St. Ann's asking her questions about decedent's prior alcohol use, and she had no idea how the hospital would have received information that her husband had a history of chronic alcohol abuse. She recalled telling one physician that her husband had not had a drink in over six weeks because "he was trying to get on this health kick and exercise and workout and decided that drinking was something he was going to stop doing." (Beever Depo., at 63.)

{¶24} As noted, various acquaintances of decedent also gave deposition testimony. John Rossler, a friend and golfing partner of decedent, testified that, "David wasn't a drinker." (Rossler Depo., at 23.) Rossler never suspected that

decedent had a drinking problem, nor did anybody ever suggest such a concern to him. According to Rossler, "David was not an alcoholic. I knew him from 1992 * * * through when he died, and there were no signs of alcoholism in David." (Rossler Depo., at 26.)

{¶25} Michael J. Kandler, decedent's stockbroker, first met decedent in 1992 or 1993 when they both joined the New Albany Country Club. Shortly thereafter, decedent became a client of Kandler's. They played golf approximately two times per week at the country club, and would also occasionally have lunch and dinner together. Kandler stated that decedent never drank while playing golf. After playing golf, Beever would have a glass of wine or he would sip on a single malt Scotch. Kandler never observed decedent to be drunk, and stated, "[i]t is just something that never came into my mind that he was an alcoholic." (Kandler Depo., at 28.) Kandler further testified that:

{¶26} "[David] * * * just was not a big drinker. He enjoyed the quality of what he drank a lot. He would drink a glass of wine. * * * He liked beef tartar and he would drink * * * a rich wine there, then maybe have a Scotch after dinner, something like that. * * * I never saw him consume any quantities of anything * * *." (Kandler Depo., at 18.)

{¶27} David Crotty, a golf instructor at a country club, was an acquaintance of decedent and his wife for approximately ten years, and socialized with them in conjunction with the country club. Crotty testified that decedent never drank while playing golf; further, although decedent would consume alcoholic beverages, Crotty never observed decedent have more than a drink at a time, nor did he ever observe him intoxicated.

{¶28} The evidence on summary judgment also included the deposition testimony of St. Ann's physicians, including the testimony of Dr. Emlich who, as previously noted, treated decedent at the time of his admission to the hospital in December of 1995. Although decedent was not coherent at the time of his admission, Dr Emlich recalled speaking with decedent's wife in the waiting room. Dr. Emlich had no independent recollection of learning whether decedent had alcohol abuse treatment or prior liver problems, and the physician did not recall the

source of information indicating the patient had a history of heavy alcohol consumption, but he believed it came from reviewing the emergency room record.

{¶29} When asked if he had an opinion whether the physical or clinical presentations of decedent were caused by alcohol abuse, Dr. Emlich responded:

{¶30} "The physical and history that Mr. Beever presented in my short time with him was consistent with hepatic disease. There are a multitude of diseases that can cause that. Toxic injury could be one. I do not have any proof that that's the case at the moment and that would be a diagnostic event that would occur as time progressed." (Emlich Depo., at 31-32.) Based upon his subsequent review of the records, Dr. Emlich opined that he had "not seen laboratory studies to rule out other reasons for his liver disease and," as such, he could "only assume that could be a potential cause at this time." (Emlich Depo., at 32.) Dr. Emlich opined that decedent did suffer from apparent liver disease. Dr. Emlich did not know the origin of the reference to decedent's history of heavy alcohol consumption.

{¶31} Dr. James Fagan also treated David Beever shortly after his admission to St. Ann's. Dr. Fagan made a reference to "alcoholism" on a January 1, 1996 diagnosis note, based upon his physical examination and information presented at the time of the consultation. Dr. Fagan noted that laboratory findings indicating elevated ammonia levels, as well as liver function tests, contributed to his diagnosis of alcoholism. Dr. Fagan believed that decedent's hepatic failure, Mallory-Weiss tear, gastrointestinal bleeding and intravenous volume loss stemmed from alcohol problems, and he opined that decedent's medical problems were directly caused by alcoholism. Dr. Fagan believed that decedent's liver failure was a process that had occurred over a number of months, and he believed that decedent had advanced alcoholism.

{¶32} On cross-examination, Dr. Fagan stated that he did not remember having any meaningful conversation with decedent or with other individuals who knew decedent. Dr. Fagan could not recall where he obtained information regarding notes describing decedent's significant alcohol history or alcohol abuse, and he was uncertain whether decedent had ever been treated for alcoholism prior to this hospitalization. The physician noted that no pathologic testing was

performed on decedent's liver or liver tissue following his death. Dr. Fagan acknowledged that allusions to alcohol in the chart pre-dated his consult, and that when he began treating decedent he took those allusions to alcohol in the chart and incorporated them in his findings and opinions. He further acknowledged that, "my independent exam was suggestive of an individual with alcoholic liver failure, but that is not the only explanation possible." (Fagan Depo., at 57.)

{¶33} Dr. Fagan did not know whether the patient was aware that symptoms such as palmar erythema (redness of the palms), or caput medusae are associated with alcoholism. The physician acknowledged that his diagnosis of alcoholism was heavily reliant upon information that pre-dated his involvement with decedent, and that he had no way of knowing when decedent might have become aware of symptoms he could relate to liver failure or alcoholism. He also conceded that "[d]enying is a tremendous component of patients with alcohol abuse or alcoholism," and that the issue of whether or not an individual is an alcoholic is quite subjective from the viewpoint of the person with the condition. (Fagan Depo., at 62.) Dr. Fagan did not know whether decedent himself knew of any indications of alcoholism from a health standpoint. Finally, Dr. Fagan opined that an individual weighing 180 pounds who drank one glass of wine and one glass of Scotch each day for four days a week would not be likely to develop the "physiologic sequela of alcohol abuse." (Fagan Depo., at 67.)

{¶34} Plaintiff submitted the deposition testimony of two insurance experts, Miles Barber and Dean Potter, and an addiction psychiatrist, Dr. Tom H. Pepper. Dr. Pepper opined that decedent was not an alcoholic, noting that his review of the records revealed no evidence that decedent had ever been treated for alcohol dependency, and that there was no clear evidence that excessive alcohol consumption caused his liver disease. Dr. Pepper found decedent's history, as described by friends and family, to be "very persuasive." (Pepper Depo., at 28.) He viewed decedent as "a classic social drinker who somehow died of an acute liver failure, and I see nothing inconsistent with that." (Pepper Depo., at 76.) Dr. Pepper stated that, as a physician, he was unsure of the meaning of the phrase "known indication of alcoholism," as stated in the policy.

{¶35}  Barber, who has previously testified as an insurance industry expert, stated that his review of the records in the case convinced him that the claim should have been paid.  According to Barber, the application was very poorly written, and he deemed the language of the policy, asking the applicant if he or she was aware of any "known indication of alcoholism," to be "totally subjective." (Barber Depo., at 55.)  Barber stated that, based upon the investigation performed by defendant, the policy was wrongfully denied as there were no records, prior to the time of the application on December 19, 1995, providing any substantiating evidence that decedent suffered from alcoholism.  He viewed the St. Ann records as speculative and irrelevant, stating that "[e]very one of these physicians when queried indicated that there is a possibility.  And as long as there is a question of doubt, that's the question, 'possibility.'  That it may not have been alcoholism." (Barber Depo., at 75-76.)  Barber stated that, although Arlen's initial review of the St. Ann's records would have raised enough questions in his mind to request additional medical information, defendant's claims manager was unable to find any additional medical information but still continued to deny the benefits when they should have been paid.

{¶36}  According to Barber, whenever an underwriter receives information or records indicating further investigation is required, the underwriter is obligated to complete the investigation.  Barber stated that defendant should have spoken with decedent's friends and family regarding possible indications of alcoholism.  Barber opined that defendant acted in bad faith during the initial four months when it decided to rescind the policy, and that defendant continued to act in bad faith throughout the course of the litigation.  He further opined that it was unreasonable that defendant "arbitrarily made a decision based on a post-claim evaluation that the claim should be denied until they could find no evidence or proof or verification of documentation that existed anywhere in the world that proved their contention that he was an alcoholic or abused alcohol."  (Barber Depo., at 107.)  Barber stated that, based upon his experience in underwriting, he would have paid the claim in this case and to do otherwise "is an act of bad faith based on everything that I've read."  (Barber Depo., at 110.)  Barber further stated there was no

evidenc. roving that the decedent had prior knowledge of any problem related to alcoʰˡ when he filled out the application.

{¶37} Plaintiff's other insurance expert, Potter, is president of Century Management Company. Potter also stated that defendant acted in bad faith in failing to investigate the claim, noting that defendant only investigated what happened "after the claim," and that there was no documentation indicating that "any of the conditions existed prior to the date of the application that, in effect, Mr. Beever, knew." (Potter Depo., at 93.) Potter noted that, at the time decedent filled out the application, an inspection report regarding the claimant's character, habits, etc., was authorized but never obtained. Potter was critical of defendant's failure to "get the inspection report, which would address their position of indications of alcoholism." (Potter Depo., at 98.)

{¶38} Concerning his review of the medical records, Potter stated that he could not conclude that the decedent "knew or had any indication that he knew of whether or not he had any relationship with alcoholism, plus or minus. And obviously, those facts play an integral part in the coming to the conclusions that I have with regard to Cincinnati's claim investigation." (Potter Depo., at 111.) Potter noted that, despite an initial reference to possible alcohol ingestion by decedent, contained in the record generated by the first attending physician at St. Ann's, "they never did ascertain what the cause" of cirrhosis was for the patient. According to Potter, defendant's employees "made their decision to deny based upon the assumption made by medical practitioners at the time they were trying to save his life. And that was not paramount in the medical practitioner's mind as the ultimate cause of his liver disease." (Potter Depo., at 114.) Potter noted that there was no biopsy of decedent to indicate what type of cirrhosis he suffered from. He opined that the St. Ann's medical records did not establish that decedent was an alcoholic at the time he was in the hospital, and Potter further stated that it would be very rare for an alcoholic to make a diagnosis that he suffered from alcoholism, as such individuals are often in denial.

{¶39} Defendant's own expert, Gregory Collins, acknowledged that various factors associated with alcoholism, including drunk driving convictions, domestic

violence, the concern of friends who suspect a problem, etc., were not present in relation to decedent. He also conceded that there was a reasonable likelihood that decedent had a genetic susceptibility to liver disease.

{¶40} Upon review, we conclude that there are genuine issues of material fact as to whether defendant and its agents conducted a thorough investigation of plaintiff's claim, and whether defendant had a reasonable justification for delaying payment. Here, plaintiff's experts provided deposition testimony that defendant failed to conduct a meaningful investigation prior to denying coverage, and that defendant continued to show indifference by delaying payment despite plaintiff's assertion that her husband was not an alcoholic. These experts challenged whether defendant's delay in paying the claim was based upon an effective effort to consider all available information. According to Barber, defendant should have consulted with the decedent's friends and family members regarding evidence of known indications of alcoholism. In this regard, plaintiff points out that, in answers to interrogatories, defendant admitted that it failed to: (1) interview or speak with any of decedent's medical providers; (2) interview or ask any medical experts for opinions; (3) interview or ask decedent's surviving spouse any questions about her husband's use or consumption of alcohol; and (4) interview or ask decedent's friends any questions about his use of alcohol.[1]

{¶41} In asserting that the trial court improperly granted summary judgment, plaintiff relies in part upon *Zoppo,* supra, in which the Ohio Supreme Court held that the defendant insurance company breached its affirmative duty to adequately investigate a claim by not questioning known suspects as to the possible cause of a fire at the insured's bar prior to refusing to pay on the insurance claim, giving rise to a bad-faith award. In *Zoppo,* the court found that defendant's investigators did not "seriously explore" evidence that other individuals had threatened to burn the bar down; when interviewing some of the alleged perpetrators, the insurer's investigators did little more than ask cursory questions

---

[1] We note that Richard Arlen, defendant's manager of life and health claims, states in his affidavit that "[o]n or about August – September 1997 Cincinnati retained an outside investigative firm to interview the St. Ann's Hospital physicians who had taken the alcohol abuse history from Mr. Beever." However, the record in this case does not indicate whether such interviews were conducted and, if so, what the results of any interviews may have revealed.

as to w̲h̲ , they were responsible for the fire. Id. at 555. Instead, investigators

üh inconsistencies in the insured's statements regarding the sequence of

foct·
its on the morning of the fire. The court also pointed to testimony by the
p̲

insured's expert, a claims consultant, stating that defendant's investigation was

inadequate and that defendant was not justified in denying the claim.

{¶42}    In the present case, the primary extent of defendant's investigation appears to have been a review of St. Ann's records. While both of plaintiff's experts agreed that defendant's initial review of the St. Ann's medical records would have raised concerns about whether decedent was an alcoholic, these experts stated that defendant had a duty to engage in further investigation. The thrust of the expert testimony was that there was no evidence, prior to decedent's admission, indicating that he ever suffered indications of alcoholism, and that subsequent allusions to alcoholism in the St. Ann's records did not provide a reasonable basis for denying the claim. As noted above, Barber viewed the diagnoses in the St. Ann's records as speculative, stating that a closer investigation would have revealed that the records only offered the "possibility" that decedent suffered from alcoholism. Barber and Potter both believed that, had defendant interviewed St. Ann's physicians during the claims investigation, it would have learned that a diagnosis of alcoholism was suspected rather than confirmed. Plaintiff's experts opined in their deposition testimony that a reasonable insurer would have conducted a more thorough investigation, and we find that the reasonableness of defendant's review of the available information presents an issue for the trier of fact.

{¶43}  We note that the issue of whether an adequate investigation was undertaken is complicated in part by the language of the policy itself, and the fact that the term "indication of alcoholism" is not defined in the policy. While defendant's claims reviewer testified he believed, based upon the St. Ann's records, that decedent was aware he suffered from "known indications of alcoholism," even defendant's former president, James Currin, acknowledged that the application language at issue poses a subjective inquiry. Specifically, Currin acknowledged that the subject question pertains to the applicant's personal belief:

was unsure as to what the company "would be looking for. I would however drinking too much, but I don't know exactly what the thoughts were." (Ima in Depo., at 24.) Further complicating this issue is deposition testimony by physicians and experts noting (what would seem to be the obvious fact) that most individuals suffering from alcoholism do not believe they are afflicted.

{¶44} As to the trial court's finding that none of the records submitted by plaintiff contradicted the implication that decedent had known indications of alcoholism, the practical effect of the court's determination was to require plaintiff to prove that medical records *must* exist showing that her husband was not an alcoholic. However, assuming that decedent had never been treated for alcoholism, the absence of such records would be neither remarkable nor determinative. We note that, although there was deposition testimony by defendant's witnesses that signs of alcoholism may be demonstrated in a number of ways, including traffic and drunk-driving convictions, work absences, the inability to function normally in social settings, etc., plaintiff presented the deposition testimony of a number of witnesses who stated that decedent never exhibited such behavior.

{¶45} Based upon the foregoing, because triable issues of fact remain regarding whether there was reasonable justification for the insurer's delay in payment, the trial court erred in granting summary judgment in favor of defendant.

{¶46} In remanding this matter to the trial court, we will address two other issues raised by plaintiff on appeal. The first issue involves plaintiff's assertion that the trial court erred in failing to apply R.C. 3911.06, which states as follows:

{¶47} "No answer to any interrogatory made by an applicant in his application for a policy shall bar the right to recover upon any policy issued thereon, or be used in evidence at any trial to recover upon such policy, unless it is clearly proved that such answer is willfully false, that it was fraudulently made, that it is material, and that it induced the company to issue the policy, that but for such answer the policy would not have been issued, and that the agent or company had no knowledge of the falsity or fraud of such answer."

{¶48} Plaintiff argues the trial court made no analysis whatsoever regarding the applicability of this statute to a bad-faith action. Plaintiff acknowledges that defendant ultimately paid on the policy; plaintiff maintains however that, even though only traditional contract damages are available in the typical breach of contract case, the Ohio Supreme Court has expanded the types of damages that are available when an insurer breaches an insurance contract. In response, defendant argues that R.C. 3911.06 is inapplicable, as plaintiff does not seek to recover on the policy in the instant case.

{¶49} We initially note that this court's review of the cases relied upon by plaintiff reveal that none involve the application of a bad-faith claim to R.C. 3911.06; rather, as argued by defendant, the cases cited by plaintiff all involve contract claims.

{¶50} In general, Ohio courts have held that the tort of bad faith is "independent of the contract of insurance." *United Dept. Stores Co. No. 1 v. Continental Cas. Co.* (1987), 41 Ohio App.3d 72, 73. See, also, *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 276 ("The liability of the insurer in such cases does not arise from its mere omission to perform a contract obligation * * *. Rather, the liability arises from the breach of the positive legal duty imposed by law due to the relationships of the parties"). Thus, courts have held that actions alleging that an insurer acted in bad faith in handling an insurance claim are governed by the four-year statute of limitations for torts rather than being subject to the limitation period contained in the policy. *United Dept. Stores,* supra, at 73. See, also, *Plant v. Illinois Employers Ins. of Wausau* (1984), 20 Ohio App.3d 236 (claim for breach of duty of good faith was independent of policy, and therefore not subject to 12-month limitations period contained in policy).

{¶51} In light of the general principle that the tort of bad faith exists independent of the insurance contract, we decline to find under the particular facts of this case, where the policy proceeds have been paid, that plaintiff's bad-faith claim is an action to recover upon the policy. Accordingly, while we find that genuine issues of material fact remain as to plaintiff's bad-faith claim, we find

unpersuasive plaintiff's contention that the court erred in failing to consider the applicability of R.C. 3911.06.

{¶52} Plaintiff also asserts that, because of defendant's failure to pay the claim for a period of approximately four years, she should not be limited to statutory interest under R.C. 3915.02. Specifically, plaintiff contends that, had defendant paid the claim in 1996, she would have invested these proceeds in an Everen Securities stock account she owned on that date. Plaintiff argued before the trial court that proceeds invested in that account would have, during the period of April 17, 1996 through March 9, 2000, increased in value from $100,000 to $667,955.07.

{¶53} In response, defendant argues that it is undisputed that it paid plaintiff $126,059.66 in March of 2000, representing $100,000 on the policy, plus statutory interest. Defendant maintains that plaintiff was compensated for her lost use of funds through the interest paid, which was statutorily mandated.

{¶54} Defendant also argues that plaintiff's lost investment claim is too speculative. In support, defendant relies upon *Fortney v. Tennekoon* (Mar. 13, 1998), E.D.Pa. No. CIV. A. 95-4685, in which the plaintiffs argued they were entitled to the loss of investment income they could have earned if they had placed proceeds from a failed sale of a home in a Janus mutual fund. The court in *Fortney* rejected this contention, holding that defendants had no reason to foresee that plaintiffs would place the money in that fund and not a more conservative account, and further finding that none of the parties could have predicted that the fund would have returned almost 20 percent. Instead, the court held that plaintiffs were entitled to interest at the legal rate of statutory interest.

{¶55} We find the reasoning of *Fortney* persuasive, and we agree with defendant's contention that plaintiff's claimed loss of investment opportunity is speculative. In general, compensatory damages must be shown with certainty, and damages that are merely speculative will not give rise to recovery. *Moton v. Carroll* (Feb. 12, 2002), Franklin App. No. 01AP-772. In the instant case, as noted by defendant, despite plaintiff's assertion that she would have placed all of the proceeds in her Everen Securities account, plaintiff's contemporaneous investment

activity with other available funds does not lend credence to her claim. Specifically, while there was evidence indicating that plaintiff received other insurance proceeds from defendant in 1996, she did not place those amounts in the Everen account. Here, we find assumptions that plaintiff would have placed all of the proceeds in the Everen account to be speculative, and we further find, as in *Fortney,* supra, that none of the parties could have contemplated that plaintiff's investment would have returned over 560 percent over a four-year period (or an annual rate of return of approximately 60 percent). See, also, *Vanderbeek v. Vernon Corp.* (2000), 25 P.3d 1242, 1246-1247 (victim of wrongful attachment not entitled to recover damages based on speculative lost value of stock it never purchased as a result of wrongful attachment; no reasonable person would have foreseen that stock would go up so dramatically in value because stock trading is a "gambler's business"). In *Vanderbeek,* at 1247, the court cited with approval Restatement of the Law 2d, Torts (1979), Section 912, Comment f, for the principal that the requirement of "certainty" in a damages claim is only met when the injured party "would have had a substantial and measurable chance of a profit *without a chance of loss.*"   Here, we find plaintiff's claim for damages based upon a lost investment opportunity is without merit.

{¶56}  Based upon the foregoing, plaintiff's single assignment of error is sustained to the extent that genuine issues of material fact remain as to whether defendant had a reasonable justification for delaying payment on the claim. Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this opinion.

Judgment reversed
and cause remanded.

TYACK and LAZARUS, JJ., concur.

---