IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. C-1-02-479

JEFFERSON-PILOT LIFE INSURANCE CO., )
                 Plaintiff )
)
v. )
)
CHRISTOPHER L. KEARNEY, )
                 Defendant )

DEPOSITION OF: ROBERT MILLS, taken before Sharon R. Roy, Notary Public Stenographer, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the law offices of ACCURATE COURT REPORTING, 1500 Main Street, Springfield, Massachusetts on May 14, 2004 commencing at 8:38 p.m.

A P P E A R A N C E S:
(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

---

A P P E A R A N C E S:

FOR THE PLAINTIFF:

WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH 45202-2491
513-852-6000
   BY: WILLIAM R. ELLIS, ESQ.

FOR THE DEFENDANT:

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45201
513-621-6464
   BY: MICHAEL A. ROBERTS, ESQ.

Also Present:

Adam E. Formus

Joanne Yacavone, Videographer

---

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Robert Mills | Direct by Mr. Roberts | 11 |
|  | Cross by Mr. Ellis | 228 |

EXHIBITS:                                     PAGE:

Exhibit 42: Privilege log ........................ 10
Exhibit 43: Compilation of material ............. 131
Exhibit 44: Binder marked "Exhibit" ............. 131

---

1  THE VIDEOGRAPHER: The caption of
2  the case is Jefferson-Pilot Life Insurance
3  Company, plaintiff, versus Christopher L.
4  Kearney, case number C-1-02-479. Would the
5  court reporter please swear in the witness.
6  
7  ROBERT MILLS, Deponent, having
8  first been duly sworn, deposes and states as
9  follows:
10  
11  MR. ROBERTS: This is Mike Roberts,
12  counsel for the defendant, and we are here on
13  Friday morning, May 14, 2004 at 8:40. This
14  deposition was to begin at 8:30 in the
15  morning. Since 8:30 two procedural issues
16  have arisen in the case.
17  First, to describe the scene, we're
18  in the court reporter's office conference
19  room in Springfield, Massachusetts. At the
20  table is the videographer, court reporter,
21  Mr. Ellis, counsel for the plaintiff, the
22  witness, and myself. In the corner of the
23  room is a lawyer named Adam Formus who is
24  in-house counsel for DMS. Yesterday during

EXHIBIT 6

5

1  the course of two depositions Mr. Formus sat
2  away from the table in the corner of the room
3  taking down on his laptop every word that was
4  said in the room. That's not a problem. The
5  problem is he was connected to the Internet
6  and connected to his office during
7  yesterday's proceedings.
8      I took one long deposition
9  yesterday of Mr. Ditmar, and at the second
10 deposition I asked the witness if he had any
11 communications regarding the conduct of the
12 proceeding. It was my understanding from the
13 testimony that Mr. Formus's Internet
14 connection back to the office and his
15 word-for-word transcription of the day's
16 proceedings were communicated to Mr. Bonsall.
17 For that reason this morning when I arrived I
18 requested that Mr. Formus, if he desired to
19 take down every word that is spoken today in
20 addition to the court reporter doing so, he
21 could do so on his laptop and save that
22 information to his laptop either on a disc or
23 not to a disc, he could save it to the hard
24 drive on the laptop. That was unacceptable

6

1  to Mr. Formus. He said, "No, I'm not going
2  to do it. I'm going to be connected to the
3  Internet." So there is reason to suspect
4  that these proceedings are being transmitted
5  back to DMS's office contemporaneous with the
6  proceedings. I have to take still two more
7  depositions this afternoon and I've asked
8  Mr. Formus for his courtesy in not being
9  connected to the Internet, not being
10 connected to his network back at the office
11 and he refuses.
12     The second procedural issues that
13 arose, is for approximately 15 months the
14 defendant has been seeking the privilege log
15 be provided. The privilege log due in the
16 case from the plaintiff was due approximately
17 15 months ago and there has been more than a
18 dozen requests for the privilege log. We are
19 now beyond the discovery cut-off. I am here
20 on my last day of depositions of DMS
21 employees. I've taken the depositions I
22 intend to take of the Jefferson-Pilot
23 employees. I've told Mr. Ellis that I need
24 the privilege log before the conclusion of

7

1  the depositions. Mr. Ellis handed to me at
2  8:30 this morning or 8:32 a fax that purports
3  to be from a woman named Christie Zerges,
4  from the law firm of Wood & Lamping, who I
5  understand to be Mr. Ellis's paralegal. The
6  fax was transmitted, according to the fax
7  transmittal line, at 4:18 May 13, 2004, and
8  the fax is specifically directed to the
9  Springfield Marriott, Guest Michael Roberts.
10 I stayed at the Springfield Marriott
11 yesterday. The total number of pages is six.
12 And the note written by Christie Zerges is,
13 "Mike, attached, please find the privilege
14 log which was completed today in the above
15 case."
16     Apparently, Mr. Ellis intercepted
17 this fax before I could receive it at the
18 Marriott yesterday and I was not provided it
19 prior to the conduct of this deposition.
20 Perhaps that was because he didn't desire me
21 to be able to review it before the
22 deposition.
23     Nonetheless, the third procedural
24 issue, actually, is that the privilege log

8

1  itself is woefully insufficient. The rules
2  specifically require that the privilege log
3  contain the dates of the communication, the
4  author of the communication by name, the
5  recipient, and the substance of the
6  communication. The purpose for that is
7  obvious. It's for the Court to be able or
8  the lawyer to be able to determine whether in
9  fact there is an appropriate designation of
10 privilege.
11     Notwithstanding those very
12 unambiguous obligations, Mr. Ellis's office
13 has prepared a list of the 86 pages, I knew
14 what 86 pages they were, I knew what the
15 Bates numbers were, and all he has done is
16 recited the Bates number of those pages and
17 said "privileged communication." Some said
18 "privileged communication from counsel to
19 client," some said "privileged communication
20 between counsel." Otherwise there is no data
21 provided in the alleged privilege log that
22 complies with the rule or offers the opposing
23 party the opportunity to explore whether or
24 not it's an appropriate exercise or assertion

```
 1     of privilege.  And for that reason I'll be
 2     filing a motion with the Court, but all these
 3     depositions will be convened in progress
 4     since the defendant has still not complied
 5     with its very clear and unambiguous
 6     discovery obligations.
 7             Are you ready, Mr. Mills?
 8             THE WITNESS:  Yes.
 9             MR. ELLIS:  Excuse me, we'll
10     respond.
11             MR. FORMUS:  As in-house counsel for
12     Disability Management Services I categorically
13     deny and reject Mr. Roberts' statement that I
14     shared any information whatsoever with either
15     Mr. Bonsall or Mr. Ditmar at any time
16     yesterday either personally and/or via the
17     Internet that's connected to the hard drive in
18     my office.  The laptop is for purposes of
19     saving my notes with regards to yesterday's
20     depositions directly to my hard drive.  I
21     neither communicated directly or indirectly
22     with Mr. Bonsall yesterday.  Therefore,
23     Mr. Roberts' allegation was patently false.
24             MR. ELLIS:  With regard to the
```

```
 1     privilege log --
 2             MR. ROBERTS:  We'll mark the
 3     privilege log as Exhibit 42, for the record.
 4                 (Exhibit 42, marked)
 5             MR. ELLIS:  Are you finished?
 6             MR. ROBERTS:  Yeah, go ahead.
 7             MR. ELLIS:  With regard to the
 8     privilege log, which was prepared by my office
 9     in my absence at Mr. Roberts' request, I don't
10     know about 15 months or 12 requests for it in
11     the past because I have not had an opportunity
12     to determine the accuracy of those statements,
13     I've told Mr. Roberts that I received the
14     privilege log by fax.  I received a copy and
15     there was a copy for him.  It was in one
16     envelope at the hotel.  I didn't intercept it
17     or attempt to intercept it.  I opened the
18     envelope at 10:30 last night.  I found both
19     faxes in it.  I didn't call him at 10:30 last
20     night, I gave it to him this morning.  The
21     privilege log, if inadequate in any way, will
22     be amended to comply with whatever
23     requirements there are with regard to the
24     privilege log as quickly as possible and I
```

11

```
 1     have no objection if he wants to continue
 2     these in progress based upon the privilege
 3     log, although none of the witnesses here are
 4     party to any of the privileged documents.
 5             MR. ROBERTS:  It's curious how the
 6     Marriott could determine from a fax directed
 7     to Mike Roberts, with a special note to Mike
 8     Roberts on the cover sheet, that I was in any
 9     way affiliated with Bill Ellis.  But
10     regardless, Mr. Mills, are you ready to begin?
11             THE WITNESS:  Yes.
12
13     DIRECT EXAMINATION BY MR. ROBERTS:
14         Q.  Could you state your residence address for
15     the court reporter, please?
16         A.  I don't feel comfortable giving my personal
17     information.
18         Q.  Okay.  Are you comfortable giving it to
19     Mr. Ellis and authorizing him to accept a subpoena on
20     your behalf?
21         A.  Yes, I am.
22         Q.  Whether or not you're still employed by DMS
23     before the conclusion of this litigation, you are
24     willing and you're authorizing Mr. Ellis on this
```

12

```
 1     record to accept service of a subpoena on your
 2     behalf?
 3         A.  Yes, I am.
 4         Q.  Okay.  How old are you?
 5         A.  I'm 34.
 6         Q.  Do you have a college degree?
 7         A.  Again, I don't feel comfortable giving out
 8     personal information.
 9             MR. ELLIS:  You can tell him whether
10     or not you have a degree.
11         A.  Yes, I do have a college degree.
12         Q.  Where did you attend college or where did
13     you receive your degree from?
14         A.  I have a degree from the University of New
15     Haven in Connecticut, undergraduate, and I also have
16     a master's degree from Western New England College,
17     Springfield.
18         Q.  When did you receive your bachelor's?
19         A.  I received my bachelor's in 1991.
20         Q.  And what is your master's in?
21         A.  My master's is a general business program.
22         Q.  An MBA?
23         A.  Correct.
24         Q.  When did you receive your MBA?
```

## Page 13

```
 1        A.   I don't know exactly. I think it's 2001 or
 2   around about.
 3        Q.   Did you undertake those MBA courses during
 4   a period of your employment? While employed, did you
 5   do a night course, weekend?
 6        A.   I took those courses while I was employed.
 7        Q.   Was it a correspondence or was it actually
 8   attendance at some night school program?
 9        A.   It was a night school program.
10        Q.   What was your major in undergrad?
11        A.   My major in undergrad was financial
12   accounting.
13        Q.   What has been your work experience since
14   '91?
15        A.   Since 1991 my work experience has been
16   exclusively in the disability insurance business.
17        Q.   Who have been your employers?
18        A.   I've worked for Monarch Life Insurance,
19   Connecticut Mutual Life Insurance Company,
20   Massachusetts Mutual Life Insurance Company, and
21   Disability Management Services.
22        Q.   When did you join DMS?
23        A.   I joined DMS in approximately October of
24   1996.
```

## Page 14

```
 1        Q.   How long were you employed at Monarch? Two
 2   years?
 3        A.   I was employed at Monarch for approximately
 4   two years, a couple months.
 5        Q.   And then you went to work at Connecticut
 6   Mutual which became or merged with MassMutual, is
 7   that right?
 8        A.   After I left Monarch I went to Connecticut
 9   Mutual, and Connecticut Mutual and MassMutual
10   subsequently merged and I became a MassMutual
11   employee.
12        Q.   Was Mr. Midghall your supervisor when you
13   joined DMS?
14             Do you understand the question?
15             MR. ELLIS:   Give him a second, he's
16   trying to remember.
17        A.   I do understand the question. I honestly
18   don't recall who I reported to at that time.
19        Q.   Have you ever reported to Mr. Midghall?
20        A.   Yes, I believe I reported to him at one
21   point.
22        Q.   Do you know when?
23        A.   I believe I reported to him for a period of
24   time at Connecticut Mutual.
```

## Page 15

```
 1        Q.   You've not reported to him since joining
 2   DMS?
 3        A.   I may have, I just don't specifically
 4   recall today.
 5        Q.   Have you ever provided sworn testimony that
 6   that was the case?
 7        A.   I don't recall if I have.
 8        Q.   You've been in a deposition before, haven't
 9   you?
10        A.   Yes, I have been in depositions before.
11        Q.   You've been deposed relative to work at
12   DMS, haven't you?
13        A.   Yes, I have.
14        Q.   Were you deposed in a case where the
15   policyholder or claimant was named King, last name
16   King?
17        A.   Do you have a first name?
18        Q.   I think it's Aubert. I think it was just
19   October 2003, maybe October 28th or 29th, if that
20   refreshes your memory.
21        A.   I don't recall having any dealings with an
22   Aubert King.
23        Q.   In what cases have you given a deposition?
24   Do you remember any names of any policyholders who
```

## Page 16

```
 1   sued your company based on work that you did and you
 2   gave a deposition?
 3        A.   I remember a case, a gentleman by the name
 4   of Nathan Friedenberg. And I can remember another
 5   case, Greenfield I think was the last name.
 6        Q.   Did you testify truthfully in the
 7   Friedenberg deposition?
 8        A.   Yes, I testified truthfully.
 9        Q.   That was in February of 2001 that you gave
10   that deposition, do you recall that?
11        A.   I don't recall the time frame.
12        Q.   If you told Mr. Friedenberg under oath that
13   Mr. Midghall was your supervisor at DMS, would that
14   have been true?
15        A.   If I said it under oath at that point in
16   time, yes, that would mostly likely be true.
17        Q.   And if it was true then, it would be true
18   today, right?
19        A.   Can you say the question again? I don't
20   understand.
21        Q.   Well, if you told Mr. Friedenberg in 2001
22   that Mr. Midghall was your supervisor when you
23   started at DMS, your initial supervisor, that would
24   still be the case today, right? I mean, it would
```

17

```
 1  still be the truth today?
 2      A.   Well, is your question is it true at that
 3  time or is Mr. Midghall my supervisor today?
 4      Q.   No, my question is not is Mr. Midghall your
 5  supervisor today.  I don't know how you understood
 6  that from the question I asked, but let me be clear.
 7  If in 2001 you told someone under oath that in '96
 8  and '97 Mr. Midghall was your supervisor, and if it
 9  was true then, that's true now, that he was your
10  supervisor back in '96 and '97?
11      A.   Well, yes, then, if I said that, he would
12  have been in '96 and '97 my supervisor, that was my
13  testimony.
14      Q.   I mean, the past can't change, right?
15      A.   Obviously not.
16      Q.   And then your supervisors in sequence were
17  Ms. Sweeney, Mr. Ditmar, and Mr. Hughes, right?
18      A.   To the best of my recollection, my
19  supervisors would have been in that order that you
20  mentioned.
21      Q.   Is Mr. Hughes your supervisor today?
22      A.   Yes, Mr. Hughes is.
23      Q.   On what block of business did you work in
24  January of 2000?
```

18

```
 1      A.   I worked -- part of January of 2000 I
 2  worked on Travelers Insurance Company, New York Life,
 3  Mutual Benefit, Monarch, MassMutual, Connecticut
 4  Mutual.  I think there was a Woodmen of the World.
 5  That's best I can recall.
 6      Q.   You worked on all those blocks while
 7  employed at DMS?
 8      A.   No, I did not work on all those blocks
 9  while employed at DMS.
10      Q.   Which of those blocks did you work on not
11  at DMS?
12      A.   The blocks that I worked on not at DMS
13  would have been Monarch, Connecticut Mutual,
14  MassMutual.  I think that would be it.
15      Q.   What block of business do you work on
16  today?
17      A.   The block of business I work on today would
18  be Equitable Life Insurance.
19      Q.   Was there a period of time you worked on
20  the Jefferson-Pilot block of business?
21      A.   Yes, there was a period of time I did work
22  on the Jefferson-Pilot.
23      Q.   What period of time was that?
24      A.   The period of time would have been January
```

19

```
 1  of 2000 up until probably around the time that these
 2  proceedings commenced.
 3      Q.   When is your judgment of the commencement
 4  of these proceedings?
 5      A.   I believe that was sometime -- my
 6  understanding, sometime last year, 2003.
 7      Q.   Do you recall when in 2003 that you were no
 8  longer responsible for the Jefferson-Pilot block of
 9  business?
10      A.   Best I recall is probably end of 2003.
11      Q.   Have you ever received a spot bonus?
12      A.   No, I don't recall ever receiving a spot
13  bonus.
14      Q.   Mr. Kearney's policy with Jefferson-Pilot
15  was designated as a WJ576A policy, do you recall
16  that?
17      A.   I recall the policy.
18      Q.   Was his claim under the WJ567A policy the
19  only claim that you administered while handling the
20  Jefferson-Pilot block of business that required you
21  understand the WJ576A policy?
22           MR. ELLIS:  Objection.
23      A.   As I sit here today, I don't recall whether
24  there were other WJ576As.  I would imagine that there
```

20

```
 1  were a number of other claims that I handled that had
 2  the similar policy.
 3      Q.   Well, there were between three and five
 4  hundred claim files transmitted from Jefferson-Pilot
 5  to DMS in or about January of 2000.  Are you mindful
 6  of that?
 7      A.   What I'm mindful of is that there was a
 8  number of cases that were transferred from
 9  Jefferson-Pilot to DMS.  I wouldn't specifically know
10  the number of those cases.
11      Q.   How many people were working on that block
12  of business simultaneous to you in the year 2000?
13      A.   Can you repeat the question?
14      Q.   How many other people worked like you on
15  the Jefferson-Pilot block of business in 2000?
16      A.   To the best of my recollection, there were
17  three other individuals other than myself.
18      Q.   Okay.  Do you know if the workload on the
19  Jefferson-Pilot block of business was distributed
20  fairly evenly between the four of you?
21      A.   I have no idea how they were distributed.
22      Q.   Do you know how many claim files that you
23  were administering in 2000 for Jefferson-Pilot?
24      A.   Again, as of today, I mean, I don't recall
```

### Page 21

```
 1  how many cases I would have been handling for that
 2  company at that time.
 3      Q.  Do you know if it was more than 50?
 4      A.  You know, I honestly, I don't recall. It
 5  seems to be a range type of number.
 6      Q.  What kind of range are we talking about?
 7      A.  The best I could recall would be a range of
 8  50 plus or minus ten files.
 9      Q.  Somewhere between 40 and 60?
10      A.  Again, I don't recall specifically the full
11  amount of cases that I had, but if I was to put a
12  range on it, I think that would be a fair estimate.
13      Q.  Did you ever keep any kind of log of the
14  files that you were responsible for?
15      A.  I had access to the computer and the
16  computer system which would log all the cases that
17  were assigned to me.
18      Q.  The DMS software program that's called the
19  claim system, you could go in there and somehow
20  figure out how many claims you were responsible for?
21      A.  Yes, there was a DMS claim system and I
22  could go in there and find out how many cases I had.
23      Q.  Has anyone ever told you that the WJ576A
24  policy was a policy that Jefferson-Pilot sold quite a
```

### Page 22

```
 1  number of?
 2      A.  Can you repeat the question?
 3      Q.  Has anyone ever told you that the WJ576A
 4  policy was a product that was fairly well received by
 5  the public; a lot of policies were purchased under
 6  that particular acronym, WJ576A, do you know that?
 7      A.  I have no knowledge of any purchase of
 8  numbers or popularity of any of the policies of
 9  Jefferson-Pilot.
10      Q.  No one's ever told you that?
11      A.  Not to my knowledge. I never recall
12  anybody saying those things to me.
13      Q.  If 40 to 60 is the total Jefferson-Pilot
14  claim files you had in 2000, how many of those were
15  the WJ576A policies?
16      A.  Again, as I said earlier, I wouldn't
17  specifically be able to recall the amount, specific
18  number of WJ576As or really any other policy form,
19  for that matter.
20      Q.  When you received these files, did you
21  familiarize yourself with the policies that
22  Jefferson-Pilot had issued to its policyholder?
23      A.  I had a base knowledge of the policies. We
24  received, like I said earlier, a whole bunch of them
```

### Page 23

```
 1  at one time, so it was kind of a crash course of
 2  handling the cases.
 3      Q.  But in doing your work, do you read the
 4  policy that applies to the particular policyholder's
 5  claim?
 6      A.  Yes, I would read the policy, not
 7  necessarily at the point in time which I received the
 8  claim file. I would probably be doing that more in
 9  the circumstances of a new notice case. However,
10  receiving a number of these well e-established files
11  from Jefferson-Pilot I did not find myself going
12  through each and every policy, that would have been
13  something that happened in the due course of time.
14      Q.  Okay, what's important in determining
15  benefit eligibility? The sickness or injury that the
16  person has sustained, is that one?
17      A.  Can you repeat the question?
18      Q.  I want to create a list of the things that
19  are important from your perspective in the job you
20  held in doing your work, okay. When administering a
21  disability claim, is it important to understand
22  the -- to determine eligibility, is it important to
23  understand the medical facts and circumstances that
24  exists with the policyholder?
```

### Page 24

```
 1      A.  On a disability claim it is important to
 2  understand the medical facts.
 3      Q.  Is it important to determine benefit
 4  eligibility, what the policy provides?
 5      A.  Yes, it is important to understand what the
 6  benefits are under the policy.
 7      Q.  Are those the two most important things to
 8  understand to determine benefit eligibility?
 9      A.  I wouldn't say that the medical and benefit
10  structure of the policy are the two, single-most
11  important things, but they are obviously essentially
12  important in making a benefit decision, and ongoing
13  benefit decisions.
14      Q.  What's more important than the facts
15  concerning the medical circumstances of the
16  policyholder and the policy's contractual rights and
17  obligations; what's more important than those two
18  things?
19      A.  I don't think one or the other is more
20  important than the other one. I think you have to
21  take them in whole in making these types of
22  decisions. You're not going to make a decision on
23  one piece of information or one fact in a disability
24  claim.
```

25

 1    Q.   I think you and I agree. I mean, those two
 2  things that I just articulated are very important.
 3  What I'm asking you, is there anything else, is there
 4  a third thing, a fourth thing that is equally
 5  important or more important than those two?
 6    A.   Each claim is unique, so depending on the
 7  circumstances of the case, I can't say which
 8  information is more important than the other. It is
 9  essentially going to be a culmination of gathering a
10  lot of the information to be able to make any type of
11  decision.
12    Q.   In your 13 years of experience in this
13  field have you ever run into a case where the policy
14  rights and obligations and the facts and
15  circumstances of the individual's medical condition
16  are less important than something else?
17    A.   Well, again, it's hard to -- you can't
18  really make those determinations on those two things
19  alone. There's other elements, information that's
20  gathered in the case that helps establish the claim,
21  the benefit eligibility, the significance of the
22  medical. You can't make decisions on those two
23  things alone.
24    Q.   Sir, that wasn't my question. My question

26

 1  was can you identify for me one instance in your 13
 2  years of experience where the rights and obligations
 3  under the policy and the facts and circumstances of
 4  the person's medical condition weren't as important
 5  in determining benefit eligibility as something else?
 6  Can you identify one case for me?
 7    A.   You know, like I said, I've handled a lot
 8  of cases over my years. I can't really point to any
 9  specific case to try to say that there's not other
10  things that are just as important in combining all
11  those factors in making a decision.
12    Q.   Why did you move from the -- why did you
13  move to the Equitable block of business?
14    A.   Why did I move to the Equitable block of
15  business? I don't think it was a choice. I think
16  it was explained that I would be moving to Equitable
17  and handling cases in that block of business.
18    Q.   Were you promoted?
19    A.   Yes, I was.
20    Q.   What was your promotion from and to?
21    A.   I was promoted from a claim consultant to a
22  director of claims for the Equitable block.
23    Q.   Who had been the director of claims for the
24  Equitable block?

27

 1    A.   There were no directors at that time. It
 2  was a block of business that we just received. I was
 3  one of the directors that were placed on the files as
 4  the cases came in.
 5    Q.   How many people report to you now?
 6    A.   I recently had someone leave, so I have
 7  three people that report to me now.
 8    Q.   Do you work out of the Springfield office?
 9    A.   Yes, I do work out of the Springfield
10  office.
11    Q.   Do you meet with your subordinates and
12  develop strategies on claims they're handling?
13    A.   My subordinates come into my office and we
14  discuss cases and strategies for the case.
15    Q.   And is that something that you did when you
16  reported to supervisors when you were a claim
17  consultant?
18    A.   I would from time to time discuss cases
19  with my superiors. I had a lot of ability to work on
20  my own because of my experience as well.
21    Q.   Would you consult with Mr. Hughes to
22  develop strategies on cases from time to time?
23    A.   Yes, I would consult with Mr. Hughes.
24    Q.   And would you consult with Mr. Ditmar when

28

 1  you reported to him, to develop strategies on cases
 2  from time to time?
 3    A.   I recall meeting with him as well to
 4  discuss cases.
 5    Q.   Would those strategy discussions
 6  incorporate developing information directed at
 7  ultimately resolving a claim?
 8    A.   Those meetings were about discussing the
 9  cases as far as what information was needed to
10  process the claim. If we were going to do medical
11  examinations in circumstances where there was a
12  disputed claim, there would have been a discussion
13  about whether or not trying to resolve the situation
14  would have made sense.
15    Q.   Did you make a trip to Miami, Florida to
16  meet an attorney named Spiegel in the fall of 2001?
17    A.   Yes, I do recall meeting with an attorney
18  John Spiegel. It most likely was the fall because I
19  remember it was shortly after 9/11. I was a little
20  apprehensive about getting on an airplane.
21    Q.   Did you prepare a field report following
22  that visit?
23    A.   I don't recall if there was a field report
24  created.

29

1  Q. When you go out and meet a policyholder in
2  the field, isn't that generally what you do, prepare
3  a field report to put in the claim file?
4  A. No, I don't have a field report in every
5  circumstance of someone that I may have met.
6  Q. Why did both you and Mr. Hughes go down
7  there?
8  A. Me and Mr. Hughes both went down there, to
9  my recollection, Attorney Spiegel had just notified
10 us of his representation. We had a difficult claim
11 where both sides were at disagreements on the
12 processing of the file, so it seemed to have made
13 sense to meet with him to discuss that and where we
14 were going to go from there, and Attorney Spiegel
15 agreed to the meeting.
16 Q. Why did two of you go was my question?
17 A. I don't know the specific reasons why. I
18 know both of us had a working knowledge of the file.
19 Q. What does that mean, you both had a working
20 knowledge of the file?
21 A. We had a -- we were familiar with the case.
22 Q. Did you go down there with the
23 understanding that you would present some settlement
24 proposal to Mr. Spiegel?

30

1  A. I don't recall whether or not that was the
2  understanding. That would have been something that
3  Mr. Hughes would have been most likely aware of and
4  would have communicated that to Attorney Spiegel if
5  that was the case. But I would imagine that it did
6  in the course of our meeting that that was going to
7  be one of the parts of our discussion.
8  Q. My question was did you have an
9  understanding before getting on the plane, based on
10 your discussions with Mr. Hughes about the trip, that
11 DMS would be presenting some settlement proposal to
12 Attorney Spiegel?
13 A. I can't say with a hundred percent
14 confidence that I didn't know.
15 Q. That you didn't know or did know?
16 A. That I was not aware that we were going to
17 present discussions of settlement. I just don't
18 recall specifically. It was a long time ago.
19 Q. I don't understand your testimony. You
20 can't say with a hundred percent confidence that you
21 didn't know that you would present an offer of
22 settlement, is that what you said?
23 A. Yeah, if that's what the court reporter
24 said. I just don't recall. I would have said that I

31

1  didn't not know that we were going to have this
2  discussion, I just don't recall today as you're
3  asking me that question.
4  Q. Did you ever lie to Mr. Kearney?
5  A. I would have no reason to lie to Mr.
6  Kearney.
7  Q. Did you ever lie to him?
8  A. To my knowledge I haven't lied to Mr.
9  Kearney.
10 Q. Are you mindful that he recorded a phone
11 conversation between you and he in February 2001?
12 A. I am aware of that now.
13 Q. And have you reviewed that transcript?
14 A. I've seen a couple pages of it but that's
15 about it.
16     MR. ELLIS: For the record, we'll
17 make an objection to the use of any recorded
18 statements upon which the second party was not
19 advised of the recording.
20     MR. ROBERTS: Great.
21 Q. (By Mr. Roberts) When was it that you
22 reviewed the transcript or portions of the
23 transcript?
24 A. I would have looked at that a couple days

32

1  ago.
2  Q. You met with Mr. Ellis -- today's Friday,
3  May 14. You met with him on Tuesday for a couple
4  hours and Wednesday for a couple hours of this week,
5  is that right?
6  A. I did not meet with Mr. Ellis on Tuesday.
7  I did meet with Mr. Ellis on Wednesday.
8  Q. And how long was that meeting?
9  A. That meeting was approximately from 9:30 to
10 3:30, 4:00 with a break for lunch.
11 Q. Was it during the course of that day that
12 you reviewed a portion of the transcript?
13 A. Can you repeat the question?
14 Q. Was it during the course of that day,
15 Wednesday, two days ago, that you reviewed the
16 portion of the transcript from February 2001?
17 A. Yes.
18 Q. Now, in that transcript did you see where
19 you told Mr. Kearney -- strike that.
20     You're mindful that for several months Mr.
21 Kearney had a concern about the forms, the
22 continuance of disability forms and the authorization
23 forms that you were requesting he sign, right?
24 A. You know, I don't recall that specifically.

34

1  I'm sure the file speaks towards that.
2      Q.  Well, the file does have numerous
3  correspondence over several months where Mr. Kearney
4  expresses repeatedly his concern about the change in
5  these forms. Did you tell Mr. Kearney the truth in
6  that transcript or in that conversation about whose
7  forms those were?
8      A.  Again, I don't recall that specific
9  conversation from over three years ago. I looked at
10 those pages, I don't have -- you know, I have a
11 recollection of speaking with Mr. Kearney on a couple
12 of occasions, but I don't recall that particular
13 conversation. I know we had a lot of conversation
14 over various things, but I can't specifically
15 remember that.
16     Q.  Okay. Well, the transcript you reviewed.
17 Did you review the portion of the transcript where
18 you're telling Mr. Kearney that the forms he has a
19 problem with were Jefferson-Pilot's forms and not DMS
20 forms?
21         MR. ELLIS: Do you want to show him
22 the transcript?
23     Q.  (By Mr. Roberts) Sir, you can go ahead and
24 answer.

1      A.  Can you repeat the question?
2      Q.  When you reviewed the transcript, did you
3  see that portion wherein you tell Mr. Kearney on his
4  question of whose forms they were, you told him they
5  were Jefferson-Pilot's forms and not DMS forms; did
6  you see that in the transcripts?
7      A.  Again, I've only -- I looked at a couple
8  pages of that, and I don't even remember exactly what
9  that part of the conversation was. If you'd like me
10 to look at it, I will.
11     Q.  Well, two days ago you looked at some part
12 of the transcript, and my question's fairly simple,
13 and it was only two days ago so I can't suspect there
14 would be a memory lapse. Did you, two days ago,
15 review that portion of the transcript where you told
16 Mr. Kearney on his direct question that the forms he
17 had a problem with were not DMS's forms, they were
18 Jefferson-Pilot's forms?
19     A.  Can you repeat the question again?
20     Q.  Sure. From your review of whatever portion
21 of the transcript you saw two days ago, do you recall
22 if the portion you saw contained your statement to
23 Mr. Kearney that the forms he had a problem with were
24 not DMS's forms, they were Jefferson-Pilot's forms?

35

1      A.  From the portion of the transcript that I
2  reviewed that you're referring to, I don't recall
3  what that information was. I didn't look at it that
4  thoroughly. I just don't recall that conversation.
5  It was a long time ago.
6      Q.  That wasn't my question. I'm not asking
7  you what you recall from February 2001. I'm asking
8  you what you recall from two days ago. And your
9  testimony under oath is that you don't recall from
10 the review you made two days ago that you told Mr.
11 Kearney that the forms that Mr. Kearney had a problem
12 with were not DMS's forms?
13         MR. ELLIS: Objection. Asked and
14 answered several times.
15     Q.  (By Mr. Roberts) You can go ahead.
16     A.  Can you repeat the question?
17     Q.  Okay. You don't recall sitting here today
18 that two days ago, when you reviewed some portion of
19 that transcript, that the portion you reviewed
20 contained your misstatement to Mr. Kearney that the
21 problems he had with the form -- strike that. Let me
22 repeat that.
23         You can't recall sitting here today that
24 the portion of the transcript you reviewed two days

36

1  ago contained or didn't contain your statement to Mr.
2  Kearney that the forms with which he had a problem
3  were not DMS's forms, but rather were
4  Jefferson-Pilot's forms?
5      A.  My statement and response to that question
6  is, although I looked at it a couple days ago, I
7  don't remember today exactly what information was
8  placed on the limited thing that I looked at. I just
9  don't recall that. I mean, I could look at it.
10     Q.  We'll get there. Tell me what you can
11 recall about the meeting with Spiegel; what you said,
12 what Hughes said, what Spiegel responded. Tell me
13 everything you can recall.
14     A.  Is it possible that I could get a glass of
15 water.
16         Can you repeat the question again, please.
17     Q.  Tell me everything you can recall about the
18 discussions with Mr. Spiegel, and tell me what you
19 said, what Mr. Hughes said, what Mr. Spiegel's
20 responses were, everything that you can recall
21 sitting here today.
22     A.  Sitting here today I recall Bill Hughes and
23 I meeting with Attorney Spiegel in his office
24 discussing the case. I don't know the specific

37

1 words, but I know we talked about some of the
2 difficulties in the case and the differences both,
3 you know, the company had as well as the differences
4 of opinions that Mr. Kearney had. I recall Bill --
5     Q.   Bill Hughes?
6     A.   Bill Hughes starting the meeting by
7 apologizing that he needed to tell him that we had
8 recently, just in a matter of minutes, uncovered an
9 error in the payment of benefits.
10         Bill Hughes discussed with him settlement
11 options. I remember at one point Attorney Spiegel
12 asked us to leave and have lunch, that he needed to
13 speak with Mr. Kearney.
14         I recall returning from lunch waiting in
15 Attorney Spiegel's waiting room for a while for him
16 to come out of his office. I recall him coming out,
17 because he had not talked with Mr. Kearney for a
18 while. I recall him talking to us about University
19 of Miami, University of Miami football. I recall him
20 getting the phone call from Mr. Kearney. He walked
21 back into his office and talked with him, I presume.
22 At some point he came back out of the office and told
23 us that our meeting was essentially over and we could
24 get back on our plane and go home.

38

1     Q.   So there wasn't any substantive dialogue
2 after the lunch hour, you were just waiting and then
3 finally you were told to go home?
4     A.   I remember there was a lot of waiting, we
5 waited a while.
6     Q.   Was there any substantive dialogue after
7 the lunch hour?
8     A.   I mean, what do you mean by substantive
9 dialogue?
10     Q.   You told me you talked about the University
11 of Miami football team, and we can go into that a
12 little later, but did you discuss Mr. Kearney's claim
13 with Mr. Spiegel after the lunch hour?
14     A.   I don't recall specifically if we talked
15 any further details at that point in time. The best
16 I can recall, it was a general conversation.
17     Q.   How long was the morning meeting?
18     A.   I don't remember the exact time frames of
19 the meeting. Going to Florida, we probably would
20 have had an early morning flight. I believe we met
21 sometime early morning, 9, 9:30 maybe, then we broke
22 for lunch at some point.
23     Q.   You said recently, in a matter of minutes,
24 we uncovered an error in the payments. Are you

39

1 saying the error in the payments, the alleged error
2 in the payments to Mr. Kearney was uncovered by
3 somebody minutes before the meeting with Spiegel?
4     A.   Yeah, several minutes before the meeting
5 with Attorney Spiegel, Bill Hughes and I were in a
6 Cuban coffee shop, I believe, and I uncovered the
7 mistake, the Jefferson-Pilot mistake in paying the
8 increase in benefits.
9     Q.   Was it a Jefferson-Pilot mistake or was it
10 a Jefferson-Pilot mistake and a DMS mistake?
11     A.   It was a Jefferson-Pilot mistake that, you
12 know, I unfortunately continued for quite some time.
13     Q.   You got control of the file in January of
14 2000, and this meeting with Spiegel occurred in
15 October 2001?
16     A.   I got the file around January 2000, and I
17 believe you're correct, because it was, again, it was
18 shortly after 9/11.
19     Q.   And Mr. Hughes was going on the trip
20 because he had working knowledge of the file prior to
21 the Cuban coffee revelation, right?
22     A.   He had knowledge of the file, and I believe
23 the file would also reflect that he had some
24 communications with Mr. Kearney.

40

1     Q.   And Mr. Ditmar worked on Mr. Kearney's file
2 in the late '90's, right?
3     A.   I know I handled it from January of 2004.
4 I don't know the extent of what Mr. Ditmar -- I'm
5 sure you spoke with him about that yesterday.
6     Q.   You're not mindful from your knowledge of
7 the claim file that he had involvement in the claim
8 file in the '97 and '98 time frame, at least?
9     A.   I'm sure that the file reflects that.
10     Q.   Is he good at his job?
11     A.   I would imagine that he's good at his job.
12     Q.   Does he have difficulty understanding
13 disability insurance policies, as far as you know?
14     A.   I don't necessarily know the man and all
15 his capacities, but he seems to be a pretty
16 knowledgeable guy.
17     Q.   He was your supervisor for disability
18 claims for several months or years, right?
19     A.   He was my supervisor, I don't know, I can't
20 recall how long that was.
21     Q.   And is Mr. Hughes a knowledgeable fellow?
22     A.   I would view Mr. Hughes as a knowledgeable
23 fellow.
24     Q.   With regard to disability claims and

41

1 understanding of disability insurance policies?
2     A.    Based on my dealings with him, I would say
3 he's a knowledgeable guy in that area.
4     Q.    Is he still your supervisor, did you say?
5     A.    Yes, Bill Hughes is still my supervisor.
6     Q.    How long has he been your supervisor?
7     A.    Bill Hughes has been my supervisor since
8 we -- let me think about that.
9           Bill Hughes has been my supervisor since
10 probably January of 2001 when I became a director.
11    Q.    Did you become director of claims of the
12 Jefferson-Pilot block of business in January of 2001?
13    A.    I became director of claims on the
14 Equitable block of business in January of 2001.
15    Q.    January of 2001? And then you maintained
16 responsibility for Jefferson-Pilot files beyond
17 January 2001?
18    A.    Yes, I had a limited responsibility of JP
19 business.
20    Q.    I understood you to say earlier you became
21 director of claims for Equitable in January of 2004.
22 I misunderstood that.
23    A.    Is that a question or --
24    Q.    Yeah, I mean, it was January 2001, not

42

1 January of 2004 that you became director of claims
2 responsible for the Equitable?
3     A.    I became director of claims responsible for
4 the Equitable block of business in January of 2001.
5     Q.    And then something happened last year when
6 this lawsuit -- when your understanding originated or
7 commenced, I think you said, that changed your
8 position in the company. What was that?
9     A.    Can you repeat the question?
10    Q.    Earlier in the deposition I thought you had
11 told me that when this lawsuit commenced your role in
12 the company changed somehow, that you got some kind
13 of promotion?
14    A.    Can you repeat the question again?
15    Q.    Has your job changed at all since 2002?
16    A.    No, my job has essentially remained the
17 same. It changes with certain people that I would
18 deal with, but essentially it's remained the same.
19    Q.    Okay, so since January of 2001 you've had
20 the title without change, promotion, or demotion or
21 alteration to the title; you've had the title
22 director of claims. And in that capacity you've been
23 responsible for the Equitable block of business?
24    A.    Since January of 2001, Director of Claims

43

1 for Equitable block of business and with a limited
2 handling of cases that I had previously dealt with on
3 the Jefferson-Pilot end.
4     Q.    Okay, so prior to January of 2001 --
5           MR. ROBERTS: Let's go off and we'll
6 change tapes.
7           THE VIDEOGRAPHER: Going off record
8 at 9:39 a.m.
9           (A recess was taken)
10          THE VIDEOGRAPHER: Back on the
11 record at 9:47 a.m.
12    Q.    (By Mr. Roberts) Okay, you're still under
13 oath, do you understand that, Mr. Mills?
14    A.    Yes, I do.
15    Q.    As I understand your testimony, during the
16 year 2000 you were responsible for a range of files
17 on the Jefferson-Pilot block of business, and then in
18 January of 2001 you received a promotion to Director
19 of Claims and took on primary responsibility for the
20 Equitable block of business, is that right?
21    A.    Can you say that again, please?
22    Q.    As I understand your testimony, during the
23 year 2000 you were responsible for a range of 40 to
24 60 Jefferson-Pilot claim files, and that in January

44

1 of 2001 you were promoted to Director of Claims and
2 your responsibilities changed and you became
3 responsible for the Equitable block of business, but
4 continued to have responsibility for some
5 Jefferson-Pilot claims. Is that right?
6     A.    That would be correct.
7     Q.    How many claims did you maintain
8 responsibility for, the Jefferson-Pilot claims?
9     A.    I probably had, not knowing the exact
10 number, but it was probably a small handful; five or
11 less.
12    Q.    How was it that it was selected or you
13 selected to maintain responsibility for those five
14 claims?
15    A.    I don't recall whether there was any
16 specific criteria other than, you know, I was
17 handling them. Todd and I were both now going to be
18 on a director level working for Bill, and it just
19 seemed to continue to make sense to maintain a number
20 of files as I started to get involved in my
21 responsibility as a director.
22    Q.    Was Todd your supervisor in 2000, Todd
23 Ditmar?
24    A.    In January of 2000, when we got the

45

```
 1  Jefferson-Pilot block, he would have been my
 2  supervisor.
 3      Q.  How about in December of 2000?
 4      A.  I don't recall specifically because that
 5  was around the time or just prior to the time in
 6  which I became promoted to director and started
 7  working with Bill. I just don't recall whether or
 8  not that transformation, when that would have been
 9  taken, from Todd to Bill.
10      Q.  Did you work under Todd until you became
11  the director of Equitable's block of business?
12      A.  I worked with Todd for a period of time
13  after January of 2000, but I also worked with Bill
14  Hughes at the time as well.
15      Q.  Did you consult with Todd in the year 2000
16  about the Kearney claim at all?
17      A.  I would have consulted with him at some
18  point in time, I just don't recall specifically when
19  that would have occurred.
20      Q.  If you had to speak with your supervisor
21  about a claim you were handling in 2000, it would
22  have been Todd that you would have gone to?
23      A.  Can you repeat the question again?
24      Q.  If you had to speak to a supervisor in the
```

ACCURATE COURT REPORTING  (413) 747-1906

46

```
 1  year 2000 about a particular Jefferson-Pilot claim
 2  you were handling, would it have been Todd Ditmar
 3  that you would have gone to?
 4      A.  If I had to speak with a supervisor in
 5  2000, it wouldn't have necessarily been Todd that I
 6  went to. I would have also have gone to Bill Hughes.
 7      Q.  Also or instead of?
 8      A.  Also.
 9      Q.  So you would have counseled Todd?
10      A.  Again, I would have talked to him at some
11  point. I don't know in what juncture that would have
12  been.
13      Q.  Was Mr. Hughes critical of your inability
14  to see the unambiguous language in the policy that
15  shows Mr. Kearney was paid in error for so long?
16      A.  Can you repeat the question?
17      Q.  When you were sitting in the coffee shop or
18  on your way back to Massachusetts later in the day,
19  did Mr. Hughes ever express any criticism of your
20  work because you were unable to glean from an
21  unambiguous policy the fact that Mr. Kearney had been
22  paid in error for nearly ten years?
23      A.  I don't recall any specific point in time
24  that Mr. Hughes was critical of my work on this file.
```

ACCURATE COURT REPORTING  (413) 747-1906

47

```
 1      Q.  Thank you. When you took on those claims
 2  in the year 2000, the Jefferson-Pilot claims --
 3  strike that.
 4          You had worked for DMS for over three years
 5  prior to January 1st of 2000, correct?
 6      A.  Well, if I got there in October of '96,
 7  yeah, three-plus years at approximately that time.
 8      Q.  And during those three-plus years it would
 9  have been your practice to directly communicate with
10  policyholders?
11      A.  Can you repeat the question?
12      Q.  During those three years you would have had
13  a practice of directly communicating with
14  policyholders?
15      A.  During that three-year period I would have
16  communicated with various insureds.
17      Q.  Insureds?
18      A.  Claimants.
19      Q.  Claimants, policyholders, same thing?
20      A.  Yes.
21      Q.  Both on the phone and in writing, correct?
22      A.  Yes, I would communicate on the phone and
23  in writing.
24      Q.  And there would have been dozens, if not
```

ACCURATE COURT REPORTING  (413) 747-1906

48

```
 1  hundreds, of different claim files that you worked on
 2  during that three-year period?
 3      A.  That was a three-year period and I can't
 4  recall today exactly how many interactions, cases
 5  that I would have administered during that point in
 6  time or how many policyholders, claimants that I
 7  would have communicated with. It's difficult to try
 8  to put a number on that.
 9      Q.  Would it have been dozens or would it have
10  been less than a couple dozen?
11      A.  Can you repeat the question?
12      Q.  How about another question. Do you think
13  it would be more or less than a hundred in those
14  three years?
15      A.  Can you explain the question a little bit
16  more as far as what you mean by a hundred?
17      Q.  What I mean by a hundred is ten times ten,
18  90 plus 10, 50 plus 50; all those equal a hundred.
19  That's what I mean. Did you have communication with
20  policyholders or claimants, as you like to call them,
21  but more than a hundred different claimants during
22  your three years prior to 2000?
23      A.  Again, not knowing a specific number, but I
24  think it would be fair to say that I had
```

ACCURATE COURT REPORTING  (413) 747-1906

49

1 communication with over a hundred claimants,
2 insureds, policyholders.
3    Q. And with all or most of them you would have
4 been in the practice of sending them monthly forms or
5 periodic forms for them to complete?
6    A. For those individuals who had a claim, yes,
7 there were claim forms that were sent to them for
8 their completion.
9    Q. And one of the claim forms is called a
10 continuance of disability form?
11    A. The continuance of disability form is a
12 form that we used at some point in time, yes. I
13 don't know if that was necessarily what it was called
14 back then.
15    Q. It's a DMS form?
16    A. A general claims form.
17    Q. It's a DMS continuance of disability form,
18 right?
19    A. I think it was a claim form that we would
20 use to send out to claimants on whatever particular
21 block of business that we would be administering
22 provided that that company would have found that that
23 met to their satisfaction.
24    Q. Okay. Did you use the same forms when you

50

1 took over responsibility for Jefferson-Pilot in 2000
2 that you were using prior to 2000?
3    A. I don't recall specifically when they
4 started sending that form, whether it was initially
5 or a couple months after. I remember some
6 individuals being a little confused because they were
7 used to a different form previously.
8    Q. That wasn't my question. My question was
9 you had a practice of working on over a hundred files
10 for three years where you were sending out DMS's
11 continuance of disability form and DMS's
12 authorization form. Did you continue to send those
13 same forms to the Jefferson-Pilot policyholders when
14 that block of business came over in January of 2000,
15 yes or no?
16    A. The best that I can recall is that the
17 structure of those forms were similar. Obviously,
18 the names of the companies were different so there
19 was certain wording referencing the company that
20 would have to be changed. I've seen a lot of
21 different forms for a lot of different companies that
22 we would use and I don't specifically recall the
23 exact changes on the form, if any.
24    Q. Your testimony under oath is that those

51

1 forms you were using for a whole bunch of different
2 insurance companies prior to 2000 were changed when
3 the Jefferson-Pilot block of business came over so
4 they could be sent to the Jefferson-Pilot
5 policyholders, is that your testimony?
6    A. My testimony is that, again, the structure
7 of those forms would pretty much be the same, but the
8 names of the companies that we were working for, the
9 block of business, would have to necessarily be
10 changed is my understanding.
11    Q. So your testimony under oath is that those
12 forms were changed before they were sent to
13 Jefferson-Pilot policyholders for their execution?
14    A. What is your definition of change? I don't
15 understand the question.
16    Q. I'm using the word you used, so really we
17 have to go back to what your definition is. What's
18 your definition of changed?
19    A. My definition of change in reference to
20 those forms were that there would have been some
21 minor degree of a change in order to reference the
22 correct company that was being sent those forms.
23 We're not going to send a reference in the Traveler's
24 Insurance Company to Jefferson-Pilot would be my

52

1 understanding.
2    Q. Okay, so you would change the identity of
3 the insurance company that was your client. Would
4 there be any other change to the form before it would
5 have gone out to the Jefferson-Pilot policyholders or
6 claimants?
7    A. Not to my knowledge, but again, I wouldn't
8 be part of that process so I wouldn't really know.
9    Q. Do you know whether or not there was any
10 change to the form, even to change potentially the
11 name of one insurance company to the other?
12    A. As I sit here today, I don't know what
13 changes exactly were made. I'm sure the file and the
14 forms in there would speak towards that.
15    Q. Before you sent any forms to
16 Jefferson-Pilot policyholders, did you ask anybody if
17 it was necessary or essential that the forms be
18 changed for those policyholders or did you just go
19 ahead and send what you had?
20    A. Can you repeat the question?
21    Q. Before you sent monthly forms, the
22 continuance of disability form or the authorization
23 form to the Jefferson-Pilot policyholders, prior to
24 the time that you started sending them those forms,

53

1  did you have any conversation with anyone about what
2  forms, what versions of DMS's form or what forms
3  should properly be sent to the Jefferson-Pilot
4  policyholders?
5  　　　A.　I don't recall having any conversations
6  with anybody about that. We had the ability to go
7  into the claim system and print the forms that were
8  required for that particular insured or company, so
9  we printed those and sent them.
10 　　　Q.　So on your claim system there's certain
11 forms for Massachusetts Casualty, certain forms for
12 Equitable, certain form for Jefferson-Pilot, and so
13 on and so on?
14 　　　A.　Can you repeat the question again?
15 　　　Q.　Are you telling me that somewhere within
16 the network of DMS you can go and print forms that
17 apply only to Massachusetts Casualty, and then a
18 separate place for the forms that apply only to
19 Jefferson-Pilot, and then separate forms for each of
20 the other companies?
21 　　　A.　I don't have any familiarity or knowledge
22 of Massachusetts Casualty. For Jefferson-Pilot you'd
23 go into the claim system, there's an icon somewhere
24 that you can print a continuance of disability form,

ACCURATE COURT REPORTING (413) 747-1906

54

1  an authorization form, you click that icon, the form
2  would come up, you print it, and that's how you would
3  get it.
4  　　　Q.　Exhibit 28 is the claim system on Mr.
5  Kearney. Can you show me where it is that you go in
6  there and you designate that you want a
7  Jefferson-Pilot continuance of disability form sent
8  to the claimant as opposed to an Equitable
9  continuance of disability form to be sent to the
10 claimant.
11 　　　　For the record, it's been represented to me
12 that is the entirety of the claim system information
13 on Mr. Kearney's two claims, I guess as it existed
14 sometime this week and was printed up for me and has
15 been made an exhibit according to other witnesses in
16 this case.
17 　　　　So is there anywhere in that exhibit where
18 you can point me to where it says or triggers the
19 sending of a Jefferson-Pilot form to a
20 Jefferson-Pilot policyholder?
21 　　　A.　Well, I want to take the time to look
22 through all these things I had here. My recollection
23 on this claim system, I do not use this claim system
24 any further, is that you need to press -- click the

ACCURATE COURT REPORTING (413) 747-1906

55

1  icon here in the right-hand corner halfway down the
2  page and it will provide you with a number of other
3  choices which would include the types of forms that
4  you are talking about.
5  　　　Q.　Okay. So, is it possible --
6  　　　　MR. ROBERTS:　Counsel, can I have a
7  copy of every form that can be triggered from
8  that icon?
9  　　　　MR. ELLIS:　I'll ask.
10 　　　　MR. ROBERTS:　Well, we're requesting
11 it.
12 　　　　MR. ELLIS:　I understand.
13 　　　Q.　(By Mr. Roberts) And your testimony, sir,
14 is that if I hit that icon and if I went in and
15 printed up every single document that can be
16 triggered through that field, I would see that DMS
17 has different forms for different companies?
18 　　　A.　My recollection, if you click that icon, it
19 gives you a sample listing of different types of
20 forms that you can use. When you choose the form,
21 it's going to print whatever you select, like a
22 continuance of disability form.
23 　　　Q.　But --
24 　　　A.　I think it will pre fill in like the policy

ACCURATE COURT REPORTING (413) 747-1906

56

1  number or the name. It might explain that this is a
2  Jefferson-Pilot, that we're a claim administrator for
3  Jefferson-Pilot. And, as I think I said earlier, the
4  language and structure of it, for the most part, is
5  the same.
6  　　　Q.　Are there different continuances of
7  disability forms for the different companies that DMS
8  works for? Are they substantively different?
9  　　　A.　What do you mean by that?
10 　　　Q.　What do I mean by different?
11 　　　A.　Yes, what do you mean?
12 　　　Q.　Is there a company that has ten questions
13 on the continuance of disability form and another
14 company that has eight?
15 　　　A.　You know, I don't have the knowledge of all
16 the forms that were used for all the different
17 companies, so I really can't answer that question.
18 　　　Q.　Who have you spoken to at Jefferson-Pilot
19 ever?
20 　　　A.　The folks I spoke with at Jefferson-Pilot
21 would be Phyllis Harden, Kimberly Braun, Harold
22 Shelton. There's a gentleman by the name of Klyde
23 Honiker. There's another gentleman by the name of
24 Paul Swink. I think there was somebody by the name

ACCURATE COURT REPORTING (413) 747-1906

57

```
 1   of Marty Ginter.  That's all that I can recall this
 2   morning.
 3       Q.   When you spoke to Mr. Shelton, was it after
 4   you took over the responsibility for some claim files
 5   from Jefferson-Pilot after January of 2000?
 6       A.   Can you repeat the question again?
 7       Q.   You weren't responsible for Jefferson-Pilot
 8   at any time prior to January 1 of 2000, right?
 9       A.   I managed cases beginning in January of
10   2000.
11       Q.   So, would you have had any cause to phone
12   anyone at Jefferson-Pilot prior to January of 2000?
13       A.   Prior to January of 2000 my recollection is
14   that we consulted on cases for them.  I know I did a
15   limited scope of work.  I don't remember to what
16   extent or what point in time that would have been.
17       Q.   Did you speak to Mr. Shelton before or
18   after the block of business came over in January of
19   2000?
20       A.   I spoke with Mr. Shelton, it was quite some
21   time ago, I don't recall specifically when I would
22   have had a conversation with him.  I know at some
23   point he did retire as well, so I can't really recall
24   the specific time frames I would have had a
```

58

```
 1   conversation with him.
 2       Q.   Did you speak to him about the Kearney
 3   claim?
 4       A.   As I sit here today, I don't know if I did
 5   ever speak to him about the Kearney claim.
 6       Q.   Would you have any reason to have spoken to
 7   him about the Kearney claim prior to January of 2000;
 8   is that something that you were working on prior to
 9   January 2000?
10       A.   Can you repeat the question, please?
11       Q.   Yes.  Did you have any knowledge of anybody
12   or any claim by the name of Kearney prior to January
13   of 2000?
14       A.   Can you say that one more time, please?
15       Q.   Sure.  Do you know who Mr. Kearney is?
16       A.   Yes, I do.
17       Q.   When did you take over responsibility for
18   his claim file?
19       A.   My understanding was that -- recollection
20   was January of 2000.
21       Q.   Okay.  Now prior to January of 2000, would
22   you have any reason that you can think of to talk to
23   anybody about a Chris Kearney or a Chris Kearney
24   claim?
```

59

```
 1       A.   Not to my knowledge.
 2       Q.   You don't want to give a categorical no to
 3   that?
 4       A.   I just don't recall.  It's a long time ago.
 5       Q.   Can you think of a circumstance where you
 6   might have had a conversation about a claim that you
 7   didn't know about and hadn't been assigned
 8   responsibility for yet?
 9       A.   You're talking about a period a long time
10   ago with a lot of cases over the years.  I just -- I
11   don't recall specific conversations going that far
12   back or -- I just don't recall.
13       Q.   Do you recall any conversations with
14   Phyllis Harden about the Kearney claim?
15       A.   I recall speaking with Phyllis.  I talk to
16   her about a lot of things, but I don't recall
17   specifically talking to her about this case.
18       Q.   If you had a substantive phone call with
19   someone at Jefferson-Pilot about the Kearney claim,
20   would you document that call in the claim file?
21       A.   Can you repeat the question?
22       Q.   Sure.  If you had a substantive phone call
23   with someone at Jefferson-Pilot, your client, about
24   the Kearney claim, would you have made notes of that
```

60

```
 1   call and preserve those notes by putting them in the
 2   claim file?
 3       A.   Again, I don't recall if I had any of those
 4   types of discussions with them.  I think as far as
 5   the circumstances of the claim, you know, where it's
 6   at and what's important I think is in the claim file
 7   and it speaks for itself.
 8       Q.   What does that mean, it speaks for itself?
 9   How does the claim file speak?
10       A.   There's information there, you read it.
11       Q.   My question was a hypothetical.  If you had
12   a phone call with someone at Jefferson-Pilot about
13   the Kearney claim, would you have documented that
14   call with notes and preserved those notes by putting
15   them in the claim file, yes or no?
16       A.   I don't even recall the types of
17   conversations that we had.  It was a general
18   conversation.  I think if there was anything that was
19   substantive to the file, the file would reflect that.
20       Q.   Okay, so if you had a substantive phone
21   call with someone at Jefferson-Pilot, you would have
22   made notes, you would have preserved those notes by
23   putting them in a claim file, do I understand you
24   correctly?
```