A. Can you repeat the question?

Q. For the fourth time, if you had a substantive telephone conversation with someone at Jefferson-Pilot about the Kearney claim, would you take notes and preserve those notes by putting them in the claim file?

Do you want to hear it again?

A. Well, I don't understand what you mean by that.

Q. Okay. Which part don't you understand?

A. The substantive part of that.

Q. Well, you used the word substantive in your earlier response, so I was using your word. Let's break it down.

If -- you understand it's a hypothetical, I'm not saying it ever happened, right?

A. Correct.

Q. If you had a call with someone at Jefferson-Pilot about Mr. Kearney's claim, would you take notes of the call and place those notes in the claim file?

A. I wouldn't have kept necessarily any notes on any phone call, and if there was anything of importance, you know, I would record it.





Q. Record it how?

A. Some type of communication, whether in a letter, conversation with the people that I dealt with at the company.

Q. You would record it in a conversation?

A. I'd pass along that information to people that I worked with.

Q. You would tell other people at DMS about the important information without putting the important information in the claim file?

A. The best that I can recall, again being a hypothetical situation, I'm not even trying to recall if the circumstances you described ever happened, if there was something that, you know, I needed to speak with Todd or Bill, I would, and if it was something of importance it would be placed in the file in some fashion.

Q. Okay. So if you had a phone call with someone at Jefferson-Pilot where there was an important issue discussed, you wouldn't make notes of that communication and put them in the claim file, but you might pass along verbally that information to either Todd Ditmar or Bill Hughes; do I now understand correctly what you're saying?





A. Can you say that again, please?

Q. Yes. If you had an important phone call with someone at Jefferson-Pilot about Mr. Kearney's claim, you would not take notes to memorialize that call and put them in the claim file; you would potentially, however, speak to Mr. Hughes or potentially Mr. Ditmar about that important call?

MR. ELLIS: Objection. Misstates the testimony.

Q. (By Mr. Roberts) Go ahead.

A. If I had a conversation with someone at Jefferson-Pilot, I may have memorialized that statement in the file, I may have passed along that information to -- in a conversation with Todd or Bill.

Q. Why is it not a good business practice to document all important phone calls by memorializing the call and preserving it by putting those notes in the claim file?

MR. ELLIS: Objection.

A. Can you repeat the question?

MR. ROBERTS: Can you read it back to him?

THE COURT REPORTER: "Question: Why





is it not a good business practice to document all important phone calls by memorializing the call and preserving it by putting those notes in the claim file?"

A. I wouldn't categorize that as a bad business decision. There's a lot of phone calls that happen on a lot of cases, a lot of phone calls that happen during the day. If it's something that was important, it would be memorialized or communicated in the file in some way through letters or conversation with the insurer.

Q. Are phone calls with your client, Jefferson-Pilot, important?

A. They're important to have.

Q. Is it important to have conversations with your investigators?

A. It's important to be able to speak with the investigator and communicate information.

Q. Are the communications you have with IME folks important?

A. It would be important if they had important information about the file, yes.

Q. What's your practice of taking notes of those important phone calls with clients,

investigators, and persons performing IMEs?
A. Can you repeat the question.
Q. What's your practice of taking notes of those important phone calls with clients, investigators, and persons performing IMEs?
A. I don't have any particular practice. I may scribble down a note if I need to know a date and time of an examination that's scheduled, and as that information is written up and sent along to the insured, I wouldn't need that note. It's not something that I do every time or necessarily on every case.
Q. If there are no notes in the claim file of any communication you ever had with Jefferson-Pilot, does that mean you didn't have any communications with Jefferson-Pilot?
A. Can you repeat the question?
Q. If there are no notes in the claim file of any communication you had with Jefferson-Pilot, does that mean you had no such communication?
A. I think this claim file reflects that there had been communication with Jefferson-Pilot, if I had communication with them, and not necessarily everything is going to be written up as a note that I





spoke with them.
Q. Can you testify under oath that you ever had any communication with anyone at Jefferson-Pilot about Mr. Kearney?
A. Can you repeat the question?
Q. Can you testify under oath that you ever had any communication with anyone at Jefferson-Pilot about Mr. Kearney?
A. I've had communication with Jefferson-Pilot over a number of their cases. I can't say specifically I spoke directly about his case.
Q. Did you ever discuss with Jefferson-Pilot the WJ576A policy?
A. Yes, I did.
Q. When was the last time you had a conversation with someone at Jefferson-Pilot about that policy?
A. Best of my recollection, that would have been a communication with their in-house counsel, I believe, last year just prior to these proceedings.
Q. These proceedings began in June of 2002, are you mindful of that?
A. I don't know when exactly it started.
Q. Well, it wasn't last year. So did you have





your communication last year or was it in 2002?
A. I don't recall a specific time, if it was last year. It was just, I think, prior or after we had come across the incorrect amount of benefit. We conversed with their legal department to seek their guidance if this was what we believed it to be. So whenever that happened, I don't remember.
Q. Who did you speak to?
A. I remember speaking to an in-house counselor by the name of Stephanie Fairbough.
Q. And that was shortly after your Cuban coffee revelation?
A. I don't know the exact date and time that conversation happened, but I think it would be fair that it was around that time.
Q. Okay, was that a phone call?
A. I would imagine it was. I don't remember specifically. I don't believe I was down in that area at that time.
Q. Have you ever met with her personally?
A. I believe I have met with her once.
Q. When?
A. I don't remember the time.
Q. Before or after your Cuban coffee





revelation?
A. My recollection is that it would have happened before.
Q. Okay. Before the Cuban coffee revelation you had a meeting with Ms. Fairbough. Was that about the WJ567A policy?
A. That's such a long time ago, I don't even recall if we even talked about claims. I don't know --
Q. What would have been the purpose of your meeting with her the one time you met with her?
A. I just remember being down there to visit their offices. I was introduced to a number of people. I can't say that I really had a one-on-one meeting, per se. It might have been a quick conversation. I just don't recall, it's a while ago.
Q. So that meeting had nothing to do with Mr. Kearney or the interpretation of the WJ576A policy, is that right?
A. To my knowledge, yeah, that would have been before.
Q. So --
THE WITNESS: Is it okay to take a break at this point?

MR. ELLIS: Sure.

THE VIDEOGRAPHER: Going off record at 10:30 a.m.

(A recess was taken)

THE VIDEOGRAPHER: Back on record at 10:37 a.m.

Q. (By Mr. Roberts) Mr. Mills, you're still under oath, you understand that?

A. Yes, I do.

Q. We were talking about a meeting that you once had with -- down in Greensboro with Jefferson-Pilot folks, and during the course of that meeting you were met or introduced to Stephanie Fairbough, a lawyer at JP, right?

A. Yes, I met her, and I wouldn't necessarily say it was a meeting. I was introduced to a number of people, one of which was her. I think we had a few words, but I don't think we talked anything in particular about cases.

Q. It had nothing to do with Mr. Kearney's claim or his policy, right?

A. Not to my knowledge, yes.

Q. And then you went down to Miami and you had this revelation with Mr. Hughes, right?





A. Down in Miami, yes, came to the realization that the benefits were being incorrectly paid.

Q. Okay. And did you speak to Jefferson-Pilot that day?

A. I don't recall.

Q. What was the next communication with Jefferson-Pilot that you can recall regarding Mr. Kearney or the WJ576A policy and/or its riders?

A. I remember a phone conversation at some point after our return trip apprising them of our -- Jefferson-Pilot's counsel, of our findings and sought their guidance on the matter.

Q. And what was their guidance?

A. They agreed that there was an overpayment.

Q. What was their guidance?

A. Their guidance was that our findings were correct.

Q. Okay. So then what happened in your communications with Jefferson-Pilot?

A. Can you repeat the question, please?

Q. What then happened with the communications with Jefferson-Pilot?

A. You know, I don't recall specifically what happened at that juncture.





Q. There's nothing you can recall from that moment in time through today of any communication or dialogue or any interaction you had with Jefferson-Pilot on that issue?

A. There was, to the best of my memory, a conversation with Jefferson-Pilot's counsel. I know that --

Q. The same conversation you've already told me about?

MR. ELLIS: Excuse me --

Q. (By Mr. Roberts) I want to know if it's the same conversation you've already talked about or something additional.

A. My recollection is that it would have been a subsequent conversation.

Q. Okay. Tell me about that conversation.

A. The best that I can recall is that it was a discussion of what steps that they wished to take at that juncture.

Q. Who was involved in the first phone conversation besides you and Stephanie?

A. My recollection is that Bill Hughes would have been involved in that call and Bill Dempsey.

Q. Bill Dempsey with Employers Reinsurance





Company?

A. Yes.

Q. Okay, who else?

A. That's all I can recall.

Q. Are you mindful of any notes that exist of this call taken by anyone?

A. Not to my knowledge.

Q. Were you here in Springfield on a conference call?

A. I believe that was the circumstances.

Q. Were you in Mr. Hughes's office with him?

A. I don't recall specifically where in our offices that conference call originated for us.

Q. Were you with him?

A. My recollection is that I was.

Q. Were either one of you taking notes during the call?

A. I don't recall taking any notes. I don't know if he did.

Q. Did either one of you prepare any documents in anticipation of the call or in preparation for the call?

A. Not to my knowledge. We conveyed our findings verbally over the phone.

Q. Did you tell Ms. Fairbough or Mr. Dempsey why it is you wanted to have the conference call?

A. I don't recall if we specifically notified both of those individuals ahead of time of the purpose of the call, but that was obviously discussed during the conversation.

Q. Based on your memory of the call, did they have an understanding of what the call would be about, or did you convene this call and they were surprised about the nature of the content?

A. Can you repeat the question, please?

Q. Based on your memory of the call, was it a surprise to Ms. Fairbough or Mr. Dempsey about the nature or the issue to be discussed during the call?

A. I don't recall what their knowledge of the situation was going into the telephone call. I don't know how to characterize their response.

Q. How long after your return from Florida was this call?

A. I don't recall when that telephone call took place.

Q. Was it within days or weeks or months of the Florida trip?

A. That was quite some time ago. I don't know





exactly when it would have taken place.

Q. Would it make sense and be logical that you would communicate that type of finding to Jefferson-Pilot relatively soon after its discovery?

A. Well, it would make sense to obviously communicate that to them in a timely fashion.

Q. And is that something that you generally do, communicate important information to clients in a timely fashion?

A. Well, we do as best we can to respond timely and promptly.

Q. Okay. Are you good at that?

A. I think I'm very good at that.

Q. Excellent. Is there a Cuban coffee revelation memo somewhere?

A. Can you phrase that question another way?

Q. Did you understand it?

A. No, I didn't.

Q. On your return trip from -- this is a relatively significant discovery at the Cuban cafe, wasn't it?

A. It was a discovery in a coffee shop that had some bearing on the case going forward.

Q. It had extraordinary bearing on the case





going forward, didn't it?

A. Yes, it did.

Q. Wouldn't it be appropriate within the policies and procedures at DMS to document some extraordinary fact that implicates a claim?

A. Well, if I recall correctly, that information was communicated to Mr. Kearney's counsel at that time as well as follow-up letters.

Q. So the only -- the only memorialization of the Cuban coffee revelation is that as stated in the October 22, 2001 letter to Mr. Spiegel from Mr. Hughes?

A. I would have to look back at the file. I know we sent a letter. I'm assuming that's what you're referring to.

Q. Right.

A. That was my recollection following that meeting that the letter summarizing the situation in the meeting was sent to his prior counsel, Spiegel.

Q. So I understand your testimony correctly, this extraordinary revelation is uncovered drinking Cuban coffee in Miami, Florida nearly ten years after the erroneous payments began, allegedly, and there does not exist any document anywhere that sets forth





your extraordinary revelation other than the letter that was sent to Mr. Spiegel?

A. Can you repeat the question, please?

Q. You and Mr. Hughes are having Cuban coffee in October 2001. You're reviewing or preparing for a meeting about a claim that's been existing for eight years, right; Mr. Kearney's claim was eight years old at that point?

A. 2001; yeah, it's probably about eight years.

Q. And the two of you, while sipping your coffee, come upon this extraordinary revelation that Mr. Roberson, who has 38 years of experience, didn't know about, Mr. Shelton, who has 38 years of experience, didn't know about, Mr. Maxwell, who has 20 years of experience, didn't know about, Ms. Harden, who has 31 years of experience, didn't know about, Jefferson-Pilot, who authored the policy and administered it for seven years, didn't know about, you, who worked on the policy for a year and eight or nine months, didn't know about, Mr. Ditmar, who you reported to for a year, didn't know about, and Mr. Hughes, who you reported to for another nine or ten months, didn't know about, this extraordinary

revelation occurs and it's your testimony, sir, that there is not an internal document at DMS or a document DMS shared with Jefferson-Pilot or a document DMS shared with Employers Reinsurance which discusses this great revelation; the only document that exists is the letter that went to Spiegel after the meeting? Is that your testimony under oath?

A. I don't know if there is any other document. To my knowledge, there is the letter that was communicated to the insured. If there's other letters that were prepared, I know there was counsel involved and there were letters that were back and forth on that material through -- I believe it was prior counsel on this case, and Mr. Ellis. I'm sure there's stuff out there, I may have seen something, but I can't a hundred percent say that it said this, this, and that; it's been a while.

Q. You didn't tell Mr. Hughes that you would do a memo that discusses this Cuban coffee revelation, and he didn't ask you to prepare a memo discussing the Cuban coffee revelation, right?

A. My recollection is in that Cuban coffee revelation that you refer to, is that I discovered the error, you know, the error that JP had made and





that I perpetuated over the time, and I made him aware of that.

I don't recall any point other than being embarrassed about it that he was critical of me or said, "Prepare a document." I just don't recall that.

Q. You don't recall him asking you to prepare a document detailing and summarizing this extraordinary revelation, and you didn't offer to do that; is that your testimony under oath?

A. To my recollection, I don't recall him asking me to do something. If it was prepared or not, I don't -- as I sit here today, a lot of time has passed, I don't remember what was prepared on that at that point in time.

MR. ROBERTS: We're going to change tapes. We'll be right back to this.

THE VIDEOGRAPHER: Going off record at 10:53 a.m.

(Off the record)

THE VIDEOGRAPHER: Back on record at 10:57 a.m.

Q. (By Mr. Roberts) Mr. Mills, you're still under oath, you understand that?





A. Yes, I do.

Q. We're talking about whether or not you have any recollection of any memorandum being prepared that discusses in details the Cuban coffee revelation, and as I understand your testimony, you're not mindful sitting here today that any such memorandum existed?

A. I think what I've said is I remember there was a letter in the file following the meeting with Attorney Spiegel that I believe Mr. Hughes wrote to him outlining the situation I don't specifically recall any other type of memorandum, you know, as I sit here today.

Q. Is there any memorandum that you can recall sitting here today that's been prepared subsequent to the letter that went to Attorney Spiegel on this Cuban coffee revelation?

A. Can you repeat the question, please?

Q. Is there any such memorandum that you're mindful of that was prepared subsequent to the responsive letter to Attorney Spiegel in October of 2001?

A. To my knowledge, a lot of this stuff has been handled between the lawyers. I don't





specifically recall preparing anything myself.

Q. You don't have a memory of authoring anything in writing after that revelation, that extraordinary revelation at the Cuban coffee house?

A. I'm trying to, as I best remember -- to the best of my memory, I didn't do anything, but I just -- I don't remember. It's been a period of time now.

Q. Was there anybody on the DMS in-house legal team consulted about your Cuban coffee revelation?

A. Not to my knowledge.

Q. Was Adam Formus, the lawyer that's sitting in the room here, responsible for the Jefferson-Pilot block of business in October 2001, as far as you know, within the legal department at DMS?

A. You know, I really don't know what Adam's full responsibilities are, quite frankly. He's in the room, you can ask him.

Q. Okay. I probably will at some point under oath. Did you have any discussions with Adam about your extraordinary Cuban coffee revelation prior to June of 2002, which would be nine months after you came upon the revelation?

A. I don't recall having conversations with

Adam Formus prior to that time.

Q. Do you have a recollection of any conversation you've had with Mr. Formus, or Attorney Formus, about the revelation?

A. I don't recall having any conversation with him pertaining to the revelation, as you phrase it.

Q. The revelation, as I phrase it, is the way that you came upon interpreting the contract at the Cuban coffee house?

MR. ELLIS: Objection.

A. That would be my understanding of what you mean by revelation.

Q. Okay, good. So sitting here today, you don't have any recollection of any communication you've ever had with Mr. Formus about your interpretation of the policy as you began to interpret it that morning?

A. Can you repeat the question, please?

Q. Sitting here today, you don't have a recollection of any conversation you've ever had with Attorney Formus about the interpretation of Mr. Kearney's policy which you came upon that day, October 2001, whenever it was?

A. I believe your prior questions were about





my knowledge of my conversations with Adam at that juncture of June of 2002, I believe you said. I have had conversations with Adam Formus subsequently about the revelation, as we understand it, about the application of the policy.

Q. When were those discussions?

A. I had at least recently the discussion with him on Wednesday when I met with him.

Q. Okay, take me the other way in chronologic order. When's the first one you can discuss, and I guess that one would be the most recent you can discuss.

A. I don't recall having any conversations with him about the revelation, really, until I met with him on Wednesday.

Q. Okay, so the only conversation you can recall having with Adam about the revelation is the one you had two days ago in Mr. Ellis' presence?

A. The only conversation I can recall having with Adam Formus on the revelation was on Wednesday, and the second part of that Mr. Ellis was present at that time.

Q. Prior to Wednesday had you had discussions about the revelation with any other in-house counsel





at DMS?

A. Can you repeat the question, please?

Q. Prior to Wednesday, had you had discussions about the revelation with any other in-house counsel at DMS?

A. Yes.

Q. Who?

A. I spoke with Andrew Cohen.

Q. When was the first time you spoke with Andrew Cohen about the revelation?

A. The only time I remember speaking with him was about a week or so, a couple weeks ago.

Q. Other than the recent conversation with Mr. Formus, the recent conversation with Mr. Cohen, have you had any discussions with any other in-house counsel at DMS about the revelation?

A. Can you repeat the question, please.

Q. Other than Mr.'s Formus and Cohen, have you had any other discussions with any other in-house counsel at DMS about the revelation?

A. To the best of my knowledge, I don't recall prior conversations.

Q. With anyone?

A. With any other in-house DMS counsel.





Q. On how many occasions have you spoken to counsel at Jefferson-Pilot about the revelation?

A. Can you repeat the question, please?

Q. On how many occasions have you spoken to counsel at Jefferson-Pilot about the revelation?

A. I don't recall the exact number of times. I think we've already talked a couple times already. I know I've been a part of a phone call during these proceedings at other times with our counsel.

Q. Your answer was "I think we've already talked about a couple times"; we haven't. We talked about one communication you had with Fairbough; it had nothing to do with Kearney or the policy when you went to Greensboro. And then we had a discussion earlier about a communication you had, a conference call, between Hughes, yourself, Fairbough, and Dempsey. Other than that conversation with Fairbough, have you had any other discussions about the Kearney policy with in-house counsel at Jefferson-Pilot?

A. I've been part of subsequent conversations that weren't initiated by me, conferenced in between Stephanie Fairbough, prior counsel on this case, Geri -- I forget her last name right now, so there's

been that type of conversation.

Q. How many of those were there?

A. I don't know how many conversations I've had. I've been involved in a couple of those conversations, not all of them.

Q. Were those before the lawsuit was filed or after?

A. I don't recall when those conversations necessarily took place in the time frame of all this stuff that's gone on since then.

Q. Did you take any notes of those phone calls?

A. No, I did not.

Q. Did you author any memorandum before or after those phone calls relative to the issue of the phone call?

A. Can you repeat the question, please?

Q. Did you author any memorandum relative to those phone calls or the issues raised in those phone calls?

A. As I sit here now, I don't recall if I authored any memorandum, notes, in regards to those phone calls.

Q. Who participated in those phone calls other





than you and Ms. Fairbough and Ms. Geraldine Johnson?

A. Johnson was the last name of the other attorney. I don't recall specifically, but I believe the other parties to that conversation would have been Bill Hughes and Bill Dempsey.

Q. You spoke in the singular, that conversation. Were there multiple conference calls with some or all of those players or was there just one that you can recall?

A. I remember multiple conversations with those individuals. I don't know exactly the exact number of conferences that would have been involved with those individuals.

Q. Do you recall from the substance of those conversations whether the persons were speaking in the context of a lawsuit having already been filed, or in anticipation of potential legal action, or both?

A. Can you repeat the question, please?

Q. Can you recall, based upon the context of those calls, whether people were speaking in terms of a lawsuit having already been filed, or whether there was discussions about the issue and the potential for future litigation?





A. I really don't recall precisely all those conversations and the time frame of those calls happening along the lines of these proceedings. A lot of that stuff was just handled by the attorneys. I had a limited knowledge of what was going on at that point.

Q. Did these calls take place over several months or a couple days?

A. These calls didn't take place over a couple days. I don't know the period of time, the length of time that these calls took place.

Q. Greater than one month's time?

A. That seems to be a fair calculation.

Q. Are there any notes that exist anywhere including indications on a calendar you may keep of when these calls may have occurred?

A. I don't recall specifically writing that down. I could have put it down on my calendar that I have on my desk.

MR. ROBERTS: We'll request a copy of that, Counsel.

Q. (By Mr. Roberts) Go ahead, I'm sorry.

A. But I don't keep a type of running calendar on the computer system or anything like that.





Q. During the course of those discussions was it ever discussed that it would be wise to strip Mr. Kearney of his ability to allege bad faith by continuing to pay him allegedly erroneously?

MR. ELLIS: I will object to the question and direct the witness not to answer anything specific about the subject of those conversations. They are both privileged as attorney/client and as work product.

MR. ROBERTS: They're not privileged nor are they work product.

MR. ELLIS: You will follow my advice and not respond to any question concerning the substance of those conversations.

MR. ROBERTS: Boone vs. Van Liner cannot be more unambiguous on this point.

Q. (By Mr. Roberts) I understand your counsel is directing you not to answer, so we'll simply have to get the documents that have not been produced and reconvene this deposition and continue it in progress.

Are you aware of anybody taking any notes of these calls or anybody authoring

any documents to memorialize these calls?

A. Again, not to my knowledge. I don't recall any individuals authoring documents. Obviously, in speaking with them, they would probably know better than I.

Q. Did you ever send or receive any e-mails relative to these discussions and the issue of the Cuban coffee revelation?

A. I don't recall sending any e-mails specifically pertaining to the Cuban coffee revelation finding.

Q. What do you mean specifically pertaining to?

A. Addressing that question or issue exclusively.

Q. Do you recall ever sending or receiving an e-mail to or from anyone that discusses the way the policy began to be interpreted after the Cuban coffee meeting with you and Hughes?

A. I recall communicating via e-mail with our -- with the prior counsel on this case, Geri Johnson.

Q. Okay. Anyone else?

A. I just recall e-mails that went to



Ms. Johnson. There might have been other people that were cc'd on that, but I don't recall who those individuals were.

Q. Did she send you e-mails?

A. I believe she did. She did send me e-mails.

Q. Did Ms. Fairbough send you e-mails or copy you on e-mails relating to the issue?

A. I do recall being copied in on e-mails from Ms. Fairbough.

Q. Did Bill Dempsey send to you, or copy you; or did you send to him, or copy to him, e-mails on the issue?

A. Can you repeat the question, please?

Q. Did you send to Mr. Dempsey, receive from Mr. Dempsey, copy from Mr. Dempsey, or did you copy to Mr. Dempsey any e-mails relating to this issue we're discussing?

A. Again, as I sit here today, I don't remember specifically whether or not I was the author of an e-mail where I had communicated directly to him or cc'd him on that e-mail.

Q. Do you recall receiving from him an e-mail or being copied on an e-mail he sent?





A. I don't remember that specifically. Since we've talked about him being involved in this process, my guess is that he had been cc'd on a lot of those, but I don't know, you'd have to speak with him about it.

Q. Do you delete e-mails you receive?

A. Do I delete e-mails that I receive? Yes, I do.

Q. What's the process you undertake to delete your e-mails?

A. Can we take a break right now?

MR. ELLIS: After you answer the question.

A. Can you repeat the question, please?

Q. What's the process you undertake to delete your e-mails?

A. The process that I undertake to delete my e-mails is, depending on what the e-mail is, I delete it that day. All the ones I delete, you know, at some point in time, I don't have any specific guidelines where if I have an e-mail for a week, a month, a year, that I necessarily delete it. A lot of times my in basket is filled up enough that the technological folks will ask you to clean a number of





documents out.

Q. Do you have Microsoft?

MR. ELLIS: He did ask for a break, he answered your question. Go ahead.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Going off record at 11:21 a.m.

(A recess was taken)

THE VIDEOGRAPHER: Going back on record at 11:30 a.m.

Q. (By Mr. Roberts) Mr. Mills, you're still under oath. You understand?

A. Yes.

Q. Have we exhausted your knowledge, sitting here today, of all the phone conversations, e-mail communications, and written documents that you're aware of sitting here today that exist commenting on, referring to, or relating to the Cuban coffee revelation?

A. I would have to say yes, as a lot of that stuff was handled by the attorneys and really taken out of my hands at that point.

Q. Do you use Microsoft Outlook?

A. Yes, I believe that's what we use.

Q. And when you get an e-mail that you want to save, do you put it in a file folder or do you just leave it in your in box?

A. I usually leave it in my in box.

Q. Do you have any file folders for your e-mails?

A. I think I've probably saved two or three e-mails, that I recall. I don't keep a specific folder to maintain any e-mail; I just don't delete it.

Q. If you get an e-mail and you want to delete it immediately or you don't see any reason to keep it, you just push "delete," and is that all you do to get rid of the e-mail, or is there something else you do?

A. I would delete the e-mail if I didn't need it. I think there's like a wastebasket that it goes into. I think that's where, after a period of time, there's a number of them, they ask you to delete a number of them. We've gotten a lot of viruses so we've had to delete a number of e-mails to get rid of that.

Q. Okay, so, if you go back to your office today, you'll have some e-mails and you might decide





to push the "delete" button on them, and you'll do that, right, you'll push "delete" on an e-mail?

A. Yeah, I guess that's the process.

Q. And then your understanding is it goes to the trash bin?

A. I don't know the specific terminology. I'm not a Microsoft technician. It's a wastebasket, deleted items. I don't know where it goes.

Q. Do you ever go into the wastebasket of the deleted items or the trash bin and perform an additional function to delete the e-mail?

A. Yes, I would do that.

Q. How frequently do you do that?

A. I think it varies. If I'm given, from our technological folks because it's overloaded and I need to delete some, I'll do that. If we have viruses that come in and we delete those, I delete them again and make sure it's not going to affect our system. Periodically I delete the e-mails that are received and sent because of the waste basket filled up. I don't do it every day, I don't do it every month, but periodically.

Q. You don't do it every month. You do it every quarter?





A. To be honest with you, Mr. Roberts, I don't really have any specific time frame. I might do it once a month, semi-annually, I can't remember.

Q. You've been advised, though, that the wastebasket will get to some capacity and you have to go in there and delete things to create more capacity?

A. I recall receiving communications that there's a large volume of e-mails that are deleted in the wastebasket and we need to ...

Q. Are those communications from in-house counsel or from the IT team at DMS?

A. My recollection, those would be from our technological unit.

Q. Have you ever received any instruction or counsel from the general counsel's office at DMS to delete e-mails on a periodic basis?

A. No, I've not received any such communication.

Q. Do you use Word?

A. Yes, I use Microsoft Word.

Q. And Excel?

A. I do use Excel periodically.

Q. If you create a word document or Excel





document on a particular claim, do you always print up the document and put it in the claim file?

A. Can you repeat the question, please?

Q. If you create a word document or an Excel spread sheet on a particular claim, do you always print up the document and then put it in the claim file?

A. I wouldn't necessarily always put whatever was on the Word document or Excel, print it and put it in the file. I imagine a good portion of those letters do go into the file.

Q. Whether they go into the file or not, do you maintain them somewhere on the network or on your hard drive?

A. I save letters on our hard drive or network drive.

Q. All letters?

A. No, I don't save all my letters.

Q. You don't save all of your claimant-related letters to the network or hard drive?

A. No, I don't.

Q. Would the same be true about the Excel spread sheets that you might prepare, some of them might get into the claim file, some might not, some

might get to the network or the hard drive and some might not?

A. I don't really recall using any type of Excel spread sheet that often.

Q. Have you used Excel with regard to claims?

A. Yes, I have.

Q. And do you always print up the product and put it in the claim file?

A. No, I wouldn't necessarily do that for every situation.

Q. Do you always save them to the hard drive or network?

A. No, I would not.

Q. Do you have e-mail communications with Bill Hughes?

A. Yes, I do.

Q. Do you save those e-mails if they're about a particular claim or do you print up the e-mails and put them in the claim file?

A. Well, what do you mean by save? Like to the hard drive again?

Q. Or network.

A. I don't save e-mails. I read them, I might not delete it right away from my in basket, but I





don't save it to the hard drive or company drive.

Q. Do you print each and every e-mail you get about a particular claim and preserve that e-mail by then putting it in the claim file?

A. No, I don't print each and every e-mail that I would get about a particular file and save it.

Q. In the claim file?

A. In the claim file.

Q. Within the past week have you reviewed any memorandum authored by anyone regarding the extraordinary Cuban coffee revelation?

MR. ELLIS: Objection to form.

A. Can you repeat the question, please?

Q. Within the past week have you reviewed any memorandum authored by anyone regarding the extraordinary Cuban coffee revelation?

A. I don't recall specifically seeing any memorandum other than what was communicated in the claims file.

Q. Other than documents that exist in the claim file, your memory is --

A. I've looked at the claims file.

Q. Did you see anything that isn't in the claim file that is a memorandum regarding the





extraordinary Cuban coffee revelation within the past week?

A. No, I don't recall seeing anything along that line.

Q. Have you seen any notes or summaries of any conference calls or phone conversations in which you've been involved regarding the extraordinary Cuban coffee revelation?

A. Can you repeat that please?

THE COURT REPORTER: "Have you seen any notes or summaries of any conference calls or phone conversations in which you've been involved regarding the extraordinary Cuban coffee revelation?"

A. The only thing I would have seen is what's been in the claim file. I haven't seen anything outside of that, that I can remember.

Q. Were there any other claims other than Mr. Kearney's impacted by your Cuban coffee revelation?

MR. ELLIS: I'm going to object to the constant reference to the -- or at least somebody define the Cuban coffee revelation so we know what we're talking about.

MR. ROBERTS: We did that earlier





with your witness on the stand, but I'm working on what he understood it to be as expressed earlier under oath.

Q. (By Mr. Roberts) Mr. Mills?

A. Can you repeat the question, please?

Q. Have there been any other claims of any other policyholders impacted by your Cuban coffee revelation?

A. I don't have any knowledge of that.

Q. No other Jefferson-Pilot claims on which you were working were impacted by that, is that correct?

A. I don't recall any other claims that I've personally handled that the similar circumstances arose and I can't speak for the other cases because I don't know.

Q. I'm not talking about any similar circumstances, I'm just talking about did your revelation impact the payment of benefits to anyone other than Mr. Kearney, as far as you know?

A. As far as I know, to my knowledge, it hasn't impacted anybody else.

Q. Has not, did you say?

A. Yeah, to my knowledge.

Q. Were you given a spot bonus after the Cuban coffee revelation?

A. I think my testimony earlier was that I don't recall ever receiving a spot bonus.

Q. Have you told me everything you can recall about communications you had with Jefferson-Pilot persons regarding Mr. Kearney's claim?

A. To the best of my knowledge as I sit here today, I've answered your questions accurately and as much as I can recall.

Q. Okay. I just want to confirm. There's nothing you can remember sitting here today about anything you communicated with a Jefferson-Pilot person regarding Mr. Kearney's claim?

MR. ELLIS: Objection. Asked and answered several times.

MR. ROBERTS: Okay.

A. Other than what we've already discussed?

Q. That's my question. Have we discussed everything that you can think of?

A. To my knowledge, yes, we have.

Q. Did you and Mr. Hughes jointly arrive at the settlement proposal that you communicated to Mr. Spiegel at the meeting in Miami?





MR. ELLIS: I'm going to object. I think that assumes facts not in evidence.

A. My recollection is that Mr. Hughes had a conversation with Mr. Spiegel about considering or discussing a settlement. I don't think it was necessarily an offer.

Q. There was no settlement offer proposed at that meeting, as far as you're aware?

A. To my recollection, numbers were discussed and discussions were held at how numbers were arrived. The circumstances or the revelation that we talked about that happened in the coffee house added another element of that discussion, but I don't think an actual number was extended to Attorney Spiegel at that point in time. Mr. Hughes would have more knowledge on that than I would.

Q. Well, you were there, weren't you?

A. Yeah.

Q. Mr. Hughes didn't have any private discussions with Mr. Spiegel during that day that you weren't participating in or present at, right?

A. Correct.

Q. And you said there was -- you said numbers were discussed. Those were without regard for the





extraordinary Cuban coffee revelation interpretation of the policy?

MR. ELLIS: Objection to form.

A. Can you repeat the question again, please?

Q. You said that numbers were discussed with Mr. Spiegel. Were those numbers without regard for the Cuban coffee revelation?

A. My recollection was that numbers that were discussed with Attorney John Spiegel were based on or without the prior understanding of the change of what the benefit would be at that point in time.

Q. I don't understand what you said. What were you trying to say?

A. That the numbers that were discussed were based on the previous understanding of what Mr. Kearney's benefit was prior to the discovery in the coffee shop.

Q. Okay, so the numbers that you and Mr. Hughes, or maybe just Mr. Hughes, were suggesting to Mr. Spiegel as the measurement of how this claim could be resolved, those numbers were presented without any consideration given to the new interpretation of the policy?

MR. ELLIS: Objection to form.





A. Can you repeat the question so I can understand it.

Q. Do you not understand it?

A. No, I did not.

Q. Was the number -- was Mr. Hughes the only one that communicated a number to Spiegel as opposed to you?

A. Yeah, he was the superior, so he communicated.

Q. Do you know how it was that Mr. Hughes arrived at determining the appropriateness of articulating whatever number he articulated?

A. I don't recall a precise analysis that he used to arrive at that number. The best of my recollection is that number would have to take into account a potential liability moving forward, interest rates, present value, mortality, morbidity, and my understanding is that those things were considered when he arrived at that number.

Q. So mortality, morbidity, discount rate, those were factors in the equation, in Mr. Hughes's equation that got him to a number that he articulated, is that right?

A. I can't speak specifically for him, because

I don't know all the discussions that he would have had necessarily about discussing numbers with Spiegel. But my understanding is that those types of factors would have been discussed or considered in coming to any type of settlement offer, number, proposal or discussion.

Q. Okay. And, as far as you know, Mr. Hughes did not incorporate in the equation this extraordinary revelation which had, in your words, an extraordinary impact on the benefits going forward?

A. My recollection, and what I talked about earlier, was that he apologized to Attorney Spiegel at the onset of that meeting and that the numbers that he had in mind prepared to discuss with him were prior to the discovery of the reduction in the benefits in the coffee house just minutes before.

Q. Okay. So Mr. Hughes was willing to present a number to Mr. Spiegel that did not incorporate or measure this extraordinary revelation, is that right?

A. Can you say that question again, please?

Q. So, as far as you know, Mr. Hughes presented a number to Mr. Spiegel that did not factor in the extraordinary revelation that you and he had reached earlier that day?





MR. ELLIS: Objection.

A. To the best of my recollection, they had discussion on numbers and that it didn't -- the numbers that they ultimately discussed did not take into account that the benefit had been incorrectly paid to date.

Q. You mean you weren't seeking a reimbursement or you didn't factor in for future benefits that item?

A. My recollection is that the discussions were based on the benefit level, the incorrect benefit level, and that the appropriate benefit level that it should have been at that time.

Q. I didn't understand your answer to the question. Did you factor in the assertion that Mr. Kearney was required to reimburse the company for any benefits paid erroneously?

A. I can't recall if that was part of the consideration at that point in time. I know at some point in time a decision was made not to seek reimbursement. I don't know at that particular time whether or not that was something that was considered in the discussion of numbers that were had.

Q. What discussions did you have with





Mr. Hughes on which you're giving testimony that you have an understanding about how he arrived at the number?

A. Can you repeat the question, please?

MR. ROBERTS: Can you read that back.

THE COURT REPORTER: "What discussions did you have with Mr. Hughes on which you're giving testimony that you have an understanding about how he arrived at the number?

A. My recollection is that the discussions that Mr. Hughes had with Attorney Spiegel included the things I talked about earlier, the mortality, morbidity, interest rates, benefit level, maximum benefit period, present value. I don't think there was an exact formula that you could punch in the numbers and come up with something.

Q. That wasn't my question. Are you testifying that you had no discussions whatsoever with Mr. Hughes about the manner in which he arrived at a number, and your testimony is based solely on what you observed in the dialogue between Hughes and Spiegel?





A. I recall having discussions with Mr. Hughes about numbers and what would make -- calculating what a settlement number would look like.

Q. Is this prior to the meeting you had with Spiegel?

A. My recollection is that I did have a conversation with him prior or at some point after, I don't know a specific time line.

Q. Tell me what you can recall from that discussion.

A. I can't recall a specific conversation of what was said other than some of the factors that you would consider in coming up with an idea of a settlement is what the present value, mortality, things that I talked about earlier. I just don't remember the exact content and specifics of the conversation.

Q. Do you have a memory that he unambiguously communicated to you that the number had nothing to do with the Cuban coffee revelation?

A. My understanding is that those numbers that were initially discussed were based on the benefit level that was being paid at that point in time, which was, I believe, why Mr. Hughes had apologized

at the onset of the meeting because those numbers weren't the numbers that we would be able to use going forward because the benefit needed to be reduced.

Q. That wasn't my question. My question was do you have a specific memory of the discussion with Mr. Hughes where he communicated to you that the number he intended to propose to Spiegel or had already proposed to Spiegel had not incorporated the Cuban coffee revelation?

A. To the best of my recollection, we had a conversation about numbers. The best I can recall the numbers that were discussed were in relation to what his -- Mr. Kearney's present benefit level was at.

Q. So it had nothing to do with the revelation?

A. That's my recollection, yes.

Q. And your recollection is based on Mr. Hughes telling you that?

A. I don't recall him necessarily telling me that or the conversations we may have had about that. I do remember him expressing that at the onset of the meeting with Attorney Spiegel.





Q. So it's just coincidence that you and your supervisor planned a trip to Florida, bought tickets, got on a plane and went to meet with Mr. Kearney's counsel, and prior to actually arriving on ground in Miami, Florida you had no discussion, no inkling or no conclusion that he had been paid erroneously up until the time that you got on a plane to Florida.

A. That was a long --

Q. That was a bad question. Let me ask you that again.

Prior to getting on the plane to Florida and committing to that trip, did you have any discussion with anyone or had you thought to yourself that the benefits paid to Mr. Kearney were being paid in error?

A. I had no knowledge that the benefits being paid to Mr. Kearney were in error until sitting down in that coffee shop 15, 20 minutes or so before we met with Attorney Spiegel.

Q. So it's just a coincidence that two people would fly from Springfield, Massachusetts to Miami, Florida to talk to a lawyer for a claimant, and it's just coincidental that an extraordinary matter came to your attention after you arrived in Florida?





A. I wouldn't call it a coincidence. You know, Attorney Spiegel had asked us for a couple copies of the policy. It made me take a look at that policy and come to the understanding. My recollection was that he was aware of the circumstances with the case, that there were differences on both parties and that we were going to discuss those, and that one of the options when there's disputes is to come to some type of resolution and that those discussions would be had.

Q. You're mindful that DMS had a copy of the WJ567A policy for over four years prior to that meeting, right?

A. I don't recall a specific time that an actual copy of that policy was received by DMS.

Q. You're mindful that DMS performed some work for Jefferson-Pilot relative to the Kearney claim going back to 1997; you're mindful of that from your knowledge of the claim file, right?

A. I recall looking at that claim file there was a handling of the case by DMS prior to 2000.

Q. And you're mindful that in 1997 that at Todd Ditmar's specific request, because he wanted the legal department to review the policy, that the





WJ567A policy was sent to him by Howard Shelton, right?

MR. ELLIS: Objection.

A. I don't recall that specific communication document. If it's -- I'm sure it's in the file. If you want me to look at it, I'll verify that for you.

Q. As far as you're aware, did Jefferson-Pilot ever provide DMS with any documents or information that describe the benefits and the policies Jefferson-Pilot had outstanding with policyholders?

A. Can you repeat that question, please?

Q. As far as you're aware, did Jefferson-Pilot ever provide DMS with any documents or information that describe the benefits and the policies jefferson-Pilot had outstanding with policyholders?

A. To my knowledge, recollection, they provided us with copies of their policies. I don't recall any other materials that they gave us.

Q. Copies of the policies were given independent of the actual claim files or were they just incorporated amongst the various claim files?

A. I don't remember the logistics, if they came in with each individual file or if they were sent all the policy forms and riders all at one time,

I don't remember that.

Q. Were all the different policies and riders consolidated into some file or binder or desk somewhere at DMS for access by different folks?

A. My recollection is that we did have a binder of copies of these policies that we could attain.

Q. So would each of the claim reps responsible for that block of business have in their cubicle or office a three-ring binder that contained the Jefferson-Pilot policies and riders?

A. I don't recall if they had an actual binder themselves on their desk or they had an area where they could go to to research that.

Q. So there was a communal area where there was some kind of binder or folder with the various policies in it, Jefferson-Pilot policies?

A. Again, my recollection was that the examiners either had all those series on their desk in a binder form or a place where they could go to so they could retrieve the information they needed.

Q. When DMS takes on a new block of business, is it the procedure that the legal department will review the policies that are now subject to





administration?

A. Can you repeat that, please?

Q. When DMS takes on a new block of business, is it the procedure that the in-house counsel staff will perform a review of the new policies that will be subject to administration by DMS employees?

A. I'm unaware of any such procedure.

MR. ROBERTS: Let's switch tapes.

THE VIDEOGRAPHER: Going off record at 12:06 p.m.

Back on record at 12:07 p.m.

Q. (By Mr. Roberts) So if I understand your testimony accurately, when -- you understand you're still under oath?

A. Yes, I do.

Q. When DMS took on the Jefferson-Pilot block of business, you're not aware of any education, training or insight into the policies that was provided to you or your peers by anyone at Jefferson-Pilot?

A. No, I am not.

Q. And you're not mindful of any education, training, or insight into the particulars of the policies that was provided to you and your peers by





DMS in-house counsel?

A. No, I'm not aware of any such program or occurrence.

Q. It doesn't necessarily need to be a program. It doesn't have to be formal; it could have been informal.

A. I have no prior knowledge of these policies.

Q. I'm not talking about prior knowledge. Was there an occasion, formal or informal, where DMS in-house counsel gave you and your peers, or you, some overview of what these policies are about?

A. No, I don't recall any type of communication like that.

Q. Did Todd Ditmar provide you and/or your peers with any counsel, insight, or overview of the Jefferson-Pilot policies?

A. I don't recall him providing any particular oversight review of the policies.

Q. So as I understand it, you and -- was it three other claim examiners on the Jefferson-Pilot block of business in 2000?

A. I believe I testified that I recall three others, I don't exactly remember.





Q. So do I understand correctly that the four of you, without any dialogue or communication with people at Jefferson-Pilot, without any dialogue or communication with DMS in-house counsel, and without any dialogue or communication with Todd Ditmar, the four of you were left to administer these policies and understand for yourselves what the policies provided?

A. Well, at that time my recollection is we were given a number of cases to administer, and yeah, I don't remember anybody specifically giving any specific guidance to anything about the cases or the policies.

Q. Were you folks given binders of the policies or were those things that you and/or your peers created on your own?

A. I don't recall if there were original policy forms received from JP or they were copies provided to us that we copied over for several other copies for multiple folks. I don't know the logistics of how all that worked out.

Q. Did you maintain a binder at your cubicle, a binder of the Jefferson-Pilot policies in 2000?

A. You know, I really don't recall.

Q. But you do know that others did?

A. Again, I don't know if others had it or not.

Q. I thought you just testified that some people had binders, others just used a communal area.

A. I think my testimony was more I don't know if they necessarily had it at their desk or if it was in a communal area or not.

Q. Oh, you don't know if it was in a communal area now?

A. I don't know if they had it at their desk or if they referred to it at a communal area or not.

Q. Is it one or the other or is it potentially neither?

A. My recollection is it was probably one or the other.

Q. Okay. And you can't recall whether you had a binder?

A. To be honest with you, Mr. Roberts, I don't remember. It's a long time ago.

Q. What did you -- did you have a cubicle back then in 2000?

A. Yes, I did have a cubicle.

Q. And now do you have an office with a door?





A. Now I do have an office with a door.

Q. What did you maintain in your cubicle?

A. In my cubicle I had my computer, I had a storage area for claim files, I had calendars, pens, pads, photos of my family. Other various items I can't recall.

Q. All personal items? Any business materials?

A. Business materials? I don't recall specifically what I would have had at my desk at that point in time.

Q. And you can't testify one way or the other under oath about whether you had a binder of the policies of Jefferson-Pilot or not?

A. Yeah, I really don't remember at that time.

Q. In your office do you have a binder of the Equitable policies?

A. Yes, I do have that.

Q. Is that a good business practice?

A. I think it's a good business practice to have copies of those policies, whether they're in your office or, you know, a ten second walk to another area where you can reference them.

Q. Do you find it convenient to have them in a





binder in your office now?

A. I don't find it convenient to have them. I don't find it any more convenient if they're in my office or if they're a short walk outside my office.

Q. So if you didn't have these policies back in 2000 in a binder in your cubicle, they would have been just a short walk away from you, is that what you're saying?

A. That would be my recollection, yes, I had access to them.

Q. Where was Todd Ditmar's office in relation to yours in 2000?

A. He was fairly close. We're on the same floor.

Q. Do you know if he maintained a binder in his office of the Jefferson-Pilot policies?

A. I really don't have any idea.

Q. Was Mr. Hughes responsible for the Jefferson-Pilot block of business at all at any time that you're aware of?

A. I don't know all of Mr. Hughes's responsibilities. I know I obviously talked to him on Jefferson-Pilot cases, so I think he did have some formal responsibility.





Q. As I understand your testimony, he wasn't your direct supervisor in 2000, but he became your direct supervisor after you became Director of Claims for the Equitable block, is that right?

A. Can you say that again, please?

Q. As I understand your prior testimony, he didn't become your supervisor until you became Director of Claims for the Equitable block?

A. Yes.

Q. Are you mindful whether he had prior responsibility prior to that time for the JP block?

A. I don't fully remember what the full scope of his responsibilities were at that point in time.

Q. On how many occasions have you given a deposition?

A. I believe there's four or five other situations.

Q. Have you ever reviewed any videotape to prepare you for what to expect in a deposition?

A. Yes, I believe I have.

Q. Is that something that DMS maintains in-house or did someone outside of DMS offer that to you?

A. I believe that was someone outside of DMS.