**Graydon
Head &
Ritchey
LLP**

*Attorney A. Roberts*
Direct Dial: (513) 629-2799
E-Mail: mroberts@graydon.com

February 2, 2007

**Via Email**
John E. Meagher, Esq.
Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131

    Re:    *Kearney v. Jefferson Pilot*

Dear Mr. Meagher:

    Below is Mr. Kearney's position regarding the JP 30(B)(6) deposition. My schedule has not permitted me to analyze the Ditmar 30(B)(6). I will review it and get back with you.

    In agreement with Judge Hogan's July 26, 2004, Order (*Doc. 76*), I continue to dispute your contention that Jefferson Pilot has satisfactorily complied with its obligation to produce a witness to address the 30(B)(6) areas of injury. Judge Hogan already evaluated Attorney Loftin's testimony and granted Mr. Kearney's request to retake the 30(B)(6) of Jefferson Pilot. Judge Hogan ruled:

> administrator. That portion of Plaintiff's motion is denied. Defendant may either retake the deposition of Ms. Loftin or request the deposition of a person with knowledge. When the Court learns the identity of the new 30(b)(6) witness designated by Plaintiff, the deposition of that person shall take place no later that August 31, 2003.

    Judge Hogan came to this conclusion because Attorney Loftin admitted in her deposition that she had no responsibility for disability claims before 2002 (*Loftin Deposition, p. 7*), she had not reviewed Mr. Kearney's claim file (*Id., p. 11*),[1] she did not "have any information or knowledge of DMS' handling of Mr. Kearney's claim" (*Id., p. 98*) she also has never even spoken to anyone at DMS regarding Mr. Kearney (*Id., 101-102*), in fact, her only knowledge of the matter was her prior evening's review of the pleadings (*Id.*),

---

[1] When Mr. Kearney's counsel questioned the propriety of Attorney Loftin's appearance as the 30(B)(6) witness, Attorney Ellis stated that he "didn't know" who at Jefferson Pilot had the "greatest knowledge" of the subject matter of the 30(B)(6) notice.

www.graydon.com

| Mailing Address | Cincinnati Office | Kentucky Office |
|---|---|---|
| P.O. Box 6464 | 1900 Fifth Third Center | 2500 Chamber Center Drive |
| Cincinnati, Ohio 45201-6464 | 511 Walnut Street | Suite 300 |
| | Cincinnati, Ohio 45202-3157 | Ft. Mitchell, Kentucky 41017-7070 |
| | telephone (513) 621-6464 | telephone (859) 282-8800 |
| | fax (513) 651-3836 | fax (859) 525-0214 |

John E. Meagher, Esq.
February 2, 2007
Page 2

she didn't know who had provided the unverified answers to the discovery requests (*Id.*), and only on the eve of her deposition did Attorney Loftin know that JP engaged DMS on Mr. Kearney's claim prior to 2002 (*Id.*, 8).

Accordingly, contrary to your self-serving argument, based on the unambiguous testimony from Attorney Loftin, Mr. Kearney has had no opportunity to examine the JP witness with knowledge of the information requested.

Attorney Loftin did testify that she came to learn that Jefferson Pilot sent DMS claims based on the monthly indemnity (i.e., high dollar claims went to DMS, low dollar claims stayed in-house). (*Id.*, 19). Attorney Loftin also testified that this circumstance was directed by the reinsurer, Employers Reinsurance. (Id., 22, 26). For these reasons we continue to demand the deposition of Employers Reinsurance. Is this too a deposition you oppose?

From the May 2004 Deposition Notice, JP must produce a witness who actually does have knowledge of the following

1. The financial and other terms of J-P's relationship with Disability Management Services, Inc ("DMS"), [*at least predating Attorney Loftin's tenure which began in 2002*] including but not limited to DMS' administration of Chris Kearney's benefits claim;

2. The information, communications, and documentation (including electronic communications) shared between J-P and DMS [*Attorney Loftin testified that quarterly reports were received from DMS and also testified that JP performed audits of DMS' activities, but those documents have not been provided*];

3. DMS' administration of Mr. Kearney's claim; [*Attorney Loftin testified that she had no knowledge of this topic*];

4. DMS' disability claim administration process, including the policies and procedures applicable to that process; and [*presumably this would require the deposition now of Clyde Honaker, Attorney Loftin's predecessor since Attorney Loftin stated she possessed no knowledge*];

5. J-P's Complaint, affirmative defenses, answers to interrogatories, and production of documents in this action. [*Since Attorney Loftin admitted knowing nothing about the matter until she reviewed pleadings the day before her deposition, Mr. Kearney still requires the opportunity to depose the JP person with knowledge of the factual basis of these items*

John E. Meagher, Esq.
February 2, 2007
Page 3

> *(Attorney Loftin stated she didn't know who provided the unverified responses or even if they were accurate)*].

In the more recent 30(B)(6) Notice Mr. Kearney requested the opportunity to depose that person with the greatest knowledge regarding:

1. The relationship between Jefferson-Pilot and DMS, including but not limited to the precise scope/limit of the DMS' duties; [*If we accept Attorney Loftin's testimony, this I conclude would require that we conduct Mr. Honaker's deposition rather than an existing JP person*];

2. The information, communications, and documentation (including electronic communications) shared between JP and DMS regarding claim administration generally and Chris Kearney specifically; [*These documents have not been provided*];

3. Training provided to claims administration representatives of DMS and JP; [*This can be covered with Honaker*];

4. Documents and materials of DMS and JP which relate to or refer to claim administration of psychiatric disability claims and/or residual disability claims; [*Since Attorney Loftin took over the disability claim field after that block of business had been closed, she likely has no knowledge of this. I will cover this too in Mr. Honaker's deposition*];

5. JP's privacy protection policies and practices since 1994; [*You appear to agree to offer someone on a limited basis on this topic. I'm not certain I understand/agree with your limitations, but perhaps we can understand each other before beginning the deposition*];

6. JP's claim settlement practices; **WITHDRAWN as to the JP 30(B)(6) request is concerned.**

7. JP's affirmative claims, defenses, answers to interrogatories, and production of documents in this action; [*This is the same as #5 from 2004 and is covered by Judge Hogan's Order*];

8. JP's quality assurance programs if any; [*Attorney Loftin testified that an audit process was in place (169) -- but had no knowledge -- we will need the person with knowledge*];

John E. Meagher, Esq.
February 2, 2007
Page 4

9. Documents exchanged between the JP and DMS prior to the execution of any claim administration agreement; [*I disagree that these documents are "privileged" as you claim*];

10. Documents exchanged between JP and DMS subsequent to the execution of any agreement, including all reports referenced in the Agreement between JP and DMS; [*Ms. Loftin testified that in a short time DMS was able to reduce the total active claims from 600 to approximately 300. (Id., p. 36) Mr. Kearney is entitled to the discovery of the written communications between JP and DMS regarding claims administration and testimony concerning those documents*];

11. JP's business reasons for ceasing, limiting, or modifying the sale of own-occupation disability insurance policies of the type issued to Kearney; *We have a disagreement on the relevance of this.*

12. JP's business reasons and decision to retain DMS to manage and/or administer own-occupation disability insurance claims; [*Contrary to your claim, this topic was not "exhausted" in Attorney Loftin's deposition. In fact, she had no knowledge/responsibility until 2 years after the agreement was entered*];

13. Agreements between JP and DMS regarding claim management; *I possess this document and examined Attorney Loftin on this. Withdrawn.*

14. Documents for the period 1994 to the present which report, comment on, or relate to the profitability of own-occupation disability insurance policies sold by JP, including all profitability analyses with respect to the type of policy that Kearney owned as well as other information regarding "cash flow underwriting," interest rate projections, or the relationship between investment income and premiums charged for individual policies; *We have a disagreement on the relevance of this.*

15. Documents for the period 1994 to the present which comment on modifying the benefits available under own-occupation disability policies (e.g., increasing premiums, shortening benefit periods, etc.) and/or changing in any manner the method, mechanics, or policies impacting claim management; *We have a disagreement on the relevance of this.*

John E. Meagher, Esq.
February 2, 2007
Page 5

16. Agreements regarding claim management including addenda which exist or which have ever existed between JP and Employers Reinsurance; *We have a disagreement on the relevance of this. According to Attorney Loftin, Employers Reinsurance directed JP to send high dollar claim files to DMS for "administration;"*

17. Annual Reports and/or form 10-k's of JP for the period 1993 to the present; *Withdrawn*

18. Marketing material of JP shared with policyholders and prospective policyholders from 1992 to the present; and *We have a disagreement on the relevance of this.*

19. Own-occupation disability insurance policies and practices. *Withdrawn*

Sincerely,

Michael A. Roberts

MAR/trg
c: Christopher Kearney, Esq.
William R. Ellis, Esq.