**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **JEFFERSON PILOT LIFE INSURANCE CO.,** ) | **CASE NO. C-1-02-479** |
| : | |
| **Plaintiff,** ) | |
| : | **Judge Barrett** |
| **vs.** ) | |
| : | |
| **CHRISTOPHER L. KEARNEY,** ) | *HEARING REQUSTED* |
| : | |
| **Defendant.** ) | |

**CHRISTOPHER KEARNEY'S MEMORANDUM**
**IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

This case pits the combined resources of three of the world's largest financial institutions (General Electric, Zurich Financial, and Lincoln Financial) against an individual to whom they owe a duty of good faith and who has been irrefutably disabled for 14 years.

In 1993, when he was 40, Christopher Kearney became disabled.  (*Kearney Declaration, Exh. 1*).  He then filed a claim for benefits under two policies ("Policies," *Doc. 89 – Exhs. 1 and 2*) he had purchased from Jefferson-Pilot Life Insurance Company, a subsidiary of Lincoln Financial ("JP").  *Id.*  The Policies pay monthly benefits for life: a potential total payout of over $4,000,000.

In the following 14 years, despite extraordinary scrutiny, the Insurer[1] could not dispute Kearney's disability.[2]  Therefore, the Insurer has (although many times late) paid Kearney a portion of benefits under the Policies for those 14 years. (*Hughes Depo., Exh. 2 at 99*).[3]  In 1994, because Kearney had a $4,000,000+ medically irrefutable claim, the Insurer began to work "in anticipation of litigation" against Kearney.  (*See, GE/ERAC Privilege Log, Exhibit 4*).  Kearney's $4,000,000+ lifetime benefit claim was a litigation-target of the Insurer, therefore, it continued working "in

---

[1]  JP, Employers Reinsurance (a subsidiary of General Electric "GE/ERAC"), and Disability Management Services (part owned by Zurich Financial Services, "DMS") are referred to as the "Insurer."

[2]  The Insurer received every medical record concerning Kearney for over 14 years, including his pharmaceutical, dermatologic, orthoepaedic, and heart attack (from June 2007) records.  (*Exh. 1*).

[3]  The Insurer improperly denied Kearney the benefit of premium waiver ~ a $25,000 benefit; had for four years (6.2002 – 3.2006) denied Kearney a cost of living increase benefit; and has routinely paid Kearney's benefits late. (*Exh. 1; Kearney Depo, Exh. 3 at 31-33; see also, Ex. 17*). *due to technical difficulty, all exhibits will be filed separately on July 10, 2007*

anticipation of litigation" each year through July 2002, when the "anticipation" of litigation against Kearney became reality. *Id.*

During that period and since, Kearney's claim has been the subject of extraordinarily intense scrutiny by the highest ranking claims examiners, investigators, physicians, in-house attorneys, and outside counsel, respectively, of JP, GE/ERAC, and DMS. *Id.*[4] The Insurer has worked tirelessly in a form of claim administration warfare to find a way to confiscate the "lifetime" benefits promised Kearney.

The Insurer's continuing effort to confiscate Kearney's benefits has so surpassed the bounds of reasonableness, that the Insurer through a conspiracy of 3 very large financial institutions has invaded Kearney's privacy, intentionally inflicted emotional distress on Kearney, and engaged in bad faith.

## I.    Material Undisputed Facts.

### A.    Kearney's Four Million ($4,000,000+) Dollar Claim.

According to the Insurer, the total amount of benefits payable to Kearney over his actuarially determined average life expectancy (age 77) will exceed $4,000,000.[5] (*Rice Declaration Exh. 5*).[6]

In addition to desiring to avoid its $4,000,000+ obligation to Kearney, the Insurer has also desired for 14 years to recapture the reserves that it has been required to set aside as the result of Kearney's Claim. In 1996, these total reserves were approximately $600,000 and are today presumably much higher. (*Dempsey Depo. Exh. 6 at 44-46, 86-87; Exh 7, GE/ERAC's Claim*

---

[4] In fact, at least 19 lawyers have been consulted to evaluate Kearney's claim. (*Exh 4*).

[5] In July 2002, the Insurer sued Kearney under a new, revised interpretation of the Policies. The Insurer's argument that the Policies are unambiguously consistent with its new interpretation is incorrect, which will be determined when that issue is resolved by the Sixth Circuit. For purposes of this motion, however, the point that is most relevant remains the same ~ from 1993-2002 the Insurer correctly believed that the payments to Kearney over his life would exceed $4,000,000. And, as a result of this Court's January 2006 summary judgment determination, the value of Kearney's claim remains in excess of $4,000,000. And if Kearney lives beyond age 77, his benefits could exceed $5,000,000.

[6] Rice calculated "overpaid benefits" only. (*Exh. 5*). He omits the $3,500 monthly base liability that the Insurer paid to Kearney and will pay going forward. This additional sum through age 77 increases Rice's $3.5 million total to well over $4,000,000.

*Summary*).   The Insurer concedes that the $600,000 reserve was a factor in its decision to focus attention and scrutiny on Kearney's claim.  (*Dempsey Exh. 6 at 28-29*).

**B.    For 14 Years Kearney's Disability Has Been Indisputable.**

The Insurer's attack on the medical merit of Kearney's claim ~ as a basis to avoid its $4,000,000+ liability to Kearney ~ has never been an option.

On a monthly basis over the past 14 years, Kearney's physicians have certified that he is disabled.  (*Exh. 1*).  Their records ~ regularly provided to the Insurer ~ bear this out.  Nonetheless, the Insurer continually tested these opinions by having their in-house medical staff review Kearney's medical records.  *Id.*  They too concluded that Kearney was/is disabled.  Still unsatisfied that it had no argument to dispute medical disability, the Insurer hired its regularly retained outside medical professionals to physically examine Kearney.  *Id.*  Their opinions reaffirmed Kearney's irrefutable disability.  (*Id.; see also, Doc. 62: Exh. 4; Doc. 70: Exh. 6; and Doc. 124: Exh.6 – By December 2001, the Insurer knew that his condition had only gotten worse over time*).

As the Insurer concedes, it has never had any basis to question Kearney's entitlement to benefits based on Kearney's medical condition.  *Id.*  No one associated with the Insurer has ever suggested that Kearney is not disabled.  (*Hughes Exh. 2 at 148; Mills 2007 Depo. Exh. 8 at 35-36*).

Nonetheless, DMS says that it continues (in 2007) to evaluate Kearney's claim.  (*Mills Exh. 8 at 29*).  DMS' claim representatives receive information from its trial attorneys to assist in DMS' separate and distinct ongoing claim analysis.  (*Mills Exh. 8 at 33*).

Amazingly, in Kearney's presence, DMS now in 2007 contends that it may well yet demand ***full repayment*** of the 168+ months of benefits it has paid to Kearney.  (*Mills Exh. 8 at 38-39, 65-66, 70-72*).  Despite Doc. 124: Ex. 6, final paragraph, the Insurer now claims that it still does not have enough information to ascertain whether Kearney is disabled.  *Id.*  This testimony came just after Mills' 10+ hour prep session with his 5 lawyer legal team.  (*Mills Exh. 8 at 75*).  Mills' testimony is at best disengenious ~ but it is effective if it is designed to harass Kearney and "manage

his expectations," which is the DMS business philosophy.  In a separate part of his deposition testimony Mills testified:

> "**Q:**      Okay, so you thought that Mr. Kearney was a fraud and his doctor was just covering for him and he really wasn't suffering from clinical severe depression and you were going to be able to disprove her opinion by having him surveilled several times?
>
> "**A:**      **No, Not at all.**  I don't think I've ever felt that way about Mr. Kearney.  In fact, I think **what the surveillance did was confirm** to (Kearney's) benefit a lot of the things that I recall he was putting down on the forms at that time about his limited abilities to work." (*Mills 2004 Exh. 9 at 177*).

## C.    The GE/ERAC Connection and Ambition To Sue Kearney.

Throughout its 14 year history, the Kearney Claim has presented the Insurer with a $4,000,000+ obligation and no medical basis to argue liability.  Accordingly, beginning in 1994, the Insurer began preparing nonetheless for litigation against Kearney.

### 1.    GE/ERAC's Interest.

GE/ERAC reinsures disability insurance policies issued by JP.  (*Dempsey Exh. 6 at 15-17*). Prior to 1993, JP "ceded" to GE/ERAC 100% of the liability/expense on one Kearney policy and 67% of the liability/expense on the other Kearney policy.  (*Id. at 20-22, 45, 84, and 95; Newkirk Depo. Exh. 10 at 14; see also, Exh. 7*).[7]

When Kearney first filed his claim in 1993, JP notified GE/ERAC: it then set a "reserve" for its percent of the liability ~ 85%.  (*Dempsey Exh. 6 at 26-27*).  In 1997, the GE/ERAC reserve portion was $501,707.  (*Id. at 44-46, 86-87; see also, Exhibit 7*).[8]  Because GE/ERAC holds more than 80% of the liability, GE/ERAC's in-house lawyers have monitored, if not directed, the 14-year administration of the claim and litigation. (*Dempsey Exh. 6 at 6, 9, 19, 52-53, 59-60, and 100-104*).

According to its privilege log, GE/ERAC became involved in Kearney's claim in 1994. (*Dempsey Exh. 6 at 37, 71; Exh. 4*).  And GE/ERAC's in-house lawyers have secretly been actively involved in the Kearney claim and litigation in "each month" for several years.  (*Id. at 19-*20).  As

---

[7] JP's "retention" (the % of risk it kept) accounts for approximately just 17% of the claim payments and expenses connected with Kearney's disability claim and this litigation.  (*Exh. 6 at 18, 67*).

[8] JP additionally set its own reserve – presumably $100,000 – for its retained liability (i.e., 1/6 of the liability on the two Policies). (*Exh. 6 at 28*).  The reserve fluctuates over time.  (*Id. at 9I*).

the claims file and Privilege Log display, emails, letters, strategy decisions, pleadings, and legal memoranda cannot be transmitted or concluded without input and direction from GE/ERAC. (*Id. at 6, 9, 19-20, 52-53, 59-60, and 100-104; Exh. 4*). And GE/ERAC claims counsel receives for their review, medical records, investigative records, surveillance, tax returns, divorce records, pleadings, correspondence, deposition and hearing transcripts, and all other documents generated regarding both the Kearney litigation and the Kearney claim. (*Id. at 50-60*). GE/ERAC even reviews drafts of correspondence, legal memoranda, and motions. (*Id. at 51-54*). And GE/ERAC's lawyers continue to "analyze" the ongoing Kearney claim. (*Id. at 59-60, 100-104*).[9] Dempsey even concedes that the recent litigation effort to obtain 14 years of credit card information on Kearney was for the true purpose of analyzing his separate and distinct ongoing claim – outside litigation. (*Id. at 101-104*).

### 2. The GE/ERAC Aim To Sue Kearney.

In February 1994, GE/ERAC began creating documents with a view to litigation against Kearney. (*Dempsey Exh. 6 at 71-72; Exh. 4*). GE/ERAC generated additional "work product" documents in anticipation of litigation against Kearney in February 1995, March 1995, November 1996, February 1997, September 1997, March 1998, May 1998, and in 2001. (*Dempsey Exh. 6 at 71-77; Newkirk Exh. 10 at 18-21*).[10]

By 1997, despite Kearney's incontestable disability, GE/ERAC became so engrossed in finding a way to terminate Kearney's $4,000,000+ claim – and recapturing its $0.5 Million reserve – that GE/ERAC specifically identified Kearney's claim for review. (*Dempsey Exh. 6 at 24-25, 97;*

---

[9] In response to a 2007 subpoena, GE/ERAC produced a 3600+ page file it maintains on Kearney. (*Dempsey Exh. 6 at 39-40*). That files materials span 1990 (the Application file) to May 2007 (the most recent claim correspondence sent Kearney). (*Id. at 48-55, 81, 97-98, 104-105*). And data in the GE/ERAC file not produced consumes a 97 page privilege log. (*Id. at 36-37; Exh. 4*). To prepare for his 3 hour deposition, Attorney Dempsey spent over 5 hours with 6 lawyers (Attorneys Baty [Kansas counsel], Meagher, Ellis, Cohen [DMS General Counsel], Formus [DMS], and Farabow [JP]). (*Dempsey at 34-36*). And during the course of that *brief* preparation session, Dempsey was given a December 2002 letter to review. The letter was written from JP's President, Valerie Loftin, to DMS' President, Robert Bonsall. (*Id. at 36-38*). That letter (although provided by Dempsey to his counsel in response to the 2007 Subpoena) has neither been produced nor identified in any of the 4 privilege logs created by JP, DMS, and GE/ERAC. (*Id. at 36*). And Bonsall testified that he had not heard of Kearney prior to May 2004. (*Bonsall Depo. Exh. 11 at 7*).

[10] JP's July 2002 complaint against Kearney, therefore, simply culminated an 8 year effort to find some basis to sue or cut-off Kearney. This aim resulted from the fact that Kearney's 14 year disability had always been beyond medical question. It was never a matter of "if" JP would sue Kearney: only "when."

*Newkirk Exh. 10 at 10, 22-25*).  GE/ERAC admits that the reserves were a factor in deciding to specifically identify claims for review.  (*Dempsey Exh. 6 at 28-29*).  With their superior in tow, Attorneys Dempsey and Newkirk boarded a plane to North Carolina to review Kearney's claim file. (*Dempsey Exh. 6 at 8; Newkirk at 10, 22-25*).  This 1996/1997 visit and file review resulted in a GE/ERAC lawyer generated "to-do" list on Kearney's claim, which was copied to DMS.  (*Dempsey Exh. 6 at 47-48, 72-73, 75; Newkirk Exh. 10 at 16; Exh. 7*).[11]  From its review, GE/ERAC's in-house lawyers determined that the policy would pay benefits to Kearney for life.  (*Dempsey Ex. 6 at 44-45; Newkirk Ex. 10 at 14-15; Ex 7*).

Then, in July 1997, at GE/ERAC's instruction, Kearney's file – along with 2 others from JP (of the several hundred it had) – was sent to DMS.[12]  (*Dempsey Ex. 6 at 92-94*).  The accompanying letter to DMS reads:

> "These are the cases that you (DMS) are going to investigate for us to see what can be done to either settle these in an equitable manner to both (GE/ERAC) and to Jefferson-Pilot, or to give us further advice on where to proceed." (*Dempsey at 92-93; see also, Ex. 12*).[13]

And by May 1998, JP's existing trial counsel (Attorney Ellis) was corresponding with GE/ERAC in-house lawyers regarding "Kearney claims handling."  (*Dempsey Ex. 6 at 77-78; Ex. 4*). This is undoubtedly because GE/ERAC had noted in 1997 that the "jurisdiction" relevant in the Kearney claim was Ohio.  (*Dempsey Ex. 6 at 47; Ex. 7*).

By September 2001, the Insurer was unable to dispense with Kearney's claim in any legitimate fashion.  Therefore, GE/ERAC authorized DMS to meet with Kearney's counsel in Miami, Florida.  (*Dempsey Ex. 6 at 87; see also, Ex. 13; Correspondence With Spiegel*).  **Prior** to that trip – and, therefore, prior to Mills' purported "Cuban Coffeehouse Revelation" – Dempsey authorized Mills to present Kearney with a settlement offer.  (*Dempsey Ex. 6 at 87-90*).  The offer, $280,000,

---

[11] This document was produced by GE/ERAC but was not produced by JP or DMS in this litigation.

[12] On April 1, 1997, because GE/ERAC was dissatisfied with the claim administration of JP, it entered a consulting Agreement with DMS whereby GE/ERAC would send specifically identified claimant's files to DMS for "expert" handling.  (*Dempsey Ex. 6 at 31-32; Bonsall Ex. 11 at 8-18*).

[13] According to Dempsey, it was "rare" for GE/ERAC to refer claims to DMS for review under the consulting agreement.  (*Dempsey Ex. 6 at 80-81*).

equaled approximately 5% of the liability on the $4,000,000+ Policies and less than 50% of the combined JP - GE/ERAC reserves value from 1997. (*Compare Ex. 5 and Ex. 13*).

**D.**   **DMS ~ A "Manager" Of Policyholders And Manager of "Outcomes."**

DMS was created in the mid-1990s to serve as a claim administrator focusing exclusively on closed blocks of non-cancellable disability insurance, in response to the opportunity created by the collapse of "40 of 70" disability insurers. (*Bonsall Ex. 11 at* 9, 27; <u>*See also*</u>, *Bonsall Depo. Ex. 40, which is attached here as Ex. 14*).

According to Bob Bonsall, the founder, President, and part owner of DMS, in the 1980s, disability insurance companies were "trying to out-do one another" in order to be "competitive," "make sales," and "find new premium that they didn't have before." (*Bonsall Ex. 11 at 25-27; Exh. 14 attached*). As a result, disability contracts, were "ill designed, had weak contract language." *Id.* From "the late 1980s right through the late 1990s, on an industry wide basis, experience in the individual disability insurance market was really poor and much worse than expected." *Id.* Claims made the financial condition of insurers "bad." *Id.* At "least 40 of the 70 carriers" of disability insurance "got out ... quickly, and it was an ugly situation." *Id.* "Carriers that stayed in ... rolled up their sleeves and went about fixing the problems." *Id.* They raised premiums, tightened underwriting, and "sharpened" policy language; companies also went about "fixing" matters by "*investing* in their claim management practices." *Id.* (*emphasis*).

At the end of 1999 (three plus years after it ceased selling disability insurance policies), JP closed its claims department in North Carolina and sent all of its outstanding disability files to DMS under a claims assessment agreement dated December 15, 1999. (*Bonsall Ex. 11 at 17-18*). The Agreement contemplates adjustments in compensation based on performance. (*Id. at 45*).[14]

Bonsall, explained, that during this time, "finally, year by year, the financial economics of

---

[14]    ERAC was DMS' 2nd client. (*Bonsall Ex. 11 at 8*). In its agreement with its 1st client, Travellers, DMS built in monetary incentives based on its performance. (*Bonsall Ex. 11 at 57-58*). And Bonsall's company gives claim representatives "spot bonuses" that are paid "on the spot," when performance warrants. *Id.* In 2002, the year DMS' acts led to this suit being filed, DMS officers received compensation of $2,009,480 and bonuses in the additional sum of $3,138,700. (*Bonsall Ex. 11 at 63*).

disabilities improved." (*Exh. 14*).  After being "unprofitable for quite a few years," the disability industry came to enjoy double digit growth in profit.  *Id.*  And Bonsall agreed that "given where disability insurance had been ... (its financial turnaround) is nothing short of miraculous."  *Id.*

Bonsall testified that it is "particularly important to DMS" to "manage expectations of policyholders." *Id.*  Bonsall explained that "claims management ... (is a) critical component of managing a block of disability business (and) successful claim management involves ... litigation." *Id.*  According to Bonsall, "managing expectations ... is a significant issue and topic for (him) because ... what (he's) really talking about is ***managing claim outcomes***.  To do that effectively, (DMS) has to effectively ***manage expectations of claimants***," like Kearney. *Id.*  Here are Bonsall's own words (*Ex. 14, p. 2*):

> **MR. ROBERT BONSALL:** As Paul mentioned, I'm with Disability Management Services, Inc. The company was founded primarily to focus on disability income claims management, primarily on the individual product line side. I'm going to talk about managing expectations, and it's a significant issue and topic for me because, as we talk about claims management, what we're really talking about is managing claim outcomes. To do that effectively, I firmly believe that we have to be able to effectively manage expectations of claimants.  What I want to talk about is what that looks like, how we think about it, and how we accomplish it. But first I want to

DMS employees are evaluated on their ability to "build a case, develop the strategy and when appropriate execute resolution." (*Ditmar Depo. Ex. 15 at 70-74*).  This includes "settlement strategies." (*Ditmar Ex. 15 at 107*-111).  And DMS employees aspire to "become more familiar with the DMS claims settlement process," "claim philosophy," and "formulate and implement appropriate claim management strategies." (*Ditmar Ex. 15 at 84-86, 109*).  This includes "advance pay and close opportunities." (*Id. at* 93).  And DMS gives spot bonuses to its employees.  (*Hughes Ex. 2 at 224*).

The DMS experience on the JP block of business from January 2000 through April 2004 shows that 336 claims were shipped to DMS in January 2000 and another 212 were shipped to DMS later that year.  (*See, Exh. 16; Ditmar Depo. Ex. 27*).  *Id.*  During 2000, DMS was able to close 33% of these claims (179 of 548 claims).  *Id.*  Included in this sum are 71 disputed claims that DMS

settled – as they attempted with Kearney in October 2001.  *Id.*[15]   In the first 4 years of the Agreement, DMS was successful in closing 764 of 1027 claims it assumed (75%).  *Id.*

**E.    Kearney's 14-year Experience.**

As Bonsall explained, the claim administration "process is a complex one that is not well understood by lay people ... [and it is] important [therefore] to communicate with claimants." (*Bonsall Ex. 11 at 24*).

What claimants do not know – and is not communicated to them – is that the Insurer many times will put a claim on "auto pay."  (*Ditmar Ex. 15 at* 92).  This occurs when disability is established and, therefore, the Insurer performs less routine (i.e., annual only) management.  *Id.* Although it should have been, Kearney's claim was never put on auto-pay.

In 1993, and since, Kearney has performed his obligations under the Policies and has monthly provided the Insurer with continuance of disability forms, limited authorizations, and certified Attending Physician Statements.  (*Exh. 1*).  He also at all times provided up-to-date medical records, tax returns, financial information, and information from his accountant.  (*Exh. 18, Excerpts of Claims file, e.g.,* 2719, 2714, 2785, 2687,  2729). These documents and perhaps an annual review of Kearney's tax returns are all of the information the Insurer needed to reasonably satisfy itself that Kearney remained entitled to benefits.

The Insurer, however, was not working to assess the claim.  Instead, the Insurer was working to find a way to deny the $4,000,000+ Kearney claim.  For that reason, its "investigation" and interaction with Kearney went well beyond acceptable claim administration.  Below is a summary of Kearney's experience on his incontestable claim:

**1.    Events of 1993 – 1995.**

---

[15] In 2001, DMS took on an additional 58 claims and was able to close 120 of the 427 claims it adjudicated (28%).  (*Ex. 16*).  In this total, are 37 disputed claims that DMS was able to settle.  *Id.*  In 2002, DMS took on an additional 130 claims and was able to close 214 of the 437 claims it adjudicated (49%).  *Id.*  In this total, are 34 disputed claims that DMS was able to settle.  *Id.*  In 2003, DMS took on an additional 291 claims and was able to close 251 of the 514 claims it adjudicated (49%).  In this total, are 47 disputed claims that DMS was able to settle.  *Id.*  And DMS "Settled" an additional 13 claims in the first 4 months of 2004.

Beginning in 1993, and continuing through the present, Kearney questioned the Insurer about his rights under the Policies (*Id. at e.g., 2690, 2804, 2857)*.  Kearney and the Insurer regularly debated what information was required for "proof of loss" (*Id. at e.g., 2684-2687*). Kearney complained that the Insurer did not afford him the benefit of premium waiver.  (*Id. at 2690*).  Kearney repeatedly complained that the Insurer did not keep his private information private. (*Id., e.g.,* 2687: asked that his business associates not be contacted).  Kearney also complained that the Insurer was intentionally causing him emotional distress.

The Insurer's numerous (approximately thirty (36)) investigations of Kearney [in addition to the pre-Policy issue investigation] yielded no basis to terminate Kearney's claim, including:

Inv. 1:   **February 1994:**  Equifax engaged to investigate/surveil Kearney (*Id., 2734-52*).

Inv. 2:   **January 1995:**  CPA retained to review Kearney's claim information (*Id., 2803*).

Inv. 3:   **February 1995:**  JP moved the administration of Kearney's claim to a supervisor and misrepresented to Kearney that his benefits would cease after 24 months (as opposed to lifetime). (*Id., 2799 and 2804*).

Inv. 4:   **February 24, 1995:**  In the same month that JP belatedly issued its first check to Kearney (2798) JP audited Kearney's Claim (*Id., p. 2790, 2793*).

In 1995 ~ at the time that the Insurer now admits they were "anticipating" litigation against Kearney ~ Kearney first advised the Insurer that he may need to engage a lawyer to combat the Insurer's bad faith, invasion of privacy, and intentional infliction of emotional distress.  (*Id., at 2753-4, 2799, 2788, 2917*).

**2.    Events of 1996 – 1999.**

In July 1996, JP ceased selling disability insurance policies altogether.  (*Roberson Depo. Exh. 19 at 21*). [16]  This was no doubt the result of the industry wide shut down referred to by Bonsall (*supra*) to forestall further financial hemorrhaging.

Inv. 5:   **August 20, 1996:**  JP again audits Kearney's Claim. (*Ex. 18 at 2830*).

---

[16] The Kearney claim rose to Roberson's level because of its value.  (*Shelton Exh. 20 at 86*).

Inv. 6:    **November 1996:** At GE/ERAC's insistence, JP retains an accounting firm, Callaghan & Narwocki (that works exclusively for disability insurers), to investigate Kearney's claims. (*Id. at 2812-24; Roberson Ex. 19 at 50*). JP had not used this specialized service with any other claim. *Id.* JP provides Callaghan with 68 pages of tax forms and the *latest* Equifax report. *Id.* And JP demanded more information from Kearney. (*Id. at 2815*).

Inv. 7:    **November 1996:** JP engaged PDC, Inc. to investigate Kearney (*Id., 2863-70*).

Inv. 8:    **November 1996:** JP again engaged Equifax to investigate Kearney (*Id., 2821*).

Kearney felt it necessary to copy counsel on correspondence in 1997. (*Id. at 2917, 2921*).

Inv. 9:    **July 8, 1997:** At GE/ERAC's behest, JP sent Kearney's file (and 2 other files) to DMS: "to see what can be done either to settle [Kearney's claim] in an equitable manner to both [GE/ERAC] and to JP or to give [JP] further advice on where to proceed." (*Id. at 2892; Ex. 12; Hughes Depo. Ex. 2 at 132; Shelton Ex. 20 at 40, 52*). Shelton sent a copy of Kearney's policy to Ditmar in September 1997. (*Ex. 18 at 2880*).

Inv. 10:    **November 1997 – February 1998**: Ms. Chelsey Ugolik reviewed the file. (*Id. at 2*866-71, *2863-64 and 2970*). Ugolik noted Dr. Judd's diagnosis – major depression. *Id.* She also summarized the financial information reflected on Kearney's individual and corporate tax returns. *Id.*

Inv. 11:    **February-April 1998:** The Insurer again retained PDC, Inc., a DMS subsidiary, and Janet Beattie, to conduct a medical review of Kearney's claim (during which the medical examiner explored "claim settlement and policy settlement" with Kearney) (*Ex. 22; Hughes Ex. 2 at 136*). Kearney makes it clear that he wanted his privacy protected. *Id.* Kearney then allowed Ms. Beattie to meet with him and his physician, Dr. Judd-McClure, for 3.5 hours. *Id.* Ms. Beattie learned and reported to the Insurer that Kearney was ***unable*** to "manage financially," bounced many checks, and was struggling to keep his house. *Id.* Beattie recommended to Kearney that he see a lawyer after she and he discussed the policies. Kearney stated his impressions of this visit in June 2001 (*Ex. 18 at 617-618*). Dr. Judd-McClure described this visit by Beattie as being made under "false pretenses" in her deposition. (*Ex. 21 at 69-71*).

In her report, Beattie recites questions and concerns that Kearney had continued to have about his Policies. (*Ex. 22, p. 7*). Beattie recommended that the Insurer satisfy Kearney and provide him with answers to these questions (e.g., written explanation of policy benefits, including own occupation, occupational definition and explanation, length of his benefits, an explanation of how JP views residual vs. total disability and how this decision is made). *Id.* The Insurer refused –

for over 4 years. In April 2002, Kearney presented the Insurer with these same questions. (*Ex. 23*; <u>*see also*</u>, *Hughes Ex. 2 at 209-218*). In response, the Insurer falsely contended that it had already answered these questions. According to Hughes, there may sometimes be a reason for the Insurer to not communicate with the policyholder. (*Hughes Ex. 2 at 192*).

One issue Kearney raised with Beattie in March 1998 ~ and which Beattie recommended the Insurer finally answer/communicate to Kearney ~ concerns whether his partial disability benefits are payable for life or until age 65. (*Ex. 22 at 7*). The Insurer did not answer this question ~ and when it was again raised by Kearney 4 years later (*Ex. 23*), the Insurer was not forthcoming. (*Ex. 24*). The Insurer withheld from Kearney its conclusion that the residual benefit disability paid for life. Even though "lifetime" was the conclusion of GE/ERAC during its 1997 audit (*Ex. 7*) and was additionally the opinion of DMS' claim rep, Todd Ditmar (*Ditmar Ex. 15 at 156*) and the opinion of JP's claim officer, Hoaward Shelton (*Shelton Ex. 20 at 22, 54*). This Newkirk-Shelton-Ditmar "lifetime" consensus opinion was always withheld from Kearney, despite his multiple requests in 1998, 2002, and otherwise.

<u>Inv. 12:</u>  **May 1998**: GE/ERAC began consulting its present lawyer, William R. Ellis, regarding the Kearney claim (4 years prior to filing suit)(*Ex. 4 Priv. Log*).

<u>Inv. 13:</u>  **July 1998:**  The Insurer retained IHI Investigation Services to surveil Kearney (*Ex. 18 at 2937, 2940*). Kearney was personally interviewed at his residence on December 1, 1999. *Id.*

<u>Inv. 14:</u>  **November 1999:**  Another surveillance team (ICS) was retained to investigate and surveil Kearney (*Id. at 2998-3005, 3009, 3103*).

In 1999 Kearney filed bankruptcy. (*Kearney Ex. 3 at 82*).

On December 15, 1999, at GE/ERAC's request, all GE/ERAC reinsured JP claims (including Kearney's) were sent to DMS for adjudication pursuant to a Claims Assessment Agreement technically entered between JP and DMS. The Agreement pays DMS a set fee, subject to adjustment based on performance. (*Loftin Ex. 25 at* 22, 27, *62*; *Shelton Ex. 20 at 10*). DMS' Bob Mills took responsibility for Kearney's claim on January 1, 2000. (*Mills 2004 Ex. 9 at 39*). In 4 years, DMS was successful in closing 75 % of the 1027 claims it assumed  (*Ex. 16*).

###    3.    <u>Events of 2000 – 2002.</u>

In addition to its 1997-1999 work on the Kearney claim pursuant to the GE/ERAC – DMS Consulting Agreement, DMS administered the Kearney claim during January 2000 – July 2002, when it orchestrated the filing of this action.  At the time it received Kearney's claim, it was a very mature file.  All medical and financial information was up-to-date and established Kearney's entitlement to benefits.  Yet, DMS set out on a "strategy" to deny the claim and harass Kearney into settling the claim for pennies.

<u>Inv. 15</u>:    **January 2000:**  In the 1st month that it took complete control of the Kearney claim, the Insurer sought medical records to date from Kearney's 5 physicians. (*Ex. 18 at 3124-25*).  Kearney cooperated and also gave DMS his tax returns.  (*Id. at* 3102-03).  But Kearney complained about the broad authorization he was now required to sign (copying an attorney).  *Id.*

<u>Inv. 16</u>:    **January 2000:**  DMS retained CS Claims Group, Inc. to secretly surveil Kearney (*Id. at 3095, 3101, 3111-12, 3122*).  They collected civil records, business information, workers compensation records, and (as specifically directed) pharmacy prescription records.  *Id.* They also contacted a business associate, Medical Safe Tech. *Id.*

<u>Inv. 17</u>:    **March 2000:**  CS Claims Group continued its investigation. (*Id.  at 3105-09*).  It researched automotive records, speeding tickets.  They followed Kearney for 2 days, videotaped him, saw his efforts to work, followed Kearney and a girlfriend into Denny's for dinner and sat next to them while they ate.  *Id.*  This investigation resulted in a photo of Kearney and his friend. (*Ex. 26*).  They also continued to research Kearney's divorce records.

<u>Inv. 18</u>:    **March 2000:**  Another surveillance by CS Claims group was performed in March 2000 – to observe Kearney's weekend activities.  (*Ex. 18 at 3095-3101*).  They again observed and videotaped his work activities, and followed Kearney and his girlfriend into a restaurant.  *Id.*  They also secured divorce and other civil action records.  *Id.*

During this time, Kearney's doctor wrote to DMS complaining about their unprofessional behavior. (*Id. at 3087-88*).

<u>Inv. 19</u>:    **April 2000:**  The Insurer retained another outside accountant, Michael Pasterczyk, to audit Kearney (*Id. at 3084*).

<u>Inv. 20</u>:    **April 2000:**  The Insurer retained a frequently used clinical psychologist, Dr. Piechowski, to review Kearney's medical records (*Id. at 0079-0081*).

Inv. 21:    **June 2000:** The Insurer again retained CS Claims Group, Inc. to perform an additional 3 days of videotaped secret surveillance on Kearney (*Id at 3068-3075*).

Kearney felt it necessary to copy counsel on correspondence in 2000 (*Id. at 3102*).

In June 2000, DMS (through William Hughes) contacted another policyholder, Aubert King, who was claiming residual disability. (*Hughes Ex. 2 at 123, Exh. 27*). In the letter, DMS asserts that it had been making residual disability payments to King by mistake and that King owed the insurer $54,649. (*Hughes Ex. 2 at 127-130*).[17]    The King case was an alleged overpaid residual claim. (*Loftin Ex. 25 at 66-70*).

In August 2000, Mills wrote Kearney and "apologized" that DMS failed to increase Kearney's disability payment in June 2000 based on the COLA rider. (*Ex. 30; Hughes Ex. 2 at 125-130*). On August 19, Kearney responded with the additional complaints he has about DMS. (*Ex. 31, Chronology of Correspondence between DMS and Kearney from August 2000 – July 2002*). And Kearney's physician, Dr. Judd, too wrote and complained about the treatment she was experiencing and Kearney was facing. *Id.*

In September 2000, Mills requested the assistance of the DMS "Claims God," William Hughes, considered the "greatest mind" at DMS, even though Hughes was assigned exclusively to DMS' Equitable block of business, not JP. (*Ex. 31; Hughes Ex. 2 at 55, 103-121; Mills 2007 Ex. 8 at 44-51*).[18] Mills consults with Hughes to develop strategies on cases. (*Mills 2004 Ex. 8 at 27-*28). A September 19, 2000, letter ghostwritten by Mills for Hughes' signature was modified by Hughes and

---

[17]    Despite working on thousands of claims and being deposed multiple times, Hughes lawyers requested that he review his testimony in the ***King*** case days before his deposition in this case. (*Hughes Ex. 21 at 22-28*). Despite his review of his King testimony, Hughes testified disengeniously that he couldn't recall the facts or issues relevant in that case. *Id.* He also disengeniously testified that he could not recall whether he met with counsel the afternoon before his deposition. *Id.*

[18]   Hughes had responsibility for a different block of business (the Equitable) but Mills sought Hughes' help because Hughes had been a highly paid (salary and bonus) officer of DMS since 1997. (*Hughes Ex. 21 at 7-8, 15, 17, 30, 33*). He also was the person at DMS responsible for training all new hires. (*Hughes Ex. 21 at 55- 61, 62-66*). He has also been invited to speak at industry conferences. (*Id. at* 67). And Hughes is not someone who sees the duty of good faith as giving the insured the benefit of the doubt. (*Id at 48-52*). Although he could not dispute the principles stated in Exhibits 4 and 5 of his deposition. (*Hughes at 68-85 , attached as Exhibits 28 and 29*).

sent to Kearney on October 2, 2000. (*Compare*, *at Exh 31; Mills 2007 Ex. 8 at 48*).  This letter was

a significant turn in the relationship and caused Kearney to again seek legal counsel:

| Requests of Sept 19 Draft | Added Oct. 02 Requests By Hughes |
|---|---|
| ▪ Complete list of business clients; and<br>▪ Complete copy of Dr. Judd's Records | ▪ Business/Personal tax returns;<br>▪ 1099's for 1992 and 1994;<br>▪ Salary expense documents for 1995 and 1996;<br>▪ Completed Occupation Description Form;<br>▪ Contracts with clients since 1991;<br>▪ Contact information at each company;<br>▪ An enedited authorization;<br>▪ Backup documents for all expenses (cancelled checks, invoices, bank statements, etc.) noted on tax returns for last 10 years;<br>▪ A signed special authorization; and<br>▪ Monthly itemized revenues, expenses, and net income for the past 12 months (including full back-up documentation for all expenses) |

Mills, an experienced claim rep who had worked on the file for 10 months asked for what he

needed.  Hughes added onerous and ridiculous requests to simply overwhelm Kearney.

Hughes' October 2000 letter to Kearney put Kearney's claim on "reservation of rights," and

is written in a tone that is totally "outrageous."  (*Ex. 31*).[19]  Hughes did this even though all

surveillance investigations in 2000 and prior had provided evidence affirming everything Kearney

was reporting regarding his disability.  (*Hughes Ex. 2 at 153; Mills 2007 Ex. 8 at 44-47*).  And

Hughes even put Kearney on "reservation of rights" before the Insurer had even asked that Kearney

submit to an IME.  (*Mills 2004 Ex. 9 at 207*-208).  Mills admits that in exercising good faith an

insurer must give the policyholder the benefit of the doubt. (*Mills 2004 Ex. 9 at 212*).   Hughes

doesn't agree.  (*Hughes Ex. 2 at 48-51*).  The "reservation of rights" threatened Kearney that the

Insurer may in the future demand a return of the benefit.  (*Hughes Ex. 2 at 155-56*).[20]

Because Kearney was entirely dependent on his monthly disability check, he responded to

the letter by closing the physical office of the business (in Cincinnati) that he had attempted to

---

[19] Hughes, DMS' Claims God, testified that in October 2000 he had a "particular understanding of the Policies" and didn't come to his revised understanding until one year later.  (*Hughes Ex. 2 at 228*-232).
[20] The "reservation of rights" in October 2000 was completely unrelated to the Insurer's purported new understanding of the Policy from October 2001. (*Hughes Ex. 2 at 169-172*).

continue afloat through his disability; and, relocated that office and his personal residence to the basement of his mother's home 200 miles away in Wooster, Ohio. (*Kearney Ex. 3 at 13-14, 18, and 38; Ex. 31*). Kearney also then – once again – retained counsel. (*Kearney Ex. 3 at 35*).  Kearney's response to Hughes letter was sent on October 25, 2000. (*Ex. 31, 3047-48*).

On October 30, 2000, Kearney phoned Mills and was told by Mills that Mills "did not know if another check was coming." (*Exh. 1*).

Inv. 22: **November 2000:** The Insurer interviewed its agent in a non-medical investigation of Kearney (*Ex. 18 at 3035-3036, 3041-42*).

Following its October 2000 threat, on November 2, 2000, the Insurer issued a letter threatening to cut Kearney off completely for not submitting information. (*Ex. 31 at 3043-44; Mills 2004 Ex. 9 at 216-221*). Kearney again made it clear to DMS that he needed the monthly checks to live and was having greater difficulty working because of the harassment he was facing by the Insurer. (*Ex. 31; Mills 2004 Ex. 9 at 223-228*). A similar threat to cut off Kearney was issued in December 2000. (*Ex. 18 at 3038*).

The November communications Kearney had with the Insurer caused him to forego going to a pre-arranged industry conference where he had hoped to showcase some of his work. (*Kearney Ex. 3 at 31*). In November 2000, DMS and the JP agent responsible for Kearney's policies discussed the fact that the matter was "headed to litigation" (*Ex. 18 at 3041*).

Inv. 23: **December 2000:** The Insurer performed its own internal non-medical investigation of Kearney (*Ex. 18 at 3018-19*).

Inv. 24: **January 2001:** The Insurer again retained CS Claims Group, Inc. to surveil Kearney (*Ex. 18 at 1543-46, 3357, 3366-68*). The Insurer gave it a list of Kearney's former business associates with a script of questions to pose to each. (*Id at 3367-68*).

Inv. 25: **January 2001:** The Insurer retained another outside accountant, Joseph Levy, to investigate Kearney (*Id. at 3196-3220, 3276-98, 3323, 3364*). This exercise came with another voluminous request for financial information. (*Id. at 3328-30, 3311-3312, 3274-76, 3280-82, 3251-54, 3202-04*). Levy also obtained information on Kearney from the IRS and SSA, which all matched the information Kearney had provided. (*Id. at 3209-10*). Kearney satisfied these repeat requests and in March 2001 Levy gave DMS a 12 page summary of Kearney's financial information from 1988-1999 and in

August 2001 he gave DMS a separate 10 page additional summary – the same day it sought more information from Kearney. (*Id at 3283-94, 3201-19*).  Kearney expressed his objection to repeated requests for a "mountain" of records dating back to 1988 when he had already repeatedly advised that he provided all info.  (*Id. at 3265*).  He also commented on his concerns about DMS keeping his information private.  *Id.*

Inv. 26:  **January 2001**: The Insurer retained another investigation firm, NWI Investigative Group, Inc., to perform unannounced visits to Kearney's business contacts (*Id. at 3331-36, 3358*).

Inv. 27:  **January 2001**: The Insurer retained an internal psychologist, Dr. Benander, to review Kearney's medical records (*Id. at 0323-24, 3348*).

Kearney felt it necessary to copy counsel on correspondence in 2001 (*Id. at 626*).  The insurer demanded in January 2001 that Kearney produce documents even though the Insurer knew that the requested documents did not exist.  (*Ex. 31; Hughes Ex. 21 at 142-146, 160)*.  Kearney's response is telling.  (*Ex. 31*).

### a.    Mills' False Claims Regarding The New Authorization.

As the Vice president of Claims for JP, Clyde Honaker, recognized, authorizations can not be unlimited.  (*Honaker Ex. 33 at 112*).  DMS should not threaten or intentionally intimidate policyholders.  (*Id. at 121*).  And it would be "disturbing" to learn that JP preyed on the particular disability of an insured to gain some advantage.  (*Id. at 125-8*).

Monthly for many years, Kearney executed an authorization authored and requested by JP.  (*Ex. 32; Kearney Depo. Ex. 3 at 91-101*).

In 2000, although the authorizations Kearney had signed for JP were still by their terms valid, DMS demanded that Kearney sign a more expansive authorization or be cutoff from benefits.  (*Kearney Ex. 3 at 91*).  DMS "forced [Kearney] to sign a big broad general authorization by – by refusing (in January – February 2001) to pay [Kearney's] benefit until he signed it."  *Id.*

In his December 22, 2000, letter Kearney again complained about the new authorization.  (*Ex. 31; Ex. 32*).  On December 28, 2000, JP sent Kearney a lapse notice even though he had timely issued a premium payment.  (*Ex. 31*)  On January 24, 2001, the Insurer threatened again to withhold benefits if Kearney did not sign their authorization.  (*Ex. 31*).  During this time, Mills

falsified to Kearney that the new form was JP's form. (*Mills 2004 Ex. 9 at 223-228*).  It wasn't.  (*Ex. 32*).

On February 15, 2001, Kearney spoke to Mills and recorded the call. (*2-15-01 taped conversation, Exh. 34*).  Mills advised Kearney that his check that should have been issued at the beginning of the month was being held because Kearney balked on executing the DMS' authorization.  (*Id., p.* 1).  Kearney correctly pointed out that the several authorizations sent him by JP and which he signed willingly before January 2000 were still in fact valid.  (*Id.; see also, Ex. 32*).

Kearney told Mills he needed the check to live and couldn't work because "the s*** DMS was putting him through." (*Ex. 34 at 4, 11*).  During the call, Mills repeatedly lied ~ telling Kearney that the new form was JP's form not DMS' form.  *Id.*  When Kearney said he thought it was DMS' standard form, Mills lied a second time and said "No … its their (JP's) form." *Id.*  That lie caused Kearney to say – with regard to the 12 month old authorization dispute – "well see you never explained this to me before … you never explained that this was Jefferson-Pilot's form." (*Id. at 4-5*).  Only after he deceived Kearney into agreeing to sign the authorization did Mills then say he would "talk to some people" to see if those fictitious people (Mills could authorize payment)  would agree to again issue a check if Kearney agreed to sign the form.  (*Id. at 5*).  Mills also then promised that a final decision would be made on the Kearney claim after the IMEs were received.  *Id.*

Then Mills lied again.  Kearney states: "I guess I have no choice – I always thought (the new authorization was a DMS) form." (*Id. at 5*).  Mills' response was a lie: "No, nnno  - the forms have changed with Jefferson Pilot." (*Id. at 5*).  Mills lied again by saying they couldn't do things without JP's "o.k." *Id.*  In fact, DMS checked nothing with JP –even the settlement offer of October 2001.

Kearney continued to explain that he didn't previously sign the authorization because DMS already had an effective one and Kearney thought the new one was DMS' form not JP's.  Mills lied again by not answering this statement honestly.  (*Id. at 5-6*).  Then at page 6, Kearney raised the subject again twice, giving Mills 2 more chances to finally tell the truth.   Mills declined each time.

(*Id. at 6*).  Another opportunity to tell the truth to Kearney was neglected at page 12 of the transcript.

As the call progressed, Mills invited Kearney to pursue a settlement, before the IMEs ~ at which time, according to Mills, the Insurer would "put on the gloves." (*Id. p. 9, 10-12*).  Kearney concluded that discussion by saying "don't bother coming back with $300,000." (*Id., p. 15*).

Throughout the call, Mills fictitiously blames JP – not himself or DMS, who were in total control of the claim - for holding up the check.  *Id.*  He also threatened Kearney with the prospects associated with litigation. (*Id., at 2-3, 15*).  At the end of the call, even though it was secured under false pretenses, Mills walked away with Kearney's promise to execute DMS' authorization, and he told Kearney he couldn't promise that a check would be forthcoming.  (*Id., p. 12, lines 27-31*).

During the Feb. 15, 2001, call Mills admitted that DMS had called Kearney's business associates and discussed his illness.  (*Id., p. 13*).

On February 23, 2001, Kearney sent Mills a letter confirming the February 15 call and enclosing the signed – under false pretenses – authorization.  (*Ex. 31*).

### b.    Final Investigations and Finally an IME.

As indicated above, DMS threatened to cut Kearney off – and had in fact been cut off in early February 2001 – despite the overwhelming evidence of disability and despite that the fact that it hadn't even requested an IME.

Inv. 28:  **January and June 2001:**  The Insurer investigated Kearney through IRS documents from 1988-99 (*Ex. 18 at 3331-36, 3358*).

Inv. 29:  **February – March 2001:**  DMS hired CS again.  (*Ex. 18 at 1543-46, 3303-04*).  This consisted of a personal profile inquiry, interviews, a review of Kearney's March 23, 1999, bankruptcy filing, and divorce records.

Inv. 30:  **January – March 2001:**  The Insurer finally requested that Kearney undergo IME's by a psychiatrist [Dr. Kausch] and a neuropsychologist [Dr. Kenny] selected by the Insurer (*Ex. 18 at 0003-0038, 0147-0178, 3248, 3257, 3260, 3338, 3350, 3352*).  This required 20 hours of examination of Kearney.

Inv. 31:  **March 2001:**  The Insurer again performed an internal investigation of Kearney's non-medical information (*Id. at 3267, 3270-73*).

Inv. 32:  **April 2001:**  The Insurer again performed an internal investigation of Kearney's non-medical information (*Id. at 3259, 3268-69*).

Inv. 33:  **April - May 2001:**  The Insurer retained a new psychologist within PDC, Dr. Green, to review Kearney's medical records (*Id. at 3260,3221, 3242, 3257, 3248*).

In April 2001 Kearney complained that DMS' agent shared sensitive health information with Kearney's family member.  (*Id. a*t 3262-63).

Inv. 34:  **April – June 2001:**  The Insurer again retained CS Claims Group, Inc. to review lawsuits, depositions, UCC filings and other non-medical information regarding Kearney (*Id. at 1547-52, 3132, 3208, 3247*).  CS performed more interviews of Kearney's associates with this final assignment, discussing Kearney's medical condition with each.

In May and June 2001 ~ contemporaneous with the Insurer's final pre-suit investigation of Kearney ~ Kearney wrote the Insurer scathing letters accusing it of bad faith, invasion of privacy, intentional infliction of emotional distress, and punitive conduct (*Ex. 31: May 22, 2001; June 12, 16, 20, and 25*).

Inv. 35:  **June 2001**: The Insurer retained a rehabilitation consulting firm, Baker & Baris, to review the claim (*Id. at 0617-0618, 3224, 3230-32, 3236-38*). Kearney responded to Baker & Baris with the comments that: "I have been asked for countless, meaningless, and trivial documents. Many of the documents were already submitted years ago.  Threats of and withholding of benefit checks have been numerous ... " (*Ex. 31*)

On July 7, 2001, Kearney's treating doctor, Donna Judd-McClure, wrote the Insurer and pleaded that it stop harassing Kearney.  (*Ex. 31*).  She pointed out that the Insurer's broken promises have again caused major stress and anxiety to Kearney.  *Id.*  Dr. Judd points out that Kearney's mental state "became even worse n October 2000 when the insurance company began to harass and intimidate him [and] most (of Kearney's depression) was due to his problems with the insurance company."  *Id.*  Dr. Judd states that it is her professional opinion that the Insurer had been harassing Kearney for "years, at least since 1997."

The Insurer wrote Kearney on July 13, 2001, and advised him that it "was not questioning whether or not [Kearney] has a medical condition for which he is receiving treatment" but would

nonetheless continue its relentless examination of every aspect of Kearney's private life.  *Id.*  After advising Kearney that the relentless investigations would continue [even though by then the Insurer had received the IMEs confirming a significant mental impairment], the Insurer stated that "it occurs to us that exploring a compromise settlement of this claim might be in the best interest of both parties."  *Id.*  The Insurer concluded by threatening, if Kearney was not interested in settlement on the Insurer's terms, "further evaluation" would continue.  *Id.* And the Insurer invited Kearney to retain counsel. *Id.*

On August 10, 2001, Kearney's counsel, Attorney Spiegel, wrote to the Insurer and made it clearly known that it had engaged in bad faith, intentional infliction of emotional distress, and invasion of privacy.  *Id.* Attorney Spiegel expressed his opinion that the Insurer had substantially "abused and harassed" Kearney.  *Id.*

In October 2001, after receiving prior input and authority from ERC and JP[21], Hughes and Mills traveled to Miami, Florida to meet with Kearney's lawyer, John Spiegel, and present a settlement offer to Kearney. (*Hughes Ex. 2 at 174-177; Mills 2004 Ex. 9 at 37-39, 103-110*).  The meeting began with Hughes "apologizing" that the Insurer would immediately cut Kearney's benefits in half and take away the COLA benefit if the parties could not agree to a resolution. (*Hughes Ex. 2 at* 206; *Mills 2004 Ex. 9 at 37-39, 103-110*).

The "apology" was based on a revelation Mills purportedly came to just "15-20 minutes" prior to the 9:30 am meeting with Attorney Spiegel during a pre-meeting stop for coffee.  (*Mills 2004 Ex. 9 at 37-39*).  At the Spiegel Meeting, the Insurer offered to pay Kearney $280,000 in exchange for Kearney's return of the Policies valued at $4,000,000+.  (*Ex. 13*).  Importantly, this offer was calculated on the basis of the monthly payment as it was being paid to Kearney without adjustment for the purported "Cuban Coffee House Revelation."  (*Mills 2004 Ex. 9 at 103-110*).

---

[21]  JP's Vice President of Claim in October 2001, testified that DMS was required to speak with him to obtain settlement authority.  (*Honaker Ex. 33 at 131-134; Loftin Ex. 25 at 38, 114*)

And it was calculated based on: potential liability going forward; interest rates; present value; mortality; and morbidity. *Id.*

Attorney Spiegel advised the Insurer that the lowball settlement proposal laced with intimidation was "bad faith and retaliatory." (*Ex. 31*). Attorney Spiegel also stated that its "intimidation" and "threats" were unacceptable. *Id.*

On March 11, 2002, *notwithstanding* Kearney's undisputed (based on the recent IMEs) medical/psychiatric condition, the Insurer again threatened Kearney with overt and covert "investigation" of his claim if he did not "continue (settlement) dialogue." (*Ex. 31*).

On April 8, 2002, Mr. Kearney, expressed his continuing concerns with the Insurer's threats. (*Ex. 31*). He questioned why the Insurer continued to refuse to concede the availability of "lifetime benefits." *Id.* And separately Kearney expressly asked the Insurer to *inter alia* "provide a written explanation of his policies to include length of [his] benefits." *Id.* Rather than answering this and the other 4 questions contained in Kearney's April 10, 2002, letter, the Insurer responded on April 25, 2002, with another onerous request for additional information. *Id.* Understandably, on May 16, 2002, Kearney expressed disbelief that the Insurer would not answer his simple questions about the policy, including *inter alia* the issue of benefit duration (lifetime of age 65). *Id.*

In June 2002, sill having not answered Kearney's straightforward questions from April and May 2002, the Insurer underpaid benefits to Kearney on both policies. (*Id.*).

On June 16, 2002, Kearney's physician reported the following to the Insurer on Kearney at that time:

> **"1.  Current diagnosis.  Major Depression.**
>
> **2.  Sad, poor self esteem, harassment and threats by the insurance company have not ceased (Please see attached letter of 7/7/2001).  This has been a continuing factor in the severe depression and anxiety experienced by (Kearney).**
>
> **3.  Dates seen 6/12/02 and 6/16/02.**
>
> **Dr. Judd McClure"** (*Ex. 18 at 3613*).

Dr. Judd expounded on these opinions in her deposition. (*Ex. 21 at e.g., 69-71, 81-88, 93-96, and 113-116*).

On June 18, 2002, after receiving Kearney's June 10, 2002, letter complaining of the underpayment of benefits, the Insurer finally responded to some of the questions posed by Kearney in April 1998, April 2002, and May 2002. *Id.* With regard to the benefit duration issue, the June 8, 2002, draft of what ultimately became JP/DMS' June 18, 2002, letter to Mr. Kearney <u>contemplated</u> advising Mr. Kearney that:

> "**we would have to agree with your assessment** that the benefit period for residual disability benefits, for a disability that begins before age 45 (such as yours), would be the same as the benefit period for Total Disability, i.e., life ... We have discussed this with JP, and they ... have stated that ... **they will** resolve the matter in your favor ..." (*Ex. 31 at 0557-0560*).

But none of these concessions were included in the final June 18 letter sent to Mr. Kearney. Instead of conceding these points to the policyholder ~ to whom they owed a duty of good faith ~ the Insurer offered that it <u>may</u> potentially consider the benefit duration question as part of a global settlement.

On July 1, 2002, the Insurer sued Kearney.

In March 2007, the Insurer requested 14 years of Kearney's credit card records to re-examine benefit eligibility for a 14 year period – unrelated to the litigation. In June 2007, likely not unrelated to the stress of his claim, Kearney suffered a heart attack at 54. (*Kearney Ex. 3 at 68-69*).

## III.    Legal Analysis.

During the course of its 14 year conspiracy to confiscate Kearney's benefits, JP-GE/ERAC-DMS unlawfully intruded into Kearney's private affairs (as repeatedly expressed by Kearney in correspondence), engaged in bad faith, and intentionally inflicted emotional distress on Kearney.

After "striking out" in its 1994-2000 effort to terminate Kearney's claim, and knowing that Kearney's claim was potentially $4,000,000+ and "lifetime," the Insurer chose another avenue to confiscate Kearney's claim. First, the Insurer intentionally inflicted emotional distress on Kearney by making onerous repeated requests, lying to Kearney, and threatening each month to withhold

benefits. Then the Insurer in October 2001 placed additional severe emotional distress on Kearney as it conveyed the settlement proposal to his counsel by: (i) manufacturing a new interpretation of the Policies; and (ii) at the same time threatening Kearney with the termination of benefits if he did not accept a less than 5% settlement offer immediately.

**A.    Breach of Contract.**

The Insurer has breached the Policies by not "paying" Kearney the premium waiver benefit of the Policy. This misapplication of the Policies has resulted in Kearney paying 13 years of premium at $1912/year - **$24,973** - that must now be refunded to him with interest.

By its terms, the Residual Disability Rider, when purchased, "becomes a part of the section of the policy called 'Benefit Provisions.'" Accordingly, when a policyholder pays premium for the additional Residual Rider and it becomes a part of the Benefits Provisions section, the waiver of premium benefit in that section applies to residual disability claims, when the policyholder is – like Mr. Kearney – receiving the equivalent of the Total Disability benefit while on Residual.

This is consistent with the proposal sold Kearney which states:

```
Waiver Of Premium

After 90 days of continuous total disability Jefferson-Pilot will
▇ive any future premiums due as long as you receive benefits for total
▇sability. Jefferson-Pilot also refunds premiums paid during the
period of total disability.

Presumptive Total Disability
```

Accordingly, the Court should deny the Insurer's summary judgment request on the remaining breach of contract claim.

**B.    Bad Faith.**

The Insurer's arguments with regard to the bad faith claim are all unavailing. First, the Insurer did unreasonably deny benefits to Kearney (1-waiver of premium; 2-cola and SSS benefits from 2002 thru 2006; and 3-delays throughout, such as in January and February 2001, when it forced through false pretenses Kearney to sign a broad authorization to keep his claim alive).

24

As far as claim denials go, the first claim denial came in the form of the Insurer's intentional concealment from Kearney that it "**would have to agree with your assessment**" that his policies did indeed provide for "lifetime" benefits.

The next 47 claim denials (monthly from May 2002 thru March 2006), came when the Insurer failed to pay Kearney a sum of benefits tied to the four (4) independent and compounding adjustments due Kearney, but denied. Each year, the Insurer should have – but did not – increase (compoundingly) Kearney's monthly disability benefits by 7%.[22] By reducing the monthly benefits it had historically paid to Kearney, the Insurer subjected itself to a claim of bad faith. Moreover, the Magistrate Judge has already determined that these monthly underpayments were in fact "denials:"

> *"In the instant case, Plaintiff denied coverage to the extent that it stopped payment for cost of living increases and social security supplements." (*Doc. 76, *page 3, paragraph 2*).

Accordingly, there in fact has been many claim denials. These subject the Insurer to a claim of bad faith.

Second, the Insurer did refuse to pay the benefits in February 2001 unless Kearney signed a broad authorization, which he was induced to do by way of Mills false statements.

Third, even if the Insurer ultimately did pay Kearney all of the benefits owed, it can still be under Ohio law liable for bad faith.

An insured is often most vulnerable financially when he submits his insurance claim. He may be injured, disabled, and have no means of income to support himself and his family other than the expected insurance benefits. An insurer who takes advantage of the insured's vulnerable position in order to force him to accept an unfair settlement of his claim is guilty of bad faith.

From the very beginning, the duty of good faith arose due to the contractual relationship between an insurer and its insured. The syllabus of <u>Hoskins v. Aetna Life Ins. Co.</u> (1983), 6 Ohio St. 3d 272, states:

---

[22] In the Summer of 2002, the Insurer decreased the promised benefits payments. The Court in January 2006, "declared" that the decrease was inappropriate and concluded that the Insurer had underpaid Kearney. *Id.* That decision triggered a payment from JP to Kearney for "the underpayment" ~ that is, the Insurer sent a check to Kearney with a spreadsheet titled "Underpayment of Benefits."

"Based upon the relations**hip between an insurer and its insured, a**n insurer has the duty to act in good faith *in the handling* and payment of the claims of its insured.  A breach of this duty will give rise to a cause of action in tort against the insurer."  (emphasis added)

Hoskins explained the philosophical underpinning of this duty as follows:

"The imposition of the duty of good faith upon the insurer is justified 'because of the relationship between the * * * [insurer and the insured] and the fact that in the insurance field the insured has no voice in the preparation of the insurance policy and because of the great disparity between the economic positions of the parties to a contract of insurance; and furthermore, *at the time an insured party makes a claim he may be in dire financial straits and therefore may be especially vulnerable to oppressive tactics by an insurer seeking a settlement* or a release.'" (*emphasis added*).

In <u>*Wightman v. Reassure America Life Insurance Company*</u> Case 3:05:204 (USDC, W.D.

Dayton, Chief Magistrate Judge Merz, Doc. 37 Dated 2/23/2007, *Ex. 36 attached*) this Court stated:

An insurance company can exhibit bad faith in ways other than in the denial of insurance coverage. *Unklesbay v. Fenwick*, 167 Ohio App.3d 408, 414 (2nd Dist. 2006). In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under the policy of insurance. *Id.*, citing *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272 (1983). Those responsibilities include the handling and payment of an insured's claim. *Id.*

The Ohio Second District Court of Appeals[2] has recognized that a bad faith "refusal to pay" encompasses more than the outright denial of a claim. *Unklesbay, supra* (citation omitted). That court has declined to interpret a bad faith "refusal to pay" as being synonymous with the denial of a claim and has reasoned that the insurer's "foot-dragging in the claims-handling and evaluation process" could support a bad faith cause of action. *Id.* (citation omitted).

As noted above, in Ohio, an insurance company can exhibit bad faith in ways other than in the denial of insurance coverage. Further, a bad faith "refusal to pay" encompasses more than the outright denial of a claim and is not necessarily synonymous with the denial of a claim. In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under the policy of insurance and those responsibilities include the handling as well as the payment of an insured's claim. Finally, while paying a claim with a "reservation of rights" may not, in and of itself, reflect bad faith, it arguably could go to the issue of the handling of a claim.

This Court reached the same essential conclusion in *Thompson v. Community Insurance*, 213 FRD 284 (S. D. Ohio 2002). In that case, in denying a motion for summary judgment, Judge Rice found that: "Upon review of Ohio cases, the Court likewise has discovered a limited number of cases venturing beyond failure to pay a claim ... the Ohio Supreme Court has permitted claims of bad faith resulting from the handling of claims not just their payment. *Hoskins, supra*."

These rulings of this Court are consistent with numerous Ohio cases: *Drouard v. United Services Automobile Association* 2007-Ohio-1049 ¶16 (6th Dist. March 2007)("the duty of good faith extends beyond those scenarios involving an outright denial of payment for a claim"); *TQL Aviation v. Intercargo Insurance Co*. 2006-Ohio-6061, ¶50; *Unklesbay v. Fenwick,* 2006-Ohio-2630 (2nd Dist. 2006) ("thus, even in cases where a claim is ultimately paid, "the insurer's foot-dragging in the claims handling and evaluation process could support a bad faith cause of action"); see also, *Mundy v. Roy,* 2006-Ohio-993 (2nd Dist 2006).

The Insurer's efforts to distinguish this line of cases and the Supreme Court's holding in *Hoskins* is meritless. Based on the above undisputed facts from the Insurer's own claim file and its manner of doing business, what happened here is obvious. Kearney's refusal to accept Ms. Beattie's April 1998 overture at settlement and its subsequent treatment of Mr. Kearney right through today, were all part of a conscious course of conduct, firmly grounded in established DMS company policy, designed to utilize the lamentable circumstances in which Mr. Kearney found himself, and the

exigent financial situation resulting from it, as a lever to force a settlement favorable to the Insurer. It was bad faith and the Insurer's motion for summary judgment should be denied.

Throughout its handling of the claim and its multitude of unwarranted investigations, the Insurer treated Kearney in a spirit of oppression, as opposed to good faith. Kearney's insurance claims practices expert, Clint Miller, agrees. In his July 2001 opinion, attached as Exhibit 37 (secured by Kearney long before the Insurer filed suit because Kearney knew he was being victimized), Miller states:

> The insurer's conduct and lack of conduct as it relates to the insured is best described as willful, wanton, malicious, oppressive, incompetent, misleading, harassing, arrogant, deceptive, fraudulent and bad faith.

And Miller notes numerous bad faith acts of the Insurer through July 2001.

## C.    Intentional Infliction of Emotional Distress.

The conduct of the Insurer detailed above – with all facts viewed in favor of the party opposing the motion for summary judgment – very clearly states a jury question on whether the Insurer is liable to Kearney for intentional infliction of emotional distress as it details a 14 year history of extreme and outrageous conduct by the Insurer that has intentionally or recklessly caused Kearney severe emotional distress. *Yeager v. Local Union 20, Teamsters* 6 Ohio St 2d 369, 453 NE 2d 666 (1993).

Because of the value of Kearney's claim, the Insurer hand-picked it in 1997 for extraordinary scrutiny by DMS and other vendors (Callaghan and Narwocki) that JP had not previously used. The overwhelimg volume of document and information requests and the repeated surveillance were all unwarranted. The claim was beyond debate medically and occupationally and Kearney should have been put on auto-pay.

Instead, the Insurer went around Kearney's back and – against Kearney's express wishes – they shared his medical condition with Kearney's family members and business associates. They also pursued Kearney into restaurants and placed their surveillance cameras within 1 foot of the face

of Kearney and his girlfriend while they ate. Further, this occurred when there could not have been legitimate question on the claim.

As expressed by Kearney and his treating physician, Dr. Judd, in their correspondence dating from August 2000 thru July 2002, the conduct of the Insurer had indeed become outrageous. This included repeated refusals to communicate policy benefits to Kearney and even the overt concealment of the fact that the claim benefit was considered "lifetime."

In October 2000, Hughes outrageous letter to Kearney (a man of nearly 50) resulted in Kearney moving back in with his mother – 200 miles away.

In February 2001, when Mills no doubt sensed Kearney was at a breaking point – because the Insurer had refused to pay any further benefits unless DMS' authorization was executed – Mills lied to Kearney to cause him to sign the authorization. All the while, the most recent JP authorization that Kearney had signed was more than adequate for the Insurer's purposes.

In October 2001, with Kearney whipped into an insecure mess by the Insurer's intentional tactics, they presented Kearney with a lowball settlement offer (5%) of the claim value, with an accompanying threat and 20 minutes to make a decision.

The fact that the Insurer's conduct caused Kearney's emotional condition to deteriorate is undisputed. (*See, Letters of Dr. Judd and Kearney from August 2000 – July 2002*). And Dr. Lehenbauer and Kearney's other physicians agree. (*See e.g., Ex. 39 Lehenbauer at 89*).

The additional events, all taken in their cumulative total, very clearly present a jury question on the emotional distress claim. Accordingly the summary judgment motion should be denied.

The Insurer's resort to an argument that Kearney in unreasonably sensitive and, therefore, the distress he truly suffered at the hands of the Insurer cannot be a proper measure is meritless. Clint Miller and Dr. Judd McClure independently agree that the actions of the Insurer were outrageous, in addition, to causing Kearney severe emotional distress. Are they too not an appropriate measure. Further, could it ever be reasonable to perform the number of investigations performed on Kearney and to also lie to him, withhold information from him, demand repeatedly a

great volume of documents, and threaten him with termination of benefits ~~ on a claim that was never medically contestable? Is that the standard of practice for the Insurer with objectively reasonable persons?

The Insurer set out on a course to deny ~ or settle at a great discount ~ the $4,000,000+ claim of Kearney. It stopped at nothing. Along the way its conduct in the aggregate was outrageous and extreme and would cause any reasonable person to suffer distress.

**D.**     **Invasion Of Privacy.**

In this case, the medical merit of Kearney's claim was never in debate, nor was any other aspect of his claim legitimately debatable as the 3 dozen investigations revealed. Notwithstanding these plain facts, the Insurer embarked on a strategic course to intrude into Kearney's private affairs unnecessarily and as it admits, share details of his health with the public. What the Insurer did in invading Kearney's life and sharing details with persons unnecessarily was outrageous – as Dr. Judd affirmed in her several scathing letters to the Insurer.

As the Insurer recognizes in its motion, Ohio's leading case _Housh v Peth_ 165 Ohio St 35, 133 NE 2d 340 (1956) recognized that privacy can be unlawfully invaded based on a deliberate and systematic campaign of harassment. Here, the Insurer's 14 year campaign of deliberate and systemic harassment of Kearney is patent from the claim file and the correspondence exchanged and the great volume of investigations when the claim was no debatable.

Accordingly, viewing the facts and inferences in favor of Kearney, there exists a jury question on his invasion of privacy claim.

**E.**     **Conspiracy**

The conspiracy of three independent entities is easily established: GE/ERAC and JP and DMS. Accordingly, the only defense the Insurer trots out on this claim is that there is no evidence of an underlying unlawful act. But there is. As stated above, there exists a claim for breach of contract, bad faith, invasion of privacy, and infliction of emotional distress. These are all unlawful

acts. So too is the fraudulent statement made by Mills and recorded by Kearney to dupe Kearney into signing a broad authorization.

For these reasons, summary judgment on the conspiracy claim must be denied.

**F.    Statute Of Limitations.**

The Insurer argues that its tortious conduct predating October 31, 1998, and/or April 16, 1999, are barred by the 4 year statutes of limitations in Ohio. The Insurer is again mistaken. Damages outside the statute of limitations period may be proved in a continuing tort ~ as existed here. *Roberts v. North American Rockwell* 650 F 2d 823, 827-828 (6th Cir. 1981).

In addition, the limitations period commences when Kearney suffered his injury as a result of the tortious conduct. *Midwest Specialties Inc. v Firestone Tire & Rubber Co* 42 Ohio App. 3d 6, 536 NE 2d 411 (1988). Thus, acts predating October 31, 1998 and April 16, 1999, that caused or were part of the cause for injuries suffered by Kearney later as the result of continuous tortious conduct gives rise to a new cause of action at that future date.

**Conclusion**

For all of the foregoing reasons, the Insurer's motion for summary judgment should be denied in its entirety.

Respectfully submitted,

s/Michael A. Roberts
Michael A. Roberts, Esq. (0047129)
GRAYDON HEAD & RITCHEY LLP
511 Walnut Street, Suite 1900
Cincinnati, OH 45202
(513) 629-2799
(513) 651-3836 - fax
mroberts@graydon.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been filed electronically with the court and thereby served this 9th day of July, 2007, upon William R. Ellis, Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, OH 45202 and John E. Meagher, Esq., Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131.

s/ Michael A. Roberts