IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON PILOT LIFE INSURANCE CO., | ) | CASE NO. C-1-02-479 |
| Plaintiff, | ) | |
| | ) | Judge Barrett |
| vs. | ) | |
| CHRISTOPHER L. KEARNEY, | ) | |
| Defendant. | ) | |

### DECLARATION OF CHRISTOPHER KEARNEY

I, Christopher L. Kearney, based on my personal knowledge of the facts recited herein, make the following declaration pursuant to the provisions of 28 U.S.C. §746:

1. I am the defendant in the above and an insured of Jefferson Pilot.

2. In 1993, when I was 40, I became disabled. I filed a claim for benefits under two policies purchased from Jefferson-Pilot Life Insurance Company, a subsidiary of Lincoln Financial ("JP").

3. In the following 14 years, the Insurer has (although many times late) paid me a portion of benefits under the Policies for those 14 years. The Insurer denied me the benefit of premium waiver ~ a $25,000 benefit; had for four years (6.2002 – 3.2006) denied me a cost of living increase benefit; and has routinely paid me benefits late.

4. In most months during the period of my claim (when its provided to me and requested by the Insurer), my physicians have executed a form certifying that I am disabled. Their records ~ regularly provided to the Insurer ~ bear this out. Yet, the Insurer continually tested these opinions by having their in-house medical staff review my medical records. They hired outside medical professionals to physically examine me. *Id.* These opinions reaffirmed my disability.

5. There has never been any basis to question my entitlement to benefits based on my medical condition or otherwise.

6. Recently, in my presence (at the May 2007 Deposition of Bob Mills), DMS contends that it may well yet demand full repayment of the 168+ months of benefits it has paid to me.

7. Since 1993, I have performed my obligations under the Policies and have provided the Insurer with continuance of disability forms, limited authorizations, and certified Attending Physician Statements. I have at all times provided up-to-date medical records, tax returns, financial information, and information from my accountant. These documents and perhaps an annual review of my tax returns are all of the information the Insurer needed to reasonably satisfy itself that I remained entitled to benefits.

8. Beginning in 1993, and continuing through the present, I questioned the Insurer about my rights under the Policies. I asked what information was required for "proof of loss." I complained that the Insurer did not afford me the benefit of premium waiver. And I repeatedly complained that the Insurer did not keep my private information private and that the Insurer was intentionally causing me emotional distress.

9. In 1998, I was asked to meet with Janet beattie of DMS. She promised me that she and DMS would keep my information private. I allowed Ms. Beattie to meet with me and my physician, Dr. Judd-McClure, for 3.5 hours. Ms. Beattie learned and reported to the Insurer that I was unable to "manage financially," bounced many checks, and was struggling to keep my house. She recommended to Kearney that I see a lawyer after she and he discussed the policies. I asked Beattie for explanations and answers to my questions. They never came.

10. In 1999 I filed bankruptcy.

11. In 2000, when my claim was turned over to DMS I exp[erienced an endless abarrage of harassment. DMS concealed information from me. They lied to me. They withheld benefits from me. They shared mny personal information against my direct request with family members and business asscociates.

12. During this time, I and my doctor wrote to DMS complaining about their unprofessional behavior. What they were doing was causing me extreme emotional distress and prevented me from continuing in my efforts to get well and back to full time work.

13. I have learned that the tactic they pulled on me in october 2001 through my lawyer was something that they had done with another policyholder 15 months earlier, Aubert King. In that case, I understand J=Hughes visitied the policyholder and "apologized" about having to advise that he had been overpaid under the same policy I have as a residually disabled person.

14. When I received Bill Hughes letter in October 2000 put my claim on "reservation of rights," in a tone that I believed to be "outrageous" anmd which impacted me dearly, I responded by closing the physical office of my business (in Cincinnati) that I had attempted to continue afloat through my disability; and, I relocated that office and my personal residence to the basement of my mother's home 200 miles away in Wooster, Ohio. On October 30, 2000, when I phoned Mills, I was told by Mills that Mills "did not know if another check was coming." And on November 2, 2000, the Insurer issued a letter threatening to cut me off completely for not submitting information. I again made it clear to DMS that I needed the monthly checks to live and was having greater difficulty working because of the harassment I was facing by the Insurer. A similar threat to cut me off was issued in December 2000. My November communications with the Insurer caused me to forego going to a pre-arranged industry conference where I had hoped to showcase some of my work.

15. In 2000, although the authorizations I had signed for JP were still by their terms valid, DMS demanded that I sign a more expansive authorization or be cutoff from benefits. In a December 22, 2000, letter I again complained about the new authorization. On Decmber 28, 2000, JP sent me a lapse notice even though I had timely issued a premium payment. On January 24, 2001, the Insurer threatened again to withhold benefits if I did not sign their authorization.

16. On February 15, 2001, I spoke to Mills and recorded the call. The 2-15-01 taped conversation, attached to the Motion as Exh. 34 is a true and accurate recording of that call.

17. Mills advised me that my check that should have been issued at the beginning of the month was being held because I balked on executing the DMS' authorization. I pointed out that the several authorizations sent to me by JP and which I signed willingly before January 2000 were still in fact valid. I told Mills that I needed the check to live and couldn't work because "the s*** DMS was putting him through."

18. During the call, Mills repeatedly lied -- telling me that the new form was JP's form not DMS' form. *At the time I did not know it was a lie.* When I said I thought it was DMS' standard form, Mills lied a second time and said "No ... its their (JP's) form." That lie caused me to agree to sign the authorization. Mills also then promised that a final decision would be made on the claim after the IMEs were received. That too was a lie.

19. As the call progressed, Mills invited me to pursue a settlement, before the IMEs -- at which time, according to Mills, the Insurer would "put on the gloves." I concluded that discussion by saying "don't bother coming back with $300,000." (*Id., p. 15*).

20. Throughout the call, Mills fictitiously blames JP -- not himself or DMS, who I now know were in total control of the claim - for holding up the check. He also threatened me with the prospects associated with litigation. At the end of the call, even though it was secured under false pretenses, I promised to execute DMS' authorization, and Mills told me he couldn't promise that a check would be forthcoming.

21. Throughout the claim I requested that the Insurer keep my information private. They promised they would. But to my distress, they shared personal information about me with my family members ans business associates.

22. On July 7, 2001, my treating doctor, Donna Judd-McClure, wrote the Insurer and pleaded that it stop harassing me. She pointed out that the Insurer's broken promises had again caused major stress and anxiety to me. Dr. Judd points out that my mental state "became even worse n October 2000 when the insurance company began to harass and intimidate me [and] most (of my depression) was due to my problems with the insurance company." Dr. Judd states that it is her professional opinion that the Insurer had been harassing me for "years, at least since 1997."

23. On July 13, 2001, the Insurer wrote and advised him that it "was not questioning whether or not [I] had a medical condition for which I was receiving treatment" but would nonetheless continue its relentless examination of every aspect of my private life.

24. After advising me that the relentless investigations would continue [even though by then the Insurer had received the IMEs confirming a significant mental impairment], the Insurer stated that "it occurs to us that exploring a compromise settlement of this claim might be in the best interest of both parties." The Insurer concluded by threatening, if I was not interested in settlement on the Insurer's terms, "further evaluation" would continue.

25. I then hired Attorney Spiegel to sue the Insurer for causing me such distress.

26.     In October 2001, Hughes met with my lawyer without me. I was told that the Insurer would be reduct=ing my benefits unless I (within 20 minutes) accepted their offer of $280,000 for my Policies. I was stunned.

27.     On June 16, 2002, my physican reported to the Insurer that:

> "**1. Current diagnosis. Major Depression.**
>
> **2. Sad, poor self esteem, harassment and threats by the insurance company have not ceased (Please see attached letter of 7/7/2001). This has been a continuing factor in the severe depression and anxiety experienced by (Kearney).**
>
> **3. Dates seen 6/12/02 and 6/16/02.**
>
> **Dr. Judd McClure"** (*Ex. 18 at 3613*).

28.     On July 1, 2002, the Insurer sued me but in the cover letter asked me to settle.

29.     In March 2007, the Insurer requested 14 years of my credit card records to re-examine benefit eleigibility for a 14 year period – unrelated to the litigation.

30.     In June 2007, likely not unrelated to the stress of my claim, I suffered a heart attack at 54.

I declare under penalty of perjury that the foregoing is true and correct.

**Dated: July 9, 2007**                        *Christopher Kearney*
                                                    **Christopher Kearney**

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed electronically with the court and thereby served this 9th day of July, 2007, upon William R. Ellis, Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, OH 45202 and John E. Meagher, Esq., Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131.

                                         s/ Michael A. Roberts