Road shop?

A. They -- well, actually, it was the same -- the same time. I just didn't want mail going to Red Bank Road with nobody there or UPS deliveries made to a shop as most of the time no one was there, so simultaneously.

Q. What time -- at what point in time did the Red Bank Road shop close?

A. In October of 2000.

Q. And what was the reason for it closing in October 2000?

A. I got a letter, I believe, and it's -- I remember this because it's -- it's a important letter as far as I'm concerned as far as my future, October 2nd of 2000 from Mr. Hughes of DMS telling me that I hadn't met my obligations and there was some suspected fraud or -- on my tax returns and that I was only going to get one more check after nine years -- maybe not nine years -- eight -- seven, eight -- if I didn't give them a laundry list of financial documents, medical documents. It was a big surprise.

Big surprise.

Q. And how do you relate that to the Red Bank Shop closing?

A. I decided at that time that since I was getting one more check, unless I did all these things, that I needed to go somewhere where I was living basically hand to mouth. I moved to -- decided to move to Wooster where my mother is and where a couple brothers are so that I had an apartment so that I could live less expensively.

Q. So without the disability check you could not afford to keep the Red Bank shop open after October 2000?

A. That's correct.

Q. What was the business of Kenwood Technologies in October 2000?

MR. ROBERTS: Objection. Asked and answered May 10, 2004. Go ahead.

Q. Go ahead and answer.

A. Could you repeat the question?

Q. Yes. What was the business of Kenwood Technologies at the time the Red Bank shop closed in October 2000?

MR. ROBERTS: Objection. Asked and answered May 10, 2004 deposition over the course of approximately 20 pages of deposition testimony. Go ahead.

MR. MEAGHER: Objection is just asked and answered, counselor. You're wasting time.

MR. ROBERTS: I'll state my objection as I wish, Your Honor.

MR. MEAGHER: Go ahead and answer, please.

A. The business was building machines and designing, some consultation work.

Q. At the time you closed the Red Bank shop, did you have a contract with any clients to build machines?

MR. ROBERTS: Objection. Asked and answered May 10, 2004 deposition. Go ahead.

A. Yes, I did.

Q. With what companies?

MR. ROBERTS: Objection. Asked and answered May 10, 2004. Go ahead. Chris,

you need to let me to finish speaking my objections. She can take us both at the same time.

A. Okay. I can't remember. I'm sorry.

Q. What kind of machines were you manufacturing or did you have contracts to manufacture in October 2000?

MR. ROBERTS: Objection. Asked and answered. Go ahead.

A. They were parts feeding systems.

Q. Where are the business records of Kenwood Technologies?

A. That's what I would like to know. You haven't provided the business records. I provided a stack of two, three thousand pages.

MR. ROBERTS: Answer the question.

A. We've been asking for five years.

MR. ROBERTS: Answer the question.

A. They're in your possession.

They're in my possession too.
Q. I'm sorry. They're in your possession too? I don't understand.
A. I made a copy in case we had to go to court.
Q. Okay. So you have a copy of Kenwood Technology's business records?
A. Yes. And so do you.
Q. That's why I'm asking you questions here at a deposition.
A. Okay. I'm answering.
Q. Were there any contracts you were unable to fulfill because you closed the shop in October 2000?
MR. ROBERTS: Objection. Asked and answered. Go ahead.
A. I don't recall.
Q. So as you sit here today you don't know of any contracts that Kenwood Technologies was unable to complete because of the closure of the Red Bank shop, is that correct?
MR. ROBERTS: Objection. Asked and answered May 10th, 2004. Asked and

answered June 20th, 2007. Go ahead.
A. I had a lot of things I was working on. I had a lot of outstanding quotes to follow up on and I had a machine built that was special. Was going to take it to a trade show in October in Dayton -- Dayton, Ohio. I paid $800 to the exhibition hall and once I talked to Robert Mills and he said he doesn't know if they're going to send me anymore checks I just -- I folded up. I mean, I just decided right then not to take that machine to the show because I was too bummed out and I didn't want to spend anymore money on hotel, traveling, putting it up there, but I had already paid the $800 fee to show this particular machine which was new.
MR. MEAGHER: Would you read back my question, please?
(Record read by Reporter.)
A. No, I completed --
MR. ROBERTS: Chris, he just asked the question to be read back, he didn't ask you another question.
DEPONENT: Oh, I'm sorry.

Q. Can you identify any contracts that Kenwood Technologies was unable to fulfill due to the closure of the Red Bank shop?
MR. ROBERTS: Objection. Asked and answered May 2004. Asked and answered --
A. I can't remember --
MR. ROBERTS: -- June 20, 2007.
A. -- or recall any.
MR. ROBERTS: Chris --
DEPONENT: Oh, I'm sorry.
MR. ROBERTS: -- she can't take down both of us at the same time.
DEPONENT: Okay.
MR. ROBERTS: You need for me to finish.
DEPONENT: Okay.
MR. MEAGHER: And your answer, sir, please?
MR. ROBERTS: Objection. Asked and answered May 2004. Asked and answered June 2007. Go ahead.
A. I don't recall.
Q. Who were the employees of

Kenwood Technologies at the time you closed the Red Bank shop?
MR. ROBERTS: Objection. Asked and answered.
A. One employee was my brother, John Kearney.
Q. Any others?
MR. ROBERTS: Objection. Asked and answered.
A. A man named Don Dayton. Actually -- yeah, Dayton. They were employees.
Q. Any others at the time you closed the Red Bank shop?
MR. ROBERTS: Objection.
A. No.
Q. Did Mr. Dayton pass away at some point in time?
MR. ROBERTS: Objection. Asked and answered.
A. Yes.
MR. MEAGHER: Certainly that wasn't asked.
MR. ROBERTS: Yes, it was.

Page 29

Red Bank shop.
A. Don's title -- Don was the -- was an engineer -- electrical engineer and he didn't really have a title, I mean.
Q. He just did the electrical engineering work?
A. Yes.
Q. What was his -- what were his hours on a weekly basis with Kenwood Technologies in 2000 before the shop closed?
A. They were -- they were part-time. I don't know if it was 10 hours a week, 20, 15.
Q. Was he also paid on an hourly basis or some other form of payment?
A. Don was paid on -- on an estimated hourly basis and it was some figure per month, 600 or something like that.
Q. Six hundred dollars or 600 hours?
A. $600.
Q. I'm sorry. I still didn't hear you. Dollars?
A. Dollars.

Page 30

Q. Okay. Thank you. Sorry.
A. Okay.
Q. Describe the machine that you had built for the trade show, please.
MR. ROBERTS: Objection. Asked and answered May 2004. Go ahead.
Q. Just briefly.
A. Okay. It's a -- it's a -- I'm trying to think of the words to convey to you so that you'll understand --
Q. I appreciate that.
A. -- it's -- it's not an ordinary machine. It's a machine which holds parts and has a hopper and has a series of conveyor belts and it has a control box too and a platform to hold a robot and the parts. It circulates the parts into position for a robot, smaller robot, to pick the parts up and do whatever. Could be assembly or --
Q. And what was the name of the trade show you were planning on taking the machine to?
A. The Dayton Industrial Show.
Q. Where is that held? In Dayton I

Page 31

know but --
A. Yeah. They have a convention center there.
Q. -- convention center? When is that held or when was this particular show held?
A. This was held -- I believe my phone call with Robert Mills was asking if they were going to send me a check and he said -- it was the day after that. It was something like November 2nd or 3rd of 2000.
Q. So does that tell me when the Dayton trade was that year?
A. Yes.
Q. Just when was the Dayton trade show? I'm sorry.
A. November 2nd or 3rd of 2000.
Q. Now, you had mentioned a letter from Mr. Hughes and now a phone call from Mr. Mills, is that correct?
A. A letter from Mr. Hughes, and then what was happening at this time is they would not send me a check on time and they would -- eventually I would have to call them

Page 32

to say where's my check.
Q. And that was one of the calls in early November 2000?
A. Right. Right.
Q. You were paid your November 2000 benefit at some point in time, correct?
A. At some point in time, yes.
Q. And, in fact, at some point in time you've been paid all the benefits up to the time we sit here today, is that correct?
MR. ROBERTS: Objection. Misstates facts. Go ahead.
A. No, it's not correct.
Q. What monies are currently owed to you?
A. There's an issue about the waiver premium which I've been paying waiver of premium or I've been paying my premiums for all these years and I'm sure it's 60, 70, 80 thousand dollars that I believe should be refunded to me and that has -- that's an issue in this trial.
Q. Anything else?
A. Other than interest, I can't

think of anything on -- on your -- some of your checks were -- which were not timely.

Q. But I'm saying timeliness aside, and I know that you say some of them weren't timely. Ultimately, as we sit here today, you've been paid all the benefits other than the waiver of premium benefits and whatever interest is owed on those payments, is that correct?

A. Eventually with the phone calls and letters I received them at some point during the month or the next month.

Q. So the answer's yes but you don't believe they were timely paid.

A. I know they weren't timely paid, yes.

Q. Yes. Okay. Did you continue to develop this -- what do you call the machine by the way is there a shorthand --

A. I -- robotics vision feeder, R-V-F.

Q. Had you prepared any marketing materials relating to the robotics vision feeder?

MR. ROBERTS: Objection. Vague. Go ahead.

A. Yes, I have.

Q. What kind of marketing materials?

MR. ROBERTS: Objection. Go ahead.

A. A two-page brochure or just a list of features.

Q. Was this a three color brochure or just mimeographed sheets or -- if there's such a thing.

A. It's a color something I did or had done. It was on two pages and it was color.

Q. When did you have that brochure made?

A. I believe shortly before this trade show.

Q. Do you still have copies of the brochure?

A. I may. I don't know.

Q. After you closed the Red Bank shop did you continue to develop the RVF?

A. No.

Q. Once your benefits had been paid, why did you not start developing the RVF again?

A. Because I had to start paying attorneys at that time to ward off DMS, Jefferson-Pilot.

Q. Which attorneys are you talking about?

A. Talking about Charles Melville and Clint Miller.

Q. Anyone else?

A. Not that I -- not that I can recall.

Q. At some point in time you retained an attorney named John Spiegel in Miami --

A. Yes.

Q. -- correct?

A. That's correct.

Q. Did you pay him?

A. Did I pay him?

Q. Yes.

A. Did I pay him?

Q. Yes. You said attorney's fees were a problem for you. I want to know did you pay John Spiegel for his work?

A. No. He -- he -- he said he was going to bill me and he didn't.

Q. So you expected to pay --

A. Paid to go down and see him. I paid for a trip to Florida.

Q. Well, that was for your trip. That didn't go into Mr. Spiegel's pocket to your knowledge, did it?

A. No, but it came out of my pocket which was money couldn't use on -- if I was -- I wasn't capable of working anyway.

Q. Did you ever call Mr. Spiegel and say you haven't sent me a bill?

MR. ROBERTS: Objection. You don't need to answer that. It's attorney/client privilege. Chris, you don't need to answer that.

DEPONENT: I'm not going to answer it.

MR. ROBERTS: Okay.

DEPONENT: It's kind of a smart

question.

MR. ROBERTS: Again.

MR. MEAGHER: My questions aren't intended to be smart or insult you, Mr. Kearney. I'm just trying to get information.

MR. ROBERTS: Well, the genuineness in that comment is -- is not something we necessarily agree with but, Chris, if he's being sarcastic to you, you just point it out, but as far as attorney/client question that he asked that he knows called for attorney/client communications, you don't answer that.

DEPONENT: Yes. Right.

Q. Did you expect to receive a bill from Mr. Spiegel for the work he performed on your behalf?

MR. ROBERTS: Objection to the extent that calls for you to answer this question based on things you communicate between Mr. Spiegel and yourself, don't answer.

DEPONENT: Yeah. I think that's

attorney/client privilege.

MR. MEAGHER: You're instructing him not to answer that question then, counsel?

MR. ROBERTS: If he thinks that calls for attorney/client information to be disclosed then absolutely, counsel.

Q. So because of the attorney's fees you were incurring in your fight with DMS and Jefferson-Pilot you were unable to continue developing the RVF, is that correct?

MR. ROBERTS: Objection.

A. No. I suffer from major depression and my depression was aggravated and accelerated during that time of having to move both my shop and my residence, which was just a one bedroom apartment, into my mother's basement or it was a shared home, but there was a whole lot to do to -- to just get all that and -- and at the same time I was being asked for thousands of pages of documents by DMS. I spent a lot of time at the photo copier as much as -- as I could. I was depressed.

Q. So when the Red Bank shop closed Kenwood Technologies moved into your mother's basement, is that the location?

A. The office did, yes, and equipment.

Q. Was it a working shop in the basement?

A. No.

Q. It was like storage, you just put everything in there?

A. No, I had my office there, Kenwood -- Kenwood Technology's office.

Q. Describe the office to me. What did you have there in your mother's basement?

A. Okay.

Q. Okay.

A. I had a desk, a computer table, a computer, fax machine, couple file cabinets, I had all the office supplies, paper, the pencils, etc., and I -- I think I had some -- some signs I had printed up for the trade show in that office as well.

Q. At the time -- I'm sorry.

A. That's not an all inclusive

list. I -- you know, that's some of the things that were there.

Q. What happened to the RVF?

A. The RVF went into the garage of the house or -- and the other equipment was put in storage.

Q. Where was the storage located?

A. In Wooster, Ohio.

Q. Like did you -- did Kenwood Technologies rent a storage facility or something?

A. Yes.

Q. Do you remember the name of the storage facility?

A. No. I can't remember their name.

Q. Does Kenwood Technologies still have that facility?

A. No.

Q. When did they get rid of that facility?

A. Somewhere in the 2002 or 2003.

Q. Why?

A. Well, I had to sell some of my

Kenwood Technologies has no other employees other than you currently, correct?
A. Correct.
Q. It hasn't since the closure of the Red Bank office, is that fair to say?
A. That's fair to say.
Q. Is the machine still in the garage, the RVF?
A. Yes, it is.
Q. Disassembled or assembled?
A. It's assembled to the degree as I told you. The -- some of the shielding is not on.
Q. So you had no purchase orders for that machine. You were just getting ready to show it, correct?
A. I had taken it to a previous show and I had a lot of interest in it. I had no purchase orders.
Q. Do you recall any of the people or companies that showed interest at the previous trade show? I take it that was before November 2000?
A. Yes, it was before

November 2000. Boston Scientific, Baxter Healthcare, some of the big names in pharmaceuticals.
Q. But since 2000 you have not made any attempt to contact those companies, is that correct?
A. That's correct.
Q. What was your role in the manufacture of that machine you described, the RVF?
A. My role was that I developed the concept of that, did some crude drawings, hand sketches and some crude CAD drawings and had some assistance from Don Dayton to make the drawings professional, and I designed the machine with the help of Don Dayton.
Q. I'm sorry. You finished?
A. Yes.
Q. All of your design knowledge was picked up on the job through life experience rather than through any technical training courses, is that correct?
A. That's correct.
Q. Have you collaborated with any

other electrical engineers for designing machines in the past three years?
A. No, I haven't. I've talked to -- well, actually, you mentioned suppliers. I can remember talking to one or two electrical contractors in the Wooster area.
Q. When was the last time?
A. Probably when the lawsuit started.
Q. Back in 2002?
A. You know, I'd have to refer to my claim notes that -- I'd have to refer to the notes that I sent in to you guys.
Q. You don't recall when the lawsuit started?
MR. ROBERTS: Objection.
A. Oh, I do recall when the lawsuit started because it was 4th of July --
Q. In 2002?
A. -- 2002.
Q. Right. Do you currently feel any restriction or limitation in your ability to travel?
A. Yes, I do.

Q. Describe that for me, please.
A. Well, I had a heart attack two weeks ago and I had stents, emergency surgery or emergency angioplasty. I'm on multiple drugs and I -- I'm supposed to right now to be very restrictive. I had my wife dive me down here.
Q. You attended a deposition taken of one of your treating physicians in this case after this angioplasty, is that correct?
A. That's correct.
Q. How far away was the location of that deposition from your home?
A. About 20 minutes and my wife drove me up to that as well.
Q. Did she also attend the deposition?
A. No.
Q. How long was it?
A. The deposition?
Q. Yes.
A. It was about 25 minutes.
Q. How many days after your angioplasty was the deposition?

A. Six, maybe.
Q. Now, you were represented by counsel at this deposition, correct?
A. No. That's the reason I went because my -- I -- I couldn't afford to pay Mike to come up there so he listened in by phone, but I wanted to make sure that he could -- there was a phone line available and that he could object if -- if need be, so I -- otherwise, I probably wouldn't have gone.
Q. But you were concerned that Mr. Roberts might not be able to take care of those issues?
A. Yes. My doctor didn't even have a speaker phone. I had to provide my cell phone and so --
Q. Prior to the angioplasty. I'm sorry. When did that occur? Do you have a date for me?
A. June 1st, 2007.
Q. How long were you in the hospital?
A. Four days.
Q. And, I'm sorry, you may have

told me the medications you're under?
MR. ROBERTS: For the heart or all?
MR. MEAGHER: Heart.
A. The heart. I'll try, but there's a drug called Zocor, there's a drug called low -- Lowpre (sic), I believe, and there's two -- two other drugs and I can't recall their name.
Q. Prior to having the -- well, what were your symptoms that led you to the hospital or were you there for a checkup? How did that occur?
A. I felt extreme pain in my right shoulder which is already injured. My right shoulder -- my rotator cuff is torn. I had MRI on that and was scheduled for surgery, which I hadn't gone through, and I had severe pain in my right shoulder, very severe and I thought it was my rotator cuff so I drove myself to the hospital. It was two in the morning and my wife would have taken me but we have a young baby and -- or young child and I just thought it was -- it might be some

pain that would go away on the way and I'd just turn around and come back but it continued. And so the pain started in my right shoulder and it was in this arm for maybe an hour and then it spread, and in the hospital they -- they wanted me to go home. They gave me a shot of morphine and I -- they gave me another shot of, I think, Demerol and nothing worked and they -- but they, said, well, it's not going to work right away or it wouldn't take away all your pain. So twice they asked me to go home and twice I said to the doctor, I said, I can't go home this pain is too severe. And then not too -- not too long after that I was probably in the emergency room two hours and then I started getting pain in my left arm and I had -- and I need -- I asked for antacids and I think they finally recognized this is a heart attack and did an EKG and then they started rushing me around.
Q. Since the inception of the lawsuit in July 2002 and prior to your having these symptoms that led to the angioplasty,

did you have restrictions and limitations in your ability to travel?
MR. ROBERTS: Objection. Go ahead.
A. Common sense restrictions, and I had restrictions, limitations in that if I traveled somewhere I knew that for a couple days I would be totally unable to do anything else.
Q. Why is that?
A. Fatigue.
Q. This is a physical -- physical fatigue?
A. I don't -- well, I don't know. It feels physical but it might be from my -- from the major depression, I believe, distress and --
Q. Any other restrictions other than -- I didn't understand what you meant by common sense restrictions.
MR. ROBERTS: Is that a question?
MR. MEAGHER: Yes.
Q. Please explain.

and answered. Look at the deposition transcript May 10, 2004, counsel.

MR. MEAGHER: I didn't get the terms of the settlement of the Grote and I would like to know what -- what it was.

Q. Did you pay them? Did they pay you?

MR. ROBERTS: Objection.

Q. How did it end?

MR. ROBERTS: Relevance. How does this relate to his claims that are pending in this lawsuit, counsel? How?

MR. MEAGHER: I'm not going --

MR. ROBERTS: Do me a favor --

MR. MEAGHER: I don't need to explain to it to you.

MR. ROBERTS: Okay. It's irrelevant to the claims in this lawsuit, it's been asked and answered, it's likely subject to a confidentiality agreement.

MR. MEAGHER: I haven't heard that at all.

Q. What was the settlement?

A. Well, it probably is like Mike



said subject to --

MR. ROBERTS: Do you know one way or the other? Can you sit here today and say it's not confidential?

DEPONENT: No.

MR. ROBERTS: Okay. Then --

DEPONENT: It's 10 years ago.

MR. ROBERTS: -- then we're not going to answer that question today. We'll find that question out and we'll give your answer in interrogatory.

MR. MEAGHER: Well, it's in 1997, is that when the settlement was?

MR. ROBERTS: So it's irrelevant is what you're saying.

Q. Can you answer my question, please?

A. I'm just thinking. It was '97 or '96 or '98.

Q. And you declared personal bankruptcy when, in 1999?

A. No.

Q. When?

A. 1998 or '97.

B



Q. Did the Grote lawsuit play a role in you declaring personal bankruptcy?

A. I'm sure it played some part in it.

Q. Who was your attorney on the Grote lawsuit?

A. Charles Melville.

Q. Is one of your claims in this lawsuit that JP and/or DMS contacted customers and damaged your business?

MR. ROBERTS: Objection. Asked and answered. Go ahead.

A. I -- I don't know, you know, how this formally we -- we hadn't even talked about our bad faith claim, I think, because we haven't got all the -- we haven't got all the discovery from you, so we haven't made all the -- put all the links together, but what was your question again?

Q. As you sit here today, do you believe that JP and/or DMS contacted customers and damaged your business?

MR. ROBERTS: You're including their vendors and agents in that question,



counsel? You including the surveillance teams that were hired?

MR. MEAGHER: Well, I object to coaching but --

MR. ROBERTS: I'm not coaching. I just want to get your question clear. If you want a correct answer, let's get the question clear. Are you talking about Bob Mills, William Hughes or are you talking about the investigators they hired in addition?

MR. MEAGHER: I am. Let me rephrase it, maybe it'll get rid of the objection.

Q. As you sit here today, do you believe that JP and/or DMS or anyone acting on their behalf contacted customers of your business and damaged your business?

A. Absolutely.

Q. Who did they contact?

A. You have a list of the companies. I don't recall off the top of my head. Even my own principals. You burned my bridges to any successful sales future if I

Q. And I think it was after your initial session of your deposition that that was produced to you.
A. Yes.
Q. So what happened with the business relationship -- well, who were you working for or as at the time of this conversation with International Fine Blanking?
A. I was working for -- with Kenwood Technology Group.
Q. And what did International fine Blanking do with Kenwood Technology Group?
A. Well, they started refusing me opportunities to quote on other projects.
Q. So did you have any ongoing projects with International Fine Blanking?
A. I think I already -- at the time I had -- I had orders to fulfill. I don't think that the orders were placed but the lead time was -- was six, eight, 10 months something like that.
Q. Did anyone tell you that it was this conversation with the investigator that

led to them refusing for you to be able to submit proposals?
A. No, of course not.
Q. Did International Fine Blanking work with Grote at all?
A. No, sir.
Q. Were they aware of that lawsuit?
A. I don't know.
(Exhibit 1 was marked for identification.)
Q. You stated that you believed that DMS and JP had gone behind your back in order to contact these people, is that correct?
A. That's correct.
Q. You were aware that throughout your claim that there was claims investigations that would occur from time to time on your claim?
MR. ROBERTS: Objection. Go ahead.
A. When DMS took over there was constant interaction, constant requests and I had, you know, previously from JP a few.
Q. And, in fact, you signed

releases with regard to obtaining payment of your benefits --
MR. ROBERTS: Objection.
Q. -- correct?
MR. ROBERTS: Objection. Go ahead.
A. When you say releases, what do you mean, two different releases or one?
Q. Well, let's start broad. Any releases. Did you sign any releases with regard to the insurer's and DMS's ability to investigate your claim?
MR. ROBERTS: Objection. Misstating facts as to release of claims. Go ahead.
A. I did sign a limited release with Jefferson-Pilot almost every month and then DMS forced me to sign a big broad general authorization by -- by refusing to pay my benefit until I signed it.
Q. So did you sign one?
MR. ROBERTS: Objection. Go ahead. Asked and answered.
A. I signed it under duress.

Q. Did you contact any lawyer to represent you at that time?
MR. ROBERTS: Objection. That requires attorney/client privilege.
Q. I'm not asking about any communication. I'm saying that since you felt you were under duress what steps, if any, did you take to protect yourself from such actions?
MR. ROBERTS: As he recalls today from 10 years ago?
MR. MEAGHER: Are you telling him not to remember, counsel? Please.
MR. ROBERTS: Did you hear me say that, counsel? I mean, your question today in 2007 is the authorization he was required to sign back in '97, '98 or is it last month's authorization, which one? Do you want a correct answer?
MR. MEAGHER: Do you have a question? Do you have a question for me because I don't have to answer his question if he doesn't understand.
MR. ROBERTS: Okay. Well, your

professionalism is noted on the record.
MR. MEAGHER: Yeah, I know that, counsel. You said --
A. If you don't mind repeating.
Q. I'll repeat it. That's fine, Mr. Kearney.
A. Sure.
Q. With regard -- you said you signed a release under duress --
A. Yes.
Q. -- and I'm saying what actions, if any, did you take to try to prevent that from occurring?
A. I tried to contact Jefferson-Pilot but they wouldn't take my calls. They just referred me back to Robert Mills. I did have an attorney that I was speaking with to give me advice.
Q. Who was that?
A. I believe it was Clint Miller.
Q. So at the time of your signing the DMS release you were represented by Mr. Miller?
MR. ROBERTS: Objection.

A. No.
MR. ROBERTS: That's not what his testimony was. Go ahead.
A. No. I was not represented by Mr. Miller. I consulted Mr. Miller.
Q. Okay. Let me hand you composite Exhibit 1.
A. Okay.
Q. And could you please look through that document --
MR. ROBERTS: Hold on. I want to review this document before the witness answers questions on it. You just handed him a 50-page document that I've not seen prior to the deposition.
MR. MEAGHER: You have seen all these pages.
MR. ROBERTS: Well, I want to make sure of that, do you mind, counsel?
MR. MEAGHER: I've handed you a copy and that's fine.
MR. ROBERTS: Thank you.
MR. MEAGHER: Let me ask a question.

MR. ROBERTS: No. I'm going to take a moment to look at these first.
MR. MEAGHER: Well, you can't stop me from asking a question then you can say wait.
MR. ROBERTS: Chris --
MR. MEAGHER: Don't answer it. Fine.
MR. ROBERTS: -- don't answer it until I'm done.
DEPONENT: I've got to review it too but --
MR. MEAGHER: Yeah, because I'm asking you a very specific question.
A. Okay.
Q. I'm not going to ask you to read every single thing. All I want to know is with regard to Plaintiff's Exhibit 1, which is a composite that I put together, can you take a look at the signatures that purport to be that of Christopher L. Kearney and tell me whether you believe any of them are not your signature?
MR. ROBERTS: Hold on, Chris.

Don't answer that question until I tell you.
DEPONENT: Are you --
MR. ROBERTS: Chris.
DEPONENT: Well, I wasn't going to answer but --
MR. MEAGHER: Did you understand my question?
MR. ROBERTS: Hold on a second, Chris.
DEPONENT: No. I didn't know if you meant for me to read this whole 50 pages --
Q. No.
A. -- or the first page.
Q. I want you to look at -- I want you to look at each page and tell me whether the signature that purports to be that of Christopher L. Kearney, you, is actually your signature or you say, no, this is not my signature.
A. Oh, you want me to look at each page. That's what I was asking you.
Q. Yes. The signature pages.
A. Fifty pages, okay. Start with

the first stage. These are my signatures.

Q. Okay.

A. Second page, that looks like my signature.

Q. Yeah, my question actually was, tell me which one of these do you not believe is your signature? If you remain silent about it, we'll assume that your answer is it is your signature.

A. Okay.

Q. That way the court reporter doesn't have to work as hard.

MR. ROBERTS: Chris, answer any way you want. If you need to affirm by saying each page, go ahead and do that.

MR. MEAGHER: Well, I point out this is not your deposition, it's mine. I've asked him the question.

MR. ROBERTS: That's fine. Point out whatever you want. Chris, if you want to do it your way, do it your way.

MR. MEAGHER: It'll just take longer, and that's fine, we have all the time in the world.

DEPONENT: Well, you know, I mean, your guys take forever reading through a 10 page document, to take 45 minutes.

Q. Well, I'm just asking you about your signature --

A. You're hurrying me up here --

MR. ROBERTS: Chris, don't go to his level.

DEPONENT: Okay.

MR. ROBERTS: Just answer the question the way you desire.

A. The second page is my signature.

Q. If you want you can refer to the bates numbers --

A. Okay.

Q. -- at the bottom right-hand corner.

A. Sure. 978, that's my signature. 982, that's my signature. 984, it appears to be my signature. 988 is my signature. 993, that's my signature. 591 is my signature. 589 seems to be the same page, it's my signature. 2797, that's my signature. 995, that's my signature. 97 -- 997, that's my

signature. 999, that appears to be my signature. 1001, that appears to be my signature. 1003, it appears to be my signature. 1005, it appears to be my signature. 1007, it appears to be my signature. 1009, appears to be my signature. 2768, it appears to be my signature. 1011, it appears to be my signature. 1013 appears to be my signature. 1015 appears to be my signature. 1017, it appears to be my signature. 1019, it appears to be my signature. 1021, it appears to be my signature. 1030 appears to be my signature. 1035 appears to be my signature. 1037, it appears to be my signature. 1040, it appears to be my signature. 1042, it appears to be my signature. 1045, it appears to be my signature. 1049, it appears to be my signature. 1051, it appears to be my signature. 1053 it appears to be my signature. 1056, it appears to be my signature. 1058, it appears to be my signature. 1060, it appears to be my signature. 1062 it appears to be my

signature. 1064 it appears to be my signature. 1066, it appears to be my signature. 1068, it appears to be my signature. 1070, it appears to be my signature. 1072, it appears to be my signature. 1074, it appears to be my signature. 1076, it appears to be my signature. 1078, it appears to be my signature. 1080, it appears to be my signature. 1082 appears to be my signature. 1084, it appears to be my signature. 1086, it appears to be my signature. 1088, it appears to be my signature. 1090, it appears to be my signature. 1094, it appears to be my signature. I think these are all same -- my doctor's statements each month. I made this many doctors statements. 1098 appears to be my signature. 1102, it appears to be my signature. 1103 A appears to be my signature. 1115, it appears to be my signature. 3120, it appears to be my signature, 118 -- 1118, 1118 A appears to be my signature. 1120 appears to be my signature. 3304 I signed this under duress.

Q. Sir, does that appear to be your signature on 3304?
A. It appears to be my signature.
MR. ROBERTS: Counsel, as you know it's noon right now. I'm kind of getting light headed. Can we get a break in the next five or 10 minutes?
MR. MEAGHER: Sure. Let me just finish this one line.
MR. ROBERTS: Five more minutes before lunch?
MR. MEAGHER: I'll try.
MR. ROBERTS: Okay.
Q. Other than the International Fine Blanking Company, any other customers that you believe were improperly contacted that cost you business?
A. International Fine Blanking was my number one customer and one of only a few with Kenwood Technology. Oh, I know another one. Medical Safe Tech. You guys went up to Indianapolis to question them.
Q. When did that occur?
A. When did they go up there?

Q. Yes.
A. It's in your surveillance files.
Q. Do you know when?
MR. ROBERTS: Objection. Asked and answered.
A. Do I know when?
Q. Yes.
A. Yes, I know when.
Q. When was it?
A. 19 -- it was the year 2000.
Q. When did you learn --
A. I believe it was March 2000.
Q. When did you learn of that contact?
A. I learned of that contact after my deposition here.
Q. And what -- how do you quantify the business you lost from Medical Safe Tech?
A. I don't quantify it.
Q. Did you have any existing contracts with them?
A. Yes, I did, and apparently that's where my original back injury occurred and apparently you guys were -- disbelieved

my claim, were trying to go back 10 years and substantiate my back injury.
Q. Have you ever told anyone you were disabled when you weren't?
A. I have ever told anybody I'm disabled when I'm not disabled?
Q. Right.
A. No.
Q. And conversely, have you ever told anyone you were not disabled when you were actually disabled?
MR. ROBERTS: Objection.
A. That question never came up. You know, I wouldn't -- nobody asked me are you disabled. It was just a question -- it was -- people don't ask you are you disabled.
Q. But you've never told anyone you were not disabled when, in fact, you believed you were disabled?
MR. ROBERTS: Objection. Vague. Go ahead.
Q. Have you?
MR. ROBERTS: Objection. Go ahead.

A. No. I would have told them the truth.
MR. MEAGHER: Good place to break for lunch?
MR. ROBERTS: Great.
VIDEOGRAPHER: Off the record.
MR. ROBERTS: Wait. Wait. We're not off the record. Well, we're off the video record. Go ahead.
VIDEOGRAPHER: Time is 12:03 and 29 seconds. We're off the record.
MR. ROBERTS: Earlier this -- this morning Mr. Ellis indicated that the information I've been seeking for at least eight months is in his possession. He apparently has declined to produce it not withstanding a November 2006 request and a May 3, 2007 request and an e-mail request last week that he completely ignored. It is my understanding it's been in his possession, he's just been ignoring my request for it. Do you have that for me now, Mr. Ellis?
MR. ELLIS: I will have it momentarily.