**Page 6**

1  EXAMINATION
2  BY MR. ROBERTS:
3    Q.  Good afternoon, sir, my name is Mike
4  Roberts.  I'm a lawyer and I represent Chris
5  Kearney in a lawsuit pending in the State of
6  Ohio Federal Court there.
7        Could you please state your name and
8  address for the record, please?
9    A.  William Edward Dempsey, D-E-M-P-S-E-Y.
10   Q.  Mr. Dempsey, I understand that you have
11  a law degree?
12   A.  Yes.
13   Q.  Where did you go to law school?
14   A.  Washburn Law school in Topeka, Kansas.
15   Q.  What year did you graduate?
16   A.  1990.
17   Q.  As did I.  Tell me your employment
18  history since 1990?
19   A.  I worked for the Kansas Insurance
20  Department from 19 -- well, until 1993, until
21  September of 1993.  And I went to work for a
22  company called US Physicians Mutual Risk
23  Retention Group in Kansas City in September of
24  1993 and was employed there until May of 1996.
25  In May of 1996 I accepted a position with Smith

**Page 7**

1  Staffing Services in Wichita, Kansas, and I
2  worked there until October of 2006, at which
3  time I accepted a position with Employers
4  Reinsurance Corporation in Overland Park,
5  Kansas, and I've been employed there since.
6    Q.  Did you say Employers Reinsurance or
7  Employees Reassurance?
8    A.  Employees Reinsurance.
9    Q.  R-E-I.
10   A.  R-e-i-n-s-u-r-a-n-c-e.  The corporation
11  was purchased by Swiss Re, a good portion of the
12  corporation was purchased by Swiss Re.  The sale
13  closed in late June of 2006 and the life and
14  health portion of the business became Employers
15  Reassurance Corporation.
16   Q.  You're getting ahead of me a little
17  bit?
18   A.  I apologize.
19   Q.  I may have written this down
20  incorrectly.  Did you say you were at Smith
21  Staffing from May of '96 to October of '96?
22   A.  Correct.
23   Q.  And then from October of '96 through
24  the present it's been Employers Reinsurance?
25   A.  It was Reinsurance until the sale of

**Page 8**

1  the company.  And then it become ERAC, Employers
2  Reassurance Corporation.
3    Q.  Change one vowel?
4    A.  Add one, yes.  Instead of ERC it's
5  ERAC.
6    Q.  Who did you report to when you started
7  at ERC?
8    A.  Robert Lainner.
9    Q.  Is Mr. Lainner a lawyer?
10   A.  No.
11   Q.  What was his position then?
12   A.  Assistant Vice-President.
13   Q.  Lainner is L-a-i-n-n-e-r?
14   A.  Correct.
15   Q.  And he was Assistant Vice-President at
16  ERC?
17   A.  Correct.
18   Q.  And did he remain your superior until
19  the transaction you described earlier with Swiss
20  Re?
21   A.  He was my supervisor until
22  approximately two years ago until they had a
23  company reorganization.  And so both Bob Lainner
24  and myself report to another person now.  We're
25  on the same level.  They flattened the

**Page 9**

1  organization so to speak.  So instead of having
2  myself and several people report to Bob, we just
3  now report to a different individual.
4    Q.  In the last two years who is it you
5  have been reporting to?
6    A.  Tom Felgate.
7    Q.  Can you spell that last name, please?
8    A.  F-e-l-g-a-t-e.
9    Q.  What is Mr. Felgate's position?
10   A.  He is the head of the life and health
11  claims area for Employers Reassurance
12  Corporation.
13   Q.  Is he also a Vice-President?
14   A.  I don't know if he has that title.
15   Q.  What is your title presently?
16   A.  Claims counsel.
17   Q.  What has your title been along the
18  progression from October of '96 through today?
19   A.  The same.
20   Q.  Did the company have a general counsel,
21  someone filling that title?
22   A.  Yes.
23   Q.  Who was that?
24   A.  I can't remember the individual's name
25  when I first started there.  And it's been

**3 (Pages 6 to 9)**

**Page 22**

1    Q.  Given the facts before us, the type of
2  policy Mr. Kearney purchased, the date he
3  purchased it, the particular riders he
4  purchased, the amounts of the claim, the date he
5  filed the loss, given all those things, because
6  of this agreement between this General Electric
7  subsidiary and Jefferson-Pilot, your company,
8  the General Electric subsidiary, has greater
9  than 50 percent of the responsibility to pay the
10  claim monetarily ultimately?
11    A.  Pursuant to the terms of the
12  reinsurance agreement, ERC has a percentage of
13  the loss, which to my recollection is greater
14  than 50 percent.
15    Q.  And since the time that Mr. Kearney
16  purchased his claim, your company, the General
17  Electric subsidiary, has been receiving a
18  percentage of the premium dollars that he's
19  paid, true?  Is that correct?
20    A.  I can only assume so.  I don't know
21  that for a fact.
22    Q.  So tell the jury what you do as claims
23  counsel for ERC?
24    A.  I work with the companies that we
25  reinsure.  I go out and look at the claims that

**Page 23**

1  are incurred on occasions.  Sometimes they are
2  sent to my office.  Just depends on the nature
3  of the reinsurance agreement.
4    Q.  I'm not sure I fully understood you.
5  Your responsibilities go beyond just the
6  individual disability insurance policies that
7  Jefferson-Pilot sold, correct?
8    A.  Correct.
9    Q.  Although that is within your
10  responsibility, you also cover these other types
11  of insurance, life, long term care, the others
12  you described to me?
13    A.  Correct.
14    Q.  But when a policyholder of a
15  Jefferson-Pilot policy files a claim, that would
16  come within your area of responsibility as the
17  reinsurer, is that right?
18    A.  No.
19    Q.  What about that question was not
20  correct?
21    A.  I don't have direct involvement with
22  the claim per se.  The claim was sent initially
23  to Jefferson-Pilot.  Subsequent to January of
24  2000, I believe the claims were sent to
25  Disability Management Services.

**Page 24**

1    Q.  I'm speaking generally.  I'm not
2  speaking about Mr. Kearney's policy
3  specifically.  I'm sorry if I confused you.
4    If John Doe, Jefferson-Pilot
5  policyholder, were to file a claim or had a
6  claim pending since '96, would that claim
7  necessarily be something that you would have
8  responsibility for here as the reinsurer?
9    A.  No.
10    Q.  Why not?
11    A.  It's not my job to adjudicate the
12  claims.
13    Q.  I didn't say adjudicate.  When would
14  you have any involvement in John Doe's
15  Jefferson-Pilot claim?
16    A.  In which context, with Jefferson-Pilot
17  or DMS?
18    Q.  Let's talk about the period prior to
19  2000.
20    A.  I would look at claims sometimes at the
21  request of Jefferson-Pilot.  Sometimes I would
22  visit Greensboro and we would look at a list of
23  claims.  We would pick out a random list of
24  claims to examine and that was the extent of my
25  involvement.  It would just be to review the

**Page 25**

1  contents of the claim file.
2    Q.  Your testimony to the jury is you would
3  from time to time go and perform somewhat of an
4  audit function in Greensboro of the
5  Jefferson-Pilot claims?
6    A.  A review would probably be a more apt
7  description of what we did.  We would review the
8  contents of the claim file.
9    Q.  Is your testimony that this review
10  would be entirely random, or would you go to
11  North Carolina from Kansas with the intention of
12  looking at specific claims that you would
13  identify?
14    A.  We would have identified claims ahead
15  of time for Jefferson-Pilot to have ready, to
16  have them pulled so that we wouldn't have to do
17  it when we got there.  So we would identify a
18  list of claims for them.
19    Q.  Did you randomly identify the claims or
20  were they claims that you specifically
21  identified for reasons?
22    A.  A combination.
23    Q.  Did you ever do that with regard to
24  Mr. Kearney's claim as far as you know?
25    A.  I don't recall if I ever examined

**7 (Pages 22 to 25)**

**Page 22**

1  Q. Given the facts before us, the type of
2  policy Mr. Kearney purchased, the date he
3  purchased it, the particular riders he
4  purchased, the amounts of the claim, the date he
5  filed the loss, given all those things, because
6  of this agreement between this General Electric
7  subsidiary and Jefferson-Pilot, your company,
8  the General Electric subsidiary, has greater
9  than 50 percent of the responsibility to pay the
10  claim monetarily ultimately?
11  **A. Pursuant to the terms of the**
12  **reinsurance agreement, ERC has a percentage of**
13  **the loss, which to my recollection is greater**
14  **than 50 percent.**
15  Q. And since the time that Mr. Kearney
16  purchased his claim, your company, the General
17  Electric subsidiary, has been receiving a
18  percentage of the premium dollars that he's
19  paid, true? Is that correct?
20  **A. I can only assume so. I don't know**
21  **that for a fact.**
22  Q. So tell the jury what you do as claims
23  counsel for ERC?
24  **A. I work with the companies that we**
25  **reinsure. I go out and look at the claims that**

**Page 23**

1  **are incurred on occasions. Sometimes they are**
2  **sent to my office. Just depends on the nature**
3  **of the reinsurance agreement.**
4  Q. I'm not sure I fully understood you.
5  Your responsibilities go beyond just the
6  individual disability insurance policies that
7  Jefferson-Pilot sold, correct?
8  **A. Correct.**
9  Q. Although that is within your
10  responsibility, you also cover these other types
11  of insurance, life, long term care, the others
12  you described to me?
13  **A. Correct.**
14  Q. But when a policyholder of a
15  Jefferson-Pilot policy files a claim, that would
16  come within your area of responsibility as the
17  reinsurer, is that right?
18  **A. No.**
19  Q. What about that question was not
20  correct?
21  **A. I don't have direct involvement with**
22  **the claim per se. The claim was sent initially**
23  **to Jefferson-Pilot. Subsequent to January of**
24  **2000, I believe the claims were sent to**
25  **Disability Management Services.**

**Page 24**

1  Q. I'm speaking generally. I'm not
2  speaking about Mr. Kearney's policy
3  specifically. I'm sorry if I confused you.
4  If John Doe, Jefferson-Pilot
5  policyholder, were to file a claim or had a
6  claim pending since '96, would that claim
7  necessarily be something that you would have
8  responsibility for here as the reinsurer?
9  **A. No.**
10  Q. Why not?
11  **A. It's not my job to adjudicate the**
12  **claims.**
13  Q. I didn't say adjudicate. When would
14  you have any involvement in John Doe's
15  Jefferson-Pilot claim?
16  **A. In which context, with Jefferson-Pilot**
17  **or DMS?**
18  Q. Let's talk about the period prior to
19  2000.
20  **A. I would look at claims sometimes at the**
21  **request of Jefferson-Pilot. Sometimes I would**
22  **visit Greensboro and we would look at a list of**
23  **claims. We would pick out a random list of**
24  **claims to examine and that was the extent of my**
25  **involvement. It would just be to review the**

**Page 25**

1  **contents of the claim file.**
2  Q. Your testimony to the jury is you would
3  from time to time go and perform somewhat of an
4  audit function in Greensboro of the
5  Jefferson-Pilot claims?
6  **A. A review would probably be a more apt**
7  **description of what we did. We would review the**
8  **contents of the claim file.**
9  Q. Is your testimony that this review
10  would be entirely random, or would you go to
11  North Carolina from Kansas with the intention of
12  looking at specific claims that you would
13  identify?
14  **A. We would have identified claims ahead**
15  **of time for Jefferson-Pilot to have ready, to**
16  **have them pulled so that we wouldn't have to do**
17  **it when we got there. So we would identify a**
18  **list of claims for them.**
19  Q. Did you randomly identify the claims or
20  were they claims that you specifically
21  identified for reasons?
22  **A. A combination.**
23  Q. Did you ever do that with regard to
24  Mr. Kearney's claim as far as you know?
25  **A. I don't recall if I ever examined**

**7 (Pages 22 to 25)**

**Page 30**

1  names appear in some business record of ERC?
2       MR. MEAGHER: Objection to form.
3    **A. Yes.**
4    Q. (By Mr. Roberts) Would all of the
5  claim files associated with those hypothetical
6  273 claimants been housed at ERC?
7    **A. We don't typically have claim files on**
8  **individual claims at ERC.**
9    Q. Well, in this lawsuit I served a
10  subpoena and last week there was over, I think
11  3600 pages of information produced by your
12  company regarding Mr. Kearney. Do you have that
13  volume of information regarding claimants on
14  which you reinsure?
15       MR. MEAGHER: Objection to the
16  form. You may answer.
17    **A. It would probably depend on the claim.**
18  **I suspect the reason there were 3600 pages as**
19  **you state with respect to this claim is because**
20  **it's in litigation.**
21    Q. (By Mr. Roberts) You said that you
22  might go out and look at a claim. And under
23  some agreement with your company's clients, you
24  send -- this is sent to the office depending on
25  reinsurance agreements. What did you mean by

**Page 31**

1  that?
2    **A. On some reinsurance agreements**
3  **particularly where a company is engaging in a**
4  **line of business that they are not perhaps**
5  **accustom to marketing such as critical illness,**
6  **ERC would have the right to review the claim**
7  **before a decision is made in that matter.**
8    Q. What did you mean by it's sent to this
9  office depending on the reinsurance agreement.
10  The entire claim file gets sent to ERC or ERAC?
11    **A. The information that the insurer has**
12  **gathered with respect to the claim would be**
13  **forwarded to our offices for review.**
14    Q. Did that happen in Mr. Kearney's case?
15    **A. No.**
16    Q. Where did you go to college, sir?
17    **A. I graduated from Fort Hays State**
18  **University.**
19    Q. In addition to having this business
20  relationship with Jefferson-Pilot in 1996 or
21  1997, did your company have a business
22  relationship with Disability Management
23  Services?
24    **A. I believe so.**
25    Q. What do you understand that the nature

**Page 32**

1  of that relationship to be?
2    **A. I, as I understand it, they had a**
3  **consulting agreement with Disability Management**
4  **Services.**
5    Q. "They" meaning --
6    **A. ERC.**
7    Q. -- ERC. Is ERC and ERAC different
8  companies or just a name change?
9    **A. ERAC was a wholly-owned subsidiary of**
10  **ERC at one point in time for business reasons**
11  **and the way they compartmentalized the various**
12  **lines of business that they engaged in.**
13    Q. Okay. So ERC entered some kind of
14  consulting agreement with Disability Management
15  Services in about '96 or '97, is that right?
16    **A. I don't know when the agreement was**
17  **entered into, but it existed at the time I began**
18  **my employment.**
19    Q. And can you tell the jury what you
20  understand to be the main points of that
21  agreement?
22    **A. I only know that ERC had that**
23  **agreement. I really -- I don't -- I never**
24  **reviewed the document. I don't know anything**
25  **about it.**

**Page 33**

1    Q. As you understand the agreement just
2  the way it works without reading it, was it a
3  situation where ERC would select certain claims
4  for review by DMS whether they be
5  Jefferson-Pilot insureds or Mass Mutual insureds
6  or other clients of ERC?
7    **A. I don't know what the process was.**
8    Q. You do know that Mr. Kearney's claim
9  was selected for review by DMS pursuant to the
10  ERC consulting agreement entered about 1997,
11  right?
12       MR. MEAGHER: Objection to form.
13    **A. I know that DMS was involved. I don't**
14  **know how it -- Mr. Kearney's claim became**
15  **involved, or how DMS became involved with**
16  **Mr. Kearney's claim.**
17    Q. (By Mr. Roberts) Were you the point
18  person for JP with regard to Mr. Kearney's claim
19  in 1997 or was that Mr. Newkirk?
20    **A. I believe that was Mr. Newkirk.**
21    Q. Did there come a point where
22  Mr. Newkirk relinquished that responsibility to
23  you?
24    **A. Yes.**
25    Q. When was that?

**9 (Pages 30 to 33)**

## Page 34

1　A. I believe it was in 1998.
2　Q. What precipitated that?
3　A. I really don't know.
4　Q. He just came into your office one day
5　and said "Here, I want you to have that client.
6　I don't want to deal with it anymore?"
7　A. No.
8　Q. Do you recall how it happened?
9　A. I recall having the responsibility for
10　the Jefferson-Pilot account given to me sometime
11　in 1998.
12　Q. What did you do in preparation for
13　today's deposition, sir?
14　A. I spoke with counsel yesterday. That's
15　essentially it.
16　Q. You're referring to?
17　A. I'm referring to Mr. Baty and Mr.
18　Meagher.
19　Q. You met with the two of them yesterday?
20　A. That is correct.
21　Q. For how long?
22　A. Probably five hours including lunch.
23　Q. Did anyone else participate during the
24　course of that five-hour meeting with two
25　lawyers?

## Page 35

1　A. Yes.
2　Q. Who else?
3　A. Mr. Formus and Ms. Farabow and
4　Mr. Ellis for a very brief period of time, and
5　Mr. Cohen for a brief period of time.
6　Q. So you're a lawyer and yesterday you
7　met with those six lawyers?
8　A. That's correct.
9　Q. Preparing for today's depo?
10　A. That is correct.
11　Q. And did you meet today with your
12　counsel in preparation for the deposition?
13　A. I spoke with him briefly before we came
14　to this floor for the meeting. For the
15　deposition I should say.
16　Q. Well, I arrived 75 minutes before the
17　deposition and my understanding was that you
18　were in conference at that point?
19　MR. MEAGHER: Objection. It
20　assumes facts not in evidence.
21　A. That's not correct.
22　Q. (By Mr. Roberts) How long were you in
23　conference today?
24　A. Perhaps half an hour.
25　Q. With whom were you in conference?

## Page 36

1　A. Mr. Meagher and Mr. Baty.
2　Q. Did you review documents during the
3　course of yesterday's preparation with the six
4　lawyers?
5　A. I reviewed a document.
6　Q. Just one document?
7　A. Just one document.
8　Q. What was that?
9　A. It was a piece of correspondence from
10　Valerie Loftin to Bob Bonzell.
11　Q. Do you know if that was produced
12　pursuant to the subpoena or identified in the
13　privilege log?
14　A. I believe it was both produced and
15　identified. I have not seen the privilege log,
16　so I don't know.
17　Q. You believe it was produced to me and
18　then also identified in the privilege log?
19　A. I believe it was produced in the course
20　of the documents that I provided to counsel.
21　And I believe it has been identified as a
22　privilege document. Again, I've not reviewed
23　the privilege log, so...
24　Q. Mr. Bonzell's name doesn't appear in
25　the privilege log. Why don't we -- I'm going to

## Page 37

1　give you the privilege log and we will mark it
2　as one. And then you take some time to review
3　it and we will go off the video record while
4　you're doing that. And it will give you a break
5　as well. Fair enough?
6　A. Sure.
7　MR. MARTIN: Time is now 12:53.
8　And we're going off the record.
9　(Off the record)
10　MR. MARTIN: The time is now
11　1:09. We're back on the record.
12　Q. (By Mr. Roberts) Mr. Dempsey, while we
13　were off the record you had an opportunity to
14　look at the privilege log as produced and then
15　chronologically created a privilege log trying
16　to identify this single document that you
17　reviewed during your multi-hour six-lawyer
18　preparation session yesterday.
19　I understand that it's a December of
20　2002 letter or correspondence between Valerie
21　Loftin and Bob Bonzell. Have you been able to
22　locate that document?
23　MR. MEAGHER: I object to the
24　form.
25　A. No, I did not.

**10 (Pages 34 to 37)**

**Page 38**

1    Q.  (By Mr. Roberts)  Am I correct it is a
2  December 2002 memo or letter between those two
3  persons?
4    A.  To my recollection that is correct.
5    Q.  And how many pages is it?
6    A.  I believe it was on two pages.
7    Q.  Who was the author?
8    A.  Valerie Loftin.
9    Q.  She wrote a letter to Bob Bonzell?
10    A.  Correct.
11    Q.  Bob Bonzell, a non-lawyer, president of
12  DMS, correct?
13    A.  Correct.
14    Q.  And what is Valerie Loftin's position?
15    A.  I'm not certain.  I believe she's the
16  head of claims for Jefferson-Pilot.
17    Q.  Was she giving Bonzell legal advice?
18    A.  I don't know.  I don't recall.
19    Q.  Did you read the letter yesterday?
20    A.  I only looked at one paragraph on it I
21  think is all I looked at.
22    Q.  Was it your judgment that that
23  paragraph contained legal advice?
24    A.  No.
25    Q.  So that -- that single paragraph of a

**Page 39**

1  single document is the only document you
2  reviewed during your several hour preparation
3  session?
4    A.  That's correct.
5    Q.  Did you have a role in gathering
6  documents for complying with the subpoena, sir?
7    A.  Yes.
8    Q.  What was your role?
9    A.  Identifying and making a CD to provide
10  to counsel.
11    Q.  So you mailed a CD to Mr. Baty with the
12  documents that you were able to collect?
13    A.  I believe a runner picked up the CD and
14  then I also produced the hard copy documents
15  that I had as well.
16    Q.  So the items that are on the CD would
17  be e-mails and other electronically transmitted
18  communications?
19    A.  Correct.
20    Q.  Anyone else at ERAC partake in the
21  production of documents pursuant to the
22  subpoena?
23    A.  Not to my knowledge.
24    Q.  Where did you go to collect the
25  documents?

**Page 40**

1    A.  The electronic documents or the hard
2  copy documents?
3    Q.  Both.
4    A.  The hard copy documents were located in
5  a lateral file immediately adjacent to my
6  office.  And the electronic documents are on my
7  computer.
8    Q.  A lateral file, you mean a --
9    A.  I mean a storage cabinet that is wider
10  than it is deep, if that makes sense to you.
11  It's just a storage file cabinet that's wider
12  than a traditional one.
13    Q.  That's where you maintained these
14  Kearney paper documents that you received?
15    A.  Yes.
16    Q.  I'm sorry, did I ask you this; was
17  there anyone else that participated in the
18  production of documents at ERAC other than
19  yourself?
20    A.  At ERAC no one else produced any
21  documents or did anything of that nature.
22    Q.  That's because you would have been the
23  only one that would have had documents in your
24  possession?
25    A.  At ERAC, yes.

**Page 41**

1    Q.  Why do you keep saying at ERAC?  Are
2  you referring to potentially documents that --
3    A.  I understand that a document was
4  produced by someone else.
5    Q.  Did you see that document?
6    A.  I have seen that document, yes.
7    Q.  Was that document something that was in
8  your files as well?
9    A.  I believe so.
10    Q.  Do you know if that was produced to me
11  from you directly?
12    A.  I believe so.  It was produced by me.
13  I believe it was in the materials that I had.
14    Q.  You're referring to the document that
15  Attorney Zahnd provided to me, right?
16    A.  I have an understanding of a document I
17  believe Attorney Zahnd produced and that is the
18  document I'm referring to, which is just very
19  short.
20    Q.  I didn't come across this document in
21  the documents produced pursuant to the subpoena
22  from ERAC that I received last week.  But it's
23  your testimony you gave that document to your
24  counsel to produce to me?
25    A.  I believe I did, yes.

**11 (Pages 38 to 41)**

**Page 42**

1   Q.  Do you know why it was that this
2   document came to me through Mr. Zahnd?
3       A.  No.
4       Q.  Did you see the letter from Mr. Zahnd?
5       A.  No.
6       Q.  Does Mr. Newkirk still work with you?
7       A.  No.
8       Q.  He went with Swiss Re in that
9   transaction?
10      A.  Correct.
11      Q.  Are you mindful that it's Mr. Newkirk
12  that produced that document to me, in addition
13  to your belief that you produced it to me?
14      A.  I have an understanding of what I
15  believe was produced, but I have not seen
16  Mr. Zahnd's letter or the document that he
17  produced.
18          (Dempsey Exhibits 1 & 2 were
19      marked for identification by the reporter.)
20      Q.  (By Mr. Roberts) Exhibit 2, sir, is
21  the letter from Mr. Zahnd?
22          MR. MEAGHER:  Do you have a copy?
23  If not, I will take a look at the witness'.
24          MR. ROBERTS:  I have a copy for
25  you, sir.

**Page 43**

1           MR. MEAGHER:  All right.  Thank
2   you.
3       Q.  (By Mr. Roberts) Have you seen this
4   letter from Mr. Zahnd before?
5       A.  No.
6           MR. MEAGHER:  If I could take a
7   look at it before the questions, I would
8   appreciate it.  Thank you so much.
9       Q.  (By Mr. Roberts) Now that Mr. Meagher
10  has a copy --
11          MR. MEAGHER:  If I could have a
12  moment to read it.  It's multi page.  By the
13  way, I don't think video was properly noticed
14  and we object to the use of video at trial.  It
15  does require prior notice.  Okay.  I have
16  reviewed it.  Thank you.
17          MR. ROBERTS:  Are you sure you're
18  ready?  You didn't take much time.
19          MR. MEAGHER:  Pretty quick
20  reader.
21      Q.  (By Mr. Roberts) Sir, according to
22  this letter from Mr. Zahnd dated May 4th, '07,
23  the document attached was a document that was in
24  Mr. Newkirk's possession at the time the
25  subpoena was served.  Do you understand that or

**Page 44**

1   is that your understanding?
2       A.  I understand that is your assertion.
3       Q.  It's not my assertion, it's what the
4   letter asserts.
5       A.  I haven't had time to complete reading
6   the letter, but...
7       Q.  Assume that I'm not misrepresenting --
8       A.  Certainly.
9       Q.  -- what the letter says, the attached
10  document was in Newkirk's possession and he's
11  producing it.  Do you know why it would be that
12  Newkirk would still have this document?
13      A.  I have no idea.
14      Q.  Was this an electronically stored
15  document?
16      A.  I have no idea.
17      Q.  Well, you say you produced it.  Is it
18  something that you stored electronically?
19      A.  No.
20      Q.  Are the numbers on here accurate?
21      A.  I have no idea.
22      Q.  Well, the document indicates, last page
23  of Exhibit 2, "Chris Kearney," it says "he has
24  two policies," gives the number and then it
25  identifies the ERC percentage.

**Page 45**

1       A.  Okay.
2       Q.  And under one policy it says ".2750,
3   lifetime," what does that mean?
4       A.  I'm not sure in what context Mr.
5   Newkirk was putting this information down.
6       Q.  Well, being familiar with the ERC
7   business and policies and individual disability,
8   does that mean that the benefits are lifetime?
9       A.  The document indicates -- it states
10  twice lifetime.
11      Q.  Once for each policy?
12      A.  Well, it has the word "lifetime" under
13  each policy number.
14      Q.  And you don't want to go out on a limb
15  and speculate as to what lifetime might be in
16  this context?
17          MR. MEAGHER:  Objection to form.
18      A.  Well, lifetime in the context of a
19  disability policy would mean that there is a
20  lifetime benefit period.
21      Q.  (By Mr. Roberts) The next says
22  "Benefit," and under the 029 policy it says
23  "67.1 percent," or actually it says .67.1
24  percent." And under the 069 policy it says a
25  "100 percent." Does that mean under one policy

**12 (Pages 42 to 45)**

**Page 46**

1  ERC has 67 percent of the responsibility and
2  under the other it's 100 percent?
3  **A. Well, it's under the heading of**
4  **Benefit, so it doesn't necessarily logically**
5  **follow, but you could make that -- you could**
6  **make that guess I suppose.**
7  Q. It says "The Reserves .317,171 under
8  one policy and 184,536 under the other. Does
9  that mean the total reserve on the policies as
10  of whatever date this document was is a little
11  over 500,000?
12  **A. I have no idea.**
13  Q. Is this a form document at ERC, this
14  type of layout of information?
15  **A. Not to my knowledge.**
16  Q. Do you know why he would include the
17  jurisdiction?
18  **A. I have no idea.**
19  Q. That's a legal term that indicates
20  where lawsuits can be brought, right?
21       MR. MEAGHER: Objection to form.
22  **A. Mr. Newkirk is a lawyer, so I can only**
23  **assume he had those type of characteristics in**
24  **mind, not necessarily to litigate, but -- I**
25  **don't know. I would have to speculate as to why**

**Page 47**

1  **Mr. Newkirk put that on there.**
2  Q. (By Mr. Roberts) That's what
3  jurisdiction means, right, where lawsuits can be
4  brought?
5       MR. MEAGHER: Objection to form.
6  **A. I think jurisdiction is somewhat of a**
7  **generic term, but, yes, that would be my**
8  **understanding, that's where a lawsuit could be**
9  **brought. It can mean a variety of things,**
10  **subject matter, personal, etcetera.**
11  Q. (By Mr. Roberts) These list of seven
12  things kind of a To-Do list down at the bottom,
13  do you see that?
14  **A. I do.**
15  Q. Do you know who was directing that to
16  To-Do List?
17  **A. I'm not sure I understand what you mean**
18  **by directing.**
19  Q. Do you know if Mr. Newkirk was creating
20  that to To-Do List and directing that others
21  undertake those items?
22  **A. No, I don't know that.**
23  Q. At the bottom it says "Copied for DMS."
24  Do you know if he actually copied this document
25  and gave it to DMS?

**Page 48**

1  **A. No, I don't know.**
2  Q. You're mindful in the documents that
3  were produced to me last week there's everything
4  from the application filed back in 1990,
5  documents all from 1990 through even last month,
6  right, May of 2007?
7  **A. That's correct.**
8  Q. How is it that ERC came to possess
9  those documents?
10  **A. Which documents?**
11  Q. Well, the documents that predate 2000?
12  **A. ERC has the right under the reinsurance**
13  **agreement to copies of all the documents. And I**
14  **can only speculate as to how they were produced**
15  **or who obtained them, but it would be pursuant**
16  **to that right under the reinsurance agreement.**
17  Q. Do you know when that happened?
18  **A. No. It predated my employment at ERC.**
19  Q. So prior to your employment at ERC
20  there were documents regarding Kearney from the
21  '90 to '96 timeframe at ERC?
22  **A. Let me amend that somewhat. Prior to**
23  **my involvement with the Jefferson-Pilot account**
24  **they were obtained. Exactly when, I don't know,**
25  **but it was prior to my involvement.**

**Page 49**

1  Q. You came to be involved in '98?
2  **A. Correct.**
3  Q. And when you came to be involved there
4  was materials regarding Mr. Kearney and ERC's
5  files that predated '98?
6  **A. Correct.**
7  Q. Do you know how big the file was then?
8  **A. My recollection of the file at the time**
9  **I obtained it would be that it was probably less**
10  **than an inch thick.**
11  Q. What materials were in there?
12  **A. The materials I recall seeing in the**
13  **claim file were some claim forms and -- I really**
14  **don't recall anything specific above and beyond**
15  **just seeing continuance of disability forms in**
16  **the file. Aside from that, I don't remember any**
17  **specific type or form of document.**
18  Q. You don't recall whether the policy was
19  in there?
20  **A. No, I don't.**
21  Q. Now ERC possesses the application file.
22  Do you know when it was that the application
23  file from 1990 was obtained by ERC?
24  **A. No, I don't.**
25  Q. You've been the person at ERC or ERAC

Page 50

1   responsible for this claim since '98, correct?
2     **A. Correct.**
3         MR. MEAGHER: Objection to form.
4     Q. (By Mr. Roberts) And you don't know
5   when it would have been that the application
6   file and all the other documents, the 3000 plus
7   documents were received?
8     **A. As for the application file, I did not**
9   **request it, so it had to have been a portion of**
10   **the file that I inherited. As for the other**
11   **3000 pages, as I stated earlier, I believe those**
12   **are largely pursuant to the litigation.**
13     Q. Well, there is certainly litigation
14   documents in there. There's pleadings, motions,
15   correspondence, deposition transcripts. But the
16   documents that predate the litigation, were
17   those things that came to ERC contemporaneous
18   with their date or were they things that came
19   after the litigation?
20         MR. BATY: Objection. Asked and
21   answered.
22         MR. MEAGHER: I join.
23     **A. To my knowledge anything aside -- I**
24   **won't say anything. The documents that you're**
25   **referring to would had to have been compiled by**

Page 51

1   **someone other than myself.**
2     Q. (By Mr. Roberts) The pre-litigation
3   documents?
4     **A. The pre-1998 documents.**
5     Q. Litigation was commenced by
6   Jefferson-Pilot in June of 2002. The documents
7   in the file that relate to the period '98
8   through 2002, are those things that came to you
9   prior to litigation?
10     **A. I would have to look at the documents.**
11   **I honestly don't know.**
12     Q. Do you recall how it is you came to
13   possess the volume, the thousands of pages?
14     **A. Once again, I believe the thousands of**
15   **pages are primarily attributable to the motions,**
16   **pleadings, correspondence, etcetera, that you**
17   **just laid out for us. The minority of the**
18   **documents were compiled prior to my involvement,**
19   **to my recollection and belief. I don't know**
20   **that I personally gathered documents. I would**
21   **have to look. If you have a specific document,**
22   **I would have to look at it.**
23     Q. So during the course of the litigation
24   is the case that you contemporaneously received
25   from somebody pleadings that are filed, e-mails,

Page 52

1   correspondence, deposition transcripts, medical
2   records?
3     **A. I'm sorry, was that a question?**
4     Q. Yes.
5     **A. Would you repeat it, please.**
6     Q. Is it the case that you receive
7   contemporaneously pleadings, correspondence,
8   deposition transcripts, medical records in the
9   litigation?
10     **A. I could receive any or all of those**
11   **documents in any given case. That is correct.**
12     Q. Why are you being copied on those
13   materials?
14     **A. You mean with respect to --**
15     Q. The litigation?
16     **A. I'm being copied on it because of ERC's**
17   **interest in the litigation and the fact that I'm**
18   **acting as an attorney for Employers Reassurance**
19   **Corporation.**
20     Q. Are you making decisions in the
21   litigation?
22     **A. I participate in discussions about**
23   **matters in the litigation. I have not made**
24   **decisions per se.**
25     Q. You weigh-in, give them your thoughts

Page 53

1   and opinions, comment about other peoples'
2   thoughts?
3     **A. Certainly.**
4     Q. And apples being apples, ERC has more
5   at stake in litigation than Jefferson-Pilot
6   does, correct?
7         MR. MEAGHER: Objection to form.
8     **A. ERC apparently has more than 50 percent**
9   **of the reinsurance liability on this claim.**
10     Q. (By Mr. Roberts) What does the term "
11   work product" mean? Are you familiar with that?
12     **A. I'm familiar with that term.**
13     Q. Can you tell the jury what it means?
14     **A. That would be documents or it could**
15   **encompass conversations that an attorney**
16   **produces with respect to their client and with**
17   **respect to litigation.**
18     Q. In anticipation of litigation?
19     **A. Certainly.**
20     Q. Isn't that the definition?
21         MR. MEAGHER: Objection to form.
22     **A. I will certainly agree with that.**
23     Q. (By Mr. Roberts) There was a lot of
24   documents that you maintained that were withheld
25   under the claim of work product, are you mindful

**14 (Pages 50 to 53)**

**Page 54**

1  of that?
2      **A. Just from my brief review of your**
3  **privilege log, I saw work product identified.**
4      Q. You didn't partake in designating
5  documents as work product or attorney/client
6  privilege?
7      **A. No.**
8      Q. You just produced everything you had to
9  your counsel and from there they decided what
10  would be referred to as work product or
11  attorney/client privilege?
12      **A. That is correct.**
13      Q. Your counsel, Mr. Baty, is with you
14  today. Do you know if he participated in that
15  exercise with any other lawyers?
16      MR. MEAGHER: I would object on
17  work product grounds as to what procedures and
18  methods were used to determine privilege claims.
19      MR. BATY: Join in the objection.
20      MR. ROBERTS: Are you instructing
21  him not to answer?
22      MR. BATY: Yes, I'm going to
23  instruct him not to answer. The only reason
24  that he would know that or understand that would
25  be in discussion with me, so I'm going to

**Page 55**

1  instruct you not to answer the question.
2      Q. (By Mr. Roberts) You know, sir, that
3  when a lawyer claims work product it's because a
4  document comments on or is in anticipation of
5  litigation, right?
6      **A. Correct.**
7      MR. ROBERTS: Can we have a
8  stipulation that all of the documents produced
9  to me are authentic?
10      MR. BATY: Yes. You and I had
11  that discussion earlier in connection with the
12  subpoena that you issued to the corporation
13  Employers Reassurance. And I told you at the
14  time that Mr. Dempsey was the witness who could
15  testify to that. And rather than go through the
16  documents that were actually produced to you, we
17  will stipulate as to the authenticity of the
18  documents.
19      MR. ROBERTS: Mr. Meagher, you're
20  shaking your head up and down. Are you --
21      MR. MEAGHER: I have no reason to
22  disagree. If the producing party says they are
23  authentic, I have no reason to object to that.
24      Q. (By Mr. Roberts) Now, as that file
25  produced to me exist, there's, I think we

**Page 56**

1  discussed the application file from 1990 on
2  Mr. Kearney is in there?
3      **A. You indicated that earlier.**
4      Q. You don't know that?
5      **A. I don't recall that.**
6      Q. Do you recall that the policy is in
7  there?
8      **A. No, I don't recall that.**
9      Q. Have you ever made an effort to look at
10  the policy?
11      **A. I have looked at a specimen policy in**
12  **connection with Mr. Kearney's claim.**
13      Q. When did you do that?
14      **A. I have probably done that several**
15  **times.**
16      Q. Prior to the litigation?
17      **A. Yes.**
18      Q. Prior to 2002?
19      **A. Yes.**
20      Q. Prior to 2001?
21      **A. Certainly in 2001. I don't know if**
22  **there was anytime prior to 2001, I don't recall,**
23  **but I know I did in 2001.**
24      Q. Do you know there's medical records in
25  there, in the ERC file?

**Page 57**

1      **A. I don't recall that.**
2      Q. You don't recall there is medical
3  records in there?
4      **A. No, I don't.**
5      Q. There's information in there about
6  Mr. Kearney's other lawsuits with third parties.
7  Are you mindful of that?
8      **A. I recall information about**
9  **Mr. Kearney's other lawsuits. I don't recall it**
10  **was in that file, but I do recall that that**
11  **information has arisen in the course of the**
12  **adjudication of his claim.**
13      Q. Are you mindful there is information in
14  there about his relationship with his wife?
15      **A. I recall there being some information**
16  **about his wife of fairly recent note, but I**
17  **don't recall anything specific beyond that.**
18      Q. You're mindful that there is
19  surveillance information in there including
20  photographs?
21      **A. I have seen a photograph that I believe**
22  **was produced by you.**
23      Q. Well, the privilege log makes reference
24  to several photographs that have been withheld
25  from me. Are those things that are maintained

**15 (Pages 54 to 57)**

Page 58

1   in your file?
2       A.  I don't recall.
3       Q.  There is IME reports on Mr. Kearney in
4   your ERC or ERAC file, are you mindful of that?
5       A.  I do recall an IME report.
6       Q.  Pleadings including drafts of pleadings
7   that weren't filed, are you mindful of that?
8       A.  I recall pleadings. I don't recall
9   drafts, but I do recall pleading.
10      Q.  It's been the case over the past
11  several years that drafts of pleadings or
12  motions or memoranda would be shared with you
13  before filing, correct?
14      A.  That's correct.
15      Q.  Drafts of correspondence to
16  Mr. Kearney's counsel has been shared with you
17  before they have been issued, correct?
18      A.  On some occasions.
19      Q.  Deposition transcripts have been
20  provided to you for your review, right?
21      A.  I have seen at least two or three
22  deposition transcripts.
23      Q.  Hearing transcripts, right?
24      A.  Hearing transcripts, yes, I believe
25  there have been a couple hearing transcripts.

Page 59

1       Q.  That are in your file?
2       A.  That were electronic documents I
3   maintained as opposed to being in a physical
4   file.
5       Q.  Electronic and physical are in your
6   file?
7       A.  I'm trying to explain, not
8   differentiate.
9       Q.  Mr. Kearney's tax returns are in your
10  file, business and personal?
11      A.  I recall seeing -- or I recall there
12  being tax information in the file.
13      Q.  Information regarding audits of
14  Mr. Kearney's financial condition is in your
15  file?
16      A.  I don't recall that.
17      Q.  Why do you have all that information?
18  You're not adjudicating the claim, are you?
19      A.  No, I'm not.
20      Q.  So why do you have all that
21  information?
22      A.  It helps me to analyze the claim.
23      Q.  And then you express your opinion to
24  the persons who are responsible for litigating
25  it, correct?

Page 60

1       A.  I express my opinions to the people
2   that are involved in adjudicating the claim as
3   well as litigating the claim.
4       Q.  Do you do that in all matters of your
5   insured, your clients insureds, that go to
6   litigation?
7       A.  Not all, but probably the majority of
8   all claims that go to litigation have a high
9   level of involvement by someone with Employers
10  Reassurance Corporation.
11      Q.  Because of the percentage of the
12  liability you carry?
13      A.  No.  Simply because it's in litigation
14  and it's something that we would be interested
15  in, but it's not a routine that's engaged in
16  every claim.
17      Q.  Did you review the privilege log before
18  it was issued to me?
19      A.  No.
20      Q.  Could you take a look at it now for me.
21      A.  Certainly.
22          MR. MEAGHER:  Do you have another
23  copy?
24      A.  Is there something in particular you
25  want me to look at or just to flip through?

Page 61

1       Q.  We are going to go through several
2   entries on there.
3       A.  Okay.
4           MR. MEAGHER:  If we're going to
5   go through several entries, why don't we have a
6   copy made of that.
7           MR. BATY:  Sure.
8           MR. ROBERTS:  Let's go off the
9   video record and off the record.
10          MR. MARTIN:  The time is now
11  1:40. We are going off the record.
12          (Off the record)
13          (Dempsey Exhibit 3 through 24 was
14  marked for identification porter.)
15          MR. MARTIN:  The time is now
16  1:49. We're back on the record.
17      Q.  (By Mr. Roberts)  Mr. Dempsey, do you
18  know who Arthur Huy, H-u-y?
19      A.  No, I do not.
20      Q.  J.L. Roberson?
21      A.  I am familiar with the name.
22      Q.  Did you hire Geraldine Johnson?
23      A.  I spoke with Geraldine Johnson about
24  this matter, but I don't believe she was
25  retained by myself or ERC per se.  We had some

16 (Pages 58 to 61)

## Page 66

1  Schmidt?
2      A.  Well, I misinterpreted your sense of
3  the word "prosecuting this".  And so, yes, there
4  have been other lawyers involved such as those
5  you just identified.
6      Q.  You personally have interacted with
7  more than ten during the course of this
8  litigation, right?
9      A.  I don't know that for a fact.
10         MR. ROBERTS:  I guess we will
11  stipulate that the privilege log is authentic as
12  well, Exhibit 1, and an accurate representation
13  of the documents referred to?
14         MR. BATY:  Right.  He didn't see
15  it, but it was produced by counsel.
16         MR. ROBERTS:  Can we have that
17  stipulation?
18         MR. BATY:  Yes.
19         MR. MEAGHER:  The privilege logs
20  aren't evidence, so authenticity is not
21  appropriate, but it is what it is.
22      Q.  (By Mr. Roberts)  Does ERC have
23  responsibility for the legal expenses in the
24  lawsuit filed by Jefferson-Pilot against
25  Mr. Kearney?

## Page 67

1      A.  ERC shares a percentage of the legal
2  expenses.
3      Q.  Commensurate with its liability on the
4  claim?
5      A.  Correct.
6      Q.  Who is Rick Strange -- or Stange,
7  S-t-a-n-g-e?
8      A.  I believe Mr. Stange is the head of
9  litigation for Jefferson-Pilot.  I don't know if
10  his role has changed since they were acquired by
11  Lincoln.
12      Q.  Lincoln Financial?
13      A.  Correct.
14      Q.  Who is Patricia Perez?
15      A.  Ms. Perez is my assistants.
16      Q.  Who is Kristin Knoll, K-n-o-l-l?
17      A.  I don't know.
18      Q.  An e-mail to me in the privilege log.
19  I won't tell anybody.  Scott Lancaster?
20      A.  I don't know Scott to my recollection.
21      Q.  Darlene Stanczak, S-t-a-n-c-z-a-k?
22      A.  I don't know.
23      Q.  C.J. Schmidt?
24      A.  I believe Mr. Schmidt is an attorney in
25  the law firm that Mr. Ellis and Ms. Callow are

## Page 68

1  members of.
2      Q.  Peter Burrell?
3      A.  I believe Peter Burrell may be in that
4  same law firm.
5      Q.  Carl Semmler, S-e-m-m-l-e-r?
6      A.  Mr. Semmler is an attorney employed by
7  Lincoln Financial, a staff attorney, in-house
8  counsel.
9      Q.  Mark Davenport?
10      A.  Mark Davenport I believe was an actuary
11  employed at Jefferson-Pilot at that time.
12      Q.  Bill --
13      A.  I'm sorry, I'm misspeaking.  I believe
14  Mark Davenport is an attorney in Dallas, Texas.
15      Q.  He apparently was involved in the
16  Kearney claim at Document 1916 in February of
17  '06.  Does that ring a bell?
18      A.  No, it doesn't.
19      Q.  How about Bill Davenport?
20      A.  I don't know a Bill Davenport.
21      Q.  Steve Rice?
22      A.  Steve Rice is a CPA employed by DMS.
23      Q.  Andy Cohen?
24      A.  Andy Cohen is counsel for DMS.
25      Q.  Adam Formus?

## Page 69

1      A.  Adam Formus is counsel for DMS.
2      Q.  Stephanie Farabow?
3      A.  Stephanie Farabow is in-house counsel
4  for Jefferson-Pilot now Lincoln Financial.
5      Q.  Carrie Barnes?
6      A.  I believe Ms. Barnes is a DMS employee.
7  I believe she's an attorney for DMS.
8      Q.  George Walker?
9      A.  I don't know.
10      Q.  Diane Goodman?  Did I mention her
11  before?
12      A.  The name is familiar.  I believe
13  Ms. Goodman may be a DMS employee, but I can't
14  state that with absolute certainty.
15      Q.  Andrew Lynn?
16      A.  I believe Mr. Lynn is an attorney at
17  DMS.
18      Q.  Norman Carrier?
19      A.  Mr. Carrier is a claim examiner
20  employed by Jefferson-Pilot now Lincoln
21  Financial in their Concord, New Hampshire
22  office.
23      Q.  What do you understand the status of
24  Mr. Kearney's non-litigation claim to be?
25      A.  I believe he's being paid.  Would it be

**18 (Pages 66 to 69)**

**Page 70**

1    possible to take a break in a minute or two?
2    Q.  That would be perfect.  Did I ask you
3    who Andy Cohen is?
4    A.  You did.
5    Q.  Who is Maria Martinez?
6    A.  I don't know.
7    Q.  Scott West?
8    A.  Scott West is in-house counsel for
9    ERAC.
10   Q.  Is he someone that reports to you?
11   A.  No.
12   Q.  Is he your peer?
13   A.  Essentially.
14   Q.  Did he recently become involved in the
15   claim?
16   A.  He's only been employed --
17   Q.  Or litigation?
18   A.  -- by ERAC for a couple of years, so
19   that would be true.
20   Q.  Now would be a good time for a break?
21   A.  Thank you.
22       MR. MARTIN:  The time is now
23   2:11.  We're going off the record.
24       (Recess)
25       MR. MARTIN:  The time is now

**Page 71**

1    2:15.  We're back on the record.
2    Q.  (By Mr. Roberts)  Mr. Dempsey, let's
3    focus a little bit on the privilege log.  Your
4    mindful of how this is laid out.  There's
5    several columns and it's -- the references are
6    here numerically based on how documents were
7    numbered, do you understand that?
8    A.  Under the Beginning Document column?
9    Q.  Yes.
10   A.  Yes.
11   Q.  So if I ask you to turn to the
12   reference to Document No. 789, could you do
13   that?
14   A.  Yes.
15   Q.  Take a look at 789, 804, 800, 801, all
16   of those documents are dated February '94 and
17   have been withheld under the claim of work
18   product privilege, right?
19   A.  That is what this document indicates,
20   yes.
21   Q.  Meaning that the company was
22   anticipating litigation against Mr. Kearney back
23   in February of 1994 would be your conclusion,
24   right?
25       MR. MEAGHER:  Objection to form.

**Page 72**

1    A.  Yes.
2    Q.  (By Mr. Roberts)  If you turn to 401.
3    A.  Okay.
4    Q.  That's a document from February of '95
5    from some unknown person to some unknown person
6    that's being withheld for what reason?
7    A.  The privilege claimed is work product.
8    Q.  In February of '95, correct?
9    A.  Correct.
10   Q.  If you turn to 718.
11   A.  Okay.
12   Q.  That's a document from the next month
13   March of '95 from an unknown author to an
14   unknown recipient also being withheld for what
15   reason is that?
16   A.  Document 718 -- I'm sorry.
17   Q.  Yes.
18   A.  Yes.  It's being withheld on the basis
19   of work product.
20   Q.  If you turn to 1466 for me?
21   A.  Okay.
22   Q.  That document is dated November 14th of
23   1996, correct?
24   A.  According to the privilege log, yes,
25   that's correct.

**Page 73**

1    Q.  By your predecessor with responsibility
2    for the claim here at ERC?
3    A.  Mr. Newkirk, that's correct.
4    Q.  Who was your predecessor responsible
5    for the Jefferson-Pilot block of business at
6    ERC?
7    A.  That is correct.
8    Q.  His responsibility was in the November
9    '96 timeframe, right?
10   A.  That was his responsibility at that
11   time.
12   Q.  You were a new-be at ERC at that time?
13   A.  That is correct.
14   Q.  And the subject of that particular
15   document being withheld is what?  What's the
16   subject of that document?
17   A.  It says it's a recommendation.
18   Q.  And it's being held on the basis of
19   what?
20   A.  Work product.
21   Q.  And it's a transmittal from ERC to
22   Mr. Roberson at Jefferson-Pilot, is that your
23   understanding?
24   A.  It's a transmittal from Mr. Newkirk at
25   ERC to Mr. Roberson at Jefferson-Pilot.

## Page 74

1  Q.  It's a memorandum?

2  **A.  That is correct. It's described as a**
3  **memorandum. I don't have the document. I don't**
4  **know, but it's described as a memorandum.**

5  Q.  Dated November of '96 being withheld.
6  This recommendation is being withheld on the
7  basis of work product, right?

8  **A.  That is what the privilege log**
9  **indicates.**

10  Q.  February '97 there's a document
11  numbered 0536?

12  **A.  Okay.**

13  Q.  Unknown author, unknown recipient,
14  subject is the Kearney claim and it too is being
15  withheld because it's a document in anticipation
16  of litigation or work product?

17  **A.  That's what the privilege log**
18  **indicates.**

19  Q.  When you produce documents, did you
20  make any effort to conclude -- strike that. A
21  minute ago I referred to a couple documents that
22  had unknown authors and unknown recipients?

23  **A.  Yes, you did.**

24  Q.  When you produce those documents, did
25  you make an effort to try to conclude who was

## Page 75

1  the author and who was the recipient?

2  **A.  No, I did not.**

3  Q.  After you produced documents, did you
4  consult with your counsel about the creation of
5  a privilege log?

6  **A.  No, I did not.**

7  Q.  You just turned the documents over and
8  now you see a privilege log?

9  **A.  That is correct.**

10  Q.  Did I have you take a look at 508? I'm
11  sorry.

12  **A.  I don't believe you did. I'm looking**
13  **at it.**

14  Q.  September of '97, document still prior
15  to your involvement being withheld under the
16  privilege called work product, right?

17  **A.  That is what the privilege log**
18  **indicates, yes.**

19  Q.  Now if you can take a look at 001 to
20  005. This is a five page memorandum reportedly
21  created by you on the subject of, quote.
22  Additional claim file review" that was
23  transmitted to Harold Shelton, right?

24  **A.  You're referring to document 001 of the**
25  **five you just mentioned?**

## Page 76

1  Q.  Document beginning date 001 and end doc
2  number 005, five page document.

3  **A.  I see, I misunderstood. Yes.**

4  Q.  There's a five page document that you
5  purportedly authored in March of '98 that
6  details your additional claim file review that
7  you gave to Jefferson-Pilot, is that right?

8  **A.  That is what the privilege log**
9  **indicates, yes.**

10  Q.  Are you mindful sitting here what
11  document is referenced there?

12  **A.  I believe I am mindful, but I'm not**
13  **certain that it is, in fact, the document that I**
14  **think it could be.**

15  Q.  Is it an accurate characterization of
16  the document to call it Additional Claim File
17  Review?

18  **A.  If it's the document I'm thinking of,**
19  **it only pertains in part to Mr. Kearney. It was**
20  **not solely related to him. There was some other**
21  **claims involved if it's the document that I**
22  **believe it is.**

23  Q.  We don't know for certain?

24  **A.  No, I don't know for certain.**

25  Q.  But you did do a claim file review on

## Page 77

1  Mr. Kearney in or about March of '98?

2  **A.  I cannot tell you that I reviewed**
3  **Mr. Kearney's entire claim file, but the**
4  **document -- if this is the document that I**
5  **believe it is, there are -- it's a result of the**
6  **review I did. So, you know, whether it was**
7  **review of documents that I had in my possession**
8  **or I actually reviewed the entirety of the claim**
9  **file at Jefferson-Pilot, I can't tell you.**

10  Q.  The next document I want you to focus
11  on is 316?

12  **A.  360?**

13  Q.  316.

14  **A.  All right.**

15  Q.  This is a May of 1998 document being
16  withheld under two separate privileges,
17  attorney/client and work product, right?

18  **A.  That's what the privilege log**
19  **indicates.**

20  Q.  And the subject matter is claim
21  handling, right?

22  **A.  That is correct.**

23  Q.  And the author is Bill Ellis, who is
24  the lawyer now in the litigation against
25  Mr. Kearney, right?

**20 (Pages 74 to 77)**

**Page 78**

1  A.  That's what the privilege log
2  indicates.
3    Q.  And the recipient is David Newkirk?
4  A.  Again that's what the log indicates.
5    Q.  So more than four years prior to
6  actually filing a lawsuit against Mr. Kearney,
7  Mr. Ellis was involved in discussing claims
8  handling with ERC on Mr. Kearney's claim?
9  A.  I don't know.
10    Q.  That's what one would conclude from
11  this reference, right?
12      MR. MEAGHER: Object to form.
13  A.  You can conclude that.
14    Q.  (By Mr. Roberts)  Is that a logical
15  conclusion?
16      MR. MEAGHER: Same objection.
17  A.  You can conclude that from the fact
18  that it's on the privilege log.
19    Q.  (By Mr. Roberts)  Do you conclude that?
20  A.  Without examining the document I can't
21  tell you, but I would conclude that by virtue of
22  the fact it's on the privilege log.
23    Q.  How many files did you personally refer
24  to DMS under the consulting agreement?
25  A.  Under the consulting agreement I don't

**Page 79**

1  know.  I honestly don't know.
2    Q.  Are we talking hundreds?
3  A.  No.
4    Q.  Talking dozens?
5  A.  No.
6    Q.  I'm talking about just not
7  Jefferson-Pilot, all of the clients?
8  A.  Under the consulting agreement period,
9  I really don't know.  There certainly have not
10  been hundreds.
11    Q.  What drives you to use their services?
12  A.  DMS provides good customer service and
13  they --
14    Q.  To whom?
15  A.  To everyone involved.
16    Q.  The policyholder?
17  A.  The policyholder.
18    Q.  What makes you conclude that?
19  A.  Just based on my understanding of how
20  they conduct their business operations.
21    Q.  They provide you good customer service?
22  A.  ERC is satisfied with the service they
23  provide.
24    Q.  DMS has been a vendor for more than a
25  decade?

**Page 80**

1  A.  That is correct.
2    Q.  So what directs -- what compels Bill
3  Dempsey to send a file to DMS?
4  A.  When a company is overwhelmed by the
5  claims volume or when a company needs additional
6  resources to investigate a claim.
7    Q.  Then you turn to DMS?
8  A.  Not in every case.  Sometimes I
9  interact with the company.
10    Q.  What directs you to engage DMS?
11  A.  I would engage DMS.  At this point we
12  have DMS involved in blocks that they manage.  I
13  don't engage them on any other basis at this
14  point.  I discuss certain cases that pertain to
15  blocks that they manage.
16    Q.  So you haven't made a referral to DMS
17  under the consulting agreement for sometime?
18  A.  No.  Not for quite sometime, no, I have
19  not done that.
20    Q.  The consulting agreement is still in
21  place?
22  A.  I don't believe it is.
23    Q.  When it was in place, was it a rare
24  occurrence for you to direct a claim file to
25  DMS, or was it a common occurrence?  I'm

**Page 81**

1  referring to DMS under the consulting agreement.
2  A.  It would be rare.
3    Q.  Sir, I think we're coming near the end
4  here.  I have marked several documents as
5  Exhibits 3 through 24.
6  A.  Would you like me to return the
7  privilege log to the reporter?
8    Q.  That would be great.  I have marked as
9  Exhibit 3, it has a Bates number at the bottom
10  WDDP 000317?
11  A.  Correct.
12    Q.  Second page is -- the full number is
13  not there.  It's 33.  And then the copier cut it
14  off.  The third page is 342, do you see that?
15  A.  Yes, I do.
16    Q.  You're mindful that Bates number refers
17  to documents produced to me that were maintained
18  in your storage cabinet?
19  A.  Yes.
20    Q.  And you understand these to be the
21  applications, some of the applications, filed
22  documents dating back to 1990 on Mr. Kearney?
23  A.  I see there is a notation on
24  Document 317 that says "App file".  And based on
25  the title of Document 338, I would assume that

**21 (Pages 78 to 81)**

**Page 82**

1   this was a report that was gathered in
2   conjunction with the application for insurance.
3   And I suspect Document 342 was in conjunction
4   with Document 338.
5       Q.   These are documents from your file,
6   right?
7       A.   By virtue of the fact that they were
8   produced, yes.
9       Q.   Exhibit 2, letter dated September 8,
10  1993.
11      A.   Just one second, Mr. Roberts. I don't
12  know that I have Exhibit 2. I go from three to
13  four.
14      Q.   Four. Letter dated September 8, '93.
15      A.   Yes. Document 813.
16      Q.   Exactly.
17      A.   Yes, I have that.
18      Q.   I think the handwriting on this
19  document is Roberson, but whether it is or it
20  isn't, does the handwriting on this document
21  make sense to you?
22      A.   No, not in this context it doesn't.
23      Q.   It seems to say, it appears "May should
24  be at the rate of 63 percent, June at 50
25  percent, July 100 percent." Those numbers don't

**Page 83**

1   mean anything to you?
2       A.   They have no significance to me.
3       Q.   Then Exhibit 5, is that 792, Document
4   792?
5       A.   Correct.
6       Q.   This came from your file. Do you hold
7   any significance to these notes on this
8   particular exhibit?
9       A.   It appears to be a document where
10  someone was inquiring with regard to residual
11  disability, onset of residual disability. I
12  can't read all the rest of it.
13      Q.   This is not a document that has been
14  produced previously in the litigation. I was
15  wondering is this a document that ERC created or
16  is this a document you received from
17  Jefferson-Pilot?
18      A.   ERC, to the best of my knowledge, did
19  not create this document.
20      Q.   Do you see it's dated November of '94?
21      A.   I do.
22      Q.   Exhibit 6, document labeled 398 appears
23  to be a April 1, '95 letter from Employers
24  Reinsurance Corporation to Jefferson-Pilot,
25  right?

**Page 84**

1       A.   Correct.
2       Q.   And it says "We've received and
3   processed the report submitted to the period
4   January through March of '95 regarding Chris
5   Kearney." And policy number. "Your report
6   indicates 100 percent of benefit amount ceded to
7   ERC. Just need for you to confirm this is the
8   correct percentage. Also, please submit a
9   current medical and/or investigative report for
10  this claimant."
11          Are the facts represented in this
12  letter accurate as far as you know?
13              MR. MEAGHER: Objection to form.
14      A.   I don't know.
15      Q.   (By Mr. Roberts) You don't know if
16  there's been 100 of the benefit amount ceded --
17      A.   No.
18      Q.   -- c-e-d-e-d to ERC?
19      A.   I apologize for interrupting. No, I do
20  not know that.
21      Q.   Do you know that not to be the case?
22      A.   No, I don't know it not to be the case
23  either. It appears that it was an issue here
24  too.
25      Q.   This too has not been produced

**Page 85**

1   previously in this litigation even though it was
2   purportedly sent to Jefferson-Pilot. Do you
3   know why that would be?
4              MR. MEAGHER: Object to form.
5       A.   I do not know.
6       Q.   (By Mr. Roberts) Next Exhibit 7. This
7   appears to be Mr. Shelton's response to ERC,
8   right?
9       A.   Correct.
10      Q.   And he expounds on it and references a
11  second policy, do you see that?
12      A.   Yes.
13      Q.   And Mr. Shelton provides
14  contemporaneously the recent disability claim
15  report for ERC, right?
16      A.   He indicates that's enclosed with this
17  information, yes.
18      Q.   Do you happen to know that was the
19  course of business that ERC would
20  contemporaneously receive those type of forms on
21  Mr. Kearney?
22      A.   No, I do not.
23      Q.   You don't know one way or the other?
24      A.   No.
25      Q.   Is that the case in '98 through 2002?

**22 (Pages 82 to 85)**

**Page 86**

1    A.  I don't believe it was the case.
2    Q.  Did you ever receive any continuance of
3  disability information involving Mr. Kearney
4  during that period?
5    A.  It's possible.  I can't tell you one
6  way or the other.
7    Q.  Document 010, 011, 012 is Exhibit 8.
8  Do you know whose handwriting this is?
9    A.  I believe this is John Anderson's
10  handwriting.
11    Q.  So at the top where it says "Res equals
12  501,707," is that the ERC reserve or is that the
13  JP reserve?
14    A.  I do not know.
15    Q.  Look back at Exhibit 2.
16    A.  I don't believe I have an Exhibit 2.
17    Q.  Okay.  The document that Mr. Newkirk
18  provided, do you know who authored that
19  document, ERC or somebody else?
20    A.  I believe Mr. Newkirk authored that
21  document.
22    Q.  When he states the reserve there, is he
23  referring to the ERC reserve exclusive of any JP
24  reserve?
25    A.  I don't know.

**Page 87**

1        MR. MEAGHER:  Objection.  Asked
2  and answered.
3    Q.  (By Mr. Roberts)  What's the total
4  reserve he reflects on Exhibit 2?
5        MR. MEAGHER:  Objection.  Form.
6    A.  Approximately 501,000 and some change.
7    Q.  (By Mr. Roberts)  Thank you.  Do you
8  recall in the whole history of this claim of
9  Mr. Kearney that there was an October 2001 Cuban
10  coffee house meeting?
11        MR. MEAGHER:  Objection to form.
12    A.  I am not certain what you're alluding
13  to there.  I can speculate, but I'm not going to
14  do that.
15    Q.  (By Mr. Roberts)  You were instructed
16  yesterday over the course of five hours not to
17  speculate, so don't do that.
18        MR. MEAGHER:  I'm going to
19  object.  It's attorney/client privilege as to
20  any discussions.
21    Q.  (By Mr. Roberts)  In October of 2001,
22  there was a meeting in Miami, Florida.  You're
23  mindful that that event was reported to you
24  subsequent, right?
25    A.  Yes.

**Page 88**

1    Q.  And at that meeting, I wasn't there, I
2  also have been told that there was a settlement
3  proposal or some kind of offer made to
4  Mr. Kearney's lawyer.  Is that your
5  understanding also?
6    A.  That's correct.
7    Q.  And the offer was contingent on
8  Mr. Kearney turning in his policies, right?
9    A.  I don't recall.
10    Q.  Were you consulted prior to the
11  individuals who made that offer to Mr. Kearney's
12  lawyer?
13    A.  I believe I was.
14    Q.  And did you participate somehow in the
15  authority that they were given to make the offer
16  in the stated amount, whatever that amount was?
17    A.  Can you restate that?
18    Q.  Can you authorize those individuals to
19  state a certain offer?
20    A.  I don't --
21        MR. BATY:  I'm going to object to
22  attorney/client privilege in terms of what he
23  did.  I think your first question was did he
24  participate and that I was going to allow him to
25  answer.

**Page 89**

1    Q.  (By Mr. Roberts)  Why don't we return
2  to my first question if that's the one that
3  you're allowed to answer.  Did you participate
4  in authorizing those individuals to make the
5  stated offer?  Are you looking for guidance?
6    A.  I'm waiting to see if there's is an
7  objection because I don't think that was your
8  prior question.
9    Q.  Can we read back the prior question?
10        (Whereupon, the previous question
11  from page 88, line 15 was read back by the
12  reporter.)
13    Q.  (By Mr. Roberts)  What do you
14  understand the question to have been?
15        MR. BATY:  The first question she
16  read, did you participate.
17        (Whereupon, the previous question
18  from page 88, line 15 was read back by the
19  reporter.)
20        MR. BATY:  Answer that question.
21    A.  I believe so.
22    Q.  (By Mr. Roberts)  Who else
23  participated?
24    A.  I don't recall.
25    Q.  Was Jefferson-Pilot represented during

**23 (Pages 86 to 89)**

**Page 90**

1 that process?
2   **A. I don't recall.**
3   Q. Do you recall who you communicated
4 with?
5   **A. I think I know who I did, but I don't**
6 **know with absolute certainty.**
7   Q. Do you think it was Bill Hughes?
8   **A. No.**
9   Q. Bob Mills?
10   **A. I believe it was Bob Mills.**
11   Q. You don't recall any other
12 participants?
13   **A. No.**
14   Q. You don't recall any other
15 participants, correct?
16   **A. No, I do not recall any other**
17 **participants.**
18   Q. Is this Exhibit 8 a form that you, ERC
19 gets from DMS on claims that are referred to
20 DMS?
21   **A. I believe ERC got certain claim**
22 **analysis reported on this form, yes.**
23   Q. Not just on Mr. Kearney's claim, but
24 other claims?
25   **A. I believe so.**

**Page 91**

1   Q. Is this an ERC created form or is this
2 a DMS created form?
3   **A. This is, to my knowledge, this is a DMS**
4 **created form.**
5   Q. This document indicates that
6 Mr. Kearney was born in 1952 and the review was
7 done in '97, so he would have been 45, 44,
8 assume for me my math is correct?
9   **A. I will make that assumption, yes.**
10   Q. The reserve 501,000, would it grow or
11 decrease as Mr. Kearney gets older?
12   **A. Ultimately it will decrease.**
13   Q. But he was 44 at that time. Would it
14 increase when he's 45, 46, 47, 48?
15   **A. I don't know.**
16   Q. Does it adjust or does it remain static
17 at the time the claim is filed or once it's
18 established?
19   **A. A reserve changes over time.**
20   Q. On a group basis or an individual claim
21 basis?
22   **A. On an individual claim basis.**
23   Q. So is there an actual exercise to
24 adjust reserves to individual claims at ERC?
25   **A. Repeat that, please.**

**Page 92**

1   Q. So is there an actual exercise to
2 adjust reserves to individual claims at ERC?
3   **A. As I stated earlier, the reserves are**
4 **what they are. What an actuary does with them I**
5 **can't tell you.**
6   Q. How about 9. Nine is a July 8th, 1997
7 letter from Mr. Shelton to DMS that comes from
8 your file and is numbered 050.
9   MR. MEAGHER: Counsel, before you
10 proceed, I note inadvertently there is other
11 insureds names identified in the Re and those
12 should be redacted before it's attached to the
13 deposition.
14   MR. ROBERTS: I don't know that I
15 agree with that, but let's proceed.
16   MR. MEAGHER: Then I would
17 designate this as confidential under the order.
18   MR. ROBERTS: The entire
19 transcript?
20   MR. MEAGHER: Not yet.
21   Q. (By Mr. Roberts) This says " Dear
22 John, Enclosed is the material from the files in
23 the above three insureds, Mr. Kahn, Mr. Kearney
24 and Mr. London. These are the cases that you're
25 going to investigate for us to see what can be

**Page 93**

1 done either to settle these in an equitable
2 manner to both the reinsurer and to
3 Jefferson-Pilot, or to give us further advice on
4 where to proceed," right?
5   **A. That is correct.**
6   Q. Are these three files files that
7 Newkirk directed JP to send to DMS under the
8 consulting agreement?
9   **A. I don't know.**
10   Q. Do you think it would be important for
11 the task to be to see what could be done to
12 settle these in an equitable manner on behalf of
13 the insured instead of just the reinsurer and
14 Jefferson-Pilot?
15   MR. BATY: Objection.
16 Argumentative.
17   MR. MEAGHER: Objection to form.
18   **A. Can I answer? Yes, I would think that**
19 **is important.**
20   Q. (By Mr. Roberts) Do you know why
21 that's not stated here?
22   MR. BATY: Objection. Same
23 objection.
24   MR. MEAGHER: Join.
25   **A. No, I do not.**

**24 (Pages 90 to 93)**

**Page 94**

1  Q. (By Mr. Roberts) Next is ten and this
2  appears to be DMS's status report on those three
3  referrals with some information redacted and
4  some information about Mr. Kearney, right?
5  **A. Yes.**
6  Q. Do you know if this information was in
7  the ERC claim file when you took responsibility
8  for the Jefferson-Pilot block of business?
9      MR. MEAGHER: Objection to form.
10  **A. No, I don't know.**
11  Q. (By Mr. Roberts) Next is a June 1998
12  letter, which is Exhibit 11, right?
13  **A. That is correct.**
14  Q. This is from Shelton to Newkirk in June
15  of '98. Had you at that point taken
16  responsibility for the claim or not?
17  **A. I don't know.**
18  Q. Well, if you look at 001 of the
19  privilege log, this is after you write a five
20  page letter to Shelton regarding additional
21  claim file review, 001 to 005, right?
22  **A. Correct.**
23  Q. And what this letter reflects is just
24  the sharing of certain expenses relating to
25  Mr. Kearney's policy, sharing of information

**Page 95**

1  about expenses?
2  **A. That's what it appears to be, yes.**
3  Q. Does the calculation at the bottom make
4  sense to you?
5  **A. Yes.**
6  Q. Does this mean that there was issued
7  $3500 of benefits and 2800 of the 3500 was
8  something ceded to ERC?
9  **A. That is what the document indicates.**
10  Q. And then someone did the math on that
11  and calculated that to be 80 percent of the
12  obligation was ceded to ERC?
13  **A. That's what it would appear to be, yes.**
14  Q. And you multiply that by the amount of
15  the expense and you come to ERC's portion,
16  right?
17  **A. I think that's correct.**
18  Q. Is that number accurate? Does ERC have
19  80 percent of the responsibility?
20  **A. I don't know.**
21  Q. Is it something that is presently in
22  dispute between you and Jefferson-Pilot?
23  **A. No.**
24  Q. Has there ever been a dispute about the
25  percentage as far as you know?

**Page 96**

1  **A. As far as I know, no.**
2  Q. Exhibit 12 is a similar letter dated a
3  week later, June 26th, '98. Do you know whose
4  handwriting that is "Okay to pay our percentage
5  to JP?"
6  **A. I believe it's Mr. Newkirk's writing.**
7  Q. Was it the procedure that you or he had
8  to authorize payments on the Kearney claim?
9  **A. For issues that are sent to us for**
10  **reimbursement, yes, we would have to authorize**
11  **the payment.**
12  Q. By reimbursement you're excluding
13  actual claim dollars paid? You're just talking
14  about the surveillance, medical records, legal
15  expenses, that kind of thing?
16  **A. For expenses certainly. For those**
17  **types of expenses we would authorize the**
18  **reimbursement, yes.**
19  Q. What about payment of the claim?
20  **A. Payment of the claim, you know, it's --**
21  **we are billed periodically from Jefferson-Pilot**
22  **for their payments.**
23  Q. How do you satisfy yourself that the
24  payments are appropriate?
25  **A. That Jefferson-Pilot's payments are**

**Page 97**

1  **appropriate? I believe we take a ceding**
2  **company's word for it rather than do a claim by**
3  **claim review.**
4  Q. Well, you do do audit reviews and you
5  get involved in litigation and you hand pick
6  some for review, right?
7  **A. True.**
8  Q. 13 is a July 9, '98 letter from Shelton
9  to Newkirk regarding Kearney and, again, the
10  sharing of expenses?
11  **A. Correct.**
12  Q. 14 is some ERC internal documents
13  regarding expenses paid on Kearney's claim?
14  **A. That's correct.**
15  Q. 15 is the cover page of a Motion For
16  Summary Judgment in a case between J.E. Grote
17  and Innomation. That appears in your Kearney
18  claim file?
19  **A. I see that.**
20  Q. From a case filed in 1997. Do you know
21  why that's in your claim file?
22  **A. I'm not certain.**
23  Q. Sixteen is a document that's Bates 191.
24  This is appears to be page two of some document.
25  Page one wasn't produced, but it indicates there

**25 (Pages 94 to 97)**

**Page 98**

1  were some surveillance of Mr. Kearney in January
2  of 2001 and you were provided the report of the
3  surveillance, is that accurate?
4        MR. MEAGHER: Objection to form.
5     **A. It appears to be a portion of an**
6  **investigative report.**
7     Q. (By Mr. Roberts) Was that the case?
8  Did you along the way get copies of all the
9  surveillance that was being conducted and
10  performed on the Kearney claim?
11     **A. I don't know that I got copies of**
12  **anything -- or excuse me, of everything.**
13     Q. You were getting billed for it?
14     **A. Uh-huh.**
15     Q. And had to authorize it for it to be
16  paid?
17     **A. Correct.**
18     Q. Is it your testimony to the jury that
19  you were getting billed for it, but you were not
20  actually getting the surveillance reports?
21        MR. MEAGHER: Objection to form.
22        MR. BATY: Join.
23     **A. That's not unusual.**
24     Q. (By Mr. Roberts) Were you directing
25  that surveillance be performed?

**Page 99**

1     **A. I don't believe so.**
2     Q. Did you at any point in time?
3     **A. I don't recall.**
4     Q. Next is Exhibit 17, which is the first
5  page of some forensic accounting report of
6  Joseph Levy to Bob Mills from your file?
7     **A. Uh-huh.**
8     Q. You're mindful that -- it's called
9  Supplemental Report. You're mindful there were
10  some financial reviews of Mr. Kearney's records
11  performed and included in your file?
12     **A. I recall that there was a financial**
13  **review done at some point, but that's the extent**
14  **of my recollection.**
15     Q. You're mindful of just one being done?
16     **A. I only recall one.**
17     Q. Next is Exhibit 18. And this is the
18  letter that Mr. Kearney received with the
19  lawsuit. I included it because I wanted you to
20  tell me who Jane Neidermyer is who is shown in
21  the blind copy?
22     **A. As I indicated to you earlier, Jane**
23  **Neidermyer is the person that was in charge of**
24  **their claim operation, of Jefferson-Pilot's**
25  **claim operation in Concord, New Hampshire.**

**Page 100**

1     Q. 19 is a document labeled 0025
2  reportedly from October of 2003. The first page
3  of -- series of medical records on Mr. Kearney.
4  You're still getting contemporaneous medical
5  records on Mr. Kearney here at ERC or ERAC?
6     **A. I last received some medical records**
7  **several months ago.**
8     Q. What's the purpose for you receiving
9  medical records?
10     **A. For me to assist in the analysis of the**
11  **claim.**
12     Q. Next is Exhibit 20 labeled -- it's
13  Bates No. 1913. This is purported an entry
14  regarding payment. This is actually never
15  actually signed by the Judge or presented to the
16  Judge as far as I'm aware, but it appears in
17  your claim file. Do I conclude correctly that
18  drafts of motions and pleadings to be filed with
19  the Court were shared with you before filing?
20     **A. On some occasions, yes.**
21     Q. Next is 21, which is a spreadsheet.
22  This is titled Unpaid COLA Benefits. Do you
23  know why this appears in your file?
24     **A. I believe it's because it's in**
25  **association with Mr. Kearney's claim.**

**Page 101**

1     Q. Next is 22 which is medical records on
2  Mr. Kearney of a Dr. Shepard from November of
3  2006, just eight months ago. I think we talked
4  about this earlier. You get medical records on
5  Mr. Kearney even ones from recent time in order
6  to assist in the evaluation, is that right?
7     **A. That is correct.**
8     Q. Is his medical condition under analysis
9  presently?
10        MR. MEAGHER: Well, with regard
11  to any discussions between the counsel group
12  during pendency of the litigation, I would
13  object on the grounds of work product and
14  attorney/client privilege.
15        MR. ROBERTS: Are you instructing
16  him not to answer?
17        MR. BATY: I join in the
18  objection, but it's to the extent that he can
19  answer the question without getting into
20  discussions that you've had with counsel.
21        MR. MEAGHER: Could you read the
22  question back, please?
23        (Whereupon, the previous question
24  was read back by the reporter.)
25

**26 (Pages 98 to 101)**

**Page 102**

1    A.  I believe Mr. Kearney's medical
2  condition is at issue.
3    Q.  (By Mr. Roberts)  His present medical
4  condition?
5    A.  His present medical condition.
6    Q.  Outside the litigation whether or not
7  he qualifies for benefits today, whether he had
8  a lawsuit pending or not, is that your
9  testimony?
10    A.  Yes.
11    Q.  And you've been assisting in that
12  endeavor, correct?
13    A.  I would like for you to define
14  assisting.
15    Q.  You're getting present medical records
16  for that purpose, correct?
17    A.  Yes.  I received medical records
18  several months or at least several weeks ago.  I
19  can't remember the last time I was updated on
20  it, but it's probably been in the four to eight
21  week range.
22    Q.  What triggered the present analysis of
23  his medical condition for his continued
24  entitlement to benefits?
25    A.  Well, I believe an ongoing disability

**Page 103**

1  claim is subject to that type of analysis at any
2  point in time.
3    Q.  You're mindful Mr. Kearney just had a
4  heart attack?
5    A.  No, I'm not.
6        MR. MEAGHER:  Is he going to be
7  available for deposition next week?
8        MR. ROBERTS:  You got a one
9  track mind.
10        MR. MEAGHER:  We want to know if
11  he's incapacitated, certainly we will change the
12  date.
13        MR. ROBERTS:  You would
14  accommodate him?
15        MR. MEAGHER:  Well, I haven't
16  been informed by you that that's a problem.
17        MR. ROBERTS:  Your colleague
18  knows.
19        MR. MEAGHER:  We have travel
20  plans.  Okay.  So it's not going on Wednesday?
21        MR. ROBERTS:  Let me proceed with
22  the deposition, please.
23        MR. MEAGHER:  You don't want to
24  respond to me?
25        MR. ROBERTS:  I will respond to

**Page 104**

1  you when the deposition is concluded, counsel.
2        MR. MEAGHER:  All right.  Fine.
3  Thank you.
4    Q.  (By Mr. Roberts)  So it's just a
5  routine exercise to review his medical records
6  because he has an ongoing claim.  That's what's
7  going on right now?
8    A.  Yes.
9    Q.  Are his credit card records being
10  evaluated for that purpose?
11    A.  I don't know.
12        MR. MEAGHER:  Objection to the
13  form.
14    Q.  (By Mr. Roberts)  Have you sought his
15  records for that purpose?
16    A.  Which records?
17    Q.  Credit card records?
18    A.  I have not sought those records.
19    Q.  Do you know if they are being sought
20  for that purpose?
21    A.  I believe so.
22    Q.  Is the next one 24 which is a May 31,
23  2007 letter to Mr. Kearney from DMS, which comes
24  from your claim file?
25    A.  I'm sorry, are you asking me if this

**Page 105**

1  comes from my claim file?
2    Q.  The next document is Exhibit 24, which
3  is a May 31, 2007 letter, correct?
4    A.  That is correct.
5    Q.  And this came from your claim file?
6    A.  I believe so.
7    Q.  This document that is just two weeks
8  old?
9    A.  I believe so.
10    Q.  And this doesn't relate to litigation.
11  This relates to his ongoing claim?
12    A.  Right.
13    Q.  And you're getting these documents
14  contemporaneous with their issuance?
15    A.  Correct.
16    Q.  I need one moment.
17        (Off the record)
18    Q.  (By Mr. Roberts)  Privilege log,
19  Exhibit 1, can you turn to 2948 and 2949?
20    A.  I have a non-chronological privilege
21  log.  I'm sorry.  I can look for it, but it
22  might take me --
23        MR. BATY:  What's the number
24  again?
25    Q.  (By Mr. Roberts)  On that document

**27 (Pages 102 to 105)**