IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. C-1-02-479

JEFFERSON-PILOT LIFE INSURANCE CO., )
                              Plaintiff )
                                       )
v.                                     )
                                       )
CHRISTOPHER L. KEARNEY,                )
                              Defendant )

DEPOSITION OF: ROBERT MILLS, taken before Sharon R. Roy, Notary Public Stenographer, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the law offices of ACCURATE COURT REPORTING, 1500 Main Street, Springfield, Massachusetts on May 14, 2004 commencing at 8:38 p.m.

A P P E A R A N C E S:

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

---

A P P E A R A N C E S:

FOR THE PLAINTIFF:

WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH  45202-2491
513-852-6000
     BY:  WILLIAM R. ELLIS, ESQ.

FOR THE DEFENDANT:

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH  45201
513-621-6464
     BY:  MICHAEL A. ROBERTS, ESQ.

Also Present:

Adam E. Formus

Joanne Yacavone, Videographer

---

3

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Robert Mills | Direct by Mr. Roberts | 11 |
|  | Cross by Mr. Ellis | 228 |

EXHIBITS:                                          PAGE:

Exhibit 42: Privilege log ......................... 10
Exhibit 43: Compilation of material ............. 131
Exhibit 44: Binder marked "Exhibit" ............. 131

---

4

1       THE VIDEOGRAPHER:   The caption of
2   the case is Jefferson-Pilot Life Insurance
3   Company, plaintiff, versus Christopher L.
4   Kearney, case number C-1-02-479.  Would the
5   court reporter please swear in the witness.
6
7       ROBERT MILLS, Deponent, having
8   first been duly sworn, deposes and states as
9   follows:
10
11       MR. ROBERTS:   This is Mike Roberts,
12   counsel for the defendant, and we are here on
13   Friday morning, May 14, 2004 at 8:40.  This
14   deposition was to begin at 8:30 in the
15   morning.  Since 8:30 two procedural issues
16   have arisen in the case.
17       First, to describe the scene, we're
18   in the court reporter's office conference
19   room in Springfield, Massachusetts.  At the
20   table is the videographer, court reporter,
21   Mr. Ellis, counsel for the plaintiff, the
22   witness, and myself.  In the corner of the
23   room is a lawyer named Adam Formus who is
24   in-house counsel for DMS.  Yesterday during

1  the course of two depositions Mr. Formus sat
2  away from the table in the corner of the room
3  taking down on his laptop every word that was
4  said in the room.  That's not a problem.  The
5  problem is he was connected to the Internet
6  and connected to his office during
7  yesterday's proceedings.
8          I took one long deposition
9  yesterday of Mr. Ditmar, and at the second
10  deposition I asked the witness if he had any
11  communications regarding the conduct of the
12  proceeding.  It was my understanding from the
13  testimony that Mr. Formus's Internet
14  connection back to the office and his
15  word-for-word transcription of the day's
16  proceedings were communicated to Mr. Bonsall.
17  For that reason this morning when I arrived I
18  requested that Mr. Formus, if he desired to
19  take down every word that is spoken today in
20  addition to the court reporter doing so, he
21  could do so on his laptop and save that
22  information to his laptop either on a disc or
23  not to a disc, he could save it to the hard
24  drive on the laptop.  That was unacceptable

1  to Mr. Formus.  He said, "No, I'm not going
2  to do it.  I'm going to be connected to the
3  Internet."  So there is reason to suspect
4  that these proceedings are being transmitted
5  back to DMS's office contemporaneous with the
6  proceedings.  I have to take still two more
7  depositions this afternoon and I've asked
8  Mr. Formus for his courtesy in not being
9  connected to the Internet, not being
10  connected to his network back at the office
11  and he refuses.
12          The second procedural issues that
13  arose, is for approximately 15 months the
14  defendant has been seeking the privilege log
15  be provided.  The privilege log due in the
16  case from the plaintiff was due approximately
17  15 months ago and there has been more than a
18  dozen requests for the privilege log.  We are
19  now beyond the discovery cut-off.  I am here
20  on my last day of depositions of DMS
21  employees.  I've taken the depositions I
22  intend to take of the Jefferson-Pilot
23  employees.  I've told Mr. Ellis that I need
24  the privilege log before the conclusion of

7

1  the depositions.  Mr. Ellis handed to me at
2  8:30 this morning or 8:32 a fax that purports
3  to be from a woman named Christie Zerges,
4  from the law firm of Wood & Lamping, who I
5  understand to be Mr. Ellis's paralegal.  The
6  fax was transmitted, according to the fax
7  transmittal line, at 4:18 May 13, 2004, and
8  the fax is specifically directed to the
9  Springfield Marriott, Guest Michael Roberts.
10  I stayed at the Springfield Marriott
11  yesterday.  The total number of pages is six.
12  And the note written by Christie Zerges is,
13  "Mike, attached, please find the privilege
14  log which was completed today in the above
15  case."
16          Apparently, Mr. Ellis intercepted
17  this fax before I could receive it at the
18  Marriott yesterday and I was not provided it
19  prior to the conduct of this deposition.
20  Perhaps that was because he didn't desire me
21  to be able to review it before the
22  deposition.
23          Nonetheless, the third procedural
24  issue, actually, is that the privilege log

8

1  itself is woefully insufficient.  The rules
2  specifically require that the privilege log
3  contain the dates of the communication, the
4  author of the communication by name, the
5  recipient, and the substance of the
6  communication.  The purpose for that is
7  obvious.  It's for the Court to be able or
8  the lawyer to be able to determine whether in
9  fact there is an appropriate designation of
10  privilege.
11          Notwithstanding those very
12  unambiguous obligations, Mr. Ellis's office
13  has prepared a list of the 86 pages, I knew
14  what 86 pages they were, I knew what the
15  Bates numbers were, and all he has done is
16  recited the Bates number of those pages and
17  said "privileged communication."  Some said
18  "privileged communication from counsel to
19  client," some said "privileged communication
20  between counsel."  Otherwise there is no data
21  provided in the alleged privilege log that
22  complies with the rule or offers the opposing
23  party the opportunity to explore whether or
24  not it's an appropriate exercise or assertion

Q.   I think you and I agree.  I mean, those two
things that I just articulated are very important.
What I'm asking you, is there anything else, is there
a third thing, a fourth thing that is equally
important or more important than those two?

A.   Each claim is unique, so depending on the
circumstances of the case, I can't say which
information is more important than the other.  It is
essentially going to be a culmination of gathering a
lot of the information to be able to make any type of
decision.

Q.   In your 13 years of experience in this
field have you ever run into a case where the policy
rights and obligations and the facts and
circumstances of the individual's medical condition
are less important than something else?

A.   Well, again, it's hard to -- you can't
really make those determinations on those two things
alone.  There's other elements, information that's
gathered in the case that helps establish the claim,
the benefit eligibility, the significance of the
medical.  You can't make decisions on those two
things alone.

Q.   Sir, that wasn't my question.  My question

was can you identify for me one instance in your 13
years of experience where the rights and obligations
under the policy and the facts and circumstances of
the person's medical condition weren't as important
in determining benefit eligibility as something else?
Can you identify one case for me?

A.   You know, like I said, I've handled a lot
of cases over my years.  I can't really point to any
specific case to try to say that there's not other
things that are just as important in combining all
those factors in making a decision.

Q.   Why did you move from the -- why did you
move to the Equitable block of business?

A.   Why did I move to the Equitable block of
business?  I don't think it was a choice.  I think
it was explained that I would be moving to Equitable
and handling cases in that block of business.

Q.   Were you promoted?

A.   Yes, I was.

Q.   What was your promotion from and to?

A.   I was promoted from a claim consultant to a
director of claims for the Equitable block.

Q.   Who had been the director of claims for the
Equitable block?

27

A.   There were no directors at that time.  It
was a block of business that we just received.  I was
one of the directors that were placed on the files as
the cases came in.

Q.   How many people report to you now?

A.   I recently had someone leave, so I have
three people that report to me now.

Q.   Do you work out of the Springfield office?

A.   Yes, I do work out of the Springfield
office.

Q.   Do you meet with your subordinates and
develop strategies on claims they're handling?

A.   My subordinates come into my office and we
discuss cases and strategies for the case.

Q.   And is that something that you did when you
reported to supervisors when you were a claim
consultant?

A.   I would from time to time discuss cases
with my superiors.  I had a lot of ability to work on
my own because of my experience as well.

Q.   Would you consult with Mr. Hughes to
develop strategies on cases from time to time?

A.   Yes, I would consult with Mr. Hughes.

Q.   And would you consult with Mr. Ditmar when

28

you reported to him, to develop strategies on cases
from time to time?

A.   I recall meeting with him as well to
discuss cases.

Q.   Would those strategy discussions
incorporate developing information directed at
ultimately resolving a claim?

A.   Those meetings were about discussing the
cases as far as what information was needed to
process the claim.  If we were going to do medical
examinations in circumstances where there was a
disputed claim, there would have been a discussion
about whether or not trying to resolve the situation
would have made sense.

Q.   Did you make a trip to Miami, Florida to
meet an attorney named Spiegel in the fall of 2001?

A.   Yes, I do recall meeting with an attorney
John Spiegel.  It most likely was the fall because I
remember it was shortly after 9/11.  I was a little
apprehensive about getting on an airplane.

Q.   Did you prepare a field report following
that visit?

A.   I don't recall if there was a field report
created.

1  words, but I know we talked about some of the
2  difficulties in the case and the differences both,
3  you know, the company had as well as the differences
4  of opinions that Mr. Kearney had.  I recall Bill --
5       Q.   Bill Hughes?
6       A.   Bill Hughes starting the meeting by
7  apologizing that he needed to tell him that we had
8  recently, just in a matter of minutes, uncovered an
9  error in the payment of benefits.
10           Bill Hughes discussed with him settlement
11  options.  I remember at one point Attorney Spiegel
12  asked us to leave and have lunch, that he needed to
13  speak with Mr. Kearney.
14           I recall returning from lunch waiting in
15  Attorney Spiegel's waiting room for a while for him
16  to come out of his office.  I recall him coming out,
17  because he had not talked with Mr. Kearney for a
18  while.  I recall him talking to us about University
19  of Miami, University of Miami football.  I recall him
20  getting the phone call from Mr. Kearney.  He walked
21  back into his office and talked with him, I presume.
22  At some point he came back out of the office and told
23  us that our meeting was essentially over and we could
24  get back on our plane and go home.

1       Q.   So there wasn't any substantive dialogue
2  after the lunch hour, you were just waiting and then
3  finally you were told to go home?
4       A.   I remember there was a lot of waiting, we
5  waited a while.
6       Q.   Was there any substantive dialogue after
7  the lunch hour?
8       A.   I mean, what do you mean by substantive
9  dialogue?
10       Q.   You told me you talked about the University
11  of Miami football team, and we can go into that a
12  little later, but did you discuss Mr. Kearney's claim
13  with Mr. Spiegel after the lunch hour?
14       A.   I don't recall specifically if we talked
15  any further details at that point in time.  The best
16  I can recall, it was a general conversation.
17       Q.   How long was the morning meeting?
18       A.   I don't remember the exact time frames of
19  the meeting.  Going to Florida, we probably would
20  have had an early morning flight.  I believe we met
21  sometime early morning, 9, 9:30 maybe, then we broke
22  for lunch at some point.
23       Q.   You said recently, in a matter of minutes,
24  we uncovered an error in the payments.  Are you

1  saying the error in the payments, the alleged error
2  in the payments to Mr. Kearney was uncovered by
3  somebody minutes before the meeting with Spiegel?
4       A.   Yeah, several minutes before the meeting
5  with Attorney Spiegel, Bill Hughes and I were in a
6  Cuban coffee shop, I believe, and I uncovered the
7  mistake, the Jefferson-Pilot mistake in paying the
8  increase in benefits.
9       Q.   Was it a Jefferson-Pilot mistake or was it
10  a Jefferson-Pilot mistake and a DMS mistake?
11       A.   It was a Jefferson-Pilot mistake that, you
12  know, I unfortunately continued for quite some time.
13       Q.   You got control of the file in January of
14  2000, and this meeting with Spiegel occurred in
15  October 2001?
16       A.   I got the file around January 2000, and I
17  believe you're correct, because it was, again, it was
18  shortly after 9/11.
19       Q.   And Mr. Hughes was going on the trip
20  because he had working knowledge of the file prior to
21  the Cuban coffee revelation, right?
22       A.   He had knowledge of the file, and I believe
23  the file would also reflect that he had some
24  communications with Mr. Kearney.

1       Q.   And Mr. Ditmar worked on Mr. Kearney's file
2  in the late '90's, right?
3       A.   I know I handled it from January of 2004.
4  I don't know the extent of what Mr. Ditmar -- I'm
5  sure you spoke with him about this yesterday.
6       Q.   You're not mindful from your knowledge of
7  the claim file that he had involvement in the claim
8  file in the '97 and '98 time frame, at least?
9       A.   I'm sure that the file reflects that.
10       Q.   Is he good at his job?
11       A.   I would imagine that he's good at his job.
12       Q.   Does he have difficulty understanding
13  disability insurance policies, as far as you know?
14       A.   I don't necessarily know the man and all
15  his capacities, but he seems to be a pretty
16  knowledgeable guy.
17       Q.   He was your supervisor for disability
18  claims for several months or years, right?
19       A.   He was my supervisor, I don't know, I can't
20  recall how long that was.
21       Q.   And is Mr. Hughes a knowledgeable fellow?
22       A.   I would view Mr. Hughes as a knowledgeable
23  fellow.
24       Q.   With regard to disability claims and

1  Q. Were you given a spot bonus after the Cuban
2  coffee revelation?
3  A. I think my testimony earlier was that I
4  don't recall ever receiving a spot bonus.
5  Q. Have you told me everything you can recall
6  about communications you had with Jefferson-Pilot
7  persons regarding Mr. Kearney's claim?
8  A. To the best of my knowledge as I sit here
9  today, I've answered your questions accurately and as
10  much as I can recall.
11  Q. Okay. I just want to confirm. There's
12  nothing you can remember sitting here today about
13  anything you communicated with a Jefferson-Pilot
14  person regarding Mr. Kearney's claim?
15  MR. ELLIS: Objection. Asked and
16  answered several times.
17  MR. ROBERTS: Okay.
18  A. Other than what we've already discussed?
19  Q. That's my question. Have we discussed
20  everything that you can think of?
21  A. To my knowledge, yes, we have.
22  Q. Did you and Mr. Hughes jointly arrive at
23  the settlement proposal that you communicated to
24  Mr. Spiegel at the meeting in Miami?

1  MR. ELLIS: I'm going to object. I
2  think that assumes facts not in evidence.
3  A. My recollection is that Mr. Hughes had a
4  conversation with Mr. Spiegel about considering or
5  discussing a settlement. I don't think it was
6  necessarily an offer.
7  Q. There was no settlement offer proposed at
8  that meeting, as far as you're aware?
9  A. To my recollection, numbers were discussed
10  and discussions were held at how numbers were
11  arrived. The circumstances or the revelation that we
12  talked about that happened in the coffee house added
13  another element of that discussion, but I don't think
14  an actual number was extended to Attorney Spiegel at
15  that point in time. Mr. Hughes would have more
16  knowledge on that than I would.
17  Q. Well, you were there, weren't you?
18  A. Yeah.
19  Q. Mr. Hughes didn't have any private
20  discussions with Mr. Spiegel during that day that you
21  weren't participating in or present at, right?
22  A. Correct.
23  Q. And you said there was -- you said numbers
24  were discussed. Those were without regard for the

1  extraordinary Cuban coffee revelation interpretation
2  of the policy?
3  MR. ELLIS: Objection to form.
4  A. Can you repeat the question again, please?
5  Q. You said that numbers were discussed with
6  Mr. Spiegel. Were those numbers without regard for
7  the Cuban coffee revelation?
8  A. My recollection was that numbers that were
9  discussed with Attorney John Spiegel were based on or
10  without the prior understanding of the change of what
11  the benefit would be at that point in time.
12  Q. I don't understand what you said. What
13  were you trying to say?
14  A. That the numbers that were discussed were
15  based on the previous understanding of what Mr.
16  Kearney's benefit was prior to the discovery in the
17  coffee shop.
18  Q. Okay, so the numbers that you and
19  Mr. Hughes, or maybe just Mr. Hughes, were suggesting
20  to Mr. Spiegel as the measurement of how this claim
21  could be resolved, those numbers were presented
22  without any consideration given to the new
23  interpretation of the policy?
24  MR. ELLIS: Objection to form.

1  A. Can you repeat the question so I can
2  understand it.
3  Q. Do you not understand it?
4  A. No, I did not.
5  Q. Was the number -- was Mr. Hughes the only
6  one that communicated a number to Spiegel as opposed
7  to you?
8  A. Yeah, he was the superior, so he
9  communicated.
10  Q. Do you know how it was that Mr. Hughes
11  arrived at determining the appropriateness of
12  articulating whatever number he articulated?
13  A. I don't recall a precise analysis that he
14  used to arrive at that number. The best of my
15  recollection is that number would have to take into
16  account a potential liability moving forward,
17  interest rates, present value, mortality, morbidity,
18  and my understanding is that those things were
19  considered when he arrived at that number.
20  Q. So mortality, morbidity, discount rate,
21  those were factors in the equation, in Mr. Hughes's
22  equation that got him to a number that he
23  articulated, is that right?
24  A. I can't speak specifically for him, because

I don't know all the discussions that he would have
had necessarily about discussing numbers with
Spiegel. But my understanding is that those types of
factors would have been discussed or considered in
coming to any type of settlement offer, number,
proposal or discussion.

Q.   Okay. And, as far as you know, Mr. Hughes
did not incorporate in the equation this
extraordinary revelation which had, in your words, an
extraordinary impact on the benefits going forward?

A.   My recollection, and what I talked about
earlier, was that he apologized to Attorney Spiegel
at the onset of that meeting and that the numbers
that he had in mind prepared to discuss with him were
prior to the discovery of the reduction in the
benefits in the coffee house just minutes before.

Q.   Okay. So Mr. Hughes was willing to present
a number to Mr. Spiegel that did not incorporate or
measure this extraordinary revelation, is that right?

A.   Can you say that question again, please?

Q.   So, as far as you know, Mr. Hughes
presented a number to Mr. Spiegel that did not factor
in the extraordinary revelation that you and he had
reached earlier that day?

---

MR. ELLIS:   Objection.

A.   To the best of my recollection, they had
discussion on numbers and that it didn't -- the
numbers that they ultimately discussed did not take
into account that the benefit had been incorrectly
paid to date.

Q.   You mean you weren't seeking a
reimbursement or you didn't factor in for future
benefits that item?

A.   My recollection is that the discussions
were based on the benefit level, the incorrect
benefit level, and that the appropriate benefit level
that it should have been at that time.

Q.   I didn't understand your answer to the
question. Did you factor in the assertion that Mr.
Kearney was required to reimburse the company for any
benefits paid erroneously?

A.   I can't recall if that was part of the
consideration at that point in time. I know at some
point in time a decision was made not to seek
reimbursement. I don't know at that particular time
whether or not that was something that was considered
in the discussion of numbers that were had.

Q.   What discussions did you have with

---

Mr. Hughes on which you're giving testimony that you
have an understanding about how he arrived at the
number?

A.   Can you repeat the question, please?

MR. ROBERTS:   Can you read that
back.

THE COURT REPORTER:   "What
discussions did you have with Mr. Hughes on
which you're giving testimony that you have an
understanding about how he arrived at the
number?

A.   My recollection is that the discussions
that Mr. Hughes had with Attorney Spiegel included
the things I talked about earlier, the mortality,
morbidity, interest rates, benefit level, maximum
benefit period, present value. I don't think there
was an exact formula that you could punch in the
numbers and come up with something.

Q.   That wasn't my question. Are you
testifying that you had no discussions whatsoever
with Mr. Hughes about the manner in which he arrived
at a number, and your testimony is based solely on
what you observed in the dialogue between Hughes and
Spiegel?

---

A.   I recall having discussions with Mr. Hughes
about numbers and what would make -- calculating what
a settlement number would look like.

Q.   Is this prior to the meeting you had with
Spiegel?

A.   My recollection is that I did have a
conversation with him prior or at some point after, I
don't know a specific time line.

Q.   Tell me what you can recall from that
discussion.

A.   I can't recall a specific conversation of
what was said other than some of the factors that you
would consider in coming up with an idea of a
settlement is what the present value, mortality,
things that I talked about earlier. I just don't
remember the exact content and specifics of the
conversation.

Q.   Do you have a memory that he unambiguously
communicated to you that the number had nothing to do
with the Cuban coffee revelation?

A.   My understanding is that those numbers that
were initially discussed were based on the benefit
level that was being paid at that point in time,
which was, I believe, why Mr. Hughes had apologized

109

1 at the onset of the meeting because those numbers
2 weren't the numbers that we would be able to use
3 going forward because the benefit needed to be
4 reduced.
5     Q.   That wasn't my question. My question was
6 do you have a specific memory of the discussion with
7 Mr. Hughes where he communicated to you that the
8 number he intended to propose to Spiegel or had
9 already proposed to Spiegel had not incorporated the
10 Cuban coffee revelation?
11     A.   To the best of my recollection, we had a
12 conversation about numbers. The best I can recall
13 the numbers that were discussed were in relation to
14 what his -- Mr. Kearney's present benefit level was
15 at.
16     Q.   So it had nothing to do with the
17 revelation?
18     A.   That's my recollection, yes.
19     Q.   And your recollection is based on
20 Mr. Hughes telling you that?
21     A.   I don't recall him necessarily telling me
22 that or the conversations we may have had about that.
23 I do remember him expressing that at the onset of the
24 meeting with Attorney Spiegel.

ACCURATE COURT REPORTING (615) 767-1906

110

1     Q.   So it's just coincidence that you and your
2 supervisor planned a trip to Florida, bought tickets,
3 got on a plane and went to meet with Mr. Kearney's
4 counsel, and prior to actually arriving on ground in
5 Miami, Florida you had no discussion, no inkling or
6 no conclusion that he had been paid erroneously up
7 until the time that you got on a plane to Florida.
8     A.   That was a long --
9     Q.   That was a bad question. Let me ask you
10 that again.
11     Prior to getting on the plane to Florida
12 and committing to that trip, did you have any
13 discussion with anyone or had you thought to yourself
14 that the benefits paid to Mr. Kearney were being paid
15 in error?
16     A.   I had no knowledge that the benefits being
17 paid to Mr. Kearney were in error until sitting down
18 in that coffee shop 15, 20 minutes or so before we
19 met with Attorney Spiegel.
20     Q.   So it's just a coincidence that two people
21 would fly from Springfield, Massachusetts to Miami,
22 Florida to talk to a lawyer for a claimant, and it's
23 just coincidental that an extraordinary matter came
24 to your attention after you arrived in Florida?

ACCURATE COURT REPORTING (615) 767-1906

111

1     A.   I wouldn't call it a coincidence. You
2 know, Attorney Spiegel had asked us for a couple
3 copies of the policy. It made me take a look at that
4 policy and come to the understanding. My
5 recollection was that he was aware of the
6 circumstances with the case, that there were
7 differences on both parties and that we were going to
8 discuss those, and that one of the options when
9 there's disputes is to come to some type of
10 resolution and that those discussions would be had.
11     Q.   You're mindful that DMS had a copy of the
12 WJ567A policy for over four years prior to that
13 meeting, right?
14     A.   I don't recall a specific time that an
15 actual copy of that policy was received by DMS.
16     Q.   You're mindful that DMS performed some work
17 for Jefferson-Pilot relative to the Kearney claim
18 going back to 1997; you're mindful of that from your
19 knowledge of the claim file, right?
20     A.   I recall looking at that claim file there
21 was a handling of the case by DMS prior to 2000.
22     Q.   And you're mindful that in 1997 that at
23 Todd Ditmar's specific request, because he wanted the
24 legal department to review the policy, that the

ACCURATE COURT REPORTING (615) 767-1906

112

1 WJ567A policy was sent to him by Howard Shelton,
2 right?
3     MR. ELLIS:   Objection.
4     A.   I don't recall that specific communication
5 document. If it's -- I'm sure it's in the file. If
6 you want me to look at it, I'll verify that for you.
7     Q.   As far as you're aware, did Jefferson-Pilot
8 ever provide DMS with any documents or information
9 that describe the benefits and the policies
10 Jefferson-Pilot had outstanding with policyholders?
11     A.   Can you repeat that question, please?
12     Q.   As far as you're aware, did Jefferson-Pilot
13 ever provide DMS with any documents or information
14 that describe the benefits and the policies
15 jefferson-Pilot had outstanding with policyholders?
16     A.   To my knowledge, recollection, they
17 provided us with copies of their policies. I don't
18 recall any other materials that they gave us.
19     Q.   Copies of the policies were given
20 independent of the actual claim files or were they
21 just incorporated amongst the various claim files?
22     A.   I don't remember the logistics, if they
23 came in with each individual file or if they were
24 sent all the policy forms and riders all at one time,

ACCURATE COURT REPORTING (615) 767-1906

177

1  suffered from severe clinical depression. Were you
2  thinking that perhaps if you had him surveilled
3  enough you could disprove those medical opinions?
4      A.   Well, this surveillance, if you look at it
5  in the full context in chronological order, this
6  surveillance looks like it took place in March of
7  2000. Now, I don't think the examinations took place
8  until several months, if not a year, later.
9           As far as one's own doctor providing
10 information, and that's -- well, obviously, we review
11 that and understand it, but we would also need to try
12 to confirm the information that any physician would
13 provide to us.
14     Q.   Okay, so you thought that Mr. Kearney was a
15 fraud and his doctor was just covering for him and he
16 really wasn't suffering from clinical severe
17 depression and you were going to be able to disprove
18 her opinion by having him surveilled several times?
19     A.   No, not at all. I don't think I've ever
20 felt that way about Mr. Kearney. In fact, I think
21 what the surveillance did was confirm to his benefit
22 a lot of the things that I recall he was putting down
23 on the forms at that time about his limited abilities
24 to work.

178

1      Q.   Then why did you have him surveilled
2  repeatedly throughout 2000, 2001? There's at least
3  six different surveillances of him throughout 2000,
4  2001. If you kept finding information that supported
5  what he was saying, why did you continue to decide to
6  spend money to have him surveilled further and
7  further?
8      A.   I don't know all the specific dates that we
9  did surveil him?
10     Q.   We'll get to them. This tab for the report
11 on 3/29/2000, we're done with the last page, which is
12 the invoice. Turn back to the first page.
13          The first sentence or first section is
14 "Additional Assignment." Why is there no note or
15 letter or any reference in the claim file recording
16 your additional assignment instruction to CS Claims
17 Group?
18     A.   The additional assignment is going to be
19 memorialized at a later point in the file. It's
20 going to be in the file, you just won't see it right
21 then and there at this point in time.
22     Q.   Why didn't you record that and preserve it
23 in the claim file when you requested the additional
24 assignment?

179

1      A.   Well, I wouldn't necessarily have to record
2  it because it's going to be recorded later on in the
3  claim file.
4      Q.   As per your instructions, they don't detail
5  what your instructions were. Why didn't you record
6  and preserve in the claim file for Mr. Kearney's
7  benefit, so he could understand what you were doing,
8  what your instructions were?
9      A.   Can you repeat the question?
10     Q.   CS Claims Group says, without detailing
11 what your instructions were, they say "As per your
12 instructions."
13          Now, if you, when you retained CS Claims
14 Group to perform this additional assignment, had
15 preserved in the claim file what your instructions
16 were, we'd be able to know what they were.
17          MR. ELLIS:  Objection. Misstates
18      the document.
19          MR. ROBERTS:  Okay, fine.
20     Q.   (By Mr. Roberts) Why did you not record to
21 preserve in the claim file your request for
22 additional assignment and the additional instructions
23 you gave to CS Claims Group? Why didn't you do that?
24     A.   My additional instructions would have been

180

1  preserved in the claim file at a later point in time
2  upon completion of the assignment by CS Claims.
3      Q.   You record in the claim file the fact that
4  Mr. Kearney returns a call and leaves a voice mail
5  message, but you don't record in the claim file
6  communications you have with surveillance folks
7  giving them an additional assignment and
8  communicating to them instructions, is that right?
9      A.   That's correct.
10          MR. ELLIS:  Objection.
11     Q.   (By Mr. Roberts) You said that's correct?
12 Mr. Ellis spoke over the top of you.
13     A.   Yes, I did.
14     Q.   Thank you.
15     A.   Can I take a break soon?
16          MR. ROBERTS:  Sure.
17          THE VIDEOGRAPHER:  Going off the
18      record at 2:46 p.m.
19          (A recess was taken)
20          THE VIDEOGRAPHER:  Back on record at
21      2:50 p.m.
22     Q.   (By Mr. Roberts) Mr. Mills, could you turn
23 to the next tab of Exhibit 44. It should be an April
24 7, 2000 -- okay.

1   just a second and then we'll flip back, but in
2   Exhibit 43 there's a letter dated January 24, 2001,
3   Bates labeled 3320 in that stack about 20 pages down.
4   It's dated January 24, 2001. If you want to go back
5   that way, it's in chronological order.
6       A.   What's the date?
7       Q.   January 24, 2001.
8       A.   What's the Bates stamp?
9            MR. ELLIS:  3320.
10      Q.   (By Mr. Roberts) It's a letter from you,
11  if that helps. I think you might have it.
12           In the third paragraph you're talking about
13  Dr. Judd -- or Dr. McClure's charge, right?
14      A.   Correct.
15      Q.   And you say that what she's requesting her
16  reimbursement rate be is tantamount to extortion?
17      A.   Yeah, I would say that that charge is
18  excessive.
19      Q.   And you say "tantamount to extortion"?
20      A.   Exactly.
21      Q.   What does extortion mean?
22      A.   That she's asking for a price that's well
23  beyond the customary charge for something of that
24  nature.

1       Q.   How is that extortion? I asked you for
2   your definition of extortion. Is that it?
3       A.   Yes.
4       Q.   When you first requested Mr. Kearney go see
5   an IME, did he agree to do so?
6       A.   My recollection is that he didn't
7   necessarily want to go at the first point in time,
8   no. I'd have to confirm that from the file.
9       Q.   Turn to IME form 1901 in Exhibit 44. Do
10  you mind putting those back in the order they came?
11  Thank you.
12      A.   Can you repeat the question again?
13      Q.   It's a middle tab, it has IME form 1901.
14  This is a Disability Management Services medical
15  resources referral form whereby you can request that
16  someone with the experience to do so provide you with
17  the right person to conduct an IME, right?
18      A.   It is a medical resource referral form and
19  it gives labels for what you want, an IME, expert
20  record review.
21      Q.   Was there something wrong about the way I
22  phrased it?
23      A.   I just want to confirm that I'm reading the
24  same thing.

1       Q.   Was I correct?
2       A.   Yes, you are.
3       Q.   This is the form that you would complete if
4   you're looking at a claim and responsible for a claim
5   if you desire to have a doctor designated to perform
6   an IME, right?
7       A.   This appears to be the form that was used
8   at that time, yes.
9       Q.   Is this your handwriting?
10      A.   Yes, that is my handwriting.
11      Q.   Was this the first time you filled out a
12  form for someone to go identify the appropriate
13  expert for you to conduct an IME of Mr. Kearney?
14      A.   Can you repeat the question?
15      Q.   Was this the first time you prepared a form
16  like this so that some expert could be identified to
17  examine Mr. Kearney?
18      A.   To my knowledge, this was the first time.
19      Q.   And the following month Dr. Kenny and Couch
20  were both designated, and within a month of that Mr.
21  Kearney saw each of those doctors, right?
22      A.   I believe he saw both those physicians
23  around that time.
24      Q.   Okay. So, it wasn't until January of 2001

1   that you sought to have Mr. Kearney examined by an
2   independent medical expert, right?
3       A.   Correct.
4       Q.   In October of 2000, months before you even
5   first requested an IME, you started paying him
6   benefits under reservation of rights, correct?
7       A.   I don't recall when that began. I mean,
8   I'd have to take a look at the file.
9       Q.   It would be reflected in the file, is that
10  your testimony?
11      A.   To my understanding.
12      Q.   Are you mindful of an October 2, 2000
13  letter that your supervisor sent to Mr. Kearney?
14      A.   I remember something along this line.
15      Q.   What's the Bates number of that letter?
16      A.   3055.
17      Q.   It's a three-page letter. Are there three
18  Bates numbers associated with those?
19      A.   Oh, yes. 3053, 3054, 3055.
20      Q.   Does this letter express to Mr. Kearney
21  that the benefit he's receiving as of that time would
22  be subject to a reservation of rights? I think it's
23  the third page.
24      A.   It says here that "While we await the above

209

```
1   materials, the company's agreed to issue an
2   additional benefit payment in the interest of good
3   will. Under the circumstances, this payment is
4   necessarily issued with the full reservation of
5   rights."
6       Q.   Does that mean he's getting the payment
7   under a reservation of rights?
8       A.   Correct.
9       Q.   What does a reservation of rights mean?
10      A.   Reservation of rights is something where
11  there is some questions on a case but we're
12  continuing to make the payment to an insured while we
13  continue to gather all the information to make a
14  benefit assessment.
15      Q.   Okay, up to this point in time had you read
16  the policy?
17      A.   I would believe that I read the policy to
18  some degree at that point in time.
19      Q.   Okay. You put him on reservation of rights
20  without a certainty that you had a full understanding
21  of his rights under the policy?
22      A.   It's more of the company reserving its
23  rights under the policy as they're continuing to
24  gather information. They don't want to -- while they
```

210

```
1   still have questions about their claim and they're
2   investigating it, they don't want to necessarily
3   discontinue benefits to an insured, because we
4   understand that can be harmful. So they're
5   continuing to investigate, need more information, and
6   in doing so they're not going to stop the payments,
7   they continue to make the payments, but reserve the
8   rights under the policy.
9       Q.   That wasn't my question. My question was,
10  you began to pay benefits to Mr. Kearney under
11  reservation of rights before you read his policy?
12      A.   Again, not knowing to the full scope of
13  when I read and what I read on the policy --
14      Q.   Would it be good faith for the company to
15  begin, to begin, after someone's been receiving
16  benefits for seven years, to begin paying them under
17  reservation of rights without the courtesy of even
18  reading the policy?
19          MR. ELLIS:  Objection.
20      A.   I don't understand the concern because the
21  insured's getting the benefits. The company's just
22  reserving its rights under the policy, whether
23  they've looked at every single page of that policy or
24  portions of the policy, there's questions about it.
```

211

```
1       Q.   Okay. And is it appropriate in good faith
2   for an insurance company to begin paying benefits
3   under reservation of rights without even conducting
4   an IME, or even asking for an IME?
5           MR. ELLIS:  Same objection.
6       A.   Every case and the circumstances are
7   different, you know --
8       Q.   Is it good faith --
9           MR. FORMUS:  Give him a chance to
10      answer. He was in the middle of a sentence.
11          MR. ROBERTS:  I'm sorry, I thought
12      he was finished.
13          MR. FORMUS:  The witness is trying
14      to finish an answer. You stopped him in
15      midstream.
16      Q.   (By Mr. Roberts) Go ahead, finish your
17  answer.
18      A.   Can you repeat the question again, please?
19      Q.   Do you have anything else to say?
20      A.   I lost my train of thought when you guys
21  started talking.
22      Q.   I'll strike the question. Is it good faith
23  for an insurance company to begin to pay somebody on
24  reservation of rights when multiple surveillance of
```

212

```
1   the individual is consistent with what he reports to
2   the company, you haven't asked him to undergo an IME,
3   and you're not even certain whether you read the
4   policy? Is it good faith?
5           MR. ELLIS:  Objection.
6       A.   You asked a long question and I'm trying to
7   understand that correctly. I think it's good faith
8   to continue to give every benefit of the doubt to the
9   insured, to continue to pay him every month as you
10  continue to address questions and gather information
11  about the case.
12      Q.   You're giving the insured every benefit of
13  the doubt as to entitlement of benefits when you
14  surveil him repeatedly, and every time you surveil
15  him it's consistent with what he says, you don't ask
16  that he go see an IME, and you're not even sure you
17  even read the policy. You're giving him every
18  benefit of the doubt by then putting him under
19  reservation of rights?
20          MR. ELLIS:  Objection. That's a
21      speech, not a question.
22      A.   Again, you got to look at the full context
23  of the case of the situation. There's other
24  questions about the case and we continued to pay him.
```

Q.   Very well.  That October 2, 2000 letter
putting Mr. Kearney's payments under reservation of
rights was authorized by Bill Hughes.  Had he
reviewed the file before he sent that letter?
A.   Could I see that letter again?
Q.   Sure.  Tell me if I'm reading the first
paragraph.  I'm going to mark as Exhibit 45 four
letters, one dated October 2, 2000 from Mr. Hughes to
Chris Kearney; a responsive letter of Mr. Kearney
dated October 25, 2000 to Mr. Hughes; a letter dated
October 19, 2000 from Mr. Spiegel to Mr. Hughes with
a fax cover sheet; and a letter from Mr. Spiegel --
excuse me, to Mr. Spiegel from Mr. Hughes.  The Bates
numbers of these documents are 3053 through 3055,
3047 and 48, 3136 and 37, 0630, 3154 and 3155.
     Does Mr. Hughes lie?
          MR. ELLIS:  Do you have a copy of
     those?
          MR. ROBERTS:  I do, but I can't put
     my hands on it immediately.  We'll do it at
     the next break.
A.   I don't know.  You'd have to ask him.
Q.   If he says that he's reviewed a policy, do
you trust that he's telling the truth?

A.   You'd have to talk to him about what he
does or doesn't do.
Q.   All right.  But what's your assessment of
his credibility?
          MR. ELLIS:  Objection.
A.   I think he's a pretty credible guy.
Q.   Have you ever known him to lie?
A.   Not to my knowledge.
Q.   Have you ever known him to misrepresent
anything to a policyholder?
A.   Not to my knowledge.
Q.   Mr. Hughes says in the first paragraph,
"Dear Mr. Kearney --
          MR. ELLIS:  Excuse me, which letter
     are we on?
          MR. ROBERTS:  October 2 of 2000.
Q.   (By Mr. Roberts) He says, "Dear Mr.
Kearney, I've been asked to assist in the evaluation
of your claim of ongoing disability benefits."  Was
that true, was he asked to assist?
A.   I don't recall.
Q.   Continuing, "Accordingly, to have a full
understanding of your situation, I have reviewed your
policy and your claim file."  Did I read that

---

215

correctly?
A.   Yes, I did.
Q.   Is he an honest guy?
A.   Like I said, I think he's a credible,
honest guy.
Q.   Does he understand disability insurance
policies and can he read unambiguous language without
misinterpreting it?
A.   He's an intelligent guy, I'm sure he can
read policies.
Q.   Can he read unambiguous language and
understand what the unambiguous language says?
A.   You'd have to talk to him about that, about
his ability to read.
Q.   What's your assessment?
A.   I understand him to be a pretty
knowledgeable guy.
Q.   "The following is a summary of that review
and an outline of the documentation and information
we'll need in order to determine further benefit
eligibility."
     So he was concerned about what level of
benefit eligibility Mr. Kearney had going into the
future and he wrote this three-page letter concerning

---

216

that, right?
          MR. ELLIS:  Objection.  Unless you
     give him the context of the letter, I object.
          MR. ROBERTS:  "Objection" would have
     been perfectly adequate for you.
A.   Again, you'd have to ask him about that.
Q.   The context of the letter, what your lawyer
said?  But he's an honest guy.  If he says he did
something, he did it?
A.   He's an honest guy.
Q.   And he can read unambiguous language
without screwing it up?
A.   He can read.  You know, you'd have to talk
to him about those things.
Q.   Let's go to the November 2, 2000 letter to
Mr. Kearney, 3043.
          MR. ELLIS:  Is that in 43 again?
          MR. ROBERTS:  43.
          MR. ELLIS:  What's the Bates on it,
     please?
          MR. ROBERTS:  3043.
Q.   This is from you to Mr. Kearney, correct?
A.   November 2 letter, 2000, addressed to
Christopher Kearney in care of Ms. Mary Kearney.

217

Q.   From you?

A.   From me.

Q.   So I was correct?

A.   You are now correct.

Q.   Okay. The last sentence of the third paragraph says, "At this time, it appears that without the requested claim materials we would be unable to evaluate your eligibility for additional benefits," right?

A.   I'm sorry, the third paragraph?

Q.   End of the third paragraph, last sentence.

A.   Mm-hmm.

Q.   "At this time, it appears that without the requested claim materials we would be unable to evaluate your eligibility for additional benefits." Did I read that correctly?

A.   Yes, you did.

Q.   So you're threatening to cut him off if he doesn't give you the information you demand, right?

A.   No, it's not threatening, it's just explaining to him that we need additional information to review the claim.

Q.   Is it extortion?

A.   No, I wouldn't say it's extortion.

218

Q.   I'm sorry, what was your --

A.   It's confirmation to evaluate a claim.

Q.   You're saying "I'm not going to pay you money unless you do this for me." Is that not extortion under your definition?

MR. ELLIS:   Objection.

A.   No.

Q.   Okay. Can you turn to 3038, December 5, 2000 letter?

MR. ELLIS:   Bates number, please?

MR. ROBERTS:   3038.

Q.   (By Mr. Roberts)  Third paragraph you say, "In a further effort to allow you sufficient time to submit the requested materials, Jefferson-Pilot has authorized an additional benefit check."

You never talked to Jefferson-Pilot about authorizing an additional benefit check at any time, did you?

A.   I think initially I would have talked to them about the benefits because I don't think we had access to be able to issue a payment.

Q.   For the December 2000 payment, it's your testimony that you had a communication with Jefferson-Pilot about, "Hey, we want some more

219

information from Kearney, but he hasn't given it to us yet. Will you authorize me to make a payment?" Did that happen?

A.   This would have been a situation where I would have spoken with Bill about that. Now, whether or not -- you know, who he spoke with, he had given me an authorization to go ahead and make a payment.

Q.   So your testimony under oath is that you're telling the truth. Jefferson-Pilot at some time in the November/December 2000 time frame was contacted by someone at your office, the situation was explained to Jefferson-Pilot, and someone at DMS sought the affirmative authorization of Jefferson-Pilot to issue another benefit payment to Mr. Kearney, is that your testimony, sir?

A.   Can you repeat the question, please?

Q.   Is it your testimony that in November of 2000 or December of 2000, there was a conversation with Jefferson-Pilot, or communication with them in some fashion, whereby DMS sought Jefferson-Pilot's authority to issue an additional benefit check to Mr. Kearney for December of 2000?

A.   I don't recall necessarily being the one that would have had any type of communication with

220

them. I don't know if others would have had at that point in time. But the authorization was given, whether it was through an individual at Jefferson-Pilot or people that were my superiors to go ahead an issue a payment.

Q.   There's nothing in the claim file that says there was any contact with Jefferson-Pilot other than contact with a guy named Swink to get Darryl Norris's address. Where is this supposed authority reflected anywhere?

A.   I don't know exactly where it would be in there to suggest that. I know I had conversations routinely with Bill, Bill Hughes.

Q.   You were never in Bill Hughes's vicinity when he had any communication with Jefferson-Pilot to obtain such authority, did you?

A.   As far as this, no, I don't recall.

Q.   Mr. Mills, that sentence is not true. Nobody sought Jefferson-Pilot's authority for an additional benefit check, right?

MR. ELLIS:   I will object to Counsel's statement on the record.

Q.   (By Mr. Roberts)  Is it true? Is that sentence true?

**221**

1    A.   I don't know. I really don't.

2    Q.   The last sentence of that paragraph,
3 "Unfortunately, if the requested items are not
4 received within the next 30 days we will be unable to
5 evaluate your eligibility for further benefits." Is
6 that extortion?

7    A.   No, that's not extortion. That's just
8 saying that we were unable to evaluate the claim.

9    Q.   In every letter where you refer to
10 receiving the authority of Jefferson-Pilot to do
11 something or not do something, were you telling the
12 truth?

13    A.   I recall that in all these letters I had
14 and I always have told the truth. Whether or not it
15 was direct contact with myself or someone at
16 Jefferson-Pilot or through any superiors, or that I
17 understood it came from Jefferson-Pilot, or through
18 them themselves, so I don't think there's any lies
19 here.

20    Q.   How many conversations can you recall you
21 having with Jefferson-Pilot in 2000 and 2001 where
22 you asked them for authority to do something on Mr.
23 Kearney's claim?

24    A.   I don't recall. I mean, that is several

**222**

1 years ago. I had a number of cases. Several phone
2 calls, you know, for business and other reasons. I
3 don't recall.

4    Q.   Did you seek their authority to hire
5 investigators?

6    A.   No, I wouldn't do that.

7    Q.   That was $12,000 every two months. Mr.
8 Kearney's benefit was only 3,000.

9         MR. ELLIS:  Objection.
10 Argumentative.

11    Q.   (By Mr. Roberts) Right?

12    A.   I think that's what the total amount was.

13    Q.   The very first page of Exhibit 33, you're
14 directing Jefferson-Pilot to issue payment. Why then
15 would you be asking them for their authority to make
16 a payment later?

17    A.   Was that the first one?

18    Q.   Yes, sir. Do you want to see it? What
19 does it say?

20    A.   This Bates 3128 is when we first got the
21 files, and I understand that we did not have the
22 ability just yet to issue the payments ourselves.
23 But if you take into context going forward to the
24 time you're now questioning, I think what the

**223**

1 questions and issues that we have on the case, there
2 was a point of authorization I would need to go to in
3 order to continue to pay the case.

4    Q.   Where is it documented in the claim file?

5         MR. ELLIS:  I'm going to object
6 unless you give him the claims file. Don't
7 make faces, Mike.

8         MR. ROBERTS:  I'm not making faces,
9 Bill.

10    A.   I don't recall them. I can look at some
11 documents for you.

12    Q.   Let's turn to --

13         MR. ELLIS:  Let's go off the record
14 for one second here.

15         MR. ROBERTS:  I have five more
16 minutes. Let's go back on the record and not
17 waste time.

18    Q.   (By Mr. Roberts) Turn to Bates number
19 3310, which is another 20 or 30 pages down the way.
20 Turn to the next page. This is the transcript of
21 your phone conversation with Mr. Kearney.

22         Now, you say you reviewed only portions of
23 it the other day. The portions of it that you
24 reviewed, were they accurate, as far as you know?

**224**

1    A.   I just saw the first couple pages of this.
2 I don't recall the conversation particularly. I
3 don't necessarily disagree that they're not my words
4 or Mr. Kearney's words. I don't recall the
5 conversation.

6    Q.   Can you turn, sir --

7         MR. ELLIS:  Again, I object to the
8 use of privately --

9         MR. ROBERTS:  Good.

10         MR. ELLIS:  -- recorded information
11 without the consent of the party being
12 recorded.

13         MR. ROBERTS:  It's not illegal.

14         MR. ELLIS:  I didn't know you were
15 the judge.

16    Q.   (By Mr. Roberts) At the top of the fourth
17 page, the first reference is you, then Kearney, then
18 you, then Kearney, and the second Kearney reference
19 is what I'm going to read.

20         Did he tell you that he's going to go to
21 the appointment, being the IME, "but I need this
22 check to live on"? Do you recall him making
23 statements to you that he needed his monthly checks
24 to live on?

225

```
 1        A.   I don't recall that particular statement at
 2   that time.
 3        Q.   Then tell me if I'm reading this correctly.
 4   "Do you understand that" -- this is Kearney
 5   continuing to talk -- "I have expenses to pay.  I
 6   haven't been working very much and all, and it's due
 7   to all this (pause) all this shit I'm going through."
 8        Your response was, "Um-hum, um-hum."
 9        "Kearney:  And umm, I'm not afraid of being
10   examined by a doctor."
11        Your response is, "Oh, it's not -- it has
12   nothing" -- and he interrupts, "I" -- and then you
13   continue, "I know, I hear that.  It's not about being
14   afraid of going to an examination.  I mean, I" -- and
15   then Kearney says, "Why don't you just send me the
16   other release form and I'll sign them.  Your new form
17   is so broad and you haven't" -- then you say
18   "That's -- that's their form.  That's
19   Jefferson-Pilot's form that every one of their
20   insureds is, to my knowledge, completing right now."
21        Were you telling the truth when you told
22   him it was Jefferson-Pilot's form?
23        A.   Again, I think I just said earlier I don't
24   recall the content of this conversation and the
```

226

```
 1   context in which it was had as well.  I can't really
 2   speak towards this because I just don't remember.
 3        Q.   If this transcript reflects on multiple
 4   occasions that in direct questioning by Mr. Kearney
 5   you tell him that the continuance of disability form
 6   and the authorization form you're asking him to sign
 7   were not DMS's forms but were Jefferson-Pilot's
 8   forms, if that's the case, would you have been
 9   telling him the truth?
10        MR. ELLIS:  Objection.
11        A.   Again, I don't feel comfortable with that
12   or able to respond to that because I don't know the
13   circumstances of what was going on at this point in
14   time.
15        Q.   Okay.  Is it true that the forms being sent
16   to Mr. Kearney were Jefferson-Pilot's forms and not
17   DMS's forms?
18        Forget about the conversation.  Forget
19   about the transcript, put it away.  Is it true that
20   the forms being sent to him were not DMS's forms but
21   were rather Jefferson-Pilot's forms?
22        MR. ELLIS:  Objection.
23        A.   They were Jefferson-Pilot forms that we
24   produced from our claimant system at that point in
```

227

```
 1   time that were different than the ones I think were
 2   used in the past.
 3        Q.   How did they become Jefferson-Pilot's
 4   forms?  They were your forms before you were doing
 5   the Jefferson-Pilot business, and then when you took
 6   on Jefferson-Pilot's business you continued using
 7   your forms?
 8        MR. ELLIS:  Objection.
 9        Argumentative.
10        Q.   (By Mr. Roberts)  Right?
11        A.   It's the continuance of disability
12   authorization forms that were produced from our
13   claimant system on behalf of Jefferson-Pilot.
14   Whether it's their form, our form, I don't know what
15   the correct characterization should be for that.
16        Q.   But you know that it was important to Mr.
17   Kearney, whether it was material or not, it was
18   important to him that they be Jefferson-Pilot's forms
19   as opposed to yours, and you told him that they are
20   Jefferson-Pilot's forms and that wasn't true, was it,
21   sir?
22        MR. ELLIS:  Objection.  Misstates
23   the testimony, misstates the transcript.
24        A.   Again, I don't recall that conversation or
```

228

```
 1   what was said to him at that time.  I believe Mr.
 2   Kearney was well aware that Disability Management
 3   Services was taking over the administration of his
 4   claim, so I wouldn't imagine that he would have
 5   expected anything other than receive claim forms from
 6   our office.
 7        MR. ROBERTS:  I have no further
 8   questions at this time.  We'll continue in
 9   progress.
10        MR. ELLIS:  Give us one minute here.
11        THE VIDEOGRAPHER:  Going off record
12   at 3:54 p.m.
13            (A recess was taken)
14        MR. ELLIS:  Okay, let's go back on
15   the record for just a moment, please.
16        THE VIDEOGRAPHER:  Back on record at
17   3:57 p.m.
18
19   CROSS EXAMINATION BY MR. ELLIS:
20        Q.   Just one question.  Since Counsel was
21   quoting to you from at least a small portion of a
22   recorded transcript, I'm going to ask you to read the
23   transcript to yourself, just above and below the part
24   he's talking about, and ask you if that explains
```