1  was?
2     A.  No, I don't.
3     Q.  Have you reviewed any documents in
4  preparation for today's deposition?
5     A.  I reviewed the one page document that I
6  found and produced.  That's the only document
7  that I reviewed.
8     Q.  That's the last document of Exhibit 2,
9  is that right?
10    A.  Yes, that's correct.
11    Q.  Did you author that document?
12    A.  Yes, I did.
13    Q.  What would be the purpose for you
14  creating this document?
15    A.  This was information that we passed on
16  to Jefferson-Pilot during the course of a file
17  review that we had at Jefferson-Pilot.  We
18  created this for use at Jefferson-Pilot and that
19  would be the primary purpose.
20    Q.  Do you recall personally being engaged
21  in a file review at Jefferson-Pilot?
22    A.  I recall going to Jefferson-Pilot.
23    Q.  On how many occasions would you go to
24  Jefferson-Pilot to do file reviews?
25    A.  I don't recall.

1     Q.  Did you go on an annual basis or more
2  frequently?
3     A.  I don't recall.
4     Q.  Or less frequently?
5     A.  I don't recall.
6     Q.  But you're certain this particular page
7  was generated as a result of your actual
8  physical visit to North Carolina at
9  Jefferson-Pilot reviewing files?
10    A.  Yes, I am.
11    Q.  How can you be so certain?
12    A.  The material was located in a file of
13  other Jefferson-Pilot claimants and was material
14  that would have been produced to
15  Jefferson-Pilot.
16    Q.  I'm not sure I understood you.  What
17  material are you talking about?
18    A.  This was part of a group of file
19  reviews that we did at Jefferson-Pilot.
20    Q.  That document --
21    A.  That's correct.
22    Q.  -- was maintained by you in 2007 in a
23  file that relates back to some claims you
24  reviewed in 1997 at Jefferson-Pilot?
25    A.  It was kept on my computer.  It had

1  been transferred over when I moved from laptop
2  to laptop.
3     Q.  So that document there is actually a
4  electronic version of that document somewhere?
5     A.  Yes, there is.
6     Q.  Did you send that electronic version to
7  your attorney, Mr. Zahnd, or did you send him a
8  hand copy?
9     A.  Mr. Zahnd is not my attorney.  He's a
10  co-worker.
11    Q.  At the time that was produced,
12  Mr. Zahnd wrote to me acting as your counsel,
13  right?
14    A.  I don't know that that's correct.
15    Q.  I'm not going to argue whether he's
16  your lawyer or not.  Mr. Zahnd is the person
17  that sent that letter and document to me,
18  correct?
19    A.  That is correct.
20    Q.  Did he author this letter or did you
21  ghostwrite it?
22    A.  I did not ghostwrite it.  I assumed he
23  authored it.
24    Q.  How did he come to possess the document
25  that he gave to me?

1     A.  I gave it to him.
2     Q.  By hand or electronically?
3     A.  I believe I printed it out and gave it
4  to him by hand.
5     Q.  Do you still maintain the electronic
6  version of it?
7     A.  Yes, I do.
8     Q.  Do you know when it was created, the
9  document?
10    A.  No, I don't.
11    Q.  Did you go to Jefferson-Pilot in 1997
12  to do this review or was it earlier?
13    A.  I don't recall.
14    Q.  Can we conclude it's 1997 since you
15  asked for tax returns from '93 through '96?
16    A.  We can conclude it's after 1996.  I
17  honestly don't recall beyond that.
18    Q.  If it were 1998 you would have
19  requested the '97 returns too, right?
20    A.  Possibly.  It would depend on the facts
21  of the case and I just don't remember enough to
22  tell you.  I can conclude it was after 1996.
23    Q.  And it would have been before sometime
24  in 1998 when you transferred responsibility for
25  the Jefferson-Pilot block of business to

**Page 14**

1    Mr. Dempsey?
2        A. I don't recall specifically when that
3    transfer happened. But, yes, it would have been
4    before whenever the transfer happened.
5        Q. The reserves you state in that
6    document, is that just ERC reserves for its
7    portion of the responsibility on the claim?
8        A. I don't remember.
9        Q. Can you tell from this document what
10   ERC's percentage of claim responsibility it was?
11       A. It appears that there were two
12   policies, one of which was 67 percent ceded, one
13   that was 100 percent ceded.
14       Q. And ceded for the jury means what?
15       A. An insurance company can enter into a
16   relationship with a reinsurance company whereby
17   a portion of the risk is in effect insured by
18   the reinsurer. The reinsurer then reimburses
19   the cedent for that portion, whatever portion is
20   agreed amongst the companies. Ceded is the term
21   that's used to describe the transfer of that
22   portion to the reinsurer.
23       Q. And does your record reflect what you
24   determined from your claim file review what the
25   period of the benefit was, benefit duration?

**Page 15**

1        A. The document indicates lifetime. I
2    don't have independent recollection of that.
3        Q. Would you have reviewed the policy to
4    come to that conclusion, the schedules to the
5    policy?
6        A. Typically the answer to that would be
7    yes. I don't recall how the Jefferson-Pilot
8    files were organized. For the duration policy
9    it's also possible that there was a deck page in
10   the file as opposed to the whole policy. I
11   don't remember.
12       Q. And what I will call it a To-Do List
13   items 1 through 7, is that a list of things that
14   you thought would be good or appropriate to do?
15       A. Well, I don't necessarily agree that it
16   is a To-Do List. It is activities that when I
17   reviewed the file I thought would be useful in
18   terms of substantiating the information in the
19   file.
20       Q. I call it a To-Do List. I was only
21   referring to 10ths. It's things that hadn't
22   been done, but you were recommending to be done
23   in the future, right?
24       A. I don't recall.
25       Q. Okay. At the bottom it says "Copy to

**Page 16**

1    DMS." Was this actually copied to DMS?
2        A. I don't recall.
3        Q. It was your intention to at least copy
4    it to DMS?
5        A. The document would certainly indicate
6    that, but I don't have an independent
7    recollection.
8        Q. Did you leave a copy with
9    Jefferson-Pilot?
10       A. Yes. This would have been information
11   that was given to Jefferson-Pilot.
12       Q. Are you mindful that there was a
13   consulting agreement between DMS and ERC in the
14   '90's?
15       A. I am aware that that existed.
16       Q. Have you ever seen one?
17       A. No.
18       Q. Did you ever make use of that
19   consulting agreement?
20       A. I don't understand the question.
21       Q. Did you ever direct claim files to DMS
22   for their review pursuant to the consulting
23   agreement in your capacity as claims counsel?
24       A. I directed files to DMS for -- as DMS
25   assist the reinsured with looking at files.

**Page 17**

1    Whether it was pursuant to that consulting
2    agreement, I don't know.
3        Q. Was that something you did hundreds of
4    times, dozens of times, couple times, rarely?
5        A. I couldn't recall the specific number
6    of times.
7        Q. Was it in the hundreds?
8        A. I don't recall. That -- it seems like
9    hundreds would be a high number.
10       Q. Did you direct that JP send the Kearney
11   file to DMS for its review?
12       A. I don't recall. I would not have -- it
13   would be unlikely that I would have directed
14   them to do that.
15       Q. Did you recommend?
16       A. I don't recall.
17       Q. Have you reviewed any other documents
18   other than what I have shown you as attached to
19   Exhibit 2?
20       A. No, I have not.
21       Q. Did you meet with Mr. Meagher and
22   Mr. Baty for several hours in preparation for
23   the deposition?
24       A. No.
25       Q. Did you meet with Mr. Meagher at all

**Page 18**

1  prior to the deposition today?
2    **A. Yes, I did.**
3    Q. Was that yesterday or just today?
4    **A. It was today.**
5    Q. Have you seen a privilege log that was
6  produced in this lawsuit?
7    **A. No, I have not.**
8    Q. -- from ERC? Sir, we've marked as
9  Exhibit 1 in Mr. Dempsey's deposition a
10  privilege log that was provided to me. And I
11  would ask that you -- have you seen one of these
12  before? Far left hand column is a sequence of
13  numbers listed numerically.
14    **A. Okay.**
15    Q. If you could turn to the page that
16  contains the reference to page 1466.
17    **A. Okay.**
18    Q. Do you have an understanding of what
19  "work product" means?
20    **A. Yes, I do.**
21    Q. Can you tell the jury what it means?
22    **A. Work product is a form of**
23  **attorney/client privilege where activities are**
24  **undertaken at the request of an attorney.**
25    Q. In anticipation of litigation?

**Page 19**

1    **A. In reasonable anticipation of potential**
2  **litigation.**
3    Q. Document 1466, can you tell the jury
4  what the date is associated with that document?
5    **A. The privilege log indicates 11-14,**
6  **1996. I have -- I don't recall this document.**
7    Q. But it indicates that you authored some
8  document to a Mr. Roberson, right?
9    **A. That's what the privilege log**
10  **indicates, correct.**
11    Q. You do know that Mr. Roberson was an
12  individual in the claims area of
13  Jefferson-Pilot?
14    **A. I don't recall the name Roberson.**
15    Q. And this suggest that on that date you
16  issued some sort of a recommendation that was in
17  anticipation of litigation on the Kearney claim,
18  right?
19        MR. MEAGHER: Objection to form.
20    **A. It was in -- well, I don't recall.**
21    Q. (By Mr. Roberts) I'm not asking if you
22  recall. I'm just saying this entry here on this
23  privilege log suggest that in November of '96
24  you sent a memorandum to Roberson that was a
25  recommendation on the Kearney claim in

**Page 20**

1  anticipation of litigation, correct?
2        MR. MEAGHER: Objection to form.
3  You can answer.
4    **A. I can see in the summary that it**
5  **indicates memorandum and in the subject**
6  **recommendation. I don't recall beyond that.**
7    Q. (By Mr. Roberts) And it suggest that
8  the document is protected from disclosure under
9  the work product doctrine, right?
10        MR. MEAGHER: Objection to form.
11    **A. It is in the privilege log.**
12    Q. (By Mr. Roberts) Do you recall
13  anticipating litigation against Mr. Kearney in
14  1996?
15    **A. No. I don't recall -- I don't recall**
16  **anything about this claim to be perfectly**
17  **honest.**
18    Q. Can you turn to the entry for
19  Document 316?
20    **A. Okay.**
21    Q. That suggest in May of '98 you had some
22  attorney/client and work product communications
23  regarding claim handling with a lawyer named
24  Bill Ellis, right?
25    **A. The log indicates that there was**

**Page 21**

1  correspondence dated 5-5, 1998 from myself to
2  Mr. Ellis.
3    Q. Actually the reverse from Mr. Ellis to
4  you?
5    **A. I'm sorry, excuse me.**
6    Q. Do you have any reason to believe
7  that's not accurate?
8    **A. I don't recall this document.**
9    Q. Do you recall any interaction with Mr.
10  Ellis?
11    **A. I know that we have used Mr. Ellis on a**
12  **couple of cases on varies subjects. I don't**
13  **recall this interaction.**
14    Q. When would have been the last time
15  prior to 2007 -- 2007 you received a subpoena.
16  So prior to 2007, when would have been the last
17  time you had any interaction of any nature with
18  regard to Chris Kearney or his claim?
19    **A. I don't recall. It would surprise me**
20  **if it was after 1998.**
21    Q. Do you recall with what frequency
22  receiving documents regarding the Kearney claim
23  from Jefferson-Pilot?
24    **A. No, I don't.**
25    Q. In the 1997 timeframe you don't know

**6 (Pages 18 to 21)**

**Page 22**

1 how many claims you had facilitated DMS
2 reviewing?
3    A. I don't recall.
4    Q. You don't know if it's less than a
5 handful or more than hundred?
6    A. The number hundred strikes me as high.
7 Other than that I don't recall.
8    Q. Could it have been just a handful?
9    A. Probably was more than a handful.
10    Q. What directed you to make the decision
11 to send a claim file to DMS for review?
12    A. Could be a variety of factors. It
13 could relate to the staffing at the company that
14 we were doing a claim audit at or had a
15 relationship with. It could be indications in
16 the file that there were -- that there was a
17 need for further investigation that the primary
18 company had not done. Could be a number of
19 things.
20    Q. Jefferson-Pilot had its own claim
21 department in '97/'98, right?
22    A. I recall them having their own claim
23 department when I visited them. I can't be
24 specific as to the '97 or '98 timeframe.
25    Q. We have marked as Exhibit 9 a July 8,

**Page 23**

1 '97 letter, Bates 502 from Shelton to DMS that
2 refers to DMS for its review three files. Do
3 you see that?
4    A. Yes.
5    Q. When you were in the process of
6 reviewing, collecting documents pursuant to the
7 subpoena you received, you came cross this
8 document on Kearney, right?
9    A. Yes.
10    Q. And in that same file did you come
11 across similar documents for Mr. Kahn and
12 Mr. London?
13       MR. MEAGHER: I'm going to
14 object. Again, I believe that information on
15 the identity of other claimants should be
16 redacted. I made that clear in Mr. Dempsey's
17 deposition. You now have read their names into
18 the record in direct contradiction to my
19 position on that. So I think that should be
20 redacted from the transcript also and this
21 record redacted.
22    Q. (By Mr. Roberts) Sir, this is already
23 a public record. It's attached to several
24 pleadings in litigation.
25    A. I searched only for Christopher

**Page 24**

1 Kearney, so I don't know.
2    Q. You didn't stumble across a similar
3 form for Mr. Kahn or Mr. London?
4    A. Again, I searched only for Mr. Kearney.
5    Q. You did an electronic search?
6    A. Yes.
7    Q. You did the word "Kearney" and the only
8 hit was that particular document?
9    A. That's correct.
10    Q. And it was stored in a electronic file
11 that relates back to your 1997 visit to North
12 Carolina?
13    A. It relates back to a visit to North
14 Carolina. I don't know the timeframe.
15    Q. Sitting here, do you recall whether you
16 facilitated, recommended that these three claim
17 files go to DMS for its review?
18    A. No, I don't.
19    Q. When you would go review a claim file
20 at Jefferson-Pilot, tell me what would happen
21 physically?
22    A. We would arrange with Jefferson-Pilot
23 for dates that would be convenient for us to be
24 at Jefferson-Pilot. We would produce a listing
25 of files that we wanted to review. We would

**Page 25**

1 send that to Jefferson-Pilot. We would travel
2 to Jefferson-Pilot. Jefferson-Pilot would
3 produce the files and we would review them.
4    Q. The files in total?
5    A. I can't say that every file we
6 requested was produced. Some would be in the
7 process of payment or in use such that they were
8 not available at the times that we were there.
9    Q. But you did review Mr. Kearney's claim
10 because -- claim file because you created that
11 document?
12    A. Yes. And I don't have a recollection
13 of doing that. The document certainly indicates
14 that I did.
15    Q. You've spoken the first person plural
16 about these visits to North Carolina. Did other
17 people accompany you?
18    A. Mr. Dempsey accompanied me on at least
19 one visit. And I believe Bob Lainner
20 accompanied me on one visit as well.
21    Q. And you would just split up the work
22 loads when you got there?
23    A. We would look at -- we would look at
24 different files, yes.
25    Q. Sir, I apologize for making you wait.

**7 (Pages 22 to 25)**