6

DIRECT EXAMINATION BY MR. ROBERTS:

Q. Good afternoon, Mr. Bonsall. My name is Mike Roberts. We met briefly in the hallway. I represent Chris Kearney who has been sued by Jefferson-Pilot in this action.

You're the president of DMS, correct?

A. Yes.

Q. And founder?

A. Co-founder of the company, yes.

Q. With John Anderson?

A. That's correct.

Q. And you presently own 30 percent equity in DMS?

A. That's correct.

Q. Did you initially own 50 percent equity in DMS?

A. I did.

Q. And both you and Mr. Anderson did in 1995 when DMS was formed, correct?

A. Yes, DMS was formed in 1995.

Q. At that time each of you owned 50 percent of the entity?

A. That's correct.

Q. And subsequently the two of you each sold 20 percent to an entity affiliated with Zurik Financial Services so that you and Mr. Anderson each owned 30 percent and that entity affiliated with Zurik owned 40 percent, is that right?

A. You got the percentages right. The name of the entity, I think it's all within the Zurik family of companies, if you will, so I think essentially it's correct.

Q. It's like Center Bermuda Solutions Limited, or something like that?

A. Center Reinsurance Limited Bermuda, or something like that. Close.

Q. Sir, have you gotten any reports today about Mr. Ditmar's testimony throughout the day?

A. Reports, you mean --

Q. Written reports or oral reports. A gentleman in your general counsel office has been sitting over here connected to the Internet taking copious notes, and I'm curious whether or not you've been receiving directly from him or through some intermediary reports of the testimony that we just undertook for the last six or seven hours.

A. The only thing that I'm aware of, there are two things, I guess, that there was some discussion

7

about name calling and some discussion about things being -- Mr. Ditmar being asked about things that didn't pertain to this matter, pertaining to another matter.

Q. Those are the only two things that have been shared with you about his six hours of testimony?

A. Yes.

Q. When did you first receive -- what is your memory of the first time you ever heard about a claimant named Chris Kearney?

A. It was recently. I think it's when I was informed that I was to be deposed in connection with the case, the first I heard of it.

Q. Prior to Mr. Kearney's counsel seeking your deposition in this action, you have no memory that his claim ever reached your level?

A. The name is not familiar to me and I don't have any -- I had no prior knowledge of it.

Q. Have you ever had a discussion with anyone regarding the existence of ambiguities in policies issued by Jefferson-Pilot?

A. I don't believe so, no.

Q. Would you condone your employees'

8

misrepresentation of facts to their policyholders, to policyholders for clients you work for?

A. Would I condone my employees' misrepresentations of facts to any policyholders, no, I would not.

Q. What would you do in the instance of discovery of such occasion?

A. If I was informed as to a misrepresentation, I'd want to know what the circumstances were, what the misrepresentation was and how it came to be.

Q. Would it be consistent with the concept of good faith for someone working for DMS to misrepresent facts to a policyholder?

A. I would say it would not be good faith to misrepresent facts.

Q. In April of 1997, I believe, there was an agreement entered between DMS and Employers Reinsurance, correct?

A. The date was again? You said 1998?

Q. April 1 of 1997, I apologize.

A. Okay. That sounds like it may be correct, yes.

Q. Employers Reinsurance would have been the

9

1  second client for DMS after Travelers?
2    A.  I believe that's true, yes.
3    Q.  And Travelers was your first client that
4  you had the day you opened shop?
5    A.  That's correct.
6    Q.  You and Mr. Anderson previously worked at
7  Travelers, correct?
8    A.  That's correct.
9    Q.  And did Mr. Anderson report to you at
10 Travelers?
11   A.  He did.
12   Q.  The two of you left Travelers sometime
13 after Travelers made the decision to get out of the
14 business of selling disability insurance policies?
15   A.  Yes, that's correct.  They stopped selling
16 disability insurance before we moved down from there.
17   Q.  How did it come to be that DMS entered a
18 contract with Employers Reinsurance Corporation?
19   A.  My recollection is that Employers
20 Reinsurance was looking for some people with
21 expertise and experience in investigating and
22 managing disability insurance claims who had
23 knowledge of the disability insurance industry; that
24 they had reinsured some blocks of business, and that

ACCURATE COURT REPORTING  (413) 747-1906

10

1  they felt that the companies that they reinsured were
2  not doing as thorough a job or as good a job as they
3  would like, and so they were looking for resources to
4  help those companies improve their performance, their
5  work.
6    Q.  How did it come to pass that DMS came into
7  contact with Employers Reinsurance for that
8  opportunity to provide that service?
9    A.  I think somebody must have referred them to
10 us, somebody who knew us from our work in the
11 industry, I believe that's the case.  And that they
12 contacted us and said, "We understand that you
13 fellows are experienced in managing disability income
14 insurance claims and that you set up a company to do
15 that kind of work, and we have a need."
16   Q.  Do you know who it was who made the
17 referral?
18   A.  I am not sure.  I have -- I think it was
19 probably an accounting firm.  That's my best
20 recollection.
21   Q.  Did you personally know anybody affiliated
22 with Employers Reinsurance Corporation prior to the
23 conduct of the negotiations that led to the April 1,
24 '97 agreement with Employers Reinsurance?

ACCURATE COURT REPORTING  (413) 747-1906

11

1    A.  I had met the people at Employers
2  Reinsurance prior to April 1, but I didn't know them
3  prior to our initial meeting that led to the
4  negotiation of that contract, if I understand your
5  question correctly.
6    Q.  Prior to the negotiations that led to the
7  agreement, prior to there being discussion about an
8  opportunity with Employers Reinsurance, you didn't
9  know anybody affiliated with that organization?
10   A.  I did not.
11   Q.  And as I understand your testimony, they
12 called you; they, Employers Reinsurance, called DMS?
13   A.  That's my recollection.  It's possible that
14 somebody said to us, "We know somebody who's looking
15 for some help and here's the name and here's the
16 number," but I don't remember whether we called them
17 or they called us.  My recollection is somebody
18 recommended us to them and that's how they learned
19 about us, and whether or not they called us or we
20 called them, I don't recall.
21   Q.  Did you conduct the negotiations on behalf
22 of DMS, you personally?
23   A.  Are you referring to the negotiation on
24 that ERC contract?

ACCURATE COURT REPORTING  (413) 747-1906

12

1    Q.  Yes.
2    A.  I believe that I was directly involved in
3  negotiating that contract, yes.
4    Q.  Did you share that responsibility with
5  anyone?
6    A.  Probably John Anderson.
7    Q.  What insurance companies did ERC reinsure
8  at that time?
9    A.  I assume you're asking me about disability
10 insurance.  I'm sure they reinsure a large number of
11 insurance companies across a spectrum of products and
12 I don't know all of them certainly, but I have a
13 better idea of the disability carriers that they
14 reinsure.
15   Q.  Okay, let's start there.
16   A.  They reinsured Connecticut Mutual, Mutual
17 Benefit Life Insurance, Jefferson-Pilot Life,
18 Provident Life & Accident.  They reinsured
19 Jefferson-Pilot.  There was one other company I know
20 that is escaping me at the moment.
21       Oh, I'm sorry, New York Life.
22   Q.  Does the Employers Reinsurance agreement
23 with DMS set forth the nature of the services that
24 DMS was supposed to provide pursuant to the

ACCURATE COURT REPORTING  (413) 747-1906

13

1 agreement?
2  A.  I believe so, yes.
3  Q.  Sitting here today, what was your
4 understanding of the work that ERC would be sending
5 you once the agreement had been executed?
6  A.  As regards to that agreement, I believe
7 that we were being asked to review disability claim
8 files, assist in investigating those files, assist in
9 evaluating information, communicating with
10 policyholders, supporting the adjudication process of
11 those companies, helping them reach decisions
12 including paying, denying, and settling claims.
13  Q.  Did Employers Reinsurance suggest to you
14 during the course of the negotiations that led to the
15 agreement any specific types of claims, or categories
16 of claims, that would be forthcoming under the
17 agreement?
18  A.  They were all disability income insurance
19 claims. They were active claims and, I believe,
20 pending claims. There were probably some claims that
21 they reviewed that they wanted us to also review.
22 And otherwise I don't remember that there are any
23 specific criteria.
24  Q.  There wasn't a certain dollar level of

14

1 claims?
2  A.  I don't recall any dollar threshold.
3  Q.  It wasn't a certain type of disability,
4 whether it be psychiatric or residual?
5  A.  No, I don't think there was any specific
6 criteria concerning the type of diagnosis or the type
7 of benefits.
8  Q.  Do you maintain any notes of your
9 negotiations?
10  A.  I don't know that I took any notes of those
11 negotiations. I doubt very much that I would have
12 retained any notes if I had them.
13  Q.  Is there anything related to that
14 transaction other than the written agreement itself
15 that still exits today, as far as you know?
16  A.  I doubt it.
17  Q.  Who was your contact at Employers
18 Reinsurance during the negotiations?
19  A.  Primary contact was Robert Linner.
20 L-I-N-N-E-R.
21  Q.  What was his position at Employers
22 Reinsurance?
23  A.  He worked in their reinsurance claims
24 operation. I don't know what his title would have

15

1 been at that time. He was somebody that supported
2 their ceding companies or kind of oversaw the
3 relationship on the claim end between ERC and their
4 ceding companies.
5  Q.  What level or involvement or engagement did
6 you have with representatives of Employers
7 Reinsurance after the agreement was executed?
8  A.  From time to time we would communicate,
9 typically by phone, to discuss the work that we did
10 and we were --
11  Q.  You personally?
12  A.  Yes.
13  Q.  Okay.
14  A.  And we were doing some work on site
15 initially for like one particular client, so we would
16 report on our visit to the client.
17  Q.  That wasn't Jefferson-Pilot, was it?
18  A.  No, it was not.
19  Q.  Would you have had any occasion after the
20 execution of the agreement to have any dialogue with
21 anyone at ERC about specific claims referred to DMS
22 under that agreement on Jefferson-Pilot
23 policyholders?
24  A.  Can you repeat that question?

16

1  Q.  Let me rephrase it. Would there have been
2 any reason for you to have dialogue with anyone at
3 Employers Reinsurance regarding DMS's work on
4 Jefferson-Pilot claims that came to DMS?
5  A.  Are you talking about at any time or --
6  Q.  I'm talking about the '97 to 2000 time
7 frame.
8  A.  I don't know that I had any discussion
9 about any specific Jefferson-Pilot claims. I think I
10 might have -- I reviewed personally very few
11 Jefferson-Pilot claims, and I don't recall that I
12 ever actually worked on any Jefferson-Pilot claims.
13  Q.  I don't suspect that you did, and I asked
14 you a higher level question. Would you have any
15 reason to dialogue with anyone at Employers
16 Reinsurance regarding the claims that came to DMS
17 that were written by Jefferson-Pilot?
18  A.  Not about any specific claims or individual
19 claims. Maybe about the body of work, the fact that
20 we were handling claims on the whole, but not about
21 any individual claims.
22  Q.  That dialogue, the responsibility for that
23 dialogue stayed at your level rather than being
24 delegated to someone subordinate to you?

21

1  presumably it would be in the claim file.
2       You know, if it was an instruction, "I want
3  you to look at the Smith case" or that kind of thing,
4  I'm not sure that that's anything that would have
5  been kept.
6    Q.  What sets DMS apart from its competitors?
7    A.  Well, we're kind of a unique company. It's
8  not easy to define who our competitors are. In some
9  respects it has to do with our -- the nature of our
10 company being a third-party administrator. There
11 just aren't many, if any, other TPAs that do what we
12 do. The disability insurance industry is a pretty
13 close-knit industry and there aren't a lot of
14 companies that have the kind of expertise that we do.
15 I would say that we have a unique combination of
16 functional capabilities and operational capabilities
17 and skills that set us apart.
18    Q.  Are there any marketing materials that
19 exist that describe how you set yourself apart?
20    A.  Yes, I would say so. I don't know if they
21 specifically say what sets us apart, but they
22 describe what we do, so in that respect I think one
23 could infer what would set us apart from somebody
24 else.

ACCURATE COURT REPORTING  (413) 747-1806

22

1    Q.  What would those marketing materials
2  consist of?
3    A.  We have a capabilities piece that we
4  created a couple years back that speaks to what our
5  capabilities are. And we have a web site that speaks
6  to the same thing.
7    Q.  Anything else?
8    A.  Those are the only marketing pieces that
9  we -- well, as far as DMS is concerned, those are the
10 only marketing pieces, I think, that we've got.
11    Q.  What information do you share with a
12 prospective client when you're out trying to secure
13 work for DMS?
14    A.  Well, it depends in part on what they're
15 asking for and what their needs are. We share
16 information about -- obviously things about who we
17 are, where we're located, the nature of the work we
18 do, the operational capabilities we have, how long
19 we've been in business. In some cases we might
20 disclose who our clients are. If we're permitted to
21 do so, we'll do that.
22    Q.  Do you share with the prospect what the DMS
23 philosophy is about the administration of claims?
24    A.  It depends. If it's germane to a

ACCURATE COURT REPORTING  (413) 747-1806

23

1  discussion, then we would share that. Certainly if
2  asked, we would.
3    Q.  Isn't that fairly basic, how you're going
4  to administer claims?
5    A.  The philosophy, I think, is pretty basic,
6  sure.
7    Q.  How about how you're going to administer
8  claims, do you share that with prospects?
9    A.  I would say if we get down to a discussion
10 that gets specific about that, then certainly we
11 would, yes.
12    Q.  What would you tell them?
13    A.  I guess at the highest level what we tell
14 them is that we believe that because every claim has
15 its own unique set of facts and circumstances, and
16 because of the nature of the disability itself and
17 the products and the process, that objectification is
18 important to be able to investigate claims thoroughly
19 to try to develop a factual basis so that we can get
20 to a point where liability is reasonably clear. That
21 we set out to try to prove every claim that is
22 submitted so that we can get it to that point where
23 liability is reasonably clear so that we can make an
24 appropriate decision. And then we believe strongly

ACCURATE COURT REPORTING  (413) 747-1806

24

1  that because, again, the process is a complex one and
2  not well understood by lay people, that it's
3  important to communicate with claimants about our
4  findings and decisions and to give them an
5  opportunity to make sure that we understand the basis
6  for their claim and, if there's a difference of
7  opinion, to try to reconcile it.
8    Q.  Is that it?
9    A.  I think that's it.
10   Q.  Do you ever discuss with a prospect the
11 concept of managing a claimant's expectations?
12   A.  Do I ever -- I'm sorry, did you say have I
13 talked with a client about that?
14   Q.  Do you ever discuss with a prospective
15 client the philosophy or endeavor to manage
16 expectations of policyholders?
17   A.  I don't specifically recall having had a
18 conversation with a client about managing
19 expectations of policyholders.
20   Q.  Have you ever used that phrase?
21   A.  I believe I have, sure.
22   Q.  Is that something that you regularly use to
23 describe what it is that's important in your line of
24 work?

ACCURATE COURT REPORTING  (413) 747-1806

25

```
 1     A.   I wouldn't say I regularly use it.  I'd say
 2  I actually made a presentation at a meeting once
 3  where that was the topic of the presentation, but
 4  it's not something that I regularly talk about.
 5     Q.   When was the last time you saw a written
 6  record of that presentation?
 7     A.   Probably sometime within the last year I
 8  read it.
 9     Q.   Was it within the past week?
10     A.   No.
11     Q.   Was that in Dallas in the spring of 2001?
12     A.   The presentation was in Dallas.  2001
13  sounds right.
14                 (Exhibit 40, marked)
15     Q.   (By Mr. Roberts) I've marked as Exhibit 40
16  a document that is ten pages long.  It says, "Record,
17  Volume 27, No. 1, Dallas Spring Meeting, May 30-June
18  1, 2001, Session 74PD, Disability Claim Management."
19          Is that the written record that you were
20  referring to?
21          Well, two questions:  Is this the
22  discussion you were referring to and is this the
23  written record you were referring to?
24     A.   This is the discussion that I'm referring
```

26

```
 1  to.  I don't know if this is the written record or
 2  not.  I guess it -- this looks like probably a
 3  transcript of that presentation, so I'm sure I read
 4  the same thing.
 5     Q.   Is this a summary or synopsis that you
 6  prepared prior to the discussion, because it doesn't
 7  appear to be an exact transcript like we're recording
 8  today.  But maybe it is.
 9     A.   I'm not sure I understand the question.
10     Q.   Do you have a sense of whether or not --
11  page 2, your name is in bold there, third paragraph.
12     A.   Mm-hmm.
13     Q.   Do you have a sense of whether or not this
14  is a verbatim recitation transcript of what you
15  communicated at that meeting or whether this is some
16  kind of summary that you or someone else may have
17  prepared?
18     A.   My belief is that it's a verbatim
19  transcript.
20     Q.   And where your name is there on the second
21  page, I think the third sentence which begins at the
22  end of the third line, "I'm going to talk," do you
23  see that?
24     A.   Yes.
```

27

```
 1     Q.   You said, "I'm going to talk about managing
 2  expectations, and it's a significant issue and topic
 3  for me because as we talk about claims management,
 4  what we're really talking about is managing claim
 5  outcomes."
 6          Would that have been a direct quote of
 7  yours?
 8     A.   I believe every word in this is a direct
 9  quote, so, yes.
10     Q.   And then in non-cancelable business, it's
11  your judgment that managing expectations becomes
12  particularly important, right?
13     A.   I said that, and I'm trying to remember why
14  I said that, but where do you see it?
15     Q.   I'm sorry, it's the third page, page number
16  3, the second paragraph, actually the first full
17  paragraph.  It starts with "My company" and that is
18  essentially taken from the first half of that
19  paragraph, if you'd like to review it.
20     A.   This is on page 3, second paragraph?
21     Q.   Yes, sir.
22     A.   So you're talking about the paragraph that
23  starts with "My company focuses exclusively on closed
24  blocks of business"?
```

28

```
 1     Q.   Right.
 2     A.   I think the point that I was making there
 3  was that non-cancelable business is -- it can't be
 4  terminated by the issuing company, that it's a
 5  long-term commitment that a company makes to a
 6  policyholder without the potential to alter rates, so
 7  that there are -- with other types of disability
 8  business, companies can either cancel the coverage or
 9  raise the rates, and that doesn't happen with
10  non-cancelable business, so I think that's the point
11  I was trying to get at there.
12     Q.   Well, you make the point that it's your
13  sense that with regard to non-cancelable business
14  that managing expectations becomes particularly
15  important, right?
16     A.   I did say that, yes.
17     Q.   Does your company pay benefits, disability
18  benefits, total disability benefits for claims for
19  which there is only subjective information?
20     A.   Sometimes, yes, certainly.
21     Q.   Is that something you do on a permanent
22  basis, or is that just an interim measure until you
23  find some other way to resolve the claim?
24     A.   Well, I would say that there are claims
```

45

1  Q. Well, the document speaks for itself as to
2  how the expenses are reimbursed and passed through,
3  right? I mean, 4A talks about section five as far as
4  expenses; I'm not really concerned about that right
5  now.
6  A. Okay, yes.
7  Q. But there's an expense reimbursement for
8  some nature of expenses DMS incurs on
9  Jefferson-Pilot's behalf?
10 A. That's correct.
11 Q. And then on top of that there is a $43,700
12 fixed monthly fee that was negotiated?
13 A. That's correct.
14 Q. Paragraph 4C suggests that, in addition to
15 reaching that agreement, it was also agreed during
16 the negotiation that every 12 months the fixed
17 monthly fees would be subject to further potential
18 adjustment that was supposed to be negotiated in good
19 faith?
20 A. That's correct.
21 Q. Now, it was, I suspect, Jefferson-Pilot's
22 expectation, and your expectation, when you entered
23 this agreement that your employees would provide
24 top-flight, efficient, appropriate, accurate and

46

1  timely service for all these claims, right?
2  A. I think that's a fair characterization.
3  Q. Why is it that you built in a clause that
4  would adjust the fixed monthly fee based on thorough,
5  diligent and fair evaluation of claims?
6  A. Well, let me speak to the notion that these
7  could be adjusted first. Hopefully, that will answer
8  the question. When we set this level of fees, we
9  made some assumptions about what it would cost for us
10 to support the client and we established our
11 projected expense level and then adjusted that for a
12 profit margin.
13    We did that without having specific
14 experience in managing this block of claims, so we
15 were taking some risk and they were taking some risk
16 about whether or not we were getting paid too much or
17 too little because this was based on a cost plus a
18 margin approach to quoting this fee.
19    At the end of the 12-month period we were
20 to evaluate our actual expense experience to
21 determine whether or not this fee level was
22 appropriate, and in terms of selecting the words, I
23 think if there was any basis upon which to determine
24 whether or not we were meeting their expectations, it

47

1  had to do with our thoroughly, diligently, and fairly
2  evaluating the claims and in supporting their
3  administration of the underlying policies.
4     So this was -- again, we projected
5  expenses, tacked on a margin, we said, "This is what
6  we think this is going to cost us to do this, but
7  we're not sure, so at the end of the 12-month period
8  we're going to evaluate what our actual expenses were
9  and if we're not making our margin it's our
10 expectation that we're going to be able to come back
11 and say going forward, if we're going to do this,
12 it's going to be at an adjusted level. And by the
13 same token if we find that our expenses are less than
14 anticipated, then we will adjust our fees down."
15    It's typical in a situation like this, they
16 didn't want to pay us a lot to do the work and we
17 felt that we should be paid to do the work. Without
18 having the actual experience, you know, I guess they
19 were taking some risk that we would actually do a
20 good job for them, and we were taking the risk that
21 we would actually be paid at a level we thought was
22 necessary to do the work and make a profit.
23 Q. Okay, the language doesn't suggest anything
24 about whether or not you're hitting the margins you

48

1  think or whether your expenses are what you think.
2  It doesn't speak in those terms, right? It talks
3  about fair, diligent, accurate evaluation of claims,
4  right?
5  A. It does make reference to thorough,
6  diligent and fair evaluation of claims, yes.
7  Q. And it doesn't make reference to adjusting
8  it based on any expense anticipation versus
9  realization, right?
10 A. No, it doesn't make that reference in this
11 paragraph.
12 Q. In your contract with Massachusetts
13 Casualty you have a submitted budget for expenses and
14 then there's a true-up in the end?
15 A. Right.
16 Q. Is there a true-up here with
17 Jefferson-Pilot as well in your actual expenses
18 versus budget?
19 A. It's not drafted that way. My
20 recollection is that the first year we did this we
21 found that our expenses were higher than what we
22 thought they would be, and that we actually said to
23 them -- I'm not even sure we're covering our
24 expenses, we might have been, but we weren't making

57

1  purpose for the contact was.
2  Q.  What year did you receive your MBA from
3  American International College?
4  A.  It was either 1981 or 1982. I get confused
5  because I think I finished school in December and got
6  the degree in the spring, so it may have been '82
7  that I actually received a degree.
8  Q.  What's a spot bonus?
9  A.  A spot bonus, to me, it's a way to
10 compensate an individual for something that
11 individual had done that you wanted to recognize them
12 for in a time frame that was closely related to the
13 activity. Though it's usually a one-time payment of
14 compensation of some money outside of salary.
15      I guess the term "spot" means on the spot,
16 I think that's where that comes from.
17 Q.  Does DMS offer its employees spot bonuses
18 for extraordinary work?
19 A.  We have from time to time.
20 Q.  Does it in the year 2004? I'm not saying
21 has one actually been paid in 2004, but is it a
22 potential benefit?
23 A.  Oh, yes. Absolutely.
24 Q.  DMS's first agreement with Travelers

58

1  incorporated a potential incentive payment?
2  A.  That's correct.
3  Q.  And that provision has been taken out of
4  your relationship. Do you have an ongoing
5  relationship with Travelers?
6  A.  Yes.
7  Q.  That no longer is part of the compensation
8  equation with Travelers, is that correct?
9  A.  That's correct.
10 Q.  You understand it's illegal for a third
11 party administrator doing disability insurance to get
12 paid for denying claims?
13 A.  The compensation can't be denied
14 directly -- or can't be paid -- tied directly to the
15 denial of claims, yes, I understand that, certainly.
16 Q.  Why was DMS given a 60 percent raise in its
17 relationship with Mass Casualty last year?
18      MR. ELLIS:  Objection. Irrelevant
19 and misstates the facts.
20 A.  I don't believe we did receive a 60 percent
21 raise. That would surprise me a lot.
22 Q.  The margin went from 10 percent to 16
23 percent, are you mindful of that?
24 A.  Oh, yeah.

59

1  Q.  That's 60 percent, isn't it?
2  A.  Okay. Our margin did increase.
3  Q.  Why did it increase so dramatically?
4  A.  When we negotiated our first contract with
5  Center, they indicated to us that they were in a
6  competitive situation with one or more other parties
7  that were bidding on a block of business, and that
8  part of their bid to acquire the business through a
9  reinsurance treaty was dependent upon their ability
10 to competitively bid, among other things, the
11 expenses associated with managing that business
12 ongoing, and we were very much interested in securing
13 that business and to help win that bid, if you will.
14 We took compensation that, to us, was less than what
15 we ordinarily would have taken. And that same
16 mindset was carried onto the next contract that we
17 did. And then the next time we entered into contract
18 discussions with them we said, you know, "We're no
19 longer in that kind of situation, and frankly, the
20 first time this happened you guys didn't know whether
21 we could effectively do what we were being asked to
22 do. And so you were taking some risk that perhaps we
23 would not perform well in transitioning that
24 business. And now, you know that we can do a good

60

1  job of it and you're not in the same kind of
2  competitive situation, and we think that we deserve
3  to be compensated at a higher margin." And frankly,
4  we also believed that not only did we deserve a
5  higher margin, but that we were their best option and
6  that we thought -- and we were having decisions with
7  them about renegotiating our contracts to secure
8  long-term agreements. And we thought it was in our
9  best interest and their best interest, so we said we
10 want a higher margin on these, and that's where we
11 arrived at. We were looking for more, they wanted to
12 pay less, and we arrived at that number.
13 Q.  You talk about "we" and "they." They
14 actually own 40 percent of DMS?
15 A.  True. True.
16      Which is interestingly another reason why
17 we felt that we should get a higher margin because,
18 theoretically, 40 percent of the profit margin to the
19 company was going back to them, which meant our
20 margin was pretty skinny.
21 Q.  They own 40 percent of the enterprise?
22 A.  True. But they didn't actually work for
23 the enterprise, and the other owners actually did
24 work for the enterprise and ran the enterprise.

61

1   Q.  What was your bonus last year, personally?
2   A.  My bonus, I think, was a hundred percent of
3   my salary.
4   Q.  Which was what?
5       MR. ELLIS: Objection. You don't
6   have to give him that information.
7   A.  I'd rather not have that be on the record
8   that anybody can just have access to.
9       MR. ELLIS: That's fine.
10  Q.  (By Mr. Roberts) I thought we were done,
11  but we're not.
12      Did you execute an affidavit in the context
13  of the lawsuit pending in Mississippi, I believe it
14  was the King case, providing sworn testimony as to
15  DMS's financial condition?
16      MR. ELLIS: Same objection. The
17  information's covered by the Court's
18  protective order that Counsel shouldn't have,
19  and I will move to keep it protected here.
20  Q.  (By Mr. Roberts) You can answer the
21  question.
22  A.  I don't recall signing an affidavit in
23  connection with the King case.
24  Q.  The year-to-date revenue, December 31, 2002

62

1   for DMS was 37 million plus. Does that ring a bell?
2       MR. ELLIS: Objection.
3   A.  Sounds like it. It's probably in the
4   ballpark, yes.
5   Q.  And the officers' salaries were just north
6   of $2 million?
7       MR. ELLIS: Objection.
8   A.  I don't believe that's -- I don't believe
9   that's true.
10  Q.  I will accommodate Mr. Ellis's request that
11  this not be an exhibit, but I will show you what
12  appears to be a sworn statement of yours, as well as
13  your general counsel, Mr. Cohen, which affirms the
14  accuracy of some attached financial statements, and
15  I'd ask you to review it and confirm for me what the
16  officers' salaries and officers' bonuses were in
17  2002.
18      MR. ELLIS: I will again ask Counsel
19  to identify the source of the information.
20      No?
21      MR. ROBERTS: I don't have to do
22  that, Bill.
23      MR. ELLIS: Does that mean you
24  refuse to do that?

63

1       MR. ROBERTS: The document speaks
2   for itself.
3   A.  Okay, what is your question?
4   Q.  Two questions. I think the page prior to
5   that, Mr. Bonsall, is the sworn statement of yours.
6   I wanted you to confirm that you executed a sworn
7   statement in relation to the King case.
8   A.  Okay. I can confirm that.
9   Q.  And what you were testifying to in that
10  sworn statement is the accuracy of the attached
11  financial statements. And my question is, what is
12  the amount of the officers' salary and officers'
13  bonus in 2002 at DMS? If you could identify for the
14  record what those amounts were.
15  A.  The officers' salaries, 2,009,480
16  Q.  2,009,000?
17  A.  That's correct.
18  Q.  What was the bonus number?
19  A.  3,138,700.
20  Q.  How many officers are there?
21  A.  Sixteen, seventeen. At least 17.
22  Q.  There aren't just four officers?
23  A.  No.
24  Q.  Are you aware of any public document that

64

1   suggests there's only four officers?
2   A.  No.
3   Q.  Who are the directors of the company?
4   A.  Myself, John Anderson -- I'm sorry, did you
5   say the directors of the company?
6   Q.  Yes, sir.
7   A.  Myself, Mr. Anderson, Andy Cohen, Richard
8   Grilli, Michael Ember, Donald Charski.
9   Q.  How about Eileen Sweeney?
10  A.  She is no longer an officer, or a director
11  of the company, rather.
12      MR. ROBERTS: Mr. Bonsall, thank
13  you. We're completed.
14      MR. ELLIS: I have two quick
15  questions.
16
17  CROSS EXAMINATION BY MR. ELLIS:
18  Q.  Since Counsel suggested it, was the
19  incentive in the original Travelers contract tied to
20  denial of claims or getting rid of claimants that
21  were supposed to be getting their benefits in any
22  way?
23  A.  Certainly not.
24      MR. ROBERTS: Objection.