DEFENDANT'S EXHIBIT
ALL-STATE LEGAL®
4/0

# RECORD, Volume 27, No. 1*

Dallas Spring Meeting
May 30–June 1, 2001

## Session 74PD
## Disability Claim Management

*Mike —
See my
highlights*

**Track:**       Health Disability Income

**Moderator:**   PAUL GEORGE ZIOBROWSKI

**Panelists:**   ANDREW BERNSTEIN†
                 ROBERT A. BONSALL, JR.‡
                 JOE BRAZ§

*Summary: Claim management is one of the most complex yet critical components of managing a block of disability business. Many aspects of successful claims management involve actuaries, including:*
- *Claim settlements*
- *Litigation*
- *Performance management*
- *Reserving assumptions*

**MR. PAUL ZIOBROWSKI:** Claims management has a profound impact on the profitability of a block of disability income insurance. It is a management tool that is often not well understood by disability actuaries. The poor claims results of the late '80s through mid '90s caused many disability insurance (DI) carriers to increase their focus on claim administration.

We have three experts in the field of claim management. They're going to help us understand some of the key issues in claims today. Our first speaker will be Mr. Robert Bonsall, the president, CEO, and chairman of the board of Disability Management Services, Inc., a company he co-founded in 1995. Bob will give an overview of some key concepts in claims management.

---

*Copyright © 2002, Society of Actuaries

† Mr. Andrew Bernstein, not a member of the sponsoring organizations, is principal at Bernstein, Bridges and Lagravinese, Inc. in South Portland, ME
‡Mr. Robert A. Bonsall, Jr., not a member of the sponsoring organizations, is president, CEO of Disability Management Services in Springfield, MA
§Mr. Joe Braz, not a member of the sponsoring organizations, is executive claims consultant with DCG Resource Options in Portland, ME

**Disability Claim Management**                                                                 2

Our second speaker will be Mr. Joe Braz. Joe currently holds the position of executive claims consultant with DCG Resource Options in Portland, Maine. Joe has over 22 years of experience in claims administration. In his current role, he provides consulting services to both individual and group disability income carriers.

Our third speaker is Andy Bernstein. Andy is a principal in the law firm of Bernstein, Bridges & Lagravinese, Inc. He provides consulting and testimonial services to clients in the insurance and self-insurance arenas. He is a frequent speaker at insurance industry and legal seminars. Andy is going to cover hot legal issues in claims administration today.

**MR. ROBERT BONSALL:** As Paul mentioned, I'm with Disability Management Services, Inc. The company was founded primarily to focus on disability income claims management, primarily on the individual product line side. I'm going to talk about managing expectations, and it's a significant issue and topic for me because, as we talk about claims management, what we're really talking about is managing claim outcomes. To do that effectively, I firmly believe that we have to be able to effectively manage expectations of claimants. What I want to talk about is what that looks like, how we think about it, and how we accomplish it. But first I want to focus on the companies that issue products and talk about how actuaries, for example, might think about expectations.

We start with assumptions, and when we're talking about claim experience, we're describing expectations with terms that you're probably familiar with. Incidence is an expectation that refers to the number of people in a population of risks who would become disabled over a given period of time. Duration refers to the length of disabilities. Another term that could be used interchangeably with duration that you might be familiar with is termination rates—the frequency with which claims turn over. So we start with a set of assumptions and a set of expectations about claims and we feel pretty good over time if our assumptions bear out in claim experience. We would define success if we could look at actual claim experience and it matched up well with what we projected, or if it was better than what our expected experience was. I think we'd say, "Okay, we're successful in terms of what our expectations were."

But what does it mean when the expectations don't pan out? Starting sometime in the late '80s right through the late '90s, on an industry-wide basis, experience in the individual disability insurance market was really poor and much worse than expected when companies were putting together pricing assumptions and designing products.

To try to understand those things, we look at risk management and we try to better manage the expectations that we have. We could do things that have to do with policy design of new issues, new products that are developed, tightening up provisions, definitions of disability, and the like. We can change rates and we can alter pricing. We have to be careful with promotional materials and activities

because, even though we have a way of thinking about products and we have expectations about products, we have people who are distributing products who might set different expectations out there. We always have to be careful about what kinds of representations are made. We have the whole risk selection and underwriting process that we know is important and there are things we can do to tighten up there. We also have claims management.

My company focuses exclusively on closed blocks of business, but with claims that will run off over a period of years because it's primarily non-cancelable business. We're focusing on expectations that relate to claims management and, obviously, a lot of the things that we talk about have to do with risk management that we don't have any control over once the policies are on the books, so managing expectations becomes particularly important in claims. Many things impacted poor claim experience over time and we looked at and reacted to things that we had control over. Those included the design and the pricing, the underwriting, and how we manage claims and so forth, but there are other things that are external to our operations that have to do with consumers and their expectations.

I would argue that there was a significant shift in the expectations of consumers over the late '80s and early '90s in terms of what policies would do for them and whether or not they were entitled to benefits and how policies worked.

If you look at, for example, experience that emerged in the early '90s, there was a significant increase in the frequency, or incidence, of physician claims, and everybody pointed to changes in how managed care affected physicians in their ability to earn income, and so forth. We know that it wasn't a matter of more people in the population getting sick or hurt that was driving that claim experience. There was no good reason to assume that more doctors were getting sick or hurt than they did 10 years before, so something else was going on there and a lot of it had to do with the shift in expectations—the way that they thought about their policies, the way that they thought about the claims process, and the way that they thought about the duties of insurance companies. There were other things that were going on as well.

When we're thinking about the expectations that they have, we talk about the incidence and duration—all the things we expect about population or risk. We know consumers have their own expectations. As a claims organization, we want to understand what those things look like to be successful and we know fundamentally that claimants want to be treated fairly. That's pretty straightforward. They want to be taken seriously. They want to be informed about where they stand. They want to know what's going on with their claim. They tend to want hassle-free service.

I can remember a time at a claims industry meeting when an executive stood up in front of a group and said, "Claim time is no time to ask questions." I thought,

"That's a little misguided." Obviously, there are an awful lot of questions that have to be asked at claim time. There's a lot of information we need. But I think the point he was really trying to make was that consumers pay their premiums and they're entitled to benefits. When they file a claim, they don't deserve to be hassled and consumers really do expect hassle-free service. They don't want to have to jump through hoops to get a claim paid, particularly when they're having to deal with all kinds of problems related to their disability. And they typically want to be paid right away. So we know that they have expectations, and we also know that we can't necessarily always meet those expectations for one reason or another.

We hope that consumers are treated fairly, are informed, and receive hassle-free service. But prompt payment doesn't always happen and we know that when some of these things don't happen, consumers will act out and let us know. That unhappiness manifests itself in their expression of dissatisfaction, and they will file complaints, which sometimes take the form of litigation. We know that this process is a very uncertain and a very expensive process, and one that causes us to focus a lot of energy and resources, sometimes with unfortunate consequences.

We also know that consumers learn by their experiences, and even if they file complaints and they don't get what they want, they're still policyholders of ours. We know that sometimes we have to deal with them again and again. If it's for claims that are not meritorious, then that can complicate matters. But the bottom line is that conflict is inherent in the claims process because we can't always meet expectations and that conflict has very serious consequences for us, as we take our obligations seriously. We know that there's a lot at stake, there's a lot of liability, and that individuals are dealing with significant problems that are of concern to them. If we can't match up in terms of expectations, then we have to deal with conflict and we have to be good at dealing with it.

The question comes down to, "How do we do it, given that inherent conflict in the process?" First, we have to understand what we're dealing with, so I'm going to take a step back here and just talk about for a second what a claim is by definition. I think the process in claims "way back when" was set up to be pretty simple. Claim forms were used for consumers to be able to make their claims, and insurance companies were supposed to respond to them. Then the attending physician would certify disability and the insurance company would pay. We found out that wasn't very efficient or very effective.

We know that a claim is a demand for something rightfully or allegedly due, and that's the perspective of claimants when they have an expectation of getting paid. It's a statement of fact that may be called into question and we see it as fundamental to the process to be able to challenge assumptions and question claims. If somebody makes a claim, it doesn't necessarily mean it's legitimate or meritorious, but it's our obligation to determine the relative merits of the claim. So we recognize that our primary objective is to gather information necessary to prove the factual basis for the claim to the extent that liability is reasonably clear.

**Disability Claim Management**                                                                 5

Decisions are not necessarily black and white. The information is not always crystal clear. We're trying to get it to a point of reasonableness where we can accept it, and we're trying to establish a factual basis for the claim.

We also know that there are issues related to the process itself that complicates the matter even further, such as multiple parties to the claim. We're not just dealing with a claimant; we're also dealing with claimants' physicians and medical providers. Sometimes they have representatives, sometimes they're legal counsel, sometimes they're accountants, sometimes they have an agent involved in the process, sometimes they're a collateral, and sometimes it might be a spouse who has an interest in the claim. The multiple parties that have an interest in the claim sometimes have conflicting interests and we have to be able to recognize what the relative interests of the parties are. There are time frames that can impact our ability to do this. The states all say that we have a certain amount of time to respond to things and to make decisions, and there are logistics that have to do with the distance between us. Sometimes we have claimants on one coast, and we're operating on the opposite coast. They're somewhere across the country and we have to be able to try to get good high-quality information in order to make decisions. We can't always be there to observe, or to see them, and that just makes matters that much more difficult. It makes the opportunity for conflict that much greater.

[handwritten margin note: "what is Ohio time limit days"]

We recognize that, given that framework, and understanding what a claim is, and what the inherent difficulties are, we better have an approach that helps us meet our objectives. We think about how we're managing claims, and we have an approach that really has three elements to it: objectification, early intervention, and communication with claimants in our operation.

We've adopted a very direct and personal approach to claims handling and claims management.

Objectify. The simplest definition I've been able to find is the Webster's definition, which is "to make objective or concrete." In other words, to try to find a factual basis for the claim. We're looking to prove the claim. We're looking for facts. We're looking for source documentation. We're not taking surface information. We're not taking subjective information if we can help it. We want objective, factually based information, and that's important to us because information is very helpful in resolving conflict if you can just stick to the facts and not the innuendo.
How do we objectify claims? One thing we do is establish a frame of reference which usually relates to a period of time just prior to the disability commencing. You must understand a person's functional capacity at that time, their occupational requirements, their financial condition, and things like that.

We want to independently verify information so if somebody asserts something in a claim, we want to make sure that there's a factual basis for it. We're going to check multiple information sources, not just one, so that we can make sure we

have consistency in terms of what the story is. We're going to cross-validate information the best we can to help assure that the consistency is there and that the information lines up and points us to an answer that's reasonable. We're always going to apply a reasonableness test to the information we get. We're not necessarily going to get absolutes. We're going to have to apply a test that says, "We think that this makes a lot of sense based on the information we have, and we've checked out different sources. We cross-validated information; we think it's reasonable."

The kinds of areas that we're looking at include medical. It's about their impact on an individual's ability to function in specific ways in a work setting—in an occupation. We have to understand exactly what the occupational requirements are. Just because somebody says, "I'm a trial attorney" or "I'm a brain surgeon," doesn't necessarily mean we have a good understanding of what that means to them occupationally. We want to make sure that we have a very distinct and succinct understanding of what that means. We want to understand their functional capacity and how that's changed from a period prior to disability to a period post-commencement of disability. Sometimes the best way to do that is to observe somebody in their environment, when they're not paying attention or aware that they're being observed, so that it's independent and unbiased. There's the financial condition because there should be a financial impact of disability that's measurable. It doesn't always work out that way, but, in many cases, if an individual's ability to function in their occupation is significantly impaired, there should also be a financial impact that we can measure. We're going to look at situational factors that impact one's motivation to claim disability, because we know that there are often things that happen in individuals' lives that have impacts on their ability to function at work and impacts their financial condition, and those things are often resolved over the course of a claim. When the medical issues are also addressed appropriately, there is sometimes still an impediment to an individual getting back to work. So we want to understand what the situational factors are that impact the individual's ability to function in the workplace and get back to work. There are contractual issues, too, and they don't just relate to what the insurance policy says. There are things that can override contract language and definitions of disability, which include state statutes and regulations. State statutes are statutes that define disability or other rules and regulations are information that can have an impact on terms of how disability is interpreted in the context of an insurance policy.

The early intervention piece of the approach is just as important and, perhaps, maybe more important, when we talk about managing expectations because claimants and consumers who file a claim for disability benefits also have a preconceived notion about what the policy will do and what they're entitled to because, typically, representations have been made. But as quickly as we have an opportunity to, we want to establish what's expected of them in the claims process and what the orientation is, which, for us, looks like recovery and return to work. That should be the focus of what the policy is about. If we have an opportunity to resolve any kind of disconnects early in the process then we're going to have a

**Disability Claim Management** 7

better opportunity to manage their expectations long term.

We know we're going to get better quality of information the earlier we get involved in investigating and developing information necessary to manage a claim outcome. Things have a way of changing. Information has a way of evolving over time, and so the earliest point in time that we can get information and understand it and assess it, the better off we're going to be. We also want the ability to precede decisions that sometimes claimants start making when they're dealing with a situation that can impact their life in a profound way. Sometimes they're thinking about things that have to do with selling off a business, relocating their family, or doing something that once you've done, there's no turning back. These situations can have a significant impact on an individual's motivation to go back to work. If they have an inconsistent expectation or a wrong expectation about what disability means or what a policy will do for them, then we have a real problem managing the outcome of the claim down the road. We want to make sure that we're dealing with those issues as early as possible.

The last thing, direct and personal communication, is also important. We know that communicating through the mail via letter campaigns and so forth in order try to meet expectations or communicate with claimants is not particularly effective. We want to be direct, we want to be upfront, and we want to share information with consumers. We want to let them know where they stand. We think that we can enhance understanding that way. We think we can avoid misunderstandings, which is just as important because a lot of conflicts that arise in the claims process arise when there are misunderstandings about what claimants are really doing or able to do and how insurance companies are thinking about their claims. If they're not talking enough, often times there's room for misunderstandings to come about. We can be more efficient in communicating. We can get information back and forth a lot more quickly to help meet their expectations for getting paid promptly, and we think there's a lot more "customer-friendly" feel to those direct communications rather than sending letters that are much less personal.

*[handwritten margin note: "but not in writing"]*

Even if we do a good job of those things and even if we have good objective information, we work to establish expectations upfront. We want to make sure that we've communicated where people stand and what the claims issues are about. Often times, we get claims that we refer to as speculative in nature, which means that they're gray, they're not black and white. It may not be a question of, "Is the person disabled or not?" It may be more of a question of, "How disabled are they and what impact does their condition really have in their ability to function?" "How motivated are they?" Often times that puts us in a position where we feel that if we can't get to the point where we feel that the liability is reasonably clear, then we have a conflict that we have to deal with. Speculative claims often times present opportunities. They certainly present conflicts that we have got to be able to respond to.

When you have conflict, what's the best way to resolve it? We believe that

negotiation, or working with claimants to try to resolve the issues central to their claims, if not the claims themselves, is going to give us the best chance of being successful. We know that if we're going to be successful in the resolution process we have to be able to meet their needs at some level, which typically means that there needs to be some kind of give and take, some kind of compromise, and that's what we're going to work towards when we're working on these claims that fall between the margins. If they're legitimate claims and we feel comfortable that we have a degree of reasonableness, we're going to pay those claims. If they're clearly not payable, we're going to deny them and we have to deal with the consequences. If they're in the middle somewhere, we're going to work with claimants and we're going to try to resolve those through compromise.

That leads us to my final point, which is what compromise looks like. Often times it looks like a settlement, or it looks like a resolution that has to do with looking outside the terms of the policy because policies typically describe the black and white scenario. If you get paid, you get this amount of money per month for this period of time. If your disability doesn't rise to that level where it's payable, then you don't get paid anything. Often times we know that this leads to conflict, we know that it leads to litigation, other complaints, or bad feelings. If we have an opportunity to do something in between, then we're talking about the value of the claim and what we can do about it. The question becomes, "What is the value of a claim?" This is something that there's no real science to, it's more art, but we have to assess the merits of the claim. We have the facts that we're going to focus on and our understanding of the impact of the condition upon the individual's ability to work. We have alternatives we can identify because we know what happens if we pay. We have a claim that we don't think is legitimate that we're paying dollars for, and once we start paying we're not sure there's ever going to be an end to it. We validated the claim. We know that if we say "No," then we're perhaps faced with litigation and we know what the cost and the uncertainty associated with that are.

What about the probability of successful alternatives? There's the cost associated with each alternative and there are other risk factors that we have to take into account that are going to impact the kind of settlement offer we might make or what kind of compromise we might be willing to seek. Those things are going to fall over a pretty wide spectrum. They have to be handled on a case-by-case basis. In individual disability we have found that there are a pretty significant number of claims that fall in the margins that I would call gray area claims, and there are a significant number of claims that we discuss with claimants with issues we try to resolve. If we can't resolve the issues, sometimes we talk about resolving the claim, the value of the claim, or about settling the claim. We do that because we believe that gives us the best chance of managing the expectations of the claimant— meeting expectations at some level, and also allowing us to get the best outcome that we think that we can get. That can have a significant impact on claim experience in the aggregate. We tend to try to work with people and deal with them directly as best we can. If we're successful we hope that the actual experience better mirrors what our expectations are as well. And if our

*what level?*

expectations and the claimant's expectations are lining up, then life is pretty good. If our expectations don't line up, it's more work and more difficulty.

**MR. JOE BRAZ:** I'm going to talk about something that kind of piggybacks on what Bob's been talking about. How many people here are not or have only limited involvement in disability? Pretty much everybody here has involvement in disability. That's good. I'm going to talk about something very different, but something that's important to me, and it's important in the management of a disability claim block.

The process of evaluating a disability claim, as Bob has just discussed, is really a complex process, especially when you're dealing with professional-level people. You're dealing with a doctor who's filing for residual disability, and you have all these factors that have to be analyzed. And the long and short of it is that some claims are going to get denied, some claims are going to end up being resolved by way of a disputed settlement, but the majority of claims are going to be paid. Most of those claims are going to be paid for a period of time and then they're going to go off the books, but a significant number of claims are going to go on the books and they're going to stay on the books. If you have coverage to age 65, or if you have lifetime coverage and you have a 25-year-old who has a total impairment disability, you have quite a liability on your hands. It's the block of business within your claims that consists of the permanent total disability claims that really comprises the biggest percentage of our reserves.

Now we have a choice. We can sit there and just honor the contract, which, of course, we want to do, and make our monthly payments and watch that reserve gradually rise until it peaks, and then gradually diminishes and we feel the weight of all these reserves on our business, or we can consider some options. What I want to talk about is commutations—settling some of these claims at their discounted value so that we get some bottom-line gain in the process. What I would argue also is a wonderful offering for claimants who otherwise are locked into a contract that only pays if the contract says it will pay. What might have made a lot of sense for them at the time they applied for that policy might no longer make any sense for them at all now.

I've been in the business a long time, I've worked for a lot of different companies, and it's been interesting watching the evolution of settlement philosophies. For a lot of years companies didn't do any settlements, at least on this block of claims. They reserved their settlements for disputed claims and there were a lot of reasons for it. Some companies just had a paternalistic attitude. Their approach was that this guy contracted with us for $5,000-a-month benefit to age 65, that's what's in his best interest, and we're not going to do anything to change that. Others decided that they didn't want to proceed to settlements on this block because of legal concerns. They were concerned about allegations that the company enticed or coerced the individual into taking the settlement. The concern was that the person would take the money, squander it, and then comes back with an aggressive attorney who would force the company to put the person back on claim in addition

to the monies they already paid out in the form of a lump-sum settlement. Over time, these attitudes have changed.

There are still some companies that are very conservative and don't want to approach settlement, but increasingly, companies are seeing the light and realizing that, yes, those are legitimate concerns but they can be resolved. The legal concerns are something you can work around through the process in which you lay out your settlement offering. In the end, they realize that the ultimate in the service offering for a policyholder or for a claimant is to provide them with options. It's one thing to have a nice monthly benefit that's going to come in for the rest of your life or to age 65. For most people that is the best thing. Settlement isn't for everybody, but there's a subset of people out there who really have other needs that could be served through a settlement. Even though the contract doesn't speak to it, for an insurance company to come forward and offer this as an option can really be viewed positively.

There are advantages and disadvantages to both the claimant and the insurance company going through with a settlement of a known liability claim. For the claimant there are some obvious things. They would have the use of tomorrow's money today. That, for some people, is huge. It just opens up a whole new world for them. They're thinking, "The rest of my life I'm locked into this insurance company and these checks that are coming in every month, and maybe they meet some of my basic household needs, but there are other things I could be doing if I just had some capital." A lump-sum settlement can provide that for them. We've used settlements to help people fund all kinds of business ventures over the years, to fund the educational responsibilities for their children, or for themselves. Some people just want to be free of the insurance company. It's not necessarily the most comfortable thing to have to go to your mailbox every month hoping that check is going to be there. People just don't like that feeling and, of course, it's almost like life insurance for them. It does provide their family with some protection against an unexpected or premature death.

The advantage to the company (and music to an actuary's ears) is that reserves are freed up and, hopefully, there's going to be some bottom-line gain along the way too, because you're going to be paying less money than you're releasing reserves. You're eliminating a significant amount of administrative expenses associated with the ongoing review of these claims year after year, the paying out every month with a check, expenses that add up significantly over the course of the years with a large block of these claims. And, as I mentioned previously, from the company's perspective, you're in a position where you're offering something extra contractual. It's a good thing, it's an option, and it's giving people the opportunity to consider alternatives that they never would have considered previously.

There are disadvantages. Again, they're obvious. The claimant loses that comfort and safety of the monthly benefit—that paternalistic attitude. There's reality to that.