69

Q. (By Mr. Roberts) Mr. Ditmar, do you know who Lance Faniel is?
A. Yes.
Q. Do you know who John Midghall is?
A. Yes.
Q. And what was John Midghall's position in the company in 2001, if you know?
A. I believe he was a vice president.
Q. Do you see where it says "Accomplishments" on the first page of Exhibit 30?
A. Yes.
Q. And at the end of the first paragraph it mentions the term "Dispute resolution." Are DMS' claim reps and/or claims persons, including directors, trained in dispute resolution?
A. I believe one of the modules in the training program does discuss resolution.
Q. What other modules are in the training program?
A. I believe there's between 10 and 15 different sections, letter writing, policies, disability insurance, medical information, investigations. I don't recall any other names.
Q. When you say policies, what does that

70

module provide?
A. It discusses a basic disability insurance policy.
Q. Can you turn to the second page of the exhibit which is DMS 019, which Mr. Ellis has graciously admitted is an authentic document.
    MR. ELLIS: I will have a continuing objection to all of this exhibits as a violation of the Court's order of confidentiality with regard to personal information concerning employees of DMS and their personnel files and reviews.
    MR. ROBERTS: As stated, that protective order that Counsel mentions refers to a different set of documents, not these.
Q. (By Mr. Roberts) But the last sentence of the first paragraph on 019 says, "As Lance gets his team to coalesce in 2002, he will expect improvement in the pace devoted to build a case, develop the strategy and when appropriate execute resolution."
    Do you know what Mr. Midghall was referring to there about building a case, developing strategy, and then, when the time is appropriate, execute resolution?

71

    MR. ELLIS: Objection. It's an improper question to ask this witness.
Q. (By Mr. Roberts) Sir?
    MR. ELLIS: How can he know what's in Mr. Midghall's mind?
    MR. ROBERTS: How many times do we have to go over, Bill, the fact that when you say "Objection," that's all you're entitled to say in a deposition. When will you abide by the Code of Civil Procedures or the Code for Professional Responsibility?
Q. (By Mr. Roberts) Sir, do you know what it is that Mr. Midghall is referring to when he discusses that Lance has been getting his team -- strike that.
    Do you know what he's referring to when he discusses the concept of building a case, developing a strategy, and when appropriate, executing resolution?
A. I do not know.
Q. Have you ever in your discussions with Mr. Midghall have him refer to building a case, developing a strategy, and executing resolution when appropriate?

72

A. I've never worked for John Midghall.
Q. Has the concept of building a case and developing a strategy ever been discussed with you in the halls of DMS among any of your co-workers?
A. Not that I can recall.
Q. Have you ever worked with any co-workers to develop a strategy on a claim?
A. I wouldn't use the term "strategy."
Q. Have you heard Mr. Midghall refer to it?
A. Have I heard Mr. Midghall refer to --
Q. Refer to developing a strategy?
A. No, I have not.
Q. How about Mr. Anderson?
A. No, I have not.
Q. Can you turn to the next page, DMS 0047?
    MR. ELLIS: Same objection.
    MR. ROBERTS: You have a continuing objection, Counsel.
    MR. ELLIS: Thank you.
    MR. ROBERTS: Okay, now I expect you to be mindful of that.
Q. (By Mr. Roberts) This is the 2002 Performance Plan and Review for John Midghall purportedly prepared by John Anderson. Now, you

73

1  report to John Anderson, don't you?
2       A.   Yes.
3       Q.   Paragraph B says, start at the second
4  sentence, "This includes providing guidance to the
5  on-site Assistant Vice President of Claims and three
6  managing Directors. Issues vary but also involve
7  current personnel and staffing, complex claim
8  strategies, claim resolution valuations, and managing
9  effectively to budget."
10           My question is, have you ever heard
11 Mr. Anderson, your superior, refer to developing
12 complex claim strategies?
13      A.   No, I have not.
14      Q.   How about is it expected, as far as you're
15 aware, or have you heard Mr. Anderson ever refer to
16 the process of developing a claim resolution
17 valuation?
18      A.   No, I have not.
19      Q.   And in the next sentence he says,
20 "Additionally, I direct our Boston lawyers regarding
21 case strategies including final decision for legal
22 exposure, legal expenses, settlement timing and
23 amounts."
24           Have you in the halls of DMS ever discussed

ACCURATE COURT REPORTING (413) 747-1906

74

1  with your co-workers timing of settlement with
2  claimants?
3       A.   Not that I can recall.
4       Q.   Can you turn to the Bates number document
5  DMS 0050, which is the first page of the 2001
6  Performance Review of John Midghall purportedly
7  performed by his manager, John Anderson?
8            MR. ELLIS:  Same objection.
9       Q.   (By Mr. Roberts)  And in the
10 Accomplishments section, Mr. Midghall -- he was the
11 vice president at this time, 2001?
12      A.   I believe he was.
13      Q.   In the Accomplishments section, he writes,
14 the last sentence of that first paragraph, "My
15 valuation and settlement strategies contributed
16 heavily to the Boston legal staff favorably settling
17 many existing lawsuits in 2001."
18           Are you mindful that Mr. Midghall engaged
19 in developing settlement strategies in 2001?
20      A.   I'm not aware of that, no.
21      Q.   Have you ever been involved in developing
22 settlement strategies?
23      A.   No, I have not.
24      Q.   What is your understanding of my question

ACCURATE COURT REPORTING (413) 747-1906

75

1  about your engagement in developing a settlement
2  strategy? How did you understand that question?
3       A.   I would understand that to say that
4  strategy is setting out a plan of thought to settle
5  the claim.
6       Q.   Okay.
7       A.   Saying I'm going to do whatever I need to
8  do to settle this claim.
9       Q.   So, in your experience at DMS it's never
10 been the case where there's been such a plan
11 developed, as far as you're aware, on any claim?
12      A.   I've never been handed a claim and said,
13 "You need to settle this claim."
14      Q.   That wasn't my question. My question was,
15 in your experience at DMS, you've never been engaged
16 in the development of a plan directed at ultimately
17 settling a claim?
18      A.   Not that I can recall.
19      Q.   How about in your experience at DMS, have
20 you ever been engaged in the development of a plan to
21 administer a claim?
22      A.   I wouldn't use the term "plan." We
23 administer claims. I don't make action plans, so to
24 speak, as I'm going to do this, this, this, and this.

ACCURATE COURT REPORTING (413) 747-1906

76

1  I handle the claim as the information comes in,
2  review the file, and determine what I need to do
3  next. I don't have a written plan or a plan in my
4  mind. I take it as it goes.
5       Q.   I know there's no written plans, but is it
6  your sworn testimony that on no claim you've ever
7  been responsible for or involved in at DMS have you
8  ever set out some kind of action steps to take in the
9  future?
10      A.   I may have.
11      Q.   You can't recall any?
12      A.   I don't recall specifically.
13      Q.   And it's not the policy of DMS to develop
14 strategies on claims?
15      A.   It's not my policy.
16      Q.   There's several references throughout these
17 performance reviews to the DMS claim management
18 philosophy. Does that term have any meaning to you?
19           MR. ELLIS:  Same objection.
20           MR. ROBERTS:  The same continuing
21      objection?
22           MR. ELLIS:  Mm-hmm.
23           MR. ROBERTS:  A little redundant,
24      wouldn't you say?

ACCURATE COURT REPORTING (413) 747-1906

81

1   explain what I was going to say.
2       Q.   If you answer the question, you can
3   explain. But if you don't answer the question I'm
4   going to ask the question. You see, this is a
5   deposition, sir. Questions are asked by the lawyer,
6   the witness is under oath in a duty to answer the
7   questions asked. Nothing else. Do you understand?
8       A.   Yes. I would like --
9       Q.   Let's go back to that question that he
10  wants to answer this time.
11      A.   Before you proceeded to interrupt me.
12           THE COURT REPORTER: "Question:
13      Well, there's several references in these
14      documents and others I've seen authored by
15      DMS that talk about resolving a claim, and
16      even in Mr. Kearney's claim file there are
17      many references to making efforts to resolve
18      his claim. Is that not -- is resolving
19      claims not an objective of DMS?
20      A.   In regards to your statement, I was trying
21  to answer the question in that I have not seen the
22  statement resolution in context with Mr. Kearney's
23  claim file. What is the second part of that
24  question.

82

1       Q.   Well, the only part of the question, quote,
2   Is resolving claims not an objective of DMS? The
3   only question asked and still not answered.
4       A.   It depends.
5       Q.   It depends. It depends on what?
6       A.   It depends on the specific claim you're
7   handling.
8       Q.   Okay. So, it is not an overriding
9   objective of DMS to resolve claims?
10      A.   What do you mean by resolve?
11      Q.   Make them go away. You inherit or you
12  administer closed blocks of business for insurance
13  companies, correct?
14      A.   Some of the business is closed.
15      Q.   Let's talk about the Jefferson-Pilot.
16  Jefferson-Pilot in January of 2000 sent to DMS,
17  you've testified under oath previously 500, today you
18  say 300 and something claims, correct?
19      A.   Yes.
20      Q.   That was a closed block of business,
21  correct?
22      A.   Yes.
23      Q.   Those were all active claims for which
24  claimants were getting checks monthly or

83

1   periodically, right?
2       A.   I believe some of the claims were pending
3   that we received.
4       Q.   Is it your testimony under oath, sir, that
5   it isn't the business philosophy or objective of DMS
6   to resolve ongoing claims such as those for less than
7   the actuarial reserve on the claims?
8           MR. ELLIS: Objection.
9       A.   And you're using the term resolved, to make
10  them go away, is that correct?
11      Q.   Correct.
12      A.   That is not how we were administering this
13  block.
14      Q.   Again, that wasn't my question. I didn't
15  ask you how you were administering the block. I
16  never said that, okay? The question is simple. In
17  situations such as you had with Jefferson-Pilot,
18  where you were asked to administer a closed block of
19  business, is it not the objective of DMS to resolve
20  as many claims as it can for less than the actuarial
21  reserve on the respective claims?
22          MR. ELLIS: Same objection.
23      A.   No, that is not the objective.
24      Q.   Very well. Can you turn to DMS 0029 of

84

1   Exhibit 30. This is a Yearly Performance Plan and
2   Review purportedly for Brian Wentworth. And under
3   Accomplishments, the third asterisked paragraph, it
4   says, "Ongoing effort to orient staff to DMS
5   philosophies and methods."
6           Do you know what he's referring to, or
7   what's your understanding of DMS's methods?
8       A.   I don't know what he's referring to.
9       Q.   Do you have an understanding of what DMS'
10  methods means?
11      A.   No, I do not.
12      Q.   Can you turn to DMS 0060. Do you know who
13  John Graff is?
14      A.   I believe he's an examiner in the Boston
15  office.
16      Q.   Working on the Mass Casualty block of
17  business?
18      A.   I believe so.
19      Q.   He writes in here as a goal, at the bottom
20  of DMS 0060, "A few of my goals are to become more
21  familiar with the different policies and riders to
22  become a good field representative for my clients and
23  to" quote "become more familiar with the DMS claims
24  settlement process."

85

 1        Do you have an understanding personally of
 2   what any DMS claims settlement process may be?
 3        A.   No, I do not.
 4        Q.   Have you ever heard anyone prior to today,
 5   prior to this deposition, say in your presence that
 6   there is some kind of DMS claim settlement process?
 7        A.   No, I have not.
 8        Q.   Can you turn to DMS 0078. And if you look
 9   at 0077 you'll see that this is a 2001 Yearly
10   Performance Plan and Review on Bill Gelardi by
11   Maureen Cleary. Do you know who she is?
12        A.   No, I do not.
13        Q.   Do you know who Bill Gelardi is?
14        A.   No, I do not.
15        Q.   You've never heard his name before?
16        A.   No, I haven't.
17             MR. ELLIS:   In which case I object
18        still further on this particular document. He
19        has no familiarity with the people or the
20        document.
21             You don't have to make faces, Mike.
22             MR. ROBERTS:   I'm not making a face
23        at you. I don't know why you would say that
24        on the record. Well, I do know why you would

86

 1   say that on the record.
 2        Q.   (By Mr. Roberts) You see in "Manager's
 3   Comments," at DMS 0078, the first paragraph says,
 4   "Additionally, I believe claim specialists must have
 5   excellent communication skills, the ability to work
 6   independently, formulate and implement appropriate
 7   claim management strategies."
 8             Now, let's assume for purposes of this
 9   question that Maureen Cleary is, as is represented by
10   this document, a manager of DMS. Have you ever heard
11   anyone at DMS refer to the formulation and
12   implementation of appropriate claim management
13   strategies?
14        A.   Not that I can recall.
15        Q.   In the third paragraph of Manager Comments,
16   she states it again. At the end of the third line
17   she writes, "However, your" -- talking about the
18   specific employee -- "letter writing skills and
19   abilities to formulate and effectively implement
20   appropriate claim management strategies
21   simultaneously within your caseload was below
22   expectations."
23             Tell me, as a supervisor and manager at
24   DMS, do you have an expectation that your

87

 1   subordinates will implement appropriate claim
 2   management strategies?
 3        A.   I don't know what's meant by those terms,
 4   so I don't know if I do or not. My understanding of
 5   reading that may be different from hers.
 6        Q.   Okay. What's your understanding of what
 7   she might be referring to? How do you approach that
 8   language there?
 9        A.   I believe I tried to define what is meant
10   by strategy before, and I would not say that I have
11   strategies or that my people that work for me develop
12   strategies in terms of claims management.
13        Q.   So, in your work and in your history with
14   DMS, you would testify under oath that there's never
15   been an occasion where you have directed anybody or
16   personally created any particular strategy on any
17   claim for which you had involvement, is that true?
18        A.   Well, it depends what's meant by strategy,
19   because --
20        Q.   The way you understand the word strategy.
21        A.   There might be an instance where I'm saying
22   I planned, there may be an instance where I requested
23   medical records with the thought of once I get the
24   records I may do an independent medical examination.

88

 1   Is that considered a plan? It may be, I don't know.
 2        Q.   Something like that would be the extent of
 3   any strategy in which you've been involved at DMS?
 4        A.   It depends. It may involve another step.
 5   I may say once I get that medical exam it may be
 6   reviewed by our in-house medical people. I don't
 7   know. Each and every claim's different.
 8        Q.   Would your strategies go further than that,
 9   just a two-step strategy that you've laid out for us?
10        A.   I don't know.
11        Q.   Can you turn to DMS 0081. This is the
12   second page of an e-mail string that begins at DMS
13   0080 which is part of the exhibit. And it begins in
14   the middle of a fairly long paragraph at the top of
15   081. And four lines up from the bottom of that
16   conclusion of that paragraph there's a sentence at
17   the end that says, "I clarified performance" -- do
18   you see that?
19        A.   Yes.
20        Q.   She writes, "I clarified performance
21   expectations in terms of appropriate claim handling
22   and the need for management to ensure that all
23   employees were exercising appropriate judgment in
24   pursuing negotiated resolutions appropriately."

89

1  Based on your history with DMS in your
2  position, do you personally feel that management has
3  a need to ensure that all employees are exercising
4  appropriate judgment, number one, and number two,
5  pursuing negotiated resolutions appropriately?
6      A.  I don't know what is meant by that
7  statement.
8      Q.  What would you understand the term
9  "negotiated resolutions" to mean?
10     A.  If we're involved with a dispute with an
11 insured and we were able to reach a compromise.
12     Q.  And that's not something you attempt with
13 every claim?
14     A.  I'm not in a dispute in every claim.
15     Q.  You don't try to compromise every claim?
16     A.  What do you mean by compromise?
17     Q.  Get the policyholder to agree to accept a
18 certain amount of money that's less than the present
19 day value of the benefits through the termination of
20 the contract?
21     A.  No, I do not.
22         THE WITNESS:  What time is it?
23         MR. ELLIS:  Five to twelve.
24         THE WITNESS:  I'd like to take a

90

1  break for lunch, please.
2         MR. ROBERTS:  Absolutely.
3         THE VIDEOGRAPHER:  Going off record
4  at 11:54 a.m.
5               (A recess was taken)
6         THE VIDEOGRAPHER:  Back on record at
7  1:23 p.m.
8      Q.  (By Mr. Roberts)  Mr. Ditmar, you are under
9  oath still.  Did you discuss your testimony with
10 Mr. Ellis during the lunch break?
11     A.  No.
12     Q.  Do you refer to Mr. Ellis as "Big Brother"?
13     A.  No.
14     Q.  Have you ever heard that expression?
15     A.  Vaguely.
16     Q.  Regarding Mr. Ellis?
17     A.  No.
18     Q.  Do you perform performance evaluations of
19 your subordinates that work in the Jefferson-Pilot
20 block of business?
21     A.  Yes.
22     Q.  For how many years have you performed that
23 function?
24     A.  Since 2000.

91

1      Q.  Could you list for me the persons who you
2  have reviewed?
3      A.  Bob Mills.  Tony Marecki.
4      Q.  Could you spell that for the court
5  reporter?
6      A.  M-A-R-E-C-K-I.  Dave LaPorte.  Mary McFall.
7  Mariah Shea.  Jacqueline Smegal.
8      Q.  Could you spell that last name, please?
9      A.  S-M-E-G-A-L.
10         I believe that's it.
11     Q.  Who is your review performed by?
12     A.  Bill Hughes and John Anderson.
13     Q.  Has it always been both of those gentlemen,
14 or at least since 2000?
15     A.  I don't recall.
16     Q.  Has Bill Hughes done your reviews since
17 2000?
18     A.  In part with John, yes.
19     Q.  Let's turn your attention back to Exhibit
20 30, if we could.  DMS 0081 is the page we left off
21 on.
22     A.  Yes.
23     Q.  And the second paragraph.
24         MR. ELLIS:  Continuing my objection

92

1  with this exhibit, questions concerning it.
2      Q.  (By Mr. Roberts)  The second sentence says,
3  "I suggested you follow up on the caseload review I
4  conducted with you on August 30th as this was
5  intended to help you identify auto pay/settlement
6  cases."
7         Does the phrase "auto pay/settlement cases"
8  mean anything to you?
9      A.  Not necessarily.
10     Q.  What do you mean, not necessarily?
11     A.  I don't know what she meant in saying that.
12     Q.  Forget about the context --
13     A.  I've heard the term "auto pay," I've heard
14 the term "settlement."  I don't know what she means.
15     Q.  What is an auto pay case?
16     A.  I don't know what her understanding is of
17 the term auto pay.  My understanding of the term auto
18 pay?
19     Q.  Yes.
20     A.  Would mean that it's a claim where the
21 payments continue to go out automatically with less
22 periodic review.
23     Q.  How much less could that possibly be?
24     A.  It depends.  Usually or typically a claim

93

1    would be paid without review for six months or less,
2    sometimes it may only be once a year depending on the
3    nature of the circumstances of the claim.
4         Q.   Do you know what the meaning is to the --
5    or do you have an understanding of what it means to
6    identify a settlement case?
7         A.   I don't know what she means, again, in her
8    terms.  A settlement, typically I would refer to it
9    as a claim where you reach a compromise with the
10   insured and the claim is resolved.
11        Q.   All right.  Is there efforts undertaken in
12   your department, or in the block of business you
13   work, to identify -- to affirmatively identify
14   settlement cases?
15        A.   It depends on the case.  If a case where
16   the facts are warranted that we would settle the
17   case, we would do that.
18        Q.   Do you have an understanding of the phrase
19   "advance pay & close opportunity" in that sentence?
20        A.   Again, I don't specifically know what she
21   meant.  I have an understanding of the term advance
22   pay.
23        Q.   Does "advance pay" go with "& close
24   opportunity"?

94

1         A.   It could be termed "advance pay & close."
2         Q.   What would be your understanding of the
3    term "advance pay & close"?
4         A.   In a case, for example, where a person
5    might have a broken leg, and it's agreed with their
6    physician and our medical department and all other
7    circumstances where an insured might be able to go
8    back to work six months from now, we may pay the
9    claim in advance for six months and agree that at
10   that point the insured would be able to go back to
11   work, so we would pay it and close the claim.
12             If additional complications arose, the
13   insured could call us back and say, "Hey, I need two
14   more weeks of benefits."
15        Q.   For the record, the sentence says "was
16   intended to help you identify auto pay/settlement
17   cases, possible advance pay & close opportunities, et
18   cetera."  You gave me a health insurance example.
19   Has there ever been a case in your experience in the
20   disability insurance field where you've been involved
21   in the advance pay and close of a disability claim
22   for which there was more than five years potentially
23   left before the policy would otherwise terminate?
24             MR. ELLIS:  I object to counsel's

95

1    misstatement to the witness's testimony.
2         A.   The example I gave you could be a
3    disability claim.  He could have a policy that pays
4    to age 65.  He could be 40 years old, but if he
5    breaks his leg, his claim in a sense would end and he
6    would return to work and his policy would still be in
7    force.
8         Q.   Have you ever been involved in a matter
9    where there has been an advance pay and close of a
10   claim where the advance pay has been greater than
11   five years of benefits?
12        A.   You're asking -- I just want to clarify.
13   Advance pay and close, my understanding of advance
14   pay and close, the insured still has the policy,
15   still keeps it.  The policy doesn't end just because
16   you pay the claim.  They still keep the policy.  The
17   policy doesn't end because we paid him six months of
18   benefits.  It's just returned to a premium paying
19   basis and his claim, in a sense, is over.  That's my
20   understanding of advance pay and close.
21        Q.   How does "close" work into that?
22        A.   It means the claim has closed.  Where,
23   if --
24        Q.   But the policy's not terminated?

96

1         A.   If you, for example, broke your leg and you
2    filed paperwork, you would have an open claim.  When
3    you returned to work and were no longer paying
4    benefits, the claim's closed, you start paying
5    premiums again if you qualified for a waiver of
6    premium in that period in between.  I'm sorry, I
7    forgot your question.
8         Q.   Back to my question --
9         A.   Of the five-year portion?
10        Q.   Right.
11        A.   Through my experience, advance pay and
12   close is usually something where you pay no more than
13   six months in advance.  I've not -- I cannot recall a
14   circumstance where I've paid five years.
15        Q.   Her next sentence she says, "We also agreed
16   to continue to use Management Referrals to assist you
17   with claim strategy on complex files."
18             Do claim examiners have the opportunity to
19   request management referrals to assist with claim
20   strategy, as far as you know?
21        A.   I have never heard that term.
22        Q.   She uses capital "M" and capital "R" there.
23   Does the capitalized term Management Referrals have
24   any meaning to you whatsoever?

105

```
 1  Jefferson-Pilot.
 2      Q.  Can you have a recision outside the
 3  contestability stage?
 4      A.  I'm not sure what you mean by
 5  contestability stage.
 6      Q.  Well, isn't it -- generally there's a
 7  two-year contestability period in the policies?
 8      A.  There's a two-year contestable period.
 9  Some of the Jefferson-Pilot policies have what's
10  called tolling language, which means they exclude if
11  a person becomes disabled within that first two
12  years, the contestability period continues to toll
13  because the period of disability is not counted
14  towards that first two years.
15      Q.  What are "Settlements"?
16      A.  Settlement is either a claim or policy
17  settlement where we reach a compromise with the
18  insured, and it may be a circumstance where the claim
19  is over, they continue keeping their policy and it's
20  returned to a premium paying basis, or a policy
21  settlement which in exchange for a sum of money their
22  policy is canceled.
23      Q.  Is there a further breakdown of Settlements
24  into those two categories somewhere?
```

ACCURATE COURT REPORTING  (413) 747-1906

106

```
 1      A.  No.
 2      Q.  Is there a report of litigation matters
 3  that's prepared for Jefferson-Pilot?
 4      A.  No.
 5      Q.  That you're aware of?
 6      A.  Not that I'm aware of.
 7              (Exhibit 32, marked)
 8      Q.  (By Mr. Roberts)  Marked as Exhibit 32 are
 9  some more of these performance reviews I'd like to go
10  over with you.
11          MR. ROBERTS:  Let's switch tapes.
12          THE VIDEOGRAPHER:  Going off record
13  at 1:43 p.m.
14              (Off the record)
15          THE VIDEOGRAPHER:  Back on record at
16  1:45 p.m.
17          MR. ELLIS:  With regard to Exhibit
18  32 I'm making the same objection, that subject
19  to a protective order in a prior case these
20  are parties, people that are not involved in
21  this particular case in any way and that I
22  will object to any questions concerning these
23  documents and object to the documents.
24          MR. ROBERTS:  It's an inaccurate
```

ACCURATE COURT REPORTING  (413) 747-1906

107

```
 1  statement that these documents are subject to
 2  a protective order in a prior case.
 3      Q.  (By Mr. Roberts)  Mr. Ditmar, the second
 4  page, DMS 017, this is Mr. Midghall's performance
 5  review of a gentleman named Lance Faniel, and
 6  approximately halfway down this long paragraph
 7  there's a sentence that starts in the middle of the
 8  page, "Since" -- do you see that?
 9      A.  "Since this agreement"?
10      Q.  Yes.  " -- I have had a few strategy
11  meetings with Lance."
12          Have you ever discussed with Mr. Midghall
13  the conduct of strategy meetings with subordinates on
14  claims?
15      A.  No, I have not.
16      Q.  I want you to skip several documents to DMS
17  055.  I think they're in numerical order.  Do you
18  know Cheryl Blomgren?
19      A.  I believe she's a director in the Boston
20  office.
21      Q.  Which is where the Massachusetts Casualty
22  business is?
23      A.  Yes.
24      Q.  And John Graff works on that business?
```

ACCURATE COURT REPORTING  (413) 747-1906

108

```
 1      A.  I believe so.
 2      Q.  This document purports to be his
 3  performance review in the year 2002, and specifically
 4  at page 2 do you see where the heading says "Goals"?
 5      A.  Yes.
 6      Q.  Right above that paragraph, the last
 7  sentence of that paragraph says "Members of the claim
 8  department have asked for my opinion on different
 9  claim situations and I have discussed strategy with
10  them when appropriate."
11          Is that a common experience at DMS where
12  representatives or claim reps among themselves or
13  with their superiors discuss strategy on particular
14  claims?
15      A.  I don't know what she means by the term
16  "strategy."  Claims people do discuss claim
17  situations or claims with each other and/or managers.
18  I don't know what they mean by the term "strategy,"
19  necessarily.
20      Q.  I think that's Mr. Graff's statement there
21  in his Accomplishments section.
22      A.  Okay.
23      Q.  Do you fill out the same type of
24  performance review form?
```

ACCURATE COURT REPORTING  (413) 747-1906

109

1   A. For my people?
2   Q. Yes.
3   A. Yes.
4   Q. And so you recognize this as a DMS
5   performance review form?
6   A. Yes.
7   Q. In the third page of his review there,
8   0056, the last paragraph, the end of the fourth line
9   it says -- and this purportedly is Cheryl Blomgren's
10  supervisor saying, "He knows when to move the claim
11  to the next level for review or strategy."
12      Have you ever had a discussion with
13  Ms. Blomgren where she talks about her expectation
14  that the claims folks beneath her move their claims
15  to a strategy level?
16  A. No, I have not.
17  Q. 0058, the second page of Mr. Graff's 2001
18  review, and in the middle of the page there's a
19  paragraph that has the heading "Goals." The fourth
20  line he expresses the interest that he, quote, "Wants
21  to become even more familiar with the claim
22  philosophy."
23      Is there a claim philosophy at DMS other
24  than we make every effort to in good faith fairly,

110

1   fully, and accurately administer claims?
2   A. I believe I had indicated before that the
3   only philosophy I'm aware of in respect to claims is
4   that we handle claims fairly, equitably and try to
5   make the correct decisions.
6   Q. Can you turn to 0064. Do you know who Jeff
7   Champagne is?
8   A. Yes.
9   Q. In his Accomplishments section which starts
10  on the first page, 0064, then carries over to 0065, I
11  want to concentrate on 0065 briefly, if we could.
12  A. Okay.
13  Q. The second page, the first paragraph starts
14  with "Additionally," the next paragraph starts
15  "In-house"?
16  A. Yes.
17  Q. The second paragraph says "In-house
18  training conducted by myself included discussions on
19  file assessment and strategy, phone calls on
20  difficult cases and complicated issues, and
21  conference calls on resolution cases."
22      Does Mr. Champagne hold a similar position
23  in the Boston office that you hold here in
24  Springfield, Massachusetts?

111

1   A. Somewhat.
2   Q. You both are responsible for a block of
3   business?
4   A. Yes.
5   Q. Do you conduct in-house training on file
6   assessment and strategy for your folks?
7   A. I train my people on how to administer
8   claims periodically through working with them on a
9   one-on-one basis.
10  Q. Have you ever heard Mr. Champagne use the
11  term "resolution cases"?
12  A. I'm not sure what he means by the term
13  "resolution cases."
14  Q. Have you ever heard him use that phrase?
15  A. No, I have not.
16  Q. Can you turn to DMS 0073. And this
17  purports to be a review performed by Mr. Midghall of
18  a gentleman named Rick Turek. And the last line of
19  this first page, 0073, recites a goal of, quote,
20  "Developing better strategies when attempting to
21  resolve" and then carried over to the next page,
22  0074, "claim issues."
23      Are you mindful of other co-workers at DMS
24  having goals of developing strategies when attempting

112

1   to resolve claim issues?
2   A. I'm not aware of other individuals' goals,
3   other than the individuals that work with myself.
4   MR. ROBERTS: Okay, Bill, why don't
5   you make your call now. Do you want this on
6   or off the record?
7   MR. ELLIS: Doesn't matter to me.
8   THE VIDEOGRAPHER: Going off the
9   record at 1:54 p.m.
10      (A recess was taken)
11  THE VIDEOGRAPHER: Back on record at
12  2:12 p.m.
13  Q. (By Mr. Roberts) When we went off record,
14  Mr. Ditmar -- we're back on record and you're still
15  under oath. You understand that?
16  A. Yes.
17  Q. We were talking about the persons who you
18  supervised and who supervised you, I believe.
19  Actually, we did that a lot earlier, I apologize. We
20  just finished Exhibit 32.
21      Do you ever speak with the legal staff at
22  DMS about any substantive matters that you're dealing
23  with?
24  A. If I have a question I may speak with them.

153

1  document contained in the claim file, Bates 2880,
2  says, "Dear Todd: As you requested in your letter
3  dated September 12, '97, enclosed you will find a
4  copy of policy form WJ576A, which is the same policy
5  from both of the above insureds policies."
6      Is it your testimony under oath that you
7  didn't receive that entire policy but rather just a
8  portion that talks about the ability to audit?
9      A.   I believe we got a portion of the policy
10 that is contained in the claim file. I do not recall
11 that a schedule page was included and whether or not
12 the riders were included also.
13     Q.   You were told, though, by Mr. Shelton
14 through this correspondence that he was on a residual
15 disability, right?
16     A.   At some point I believe Mr. Shelton
17 mentioned that.
18     Q.   Well, I think we saw a reference here in
19 the documents, didn't we?
20     A.   Under which one?
21     Q.   Well, let's look at them. On September 12
22 of '97, which is labeled 2886, you tell Mr. Shelton
23 that you're going to investigate in great depth what
24 his occupational duties are and determine the exact

154

1  duties he performs on a daily basis. Is someone on
2  total disability performing duties on daily bases?
3      A.   The question that you asked me, I believe
4  two questions ago, was whether or not Mr. Shelton
5  told me that. I believe after my review of the claim
6  file it was apparent that Mr. Kearney continued to
7  work in his business and that he was claiming
8  residual disability. I thought your question was did
9  Mr. Shelton specifically tell me that.
10     Q.   So by the fall of 1997 you had an
11 understanding that it was a residual disability
12 claim, right?
13     A.   I believe that was my understanding.
14     Q.   Thank you. And you wouldn't have requested
15 the residual disability rider?
16     A.   I believe the only reason I requested the
17 policy was to look at the terms of the financial
18 audit impact on his claim.
19     Q.   Is every document you received from
20 Jefferson-Pilot in the claim file?
21     A.   I don't recall what we did receive from
22 Jefferson-Pilot. We received some photocopies. Any
23 documents that we created or received would have been
24 forwarded back down to Jefferson-Pilot, we didn't

155

1  keep them.
2      Q.   You mean after your consulting assignment
3  concluded you sent the documents back?
4      A.   I believe at some point in the middle of
5  1998 after Janet Beattie had met with the insured,
6  created a report, I forwarded the report, and I don't
7  believe I had any additional involvement in the claim
8  until it was received at some point in January of
9  2000.
10     Q.   Well, the transmittal -- you've reviewed
11 that transmittal of the Janet Beattie report in the
12 past couple days. You transmitted only the Beattie
13 report. I see no transmittal in the file, in '98 or
14 '99, of the entire file back to Jefferson-Pilot.
15     A.   I would have mailed that by hard copy. I
16 wouldn't have faxed it to them.
17     Q.   Understood. Why is there not a transmittal
18 letter?
19     A.   I don't know if I would have done a letter
20 or not. I would have just put it in an envelope and
21 sent it to Mr. Shelton.
22     Q.   Are you testifying under oath that that in
23 fact happened, or are you just speculating?
24     A.   I would have sent any and all documents

156

1  received to Mr. Shelton during the course of our
2  evaluation of the claim.
3      Q.   Received from Mr. Kearney or received from
4  Jefferson-Pilot?
5      A.   Received from Jefferson-Pilot, Mr. Kearney,
6  and any other outside sources. We would have
7  returned all the documents we received to them.
8      Q.   So it's your testimony that in December of
9  1999 DMS maintained no documents relative to
10 Mr. Kearney?
11     A.   I do not personally. I don't know if
12 anybody else at DMS did.
13     Q.   I'm going to hand you what's been marked as
14 Exhibit 8. First, do you know whether or not
15 residual disability benefits under Mr. Kearney's
16 policy might be payable for lifetime if the residual
17 disability begins before the age of 45?
18     A.   I believe they are.
19     Q.   The policy speaks for itself on that?
20     A.   I believe residual -- I believe under
21 Mr. Kearney's policy, if his disability commences
22 before age 45, benefits are payable for life under
23 the terms and conditions of his policy.
24     Q.   If DMS makes that kind of assessment or