```
** TX STATUS REPORT **              AS OF   NOV 03 1999 00:00   PAGE.01

                                            JP


       DATE  TIME        TO/FROM      MODE   MIN/SEC   PGS   JOB#  STATUS
   03  11/03 07:58       7045678763 EC--S   01'58"   006   154   OK
```



## JEFFERSON PILOT
### FINANCIAL

### ORDINARY CLAIM DEPARTMENT – 5310
Post Office Box 21008
Greensboro, NC 27420
Fax Number: (336) 691-4254
Telephone: 1-800-487-1485

Date: __11-3-99__

To: __Rene Hinote__

Company Name: __ICS__

Fax Number: __(704) 283-9810__

From: __Phyllis Harden__

Phone Number: _____

Number of Pages Including Cover Sheet: __6__

MESSAGE: _____

The information accompanying this transmittal sheet is confidential and protected by law. It is intended for and should only be used by the individual or entity named above. If you are not the intended recipient or an authorized employee able to deliver it to the individual listed above, you are notified that any disclosure, copying, distribution or use of the attached information is strictly prohibited. If you have received this fax in error, please contact the number listed above. Thank you.

JEFFERSON-PILOT LIFE INSURANCE CO.              ALEXANDER HAMILTON LIFE INSURANCE CO.

3009

# DISABILITY MANAGEMENT SERVICES, INC.

### 1350 MAIN STREET, SPRINGFIELD, MASS. 01103-1628
### TEL: (413) 747-0990    FAX: (413) 747-1545

## FACSIMILE TRANSMITTAL SHEET

| TO: Barb Bailey | FROM: Mary McFaul    Ext. 1160 |
|---|---|
| COMPANY: | DATE: 12-29-00 |
| FAX NUMBER: (315) 234-4201 | TOTAL NO. OF PAGES INCLUDING COVER: 2 |
| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
| RE: Corp. Records Request | YOUR REFERENCE NUMBER: |

**Confidential**    . . . . . . . . . . . . . . . . . .

The documents accompanying this telecopy transmission contain information from Disability Management Services, Inc. which is confidential. The information is intended only for the use of the individual and/or entity named on this transmission sheet. Any copying, disclosure or dissemination of the information, or the taking of any action in reliance upon the contents of the information, is strictly prohibited. If you have received this telecopy in error, please notify us immediately so that we can arrange for the return of the documents at no cost to you. Thank you.

Comments:

Please deliver promptly. Thank you.

3018

## *DMS RESEARCH REQUEST FORM*

REQUESTOR:  Robert Mills    PHONE EXT:1076  Date:  December 29, 2000

INSURED:  Chris Kearney  XRef#        Policy # H493029, H538069

DOB:  Redacted    SS#  Redacted    DRIVERS LIC#        STATE  OH

ADDRESS:            Redacted

OCCUPATION:  Self-Employed, Manufacturer Rep

BUSINESS NAME:  Kearney Associates, Inc.

BUSINESS ADDRESS:  Cincinnati, OH

**ONSET DATE – 2/9/93    MO BENE AMT – 6,481.50    BENEFIT PERIOD – Age 65
DESCRIPTION OF THE DISABILITY**

| REQUESTING ITEM | IN | OUT | HITS/COST |
|---|---|---|---|
| CONSUMER CREDIT REPORT | _____ | | |
| COURT RECORDS | _____ | | |
| x    BUSINESS REPORT | _____ | | |
| SEQY        DEQY        MBR | _____ | | |
| FICTITIOUS NAME SEARCH | _____ | | |
| LICENSED OCCUPATION CHECK | _____ | | |
| MVR-DRIVER INFO        (NEED DL #) | | _____ | |
| NEWSPAPER(Please give details below) | _____ | | |
| PHONE NUMBER TRACE\ OWNER | _____ | | |
| PROFILE REPORT (AUTOTRACK) | _____ | | |
| PROPERTY\ REAL ESTATE | _____ | | |
| SS# TRACE | _____ | | |
| VEHICLE OWNERSHIP | _____ | | |
| WORKERS COMPENSATION | _____ | | |
| ACCIDENT INDEX *** | _____ | | |
| DISCOVERY | _____ | | |
| OTHER | _____ | | |

**SPECIAL NOTES  Looking to confirm closure of business in 1997.**

**Accident Index:          **REPORT          INQUIRY
***PROVIDE AS MUCH INFORMATION RE: THE ACCIDENT AS POSSIBLE .*
Accident Date
Location of Accident – complete address if available
Alleged Injuries**

3019

## Disability Management Services, Inc.

*1350 Main Street. Springfield, MA 01103-1619  Tel:(413)747-0990  Fax:(413)747-1545*
*A third party administrator for:*
### Jefferson-Pilot Life Insurance Company

December 7, 2000

Darrell Norris
7845 Pfeiffer Rd., Ste. 100
Cincinnati, OH  45242

Re:    *Christopher Kearney*
       Policy Number/s: H-493029, H-538069

Dear Mr. Norris,

Thank you for speaking with me on Tuesday, November 14, 2000.  I tried to reach you again on Wednesday, November 29, 2000 to further discuss this matter.  I left a message with your office, but have yet to hear back from you.

As part of our evaluation this claim, we need your statement concerning your recollection of the events during the processing of Mr. Kearney's application for coverage.  Please provide us with your responses to the following questions.

1) How did you come to meet the Insured? If by referral, who referred you?

2) What were the circumstances surrounding the taking of the application; e.g. who was present; where did you meet; how many times had you met, etc.?

3) Did you ask all of the questions on the application; were all of the Insured's answers recorded as supplied by the Insured?

4) Did you have a discussion about how particular provisions of the policy would be interpreted in the event Mr. Kearney should have to file a claim?  Please explain in detail.

*d/b/a: New England Claims Administration Services, Inc. in FL, MD, ME*
*Licensed as New England Claims Administration Services, Inc. in CA*
*d/b/a Centre Claims Administration Services in NH*

3035

5)  Did you advise with Mr. Kearney that he would not be required to submit financial information in the event he should need to file a claim? Please explain in detail.

6)  Did you advise with Mr. Kearney as to what would constitute proof of loss under his policy should he need to file a claim for benefits? Please explain in detail.

7)  Did you advise Mr. Kearney that in the event he should need to file a claim that he would not be required to submit specific information concerning his business? Please explain in detail.

8)  Was there any discussion about the meaning or scope of any question(s) asked during the application process? If so, to the best of your recollection, what was asked and what was your response? Please designate the question(s) or topic involved.

10)  Are there any other facts or circumstances surrounding the solicitation, application, and placement of this policy that you wish to bring to our attention?

We very much appreciate your cooperation in providing the information requested above and look forward to receiving your response as soon as possible. For your convenience, you can provide responses in a separate letter or in the spaces following each of the questions. If you do choose the latter, please be sure to sign and date the last page.

Once you have answered each of these questions, please fax your response to our office at (413) 747-1545. Please also mail a copy of the original to our office.

Please feel free to contact me should you have any questions or additional information regarding this matter.

_____          _____
      (Your Signature)                              (Date)

Sincerely,

Robert F Mills
Claims Consultant

d/b/a: New England Claims Administration Services, Inc. in FL, MD, ME
Licensed as New England Claims Administration Services, Inc. in CA
d/b/a Centre Claims Administration Services in NH

3036

*Disability Management Services, Inc.*
1350 Main Street. Springfield, MA 01103-1619 Tel:(413)747-9990 Fax:(413)747-1545
*A third party administrator for:*
*Jefferson-Pilot Life Insurance Company*

Sent via facsimile (330) 264-4216
& U.S. Mail

December 5, 2000

Christopher Kearney

Redacted

Re: Policy Number/s: H-493029, H-538069

Dear Mr. Kearney,

This letter follows our telephone conversation on Thursday, November 30, 2000.

I am in receipt of your November 26, 2000 letter, the two occupational duties forms and the tax returns for Kenwood Technology Group, Inc for the years 1998 & 1999. Unfortunately, as discussed on the telephone, we have yet to receive from you many of the items requested by Mr. Bill Hughes in his October 2, 2000 letter (copy enclosed) which are needed in order to evaluate further benefit eligibility. As you also know, despite your refusal to submit the needed documentation, Jefferson Pilot has continued to pay benefits in the interest of good will.

In a further effort to allow you sufficient time to submit the requested materials, Jefferson Pilot has authorized an additional benefit check. This payment is being made with full reservation of rights under your policies. Unfortunately, if the requested items are not received within the next 30 days we will be unable to evaluate your eligibility for further benefits.

Also, please be advised that we are presently making arrangements for an independent examination. As soon as the date and place are known, you will be notified accordingly.

Finally, you have mentioned that you might retain an attorney. If you do, please have that individual send us a letter of representation.

Please feel free to call me directly at 1-800-883-0596 ext. 1076. with any questions.

Sincerely,

Robert F Mills
Claims Consultant

d/b/a: New England Claims Administration Services, Inc. in FL, MD, ME
Licensed as New England Claims Administration Services, Inc. in CA
d/b/a Centre Claims Administration Services in NH

3038

11/14 (513) 793-3777
pending Darrell Norris,
Explained that DMS is administering a cln
for JP concerning Mr. Christopher Kennewy.
He was aware of Mr. Kenny And
Advised that it was his understanding the
case was legally forwards litigation.
I will send a letter, with Questions
for him to Respond to.

Current Address:        7845 Pfeiffer Rd
                        Ste. 100
                        Cincinnati, OH 45242

                        Fax # (513) 936-9951

                        RFW

3041

Ti Paul Swick @ IP.
The Agent of Record on Mr. Kennery's file is:

DARNELL NORRIS
Stoner - Brater Assoc.
6279 Tri-Ridge Blvd. Sk 309
Loveland OH. 45410.
(513) 791-8848 ( Disconnected )

Called directory assistance. Office is now
located in Fairfax, OH. Tele #
(513) 527-2200. Spoke w/ A
gentleme Brem the office. Mr.
Norris left The Agency 2 yrs ago.
He can be reached at the
following #'s

(513) 793 - 3777    ( office )
(513) 489 - 5313    ( home )

RPW
11/14/00

3042

### Disability Management Services, Inc.
*1350 Main Street, Springfield, MA 01103-1619  Tel:(413)747-0990  Fax:(413)747-1545*
*A third party administrator for:*
### Jefferson-Pilot Life Insurance Company

November 2, 2000

Christopher Kearney

Redacted

Re:  Policy Number/s: H-493029, H-538069

Dear Mr. Kearney,

This letter follows our telephone conversation on Monday, October 30, 2000. It was a pleasure speaking with you.

We are in receipt of your letter dated October 25, 2000 directed to Mr. William Hughes. However, your response did not include any of the claim materials requested in Mr. Hughes' letter of October 2, 2000 other than your 1999 Personal tax return. As we discussed, your letter seemed to reflect that you are maintaining your previous position that you are not required to furnish all of the claim materials requested in Mr. Hughes' letter, and that the company does not have the right to corroborate information you have provided.

As previously explained by Mr. Hughes, it is the requirement of the insured under the Proof of Loss provision of the policy to furnish evidence of benefit eligibility. Pursuant to our conversation, it remains clear that Jefferson Pilot and yourself have different interpretations concerning what constitutes "proof of loss" under the policy and what information is required in the processing your claim for benefits. Please be advised that it's the company's view that they have the right to request the information detailed in the October 2nd letter to verify your statements. At this time, it appears that without the requested claim materials we would be unable to evaluate your eligibility for additional benefits.

During our telephone conversation, you did mention that you have not decided against forwarding the requested claim materials, however, you mentioned you wished to speak with your attorney before making you final decision. In light of the above, Jefferson Pilot has agreed, in the interest of continuing good will, to provide you with another benefit payment and extend the timeframe for you to provide the outstanding claim materials for an additional 30-days in order to allow you to have enough time for the discussion with your attorney to occur. Please be aware that in making this payment Jefferson Pilot reserves its rights under the policy and to claim repayment of these benefits should it be determined that you would not have qualified for them.

*d/b/a: New England Claims Administration Services, Inc. in FL, MD, ME*
*Licensed as New England Claims Administration Services, Inc. in CA*
*d/b/a Centre Claims Administration Services in NH*

Enclosed please find two copies of an Occupational Duties form. You should complete a form relative to those occupational duties you were performing at the commencement of your claim. The other form should be completed with regard to those occupational duties you are currently performing.

We look forward to hearing back from you or your representative in the near future to discuss the next steps in the administration of your claim. Should you have any further questions, I can be reached directly at 1-800-883-0596 ext. 1119.

Sincerely,

Robert F Mills
Claims Consultant

*d/b/a: New England Claims Administration Services, Inc. in FL, MD, ME*
*Licensed as New England Claims Administration Services, Inc. in CA*
*d/b/a Centre Claims Administration Services in NH*

3044

CHRISTOPHER L. KEARNEY

Redacted

Mr. William Hughes                                                    October 25, 2000
Vice President/Claims Operations
Disability Management Services, Inc.
1350 Main Street
Springfield, MA 01103-1619

RE:    Jefferson-Pilot Policy Numbers: H-493029, H-538069

Dear Mr. Hughes:

1) After reviewing your letter on the 5th of October, I have made a time consuming and exhaustive search of my records and previous correspondence to and from Jefferson-Pilot and those acting on its behalf.

2) I have responded to all inquiries and letters and my files can prove this point. I cannot say the same for DMS as many policy questions have been ignored and not responded to. I have seen in some legal articles the term "silent misrepresentation", which I have been dealing with with DMS. This is in addition to other types of harassment and intimidation over the years attempting to induce me into ending my valid claim. More specifically, I have provided tax returns of Kearney Associates, Inc. from 1992 through 1997 when it went out of business, my personal returns from 1991 through 1998 and enclose the 1999 return which has only recently been finalized. In addition to providing monthly proof of loss claims, I have been subjected to two lengthy interviews, one of which consumed three and one-half hours with Dr. Judd present for about two hours. This interview was summarized in a memo of Janet Beattie of Psychiatric Disability Consultants, Inc. dated April 25, 1998. In that summary, Dr. Judd was acknowledged as advising Ms. Beattie that I have been unable "to make it in a sales environment". She went on to mention that Dr. Judd and I were "very forthright" in our responses. I have also completed and returned in timely fashion all proofs of loss claim forms which are the only specific requirement in my policy for receiving benefits.

3) When I purchased the first of the two subject policies from Jefferson-Pilot in 1990, I was strongly influenced by the representations of the salesman that the policy would cover my valid claims for illness and injury that might occur in my career and disrupt my income. His proposal also stated "unfortunately, you cannot control when a disability will strike or how long it will continue" and, further, that "no additional financial information is required." My application at that time included my personal earnings from the prior years as shown on my federal tax returns. No questions were asked about the business I own, the expenses or revenues, nor names of customers or principals. I was assured by the salesman that my IRS personal returns as well as my doctors' statements would be clear proof of loss. I was assured that Jefferson-Pilot would not be intruding into my business as the policy is a personal policy.

4) It was very clear that Jefferson-Pilot was eager to have my check and the monthly premiums payments thereafter. The premiums are more expensive than premiums proposed from other insurance companies but your agents convinced me that the Jefferson-Pilot Policy was the very best investment I could make "to insure your most valuable asset – your ability to earn an income."

3047

5) I would appreciate a delineation of your basis for requesting the additional information. Jefferson-Pilot has been extremely inconsistent in any demands for my personal returns. *I have complied, to be safe, even though I believe that you have waived this right if you ever had this right in the first place.* My policies state "Jefferson-Pilot may require you to present reasonable proof of your Current Monthly Income and your prior Monthly Income." Please note that it says "reasonable". My personal tax returns and W-2s are certainly "reasonable". The policy says nothing of being required to submit to company audits or sending in Corporate Documents of any kind. Furthermore, Corporate Documents were not needed to buy the policy in the first place.

6) The expense issue you referred to is simple. I did not increase my travel. I hired other salespeople to help since I could not do that which was necessary. Their travel expenses and mine are reflected in the figures you question as well as the wages you question. I have already addressed this issue in my letter of January 13, 1998 to Mr. Shelton.

7) My questions and concerns sent to your office this year by fax and letter have been largely ignored and unanswered. As you have recently gone through my files, please ask Mr. Mills to answer my questions posed in my letters and faxes of this year, immediately. Also, he did not have the courtesy to respond to my question of "proof of loss".

8) In addition to the above, I would like for you to please delineate the basis upon which your not-so veiled threat of withholding benefit checks is based.

9) The "Occupation Duties Form" forwarded to me referenced both "immediately prior to disability" and "currently". Would you be kind enough to advise for which period you are making inquiry? As you would be aware if you were to review the file, my duties and activities prior to my disability were almost exclusively sales and their related activities wherein now a sales environment is extremely difficult for me. In December of 1999 an investigator from *International Claims interviewed me extensively regarding my occupational duties and activities* and there has been little or no change since that time. I am sure that this information is available to you.

10) I am dependent on the checks that have been provided me for payment of my living expenses and your accusations that I have not supplied the required proof and inaccurate statement that I have "prevented the company from independently verifying" my claim has caused severe mental anguish and significant amounts of lost sleep. Due to this, my physician has increased my medication in an effort to assist me in dealing with Jefferson-Pilot threats and apparent efforts to avoid their responsibility under the policies which I have paid premiums since March of 1990.

Sincerely,

*Christopher L. Kearney*

Christopher L. Kearney

3048



**CS CLAIMS
GROUP INC.**

401 Huehl Road, #1-E
Northbrook, IL 60062
Phone (847) 559-0670
Fax (847) 559-0672

TAX I.D. #36-3756269

TO:  Bob Mills
DISABILITY MANAGEMENT SERVICES, INC.
1350 MAIN ST.
SPRINGFIELD, MA 01103-1619

Case Name: Christopher Kearney
Your File #: H538069
C S Claims File #: DM02-035
Invoice Date: 6/30/00

| Description | | | Cost |
|---|---|---|---|
| Professional Services | (Background) | 4.25  hrs. @ $53 | $225.25 |
| Professional Services | (Surveillance) x 2 vehicles | 40.25  hrs. @ $59 | 4,749.50 |
| Steno | | | 40.69 |
| Telephone | | | 21.79 |
| Mileage | | | 305.20 |
| 8 mm & VHS Videotape | | | 15.00 |
| Postage | | | 4.07 |

Total due for June, 2000                    $5,361.50

3068



**CS CLAIMS GROUP, INC.**

| | |
|---|---|
| Date: 6/22/00 | Our File # DM02-035 |
| Report To: | Report On: Christopher Kearney |
| Bob Mills DISABILITY MANAGEMENT SERVICES, INC. 1350 MAIN STREET SPRINGFIELD, MA 01103-1619 | Claim/Policy # 493029/H538069(JP) |
| | D/Last Report 3/29/00 |

**ADDITIONAL INSTRUCTIONS:** As per your additional instructions, we were to conduct an additional three days of surveillance on the insured in an effort to document the extent of any current activities, with this additional surveillance to be comprised of a Thursday, Friday, and Saturday.

**SURVEILLANCE SUMMARY:** The insured was observed going to work at Kenwood Technology Group. He was also observed delivering a large piece of equipment to IFC on Dryden Road in Dayton, Ohio. During the surveillance, he also walked his dogs, went out to eat, and ran errands.

**SURVEILLANCE LOG:**
**Thursday, May 18, 2000:**

8:00 a.m.     We arrived at     Redacted     The Dodge truck was not parked at the residence.

8:30 a.m.     We arrived at Kenwood Technologies. The Dodge truck was parked in the parking lot. A trailer was attached to the truck.

9:41 a.m.     We observed Mr. Kearney briefly.  He was wearing a type of supportive device designed to aid in lifting. Due to our view being partially obstructed, we were unable to observe and/or videotape the insured's exact activities at this point.

9:48 a.m.     He entered the truck and drove away. He was pulling a trailer behind his truck.

10:08 a.m.     He arrived at Smith Trailers & Equipment, on Route 42 in Sharonville. He exited the store with a female employee. Moments later, they walked back into the store.

CS Claims Group, Inc.
401 Huehl Road #1-E
Northbrook, IL 60062
847/559-0670
FAX#847/559-0672

3070

Kearney
Page 2
6/8/00

10:12 a.m.     He exited the store. He took the bolt out of the trailer, using a ratchet.   While doing this, the insured bent over frequently, and maintained a bent over posture while performing this task.

10:15 a.m.     He entered the store.

10:18 a.m.     He exited the store continued his efforts to remove the trailer from his pickup. Mr. Kearney and a male employee worked together to unhook the trailer.

10:19 a.m.     He spoke briefly to the male, then entered the truck and drove away.

10:38 a.m.     He returned to his office.

11:49 a.m.     He left in the truck.

12:08 p.m.     He arrived at Losantiville Store 7 Lock, on Losantiville Road.  This appeared to be a Ryder Truck rental location.

12:35 p.m.     He left In a Ryder truck.

12:50 p.m.     He returned to his office.  He then made repeated efforts at backing the truck into a loading position.

12:56 p.m.     Mr. Kearney and a male used a fork lift to load a piece of machinery into the Ryder truck. They conversed while the male took measurements to confirm that the piece of machinery would fit into the rear of the rented truck.

12:57 p.m.     Mr. Kearney continued conversing with the man. Mr. Kearney was observed eating at the same time.

12:59 p.m.     Mr. Kearney checked both sides of the equipment for clearance, while the other man loaded the equipment into the truck.

2:15 p.m.     Mr. Kearney climbed into the truck. He waved goodbye and closed the door.

2:16 p.m.     The insured got back out of the truck, and then proceeded to climb back into the truck once again. Each of these movements appeared to be done fluidly, and with no apparent signs of any discomfort, or restriction.

3:13 p.m.     He arrived at IFC, on Dryden Road in Dayton.

3071

Kearney
Page 3
6/8/00

| | |
|---|---|
| 3:20 p.m. | He backed the truck to the loading dock. He entered the building. |
| 3:24 p.m. | Mr. Kearney and a male conversed near the truck. Moments later, they entered the building. |
| 3:38 p.m. | Employees from IFC unloaded the pieces of equipment from the truck. |
| 3:48 p.m. | The insured exited the building, carrying an arm full of straps. He spoke to a male as he walked back to the truck. |
| 3:50 p.m. | The insured then hopped back up into the truck, and then hopped back out again in order to quickly run to the rear wheels of the truck, and pull out a set of wheel blocks. He hurriedly bent over while doing this, and then quickly got back into the truck and drove away. |
| 4:48 p.m. | He arrived at a Sunoco station, on East Seymore in Cincinnati. He walked into the station briefly before returning to the truck. |
| 4:49 p.m. | He pulled the truck up next to a pump and filled the truck with gas. |
| 4:53 p.m. | He left Sunoco. |
| 5:02 p.m. | He arrived at Losantiville Store & Lock. He carried the ties from the rented truck and placed them in his truck, and then entered the Ryder rental office. |
| 5:07 p.m. | He left in his truck. |
| 5:25 p.m. | The insured returned to his office. |
| 5:27 p.m. | He removed the straps from his truck. He carried them into his shop. |
| 5:32 p.m. | He entered his truck and drove away. |
| 5:41 p.m. | He returned to his residence. |
| 6:24 p.m. | He walked his dogs. |
| 6:39 p.m. | He entered his residence. |
| 7:30 p.m. | With no further activity, further urveillance was terminated. |

3072

Kearney
Page 4
6/8/00

**Friday, May 19, 2000:**

6:30 a.m.    We arrived at 3218 Glengyle. The truck was parked in the driveway.

7:32 a.m.    Mr. Kearney walked his dogs.

7:53 a.m.    He returned to his residence.

11:05 a.m.   He left in the Dodge truck. We lost visual contact with the insured's vehicle by the Cincinnati police station. Several police cars left with their sirens on. Mr. Kearney was several cars ahead when traffic was pulled to the side of the road. We kept catching lights, and eventually could not see Mr. Kearney any longer. We checked Kenwood Technologies and the residences during the next several hours. Mr. Kearney did not arrive at either place.

3:05 p.m.    Mr. Kearney returned to the residence.

3:11 p.m.    He walked his dogs.

3:25 p.m.    He returned to his residence from walking his dogs.

6:27 p.m.    The insured left in the truck.

7:05 p.m.    He arrived at the Augusta Square Apartments. A female entered the truck.

7:09 p.m.    They arrived at Old Country Buffet.

7:42 p.m.    They left Old Country Buffet.

7:54 p.m.    They returned to the Augusta Square Apartments. The female exited the truck.

7:57 p.m.    Mr. Kearney drove away.

9:06 p.m.    He returned to his residence.

9:30 p.m.    Surveillance was terminated.

**Saturday, May 20, 2000:**

7:00 a.m.    We arrived at Mr. Kearney's residence. The truck was not parked at the residence. One investigator remained at the house, while the second investigator went to the office. Mr. Kearney was not immediately observed at either location.

3073

Kearney
Page 5
6/8/00

12:00 p.m.    In addition to checking the office and residential
locations for the insured, we also checked a number of
locations he had been known to frequent from previous
surveillance efforts.    This included the residential
location of his female acquaintance.    Despite re-
checking a number of locations repeatedly, and also
his residence, we were unable to locate the insured,
surmising that he was possibly out of town on this
date.

Based upon the insured's unavailability on this date,
we rescheduled for Saturday, June 3, 2000.

**Saturday, June 3, 2000:**

6:30 a.m.    Surveillance was initiated at Mr. Kearney's residence.
The blue truck was parked in the drive.

8:12 a.m.    The insured exited the house, with his dogs. He walked
them around the neighborhood.

8:25 a.m.    He returned to his house.

9:43 a.m.    Mr. Kearney left his residence in his blue truck.

9:50 a.m.    He arrived at Kenwood Technology Group. He carried a
cooler and other items into the office. He used a key
to unlock the door.

1:22 p.m.    Mr. Kearney left the office.

1:25 p.m.    The insured arrived at Frischs. He went through the
drive-thru. He parked in the lot and ate.

1:40 p.m.    He started his truck and pulled from the lot.

1:48 p.m.    He arrived at his residence. He parked his truck and
walked inside.

2:03 p.m.    Mr. Kearney took his dogs for another walk.

6:30 p.m.    With no signs of any further observable activity, we
elected to terminate further surveillance efforts for
this date.

**FURTHER INQUIRIES/MEDICAL SAFE TEC:**    After further attempts, we
were able to speak with Mr. Jon Watson, the owner/manager of Circle
Medical Products.

After speaking with Mr. Watson preliminarily and introducing
ourselves, he immediately asked us to wait.    In just several
seconds, he came back on the line and we then heard a click, making

3074

Kearney
Page 6
6/8/00

us think that perhaps he was recording our conversation. Mr. Watson again asked us for an explanation as to the nature of our call. We indicated that we were merely gathering information to assist in updating an insurance file. Mr. Watson went on to state that he was not familiar with anyone by the name of Christopher Kearney. He then went on to deny any former business relationships with Christopher Kearney, Kearney Associates, and/or Kenwood Technology Group. He went on to indicate that he was unable to answer any questions concerning deliveries made to Medical Safe Tec, Inc., and stated that he was unfamiliar concerning any shipping arrangements by freight and/or any other carriers who may have done the unloading of products, equipment, or supplies for Medical Safe Tec, Inc., explaining that he "did not acquire Medical Safe Tec, Inc. until 1996". He further indicated that he had no business records prior to 1994. Mr. Watson then quickly asked us if we had any more questions. We again explained that the questions we had were in relation to Mr. Kearney and the nature of his involvement with Medical Safe Tec, at which point Mr. Watson responded by stating "I can't help you", and he quickly hung up the phone.

**PENDING ACTIVITIES:** With this report, our handling has been suspended, awaiting your further review and any additional instructions you may have.

Jay Etter/Rob Wolfe/Leah Jenkins

Enclosure: VHS Videotape

3075

 **MICHAEL P. PASTERCZYK CONSULTING, INC.**

The CPA. Never Underestimate The Value.

65 McDONALD DRIVE
CHICOPEE, MA 01020
(413) 592-9819

April 7, 2000                                    Invoice #2057

Disability Management Services
1350 Main Street
Springfield, MA  01103

Insured: C. Kearney
         Jefferson Pilot Life Insurance Company
         Claim/Policy #H493029/H538069

Claim Examiner: Bob Mills

Financial analysis:

2 hours @ $100 per hour                          $    200
                                                 ========

**Please Pay Upon Receipt**

**Tax ID# 04-3083267**

3084

934576F

# Donna Judd-McClure, Ph.D.
*Clinical Psychologist*

| 26700 Goose Creek Rd. |
| McArthur, OH 45651-8984 |
| Phone: 1-740-596-3823 |

March 25, 2000

In reply to: PMSI request #034576F-01

Ms. Candra Steen
PMSI
PO Box 2666
Waco, Texas 76702-2666

Dear Ms. Steen:

This letter is written in reply to your request for information on the current mental status of Mr. Christopher Kearney, DOB: 11/9/52. I do have some professional concerns about the nature of your request and your manner of contact. First, I do not know who is PMSI? What are the credentials of the individuals who might be reviewing information on Mr. Kearney? Why do you request this material?

As I assume your are aware (?) of my meeting with Ms. Janet Beattie ,MS. CRC, CIRS with a group known as PSYCHIATRIC DISABILITY CONSULTANTS, INC. I met with Ms. Beattie on April 25, 1998. This placed my client in a difficult position as my fees are greater for individual consultations with other professionals and my forensic fees are much higher. As you know Mr. Kearney lives on a modified budget since he has been unable to assume full employment as a manufactures representative.

During my conversation with Ms. Beattie I shared an updated mutiaxial diagnosis, treatment plans and a list of therapeutic goals and interventions. Following this consultation Ms. Beattie wrote a report with specific recommendations to Mr. Kearney's insurance company: Jefferson Pilot.

My present concern is that if Jerfferson Pilot has concerns about Mr. Kearney's mental status they may proceed with their own format. My duty is to protect the confidential nature of therapy sessions with Mr. Kearney. Your company of "experts" is now requesting that I send all materials on Mr. Kearney to them. Well I ask again, who are you? This whole situation from my observation is being addressed in an unprofessional manner. What is your companys relationship with Jefferson Pilot? Is this a long standing business relationship? Who monitors the quality assurance of your company?

The number of individuals in various states across the country that are involved in Mr. Kearney's case is creating an environment wherein confidenitality cannot be maintained. It is important to maintain a working relationship with my client, an environment of trust. I do not believe it is in my client's best interest to share his present adjustment with so many individuals. In fact, there was no witness signature on the request for release of information? Just how many companies are involved in this and how many request for information will be required? It is my professional opinion that the Jefferson Pilot Insurance Company can request further evaluation of Mr. Kearney. In fact, what is it that the Jefferson Pilot Insurance Company does want? I will contact Jefferson Pilot Insurance Company to assess their specific number of contractors, fees, qualifications and quality of professional contracts.

If my client chooses to meet with your representative in Ohio or if Jefferson Pilot contracts

3087

with an Ohio practioner I will be glad to cooperate in this request of information. Mr. Kearney would still have to give his permission before this could occur.. I have forensic experience and presently am working in a State system where numerous request of release of information are made. We follow a professional format in releasing materials.

You may contact me at the above address or by phone: 1-740-965-3823 in Ohio. Please refrain from sending materials and requests to my present State job site. I am working for the State and my time is used for state work only.

My limited private practice office is not yet fully equipped for operation. When this is arranged, I will alert Jefferson Pilot Insurance Company of this fact.

Thank you for your request. I need to alert you to my concern for my client. It would probably be good for Jefferson Pilot to use personal contacts in Ohio for these type of requests.

Sincerely:

Donna P. Judd-McClure, Ph.D.
Ohio Psychologist

---

cc: Mr. Christopher Kearney
    Jefferson Pilot Insurance Company, PO Box21008, Greensboro, N. C. 27420
    Thompson, Hine and Flory LLP, 10 W. Broad . Columbus, Ohio 43062

3088

 **CS CLAIMS GROUP INC.**

401 Huehl Road, #1-E
Northbrook, IL 60062
Phone (847) 559-0670
Fax (847) 559-0672

TAX I.D. #36-3756269

TO:  Bob Mills
DISABILITY MANAGEMENT SERVICES, INC
1350 MAIN ST.
SPRINGFIELD, MA 01103-1619

Case Name: Christopher Kearney
Your File #: H538069(JP)
C S Claims File #: DM02-035
Invoice Date: 3/31/00

| Description | | | Cost |
|---|---|---|---|
| Professional Services | (Background) | 13.25 hrs. @ $53 | $702.25 |
| Professional Services | (Surveillance) x 2 vehicles | 48 hrs. @ $59 | 5,664.00 |
| Steno | | | 89.13 |
| Telephone | | | 30.70 |
| Mileage | | | 500.80 |
| Records | | | 21.75 |
| 8 mm & VHS Videotape | | | 60.00 |
| Copies | | | 2.75 |
| Postage | | | 8.88 |

Total due for March, 2000                $7,080.26

3091



 **CS CLAIMS GROUP, INC.**

Date:   3/29/00

Our File #   DM02-035

Report To:

Report On:   Christopher Kearney

Bob Mills
DISABILITY MANAGEMENT SERVICES, INC.
1350 MAIN STREET
SPRINGFIELD, MA 01103-1669    Claim/Policy # 493029/H538069(JP)

D/Last Report  3/13/00

---

**ADDITIONAL ASSIGNMENT:**  As per your instructions, our handling of this matter was to conduct additional surveillance of the insured in an effort to document the extent of any current activities, specifically consisting of a Friday and Saturday.

**SURVEILLANCE LOG:**
**Friday, March 10, 2000:**

7:15 a.m.    We arrived in the vicinity of 3218 Glengyle Drive.  The Dodge truck previously observed was seen parked in the driveway.

7:20 a.m.    We observed the insured as he emerged, and was walking both of his dogs.

7:29 a.m.    The insured returned to his residence while walking the dogs, and proceeded up the stairs at the front portion of his property, with no apparent difficulty or signs of any immobility.

10:17 a.m.   The insured was observed as he departed the area in his truck, and we subsequently followed him at a distance.

10:24 a.m.   The insured arrived at a machine shop, situated on Eastern Ave.

10:33 a.m.   The insured departed from the machine shop, reentered his truck, and left the area.

10:37 a.m.   The insured proceeded to a nearby location on Eastern Ave., and went to Johnson's Electric Supply Company.

10:39 a.m.   The insured departed from Johnson's Electric Supply Company, and was followed at a distance.

---

CS Claims Group, Inc.
401 Huehl Road #1-E
Northbrook, IL 60062
847/559-0670
FAX#847/559-0672

3095

Kearney
Page 2
3/29/00

11:05 a.m.   We lost visual contact with the insured's vehicle, as a
             result of heavy traffic.

11:25 a.m.   We returned to the vicinity of the insured's residence,
             in an effort to reestablish contact.

11:59 a.m.   The insured was observed as he returned to his
             residence, driving his truck.

12:37 p.m.   The insured again departed from the residence, driving
             his pickup truck.

1:05 p.m.    After having followed the insured for some distance, we
             lost visual contact with his vehicle on the Red Bank
             Expressway.

1:09 p.m.    In an effort to reestablish contact, our vehicles
             separated, proceeding to the offices of Kenwood
             Technology Group, and also the insured's residence.

6:45 p.m.    With no further sightings of the insured or his
             vehicle, we maintained position at the residence, and
             relocated our second vehicle from the offices of
             Kenwood Technology Group to the apartment complex
             located on Knollridge Dr. that he has been known to
             arrive at previously.

7:15 p.m.    With no further observations of the insured or his
             vehicle, we elected to terminate further surveillance
             efforts for this date.

**Saturday, March 11, 2000:**

7:00 a.m.    We arrived in the vicinity of 3218 Glengyle Dr., and
             noted that the insured's truck was parked in the
             driveway.

8:24 a.m.    The insured was observed as he exited his home with
             both of his dogs. He was observed as he walked the
             dogs down the block. It should be noted that it was
             raining and sleeting at this time.

8:39 a.m.    The insured was observed at a distance as he merged
             back into sight, walking the dogs at a rather brisk
             pace.

8:41 a.m.    The insured arrived back at his residence and proceeded
             up the front steps on his walk, with no apparent
             difficulty.

8:58 a.m.    The insured backed his truck out of the driveway and
             proceeded to leave the area.

3096

Kearney
Page 3
3/29/00

9:07 a.m.     The insured parked at a metered parking space on
              Edwards Road, and then entered PNC Bank.

9:32 a.m.     The insured exited PNC Bank and climbed back into his
              truck.

9:41 a.m.     The insured arrived back at his residence on Glengyle
              Drive.

11:15 a.m.    The insured was observed as he departed his residence,
              driving his pickup truck.

11:28 a.m.    The insured arrived at Kenwood Technology Group
              offices, located on Red Bank Expressway. As he exited
              his truck, he could be observed to be carrying some
              type of small box or cooler. He bent over quickly and
              smoothly to place this item on the ground, and then
              quickly straightened up to unlock the door to his
              office. After unlocking the door, he then bent over
              quickly again to pick the item up before going inside.

1:40 p.m.     The insured exited his office and proceeded to leave
              the area in his truck.

1:44 p.m.     The insured arrived at Frisch's Restaurant on Route 50,
              and went through the drive-thru.

1:48 p.m.     The insured was observed as he parked his truck in the
              lot, and could be seen eating inside his truck.

1:53 p.m.     The insured departed the parking lot at Frisch's.

2:01 p.m.     The insured arrived at a CVS Pharmacy, on Linwood.

2:06 p.m.     The insured exited the pharmacy, carrying a small bag
              in his right hand. He then departed from the area in
              his truck and was briefly lost in traffic.

2:15 p.m.     After a brief search of the area, we observed the
              insured exiting Mailboxes, Etc. He climbed back into
              his truck and departed the area.

2:24 p.m.     The insured was observed as he arrived back at his
              residence.

3:13 p.m.     An unidentified person arrived at the insured's
              residence, in a vehicle bearing KY plates.

4:32 p.m.     The insured was observed as he exited his home, walking
              his two dogs. He quickly walked the dogs in the rain
              and freezing snow.

3097

Kearney
Page 4
3/29/00

4:47 p.m.   The insured was observed as he arrived back at his
residence with the two dogs.

5:05 p.m.   The insured was observed as he departed from the area
in his pickup truck.

5:31 p.m.   The insured arrived at the apartment complex where we
have seen him previously, located on Knollridge Dr.

5:35 p.m.   The same adult female we had observed previously exited
from the apartment area and proceeded to the insured's
truck.  He then drove away.

5:46 p.m.   The insured and his companion arrived at the Old
Country Buffet, located in Forest Park.  We entered the
restaurant shortly thereafter, and observed the insured
and the adult female seated in a booth.  Due to a lack
of available table space, we were unable to establish
an optimal surveillance position.

6:17 p.m.   The insured and his companion exited from the
restaurant arm in arm, and walked across the parking
lot, which was somewhat icy.

6:19 p.m.   They both entered the truck and proceeded to depart
from the lot.

6:31 p.m.   The insured and his companion arrived at Wal Mart, on
Kemper Road.  He got out of the vehicle and proceeded
inside the store.

6:49 p.m.   The insured and his companion both exited Wal Mart,
with the female observed to be carrying a small bag.

7:03 p.m.   The insured's vehicle arrived at Furniture Fair,
located on State Route 4 in Fairfield, OH.  The insured
was observed as he briefly spoke to a male outside the
front entrance of the store.  He appeared to be giving
directions to this man.

7:04 p.m.   The insured and his companion were observed as they
entered the Furniture Fair store.

7:35 p.m.   Through the front window of the store, we could observe
the insured seated on a couch near the front of the
store.  He then got up and sat back down in a slightly
different location, with no apparent difficulty in
getting up, or in sitting back down.

7:39 p.m.   The insured and his companion were observed as they
exited the furniture store.  The insured then briefly

3098

Kearney
Page 5
3/29/00

                    put his arm around her, as they walked across the lot.
                    They then entered the truck and departed from the area.

7:54 p.m.           The insured's vehicle arrived back at the apartment
                    complex located on Knollridge Dr.    The female was
                    observed as she exited the truck, and the insured
                    subsequently drove away.

8:28 p.m.           The insured was observed as he arrived back at his
                    residence and proceeded inside.

9:00 p.m.           With no further observable activity, we elected to
                    terminate further surveillance efforts for this date.

**HAMILTON COUNTY RECORDS:**   We did conduct a search of available
Civil and Municipal court records within Hamilton County concerning
your insured.   A review of the case indices reveals a number of
cases involving your insured, some of which were unavailable for
review at the time our search was conducted.   We did locate Case
#A9802701 within the Hamilton County Court of Common Pleas,
originally filed May 13, 1998, and ultimately resulting in
dismissal on September 25, 1998.   This complaint evidently alleges
an attack and physical assault on the plaintiff, by the named
defendant in this matter, Christopher Kearney.   The allegations
herein included punching and kicking of the plaintiff by your
insured.   A copy of the complaint was obtained, along with a copy
of the Stipulation for Voluntary Dismissal.

Also included in our search is an apparent divorce case under File
#DR9400847, that was filed March 18, 1994 by the insured vs.
Yoshiko Kearney, ultimately resulting in a decree of divorce dated
October 28, 1994.

We additionally located Case #96CV22732, filed in Hamilton County
Municipal Court on August 29, 1996, involving the insured as
plaintiff vs. Carol and Rick Smith.   According to this complaint,
the insured alleged that the defendant owed an amount of $703.48
for personal use of two cellular phones which were billed to
``Kearney Magnetics and Engineering - her former employer''.   This
case file is included herein for your review.

We additionally conducted a review of Case #95CV23030, involving
Christopher M. Kearney vs. Office Pavillion APG.   This file did not
appear to involve one and the same individual as your insured.

Case #98CV27320 was filed October 16, 1998 involving Associates
Commercial vs. Innomation, Inc., et al.   This file was not
immediately available for review, and we have not confirmed whether
this involves one and the same as your insured.

**MEDICAL SAFE TEC, INC.:**   Preliminary research has revealed that
this business was last known to be located at the address of 3950

3099

Kearney
Page 6
3/29/00

Culligan Ave., Indianapolis, IN. We did proceed to this location
in an effort to develop any available information with respect to
the insured's activities and/or business dealings with this entity.
Upon our preliminary arrival, we found no company at this location
by the name of Medical Safe Tec, Inc. Most of the businesses at
this location appeared to be unrelated. We noted that in Suite D,
however, there was a sign in the window which indicated ``Circle
Medical Products, Inc.''. The door to this office space was
locked, and through the window we could see that the space was
empty of any office furniture or equipment.

We proceeded next door to Suite E and spoke to two gentlemen at
Commercial Food Systems. They indicated that they had not been
familiar with the name of Medical Safe Tec, but indicated that they
knew about Circle Medical Products next door. The younger of the
two men indicated that the company had moved several months ago,
and he provided us with a copy of a sign that was similar to the
one next door, and had been in the window of Circle Medical
Products after they had moved. This younger gentleman informed us
that to his knowledge, Circle Medical Products did not sell any
type of medical equipment, but rather was involved in the disposal
of various medical wastes, such as needles, etc. We were provided
with a more recent address thought to be associated with that of
Circle Medical Products at 5616 Massachusetts Ave., Indianapolis,
IN. In proceeding to this location, we found that there was no
sign at the front of the building. The only way we were able to
identify the proper space was through numbers located on several
mailboxes in front of this small stand-alone red brick office
building. In proceeding here, we found that there were no lights
on, and the doors were apparently locked. When we knocked, a young
male opened the door, and came to let us in. In attempting to
develop further information from this individual, we were advised
that to his knowledge, Medical Safe Tec, Inc. was no longer in
business. He informed us that the owner had two other companies in
addition to Circle Medical Products, and he advised us that the
owner was not in the office very much, but that his phone calls do
come into this office location. The young man ultimately revealed
to us that he was the son of the owner of Circle Medical Products,
and he identified himself as Mr. Jon Watson. His business card
identifies him as the General Manager of Circle Medical Products,
Inc. Mr. Watson informed us that he had only been working for his
father for one year, mainly working in the part of the company that
deals with glues and adhesives. When we asked him what products
Circle Medical Products provided to their customers, he said that
the only thing he knew was to be curtains, used in providing
privacy within hospitals. Mr. Watson advised that they were
plastic curtains, including those having places for hands, arms,
and stethoscopes as may be used in isolation to provide protection
from exposure to patients with various infections. He indicated
that most of the curtains are shipped to other countries. We did
leave a request and business card with Mr. Watson, asking that he
have his father return our call, in an effort to obtain any further

3100

Kearney
Page 7
3/29/00

information that might be available concerning Medical Safe Tec,
Inc.

**PENDING ACTIVITIES:**  We are continuing to pursue additional
background information, and will keep you further advised.

Jay Etter/Rob Wolfe

Enclosure:   Hamilton County Case Indices Printouts
             Case #A9802701
             Case #96CV22732
             VHS Videotape

3101



Saturday, March 25, 2000

Robert Mills
Disability Management Services, Inc.
1350 Main St.
Springfield, MA  01103-1628

RE: Policy #H-493029, H-538069, Request for additional information per letter of 1-31-2000

Mr. Mills:

Enclosed is:

1) Continuance of disability form- filled out by myself and my doctor.

2) US Corp. Return, Form 1120 with all schedules for years (1996) and (1997) for Kearney Associates, Inc.  1997 was final year and final return.

3) Christopher L. Kearney, Form 1040, US Indiv. Tax Returns for years 1996, 1997, 1998 with W-2 copies attached.  Copy of 1999 will be copied and forwarded when completed.

4) Kenwood Technology Group, Inc. W-2 to Christopher L. Kearney for 1999.

Not included:

1) Kenwood Technology Group, Inc. 1998 (first year of corp.) 1120 was completed and sent to IRS, copy has been requested from my Accountant.  1999 is not completed.

2) Disability Management Services, Inc. Authorization to Obtain Information:  I will discuss this my attorney.  Among other things, you are asking now for authorization to collect information which is none of your business- specifically "any other non-medical information" from a broad range of people and companies.

Also, I noticed that you are asking for another statement filled out and signed by my doctor.  Okay, but the amount of information and the phone calls from your investigative agents are very bothersome and time consuming in addition to being unprofessional.  She has also heard from another investigative agency, called PMSI, and been asked to fill out additional information.  Who are they?  They claim they do not have her phone number but your other investigator called her several times- what gives?  This confusion on your part leads me to think that it is quite possible for my new business to be ruined by intentionally or unintentionally questioning business contacts about my personal health.  Also, personal relationships can be ruined.

If I am dropped as a patient, or my rates are jacked up, from either of my doctors because of the excessive phone calls, information questionaires, requests for meetings, etc. from Jefferson-Pilot, you will be notified by my attorney.

I think that you are trying to interfere with my treatment by harassing my doctors.  I think that you are hurting my condition by this action.  It may be your intent to get me exasperated and kill myself so that your company and Jefferson Pilot can drop me from your list of payees, and thus make your multi-billion dollar bottom line better by a millionth of a percent.

I have been visited without notice by International Claims Specialists Company (one of Jefferson Pilots detective agencies) in December 1999.  I met in my home (also my office) for almost an hour with

3102

Michael Conlon. I answered all his questions in detail including my day to day activities and showed him my office area and some examples of my work.

Now you are asking me to repeat that info again in addition to the monthly statements I send in which have similar questions.

In addition, I realize from a conversation with Ms. Harden at Jefferson-Pilot that you are probably following me around with another detective. I asked Ms. Harden what he does, and she replied: "He will monitor your activities, follow you to the store, and follow you to Church and sit with you." She says I am not being singled out but I don't believe her.

I believe that I am being harrassed because I have a psychological illness and you think all your requests and the threat of withholding checks will cause me to somehow (dead or alive) to withdraw my lawful claim per my policies.

Your policies state you may seek reasonable proof of my income and health. You have gone much further.

As you have before, I suspect you will have some accountant investigator call me and ask to spend a week or two in my office going over all my business.

My usage of Xanex in the last few months has increased. I thought I was making some progress in dealing with my situation but I feel worse than ever and working full-time does not seem attainable.

Sincerely,

Chris Kearney

P.S.  Please don't call me - send a letter if you need to contact me.

cc: Stephan J. Patsfall, Patsfall, Yeager & Pflum LLC

3103



**CS CLAIMS GROUP, INC.**

Date:    3/13/00

Report To:
Bob Mills
DISABILITY MANAGEMENT SERVICES, INC.
1350 MAIN STREET
SPRINGFIELD, MA 01103-1669

Our File #    DM02-035

Report On:    Christopher Kearney

Claim/Policy # 493029/H538069(JP)

D/Last Report  3/8/00

---

**INVESTIGATIVE REPORT:**    A social locator lists Chris Kearney's current address as 3218 Glen Gyle Avenue.

He has a valid Ohio driver's license, which was issued on 11/19/97, and expires on 11/9/01.    He had a citation for speeding in Sharonville on 5/12/97, and in Eaton on 2/1/99.    He has not been involved in any accidents in the last 36 months.

The BMV lists a 1995 Dodge truck, PBW 6916, currently registered to Chris Kearney.

**SURVEILLANCE LOG:**
**Tuesday, February 29, 2000:**

6:15 a.m.    We arrived at 3218 Glen Gyle Avenue.    This is a 2-story home, with an attached 2-car garage.    The Dodge truck, PBW 6916, was parked in the driveway.

7:57 a.m.    The insured departed in the truck.

8:46 a.m.    The insured arrived at Day Ton on Progress Road, in Dayton, OH.

8:48 a.m.    The insured exited the truck, then re-opened the truck to retrieve an item.

8:50 a.m.    He placed a brief case over his right shoulder, and appeared to be carrying a folder in his left hand as he entered the building.

11:52 a.m.    The insured left Day-Ton, folded his jacket, and then climbed into his truck.

12:06 p.m.    The insured arrived at TJ's restaurant, on Dryden Road in Moraine, Ohio.

---

CS Claims Group, Inc.
401 Huehl Road #1-E
Northbrook, IL 60062
847/559-0670
FAX#847/559-0672

Kearney
Page 2
3/13/00

| | |
|---|---|
| 12:28 p.m. | The insured left the restaurant; he entered the truck and drove away. |
| 12:32 p.m. | He arrived at International Fineblanking, located at 2350 Dryden Road in Dayton, OH.  He entered a door adjacent to a loading area. |
| 12:42 p.m. | He exited the building and moved his truck.  The rear hatch of the truck was open. |
| 12:43 p.m. | He leaned into the truck to retrieve something, with no apparent difficulty.  We observed Mr. Kearney speaking with a male near his truck. |
| 12:48 p.m. | Mr. Kearney and the male entered the building. |
| 12:50 p.m. | A male drove a fork lift to the truck.  It appeared that something was being loaded into the back of the truck. |
| 12:52 p.m. | The fork lift placed another load into the truck. |
| 12:56 p.m. | The insured exited the building.  He lifted the tailgate, closed the hatch window, and entered the truck.  The insured stood for a period of time while conversing with the other male. |
| 12:59 p.m. | The insured removed his jacket, folded it, and then entered the vehicle in a normal and fluid manner, with no outward signs of any impairment or immobility.  The insured left in the truck. |
| 1:15 p.m. | He arrived at Silver Tool, located at 350 Fame Road in Miamisburg.  He appeared to be carrying blueprints, or some type of plans or drawings. |
| 1:17 p.m. | The insured walked to the truck.  He leaned into the passenger side of the truck. |
| 1:18 p.m. | He entered the building. |
| 2:00 p.m. | The insured exited the building, carrying a day planner.  He left the area in the truck. |
| 2:45 p.m. | He arrived at Mail Boxes, Etc., on State Route 561 in Cincinnati. |
| 2:48 p.m. | He left Mail Boxes, Etc. |
| 2:55 p.m. | The insured arrived at a BP station on Erie Road.  He got a soda from the vending machine. |

3106

Kearney
Page 3
3/13/00

| Time | Event |
|---|---|
| 2:56 p.m. | He left in the truck. |
| 3:00 p.m. | The insured arrived at Kenwood Technology Group, Inc., at 102 Red Bank Expressway in Cincinnati. He entered the building. |
| 3:02 p.m. | The insured moved his truck to the rear of the building. |
| 4:08 p.m. | He exited the building and spoke to a male. |
| 4:16 p.m. | He locked up the building and left in the truck. |
| 4:29 p.m. | The insured returned to his residence. |
| 4:47 p.m. | The insured was observed walking two dogs on Delta Avenue. His gait and all other movements appeared normal, without restriction. |
| 5:07 p.m. | He returned to his residence. |
| 9:03 p.m. | With no signs of any further activity, surveillance was terminated. |

**Wednesday, March 1, 2000:**

| Time | Event |
|---|---|
| 6:15 a.m. | We arrived at 3218 Glen Gyle Drive. The Dodge truck was parked in the driveway. |
| 7:25 a.m. | We observed Mr. Kearney walking his two dogs. |
| 7:45 a.m. | The insured returned to his residence after walking the dogs around the block. |
| 7:47 a.m. | He climbed the steps at the front of his property, with no apparent difficulty. |
| 9:15 a.m. | The insured left the area in the truck. |
| 9:24 a.m. | He arrived at Kenwood Technology Group, Inc., on Red Bank Road. He unlocked the door and proceeded into the office. |
| 3:08 p.m. | The insured exited the office, locked the door, and left the area in the truck. |
| 3:13 p.m. | He went through the drive-thru at Frischs, on State Route 50 in Fairfax, OH. He sat in the parking lot and ate. |

3107

Kearney
Page 4
3/13/00

| | |
|---|---|
| 3:24 p.m. | He left Frischs in the truck. |
| 3:37 p.m. | The insured arrived at Mail Boxes, Etc., on State Route 561. |
| 3:41 p.m. | He exited the Mail Boxes, Etc. carrying numerous envelopes and packages, and left in the truck. |
| 3:48 p.m. | He returned to his residence.  He carried an empty garbage can to the residence. |
| 4:04 p.m. | We observed Mr. Kearney walking his two dogs up Delta Avenue. |
| 4:12 p.m. | The insured returned to his residence. |
| 4:29 p.m. | The insured left in the truck. |
| 5:03 p.m. | The insured arrived at an apartment on Knoll Ridge Drive, in Fairfield, OH.  A female entered the truck and they drove away. |
| 5:16 p.m. | They arrived at Denny's, on State Route 4. |
| 5:18 p.m. | We entered the restaurant and sat next to Mr. Kearney. |
| 5:55 p.m. | Mr. Kearney and the female left the restaurant. |
| 6:07 p.m. | Mr. Kearney arrived at Burger King, on State Route 127. He went through the drive-thru. |
| 6:12 p.m. | He left Burger King. |
| 6:19 p.m. | The insured arrived at the apartment on Knoll Ridge Drive.  The female exited the vehicle and Mr. Kearney drove away. |
| 6:50 p.m. | Mr. Kearney arrived at a residence located at 1055 Sheffield Drive, Mason, Ohio. |
| 7:32 p.m. | Mr. Kearney left the residence in the truck. |
| 7:41 p.m. | The insured arrived at a Shell station on Fields Ertle Road. |
| 7:44 p.m. | He left the Shell station. |
| 7:59 p.m. | The insured arrived at Kenwood Technology Group, Inc. He remained in the truck. |

3108

Kearney
Page 5
3/13/00

8:00 p.m.   He left Kenwood Technology Group, Inc.

8:13 p.m.   The insured returned to his residence.

8:54 p.m.   Surveillance was terminated.

**PENDING ACTIVITIES:**     We are continuing to pursue available
information from the Ohio Board of Workers Compensation, Super X
Pharmacy, divorce/civil records, and Medical Safe Tee.  We are also
pursuing additional background information concerning Day-Ton,
International Fineblanking, and Silver Tool.  We will also be
forwarding the results of additional surveillance, and will keep
you further advised.

Bob Clemmer/Craig Knepp

Enclosures:  VHS Videotapes

3109



**CS CLAIMS GROUP, INC.**

Date: 3/8/00

Our File # DM02-035

Report To:

Report On: Christopher Kearney

Bob Mills
DISABILITY MANAGEMENT SERVICES, INC.
1350 MAIN STREET
SPRINGFIELD, MA 01103-1619

Claim/Policy # 493029/H538069(JP)

D/Last Report Initial Report

**ASSIGNMENT:** As per your instructions, our handling of this matter was to consist of appropriate pre-surveillance background information, and surveillance of the insured in an effort to document the extent of any current activities. We were to additionally obtain documents from available civil records, business related information, and specific items from the Ohio Board of Workers Compensation, and pharmacy prescription history.

**CVS/REVCO:** We had been specifically directed to obtain prescription information from Super X Pharmacy, at the telephone listing of (513)563-0728. In subsequently contacting this source, however, we learned that this location is in reality a CVS/Revco Pharmacy location in Sharonville, OH. In checking further with sources at this location, we did locate a prescription history with reference to the insured, finding that this history was available from December, 1996 through December, 1999, on their system. The enclosed prescription history they did provide would appear to date to only as recently as December, 1998. It would appear possible as though the insured may not have filled any prescriptions subsequent to this time, or may possibly have since switched pharmacies.

**OHIO BUREAU OF WORKERS COMPENSATION:** We initially did conduct a search of available database information relative to Ohio Bureau of Workers Comp claims, reportedly with no record concerning the insured. Subsequent to this point, however, we did make an inquiry directly with this agency, finding only one claim referencing your insured, dating from 1989. We are advised that no subsequent claims appear on record. We are advised that the file for the 1989 claim has since been destroyed, and that the claim was closed long ago. We are attempting to obtain any information that may have been purged, but still available, according to their system.

**MEDICAL SAFE TEC, INC.:** We have located this company, and possible client of your insured, at 3950 Culligan Ave., Indianapolis, IN. Direct contact with this company has been scheduled for the immediate conclusion of our surveillance efforts in the Cincinnati area.

CS Claims Group, Inc.
401 Huehl Road #1-E
Northbrook, IL 60062
847/559-0670
FAX#847/559-0672

3111

Kearney
Page 2
3/8/00

**PENDING ACTIVITIES:**  We will be forwarding results of our recent surveillance efforts in the very near future and, as directed, will be pursuing two additional days of surveillance, specifically a Friday and Saturday.

We are additionally continuing to pursue further information from the Ohio Board of Workers Compensation, Super X Pharmacy, divorce/civil records, and Medical Safe Tec, Inc.  We will keep you advised as to any further developments.

Susan Hardy/Craig Knepp

Enclosures:  Prescription History/CVS/Revco

3112