Case 1:02-cv-00479-MRB    Document 164-27    Filed 07/13/2007    Page 1 of 2

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney       C-1-02-479
John L. Roberson                                                   5/7/2004

Page 18

1  Q. The people who create those proposals, are they
2     mindful of the actual provisions of policies?
3  A. Yes.
4  Q. And does Jefferson-Pilot train its marketing folks and
5     claims analyst folks about how the policies that are
6     issued are interpreted?
7  A. (No response)
8  Q. There's a long pause in your answer. Is there a
9     reason for that? Did you understand the question?
10 A. I didn't fully understand it, no. Do you want to --
11 Q. Okay. To me it could go one way or the other. You
12    have a company with a whole bunch of employees, the
13    company sells policies, and either you leave it up to
14    everybody to come to their own understanding of what
15    the policy means -- and hopefully it's the same
16    understanding -- or the company gives direction or
17    provides some education about what the policy says.
18    Which one of those was it at Jefferson-Pilot?
19 A. We would review new policies with the claims analysts
20    and with the underwriting personnel.
21 Q. Who is we?
22 A. Myself primarily for our department.
23 Q. So who would -- for the marketing folks who prepare
24    these proposals, did they obtain any training or
25    education about what the actual policies provide, or

Page 19

1     if a new marketing person was hired on a given day, to
2     create a proposal, was he or she just supposed to come
3     up with their own understanding of what the policy
4     means?
5  A. Proposals were standardized. I think they were on
6     some type disk. I don't remember, fully remember the
7     process.
8  Q. So the head of the Marketing Department with input
9     from someone in Actuarial and Legal would create the
10    proposal?
11 A. I think that's correct.
12 Q. Okay. The company just didn't leave to each
13    employee's own determination what the policy says or
14    means; the company provided education and training to
15    its employees about what the policies say or provide,
16    right?
17 A. Correct.
18 Q. Okay. And based on that education and training and
19    input from other departments, the persons responsible
20    for developing the proposals would create those
21    proposals, and I guess you suggested there was some
22    kind of template form of a proposal that was blessed
23    by the company; is that right?
24 A. Yes.
25 Q. Did you ever see a proposal that misstated what the

Page 20

1     policy provides?
2  A. I don't recall one.
3  Q. Are you mindful of a proposal ever having to be
4     scrapped because it was wrong and a new template of a
5     proposal was created for distribution to the agents in
6     the field?
7  A. Not that I recall.
8  Q. Do you receive any retirement income from
9     Jefferson-Pilot?
10 A. Yes.
11 Q. Still today?
12 A. Yes.
13 Q. Have you ever spoken to anyone at Disability
14    Management Services?
15 A. No.
16 Q. Do you know what company that is that I refer to?
17 A. No.
18 Q. Are you mindful from speaking to counsel or anyone
19    else that they were engaged to administer claims on
20    behalf of Jefferson-Pilot?
21 A. I was advised of that, yes.
22 Q. Okay. But you've never spoken to anybody there?
23 A. No.
24 Q. And you're not aware of them being engaged to assist
25    in the administration of any claims prior to your

Page 21

1     retirement?
2  A. They were not, I can tell you that, no.
3  Q. Okay. Do you know when it was that Jefferson-Pilot
4     made the business decision to stop selling disability
5     insurance policies?
6  A. Well, the line was discontinued I think July 1, 1996,
7     and the decision would have been made sometime prior
8     to that. As I said before, it's a management
9     decision, or I should say it was a management
10    decision, not is a management.
11 Q. Was Clyde Honaker employed by the company when you
12    retired?
13 A. I don't recall.
14 Q. He was an employee of the company at some point,
15    though, right?
16 A. He was with Kentucky Central, who was purchased by
17    Jefferson-Pilot. He subsequently came to Greensboro
18    to head up the Ordinary Claims Department. I only met
19    Clyde for a short period after I retired, so I don't
20    recall when he came here.
21 Q. He arrived in Greensboro after you retired; is that
22    what you're saying?
23 A. As far as I know.
24 Q. Okay. What's ordinary claims refer to? What's that
25    nomenclature mean?

6 (Pages 18 to 21)

Case 1:02-cv-00479-MRB    Document 164-27    Filed 07/13/2007    Page 2 of 2

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                       5/7/2004

### Page 50

1   A. Yes.
2   Q. You then went to the effort of engaging on behalf of
3      the company Callaghan & Nawrocki?
4   A. That's correct.
5   Q. Callaghan & Nawrocki is a CPA firm located in New York
6      that specializes in work for disability insurance
7      companies; isn't that correct?
8   A. I think that's correct.
9   Q. You used them on several occasions during your
10     employment at Jefferson-Pilot?
11  A. I don't recall ever having used them before.
12  Q. How do you know that they specialize in disability
13     insurance matters?
14  A. I was told that by a reinsurer, I believe.
15  Q. Okay. Prior to their engagement for Mr. Kearney's
16     claim?
17  A. Yes.
18  Q. Who was the reinsurer that told you that?
19  A. It was Employers Reinsurance Corporation.
20  Q. Who at Employers Reinsurance would have told you that?
21  A. I don't recall.
22  Q. Is there any memorialization of your communications
23     with Employers Reinsurance that's in the claim file?
24  A. Not that I recall.
25  Q. Why would you not put that in the claim file?

### Page 51

1   A. I don't know that it was of any significance.
2   Q. Aren't you supposed to document everything you do on a
3      claim and put it in the claim file?
4   A. Yes.
5   Q. Why did you not do that when you spoke to Employers
6      Reinsurance about your interest in investigating Mr.
7      Kearney through Callaghan & Nawrocki?
8   A. I said as far as I know, I don't recall having put
9      anything in there, other than we got the letter saying
10     that we did it.
11  Q. Isn't it as a matter of protocol required that you
12     document that type of communication in Mr. Kearney's
13     claim file?
14  A. Not necessarily, no.
15  Q. Why would you not -- why is it not appropriate to
16     document communication you had about your desire to
17     investigate a claimant? Why is that not appropriate
18     for putting in the claim file?
19  A. It may be of no significance.
20  Q. To whom?
21  A. To anybody.
22  Q. The fact that a claimant has provided you with his tax
23     returns and then you want to have him investigated by
24     a firm that specializes on behalf of insurance
25     companies in disability matters to investigate further

### Page 52

1      and audit his financial records is not of significance
2      to the claimant?
3         MR. ELLIS: Objection to form.
4   A. He would have been contacted --
5   Q. But your communication with Employers Reinsurance
6      about initiating that investigation, why is that not
7      in the claim file?
8   A. I don't recall what type communications. It may have
9      been just a general question and I don't recall
10     specifically discussing this other than I know that
11     from -- we got this name from Employers Reinsurance
12     Corporation. It may have been mentioned just in
13     general for processing the residual claims of
14     independent employees. I don't know that we
15     specifically mentioned Mr. Kearney with them or not.
16  Q. That's directly contradictory to what you just told me
17     five minutes ago. You told me five minutes ago that
18     you hired Callaghan & Nawrocki for the first time ever
19     on Mr. Kearney's claim at the instruction or on the
20     counsel or some contact of Employers Reinsurance.
21        MR. ELLIS: Objection.
22  Q. Wasn't that your testimony just a few minutes ago,
23     sir?
24  A. I don't see where that conflicts with what I said here
25     in that I may or may not have mentioned his name

### Page 53

1      specifically, but yes, that was -- the information
2      that they gave us was the reason or -- the reason I
3      used them is because they gave me that information on
4      this time of claim.
5   Q. Who performed the Equifax activities check and why is
6      it not in the claim file?
7   A. I have no idea.
8   Q. You see that you sent him an Equifax activities check?
9      I think you're ahead of me, sir. I'm on the November
10     15, '96 fax transmittal cover sheet to Ernie Smith.
11  A. Now, what's your question again?
12  Q. Who obtained the Equifax report?
13  A. Who in our office requested it?
14  Q. I don't know if it was in your office or some third
15     party.
16  A. Well, we would have requested it. One of the claims
17     analysts would have requested it.
18  Q. Why is that not documented in the claim file and why
19     is the Equifax report not in the claim file?
20  A. I don't know that it's not.
21  Q. It's not in the one that was given to me.
22  A. I don't know.
23  Q. Should it be in there?
24  A. Any report that Equifax gave us should be in the claim
25     file.

14 (Pages 50 to 53)