Page 10

1  A. Yes.
2  Q. What did you know about DMS before seeking their
3     assistance on Mr. Kearney's claim?
4  A. I did not know anything about them. They were
5     recommended by the reinsurer.
6  Q. Okay. Did you actually speak to the reinsurer about
7     the recommendation?
8  A. I think they may have discussed that with us that they
9     would like for them to review that, and as I recall,
10    we may have furnished the file to them for review, but
11    other than that, I knew nothing about them.
12 Q. How was it that Mr. Kearney's claim came up for
13    discussion with the reinsurer and the need to have
14    more eyes take a look at the claim?
15 A. I believe the normal initiation in a situation like
16    that is that the reinsurer on a periodic basis,
17    sometimes once a year, would come through and they
18    would review -- ask for and review certain claims --
19 Q. Okay.
20 A. -- some criteria that they may have as a reinsurer.
21    They would ask for the files and review those, make
22    recommendations and ask for our concurrence as to, you
23    know, whether this was acceptable.
24 Q. So they would perform somewhat of an audit function?
25 A. Yes.

Page 11

1  Q. Was it the higher dollar claims that they would focus
2     on?
3  A. Perhaps it might be that or the length of time in
4     which benefits are being paid or a lot of times just a
5     follow-up as to maybe additional information might be
6     needed. They had their own criteria which they didn't
7     particularly discuss with us.
8  Q. So is it your memory then that Employers Reinsurance
9     came in and performed some general audit of some
10    selected claim files and determined that the Kearney
11    claim was one in which DMS's assistance may be of
12    value?
13 A. Yes.
14 Q. Okay.
15 A. And I recall that only because of the -- I believe the
16    correspondence, which my major correspondence with
17    Employers Re was sending them a copy of the bill from
18    DMS because they were footing part of the bill. That
19    was one of my major concerns as far as they were
20    concerned.
21 Q. Was DMS expensive?
22 A. I do not recall what they charged.
23 Q. Did you put those correspondence in the claim file or
24    does that not go in the claim file?
25 A. It should be in the claim file.

Page 12

1  Q. Okay. I haven't seen it, but maybe Mr. Ellis would be
2     good enough to give me that later.
3         So when Employers Reinsurance came to
4     Greensboro to take a look at some of the claim files,
5     do you recall a focused discussion with them about Mr.
6     Kearney's claim?
7  A. I do not.
8  Q. Okay. Is it your sense that that's what happened,
9     though?
10 A. Yes, the fact that they were paying part of the charge
11    for DMS leads me to believe that they are the ones
12    that recommended it for review.
13 Q. Did they have experienced claim type folks who
14    actually looked at the policy and the riders and the
15    information in the file?
16 A. Yes.
17 Q. Did they tell you when they audited Mr. Kearney's
18    claim file that you had made a mistake?
19 A. I do not recall that they did.
20 Q. Okay. There's no record of that in the claim file?
21 A. No.
22 Q. No documents have been brought to your attention in
23    the past two days that suggest that?
24 A. No.
25 Q. Correct?

Page 13

1  A. Yes, that's correct.
2  Q. See, I always ask negative questions. So then
3     ultimately you referred not just Mr. Kearney's claim
4     but two other claims to DMS in 1997?
5  A. I do not recall specifically any other references.
6  Q. Mr. Shelton, I'm going to mark an exhibit which is the
7     principal correspondence in the claim file that
8     appears to have been directed to you or authored by
9     you and it's maybe 30 or 40 pages. I'd like for you
10    to kind of glance through the whole thing before I
11    start going through those with you.
12        MS. FARABOW: What's the exhibit number?
13        MR. ROBERTS: Oh, I'm sorry. It will be 23.
14        (Defendant's Exhibit No. 23 was marked for
15    identification by Mr. Roberts.)
16 Q. (Indicating)
17 A. (Witness reviews document)
18 Q. Okay. Thank you for taking the time to review that.
19    I know it's a lot of material. But did you see that
20    I've tried to put into chronological order the
21    correspondence in the claims file that --
22 A. Yes.
23 Q. -- has your name on it somewhere or abouts?
24 A. Yes.
25 Q. Do you have any memory of any other correspondence you

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 22

1  Q. Right. And what you're saying is applicable is the
2     maximum benefit period that's applicable for total
3     disability? What you're saying is, that's applicable
4     for residual disability, correct?
5  A. To age 65.
6  Q. Well, it's lifetime if you get disabled prior to 45,
7     correct?
8  A. It appears so.
9  Q. Okay. And that's the definition of maximum benefit
10    period you need to use for residual disability,
11    correct?
12 A. It appears that way.
13 Q. Okay. Let's talk about another example. The
14    definition of monthly benefit, if you can find it in
15    the policy on page 3.
16 A. I have it.
17 Q. Okay. It's the amount shown in the schedule or
18    one-thirtieth, et cetera, for a partial month?
19 A. Yes.
20 Q. It doesn't say anything about residual disability?
21 A. No.
22 Q. Is there a definition for the monthly benefit for
23    residual disability anywhere? To answer that
24    question, you're looking at the rider. Doesn't the
25    rider state that it's the amount shown on the

Page 23

1     schedule?
2        MR. ELLIS: Let him answer one question at a
3     time, and don't throw me the finger again.
4        MR. ROBERTS: What are you talking about?
5  A. Question again, please.
6  Q. The residual disability rider -- you went from the
7     policy and I asked you where is the residual
8     disability definition for monthly benefit, and you
9     turned to residual disability rider and it says
10    monthly benefit is the amount shown in the schedule,
11    right? Towards the bottom of the first column, the
12    residual disability rider, there's a paragraph that
13    says Residual Disability Monthly Benefit, do you see
14    that?
15 A. I'm looking at that.
16 Q. The sentence above that says "'Monthly Benefit' is the
17    amount shown in the schedule as such." That's the
18    language of the rider. Can you turn to -- we need
19    then to turn to the schedule to determine what the
20    residual disability monthly benefit definition is,
21    right?
22 A. The monthly benefit is the amount shown in the
23    schedule as such.
24 Q. Okay. So we went from the policy to the rider and the
25    rider tells us to go to the schedule. Let's go back

Page 24

1     to the schedule.
2  A. Okay.
3  Q. How is the monthly benefit for residual disability
4     defined on the schedule?
5  A. It is not.
6  Q. Well, it's defined under total disability and so you
7     must use it to determine what residual disability
8     monthly benefit is, correct?
9  A. But there's also a calculation that has to be done.
10 Q. Correct, for residual disability monthly benefit?
11 A. Yes.
12 Q. I'm talking about the term -- the paragraph above that
13    for the defined term "Monthly Benefit." That's what
14    we're talking about right now, okay? To determine
15    what that means in the context of residual disability,
16    the rider says look at the schedule?
17 A. Yes.
18 Q. Okay. And the schedule doesn't say anything about
19    monthly benefit residual disability; it only talks in
20    the context of total disability, right?
21 A. That's the way it appears, yes.
22 Q. Okay. So I've just pointed out for you three
23    examples: elimination period, maximum benefit period,
24    and monthly benefit. Those are three pretty important
25    aspects to a disability policy, right?

Page 25

1  A. Yes.
2  Q. Okay. With those three examples, there is no
3     definition -- independent residual disability
4     definition for those three items; rather the policy,
5     the rider, and the schedule all require that you use
6     the total disability definition for those items,
7     right?
8  A. It refers to the schedule which has those items there.
9  Q. In the context of total disability only, right?
10 A. Yes.
11 Q. Okay. Why is the waiver of premium different -- just
12    because the definition of waiver of premium says total
13    disability, where is it that says elimination period,
14    maximum benefit period, and monthly benefit all are
15    defined in terms of total disability but they apply to
16    residual disability -- where does it say that even
17    though those three apply to residual disability,
18    waiver of premium doesn't?
19 A. The increase in benefits on benefit provisions
20    requires that you receive benefits for total
21    disability for twelve months -- no, I'm sorry.
22 Q. We're talking about --
23 A. I'm looking at something else, I'm sorry.
24 Q. -- premium waiver. Where is it that Mr. Kearney was
25    advised that those three examples we just talked about

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 164-28    Filed 07/13/2007    Page 3 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Harold Shelton    5/7/2004

Page 38

1  or lined paper that's been --
2  A. What number is that?
3  Q. 2874, October 29, '97.
4  A. Okay.
5  Q. This is a letter you received or was sent to you the
6     end of October '97 from a gentleman named Todd Ditmar.
7     Do you understand him to have been a disability claim
8     consultant at Disability Management Services?
9  A. Yes.
10 Q. Okay. Did you have some regular contact with him in
11    the '97, '98, '99 time frame?
12 A. I believe I did.
13 Q. Okay. You had referred to him three separate files:
14    Mr. Kearney's file, Gregor Kohn's file, and Felia
15    Rampersad's file, right?
16 A. Yes.
17 Q. And why did you refer Mr. Kohn and Ms. Rampersad's
18    files to DMS for review?
19 A. I do not recall.
20 Q. You don't recall what the issues were related to those
21    files?
22 A. No, I do not.
23 Q. Is Ms. Rampersad located in Florida?
24 A. I don't recall.
25 Q. Okay. Are those the two people's names who you

Page 39

1  blacked out of 2892 or someone blacked out with 2892?
2  It's July 8, '97, if you want to figure it out that
3  way.
4  A. Well, it's been blacked out. I don't know whether I
5     did that or not.
6  Q. Did you refer more than three claims to DMS in that
7     summer '97 time frame?
8  A. I do not recall.
9  Q. In the second paragraph you write, "These are cases
10    that you are going to investigate for us to see what
11    can be done either to settle these in an equitable
12    manner to both the reinsurer and to Jefferson-Pilot or
13    to give us further advice on where to proceed."
14       Did you ever suggest to DMS that they might
15    want to think about settling or resolving them in an
16    equitable manner to the policyholder?
17 A. Well, I think -- this doesn't say that per se, but the
18    intent would always be something that the insured
19    is -- the policyholder is agreeable to and is
20    equitable to everyone involved.
21 Q. Did you have phone conversations with Mr. Anderson?
22    This letter that you wrote on July 8, '97, is the
23    first letter of any communication you had with DMS, I
24    assume, correct?
25 A. Apparently so.

Page 40

1  Q. Okay. You wrote it to the attention of John Anderson?
2  A. Yeah.
3  Q. Did you understand him to be an equity owner of DMS
4     and head of the claims --
5  A. Did not specifically know him. I'm sure I was advised
6     by Employers Re to -- that's who I'd sent it to,
7     because I -- you know, I did not know any of these
8     folks at DMS.
9  Q. Okay. Did you then subsequently have conversations
10    with Mr. Anderson about Mr. Kearney's claim?
11 A. I do not specifically remember any.
12 Q. Okay. 2886 dated September 12, '97, the third
13    paragraph, Todd Ditmar writes to you, "As Mr. Kearney
14    has refused Jefferson-Pilot's request for an
15    independent financial audit, we would request that you
16    forward a copy of Mr. Kearney's policy to us so that
17    we may have it reviewed by our legal counsel. It
18    would seem that an audit would be the only true way to
19    measure and objectify his reported loss of income."
20       Mr. Kearney communicated to you there was a
21    specific reason why he did not desire for
22    Jefferson-Pilot or Jefferson-Pilot's agents to contact
23    the people he worked for and tell them that he
24    suffered from chronic severe depression, didn't he?
25 A. I do not recall specifically, but I would think that

Page 41

1  would be a logical request.
2  Q. Okay. And then Mr. Ditmar, he's someone you did have
3     frequent communications with in the '97 --
4  A. Apparently he was handling this particular case.
5  Q. He worked for Mr. Anderson?
6  A. Apparently.
7  Q. Okay. He requested that you send him a copy of the
8     policy so their lawyers could take a look at it to
9     determine what the rights were, right?
10 A. Yes.
11 Q. Okay. And then the next page dated September 18,
12    1997, document 2880, you sent him the policy, right?
13 A. Yes.
14 Q. And if he did what he said he was going to do, he was
15    going to have his lawyers at DMS who this is what they
16    do, administer claims, determine what the rights are
17    in the policy, right?
18 A. Yes.
19 Q. And Mr. Kearney's payments didn't change; this alleged
20    error wasn't disclosed or discovered for four more
21    years, right?
22 A. Apparently.
23       MR. ELLIS: If can we take a break so I can
24    check out.
25       MR. ROBERTS: Can we proceed while you're

11 (Pages 38 to 41)

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 50

1  day?
2  A. Very possibly. If everything is in order, it's just a
3     matter of the examiner reviewing that and approving
4     the payment and it could be within a day or two.
5  Q. Do you date-stamp the receipt of the claim form or the
6     supplemental statement?
7  A. Yes.
8  Q. They're all date-stamped?
9  A. Yes.
10        MR. ELLIS: Just for your information,
11    Counsel, they date-stamp on the reverse side, which is
12    why none of the copies of mine have them. They
13    date-stamp their claims material on the reverse side.
14        MR. ROBERTS: Were those produced?
15        MR. ELLIS: Apparently it was never copied
16    for either my copy of the claim file or yours. There
17    were only one-sided copies and --
18        MR. ROBERTS: Can something be undertaken to
19    remedy that?
20        MR. ELLIS: I can get the date-stamping for
21    them if you like.
22        MR. ROBERTS: Yes.
23 Q. March 23, '98, which is a letter numbered 2956?
24 A. Okay.
25 Q. Now you're getting copies of letters that Mr. Kearney

Page 51

1     is dialoguing directly with DMS?
2  A. Yes.
3  Q. Was there a switch in the relationship at that point
4     where he was dialoguing directly with them and just
5     keeping you in the loop of comments?
6  A. Mr. Kearney?
7  Q. Right.
8  A. I suspect at that point DMS had contacted him about
9     whatever they were needing and he was just writing to
10    them and then just keeping me informed.
11 Q. Who was running the show on Kearney's claim from
12    summer of '97 through the end of '99? Was it
13    principally DMS or was it principally Jefferson-Pilot?
14 A. No, we continued to make the payments. All they were
15    doing was reviewing it.
16 Q. You were getting the supplemental forms monthly,
17    Jefferson-Pilot meaning you?
18 A. Yes.
19 Q. And Jefferson-Pilot was issuing the checks?
20 A. That's correct.
21 Q. But everything else was being taken care of by DMS?
22 A. Well, I wouldn't say everything else. I think -- you
23    know, they were doing a review. They were attempting
24    to get additional information.
25 Q. Okay. Your company wasn't engaged in doing that once

Page 52

1     DMS got involved to do that? You were performing
2     other functions?
3  A. Yes.
4  Q. Okay. Was there any kind of written agreement that
5     set forth --
6  A. I think the -- I would think that the agreement was
7     probably with Employers Re.
8  Q. Between DMS and Employers Re?
9  A. Yes. That would just be my guess, because I don't
10    remember any contract that we had with them. They
11    just asked us to send these forms to them.
12        MR. ROBERTS: I believe that's been requested
13    in the 34 discovery. Bill, is it going to be
14    produced?
15        MR. ELLIS: I'm not aware of any.
16        MR. ROBERTS: Okay. Well, will you see if it
17    exists or not?
18        MR. ELLIS: Sure.
19 Q. Did anyone ever tell you there was a written agreement
20    between --
21 A. No. I just know that DMS billed us directly and I
22    would send a copy over to Employers Re to get their
23    part of the charge.
24 Q. There was no reference to a contract in the invoice or
25    anything?

Page 53

1  A. Not that I'm aware of.
2        MR. ROBERTS: I'd like those as well.
3     They're not in the claim file.
4        MR. ELLIS: What's that?
5        MR. ROBERTS: His transmittals to Employers
6     Re with the invoices of DMS.
7  Q. There's a fax transmittal that's turned sideways,
8     April 23, '98, from you to Ditmar. Now, if Mr.
9     Kearney's residual disability began prior to the age
10    of 45 -- I think we talked about this earlier -- his
11    maximum benefit period on the schedule is lifetime,
12    correct?
13 A. I believe that's correct.
14 Q. And in this fax you represent that it's to age 65.
15    Was the policy ambiguous on the point?
16 A. I don't think it was. Many times -- you didn't go
17    back and review the contract every time you got
18    involved in the correspondence. Usually if it's a
19    lifetime benefit, it would have been written on the
20    claim form at the top and you may have just referenced
21    that. I'm not sure about that claim form, but it may
22    have indicated to age 65 and that's maybe where I got
23    that.
24 Q. Okay.
25 A. But I'm not sure.

14 (Pages 50 to 53)

Case 1:02-cv-00479-MRB    Document 164-28    Filed 07/13/2007    Page 5 of 5

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Harold Shelton    5/7/2004

Page 86

1  Q. Is JL Roberson qualified to examine these policies, in
2     your judgment?
3  A. Yes.
4  Q. Does he look at every single claim?
5  A. No.
6  Q. So if he looked at Kearney's claim, he would have done
7     it affirmatively to examine something, right?
8  A. Based on -- well, based on the amount of benefits.
9  Q. Okay. Mr. Kearney's claim was a lot, so he was
10    getting more attention than someone getting $100 a
11    month, $1,000 a month?
12 A. Well, it had to be approved by Mr. Roberson.
13 Q. Okay. But he actually wrote letters to Mr. Kearney,
14    too, are you mindful of that?
15 A. I'm not sure particularly what he did.
16 Q. Do you suspect that he wrote all the claimants that
17    filed disability claims, Vice President of the
18    company?
19 A. No, he did not.
20 Q. Mr. Ellis argued that reference in Exhibit 9, Bates
21    0962, where it says, "We are pay TD benefits, COLA
22    applies." Do you know who wrote that?
23 A. No, I don't.
24 Q. Do you know when it was written?
25 A. No.

Page 87

1  Q. Okay. Do you know what the reference to "We are pay
2     TD benefits" -- I mean, if someone is getting -- if
3     someone's loss in residual disability exceeds
4     75 percent, they get the total disability benefit,
5     right?
6  A. They get the total benefit.
7  Q. Thank you.
8  A. Disability -- total disability benefit.
9  Q. Thank you. Let's talk about a couple of other
10    matters. Now, Mr. Ellis says that it doesn't matter
11    that you use elimination period total disability
12    definition for residual, it doesn't matter that you
13    use maximum benefit period total disability definition
14    for residual, it doesn't matter that you use monthly
15    benefit total disability definition for residual. You
16    don't use it for waiver of premium. Well, let's take
17    another look at the policy. There's other issues in
18    the policy --
19       MR. ELLIS: I object to the speech, but --
20 Q. -- that aren't referenced in the residual disability
21    rider that must apply. Do you pay residual disability
22    benefits for self-inflicted wounds, intentionally
23    self-inflicted wounds?
24 A. Right off I don't know.
25 Q. Okay. Well, why don't you take a look at the residual

Page 88

1     disability rider and tell me if you see an exclusion
2     for intentional self-inflicted wounds.
3  A. I don't see it.
4  Q. Okay. But you don't think the policy permits residual
5     disability benefits for intentional self-inflicted
6     wounds, do you?
7  A. I'm not sure.
8  Q. They would be excluded just like they're excluded in
9     the core policy that was purchased, right?
10 A. I'm not sure right --
11 Q. Probably? Unclear? Ambiguous?
12 A. I'm just not sure.
13 Q. Okay. Let's go over another one.
14 A. I'm going to have to take a break right quick if it's
15    okay.
16 Q. Yes, sir, absolutely.
17       (Brief recess)
18 Q. I think we're back on the policy again, Mr. Shelton.
19    Page 3 -- actually page 4 excludes in the limitations
20    and exclusions provision --
21 A. Page 4, yes.
22 Q. Page 4, yes, sir.
23 A. Okay.
24 Q. -- excludes liability when injury is caused by some
25    war incident?

Page 89

1  A. Yes.
2  Q. Do you pay residual disability benefits for war-caused
3     disabilities?
4  A. Residual disability?
5  Q. Yeah.
6  A. I would say that we would not.
7  Q. Okay. Where does it say that in the residual
8     disability rider? Where is the specific reference to
9     that, if that's where we're going to draw the line?
10 A. I don't know.
11 Q. Is there a reference to that in the residual
12    disability rider?
13 A. I don't see it in this rider.
14 Q. How about normal pregnancy or resulting childbirth
15    that's excluded in the policy? If there's a residual
16    disability caused by pregnancy or childbirth, are
17    residual disability benefits payable?
18 A. I'm sorry, repeat that question, please.
19 Q. Are residual disabilities caused by pregnancy or
20    childbirth payable? I know that they're excluded
21    under total disability, but do you pay them if they
22    result in residual disability?
23 A. I'm not sure.
24 Q. The residual disability rider doesn't say either way,
25    correct?

23 (Pages 86 to 89)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593