69

1  reality.
2     A.  Well, I don't know.
3     Q.  Okay. The reason I ask is on May 22,
4  1998, the next month, your progress note,
5  particularly page 41 -- 4041.
6     A.  May 1, sir?
7     Q.  I'm showing you the progress note. It's
8  dated May 22, 1998. Do you see the progress note,
9  the second page of the progress note?
10    A.  Yes.
11    Q.  In it you described him as intense and
12 agitated and then the word "delusional" was
13 underscored.
14    A.  Uh-huh. So I had some concerns about
15 what he was presenting because back on 4/25 he
16 indicated to me that this lady from -- who had come
17 to talk to him from the psychiatric disability
18 company said: If you don't stop making I don't know
19 what claims, these claims, Jefferson-Pilot will play
20 hardball with you, whatever that is to mean. You
21 better get a good attorney.
22        This lady offered the settlement,
23 according to him, $100,000 to stop the claims.
24 Client very distraught. He thought she was a mental

70

1  health professional and was there to assist in the
2  rehabilitation. He felt he could not answer any
3  questions about his insurance policy as she promised,
4  and he got very upset then and suicidal.
5         Again, I had this question, is he
6  suicidal, because if he were, I would certainly
7  hospitalize him immediately because I didn't want him
8  hurting himself.
9     Q.  But you did not hospitalize himself that
10 day?
11    A.  No. He assured me he was not, and,
12 again, working with the patient, you know, I felt he
13 would not. He would call and talk with me. It's
14 always iffy, let me tell you. It's always iffy.
15    Q.  I guess what I'm looking at is the
16 description of the meaning --
17    A.  Delusional.
18    Q.  -- he gave or for his perception of the
19 meeting versus the fact even after that meeting these
20 checks continued to come every month just like
21 before.
22    A.  You're saying "just like before." There
23 were times I recall him sharing with me that they
24 were late or they were being held and that would

71

1  always be upsetting to him because he would say:
2  What am I going to live on? How am I going to manage
3  this? And he was pretty upset.
4         You know, again, from my standpoint, I'm
5  trying to stabilize a client, and it's like what a
6  client is telling me the agent came under false
7  pretense and the insurance company is holding my
8  checks. It became sort of like a struggle for him to
9  get beyond that, which is difficult from my
10 standpoint because I wanted to work on other things.
11    Q.  The same thing is true when he would talk
12 about his obsessions and downturns with the work or
13 his fights with his girlfriend and so forth, those
14 would result in the same kind of reaction --
15    A.  Right, he would be upset.
16    Q.  -- that he was having with the insurance
17 company; right?
18    A.  Uh-huh.
19    Q.  The insurance company then sort of fades
20 out in the notes until around 2000.
21    A.  I don't know. I haven't looked at all of
22 them, but I assume from what you're saying.
23    Q.  In 2000, in 2000, late 2000, you found
24 that he was showing signs of being very paranoid,

72

1  very depressed, and obsessive.
2     A.  Which is the way we've described him from
3  the beginning, I mean, you're even going back
4  historically.
5     Q.  So basically he's reverting to
6  obsessiveness.
7     A.  His immaturity.
8     Q.  His immaturity?
9     A.  Uh-huh.
10    Q.  You made notes saying he felt others were
11 out to get him, and he described both people in the
12 business and girlfriends and others with whom he
13 dealt.
14    A.  Yes.
15    Q.  In December of 2000 he talks about or you
16 talk about, I'm not sure which, that he was recalling
17 the intense psychological pain that he was suffering
18 because he could not maintain these interpersonal
19 relationships and again went back as far as Yoshi and
20 came forward with basically being let down by the
21 people he was codependent on?
22    A.  Everybody, uh-huh.
23    Q.  Everybody. And then he began to focus on
24 or obsess with the issue of the insurance company and

Dr. Donna Judd-McClure

81

1  things were still within the realm of possibility of
2  normality.
3      Q. You talked about a cognitive thought
4  stoppage.
5      A. Yes.
6      Q. What is that, please?
7      A. All right. What you do is you say to
8  yourself: This is something I will not think about.
9  It will not affect me. And you make a definite
10 resolution that that aspect is not going to bother
11 you. You don't think about it. You stop the
12 negative activity of it, and you begin to focus on
13 other aspects.
14     Q. That was in October, and the following
15 month, a couple weeks after he was telling you that
16 he was drinking every night, that he had a fear of
17 relationships --
18         MR. MATAN: What entry are you on? Are
19 you skipping all around? We can't keep track here.
20         MR. ELLIS: I'm sorry. I apologize.
21 It's 10/8/2000.
22     Q. You've checked his drinking problem waxes
23 and wanes, October 2000; right?
24     A. Yes.

82

1      Q. You put on the note on the side: Out
2  drinking every night, fear of relationships,
3  opportunities, hungover episodic.
4      A. He complained of that.
5      Q. Okay. At the time he was having grieving
6  issues with regard to his nephew and his father.
7      A. Correct.
8      Q. He was living with his mother and helped
9  move in with his mother to help stabilize things.
10     A. Yes.
11     Q. He was complaining about paying bills.
12     A. Yes.
13     Q. And drinking.
14     A. (Witness nods head.)
15     Q. You described him as angry and anxious.
16     A. Angry, anxious and depressed.
17     Q. Angry, anxious and depressed, all right.
18 In that you double-checked, I guess which means more
19 so than normal, depression or depressive.
20     A. Yes.
21     Q. That he was obsessive.
22     A. Where are we, what date?
23     Q. The second page of that same note. I'm
24 looking at the checkmarks.

83

1      A. Paranoid, concerned about increase in
2  fears, on his fear of the insurance company, and his
3  thought processes were disruptive at the time, and I
4  said: Discuss feelings, need to grieve and cognitive
5  control of obsessively dealing with the past,
6  stabilize in new environment. Could not attend trade
7  show because of anxious about insurance check and
8  overall depression, and that he wouldn't have the
9  money, I'm sure, to survive.
10     Q. So, again, he continued to get the check
11 anyway, regardless of his anxiousness or fears about
12 that.
13     A. I don't know that.
14     Q. Did he ever tell you that they stopped
15 paying?
16     A. Yes, there were periods where he did tell
17 me they stopped paying.
18     Q. Where they had stopped paying?
19     A. Yes.
20     Q. Did you discuss why, if, in fact, that
21 happened? I didn't see the note. That's why I'm
22 asking.
23     A. I don't know. I may not have written it
24 down, but I know there was a period where he did not

84

1  get it for some number of months, as I recall.
2      Q. Okay.
3      A. And, I don't know, in other words, in
4  terms of being dependent on his mother, you know, to
5  take care of him.
6      Q. He never discussed with you what the
7  difficulty was, if any, with regard to the checks
8  being sent? Why, any reason?
9      A. Well, other than the fact he would get --
10 early on they explained they were following him
11 around, so I made an assumption, I suppose, that they
12 felt that he might be doing something else with his
13 time. I mean, they were watching him, was he
14 working, was he not working.
15     Q. How often were they doing that?
16     A. I don't recall, but it happened.
17     Q. Do you know he had told them he was
18 working; right?
19     A. For part of the time I saw him, I know
20 that he was working. I think he was trying to
21 develop a new piece of equipment, hoping that he
22 would be successful with that, and that he could go
23 on with his life and he wouldn't need the insurance
24 company. He wouldn't need anybody to give him the

21 (Pages 81 to 84)

Armstrong & Okey, Inc. Columbus, Ohio (614) 224-9481

85

1  support he needed.
2       But how long, you know, it never seemed
3  to come to fruition, and the fear and the concern and
4  the fighting with the insurance seemed to take over a
5  lot of his time and fears.
6       Q. It became his --
7       A. Obsession.
8       Q. -- obsession?
9       A. Yes.
10      Q. When a person obsesses over something, is
11  it normal that they have a realistic view of what's
12  happening, or does their view get distorted somewhat
13  by the obsession?
14      A. It could have been distorted somewhat. I
15  never asked if he took people like to sit down and
16  discuss with the insurance company what was going on,
17  if he had support or whatever.
18      Q. You did not know any of the dates, you
19  just knew he was upset about it.
20      A. Yes.
21      Q. And obsessing over it.
22      A. And concerned, because knowing how he was
23  going to go on and take care of things.
24      Q. In that same meeting you described him

86

1  with a double-check mark, which is where I started,
2  with depression suggesting he is very depressed at
3  the time.
4       A. Yes. Right.
5       Q. That he was obsessive, which we
6  discussed.
7       A. Right.
8       Q. That he was paranoid; right?
9       A. Yes.
10      Q. And that he had phobias or unfounded
11  fears; right?
12      A. Uh-huh. Right.
13      Q. When he's in this position of obsessing
14  over a specific thing, which he had done in the past
15  over women and over business and over money issues
16  and now over the insurance company, is his perception
17  of what's happening an accurate reflection of
18  reality, or is he hypersensitive?
19      A. It could have some aspects of both. Part
20  of it could be realistic and part of it could be a
21  fragmented view.
22      Q. Okay. For example, if an insurance
23  company, just as an example, if an insurance company
24  is paying a benefit based upon a loss of income which

87

1  would require them to, of course, know what the
2  income was; right?
3       A. Correct.
4       Q. Asked for an audit, that could be a very
5  reasonable thing from the insurance standpoint and a
6  very oppressive thing from someone like Chris'
7  viewpoint?
8       MR. MATAN: I'm going to object here,
9  inserting hypothetical things. She has no knowledge
10 here, nor are they in her notes.
11      MR. ELLIS: I'm trying to understand the
12 perceptions.
13      Q. So, Doctor, what I'm saying, in that
14 circumstance while it may appear to the insurance
15 company to be a reasonable thing to do to find out or
16 verify the income, for someone who is obsessed with
17 being victimized by the insurance company, that would
18 be perceived or could well be perceived as harassment
19 or unfair treatment or bad faith.
20      MR. MATAN: I'll object again. It's
21 hypothetical. She has no information other than what
22 you're putting in that question.
23      MR. ELLIS: Sure.
24      Q. If you can give me an opinion on that,

88

1  I'd appreciate it, Doctor.
2       A. I am not going to answer that.
3       Q. You agree that Chris was obsessed from
4  the time that that Dateline was on about insurance
5  companies. It appeared in every note.
6       A. I don't think that it appeared in
7  virtually every note. As I look at the notes, I
8  don't see where I mentioned it, and I don't know what
9  you mean by, you know, how much. You would have to
10 give me the number of times.
11      Q. Very good. He was expressing at that
12 time in October that, for example, he called you for
13 support to help decrease his depression. He is
14 agitated, speaking in a soft voice, thinking no one
15 understands him. You suggested he may be delusional.
16 That's document 4096 in mine, October 24, 2000.
17      A. He was pretty upset, I would say, during
18 that call.
19      Q. Right, to the point you suggested he may
20 be delusional.
21      A. You're talking about I just checked it,
22 would be the question I guess I would have. But how
23 much, I don't know.
24      Q. Okay. The following month in November

### Page 93

1  answer at this point. I have to think about it.
2    Q. Okay.
3    A. It may have been a request for something,
4  but I don't know. He has a fairly -- you know, if he
5  would need to deal with her, he could deal with
6  Yoshi. I mean, she does not hate this man.
7    Q. Okay. In your goals on that visit,
8  you're talking about looking for another job. His
9  brother had suggested maybe a teaching job.
10    A. Yes.
11    Q. You suggested a job like that might
12  provide better structure and a daily schedule that he
13  could be motivated to meet as opposed to being out on
14  his own creating a business and running a business by
15  himself where he lacked the support and felt put upon
16  with those he was dealing with.
17    A. I think it would have been good at that
18  point, that he would have had some support, a
19  different type.
20    Q. From this period forward would it be fair
21  to say that there were fewer up days and more anger
22  and upset with both the failure of the business, the
23  lack of success in his new business venture, and his
24  dealings with the insurance company?

### Page 94

1    A. He became very upset about the insurance
2  company. I have here he felt that they were not
3  being honest with him.
4    Q. Uh-huh.
5    A. And that was creating a lot of difficulty
6  totally in his functioning and causing him to feel
7  very depressed, very oppressed, if you will, that
8  they're not being honest and open with me, and
9  they're trying to cut him out, and he did not see
10  them as -- in other words, when he would form this
11  kind of contract with an insurance company, it is his
12  thought the insurance company would be supportive,
13  and he's not experiencing that. He's feeling that
14  they are destroying him and making him actually get
15  worse.
16    Q. Okay, that was his perception.
17    A. (Witness nods head.)
18    Q. And the perception was based upon what?
19  What was the insurance company doing, other than
20  sending him the check, that he felt they were being
21  dishonest?
22    A. They had him evaluated by several
23  different people to see if this were truly the
24  problem with him, was major depression, and actually

### Page 95

1  the conclusion is, yes, it is major depression.
2  There are a lot of other aspects and dynamics that
3  come out, but it would very important for the
4  insurance company to see him -- I mean to actually be
5  supportive of him, to help him get better. And if
6  it became, you know, to the degree he becomes
7  enmeshed in it, he can't operate if they are
8  threatening him with terminating the contract.
9    Q. Okay. They never did terminate the
10  contract; correct?
11    A. To my knowledge, not at this time. Now
12  is that a possibility? Could be.
13    Q. So his perception, at least at this time,
14  was that if the insurance company asked for
15  information or verification, if they asked for an
16  IME, an independent medical exam, if they asked if
17  you had done any objective testing and so forth, or
18  asked for your notes, that was, to Chris' perception,
19  some form of dishonesty and an attempt to stop paying
20  him benefits.
21    A. I think he believed they were going to
22  stop paying him benefits, and he had signed the
23  contract in good faith a number of years ago, and I
24  think he was worried about, you know, what was

### Page 96

1  happening here because he did trust them for a long,
2  long time, and with the avenue of them continually
3  questioning him to what he was doing, was he
4  cooperating, and withholding checks, as I said
5  before, and he felt, you know, that he was being
6  overwhelmed.
7    Q. You say that like withholding the checks
8  was a common occurrence. Exactly how many times did
9  he tell you that exactly happened?
10    A. I don't know, but it was a number of
11  times.
12    Q. A number of times they withheld checks.
13    A. Yes. It was more than once or twice.
14    Q. According to Chris' perception.
15    A. Yes.
16    Q. And the fact they asked for information
17  he perceived as an attempt to avoid payment.
18    A. Yes.
19    Q. When, in fact, he continued to get paid.
20    A. Well, I assume he did. I mean, I would
21  have to make an assumption, I don't know.
22    Q. Sure. If Chris testified that he had
23  continued to receive the payments and to this day
24  continues to receive the payments, you would have no

Dr. Donna Judd-McClure

### 113

1  false?
2  A. They did not provide me anything. They
3  provided him some information and request.
4  Q. Okay. And he showed it to you?
5  A. Yes.
6  Q. And what I'm asking you, in what he
7  showed you, what was either misleading or false in
8  what they said?
9  A. I would have to look at it.
10 Q. How did you know it was misleading or
11 false?
12 A. It had to be interpreted that way by me,
13 and I would have to see it now.
14 Q. Or by Chris for you?
15 A. No, no. Mr. Kearney is not influencing
16 me in that sense. I became incensed against the
17 insurance company because I thought they were doing
18 things that were not correct.
19 Q. Okay. What I'm asking you and where I'm
20 having -- I'm not criticizing you, Doctor.
21 A. No, I know.
22 Q. I'm trying to understand. You're
23 suggesting to this company they made misleading and
24 false statements to your client with whom you have

### 114

1  empathy because you appreciate his feeling about it,
2  but I'm trying to get to the basis of your comment as
3  to what they misled him about since they were paying
4  him benefits and what they said to him that was false
5  when you didn't know what the contract said in the
6  first place.
7  A. Because he was telling me, I understand
8  what you're asking, and he also showed me some of the
9  statements that the insurance company was requesting.
10 I think that it was also my professional opinion that
11 this insurance company somehow wanted beyond what was
12 being required from any other patient I had.
13 Q. Such as? What did they ask for that was
14 beyond a reasonable request?
15 A. The allegations that he was lying. The
16 allegation that he was distrustful.
17 Q. Okay.
18 A. They had to put somebody around to watch
19 his behavior. How ludicrous that is.
20 Q. Let me ask you this. What did they or
21 someone say to you that suggested that they thought
22 Mr. Kearney was lying?
23 A. Merely from the fact that they even
24 requested other reports of his condition.

### 115

1  Q. So if they attempted to verify
2  information, other than accepting your word or
3  Mr. Kearney's word, that would be suggesting
4  Mr. Kearney is lying.
5  A. They were suggesting that Mr. Kearney was
6  lying. They seem to be suggesting, at least in my
7  interpretation, that he was not being honest about
8  his medical condition or his depression, and they did
9  not seem to understand the nature and the quality of
10 what depression is all about.
11 Q. And the basis for --
12 A. That bothered me. People are coming
13 forward indicating the degree of the depression, how
14 hard they have to fight it, and they know now it is a
15 brain disease and the brain is involved in it, and
16 yet the company would be saying to him: What is it
17 you're doing every minute of the day? Which is
18 enough to make someone become paranoid.
19 Q. Every minute of the day?
20 A. That was what he seemed to believe that
21 they were requiring of him.
22 Q. Okay.
23 A. And it became very distorted. I mean,
24 you know, it may not be the truth, but you see they

### 116

1  did play some role in this.
2  Q. The fact that the insurance company did
3  an investigation --
4  A. Then they should have written me a letter
5  and they should have said to me, "we're doing an
6  investigation of this client because of these
7  reasons," and I received no such letter or note.
8  Q. If I can finish my question, Doctor. If
9  the fact that the insurance company did an
10 investigation, whether it's reasonable or not, if it
11 adversely affected your patient, it would generate
12 this letter?
13 A. Yes.
14 Q. Correct?
15 A. Correct.
16 Q. In it you describe the company as
17 exercising extreme conduct. What was the extreme
18 conduct that they did?
19 A. I don't know. You're -- I think it was,
20 again, the length of time and just all the inquiry
21 about it. There were several different times over
22 the years that Mr. Mills had made contact with me or
23 attempted to.
24 Q. Okay. Would you agree with me that

29 (Pages 113 to 116)