Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

Page 22

1  those claims that exceed the certain monetary monthly
2  threshold?
3  A. At the time that we transferred the files to DMS, it
4  was at the recommendation of our reinsurer, Employers
5  Reinsurance. They recommended the use of DMS because
6  they had had prior relationships with DMS.
7  Q. Through other disability insurance companies that they
8  had ownership in or reinsurance arrangements with?
9  A. Exactly.
10 Q. Was anyone else considered by Jefferson-Pilot other
11 than DMS to take on that role?
12 A. Not to my knowledge.
13 Q. Did Jefferson-Pilot conduct any due diligence about
14 the services that DMS would be offering?
15 A. I know that they obtained references from our
16 reinsurers who had prior -- and this is what I know
17 not because I was involved but from basically talking
18 to people who were involved at the time and who are no
19 longer with Jefferson-Pilot.
20 Q. Okay. Do you know who at first request on the Notice
21 of Deposition is the person to produce the person with
22 the financial -- with the best knowledge of the
23 financial and other terms of JP's relationship with
24 DMS, do you know who would be most mindful inside
25 Jefferson-Pilot about why DMS was selected back in

Page 23

1  '99?
2  A. That would be me.
3  Q. But you weren't directly involved in that?
4  A. But I have become aware since taking over as Vice
5  President of Claims, because we have a continuing
6  relationship with DMS.
7  Q. Okay. Well, who at Jefferson-Pilot would have
8  firsthand personal knowledge of those events?
9  A. No one that I know of.
10 Q. Who signed the agreement on behalf of Jefferson-Pilot?
11 A. Do you have a signed copy?
12 Q. Do you know?
13 A. I can't remember who signed the agreement on behalf of
14 Jefferson-Pilot.
15 Q. Would there be a signed copy somewhere inside
16 Jefferson-Pilot?
17 A. Where did this one come from?
18 Q. Would there be a signed copy somewhere inside
19 Jefferson-Pilot?
20 A. I don't know.
21 Q. Okay. Does the President of Jefferson-Pilot Life
22 Insurance Company execute agreements such as these?
23 A. No.
24 Q. Who would have executed agreements such as this one at
25 that time?

Page 24

1  A. At that time I don't know who executed this agreement,
2  but it would have made sense for it to have been
3  executed by the Vice President of Claims at the time,
4  but I don't know that he actually is the one that
5  signed the agreement.
6  Q. Do you know the name of the person who served in that
7  capacity at that time?
8  A. That would be Clyde Honaker.
9  Q. Is he still employed by the company?
10 A. No.
11 Q. Did he retire or take on a new job somewhere else?
12 A. He's taken on a new job.
13 Q. Not within the Jefferson-Pilot umbrella?
14 A. No.
15 Q. Do you know who he works for now?
16 A. No.
17 Q. Do you know when he left?
18 A. June of 2002.
19 Q. Do you know what state he lives in?
20 A. Kentucky.
21 Q. Do you know what city he lives in?
22 A. Lexington.
23 Q. Is he still in the insurance industry?
24 A. I believe so, yes.
25 Q. Do you know for what company?

Page 25

1  A. No.
2  Q. Is it disability insurance?
3  A. I don't know.
4  Q. Okay. Who was it that decided what the monetary
5  threshold would be?
6  A. I don't know.
7  Q. What was the monetary threshold in December '99,
8  January 2000?
9  A. I believe the threshold was benefits under $2,000.
10 Q. Per month?
11 A. Per month.
12 Q. And those that exceeded $2,000 per month went to DMS
13 for administration?
14 A. Yes.
15 Q. What's the business reason for that?
16 A. The business reason is reinsurance.
17 Q. I don't understand.
18 A. The disability claims are reinsured on a pro rata
19 basis, which means that the reinsurer and the primary
20 insurer share claims handling expenses. On the
21 smaller claims there would not necessarily have been
22 that reinsurance in place, and therefore
23 Jefferson-Pilot would have picked up 100 percent of
24 the cost of outsourcing the handling of those claims.
25        On the reinsured claims we would have shared

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 164-33    Filed 07/13/2007    Page 2 of 7

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney        C-1-02-479
Valerie Loftin        5/6/2004

Page 26

1 the cost with ERC on a pro rata basis, and that made
2 sense from a business standpoint.
3 Q. So Employers Reinsurance didn't have any liability for
4   those claims that did not exceed $2,000 a month?
5 A. I'm not -- I can't say. I know that was the
6   threshold. I do not know what their liability might
7   have been on those particular claims.
8 Q. You don't know what the threshold is for their
9   liability when their responsibility kicks in?
10 A. It varies from claim to claim.
11 Q. Based on what?
12 A. Based on the treaty that would have been in force at
13   the time the policy was issued, based on the block of
14   business that the policy was sold in.
15 Q. So do I understand your testimony to be that DMS was a
16   company that was suggested by Employers Reinsurance
17   because they shared in the liability of those larger
18   claims?
19 A. Yes.
20    MR. ELLIS: I'm sorry, who is they?
21    MR. ROBERTS: She understood the question.
22    THE WITNESS: Employers Reinsurance would
23 share in the liability of the claims.
24    MR. ELLIS: Thank you.
25    MR. ROBERTS: I'll take your deposition

Page 27

1 later.
2    MR. ELLIS: Whatever.
3 Q. Are there any other reinsurers on the block of
4   business other than Employers Reinsurance?
5 A. Not on the Jefferson-Pilot Life block, no.
6 Q. Has there been any change or shift in policies that --
7   or claims that are referred to DMS, meaning are they
8   now getting more claims than just those that exceed
9   $2,000 a month in liability?
10 A. Yes.
11 Q. Okay. Do they get all the claims at this point?
12 A. They get all of the claims that are reinsured through
13   ERC.
14 Q. That was at the direction of Employers Reinsurance?
15 A. It was at my direction and with agreement from
16   Employers Reinsurance.
17 Q. Is that in writing?
18 A. No.
19 Q. Have you received any letters, notes, e-mails from
20   your contact at Employers Reinsurance about DMS and
21   their work?
22 A. From Employers Reinsurance?
23 Q. Uh-huh.
24 A. No.
25 Q. All of your communications between you and Employers

Page 28

1 Reinsurance reps who you interact with concerning DMS
2   are verbal?
3 A. I believe so, yes.
4 Q. Who are your contacts at Employers Reinsurance?
5 A. The general counsel is a gentleman named Bill Dempsey.
6 Q. Okay. Is that it? He's the only person you interact
7   with?
8 A. Uh-huh.
9 Q. How long have you been interacting with Mr. Dempsey?
10 A. Since I became Vice President of Claims in 2002.
11 Q. Prior to your talking on that role in 2002, you had no
12   interaction with him at all?
13 A. No, I did not.
14 Q. And in your two years with him, you have never
15   exchanged any written document of any sort, including
16   e-mails?
17 A. About the handling of a claim?
18 Q. Relating to DMS.
19 A. No.
20 Q. I asked you a negative question, you gave me a
21   negative response. As a lawyer, you know what that
22   looks like.
23 A. I have not e-mailed Bill Dempsey regarding the DMS
24   relationship, to my knowledge. I have had telephone
25   conversations with him and I have exchanged e-mails

Page 29

1 with Bill Dempsey related to non-DMS matters.
2 Q. Do you have any notes of your verbal conversations
3   with him regarding DMS?
4 A. No.
5 Q. Okay. So in your two years the Jefferson-Pilot claims
6   that you oversee have been administered by DMS, the
7   direction of ERC, the person you have contact with,
8   you never had any e-mail communication to him or from
9   him or any other type of written communication that
10   regards DMS?
11 A. I don't remember.
12 Q. How would one go about learning whether that happened
13   or not?
14 A. I don't know.
15 Q. Do you maintain files of your correspondence with Bill
16   Dempsey?
17 A. I don't recall any correspondence with Bill Dempsey
18   regarding DMS.
19 Q. Isn't there some written agreement between you and
20   Employers Reinsurance that refers the balance of the
21   claims that they reinsure to DMS?
22 A. I'm sorry, I don't understand the question.
23 Q. I thought you had told me that there was some
24   arrangement you entered into to transfer all claim
25   administration for those claims that are reinsured by

8 (Pages 26 to 29)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Case 1:02-cv-00479-MRB   Document 164-33   Filed 07/13/2007   Page 3 of 7

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
Valerie Loftin                                                         5/6/2004

**Page 38**

1  A. Right, yes. That was a negative question. We send
2     them only claims.
3  Q. What is the reporting that's required from DMS about
4     their strategy -- do they report what their intended
5     strategy is on a particular claim, new claim, old
6     claim, to Jefferson-Pilot?
7  A. The only time that they would discuss their handling
8     of a JP claim would be if they required authorization
9     for settlement.
10 Q. Okay. So once you send them the claim, other than
11    getting the quarterly reports, DMS doesn't interact
12    with Jefferson-Pilot about what their intentions are
13    about administering the claim until some settlement
14    that might exceed $75,000?
15 A. We do periodic audits of the claim -- Jefferson-Pilot
16    goes to DMS. I have gone to DMS and while I have not
17    personally reviewed the files, my staff have reviewed
18    files.
19 Q. Okay.
20 A. So in terms of interaction, there is more interaction
21    just than settlement approval.
22 Q. Okay. That's what I'm trying to nail down. But when
23    DMS receives a claim, let's assume they develop
24    internally some strategy about how they're going to go
25    about dealing with the claim. That's not something

**Page 39**

1     they necessarily share with Jefferson-Pilot; they just
2     go do it, and unless you go to their office and audit
3     a claim file or unless they come with you with request
4     for settlement authority of -- what's the minimum,
5     75,000?
6  A. Yes.
7  Q. It is?
8  A. Yes, I believe so.
9  Q. Okay. So other than those two situations and the
10    third situation of information that may be contained
11    about a claim on a quarterly report, there is no
12    direction that DMS has to provide information to
13    Jefferson-Pilot about respective claims?
14 A. That's correct.
15 Q. Okay. How frequently do these audits take place?
16 A. We are trying to do them once a quarter.
17 Q. Since your tenure started in 2002 as VP of Claims, how
18    many have there been?
19 A. We have had two, I believe.
20 Q. Who at Jefferson-Pilot has undertaken the effort to do
21    the audits?
22 A. My disability manager and some of her staff.
23 Q. Who's your disability manager?
24 A. Cynthia Croft.
25 Q. Has it been the same person from her staff that's gone

**Page 40**

1     with her both times?
2  A. Norm Carrier.
3  Q. I'm sorry?
4  A. Norm Carrier is the disability examiner.
5  Q. Croft is C-R-O-F-T?
6  A. Uh-huh.
7  Q. Carrier is C-A-R-R-I-E-R?
8  A. Uh-huh.
9  Q. How many depositions have you given?
10 A. In my life?
11 Q. Uh-huh.
12 A. I don't know.
13 Q. Dozens?
14 A. Probably less than a dozen.
15 Q. Okay. Do you keep copies of all your deposition
16    transcripts?
17 A. No.
18 Q. Any of them?
19 A. No.
20 Q. Are they kept, as far as you know, in the general
21    counsel's office?
22 A. Not to my knowledge.
23 Q. Paragraph 1-C of the agreement says, "DMS will retain
24    third-party and affiliated investigators (including
25    but not limited to medical, physical therapy, and

**Page 41**

1     psychiatric personnel) at the company's expense to
2     conduct or have conducted such further investigation
3     regarding each claim as is appropriate within the
4     parameters, if any, specified by the company."
5        Has the company ever given DMS any parameters
6     on their administration of a claim?
7  A. Within the scope of who they should refer -- who they
8     should use as a third-party vendor?
9  Q. If that's what that paragraph refers to. I suspect
10    you haven't done that, so I went ahead and asked the
11    question have there ever been any parameters placed on
12    anything that DMS does on behalf of Jeff Pilot.
13 A. Yes.
14 Q. Okay. What?
15 A. That they are supposed to make accurate liability
16    determinations on our claim files.
17 Q. Okay. Is that expressed anywhere other than in the
18    agreement?
19 A. In any verbal conversation I have with DMS.
20 Q. Okay. There's an agreement that exists that we're
21    working our way through here.
22 A. Uh-huh.
23 Q. Are there any other documents that exist going from
24    Jefferson-Pilot to DMS saying, we want you to
25    administer claims in the following fashion, or we want

11 (Pages 38 to 41)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 62

1    43,000 in monthly fee, right?
2 A. Yes.
3 Q. It's a set fee?
4 A. Yes.
5 Q. Okay. This paragraph says that that set fee annually
6    could be reviewed for adjustment and the adjustment is
7    based on "DMS's performance in thoroughly, diligently,
8    and fairly evaluating claims and on its performance in
9    supporting the company's administration of the claims
10   and underlying policies during the preceding twelve
11   months." That's what it says. It doesn't say
12   anything about if you hire more people and have a
13   higher salary expense to administer claims, we'll
14   adjust the fixed monthly fee, does it?
15 A. No.
16 Q. Okay. Can you turn to paragraph 6 of the agreement.
17   Paragraph 6 is titled Performance Standard and here it
18   says, "DMS shall perform its services in a
19   professional manner in accordance with applicable law
20   and generally accepted disability income insurance
21   claims management practices and shall keep apprised of
22   and comply with current developments in the law
23   governing disability income insurance claims
24   management." That's the entire paragraph.
25       Do you have an understanding of what the

Page 63

1    generally accepted disability income insurance claims
2    management practices may be?
3 A. I would assume that what we were referring to would be
4    handling claims in good faith.
5 Q. Is that it?
6 A. Yes.
7 Q. What does good faith mean to you?
8 A. It means making fair and accurate evaluations of
9    liability.
10 Q. Anything else?
11 A. Under the terms of the contract.
12 Q. Anything else?
13 A. And administering the claims in a professional manner.
14 Q. Anything else?
15 A. No.
16 Q. Okay, no. Did the company ever set out in writing for
17   DMS's benefit what the company considered to be the
18   generally accepted disability income insurance claims
19   management practices?
20 A. Not to my knowledge.
21 Q. Okay. When was Geraldine Johnson retained to assist
22   Jefferson-Pilot on Mr. Kearney's claim?
23 A. I don't know.
24 Q. Have you ever had discussions with Ms. Johnson?
25 A. No.

Page 64

1 Q. Ever on any claim?
2 A. No.
3 Q. You've never had any discussion with her about any
4    claim?
5 A. No.
6 Q. You've never had any discussion, correct?
7 A. With Geraldine Johnson?
8       MR. ELLIS: Third time.
9 Q. Correct.
10 A. Not my knowledge.
11 Q. Okay. I asked in a negative, you gave me negative.
12 A. I'm sorry.
13 Q. No, it's just my quirk, not yours.
14       So if I asked for the production of all notes
15   or documents relating to the creation of the policies
16   and the riders that Mr. Kearney purchased and any
17   notes or documents relating to revisions or
18   contemplated revisions to those policies and riders,
19   you don't know where to start looking for that
20   information?
21 A. I don't know where to start looking for that
22   information and I don't know that we even retained
23   that information.
24 Q. Is there a policy to destroy that information?
25 A. There is a record retention policy. I don't know what

Page 65

1    the time period is for policy forms.
2 Q. How would I find out what it is?
3 A. I don't know.
4 Q. Who would you ask in the organization if you desired
5    in your capacity to obtain that information?
6 A. I don't know.
7 Q. Where would you start?
8 A. I don't know.
9 Q. Okay. Who do you interact with at DMS?
10 A. I have interacted with Bob Bonsall and with Todd
11   Ditmar. I have met other individuals at DMS, but I
12   can't recall the names right now. As I said, I have
13   visited the headquarters of DMS and I have been
14   introduced to a number of their staff.
15 Q. Have you had any discussions with Bonsall about any
16   specific claims?
17 A. Yes.
18 Q. Have you had any discussions with him about Mr.
19   Kearney's claim?
20 A. No.
21 Q. How many individuals at DMS are responsible for the
22   administration of the Jefferson-Pilot claims?
23 A. I don't know.
24 Q. Do you know who's in charge of the personnel within
25   DMS on that particular block of business?

17 (Pages 62 to 65)

Case 1:02-cv-00479-MRB    Document 164-33    Filed 07/13/2007    Page 5 of 7

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
Valerie Loftin                                                        5/6/2004

### Page 66

1   A. I believe it is Todd Ditmar.
2   Q. Are you mindful of any other lawsuits in which the
3      company has been engaged where it has asserted that it
4      has overpaid someone receiving residual disability
5      because the company has paid that person Social
6      Security Supplement benefit?
7   A. No.
8   Q. Were you involved at all in the King litigation in
9      Alabama or Mississippi?
10  A. Yes.
11  Q. Wasn't that one of the issues in that case?
12  A. No.
13  Q. It wasn't an issue about him being overpaid Social
14     Security Supplement benefit while on residual
15     disability?
16  A. Not to my knowledge.
17  Q. Did you ever execute an affidavit in that case?
18  A. I may have.
19  Q. Did you give a deposition in that case?
20  A. Yes.
21  Q. When was that?
22  A. October of 2003.
23  Q. Before we turn to the King case, are you mindful of
24     any other lawsuits in which it's been asserted by the
25     company that it overpaid someone on residual

### Page 67

1      disability by paying to that person either a Social
2      Security Supplement benefit or a COLA benefit?
3   A. Not to my knowledge.
4         (Defendant's Exhibit No. 6 was marked for
5      identification by Mr. Roberts.)
6   Q. Do you ever interact with Mr. Hughes regarding the
7      claim of Aubert King?
8   A. Mr. Hughes may be one of the individuals that I met at
9      DMS, but I don't recall him specifically.
10  Q. You don't recall any interaction with him in specific
11     regard to the Aubert King litigation?
12  A. He may have been present at some of the depositions.
13     I don't recall.
14  Q. In this June of 2000 letter purportedly written by Mr.
15     Hughes, purportedly sent to a lawyer, purportedly
16     regarding a guy named Aubert King, it is suggested by
17     DMS that the individual Mr. King, the policyholder,
18     had been overpaid under the residual disability rider
19     and had been overpaid 21,000 under the Social Security
20     Supplement rider. Does that jog your memory at all
21     about the Social Security Supplement benefits
22     overpayment issue in the King litigation?
23        MR. ELLIS: Objection.
24  A. I don't recall being asked any questions about the
25     Social Security Supplement rider.

### Page 68

1   Q. That wasn't my question. I didn't ask what questions
2      you were asked at deposition. I said did it jog your
3      memory about that issue being an issue in the
4      litigation?
5   A. I don't remember that issue being an issue in the
6      litigation. It may have been an issue in the
7      litigation, but I don't recall the specifics of the
8      allegations in that case.
9   Q. Okay.
10        (Defendant's Exhibit No. 7 was marked for
11     identification by Mr. Roberts.)
12  Q. Exhibit 7 is an Affidavit of Valerie Loftin in King
13     versus Jefferson-Pilot Life Insurance Company. Do you
14     recall executing this affidavit?
15  A. Yes.
16  Q. Okay. Is the information in here truthful?
17  A. Yes.
18  Q. Okay. In paragraph 3 you say under oath that the
19     payments under the policy were for total disability
20     benefits, residual disability benefits, and Social
21     Security Supplement benefits.
22  A. Yes.
23  Q. Does that refresh your memory that Social Security
24     Supplement benefits were an issue in the case?
25  A. I didn't remember Social Security Supplement benefits

### Page 69

1      being an issue. I remembered residual disability
2      benefits being an issue.
3   Q. Do you now recall that it was an issue, having seen
4      your affidavit?
5   A. Obviously it was.
6   Q. And in paragraph 4 you laundry-list from some -- did
7      you do any work to prepare this sworn testimony or
8      just sign what someone had provided you?
9   A. This was something someone had provided me.
10  Q. Did you check to see whether the information was
11     accurate before you swore to its truth?
12  A. Yes.
13  Q. Okay. Paragraph 4 you say that Mr. King received an
14     overpayment of residual disability benefits of
15     $33,000. In paragraph 5 you say under oath that he
16     received a $21,000 overpayment of Social Security
17     Supplement benefits. Was that while he was on
18     residual disability?
19  A. I don't recall.
20  Q. You don't know one way or the other?
21  A. I don't recall the specifics of this particular case.
22  Q. How do you know -- so you don't any longer have the
23     personal knowledge you purported to have about there
24     being an overpayment?
25  A. I don't recall the specifics of this individual case

18 (Pages 66 to 69)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney   C-1-02-479
Valerie Loftin                                                  5/6/2004

### Page 70

1  anymore.
2  Q. Okay.
3  A. I do recall that it was related to overpayment of
4     residual disability.
5  Q. Is that your signature on the affidavit?
6  A. Yes, it is.
7  Q. Were you put under oath before you signed it?
8  A. No.
9  Q. You were not put under oath before you signed it?
10 A. I signed before a notary.
11 Q. Did she put you under oath or did he put you under an
12    oath?
13 A. I signed before a notary. What does that mean by
14    being put under oath? Did I raise my right hand? No.
15    I had a notary witness my signature.
16 Q. Did you work with Mr. Ditmar on that claim?
17 A. No, I didn't work with Mr. Ditmar on this particular
18    claim. I have worked with Mr. Ditmar on more general
19    matters.
20 Q. Who is Kim Brann?
21 A. Spell the name, please.
22 Q. B-R-A-N-N.
23 A. I don't know.
24 Q. Can you recall here now any other litigations where
25    Social Security Supplement rider benefits were alleged

### Page 71

1     to have been overpaid to a residual disability
2     claimant?
3  A. I don't recall.
4  Q. Any litigation concerning the alleged overpayment of a
5     COLA benefit to a residual disability claimant?
6  A. I don't know.
7  Q. Do you know who was the first person to suggest that
8     Mr. Kearney had received an overpayment?
9  A. No.
10 Q. Do you know the process by which anyone came to that
11    conclusion?
12 A. No.
13 Q. So you personally have no understanding or experience
14    with the administration, the actual administration by
15    Jefferson-Pilot of claims, disability insurance
16    claims?
17 A. I do have understanding of the administration of
18    disability claims by Jefferson-Pilot. Disability
19    claims administration reports to me.
20 Q. But that is not a function that Jefferson-Pilot has
21    performed since you took over Vice President of
22    Claims?
23 A. For Jefferson-Pilot Life Insurance policies that are
24    reinsured through ERC, those are handled through DMS.
25 Q. Okay.

### Page 72

1  A. We have a disability department in-house in Concord,
2     New Hampshire, and we do handle disability claims.
3  Q. Does Jefferson-Pilot educate its claims administration
4     personnel on the terms of its policies or do they just
5     leave it to the claims administration person to come
6     to the correct understanding of a particular policy,
7     and I guess correct being consistent with the other
8     individuals at Jefferson-Pilot?
9        You're looking at me quizzically. Did I not
10    phrase that question artfully?
11 A. No, you didn't phrase the question artfully. Let's
12    try it again.
13 Q. Does Jefferson-Pilot provide any education or training
14    to its claims administration personnel to insure that
15    they all have a singular and accurate understanding of
16    the benefits provided under respective policies?
17 A. We provide our disability examiners with ongoing
18    training that includes the various provisions under
19    our various policies.
20 Q. Does that mean that there's an interpretation of the
21    policies that is stated by the company to -- for
22    example, if I started today as a claims person in --
23    did you say New Hampshire?
24 A. Yes.
25 Q. If I went there, I'm right out of school, no

### Page 73

1     experience, I take on a job being a claim rep and you
2     have 20 different policies that have been sold that
3     are active policies with regard to the files that I've
4     been provided to administer, am I left to read for
5     myself and conclude for myself what rights the
6     policyholder has under a specific policy or is there
7     some education that I would be given to help me
8     understand what rights the policyholder has under a
9     policy?
10 A. We would expect a claims examiner to be able to read
11    the policy --
12 Q. Okay.
13 A. -- that was applicable to a specific case.
14 Q. Okay. So all of the claims persons are assumed to
15    accurately, correctly read the policy and they're all
16    assumed to have the exact same interpretation of the
17    policy?
18 A. We provide them with training, both internal and
19    through industry-sponsored courses regarding various
20    issues surrounding the handling of disability claims.
21    That would include training on the various contracts
22    that are available. But we ultimately expect them to
23    be able to read the contract and apply it to the case
24    at hand.
25 Q. They're not lawyers, they don't have any legal

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MRB   Document 164-33   Filed 07/13/2007   Page 7 of 7

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

### Page 114

1  Q. You don't know, okay. If Mr. Hughes of DMS on behalf
2     of Jefferson-Pilot extended to Mr. Kearney an offer of
3     settlement in October of 2001 in the amount of
4     $280,000, that settlement offer, the amount, based on
5     your knowledge of the relationship between JP and DMS,
6     would have necessarily required JP's authority?
7  A. Yes.
8  Q. Okay. In the fall of 2001, who at Jefferson-Pilot
9     would have interacted with DMS to provide that
10    authority?
11 A. I believe it would have been Clyde Honaker.
12 Q. Is he still employed by the company?
13 A. No.
14 Q. He's the guy in Lexington?
15 A. Yes.
16 Q. I'll see him on my way back. What was his position at
17    that time?
18 A. He was Vice President of Claims.
19    (Defendant's Exhibit No. 13 was marked for
20    identification by Mr. Roberts.)
21 Q. I've marked as Exhibit 13 a copy of a letter from Mr.
22    Kearney's prior counsel in October of 2001 and a
23    response of William Hughes three days later on October
24    22, 2001. Have you seen these letters previously?
25 A. Not that I recall, no.

### Page 115

1  Q. On the first page of the first letter in that
2     compilation, the last sentence, first paragraph says,
3     "Mr. Kearney was not interested in making a
4     counteroffer to your offer to him of $280,000." Is
5     this the first occasion that it's been represented to
6     you that there was a settlement offer made to Mr.
7     Kearney back in 2001?
8     MR. ELLIS: I'll object and ask for a
9     continuing objection under Rule 408.
10    MR. ROBERTS: It's not Rule 408, buddy.
11 Q. Go ahead.
12 A. I don't know.
13 Q. You don't know if it's the first time you've heard
14    about that?
15 A. I don't know any of the particulars surrounding DMS's
16    handling of Mr. Kearney's --
17 Q. That wasn't my question. My question was, is right
18    now the first time that you've understood or someone
19    has shared with you an offer made to Mr. Kearney in
20    the fall of 2001?
21 A. I don't remember.
22 Q. Have you ever reviewed the proposal provided to Mr.
23    Kearney before he decided to accept the proposal and
24    buy the insurance from your company?
25 A. Yes, I did.

### Page 116

1  Q. When did you do that?
2  A. Last night.
3     MR. ROBERTS: Let's go off the record for one
4     second.
5     (Discussion off the record)
6  Q. You reviewed the proposal last night?
7  A. Not the whole thing. I think I may have looked at
8     some pages of the proposal, and there were references
9     to it in one of your motions for summary judgment.
10 Q. The one you weren't persuaded by?
11 A. Yes, the one I wasn't persuaded by.
12 Q. It's a small group you're in.
13    (Defendant's Exhibit No. 14 was marked for
14    identification by Mr. Roberts.)
15 Q. Were you with anybody last night when you were
16    conducting this review or were you by yourself?
17 A. Well, if you count my three kids.
18 Q. How old are they?
19 A. Seven, ten, and fourteen.
20 Q. Did you ask for their input?
21 A. No.
22 Q. I've handed to you what has been Bates labeled as 0635
23    through 0642, and then there is 0642-A and 0643. Also
24    attached to this exhibit are 0633, 0633-A, and 0634.
25    Do I understand correctly that a disability

### Page 117

1     insurance company such as Jefferson-Pilot sells its
2     policies to the public through various agents?
3  A. Yes, sir.
4  Q. Okay. Are the agents given information to provide to
5     their prospective policyholder that educates the
6     policyholder on what their rights may be if they
7     purchase this product?
8  A. The agents are given marketing material that
9     summarizes provisions in the proposed contracts but
10    does not spell out all of the particulars of a
11    contract.
12    MR. ROBERTS: Let's stop there.
13    (Lunch recess)
14 Q. Were you able to make that call to see who provided
15    the information, the sworn factual information --
16 A. I spoke with in-house counsel and was advised that the
17    information came from our Legal Department's
18    conversations with DMS examiners who had handled the
19    file.
20 Q. Who's going to verify the responses?
21 A. (Indicating)
22 Q. Who's going to swear to the truth of the responses?
23 A. I don't know, someone from our Legal Department.
24 Q. They don't have any factual knowledge. So we're just
25    not going to get sworn responses?

30 (Pages 114 to 117)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593