```
 1              and answered.
 2    Q.        Correct?
 3    A.        I don't believe I've ever heard that
 4    before.
 5    Q.        During the time that you were the
 6    senior executive officer responsible for the
 7    disability insurance claims at Jefferson-Pilot, was it
 8    acceptable to you that DMS investigate claimants
 9    without regard for any bounds?
10              MR. MEAGHER:  Objection to form.
11    A.        I don't know what you mean without any
12    bounds.
13    Q.        Was it okay -- are you familiar with
14    the concept of invading someone's privacy?  Excuse
15    me.  I just invaded your counselor's privacy.
16    A.        Yes.
17    Q.        That term means something to you.
18    Whatever that term means to you, is it acceptable, in
19    your judgment, that DMS, in administering a claim, do
20    something that you would believe is an invasion of
21    privacy?
22              MR. MEAGHER:  Objection to form.
23    A.        DMS would investigate claims in order
24    to obtain the information needed to make a proper
25    decision on the administration or adjudication of a
                                                      109
```

```
 1    claim.
 2    Q.        Is that your answer?
 3    A.        Yes.
 4    Q.        What if, in the course of doing that
 5    job, they did something that invaded somebody's
 6    privacy the way you view the concept of invasion of
 7    privacy, would that be acceptable to Jefferson-Pilot
 8    while you were the senior executive officer?
 9              MR. MEAGHER:  Objection to form.
10    A.        They should investigate based on
11    information -- the contract provisions that would
12    allow them to obtain information and releases that
13    would be signed by a claimant to do an investigation.
14    Q.        What if, in doing that job, they
15    overstepped their bounds and do something that you
16    would consider to be an invasion of privacy, would
17    that be okay with Jefferson-Pilot?
18              MR. MEAGHER:  Objection, calls for
19              speculation.
20    A.        Again, it would be based on the -- what
21    they were permitted to do on the...
22    Q.        Agreement?
23    A.        Right, the -- not the agreement, the
24    claimant's --
25    Q.        Authorization?
                                                      110
```

```
 1    A.        -- authorization.
 2    Q.        What if you learned while you were the
 3    senior officer of claims they did something that you
 4    would consider to be an invasion of privacy, would
 5    that be okay?
 6              MR. MEAGHER:  Objection, calls
 7              for speculation, assumes facts not in
 8              evidence.  You can answer.
 9    A.        I don't know how to answer you except
10    to say they would never go outside the bounds of the
11    authorization.
12    Q.        How do you know that?  You're
13    testifying under oath that you know for certain that
14    during those 28 months DMS never did anything that
15    exceeded the scope of their authorization?  You're not
16    saying that, are you?
17              MR. MEAGHER:  Objection to form.
18    A.        I was never made aware.
19    Q.        But you agree with me --
20              MR. MEAGHER:  Excuse me.  Did you
21              finish your answer?  You said you were
22              never made aware.
23    A.        I was never made aware of them stepping
24    outside the bounds of the authorization.
25    Q.        Okay.  But you agree with me that,
                                                      111
```

```
 1    first of all, you don't know everything they did?  You
 2    don't know everything DMS did in those 28 months on
 3    all the claims they had, correct?
 4    A.        That's correct.
 5    Q.        And you can't testify under oath that
 6    in all the claims that they had for Jefferson-Pilot
 7    they never stepped outside of the bounds of the
 8    authorizations signed by policyholders on respective
 9    claims, right?
10    A.        Not that I was ever made aware of.
11    Q.        The authorization doesn't give them the
12    right to do anything and everything that's possibly
13    doable, right?
14    A.        I'm sure there are restrictions.
15    Q.        Is invading someone's privacy, in your
16    judgment, a restriction?
17              MR. MEAGHER:  Objection to form.
18    A.        Again, I think invasion of privacy -- I
19    don't know how to answer your question.
20    Q.        Okay.  Does the authorization -- if
21    someone did sign an authorization, in your judgment,
22    does that completely open the door and remove from
23    that person's right the right of privacy?
24              MR. MEAGHER:  Objection insofar
25              as it calls for a legal conclusion.
                                                      112
```

**Page 129**

```
 1   Q.       And you don't recall any training that
 2   JP gave DMS about managing its block of business?
 3   A.       Again, as I had said previously, you
 4   know, we gave them copies of policies, policy forms,
 5   claimants' statements, authorization. Those are just
 6   items that I can think of at this point. There may
 7   have been others.
 8   Q.       And how they went about doing their job
 9   was up to them?
10   A.       They did their job based on policy
11   provision and the claim investigation that they were
12   doing.
13   Q.       You presume, right? You're presuming
14   they did that that way. No one at Jefferson-Pilot
15   oversaw the way they went about doing their work.
16   A.       I was never in DMS's office that I
17   recall.
18   Q.       No one at Jefferson-Pilot oversaw the
19   manner in which DMS was doing its work, correct?
20           MR. MEAGHER: Objection, calls
21           for speculation. You can answer.
22   A.       As I had indicated earlier in the
23   deposition, I received periodic reports on items that
24   were -- on the claim handling that was being done.
25   Q.       But those didn't comment on the manner
```

**Page 130**

```
 1   in which DMS was doing its job, did they?
 2   A.       Not that I recall.
 3   Q.       So nobody at Jefferson-Pilot oversaw
 4   the manner in which DMS was going about interacting
 5   with claimants, correct?
 6           MR. MEAGHER: Objection,
 7           speculation. You can answer.
 8   A.       I never saw any complaints regarding
 9   that.
10   Q.       Didn't ask you that question.
11   A.       Okay.
12   Q.       Was there anybody at Jefferson-Pilot
13   that oversaw the manner in which DMS was interacting
14   with Jefferson-Pilot policyholders?
15   A.       That would have been part of my
16   responsibility that I would have judged based on
17   complaints that I received from policyholders if I --
18   or from claimants.
19           (Mr. Kearney confers with
20           Counsel.)
21   Q.       Do you know, sir, whether or not DMS
22   was instructing its -- the policyholders -- or that
23   DMS was instructing the JP policyholders to not
24   contact Jefferson-Pilot but rather deal exclusively
25   with DMS?
```

**Page 131**

```
 1   A.       DMS was our third-party administrator
 2   handling the claims. They could have always called
 3   the home office claim department. But I do not know
 4   the answer to your question.
 5   Q.       Right. The fact of the matter is you
 6   don't have any information about what they were saying
 7   or not saying to policyholders?
 8   A.       I don't recall anything at this point.
 9           (Mr. Kearney confers with
10           Counsel.)
11   Q.       Did DMS interact with Jefferson-Pilot
12   with regard to settlement of claims?
13   A.       What do you mean by settlement?
14   Q.       Agreeing to resolve a dispute with a
15   policyholder for the payment of some consideration.
16   A.       Yes.
17   Q.       I can't remember what the question was
18   you're answering.
19   A.       Yes, they would have consulted with
20   Jefferson-Pilot.
21   Q.       Were they in every instance required to
22   get your approval for some settlement proposal?
23   A.       I'm not certain on every proposal for
24   settlement. Generally, yes.
25   Q.       Who was the person that DMS would need
```

**Page 132**

```
 1   to interact with to receive authorization to extend a
 2   settlement proposal to a policyholder?
 3   A.       It would have been me.
 4   Q.       Would you have interacted with the
 5   lower level claim examiners or would it be the claims
 6   manager at DMS who would contact you for that
 7   authority?
 8   A.       I don't recall who it would have been.
 9   Q.       Do you recall authorizing anybody at
10   DMS to ever settle a claim for greater than $200,000?
11   A.       Again, it's been so long, I just -- I
12   don't remember what amounts would have been -- you
13   know, what the maximum amount they would have
14   requested settlement for.
15   Q.       That's within the ballpark of
16   conversations you would have had with them, that type
17   of number?
18           MR. MEAGHER: Objection to form.
19   A.       Or less or more.
20   Q.       Was it the situation where if they were
21   going to go to a policyholder and say, hey, we'll pay
22   $250,000 to settlement the dispute, would they have
23   needed your authority to make that proposal?
24   A.       There was -- I think there was some
25   limit where they would have to get my authority, but I
```

1  don't recall what that amount was.
2  Q.  You don't know if it's north or south
3  of $250,000?
4  A.  I really don't. I just don't recall.
5      (Mr. Kearney confers with
6      Counsel.)
7  Q.  If the agreement suggests that the
8  threshold for seeking authorization is less than
9  $100,000, was it your expectation that before they
10 made settlement offers at -- north of $200,000, they
11 would have come to you and asked for your authority?
12 A.  I don't know what -- I don't know what
13 the agreement says. I don't recall what it says.
14 Q.  Assume for me it says $75,000.
15 A.  I'm sorry?
16 Q.  Assume for me that it says $75,000,
17 okay? Would it be your expectation that they would
18 interact with you before offering to settle a claim
19 for $250,000?
20 A.  I would assume that, yes.
21 Q.  And what type of information would you
22 have required to judge for yourself whether that
23 number was appropriate or not?
24 A.  I would ask for details.
25 Q.  Did you get memoranda saying, you know,

133

1  Joe Blow claimed X, Y, Z disability, here's what we
2  know, here's what he claims, here's the dispute,
3  here's what we'd like to propose?
4  A.  I don't recall getting any memoranda
5  regarding that.
6  Q.  It was all just over the phone?
7  A.  Telephonic.
8  Q.  Catch you on the fly, here's the deal,
9  what do you say, yes or no, that kind of thing?
10     MR. MEAGHER: Objection to form.
11 A.  It was usually by telephone.
12 Q.  And they were usually conversations you
13 would cover in a single phone call?
14 A.  Again, I don't recall. It may have
15 been one call or it may have been more than one. I
16 may have had additional questions. Again, whatever
17 the limitation is, just because it is that limit
18 doesn't mean that they wouldn't call on items below
19 that limit.
20 Q.  Right. Did Swift have any interactions
21 with DMS along that regard?
22 A.  Who?
23 Q.  Who's the gentleman that worked with
24 you? Was it Swift?
25 A.  Paul Swink.

134

1  Q.  Swink.
2  A.  He may have.
3  Q.  Did he have authority from you to
4  authorize settlement of claims north of $200,000?
5  A.  No.
6  Q.  Do you know Mr. Kearney?
7  A.  No, I do not.
8  Q.  Do you recall anything about
9  Mr. Kearney being a policyholder or claimant of
10 Jefferson-Pilot?
11 A.  No, I do not.
12 Q.  Do you recall an occasion in 2001 where
13 Mr. Hughes or Mills or Ditmar sought your authority to
14 settle Mr. Kearney's claim?
15 A.  No, I do not.
16 Q.  When you authorized the settlement of
17 claims or disputes with policyholders, did you discuss
18 with DMS the other materials that would go with the
19 offer; for example, how long the offer would be open,
20 things like that?
21 A.  I don't specifically recall discussing
22 those items.
23 Q.  And as a general manager, if you
24 learned that DMS was making settlement proposals to
25 policyholders and giving them 15 minutes to make the

135

1  decision or the offer was withdrawn, would that have
2  disturbed you?
3      MR. MEAGHER: Objection, assumes
4      facts not in evidence, speculation.
5      You can answer.
6  A.  In my experience, that never happened.
7  Q.  What if that did happen on an offer
8  that you had authorized them to make, is that
9  something you would think is consistent with a duty of
10 good faith to the policyholder?
11 A.  Again, my response would be it never
12 happened.
13 Q.  What if it did happen?
14     MR. MEAGHER: Objection, assumes
15     facts not in evidence, asked and
16     answered.
17 A.  But it didn't.
18 Q.  Would it be disturbing, if it did?
19     MR. MEAGHER: Calls for
20     speculation, objection. You can
21     answer.
22 A.  I've never seen a situation where
23 someone was given 15 minutes to make a decision.
24 Q.  Would it be inconsistent, you think,
25 with the duty you have to the policyholder to put that

136