2-15-01

## ROBERT MILLS PHONE CONVERSATION 2/15/01

Mills: Good afternoon, Bob Mills

Kearney: Hello, Mr. Mills, this is Chris Kearney.

Mills: Hi Chris. How are you today?

Kearney: I'm all right. How are you doing?

Mills: Good.

Kearney: I called, uh; I called Jefferson-Pilot direct concerning my check this month

Mills: O.K

Kearney: Cause I thought I had...

Mills: Hang on, I...I didn't...right now they weren't...weren't issuing it cause I know I ha spoken with Mr. Hughes about that and we were still waiting for having getting that authorization completed, as well as, ummm, trying to think off hand...what the other reason was for that, ummm

Kearney: Who's Mr. Hughes?

Mills: Mr. Hughes is one of the vice presidents here. I think he corresponded with you on your claim a couple times and the other thing was, ummm...he had some of the information and initial contacts with the previous people that you conducted business with suggested that ahhh...some of the reasons why you discontinued doing the work were for reasons other than medical. So there was a question ahhh...

Kearney: (breaking in) Several of them? How many of them?

Mills: There was first one that we had spoken to so we haven't gotten any feedback from the rest and I don't know if that's because of, you know, they haven't spoke with the individuals or if they won't speak to the people out in the field because they don't have a proper authorization, kinda brings us full circle back to the original problem that we have always had in trying to talk to ya and explain the need for.

Kearney: So Mr. Mills, you do have my authorization that I gave *Jefferson-Pilot* which includes you and it says on it that "its good for the life of the claim". So you have authorization already.

Mills: I don't know anything about no authorization. I realize, I know it says that for the duration of claim but a lot of medical facilities people that you speak with ahh... anybody when your gathering information they want that authorization to be sometimes within 30

sometimes within 90 days before they'll even file a release or anything. So that's when they see something signed from like '98-'97 or something that's been awhile they're very reluctant to provide information. While I understand that the authorization does stipulate that its O.K. to release it they do get concerned and more times than not will not release anything so that's why I have been asking you to complete that you know an authorization that you know really every claimant that is insured by *Jefferson Pilot* is receiving now and then completing so its no different from anybody else

Kearney: (After several attempts to speak) Well, its like I said in one of my letters its so overly broad and then it also does not stipulate that my doctor can receive copies of the information that you gather that's also not on there.

Mills: Well, I-I realize that, some of that you have to understand, I mean its information that they gather for their files to evaluate your claim and…

Kearney: Uh-huh

Mills: …you know that's –that's information that they- they more time than not pay for and part of their collective files and they don't disseminate that to no other parties even the insured unless there is a specific state law that says so or obviously by subpoena

Kearney: Uh-huh, O.K.

Mills: Umm…so that's-that's kinda with that, I know a-I think you know a gentleman that you dealt with that returned a phone call today, I just got a message a did you speak with him? Mr. Ditmar, Did you speak with him?

Kearney: Ummm…No, I did leave him a message yesterday, just to let me know if there was gonna be a check coming or not because Saturday I have this interview. If your gonna cut me off now I don't see any sense in going to this clinical interview

Mills: Well that's- I mean- I would imagine that he'd…(sigh)

Kearney: Do you understand what I 'm saying?

Mills: Well…it

Kearney: Why would I go through with this if he's made a decision to cut me off

Mills: Well, I mean what-what do you do then? I mean, you obviously have the rights to seek legal representations …

Kearney: Right

Mills: …and file lawsuits against the company which they are gonna, I mean it's a contractual right, one of the-one of the first things there gonna do during the discovery is

their gonna say is we are setting up this exam so I don't understand why you wouldn't want to go through that anyways

Kearney: I don't mind going through that, I told you I welcome it! If these people are objective but, uh, I don't see spending the time to drive up there, you know if I have to with legal action I will, but at this point I think that, uh, I don't remember ever getting a check this late so it appears to me your cutting me off

Mills: Well...I think as the letters had talked about before its kinda pending on trying to get this authorization I mean its kinda like its in a suspense situation where you know they've asked for this information from you and you haven't provided it to them in quite some time- you have your reasons. They feel they are their right about this and would win in any type of, you know, court arena. So now they are exercising their contractual rights to have you examined to so do they have questions of what your future benefit eligibility is. So if you do go through the exams and it supports that you should be paid, then you'll be paid. If it comes back and doesn't support the...

Kearney: Well I'm not gonna wait and you should have paid me at the beginning of the month.

Mills: But if they don't feel...if they have questions they do not...

Kearney: (breaking in) They can have the money back

Mills: What's that?

Kearney: I said, They-they according to what I've read is you-the insurance company has been paying me at the beginning of the month-if they are not going to pay at the beginning of the month then I-I don't have any a-I can't see anything other than your stopping payment, and...

Mills: But I-I think they had correspondence-I mean-I know because I have read a lot of the letters and of course...

Kearney: No-no they have never had- I haven't got anything that says your cut off. Have I?

Mills: Not that formally says the claim has been denied, I mean, its not denied at this point their there to ask questions about your benefit eligibility, I mean their not gonna necessarily make a benefit payment to you without having the objective evidence so that's why their setting up this exam that's why they are having the accountant meet with you and your accountant together the necessary work documents...

Kearney: I already sent her something yesterday
Mills: O.K., that's good

Kearney: And if I don't get a check then, you know, I'm gonna put off this doctor visit, you know, if it has to be a lawsuit I guess, ummm...

Mills: Well, you know I don't want you choice. I mean, I don't wanna-I mean-I'm not looking to get into all that or anything I mean I would hope that we could come to some, you know, some sort of resolution on this

Kearney: I am going to the appointment, but I want-I need this check to live on. Do you understand that? I have expenses to pay. I haven't been working very much and all and its do to all this (pause) all this shit I'm going through

Mills: Um-hum, Um-hum

Kearney: And-ummm-uh I'm not afraid of being examined by a doctor

Mills: Oh, its not –it has nothing

Kearney: I-I

Mills: I know, I hear that, it's not about being afraid of going to get an examination, I mean I...

Kearney: Why don't you just send me the other release form and I'll sign 'em. Your new form is so broad and you haven't...

Mills: That's-That's their form. That's *Jefferson-Pilots* form that everyone of their insured is to my knowledge is completing right now

Kearney: Oh, It's their form; it has your name on it

Mills: Uh-yea, but it says we are the agent for the company. This is the form that they send out to all their claimants-via through us. So, I mean, your-I mean this is they are not arbitrarily giving you a different form I mean this is something that goes out to everybody

Kearney: O.K. I thought this was your standard form

Mills: No, that-that's the form that they-its there form but because we the third party claim administrator that has to be referenced on the top of-of the-a-any correspondence as you know and see so that's the form that they have authorized us to send out

Kearney: Well see you never explained this to me before, I asked you in a long letter in September to explain why you needed this form and basically you said because it's good for America.

Mills: (laughter) I don't think I said it like that

Kearney: (During *Mills* laughter) You said-you said

Kearney: Very close-It was like we need this because its very important. Well, I wanted to know, why was it so important. You never explained that this was *Jefferson-Pilots* form

Mills: Um-hum, Um-hum

Kearney: and a...so I thought I was

Mills: (Breaking in) Oh, are you telling me...let me ask you this...I'll go talk to some people and see if they can do that, ummm- (pause)

Kearney: Is that the only...

Mills: You know if I said to them, you know, you're-you're going to the examinations and you'll complete an unaltered authorization form, uh-you know, you know in the interest of good-will we get the payment out to you and wait for the results of the examination and make a decision on the claim. Would that be something that you're comfortable with?

Kearney: Um-I guess I have no choice but I-uh-I have always thought that your form was your own form, and I was forced to sign two different forms

Mills: No-nnno, the forms have changed with *Jefferson-Pilot,* as you've seen in the past.

Kearney: No, I saw the same one for six years, that's why I'm so confused

Mills: That's-O.K., O.K.-well that-maybe there is some confusion that-that hasn't been for whatever reason communicated to you, but those are their forms as in these are the forms that they want to have completed. I mean that's-that's where we manage *Jefferson-Pilots* stuff, but that's their claim file, you know, we can't necessarily do certain things without their O.K. on stuff, so

Kearney: O.K I thought this was your own claim form and I really don't like it because it's so broad I think...

Mills: I-I know you don't like it and there are certain people that have raised that concern too, I mean, you're not the first. So, I mean, I don't think that a-ummm.

Kearney: And-and I never signed it because I know you've already got one in effect, and...

Mills: Oh, I know, those things like I said are routinely sent out because after they get 30 to 90 days old, there stale. I mean, these people do not (stuttering) you know I've gone to

medical records, you know, it says clear as day, you know, for the duration of the claim. And then it's their practice not to release anything without an authorization on their paper, your know, or within outside of 90 days. So, ummm...

Kearney: Yea

Mills: I mean, that's-that's the way that works. I mean, I'm comfortable doing that so if I-I mean, if that's something that you think is reasonable, I mean, I 'll can make, ummm...

Kearney: (breaking in) Yea, I'm really not...

Mills: I'll speak to Mr. Hughes about that...

Kearney: That's why I asked you in a letter to explain it to me, and basically your letter coming back was because it is very important and that didn't really tell me it was a new form of *Jefferson-Pilots* and not your own.

Mills: Um-hum

Kearney: and that's why I never signed it because I didn't think I had a reasonable explanation not-because it is-it is overly broad I think, but if they requested that and not you. Then I would give that more consideration, and a-I will sign it if you get my check out to me, but if I don't get a check; uh, I think, your already-why don't I get checks on time? That's what I'm wondering?

Mills: Well, a-again, like we gone back and the number of letters, you know, they've had some questions what the benefit eligibility should be to you whether they should be paying you or not. You know, and they have continued to make some payments with some information that if-you know-is highly suggestive that there might reasons other than medical reasons as to why you stopped, ceasing in the work that you did or the work that your doing now that the loss of income is not a derivative of really a medical condition. So...

Kearney: Did you read my whole claim file? Did you read all the letters in the past that I sent to them? And they sent to me.

Mills: Yea, I-I'm aware of your whole claim file.

Kearney: Well, did you ever see letters in there from them suggesting to me that your five years are up, you better start looking for a new job?

Mills: But that-that point has been brought up several times, I mean, that 's really, you know that's a separate issue and it's really not applicable because your talking about, it all gets back to the root of the matter, why a disability claim is honored because it's got to be a medical condition that's causing a loss. So, you know, that's talking about

changes occupational-the way the occupation is looked at from the occupation your doing at the time of the claim-to any occupation by virtue of education and training experience after a certain number of years. Their feeling is that some of this evidence that's now coming to light almost (six?) years later...

Kearney: One call? One call? I'm not very surprised at all. I fact, I'm-I'm a-delighted that your not getting any further on that-you know, I'm delighted that only one said something like that anyway. Cause I was directly-a-told in a letter that my five years was up we are going to send you-pay to see a rehabilitation expert and it's-several letters suggesting that I get a new occupation. And if I'm only down to one principal, uh-uh, and that principal was unhappy if I told him I was gonna get into a new occupation um, it preempted any dropping on his part, you know, that did happen. But I don't think anybody in my position could say that I willingly got out of my business.

Mills: Well, you know, you gotta understand there's gotta be a medical interest to the bottom line, the reason...

Kearney: **You know Janet Battie asked, ummm, Dr. Judd, what she thought, she said even in Janet Battie's report that I'm not going to make it in a sales environment that's pretty much verbatim and,** um-uh, you've got doctors-you've got an overwhelming abundance of information...

Mills: Well, you know, the odd thing too, Chris, is I mean you-you, and we find that when someone's treating someone for a long time and their not getting better; you know that's the time when you start saying "gee, maybe-you know-maybe I should be looking at other means of treatment or other physicians or get a second or third opinion, because you know what I just don't feel like I'm getting better and maybe there's something out there, you know, if you have a problem; maybe, there's something out there that can help ya. You know, and part, you know many of these cases too, when you-when your claiming the type of difficulties that you have I mean, you usually go, I mean the treatment providers that we've become accustomed to, they will throw the persons through an assortment of test. To kinda rule in or rule out different things so that they can know what needs to be looked at next, and so the individual can be treated appropriate in the symptoms they do have. And you know, it's just, you don't see anything now, all the time with you and, umm, and I can-you know-from my own self-I would start to question well is this really helping me. You know, should I be, is there other means out there to help me get better.

Kearney: Uh, there might be but I-I can't, all-all the misinformation I've gotten from *Jefferson-Pilot* I should have been on total disability a long time ago and been able to either go to school or do something to rehabilitate get into a different profession without as much stress. And that's clearly what I think and I think that a-a my feeling is that I was coerced, I was not told-my questions were not answered properly by *Jefferson-Pilot* and by Janet Battie and I was intentionally not given the full information. I should have been on total disability then I should have five years to rehabilitate and get into something else...

8

Mills: Where here-but are-do you really say your totally disabled-I mean, your-your I mean, I've talked to you a couple times and-and...

Kearney: With regards to sales, I am. I-I am according to your definition-do you know what the definition in my policy is of total disability?

Mills: A-most likely it talks about the materials? of duties in way that many of the policies are...

Kearney: Yea, I feel very strongly that yea; I'll never go back to full time sales. I am totally disabled...

Mills: I mean-I mean-I know you still deal with people...

Kearney: Not in the last few months, I haven't

Mills: I mean you've been able to work with me and letters on the phone it's not likely your totally secluded from-from the rest of the world and your not associating with people so, I mean I...

Kearney: That doesn't make me-that doesn't make me a salesman

Mills: Well, maybe, you know maybe, it's your selling the wrong product there's not a market for that, you know your not gonna get sales no matter if you're the number one sales guy in the country or aren't or you know maybe you...

Kearney: I have a proven track record...

Mills: What's that?

Kearney: I have a proven track record of many years at? sales doing well and a-maybe-you should read up more about depression and you don't really understand it.

Mills: Well, I do know, I mean I'm not a doctor, absolutely, I do have a layman's understanding and I've talked to people and people get better from that, they get better they get back and if things extend over periods of time that a- an unusual duration you know the insurance company starts to look at that and say why hasn't this person been better-you know is this condition really disabling at this point any longer uh, you know they have obviously have honored the claims for a number of years, but by the same token has some questions as to what is happened all along and why haven't you gotten better umm, I mean, I (pause) you know this something that's going doing the path of making a black and white decision. I mean, I obviously understand that you know you guys have a side of the story to tell, I mean, I don't know if did ever come to any point that they mentioned some rehab stuff, I mean, it all seem to make sense to talk to them or speak to them about some resolution on this where they tell you something, and

everybody would walk their own way. I don't know if that is something you are considering with, because I could be a point person for you on that to talk to them about that or if it makes sense if they or you just kinda want to make that black and white decision to go through the testing. And that's an option that we're always willing to talk to them about it, but you know-it's whatever you want to

Kearney: O.K., umm, you know obviously dealing with you guys, I mean, ( pleeing ?) is extremely stressful and asking me for like-40,000 to 50,000 pages of-of back information. You know I'm a small businessman. I don't have an accountant. I don't have a secretary. And it's very daunting, umm, you know, I don't have anything to hide but I just-it's photocopier all day with canceled checks and all that, otherwise, I meet with your representative, I'll be just sitting around while she's going through all this stuff and then she has to photocopy it anyway, and umm, but I don't mind- I'm going to do that.

Mills: Uh-hmm

Kearney: But I'm gonna do that I've already sent her information and I don't care, she can nit-pick through all this. But I only have the last 3 years of information with *Kenwood Technology* and which I told you in a letter but that's all I've got and a…

Mills: But what about the other stuff, I mean, aren't you by law, have to maintain that stuff in case the IRS ever wants to look into that for auditing purposes

Kearney: I-I think you're supposed to for a year, uh…

Mills: It's gotta be longer than a year

Kearney: I don't think you have your information right about the 7-year thing. That's not what I was told and uh, I talked to my accountant before I discarded anything. I mean, I made several moves and he said it was O.K. to discard it-I discarded it and I did keep it for quite a period of time

Mills: Is your accountant willing to put that in writing?

Kearney: Uh-I don't know, I don't know, I'll ask him

Mills: Yea

Kearney: Why?

Mills: Well, I just-maybe-I-I'm incorrect but I mean I would like to have something in writing that says it's, that references that it is O.K. to throw that out after a year and that he advised you to do so. I mean, if I am able to present that to *Jefferson-Pilot* than that's what happened then what else can they do at that point but…

Kearney: Well, they can ask me that question then I'll...
Mills: (breaking in) Then ask him if he-if that's what he said to you-and he's willing to put it in writing, then maybe he answers that question right there

Kearney: Uh-I don't know if he'll put it into writing or not. But that's what he told me, you'll likely never use it for the IRS there-you know-your out of business and you don't need to keep this stuff.

Mills: Um-hum

Kearney: And I don't keep-and-and-uh, I did keep those tax returns from *Kearney, Associates* but-which I've given to you. And-and now you want confirmation, I just sent this lady also my social security record and it's conforms with what I told you guys. I don't know-you just beating a dead horse. And a-what kind of settlement could I get-I know my policy's worth-an attorney told me like, something like 2 million dollars.

Mills: Well, I wouldn't even professionally go into, I mean-come near that number to them. I mean for them to consider doing that type of agreement there would obviously be some discounting on future benefits and then you have the scenario where it might be the insurance company's decision to say, gee, we really don't feel he's entitled to anything and we feel that-that's what the results of the medical examinations will show, let's have him go through the medical examination then we'll make a decision on whether or not to claim would continue at that point. I mean, obviously, you know if they said pay then they would continue paying you. And then if they decline, you would sue them and then you would go through that whole process, so there's that expense so they would probably be looking at what they would incur from a legal perspective and to fight a decision-you know-that they feel there a hundred percent right on, obviously there still looking at the potential for future claims, so there is some consideration from that. So it would be a reasonable number a number that your satisfied with, but by the same token, you know-2 million would be way out of the realm that...

Kearney: Well, you can respond with a number, but basically, I'm not afraid of taking these test and I...

Mills: It's not about being afraid of doing that, I mean, I'm just-I'm just, cause like I said these tests might help you and substantiate the medical aspect of your claim, you know, and that's what there trying to understand and know, umm, so that

Kearney: I talked-Mr. Mills-I just talked with my 74 year old uncle

Mills: I'm sorry say that again

Kearney: I said you don't understand my situation I just talked with a 74 year old uncle and he told me that he's depressed right now and he's going to start back on-back on some kind of (Paxol ?) or something. I was very surprised. I didn't know-I knew he had been depressed before but he said he was hospitalized three or four times in the last ten

years. And this is a man 74 years old, and I said-he said his wife asked him "what he was depressed about" and, he said "damned if I know, I don't know." You don't...

Mills: Um-hum

Kearney: You do not know, you know you can learn everything in books, but umm, if it's a matter of a-a chemical imbalance in your brain, there is no cure. I'm-I'm not saying I can't work in the future. I certainly know that I can work certainly part-time, but I'm telling you that I...

Mills: Well, how-how's your new business doing?

Kearney: It's not doing so good

Mills: Why?

Kearney: Because of all the shit I've been going through with you guys. When I talked to you that-that one day and you told me I wasn't gonna get a check-or you didn't know my, my-I just went home and went to bed. I was so bummed out. I had no-I had a trade show to go to the very next day-I skipped it altogether. I could just not sell, and this is what this does to me. I'm dependant on this money. And, umm, in my new business I put a lot of money into it, uh, to keep-get it going and I thought I'm actually doing pretty good but the last six months while they threaten each month. I cannot think of anything except how to deal with you guys, how to get your information, how to a-what are my rights umm, I've had to go to the library-á to the law library, to a-you know I've moved up-moved in with my mother to try and reduce expenses, because if I'm cut off I'm in deep shit.

Mills: Um-hum

Kearney: and umm,

Mills: And-and again I'm not-you know you have to make a decision on what the policy stipulates. And its not-it's not a matter of, you know, putting you out on the street. I mean, by the same token, and if they don't have the evidence to support the payment I can't just keep on making the payments because you don't have a job or a business that's viable at this point in time. And that's why, I think, in scenarios like you, where it's you have become accustomed to the payments because it's now something-it's your support system that, you know, I'm not adverse to recommending to the insurance carrier that right, wrong or indifferent, maybe sometimes in situations like that, you know it makes sense to look at making a decision that falls-you know a resolution decision that will fall to everyone's satisfaction, rather then making the black and white decisions and you know putting on the gloves so to speak so...

Kearney: (after several attempts to break in) Mr. Mills...

Mills: I mean, whatever you want to do at this point and I'll communicate that...

**ROBERT MILLS PHONE CONT'  2-15-01    SIDE B**

Mills: (cont') if I-you'll go to the examination

Kearney: Yes, but I better have a check coming in the mail

Mills: And the authorization form too, do you have a copy of that

Kearney: Yea, if you'll, so that's *Jefferson-Pilots,* tell them I never knew it was *Jefferson-Pilot,* I thought that you guys was trying to force something down my throat that was beyond *Jefferson-Pilot.* **I will sign that but at the same time you understand my concern for having you guys call-it's not necessary to call my family and friends and all this-it's not necessary. If I go to these doctors and you have other information from doctors, why do you want to spread word about my illness-that hurts.**

Mills: Well, it's not releasing specific details, obviously, about your medical condition but that's how you collaborate that type of condition because its it really is a self reported thing and a good psychiatrist when they conduct their evaluation they speak with family members, they speak with friends-have you seen any changes in Chris's demeanor-you know what in the last six months, you know, I've seen a change in him. Things to help, and you've been telling her that for a while, that helps substantiate, that's-that's the **equivalent of obtaining objective evidence to substantiate self reported comments,** and those type of claims in that condition is tough and unfortunately, umm, it is a sensitive thing and we realize that and not trying to-and **don't spread word on stuff,** but I mean, umm, how do you-if there is a better way to do then let me know.

Kearney: Well, I just think you have an over abundance of information already and-and that, um, I'll go see these doctors, but send me the check, because I need to pay my bills

Mills: Well, I'll-I'll ask them but I can't say that they are going to do it at this point, but **I will let them know**

Kearney: Call me tomorrow. Because if I don't hear from you then I'm just gonna post-pone it

Mills: O.K. and a

Kearney: But I-but I don't agree with your-the way you described my situation, I-I had back surgery and suffered depression, went through a divorce and I lost half of my business right in those two years, at least, and then a-your on a downhill slide your further depressed you lose-I lost my business because of my illness

Mills: I know, I'm not disputing that you might have had some of those problems back then but people get better. It's like, you know, alright, you know; you've fallen off the

horse a little bit but at some point you have to get back on and get moving on with what you do with your life. And it's almost like nothing has really happened and not taken some of those advances, so and then trying to find the information to substantiate that is another thing as we've kind of gone over and, you know, we can disagree. I mean, I'm not saying I'm-I'm not trying to convince you to support my opinions but...

Kearney: Well, I cant...

Mills: You have to understand that other people do have opinions and look at these things differently than you do.

Kearney: Yea, I know and I've a-a I know my situation and I know that-that it doesn't really help to talk to people that don't understand my illness, because its- there is a stigma to it. And I don't like to talk to a lot of people about it, but

Mills: Sure

Kearney: doctors

Mills: Hey, I'm sure its not something you walk up on to the street and say, you know, "I'm treating with a psychiatrist", you know that's the only thing that happens when your in L.A. that's like that's chic, that's in, umm, but most people are not talking about it so, I mean, I can realize where your coming from on that

Kearney: Just you guys contacting my former principal, that-that really bothered me, because here's people some I like, some I didn't like; you guys calling them up and questioning my ability to work is, umm, whether I talk to them in the future or not it doesn't feel good to have them involved when it wasn't really necessary. And now that you've got that information go ahead and call them all up and see for yourself

Mills: Um-hum, well I-I

Kearney: I think you already have other

Mills: I think that's something that needs to be done

Kearney: Oh, I think you probably done it and umm and a-because you haven't got any information that's going to help your case-I told you that all along

Mills: Well, that's not true cause like I said, you know, one of the people had mentioned that there was a mutual separation, umm, I don't know which one off hand if you ask me but, you know, it was a mutual agreement to separate, it nothing to do with anything other than, you know, not producing the numbers. So, I mean, that's-that's

Kearney: Well, but sometimes

Mills: ...has caused some alarm

Kearney: Well, if you knew the business, most people if your "dropped" they don't tell you a specifically, but you know, you've gotten phone calls from them before and their usually just nice about it saying we ought to separate-but I

Mills: Well then, how, O.K., but how do you put your finger on it conclusively to say you know your going to say it's because of my medical condition their gonna say well we saw nothing about that, you it's really because he's not

Kearney: Of course!

Mills: You know, well how well-is it a trick on either side. Or was it somewhere in between.

Kearney: Do you think I was joking with you...(mingled with Mills previous comment)

Mills: You know it's a hard analysis, um,

Kearney: You've got my doctor's reports from those years and you've got-and now your talking to these people and I didn't go out and tell them I'm depressed and that's why my work has been cut down um, or my back surgery. I didn't tell-you don't go telling your principals your having back problems you get canned-they'll use that as an excuse right away to cut you off

Mills: Um-hum

Kearney: Whether it's ethical or not

Mills: Um-hum

Kearney: But I mean, you don't-you don't admit that you're physically or mentally weak

Mills: Um, hum

Kearney: ...in business at all. So it's not surprising that these people don't know about my condition. I didn't tell them about it an uh-uh at that time and um-um it's kinda sad to have you do this. But go ahead and do it and um

Mills: Well, this is what I'll do, Chris. I'll talk to them. I'll get back to you tomorrow I'll leave a message at the office number that I have, um, I'll let them know that a-if I understand this correct, your gone to complete the authorization form no matter what, but um, contingent upon them issuing a check your not going to go to the examination. Is that what I understand?

Kearney: Umm, I'll-you'll just have to post-pone the examination if there not going to issue a check-well I'm not even going to sign that form if you are going to blow me off.

Mills: Well O.K., I'll go ahead and explain it to them that way and I'll get back to you then tomorrow and let you know what their decision is um

Kearney: And-and if you're talking about money, too, Mr. Mills, you have to consider that I've got a lot of information over the years from *Jefferson-Pilot* that just is not true and I've had that documented and it's caused me a lot of confusion and that'll be a large part of what um, I am seeking if this has to go to court, I'm not trying to-I'm not trying to

Mills: Yea, I understand that, I mean, you obviously, need to have your rights. I mean, and their and when it gets into those things I know because I've been through them before I mean, it's open books, it's full of discovery things that, you know they ask for you have to provide as far as that suit and you know that's talking to anybody that had dealings from you a-work and medical experience to understand the story so I mean, it works both ways. So, I mean, so all I say is you just gotta understand that

Kearney: Oh, yea

Mills: I'm willing to talk to them about it, I mean I, you know in a case like that I-I think this could be something that would make a lot of sense for both parties but I will tell you up front um, I mean, somewhere in 2 million, and that I won't even get in the front door by saying the words so

Kearney: Well-well

Mills: I mean, if you have, I mean I don't know what that final number would be but I mean it would be far below that and I didn't want to give any false expectations

Kearney: Yea, but don't bother coming back with anything like 300 or $400,000 cause that doesn't interest me at all I would rather take my chances in court

Mills: O.K.

Kearney: You know I have, um, um

Mills: That's-that's good. I mean, that's good to know I mean that if that's you know if that's the route things go then that's so be it and life goes on and decisions are made and we have to live with them

Kearney: (trying to break in) And..Uh

Mills: I will address everything to them

Kearney: And I don't know if there is true justice in the court system, you know it's a crapshoot but I have been told that I have a very good case

Mills: Ya, I am sure someone is telling you that, ..I've..I've know that too. I mean people have said we have a really good case and we've lost. In cases we didn't think was the best and you know we thought we were and we've won. Your talking about our peers looking at this and the decision is out of our hands, so you never know the way they go.

Kearney: That's why I would rather avoid it and I am not, I'm not anxious for that

Mills: They're not anxious, I'm sure they're not, I mean, who knows maybe the exam answers all of our questions. But they are not eagerly jumping up and down licking their chops, looking to get into some legal battle with you. You know, why get into something like that... I think that can be resolved to someone's satisfaction. So that's.... by the same token, they are not afraid to go that route if it has to happen. You weigh your balances and chances if something like that ever happens.

Kearney: The other thing I wanted to tell you about- It very distressed me about the check I sent to, you directed me to send to Joyce or, ah, the lady at Jefferson-Pilot. In December, I was going to send a check to you and I sent it to you, Phyllis Harden- you told me to send it to her. She did not put that check into the system at all. I had to call up a month later when, just before I got notices that I was overdue.

Mills: I don't know what check do you mean? A check that was mailed to ya?

Kearney: No, no. I mailed my

Mills: (breaking in) Change of Address?

Kearney: Ya, Ya, that whole thing was I thought taken care of and I called and confirmed with the lady in that department on January 9th and I called back a few weeks later, and she said, "we didn't receive anything from you Mr. Kearney. And I said, "Yes you did. I sent that stuff and..

Mills: Okay. (breaking in) Ya I talked to them and I called up and I got your (unintelligible) and I think I had them call you directly too, or fax something. It's been since resolved, correct?

Kearney: Ya, but…

Mills: Okay

Kearney: Ya, but, but is this harassment or what?

Mills: I mean think about it. Why would they intentionally want to

Keaney: Stop the payments

Mills: Stop, you know, a change of address. I have your address of where the checks are going to. Why wouldn't they want to have the correct address to collect your money. I mean, that doesn't seems to, to make sense.

Kearney: No, I found it very, very, very hard to understand that Phyllis Harden wouldn't walk down two floors and hand the check over to the lady. Plus, I told the lady that she had my check. Why didn't she walk up and get it and then I wouldn't have ta…I was very afraid that my policy was going to lapse.

Mills: Well, ah, it didn't. Sometimes if you don't send it to the correct person, they don't know where it should be directed so..

Kearney: (breaking in) I didn't send it to the wrong person

Mills: You did the right thing, you followed back up with me. I got in touch again with the right people and made sure before I got off the phone that it was going to be taken care of… so I don't consider that to be an issue anymore, it's been resolved and again, I don't see why they would want to have your correct address to draw your premiums. That doesn't make sense… of course they would want to do that, they're in the business of collecting premiums.

Kearney: And when are my checks, let me ask you this…When are my checks supposed to be here…..legally?

Mills: **Ah, I don't know the dates that you are being paid offhand.**

Kearney: Because there is certain point in time when I don't get I check, then I have to consider myself cut off, right?

Mills: Well…I mean..ah…You can get it early, you can get it later. I mean if they didn,t pay, I mean obviously, they don't feel… **there's a question about benefit eligibility and there needs to be certain things done like the examination in order that they could make a further decision on the claim..** so they're in a difficult position to say, "hey, why should we make a payment, we don't kinda think this guy should be paid and what if the examinations come back and say we shouldn't have paid him, we've been paying him, you know, all this time. Is he really going to give us the money back?"

Kearney: Um, are you truly sure these people are objective and that they're, ah, um, do they know each other?

Mills: They have the qualifications. I mean, they're doctors right in your area, you know, they're

Kearney: Paid by you.

Mills: Paid by the insurance company- their right to pick and choose who it is, but again, I mean these, you know, I've heard that argument before. The same can be said about your own attending physician and whether or not, you know, that individual is really objective. Um, because, you know, quite frankly, you pay her. So, I mean, these are professional people. We have to rely on their opinions and impressions, so, justice, you know, it's a contractual right and, you know, that's the way that goes.

Kearney: Ya, Okay. All right, thank you very much.

Mills: Ah, are you going to be in your office tomorrow?

Kearney: Um, If I am not, just leave a message, okay?

Mills: Okay

Kearney: Um, the reason I don't really like to fax and leave messages because I am living with my mother and there are grandchildren, my nieces and nephews, running around....

Mills: Okay

Kearney: I don't really want them to be picking up this information. Okay?

Mills: Okay

Keaney: Thank you.

Mills: All right Chris

Kearney: But, but, do leave a message tomorrow. I'll, I'll either lock this door or something.

Mills: Okay

Kearney: Thank you.

Mills: All right.

Kearney: Bye

Mills: Bye, bye.

*End of Conversation*