July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 1

## OVERVIEW

Based upon the voluminous documents that I have studied to date, it is my strong opinion that Christopher L. Kearney (hereinafter the "insured") has been and continues to be a victim of his own insurance company; Jefferson-Pilot Life Insurance Company (hereinafter the "insurer').

The insurer's conduct and lack of conduct as it relates to the insured is best described as willful, wanton, malicious, oppressive, incompetent, misleading, harassing, arrogant, deceptive, fraudulent and bad faith.

The insurer's duties owned to the insured are 1) service, 2) trust, 3) protection, 4) peace of mind.  The insurer's duties owed to the insured, as it pertains to this case, have been minimal on some occasions and non-existent on most occasions.

## BACKGROUND

The insured purchased his first of two policies from the insurer on May 28, 1990, (effective date) and the policy is identified as Policy No.H0493029.  This policy originally had monthly benefits of $1,125.00 per month, with a 90-day elimination period, a social security supplemental benefit, ($625.00 a month) and residual disability benefit and a cost of living increase benefit built into the "schedule" of this policy.  The annual premium until the insured reached age 65 is $1212.01 per year.  A renewal of coverage beyond age 65 may require an increase in the renewal premium after age 65.

It is noted on the schedule that **total** disability, due to illness, is "lifetime".  However, the scheduled benefits as noted in subject policy is silent on the issue of residual disability but it can be reasonably inferred, since the policy does not state otherwise, that the

insured would have lifetime benefits for residual disability, since the insured's disability commenced prior to "the anniversary date of this policy next following your 45th birthday." Moreover, when Chelsey Ugolik completed her file review on November 18, 1997, Ms. Ugolik came to the same conclusion that I did, which is the subject policy is a "lifetime" policy [3-6]. (To date the insured has never received "Total" Disability benefits). It is also noted on Rider W.J.-1878, enclosed within the first disability policy, that "total" disability is defined as follows: "Means that you are unable to perform the duties of your occupation. The Rider goes on to state, "Your occupation means: 1) During the elimination period and for the **first five years** of a period of disability, the occupation in which you are regularly engaged at the time you became disabled: and 2) thereafter **any** gainful occupation in which you might reasonably be expected to engage because of your education, training or experience." This is a most unusual definition of total disability. As this "Rider" states, "Total Disability" means you are unable to perform the duties of your occupation. The usual and customary definition found in disability policies is that the insured, in order to qualify for total disability must demonstrate that he/she cannot perform the "usual or customary job duties" or that the insured is unable to do the" material and substantial duties" of one's occupation. The definition of total disability in the insured's policy is vague and ambiguous. That is, what does the insurance company mean by "unable to perform the duties of your occupation?" Does that mean **some** of the duties, or **most** of the duties or **all** of the duties of the insured's occupation? The industry standard is, that the insured must demonstrate that he/she is unable to perform the "substantial and material duties" of one's occupation in order to qualify for total disability coverage. I would think that, in this case, dealing with

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 3

this insured, if Mr. Kearney could demonstrate that he was unable to perform the material and substantial duties of his profession or occupation, as of the date of his disability (February 9, 1993) [3-5] that Mr. Kearney would be considered, within the industry standards and the policy language in the subject Rider, totally disabled, otherwise, residually disabled.

Usually, the difference between residual disability and total disability is based on the number of duties that the insured can or cannot accomplish in the insured's usual and customary daily job activities.

For example, if the insured was earning approximately $100,000.00 a year, and, due to an illness disability, the insured was only able to earn $20,000,00 instead of $100,000.00 per year, then the insured would be declared "totally" disabled rather than residually disabled. Residual disability usually means that the insured earns at least 20% of his/her earning capacity but less than 80% of his/her earning capacity during a disability period. It is also noted, in the definition of "total disability" as noted in the subject Rider in the insured's first policy (Policy No.H0493029) that the insured does **not** have to be under the care of a physician. This is most unusual. Most total disability policies require that insured not be able to perform the substantial material duties of their profession or occupation, **and** be under the care of a physician, and not otherwise employed unless the disability policy is an "own" occupation type policy. However the insured, in this case, has an "own" occupation type policy for the first five years of total disability. After five years, the insured must be able to demonstrate that he/she cannot perform "any" occupation based on education, training, and experience. **However** please note the insured's **second** policy (issued May 28, **1991**) has a **different** definition of "Total"

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 4

disability [1-27-10].  Since "Total" disability is a **non-**issue at this time I will reserve any

discussion regarding the 2nd definition.  In the subject policies, the insured is being paid

for **"residual"** disability.  It is also noted on page 3 of the policy under FormWJ-1817A

(Rev 1/89) that "any loss of monthly income of more than 75% of the prior monthly

income will be deemed to be 100%".  "Monthly Benefit" is the amount shown in the

schedule.  Moreover, on page 3 of the subject policy, "Residual Disability Monthly

Benefit" is the benefit payable for each month of Residual Disability.  It will be

computed monthly, as follows:  "Loss of monthly income divided by prior monthly

income, multiplied by the monthly benefit and that equals the Residual Disability

Monthly Benefit".  Hence, if the insured's earned income drops down to 25% or less of

his earned income, as of the date of the disability, then the insured gets 100% of the

Policy Benefits, as identified in the schedule in the Policy.

On May 28, **1991**, a **second** policy was issued by the insurer to the insured.  This is

policy No.  H538069.  The second policy is basically the same as the first policy, as far as

"Residual Disability" policy language.  Hence, as of May 28, 1991, the insured is now

the owner of **two** disability policies, issued by the same insurer.  As of May 28, 1991, the

insured's occupation is that of a "manufacturer's representative".  In fact, the insured is

the President of Kearney Associates, Inc.  which is a manufacturer's representative

agency.  On February 9, 1993, the insured files for "**residual**" disability.

On June 9,1993 [1-129] the insured furnishes the insurer a claim form for residual

disability.  The June 9, 1993 claim is for the disability period of February 4, 1993 to June

9, 1993 and for severe back pain.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 5

On July 6, 1993 [1-129] the insurer sends the insured another claim form, which the insured completes and returns to the insurer.  Subsequently, the insured receives a "phantom letter" (no author of letter identified on the correspondence sent to the insured) and the insured is informed by virtue of this phantom letter that he may recover policy benefits every thirty days.  In other words, the insured has the option to be paid other than every thirty days [1-128].  However, it appears that the insured elects to be paid monthly. On or about September 8, 1993, [1-127] the insurer informs the insured that there is no "waiver" benefit regarding "residual" disability claims.

It appears that the insured's nightmare with the insurer began on or about September 15, 1993 [1-126].  This is when the insurer sent a letter to the insured and enclosed a check dated September 14, 1993.  It is interesting that it only took one day for the insurer to mail a policy benefit check to the insured.  This will become important subsequently, in this report.  **However**, the insurer failed to enclose a supplemental claim form so that the insured could file for another month's policy benefits.  (Currently, it is not known if the failure to enclose a supplemental claim form, with a policy benefit check was inadvertent or part of an agenda to start harassing and annoying and causing emotional distress to this insured).  It should be clearly noted that the insured's claim, as of September 1993, was for a back injury.

Moreover, even as early as 1993, most, if not all, professional life insurance companies, selling and servicing disability income policies, were automated.  That is, a Claims Representative would input into a computer system, the dates that checks were to be issued, promptly, to the insured and unless otherwise noted, the supplemental claim form would automatically be enclosed with a monthly disability payment.  Additionally, within

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 6

the September 15, 1993 letter sent to the insured, the insurer requests information as to whom the insured's principals were, that the insured was working for in 1993.  It would appear that the insurer had the idea to contact the insured's principals (customers) to determine any disability while dealing with any of those customers.  **This is an absurd idea**.  If you stop and think for a minute, and based on your experience in dealing with people, what are the chances that this insured would go to each and every one of his principals, or any of them, and voluntarily disclose any disability?  That just doesn't happen in the real world.  Having dealt with thousands of insured's, I have yet to know of or hear or read about any insured who voluntarily goes to his livelihood, that is, his customers, and voluntarily disclose that he has any disability.  Hence, the request for a list of the insured's principals, in May of 1993, was suspect.  Moreover, it is currently believed that all of the insured's principals or customers were non-medical professionals or had any medical training or had been through medical school and could offer any credible evidence as to whether the insured was suffering from any disability.  It is also noted that the insurer never explains **why** the insurer wants a list of the insured's principals as of September 1993.  Additionally, in the September15, 1993 letter, the insurer requests the name of the insured's Tax Accountant.  This could be a very reasonable request.  If the insurer requires tax returns or P&L statements (profit and loss) etc., then the insurer, a multi-billion dollar corporation, could easily withstand the time and expense to secure the insured's tax records to verify the insured's income.  Additionally, and it is a significant point, the diagnosis of the insured, as of November 1994, is severe back pain.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 7

On May 20, 1993, the insured wrote a letter to the insurer and disclosed who his Tax Accountant was but refused to identify his clients, since there was the substantial likelihood that the insurer was going to disclose to the insured's principals, the fact that the insured was suffering from severe back pain. If, in September of 1993, the insurer was uncomfortable with the idea that the insured was suffering from severe back pain, the insurer ought to, pursuant to the policy provisions, had the insured examined. (Independent Medical Examination). I think that it is remarkable that this insured, in this case, wanted to go to work even though he knew he was suffering from severe back pain. Many insureds would have just thrown in the towel and filed for total disability, for life. This insured did not do so. That is commendable.

It is noted that on September 20, 1993, [1-124] that once the insurer learned who the insured's CPA was, the insurer didn't contact the insured's CPA! However, as of September 28, 1993, the insurer repeats its demand for the identity of all the insured's principals for the past one year. The insurer stated that it needed the identity of all the insured's principals "for our files". Based on the subsequent conduct of the insurance company, the insurance company was something less than honest and honorable with its own insured. Subsequently, the insurer did exactly what the insured was fearful of, that is the insurer actually went out and contacted the insured's principals, non-medical type professionals, in which to learn whether the insured suffered from a disability of depression and/or paranoia! Put another way, the insurer simply lied to its own insured when the insurer stated that it needed the principal's names "for our files".

Subsequently, on October 18, **1993**, [1-123] the insurer sends the insured another letter and again requests the identity of the insured's principals. You will note that the insurer

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 8

did not tell the insured **why** the insurer really wanted a list of the insured's principals

until February 15, **2001**, when, during a telephone conversation, Mr. Mills disclosed, in a

candid telephone conversation with the insured, that the insurer would interview the

insured's principals to determine if the insured was "disabled" due the illness of paranoia

and depression **or** whether the insured just decided to voluntarily get on the payroll of the

insurance company.  That is, in the mind of the insurer and at least the Claims

Representative, Mr. Mills, it was the insurer's thinking that the insured got tired of

working and decided to be disabled so that he could draw lifetime policy benefits from

the insurer, pursuant to the insured's two disability policies.  It was the insurer's thought

process that the insured was a deadbeat or a flake or a cheat.

On October 19, 1993, the insured sent a letter to the insurer regarding his two policies

and pursuant to the insurer's letter of September 29, 1993.  The insured explains that he is

an employee of Kearney Associates, Inc. and that corporation pays the insured wages and

expenses and provides the insured with a W2 form.  Moreover, the insured explains that

Kearney Associates, Inc. is the insured's sole employer.  Equally important, the insured

informs the insurer to contact the insured's accountant, if necessary, to verify the

insured's income.  Again, the insured asks the insurer for "the exact purpose" as to why

the insurer needs to contact the insured's principals.  It is noted that the insurer never

answers the insured's question as to **why** the insurer needs to talk to the insured's

principals or customers.

Then on October 31, 1994, approximately one year after the insured's last letter of

October 19, 1993, which was sent to the insurer, the insured submits a "new" disability

claim.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 9

On November 8, 1994, the insurer sent a letter to the insured and requested the insured's 1992 and 1993 tax returns and W-2 forms and a statement from the insured's CPA regarding the insured's 1994 earnings to date. What is interesting about the insured's November 8, 1994 letter is that is received by the insured on November 26, 1994. However the envelope that enclosed the insured's letter was postmarked November 22, 1994. This is significant for two reasons. The mailing time from the insurer to the insured is four days (November 22,1994 to November 26, 1994).

Secondly, the insurer "sat" on its letter of November 8, 1994, until it mailed that letter on November 22, 1994; a delay of fourteen days. Normally, fourteen days isn't a big deal. However, in the disability income industry, fourteen days can be the difference between paying your rent on time or your other bills on time or incurring late fees or penalties because you haven't received a timely check from your insurance company with which to meet your financial obligations. It is also interesting to note that when this delay of fourteen days was brought to the attention of the insurer by the insured, the insurer never apologized or gave an explanation or an excuse as to why the insurance company "sat" on its correspondence for two weeks before even mailing it to the insured. Just this one example of a fourteen-day delay which is a Bad Faith Claim Practice. (Bad Faith is generally recognized in every jurisdiction in the United States as an **unreasonable** delay or **unreasonable** withholding of a first party insured's policy benefits. This is extremely crucial when dealing with disability income type policies because those policies were designed to pay the insured X amount of dollars **every** thirty days and is to be a **substitute** for the insured's otherwise paycheck when the insured was not suffering from an illness or injury.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 10

Then on November 29, 1994 [1-114] the insured sends a letter to the insurer. Enclosed

with that letter are the insured's 1992 and 1993 tax returns and W-2s. The insured also

enclosed his CPA's 1994 earnings to date. What is significant is that the insured's

earnings to date are $20,800.00. If the insured was earning $80,000.00, for example,

prior to his disability of February, 1993, then $20,800.00 would approximately represent

a 75% reduction in earned income. According to the two insurance policies, if the

insured's income is reduced by 75% due to an illness, then the insured would receive the

maximum policy benefits, pursuant to the schedule in the two policies and meet the

definition of "total disability" in each policy which states, "Total disability means that

you are unable to perform the duties of your occupation." I reached this conclusion

mainly because the insurer's definition of total disability is vague and ambiguous. The

insurer's definition doesn't quantify whether the insured's inability to perform his duties

means most of his duties, or all of his duties or the material and substantial duties of the

insured's occupation as of the date of disability. Hence, as November29, 1994, the

insured could have been "totally disabled" by virtue of a reduction of his earned income

by 75% or more.

On December 20, 1994 [1-110] the insured's CPA sends a letter to the insurer and

encloses the insured's 1992 and 1993 corporate tax returns and income statements. It is

noted that the insured's "gross" income for year to date is $22,800.00, Moreover, the

CPA for the insured explains to the insurer that the insured has a part time employee, a

secretary, since1988 and the secretaries gross income if $4,306.00 year to date for 1994.

The secretary's gross income was $3,801.25 in 1993. Also, the insured pays

commissions to self-employed "sub" Manufacturer Representatives. On December 22,

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 11

1994, [1-109] the insurer sends a letter to the insured's CPA. The insurer requests the insured's year to date "income statement". This is interesting in that just a week before, on December 20, 1994, the insured's CPA had already given that information to the insurer.

Then on January 26, 1995, [1-105] the insured sends a letter to his insurer. The insured is understandably upset, in that **three months have passed** since he submitted his last disability claim form and yet the insurance company hasn't paid the insured a penny. The insured reminds the insurer that he submitted his claim on or about November 1, 1994, and that he didn't even get a response to his claim until November 28, 1994. Moreover, the insurer was sending letters to his **old address** and the insurer was asking his CPA for **redundant** information (which cost the insured money for the time the CPA responds to **redundant** requests from the insurance company) and the insurer asks for a tax return that is not available which unreasonably delayed the processing of payments as of late January, 1995. This is causing the insured **stress** and is **complicating** the insured's recovering of his major depression and paranoia. It appears that the insurer simply does not care about its insured, in this case.

As of February 6, 1995, [1-100] the insured is forced to report the insurer to the Ohio Department of Insurance for not honoring the insured's two disability policies and the insurer's Claims Representative fails to return the insured's phone calls, as promised by that Claims Representative as to what is the problem about disability payments not being issued promptly. The insured also reminds the insurer that the insurer is to issue checks to the insured **every** thirty days.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 12

On February 8, 1995, [1-99] the insured reminds the insurer that his current claim is a "continuation" of the insured's prior claim. At this time, February 8, 1995, the insurer's Claims Representative represents to the insured that there is a 24-month limitation on benefits. This type of blatant policy misrepresentation is Bad Faith. Also, the insurer would have a duty to the insured not to aggravate his pre-existing major depression and/or paranoia.

On February 10, 1995 [1-98] and **after** the insured had reported the insurer to the Ohio Department of Insurance, on January 26, 1995, then the insurer honors the insured's disability claim for the two policies that the insurer has sold to the insured. The insurer issued one check for $11,200.00 and a second check for $19,250.00 to the insured. What is interesting is that the insurer did not 1) **apologize** for a three-month delay in paying policy benefits and 2) the insurer did not **pay interest** on the wrongfully withheld policy benefits for three months. In essence, the insurance company used the insured's policy benefits to the insurer's benefit while stonewalling the issuance of duly owed policy benefits to the insured. This is another example of insurance Bad Faith claims practices. As you are probably aware, insurance companies don't let $11,200.00 or $19,250.00 just sit around in an office. Insurance companies have that money out working twenty-four hours a day, seven days a week. Insurance companies make a profit on wrongfully withheld policy benefits by virtue of interest or investments. Hence, there is an incentive on the part of the insurance company not to promptly pay policy benefits to its insureds. It is common knowledge in the industry that insurance companies are "silent bankers". That is, they receive millions, and sometimes billions of dollars, in the form of premium dollars and then sit on that money as long as possible before letting it go in the form of

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 13

paying valid claims. It is the time between receipt of premium dollars and the release of those premium dollars in the form of paying claims, that insurance companies make significant amounts of money through the form of investments or short-term interest rates.

Subsequently, on February 14, 1995, the insurer's **Vice President**, Mr. Roberson, sends a letter to the insured and explains that there isn't a two year limitation on benefits, since the insured's disability started prior to the insured's 55th birthday.

Then we move on to December 2, 1996. At this time the insurer hires a New York, New York Forensic CPA firm to audit the insured's tax returns. Apparently there aren't any forensic CPA experts in the state of Ohio, where the insured resides. The insurer's forensic CPA then informs the insured that the forensic CPA for the insurer wants tax records going back to 1990! Not only does the forensic CPA expert for the insurer want tax records going back to 1990 for the insured's individual returns, but also corporate returns and monthly P&L statements for the period of February, 1993, to November, 1996! It appears that in December 1996, the insurance company decides to declare war against its own insured. Moreover, the insured's forensic CPA wants all billing records for 1990 to the present (December 2,1996) and all appointment calendar and cash receipts and bank statements and check stubs and deposit slips and cancelled checks and a discussion on the operation of the business! The question that comes to mind, in December of 1996 is, why are 1990 tax records relevant or material or otherwise valuable information since the insured has been on disability since 1993. That is, why would an insurance company wait three years to request this financial information, which is irrelevant and immaterial, and of which the insurer has most probably either waived its

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 14

right to this information or the insurance company is estopped to ask for this information, since it was never even important to the insurance company until December of 1996.

On February 1, 1997 [1-89] the insured sends a letter to the insurers forensic CPA. The insured declines to participate in the forensic CPA's massive tax audit, going back to 1990. Equally important, the insured shares with the insurer's forensic CPA that the insurance contract (policy) only requires the insured to document his disability claim pursuant to the policy language, which states, "**Reasonable**" proof of my current monthly income and previous monthly income if necessary. The insured states, " I have regularly and consistently done this by submitting my business and personal tax returns, as well as statements from my accountant". The insured is right. The insurance company's "witch hunt" is wrong. The insured goes on and states in his letter of February 1, 1997, "I don't see any provision in my insurance contract giving Jefferson-Pilot the right to conduct an audit. (Back to 1990).

Then in March of 1997, the insurer sends a letter to the insured and admits that it has the insured's March 3, 1997, claim form but "**Before considering benefits**, we need additional information regarding your income." This is one of the first examples of the insurance company intentionally suggesting that the insured is going to be "cut off" unless the insured does everything the insurer wants. Also, apparently in March of 1997, the insured shares with the insurer that he has not earned any income for November or December 1996, nor for January or February 1997. You will note in March of 1997, that the Vice President of the insurer, Mr. J.L. Roberson is now writing to this individual policyholder, the insured. Apparently the insurer uses its Vice President in which to write suggestive letters to its policyholders, in which those Vice Presidents employ

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 15

"intimidation" and "badgering" as a claims technique in which to get insureds to jump through the insurer's hoops.  It is most unusual to have a Vice President of a life insurance company writing a letter to an individual policyholder.  In any event, the **undated letter by the Vice President, Mr. Roberson, states, "However, before considering benefits**, we need additional information regarding your income."

Basically, the Vice President is telling the insured, "**You're cut off** until we get additional information regarding your income".  This is a letter sent by a senior officer of the life insurance company to an individual of which the insurance company knows expressly, that the insured is suffering already from **major depression and paranoia**.

This type of letter is analogous to pouring fuel on the fire of the insured's illness. (Aggravation of the insured's illness).  This type of tactic is bad faith and despicable conduct by a professional insurance company.

The insured responds to the Vice President of claims for the life insurance company and states that the reason that he doesn't have any earned income for the past four months is because his expenses have exceeded his income.

Technically, the insured could now be totally disabled.

Also, the insured asked for his policy benefits, "As I am very dependent on this income for **financial survival**."  (Of course, the insurance company knows this and therefore the insurance company has tremendous power over that of a single policyholder).

On December 12, 1997, [1-84] the insurer sends a letter to the insured and informs the insured that the insurer will reassign the insured's case to "Disability Management Service" (DMS).  This is significant.  According to the insurer, the insurer is operating on the premise that the insured's five years of **total** disability benefits will expire on

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 16

February 9, 1998; in approximately two months.  **This is another material misrepresentation of the insurance policy.**  As you will recall, the insured has been qualified as a claimant receiving "**residual**" disability and **not total disability**.  Hence, the insurer has again made a material misrepresentation of the insurance policy.

The insured writes to the insurer on December 17, 1997, and asks two questions, The first, when did the insured become "totally" disabled?  (The insured's claims have always been a "**residual**" disability claims).  The second question is, where in the policy does the policy say "any" occupation "for which you are qualified for by education, training or experience" after five years of  "**residual**" disability?  (It doesn't).

On December 19, 1997, the insurer responds to the insured's letter of December 17, 1997.  The insurer states that the insured's total disability and residual disability, combined, is for almost five years now, while the insured was operating his business, **part time.**  This is a very creative approach by the insurance company.  This is sometimes referred to as **"post claims underwriting"**, in which the insurance company rewrites the policy language after the insured has submitted a claim.  That is, insurance companies just fabricate policy language which happens to fit its personal needs at a given time.  This is also known as **fraudulent** claims practices.  As all professionals in the insurance industry know, the claims game must be played by the rules and limitations as outlined in the insurance contract.  That is, the insurance company just can't makeup new rules as they go along to fit its personal needs.

Moreover, the insurer's letter of December 19, 1997, just prior to Christmas, explains to the insured, "The policy definition of your policy indicates that during the first five years of a period of **total** disability, that because of sickness or injury, you are 1) unable to

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 17

perform the substantial and material duties of your occupation; and 2) you are not actually engaged in any other occupation." **Again**, the insured is on **"residual"** disability and **not total disability**, as of December, 1997. What is also significant about that sentence, which is the first sentence in paragraph 2 of the insurer's letter of December, 1997, is that the insurance company doesn't even know the definition, of total disability! As noted previously in this report, "Substantial and material duties of your occupation," is not the definition of total disability in the two policies issued to the insured! That is, the "Rider changing the definition of total disability" states, "The definition of "total disability" in the policy to which this rider is attached is hereby **deleted** and the following substituted therefore: "Total disability" means that you are unable to perform the duties of your occupation." Hence, the insurer's definition of total disability, as noted on page 1, paragraph 2, of the insurer's letter of December 19, 1997, and authored by Harold D. Shelton, Manager, Individual Health Administration, doesn't even know the definition of total disability in the insured's two policies issued to the insured by the insurer. There is no "substantial and material duties of your occupation" language in the definition of total disabilities in the two policies issued by the insurer, per the rider in both policies.

Also, noted in the insurer's letter of December 19, 1997, the <u>insured</u> states, "The question was that you may have lost a large client that affected your business, **rather than** having to reduce the number of your clients, due to your disability. Because we are not able to make that decision, there have been questions as to the true status of your situation." To my knowledge, this is the first time that the insurance company has let the cat out of the bag by informing the insured that it is the mind set of the insurance company that the real reason that the insured is "disabled" is because he has lost "a large client" rather than

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 18

being disabled, due to an illness; major depression and paranoia.  The insurance company

is telling the insured that the insured has made a "choice" to retire on the insurance

company's payroll as a claimant, pursuant to his two disability policies rather than

continuing to work as the insured has worked for the past ten to twenty years.  Basically,

the insurance company is telling the insured that the insured is a flake or a deadbeat and

is really not disabled, due to an illness.

In the last paragraph, on page 1, of the insured's letter of December 19, 1997, the insurer

goes on to state, "Even though you continue to provide attending physician's statements,

**certifying** that you are disabled due to depression, we **wonder** if perhaps you are able to

expand your business, but have **adjusted to the disability income**.  Hence, according to

the insurer, the insured and the insured's attending physician are in collusion to defraud

the insurance company because the insurance company states, "Even though you

continue to provide attending physicians statements, **certifying** that you are disabled, due

to depression. . . . "  It would appear at this point in time that the insurance company is

suffering a greater degree of paranoia than that of the insured.  Basically the insurance

company is telling the insured that the insured is ripping off the insurance company by

submitting a bogus illness disability claim.

On January 13, 1998, [1-79] the insured sends a letter to the insurer.  The insured

explains to the insurer that his two brothers have been hospitalized for depression after

suicidal attempts.  His sister has been hospitalized this past year for depression.  The

insured has gone through back surgery and has had his marriage dissolve due to the

insured's complications of his current depression.  Moreover, the insured's father has

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 19

passed away in the past year, without the insured having a chance to say "Good-bye."

Additionally, the insured has had thoughts of ending his life on many occasions.

On January 19, 1998 [1-17] the insured sends a letter to the insurer. Based on a

telephone conversation between the insured and the insurer, it is the insurer's position

that the insured has been on **total** disability for almost five years. Based on the insurance

company's representation, the insured makes a claim for a "refund" of the premiums that

the insured has been paying for the past forty-eight months. The policy is clear that if the

insured is **totally** disabled, and because of a waiver of premium benefit in the policy, the

insured should not have been paying premiums to the insurance company for the past

four years. The insured asked for a refund of the premiums paid for the past four years,

which represents $7,709.28.

On February 14, 1998, [1-77] the insured sends a letter to a Ms. Beattie in Newton,

Massachusetts. The insured wanted to know what Ms. Beattie's agenda was, that is, why

did Ms. Beattie want to meet with the insured in the first place? This letter becomes

significant because Ms. Beattie refused to answer the inquiries of the insured or explain

to the insured why a meeting was necessary in the first place. This letter also lays the

foundation for a **pretext** interview with the insured subsequently.

On February 28, 1998, the insurer sends a letter to the insured. This is in regards to the

insured's letter of January 19, 1998 [1-78]. You will note that it took **over a month** for

the insurer to respond to the insured's inquiry concerning his claim. This is clearly an

unreasonable and excessive amount of time for an insurance company to respond to its

own insured's inquiry about the insured's claim. This letter is significant in that the

insurer **reverses** itself (again) in that the insured has been receiving **residual** disability

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 20

benefits for the past five years and **not total disability benefits**. Therefore the "any"

occupation provision will not apply, since the insured, **according to the insurer** has not

been on total disability for approximately the past five years. The insurance company

also makes it clear to the insured that because the insured has **not** been on total disability

for the past five years, that the "waiver" policy benefits do not apply. That is, the

"waiver" of premiums provision only applies to **total** disability claims. The insurer goes

on to state, **"We will continue to pay benefits under the residual portion of the policy**

**so long as conditions remain as they are at the present time".** This is significant

because from February 28, 1998, the date of the insured's letter, and until the present

time, June of 2001, nothing has changed in the insured's disability claim. That is, the

insured's conditions (major depression and paranoia) have "remained as they are at the

present time."

On March 23, 1998, [1-73] the insured sends a letter to the insurer. The insured asked the

insurer, What is Ms. Beattie's "agenda". This is the insured's second request for

information about why Ms. Beattie wants to meet with the insured. The first inquiry was

February 14, 1998 [1-77]. It should be noted that Ms. Beattie, as well as the insurer **both**

totally ignore the insured's inquiry as to what is Ms. Beattie's "agenda." Also, the

insured shares with the insurer that Ms. Beattie stated that she would do a report

following the insured's meeting. However, the Insurer's Representative, Mr. Ditmar

(with DMS) stated that Ms. Beattie **would not** do a report following her meeting with the

insured. It appears that the insurance company can't get its story correct when

communicating with the insured. Also, the insured informs the insurer that a faxed letter

to Ms. Beattie was not forwarded to the insurer, Mr. Ditmar, **as promised** by Ms. Beattie.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 21

This is just one of dozens of promises, made by the insurer and its agents, which are repeatedly broken.  The insured also informs the insurer that he has now waited approximately thirty nine days (since February 14, 1998) for a response from Ms. Beattie as to what her "agenda" is in relation to the meeting that Ms. Beattie wishes to set up with the insured and the insured's attending physician, Dr. Judd.  Within **industry standards**, inquiries by insureds of their insurance company ought to be responded to in approximately five days.

On March 25, 1998, two days after the insured's complaint filed with the insurance company, about Ms. Beattie not responding to the insured's inquiry, Ms. Beattie does send a letter to the insured's doctor, Dr. Donna Judd.  Ms. Beattie states that she wants to meet with the insured and the insured's doctor, Dr. Judd, to discuss Mr. Kearney's **treatment plan and prognosis for return to work.**  This type of meeting is unusual in that the usual procedure is, when the insurer wants to discuss the insured's "treatment plan and prognosis for return to work" this is usually done by telephone or by letter. However, as will be discussed, Ms. Beattie's "agenda" comes to life in the meeting between only Ms. Beattie and the insured.  Also noted in Ms. Beattie's letter of March 25, 1998 [1-71], Ms. Beattie confirms that she will provide the insured with a copy of her report regarding her meeting with the insured and the insured's attending physician, Dr. Judd, within ten days, following this meeting.

Subsequently, on April 7, 1998, [1-70] Ms. Beattie sends a letter to the insured.  She discloses that she is a **consultant** for Disability Management Services.  Ms. Beattie states that she works for "Psychiatric Disability Consultants, Inc." which is a subsidiary of Disability Management Services."  Ms. Beattie goes on to state that she has a Master's

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 22

Degree" in "Vocational Rehabilitation." Hence, Ms. Beattie gives the impression that the meeting between the insured and the insured's attending physician, Dr. Judd, is to investigate the possibility of rehabilitating the insured's vocation. Ms. Beattie, due to the insured's extreme concern about privacy, as it pertains to his personal life, is assured by Ms. Beattie, in her letter of April 7, 1998, that all information that the insured provides to Ms. Beattie or Disability Management Services or Jefferson-Pilot Life Insurance Company is **confidential** and will not be released to any other parties without your "knowledge."

Also, Ms. Beattie confirms, in writing, in her letter of April 7, 1998, that the insurer **will** pay for Dr. Judd's customary rate for a one-hour meeting.

Following the meeting between Ms. Beattie and Dr. Judd and the insured, then the insured was going to send a letter to the insurer's Vice President in charge of claims, Mr. Roberson and discloses the true "agenda" that Ms. Beattie had, presumably prior to or during her meeting with the insured and the insured's attending physician, Dr. Judd. After the meeting with the insured and Ms. Beattie and the insured's attending physician, Dr. Judd, which lasted for approximately one and one half hours, and **after the insured's attending physician left the meeting**, then there was a discussion between the insured and **only** Ms. Beattie, which lasted for approximately one and one half hours. While the insured and Ms. Beattie were alone, Ms. Beattie suggested to the insured that the insured's best interest would be served by the insured **giving up his disability insurance policies** for a sum of money! (Now the true agenda of Ms. Beattie comes to the surface). The true agenda of Ms. Beattie was to either buy out or buy back the insurance policies (2) that the insured had in force with the insurer. This is significant in that, Ms. Beattie,

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 23

who purportedly represented herself as a Psychiatric Disability Consultant, **is really a Claims Adjuster and Claims Negotiator**.

As noted in the Ohio Insurance Revised Code, Section 3904.01 (T), "pretext interview" (3) "misrepresents the **true purpose** of the interview", **the true purpose** of meeting with the insured was to try to convince the insured to surrender his two disability policies with the insurer!  This is despicable conduct by an insurer and Ms. Beattie, who falsely represented her "agenda" in which to meet with the insured privately and without the assistance or counsel of his doctor or an attorney.  This is despicable conduct.  Basically, the insurer and Ms. Beattie lied to their own insured as to the **true intent** of the meeting between Ms. Beattie and the insured.  Moreover, following this meeting between the insured and Ms. Beattie, and the insured's attending physician, Dr.Judd, Ms. Beattie was never heard from again.  Ms. Beattie's recommendation of a settlement or buy out of the insured's two policies were one or two years of payments in a lump sum.  **However**, the **true value** of the insured's disability claim, pursuant to the two policies in force with the insurer, was lifetime benefits.  At the time of the meeting, the insured was approximately 46 years of age.  At the time of the meeting, the insured's life expectancy would probably be an **additional thirty years**.  Assuming the best case scenario for the insurer, that is, the insurer was willing to offer two years of policy benefits for a lump sum settlement, then the insurance company was prepared to cheat the insured out of approximately twenty-eight years of policy benefits, which would be the equivalent of a few million dollars in policy benefits.  This is commonly known in the insurance industry as **"low balling"**.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 24

Nor should an insurance company ever reward itself for first abusing its own insured in an insurance disability setting, and wear that insured down or attempt to wear that insured down, especially in a case where the insureds claim is for **major depression and paranoia**, and **then "low ball"** the insured by offering two out of thirty years of potential benefits!  This is absolute despicable conduct by any insurance company or agent or representative of an insurance company.

Also, the question comes to mind, how can a one or two year lump sum payment of policy benefits be in the "best interest" **of the insured**?  Basically, the insurer was trying to steal the insured's two very valuable income policies.   The insurer was basically offering the insured **less than 10%** of the true value of the insured's disability claim, pursuant to the two policies issued to the insured by the insurer.

Part of Ms. Beattie's presentation in the meeting with the insured, following the departure of the insured's attending physician, was that a lump sum settlement would get the insurer  **"off my back".**  Ironically, the insurer is offering the insured "peace of mind" by getting off the insured's back, (the words of Ms. Beattie, who is the insurer's representative) for a **token payment** to the insured.

Ms. Beattie also informed the insured at the subject meeting, that "if" the insured continues to file monthly claims much longer, Jefferson-Pilot Life Insurance Company is going to "**play hardball**".  (The insurer's claims practices have now diminished to the point of suggestive threats and intimidation towards the insured, "if" he (the insured) **continues** to file additional monthly claims for disability)  This is absolutely despicable conduct.  Also, Ms. Beattie informed the insured at the subject meeting that if the insured continues to make monthly claims, then the insured should "**get a good attorney**."  This

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 25

additional claims tactic goes beyond the concept of bad faith and becomes intentional, malicious, oppressive and fraudulent claims practices.

Ms. Beattie goes on to state to the insured, at the subject meeting, that the insured should allow the insurer to buy-out the insured's two disability policies with Jefferson-Pilot Life Insurance Company for approximately $150,000.00 to $200,000.00.  However, as noted previously in this report, the insured's potential policy benefits are easily in the multi-million dollar range.

Additionally, the insurer knew, or should have known, that the disclosure by the insurer of its "**hard-ball**" tactics and the statement that the insured **should get "a good attorney**," would cause the insured extreme anxiety and compound the insured's current major depression and paranoia.  The insured was so upset, that the insured had to start again to take Xanax for anxiety.  The insured's conduct could be reasonably described as an intentional infliction of emotional distress which was preplanned and premeditated by virtue of the insurer's representative, Ms. Beattie,  [1-131] **and her superiors**.

It should be noted that prior to the meeting between the insured and Ms. Beattie, Ms. Beattie never disclosed her "hidden agenda" until after the insured's attending physician had left the meeting and when the insured and Ms. Beattie **were alone**.

After the attending physician of the insured had left the subject meeting, Ms. Beattie told the insured, that the insurer had paid my claim **three years too long already**.  This would reasonably imply that the insured was filing non-meritorious disability claims had been doing **so for the last three years**.  Also, Ms. Beattie, as well as Mr. Maxwell (insurer's Claims Representative) both told the insured that the insured's two policies **only** paid policy benefits **for twenty-four months**.  Since there is no such language in either of the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 26

two disability policies, both Mr. Maxwell and Ms. Beattie misrepresented the policy

terms to the detriment, or potential detriment of the insured.  Mr. Maxwell made the

statement that the insured's policies only paid policy benefits for twenty-four months a

few years prior to the subject meeting.  (Repeatedly, misrepresentation of policy benefits

is not good faith claims practices).

Ms. Beattie prepares a report for the insurer, which dated April 25, 1998.  [1-134].  Ms.

Beattie **admits to discussing a claim settlement and policy settlement and admits to**

**representing to the insured, policy interpretations**.  The first question that comes to

mind, since Ms. Beattie appears to be employed as a medical professional, is whether Ms.

Beattie a **licensed insurance adjuster**?  Or is Ms. Beattie **a licensed attorney**?

Ms. Beattie goes on to state in her report of April 25, 1998 [1-139] that the insured has

disclosed in his meeting with Ms. Beattie that he is starting a new occupation.

(Engineering).  This is significant in that most insured's, after battling major depression

and paranoia for five years, since 1993, would simply throw in the towel and give up.

However, it appears that the insured is demonstrating extraordinary attempts to

rehabilitating himself so that he can go back to work full time, if possible.

It is also noted in Ms. Beattie's report of April 25, 1998, [1-140] that Ms. Beattie makes

recommendations to the insurer which are **ignored** by the insurer.  For example, Ms.

Beattie recommends to the insurer that the insurer give the insured a "written"

explanation of his policy benefits, at least in the opinion of the insurer as to A) what does

"own occupation mean, B) what does the word occupation mean to the insurer, C) what is

the length of the insured's benefits under each of his two policies with the insurer, D) and

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 27

that the insurer should explain residual vs. total disability and "how this decision is made." The insurer **ignores** Ms. Beattie's recommendations.

By December 30, 1999 [1-69] the insurer sends the insured a letter explaining that the insurer has selected a third party administrator to handle the insured's claim. **Why?** Why would the insurer want to reassign the insurance claim to a third party administrator? In the insurer's letter to the insured, of December 30, 1999, it is noted that the insurer does not identify the new Claims Representative at the third party administrator's office. Although this would possibly be an insignificant matter, again it must be appreciated that the insured is suffering from "major depression and paranoia". It is significant that throughout the handling of the insured's claim, by the insurer, there is never any empathy or compassion or thought about how the insured will perceive **disruption** in the process of the insured's claim.

On January 31, 2000, the insurer sends a letter to the insured. (The insurer is now mainly "Disability Management Services, Inc.)." The new Claims Representative is Robert F. Mills, a Claims Consultant for Disability Management Services, Inc. Mr. Mills's requests of the insured an updated attending physician's statement, a claim form to be completed by the insured and an authorization form.

(However, the insurer, Jefferson-Pilot Life Insurance Company **already** had an authorization form to obtain information). Next, Disability Management Services, Inc. requests "complete copies of your 1996, 1997, 1998 and 1999 (when available) **personal** tax returns #1040s, including all schedules and W-2s. In addition, **Mr. Mills states**, please include the **corporate** tax returns for Kearney Associates and/or Kenwood Technology Group for the same years. This is significant in that the insured's disability

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 28

claim is approaching six years in duration and now, for the first time, the insurer's

representative, Mr. Mills, wants all of this **massive** tax record, involving the insured

personally and his corporations.  You will also note that the insurer never gives an

explanation or reason **why, at this late date**, that the insured's personal and corporate tax

returns are **relevant or material** to the insured's current disability claim.

It would appear, at this time, the beginning of the year 2000, that the insurance company

is going to **step up its intensity of investigating the insured's claims**.  However, there

is no known rational or reasonable basis to **step up the intensity** of an investigation of

the insured, after almost six years of being **"residually"** disabled and receiving six years

of policy benefits, without so much as an independent medical examination or other

investigative tools.

By March 14, 2000, the insured faxes a letter to the insurer (third party administrator)

about various investigators and Claims Representatives, calling the attending physician,

Dr. Judd, out of the clear blue sky, and without any prior notice or identification.  The

insured reports to the insurer that this type of conduct on the part of the insurer is causing

the insured to be very "agitated".  You will note that there is no communication between

the insurer and the insured as to the insurer's agenda" in which the insurer would

normally inform the insured that the insurer is going to contact the attending physician of

the insured in which to acquire information.  Again, this would not normally be a big

deal, however the insurer ignores, apparently intentionally, that the insured's claim is for

**major depression and paranoia**.  As anyone who has ever worked in the disability

income field knows, when you are handling major depression and paranoia claims of

insureds, it is incumbent upon a professional Claims Representative to keep the insured

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 29

informed in which to mitigate or **avoid aggravating** the insured's **deep depression**

**and/or paranoia**.  However, the insurer apparently doesn't care.  The insurer treats the

insured as just another claimant.  This is especially important because of the attending

physician's written report of **March 10, 2000**, the attending physician, Dr. Judd-

McClure, Ph.D. informs the insurer that the insured is "depressed and sad, poor

interpersonal relationship, poor coping, plus fatigue-sleeping in daytime, inability to

concentrate."  The attending physician also reports that the insured is suffering from

**depression and paranoia ideations**.

On March 20, 2000, [1-67] the insurer (Disability Management Services, Inc.) sends a

letter to the insured.  This is a significant letter in that the insurer's representative states

to the insured, "It is our obligation to obtain "**objective**" information in order to

"**properly**" evaluate your claim for benefits."  What is significant is that the insurer has

now rewritten the insurance policy.  That is, nowhere in the insurance policies, or any

insurance policies ever issued, to my knowledge, by any disability insurer does it state

that the standard of proof in order to submit a proof of loss of disability requires the

standard of "**objective**" evidence.  This is due in part because many disability claims are

"self reporting" including depression claims and paranoia claims, etc.  This is another

example of "post claims underwriting" by the insurer.  That is, the usual and customary,

including this case, standard proof is a completed claim for by the insured and a

completed attending physician statement by the insured's doctor.  As to the insured's

finances, or earned income or the lack thereof, the usual and customary **standard in the**

**industry**, including this case, is that the insured, who is on residual disability, states what

their earnings were, prior to the disability, and states what their earnings are commencing

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 30

as of the date of illness and residual disability. This could be easily accomplished by the insurance company contacting either the insured or the insured's CPA or bookkeeper and getting monthly statements, **if necessary**, as to the insured's earnings or the lack thereof. This is especially true **after a few years** of ongoing disability for a given insured. such as Mr. Kearney (the insured).

As to "subjective" or "objective" evidence or information, in order to properly evaluate a claim for disability benefits, "**subjective**" evidence is a perfectly acceptable **standard** in the insurance disability industry. That is, the insured does not have to account for a **higher** standard of "objective" medical evidence or information in order to satisfy the "proof of loss" as outlined in the subject policies. Mr. Mills also goes on and **again misrepresents** the policy language by stating, "Notwithstanding, this information [objective evidence] is required under the proof of loss provision of your policy . . .." That is a **direct misrepresentation of fact**. The fact is, that the "proof of loss provision of your policy" does **not** require that the insured provide "**objective** information" in order to properly evaluate the insured's claim for disability benefits. It appears that the insurer and its representatives clearly just make up rules about the presentation and administration of a disability claim as the insurer wishes! You will also note that it is extremely rare that the insurer ever sites the page and paragraph by which the insurer is suggesting that the insurer has the right to certain information or has a right to demand the insured to do anything other than submit a "proof of loss" for a given period of time of disability. Rather, the insurance company just makes up rules as they go along, **irrespective of the policy language.**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 31

On March 25, 2000 [1-66] the insured's attending physician, Dr.Judd-McClure, Ph.D.,

Clinical Psychologist, tells the insurer, in writing, that the insurer's demands on the

insured, by so many representatives of the insurer, without disclosure of who and what

the reports are for, is **unprofessional**.  Also, the attending physician states that the data or

information requested of either herself, Dr.Judd-McClure or the insured, is **without any**

**objective reason or explanation**.  The attending physician also shares with the insurer

that the insured is very concerned about the **lack of medical confidentiality**; that is, who

will receive and read materials about the insured's personal life.  Again, this is not

usually a big deal in many disability cases.  However, when the insured is being paid by

the insurance company for the disability illness of paranoia **and depression**, this

becomes a **major** concern that the insurer must address.  However, the insurer's conduct,

or lack thereof, repeatedly indicates that the insurer could care less about the insured's

paranoia or depression or concern that confidential information about the insured could

be shared with anyone.  Simply, the insurer just doesn't care about its own insured.

On Saturday, March 25, 2000 [1-65] the insured sends a letter to the insurer.  Enclosed

with that letter is a continuing disability form, completed by the insured and the insured's

attending physician.  Also enclosed are corporate tax returns for 1996 and 1997 (last year

of the insured being in business) and the insured's personal tax returns for1997, 1998 as

well as the insured's W-2 forms.  Again, there is no rational basis for this information

since it wasn't relevant in 1996 and 1997 and 1998, when the insurer was, at all times,

paying the insured's disability claim without these documents.  Also the insured

complains that investigators are still hounding the insured and the attending physician

with numerous phone calls.  Additionally the insured feels that the insurer is interfering

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 32

with the insured's treatment with the insured's attending physician and the insurer's

conduct is hurting the insured's medical condition, that is, deep depression and paranoia

ideations. For example, another representative of the insurer, International Claims

Specialists Company, still goes to the insured's home, unannounced, (cold turkey

contacts). Apparently the insurance company is hoping to catch the insured in a

compromising situation which would offer the insurer some ammunition in which to

defeat the insured's current disability claims. Although the insured's **family** Doctor, Dr.

Lehenbauer, tells Mike Conled, it's "ok" to contact the insured, (November 23, 1999) the

insured's Doctor does not consent to a "Cold Turkey" contact with the insured.

Moreover, the insured complains about the insurer who has put a "tail" (private

investigator) on the insured and the insurer (Ms. Harden) states, "He [private

investigator] will monitor your activities, follow you to the store, and **follow you to**

**church and sit with you".**

I am also a licensed private investigator and have conducted hundreds of sub-rosa

investigations but I, nor any other private investigator I have ever heard about, or read

about, or known about, **has ever followed a policyholder into their place of worship,** to

observe the policy holder **during their time of worship.** Such conduct, as in this case, is

despicable.

Moreover, in the insured's letter of Saturday, March 25, 2000 [1-65.5] the insured

complains that the insurer's request for documents and "**the threat of withholding**

**checks** will cause me to somehow (dead or alive) withdraw my lawful claims, per my

policies "is unfair". The insured goes on to state that the insurer's conduct is making the

insured's medical condition and illness "**feel worse than ever. . . .**"

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 33

On March 31, 2000, [1-64] the insured faxed a letter to the insurer.  In the letter the

insured states that the insurer is causing unnecessary anxiety by assigning his claim to a

Third Party Administrator without explaining **who** would send the insured his monthly

checks or if the insurer would send monthly checks to the insured, after January 1, 2000.

Also, the insured asked the insurer, would the transfer of the insured's claim to the Third

Party Administrator cause any **delays** in getting the insured's monthly benefit check?

Moreover, **who** would be sending the claim forms to the insured each month?  For

example, the insured called Ms. Harden (Claims Representative) on three different

occasions in December of 1999, and left messages for answers to the insured's questions.

However, Ms. Harden has **never returned any of the insured's phone calls or phone**

**messages**.  Another concern of the insured was by January 5, 2000, the insured's rent was

due and no check was received by the insured nor did the insured know when, if ever, he

would be given a disability income check.  Again, because of the type of this claim,

depression and paranoia, it was absolutely incumbent on the insurance company to

communicate with its insured and explain how the transition of his claim from the

insurance company to a third party administrator would work and offer the insured

"**peace of mind**."  However, the insured did nothing to offer the insured "**peace of**

**mind**".

On May 9, 2000 [1-63] the insurer sends a letter to the insured's attending physician, Dr.

Judd-McClure, Ph.D.  The insurer states that they were responding to this physician's

letter of March 25, 2000.  (You will note that it took the insurance company

approximately five and one half weeks just to respond to the insured's attending

physician's letter of March 25, 2000).  The insurer explains that they want a complete

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 34

copy of the insured's medical records. This is interesting in that as of May 9, 2000, the insured's claim is approximately seven years old (since February of 1993). Why are the doctors medical records important now, in May of 2000, but apparently were not important in the preceding six years? The insurer goes on to state that they are willing to compensate the attending physician, for a "reasonable fee" (vague and ambiguous) in which to compile all of the insured's medical records. [1-63.5] .

On June 1, 2000, the insured receives his disability checks but no claim form for the next payment. The insured writes to the insurer and requests, at least, two claim forms since the insurer, from time to time, forgets to enclose an additional or new claim for the next month of policy benefits. Again, due to the insured's illness, deep depression and paranoia, it is especially important to make sure that the usual customary procedures are actually followed, i.e., enclosing a new claim form for the next month's policy benefits, which is to be enclosed with the payment of a current disability benefit.

On June 3, 2000, [1-61] the insurer is informed by the insured that they, the insurer, have failed to include s 7% cost of living increase, which is part of the insured's policy benefits. This inquiry is ignored by the insurer for months.

On July 28, 2000, [1-60] the insured again asks the insurer why his checks do not include a 7% cost of living increase, which is a specific policy benefit. The insured reminds the insurer on July 28, 2000, that the insured brought this matter to the insurer's attention way back on June 3, 2000; **almost two months ago**. For an insurance company not to respond to the insured's inquiries or to take two months to deliver policy benefits is bad faith claims practices. It is not good faith claims practices for the insurer to **ignore** the insured **or fail to deliver policy benefits timely**.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 35

On August 11, 2000. the insurer sends a letter to the insured.  The insurer acknowledges that the insured's letter of July 3, 2000; over a months after the insured's letter was sent to the insurer, that the insurer will pay the cost of living adjustment benefits **that were due June 6, 2000.**  A two-month delay in policy benefits is bad faith claims practices.  It is also interesting to note that the insurer never pays or offers to pay **interest** on the unreasonable delay of policy benefits.  That is, the insurer had use of the insured's money, for over two months, and the insurer earns, at least, interest on the insured's benefits that were due and owing two months ago.

On Saturday, August 19, 2000, the insured sends a letter to the insurer.  The insured is upset about 1) missing checks, 2) late checks, 3) lack of response to the insured's questions and inquires, 4) and the insurer's "numerous oversights".  (Those oversights include, but are not limited to the following: failure to pay the full policy benefits timely, and the misrepresentations of policy language, for example. the insured is **only** entitled to two years or twenty-four months of policy benefits if the insured is claiming residual disability rather than total disability).  The insured explains that the insured's "oversights" is a hassle, and is making it more difficult and frustrating for the insured to attempt to recover from his **major depression and paranoia**.  Also, the insured's "new" authorization form that the insurer wants the insured to sign, now includes the ability of the insurer to contact the insured's 1) friends, 2) neighbors, 3) family, 4) present business associates, 5) prior business associates, 6) customers, 7) employees, etc.  You will note that nowhere in either of the insured's disability policies nor in any disability policies ever issued by any disability carrier, to my knowledge, going back forty years, has an insurer reserved the right to ask for or force an insured to sign any authorization form.  A

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 36

close and repeated reading of the insured's disability policies makes it abundantly clear that the insurance company doesn't even have the right to ask the insured to sign **any** authorization form.

All the policy requires of the insured is for the insured to submit a "proof of loss" of his disability and impliedly, the insured's loss of earnings as it pertains to the insured's **own** occupation as of the date of injury or illness. That is all the insured has to do to satisfy the insurance contract!

If the insurance company wishes to conduct a sub-rosa or a non sub-rosa investigation or conduct interviews with the insured's friends, neighbors, family, business associates, customers, employees, etc., then so be it. However, the insured is not under any obligation, whatsoever, to aid and assist its own insurance company to invade the insured's privacy, as it pertains to the insured's friends, neighbors, family, business associates, customers, etc.

Moving on to October 2, 2000, the insurer (Mr. Hughes, Vice President of Claims) sends a letter to the insured. Mr. Hughes suggests to the insured, on page 1, paragraph 1, that the insurer needs further documentation about the insured's claim, "In order to determine **further** benefit eligibility." Again, the **subtle threats** of withholding policy benefits appear over and over in the claim documents that I have read, to date.

You will also note, on page 1, paragraph 2, of the Vice President's letter of October 2, 2000, that he states, "The above policies provide benefits when disability **either completely prevents someone from working** (total disability) or limits their ability to work, such as they suffer a loss of earnings (residual disability)". This is interesting language, in that it does not appear in the policy! One would think that the Vice

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 37

President in Charge of Claims would, above all other people, know that if you are going to site a definition, you use the definition that is in the policy and not some other definition that is not in the policy. The Vice President goes on to state, "As you also may know, under the proofs of loss provision, the insured is required to furnish evidence of benefit eligibility within these parameters". (What parameters?) The Vice President in Charge of Claims almost has it right in that he does site the "proof of loss provision" in the policy. The "proofs of loss" provision in the policy states, "Written proof of loss must be given within ninety days after the end of each period, for which Jefferson-Pilot is liable for periodic payments for a continuing loss. For any other loss, written proof must be given within ninety days after such loss. If it was not reasonably possible to given written proof in the time required, Jefferson-Pilot shall not reduce or deny the claim for this reason, if the proof is filed as soon as reasonably possible. In any event, the proof required must be given no later than one year from the time specified unless you were legally incapacitated."

Just below the caption "Proofs of Loss" is the caption "Claim Forms". Claim forms states "When Jefferson-Pilot receives a Notice of Claim, it will send you **forms** for filing proof of loss. If the forms are not sent to you within **fifteen days**, you will meet the Proof of Loss requirement if you give Jefferson-Pilot a written statement of the nature and extent of the loss within the time limit stated in the Proofs of Loss section". You will note on page 5 that there is no requirement for an Authorization Form. In fact, the policy language, as noted on page 5 of the policy places the burden on the insured to complete the insurer's Claim **Forms** or "If you give Jefferson-Pilot a written statement of the nature and extent of the loss within the time limit stated in the Proofs of Loss section."

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 38

Moreover, and continuing on page 5 of the policy, under the major heading "General

Provision." is a captioned heading entitled "Time Payment of Claims." This section

states, "As soon as written proof of disability is received, **[not "objective" proof]**

Jefferson-Pilot will pay monthly all benefits that are due from which Jefferson-Pilot is

liable. Benefits for any other loss covered by this policy will be paid as soon as

Jefferson-Pilot receives the proper written proof." This section, as well as most of the

sections in the insurance policy are vague and ambiguous, for example, "proper written

proof ". (what is **"proper?"**) All the insured has to do is to submit a statement that

he/she is disabled, and why, with an accompanying attending physician statement

**verifying** that the insured is disabled. **That is all the policy calls for.**

The Vice President in Charge of Claims, Mr. Hughes, continues on page 2 and 3 of his

letter of October 2, 2000, with a long laundry list of items that the Vice President says

that they "need". Moreover, the Vice President in Charge of Claims allows the insured

up to thirty days in which to compile and submit to the insurance company, the long

laundry list of items, including personal and business income tax returns with all

schedules and attachments for 1998, 1999; copies of the insured's 1099s, including

summary page; documentation of your salary expense in **1995**; completion of enclosed

description of occupational form: copies of any and all agreements or contracts that the

insured had with any of his principals **since 1991**!; the names and addresses of all the

insured's "main contact" at "each of the above companies"; execution of the General

Authorization Form" ("Returned to us unedited"); back-up documentation for all

expenses (cancelled checks, invoices, bank statements, etc.)" Moreover, the insurer

requests the insured's business federal income tax returns **from 1991** to the present; and

**monthly** itemizations of gross revenue, expenses, net income to you for the present year.

It would appear that the insured now has a full time job, working for the insurance

company, compiling unnecessary, irrelevant and immaterial documentation. Such "busy

work" is unreasonable, and harassment of the insured.

Lastly, the Vice President in Charge of Claims, Mr. Hughes, states, "In the interest of

good will" the company will agree to issue an additional benefit payment (singular).

Additionally, the additional benefit payment is being issued with a "full reservation of

rights". Apparently the "full reservation of rights" statement relates to the Vice

President's statement in which he states, **"Since there is little evidence in the file that**

**you are suffering a disability** regarding loss of earnings with respect to your new

company, the amount of any ongoing benefit eligibility is even more unclear".

It would appear that the allegation on the part of the insurer that there is **"little evidence**

**in the file"** to show that the insured is suffering a disability, **is absurd**. For the preceding

seven years, the insured and the **insured's attending physician** have submitted

**periodical statements of disability** and of which the **insured's attending physician has**

**documented and verified that the insured has been disabled for the past seven years!**

It is the usual and customary practice in the disability income field that attending

physicians who **certify** that their patient, the insured in this case, is disabled, **is all that is**

**necessary**.

On October 25, 2000 [1-55] the insured sends a letter to the insurer and to, specifically,

Mr.Hughes, Vice President of Claims. The insured is upset because, Mr. Hughes, does

not answer many of the insured's questions and continues to harass the insured as the

insurer has for many years. The insured is upset with the insurer's intimidation and the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 40

burdensome requests for irrelevant and immaterial documentation, such as the 1992

**through** 1997 tax returns for Kearney Associates, Inc. (Kearney Associates, Inc. went

out of business in 1997). Moreover, the insured's personal tax returns of 1991 through

1999 **have already been produced**. The insured has produced monthly proof of loss

claims. The insured has consented to two lengthy personal interviews, one by Ms.

Beattie (April 25, 1998) in which Dr. Judd stated that the insured was unable to "make it"

in a sales environment and the insured and Dr. Judd were "**very forthright**." **Again**, the

insured asked, "Why" more information is necessary at this late date (October 25, 2000)

since the insured has been totally cooperative as to each and every request **and even**

**some unreasonable requests** by the insurer for the preceding few years. The insured

reminds the insurer that the insurance policy states that the insured need only present

**"reasonable" proof of his current monthly income and his prior monthly income.**

The insured has done that. The insured suggests to the insurer that the insured's tax

return and W-2s is "reasonable" evidence of the insured's earnings. The insured is

obviously correct. The insured also reminds the insurer that the policy does not say or

state that the insured must submit to a "company audit". Again, the insured is correct.

Nor does the policy say that the insured must send any **corporate** documents.

**Corporate documents were not a necessity in which to purchase the two policies of**

**insurance in the first place.** Again, the insured is correct. For some unknown reason

the insurance company is conducting a "witch hunt" against the insured. The insured

**again** answers the question of why his expenses have increased and the insured explains,

because his sales people, hired by the insured, had higher expenses. Additionally, the

insured **already** addressed this issue in the insured's letter of January 13, 1998 – almost

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 41

two years ago, to the insurer.  This would indicate that the insurance company does not read the correspondence received by the insured.  The insurer merely "drop files" the insured's correspondence when they receive the insured's documents.  That means, the insured sends documents to insurance company and the Claims Representative **"drops"** those documents in the Claims File **without first reading or analyzing the documents submitted by the insured**.  This is Bad Faith in claims practices.

Moreover, the insured continues to complain in his letter of October 25, 2000, [1-55.4] that the insurance company continues to largely ignore the insured's questions and inquiries.  Moreover, the insurer suggests from time to time that if the insured does not jump through all of the insured's hoops, the insurer will **cut off** the insured's policy benefits.  As to the insurer's request for "occupational duties form" this form was covered in December of 1999 (almost a year ago) with the insurer's "international claims" interviewer or investigator.  Additionally, the insured explains to the insurer that his occupational duties have not changed since last December, 1999.  The insured explains to the insurer that the insurer's **harassment** of the insured has caused the insured "**severe** mental anguish and **significant** amounts of lost sleep".  Because of the insurer's demands, the insured has had to **increase** his medication.

On October 30, 2000, [1-54] the insured called the Vice President of Claims, Mr. Hughes, who had sent the insured a 3-page letter on October 2, 2000 (less than a month before).  Mr. Hughes didn't know who the insured was and asked the insured, **"Should I know you?"**  Mr. Hughes, then referred the insured to the Claims Representative, Mr. Mills.  Mr. Mills informed the insured, **"At this point, I don't know if your check is coming"**.  This is a statement made to the insured, who is suffering from **deep**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 42

**depression and paranoia**.  It appears that on a fairly regular basis, the insurer keeps the insured **on edge or off balance** by never offering any "peace of mind" that the insured's disability checks will arrive **consistently and promptly**.  The insured is kept in a state of **limbo** rather than in a state of **peace of mind**.  During this conversation with Mr. Mills, of October 30, 2000, the insured asked the Claims Representative, Mr. Mills for the definition of "proof of loss".  The Claims Rep said**, "He didn't know exactly!"**  It is suggested that it is difficult for the insured to deal with the Claims Representative who **doesn't "know exactly" what is required of the insured** as far as a "proof of loss".  What the Claims Rep ought to have done was say, if he didn't know, "I don't know but I will find out and I will get back to you today or tomorrow".  The point is, you don't just tell a policyholder you don't know **and that is the end of the conversation**.  It was also surprising and significant that Mr. Mills, a Claims Representative for the insurer's third party administrator, Disability Management Services, Inc.**, had not been provided with all of the insured's Claims File**.  This could account for **why** the repetitive demands by the insurer for the same documentation because the right doesn't know what the left hand is doing.

On November 2, 2000, the Claims Representative, Mr. Mills, sends a 2-pageletter to the insured.  It is noted on page 1, paragraph 3, that the insurer states, "As previously explained by Mr. Hughes, it is the requirement of the insured, under the Proof of Loss provision of the policy to furnish evidence of Benefit Eligibility.  This statement is correct.  The issue now is, has the insured submitted or furnished evidence of Benefit Eligibility?  The answer is clearly yes.  That is, the insured has filled out the insurer's Claim Forms, as well as the Attending Physician's forms by the insured's doctor.  Also,