July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 43

the insured has submitted periodical financial documents which reasonably show the loss

of earned income on the part of the insured.  That is all the insured has to do.  That is the

industry standard and definition of a "proof of loss" as it pertains to disability policies.

Also, in the same paragraph, paragraph 3 on page1 of the insurer's letter of November 2,

2000, Mr. Mills, the Claims Representative states, "Please be advised that it is the

company's view that it has the right **to request** the information detailed in the October 2,

[2000] letter to verify your statements."

You will note in the two policies issued by the insurer to the insured, there is no provision

by which the insurer reserves the right to verify the insured's "proof of loss!"  In fact, the

policy and industry standards delegate the "proof of loss" **ultimately to the attending**

**physician** of the insured.  It is because of this fact, that the insurance policies reserve the

right to have the insured examined by doctors selected by the insurance company and at

the insurance company's expense.  Short of an IME (Independent Medical Examination)

that is the only **reserved right** that the insurance company has in which to attack or

challenge the attending physician's statements that the insured is, in fact, disabled.

Additionally, in the same paragraph, the insurance company states, "At this time, it

appears that without the requested claim materials **we would be unable to evaluate your**

**eligibility benefits.**"  Again, the insurance company is using the form of intimidation and

**threats of cutting off the insured** if the insured doesn't jump through all of the

insurance company's hoops and requests.  Intimidation and threats are not examples of

good faith claims practices.  However, in the last paragraph of page 1 of the insurer's

letter of November 2, 2000, **the insurer recognizes that the insured has an attorney**,

and therefore the insurer "in the interest of continuing good will" will provide another

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 44

benefit payment. However, they will only extend policy benefits "for an additional thirty

days". Again, the current policy benefits are being issued pursuant to a "reservation of

rights". This is a usual and customary standard in the insurance industry, when the

insurer alleges disputed coverage. However, it is not the industry standard or custom or

procedure to threaten an insured or to intimidate an insured or harass an insured into

doing something that is not based on the policy language.

The burden of proof to **disprove** a disability claim is upon the insurer, not the insured.

As noted [23] the insured was only paid timely twice between December 1, 2000, and

May 7, 2001. Timely payments usually mean no later than one week following the first

of each month. Hence, the insured is only receiving approximately 33% of the time,

"peace of mind". The rest of the time the insured has to threaten the insurer with going to

the Department of Insurance for the State of Ohio or seeking counsel from his attorney or

some other means by which to motivate the insurer to pay the due and owing policy

benefits. It appears that the insurer enjoys making the insured work for his money twice;

once to earn the money to pay the premiums and then a second time to pry the policy

benefits out of the firm grasp of the insurer's hand.

On December 5, 2000, the insurer's Claims Representative, Mr. Mills, sends a letter to

the insured. The insurer states that, even though the insured will not or has not provided

what the insurer "wants" [1-56], [1-56.1], [1-56.2], the insurer states, "In the interest of

good will" the insurer will pay another month's policy benefits, pursuant to a Reservation

of Rights. You will note that the insurance company never defines the "Reservation of

Rights". However, even in December, 2000, the insurance company **again threatens the**

**insured** that if all the requested data is not received **within the thirty days**, the insured's

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 45

benefits will be **cut off**.  This **continuous and constant threat or threats to the insured is not a good example of good faith claims practices,** nor does it honor the implied "peace of mind" that accompanies each and every disability policy issued to an insured. In all of the literature that any and all disability carriers issue in which to induce people to buy disability policies, the **number one thrust of advertising** is that if you become injured or suffer an illness which prevents you from working and earning an income, **you can sleep at night and rest assured that your lost earnings are protected**, pursuant to the purchase of a disability income policy.

People who buy disability income policies don't just buy the policy for the peace of mind that they will get their lost earnings indemnified, but also that those lost earnings will be replaced **promptly and timely, without fighting with their insurance company**.

It is also believed that since the insured mentioned that he "might retain an attorney", then that was enough incentive for the insurance company to give the insured one more month's benefits.

The next fiasco commences on December 11, 2000 [1-290].  At this time, the insured faxed to Disability Management Services, Inc., the insurer's agent, a request for a new bank withdrawal form.  The insured apparently had a bank withdrawal system in place but with a different bank.

On December 13, 2000, Mr. Mills promptly responded to the insured's fax (a first) and stated that the insurance company had been notified of the insured's request to set up an automatic withdrawal for the insurance premiums at the insured's **new** bank.  However, the insurance company ignored, purportedly, Mr. Mills's notification to the insurance company of the insured's wish to have his **new** bank have an automatic withdrawal, to

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 46

the favor of the insurer, in order to guarantee prompt payments so that his policies would not lapse for non-payment of premiums.

On about December 27, 2000 [1-290] [1-294] the insured became "worried" about a "lapse" of coverage since the insurer had **ignored** his request for **new** bank forms to have his premiums paid automatically to the insurance company. Therefore, the insured faxed a memo to Mr. Mills, stating that the insured would be sending a personal check (check #110) for $160.61 to Mr. Mills, as the agent of the insurance company, for a premium payment on the insured's policy. Also, on December 27, 2000, [1-290] Mr. Mills, the agent of the insurance company called the insured and told the insured to mail his premium check to "Phyllis Harden, Jefferson-Pilot Claims Department". On the same date, December 27, 2000, the insured sent his check for payment of his premiums and a copy of the insured's fax to Mr. Mills to Phyllis Harden, at Jefferson-Pilot Life Insurance Company.

On December 29, 2000, [1-290] Betty Lou Hand (with the insurer's billing and collection department) sent a fax to the insured with a "blank draft form" to fill out. It should be noted that this is the same form that the insured requested on December 10, 2000. (It took eighteen days for the insurer to simply forward a bank form to the insured).

On the same day, December 29, 2000, the insured sent to Ms. Hand, 1) a bank draft form, and 2) a voided check for the insured's new bank. The insured also told Ms. Hand that he had sent a check to Ms. Harden for the current premiums due on the insured's two policies.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 47

On January 2, 2001, [1-297] the insurers sent the insured a letter about the **new** bank account and the automatic withdrawal of premiums necessary to keep the insured's policy active.

On January 9, 2001, the insured called Ms. Hand and Ms. Hand **acknowledged receiving** the insured's voided check and filled out bank form. Ms. Hand informed the insured, "Everything is fine".

Then on January 25, 2001, [1-291] the insured called Ms. Hand again (pursuant to the insured's prior phone call of January 9, 2001) and the insured asked "If everything is processed on my **new** bank account, since I sent the **new** form." To the insured's complete dismay, Ms. Hand stated to the insured, "Mr. Kearney, **we haven't received any new forms from you".** Moreover, Ms. Hand told the insured that she has not received a check from Ms. Harden. This was extremely distressful to the insured. (An insured who was suffering from **major depression and paranoia)**. On the same date, January 25, 2001, Ms. Hand's supervisor called the insured, a Ms. Clark, who informed the insured that 1) **nothing had been received by the insurer** and 2) **no check was received from Ms. Harden**. Subsequently, on the same day, Ms. Clark called the insured and informed the insured that his check for the policy premiums "**was on Phyllis Harden's desk** – you sent it to Bob Mill's attention". (It is interesting that the insurance company never makes a mistake and if there are any problems, that in the opinion of the insurer, the insured is the cause of his own problems). Ms. Clark stated that the insured's check would be cashed on January 25, 2001, and it would be applied to the December, 2000, payment due and that the insurer would withdraw from the insured's **new** bank, the sufficient amount of money to pay the January, 2001, policy premium payment. Ms.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 48

Clark also informed the insured to disregard the **cancellation notice** that had **already** been sent to the insured. Again, this stress was perpetrated on the insured who is suffering from **major depression and paranoia**. Moreover, the insurer **never apologized** to the insured as it relates to this matter. After two months of dealing with the insurance company on just trying to get the insured's **new** bank's forms set up for an automatic withdrawal of payment of the premiums on the insured's two policies, it was the insured's opinion that the insurance company intentionally sat on the insured's premium check that he had sent to the insurance company with the hope that his policies would lapse for non-payment of premiums. Normally, I might disagree with the insured. **However**, based on the preceding six years of harassment of the insured, and specifically the meeting between Ms. Beattie and the insured on April 25, 1998, which is almost three years prior to January of 2001, **the insured is probably correct**. That is, approximately three years prior to January of 2001, Ms. Beattie informed the insured that 1) the insurance company was going to play "**hard ball**" with the insured if the insured continued to submit disability claims on a monthly basis, and of which, in fact, the insured did and 2) that the insured better have a good attorney, 3) that the insurer had been paying policy benefits to the insured for three years, and of which **those payments were not meritorious** and 4) **if the insured wanted to get the insurer off the insured's back**, that the insured should settle for one to two years of additional policy benefits, rather than receiving policy benefits for his lifetime. Because of these factors, it would make perfectly good sense for the insurance company to just sit on the insured's policy premiums, without processing the insured's check and dragging its feet before giving the insured a **new** bank statement or form of which the insured's **new** bank could pay the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 49

insured's premiums. Based on the significant background of this insurance company for at least three years prior to January of 2001, the insured's position is correct that **the insurer was looking for a way to cancel the insured's valuable disability policies**. But for, the insured's persistence in following through with the insurance company could, and I strongly believe would, have canceled the insured's two disability policies in February of 2001, for non-payment of premiums.

In the interim, December 21, 2000, Dr. Judd-McClure Ph.D. sent her invoice for compiling all of the insured's medical records for the past seven years to the insurer. She itemized her invoice of $2,160.00. The insured asked for $1,000.00 advance before sending the documents to the insurer and the insurer was to pay the doctor the balance of $1160.00 upon receipt of all of the insured's medical records for the preceding seven years. All of this work by the insured's attending physician, Dr. Judd-McClure Ph.D. was **pursuant only to the request by the insurer**.

On December 22, 2000, the insured sent a letter to the insurer. Enclosed with the insured's letter are 1) a list of former principals of Kearney Associates, Inc., 2) a notice that in nine days the insured will submit his P&L statement for Kenwood Technology Group, Inc. for the year 2000, 3) Notice that the insured has **already sent** to the insurer, all of the records the insured had regarding Kearney Associates, Inc., 4) notice that the "new" authorization that the insurer wanted the insured to sign would not be signed and returned to the insurance company because the insurer **never responded to the insured's four letters** containing questions as to the **scope** of the **"new"** authorization, 5) as to the insurer's request for a "special" authorization form, none has been received by the insured to date, 6) as to the "backup documents for Kenwood Technology Group, Inc.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 50

there are several thousand pages" that the insurer can copy at the insurer's business location," 7) The balance of the requests in the insurer's demand letter of October 2, 2000, have been **already sent** to the insurer.

On January 9, 2001, the insured sends a faxed letter to the insurer and encloses and makes comments: 1) the insured's 1998 personal tax returns are enclosed, 2) the insured's notice that the insured will provide his personal tax return for the year 2000, 3) the insurer never identified the insurer's psychiatrist at Disability Management Services, Inc. who would review the insured's personal medical records, 4) the new authorization form is **too broad** and therefore the insured will not sign it.

On January 12, 2001, [1-46] the insurer's **forensic** accounting company requests from the insured the following: 1) personal tax records dating back to **1988** (?), 2) an authorization regarding the IRS records, 3) a request for the business tax returns back to **1988** (?), 4) **monthly** financial statements, 5) general ledgers, 6) books of original entries of all businesses, A) cash receipt journals, B) cash distribution journals, C) sales or billing journals, 7) sales invoices and contracts, 8) sales records (or name of each customer) 9) monthly bank statements and cancelled checks, 10) all payroll records, 11) any other records to substantiate  you disability income, going back to **1988.**

As it can clearly be seen, the insurance company, through its **forensic** accountant has declared war on the insured's financial records.  For what reason, it is not clear.

Moreover, the insured's and/or the insured's never explained **why** all this **massive** financial data is even remotely necessary or relevant or material to the processing of the insured's disability claim in the year **2001**.  It is curious as to why this **massive** financial

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 51

data is now necessary in the year 2001 but was not necessary when the insured filed his claim in **1993** or any time in between.

On January 22, 2001, the insured sends a letter to the insurer's forensic CPA.  The insured states that he will provide the requested documents that the insured has in his possession and also the insured will authorize the IRS and Social Security forms for the insurer's forensic CPA's letter of January 12, 2001.  However, the insured suggests to the insurers forensic CPA first get all of the tax records **that have already** been sent to the insurer.  (Repetitive demands for the **same** documents is bad faith).

On January 24, 2001, [1-44] the insurer sends a letter to the insured.  The insurer complains that the insured has not complied with all the wishes and requests of the Insurer.  However, the insurer never, at any time, gives any **basis** in fact or **basis** in law or **basis in the insurance contract** by which the insured **must** comply with the insurer's request."  Now the insurer wants **monthly** P&L statements.  If that is the insurer's wish, then the insurer ought to utilize the authorization that they **have** in the claims file and request this information directly from the insured's CPA.  That request, by the insurer, should be at the insurer's expense, and not the insured's, since this is an unreasonable request.  It is curious to note that prior to January of 2001 "monthly" P&L statements **were not required**.  That is because they were not reasonable requests.  It appears that the insurer is upgrading the stress and pressure on the insured, in order for the insured to continue filing monthly claims with the insurer.

Also noted in the insurer's letter of January 24, 2001, is the insurer's statement that the insured's attending physician's invoice for compiling seven years of medical records, at various locations was "**tantamount to extortion**".  Defamation of character is not an

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 52

indication of good faith claims practices.  Nor have I seen in the past 40 years any

insurance company, reduce to writing, in letter form, the statement that strongly implies

that the **attending physician is an extortionist**.  The insurer identifies the attending

physicians bill of $960.00 as a charge for **only** photocopying.  This is a false statement.

The insured's attending physicians fees were not 1) $960.00 but rather $2,160.00 and was

highly itemized as to how that time was accounted for.  Most of the time was spent

searching for and recovering seven years of medical records and reviewing those medical

records and traveling to different locations to secure those medical records.  It should be

noted [11-1] that pursuant to the <u>American Psychologist</u> statement of September, 1993,

professional charges for "reproduction" of records is professionally permissible.  The

insurer also responds to the insured's inquiry as to **who** will be reviewing the insured's

intimate medical records.  The insurer identifies a Doctor Benander, Ph.D.  However the

insurer goes on to state in the letter of January 24, 2001, [1-44] [1-44.1] that **the insurer**

**reserves the right to have the insured's medical records reviewed by any other**

**professional qualified to do so** . . .."  This is a direct violation of **the insured's repeated**

**pleadings** with the insurer that he didn't want his personal psychiatric records passed

around to different people.  He wanted to keep his confidential life confidential.  Also

contained within the insurer's letter of January 24, 2001, is the statement by the insurer

that it needs a carte blanche authorization form signed by the insured in which "to obtain

information from all of the companies and clients and individuals you have done business

with since 1991, to determine if any reduction of termination of your work activities was

due to disability **or factors unrelated to disability."**  What is interesting about this

request, is that, to the best of my knowledge none of the insured's clients or customers

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 53

are **medical professionals**.  That is, they are **lay people**.  Also, the insured has

**previously** reported to the insurance company that he **didn't** go around telling people, or

his customers or principals that he was suffering from major depression and paranoia.

Hence, the insurer's request to interview lay people as to the insured's mental condition

is ludicrous.

On January 25, 2001, [1-43] the insured faxes a memo to the insurer.  The insured

reminds the insurer that his medical records and medical reports, whether by his own

attending physician or an independent medical examiner is to be considered as

"confidential information".  This "reminder" will become significant within the next few

months.

On January 27, 2001, [1-42] the insured sends a letter to the insurer (Mr. Mills at

Disability Management Services, Inc).  The insured states that the insurer has received

the insured's medical records from Dr. McClure, Ph. D., which represented six years of

medical records.  These records were submitted even though the insurer did not 1) pay

Dr. McClure for all the time spent compiling the six years of medical records on the

insured and 2) without the insurer identifying **who** would see the insured's medical

records.  (Please see the insured's request of March 25, 2000; a request which is 10

months old at this time) 3) without the insurer identifying the credentials of who would

see the insured's medical records.  (This request was also made in writing by the insured

on March 25, 2000), 4) and without the insurer complying with his promise to have the

insurer's psychiatrist send a letter to the insured's doctor introducing this psychiatrist

who will be examining the insured,  (This was never done by the insurance company).

Another broken promise, 5) the insured continues to document that the insurer is using

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 54

harassment and intimidation tactics during the processing of this claim.  6) The insured

informs the insurer "I still am suffering severe emotional distress from your intimidation

and in the last six months and threats to withhold benefit checks.  This emotional distress

is taking its toll on me."  7) The insured reminds the insurer that since **March 25, 2000**,

(approximately ten months before) **the insurer has still failed to define "proofs of**

**loss".**  You will also note that **the insurance company has failed to follow the**

**recommendations of Ms. Beattie** when she informed the insurer, on April 25, **1998, to**

**explain to the insured**, the insured's benefits and how the policy is interpreted.  8) The

insured reminds the insurer that the insurance policy states that the insurer will send you,

that is the insured, **forms** for filing proofs of loss.  The insured reminds the insurer

[1-42.1] **that up until January, 2001, the insured was never required to file monthly**

**P&L statements.**  (Profit and loss).  Lastly, the insured encloses with his letter, his W-2

for the year 2000, which indicates that the insured earned approximately $5,000.00 in the

year 2000.  Prior to the insured's disability, the insured was earning upwards of

$100,000.00 a year.  The insured is now making approximately 5% of his ordinary earned

income, prior to his disability.

On February 2, 2001, [1-41] the insurer sends a letter to the insured.  The insurer states

that we "will be pleased" to send a copy of the independent medical examination results

to your doctor, Dr. Judd-McClure, Ph. D., **as soon as we receive them**.  Also, the insurer

states that they will refuse to release any of the insured's own medical records from the

claims file to the insured.  (Why not?)  You will note that the insurance policy does not

reserve the right to withhold this information from the insured.  What could the insurance

company possibly have **to hide from its own insured**?  Moreover, the insurer states to

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 55

the insured they it will give the name of "any" doctors who have provided the insurer

with medical records.  If the insured wishes to get copies of the medical records sent to

the insurer directly from those doctors, the insured can do it on his own.  This would be

another excellent example of harassment of the insured in which the insurer forces the

insured to go to the time and expense to collect **the same identical medical records** that

the insurer **already has**.

On February 15, 2001, [1-25] there is a telephone call between the insured and the

insurer's representative, Mr.Mills.  The Claims Representative explains to the insured

**that the insurer will be withholding the insured's monthly policy benefits** until the

insured signs a "new" authorization form.  This is commonly known in the insurance

industry as "economic duress".  As Ms. Beattie stated in her meeting with the insured, on

April 25, 1998, **the insurance company is going to play "hard ball" if you continue to**

**report monthly claims to the insurer**.  Ms. Beattie, an agent of the insurance company

hit the nail on the head.  Any time the insurance company wants something from the

insured, all the insurer has to do is withhold the insured's policy benefits until the insured

is **forced to comply** with the wishes of the insurer.  Moreover, in the telephone

conversation of February 15, 2001, the Claims Representative indicates that the insurer

has contacted people that the insured did business with and at least one of those people

(**phantom person**, i.e., no identity ever disclosed) "suggested" that some of the reasons

why the insured discontinued doing work was for reasons other than medical reasons.

On February 16, 2001, the insurer then reverses itself, and agrees to pay the insured

policy benefits **if** the insured meets with the insurer's medical examiner and signs the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 56

broad form release or **new** release of information that the insurer demanded on February 15, 2001.

As it relates to the telephone conversation between the insured and the insurer's Claims Representative on February 15, 2001, the Claims Representative appears to let the cat out of the bag by stating that the insurer requires "objective" evidence of disability and that is why the insurer wants an independent medical examination of the insured and that is why the insurer hired a **forensic** CPA. However, the standard of "objective" evidence is **not** the standard dictated by the insurance policy. Rather, "subjective" evidence has been adequate and reasonable evidence, not only in this case, and this insurance policy, but **the industry standard** for at least 40 years. The insurance company is clearly using **the wrong "standard"** by which to evaluate a disability claim. Also, the Claims Representative suggests to the insured, in the subject telephone conversation of February 15, 2001, that the insured has made a "choice" to be disabled, rather than work any more and it is a "financial gain" to the insured **"to be" disabled** rather than work as a "manufacturer's representative." Basically the Claims Rep is telling the insured he is a phony and a cheat and he is ripping off the insurance company.

These statements by the Claims Representative, Mr. Mills, are significant in that he admits in this telephone conversation of February 15, 2001, that **he is not a doctor**. However, it is Mr. Mills's opinion that the insured is not disabled, contrary to approximately seven years of doctor's reports (attending physician's statements) that says the insured is disabled and why the insured **is** disabled.

The Claims Representative asks the insured why he is not doing well in his new business. The insured responds because the insurance company is harassing and intimidating the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 57

insured to the point that the insured's **major depression and paranoia** is getting worse rather than better. The insured explains that when he is told that he is **not going to get his monthly check**, the insured becomes depressed and can't work, even part time. As the insured states, "Because if I am cut off, I am in deep shit." It is my opinion that the insurance company knew that every time they **cut** the insured off or **threatened to cut the insured off** or intimidated the insured or threatened the insured, that was done intentionally, since the insurance company **knew** and had seven years of medical reports from the attending physician that the insured suffered from **major depression and paranoia**.

However, the business of claims adjusting is all about money. Money is the bottom line. If the insurance company has to sacrifice the insured in order to improve its profit margin, so be it. The insurer looks at the insured as a **financial liability**. It is nothing personal. It is just about money. If the insurer's conduct aggravates the insured's major depression and paranoia, so be it.

The Claims Representative, Mr. Mills, goes on to state in the same telephone conversation, "In a scenario like you, where you have become accustomed to the payments, because it is now something -- **it is now your support system. . . .**" What the Claims Representative is saying to the insured is that he has become comfortable being on the insurance company's payroll and doesn't want to get off the payroll. This is very significant because in this candid telephone conversation between the Claims Representative and the insured, the "mind set" of the insurer comes to the surface. The point is, even though **there is no medical evidence to support the insurance company's speculation** that the insured is a dead beat, the insured must suffer the attacks

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 58

on himself and expose himself to ridicule and abuse, in order to recover monthly policy benefits.

The Claims Representative goes on to state in the same telephone conversation, because the insured's claim is a **"self reported thing"** then the insured's friends and family have to be contacted to document the insured's demeanor in which to have **"objective"** evidence of the insured's disability. **This is absurd**. However the Claims Representative again lets another cat out of the bag in that the Claims Representative is telling the insured that because the insured's illness is **subjective**, that is you can't see it, you can't feel it, you can't x-ray it, then the insurance company is at the mercy of the insured who says, "I'm depressed and I'm paranoid." This is the real crux of why the insurance company is beating up its own insured because the insured has been on the insurance company's payroll for approximately seven years now, and there is no light at the end of the tunnel that the insured will ever make the type of recovery that he can go back to working full time again. The point is, the insurance company sees a very long term, probably 30 years, liability that they can't shake.

And yet another major point of the Claims Representative, Mr. Mills, in the same telephone conversation, is that the insured could be depressed and could be paranoid "but people get better". The Claims Representative does not understand why the insured is not getting better and appears to be frustrated with the insured's claim.

On February 23, 2001, [1-39] the insured sends a letter to the insurer. The insured again documents that the insurer has **again** withheld the insured's benefit check and is currently trying to force the insured to sign a new carte blanche release of information **form**. Moreover, the insurer **continues** to ignore the insured's request for some or any control

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 59

regarding the carte blanche new release of information **form** that was sent to the insured.

Also, the insured asked for an explanation as to **why** the new release of information **form**

is even necessary.  The insurer **ignores** the insured's request for information.

Additionally, since the insurance company, by now (February 23, 2001) has a mountain

of medical documentation and tax returns and accounting statements, etc., as it pertains to

the insured, why would, at this late date, the insurer need a **new** authorization form?

The insured called two Claims Representatives, Mr. Honake (V.P. of Claims) and Mr.

Ditman, a week ago, but neither of two Claims Representatives would return the

insured's phone messages, regarding the insured's "over due checks."  This type of

avoidance by the insurance company, and with full knowledge that they dealing with a

policyholder who is suffering from **major depression and paranoia**, is inexcusable.

Both Claims Executives know, or should have known, that the insured's "**peace of mind**"

is paramount under the specific circumstances of this case.  As of February 23, 2001, the

insured's two benefit checks are now three weeks old **and the insurance company**

**won't talk to its own insured.**

On March 7, 2001, [1-38] the insurer sends a letter to the insured.  The insurer states that

the authorization form is necessary to obtain information but not to "divulge" information

to anyone."  However, the insurer goes on to state that the authorization form requested

states, "I understand similar information may be reported M.I.B.  (Medical Information

Bureau) which is a **clearinghouse** of medical information available to all members of

M.I.B.  [1-39.5].  Hence, when the insurer states, "You can also rest assured that while

the authorization allows us to obtain information from every source, it does not allow us

to **divulge** to anyone, any of your personal medical information, then the insurance

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 60

company is only offering a **half-truth to the insured**.  Again, the insured's issue of confidentiality, as it pertains to his personal life and the insured's medical history is crucial to the insured.  However, the insurer wants the insured to sign an authorization form that allows the insurer **to disclose** the insured's personal medical records and history to **a clearinghouse** of information for all insurance companies to gain access thereto.  It would appear that the insurance company is talking out of both sides of its mouth.

On February 15, 2001, there is a very candid conversation between the insured and the insurer's representative, Mr. Mills.  In this candid telephone conversation, Mr. Mills explains to the insured that the Vice President in charge of claims, Mr. Hughes, **has cut off the insured and the insured will not receive any more monthly policy benefits** because the insured will not sign the carte blanche new authorization form.  However, and pursuant to the insurance policy and industry standards, the insurance company **does** have an authorization form which is part of the monthly claim form sent to the insured for continued policy benefits.  Also, the authorization form that the insurance company **has always had** on the insured, is good "for the duration of the claim".  The Claims Representative also offers a second reason why the insured has been cut off and that is that some **"phantom person"** purportedly told the insurer that the insured is not working "for reason other than medical".  However, the insurance company will **not disclose who** the phantom person is and who purportedly made this comment to the insurance company.

Also, Mr. Mills, the insurer's Claims Representative, states,"Everyone" is signing the "new authorization form".  Mr. Mills also suggests that the medical providers (the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 61

insured's attending physician) will not accept a one or two year old authorization form

because the authorization is too old.  **However,** Mr. Mills, the Claims Representative,

**never identifies anyone who has ever refused the authorization that the insurer**

**already has!**

Also, the "new" authorization form that the insurer wishes to use, and which is

independent of the authorization form that the insurance company **already has**, does not

allow the insured to have a copy of the medical records that are collected by the insurance

company on the insured.  **I would be curious to know who is the author of this "new"**

**authorization form.**  [10].

However, [44-1] pursuant to Jefferson-Pilot's "Privacy Practices Notice" it appears that

the insured **can** review "personal information" about the insured relating to any insurance

issued by Jefferson-Pilot. . . ."

What is terribly significant at this time, February 15, 2001, is that the insurance

company's Claims Representative, Mr. Mills, **only casually** told the insured that he was

**cut off, two weeks after the insured was cut off,** and the insured only learned that he

was **"cut off"** because he called the insurance company to find out where his monthly

benefits check was.  That is, the insurance company had decided to **abandon the insured**

without even telling the insured that **he had been abandoned** by his own insurance

company.  If the insured had never called the insurance company, on February 15, 2001,

**the insured could have waited forever** before receiving his next monthly benefits

check.  A silent denial of policy benefits is bad faith, malicious, oppressive, despicable

and willful and wanton disregard of the insured's policy rights.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 62

Also, in the same telephone conversation of February 15, 2001, the Claims Representative indicates that if there is litigation, then the insured could get a copy of his medical records from the insurance company by virtue of subpoenaing the insurance company's claims file.  It is also interesting to note that the Claims Representative, Mr. Mills **never sited any part of the insurance policy's authority that the insured has to sign a "new" carte blanche authorization form**.  Again, it appears that this insurance company just makes up its own rules as it goes along in the processing of a claim.

The Claims Representative explains to the insured that if the old authorization is thirty to ninety days old, then people will not honor that authorization because it is not new.

**However, the Claims Representative has never identified a single person who has ever challenged the insurance company's authorization they have always had on the insured.**

During this candid telephone conversation, the Claims Representative, Mr. Mills, suggests to the insured that the insurance company's investigation indicates that the insurance claim is not **medically** based.  However, the Claims Representative **never offers any evidence whatsoever as a basis for his opinion** that the insured's claim is "medically" based.

The Claims Representative suggests to the insured that, because the insured **can talk** on the telephone **and write letters**, and **because the insured is not totally secluded from the world,** or maybe the insured is "selling the wrong product".  The Claims Representative goes on to state, "**I am not a doctor**".  The Claims Representative goes on to complain that people get better and get back to work but the insured is not getting better and is not going back to work so what is wrong with the insured?

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 63

The Claims Representative, Mr. Mills, also suggests, just like that of Ms. Beattie, that the insurance company could have paid the insured "something" and then every one could just walk away.  The insured then asked the Claims Representative, "What is the insurance policy worth?"  The Claims Representative states that it would be worth some "discounts" based on future policy benefits.

The insured also shares with the insurer's Claim Representative, Mr. Mills, that in anticipation of being cut off, he has moved in with his mother.

On the following day, February 16, 2001 [Tape] [10], the Claims Representative, Mr. Mills, calls the insured and leaves the message on the insured's recorder stating that "if" the insured will sign the new unaltered authorization and "if" the insured will go to an independent medical examiner, then the insurer **will pay** the insured's policy benefits for both of his policies.  The insured is now **financially distressed** and succumbs to the insurer's unreasonable demands just so that he can get paid something so he can pay his bills.  The manipulation of an insured through **financial dur**ess is not good faith claims practices.  What you basically have is a David vs. Goliath relationship.  The insured has to succumb to the demands of the insurer just so he can pay his bills.

On March 15, 2001, [1-37] Dr. Kausch called the insured.  Dr. Kausch is the insurance company's board certified psychiatrist.  This gentleman will conduct, in part, the insured's independent medical examination pursuant to the policy language.  In this telephone conversation, Dr. Kausch suggests to the insured that the reason the insured is not working is because the insured wants to get out of the "sales business".  This is most unusual in that independent medical examiners are supposed to **acquire** information and not give medical advice to a **non**-patient, the insured in this case.  Dr. Kausch goes on to

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 64

state to the insured, that Dr. Judd's report stated that the insured was an "alcoholic".

However the insured immediately challenged the independent medical examiner's

conclusion that he was an alcoholic and asked for a **basis** for the independent medical

examiner's opinion.  The independent medical examiner then **reversed** himself and stated

that Dr. Judd (the insured's attending physician) "had questions of possible alcohol

addiction".  The insured went on to explain to Dr. Kausch that Janet Beattie (another

representative of the insurance company) had threatened the insured by telling the insured

to "accept a buy out" of $100,000.00 to $200,000.00 or **Jefferson-Pilot would**

**play"hard" ball.**

In a clinical interview on March 8, 2001, Dr. Kausch informed the insured, "It appears

that you are in a significant depression and you are very angry at the insurance company

[Jefferson-Pilot].  Am I right?  The insured responded, "Yes, you are right" and

"Jefferson-Pilot and D.M.S.  [Disability Management Services] made threats and were

intimidating which was unbearable" then Dr. Kausch said to the insured, **"A buy out or**

**settlement may be best for you**.  Are you proposing that?"  The insured responded, "I

am not opposed but don't think they [insurance company] will offer anything fair".  This

is most unusual.  I don't think I have ever heard of or seen or read anything about an

**independent medical examiner** delving into, in any fashion or form, a discussion about

**"a buy out or settlement."**  This is the first.  Again, Dr. Kausch is an independent

medical examiner, retained, purportedly, to examine the insured and **not to suggest or**

**open up discussions about settlements or buy outs of the insured's insurance**

**policies!**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 65

One gets the distinct impression that **Dr. Kausch is a mirror of Ms. Beattie** in which both medical professionals have an ulterior agenda in which to suggest or seek out the possibility that **the insured might settle his disability claim rather than continuing that claim for potentially decades into the future.** Medical professionals are supposed to offer medical services. Insurance adjusters and Claims Representatives are supposed to offer claims services, including claim settlements, if necessary. It is most strange that medical professionals such as Dr. Kausch and Ms. Beattie would even remotely delve into even a possibility of a buy out of the insured's disability policies. If a doctor or medical professional is wearing two hats, one as a medical professional and a second as a claims adjuster or a claims negotiator, then that significant fact **should be disclosed,** beforehand, so that the insured understands **who and what they are dealing with.**

On March 4, 2001, the second independent medical examiner, Dr. Kenny, Ph.D. (neuropsychologist) has three meetings with the insured on February 17, 2001, February 24, 2001 and February 25, 2001, for a total of twelve hours.

It should be noted that the insured agreed to release the results of this three day IME (independent medical examination) to **only** 1) DMS, Inc. and 2) Dr. Kausch. The insured's release did not allow the contents of his independent medical examination with two independent medical examiners to be released to Jefferson-Pilot!  [4-2].

It is also noted that the independent medical examiners were instructed by the insurer, to examine the insured pursuant to an "**objective**" vs. "subjective" basis. Hence, the independent medical examination was based **on the wrong standard** by which the insured may recover disability payments pursuant to his two policies. Nor is there any currently known evidence or documents that corrected either independent medical

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 66

examiner to evaluate and examine the insured, based on "subjective" data or information.

The point is, **the independent medical examinations are based on the wrong**

**standard.** (Pursuant to the insurance policies).

As noted in Dr. Kenny, Ph.D.'s IME report, the insured comes from a "strong" family

history of depression. Also, the insured's major depression is **"severe"** (Please see page

9 of Dr. Kearney's Report of March 4, 2001). The insured's Father, four brothers, two

sisters, and at least two aunts and two uncles have been the victims of major depression.

Two brothers have attempted suicide without resulting death. Dr. Kenny, Ph.D.'s report

goes on to state that Jefferson-Pilot implied to the insured that he was a "tax cheat" and

this false characterization of the insured, According to the insured, **"It flattened me."**

Moreover, in the doctor's opinion, the insured is able to work a few hours a day or "ten

hours per week." due to the insured's 1) depression, 2) fatigue, 3) difficulty

concentrating. Also, in the IME report it is noted that, according to the insured, **the**

**insurance company misplaced the insured's premium check in which to attempt to**

**cancel his policies for non-payment of premiums.**

Dr. Kenny, Ph.D.'s report further states that the **insured is not malingering.** Also, this

IME doctor's tests indicate "a serious psychopathology consisting of depression, anergia,

withdrawal, anxiety and paranoid mentation". The IME doctor goes on to state that the

insured "appears to have very little energy", and a "low level of efficiency" and

"difficulty keeping up with daily affairs", due to the "fatigue, poor memory,

concentration problems and the inability to make decisions". Further, the insured

"appears to be immobilized, as well." The doctor goes on to state that the insured's

personality problems were "probably central to his divorce and are **likely to be a distinct**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 67

**liability in sales type positions".** The IME doctor goes on to state that the insured is

"not the type of person one would want to buy merchandise from". Also, the insured

does meet "the criteria for social phobia and avoidant personality disorder". Moreover,

retraining at this point (March 4, 2001) "would likely be very problematic" [4-15],

Moreover, Dr. Kearney states "This level and pattern of performance is quite consistent

with that of depressed patients," Also Dr. Kearney states, the insured's personality issues

"do not augur well for work in the field of sales and are not likely to change **even with**

**treatment."** On March 18, 2001 [6-1] the insured's brother (Tim Kearney) sends a letter

dated March 18, 2001, to the insured. The insured's brother stated that on March 15,

2001, the IME doctor-psychiatrist asked the brother about the insured's drinking habits.

The brother (Tim) told the IME doctor that the insured "never had a drinking problem".

The IME doctor, Dr. Kausch, did not have the authority from the insured to release test

results or anything to the insured's brother. However, **Dr. Kausch told the insured's**

**brother, Tim,** that the insured "had recently taken a personality test and the results

indicated that **you [the insured] were "shy and withdrawn" and the test indicates that**

**you have "a very poor sales aptitude".** This would obviously be a **breach of the**

**confidential agreement between the insured and the insurer, as well as the IME**

**doctor, Dr. Kausch.** Once the insured's brother told the insured about this **disclosure of**

**confidential information, and the results of the insured's testing by Dr. Kausch,** the

insured became **further** depressed.

On March 19, 2001 [3-1] the IME doctor, Dr. Kausch, sent his report to the insurer. You

will note [3-8], [3-10] that this report is based on **"objective"** data and **"objective**

support" for "any impairment limiting the claimant from working full time". Again, the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 68

policy does not require "objective" evidence in which to support a disability claim.

Rather, "subjective" evidence is **adequate** and within **the industry standard** in which to

support a disability claim by an insured.

The IME report by Dr. Kausch indicates that he was requested to conduct an independent

medical examination of the insured, pursuant to the insurance company's **letter of**

**instruction** dated February 9, 2001.  (Please secure a copy, if possible.)  Also, Dr.

Kausch was provided with a copy **of Ms. Beattie's notes of April 25, 1998.**  (Please

secure copies, if possible).  Moreover, Dr. Kausch was provided with **surveillance logs**

from February 29, 2000 to May 20, 2000.  **(Almost three months of surveillance).**

(Please secure those surveillance logs and tapes, if any).  Also provided to Dr. Kausch

was Chelsey Ugolik's **file review** of November 18, 1997.  (Please secure, if possible, a

copy of that **file review**).  Also provided to Dr. Kausch was, Dr. Piechowski, Ph.D. file

review of April 26, 2000.  (Please secure those file **review notes,** if possible).

Dr. Kausch goes on to state that about October, 2000, the insured moved in with his

mother for morale and financial support because of a pattern of  **"intimidation by his**

**insurance company**. . . ."  (His insurance company is Jefferson-Pilot.)

Dr. Kausch's IME report goes on to state that the insured secured his Bachelor of Arts in

Psychology in 1974.  The insured's divorce **after 15 years of marriage was stressful in**

**1994** and the divorce was due, in part, to the insured's **depression**.  The report goes on to

state that in 1992, the insured had a back injury.  Following the back injury, the insured

was unable to travel by car **as he used to do,** prior to his back injury.  Following the back

injury the insured's problems such as sitting at a desk and the insured's loss of business,

because his employees could not close business transactions like the insured could,

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 69

caused a significant reduction in earnings.  Because the insured was no longer the central

sales person, some of the insured's principals terminated their relationship with the

insured.  The insured did not share with his principals that he was suffering from major

depression **and paranoia**.  This is understandable.  That type of disclosure of information

would not be beneficial to a **business relationship**.  In 1998, the insured filed for

bankruptcy.  Following bankruptcy, the insured, in 1998, started a new business.  The

new business was known as "Kenwood Technologies, Inc".  (An **engineering** enterprise).

At this time Jefferson-Pilot was putting "pressure" on the insured to produce a whole

array of documents.  Apparently in 1998, the insured filed a **total** disability claim with

Jefferson-Pilot but the total disability claim **was denied** by Jefferson-Pilot Life Insurance

Company.  [3-2]. The insured's new business, Kenwood Technologies, Inc. was making

"steady progress" until Jefferson-Pilot started in October, 2000,to  "harass and

intimidate" the insured with **"endless documentation and paper work which required**

**all of insured's energy."** [3-3].

In October, 2000, Jefferson-Pilot started to harass the insured and intimidate the insured.

[3-4].  "Most" of the insured's depression is due to Jefferson-Pilot's harassment and

intimidation of the insured.

The insured has a feeling of "hopelessness" due to the treatment by his insurance

company, Jefferson-Pilot.  [3-4].

The insured expressed to the independent medical examiner, Dr. Kausch, M.D., a great

deal of anger towards the insurance company.  He described a pattern of harassment and

intimidation by the carrier.  He said they had essentially told him, **"We'll play hard ball**

**with you, if you don't drop this claim"  (Intentional infliction of emotional distress**).

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 70

It is also noted on page 5 of Dr. Kausch's IME report of March 19, 2001, that the insured informed the doctor that the insurance company has "been hounding him with letters and telephone calls over the past year". The insured felt "threatened" by them. The insured said, "The pressure by them is constant". The insured stated that the insurance company "essentially called him a cheat". The insured went on to state, "They have demanded large amounts of documentation about his business affairs, have asked him to produce **twelve years worth of receipts**, and that he spends all of his available time and energy, trying to answer their demands. The IME report further states, " He stated strongly during our examination that the insurance company should stick to its obligation, as he saw it, to continue to pay him full benefits, and that he was due these benefits **for the rest of his life**.

**Dr. Kausch stated that Dr. Kenny checked the insured for "malingering" and "found none" in Mr. Kearney's testing.** "According to Dr. Kenny, Mr. Kearney's MMPI profile **was valid** and several scales were evaluated. Dr. Kenny noted the configuration indicated "serious psychopathology consisting of depression, anergia, withdrawal, anxiety, and paranoid mentation".

What is unusual on page 6 of Dr. Kausch's report of March19, 2001, (please see paragraph 3) is that the doctor is talking about **insurance policies and policy provisions and monthly payment of benefits, etc**. This is most unusual. What possible difference could it make whether the insured had a policy or policies with the insurance company and what the monthly policy benefits were? What difference does it make? One would think that the independent medical examiner, Dr. Kausch's task at hand is whether the insured is disabled or not. That should be an IME doctor's only interest and assignment.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 71

On page 7 of Dr. Kausch's report, the doctor states, "Mr. Kearney said that it was the depression that caused him to not be able to tolerate travel.  It caused him difficulty dealing with principals."  He said such things were not a problem for him before he became depressed.  He said it takes a lot of patience to be in sales and he no longer had any patience, once he became depressed."  It is also noted that the insured is spending all of his time dealing with insurance matters.

Dr. Kausch also interviewed the insured's mother, Mary Kearney, on March 15, 2001.  The insured's mother said that the insured is "very depressed".  The insured's mother went on to state that the insured is depressed much of the time, and becomes exhausted easily."

Dr. Kausch also interviewed the insured's brother, Tim Kearney, who is an older brother, on March 15, 2001.  It appears that the insured's divorce, in 1994, had a big impact on the insured's depression.  The insured's brother also stated that the insured's depression seems mostly **fueled by frustration with the insurance company**.  He thought that this really "accentuated" his brother's depression.  He described his brother "consumed by" and "overwhelmed with" his conflicts with the insurance company.  (Jefferson-Pilot Life Insurance Company).  Moreover, on page 8 of Dr. Kausch's IME report, the doctor reports that the insured's brother, Tim, "has never been aware of his brother being intoxicated".  Also of great import is the paragraph on page 8, center of the page, which states, "Please provide your full diagnosis of the claimant, including all five axis.  Please discuss the extent the diagnosis is based upon – **objective vs. subjective data**."

On page 8 of the report, Dr. Kausch discloses that axis II and axis IV deal with **the wrong and stress that the insurer has inflicted on its own insured!**  The doctor goes

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 72

on to state that there is evidence of bipolar disorder regarding the insured and some of the insured's siblings and Dr. Kenny, through psychological testing, suggests a diagnosis of social phobia.  **It is interesting that on page 10 of the doctor's report, the insurance company's own doctor came to the conclusion that even by an "objective" standard, Dr. Kausch states that the insured is disabled**.

According to the doctor, some of the insured's disability is due to 1) mood disorder, 2) serious psychopathology, 3) chronic fatigue, 4) wronged by the insurance company (Jefferson-Pilot Life Insurance Company), which **contributed significantly to the insured's disability**.  To the best of my knowledge and belief, this is the first time I have ever seen an insurance company who is a significant factor in the continuing disability of its own insured.  (How ironic).

On page 11 of Dr. Kausch's report, the doctor feels the insured is suffering from "CFS with a psychological etiology".  CFS is believed to mean Chronic Fatigue Syndrome.

On page 11 of Dr. Kausch's report, the doctor states, **"There is really no evidence available to me that he [insured] is simply faking his psychological condition just to get insurance money."**

On page12 of Dr. Kausch's report, the doctor states, "The current plan, as described by Mr. Kearney, appears to consist of ongoing psychotherapy with Dr. Donna Judd, three or four times a month, along with some telephone contact; also medication checks with Dr. Lehenbauer (the insured's family physician) every few months.  The doctor goes on to state, "His level of impairment is **substantial** and has, it seems, actually gotten worse over **the last five months**.  He appears now to be at his lowest level of functioning in the

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 73

past seven years.  The doctor goes on to state, "Mr. **Kearney is impaired by his mood disorder"**.

On April 5, 2001 the insured writes a letter to the insurance company's forensic CPA, Ms. Hymowitz.  [1-33].  The insured states that he "disturbed" that the forensic CPA wants A) mountain of documents for Kearney Associates, Inc. dating back to **1988**.  (13 years ago).  You will note, however, that when the insured took out his policies of disability insurance these 1988 business records were **not necessary in which to issue the two policies to the insured.**  Now they are?  Why?  Moreover, the insured explains again, that on December 22, 2000, that the insured did not have any further documents to share with the insurer.  Also, the insured already provided the 1992 and 1993 personal tax records to the insurance company.  Apparently the insurance company repeatedly asked for the **same** documents to the point that the insured is frustrated.  The insured also shares with the insurer in his letter of April 5, 2001, that the earlier tax records (pre 1992) **already have been provided** to the insurer to purchase the two disability income policies in the first place.  Lastly, the insured complains that the insurance company's forensic CPA will not send the Social Security and the tax returns that the forensic CPA secured by virtue of the release form that the insured signed and sent to the insurance company's forensic CPA.  It would appear that the insurance company's conduct just continues to compound the insured's depression and paranoia.

On April 11, 2001, [11-32] the insured sends a letter to the insurer.  The insured states, "I am outraged and very disturbed to find out that your board certified psychiatrist, Otto Kausch, M.D., **disclosed** to my brother, Timothy L. Kearney, **confidential results** or

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 74

interpretation of results from the recent psychological testing I underwent for your

purposes."

The insured admits that he gave Dr. Kausch his permission, in good faith, to briefly talk

with his brother and mother.  Dr. Kausch specifically told the insured that he needed to

talk to his brother and mother  **"to ask a few questions, not to disclose confidential**

**information about you".**  Dr. Kausch **breached his confidentiality agreement** with the

insured when he told the insured's brother, on March 15, 2001, that psychological

personality **testing recently taken by me indicates that I am shy and withdrawn"** and

**that my sales aptitude is "very poor."**  These comments by Dr. Kausch to the insured's

brother, Tim, took place on March 15, 2001.  The disclosures by the doctor to the

insured's brother **were without the insured's consent.**  The insured found this disclosure

to his brother to **be "highly embarrassing".**  There was a specific understanding that the

doctor would **not disclose the test results or anything else personal about the insured,**

**to anyone, including the insured's brother and/or mother.**

The insured also reminds the insurance company that the insurance company's letter of

March 7, 2001, stated, "You can rest assured, that while the authorization allows us to

**obtain** information from various sources, it does not allow us to **divulge** to anyone, any

of your personal medical information".

On May 7, 2001, [1-30] the insurance company's forensic CPA informs the insured that

she needs more documents from the insured, going back to 1988.  However, there is

never any reason or rationale or explanation as to **why** financial records going back to

**1988**, are even remotely necessary or relevant.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 75

On May 25, 2001, [2-1] the insured sends a letter to the insurer.  The insured explains, among other things, that he has been **waiting for almost two months now** for answers from the insurance company's CPA.  That forensic CPA will not answer the insured's questions.  Nor will the insurance company answer questions on behalf of its own forensic CPA.

On June 5, 2001 [4-1] the insurance company sends to the insured's attending physician, the two IME reports by Dr. Kenny Ph.D. and Dr. Kausch M.D. reports dated March 4, 2001 and March 19, 2001 respectively.  [3-1].  You will note that **it took over two and one half months** for the insurance company to forward copies of the insured's IME reports, even though those reports were promised **"as soon as we receive them."**  It appears the insurance company just sat on these two IME reports for months and **breached its promise** to the insured to send those reports to the insured **as soon as the insurance company received those IME reports.**

On June 5, 2001, the insurance company sends a letter to the insured.  The insurance company states that they acknowledge the insured's letters of May 22, 2001, and May 25, 2001, and the insured's ongoing "clamoring".  This appears to be rude and unprofessional when making reference to the insured's letters as "clamoring".  The insurance company's excuse for Dr. Kausch's **disclosure** of personal information about the insured to the insured's brother is apparently justified, in the opinion of the insurer, since that conservation and **disclosure** of the insured's personal matters **"was short."**  Apparently if the insurance company and the insurance company's agent, Dr. Kausch, only makes a **"short" disclosure of confidential information to a third party,** that is okay in the opinion of the insurance company.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 76

The insurance company makes mention, in the same letter of June5, 2001, that now the insurance company wants to have the insured interviewed by an "independent occupational specialist". The insurance company now wants to "understand your work experiences". The insurance company goes on to state that the insurance company wants to learn "if there are any transferable skills" from the insured's previous employment to current duties. Apparently all of the insured's **massive** communications with his own insurance company has fallen on deaf ears. Moreover, this may be another ploy on the part of the insurance company to send out another individual, like that of Ms. Beattie, and under **false pretenses** to attempt to buy back or buy out the insured" two policies. Based on the insurance company's past conduct, the insured should be **on guard** as to any new tricks the insurer may have up its sleeve.

On June 12, 2001, the insured sent a letter to the insurer. The insured complains that the insurance company continues to repeatedly ask the insured for documents that the insured doesn't have and which the insured has **previously told the insurer that he does not have.** Moreover, the insurer's forensic CPA **already has** the documents that the insurance company is now requesting. Apparently there is very poor communications between the insurer and the insurer's forensic CPA.

It is also interesting to note that the third party administrator (Disability Management Services, Inc's. Claims Representative, Mr. Mills, admits to the insured that he doesn't have all of the insured's claim records. It appears that the insured's records are divided up between the insurer and the insurer's third party administrator, Disability Management Services, Inc. This is also significant in that it is not a good faith claims practice for a Claims Representative to know only **some** of the information about a given file. **Again,**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 77

**the insured's policy benefit checks are late.** It is interesting to note that on all late

policy benefit checks, the insurer **never pays interest** on those late payments.

Equally important, the insurance company **never apologizes** for its unreasonable delays

in issuing monthly policy benefit checks. I believe this is very strong evidence that the

insurance company just doesn't care about its insured, Christopher L. Kearney.

Moreover, the insured documents that the Claims Representative for the insurer, Mr.

Mills, can't understand why the insured is disabled because the insured **"sounds" okay**

on the phone and the insured **can "talk"** on the phone and the insured is **not in a "dark"**

**place** or "in bed". It would appear that the Claims Representative doesn't have a clue

about the concept of deep depression and/or paranoia. However, it's the Claims

Representative's **attitude** that is the underlying cause of much of the insured's grief

during the course of his claim.

It would appear that the Claims Representative, Mr. Mills, is "playing doctor" in that he

is substituting his **subjective, lay opinion** on what is major depression and/or paranoia in

place of **the attending physician and the two independent medical examiners** who

have examined the insured on numerous days. The disability income industry **standard**

is, that **medical doctors,** within the insured's medical specialty field of treatment, **decide**

**disability** and not "lay people" or Claims Representatives such as Mr. Mills. It is bad

faith for a **non**-medical specialist, such as Mr. Mills, to opine on the medical disability of

Mr. Kearney (insured). Nor is there any evidence that the Claims Representative, Mr.

Mills, is an **expert** on the insured's medical condition. However, in January, 2001 the

insured's attending Doctor Report stated, "Difficult to treat **because of stressors from**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 78

**Insurance Company",** and "patient condition" requires **permanent long term treatment."**

Lastly, the insured reminds the insurer that he is **still waiting** (since October 30, 2000) for the insured's understanding of "proof of loss". The insured has been waiting for an answer to this apparent easy question for **the last seven months**. Rather than respond to the insured, the insurer continues to **ignore** the insured's questions about his policy. The insured's question should have been easily answered up to a week in time.

On June 14, 2001 [55-1] the insured sends a letter to the insurer. The insured encloses the federal tax records, regarding information (1995) for the years of 1995, 1996 and 1997**. Again, the insured reminds the insurer that his insurance policy only requires "reasonable proof " of income that "may" be required.** The insured also encloses Form 941, which is the employer's quarterly tax return for Kenwood Technology Group, Inc. You will note that the insured's earned income is zero.

Moreover, the insured shares with the insurer that he has now made **three requests** for answers to the insured's questions that were directed to the insured's forensic CPA. The insured's forensic CPA, like the insurer, **simply ignores** the insured's inquiries and questions. Also, the insured asked the insurer what the insurer means when it says it needs to "understand your work experience". The immediate question, after having dealt with the insured for the past seven years is, why doesn't the insurer already know the answer to its own insured's question or inquiry? The insurer has received a mountain of financial and medical information, including two recent independent medical examination reports from the insurer's hand picked physicians and has had numerous personal interviews with the insured and the insured's attending physician, going back for

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 79

years.  The question then is, what "further understanding" of the insured's "previous

work background" is not understood by the insurer and why?  Moreover, the insurer

knows the insured's "current duties;" which are almost nonexistent except to work "full"

time "for the insurance to copy irrelevant and immaterial documents.

## SUMMARY

Bad faith is as much a legal concept as it is **an attitude of reasonableness**.

As noted in the body of this report, for years the insurer has, with full knowledge of the

insured's illness; **major depression and paranoia,** committed the following bad faith

acts.

1)    Harass the insured with **non**-meritorious demands for **irrelevant and immaterial**

    **documentation.**

2)    On occasions, unreasonably delayed the insured's policy benefits (monthly

    checks).

3)    **Intentionally** delayed the insured's policy benefits.

4)    Attempted to allow the insured's two policies to lapse **for non-payment of policy**

    **premiums.**

5)    **Misrepresented** the insurance policy provisions.

6)    Met with the insured under **false pretenses.**

7)    Specifically told the insured that his disability claim was not an illness disability

    **but a fabricated disability.**

8)    Made **false promises.**  ([1-73]. [1-100].

9)    Failed to keep the policy benefits **current** (i.e.: cost of living adjustments were

    not timely applied to the insured's base policy benefits).

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 80

10) **Intentionally disclosing personal and private information** about the insured to a third party (the insured's brother, Tim).

11) **Failed to respond** to the insured's A) phone calls and messages left with the insurer and B) letters to the insurer and the insurer's representatives and agents, i.e., Ms. Beattie and the insurer's forensic CPA.

12) Repeatedly asking the insured for documents that the insurer **already had** in its possession [1-105].

13) **Following the insured into the insured's place of worship** to spy on the insured.

14) **Defamation of the insured's attending physician, i.e., an extortionist.**

15) Numerous **threats** directed towards the insured, regarding both holding of policy benefits unless the insured provided to the insurer documents not required in the insurance policy  (i.e.: carte blanche authorization forms rather than the standard authorization language found on the monthly claim forms).  [1-97]

16) Threatening the insured to accept a few years of future policy benefits as a lump fund settlement or be prepared to **"hire a good attorney"** to fight for policy benefits.

17) **Low balling the insured's benefits** in order to get the insurer off the back of the insured (Harassment – **intentional threats** of withdrawing or withholding the insured's policy benefits).

18) Failing to pay the insured's attending physician – a promised reasonable professional fee to amass all of the insured's medical records for the past six to seven years.

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 81

19)   Telling the insured that he decided to stay on the insured's payroll as a disability claimant rather than return to work, part time or full time **without any good faith basis** for such a position on the part of the insurer.  [1-81].

20)   **Intentionally** inflicting emotional distress on the insured (outrageous and extreme acts and omissions).

21)   Negligent infliction of emotional distress on the insured.

22)   Delaying policy benefits **without a reasonable basis.**

23)   Utilizing **economic duress** to force the insured to do an act of which there was **no good faith basis** to force the ensured to act.

24)   Utilization of **coercion and outright bullying tactics against the insured.**

25)   **Misrepresentation of policy language to limit benefits,** i.e.; Twenty-four months limitation for the insured's illness (a known false misrepresentation by the insurer).  [1-99], [1-84].

26)   Embarking on an **intentional** concerted course of conduct to induce the insured to **surrender** his insurance policies.

27)   Attempting to induce the insured to enter into a "settlement" **due to a nonexisting dispute**, due to false and threatening statements and employment of economic pressure.

28)   Suggesting to the insured that he is a phony claimant.

29)   **Tactical utilization of shame, humiliation and embarrassment to coerce the insured into withdrawing his disability claim.**

30)   Utilization of worry, shame, humiliation, anger, intimidation, and threats when the insurer **knew** the insured was **highly susceptible to worry, shame,**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 82

**humiliation, anger, intimidation and threats**.  (The insurance disability was for

**major depression and paranoia**).

31)    On numerous occasions the insurer demonstrated a **conscious** disregard for the

insured's policy rights.

32)    The insurer knew the insured had a valid disability claim; the insurer had

knowledge of many, if not all, of the insured's medical records, income records

and **had been in contact with the insured's attending physician**, the insured,

the insured's CPA and the insured's mother and the insured's brother (Tim) all of

whom **verified the insured's medical and income documentation** submitted to

the insurance company **as well as the inability to work.**

33)    The insurer **knew** the toll that the insurers were making on the insured due to the

insurer's massive investigation of the insured's medical condition and financial

condition.

34)    **The insurer's purpose was to save itself money,** which constitutes use of

economic power to **oppress** and **withhold benefits** in frustration of the very

purpose for which the insurer received premiums and contrary to its duty to

timely pay and acknowledge an insured's rights to benefits **as expeditiously** as

possible.

35)    Failure to enclose a new claims form with a current payment of policy benefits,

causing the insured to have to **chase after the insurer** to get a current monthly

benefit claim form for payment for the following month.  [1-126].

36)    **A bad faith claims investigation**; requiring the name of the insured's business

clients to contact those clients about the insured's **major depression and/or**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 83

**paranoia**.  It is bad faith to contact **non**-medical or lay people for an opinion about **major depression and/or paranoia** [1-120].

37)    **Delay** of claim payments by sitting on correspondence to the insured for weeks. [1-115].

38)    **Delay** of claim processing of the insurance claim by sending correspondence to the insured's old address.  [1-105].

39)    The insured's claim of November 1, 1994, was paid on February 10, 1995, which is an **unreasonable delay of policy benefits**.  [1-99], [1-98].

40)    The insurer knew the insured's **financial survival** depended on the insured's receiving timely policy benefits.  However, the insurance company **didn't care** if the insured financially survived or not, [1-86].

41)    When (rarely) the insurer "responds" to the insured's question, the insurer takes an **unreasonable amount of time to "respond" if ever**.  [1-75], [1-73].

42)    The insurer employed **false pretenses** to attempt to **low ball** the insured's two policies which had a combined value in the **multi-million dollar range** but were only willing to offer **a few hundred thousand dollars for the surrender of those two policies.**  [1-72].  As you will recall, the insurance company told the insured that the meeting between the insured, the insured's attending physician and the insurer's representative, Ms. Beattie, was to discuss Mr. Kearney's **treatment plan and prognosis for a return to work** and not to discuss a buy out of the insured's two disability policies.  Part of the **false pretenses** was that Ms. Beattie represented herself as a "vocational rehabilitationist".  However, her

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 84

agenda was primarily as a **claims negotiator**.  A "misrepresentation of the **true purpose** of the interview" is a "pretext interview".

43)    The **compounding** of a false pretext and intimidation and threats and misrepresentation, while dealing with an **unrepresented** (non-attorney) disability claimant, suffering from **major depression and paranoia**, in a non-legal manner (vocational rehabilitationist: Ms. Beattie) **is probably the ultimate in pretext negotiations**.  [43] , [1-131], [1-132], [1-133] , [1-139].

44)    "Cold turkey" phone contacts with the insured and the insured's attending physician, without prior notice of requested information caused the insured to be "very agitated".  This conduct was done intentionally by the insurance company, **with full knowledge that the insured was suffering from major depression and paranoia.**  [1-67], [1-65].

45)    The insurance company used an **improper standard of evidence**; that is, the insurer told the insured that his claim had to be based on **"objective" evidence**. However, nowhere in the policies that the insurer issued to the insured is the word "objective" ever used in any manner.  Also **the industry standard**, for at least the past 40 years has utilized **a "subjective" standard of evidence**, by which a disability claim **can be honored**.  That is, "subjective" evidence of a disability is sufficient to establish a "proof of loss" or "proof of claim".

46)    The insurer **knew** at all times that the insured's privacy and the confidentiality of the insured's personal and private life and medical records **were paramount**. However the insurance company **ignored this paramount interest** and concern of the insured as to his **privacy and disclosed personal and private information**

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 85

about its own insured, **to a third party**; the insured's brother, Tim.  [1-66], [1-65.5]'

47)    The insurance company "presumably" retained a private investigator or other person to follow the insured for apparently a number of months.  The insurer instructed its representative **to even follow the insured into church and sit with him during his time of worship**.  This type of conduct is despicable, malicious, oppressive, outrageous and bad faith.  [1-65.5].

48)    **"Stonewalling"** the timely payment of policy benefits.

49)    The insurer made demands on the insured **without citing**, at any time, **the page and/or paragraph in the insurance policy as support for the insurance company's demands placed on the insured.**

50)    The insurers "knew" that a stand-alone authorization **form** is not authorized in the insurance policy, or within **the usual and customary practices of the disability income industry**.  As you will recall, the insurance company forced the insured to sign this "new" authorization form **without any good faith basis**, in fact or in law.

51)    The insurer only offered **vague evidence** of why the insured might not be disabled.  That is, the insurance company **never names names**, that is, the names of people that the insurance company purportedly interviewed who were adverse to the insured's position that he is residually disabled, as that term is used in the insurance policy.  [1-25.9].

52)    The insurance company used the tactic to suggest to the insured that the insured had **chosen to be disabled** in order to get a free ride for the rest of his life of

July 7, 2001
**Christopher L. Kearney and Jefferson-Pilot Insurance Company**
Page 86

drawing disability checks from the insurance company.  However, there is

absolutely **not an ounce of evidence that such a position would even be**

**remotely correct.**  This is just part of the intimidation and harassment of the

insured, while the insurer had full knowledge that the insured was already

suffering from **major depression and paranoia**.  This is bad faith claims

practices.  [1-25.9]

I cannot recall a more devastating bad faith case in the past 40 years, nor have I seen or

heard of or read about a more egregious bad faith claim in the field of disability

insurance.

Even though the insurer's "defense" will most probably be: we paid all the policy

benefits, what's your problem?  The problem is, that this case is tantamount to a mugger

being caught in the act of mugging a victim and the return of the victim's property with

the hope that the returning of the victim's money and some sort of an apology will

makeup for the act of mugging.  It is my position that the insured is entitled to reasonable

compensation for being mugged by his own insurance company for the past three to four

years.  **Otherwise, without accountability, the insured is just another victim, and the**

**insurance company will go on with business as usual, and mug another insured**.


Respectfully submitted,


_____
Clinton E. Miller, J.D., DABFE, FACFE. DABDA
CEM/mil