1

```
 1            UNITED STATES DISTRICT COURT
 2             SOUTHERN DISTRICT OF OHIO
 3                  WESTERN DIVISION
 4
 5   JEFFERSON-PILOT           :
     INSURANCE COMPANY,        :
 6                             :
          Plaintiff,           :
 7                             :
     vs.                       : Case No. C-1-02-479
 8                             :
     CHRISTOPHER L.            :
 9   KEARNEY,                  :
                               :
10        Defendant.           :
11      Deposition of MARTIN P. LEHENBAUER, M.D.,
12   a witness herein, taken by the plaintiff as
13   upon cross-examination, pursuant to the
14   Federal Rules of Civil Procedure and pursuant
15   to notice by counsel as to the time and place
16   and stipulations hereinafter set forth, at
17   the offices of Health First Physicians, 608
18   Reading Road, Suite C, Mason, Ohio, at 7:38
19   a.m., June 14, 2007, before Elaine Haberer, a
20   Registered Professional Reporter and Notary
21   Public within and for the State of Ohio.
22                      - - -
23
24
```

2

```
 1   APPEARANCES
 2   On behalf of Plaintiff:
 3
        WILLIAM R. ELLIS, ESQ.
 4          of
        Wood & Lamping
 5      600 Vine Street
        Suite 2500
 6      Cincinnati, Ohio 45202
 7   On behalf of Defendant:
 8      KENT WELLINGTON, ESQ.
            of
 9      Graydon Head & Ritchey
        1900 Fifth Third Center
10      511 Walnut Street
        Cincinnati, Ohio 45202
11
```

3

```
 1           S T I P U L A T I O N S
 2      It is stipulated by counsel for the
 3   respective parties that the deposition of
 4   MARTIN P. LEHENBAUER, M.D., a witness herein,
 5   may be taken at this time by the plaintiff as
 6   upon cross-examination and pursuant to the
 7   Federal Rules of Civil Procedure and notice
 8   to take deposition, all other legal
 9   formalities being waived by agreement; that
10   the deposition may be taken in stenotype by
11   the Notary Public Reporter and transcribed by
12   her out of the presence of the witness; that
13   the transcribed deposition was made available
14   to the witness for examination and signature
15   and that signature may be affixed out of the
16   presence of the Notary Public-Court Reporter.
```

4

```
                        INDEX
WITNESS         DIRECT   CROSS   RE-      RE-
                                 DIRECT   CROSS
MARTIN P. LEHENBAUER, M.D.
BY MR. ELLIS:            5

OBJECTIONS                       PAGE   LINE
MR. WELLINGTON:                    22     13
MR. WELLINGTON:                    41     19
MR. WELLINGTON:                    42      5
MR. WELLINGTON:                    42     19
MR. WELLINGTON:                    46     11
MR. WELLINGTON:                    61      5
MR. WELLINGTON:                    65      4
MR. WELLINGTON:                    80     11
MR. WELLINGTON:                    84      3
MR. WELLINGTON:                    97     24
MR. WELLINGTON:                    98     24
MR. WELLINGTON:                    99     16
MR. WELLINGTON:                   100     15
MR. WELLINGTON:                   108     16
                        - - -
```

5

1        MARTIN P. LEHENBAUER, M.D.,
2   a witness herein, of lawful age, having
3   been first duly sworn as hereinafter
4   certified, was examined and testified as
5   follows:
6              CROSS-EXAMINATION
7   BY MR. ELLIS:
8       Q.   Morning, Doctor, would you
9   please identify yourself for the record?
10      A.   Martin Lehenbauer, MD.
11      Q.   Doctor, what's the area of
12  practice that you're in?
13      A.   Family practice.
14      Q.   In your practice did you have
15  occasion to treat Christopher Kearney?
16      A.   Correct.
17      Q.   And according to the records
18  that you provided to me, the first visit was
19  in November of 1993?
20      A.   Yes.
21      Q.   At that time when he came to see
22  you, the chief complaint that he made was
23  that he was experiencing anxiety for a period
24  of roughly equal to a year, primarily

6

1   secondary to work, stress because his
2   business is down 30 percent; is that correct?
3       A.   Correct.
4       Q.   You indicated in there that he
5   owned his own business --
6       A.   Correct.
7       Q.   -- right?  Did he tell you what
8   that business was during that visit?
9       A.   I don't see that in my notes,
10  so --
11      Q.   Okay.  Under the review of
12  systems, you have wife, some symbol, and then
13  successful, I'm not sure what that --
14      A.   With -- wife with successful
15  treatment.
16      Q.   Okay.  Wife have successful
17  treatment with Prozac?
18      A.   Correct.
19      Q.   Okay.  And you indicated there
20  that he was presently utilizing counseling
21  for the past several years?
22      A.   Correct.
23      Q.   Is that the wife or Chris?
24      A.   I think my intention there was

7

1   that he was involved in that, I didn't make
2   notes in terms of whether that was, you know,
3   in terms of that particular note it looks
4   like it was in reference to the marital
5   situation.
6       Q.   Okay.  The reason I ask you,
7   wife is being successfully treated with
8   Prozac, she's happy in the marriage.  You
9   have presently utilizing counseling past
10  several years.  I wasn't sure whether Chris
11  or the two of them, or what you were trying
12  to suggest.
13      A.   Well, the note says, happy in
14  marriage, presently utilizing counseling.
15  Since that was all one sentence I think my
16  intention there was that particular reference
17  was to that.
18      Q.   All right.  You indicated that
19  he told you he had a degree in psychology and
20  that he was a patient who was well versed in
21  the recent treatment aspects?
22      A.   Correct.
23      Q.   Are we talking about him
24  understanding his treatment for --

8

1       A.   Right.
2       Q.   -- psychological issues?
3       A.   Correct.
4       Q.   Did he tell you how long he had
5   been treating for his psychological issues?
6       A.   I don't have that in my notes
7   for that first visit.
8       Q.   Did he appear to be an
9   intelligent and insightful individual to you
10  at that time?
11      A.   Go ahead and ask that question
12  again.
13           MR. WELLINGTON:  Are we still in
14  November '93?
15           MR. ELLIS:  Yes.
16      Q.   As of the first visit, did he
17  strike you as an intelligent, straight
18  thinking individual who understood his
19  situation?
20      A.   In my physical exam I just, I
21  had listed that he was insightful and
22  motivated presently for improvement, so --
23      Q.   Your assessment was dysthymia
24  and anxious mood?

81

1 questioning him?
2   A. Yeah, those doctors raised that
3 possibility. And I think in my notes I was
4 stating that clear manic features, to me, and
5 but psychologists, and I may have left out a
6 word, has not been concerned either with
7 bi-polar. So, I think at that point I'm just
8 trying to balance this information that I had
9 just received with, you know, to that point
10 how I had been treating him.
11   Q. Now, bi-polar, as I understand,
12 is going to extreme highs, from manic, full
13 of energy, full of life, full of everything,
14 and then down into dark depression and back
15 up again, right?
16   A. That can be cyclical -- cyclical
17 features, correct.
18   Q. In his case we had the
19 depressive or down cycles that you described,
20 but he never really rose to the manic level
21 that you --
22   A. And that's what I was saying,
23 yeah, in my exam to me, not clear manic
24 features, correct.

82

1   Q. So, the cycles were there, but
2 the heights of manic, which would be required
3 for a bi-polar diagnosis, were absent?
4   A. In my mind I didn't have a
5 history of mania, correct.
6   Q. Okay. From that visit forward,
7 is it fair to say that every visit that he
8 had with you, or nearly every visit that he
9 had with you demonstrated a focus on the
10 disability insurance and his disagreements
11 with them?
12   A. And I would have to review each
13 of those office visits since I'm also foggy
14 on things that --
15   Q. Let's work our way through them,
16 but keep that in the back of your head. The
17 next visit is March 15th, 2002; is that
18 correct?
19   A. Correct.
20   Q. Very anxious today?
21   MR. WELLINGTON: What's the
22 date, I'm sorry?
23   A. March 15th, 2002.
24   Q. Very anxious today but he's been

83

1 off the Serzone dose for two nights?
2   A. Correct.
3   Q. So, he had stopped taking the
4 medication, or had run out of it?
5   A. At that point I don't have an
6 idea of whether he just ran out or hasn't
7 taken it.
8   Q. Okay. Normally takes Xanax but
9 limiting it to avoid over use, so he's kind
10 of --
11   A. All by history.
12   Q. Kind of adjusting his own
13 medications as he sees?
14   A. Well, the Xanax was PRN
15 previously, prescribed as needed anyways.
16   Q. Now it says, now there's no
17 business presently secondary to the increased
18 stress related to the disability, right?
19   A. Yep, that's a history from him.
20   Q. That's the history from him.
21 Now, in the prior several notes he's been
22 talking about the fact that his business is
23 down, he's got nobody to sell these machines
24 to, he couldn't find a market for it, right?

84

1 And his only hope was to get a patent for
2 this machine, do you remember those notes?
3   MR. WELLINGTON: Objection.
4   A. Yeah, it wasn't the very last
5 visit, but I think I recall the visit prior.
6   Q. Now, he's relating the loss of
7 business to his increased stress levels
8 because of this disability insurance in the
9 note of March '02?
10   A. The 15th all I said was related
11 to disability, and again, I didn't say
12 necessarily disability insurance company
13 either.
14   Q. Well, if we look down further in
15 the note, he sought out help from national
16 experts to support his case of disability;
17 he's preparing for a lawsuit.
18   A. Preparing self for lawsuit,
19 correct.
20   Q. Right. On the other side is,
21 thought processes are clear and linear, but
22 very focused on the effect of life from his
23 disability company, right?
24   A. Which side are you on on that

85

1 note?
2   Q.  I was just reading down.
3   A.  **Focused on effect of life --**
4   Q.  Again, I was just reading --
5   A.  **-- from his disability.**
6   Q.  Basically this note was, my life
7 is awful at this point, and it's all because
8 of the disability company, right, March of
9 2002?
10  A.  **I mean, most of that, again,**
11 **ties around to the -- I mean, notes about the**
12 **anxiety, in my mind, I would have been**
13 **thinking also about, you know, if he hadn't**
14 **taken his medicine for a couple days. You**
15 **know, this case obviously got some lines from**
16 **me, so, but in terms of my physical exam,**
17 **thought processes were focused on the effect,**
18 **I don't know if I -- effect of life, but**
19 **probably on his life from disability.**
20  Q.  I'm sure, yeah, but the overall
21 picture, March 15th, 2002, that he was
22 presenting was that his business is down, his
23 anxiety is up, his depression is worse, he's
24 very stressed, all because of his disability

86

1 insurance?
2   A.  **I mean, and again, the line that**
3 **I used in terms of the -- at the top of that**
4 **note just related to disability. I'm not**
5 **sure I was thinking his disability in regards**
6 **to his depression versus, you know -- but I**
7 **guess what I hear you asking is it says**
8 **disability insurance company and I'm**
9 **separating those two, I guess, to some**
10 **extent.**
11  Q.  I understand that you are and
12 here's where my question comes in, why all of
13 a sudden is his stress increase related to
14 his disability? He's had this disability
15 since 1993?
16  A.  **Again, trying to think back to**
17 **2002, you know, what I was stating there, and**
18 **this is more coming from him, no business**
19 **presently, secondary to increased stress**
20 **related to disability.**
21  Q.  He was telling you that the
22 disability and the battle with the insurance
23 company is so stressful that he can't do any
24 business, right?

87

1   A.  And again, it comes back to --
2 and I didn't put it in quotes, so I don't
3 know if those are his words or my
4 interpretation of his words. So at that
5 point all I can say is it's my interpretation
6 of taking his history from him.
7   Q.  But his focus in everything he
8 told you below, because you wouldn't have
9 known it otherwise, was what he perceived as
10 an on -- a soon to be legal issue with the
11 disability insurer?
12  A.  And I think I had made some
13 notes in prior visits about the possibility
14 of lawsuits, or he had mentioned that there
15 was something ongoing, so --
16  Q.  Did he tell you whether or not
17 he was being paid his benefits throughout
18 this whole period of time?
19  A.  I don't know if I have that in
20 my notes or not to this point in time, so --
21  Q.  Were you under the impression
22 that the disability company was not paying
23 benefits, that's what the fight was about?
24  A.  I think my feel, at least,

88

1 looking at these notes was more that -- more
2 of the feeling of harassment, doesn't really
3 have to do with whether he was receiving
4 disability or not, so --
5   Q.  Okay. But you don't know as we
6 sit here what this harassment was other than
7 what would be normal asking for independent
8 medical examinations and some supporting
9 documents, right?
10  A.  I'm not necessarily connecting
11 those two, I mean, the independent
12 evaluations I looked at as just being
13 something that his insurance company had
14 asked him to do to verify, you know, the
15 diagnosis that I had been treating him for,
16 and his psychologist had been treating him
17 for. I would, in looking back at those
18 notes, still separate out that his feeling of
19 harassment was really a separate issue, not
20 having to do those things, or having to be
21 evaluated, but was something still different.
22  Q.  The very first time that he
23 starts mentioning anything about the
24 disability insurance company is after this

```
                                          89
 1  request for an independent medical exam, is
 2  it not?  Prior to that IME, in your notes,
 3  there's no mention of it at all, is there?
 4  Other than the fact that he's making a claim
 5  for it?
 6       A.    I mean, that was in terms of
 7  using the word harassment showed up in
 8  June 29th, 2001.
 9       Q.    Which was after the independent
10  medical exams?
11       A.    Right.  I mean, that's the first
12  time I saw those, correct.
13       Q.    And from that date when he told
14  you he had to do the independent medical
15  exams forward, your notes, at least to where
16  we are now in March of 2002, the notes are
17  reflecting his focus as we've discussed in
18  the past, now being on issues with the
19  disability insurance carrier?
20       A.    You know, the January 10th of
21  2001, which would have been before, I think
22  before those evaluations, again, I had that
23  line in there, increased stress primarily due
24  to dealing with disability company, so --
```

```
                                          90
 1       Q.    Uh-huh.
 2       A.    I mean, the timing, I mean,
 3  sounds like he and I had talked about it in
 4  January 10th, or he had at least mentioned it
 5  to me at that time, and again, I don't know
 6  that I was aware that he was going to get
 7  other evaluations until he showed up at that
 8  next visit, so --
 9       Q.    Yeah.  What are the dates of the
10  evaluations?
11       A.    I think they were March, I think
12  the one from the psychiatrist was March 19th,
13  and there was another one that was dated
14  March 4th.
15       Q.    Uh-huh.  You agree those would
16  have had to have been set up in advance?
17       A.    I can make that assumption, all
18  I'm saying is that --
19       Q.    Right.
20       A.    -- at the January visit there
21  wasn't any mention of that to me.
22       Q.    No mention --
23       A.    That I have in my notes.
24       Q.    -- of any independent medical
```

```
                                          91
 1  exams?
 2       A.    That I have in my notes.
 3       Q.    Very good.  Next visit is
 4  October 2002; October 22nd?
 5       A.    I have a visit March 15th of
 6  2002?
 7       Q.    I'm sorry, yeah, that's the one
 8  I thought we were just discussing before.
 9  Very focussed on the effects on his life of
10  his disability company.  Isn't that the one
11  we were just discussing?
12       A.    I'm sorry.
13       Q.    The next visit is October 22nd,
14  2002?
15       A.    Correct.
16       Q.    In that he's complaining that
17  he's still on edge concerning the battles
18  with the disability company.  Has attorneys
19  involved in the process, getting expert
20  opinions, right?
21       A.    Yes.
22       Q.    On this visit he doesn't even
23  talk about his business, now the only focus
24  is on the disability company, right?
```

```
                                          92
 1       A.    Yeah.  I mean, I made a note
 2  that was under the physical exam part in
 3  terms of what he's telling me and the history
 4  part of depression continues to be monitored
 5  by psych, which I don't really clarify in
 6  the -- the note under the physical exam.
 7       Q.    Uh-huh.  But that's, I mean,
 8  obviously --
 9       A.    His expressions are primarily
10  focused around these battles with the
11  disability company.
12       Q.    And he was intense about it,
13  wasn't he?
14       A.    I put remains on edge.
15       Q.    We go from there to November of
16  '03?
17       A.    Yes.
18       Q.    Again, he no longer talks about
19  his business, he no longer talks about his
20  family, he no longer talks about his
21  girlfriend, his focus is once again on the
22  disability battle, right?
23       A.    Well, in that note -- we're at
24  November 25th of 2003, correct?
```

93

1  Q. Correct.
2  A. Just to clarify, I mean, in that
3  note I do have he is remarried and going to
4  infertility work up. So I would have also
5  included that kind of as a stressor and I did
6  note in my assessment and plan with multiple
7  stressors.
8  Q. Looking for the --
9  A. On that note it's towards the
10 bottom left there.
11 Q. Okay. I'm looking, 58 years
12 old?
13 A. Brother with coronary artery
14 disease, five vessel cabbage bypass.
15 Q. Also has positive --
16 A. -- family history in father and
17 paternal aunt, I was connecting that with the
18 coronary artery disease part.
19 Q. Okay. His weight is up
20 11 pounds, still pending lawsuit with
21 disability battle continues to be stressful
22 and has --
23 A. And followed by psychologist.
24 Q. And followed by psychologist.

94

1  A. Still AM fatigue with some
2  relief, and present Wellbutrin and then
3  remarried and going to infertility work up.
4  Q. So as you're asking him what's
5  going on in his life, the first thing he
6  tells you is he's got this ongoing battle
7  with the disability company, very stressful,
8  causing him all sorts of angst, and that he's
9  still tired in the morning. And oh, by the
10 way, I got married and I'm going to a
11 fertility expert. Kind of in that order,
12 isn't it?
13 A. Yeah, the chief complaint was
14 still his low energy most of the time.
15 Q. Which he relates directly to
16 this battle?
17 A. Well, again, in terms of the
18 order of my notes, the next thing I list
19 after that had to do with the coronary artery
20 disease of his brother. So, and then the
21 weight gain, and then again, the still
22 pending lawsuit at that point, so --
23 Q. Your assessment and impression,
24 chronic depression with multiple stressors

95

1  and then specifically trial?
2  A. Well, trial change to
3  Wellbutrin.
4  Q. Oh, I'm sorry, I misread that.
5  Thank you. Trial change to -- so that goes
6  to the next line?
7  A. Correct.
8  Q. Okay. What was the next time
9  you saw Mr. Kearney?
10 A. November 25, 2003, looks like
11 the next visit is October 5th, 2004.
12 Q. Did he send you or bring you in
13 some disability forms signed by Dr. Judd?
14 A. I have some forms that were
15 signed by Dr. Judd that I initialed
16 July 12th, '05.
17 Q. Do you see the one from the
18 February 11th, '04?
19 A. There was -- those are all
20 together and I don't -- what I don't know is
21 whether those all came in together. I have
22 one list of February 11th of '04; I have one
23 5/10 of '04; looks like 8/17/04.
24 Q. I would like to focus on the

96

1  February 11th, '04 for the moment.
2  A. February 11th of '04, okay.
3  Q. Uh-huh. Under the additional
4  comments --
5  A. Okay.
6  Q. -- box nine, patient distressed
7  by continued legal delays which are intended
8  to cause further emotional distress and
9  financial burdens. Did he ever complain to
10 you or suggest to you that the speed with
11 which the court dealt with the case was --
12 let me ask it a different way. Did he ever
13 suggest to you that the court itself was
14 intending to cause him harm?
15 A. Not that I'm aware of from my
16 notes.
17 Q. Okay. So then we would assume
18 that in his view at least, any delay in the
19 legal process was caused by the disability
20 company, or you don't know?
21 A. I don't know since that's Dr.
22 Judd's --
23 Q. Okay. Let's go to your visit,
24 October 5th of '04.