1              COURT OF COMMON PLEAS

2              HAMILTON COUNTY, OHIO

3

4                      - - -

5    J.E. GROTE COMPANY, INC.,          :

6              Plaintiff,               :

7    vs.                               : CASE NO. A9707796

8    INNOMATION, INC, f/k/a KEARNEY    :

9    MAGNETICS & ENGINEERING, INC.,    :

10             Defendant.              :

11                     - - -

12        The deposition of CHRISTOPHER KEARNEY, a

13   witness herein, taken by the plaintiff as upon

14   cross-examination pursuant to the Ohio Rules of Civil

15   Procedure and pursuant to Notice and stipulations

16   hereinafter set forth, at the offices of Strauss &

17   Troy, 2100 PNC Center, 201 East Fifth Street,

18   Cincinnati, Ohio, at 12:40 p.m. on May 4, 1998,

19   before Renee Rogers, a notary public within and for

20   the State of Ohio.

21                     - - -

22

23              Cin-Tel Corporation
                   813 Broadway
24            Cincinnati, Ohio  45202
                  (513) 621-7723



982392

2125

1    APPEARANCES:

2        On behalf of the Plaintiff:

3            CHRISTY A. HOCHANADEL, ESQUIRE
               J.E. Grote Company, Inc.
4            1160 Gahanna Parkway
               Blacklick, Ohio  43004
5            (614) 868-8414

6        On behalf of the Defendant:

7            CHARLES H. MELVILLE, ESQUIRE
               Strauss & Troy
8            2100 PNC Center
               201 East Fifth Street
9            Cincinnati, Ohio  45202-4186
               (513) 621-2120

10

11             S T I P U L A T I O N S

12    It is stipulated by and among counsel for the

13  respective parties that the deposition of Chris

14  Kearney may be taken at this time by the plaintiff as

15  upon cross-examination, pursuant to the Ohio Rules of

16  Civil Procedure and pursuant to Notice and agreement

17  of counsel as to the time and place; that the

18  deposition may be taken in stenotypy by the notary

19  public-court reporter and transcribed by her out of

20  the presence of the witness; that the deposition is

21  to be submitted to the deponent for his examination

22  and signature, and that the signature may be affixed

23  out of the presence of the notary public-court

24  reporter.

2

2126

1                         I N D E X

2

3    Witness                                    Cross

4    CHRISTOPHER KEARNEY

5       By Ms. Hochanadel                          4

6

7

8

9                     E X H I B I T S

10                                             Marked

11   Plaintiff's Exhibit Number 1               7

12   Plaintiff's Exhibit Number 2               17

13   Plaintiff's Exhibit Number 3               24

14   Plaintiff's Exhibit Number 4               65

15

16

17

18

19

20

21

22

23

24

3

1            MS. HOCHANADEL: Okay. My name is

2    Christy Hochanadel. I represent the Grote

3    Company. I'm here to depose you today.

4            If at any time during the deposition

5    you don't understand or can't hear any of my

6    questions, please let me know and I'll

7    restate them for you.

8            Also, make sure you give verbal

9    responses and not nods for the court

10    reporter.

11            And please let me finish answering --

12    or finish my question before you answer, and

13    I'll let you finish your answer.

14            THE WITNESS: Okay.

15            CHRISTOPHER KEARNEY,

16 of lawful age, as having been duly sworn, was

17 examined and testified as follows:

18            <u>CROSS-EXAMINATION</u>

19 BY MS. HOCHANADEL:

20      Q    Let's start with your name, full name.

21      A    Christopher L. Kearney, K-E-A-R-N-E-Y.

22      Q    Okay. And your address?

23      A    1 -- my business or home?

24      Q    Home.

1          A       12168 Village Woods Drive, Cincinnati

2     45241.

3          Q       And how old are you?

4          A       45.

5          Q       Okay.  Are you married?

6                  MR. MELVILLE:  How old?

7                  THE WITNESS:  45.

8                  MR. MELVILLE:  I didn't think he was

9     that old.

10         Q       Are you married?

11         A       No, I'm not.

12         Q       Do you have any children?

13         A       No.

14         Q       Tell me about your education.  Where

15     did you go to high school?

16         A       I went to Saint Ignatius,

17     I-G-N-A-T-I-U-S, in Cleveland, Ohio.

18         Q       Okay.

19         A       High school.

20         Q       Where did you go to college, or did you

21     go to college?

22         A       I went to the University of Dayton,

23     Dayton, Ohio.

24         Q       Okay.  And did you graduate?

2129

1    A    Yes.

2    Q    Okay.  What was your degree in?

3    A    Psychology.  It was a minor in

4    philosophy.

5    Q    Okay.  What is your current position?

6    A    I am president of Innomation.

7    Q    Okay.  Are you a shareholder in the

8    company?

9    A    Yes, I am.

10    Q    Are you the sole shareholder?

11    A    Yes, I am.

12    Q    And as the president, what are your

13    duties and responsibilities?

14    A    They're varied.  I do the accounting,

15    sales, I sometimes sweep up the floor, clean the

16    johns.  We're a small company.

17    Q    What was your experience -- well, first

18    of all, when did you start the company?

19    A    Approximately four years -- four or

20    five years ago.  I can't recall exactly.

21    Q    Okay.  And then did the company have a

22    different name at that time?

23    A    Yes.  Kearney Magnetics and

24    Engineering.

6

1       Q    When did the company change to

2  Innomation?

3       A    I think it was April of last year, a

4  little over a year ago.

5       Q    Has the structure of the company

6  changed?

7       A    No.

8       Q    Okay.  So it was simply a name change?

9       A    Just a name change.

10       Q    Okay.  Why did you change the name to

11  Innomation?

12       A    Because we make automated equipment and

13  the name "magnetics," we were getting a lot of calls

14  for health magnetic field things and I just -- we

15  just thought it was a more appropriate name for what

16  we do.

17       Q    Okay.  Was it -- prior to being Kearney

18  Magnetics, was there any other type of organization?

19       A    Was it?  That was incorporated as

20  Kearney Magnetics and Engineering.

21       Q    I have a -- let's see here.  Excuse me

22  for a minute while I find this.

23          (Whereupon, Plaintiff's Exhibit Number

24          1 was marked for identification.)

7

CIN-TEL CORPORATION

2131

1          Q      I'm going to hand you Plaintiff's

2    Exhibit Number 1.  Actually, here.  You get this

3    copy.

4          A      I get this copy?

5          Q      Yeah.

6               MR. MELVILLE:  Do you have a copy for

7          me?

8               MS. HOCHANADEL:  Can you share?

9               MR. MELVILLE:  Sure.

10         Q      I just am curious as to the form of the

11   company.  Had it changed?  I know it was crossed out

12   up there at the top where it said representing AEC --

13         A      Magnetics.

14         Q      -- Magnetics.  Yes.  What was --

15         A      Well, we formally represented AEC

16   Magnetics.  They make magnets.  And we had a sales

17   agreement with them.

18         Q      Okay.

19         A      They're our local firm.

20         Q      Was that the sole work that you did,

21   then, was for that company?  How did that work?

22         A      No.  We also -- and engineering.  We

23   did engineering as well, built special equipment.

24         Q      Okay.

1      A    So we did both.  We sold for a company

2  that made magnetics, but we also did engineering as

3  well.

4      Q    So you sold -- your duty -- describe to

5  me that relationship a little.

6      A    It's been awhile.  We were a

7  distributor for a company that makes lifting magnets

8  for industry.

9      Q    So they actually manufactured them and

10  you sold them; is that correct?

11      A    Yes.

12      Q    Is that how you got started?

13      A    Me?  In business?

14      Q    In this business.  Is that how this

15  business got started?

16      A    That's how this business got started.

17  We also used the name "engineering" because Guy Lampe

18  has many years' experience in engineering.  And we

19  wanted to convey that we did engineering as well.

20      Q    Okay.  All right.  I just wanted to get

21  an idea of the formation.  So it looks like you've

22  also -- you changed the address of the corporation as

23  well?

24      A    Yes.

9

1        Q    Okay.  You had two locations?

2        A    We had two locations at one time.  We

3    had a location in Toledo also, a sales office.

4        Q    At this point in time, what is your

5    address of your company?

6        A    11126 Luschek Drive, Cincinnati, Ohio.

7        Q    And is that the only address?  Is that

8    the only place the company is?

9        A    Yes.

10        Q    Okay.

11        A    Well, I have an office in my home, too,

12    which is 12168 Village Woods Drive.

13        Q    Prior to starting Kearney, tell me a

14    little bit about your experience.  I guess start

15    after you got out of college.

16        A    I worked in a grocery store for about a

17    year because there weren't many jobs available just

18    after college.  And then I started as a

19    manufacturer's agent with a sales organization and

20    performed duties as a manufacturer's representative

21    for 20 years.

22        Q    With the same organization?

23        A    I was always technically self-employed,

24    so, yes.  I mean, companies changed, principals

10

CIN-TEL CORPORATION

2134

1    changed, but basically I was the organization.

2              Q    And as a manufacturer's representative

3    or agent, what did you do?

4              A    I would contact companies like JE

5    Grote and try to sell various component parts,

6    fabrications, machined parts.

7              Q    Okay.

8              A    And my products changed over the years.

9              Q    Okay.

10             A    But stayed in the industrial field.

11             Q    And those were manufactured, then, by

12   other companies?

13             A    Right.

14             Q    So was Kearney your first experience in

15   actually manufacturing equipment?

16             A    Kearney Magnetics and Engineering?

.17            Q    Yes.

18             A    I'm just trying to think if I ever

19   manufactured anything over 20 years.  It was

20   basically my first manufacturing experience.

21             Q    Okay.  Would -- at this present time,

22   what other assets does the company own -- Kearney

23   own?

24             A    Innomation?

1      Q    Innomation.  I apologize.

2      A    Innomation owns a lunch table, a couple

3   book shelves, one desk, and a few bench tools, and

4   that's just off the top of my head.

5      Q    Okay.  Do you operate out of a

6   building?

7      A    Yes.

8      Q    Do you rent the building?

9      A    Yes.

10      Q    Is Innomation a shareholder in any

11   other corporations?

12      A    No.

13      Q    Describe the business that Innomation

14   is in.

15      A    Innomation makes custom equipment.

16      Q    What type of custom equipment?

17      A    Primarily industrial.

18      Q    Okay.  Does it specialize in any

19   certain type of equipment or --

20      A    No.  Our markets are pretty extensive

21   and our capabilities are pretty extensive.  Custom

22   designed equipment.

23      Q    How many employees are currently

24   employed by Innomation?

12

2136

1      A      Three.

2      Q      Could you please name the employees.

3      A      Matt Spears, Jay Sanders [sic] and Chad

4  Lamb, C-H-A-D, L-A-M-B.

5      Q      And what are their titles?

6      A      Jay -- Jay Sanders is -- Sander, his

7  title is senior project engineer.  Matt Spears is

8  design engineer, and Chad Lamb is sales engineer.

9      Q      In September of '96 could you please

10  name the employees that worked at Innomation?

11      A      Including a secretary?

12      Q      Yeah.  Everybody.

13      A      Bev Schwartz, secretary,

14  S-C-H-W-A-R-T-Z; Guy Lampe, and I'm not sure -- I'm

15  not sure exactly if Matt started -- Matt Spears was

16  with me in late September or early October, somewhere

17  in there.

18      Q      And what was Guy's title?

19      A      Engineering manager.  I believe it

20  was -- I'm not sure if he had that title at that

21  time, but at some point he became engineering

22  manager.

23      Q      Okay.  Is Innomation involved in any

24  pending lawsuits besides Grote right now?

13

```
1         A    Yes.  Yes.
2         Q    Could you describe those?
3         A    I can tell you the one is BW Rogers.
4         Q    And just briefly what is that about?
5         A    It's about some equipment that we
6   failed to pay for.
7         Q    Any others?
8         A    And Cincinnati Belting.
9         Q    And what's that regarding?
10        A    It's regarding our failure to pay since
11  we have not gotten paid by JE Grote.
12        Q    Any others?
13        A    No.
14        Q    Any lawsuits prior to Grote's lawsuit
15  and prior to these?
16        A    We had a small-claims lawsuit on a
17  leasing company of a forklift.
18        Q    Is that all?
19        A    Yes.
20        Q    Tell me how you became acquainted with
21  the Grote Company.
22        A    I became aware of Grote early on,
23  probably 15, 20 years ago and called probably on your
24  father.  I'm not sure, but I don't know.  I don't
```

1    have records back then but I don't know who -- who I

2    called on, but -- .

3            Q    Was that when you were a manufacturer's

4    representative?

5            A    Yes.

6            Q    For a different --

7            A    In the seventies, late seventies.

8            Q    So it was a different manufacturer at

9    that point in time?

10           A    Yes.  I can't even remember what I was

11   trying to sell.

12           Q    Okay.

13           A    And --

14           Q    How about --

15           A    Recently?

16           Q    Recently.

17           A    I called on JE Grote about five or six

18   years ago, maybe four -- I'm not sure -- for Deltech

19   in Batavia, Ohio who makes stainless steel

20   fabrications.  And we sold you a few fabrications.

21           Q    And then with Innomation, how did you

22   become acquainted?

23           A    Chuck Searl called me in January of --

24   I think 1996 to come in and look at this blade

1    project. I think John Williamson told him that we

2    also can make automated equipment.

3            Q    Okay. So describe the first time that

4    you came in to talk to the Grote Company.

5            MR. MELVILLE: By the first time, the

6            recent one with Innomation?

7            Q    The recent one with Innomation.

8            A    With Chuck Searl?

9            Q    When he called you in.

10            A    Okay. And it was Kearney Magnetics

11    back then.

12            Q    Right.

13            A    I'm trying to think. I mean, it was a

14    long time ago. I met Chuck and I believe that he

15    introduced me to John and briefly described what you

16    wanted to do with these blades, and took me back to

17    the blade area.

18            And I believe he introduced me to Bill,

19    just a quick introduction. And he told me the scope

20    of what project you were under way to automate your

21    production.

22            Q    Okay. At that time did you get into

23    any conversations about speed or the method of

24    winding or tying the blades?

16

2140

1       A    We saw your method and it was pointed

2   out that Grote wanted to reduce worker injuries from

3   cuts.  As far as the packaging.  We also considered

4   the welding.

5           But as far as the blade packaging,

6   there was major concerns about carpal tunnel.  I

7   don't know if -- I can't recall if you had any recent

8   cases, but also with workers cutting themselves and

9   getting stitched up, and then the lack of -- lack of

10  time that any of your workers could do that for.

11          It was my understanding that there was

12  a lot of workers that came and went.  You hired them,

13  they cut themselves a few times, few weeks later they

14  got sick of the job and quit.  So you wanted to

15  automate it for basically those reasons.  Speed was

16  not -- not an issue.

17      Q    So you don't remember talking about

18  production rates or anything like that?

19      A    No.

20      Q    Okay.

21      A    No.  The only thing we -- never mind.

22      Q    Okay.

23          (Whereupon, Plaintiff's Exhibit Number

24          2 was marked for identification.)

1        Q    Okay.  I'm going to hand you

2   Plaintiff's Exhibit Number 2.

3             MS. HOCHANADEL:  If you would like me

4             to make more copies.  I apologize.  I only

5             brought one for both of you.

6        Q    Could you please describe this for me,

7   tell me what this is.

8        A    This is a letter to Terry Griffith from

9   Chris -- from me, Chris.

10       Q    Okay.  Could you look at the entire --

11  the entire exhibit for me.  I believe there's more

12  than one page.

13       A    It's our quote, Kearney Magnetics

14  Quote, KME0047, revision D, September 12, 1996.

15       Q    Okay.  Could you turn to page eight for

16  me.  And is that your signature where it says

17  approved by?

18       A    Yes.

19       Q    Okay.  Were you signing on behalf of

20  Kearney Magnetics at that time?

21       A    Yes.

22       Q    Did you have authority to sign as

23  president of the company?

24       A    Yes.

18

CIN-TEL CORPORATION          2142

1          Q    Okay.  So you had authority to enter
2     into contracts?
3          A    Pardon me?
4          Q    So you had authority to enter into
5     contracts with a company?
6          A    Yes.
7          Q    Okay.  Let's turn to page two, if you
8     could.  Actually, could you tell me who prepared this
9     contract?
10          A    Bev Schwartz.
11          Q    Okay.  Was she an employee of
12     Innomation?
13          A    Yes.
14          Q    Okay.
15          A    She typed it up.  Is that what you mean
16     by prepared?
17          Q    Prepared.  Prepared the language.
18          A    Oh, the language, Guy Lampe primarily.
19          Q    Okay.  And he was an employee of
20     Innomation as well; is that correct?
21          A    Yes.
22          Q    Okay.  The very first paragraph there,
23     could you please describe to me what that says?
24          A    It says quote number KME0047, revision

19

1    C, saw blade packaging machine.

2         Q    The first paragraph there, after that.

3         A    Oh.  This proposal is limited to one

4    machine designed, manufactured and built to coil

5    various lengths of continuous length saw blades.

6    This machine will be capable of packaging

7    approximately 420 saw blades per hour.

8         Q    Okay.  To your knowledge, is the

9    machine that was delivered capable of packaging 420

10   saw blades per hour?

11        A    I think it is capable of doing 420

12   small -- of the small blades.

13        Q    Of the -- why do you believe that?

14   What leads you to believe that?

15        A    Because I have a film that shows it's

16   very quick.

17        Q    Did you -- do you have any timing

18   records of the machine?

19        A    No.  Because we never were given a time

20   after we got flat cardboard sheets to actually do a

21   professional timing of the machine.  We were

22   instructed to -- we had a deadline to meet.

23        Q    Do you have that --

24        A    It was only with less than a week of

20

1     A    I feel it's possible, but I can't state

2  that for certain.  There's never been a professional

3  timing of the machine.

4     Q    Would it be capable of packaging our

5  regular and longer length blades?

6     A    It does -- it's capable of packaging

7  your regular.

8     Q    At 420 saw blades per hour?

9     A    I don't know.

10    Q    At the run-off that you did on December

11  5, did the machine achieve a rate of 420 saw blades

12  per hour?

13    A    The machine apparently was timed with

14  an inexperienced operator who made a multitude of

15  errors, and I don't consider that a really fair

16  run-off and a fair timing of the machine.

17         I think that -- I think that the

18  machine is operator-dependent and the operator

19  clearly -- even Jay is not an experienced operator.

20  I don't know.

21    Q    Is it --

22    A    I don't know all the data, but I have

23  reviewed films.

24    Q    Was the machine manufactured to be run

22

CIN-TEL CORPORATION

2145

1    good cardboard carriers that were flat to spec.

2           Q    Do you believe that the machine is

3    capable of packaging at this speed all of the types

4    of blades that Grote manufactures in all of the

5    lengths?

6           A    No.  It was never intended to package

7    all of your lengths.  There are some blades that have

8    been excluded such as the saber tooth -- saber

9    blade.

10           I don't know -- I don't -- I don't have

11    a part number here, but there are blades that were

12    excluded from performance by this machine.

13           Q    To your knowledge, was the machine

14    intended to coil -- to wind and coil all lengths of

15    our blades?

16           A    No.  I just stated that it was not

17    intended to coil several particular blades that you

18    supply to your customers.

19           Q    But I guess I'm talking about lengths.

20           A    Lengths?

21           Q    Your statement -- am I correct that

22    your original statement was that you feel it is

23    capable of packaging approximately 420 of our smaller

24    blades?  Is that what you said?  Is that correct?

21

1     by a production worker at the Grote Company?

2              A     With training.

3              Q     What would the training have entailed?

4              A     I would have to -- I would have to -- I

5     don't know exactly.  I would have to refer that

6     question to my engineers.

7              Q     Okay.  Can you look at section one of

8     the contract for me.

9              A     Um-hmm.

10             Q     It's 1.0.b.2.  Could you read that for

11    me.

12             A     Two plastic tie devices to tie the

13    coiled saw blade to the tray.

14             Q     Would you agree that the tie devices

15    were incorporated, then, in the original contract

16    between Grote and Innomation?

17             A     The original proposal or the original

18    contract?

19             Q     The contract between the parties.

20             A     It's in this contract.

21             Q     Is this -- do you know of any other

22    contracts between the parties?

23             A     No, I don't.

24             Q     Okay.

23

2147

1              THE WITNESS:  Could I have a word with

2         my attorney?  I mean just --

3              MS. HOCHANADEL:  Sure.

4              (A discussion was held off the record.)

5         Q    Okay.  Section two, could you please

6    tell me what that says?  You can describe it.  You

7    don't have to read it word for word if you don't want

8    to.

9         A    A programmable controller will provide

10   coordination between the electrical operators and

11   motors and to monitor the number of blades put into

12   the shippers and count shippers.  It will also allow

13   for quick changes needed for different blade lengths.

14        Q    To your knowledge, did the machine that

15   was delivered contain a programmable controller?

16        A    Yes.

17        Q    Okay.  Was the programmable controller

18   according to the specifications set forth in this

19   contract?

20        A    Yes.

21        Q    And agreed to by the parties?

22        A    Yes.

23             (Whereupon, Plaintiff's Exhibit Number

24        3 was marked for identification.)


                          24

1          Q     I'm going to hand you Exhibit Number

2     3. Could you please tell me what -- I'm sorry.

3     There you go.  Could you please tell me what this is?

4          A     This is a letter to Chuck Searl from

5     Chris Kearney.

6          Q     Okay.  And let's see.  What are you --

7     what are you requiring in this letter?  Could you

8     read to me, let's see, number four.

9          A     Any preferences to electrical

10    components, pneumatic components, other components.

11         Q     Did -- after you -- after you asked

12    whether or not the Grote Company had any preference,

13    did you receive a response to that?

14               Did anyone from the Grote Company ever

15    tell you or any of your engineers a specific type of

16    component to be used in the machine?

17         A     Not to my knowledge.

18         Q     So you're unaware of any conversations

19    about a Mitsubishi programmable controller?

20         A     Guy Lampe probably did most of the

21    discussions.  I wrote the letter, but he did the

22    discussions.

23         Q     Okay.

24         A     So I'm not aware.

25

1           Q    Also, there, number two, could you

2      please tell me what that says?

3           A    We need to have a list -- the band saw

4      types?

5           Q    Uh-huh.

6           A    Is that what you mean?  We need to have

7      a list of all lengths, code numbers, with any

8      potential future sizes.

9           Q    Okay.  And did you receive a list from

10     the Grote Company?

11          A    Yes, we did.

12          Q    Okay.  And do you have a copy of that?

13          A    I'm sure we do.  I mean, I would have

14     to hunt through all my notes and all of my records.

15          Q    Okay.  I want to go back to the

16     contract, Exhibit Number 2.

17          A    Is this --

18          Q    You can go ahead and keep that.  On

19     page four at the top where it says pricing includes,

20     can you tell me what's included in the price?

21          A    Mechanical and electrical engineering,

22     frames and drives, electrical and pneumatic controls,

23     guarding and safety devices, shipping and

24     installation assistance, eight hours' training at

26

2150

1    your facility, manual and parts lists.

2             Q    Were there any limits put on the

3    engineering that was provided with this?

4             A    I don't understand your question.

5             Q    Were there any -- were there any limits

6    on the time of engineering that would be put into

7    this project by Kearney, the amount involved?

8             A    Amount of dollars?

9             Q    The amount of engineering time.  Was

10   there any limits put on the amount of engineering

11   time?

12            A    No.

13            Q    Does it specify in here what exactly is

14   shipping and installation assistance?

15            A    It does not specify anything further

16   than what it says.

17            Q    Okay.  Under the delivery, can you tell

18   me what the delivery term was?

19            A    Seven months ARO and check.

20            Q    Is ARO, does that mean after receipt of

21   order?  Is that correct?

22            A    Yes.

23            Q    And when was this order received?

24            A    When was it received?  I can't give you

27

1    the specific date.  I mean, it was in September, I

2    believe.

3              Q    When was it signed?

4              A    I signed it 9-18-96.  I don't know when

5    we got the check.

6              Q    Okay.  Original delivery, however,

7    under the contract should have been made in April; is

8    that correct?

9              A    I didn't really calculate it out, but

10   if you tell me that's --

11             Q    Seven months from September.

12             A    Okay.

13             Q    Would you agree with that?

14             A    Yeah.  I would say late April, because

15   like I said, I'm not sure what time -- when we got

16   the check.

17             Q    And the payment terms, could you please

18   tell us what the payment terms are in the contract.

19             A    Thirty-three percent with order and 67

20   percent after delivery.

21             Q    And did you receive Grote's -- did you

22   receive Grote's down payment of 33 percent?

23             A    Yes.

24             Q    Could you turn to page six for me.  At

28

2152

1    the very top of page six, could you read what it

2    says.

3            A    Time is of the essence.  Failure by

4    Kearney to meet the delivery date set forth in this

5    contract constitutes breach of contract in which case

6    Kearney agrees to refund the entire down payment

7    within ten days of request by Grote.

8            Q    Is that your initials up there?

9            A    Yes.

10           Q    Okay.  Did you receive a request by

11   Grote for the return of their down payment?

12           A    Yes.  After it had been delivered.

13           Q    Okay.

14           A    And accepted.

15           Q    Did you refund the down payment?

16           A    No, I did not.

17           Q    Could you read number seven for me?

18   You don't have to read the whole thing, but could you

19   just tell me what that is regarding.

20           A    It's a warranty.

21           Q    And basically -- and the very first

22   paragraph, what does the warranty state?

23           A    It states a one-year warranty after

24   date of shipment to the buyer.

29

CIN-TEL CORPORATION

2153

1           Q      Okay.  I want to go back to the point

2      that you had just made a few minutes ago when we were

3      talking about failure to return the down payment

4      after you got notice.  You stated that the machine

5      was accepted; is that correct?

6           A      Um-hmm.

7           Q      When, exactly, was the machine accepted

8      by the Grote Company?

9           A      On the date that we delivered the

10     machine.  Delivery acceptance.

11          Q      Did anybody from the Grote Company ever

12     tell you that the machine was acceptable, or any of

13     your engineers?

14          A      When we delivered it was nighttime.  I

15     don't know that there was anyone in, except your

16     father was there, I think.  I don't know.

17          Q      Was the machine ready to be run upon

18     delivery?  Could it be used in production?

19          A      No machine is ever ready to run --

20          Q      Once it was installed by the engineers

21     was it ready for production?

22          A      Yes.

23          Q      Were any other modifications or changes

24     made to the machine after it was installed by the

1    engineers?

2                A    There were some.

3                Q    Did these changes or modifications,

4    would these have affected the production?

5                A    Changes -- changes were made to accept

6    out-of-print carriers.  Changes were made to our

7    feeding equipment to accept out-of-print carriers.

8                Q    Were there any changes made that didn't

9    have anything to do with the carriers at all?

10               A    I'm not sure.

11               Q    Was Grote Company making parts for

12    Innomation at that time for these changes?

13               A    Grote Company offered to make parts,

14    yes.

15               Q    Was the machine capable of meeting the

16    production speeds that we just discussed in this

17    contract at the time that it was delivered?

18               A    We had no idea of speeds since we had

19    not had the proper cardboard carriers to fully test

20    it.  So basically I don't know.

21               Q    But there were changes and

22    modifications made to the machine that didn't have

23    anything to do with the carriers; is that right?

24    After the time --

31

CIN-TEL CORPORATION

2155

1    A    I know there were some enhancements.

2    Since we were waiting for the carriers there were

3    some enhancements, but the machine was ready to run

4    when shipped.

5    Q    Why wasn't the machine run then?  Do

6    you know?

7    A    Because we didn't have the carriers

8    that were to spec.

9    Q    Did you make any changes to the

10   carriers?

11   A    We did make one change to the carriers.

12   Q    When was that?

13   A    I'm not sure.

14   Q    Did that delay the carriers?

15   A    Possibly.  I don't know.  You would

16   have to check with your purchasing agent.

17   Q    How long would that have delayed the

18   carriers?

19   A    A week or two maybe.

20   Q    Do you know what the problems were with

21   the carriers?

22   A    They were out of flatness and there

23   were perforations missing.

24   Q    Do you know the causes of the problems?

32

CIN-TEL CORPORATION

2156

1      A    Of the carriers?

2      Q    Yes.

3      A    They weren't manufactured properly.

4      Q    Okay.  I'm going to go back a little

5 bit.  Who was the original project engineer on the

6 blade packaging machine?

7      A    Guy Lampe.

8      Q    You stated before, I believe, that Guy

9 had experience with packaging machinery or with

10 automated equipment; is that right?

11     A    Yes.

12     Q    Tell me a little bit about his

13 experience.

14     A    I believe that he had about 20 years'

15 experience working with several companies making

16 automated equipment.

17     Q    Did you at the present --

18     A    Without looking at his resume I

19 couldn't describe in detail.

20     Q    Did you use his experience as a selling

21 point to the Grote Company?

22     A    That was one of our strengths, yes.

23     Q    Can you tell me when Mr. Lampe left the

24 company, left Innomation?

1       A    April of '90 -- last year, '97.

2       Q    And why --

3       A    I can't think of -- I don't know the

4   exact date.

5       Q    And why did he leave the company?

6       A    Because I let him go.

7       Q    Why did you let him go?

8       A    For insubordination.

9       Q    How -- describe the insubordination to

10   me.

11       A    He talked back to me on -- I guess just

12   one too many occasions.

13       Q    Did the reason that he left have

14   anything to do with the blade packaging machine or

15   with the Grote Company?

16       A    He had -- he had -- we had other things

17   besides the blade packaging machine.  Part of -- I

18   mean, his -- his duties included the blade packaging

19   machine and quoting other jobs and some sales.  And

20   it had -- my letting him go was due to his

21   insubordination to me.

22       Q    So it didn't have anything to do with

23   the Grote Company or the blade packaging machine?

24       A    Well, inasmuch as it was his -- part of

34

2158

1      his project, the whole scope, all his duties were --

2      I was unhappy with his insubordination concerning all

3      of his duties.

4              Q      Were you unhappy with his performance

5      on the blade packaging machine itself?

6              A      There was some aspects that I was not

7      unhappy with his performance.

8              Q      What were the problems that he had --

9      that you had with his performance regarding the blade

10     packaging machine?

11             A      I'm just trying to refresh my memory.

12     It's been --

13             Q      Take your time.

14             A      One -- let's see.  Well, one, he failed

15     to deliver a report to me concerning the entire

16     status of the entire machine.

17             Q      Anything else that you can remember?

18             A      His -- he went over budget using

19     outside sources for time and material with those type

20     terms that I was not pleased with.

21             Q      Anything else?

22             A      No.  Not that I can recall.

23             Q      Did you have any involvement with his

24     design of the machine?

35

2159

1          A     I sourced the twist tie units myself.

2     Well, not myself, but I helped him with that.

3          Q     Did you have any other involvement in

4     the design of the machine?

5          A     Not much.  I can't think of specifics.

6          Q     Did you have any discussions with

7     Mr. Lampe regarding any problems with the blade

8     packaging machine prior to his leaving?

9          A     No.  I fired him very quickly.

10         Q     Before you fired him, did you have any

11    discussions about any problems that he was having or

12    you were having with the design of the machine?

13         A     As I mentioned previously, I was

14    unhappy that I didn't have a report done and also

15    that -- the only thing that I think the day I fired

16    him I was upset with was that he hadn't made an

17    appointment for the following day that he either put

18    aside or forgot, whatever.  But I thought that he was

19    supposed to make an appointment.

20         Q     Did that have to do with the Grote

21    Company?

22         A     With Cincinnati Belting and Supply.

23    So I had to make that appointment after I fired him.

24         Q     Did Guy keep any documents, records,

36

CIN-TEL CORPORATION

2160

1    designs, drawings, on the blade project?

2         A    Did he keep them in his possession?

3         Q    Did he have any --

4         A    Oh, does he?

5         Q    At Kearney.

6         A    Of course he does.

7         Q    Do you have possession of those

8    documents?

9         A    I have possession of most of them, I

10   believe.

11             MS. HOCHANADEL:  Okay.  And again --

12        A    But I'm -- I'm -- what he took with

13   him, I couldn't tell you.

14        Q    Do you believe he took anything with

15   him regarding the blade project?

16        A    I don't think so, but I'm not -- I'm

17   not positive.

18             MS. HOCHANADEL:  And, again, I'm sure I

19        requested this before but --

20        A    I know --

21             MR. MELVILLE:  We understand.

22        A    Yeah.

23        Q    Then have you reviewed the documents

24   that he had left?

37

1          A    Some of them I have, yes.

2          Q    Did you see any problems in the design

3     of the packaging machine from the documents that he

4     left?

5          A    No.

6          Q    Did he have any documents regarding

7     initial conversations with Grote employees regarding

8     the design of the machine?

9          A    I'm sure that there are some notes that

10    he took at some of the meetings.

11         Q    Okay.  Tell me about the process of

12    designing and manufacturing the blade machine, the

13    problems that you ran into.

14         A    Over the whole period?

15         Q    Before it was delivered.

16         A    We were under intense pressure from

17    Grote from the start for delivery, and the twist tie

18    units requested by Grote were a very late addition to

19    this project so --

20         Q    Explain to me what you mean by that.

21         A    I mean like two weeks prior to the

22    order we were to -- it was decided by John Berry that

23    it's got to have twist tie units.

24              We had worked for six months on a

38

CIN-TEL CORPORATION

2162

1  design without twist tie units.  The blades were to

2  be secured by the cardboard carrier that Guy

3  invented.

4           And at the very late -- like just prior

5  to the order, I don't know if it was days or weeks,

6  but he said it's got to have twist tie units.

7           So our major problem was finding a

8  suitable twist tie unit which would fit underneath

9  the machine.

10          Q    Did you understand at the time that you

11  entered into the contract that the contract involved

12  twist ties?

13          A    Yes.  I signed the contract.

14          Q    When you say you were under intense

15  pressure from Grote for delivery, what do you mean by

16  that?  From the very beginning?  Was that delivery

17  date made known that you had to achieve that delivery

18  date?

19          A    No.  It was -- it was cutting our lead

20  time from what we wanted, nine months to seven

21  months, was what I consider our intense pressure from

22  Grote to shorten that lead time.

23          Q    I see.

24          A    Prior to the order.

39

CIN-TEL CORPORATION                    2163

1      Q   But you understood when you entered

2   into the contract that the delivery time would be

3   seven months; is that right?

4      A   The requested delivery time was to

5   deliver in seven months, yes.

6      Q   And that's the delivery time that you

7   agreed upon when you entered into the contract; is

8   that right?

9      A   On paper, yes.

10      Q   Did you have any verbal conversations?

11      A   Yes, I did.

12      Q   Tell me a little bit about those.

13      A   I told Chuck and John that we'll do the

14   very best we can.  I told them that we are concerned

15   with the addition of the twist tie units.

16      And I was told that we're not going to

17   hold you to the seven months.  If you're a little bit

18   late, that's okay.

19      Q   Do you have anything in writing saying

20   that, any letters, memos, anything extending that or

21   making that delivery date more lenient from the Grote

22   Company or signed by the Grote Company?

23      A   Do you mean towards the end of the

24   project or do you mean right at that time did they --

40

CIN-TEL CORPORATION

1        Q    At that time.

2        A    Send me a statement saying yes, we

3    agree?

4        Q    Right.

5        A    No.  I don't have anything in writing

6    of that.

7        Q    Okay.

8        A    I don't have a response in writing.

9        Q    Tell me why the delivery date had to be

10    extended.

11        A    Because the machine was not ready to

12    ship.

13        Q    Why wasn't the machine ready to ship?

14        A    We never had enough carriers to really

15    completely debug it.  We had to work with what we

16    had.  That was one reason.

17        Q    Any other reasons?

18        A    There were other reasons.  In the midst

19    of the order my engineer was contacted by Chuck Searl

20    and specifically asked to look into printing

21    equipment for this project which took my engineer,

22    Guy Lampe, at least two, three weeks to investigate,

23    get an answer on a formal quote to Chuck.  That

24    delayed -- that took up my engineer's time.

41

CIN-TEL CORPORATION

2165

1          Q      At that point in time did your engineer

2     or yourself ever talk to Chuck or anybody at the

3     Grote Company about the fact that that was going to

4     extend the delivery date?

5          A      I don't know if Guy did or not.

6          Q      And do you have any -- anything in

7     writing to the effect that that was going to extend

8     the delivery date, the fact that he needed to spend

9     time on another proposal?

10         A      No.  I don't have anything in writing.

11         Q      Any other problems -- any other reasons

12    why the machine -- why we had to extend the delivery

13    date?

14         A      Well, other than what -- other than

15    some technical problems of materials and machine

16    parts and the things that are typical with custom

17    machining, program changes.  We also had one case of

18    blades that we tried running.

19               And I can't give you a specific date

20    that we -- that we were told -- and I can't -- I

21    can't tell you if it was like 85-inch blades, but we

22    found out after a couple days of trying to program

23    these things that they were not, in fact, 85-inch

24    blades, they were 87.  So we were sent -- we were

42

CIN-TEL CORPORATION

2166

1    sent bad blades by Bill.

2            Q    Any other problems?

3            A    Not that I can -- just general

4    problems.

5            Q    So there were other problems besides

6    the carriers; is that right?

7            A    Yes.  There were some other problems.

8            Q    Okay.  And --

9            A    At that early -- at that early stage.

10           Q    And when was the machine actually

11   delivered?

12           A    According to you guys or us?

13           Q    According to you.

14           A    The true date is July 9.  I -- I take

15   that back.  I don't know if it's the 7th or 9th.

16   It's -- it's between the 7th, 9th.  It's a

17   Wednesday.  The --

18           Q    Do you have records --

19           A    Yes.

20           Q    -- showing the delivery?

21           A    Yes.  We have truck receipts for rental

22   equipment.

23               MS. HOCHANADEL:  And, again, I'm sure

24               they would be included in my request, but I

43

1          would like to have records of those.

2              A    Um-hmm.

3              Q    Before the machine was delivered, did

4      you ever have any conversations with anybody from the

5      Grote Company regarding the speed of the machine?

6              A    Yes.

7              Q    Tell me about those conversations.

8              A    You're saying before it was delivered?

9              Q    Um-hmm.

10             A    On the visit to Innomation by John,

11     Bill and Chuck in June, I can't recall the exact

12     date, maybe 17th or something like that, we ran --

13     ran blades for them, I think 10 or 12, and just used

14     a crude timing of the sequence and they were running

15     at a pace of about 20 seconds each, something like

16     that.  Approximately.

17             Q    And what kind of conversations did you

18     have regarding the speed?

19             A    And we told -- we noted that you guys

20     said the speed was slower than what we think, and

21     then I said we don't know if we're going to be able

22     to make this seven blades per minute.

23             Q    And what was the response from the

24     Grote Company?

44

2168

1          A    That's okay.  Keep working on it.  We

2    still want the machine.

3          Q    Did the Grote Company -- did anyone

4    from the Grote Company stress the importance of the

5    speed?

6          A    No.

7          Q    Talk about the speed at all?

8          A    They said they would like to have it

9    faster than that but they wanted the machine

10   regardless.

11         Q    Did you or any of your engineers

12   give --

13         A    Keep working on it.

14         Q    Did you or any of your engineers

15   give -- talk about increasing the speed or the fact

16   that you could increase the speed?

17         A    We said we can't -- we think we may be

18   able to increase the speed by changing some motors

19   and we'll do our best.

20              And they said fine.  That's -- we still

21   want the machine.  Definitely keep working on it.

22   We'll be back for a run-off in a couple of weeks.

23         Q    Do you have any documents, records,

24   notes, anything regarding any of the conversations --

45

2169

1       A    Yes.

2       Q    -- that you had?

3       A    I have a follow-up letter.

4       Q    Okay.  Do you have any letters,

5   anything from anyone from the Grote Company?

6       A    No.  Grote Company didn't seem to want

7   to send me any documents, anything in writing all

8   through the whole course of the --

9       Q    What do you mean by that?  Did you ever

10  request items that you didn't receive or --

11      A    Everything was done on their part by

12  phone, except the letter from you.

13      Q    Did you see any --

14      A    It's the first time I ever saw your

15  letterhead.

16      Q    Did you see any problems with that?

17      A    I thought it was strange.

18      Q    Were there times where you needed

19  letters or documents that you didn't receive them?

20      A    I thought on some of these issues we

21  should have had confirmation of receipt of our

22  letters or written statements from Grote, yes.

23      Q    But you communicated by phone?

24      A    We communicated by phone, fax, letter.

1      Q    Okay.  After the machine was delivered,

2   tell me a little bit about the speed, attempts to

3   increase the speed, conversations you had about the

4   speed.

5      A    Once we delivered the machine, Grote

6   did a turnabout as far as stating that the machine

7   must run seven blades per minute which was a -- which

8   was totally different from the conversations we had

9   prior to shipment.

10     Q    Did the Grote Company ever say the

11   machine doesn't have to run seven blades per minute

12   or 420 blades per hour?

13     A    The 420-blades-per-hour figure was not

14   used by either -- I mean, that only came up when you

15   wrote a letter canceling the machine.

16          I mean, yes, it's in there, but we --

17   we -- that term was not used very often.

18     Q    Did you actually put that term in the

19   contract, the 420 blades per hour?

20     A    No, I did not.

21     Q    Did somebody -- did an employee of

22   Innomation do that?

23     A    I think it was at the request of Grote.

24     Q    Do you recall why that was put in

47

1    there?

2          A    No, I don't.

3          Q    Prior to it saying 420 blades per

4    minute [sic], do you recall what the previous

5    proposal said?

6                MR. MELVILLE:  Per hour.

7          Q    Per hour.  I'm sorry.  420 blades per

8    hour.  Thank you.

9          A    Our previous quote said seven, I

10   believe.

11         Q    Seven what?

12         A    Seven -- I believe it said seven blades

13   per minute, but without looking at the exact

14   verbiage, I will not bet my life on it.

15         Q    And did all the proposals that you

16   submitted contain seven blades per minute?  Was that

17   term in there from the beginning?

18         A    That, again, I'm not sure.  I mean, I

19   would have to look back over the proposals.

20         Q    Tell me about the discussions you had

21   with the Grote Company about the delivery.

22         A    The Grote Company sent John Berry and

23   Chuck Searl down -- made an appointment, and I

24   believe it was April 5 because it seemed like it was

48

1    a day after I let Guy go, so it was a Friday.  And we

2    had lunch at Hooter's in -- across the river in

3    Kentucky.

4                     And at that time I told them that I was

5    very concerned that your contract seemed to -- or

6    states that you can cancel the contract at any time.

7                     And I told them that I was very

8    concerned.  It made me extremely nervous.  And I

9    asked them, If we're late are you going to cancel

10   this order?

11                    And they said, Absolutely not.  We want

12   this machine and -- you know, no matter when you

13   deliver it.

14                    So I said -- and they said, Well, how

15   much time do you need?

16                    And I said, I don't -- I don't know.  I

17   said I'm -- you know, it's just Matt and myself and

18   Jay.  We'll be working as a contractor so I said I'm

19   not sure.

20                    And they said -- and I asked them for

21   an extension, at which point they apparently

22   contacted you and they asked me how much time and I

23   said I don't know.

24                    And they said, Let's just make it for

49

2173

1    six weeks and if you need more, okay.  But we'll make

2    the written one for six months -- or six weeks.

3                     So I felt very comfortable with their

4    word that they still wanted the machine and I was not

5    concerned about the delivery date after the

6    extension.

7                     And nobody said a word at JE Grote

8    that, hey, your time's up, cancel the order.  John

9    and Chuck assured me on several occasions that this

10   will not be -- we still want it no matter when the

11   delivery is.

12                    And I took their word.  And in June

13   when they came down -- never mind.  I'll answer the

14   question.

15           Q    Well, you can go on and tell me about

16   June when they came down.  What happened?

17           A    They said the same thing.  We want the

18   machine.  We're not concerned about -- I mean, we

19   want it as soon as possible, of course, but we'll

20   give you time to finish it and run it off at your

21   place and Terry Griffith is not going to cancel this

22   order.  We want this machine definitely.

23           Q    Was this --

24           A    And that -- and I had put my trust in


50

1    their word.

2          Q    Was the machine delivered after the

3    extension that was given in writing?

4          A    Yes.  It was after the extension in

5    writing.

6          Q    Once the machine was delivered to the

7    Grote Company, did you have any conversations with

8    anybody at the Grote Company regarding installing the

9    machine?

10          A    No, I did not.

11          Q    Did you instruct your engineers to

12    install the machine?

13          A    I instructed them to assist.

14          Q    Were you aware that your engineer

15    installed the machine?

16          A    I was aware that they were not given

17    any help except -- except I think for the drops, the

18    electrical drops.

19          Q    What is installation assistance?  Could

20    you please describe that for me?

21          A    I mean -- from what I understand, it

22    means that one of our engineers would be there

23    directing your people how to -- where to put it, how

24    to fasten things together.  He would be a supervisor.

51

1          Q    Were employees of the Grote Company

2     notified that the machine was being delivered?

3          A    Yes.  They insisted that it be

4     delivered.

5          Q    Was a time for installation ever

6     discussed between yourself or any of the engineers

7     with anybody from the Grote Company?

8          A    No.  You mean after it was shipped?

9          Q    Um-hmm.

10         A    No.  It was -- I didn't discuss it with

11    any of the Grote personnel.

12         Q.   After the machine was shipped, did

13    engineers from Innomation just begin working on the

14    machine at that point?

15         A    I think they were told to by -- I mean,

16    they did -- they knew we were under pressure by Grote

17    Company to get the machine up and running.  And what

18    assistance they got, I'm not sure.  I was not there.

19         Q    What did Innomation need to do in order

20    to get the machine up and running?

21         A    The machine -- we needed electrical

22    drops which is standard for just about any -- you

23    need electricity hooked up to it.

24         Q    When did those -- when did you get

1    those?

2           A    That was done by Grote but that was --

3    that's standard in this business.  I can't tell you

4    for sure how soon it -- you know, if it was a day or

5    week, two weeks.  I think within a week.

6           Q    What else was required in order to get

7    the machine up and running?

8           A    Machines had to be moved by forklifts

9    into the -- there were several components of the

10   machine, and three major components they had to be

11   forklifted, bolted together.

12               There was -- it has substantial

13   guarding that was -- that was put in place.  I'm sure

14   there's other things that I can't remember.  It also

15   has a conveyor that had to be put in place.

16           Q    Anything else needed to get it up and

17   running?

18           A    We needed to have good carriers and we

19   needed to have blades, of course.

20           Q    Was the machine ready to run?

21           A    Yes.

22           Q    Besides that?

23           A    Yes.

24           Q    Okay.  And can you describe for me


53

1    again the changes and modifications that were made

2    after the machine was there and installed?

3           A    After the machine was installed, as I

4    mentioned previously, Grote started saying to us --

5    which they didn't previously -- hey, it's got to run

6    seven blades per minute.

7           Q    So they never said that at your

8    facility?

9           A    No.  That was a goal, but it was not

10   a -- it was a goal but it was not a priority.

11          Q    But it was --

12          A    Until -- until we delivered our machine

13   to your plant.

14          Q    But you were aware, though, that that

15   was in the contract and that was what was contracted

16   for; is that correct?

17          A    Yes.  I was aware that it's in the

18   contract.  But as I stated, it was verbally discussed

19   at our plant and it was not a priority of JE Grote at

20   that point prior to delivery.

21          So after delivery when my engineers

22   told me that, hey, they're starting to say it's got

23   to run seven blades per minute, then we -- I think we

24   made some changes to the motors.

54

1            And then the rest -- I think most of

2    the rest of the modifications were due to

3    inconsistent packaging carriers that we had to --

4    that we had to figure out how to run these poor

5    carriers.  And we told Grote, Can't do it with these

6    carriers.

7            Q    Before the machine was delivered, were

8    you trying -- were you working with the motors to

9    increase the speed at that time?

10           A    I don't know.  I mean, I can't -- I

11   just don't recollect when exactly we started to

12   change the motors.

13           Q    Did you ever request that the Grote

14   Company make any parts for the machine?

15           A    Me personally?

16           Q    (Nods head.)

17           A    No.

18           Q    Anybody at the -- any of your

19   engineers?

20           A    We -- I think we made a few requests

21   after an offer by either Chuck or John to make the

22   parts.

23           Q    And was there any verbal agreement

24   between yourself or Chuck or John or any other Grote

1  employee regarding the cost of those parts?

2      A    No.  I assume that it was -- because

3  they made us ship it early that it was just their --

4  their way of helping us, since they made it difficult

5  for us.

6      Q    Being in business for 20 years prior

7  to this, is this a fairly common practice that you

8  see a customer actually making parts for their own

9  machine?

10     A    Yes, I do.  We have other orders where

11 if there is -- that building a machine is a

12 partnership and everything is not always in the

13 contract.  So it's not a -- it's not a cut and dried

14 black and white situation.

15         Yeah.  It happens at other -- we do it

16 ourself.  We make modifications to equipment that

17 comes in to -- on our own time.  We don't always send

18 it back.

19         We go out and make parts -- we get

20 parts in that we make modifications to and never

21 charge the supplier.  We do it a lot.

22     Q    The contract actually required Kearney,

23 at that time, now Innomation, to design and

24 manufacture a machine to wind, coil, package band

1    blades; is that right?

2              A    Wind, coil, twist tie --

3              Q    And package at 420 blades per minute --

4    per hour?

5              A    Yes.  But as I said, not all your

6    blades.

7              Q    Does that state that anywhere in the

8    contract?

9              A    I don't know.  I mean, it's a rather

10   lengthy contract.  I would have to go through it

11   again.

12             Q    How many parts did Grote make for the

13   machine?  Do you know?

14             A    I don't know.

15             Q    Tell me about the final run-off on

16   May -- or on December 5.

17             A    I wasn't in attendance.  So what do you

18   want to know?

19             Q    Tell me what happened, to your

20   knowledge.

21             A    To my knowledge, our machine ran very

22   well.

23             Q    Was the machine ever able to reach the

24   speed required in the contract?

2181

1        A    The machine never was tested

2    professionally for speed with someone that's -- as

3    far as I know, I don't know that Grote figures

4    indicate who was running the machine when things were

5    tested.  So I can't say that it was fairly tested.

6        Q    Do you know of any problems with the

7    blades as a result of the machine?

8        A    I know that we ran a scalloped blade

9    which was a surprise to us that it was chosen and it

10   was not -- our machine was not intended to grab that

11   blade, and I believe that particular blade broke the

12   twist ties on several occasions.

13       Q    Do you know of any other problems that

14   occurred during the final run-off?

15       A    Yes.  An operator -- it was mostly

16   operator error, sticking hands in the light curtain

17   stopping operator production.

18            That's another thing.  I don't know if

19   that time of the clock kept ticking as you were -- as

20   one of your employees stopped it by mistake and -- so

21   there was no one trained on that machine.

22       Q    This machine, though, was intended for

23   a regular production operator, though; is that

24   correct?

1      A    With training.

2      Q    Is it -- did your engineer have any

3  problems as far as with the machine?

4      A    He cut himself because he was trying to

5  load too fast.

6      Q    Did the engineer rip the light or the

7  light curtain?  Is that what you call it?

8      A    Yeah.

9      Q    Yeah.

10      A    Our engineer?

11      Q    Um-hmm.

12      A    I don't know.  He may, but I know that

13  your employee, Bill, tripped it several times.  And

14  it's not a -- that's to be expected because he never

15  ran the machine before.

16      Q    Had Jay had a lot of experience running

17  the machine or trying to run the machine?

18      A    No.  Not a lot because we never had the

19  carriers that were -- that made it possible for us to

20  do continual runs.

21      Q    Was Jay actually the product engineer

22  that designed the machine?

23      A    Guy Lampe designed the machine.

24      Q    What was Jay's role then?

59

2183

1      A    With training.

2      Q    Is it -- did your engineer have any

3   problems as far as with the machine?

4      A    He cut himself because he was trying to

5   load too fast.

6      Q    Did the engineer rip the light or the

7   light curtain?  Is that what you call it?

8      A    Yeah.

9      Q    Yeah.

10     A    Our engineer?

11     Q    Um-hmm.

12     A    I don't know.  He may, but I know that

13   your employee, Bill, tripped it several times.  And

14   it's not a -- that's to be expected because he never

15   ran the machine before.

16     Q    Had Jay had a lot of experience running

17   the machine or trying to run the machine?

18     A    No.  Not a lot because we never had the

19   carriers that were -- that made it possible for us to

20   do continual runs.

21     Q    Was Jay actually the product engineer

22   that designed the machine?

23     A    Guy Lampe designed the machine.

24     Q    What was Jay's role then?

1    would be confidential.

2          Q    Do you have any patents on that

3    technology?

4          A    We can't discuss that.

5          Q    You can't discuss it?

6          A    No.  It's really none of your business

7    at this point.

8          MS. HOCHANADEL:  Can we go off the

9          record for a minute.

10         (A discussion was held off the record)

11         Q    Do you have a patent on the technology

12   that you believe that Grote misappropriated?

13         MR. MELVILLE:  That's the same question

14         you just answered.

15         A    I just answered.

16         MR. MELVILLE:  She wants it on the

17         record.

18         Q    Could you answer on the record.

19         A    Oh, we have a patent application -- or

20   we have consulted a patent attorney.

21         Q    Okay.  Do you have a patent at this

22   time?

23         A    No.

24         Q    And state again what the technology is,

61

1      A    Jay's role is senior project engineer.

2      Q    What impact did he have on the machine?

3      A    Jay designed the winding head and he

4  was involved in the project, since I hired him in

5  April.  I mean, he was involved previous to that.  He

6  did the actual CAD design.

7      Q    Do you believe that some of the

8  problems you·had with the machine were as a result of

9  Guy leaving the company?

10     A    No.  I would say we have a better

11  machine.

12     Q    Tell me why you believe that Grote

13  attempted to copy the blade packaging machine.

14     A    I don't think that I ever said you

15  copied the blade packaging machine.  You did copy

16  some of our technology.

17     Q    What was that?

18     A    Our blade carriers.

19     Q    And did you ever have any type of

20  confidentiality agreements with anyone at the Grote

21  Company regarding the blade carriers?

22     A    I don't know.  I don't know if that was

23  on our prints or if that was -- it was -- Grote

24  Company is our customer.  We would expect that it

60

CIN-TEL CORPORATION

2186

1    what you are currently applying for a patent on.

2          A    I need to consult with my attorney.

3          MR. MELVILLE:  Just tell them what your

4    understanding is, Chris.

5          Let the record show that Mr. Kearney is

6    not a patent attorney and not really

7    qualified to give an opinion as to the

8    patent, although he can tell you what he has

9    discussed regarding the patent.

10         A    We have invented the whole machine.  We

11   have invented the blade carrier and we are pursuing

12   patents.

13         Q    By the blade carrier, do you mean the

14   piece of cardboard --

15         A    Yes.

16         Q    -- that the blade is attached to?

17         A    Yes.

18         Q    Is that exactly what you believe that

19   Grote has misappropriated, that carrier itself?

20         A    Yes, I believe that.

21         Q    Is there any other part of your

22   technology that you believe Grote has attempted to

23   copy?

24         A    My own personal beliefs?

CIN-TEL CORPORATION

1          Q    Um-hmm.

2          A    Yes, I do.

3          Q    Could you please tell me why -- why you

4    believe that Grote, first of all, has attempted to

5    copy the carrier itself?

6          A    Well, I've seen your carriers.

7          Q    Tell me what you've seen.  What have

8    you seen?

9          A    I've seen four or five pallets of

10   carriers, cardboard carriers similar to our design.

11         Q    Were they used with this machine, were

12   they used with this blade packaging machine?

13         A    I don't know.  I didn't see them in

14   use.

15         Q    How did you see these cardboard

16   carriers?

17         A    Jay and I went up to take pictures of

18   my machine for other -- for our own purposes, and as

19   Jay stated, we looked -- we noticed them sitting

20   there.

21         Q    Did you do that without the knowledge

22   of the Grote Company?

23         A    We walked in the open door which is the

24   way we've always gone to look at our machine or to


63

CIN-TEL CORPORATION

2188

1          They were poking around looking all

2    around the machine at its operation and they were

3    also filming our machine.

4          Q    So that's kind of an impression you

5    have, then, from what you saw at the run-off or what

6    your engineers saw?

7          A    And -- yes.  And the questions posed to

8    my engineers during the course of the building of the

9    machine were -- leads us to believe that it's going

10   to be copied.

11         Q    But you're not aware of any type of

12   confidentiality agreements that were signed?

13         A    With the JE Grote Company?

14         Q    Yes.  Or with any employees of the

15   company?

16         A    No, I'm not.

17              (Whereupon, Plaintiff's Exhibit Number

18              4 was marked for identification.)

19         Q    I'd like to hand you Plaintiff's

20   Exhibit Number 4.  Could you please tell me what this

21   is.

22         A    It's a quote.

23         Q    Okay.  Could you look at the drawing

24   after page four.  Do you see any type of markings of

65

CIN-TEL CORPORATION

2189

1    confidentiality on this drawing, anything that says

2    it's a trade secret of Innomation or Kearney

3    Magnetics?

4         A    I don't see that wording.

5         Q    Do you see that in any other way?

6         A    I see that it's our drawing.

7         Q    What's it a drawing of?

8         A    It's a drawing of a packaging machine.

9         Q    Okay.  Would you look at the next

10   page.  What's this a drawing of?

11        A    It's a drawing of our packaging

12   machine, designed by us.

13        Q    And this was included in this quote

14   number KME0047; is that correct?

15        A    That is -- it's included, but I'm not

16   sure that we -- I mean, it's included, but if it was

17   included in the original, I don't know.

18        Q    Okay.  Did you send other types of

19   drawings, preliminary concept drawings to the Grote

20   Company about the blade packaging machine before the

21   order and during the order?

22        A    I don't know.

23        Q    If you would have, would you -- do you

24   know if there was any type of confidentiality stamps,

1    proprietary stamps on any of the information that you

2    would have sent?

3           A    I don't know.

4           Q    Was there on these?  Was there any

5    stamps of confidentiality or proprietary information

6    on these two drawings that were included in the

7    original -- one of the original proposals?

8           A    Stamps on, no.  I trusted JE Grote

9    Company.

10          Q    Okay.

11          A    But as far -- to answer your question

12   fully, I don't know.  As I said, I see what's -- I

13   answered your question about this, but as far as

14   other drawings, I would have to look at my files.

15          Q    Okay.  Any other reasons that you

16   believe that we copied your machine?

17          A    That you have copied it or you will

18   copy once this is over?

19          Q    Just any other reasons that you believe

20   this.

21          A    Yes.

22          Q    Please tell me, what are those

23   reasons?

24          A    I believe that there are other machines

67

CIN-TEL CORPORATION

2191

1    in your plant that have been copied from other

2    manufacturers.

3            Q    How do you have reason to believe that?

4            A    I was told by another company that JE

5    Grote made four or five trips into their plant before

6    they -- before Grote made their original grinder and

7    they copied the techniques.

8            Q    Any other reasons?

9            A    The constant -- the constant presence

10   of engineers while my workers were working made me --

11   is another reason.

12            I thought that there was more reason

13   for them being there other than that they were

14   watching what we do, how we do it, how our mechanisms

15   worked, and their questions about the operation of

16   the machine, that it didn't have to do with your

17   blades.

18            Q    Okay.  Tell me about the carriers that

19   you saw on your visit to the Grote Company, the ones

20   that you believe -- you believe that these are

21   copies; is that correct?

22            A    Yes, I do.

23            Q    What is actually copied?  What do you

24   believe has been copied?

68

1          A     The whole concept.

2          Q     The concept?

3          A     The material, the tabs, cutouts.

4          Q     Is it exactly the same, the carrier?

5          A     Very close.

6          Q     Are there any differences -- were there

7     any differences that you observed?

8          A     I don't know.  I just -- you know, I

9     can't -- didn't take a real close look at them.

10         Q     But you did take pictures; is that

11    right?

12         A     I have one picture, yes, maybe two.

13              MS. HOCHANADEL:  Okay.  And, again,

14         they should be requested in my production,

15         but I would like to make sure I get any type

16         of pictures that you took.

17         A     Um-hmm.

18         Q     So you have a picture but you're not

19    quite sure if it's exactly the same carrier?  You say

20    it's very close; is that right?

21         A     That's right.  I'm not sure exactly.  I

22    know it's not exactly our -- I know it's not our

23    carrier, but I know it's very, very similar.

24         Q     So there are differences though?

1        A    There may be some differences.

2            MS. HOCHANADEL:   Okay.   I don't have

3    any other questions.

4            MR. MELVILLE:   We have no questions at

5    this time.

6            (Deposition concluded at 2:30 p.m.)

7

8

9

10                              _____

11                              CHRISTOPHER KEARNEY

12

13

14

15

16

17

18

19

20

21

22

23

24


                              70