UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JEFFERSON-PILOT LIFE INSURANCE COMPANY, et al. | : | CASE NO. C-1-02-479 |
| | : | |
| | : | (Judge Barrett) |
| Plaintiff/Counterclaim Defendants, | : | |
| | : | |
| vs. | : | **COUNTERCLAIM DEFENDANTS** |
| | : | **REPLY IN SUPPORT OF MOTION** |
| CHRISTOPHER L. KEARNEY, | : | **FOR SUMMARY JUDGMENT** |
| | : | |
| Defendant/Counterclaim Plaintiff. | : | |
| | : | |

      Counterclaim Defendants, Jefferson Pilot Life Insurance Company ("JP") and Disability Management Services, Inc. ("DMS") (collectively referred to as "Counterclaim Defendants"), respectfully submit this reply in support of their Motion for Summary Judgment (the "Motion").

      To successfully oppose the Motion, Counterclaim Plaintiff, Christopher Kearney ("Kearney"), must present evidence of a *genuine* issue of *material* fact. Despite his submission of a 35-page opposition memorandum (the "Opposition Memorandum"), accompanied by 39 exhibits numbering in excess of 300 pages, Kearney fails to satisfy his burden of providing any such evidence. Instead, Kearney resorts to *ad hominem* attacks, pleas for sympathy due to the comparative net worth of the parties (and non-parties, too, in the case of Employers Reassurance Company and assorted parent companies), distortions of the record, and a melodramatic, "Grisham-like" writing style in an attempt to create issues where none exist. Unfortunately for Kearney, at this stage of the proceedings, the Court weighs facts by their quality, not by the pound.

1. **<u>Kearney's bad faith claim cannot stand, as there was never a refusal to pay his claim.</u>**

Despite his best efforts to bury it with the sheer volume of his submissions, Kearney cannot hide the single fact which, standing alone, is fatal to his bad faith claim, i.e., that his disability claim has been paid during the entire 14 years that it has been pending. In fact, as the Court is aware, due to Counterclaim Defendants' mistake in paying to Kearney a "Social Security Supplemental Benefit" and a "Cost of Living Increase" (collectively referred to as the "Additional Benefits") to which he was not contractually entitled, Kearney received $478,287.49 **in excess** of the disability benefits set forth in his policies.[1]

Based on these facts, Kearney's bad faith claim must fail because an essential element of such a claim under Ohio law is the presence of an unreasonable "refusal to pay the claim." *Hart v. Republic Mutual Insurance Co.,* 152 Ohio St. 185, 87 N.E.2d 347 (1949). "An insurer lacks reasonable justification for denying a claim when its refusal to pay is based upon an arbitrary or capricious belief that the insured is not entitled to coverage." *Drouard v. United Services Automobile Association*, 2007-Ohio-1049, 2007 WL 707532, ¶17 (Ohio App. 6 Dist.). Kearney can point to no Ohio opinion (or that of any other jurisdiction) holding it *possible* to find an insurer in bad faith where the plaintiff's claim has been timely paid for 14 years, let alone <u>overpaid</u> for that length of time.

Aware of this Achilles Heel in his bad faith claim, the "best" Kearney can do, which is far from enough, is cite cases where an insurer's unreasonable delay in payment is so significant that it amounts to a claim denial.[2] *See, e.g., Unklesbay v. Fenwick*, 167 Ohio App.3d 408, 855

---

[1] These figures are as of Motion filing date. These numbers continue to increase, as Kearney is currently being paid approximately twice the amount of his contractual benefit each month, based upon the Court's earlier finding of an "estoppel."

[2] This argument was anticipated by Counterclaim Defendants and the cited cases are addressed in Section 2(a) of the Motion.

N.E.2d 516 (Ohio App. 2nd Dist. 2006)(**3-year** refusal to pay a claim sufficient to state a bad faith claim for that time period, but not after payment, under Ohio law); *Mundy v. R*oy, 2006-Ohio-993, 2006 WL 522380 (Ohio App. 2nd Dist. 2006) (finding a "refusal to pay" where insurer refused to pay claim for **2 years** and compensated insured only after a jury rendered a verdict against it); *Thompson v. Community Ins. Co.*, 213 F.R.D.284 (S.D. Ohio 2002) (**termination** of health care coverage for a group of elderly insureds constitutes a refusal to pay any future claims.)

Under the standards set forth in this line of cases, however, Kearney was timely paid. While he vaguely asserts in his affidavit and Opposition Memorandum that the Counterclaim Defendants "routinely paid me benefits late," he admitted in his 2007 deposition that, at the most, he was paid his benefit within **one (1) month** after he believed it due, to wit:

> Mr. Meagher: …Ultimately, as we sit here today, you've been paid all the benefits other than the waiver of premium benefits and whatever interest is owed on those payments, is that correct?
>
> Mr. Kearney: Eventually with the phone calls and letters **I received them at some point during the month or the next month**.

(Kearney 2007 depo. 33:5-12, attached as Exhibit "A", hereto). Kearney's testimony is corroborated by the Counterclaim Defendants' benefit payment sheets, illustrating the regular stream of monthly payments to Kearney. (Exhibit "B", hereto). Further, Kearney's counsel acknowledged Kearney's receipt of the monthly payments in open Court. See Motion at Exhibit "E". Any attempt to equate the "late payments" complained of now by Kearney (a matter of

days"), to those in the narrow exception set forth in *Unklesbay* and its progeny (a matter of "years" or "forever"), fails as a matter of law.[3]

In fact, the only significant gap in benefit payments was from March 31, 1994 to February 7, 1995. See JP Payment Log, attached hereto as Exhibit "C". (Kearney 2007 dep. 174:11 to 176:15 and Exhibit 7 thereto, attached as Exhibit "D", hereto). Kearney can hardly complain about this gap, since it resulted from his admitted failure to submit any claim forms during that period. An examination of the circumstances surrounding this gap is a good illustration of how Kearney, rather than being a "David battling Goliath," is a shrewd individual, who, from time to time, has manipulated the claim process for his financial gain. In the divorce proceedings Kearney filed against his first wife, Yoshiro Kearney, he submitted to the court an April 30, 1994 sworn financial affidavit setting forth his employment and income information.[4] After describing his 1993 back injury, which was his initial disabling condition prior to the conversion of his claim to the current "mental/nervous claim," Kearney stated therein:

> It was not until April 1994 that I have been able to again resume normal business activities….While I was disabled, I did receive a disability compensation for seven months in 1993. The total compensation was $28,477.98. As of March 31, 1994, I no longer receive any disability compensation.

(Kearney 2007 dep. at Ex. 5, ¶¶ 3,4, attached hereto as Exhibit "E"). The judgment of divorce was entered on October 28, 1994, incorporating by reference Kearney's financial affidavit. (Kearney 2007 dep. at Ex. 6, attached hereto as Exhibit "F".). **Three days later,** Kearney submitted a claim form to JP, claiming he was "residually disabled from February 8, 1993 to

---

[3] This is so without even examining the reasons a benefit may have been paid the following month, such as Kearney's treating physicians' failure/refusal to respond to requests for interviews and medical records. See, e.g., Exhibit "G", hereto

[4] The existence of this affidavit, which contradicts his later claim form as described herein, was unknown to Counterclaim Defendants prior to this lawsuit.

4

[October 31, 1994]." (Kearney 2007 dep. at Ex. 7, attached hereto as Exhibit "H")(bracketed material supplied). This period of claimed disability, of course, includes the time Kearney told the divorce court that he "was able to resume normal business activities." Kearney denies the suggestion that he purposely withheld filing claim forms during the pendency of his divorce proceedings in order to minimize his financial exposure to his ex-wife, Yoshiro. (Kearney 2007 dep. at p. 176, lns. 3-15). However, he does not explain why he failed to submit his claim forms during that 7-month gap and then, in October, demanded benefits back to March. Whatever the explanation, it is not surprising that Kearney does not come up with "specific facts" of untimely payments, as these are the circumstances surrounding the only significant gap in payment.[5]

Of course, the fact that this gap in payment was his own doing did not stop Kearney from threatening to sue JP in February, 1995. Exhibit "I". Although Kearney attempts to portray Counterclaim Defendants as long-time plotters of litigation against Kearney, the record shows the exact opposite. Kearney's constant threats are the reason JP and, later, DMS, "anticipated litigation" from early on in this claim. It is beyond dispute, however, that the only litigation Counterclaim Defendants considered instituting was this Declaratory Judgment action, which in no way challenges Kearney's *entitlement* to his benefits, only the *amount*. This is another example of Kearney's distortion of the record.

In a desperate effort to find case law in his favor, Kearney stoops to citing a Magistrate Judge's unpublished decision on a *discovery motion* in *Wightman v. Reassure America Life Insurance Co.*. Opposition Memorandum at 26-27. But even that slender reed provides Kearney no support. In *Wightman*, the Magistrate Judge simply ruled that discovery relating to plaintiff's "claim of Reassure's bad faith in processing or evaluating or otherwise handling her

---

[5]Moreover, the statute of limitations bars any claim that JP acted in bad faith for failing to timely pay Kearney's claim in 1994. <u>See</u>, <u>Bullet Trucking,, Inc. v. Glen Falls Ins. Co.</u>, 84 Ohio App. 3d 327, 616 N.E.2d 1123 (1992).

5

disability claim [is] discoverable," appropriately recognizing the existence of the *Unklesbay* line of cases. Wightman at 3. At that stage of the case, there was no analysis or conclusion as to whether the plaintiff's claim actually satisfied the *Unklesbay* standard. To argue this unpublished discovery ruling supports Kearney's novel claim in this action, i.e., that despite being (over)paid for his entire claim he can still sustain a bad faith claim, defies credulity.[6]

Kearney's citation of *Drouard v. United Services Automobile Association*, 2007-Ohio-1049, 2007 WL 707532 (Ohio App. 6 Dist.) (Opposition Memorandum at 27), is surprising, as it provides strong support for the granting of the Motion. A copy of the Drouard case is attached as Exhibit "J". In *Drouard*, the Ohio appellate court *affirmed* the trial court's grant of summary judgment in the insurance company's favor on the Drouards' bad faith claim. In that case, a dispute arose between the Drouards, insureds under a USAA homeowner's policy, and USAA regarding the amount of a loss to the plaintiffs' home after it was damaged by a fire. *Id.* At ¶4. As part of an appraisal process contained within the Drouards' policy, USAA's adjuster contested several aspects of a damage estimate provided by the Drouards' first general contractor, SMB Construction,[7] which then lowered its estimate.[8] *Id.* at ¶18, 19. At the conclusion of the appraisal process, wherein the Drouards submitted an appraisal prepared by the contractor hired to replace SMB, Cousino Construction, that exceeded the final SMB estimate, the Drouards were awarded more than the final SMB estimate. *Id.* at ¶19. Immediately after the

---

[6] More relevant to this case is the Magistrate Judge's comment, "Finally, as Reassure noted, it is a fair statement to say that a majority of claims that reach the litigation stage include a bad faith allegation regardless of whether the allegation has merit…" *Wightman* at 5. Kearney's counterclaim fits that description perfectly.

[7] SMB Construction was dismissed from the job site as a result of a disagreement with the Drouards and was both a defendant and counterclaimant in the lawsuit. *Id.* at ¶3. The Drouards then hired Cousino Construction to complete the repairs. *Id.*

[8] It is unclear from the opinion whether revised "inadequate" estimate was the cause of the disagreement between SMB and the Drouards, but it seems likely to have played a part.

award, USAA "paid the amount of loss as determined by the appraisers in full." *Id.* at ¶8. The Druouards then sued USAA for, <u>inter alia</u>, bad faith.

Despite the fact that USAA <u>denied</u> the Drouards' claim, criticized the Drouards' initial damages appraisal performed by SMB (resulting in it being lowered to an "inadequate" level, see ¶19), and was ultimately shown to have been incorrect in its estimate of the damages owed to the Drouards, Ohio's Sixth District Court of Appeals found the record "devoid of evidence tending to show a lack of good faith on the part of this insurer" and affirmed summary judgment. *Id.* at ¶17. Further, the court found that "[b]roadly stated opinion evidence" by the Drouards' expert was insufficient to create a genuine issue of material fact regarding their bad faith claim. Finally, the court found that the Drouards' complaint that USAA committed bad faith by not attempting to make additional efforts outside of the appraisal process to resolve the dispute could not reasonably be construed as evidence of the lack of good faith. *Id.* at 20.

The *Drouard* case, decided less than 6 months ago, clearly demonstrates the frivolity of Kearney's claim here. Where a claim has been (over)paid for 14 years, it makes no sense for the law to allow the fully paid claimant to sue for bad faith. Moreover, although Kearney complains that Counterclaim Defendants committed bad faith by freezing his benefits (though continuing to pay them) at the *status quo* upon the filing of this declaratory judgment action, all those benefits were immediately paid after the Court's decision on the cross-motions for summary judgment. Motion, Exhibit "A". *Drouard* makes clear that Kearney's claim is legally insufficient, as USAA took similar action -- paying the higher amount immediately after the appraisal process

7

took its course -- yet summary judgment was entered in USAA's favor and affirmed on appeal.[9] *Id.* at ¶8.

### 2. **Kearney's Story of Improper Claim Handling is Not Supported by the Record.**

#### (a) **Counterclaim Defendants' requests for information were legitimate.**

As shown above, Kearney's claim fails because he cannot show a "refusal to pay," let alone one that was unreasonable. Assuming *arguendo* that he could satisfy that hurdle, his claim still would fail, as the record establishes that Counterclaim Defendants' actions were not "arbitrary and capricious." See *Drouard*, *supra*, at ¶17. A dispassionate review of the claim handling evidence in this case, stripped of Kearney's pejorative adjectives, establishes that Kearney's bad faith claim (as well as his various tort claims, see Section 3, below) cannot withstand scrutiny and should be dismissed with prejudice.

It must be remembered that, after Kearney's brief period of "total disability" following his 1993 back surgery, Kearney chose to change his claim to one for "residual disability." *See* Kearney's Statement of Claim, attached hereto as Exhibit "K". In that Claim Form, Kearney states that he has returned to work, but is "unable to spend as much time on job." *Id.* As defined by Kearney's policies, Residual Disability requires the insurer to make a *monthly* determination of liability, which includes not only the question of whether Kearney remains ill, but how much time he *is able* to spend on the job, what (if any) financial losses are being sustained, whether those financial losses result from his disability (rather than business downturns, producing defective machinery, etc.) and, if so, the percentage of his loss. See Residual Rider, attached

---

[9] While advocates, at times, are justly accused of overusing the "parade-of-horribles" argument, it fits perfectly here. One can only imagine a world in which insureds whose claims are being paid without significant delays are permitted to sue for bad faith and ask a jury for punitive damages. Insurers would be exposed to bad faith exposure in Ohio on every claim—even those being paid. It is to prevent such an absurd result that the law requires a showing of an "unreasonable denial."

hereto as Exhibit "L". This is hardly the stuff of "auto-pay;" it requires a steady stream of inquiry on a monthly basis.

While Kearney's Opposition Memorandum contends his claim should have been placed on "auto pay" because his claim was "irrefutable," that is not borne out by a reasonable view of the evidence, which shows him to be a very high-functioning, though impaired, individual. As stated by his psychologist, Dr. Judd-McClure, "…the total overall functioning…of Chris is good. He doesn't need to be in the hospital. He doesn't need to be away from society, and he functions very well in some aspects of his life,…" (Judd-McClure dep. 142:21-143:4).

Further, Kearney was not forthcoming about his work activities. For example, in 1995-96, Kearney started a new company, Innomation, Inc., which designed and manufactured industrial machinery. Kearney, however, did not disclose Innomation's existence to Counterclaim Defendants. Exhibit "M" After Innomation was discovered by DMS, Kearney defended his failure to disclose its existence by stating:

> You have asked for information about the company Innomation, Inc. I owned this company for several years – it is now out of business. The work I did for Innomation, Inc. was as an agent of Kearney Associates, Inc. I was involved in sales and some management….
>
> * * * * *
>
> I was never an employee and I funded this company with my own personal resources, therefore there was no reason to report this to you. The Occupational Duties Form is apparently [sic] designed for employees. As stated, my employer was not Innomation, Inc.

Exhibit "N".

Kearney's description of his role in Innomation, however, is grossly incomplete and misleading, as established by his own sworn deposition testimony in *J. E. Grote Company, Inc. v. Innomation, Inc. f/k/a Kearney Magnetics and Engineering, Inc.*, a copy of which is attached hereto and Exhibit "O" In that deposition, Kearney describes at length his company's efforts to

design, manufacture, and patent an industrial machine that ultimately, according to the buyer, failed to work. His description to DMS of merely being involved in "sales and some management," at best, is disingenuous. So, too, is his hyper-technical explanation that, because he was not a W-2 employee, he need not disclose any of his work activities for that entity to Counterclaim Defendants. Clearly, Counterclaim Defendants' requests for information were absolutely necessary, especially where the insured withheld information of this type from them.

Moreover, the policies require that his financial loss be due to disability. Innomation failed not because of Kearney's impairment, but because the machine Kearney had been hired to manufacture did not (according to the purchaser) work. See Exhibit "O", supra. This business dispute led to a series of lawsuits by the buyer and Kearney's creditors, culminating in his filing personal bankruptcy in 1999. Exhibit "P". Under such circumstances, a determination of Kearney's entitlement to monthly residual benefits raised various questions throughout the claim. For Kearney to describe his claim as "irrefutable" and "beyond debate medically and occupationally," (Opposition Memorandum 1, 28) simply because it was always paid, is pure fabrication.

It is inarguable that an insurer is entitled and, indeed, obligated to seek and obtain information verifying a claim -- even Kearney's retained bad faith "expert," Clinton Miller ("Miller"), agrees.[10] One of the documents Miller produced at his deposition and incorporated in his report was a 10-page excerpt from a treatise entitled "Claim Administration, Principles and Practices, 3d Edition," published by the International Claims Association ("ICA"), which Miller describes as a "professional organization outlining the principles of good faith, [sic] processing

---

[10] While Counterclaim Defendants in no way concede that Clinton Miller, the California attorney hired by Kearney to "opine" as to bad faith, satisfies the threshold requirements for expert testimony set forth in <u>Daubert</u> and its progeny, citation to Miller's own materials demonstrates that the issues discussed are beyond dispute.

of claims." (Miller dep. 28:11-18, Ex. D, attached hereto as Exhibit "Q")  This excerpt states, in pertinent part:

> An insurance company has a responsibility to its insured to provide prompt, fair payment of all legitimate claims. In addition, the laws of most jurisdictions require that claims be settled promptly. **However, insurers balance prompt claim settlement against the need to be accurate in determining liability for each claim. The claim administration processes are organized to facilitate rapid settlement without losing appropriate controls over the legitimacy of claims.**
>
> The general approach to claim administration sounds very simple: an insurer receives a claim and examines it, and, if the claim is valid, the insurer issues payment for it. **However, claim administration processes are far more complex.** (p. 3) (emphasis supplied).
>
> \* \* \* \* \* \*
>
> **The primary duty of the claim analyst is to make accurate claim decisions. The central reason for claim accuracy is to protect the interests of all the insurer's policy owners, as well as to maintain the financial stability and strength of the insurance company. Paying invalid claims, or paying valid claims in the wrong amounts, can weaken the insurer's financial strength and render it less capable of fulfilling its promises to its other insureds when their claims come due.** Denying valid claims can also cause insureds to lose trust in the company and result in expensive litigation. (p.4) (emphasis supplied).
>
> \* \* \* \* \* \*

While Counterclaim Defendants' actions admittedly ran afoul of this last point, in that they have overpaid Kearney, thus "paying a valid claim in the wrong amount," they certainly should not be sued for doing so.

Moreover, although Kearney attempts to make much of the size of the reserve on his claim, arguing that he was unfairly "targeted," his own expert's materials explain that larger claims merit greater examination than smaller ones, stating:

> In requesting additional information to make a claim decision, claim analysts bear in mind the cost of obtaining the information. The goal of every insurer is to minimize the cost of the claim administration process in

11

> order to operate the business on a financially sound basis. **Not every claim warrants the same amount of attention and scrutiny. If a claim analyst conducted a detailed analysis of every claim, claim administration costs would rise, as would the cost of providing insurance and, therefore, the premium rates for the coverage.** (p. 5) (emphasis supplied).

In fact, it was only after years of such "attention and scrutiny" that DMS discovered that Kearney was receiving twice the benefit amount his policies provided. So, in actuality, the hiring of DMS by JP to handle its claims in order to take advantage of DMS's expertise proved to be the correct decision. How ironic that JP and DMS are now the subject of a lawsuit due to that correct decision.

Miller's ICA excerpt also emasculates another of Kearney's shibboleths, that "DMS is evil because it *settles* claims." Leaving aside the irony of criticizing "settlements" in a judicial system that increasingly mandates mediations, Miller's excerpt correctly extols the virtues of claim settlements, listing the advantages inuring to the benefit of both the insured and the insurer when settlements can be achieved. See Ex. "R" at 10.

In a perfect illustration of Benjamin Disraeli's statement, "There are three kinds of lies: lies, damned lies, and statistics," Kearney offers his recalculation of Counterclaim Defendants' claim closure numbers in an attempt to paint a picture of rapacious companies denying legitimate claims. Opposition Memorandum at 8-9 and Exhibit 16 thereto. An examination of Exhibit 16, however, shows the opposite is true. Of the 764 closed claims over 4 years, 217 of the claimants recovered and returned to work, 12 were paid in full in advance, 50 died, 97 reached maximum benefit, 45 failed to provide any proof of loss and abandoned the claim, 118 were returned to JP, and 202 were amicably settled. Thus, 741 of the claims were "closed" with no relation to a denial or litigation to verdict. Only a small portion of them were denied.

These are but a few of the numerous record distortions put forth by Kearney in his attempt to avoid the entry of summary judgment against him. While Counterclaim Defendants could spotlight and expose each one, that simply is not necessary for disposition of the Motion,

as Kearney's "facts" are neither "genuine" nor "material."

    3.    **Kearney's remaining claims also fail as a matter of law.**

        (a)    **Kearney's claim for breach of contract has already been decided against him.**

Kearney claims that he is entitled to "waiver of premium" and, therefore, JP has breached the policies. That claim, has already been decided against him, however. *See* Order dated January 26th, 2006 attached as Exhibit "S" hereto. As such, it is law of the case. In his order, Judge Watson made several rulings based upon the undisputed facts which resolve the issue of the "Breach of Contract" claim.[11]

All of the undisputed facts and holdings of the Court apply equally to the issue of "Waiver of Premiums" which the Court mentions in f.n. 9 on page 13 of the Opinion. The clear and unambiguous language of the Policy on page 4 limits "Waiver of Premium" to periods of "Total Disability" and no provision in the "Residual Disability Rider" provides for nor adopts the "Waiver of Premium" as a benefit provided for Residual Disability claims. Thus the claim

---

[11] First the Court recognized that Kearney had been paid all of the benefits due under the policy and that the benefits continue to be paid. *Id.* at pages 4-5.

Second, the Court recognized that the additional benefits were also still being paid during the pendency of the suit. *Id.* at page 5.

Third, The Court held that the language of the additional benefits provisions is "clear and unambiguous. *Id* at pages 8-9.

Fourth, the Court held that The interpretation urged by Kearney was not reasonable. *Id* at page 9.

Fifth, The Court held that it could not read an ambiguity into the policy language where no ambiguity existed. *Id* at page 10.

Finally, the Court held that under the clear and unambiguous language of the policy Kearney was not entitled to any of the additional benefits. *Id* at page 9.

cannot be legitimately be based on the "Waiver of Premium" argument that was abandoned back in 1993.

Counterclaim Defendants have been unable to find any case in any jurisdiction in which an overpayment by an insurer has ever been found to create a cause of action for breach of contract in the person who benefited from the erroneous overpayment. If such a claim would be created here, what would be the damages suffered by the insured? Further, what would be the rationale by which the insured, who had already received an overpayment of benefits by nearly ½ Million dollars, would be entitled to still more money than he has already received?

The purpose of continuing to press a breach of contract claim where none exists is Kearney's recognition that one cannot fully perform under a contract and do so in bad faith. He must continue the fictitious contract claim in order to attempt to support his other disingenuous claims.

**(b)    Kearney's claim for intentional infliction of emotional distress is legally insufficient.**

No fair reading of the facts before the Court could establish the intentional or reckless "extreme and outrageous conduct" going "beyond all possible bounds of decency" such as to be considered as "utterly intolerable in a civilized community" necessary for this claim to stand under Ohio law. *See*, *e.g.*, *Yeager v. Local Union 20, teamsters, Chauffeurs, Warehousemen and Helpers of America,* 453 N.E. 2d 666 (1993); *Scott v. Spearman*, 684 N.E. 2D 704 (Ohio App. 5th Dist. 1996).

While Kearney repeats the word "outrageous" as though it has talismanic effect, "saying it's so don't make it so." While Kearney may, in fact, believe such conduct to be outrageous, his subjective belief is not the test used by Ohio Court's in determining the

14

sufficiency of an intentional inflection claim. Rather, the test is objective and that of a "*reasonable man.*"  *Meyers v. Hot Bagels Factory, Inc.* 721 N.E. 2d 1068 (Ohio App. 1st Dist. 1999).

The testimony of Kearney's own treating physicians, however, makes clear that Kearney's perception of reality cannot be considered that of a "reasonable man." (Judd-McClure, Ph.D. dep. 39:20-40:8; 76:6-13; 89:11-23; 89:20-90:4); (Patel, M.D. dep. 29:6-17). In fact, Kearney was ordered to see Dr. Patel after his wife asserted charges of domestic violence against him. (Patel dep. 18:6-14). Another of his treating physicians, Dr. Lehenbauer, worked with Kearney on reducing his aggressive tendencies after Kearney "pummeled" an engineer he believe "back-stabbed" him in a business deal. (Lehenbauer dep. 37:7 – 38:2). It is clear that Kearney's definition of "uncivilized conduct" cannot be used by this Court as the test for legal sufficiency. While Kearney attempts to make much of Dr. Judd-McClure's "complaint letter" regarding DMS's claim handling, she admits that such a letter would have been generated in any situation where a claim investigation, *whether reasonable or not*, was causing her patient distress. (Judd-McClure dep. 116:8-15).

Kearney's lengthy argument on Robert Mills' purported "lie" as to the origin of a release Kearney was asked to sign in 2001 is, in equal parts, illogical and irrelevant. Kearney admits he consulted with his attorney before signing it. (Kearney 2007 dep. 91:9 – 93:20, and Exhibit "1" thereto) (Attached hereto as Exhibit "T"). Further, his explanation that he only signed it because he believed JP, rather than DMS, drafted it, makes no sense – either the release was offensive or it was not, regardless of the author. Kearney signed it, as he did numerous others, so that Counterclaim Defendants could proceed with the claim investigation it was entitled (and required) to do. *Id.* In fact, Counterclaim Defendants were so careful with Kearney's privacy

15

that they had him sign a separate release so that the independent medical examiner could speak with his brother and mother. (Kearney 2007 dep., Exhibit "2")(attached hereto as Exhibit "U") One notes that, although Kearney now rails against the requirement that he sign releases authorizing Counterclaim Defendants to proceed with their investigation, he has made no offer to return the benefits paid to him as a result of those investigations.

### (b) Kearney's remaining claims should be dismissed with prejudice.

Kearney's remaining claims for "civil conspiracy" and "invasion of privacy" also must fall. As set forth in the Motion, the former cause of action can only proceed if Kearney can show, *inter alia*, an "unlawful act independent of the conspiracy." *See, e.g., Cruz v. South Dayton Neurological Associates, Inc.* 700 N.E. 2d 675 (Ohio App. Second Dist. 1997). Here, Kearney cannot even establish a claim denial, let alone an "unlawful act." The cause of action for civil conspiracy was not created for cases such as this. His claim should be dismissed with prejudice.

Likewise, Kearney's 'invasion of privacy" cannot stand as he cannot establish the elements of that claim, which are:

1. Unwarranted appropriation or exploitation of one's personality;

2. The publicizing of one's private affairs with which the public has no legitimate concern; or

3. Wrongful intrusion into one's private activities…in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.

*Housh v. Peth*, 165 Ohio St. 35, 133 N.E. 2d 340 (1956); *see also Melton v. Board of County Commissioners of Hamilton County*, 267 F. Supp. 2d 859 (S.D. Ohio 2003); *Misseldine v. Corporate Investigative Services, Inc.* 2003 WL 21234928 (Ohio App. Eighth Dist. 2003) Kearney's Opposition Memorandum utterly fails to satisfy these elements and, once again,

Kearney's claim falls victim to the requirement that the requisite "mental suffering, shame or humiliation" be that of a "person of ordinary sensibilities," which Kearney is not.

Assuming *arguendo* any of his claims survive the Motion, those occurring prior to October 31, 1988 would be time-barred by the applicable statue of limitations. *See Bullet Trucking, Inc. v. Glen Falls Insurance Company*, 84 Ohio App. 3d 327, 616 N.E.2d 1123 (1992).

4.     **CONCLUSION**

This remains, as it always has been, a case in which an Insurer attempted to get a simple clarification from the Court as to the rights and liabilities of the parties as to a potential overpayment of benefits. The balance of the last 5 years has been spent attempting to battle Kearney's claims that the overpayment should continue and be enhanced by damages based upon the other fictitious claims that were raised as a tactic to influence the decision on the original Declaratory Judgment action.

Put simply, Kearney does not have standing to pursue a bad faith claim, as it is undisputed that he cannot show a "refusal to pay the claim" or a breach of contract, as required by Ohio law. Nor can he squeeze his case into the narrow exception to that rule by demonstrating such a significant delay in payment that it constitutes a claim denial. Assuming he can show the required denial, Kearney cannot show that it was "unreasonable," a term defined by recent case law as equating to an "arbitrary and capricious" standard.

Kearney's remaining claims fare no better. The breach of contract claim has already been decided by the Court adverse to Kearney. As to his tort claims, even when uttered in stentorian tones using emotion-laden verbs, the facts here do not support any claim for intentional infliction of emotional distress, civil conspiracy or invasion of privacy under Ohio law. In spite of the rhetoric, Kearney has yet to present any factual evidence to establish a material issue of fact that avoids Summary Judgment on any of his remaining claims.

Accordingly, Kearney's remaining counterclaims should be dismissed with prejudice and judgment entered in favor of Counterclaim Defendants.

                                        Respectfully submitted,

                                        /s William R. Ellis
                                        William R. Ellis (0012279)
                                        Wood & Lamping LLP
                                        600 Vine Street, Suite 2500
                                        Cincinnati, OH  45202-2491
                                        Telephone:    (513) 852-6000
                                        Telefax:         (513) 852-6087
                                        E-mail:  wrellis@woodlamping.com

OF COUNSEL:                        John E. Meagher (511099)
                                        SHUTTS & BOWEN LLP
                                        201 S. Biscayne Boulevard
                                        1500 Miami Center
                                        Miami, Florida  33131
                                        Telephone:  (305) 358-6300
                                        Telecopier: (305) 381-9982
                                        E-mail:        JMeagher@Shutts-law.com

                                        Attorneys for Plaintiff, Jefferson-Pilot Life
                                        Insurance Company and Cross-Claim Defendant,
                                        Disability Management Services, Inc.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been filed with the Court by electronic means on this 13th day of August, 2007. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ William R. Ellis

326590.1