**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Jefferson-Pilot Life Ins. Co..,

   Plaintiff,

  v.          Case No. 1:02cv479

Christopher L. Kearney,     Judge Michael R. Barrett

   Defendant.


## OPINION & ORDER

This matter is before the Court upon a Motion for Summary Judgment filed by Plaintiff and Counterclaim Defendant, Jefferson-Pilot Life Insurance Company (Jefferson-Pilot"), and Defendant Disability Management Services, Inc. ("DMS") ("Defendants").[1] (Doc. 157)

## I. BACKGROUND

Christopher Kearney purchased two disability insurance policies from Jefferson-Pilot. (Doc. 21, Ex. A, Aff. Kearney)  One policy was effective May 28, 1990 and the other policy was effective May 28, 1991.  (Doc. 1, Ex. A, B)  While the "Monthly Benefit" of each of the Policies differ, the language contained in each Policy is identical.  The Policies provide for the payment of monthly benefits in the event that an injury or sickness results in "Total Disability."  (Id. Ex. A)

---

[1] The Court notes that the docket sheet incorrectly designates DMS as a defendant in this matter. Defendant Christopher L. Kearney's initially and incorrectly referred to DMS as a Cross-claim Defendant in his First Amended Counterclaim.  (Doc. 13)  DMS has repeated this mistake.  (See Docs. 17, 157)  DMS was previously not a party, and therefore no cross-claims could have been brought against it.  Instead, DMS is properly designated as a third-party defendant.

In addition to purchasing the two disability policies, Kearney purchased three "Additional Benefit Provisions" which were listed on the Schedule Page as (1) Social Security Supplemental Benefit, (2) Residual Disability; and (3) Cost of Living Increase.

When Kearney initially applied for and received benefits in 1993, these benefits were for Total Disability. (Doc. 87, Tr. 67) Kearney received these Total Disability benefits for a period of four months. (Id.) Thereafter, Kearney applied for and received Residual Disability benefits. (Id.; Doc. 30, Ex. G) Under the "Limitations" section, the Policies provide that the Residual Disability benefit will not be paid for any period of time:

> (a) during which your Loss of Monthly Income is not at least 20% of your Prior Monthly Income.
> (b) that you are not under the care and attendance of a Doctor; or
> (c) that benefits are payable for Total Disability or loss of sight, speech, hearing, or use of two members.

> Jefferson-Pilot may require you to present reasonable proof of your Current Monthly Income and your Prior Monthly Income.

(Doc. 1, Exs. A, B)

At this time, there is no dispute that Kearney's medical condition entitles him to Residual Disability benefits. Kearney has periodically submitted to Defendants forms completed by his medical providers certifying that he is disabled. (Doc. 168, Ex. 1, Kearney Aff. ¶ 1) The Parties also agree that since 1993, Jefferson-Pilot has paid Kearney "Additional Benefits" under the Social Security Supplemental Benefit and the COLA provisions. Jefferson-Pilot maintains that these Additional Benefit payments were in error, and the error was continued by DMS, who began administering Kearney's claim in January of 2000 as a third-party administrator. (Doc. 164, Ex. 31) Jefferson-Pilot continued to pay

the Additional Benefits to Kearney under a reservation of rights.[2]

There also is no dispute that Kearney has continued to pay premiums to Jefferson-Pilot while receiving Residual Disability benefits.  The Residual Disability section of the Policies, which was added as an "Additional Benefit Provision," does not contain any language addressing the payment of premiums.  However, the Policies do contain a provision entitled "Waiver of Premium," which provides:

> If you become Totally Disabled for a continuous period of at least 3 months, Jefferson-Pilot will:
>
> (1)    waive premiums that come due during the disability; and
>
> (2)    refund any payments made for premiums due during the disability.
>
> Jefferson-Pilot will continue to waive premiums under this policy until you are no longer Totally Disabled or benefits are no longer payable, whichever is earlier. . . .

Citing this provision, Kearney questioned whether he was required to pay premiums on several occasions.  (Doc. 85, Shelton Depo. Ex. 23)  Jefferson-Pilot maintained that the Waiver of Premium provision only applied if benefits were being paid under the Total Disability portion of the Policy.  (Doc. 170, Ex. 18 at 2690; Doc. 164, Ex. 24)

In its Complaint, Jefferson-Pilot sought declaratory judgment confirming that Jefferson-Pilot owes no duty of coverage to Kearney under the "Additional Benefit Provisions."  Jefferson-Pilot did not seek repayment of the alleged "overpayments" paid before the reservation of rights.  Jefferson-Pilot calculates these overpayments to total $478,287.49.  (Doc. 157, Ex. A, Stephen P. Rice Aff.)

---

[2]The one exception being that Jefferson-Pilot did not pay the COLA increases which accrued during the pendency of this litigation.  However, following the Court's ruling on Jefferson-Pilot's declaratory action, Jefferson-Pilot paid the increases which it had withheld under a reservation of rights.

In ruling upon Jefferson-Pilot and Kearney's cross-motions for summary judgment, this Court found that language of the policy is clear and unambiguous. (Doc. 105) The Court explained that based upon a plain reading of the language, Kearney would not be entitled to the increases under the "Additional Benefit Provisions" because he was not entitled to Total Disability benefits. (Id.) However, this Court found that equitable estoppel was applicable, and therefore Jefferson-Pilot was estopped from denying coverage under the provisions.

Defendant Kearney has brought claims against Jefferson-Pilot and DMS for breach of contract, bad faith, conspiracy, intentional infliction of emotional distress, and invasion of privacy. The Parties agree that Ohio law applies to these claims. Jefferson-Pilot and DMS have now moved for summary judgment on Kearney's claims. Kearney maintains that the following chronology supports his claims:

**February 1994:** Jefferson-Pilot hired Equifax to conduct surveillance on Kearney. (Doc. 170, Ex. 18 at 2734-52) Equifax conducted three days of surveillance. (Id. at 2735)

**January 1995:** Jefferson-Pilot referred Kearney's claim to a Certified Public Accountant. (Id. at 2803)

**February 1995:** Jefferson-Pilot moved the administration of Kearney's claim to a supervisor. (Id. at 2799) Kearney claims that he received his first check belatedly. (Id. at 2804) Kearney also claims that Jefferson-Pilot misrepresented to him that his benefits would cease after twenty-four months, instead of continuing for a lifetime. (Id. at 2804) Jefferson-Pilot sought medical records from Kearney's treatment providers for an audit of his claim. (Id. at 2790, 2793)

**August 20, 1996:** Jefferson-Pilot requested from Kearney a copy of his personal and business income tax reports for an audit of his claim. (Id. at 2830)

**November 1996:** Jefferson-Pilot retained an accounting firm, Callaghan & Narwock, to assist them in analyzing the financial aspects of Kearney's claim. (Id. at 2815) Callaghan & Narwock wrote Kearney seeking tax forms, profit and loss statements, copies of billing, appointment calendars, cash receipts and disbursement journals,

and access to bank statements, check stubs, deposit slips, and cancelled checks. (Id. at 2815-16)  Jefferson-Pilot hired Equifax, as well as Psychiatric Disability Consultants, Inc. to investigate Kearney.  (Id. at 2821, 2863-70)

**July 8, 1997:**  Jefferson-Pilot sent Kearney's file along with two other files to DMS "to see what can be done either to settle these [claims] in an equitable manner to both the reinsurer and to Jefferson-Pilot or to give us further advice on where to proceed."  (Doc. 164, Ex. 12)

**September 18, 1997:** Harold Shelton, a manager for Jefferson-Pilot, sent a copy of Kearney's policy to Todd Ditmar at DMS in September 1997.   Shelton enclosed a copy of the Policy.  (Doc. 164, Ex. 13 at 2880)

**November 1997:**  Chelsey Ugolik, a consultant for Psychiatric Disability Consultants,[3] performed a review of Kearney's file, and reported her findings to Ditmar. (Doc. 170, Ex. 18 at 2866-871)  Ugolik then contacted Kearney's treatment providers.  (Id. at 2863-64)

**April 25, 1998:** Janet Beattie, a consultant for Psychiatric Disability Consultants, conducted a medical review of Kearney's claim, and reported her findings to Ditmar. (Id. at 572)  As part of the review, Kearney and his physician met with Beattie for 3.5 hours.  (Id.)

**November 1999:** Jefferson-Pilot hired International Claims Specialists to investigate Kearney's routine activities.  (Id. at 3006, 3008)  The investigator made an initial unannounced visit, but then made an appointment and met with Kearney a few days later.  (Id. at 3001)  The investigator spoke with the landlord for Kearney's office, as well as the owner of an adjacent business and an unidentified female outside his home.  (Id. at 3002)

**January 2000:** DMS requested all medical records to date from Kearney's five physicians.  (Id. at 3124-25)

**March 2000:** DMS hired CS Claims Group to conduct additional surveillance; obtain Kearney's prescription information from a pharmacy; find any claims Kearney may have filed with the Ohio Bureau of Workers Compensation; research divorce or civil records related to Kearney; and locate and contact a specific client of Kearney.  (Id. at 3105, 3111-12)  Later in the month, DMS hired CS Claims Group again to conduct surveillance on Kearney which would include a Friday and Saturday.  (Id. at 3095) CS Claims Group also searched public records for information on Kearney. (Id. at 3099)  In response to a request by DMS, Kearney submitted his 1999 tax returns.  (Id. at 3102)

---

[3]Psychiatric Disability Consultants is a subsidiary of DMS.  (Doc. 170, Ex. 18)

**April 2000:** DMS retained an accountant to perform a financial analysis. (Id. at 3084) Jefferson-Pilot also hired a clinical psychologist to review Kearney's medical records. (Id. at 79-81)

**June 2000:** DMS hired CS Claims Group to perform an additional three days of videotaped surveillance on Kearney. (Id. at 3070)

**October 2, 2000:** DMS sent a letter requesting that Kearney submit a list of information within thirty days, including personal tax returns for 1998 and 1999; a signed Description of Occupation form; copies of any and all agreements or contracts Kearney had in place with any principles, customers, or clients since 1991; names and address of the main contacts for these companies; a signed general authorization; backup documents for all expenses (cancelled checks, invoices, bank statements, etc.) noted on business tax returns from 1991 to present; a signed special authorization directing Kearney's treating physician to release all of Kearney's medical records to DMS; and monthly itemized revenues, expenses, and net income from January 1, 2000 to the present (including full back-up documentation for all expenses). (Doc. 164, Ex. 31 at 3053-55) The letter also informed Kearney that is was making a benefit payment "in the interest of good will," but the payment is issued with a full "reservation of rights." (Id.)

**November 2000:** Jefferson-Pilot sent a list of questions to the agent who processed Kearney's application for coverage. (Doc. 170, Ex. 18 at 3035-3036, 3041-42). On November 2, 2000, Jefferson-Pilot wrote a letter to Kearney making a second request for certain information not provided in response to the October 2, 2000 letter. (Id. at 3043-44) Jefferson-Pilot provided Kearney with an additional thirty days to provide the information. (Id. at 3043)

**December 2000:** Jefferson-Pilot wrote a letter to Kearney making a third request for the information requested in the October 2, 2000 letter. (Doc. 170, Ex. 18 at 3038) Jefferson-Pilot explained that it was continuing to pay benefits, but informed Kearney if the information was not received within the next thirty days, Jefferson-Pilot would be unable to evaluate Kearney's eligibility for further benefits. (Id.) DMS performed its own internal investigation to determine if his business closed in 1997. (Id. at 3019) On December 22, 2000, Kearny wrote a letter to DMS expressing concerns about the language in the new authorization DMS requested that he sign. (Ex. 31, at 3023)

**January 2001:** Jefferson-Pilot again hired CS Claims Group to conduct surveillance on Kearney. (Doc. 170, Ex. 18 at 1543-46, 3357, 3366-68). Jefferson-Pilot sent CS Claims Group a list of Kearney's former business associates with a script of eight

questions to pose to each. (Id. at 3367-68)[4] DMS also hired an investigation firm, NWI Investigative Group, Inc., to perform unannounced visits to Kearney's business contacts. (Id. at 3331-36, 3358) Jefferson-Pilot's in-house psychologist, Dr. Benander, reviewed Kearney's medical records. (Id. at 323-24, 3348) Dr. Benander recommended a two-part IME consisting of evaluations by both a psychiatrist and a neuropsychologist. (Id. at 3348) On January 24, 2001, DMS informed Kearney that without a signed authorization "if we are unable to obtain what we need because we don't have an Authorization from you, this will potentially result in further delay in our evaluation of your ongoing eligibility for benefits." (Doc. 164, Ex. 31 at 3321)

**January-August 2001:** DMS hired an accountant, Joseph Levy, to investigate Kearney. (Doc. 170, Ex. 18 at 3364) Levy requested that Kearney provide him with financial and business information, including all personal tax returns for the years 1988 through 2000, business tax returns for the years 1988 through 2000, monthly financial statements, general ledgers or accountant worksheets, books of original entry of all businesses, sales invoices and contracts, customer and client lists, monthly bank statements and cancelled checks, and payroll records. (Id. at 3328-30) Levy also obtained information on Kearney from the IRS and the Social Security Administration. (Id. at 3209-210) Kearney expressed his objection to the repeated requests for a "mountain" of records dating back to 1988 when he had already provided this information to DMS. (Id. at 3265) Kearney expressed concern about DMS keeping personal information confidential. (Id.)

**February 15, 2001:** Kearney spoke to Mills and recorded the call. (Doc. 164, Ex. 34) Mills advised Kearney that his check that should have been issued at the beginning of the month was being held because DMS was waiting for a signed authorization from Kearney. (Id.) Kearney pointed out that the authorization he signed for Jefferson-Pilot stated that it was good for the life of the claim. (Id.) As the call progressed, Mills invited Kearney to pursue a settlement. (Id.) On February 23, 2001, Kearney sent Mills a letter confirming the February 15th call and enclosed

---

[4]These questions were:

1. Have you ever conducted business with Mr. Christopher Kearney of Kearney Associates or Kenwood Technology Group, Inc.?
2. Did Mr. Kearney ever personally meet with you? How frequently?
3. During the course of your business dealings with Mr. Kearney, did he conduct business discussions with you over the telephone or did he meet personally with you?
4. What services/products were sold/offered to you or by Kearney Associates?
5. Do you still conduct business with Mr. Kearney through Kenwood Technology Group? If so, please explain in detail whether your business dealings with him have changed between working with Mr. Kearney at Kearney Associates vs. Kenwood Technology?
6. Please advice us of the years that you conducted business with Kearney Associates?
7. Please explain why you ceased doing business with Kearney Associates?
8. Please provide us with any copies of contracts that you had to do business with Kearney Associates.

the signed authorization. (Ex. 31)

**February-March 2001:** At Defendants' request, Kearney underwent Independent Medical Examinations by a psychiatrist and a neuropsychologist. (Doc. 170, Ex. 18 at 11-38, 152-324)

**February-June 2001:** DMS hired CS Claims Group to perform an updated personal profile inquiry using Kearney's social security number. (Ex. 18 at 1543) This consisted of a public records search and subsequent personal interviews based upon the records. (Id. at 1543-48, 1549-52) The interviewees included Kearney's former secretary and former business associates. (Id. at 1547-48)

**March 2001:** DMS performed an internal investigation regarding Kearney's businesses. (Id. at 3267, 3270-73)

**April 2001:** DMS performed an internal investigation regarding Kearney's businesses. (Id. at 3259, 3268-69)

**April-May 2001:** Dr. Jeff Green, Clinical Director of DMS and/or Psychiatric Disability Consultants, performed a review of Kearney's medical records. (Id. at 3260, 3221, 3242, 3257, 3248) Kearney complained to DMS that the psychiatrist who conducted an IME for DMS disclosed confidential results or interpretation of results with Kearney's brother. (Id. at 3262-63) A copy of that letter was forwarded to the psychiatrist. (Id. at 3260) The psychiatrist responded that he had informed both Kearney and his brother that the evaluation process is not confidential, and that he only revealed in general terms that there was information that he had from testing which was inconsistent with statements that Kearney's brother was making about Kearney's personality. (Id. at 3248)

**April-June 2001:** As a follow up to its previous report, CS Claims Group reviewed the depositions filed in civil cases related to Kearney, and also contacted an attorney in one of the matters. (Id. at 1547-52) DMS retained a rehabilitation consulting firm, Baker & Baris, to coordinate a comprehensive vocational evaluation. (Id. at 3237) Baker & Baris referred Kearney to a rehabilitation counselor for a interview. (Id. at 3236) The rehabilitation counselor was instructed to contact any prior employees or current subcontractors for additional input on Kearney's occupational functioning. (Id. at 3237)

**July 7, 2001:** Kearney's treating psychologist wrote a letter to DMS stating that Defendants' "harassment and intimidation, including misleading and false statements, has been constant the past few years. It has been so severe that my client has had a major setback in his business and personal relationships to such a degree that I have been very concerned about his mental health and his ability to live through this extreme conduct on the part of the insurance company. His severe emotional distress is the result of your malicious conduct." (Doc. 164, Ex. 31 at 620)

**July 13, 2001:** DMS wrote a letter advising Kearney that it "was not questioning whether or not you have a medical condition for which you are receiving treatment," but under the Residual Disability benefit provision, Kearney's disability must be the cause of his income decrease.  (Id. at 3632)  DMS explained that since the documentation its has "is just not conclusive," DMS must continue to investigate Kearney's claim.  (Id. at 3634)  DMS also offers that "it occurs to us that exploring a compromise settlement of this claim might be in the best interest of both parties."  (Id.)

**October 2001:**  William Hughes and Mills traveled to Miami, Florida to meet with Kearney's lawyer, John Spiegel, and present a settlement offer to Kearney. Jefferson-Pilot offered to pay Kearney $280,000 in exchange for Kearney's return of the Policies.  (Doc. 164, Ex. 13)

**March 11, 2002:** DMS wrote to Kearney seeking information previously requested. (Id., Ex. 31 at 3689)  DMS stated that "[w]e remain interested in resolving our differences with you and had discussed an offer with Mr. Speigel towards reaching a settlement in this matter."  (Id.)

**April 25, 2002:**  Jefferson-Pilot made a request for updated tax information.  (Id. at 3414-15)

## II.    ANALYSIS

### A.    Motion for Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the

evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252. However, it is important to note that the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-480 (6th Cir. 1989).

**B.    Statute of Limitations**

Defendants argue that the four-year statute of limitations found in Ohio Revised Code § 2305.09 applies to Kearney's tort claims. Kearney filed his original counterclaim on October 31, 2002, and included claims for bad faith and intentional infliction of emotional distress. On April 16, 2003, Kearney filed an amended counterclaim which added claims for conspiracy and invasion of privacy.

Federal Rule of Civil Procedure 15(c)(2) provides that: "An amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." A party will be permitted to add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence. *Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000); *see also Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973) ("where the parties are the same, . . . an amendment which adds another claim arising out of the same transaction or occurrence does relate back to the date of the original complaint."). Because Kearney's claims for conspiracy and invasion of privacy arise out of the same conduct set forth in his original counterclaim, for purposes of the statute of limitations, all Kearney's claims are to be treated as if they were filed on October 31, 2002.

Kearney argues that he is not limited to relying upon events occurring four years

before this date because Defendant engaged in continuous tortious conduct.

The statute of limitations does not usually begin to run until a tort is complete. *Craver v. Doogan*, 2006 WL 902420, *2 (Ohio Ct. App. 2006) (unreported), *citing* Restatement of the Law 2d, Torts (1979), Section 899, Comment c.  In the instance of a continuing act, there is constant, new damage until the conduct stops.  *Id.*, *citing Boll v. Griffith*, 535 N.E.2d 1375, 1377 (Ohio Ct. App. 1987) (statute of limitations not a bar to action of continuing trespass when constant weight of removed debris allegedly weakened party wall between adjoining landowners); *see also West 11th Street Limited Partnership v. City of Cleveland*, 2001 WL 112121, *10 (Ohio Ct. App. 2001) (unpublished) ("As it has been applied in this state, the continuing trespass/tort doctrine allows an injured party to recover for a continuous and repetitious, injurious wrong where damages flow from the act as a whole, rather than from each individual injurious act, and where at least one of those acts occurred within the limitation period.").  The Court finds that the acts of Defendants were continuous, and the continuing tort doctrine is applicable.  Therefore, Kearney's tort claims are not barred by the statute of limitations.

## C. Breach of Contract

In Ohio, a breach of contract claim consists of the following material elements: (1) the existence of a binding contract or agreement; (2) the non-breaching party fulfilled its contractual obligations; (3) the breaching party failed to fulfill its contractual obligations without legal excuse; and (4) the non-breaching party suffered damages as a result of the breach.  *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio Ct.App. 1996).  The Parties' arguments are centered upon what their respective contractual obligations were under the Policies.

Kearney argues that Jefferson-Pilot has breached the Policies by not waiving the payment of premium. Kearney explains that the Residual Disability Rider, when purchased, "becomes a part of the section of the policy called 'Benefit Provisions.'" Kearney argues that since he is receiving the equivalent of the Total Disability benefit, the waiver of premium benefit in that section applies to his Residual Disability claim. Kearney argues that this interpretation is consistent with the proposal sold Kearney. Defendants argue the clear and unambiguous language of the Policy limits "Waiver of Premium" to periods of "Total Disability;" and because Kearney is under a "Residual Disability," the "Waiver of Premium" provision is not applicable.

If a contract's terms are unambiguous, a court may not interpret the contract in a manner inconsistent with those terms. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978). Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation. *U.S. Fid. & Guar. v. Aultman St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio 1999).

The Court finds that the contract terms at issue are unambiguous. The Policies themselves provide that the "Waiver of Premium" provision applies "[i]f you become Totally Disabled for a continuous period of at least 3 months." Under the Policies, "Total Disability" means "that you are unable to perform the duties of your occupation." Kearney does not contend that he falls within this definition. Therefore, the "Waiver of Premium" provision does not apply to him. Also, the proposal which was presented to Kearney clearly states that the proposal "is not a policy or insurance contract." Therefore, Jefferson-Pilot is not

bound by any of the terms found within the proposal.[5] Since Jefferson-Pilot was not contractually obligated to waive his payment of premiums, there can be no breach of contract based upon this provision. Accordingly, Defendants are entitled to summary judgment on this claim.

### D.    Bad Faith

The relationship between an insurer and its insured creates a duty on the part of an insurer to act in good faith in the handling and payment of the claims of its insured. *Hoskins v. Aetna Life Ins. Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983). "[A]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 400 (Ohio 1994). To prevail on a claim of bad faith, the insured "must prove that the insurer's refusal to pay a claim was totally arbitrary and capricious." *Spremulli's Am. Serv. v. Cincinnati Ins. Co.*, 632 N.E.2d 599, 602 (Ohio Ct. App. 1992).

Defendants argue that there can be no bad faith claim where there has not been a refusal to pay. Defendants point out that Jefferson-Pilot has never denied Kearney's claims or refused to pay benefits. Kearney counters that Jefferson-Pilot denied benefits when (1) it refused to waive the payment of premiums; (2) paid "Additional Benefits" under a reservation of rights and failed to increase payments under the Cost of Living Increase provision; and (3) it delayed or made late payments.

---

[5]The Court notes incidentally that the language contained in the proposal regarding the waiver of premiums tracks the language found in the Policies: "After 90 days of continuous total disability Jefferson-Pilot will waive any future premiums due as long as you receive benefits for total disability."

Based upon the Court's ruling on Kearney's breach of contract claim, Jefferson-Pilot's refusal to waive the payment of premiums cannot said to be arbitrary or capricious. Jefferson-Pilot was not obligated under the language of the Policies to waive the payment of premium, and therefore its refusal was reasonable. *Accord GRE Ins. Group v. International EPDM Rubber Roofing Systems, Inc.*, 1999 WL 253044, *5 (Ohio Ct. App. 1999) (unpublished) ("Obviously, if a reason for coverage denial is correct, it is *per se* reasonable.").

Next, Kearney testified in his deposition that his benefits were paid within a month or two of his calls and letters. (Doc. 171, Ex. B, Kearney Depo. at 33) The Court finds that this delay does not rise to the level of being arbitrary or capricious. Kearney has cited no caselaw to the contrary.

Finally, the Court finds that the payments made under a reservation of rights cannot form the basis of a bad faith claim. Finding no case on point in this Circuit, the Court relies upon the holding and rationale of the Eastern District of Pennsylvania in *Saldi v. Paul Revere Life*:

> Preliminarily, we note that the basic purpose of a reservation of rights suggests that it is not, in itself, grounds for a bad faith claim. A reservation of rights allows an insurer to make payments to an insured while maintaining the right to seek reimbursement if it later becomes clear that the insured was not entitled to the payments. *Mass. Cas. Ins. Co. v. Rossen*, 953 F.Supp. 311, 315 (C.D.Cal. 1996). "A reservation of rights protects an insurer from potential liability for bad faith if it were to withhold payments, and it also provides the insured with the use of the payments until the determination is made." *Id.* The reservation of rights, then, is itself a means of preventing a bad faith claim by the insured.

2006 WL 140585, *2 (E.D. Pa. 2006) (unpublished). However, as this Court noted in *Wightman v. Reassure America Life Ins. Co.*, No. 3:05cv204 (S.D. Ohio filed February 23,

2007) (unpublished),"while paying a claim with a 'reservation of rights' may not, in and of itself, reflect bad faith, it arguably could go to the issue of the handling of a claim."

Ohio courts have held that there can be a claim of bad faith absent a refusal to pay. An insurance company can exhibit bad faith in ways other than the denial of coverage. *Unklesbay v. Fenwick*, 855 N.E.2d 516, 520 (Ohio Ct. App. 2006). In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under the policy of insurance. *Id.*, *citing Hoskins*, 452 N.E.2d 1315, 1316. Those responsibilities include "the handling and payment of an insured's claim." *Id.*; *see also Mundy v. Roy*, 2006 WL 522380, *4 (Ohio Ct. App. 2006) (declining to interpret a "refusal to pay" as being synonymous with the outright denial of a claim where insurer refused to pay insured underinsured-motorist claim when it disputed his alleged damages, rejected his settlement demand, and compensated him only after a jury rendered a verdict against it).

Kearney argues that the value of his claim caused Jefferson-Pilot's "investigation" and interaction with him to go well beyond acceptable claim administration. Kearney argues that he provided Jefferson-Pilot with continuance of disability forms, limited authorizations, certified Attending Physician Statements, up-to-date medical records, tax returns, financial information, and information from his accountant, and that these documents, and perhaps an annual review of his tax returns are all of the information Jefferson-Pilot needed to reasonably satisfy itself that Kearney remained entitled to benefits. Kearney argues further that his claim should have been put on "auto pay" because Kearney's disability is established. Defendants argue that under the Policies, the determination of Residual Disability is to be made monthly.

A close reading of the Policies reveals that under the "Limitations" section, Jefferson-

Pilot "may require [the insured] to present reasonable proof of [his or her] Current Monthly Income and [his or her] Prior Monthly Income." Consequently, Jefferson-Pilot could seek reasonable proof regarding income each month. However, the Policies are silent as to the frequency Jefferson-Pilot will seek medical information related to the insured's medical condition. In terms of frequency, the record shows that Defendants performed surveillance on Kearney approximately seven times in the fourteen-years since Kearney first made a claim for benefits. Defendants requested medical records or contacted Kearney's medical providers approximately five times. Defendants requested tax information six times and business information four times.[6] Defendants or their agents conducted interviews of Kearney's business associates on three occasions. Kearney was required to attend two independent medical reviews, and one interview with a rehabilitation counselor. Based on these numbers, the Court concludes that the amount of attention paid by Defendants to Kearney's claim did not constitute an arbitrary and capricious handling of the claim. When viewed in light of a fourteen-year period, the frequency of surveillance, requests for information, and investigations was not unreasonable.

However, the Court finds that there is a genuine issue of material fact as to whether the extent of these investigations was reasonable or arbitrary and capricious. Defendants' investigations included information which appear to have no relationship or bearing on his medical condition or monthly income, such as documents from his divorce proceeding and his speeding and traffic tickets. Even after he submitted all requested medical records, Kearney and his medical provider were required to meet with a consultant for Psychiatric

---

[6]The Court notes that there are some instances of overlap in these requests.

Disability Consultants for 3.5 hours.  Investigators made unannounced visits to Kearney's business associates along with a list of questions which seek information unrelated to Kearney's monthly income.  DMS hired an accountant who requested records dating back to 1988, even though Kearney first applied for benefits in 1993.  A reasonable jury could find that this course of conduct indicates bad faith in Defendants' handling of Kearney's claim.  *Accord Spadafore v. Blue Shield*, 486 N.E.2d 1201, 1204 (Ohio Ct. App. 1985) (finding course of conduct which had continued over two and one-half-year period due solely to insurer's refusal to pay until admitting the claim in court raises issue for the jury whether insurer handled claim in bad faith); Roberts v. Personal Service Ins. Co.,  467 N.E.2d 257, 259 (Ohio Ct. App. 1983) (finding that while insurer's actions, considered separately, do not constitute "bad faith," insurer's course of conduct raised issue for jury as to whether insurer had acted in bad faith).

Accordingly, Defendants are not entitled to summary judgment on Kearney's claim of bad faith.

### E.    Intentional Infliction of Emotional Distress

Under Ohio law, " '[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.' " *Yeager v. Local Union 20*, 453 N.E.2d 666 (1983) (citing Restatement (Second) of Torts 77 § 46(1) (1965)).  As this Court recognized in *White v. Honda of America Mfg., Inc.*, 191 F.Supp.2d 933, 955 (S.D. Ohio 2002), both the Ohio Supreme Court in *Yeager* and the Sixth Circuit in *Polk v. Yellow Freight System*, 801 F.2d 190 (1986), have adopted the standard set forth in comment d to Section 46 of the Second Restatement of Torts for

determining whether the "extreme and outrageous" requirement has been met:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

As evidence of extreme and outrageous conduct, Kearney points to Defendants sharing of his medical condition with his family members and business associates and the surveillance Defendants conducted on he and his girlfriend while they ate in a restaurant, Kearney argues that this occurred when "there could not have been legitimate question on the claim."

There is evidence in the record that the actions of Defendants have caused Kearney emotional distress. However, a defendant's conduct must be judged by the objective standards of the community, not by a particular plaintiff's subjective sensibilities. *Ullmann v. Olwine, et al.*, 123 F.R.D. 237, 252 (S.D.Ohio 1987), *citing Reamsnyder v. Jaskolski*, 462 N.E.2d 392 (1984).

The Court finds that the surveillance of Kearney in public locations does not amount to extreme and outrageous conduct. *Accord York v. Gen. Elec. Co.*, 759 N.E.2d 865, 867 (Ohio Ct. App. 2001) (holding that public videotaping could not be construed as extreme and outrageous conduct). Next, the Court finds that there is no evidence in the record that Kearney's medical condition or information was revealed to his business associates. Finally, the Court finds that there is only one instance in the record where it appears that

information was relayed to a family member.  On that occasion, it appears that there was some discussion between Kearney's brother and the psychiatrist who conducted an independent medical examination about Kearney's personality, not necessarily his medical condition.  Moreover, Kearney signed a release which permitted the psychiatrist to speak to his brother.  (Doc. 171, Ex. U)  The Court does not find that this conduct reaches the level of extreme and outrageous conduct.

Therefore, the Court concludes that Defendants are entitled to summary judgment on Kearney's claim of intentional infliction of emotional distress.

F.    **Invasion of Privacy**

In order to state a cause of action for invasion of privacy under Ohio law, a plaintiff must establish that:

(a) the defendant has unreasonably intruded upon the plaintiff's seclusion,

(b) the defendant has appropriated the plaintiff's name or likeness,

(c) the defendant has unreasonably publicized the plaintiff's private life, or

(d) the defendant has unreasonably placed the plaintiffs in a false light before the public.

*Welling v. Weinfeld*, 866 N.E.2d 1051, 1059 (Ohio 2007) (adopting Restatement of the Law 2d, Torts, Section 652E for what constitutes invasion of privacy in Ohio).

Kearney argues that Jefferson-Pilot embarked on a strategic course to intrude into Kearney's private affairs and unnecessarily share details of his health with the public. Therefore, it appears that Kearney's claim is based upon the first and third branches.

The first branch, known as the "intrusion upon seclusion" branch of the tort, is shown when the following test is met: "One who intentionally intrudes, physically or otherwise,

upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be highly offensive to a reasonable person." *Sustin v. Fee*, 431 N.E.2d 992, 993-94 (Ohio 1982), *quoting* Restatement of the Law 2d, Torts (1977), section 652B.

Citing to *Housh v. Peth*, 133 N.E.2d 340 (Ohio 1956), Kearney argues that privacy can be unlawfully invaded based on a deliberate and systematic campaign of harassment. Kearney argues that Jefferson-Pilot's fourteen year campaign of deliberate and systemic harassment of Kearney is patent from the claim file and the correspondence exchanged and the great volume of investigations when the claim was not debatable. In *Housh*, the plaintiff brought a claim for invasion of privacy against a debt collector. 133 N.E.2d at 341. The Ohio Supreme Court explained that a creditor "has a right to take reasonable action to pursue his debtor and persuade payment although the steps taken may result to a certain degree in the invasion of the debtor's right of privacy." *Id.* at 344. The court concluded that "[s]uch action is not reasonable where a creditor or his representative initiates a campaign to harass and torment the debtor, telephones the debtor six or eight times every day at her home and place of employment-some of the calls as late as 11:45 p. m.-over a period of three weeks, telephones the debtor's superiors and informs them of the debt, and calls the debtor at her place of employment three times within a period of 15 minutes with a resultant threat of loss of employment." *Id.* at 341.

The Court finds that a reasonable jury could find that Defendants have intruded upon Kearney's seclusion. While the frequency of Defendants' investigation or contacts is not of the volume found in *Housh*, the Court finds that the intrusions could be equally invasive. In addition to the extensive personal and business information which Kearney voluntarily

submitted to Defendants, Defendants hired investigators to make unannounced visits to Kearney's home and place of business, investigators spoke with Kearney's landlord and neighbor, investigators stopped a woman outside his home, investigators obtained pharmacy information on Kearney, an independent medical examiner spoke to Kearney's brother about him, several representatives spoke to Kearney's treatment providers, investigators made unannounced visits to Kearney's business associates, and Defendants provided investigators with an extensive list of questions to ask Kearney's business associates.  The Court finds that these intentional intrusions upon Kearney's solitude and seclusion, as well as his private affairs and concerns create an issue for the jury.

The third branch, also called the "publicity tort" requires that:

(1) there must be publicity, *i.e.*, the disclosure must be of a public nature, not private; (2) the facts disclosed must be those concerning the private life of an individual, not his public life; (3) the matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities; (4) the publication must have been made intentionally, not negligently; and (5) the matter publicized must not be a legitimate concern to the public.

*Seta v. Reading Rock, Inc.*, 654 N.E.2d 1061, 1067 (Ohio Ct. App. 1995), *quoting Killilea v. Sears, Roebuck & Co.*, 499 N.E.2d 1291 (Ohio Ct. App. 1985).

"Publicity," as used in the first prong, means "communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' [as used in defamation cases and] meaning any communication by the defendant to a third person."  *Id.*, *citing Killilea*, 499 N.E.2d at 1294.  While there is no evidence that Defendants communicated any of Kearney's information to the public at large, it is clear from the record that a great number of people had access to his private information, including his medical condition,

social security number, home and business addresses, and financial information. The Court finds that there are genuine issues of material fact as to whether Kearney's private information was publicized.

Accordingly, the Court finds that Defendants are not entitled to summary judgment on Kearney's claim for invasion of privacy.

### G.    Conspiracy

In Ohio, civil conspiracy is "a malicious combination of two of more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995). An underlying unlawful act is required before a civil conspiracy claim can be successful. *Minarik v. Nagy*, 193 N.E.2d 280, 281-282 (Ohio Ct. App. 1963). To fulfill this requirement, Kearney points to Defendants' breach of contract, bad faith, invasion of privacy, and infliction of emotional distress. Given the Court's above rulings on Kearney's claims for breach of contract and infliction of emotional distress, the Court finds that these claims cannot support a claim for civil conspiracy. However, Kearney's claims for bad faith and invasion of privacy still remain, and therefore Defendants are not entitled to summary judgment on Kearney's claim for civil conspiracy.

### III.    CONCLUSION

Based on the foregoing, it is hereby **ORDERED** as follows:

1.    The Clerk is **DIRECTED** to designate Disability Management Services as a Third-Party Defendant.

2.    The Motion for Summary Judgment filed by Jefferson-Pilot and DMS (Doc. 157) is **GRANTED in PART and DENIED in PART**:

      a.    Kearney's claims for breach of contract and intentional infliction of

emotional distress are dismissed;

b.    Kearney's claims for bad faith, invasion of privacy and civil conspiracy remain pending.

**IT IS SO ORDERED.**

s/  Michael R. Barrett
Michael R. Barrett, Judge
United States District Court