UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


JEFFERSON-PILOT INSURANCE

COMPANY,

                Plaintiff,

vs.                              No. C-1-02-479

CHRISTOPHER L. KEARNEY,

                Defendant.


VIDEOTAPED DEPOSITION OF WILLIAM

DEMPSEY, a Witness, taken on behalf of the

Defendant before Mary Lynn Cushing, CSR, CCR No.

1077, pursuant to Notice on the 13th day of

June, 2007, at the Law Offices of Stinson,

Morrison, Hecker, LLP, 1201 Walnut Street, Suite

2900, Kansas City, Missouri, 64106.

## Page 2

APPEARANCES

Appearing for Jefferson-Pilot Insurance Company and Disability Management Services was Mr. John E. Meagher of Shutts & Bowen, LLP., 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida, 33131

Appearing telephonically for Jefferson-Pilot Insurance Company was Ms. Stephanie T. Farabow, 826 North Elm Street, Greensboro, North Carolina, 27401.

Appearing telephonically for Disability Management Services was Mr. Adam Formus, Legal Counsel, of Disability Management Services, 1391 Main Street, Suite 1600, Springfield, Massachusetts, 01103.

Appearing for William Dempsey was Mr. Bruce E. Baty of Stinson, Morrison, Hecker, LLP, 1201 Walnut Street, Suite 2900, Kansas City, Missouri.

Appearing for Christopher Kearney was Mr. Michael A. Roberts of Graydon, Head & Ritchey, LLP, 1900 Fifth Third Center, 511 Walnut Street, Cincinnati, Ohio, 45202.

## Page 3

Also present was Jeremy Martin, Videographer of Metropolitan Court Reporters, Inc., 9200 Indian Creek Parkway, Suite 205, Overland Park, Kansas, 66210.

INDEX CONTINUED:

WITNESS:                    PAGE:
WILLIAM DEMPSEY
    Examination by Mr. Roberts        6

EXHIBITS:                MARKED: IDENTIFIED:
| Exhibit | Marked | Identified |
|---|---|---|
| Dempsey Exhibit 1 | 42 | 61 |
| Dempsey Exhibit 2 | 42 | 42 |
| Dempsey Exhibit 3 | 61 | 81 |
| Dempsey Exhibit 4 | 61 | |
| Dempsey Exhibit 5 | 61 | 83 |
| Dempsey Exhibit 6 | 61 | 83 |
| Dempsey Exhibit 7 | 61 | 85 |
| Dempsey Exhibit 8 | 61 | 90 |
| Dempsey Exhibit 9 | 61 | 92 |
| Dempsey Exhibit 10 | 61 | 94 |
| Dempsey Exhibit 11 | 61 | 94 |
| Dempsey Exhibit 12 | 61 | 96 |
| Dempsey Exhibit 13 | 61 | 97 |
| Dempsey Exhibit 14 | 61 | 97 |
| Dempsey Exhibit 15 | 61 | 97 |

## Page 4

INDEX CONTINUED:        MARKED: IDENTIFIED:
| Exhibit | Marked | Identified |
|---|---|---|
| Dempsey Exhibit 16 | 61 | 97 |
| Dempsey Exhibit 17 | 61 | 99 |
| Dempsey Exhibit 18 | 61 | 99 |
| Dempsey Exhibit 19 | 61 | 100 |
| Dempsey Exhibit 20 | 61 | 100 |
| Dempsey Exhibit 22 | 61 | 101 |
| Dempsey Exhibit 23 | 61 | |
| Dempsey Exhibit 24 | 61 | 105 |

(Exhibits filed with the Original.)

## Page 5

(Deposition commenced at 12:00 PM.)

MR. MARTIN: This is the videotaped deposition of William Dempsey, Case No. C-1-02-479. Today's date is June 13th of 2007. The time is now 12:11 a.m. Central Standard Time. We are going on the record. Counsel, would you please state your appearances.

MR. MEAGHER: John Meagher representing Jefferson-Pilot and Disability Management Services.

MR. BATY: Bruce Baty representing the witness, Mr. Dempsey.

MR. ROBERTS: For the defendant Chris Kearney is Mike Roberts.

MR. MARTIN: Do you want the appearing by phone to announce?

MR. MEAGHER: Also appearing are Adam Formus of Disability Management Services and Stephanie Farabow of Jefferson-Pilot.

MR. MARTIN: Thank you. Would you please swear in the witness.

WILLIAM DEMPSEY, being first duly sworn, testified under oath as follows:

**2 (Pages 2 to 5)**

**Page 6**

1 EXAMINATION
2 BY MR. ROBERTS:
3   Q.  Good afternoon, sir, my name is Mike
4 Roberts. I'm a lawyer and I represent Chris
5 Kearney in a lawsuit pending in the State of
6 Ohio Federal Court there.
7      Could you please state your name and
8 address for the record, please?
9   **A.  William Edward Dempsey, D-E-M-P-S-E-Y.**
10   Q.  Mr. Dempsey, I understand that you have
11 a law degree?
12   **A.  Yes.**
13   Q.  Where did you go to law school?
14   **A.  Washburn Law school in Topeka, Kansas.**
15   Q.  What year did you graduate?
16   **A.  1990.**
17   Q.  As did I. Tell me your employment
18 history since 1990?
19   **A.  I worked for the Kansas Insurance**
20 **Department from 19 -- well, until 1993, until**
21 **September of 1993. And I went to work for a**
22 **company called US Physicians Mutual Risk**
23 **Retention Group in Kansas City in September of**
24 **1993 and was employed there until May of 1996.**
25 **In May of 1996 I accepted a position with Smith**

**Page 7**

1 **Staffing Services in Wichita, Kansas, and I**
2 **worked there until October of 2006, at which**
3 **time I accepted a position with Employers**
4 **Reinsurance Corporation in Overland Park,**
5 **Kansas, and I've been employed there since.**
6   Q.  Did you say Employers Reinsurance or
7 Employees Reassurance?
8   **A.  Employees Reinsurance.**
9   Q.  R-E-I.
10   **A.  R-e-i-n-s-u-r-a-n-c-e. The corporation**
11 **was purchased by Swiss Re, a good portion of the**
12 **corporation was purchased by Swiss Re. The sale**
13 **closed in late June of 2006 and the life and**
14 **health portion of the business became Employers**
15 **Reassurance Corporation.**
16   Q.  You're getting ahead of me a little
17 bit?
18   **A.  I apologize.**
19   Q.  I may have written this down
20 incorrectly. Did you say you were at Smith
21 Staffing from May of '96 to October of '96?
22   **A.  Correct.**
23   Q.  And then from October of '96 through
24 the present it's been Employers Reinsurance?
25   **A.  It was Reinsurance until the sale of**

**Page 8**

1 the company. And then it become ERAC, Employers
2 Reassurance Corporation.
3   Q.  Change one vowel?
4   **A.  Add one, yes. Instead of ERC it's**
5 **ERAC.**
6   Q.  Who did you report to when you started
7 at ERC?
8   **A.  Robert Lainner.**
9   Q.  Is Mr. Lainner a lawyer?
10   **A.  No.**
11   Q.  What was his position then?
12   **A.  Assistant Vice-President.**
13   Q.  Lainner is L-a-i-n-n-e-r?
14   **A.  Correct.**
15   Q.  And he was Assistant Vice-President at
16 ERC?
17   **A.  Correct.**
18   Q.  And did he remain your superior until
19 the transaction you described earlier with Swiss
20 Re?
21   **A.  He was my supervisor until**
22 **approximately two years ago and they had a**
23 **company reorganization. And so both Bob Lainner**
24 **and myself report to another person now. We're**
25 **on the same level. They flattened the**

**Page 9**

1 **organization so to speak. So instead of having**
2 **myself and several people report to Bob, we just**
3 **now report to a different individual.**
4   Q.  In the last two years who is it you
5 have been reporting to?
6   **A.  Tom Felgate.**
7   Q.  Can you spell that last name, please?
8   **A.  F-e-l-g-a-t-e.**
9   Q.  What is Mr. Felgate's position?
10   **A.  He is the head of the life and health**
11 **claims area for Employers Reassurance**
12 **Corporation.**
13   Q.  Is he also a Vice-President?
14   **A.  I don't know if he has that title.**
15   Q.  What is your title presently?
16   **A.  Claims counsel.**
17   Q.  What has your title been along the
18 progression from October of '96 through today?
19   **A.  The same.**
20   Q.  Did the company have a general counsel,
21 someone filling that title?
22   **A.  Yes.**
23   Q.  Who was that?
24   **A.  I can't remember the individual's name**
25 **when I first started there. And it's been**

**Page 10**

1    bracketed Dennison & Woods General Electric of
2    recent years. I take it back, John Conley was
3    general counsel with ERC when I began there. He
4    retired after I was there for five or six years
5    and I can't recall the name of the gentleman
6    that took -- I take it back again. Nick Spaeth,
7    S-p-a-e-t-h. And I'm not sure who succeeded
8    Mr. Spaeth in that position since then.
9        Q.  And then the next time your employer
10   had a general counsel would be with GE in the
11   past two years?
12       A.  Right. They recently retained an
13   individual by the name of Katherine Russell out
14   of our Indianapolis office to fill that position
15   for our new entity. We've not had a person in
16   that position since we've been ERAC, so they
17   just recently put that person in that position.
18       Q.  Let's go back to '96 to the timeframe
19   prior to the transaction between Swiss Re and
20   whoever else. Were you in the General Counsel
21   Office during that period or were you outside
22   that office?
23       A.  I was outside that office.
24       Q.  How many lawyers were in that office?
25       A.  I don't know.

**Page 11**

1        Q.  Why were you not in the General Counsel
2    Office during that '96 through 2004 period?
3        A.  I don't know.
4        Q.  Were there other lawyers like you who
5    were not inside the General Counsel Office at
6    ERC?
7        A.  Yes.
8        Q.  Was Mr. Newkirk a lawyer like you
9    outside the General Counsel Office?
10       A.  Yes.
11       Q.  Was he also a claims counsel?
12       A.  I believe David's title was Assistant
13   Vice-President at that time I came into the
14   organization.
15       Q.  But you didn't report to him?
16       A.  No.
17       Q.  Did you ever report to him?
18       A.  No.
19       Q.  Was there ever an occasion where he
20   reported to you?
21       A.  No.
22       Q.  Did you work on files with Mr. Newkirk?
23       A.  My job duties were similar to
24   Mr. Newkirk's. However, I guess I'm not certain
25   what you mean by work on files.

**Page 12**

1        Q.  You're mindful that this particular
2    litigation concerns a long term disability or
3    residual disability insurance policy?
4            MR. MEAGHER:  Objection to form.
5        A.  Yes.
6        Q.  (By Mr. Roberts)  Are those types of
7    policies the only types of insurance policies
8    that you have had responsibility for since '96?
9        A.  No.
10       Q.  What kind of insurance policies have
11   you had responsibility for since '96?
12       A.  Life insurance, critical illness, long
13   term care, group -- excuse me, group disability
14   and individual disability and occasionally some
15   medical claims.
16       Q.  So this fits within the individual
17   disability arena?
18       A.  Yes.
19       Q.  Were there other lawyers at ERC from
20   '96 to 2004 that also had responsibilities for
21   individual disability claims?
22       A.  Yes.
23       Q.  Who were they?
24       A.  David Newkirk.
25       Q.  Anyone else?

**Page 13**

1        A.  Not that I recall. Can I correct that?
2        Q.  Absolutely.
3        A.  I do recall one individual who had some
4    involvement with individual, but was primarily
5    focused on the group disability claims, a person
6    by the name of Dan Schlep, S-c-h-l-e-p. Also
7    had a limited amount of involvement with
8    individual disability.
9        Q.  Thank you. Have you ever given a
10   deposition before?
11       A.  Yes.
12       Q.  How many occasions?
13       A.  One.
14       Q.  Have you ever testified at a trial?
15       A.  Yes.
16       Q.  Was the deposition in an individual
17   disability case?
18       A.  It related to individual disability
19   cases, but it did not concern one specific
20   disability case.
21       Q.  What type of proceeding or action was
22   it?
23       A.  It was a contract action between
24   Employers Reassurance Corporation and one of the
25   companies that we do business with.

**4 (Pages 10 to 13)**

**Page 14**

1    Q.  Jefferson-Pilot?
2    A.  No.
3    Q.  What was the other company?
4    A.  Mass Mutual.
5    Q.  Was that proceeding here in Kansas?
6    A.  No.
7    Q.  Where was it?
8    A.  Western District of Missouri.
9    Q.  What year?
10   A.  Filed in 2006, February of 2006 I
11   believe.
12   Q.  It's gone to trial already?
13   A.  No, it's in discovery.
14   Q.  That's the case you gave your
15   deposition in?
16   A.  Yes.
17   Q.  What type of proceeding did you testify
18   at trial?
19   A.  A matter involving an insurance
20   receivership.
21   Q.  Is Employers Reinsurance Corporation a
22   plaintiff in the Western District of Missouri
23   case?
24   A.  Yes.  It -- actually, I take that back.
25   It may be Employers Reassurance Corporation,

**Page 15**

1    ERAC.  I'm getting confused by my own acronyms
2    here.  It's Employers Reassurance Corporation.
3    Q.  Does the action concern rights and
4    responsibilities between the insurer Mass Mutual
5    and the reinsurer ERC or ERAC?
6    A.  Yes.  It is a contract action.
7    Q.  Is General Electric the owner or is
8    ERAC a subsidiary of General Electric?
9    A.  Yes, ultimately.
10   Q.  How long has that been the case?
11   A.  I believe General Electric purchased
12   Employers Reinsurance Corporation in 1984 or
13   '85.  I don't know the exact date, but that's a
14   ballpark figure.
15   Q.  So throughout your tenure with ERC or
16   ERAC, it's been a subsidiary of GE?
17   A.  Correct.
18   Q.  And in 2004 a company affiliated with
19   Swiss Re purchased some of the business that had
20   been traditionally within ERC?
21   A.  Actually, I believe it is Swiss Re
22   themselves that made the purchase.
23   Q.  But that purchase did not concern
24   individual disability reinsurance?
25   A.  No, it did not.

**Page 16**

1    Q.  I asked you a negative question.  Do
2    you know what the reason for that was?
3    A.  The reason for what?
4    Q.  Why that was not part of the
5    transaction that particular block of business?
6    A.  I heard some reasons, but I don't know
7    that they are -- I wasn't involved in the
8    negotiations, so I can't tell you other than
9    hearsay.
10   Q.  You're mindful that Mr. Kearney's
11   insurer is Jefferson-Pilot, right?
12   A.  I'm aware that Mr. Kearney has a policy
13   issued by Jefferson-Pilot.
14   Q.  Can you describe for the jury what
15   ERC's now ERAC's relationship is with
16   Jefferson-Pilot as it would concern Mr. Kearney?
17   A.  There's a reinsurance agreement between
18   Jefferson-Pilot and ERC that provides that ERC
19   reimburses a percentage of loss on claims.
20   Q.  Across an entire spectrum of policies
21   that have been sold by Jefferson-Pilot?
22   A.  Within a timeframe.  I don't recall the
23   exact period that it was involved, but ERC has
24   reinsured the Jefferson-Pilot block since
25   sometime in the 1960's I believe.

**Page 17**

1    Q.  And I presume that in the 60's there
2    was some large agreement that lawyers helped
3    create and probably been modified or amended
4    coming forward to 2007?
5    A.  There's a reinsurance agreement between
6    the parties, yes.
7    Q.  The parties being ERC and
8    Jefferson-Pilot?
9    A.  Correct.
10   Q.  And under that agreement, does ERC,
11   subsidiary of General Electric, have 80 percent
12   of the obligation on claims like Mr. Kearney's
13   that have been made under the insurance policy?
14   A.  The reimbursement under the reinsurance
15   agreement varies according to the date of loss.
16   Q.  I saw some references in the documents
17   produced to me a week ago that it's 80 percent
18   or so in Mr. Kearney's case.  Is that correct as
19   far as you know?
20   A.  I don't know.
21   Q.  So depending on when Mr. Kearney
22   purchased his policy would direct how much, what
23   percentage of the obligation ERC would have
24   versus Jefferson-Pilot should he ever file a
25   claim, is that accurate?

**5 (Pages 14 to 17)**

1   A.  No.
2       Q.  Can you tell the Court or the jury how
3   this reinsurance agreement works when someone
4   like Mr. Kearney files a claim?
5       A.  It would be triggered by the date of
6   loss and the amount of the retention that
7   Jefferson-Pilot had on the claim at that point
8   in time.
9       Q.  Can you tell the jury what retention
10  means?
11      A.  Retention is the amount of the overall
12  risk that is kept by Jefferson-Pilot and the
13  balance is paid by Employers Reinsurance
14  Corporation.
15      Q.  Do you know what the retention was on
16  Mr. Kearney's claim?
17      A.  No, I don't.
18      Q.  Is that something that is dictated by
19  the reinsurance agreement based on his date of
20  loss?
21      A.  Correct.
22      Q.  Are you mindful Mr. Kearney is getting
23  paid benefits today and has been receiving
24  benefits for 14 years?
25      A.  I'm aware that Mr. Kearney is receiving

1   benefits and has been receiving them since
2   sometime in the 1990's. I'm not sure of the
3   exact date of loss.
4       Q.  Can you tell the jury what percentage
5   of those benefit payments are the responsibility
6   of ERAC today versus Jefferson-Pilot?
7       A.  No.
8       Q.  Why not?
9       A.  I don't know what the retention is on
10  his particular claim.
11      Q.  Sir, every month for several years
12  you've been involved in correspondence and
13  e-mails regarding Mr. Kearney's claim in this
14  litigation, correct?
15      A.  I've been involved in numerous e-mails
16  and correspondences over the course of time,
17  yes.
18      Q.  We can go through the privilege log.
19  You've been involved every month for years in
20  this claim, right?
21          MR. MEAGHER:  Objection, asked
22  and answered.
23      Q.  Correct?
24      A.  Yes.
25      Q.  (By Mr. Roberts) And your testimony in

1   front of the jury is that you don't know what
2   percentage of Mr. Kearney's claim is on your
3   company's nickel versus Jefferson-Pilot's
4   nickel?
5          MR. MEAGHER:  Objection, asked
6   and answered.
7       A.  That is correct.
8       Q.  (By Mr. Roberts) Is your company's
9   responsibility more or less than 50 percent?
10      A.  I believe it's more than that, more
11  than 50 percent?
12      Q.  Is it more or less than 75?
13      A.  I don't know.
14      Q.  Can you tell the jury what the word
15  ceded means?
16      A.  Ceded in the reinsurance context means
17  the amount of a given loss that an insurer, such
18  as Jefferson-Pilot, would cede to a reinsurer,
19  such as Employers Reinsurance Corporation,
20  meaning that a percentage of the loss is in
21  exchange for a percentage of the premium is paid
22  by the reinsurer.
23      Q.  So let's try to say that in a way that
24  I can understand. Are you saying that insurance
25  companies sell policies to Joe Smith. And in

1   that policy the insured, the individual says
2   "I'll pay you so much premium if you promise to
3   pay me so much of a benefit if I ever have a
4   claim."
5          And then what the insurance company
6   does is goes to a reinsurer like ERAC and says
7   "Hey, we have this block of policies that we
8   intend to sell or we have sold. It's going to
9   bring us X amount premium dollars a year. We
10  will give you so much percentage of that if you
11  agree to accept the risk when people file claims
12  under this block." Is that kind of an accurate
13  description of what's going on?
14      A.  In essence the reinsurer accepts part
15  of the risk in return for part of the premium.
16      Q.  So on this particular type of policy
17  that Mr. Kearney purchased from Jefferson-Pilot,
18  because of the type of policy it is during the
19  time period he purchased it, and the period he
20  filed a claim, ERC and now ERAC has had a
21  greater than 50 percent stake in the payment of
22  benefits to Mr. Kearney, is that correct?
23      A.  Can you restate that, please? I want
24  to make sure I understand exactly what you're
25  saying.

**6 (Pages 18 to 21)**

**Page 22**

1    Q.  Given the facts before us, the type of
2  policy Mr. Kearney purchased, the date he
3  purchased it, the particular riders he
4  purchased, the amounts of the claim, the date he
5  filed the loss, given all those things, because
6  of this agreement between this General Electric
7  subsidiary and Jefferson-Pilot, your company,
8  the General Electric subsidiary, has greater
9  than 50 percent of the responsibility to pay the
10  claim monetarily ultimately?
11    A.  Pursuant to the terms of the
12  reinsurance agreement, ERC has a percentage of
13  the loss, which to my recollection is greater
14  than 50 percent.
15    Q.  And since the time that Mr. Kearney
16  purchased his claim, your company, the General
17  Electric subsidiary, has been receiving a
18  percentage of the premium dollars that he's
19  paid, true?  Is that correct?
20    A.  I can only assume so.  I don't know
21  that for a fact.
22    Q.  So tell the jury what you do as claims
23  counsel for ERC?
24    A.  I work with the companies that we
25  reinsure.  I go out and look at the claims that

**Page 23**

1  are incurred on occasions.  Sometimes they are
2  sent to my office.  Just depends on the nature
3  of the reinsurance agreement.
4    Q.  I'm not sure I fully understood you.
5  Your responsibilities go beyond just the
6  individual disability insurance policies that
7  Jefferson-Pilot sold, correct?
8    A.  Correct.
9    Q.  Although that is within your
10  responsibility, you also cover these other types
11  of insurance, life, long term care, the others
12  you described to me?
13    A.  Correct.
14    Q.  But when a policyholder of a
15  Jefferson-Pilot policy files a claim, that would
16  come within your area of responsibility as the
17  reinsurer, is that right?
18    A.  No.
19    Q.  What about that question was not
20  correct?
21    A.  I don't have direct involvement with
22  the claim per se.  The claim was sent initially
23  to Jefferson-Pilot.  Subsequent to January of
24  2000, I believe the claims were sent to
25  Disability Management Services.

**Page 24**

1    Q.  I'm speaking generally.  I'm not
2  speaking about Mr. Kearney's policy
3  specifically.  I'm sorry if I confused you.
4       If John Doe, Jefferson-Pilot
5  policyholder, were to file a claim or had a
6  claim pending since '96, would that claim
7  necessarily be something that you would have
8  responsibility for here as the reinsurer?
9    A.  No.
10    Q.  Why not?
11    A.  It's not my job to adjudicate the
12  claims.
13    Q.  I didn't say adjudicate.  When would
14  you have any involvement in John Doe's
15  Jefferson-Pilot claim?
16    A.  In which context, with Jefferson-Pilot
17  or DMS?
18    Q.  Let's talk about the period prior to
19  2000.
20    A.  I would look at claims sometimes at the
21  request of Jefferson-Pilot.  Sometimes I would
22  visit Greensboro and we would look at a list of
23  claims.  We would pick out a random list of
24  claims to examine and that was the extent of my
25  involvement.  It would just be to review the

**Page 25**

1  contents of the claim file.
2    Q.  Your testimony to the jury is you would
3  from time to time go and perform somewhat of an
4  audit function in Greensboro of the
5  Jefferson-Pilot claims?
6    A.  A review would probably be a more apt
7  description of what we did.  We would review the
8  contents of the claim file.
9    Q.  Is your testimony that this review
10  would be entirely random, or would you go to
11  North Carolina from Kansas with the intention of
12  looking at specific claims that you would
13  identify?
14    A.  We would have identified claims ahead
15  of time for Jefferson-Pilot to have ready, to
16  have them pulled so that we wouldn't have to do
17  it when we got there.  So we would identify a
18  list of claims for them.
19    Q.  Did you randomly identify the claims or
20  were they claims that you specifically
21  identified for reasons?
22    A.  A combination.
23    Q.  Did you ever do that with regard to
24  Mr. Kearney's claim as far as you know?
25    A.  I don't recall if I ever examined

**7 (Pages 22 to 25)**

1  Mr. Kearney's claim in it's entirety. I can't
2  tell you that I did or did not. I honestly
3  don't recall.
4     Q.  So your involvement in the
5  Jefferson-Pilot insured claims would be either
6  at Jefferson-Pilot's invitation, or you might
7  identify a claim that's been pending that you
8  want to take a look at, or you could randomly
9  just go to Greensboro and do an audit of a
10  claim?
11     A.  I could randomly identify certain
12  claims and examine them when I got there, yes.
13     Q.  Did the situation ever exist where --
14  did Jefferson-Pilot have a duty to report to the
15  reinsurer new claims that were filed, amounts of
16  indemnity, what percentage ERC had to pay versus
17  what percentage JP had to pay?
18     A.  Jefferson-Pilot has an obligation under
19  the reinsurance agreement to place ERC on notice
20  of events likely to lead to liability. So you
21  can, I guess, interpret that to mean a lot of
22  different things. But that's essentially the
23  wording of the reinsurance agreement.
24     Q.  Do you understand that agreement then
25  to require JP to notify you when a claim is

1  filed by an insured under an individual
2  disability policy?
3     A.  I believe so.
4     Q.  And then is there some tracking system
5  at ERC to follow how that claim develops and how
6  it's adjudicated by Jefferson-Pilot at least
7  prior to 2000?
8     A.  No.
9     Q.  What do you do with that information
10  when you get the notice from Jefferson-Pilot?
11     A.  Those were primarily used for billing
12  purposes and to establish the appropriate
13  reserves.
14     Q.  Did ERC establish its own reserves
15  regardless of what Jefferson-Pilot may have
16  reserved?
17     A.  I believe we use the information from
18  the insurer to establish the reserve. And I
19  think we may have also had formulas based on
20  experience that we applied in addition to
21  strengthen reserves.
22     Q.  So did -- the situation where ERC
23  maintained its own reserve on a claim and
24  Jefferson-Pilot maintained its own reserve?
25     A.  Both companies maintain their own

1  records, but I'm not a pricing or reserving
2  actuary, so I can't really address that.
3     Q.  I'm not asking you to opine for me.
4  Just based on your knowledge, did ERC maintain a
5  reserve for its portion of the liability on a
6  claim and Jefferson-Pilot maintain its own
7  reserve for its portion of the liability on a
8  claim?
9     A.  I believe Jefferson-Pilot maintains a
10  reserve and then takes a credit on their annual
11  statement for reinsurance agreements. ERC also
12  -- or ERC carries a reserve commensurate with
13  their liability on a block of business.
14     Q.  So once a claim is made, ERC, someone
15  outside of your department, presumably somebody
16  in the actuary department, makes some assessment
17  of what the reserve is that should be carried by
18  ERC, at least prior to 2000?
19     A.  That would be my understanding.
20     Q.  And then that person, John Doe's claim,
21  would be in some directory or log of the pending
22  claims on which reserves need to be maintained?
23     A.  I believe so.
24     Q.  In your capacity as claims counsel,
25  would you then use that information you had

1  internally at ERC to identify claims on which
2  you desired greater information from
3  Jefferson-Pilot?
4     A.  That -- a reserve is a factor we would
5  consider among other factors, but it was not a
6  determinant in and of itself.
7     Q.  Thank you for your answer. Actually
8  that wasn't my question. But once a claim is
9  reported to ERC, there is some monitoring of
10  that or reflection of that in ERC's own business
11  records, right?
12        MR. MEAGHER: Objection to form.
13     A.  I'm not sure what you mean by
14  monitoring. I mean the numbers are what they
15  are. They're formulated. They are derived from
16  the Commissioners of Insurance Disability
17  Tables, and so they are what they are. They are
18  not something that are subject to change by an
19  individual on any basis. You just plug the data
20  in and the reserve is what it is.
21     Q.  (By Mr. Roberts) That wasn't my
22  question. My question was if, say, in '96 there
23  were 273 claims pending at Jefferson-Pilot on
24  which the subsidiary of General Electric had
25  reinsurance obligations, would all 273 of those

**8 (Pages 26 to 29)**

**Page 30**

1   names appear in some business record of ERC?
2          MR. MEAGHER: Objection to form.
3   **A. Yes.**
4   Q. (By Mr. Roberts) Would all of the
5   claim files associated with those hypothetical
6   273 claimants been housed at ERC?
7   **A. We don't typically have claim files on**
8   **individual claims at ERC.**
9   Q. Well, in this lawsuit I served a
10  subpoena and last week there was over, I think
11  3600 pages of information produced by your
12  company regarding Mr. Kearney. Do you have that
13  volume of information regarding claimants on
14  which you reinsure?
15         MR. MEAGHER: Objection to the
16  form. You may answer.
17  **A. It would probably depend on the claim.**
18  **I suspect the reason there were 3600 pages as**
19  **you state with respect to this claim is because**
20  **it's in litigation.**
21  Q. (By Mr. Roberts) You said that you
22  might go out and look at a claim. And under
23  some agreement with your company's clients, you
24  send -- this is sent to the office depending on
25  reinsurance agreements. What did you mean by

**Page 31**

1   that?
2   **A. On some reinsurance agreements**
3   **particularly where a company is engaging in a**
4   **line of business that they are not perhaps**
5   **accustom to marketing such as critical illness,**
6   **ERC would have the right to review the claim**
7   **before a decision is made in that matter.**
8   Q. What did you mean by it's sent to this
9   office depending on the reinsurance agreement.
10  The entire claim file gets sent to ERC or ERAC?
11  **A. The information that the insurer has**
12  **gathered with respect to the claim would be**
13  **forwarded to our offices for review.**
14  Q. Did that happen in Mr. Kearney's case?
15  **A. No.**
16  Q. Where did you go to college, sir?
17  **A. I graduated from Fort Hays State**
18  **University.**
19  Q. In addition to having this business
20  relationship with Jefferson-Pilot in 1996 or
21  1997, did your company have a business
22  relationship with Disability Management
23  Services?
24  **A. I believe so.**
25  Q. What do you understand that the nature

**Page 32**

1   of that relationship to be?
2   **A. I, as I understand it, they had a**
3   **consulting agreement with Disability Management**
4   **Services.**
5   Q. "They" meaning --
6   **A. ERC.**
7   Q. -- ERC. Is ERC and ERAC different
8   companies or just a name change?
9   **A. ERAC was a wholly-owned subsidiary of**
10  **ERC at one point in time for business reasons**
11  **and the way they compartmentalized the various**
12  **lines of business that they engaged in.**
13  Q. Okay. So ERC entered some kind of
14  consulting agreement with Disability Management
15  Services in about '96 or '97, is that right?
16  **A. I don't know when the agreement was**
17  **entered into, but it existed at the time I began**
18  **my employment.**
19  Q. And can you tell the jury what you
20  understand to be the main points of that
21  agreement?
22  **A. I only know that ERC had that**
23  **agreement. I really -- I don't -- I never**
24  **reviewed the document. I don't know anything**
25  **about it.**

**Page 33**

1   Q. As you understand the agreement just
2   the way it works without reading it, was it a
3   situation where ERC would select certain claims
4   for review by DMS whether they be
5   Jefferson-Pilot insureds or Mass Mutual insureds
6   or other clients of ERC?
7   **A. I don't know what the process was.**
8   Q. You do know that Mr. Kearney's claim
9   was selected for review by DMS pursuant to the
10  ERC consulting agreement entered about 1997,
11  right?
12         MR. MEAGHER: Objection to form.
13  **A. I know that DMS was involved. I don't**
14  **know how it -- Mr. Kearney's claim became**
15  **involved, or how DMS became involved with**
16  **Mr. Kearney's claim.**
17  Q. (By Mr. Roberts) Were you the point
18  person for JP with regard to Mr. Kearney's claim
19  in 1997 or was that Mr. Newkirk?
20  **A. I believe that was Mr. Newkirk.**
21  Q. Did there come a point where
22  Mr. Newkirk relinquished that responsibility to
23  you?
24  **A. Yes.**
25  Q. When was that?

**9 (Pages 30 to 33)**

Page 34

1    A.  I believe it was in 1998.
2    Q.  What precipitated that?
3    A.  I really don't know.
4    Q.  He just came into your office one day
5  and said "Here, I want you to have that client.
6  I don't want to deal with it anymore?"
7    A.  No.
8    Q.  Do you recall how it happened?
9    A.  I recall having the responsibility for
10  the Jefferson-Pilot account given to me sometime
11  in 1998.
12    Q.  What did you do in preparation for
13  today's deposition, sir?
14    A.  I spoke with counsel yesterday. That's
15  essentially it.
16    Q.  You're referring to?
17    A.  I'm referring to Mr. Baty and Mr.
18  Meagher.
19    Q.  You met with the two of them yesterday?
20    A.  That is correct.
21    Q.  For how long?
22    A.  Probably five hours including lunch.
23    Q.  Did anyone else participate during the
24  course of that five-hour meeting with two
25  lawyers?

Page 35

1    A.  Yes.
2    Q.  Who else?
3    A.  Mr. Formus and Ms. Farabow and
4  Mr. Ellis for a very brief period of time, and
5  Mr. Cohen for a brief period of time.
6    Q.  So you're a lawyer and yesterday you
7  met with those six lawyers?
8    A.  That's correct.
9    Q.  Preparing for today's depo?
10    A.  That is correct.
11    Q.  And did you meet today with your
12  counsel in preparation for the deposition?
13    A.  I spoke with him briefly before we came
14  to this floor for the meeting. For the
15  deposition I should say.
16    Q.  Well, I arrived 75 minutes before the
17  deposition and my understanding was that you
18  were in conference at that point?
19        MR. MEAGHER: Objection. It
20  assumes facts not in evidence.
21    A.  That's not correct.
22    Q.  (By Mr. Roberts) How long were you in
23  conference today?
24    A.  Perhaps half an hour.
25    Q.  With whom were you in conference?

Page 36

1    A.  Mr. Meagher and Mr. Baty.
2    Q.  Did you review documents during the
3  course of yesterday's preparation with the six
4  lawyers?
5    A.  I reviewed a document.
6    Q.  Just one document?
7    A.  Just one document.
8    Q.  What was that?
9    A.  It was a piece of correspondence from
10  Valerie Loftin to Bob Bonzell.
11    Q.  Do you know if that was produced
12  pursuant to the subpoena or identified in the
13  privilege log?
14    A.  I believe it was both produced and
15  identified. I have not seen the privilege log,
16  so I don't know.
17    Q.  You believe it was produced to me and
18  then also identified in the privilege log?
19    A.  I believe it was produced in the course
20  of the documents that I provided to counsel.
21  And I believe it has been identified as a
22  privilege document. Again, I've not reviewed
23  the privilege log, so...
24    Q.  Mr. Bonzell's name doesn't appear in
25  the privilege log. Why don't we -- I'm going to

Page 37

1  give you the privilege log and we will mark it
2  as one. And then you take some time to review
3  it and we will go off the video record while
4  you're doing that. And it will give you a break
5  as well. Fair enough?
6    A.  Sure.
7        MR. MARTIN: Time is now 12:53.
8  And we're going off the record.
9        (Off the record)
10        MR. MARTIN: The time is now
11  1:09. We're back on the record.
12    Q.  (By Mr. Roberts) Mr. Dempsey, while we
13  were off the record you had an opportunity to
14  look at the privilege log as produced and then
15  chronologically created a privilege log trying
16  to identify this single document that you
17  reviewed during your multi-hour six-lawyer
18  preparation session yesterday.
19        I understand that it's a December of
20  2002 letter or correspondence between Valerie
21  Loftin and Bob Bonzell. Have you been able to
22  locate that document?
23        MR. MEAGHER: I object to the
24  form.
25    A.  No, I did not.

**10 (Pages 34 to 37)**

**Page 38**

1    Q.  (By Mr. Roberts)  Am I correct it is a
2  December 2002 memo or letter between those two
3  persons?
4    **A.  To my recollection that is correct.**
5    Q.  And how many pages is it?
6    **A.  I believe it was on two pages.**
7    Q.  Who was the author?
8    **A.  Valerie Loftin.**
9    Q.  She wrote a letter to Bob Bonzell?
10    **A.  Correct.**
11    Q.  Bob Bonzell, a non-lawyer, president of
12  DMS, correct?
13    **A.  Correct.**
14    Q.  And what is Valerie Loftin's position?
15    **A.  I'm not certain.  I believe she's the**
16  **head of claims for Jefferson-Pilot.**
17    Q.  Was she giving Bonzell legal advice?
18    **A.  I don't know.  I don't recall.**
19    Q.  Did you read the letter yesterday?
20    **A.  I only looked at one paragraph on it I**
21  **think is all I looked at.**
22    Q.  Was it your judgment that that
23  paragraph contained legal advice?
24    **A.  No.**
25    Q.  So that -- that single paragraph of a

**Page 39**

1  single document is the only document you
2  reviewed during your several hour preparation
3  session?
4    **A.  That's correct.**
5    Q.  Did you have a role in gathering
6  documents for complying with the subpoena, sir?
7    **A.  Yes.**
8    Q.  What was your role?
9    **A.  Identifying and making a CD to provide**
10  **to counsel.**
11    Q.  So you mailed a CD to Mr. Baty with the
12  documents that you were able to collect?
13    **A.  I believe a runner picked up the CD and**
14  **then I also produced the hard copy documents**
15  **that I had as well.**
16    Q.  So the items that are on the CD would
17  be e-mails and other electronically transmitted
18  communications?
19    **A.  Correct.**
20    Q.  Anyone else at ERAC partake in the
21  production of documents pursuant to the
22  subpoena?
23    **A.  Not to my knowledge.**
24    Q.  Where did you go to collect the
25  documents?

**Page 40**

1    **A.  The electronic documents or the hard**
2  **copy documents?**
3    Q.  Both.
4    **A.  The hard copy documents were located in**
5  **a lateral file immediately adjacent to my**
6  **office.  And the electronic documents are on my**
7  **computer.**
8    Q.  A lateral file, you mean a --
9    **A.  I mean a storage cabinet that is wider**
10  **than it is deep, if that makes sense to you.**
11  **It's just a storage file cabinet that's wider**
12  **than a traditional one.**
13    Q.  That's where you maintained these
14  Kearney paper documents that you received?
15    **A.  Yes.**
16    Q.  I'm sorry, did I ask you this; was
17  there anyone else that participated in the
18  production of documents at ERAC other than
19  yourself?
20    **A.  At ERAC no one else produced any**
21  **documents or did anything of that nature.**
22    Q.  That's because you would have been the
23  only one that would have had documents in your
24  possession?
25    **A.  At ERAC, yes.**

**Page 41**

1    Q.  Why do you keep saying at ERAC?  Are
2  you referring to potentially documents that --
3    **A.  I understand that a document was**
4  **produced by someone else.**
5    Q.  Did you see that document?
6    **A.  I have seen that document, yes.**
7    Q.  Was that document something that was in
8  your files as well?
9    **A.  I believe so.**
10    Q.  Do you know if that was produced to me
11  from you directly?
12    **A.  I believe so.  It was produced by me.**
13  **I believe it was in the materials that I had.**
14    Q.  You're referring to the document that
15  Attorney Zahnd provided to me, right?
16    **A.  I have an understanding of a document I**
17  **believe Attorney Zahnd produced and that is the**
18  **document I'm referring to, which is just very**
19  **short.**
20    Q.  I didn't come across this document in
21  the documents produced pursuant to the subpoena
22  from ERAC that I received last week.  But it's
23  your testimony you gave that document to your
24  counsel to produce to me?
25    **A.  I believe I did, yes.**

**11 (Pages 38 to 41)**

## Page 42

1    Q. Do you know why it was that this
2  document came to me through Mr. Zahnd?
3    **A. No.**
4    Q. Did you see the letter from Mr. Zahnd?
5    **A. No.**
6    Q. Does Mr. Newkirk still work with you?
7    **A. No.**
8    Q. He went with Swiss Re in that
9  transaction?
10   **A. Correct.**
11   Q. Are you mindful that it's Mr. Newkirk
12  that produced that document to me, in addition
13  to your belief that you produced it to me?
14   **A. I have an understanding of what I**
15  **believe was produced, but I have not seen**
16  **Mr. Zahnd's letter or the document that he**
17  **produced.**
18   **(Dempsey Exhibits 1 & 2 were**
19  **marked for identification by the reporter.)**
20   Q. (By Mr. Roberts) Exhibit 2, sir, is
21  the letter from Mr. Zahnd?
22   MR. MEAGHER: Do you have a copy?
23  If not, I will take a look at the witness'.
24   MR. ROBERTS: I have a copy for
25  you, sir.

## Page 43

1    MR. MEAGHER: All right. Thank
2  you.
3    Q. (By Mr. Roberts) Have you seen this
4  letter from Mr. Zahnd before?
5    **A. No.**
6    MR. MEAGHER: If I could take a
7  look at it before the questions, I would
8  appreciate it. Thank you so much.
9    Q. (By Mr. Roberts) Now that Mr. Meagher
10  has a copy --
11   MR. MEAGHER: If I could have a
12  moment to read it. It's multi page. By the
13  way, I don't think video was properly noticed
14  and we object to the use of video at trial. It
15  does require prior notice. Okay. I have
16  reviewed it. Thank you.
17   MR. ROBERTS: Are you sure you're
18  ready? You didn't take much time.
19   MR. MEAGHER: Pretty quick
20  reader.
21   Q. (By Mr. Roberts) Sir, according to
22  this letter from Mr. Zahnd dated May 4th, '07,
23  the document attached was a document that was in
24  Mr. Newkirk's possession at the time the
25  subpoena was served. Do you understand that or

## Page 44

1  is that your understanding?
2    **A. I understand that is your assertion.**
3    Q. It's not my assertion, it's what the
4  letter asserts.
5    **A. I haven't had time to complete reading**
6  **the letter, but...**
7    Q. Assume that I'm not misrepresenting --
8    **A. Certainly.**
9    Q. -- what the letter says, the attached
10  document was in Newkirk's possession and he's
11  producing it. Do you know why it would be that
12  Newkirk would still have this document?
13   **A. I have no idea.**
14   Q. Was this an electronically stored
15  document?
16   **A. I have no idea.**
17   Q. Well, you say you produced it. Is it
18  something that you stored electronically?
19   **A. No.**
20   Q. Are the numbers on here accurate?
21   **A. I have no idea.**
22   Q. Well, the document indicates, last page
23  of Exhibit 2, "Chris Kearney," it says "he has
24  two policies," gives the number and then it
25  identifies the ERC percentage.

## Page 45

1    **A. Okay.**
2    Q. And under one policy it says ".2750,
3  lifetime," what does that mean?
4    **A. I'm not sure in what context Mr.**
5  **Newkirk was putting this information down.**
6    Q. Well, being familiar with the ERC
7  business and policies and individual disability,
8  does that mean that the benefits are lifetime?
9    **A. The document indicates -- it states**
10  **twice lifetime.**
11   Q. Once for each policy?
12   **A. Well, it has the word "lifetime" under**
13  **each policy number.**
14   Q. And you don't want to go out on a limb
15  and speculate as to what lifetime might be in
16  this context?
17   MR. MEAGHER: Objection to form.
18   **A. Well, lifetime in the context of a**
19  **disability policy would mean that there is a**
20  **lifetime benefit period.**
21   Q. (By Mr. Roberts) The next says
22  "Benefit," and under the 029 policy it says
23  "67.1 percent," or actually it says .67.1
24  percent." And under the 069 policy it says a
25  "100 percent." Does that mean under one policy

**12 (Pages 42 to 45)**

**Page 46**

1  ERC has 67 percent of the responsibility and
2  under the other it's 100 percent?
3      A.  Well, it's under the heading of
4  Benefit, so it doesn't necessarily logically
5  follow, but you could make that -- you could
6  make that guess I suppose.
7      Q.  It says "The Reserves .317,171 under
8  one policy and 184,536 under the other.  Does
9  that mean the total reserve on the policies as
10  of whatever date this document was is a little
11  over 500,000?
12      A.  I have no idea.
13      Q.  Is this a form document at ERC, this
14  type of layout of information?
15      A.  Not to my knowledge.
16      Q.  Do you know why he would include the
17  jurisdiction?
18      A.  I have no idea.
19      Q.  That's a legal term that indicates
20  where lawsuits can be brought, right?
21          MR. MEAGHER:  Objection to form.
22      A.  Mr. Newkirk is a lawyer, so I can only
23  assume he had those type of characteristics in
24  mind, not necessarily to litigate, but -- I
25  don't know.  I would have to speculate as to why

**Page 47**

1  Mr. Newkirk put that on there.
2      Q.  (By Mr. Roberts)  That's what
3  jurisdiction means, right, where lawsuits can be
4  brought?
5          MR. MEAGHER:  Objection to form.
6      A.  I think jurisdiction is somewhat of a
7  generic term, but, yes, that would be my
8  understanding, that's where a lawsuit could be
9  brought.  It can mean a variety of things,
10  subject matter, personal, etcetera.
11      Q.  (By Mr. Roberts)  These list of seven
12  things kind of a To-Do list down at the bottom,
13  do you see that?
14      A.  I do.
15      Q.  Do you know who was directing that to
16  To-Do List?
17      A.  I'm not sure I understand what you mean
18  by directing.
19      Q.  Do you know if Mr. Newkirk was creating
20  that to To-Do List and directing that others
21  undertake those items?
22      A.  No, I don't know that.
23      Q.  At the bottom it says "Copied for DMS."
24  Do you know if he actually copied this document
25  and gave it to DMS?

**Page 48**

1      A.  No, I don't know.
2      Q.  You're mindful in the documents that
3  were produced to me last week there's everything
4  from the application filed back in 1990,
5  documents all from 1990 through even last month,
6  right, May of 2007?
7      A.  That's correct.
8      Q.  How is it that ERC came to possess
9  those documents?
10      A.  Which documents?
11      Q.  Well, the documents that predate 2000?
12      A.  ERC has the right under the reinsurance
13  agreement to copies of all the documents.  And I
14  can only speculate as to how they were produced
15  or who obtained them, but it would be pursuant
16  to that right under the reinsurance agreement.
17      Q.  Do you know when that happened?
18      A.  No.  It predated my employment at ERC.
19      Q.  So prior to your employment at ERC
20  there were documents regarding Kearney from the
21  '90 to '96 timeframe at ERC?
22      A.  Let me amend that somewhat.  Prior to
23  my involvement with the Jefferson-Pilot account
24  they were obtained.  Exactly when, I don't know,
25  but it was prior to my involvement.

**Page 49**

1      Q.  You came to be involved in '98?
2      A.  Correct.
3      Q.  And when you came to be involved there
4  was materials regarding Mr. Kearney and ERC's
5  files that predated '98?
6      A.  Correct.
7      Q.  Do you know how big the file was then?
8      A.  My recollection of the file at the time
9  I obtained it would be that it was probably less
10  than an inch thick.
11      Q.  What materials were in there?
12      A.  The materials I recall seeing in the
13  claim file were some claim forms and -- I really
14  don't recall anything specific above and beyond
15  just seeing continuance of disability forms in
16  the file.  Aside from that, I don't remember any
17  specific type or form of document.
18      Q.  You don't recall whether the policy was
19  in there?
20      A.  No, I don't.
21      Q.  Now ERC possesses the application file.
22  Do you know when it was that the application
23  file from 1990 was obtained by ERC?
24      A.  No, I don't.
25      Q.  You've been the person at ERC or ERAC

**Page 50**

1  responsible for this claim since '98, correct?
2     **A. Correct.**
3        MR. MEAGHER: Objection to form.
4     Q. (By Mr. Roberts) And you don't know
5  when it would have been that the application
6  file and all the other documents, the 3000 plus
7  documents were received?
8     **A. As for the application file, I did not**
9  **request it, so it had to have been a portion of**
10 **the file that I inherited. As for the other**
11 **3000 pages, as I stated earlier, I believe those**
12 **are largely pursuant to the litigation.**
13    Q. Well, there is certainly litigation
14 documents in there. There's pleadings, motions,
15 correspondence, deposition transcripts. But the
16 documents that predate the litigation, were
17 those things that came to ERC contemporaneous
18 with their date or were they things that came
19 after the litigation?
20       MR. BATY: Objection. Asked and
21 answered.
22       MR. MEAGHER: I join.
23    **A. To my knowledge anything aside -- I**
24 **won't say anything. The documents that you're**
25 **referring to would had to have been compiled by**

**Page 51**

1  **someone other than myself.**
2     Q. (By Mr. Roberts) The pre-litigation
3  documents?
4     **A. The pre-1998 documents.**
5     Q. Litigation was commenced by
6  Jefferson-Pilot in June of 2002. The documents
7  in the file that relate to the period '98
8  through 2002, are those things that came to you
9  prior to litigation?
10    **A. I would have to look at the documents.**
11 **I honestly don't know.**
12    Q. Do you recall how it is you came to
13 possess the volume, the thousands of pages?
14    **A. Once again, I believe the thousands of**
15 **pages are primarily attributable to the motions,**
16 **pleadings, correspondence, etcetera, that you**
17 **just laid out for us. The minority of the**
18 **documents were compiled prior to my involvement,**
19 **to my recollection and belief. I don't know**
20 **that I personally gathered documents. I would**
21 **have to look. If you have a specific document,**
22 **I would have to look at it.**
23    Q. So during the course of the litigation
24 is the case that you contemporaneously received
25 from somebody pleadings that are filed, e-mails,

**Page 52**

1  correspondence, deposition transcripts, medical
2  records?
3     **A. I'm sorry, was that a question?**
4     Q. Yes.
5     **A. Would you repeat it, please.**
6     Q. Is it the case that you receive
7  contemporaneously pleadings, correspondence,
8  deposition transcripts, medical records in the
9  litigation?
10    **A. I could receive any or all of those**
11 **documents in any given case. That is correct.**
12    Q. Why are you being copied on those
13 materials?
14    **A. You mean with respect to --**
15    Q. The litigation?
16    **A. I'm being copied on it because of ERC's**
17 **interest in the litigation and the fact that I'm**
18 **acting as an attorney for Employers Reassurance**
19 **Corporation.**
20    Q. Are you making decisions in the
21 litigation?
22    **A. I participate in discussions about**
23 **matters in the litigation. I have not made**
24 **decisions per se.**
25    Q. You weigh-in, give them your thoughts

**Page 53**

1  and opinions, comment about other peoples'
2  thoughts?
3     **A. Certainly.**
4     Q. And apples being apples, ERC has more
5  at stake in litigation than Jefferson-Pilot
6  does, correct?
7        MR. MEAGHER: Objection to form.
8     **A. ERC apparently has more than 50 percent**
9  **of the reinsurance liability on this claim.**
10    Q. (By Mr. Roberts) What does the term "
11 work product" mean? Are you familiar with that?
12    **A. I'm familiar with that term.**
13    Q. Can you tell the jury what it means?
14    **A. That would be documents or it could**
15 **encompass conversations that an attorney**
16 **produces with respect to their client and with**
17 **respect to litigation.**
18    Q. In anticipation of litigation?
19    **A. Certainly.**
20    Q. Isn't that the definition?
21       MR. MEAGHER: Objection to form.
22    **A. I will certainly agree with that.**
23    Q. (By Mr. Roberts) There was a lot of
24 documents that you maintained that were withheld
25 under the claim of work product, are you mindful

**14 (Pages 50 to 53)**

**Page 54**

1   of that?
2   **A.  Just from my brief review of your**
3   **privilege log, I saw work product identified.**
4   Q.  You didn't partake in designating
5   documents as work product or attorney/client
6   privilege?
7   **A.  No.**
8   Q.  You just produced everything you had to
9   your counsel and from there they decided what
10  would be referred to as work product or
11  attorney/client privilege?
12  **A.  That is correct.**
13  Q.  Your counsel, Mr. Baty, is with you
14  today.  Do you know if he participated in that
15  exercise with any other lawyers?
16         MR. MEAGHER:  I would object on
17  work product grounds as to what procedures and
18  methods were used to determine privilege claims.
19         MR. BATY:  Join in the objection.
20         MR. ROBERTS:  Are you instructing
21  him not to answer?
22         MR. BATY:  Yes, I'm going to
23  instruct him not to answer.  The only reason
24  that he would know that or understand that would
25  be in discussion with me, so I'm going to

**Page 55**

1   instruct you not to answer the question.
2   Q.  (By Mr. Roberts)  You know, sir, that
3   when a lawyer claims work product it's because a
4   document comments on or is in anticipation of
5   litigation, right?
6   **A.  Correct.**
7         MR. ROBERTS:  Can we have a
8   stipulation that all of the documents produced
9   to me are authentic?
10        MR. BATY:  Yes.  You and I had
11  that discussion earlier in connection with the
12  subpoena that you issued to the corporation
13  Employers Reassurance.  And I told you at the
14  time that Mr. Dempsey was the witness who could
15  testify to that.  And rather than go through the
16  documents that were actually produced to you, we
17  will stipulate as to the authenticity of the
18  documents.
19        MR. ROBERTS:  Mr. Meagher, you're
20  shaking your head up and down.  Are you --
21        MR. MEAGHER:  I have no reason to
22  disagree.  If the producing party says they are
23  authentic, I have no reason to object to that.
24  Q.  (By Mr. Roberts)  Now, as that file
25  produced to me exist, there's, I think we

**Page 56**

1   discussed the application file from 1990 on
2   Mr. Kearney is in there?
3   **A.  You indicated that earlier.**
4   Q.  You don't know that?
5   **A.  I don't recall that.**
6   Q.  Do you recall that the policy is in
7   there?
8   **A.  No, I don't recall that.**
9   Q.  Have you ever made an effort to look at
10  the policy?
11  **A.  I have looked at a specimen policy in**
12  **connection with Mr. Kearney's claim.**
13  Q.  When did you do that?
14  **A.  I have probably done that several**
15  **times.**
16  Q.  Prior to the litigation?
17  **A.  Yes.**
18  Q.  Prior to 2002?
19  **A.  Yes.**
20  Q.  Prior to 2001?
21  **A.  Certainly in 2001.  I don't know if**
22  **there was anytime prior to 2001, I don't recall,**
23  **but I know I did in 2001.**
24  Q.  Do you know there's medical records in
25  there, in the ERC file?

**Page 57**

1   **A.  I don't recall that.**
2   Q.  You don't recall there is medical
3   records in there?
4   **A.  No, I don't.**
5   Q.  There's information in there about
6   Mr. Kearney's other lawsuits with third parties.
7   Are you mindful of that?
8   **A.  I recall information about**
9   **Mr. Kearney's other lawsuits.  I don't recall it**
10  **was in that file, but I do recall that that**
11  **information has arisen in the course of the**
12  **adjudication of his claim.**
13  Q.  Are you mindful there is information in
14  there about his relationship with his wife?
15  **A.  I recall there being some information**
16  **about his wife of fairly recent note, but I**
17  **don't recall anything specific beyond that.**
18  Q.  You're mindful that there is
19  surveillance information in there including
20  photographs?
21  **A.  I have seen a photograph that I believe**
22  **was produced by you.**
23  Q.  Well, the privilege log makes reference
24  to several photographs that have been withheld
25  from me.  Are those things that are maintained

**15 (Pages 54 to 57)**

Page 58

1  in your file?
2     A.  I don't recall.
3     Q.  There is IME reports on Mr. Kearney in
4  your ERC or ERAC file, are you mindful of that?
5     A.  I do recall an IME report.
6     Q.  Pleadings including drafts of pleadings
7  that weren't filed, are you mindful of that?
8     A.  I recall pleadings.  I don't recall
9  drafts, but I do recall pleading.
10    Q.  It's been the case over the past
11 several years that drafts of pleadings or
12 motions or memoranda would be shared with you
13 before filing, correct?
14    A.  That's correct.
15    Q.  Drafts of correspondence to
16 Mr. Kearney's counsel has been shared with you
17 before they have been issued, correct?
18    A.  On some occasions.
19    Q.  Deposition transcripts have been
20 provided to you for your review, right?
21    A.  I have seen at least two or three
22 deposition transcripts.
23    Q.  Hearing transcripts, right?
24    A.  Hearing transcripts, yes, I believe
25 there have been a couple hearing transcripts.

Page 59

1     Q.  That are in your file?
2     A.  That were electronic documents I
3  maintained as opposed to being in a physical
4  file.
5     Q.  Electronic and physical are in your
6  file?
7     A.  I'm trying to explain, not
8  differentiate.
9     Q.  Mr. Kearney's tax returns are in your
10 file, business and personal?
11    A.  I recall seeing -- or I recall there
12 being tax information in the file.
13    Q.  Information regarding audits of
14 Mr. Kearney's financial condition is in your
15 file?
16    A.  I don't recall that.
17    Q.  Why do you have all that information?
18 You're not adjudicating the claim, are you?
19    A.  No, I'm not.
20    Q.  So why do you have all that
21 information?
22    A.  It helps me to analyze the claim.
23    Q.  And then you express your opinion to
24 the persons who are responsible for litigating
25 it, correct?

Page 60

1     A.  I express my opinions to the people
2  that are involved in adjudicating the claim as
3  well as litigating the claim.
4     Q.  Do you do that in all matters of your
5  insured, your clients insureds, that go to
6  litigation?
7     A.  Not all, but probably the majority of
8  all claims that go to litigation have a high
9  level of involvement by someone with Employers
10 Reassurance Corporation.
11    Q.  Because of the percentage of the
12 liability you carry?
13    A.  No.  Simply because it's in litigation
14 and it's something that we would be interested
15 in, but it's not a routine that's engaged in
16 every claim.
17    Q.  Did you review the privilege log before
18 it was issued to me?
19    A.  No.
20    Q.  Could you take a look at it now for me.
21    A.  Certainly.
22        MR. MEAGHER:  Do you have another
23 copy?
24    A.  Is there something in particular you
25 want me to look at or just to flip through?

Page 61

1     Q.  We are going to go through several
2  entries on there.
3     A.  Okay.
4        MR. MEAGHER:  If we're going to
5  go through several entries, why don't we have a
6  copy made of that.
7        MR. BATY:  Sure.
8        MR. ROBERTS:  Let's go off the
9  video record and off the record.
10       MR. MARTIN:  The time is now
11 1:40.  We are going off the record.
12       (Off the record)
13       (Dempsey Exhibit 3 through 24 was
14 marked for identification porter.)
15       MR. MARTIN:  The time is now
16 1:49.  We're back on the record.
17    Q.  (By Mr. Roberts)  Mr. Dempsey, do you
18 know who Arthur Huy, H-u-y?
19    A.  No, I do not.
20    Q.  J.L. Roberson?
21    A.  I am familiar with the name.
22    Q.  Did you hire Geraldine Johnson?
23    A.  I spoke with Geraldine Johnson about
24 this matter, but I don't believe she was
25 retained by myself or ERC per se.  We had some

**16 (Pages 58 to 61)**

**Page 62**

1  discussions with her.
2      Q.  Is Geraldine Johnson a lawyer that ERC
3  had used prior to Mr. Kearney?
4      A.  No.
5      Q.  So your testimony under oath is that
6  you're not the person and ERC wasn't the entity
7  that directed she be retained to file a lawsuit
8  against Mr. Kearney?
9      A.  I believe my recollection is that I
10  spoke with Ms. Johnson about Mr. Kearney's
11  claim.
12      Q.  Did you participate in the decision to
13  retain her to file a lawsuit against
14  Mr. Kearney?  Don't tell me what you told her or
15  what she said.  I just want to know if you
16  participated in the decision to retain her?
17      A.  I believe I indicated to
18  Jefferson-Pilot that we had spoken with
19  Geraldine Johnson and that she had reviewed the
20  contract, the policy.
21          MR. BATY:  His question was did
22  you participate.
23      A.  I don't recall.  I don't recall whether
24  that occurred or not.  I just don't recall the
25  exact mechanics of how that occurred.

**Page 63**

1      Q.  Whose Jane Neidermyer?
2      A.  Jane Neidermyer is an employee of now
3  Lincoln Financial formally Jefferson-Pilot.
4      Q.  You had interactions with her regarding
5  this claim?
6      A.  I don't recall that I did.
7      Q.  Do you know what her role was at
8  Jefferson-Pilot?
9      A.  She was the -- she was in charge of the
10  claims area at Jefferson-Pilot at that time.
11      Q.  Was she a lawyer as far as you know?
12      A.  Not to my knowledge.
13      Q.  Do you know who Lori Gallien is?
14  G-a-l-l-i-e-n.
15      A.  The name is vaguely familiar, but I
16  don't recall in what context.
17      Q.  Neidermyer is N-e-i-d-e-r-m-y-e-r.  Who
18  is Karen Gaum, G-a-u-m?
19      A.  I have no idea.
20      Q.  Have you spoken with Bill Hughes about
21  this matter?
22      A.  Not that I recall.
23      Q.  You cannot recall ever speaking to
24  Mr. Hughes about Chris Kearney?
25      A.  No, I don't.

**Page 64**

1      Q.  I asked you a negative question and you
2  gave me a negative response.
3      A.  I do not recall ever speaking with
4  Mr. Hughes about Chris Kearney's claim.
5      Q.  Thank you.  Who is Lisa Pluto?
6      A.  I have no idea.
7      Q.  Who is Pat Beardshaw?
8      A.  I don't know.
9      Q.  Diane Goodman?
10      A.  I don't know.
11      Q.  Sandie Cook?
12      A.  I don't know.
13      Q.  John Cohill?
14      A.  I don't know.
15      Q.  Cynthia Croft?
16      A.  Cynthia Croft is the head of claims at
17  the Lincoln Financial office in Concord, New
18  Hampshire.
19      Q.  Michelle Allen?
20      A.  I don't know -- I take that back.
21  Michelle Allen I believe is an employee of DMS.
22      Q.  Do you know what her role is?
23      A.  No.
24      Q.  Is she in a support role or does she
25  have some claims responsibility?

**Page 65**

1      A.  I don't know.  I recognize her name as
2  an employee of DMS.
3      Q.  Do you know who Dave Foster is?
4      A.  No, I do not.
5      Q.  John Zervas?
6      A.  I do not know John.
7      Q.  A lawyer.  Z-e-r-v-a-s.
8      A.  I do not know John to my knowledge.  I
9  don't recall the name.
10      Q.  Shared some correspondence with him
11  according to the privilege log in January of
12  '04?  It doesn't ring a bell?
13      A.  No, it doesn't.
14      Q.  Linda Bey, B-e-y?
15      A.  I believe Ms. Bey is a legal assistant
16  or paralegal at Disability Management Services.
17      Q.  How many lawyers have been involved in
18  prosecuting this claim against Mr. Kearney?
19          MR. MEAGHER:  Objection to form.
20      A.  I believe Geraldine Johnson until the
21  time of her death and Mr. Ellis and Mr. Meagher.
22      Q.  The privilege log shows a whole bunch
23  of other lawyers Peter Burrell, Randy McGaff,
24  Amy Gasser Callow, Adam Formus, Stephanie
25  Farabow, yourself, and the list goes on.  C.J.

**17 (Pages 62 to 65)**

Page 66

1  Schmidt?
2      A.  Well, I misinterpreted your sense of
3  the word "prosecuting this".  And so, yes, there
4  have been other lawyers involved such as those
5  you just identified.
6      Q.  You personally have interacted with
7  more than ten during the course of this
8  litigation, right?
9      A.  I don't know that for a fact.
10         MR. ROBERTS:  I guess we will
11  stipulate that the privilege log is authentic as
12  well, Exhibit 1, and an accurate representation
13  of the documents referred to?
14         MR. BATY:  Right.  He didn't see
15  it, but it was produced by counsel.
16         MR. ROBERTS:  Can we have that
17  stipulation?
18         MR. BATY:  Yes.
19         MR. MEAGHER:  The privilege logs
20  aren't evidence, so authenticity is not
21  appropriate, but it is what it is.
22      Q.  (By Mr. Roberts)  Does ERC have
23  responsibility for the legal expenses in the
24  lawsuit filed by Jefferson-Pilot against
25  Mr. Kearney?

Page 67

1      A.  ERC shares a percentage of the legal
2  expenses.
3      Q.  Commensurate with its liability on the
4  claim?
5      A.  Correct.
6      Q.  Who is Rick Strange -- or Stange,
7  S-t-a-n-g-e?
8      A.  I believe Mr. Stange is the head of
9  litigation for Jefferson-Pilot.  I don't know if
10  his role has changed since they were acquired by
11  Lincoln.
12      Q.  Lincoln Financial?
13      A.  Correct.
14      Q.  Who is Patricia Perez?
15      A.  Ms. Perez is my assistants.
16      Q.  Who is Kristin Knoll, K-n-o-l-l?
17      A.  I don't know.
18      Q.  An e-mail to me in the privilege log.
19  I won't tell anybody.  Scott Lancaster?
20      A.  I don't know Scott to my recollection.
21      Q.  Darlene Stanczak, S-t-a-n-c-z-a-k?
22      A.  I don't know.
23      Q.  C.J. Schmidt?
24      A.  I believe Mr. Schmidt is an attorney in
25  the law firm that Mr. Ellis and Ms. Callow are

Page 68

1  members of.
2      Q.  Peter Burrell?
3      A.  I believe Peter Burrell may be in that
4  same law firm.
5      Q.  Carl Semmler, S-e-m-m-l-e-r?
6      A.  Mr. Semmler is an attorney employed by
7  Lincoln Financial, a staff attorney, in-house
8  counsel.
9      Q.  Mark Davenport?
10      A.  Mark Davenport I believe was an actuary
11  employed at Jefferson-Pilot at that time.
12      Q.  Bill --
13      A.  I'm sorry, I'm misspeaking.  I believe
14  Mark Davenport is an attorney in Dallas, Texas.
15      Q.  He apparently was involved in the
16  Kearney claim at Document 1916 in February of
17  '06.  Does that ring a bell?
18      A.  No, it doesn't.
19      Q.  How about Bill Davenport?
20      A.  I don't know a Bill Davenport.
21      Q.  Steve Rice?
22      A.  Steve Rice is a CPA employed by DMS.
23      Q.  Andy Cohen?
24      A.  Andy Cohen is counsel for DMS.
25      Q.  Adam Formus?

Page 69

1      A.  Adam Formus is counsel for DMS.
2      Q.  Stephanie Farabow?
3      A.  Stephanie Farabow is in-house counsel
4  for Jefferson-Pilot now Lincoln Financial.
5      Q.  Carrie Barnes?
6      A.  I believe Ms. Barnes is a DMS employee.
7  I believe she's an attorney for DMS.
8      Q.  George Walker?
9      A.  I don't know.
10      Q.  Diane Goodman?  Did I mention her
11  before?
12      A.  The name is familiar.  I believe
13  Ms. Goodman may be a DMS employee, but I can't
14  state that with absolute certainty.
15      Q.  Andrew Lynn?
16      A.  I believe Mr. Lynn is an attorney at
17  DMS.
18      Q.  Norman Carrier?
19      A.  Mr. Carrier is a claim examiner
20  employed by Jefferson-Pilot now Lincoln
21  Financial in their Concord, New Hampshire
22  office.
23      Q.  What do you understand the status of
24  Mr. Kearney's non-litigation claim to be?
25      A.  I believe he's being paid.  Would it be

**18 (Pages 66 to 69)**

## Page 70

1 possible to take a break in a minute or two?
2 Q. That would be perfect. Did I ask you
3 who Andy Cohen is?
4 A. You did.
5 Q. Who is Maria Martinez?
6 A. I don't know.
7 Q. Scott West?
8 A. Scott West is in-house counsel for
9 ERAC.
10 Q. Is he someone that reports to you?
11 A. No.
12 Q. Is he your peer?
13 A. Essentially.
14 Q. Did he recently become involved in the
15 claim?
16 A. He's only been employed --
17 Q. Or litigation?
18 A. -- by ERAC for a couple of years, so
19 that would be true.
20 Q. Now would be a good time for a break?
21 A. Thank you.
22         MR. MARTIN: The time is now
23 2:11. We're going off the record.
24         (Recess)
25         MR. MARTIN: The time is now

## Page 71

1 2:15. We're back on the record.
2 Q. (By Mr. Roberts) Mr. Dempsey, let's
3 focus a little bit on the privilege log. Your
4 mindful of how this is laid out. There's
5 several columns and it's -- the references are
6 here numerically based on how documents were
7 numbered, do you understand that?
8 A. Under the Beginning Document column?
9 Q. Yes.
10 A. Yes.
11 Q. So if I ask you to turn to the
12 reference to Document No. 789, could you do
13 that?
14 A. Yes.
15 Q. Take a look at 789, 804, 800, 801, all
16 of those documents are dated February '94 and
17 have been withheld under the claim of work
18 product privilege, right?
19 A. That is what this document indicates,
20 yes.
21 Q. Meaning that the company was
22 anticipating litigation against Mr. Kearney back
23 in February of 1994 would be your conclusion,
24 right?
25         MR. MEAGHER: Objection to form.

## Page 72

1 A. Yes.
2 Q. (By Mr. Roberts) If you turn to 401.
3 A. Okay.
4 Q. That's a document from February of '95
5 from some unknown person to some unknown person
6 that's being withheld for what reason?
7 A. The privilege claimed is work product.
8 Q. In February of '95, correct?
9 A. Correct.
10 Q. If you turn to 718.
11 A. Okay.
12 Q. That's a document from the next month
13 March of '95 from an unknown author to an
14 unknown recipient also being withheld for what
15 reason is claimed?
16 A. Document 718 -- I'm sorry.
17 Q. Yes.
18 A. Yes. It's being withheld on the basis
19 of work product.
20 Q. If you turn to 1466 for me?
21 A. Okay.
22 Q. That document is dated November 14th of
23 1996, correct?
24 A. According to the privilege log, yes,
25 that's correct.

## Page 73

1 Q. By your predecessor with responsibility
2 for the claim here at ERC?
3 A. Mr. Newkirk, that's correct.
4 Q. Who was your predecessor responsible
5 for the Jefferson-Pilot block of business at
6 ERC?
7 A. That is correct.
8 Q. His responsibility was in the November
9 '96 timeframe, right?
10 A. That was his responsibility at that
11 time.
12 Q. You were a new-be at ERC at that time?
13 A. That is correct.
14 Q. And the subject of that particular
15 document being withheld is what? What's the
16 subject of that document?
17 A. It says it's a recommendation.
18 Q. And it's being held on the basis of
19 what?
20 A. Work product.
21 Q. And it's a transmittal from ERC to
22 Mr. Roberson at Jefferson-Pilot, is that your
23 understanding?
24 A. It's a transmittal from Mr. Newkirk at
25 ERC to Mr. Roberson at Jefferson-Pilot.

**19 (Pages 70 to 73)**

**Page 74**

1    Q. It's a memorandum?
2    **A. That is correct. It's described as a**
3    **memorandum. I don't have the document. I don't**
4    **know, but it's described as a memorandum.**
5    Q. Dated November of '96 being withheld.
6    This recommendation is being withheld on the
7    basis of work product, right?
8    **A. That is what the privilege log**
9    **indicates.**
10   Q. February '97 there's a document
11   numbered 0536?
12   **A. Okay.**
13   Q. Unknown author, unknown recipient,
14   subject is the Kearney claim and it too is being
15   withheld because it's a document in anticipation
16   of litigation or work product?
17   **A. That's what the privilege log**
18   **indicates.**
19   Q. When you produce documents, did you
20   make any effort to conclude -- strike that. A
21   minute ago I referred to a couple documents that
22   had unknown authors and unknown recipients?
23   **A. Yes, you did.**
24   Q. When you produce those documents, did
25   you make an effort to try to conclude who was

**Page 75**

1    the author and who was the recipient?
2    **A. No, I did not.**
3    Q. After you produced documents, did you
4    consult with your counsel about the creation of
5    a privilege log?
6    **A. No, I did not.**
7    Q. You just turned the documents over and
8    now you see a privilege log?
9    **A. That is correct.**
10   Q. Did I have you take a look at 508? I'm
11   sorry.
12   **A. I don't believe you did. I'm looking**
13   **at it.**
14   Q. September of '97, document still prior
15   to your involvement being withheld under the
16   privilege called work product, right?
17   **A. That is what the privilege log**
18   **indicates, yes.**
19   Q. Now if you can take a look at 001 to
20   005. This is a five page memorandum reportedly
21   created by you on the subject of, quote,
22   Additional claim file review" that was
23   transmitted to Harold Shelton, right?
24   **A. You're referring to document 001 of the**
25   **five you just mentioned?**

**Page 76**

1    Q. Document beginning date 001 and end doc
2    number 005, five page document.
3    **A. I see, I misunderstood. Yes.**
4    Q. There's a five page document that you
5    purportedly authored in March of '98 that
6    details your additional claim file review that
7    you gave to Jefferson-Pilot, is that right?
8    **A. That is what the privilege log**
9    **indicates, yes.**
10   Q. Are you mindful sitting here what
11   document is referenced there?
12   **A. I believe I am mindful, but I'm not**
13   **certain that it is, in fact, the document that I**
14   **think it could be.**
15   Q. Is it an accurate characterization of
16   the document to call it Additional Claim File
17   Review?
18   **A. If it's the document I'm thinking of,**
19   **it only pertains in part to Mr. Kearney. It was**
20   **not solely related to him. There was some other**
21   **claims involved if it's the document that I**
22   **believe it is.**
23   Q. We don't know for certain?
24   **A. No, I don't know for certain.**
25   Q. But you did do a claim file review on

**Page 77**

1    Mr. Kearney in or about March of '98?
2    **A. I cannot tell you that I reviewed**
3    **Mr. Kearney's entire claim file, but the**
4    **document -- if this is the document that I**
5    **believe it is, there are -- it's a result of the**
6    **review I did. So, you know, whether it was**
7    **review of documents that I had in my possession**
8    **or I actually reviewed the entirety of the claim**
9    **file at Jefferson-Pilot, I can't tell you.**
10   Q. The next document I want you to focus
11   on is 316?
12   **A. 360?**
13   Q. 316.
14   **A. All right.**
15   Q. This is a May of 1998 document being
16   withheld under two separate privileges,
17   attorney/client and work product, right?
18   **A. That's what the privilege log**
19   **indicates.**
20   Q. And the subject matter is claim
21   handling, right?
22   **A. That is correct.**
23   Q. And the author is Bill Ellis, who is
24   the lawyer now in the litigation against
25   Mr. Kearney, right?

**20 (Pages 74 to 77)**

**Page 78**

1   A.   That's what the privilege log
2   indicates.
3   Q.   And the recipient is David Newkirk?
4   A.   Again that's what the log indicates.
5   Q.   So more than four years prior to
6   actually filing a lawsuit against Mr. Kearney,
7   Mr. Ellis was involved in discussing claims
8   handling with ERC on Mr. Kearney's claim?
9   A.   I don't know.
10   Q.   That's what one would conclude from
11   this reference, right?
12        MR. MEAGHER:  Object to form.
13   A.   You can conclude that.
14   Q.   (By Mr. Roberts)  Is that a logical
15   conclusion?
16        MR. MEAGHER:  Same objection.
17   A.   You can conclude that from the fact
18   that it's on the privilege log.
19   Q.   (By Mr. Roberts)  Do you conclude that?
20   A.   Without examining the document I can't
21   tell you, but I would conclude that by virtue of
22   the fact it's on the privilege log.
23   Q.   How many files did you personally refer
24   to DMS under the consulting agreement?
25   A.   Under the consulting agreement I don't

**Page 79**

1   know.  I honestly don't know.
2   Q.   Are we talking hundreds?
3   A.   No.
4   Q.   Talking dozens?
5   A.   No.
6   Q.   I'm talking about just not
7   Jefferson-Pilot, all of the clients?
8   A.   Under the consulting agreement period,
9   I really don't know.  There certainly have not
10   been hundreds.
11   Q.   What drives you to use their services?
12   A.   DMS provides good customer service and
13   they --
14   Q.   To whom?
15   A.   To everyone involved.
16   Q.   The policyholder?
17   A.   The policyholder.
18   Q.   What makes you conclude that?
19   A.   Just based on my understanding of how
20   they conduct their business operations.
21   Q.   They provide you good customer service?
22   A.   ERC is satisfied with the service they
23   provide.
24   Q.   DMS has been a vendor for more than a
25   decade?

**Page 80**

1   A.   That is correct.
2   Q.   So what directs -- what compels Bill
3   Dempsey to send a file to DMS?
4   A.   When a company is overwhelmed by the
5   claims volume or when a company needs additional
6   resources to investigate a claim.
7   Q.   Then you turn to DMS?
8   A.   Not in every case.  Sometimes I
9   interact with the company.
10   Q.   What directs you to engage DMS?
11   A.   I would engage DMS.  At this point we
12   have DMS involved in blocks that they manage.  I
13   don't engage them on any other basis at this
14   point.  I discuss certain cases that pertain to
15   blocks that they manage.
16   Q.   So you haven't made a referral to DMS
17   under the consulting agreement for sometime?
18   A.   No.  Not for quite sometime, no, I have
19   not done that.
20   Q.   The consulting agreement is still in
21   place?
22   A.   I don't believe it is.
23   Q.   When it was in place, was it a rare
24   occurrence for you to direct a claim file to
25   DMS, or was it a common occurrence?  I'm

**Page 81**

1   referring to DMS under the consulting agreement.
2   A.   It would be rare.
3   Q.   Sir, I think we're coming near the end
4   here.  I have marked several documents as
5   Exhibits 3 through 24.
6   A.   Would you like me to return the
7   privilege log to the reporter?
8   Q.   That would be great.  I have marked as
9   Exhibit 3, it has a Bates number at the bottom
10   WDDP 000317?
11   A.   Correct.
12   Q.   Second page is -- the full number is
13   not there.  It's 33.  And then the copier cut it
14   off.  The third page is 342, do you see that?
15   A.   Yes, I do.
16   Q.   You're mindful that Bates number refers
17   to documents produced to me that were maintained
18   in your storage cabinet?
19   A.   Yes.
20   Q.   And you understand these to be the
21   applications, some of the applications, filed
22   documents dating back to 1990 on Mr. Kearney?
23   A.   I see there is a notation on
24   Document 317 that says "App file."  And based on
25   the title of Document 338, I would assume that

**21 (Pages 78 to 81)**

1  this was a report that was gathered in
2  conjunction with the application for insurance.
3  And I suspect Document 342 was in conjunction
4  with Document 338.
5      Q.  These are documents from your file,
6  right?
7      A.  By virtue of the fact that they were
8  produced, yes.
9      Q.  Exhibit 2, letter dated September 8,
10 1993.
11     A.  Just one second, Mr. Roberts.  I don't
12 know that I have Exhibit 2.  I go from three to
13 four.
14     Q.  Four.  Letter dated September 8, '93.
15     A.  Yes.  Document 813.
16     Q.  Exactly.
17     A.  Yes, I have that.
18     Q.  I think the handwriting on this
19 document is Roberson, but whether it is or it
20 isn't, does the handwriting on this document
21 make sense to you?
22     A.  No, not in this context it doesn't.
23     Q.  It seems to say, it appears "May should
24 be at the rate of 63 percent, June at 50
25 percent, July 100 percent."  Those numbers don't

1  mean anything to you?
2      A.  They have no significance to me.
3      Q.  Then Exhibit 5, is that 792, Document
4  792?
5      A.  Correct.
6      Q.  This came from your file.  Do you hold
7  any significance to these notes on this
8  particular exhibit?
9      A.  It appears to be a document where
10 someone was inquiring with regard to residual
11 disability, onset of residual disability.  I
12 can't read all the rest of it.
13     Q.  This is not a document that has been
14 produced previously in the litigation.  I was
15 wondering is this a document that ERC created or
16 is this a document you received from
17 Jefferson-Pilot?
18     A.  ERC, to the best of my knowledge, did
19 not create this document.
20     Q.  Do you see it's dated November of '94?
21     A.  I do.
22     Q.  Exhibit 6, document labeled 398 appears
23 to be a April 1, '95 letter from Employers
24 Reinsurance Corporation to Jefferson-Pilot,
25 right?

1      A.  Correct.
2      Q.  And it says "We've received and
3  processed the report submitted to the period
4  January through March of '95 regarding Chris
5  Kearney."  And policy number.  "Your report
6  indicates 100 percent of benefit amount ceded to
7  ERC.  Just need for you to confirm this is the
8  correct percentage.  Also, please submit a
9  current medical and/or investigative report for
10 this claimant."
11         Are the facts represented in this
12 letter accurate as far as you know?
13             MR. MEAGHER:  Objection to form.
14     A.  I don't know.
15     Q.  (By Mr. Roberts)  You don't know if
16 there's been 100 of the benefit amount ceded --
17     A.  No.
18     Q.  -- c-e-d-e-d to ERC?
19     A.  I apologize for interrupting.  No, I do
20 not know that.
21     Q.  Do you know that not to be the case?
22     A.  No, I don't know it not to be the case
23 either.  It appears that it was an issue here
24 too.
25     Q.  This too has not been produced

1  previously in this litigation even though it was
2  purportedly sent to Jefferson-Pilot.  Do you
3  know why that would be?
4              MR. MEAGHER:  Object to form.
5      A.  I do not know.
6      Q.  (By Mr. Roberts)  Next Exhibit 7.  This
7  appears to be Mr. Shelton's response to ERC,
8  right?
9      A.  Correct.
10     Q.  And he expounds on it and references a
11 second policy, do you see that?
12     A.  Yes.
13     Q.  And Mr. Shelton provides
14 contemporaneously the recent disability claim
15 report for ERC, right?
16     A.  He indicates that's enclosed with his
17 information, yes.
18     Q.  Do you happen to know that was the
19 course of business that ERC would
20 contemporaneously receive those type of forms on
21 Mr. Kearney?
22     A.  No, I do not.
23     Q.  You don't know one way or the other?
24     A.  No.
25     Q.  Is that the case in '98 through 2002?

**22 (Pages 82 to 85)**

**Page 86**

1    A. I don't believe it was the case.
2    Q. Did you ever receive any continuance of
3 disability information involving Mr. Kearney
4 during that period?
5    A. It's possible. I can't tell you one
6 way or the other.
7    Q. Document 010, 011, 012 is Exhibit 8.
8 Do you know whose handwriting this is?
9    A. I believe this is John Anderson's
10 handwriting.
11    Q. So at the top where it says "Res equals
12 501,707," is that the ERC reserve or is that the
13 JP reserve?
14    A. I do not know.
15    Q. Look back at Exhibit 2.
16    A. I don't believe I have an Exhibit 2.
17    Q. Okay. The document that Mr. Newkirk
18 provided, do you know who authored that
19 document, ERC or somebody else?
20    A. I believe Mr. Newkirk authored that
21 document.
22    Q. When he states the reserve there, is he
23 referring to the ERC reserve exclusive of any JP
24 reserve?
25    A. I don't know.

**Page 87**

1       MR. MEAGHER: Objection. Asked
2 and answered.
3    Q. (By Mr. Roberts) What's the total
4 reserve he reflects on Exhibit 2?
5       MR. MEAGHER: Objection. Form.
6    A. Approximately 501,000 and some change.
7    Q. (By Mr. Roberts) Thank you. Do you
8 recall in the whole history of this claim of
9 Mr. Kearney that there was an October 2001 Cuban
10 coffee house meeting?
11       MR. MEAGHER: Objection to form.
12    A. I am not certain what you're alluding
13 to there. I can speculate, but I'm not going to
14 do that.
15    Q. (By Mr. Roberts) You were instructed
16 yesterday over the course of five hours not to
17 speculate, so don't do that.
18       MR. MEAGHER: I'm going to
19 object. It's attorney/client privilege as to
20 any discussions.
21    Q. (By Mr. Roberts) In October of 2001,
22 there was a meeting in Miami, Florida. You're
23 mindful that that event was reported to you
24 subsequent, right?
25    A. Yes.

**Page 88**

1    Q. And at that meeting, I wasn't there, I
2 also have been told that there was a settlement
3 proposal or some kind of offer made to
4 Mr. Kearney's lawyer. Is that your
5 understanding also?
6    A. That's correct.
7    Q. And the offer was contingent on
8 Mr. Kearney turning in his policies, right?
9    A. I don't recall.
10    Q. Were you consulted prior to the
11 individuals who made that offer to Mr. Kearney's
12 lawyer?
13    A. I believe I was.
14    Q. And did you participate somehow in the
15 authority that they were given to make the offer
16 in the stated amount, whatever that amount was?
17    A. Can you restate that?
18    Q. Can you authorize those individuals to
19 state a certain offer?
20    A. I don't --
21       MR. BATY: I'm going to object to
22 attorney/client privilege in terms of what he
23 did. I think your first question was did he
24 participate and that I was going to allow him to
25 answer.

**Page 89**

1    Q. (By Mr. Roberts) Why don't we return
2 to my first question if that's the one that
3 you're allowed to answer. Did you participate
4 in authorizing those individuals to make the
5 stated offer? Are you looking for guidance?
6    A. I'm waiting to see if there's is an
7 objection because I don't think that was your
8 prior question.
9    Q. Can we read back the prior question?
10       (Whereupon, the previous question
11 from page 88, line 15 was read back by the
12 reporter.)
13    Q. (By Mr. Roberts) What do you
14 understand the question to have been?
15       MR. BATY: The first question she
16 read, did you participate.
17       (Whereupon, the previous question
18 from page 88, line 15 was read back by the
19 reporter.)
20       MR. BATY: Answer that question.
21    A. I believe so.
22    Q. (By Mr. Roberts) Who else
23 participated?
24    A. I don't recall.
25    Q. Was Jefferson-Pilot represented during

**23 (Pages 86 to 89)**

**Page 90**

1    that process?
2    **A.  I don't recall.**
3    Q.  Do you recall who you communicated
4    with?
5    **A.  I think I know who I did, but I don't**
6    **know with absolute certainty.**
7    Q.  Do you think it was Bill Hughes?
8    **A.  No.**
9    Q.  Bob Mills?
10   **A.  I believe it was Bob Mills.**
11   Q.  You don't recall any other
12   participants?
13   **A.  No.**
14   Q.  You don't recall any other
15   participants, correct?
16   **A.  No, I do not recall any other**
17   **participants.**
18   Q.  Is this Exhibit 8 a form that you, ERC
19   gets from DMS on claims that are referred to
20   DMS?
21   **A.  I believe ERC got certain claim**
22   **analysis reported on this form, yes.**
23   Q.  Not just on Mr. Kearney's claim, but
24   other claims?
25   **A.  I believe so.**

**Page 91**

1    Q.  Is this an ERC created form or is this
2    a DMS created form?
3    **A.  This is, to my knowledge, this is a DMS**
4    **created form.**
5    Q.  This document indicates that
6    Mr. Kearney was born in 1952 and the review was
7    done in '97, so he would have been 45, 44,
8    assume for me my math is correct?
9    **A.  I will make that assumption, yes.**
10   Q.  The reserve 501,000, would it grow or
11   decrease as Mr. Kearney gets older?
12   **A.  Ultimately it will decrease.**
13   Q.  But he was 44 at that time.  Would it
14   increase when he's 45, 46, 47, 48?
15   **A.  I don't know.**
16   Q.  Does it adjust or does it remain static
17   at the time the claim is filed or once it's
18   established?
19   **A.  A reserve changes over time.**
20   Q.  On a group basis or an individual claim
21   basis?
22   **A.  On an individual claim basis.**
23   Q.  So is there an actual exercise to
24   adjust reserves to individual claims at ERC?
25   **A.  Repeat that, please.**

**Page 92**

1    Q.  So is there an actual exercise to
2    adjust reserves to individual claims at ERC?
3    **A.  As I stated earlier, the reserves are**
4    **what they are.  What an actuary does with them I**
5    **can't tell you.**
6    Q.  How about 9.  Nine is a July 8th, 1997
7    letter from Mr. Shelton to DMS that comes from
8    your file and is numbered 050.
9         MR. MEAGHER:  Counsel, before you
10   proceed, I note inadvertently there is other
11   insureds names identified in the Re and those
12   should be redacted before it's attached to the
13   deposition.
14        MR. ROBERTS:  I don't know that I
15   agree with that, but let's proceed.
16        MR. MEAGHER:  Then I would
17   designate this as confidential under the order.
18        MR. ROBERTS:  The entire
19   transcript?
20        MR. MEAGHER:  Not yet.
21   Q.  (By Mr. Roberts)  This says " Dear
22   John, Enclosed is the material from the files in
23   the above three insureds, Mr. Kahn, Mr. Kearney
24   and Mr. London.  These are the cases that you're
25   going to investigate for us to see what can be

**Page 93**

1    done either to settle these in an equitable
2    manner to both the reinsurer and to
3    Jefferson-Pilot, or to give us further advice on
4    where to proceed," right?
5    **A.  That is correct.**
6    Q.  Are these three files files that
7    Newkirk directed JP to send to DMS under the
8    consulting agreement?
9    **A.  I don't know.**
10   Q.  Do you think it would be important for
11   the task to be to see what could be done to
12   settle these in an equitable manner on behalf of
13   the insured instead of just the reinsurer and
14   Jefferson-Pilot?
15        MR. BATY:  Objection.
16   Argumentative.
17        MR. MEAGHER:  Objection to form.
18   **A.  Can I answer?  Yes, I would think that**
19   **is important.**
20   Q.  (By Mr. Roberts)  Do you know why
21   that's not stated here?
22        MR. BATY:  Objection.  Same
23   objection.
24        MR. MEAGHER:  Join.
25   **A.  No, I do not.**

**24 (Pages 90 to 93)**

Page 94

1    Q.  (By Mr. Roberts) Next is ten and this
2  appears to be DMS's status report on those three
3  referrals with some information redacted and
4  some information about Mr. Kearney, right?
5    A.  Yes.
6    Q.  Do you know if this information was in
7  the ERC claim file when you took responsibility
8  for the Jefferson-Pilot block of business?
9        MR. MEAGHER:  Objection to form.
10   A.  No, I don't know.
11   Q.  (By Mr. Roberts) Next is a June 1998
12  letter, which is Exhibit 11, right?
13   A.  That is correct.
14   Q.  This is from Shelton to Newkirk in June
15  of '98. Had you at that point taken
16  responsibility for the claim or not?
17   A.  I don't know.
18   Q.  Well, if you look at 001 of the
19  privilege log, this is after you write a five
20  page letter to Shelton regarding additional
21  claim file review, 001 to 005, right?
22   A.  Correct.
23   Q.  And what this letter reflects is just
24  the sharing of certain expenses relating to
25  Mr. Kearney's policy, sharing of information

Page 95

1  about expenses?
2    A.  That's what it appears to be, yes.
3    Q.  Does the calculation at the bottom make
4  sense to you?
5    A.  Yes.
6    Q.  Does this mean that there was issued
7  $3500 of benefits and 2800 of the 3500 was
8  something ceded to ERC?
9    A.  That is what the document indicates.
10   Q.  And then someone did the math on that
11  and calculated that to be 80 percent of the
12  obligation was ceded to ERC?
13   A.  That's what it would appear to be, yes.
14   Q.  And you multiply that by the amount of
15  the expense and you come to ERC's portion,
16  right?
17   A.  I think that's correct.
18   Q.  Is that number accurate?  Does ERC have
19  80 percent of the responsibility?
20   A.  I don't know.
21   Q.  Is it something that is presently in
22  dispute between you and Jefferson-Pilot?
23   A.  No.
24   Q.  Has there ever been a dispute about the
25  percentage as far as you know?

Page 96

1    A.  As far as I know, no.
2    Q.  Exhibit 12 is a similar letter dated a
3  week later, June 26th, '98.  Do you know whose
4  handwriting that is "Okay to pay our percentage
5  to JP?"
6    A.  I believe it's Mr. Newkirk's writing.
7    Q.  Was it the procedure that you or he had
8  to authorize payments on the Kearney claim?
9    A.  For issues that are sent to us for
10  reimbursement, yes, we would have to authorize
11  the payment.
12   Q.  By reimbursement you're excluding
13  actual claim dollars paid?  You're just talking
14  about the surveillance, medical records, legal
15  expenses, that kind of thing?
16   A.  For expenses certainly.  For those
17  types of expenses we would authorize the
18  reimbursement, yes.
19   Q.  What about payment of the claim?
20   A.  Payment of the claim, you know, it's --
21  we are billed periodically from Jefferson-Pilot
22  for their payments.
23   Q.  How do you satisfy yourself that the
24  payments are appropriate?
25   A.  That Jefferson-Pilot's payments are

Page 97

1  appropriate?  I believe we take a ceding
2  company's word for it rather than do a claim by
3  claim review.
4    Q.  Well, you do do audit reviews and you
5  get involved in litigation and you hand pick
6  some for review, right?
7    A.  True.
8    Q.  13 is a July 9, '98 letter from Shelton
9  to Newkirk regarding Kearney and, again, the
10  sharing of expenses?
11   A.  Correct.
12   Q.  14 is some ERC internal documents
13  regarding expenses paid on Kearney's claim?
14   A.  That's correct.
15   Q.  15 is the cover page of a Motion For
16  Summary Judgment in a case between J.E. Grote
17  and Innomation.  That appears in your Kearney
18  claim file?
19   A.  I see that.
20   Q.  From a case filed in 1997.  Do you know
21  why that's in your claim file?
22   A.  I'm not certain.
23   Q.  Sixteen is a document that's Bates 191.
24  This is appears to be page two of some document.
25  Page one wasn't produced, but it indicates there

**25 (Pages 94 to 97)**

1  were some surveillance of Mr. Kearney in January
2  of 2001 and you were provided the report of the
3  surveillance, is that accurate?
4         MR. MEAGHER: Objection to form.
5     A.  It appears to be a portion of an
6  investigative report.
7     Q.  (By Mr. Roberts) Was that the case?
8  Did you along the way get copies of all the
9  surveillance that was being conducted and
10  performed on the Kearney claim?
11    A.  I don't know that I got copies of
12  anything -- or excuse me, of everything.
13    Q.  You were getting billed for it?
14    A.  Uh-huh.
15    Q.  And had to authorize it for it to be
16  paid?
17    A.  Correct.
18    Q.  Is it your testimony to the jury that
19  you were getting billed for it, but you were not
20  actually getting the surveillance reports?
21        MR. MEAGHER: Objection to form.
22        MR. BATY: Join.
23    A.  That's not unusual.
24    Q.  (By Mr. Roberts) Were you directing
25  that surveillance be performed?

1     A.  I don't believe so.
2     Q.  Did you at any point in time?
3     A.  I don't recall.
4     Q.  Next is Exhibit 17, which is the first
5  page of some forensic accounting report of
6  Joseph Levy to Bob Mills from your file?
7     A.  Uh-huh.
8     Q.  You're mindful that -- it's called
9  Supplemental Report. You're mindful there were
10  some financial reviews of Mr. Kearney's records
11  performed and included in your file?
12    A.  I recall that there was a financial
13  review done at some point, but that's the extent
14  of my recollection.
15    Q.  You're mindful of just one being done?
16    A.  I only recall one.
17    Q.  Next is Exhibit 18. And this is the
18  letter that Mr. Kearney received with the
19  lawsuit. I included it because I wanted you to
20  tell me who Jane Neidermyer is who is shown in
21  the blind copy?
22    A.  As I indicated to you earlier, Jane
23  Neidermyer is the person that was in charge of
24  their claim operation, of Jefferson-Pilot's
25  claim operation in Concord, New Hampshire.

1     Q.  19 is a document labeled 0025
2  reportedly from October of 2003. The first page
3  of -- series of medical records on Mr. Kearney.
4  You're still getting contemporaneous medical
5  records on Mr. Kearney here at ERC or ERAC?
6     A.  I last received some medical records
7  several months ago.
8     Q.  What's the purpose for you receiving
9  medical records?
10    A.  For me to assist in the analysis of the
11  claim.
12    Q.  Next is Exhibit 20 labeled -- it's
13  Bates No. 1913. This is purported an entry
14  regarding payment. This is actually never
15  actually signed by the Judge or presented to the
16  Judge as far as I'm aware, but it appears in
17  your claim file. Do I conclude correctly that
18  drafts of motions and pleadings to be filed with
19  the Court were shared with you before filing?
20    A.  On some occasions, yes.
21    Q.  Next is 21, which is a spreadsheet.
22  This is titled Unpaid COLA Benefits. Do you
23  know why this appears in your file?
24    A.  I believe it's because it's in
25  association with Mr. Kearney's claim.

1     Q.  Next is 22 which is medical records on
2  Mr. Kearney of a Dr. Shepard from November of
3  2006, just eight months ago. I think we talked
4  about this earlier. You get medical records on
5  Mr. Kearney even ones from recent time in order
6  to assist in the evaluation, is that right?
7     A.  That is correct.
8     Q.  Is his medical condition under analysis
9  presently?
10        MR. MEAGHER: Well, with regard
11  to any discussions between the counsel group
12  during pendency of the litigation, I would
13  object on the grounds of work product and
14  attorney/client privilege.
15        MR. ROBERTS: Are you instructing
16  him not to answer?
17        MR. BATY: I join in the
18  objection, but it's to the extent that he can
19  answer the question without getting into
20  discussions that you've had with counsel.
21        MR. MEAGHER: Could you read the
22  question back, please?
23        (Whereupon, the previous question
24  was read back by the reporter.)
25

**Page 102**

1    A. I believe Mr. Kearney's medical
2 condition is at issue. His present medical
3    Q. (By Mr. Roberts) His present medical
4 condition?
5    A. His present medical condition.
6    Q. Outside the litigation whether or not
7 he qualifies for benefits today, whether he had
8 a lawsuit pending or not, is that your
9 testimony?
10    A. Yes.
11    Q. And you've been assisting in that
12 endeavor, correct?
13    A. I would like for you to define
14 assisting.
15    Q. You're getting present medical records
16 for that purpose, correct?
17    A. Yes. I received medical records
18 several months or at least several weeks ago. I
19 can't remember the last time I was updated on
20 it, but it's probably been in the four to eight
21 week range.
22    Q. What triggered the present analysis of
23 his medical condition for his continued
24 entitlement to benefits?
25    A. Well, I believe an ongoing disability

**Page 103**

1 claim is subject to that type of analysis at any
2 point in time.
3    Q. You're mindful Mr. Kearney just had a
4 heart attack?
5    A. No, I'm not.
6    MR. MEAGHER: Is he going to be
7 available for deposition next week?
8    MR. ROBERTS: You got a one
9 track mind.
10    MR. MEAGHER: We want to know if
11 he's incapacitated, certainly we will change the
12 date.
13    MR. ROBERTS: You would
14 accommodate him?
15    MR. MEAGHER: Well, I haven't
16 been informed by you that that's a problem.
17    MR. ROBERTS: Your colleague
18 knows.
19    MR. MEAGHER: We have travel
20 plans. Okay. So it's not going on Wednesday?
21    MR. ROBERTS: Let me proceed with
22 the deposition, please.
23    MR. MEAGHER: You don't want to
24 respond to me?
25    MR. ROBERTS: I will respond to

**Page 104**

1 you when the deposition is concluded, counsel.
2    MR. MEAGHER: All right. Fine.
3 Thank you.
4    Q. (By Mr. Roberts) So it's just a
5 routine exercise to review his medical records
6 because he has an ongoing claim. That's what's
7 going on right now?
8    A. Yes.
9    Q. Are his credit card records being
10 evaluated for that purpose?
11    A. I don't know.
12    MR. MEAGHER: Objection to the
13 form.
14    Q. (By Mr. Roberts) Have you sought his
15 records for that purpose?
16    A. Which records?
17    Q. Credit card records?
18    A. I have not sought those records.
19    Q. Do you know if they are being sought
20 for that purpose?
21    A. I believe so.
22    Q. Is the next one 24 which is a May 31,
23 2007 letter to Mr. Kearney from DMS, which comes
24 from your claim file?
25    A. I'm sorry, are you asking me if this

**Page 105**

1 comes from my claim file?
2    Q. The next document is Exhibit 24, which
3 is a May 31, 2007 letter, correct?
4    A. That is correct.
5    Q. And this came from your claim file?
6    A. I believe so.
7    Q. This document that is just two weeks
8 old?
9    A. I believe so.
10    Q. And this doesn't relate to litigation.
11 This relates to his ongoing claim?
12    A. Right.
13    Q. And you're getting these documents
14 contemporaneous with their issuance?
15    A. Correct.
16    Q. I need one moment.
17    (Off the record)
18    Q. (By Mr. Roberts) Privilege log,
19 Exhibit 1, can you turn to 2948 and 2949?
20    A. I have a non-chronological privilege
21 log. I'm sorry. I can look for it, but it
22 might take me --
23    MR. BATY: What's the number
24 again?
25    Q. (By Mr. Roberts) On that document

**27 (Pages 102 to 105)**

**Page 106**

1  January 27, 2006, and it's Bates No. 2948.
2    **A.  I got it.**
3    Q.  So you should be at document 02948 to
4  02949, dated January 27, 2006 from Bill Ellis to
5  Formus, Dempsey, Farabow, copy Callow.  And the
6  subject matter is the Jay trial.
7    **A.  I see that.**
8    Q.  Is this a misprint or does this relate
9  to Kearney?
10    **A.  I don't know.**
11    Q.  2941 dated February 9th of '06.
12       MR. MEAGHER:  What number?
13    Q.  2941 dated February 9th '06?
14    **A.  I got it.**
15    Q.  The subject matter concerns a voice
16  mail from Dorsey and Whitney, which is a law
17  firm.  Are they a law firm that's been retained
18  on the Kearney claim?
19    **A.  I don't recall.**
20    Q.  Can you turn to May 24, 2004,
21  Document 3261.
22    **A.  What was the document number again,**
23  **please?**
24    Q.  3261.
25    **A.  I have that.**

**Page 107**

1    Q.  And the subject is Kearney, Jeffries
2  and King.  Do you know who Jeffries is?
3    **A.  It rings a bell, but I can't tell you**
4  **affirmatively that I know who it is.**
5    Q.  Is that another claim you're handling?
6    **A.  No, I don't believe so.**
7    Q.  Ever handled?
8    **A.  I don't believe so.**
9    Q.  Do you know what it's relation to
10  Kearney is?
11    **A.  No, I don't.**
12    Q.  Do you know who King is?
13    **A.  I believe I do.**
14    Q.  That's a gentleman that filed a lawsuit
15  against Jefferson-Pilot down south somewhere?
16    **A.  I believe in Mississippi.**
17    Q.  What is his association to Kearney?
18    **A.  I can't tell you without looking at the**
19  **document.**
20    Q.  Did he too have a residual disability
21  claim and litigation commenced and there was a
22  dispute about what the policy provided?
23    **A.  I don't recall.**
24    Q.  Turn to 3339 dated February 28th, '07.
25    **A.  Can you give me the document number**

**Page 108**

1  again.
2    Q.  3339, February '07.
3    **A.  Okay, I have that.**
4    Q.  This is an e-mail from Ellis to
5  Meagher, Formus, Dempsey, Farabow and Callow
6  regarding Kearney's divorce status.  How does
7  that relate to his claim?
8       MR. MEAGHER:  I'm going to
9  object.  This is work product and
10  attorney/client privilege.
11    Q.  (By Mr. Roberts) So you're
12  investigating his divorce status?
13       MR. BATY:  I join in the
14  objection to the extent this is work product and
15  I instruct the witness not to answer that.
16    **A.  On the advice of counsel I will not**
17  **respond to that.**
18    Q.  (By Mr. Roberts) 3344 to 3347.
19    **A.  What's the date on that, sir?**
20    Q.  February 23rd, '07, from Meagher to you
21  copying Formus and Farabow, an e-mail that says
22  "Re: Kearney records RVW-IME question mark,
23  question mark."  Do you know what the acronym
24  RVW stands for?
25       MR. MEAGHER:  Again, it's work

**Page 109**

1  product, attorney/client.
2       MR. ROBERTS:  The acronym RVW?
3       MR. BATY:  Join in the objection.
4  And instruct the witness not to answer.
5    **A.  On advice of counsel I won't respond.**
6    Q.  (By Mr. Roberts) You're indicating to
7  me what the word says, but you're not going to
8  tell me what it actually means?
9       MR. BATY:  Same instruction.
10       MR. ROBERTS:  I'm asking counsel.
11  I mean this is a document that you or your law
12  firm created and you shortened something to get
13  into the space it looks like.  You're not going
14  to tell me what RVW stands for?
15       MR. BATY:  No.
16    Q.  (By Mr Roberts) Who is ERAC's direct
17  parent?
18    **A.  They have had a business**
19  **reorganization, so I can't state with certainty.**
20    Q.  Is there any entity that has liability
21  other than JP and ERC should there be liability
22  on Mr. Kearney's claim?
23    **A.  Not to my knowledge.**
24    Q.  You don't have any other reinsurance
25  agreement or treaty with any other entity?

**Page 110**

1    A.  There are retro-session agreements in
2  place, but I don't know whether they are
3  applicable to this particular reinsurance
4  agreement or not.
5         MR. ROBERTS:  Thank you.  I have
6  no further questions.
7    A.  Thank you.
8         MR. MEAGHER:  No questions.
9         MR. MARTIN:  Time is 3:12.  We
10  are going off the record.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 111**

1
2
3
4
5
6  _____
7         WILLIAM DEMPSEY
8
9
10
11         Subscribed and Sworn to before
12  me this _____ day of _____, 2007.
13
14
15  _____
16         Notary Public
17
18         County of _____
19         State of _____
20
21
22
23  JEFFERSON-PILOT vs. CHRISTOPHER KEARNEY
24
25

**Page 112**

1    C E R T I F I C A T E
2         I, Mary Lynn Cushing, a Certified
3  Shorthand Reporter for the State of Missouri, do
4  hereby certify:
5         That prior to being examined the
6  witness was by me duly sworn;
7         That said deposition was taken down by
8  me in shorthand at the time and place
9  hereinbefore stated and was thereafter reduced
10  to writing under my direction;
11         That I am not a relative or employee or
12  attorney or counsel of any of the parties, or a
13  relative or employee of such attorney or
14  counsel, or financially interested in the
15  action.
16         WITNESS my hand and seal this _____
17  day of _____, 2007.
18
19  _____
20         MARY LYNN CUSHING, CSR, CCR No. 1077
21  FEES DUE METROPOLITAN COURT REPORTERS, INC. :
22  $_____ ATTORNEY FOR PLAINTIFF
23  $_____ ATTORNEY FOR DEFENDANT
24
25

1
2  June 28, 2007
3
4  Mr. William Dempsey
5  c/o Mr. Bruce E. Baty
   Stinson, Morrison, Hecker, LLP
   1201 Walnut Street, Suite 2900
6  Kansas City, Missouri, 64106
7  RE: JEFFERSON-PILOT VS. CHRISTOPHER KEARNEY
8  Dear Mr. Dempsey:
9  Enclosed is your deposition, given in the
   above-named matter, for your examination and
10  signing.  You will also find a signature page
   and an errata sheet for your convenience in
11  making any changes or corrections.
12  Pursuant to the law, any change in "form or
   substance" of an answer shall be accompanied
13  with a statement of the reason given by you for
   making such change.
14
   Upon completion of your examination and reading,
15  please sign the enclosed signature page and
   errata sheet and return them to this office in
16  the enclosed self-addressed envelope.  If we
   have not received the signed documents from you
17  within 30 days from the date of this letter, an
   unsigned copy of your deposition will be filed.
18
   Yours very truly,
19
   METROPOLITAN COURT REPORTERS, INC.
20
21
   By: MARY LYNN CUSHING, CSR, CCR No. 1077
22
23
24
25

**29 (Pages 110 to 113)**

```
 1            ERRATA SHEET
 2   RE: JEFFERSON-PILOT VS. CHRISTOPHER KEARNEY
 3   DEPOSITION OF:  WILLIAM DEMPSEY
 4   PG/LN NO.  CORRECTION    REASON FOR CHANGE
         _____:_____:_____
 5       _____:_____:_____
 6       _____:_____:_____
 7       _____:_____:_____
 8       _____:_____:_____
 9       _____:_____:_____
10       _____:_____:_____
11       _____:_____:_____
12       _____:_____:_____
13       _____:_____:_____
14       _____:_____:_____
15       _____:_____:_____
16       _____:_____:_____
17       _____ I certify that I have read my deposition
18   in the above case and I request that no changes
     be made.
19       _____ I certify that I have read my deposition
     in the above case and I request that the above
20   changes be made.
21       SIGNATURE OF DEPONENT:
22       _____
         DATED: _____
23
24
25
```

1

## A

**able (2)**
37:21 39:12
**above-named (1)**
113:9
**absolute (2)**
69:14 90:6
**Absolutely (1)**
13:2
**accept (1)**
21:11
**accepted (2)**
6:25 7:3
**accepts (1)**
21:14
**accommodate (1)**
103:14
**accompanied (1)**
113:12
**account (2)**
34:10 48:23
**accounting (1)**
99:5
**accurate (8)**
17:25 21:12 44:20 66:12
    76:15 84:12 95:18 98:3
**accustom (1)**
31:5
**acquired (1)**
67:10
**acronym (2)**
108:23 109:2
**acronyms (1)**
15:1
**acting (1)**
52:18
**action (5)**
13:21,23 15:3,6 112:15
**actual (3)**
91:23 92:1 96:13
**actuary (4)**
28:2,16 68:10 92:4
**Adam (5)**
2:13 5:19 65:24 68:25 69:1
**Add (1)**
8:4
**addition (3)**
27:20 31:19 42:12
**additional (5)**

75:22 76:6,16 80:5 94:20
**address (2)**
6:8 28:2
**adjacent (1)**
40:5
**adjudicate (2)**
24:11,13
**adjudicated (1)**
27:6
**adjudicating (2)**
59:18 60:2
**adjudication (1)**
57:12
**adjust (3)**
91:16,24 92:2
**advice (5)**
38:17,23 93:3 108:16 109:5
**affiliated (1)**
15:18
**affirmatively (1)**
107:4
**afternoon (1)**
6:3
**ago (6)**
8:22 17:17 74:21 100:7
    101:3 102:18
**agree (3)**
21:11 53:22 92:15
**agreement (33)**
16:17 17:2,5,10,15 18:3,19
    22:6,12 23:3 26:19,23,24
    30:23 31:9 32:3,14,16,21
    32:23 33:1,10 48:13,16
    78:24,25 79:8 80:17,20
    81:1 93:8 109:25 110:4
**agreements (4)**
28:11 30:25 31:2 110:1
**ahead (2)**
7:16 25:14
**Allen (2)**
64:19,21
**allow (1)**
88:24
**allowed (1)**
89:3
**alluding (1)**
87:12
**amend (1)**
48:22

**amended (1)**
17:3
**amount (10)**
13:7 18:6,11 20:17 21:9 84:6
    84:16 88:16,16 95:14
**amounts (2)**
22:4 26:15
**Amy (1)**
65:24
**analysis (5)**
90:22 100:10 101:8 102:22
    103:1
**analyze (1)**
59:22
**Anderson's (1)**
86:9
**Andrew (1)**
69:15
**Andy (3)**
68:23,24 70:3
**and/or (1)**
84:9
**announce (1)**
5:17
**annual (1)**
28:10
**answer (14)**
29:7 30:16 54:21,23 55:1
    88:25 89:3,20 93:18 101:16
    101:19 108:15 109:4
    113:12
**answered (4)**
19:22 20:6 50:21 87:2
**anticipating (1)**
71:22
**anticipation (3)**
53:18 55:4 74:15
**anybody (1)**
67:19
**anymore (1)**
34:6
**anytime (1)**
56:22
**apologize (2)**
7:18 84:19
**App (1)**
81:24
**apparently (2)**
53:8 68:15

2

**appear (3)**
30:1 36:24 95:13
**appearances (2)**
2:1 5:8
**appearing (7)**
2:3,8,12,17,21 5:17,18
**appears (12)**
82:23 83:9,22 84:23 85:7
94:2 95:2 97:17,24 98:5
100:16,23
**apples (2)**
53:4,4
**applicable (1)**
110:3
**application (7)**
48:4 49:21,22 50:5,8 56:1
82:2
**applications (2)**
81:21,21
**applied (1)**
27:20
**appreciate (1)**
43:8
**appropriate (4)**
27:12 66:21 96:24 97:1
**approximately (2)**
8:22 87:6
**April (1)**
83:23
**apt (1)**
25:6
**area (3)**
9:11 23:16 63:10
**arena (1)**
12:17
**Argumentative (1)**
93:16
**arisen (1)**
57:11
**arrived (1)**
35:16
**Arthur (1)**
61:18
**aside (2)**
49:16 50:23
**asked (6)**
16:1 19:21 20:5 50:20 64:1
87:1
**asking (3)**

28:3 104:25 109:10
**assertion (2)**
44:2,3
**asserts (1)**
44:4
**assessment (1)**
28:16
**assist (2)**
100:10 101:6
**assistant (4)**
8:12,15 11:12 65:15
**assistants (1)**
67:15
**assisting (2)**
102:11,14
**associated (1)**
30:5
**association (2)**
100:25 107:17
**assume (5)**
22:20 44:7 46:23 81:25 91:8
**assumes (1)**
35:20
**assumption (1)**
91:9
**attached (3)**
43:23 44:9 92:12
**attack (1)**
103:4
**attorney (14)**
41:15,17 52:18 53:15 67:24
68:6,7,14 69:7,16 112:12
112:13,22,23
**attorney/client (8)**
54:5,11 77:17 87:19 88:22
101:14 108:10 109:1
**attributable (1)**
51:15
**audit (3)**
25:4 26:9 97:4
**audits (1)**
59:13
**authentic (3)**
55:9,23 66:11
**authenticity (2)**
55:17 66:20
**author (5)**
38:7 72:13 74:13 75:1 77:23
**authored (3)**

76:5 86:18,20
**authority (1)**
88:15
**authorize (5)**
88:18 96:8,10,17 98:15
**authorizing (1)**
89:4
**authors (1)**
74:22
**available (1)**
103:7
**aware (3)**
16:12 18:25 100:16
**a.m (1)**
5:5

**B**

**back (17)**
10:2,6,18 14:24 37:11 48:4
61:16 64:20 71:1,22 81:22
86:15 89:9,11,18 101:22,24
**balance (1)**
18:13
**ballpark (1)**
15:14
**Barnes (2)**
69:5,6
**based (6)**
18:19 27:19 28:4 71:6 79:19
81:24
**basis (8)**
29:19 72:18 73:18 74:7
80:13 91:20,21,22
**Bates (5)**
81:9,16 97:23 100:13 106:1
**Baty (28)**
2:18 5:12,12 34:17 36:1
39:11 50:20 54:13,19,22
55:10 61:7 62:21 66:14,18
88:21 89:15,20 93:15,22
98:22 101:17 105:23
108:13 109:3,9,15 113:4
**Beardshaw (1)**
64:7
**began (2)**
10:3 32:17
**beginning (2)**
71:8 76:1
**behalf (2)**

1:16 93:12
**belief (2)**
42:13 51:19
**believe (74)**
11:12 14:11 15:11,21 16:25
20:10 23:24 27:3,17 28:9
28:23 31:24 33:20 34:1
36:14,17,19,21 38:6,15
39:13 41:9,12,13,17,25
42:15 50:11 51:14 57:21
58:24 61:24 62:9,17 64:21
65:15,20 67:8,24 68:3,10
68:13 69:6,7,12,16,25
75:12 76:12,22 77:5 80:22
86:1,9,16,20 88:13 89:21
90:10,21,25 96:6 97:1 99:1
100:24 102:1,25 104:21
105:6,9 107:6,8,13,16
**bell (3)**
65:12 68:17 107:3
**benefit (7)**
19:5 21:3 45:20,22 46:4 84:6
84:16
**benefits (9)**
18:23,24 19:1 21:22 45:8
95:7 100:22 102:7,24
**best (1)**
83:18
**Bey (2)**
65:14,15
**beyond (3)**
23:5 49:14 57:17
**big (1)**
49:7
**Bill (8)**
63:20 68:12,19,20 77:23 80:2
90:7 106:4
**billed (3)**
96:21 98:13,19
**billing (1)**
27:11
**Biscayne (1)**
2:7
**bit (2)**
7:17 71:3
**blind (1)**
99:21
**block (7)**
16:5,24 21:7,12 28:13 73:5

94:8
**blocks (2)**
80:12,15
**Bob (9)**
8:23 9:2 36:10 37:21 38:9,11
90:9,10 99:6
**Bonzell (5)**
36:10 37:21 38:9,11,17
**Bonzell's (1)**
36:24
**born (1)**
91:6
**bottom (4)**
47:12,23 81:9 95:3
**Boulevard (1)**
2:7
**Bowen (1)**
2:6
**bracketed (1)**
10:1
**break (3)**
37:4 70:1,20
**brief (3)**
35:4,5 54:2
**briefly (1)**
35:13
**bring (1)**
21:9
**brought (3)**
46:20 47:4,9
**Bruce (3)**
2:18 5:12 113:4
**bunch (1)**
65:22
**Burrell (3)**
65:23 68:2,3
**business (19)**
7:14 13:25 15:19 16:5 28:13
29:10 30:1 31:4,19,21
32:10,12 45:7 59:10 73:5
79:20 85:19 94:8 109:18
**B-e-y (1)**
65:14

---
**C**
---

**C (2)**
112:1,1
**cabinet (3)**
40:9,11 81:18

**calculated (1)**
95:11
**calculation (1)**
95:3
**call (1)**
76:16
**called (3)**
6:22 75:16 99:8
**Callow (4)**
65:24 67:25 106:5 108:5
**capacity (1)**
28:24
**card (2)**
104:9,17
**care (2)**
12:13 23:11
**Carl (1)**
68:5
**Carolina (2)**
2:11 25:11
**Carrie (1)**
69:5
**carried (1)**
28:17
**Carrier (2)**
69:18,19
**carries (1)**
28:12
**carry (1)**
60:12
**case (22)**
5:3 13:17,20 14:14,23 15:10
17:18 31:14 51:24 52:6,11
58:10 80:8 84:21,22 85:25
86:1 97:16,20 98:7 114:18
114:19
**cases (3)**
13:19 80:14 92:24
**CCR (3)**
1:17 112:20 113:21
**CD (4)**
39:9,11,13,16
**cede (1)**
20:18
**ceded (6)**
20:15,16 84:6,16 95:8,12
**ceding (1)**
97:1
**Center (2)**

4

2:6,23
**Central (1)**
5:5
**certain (13)**
11:24 26:11 33:3 38:15
76:13,23,24 80:14 87:12
88:19 90:21 94:24 97:22
**certainly (10)**
44:8 50:13 53:3,19,22 56:21
60:21 79:9 96:16 103:11
**certainty (3)**
69:14 90:6 109:19
**Certified (1)**
112:2
**certify (3)**
112:4 114:17,19
**change (8)**
8:3 29:18 32:8 87:6 103:11
113:12,13 114:4
**changed (1)**
67:10
**changes (4)**
91:19 113:11 114:18,20
**characteristics (1)**
46:23
**characterization (1)**
76:15
**charge (2)**
63:9 99:23
**Chris (6)**
5:15 6:4 44:23 63:24 64:4
84:4
**Christopher (5)**
1:9 2:21 111:23 113:7 114:2
**chronologically (1)**
37:15
**Cincinnati (1)**
2:24
**City (4)**
1:21 2:19 6:23 113:6
**claim (116)**
17:25 18:4,7,16 19:10,13,20
20:2 21:4,20 22:4,10,16
23:15,22,22 24:5,6,6,15
25:1,8,24 26:1,7,10,25 27:5
27:23 28:6,8,14,20 29:8
30:5,7,17,19,22 31:6,10,12
33:8,14,16,18 49:13,13
50:1 53:9,25 56:12 57:12

59:18,22 60:2,3,16 62:11
63:5 64:4 65:18 67:4 68:16
69:19,24 70:15 71:17 73:2
74:14 75:22 76:6,16,25
77:3,8,20 78:8 80:6,24
85:14 87:8 90:21,23 91:17
91:20,22 94:7,16,21 96:8
96:13,19,20 97:2,3,13,18,21
98:10 99:24,25 100:11,17
100:25 103:1 104:6,24
105:1,5,11 106:18 107:5,21
108:7 109:22
**claimant (1)**
84:10
**claimants (2)**
30:6,13
**claimed (2)**
72:7,15
**claims (45)**
9:11,16 11:11 12:15,21 13:5
16:19 17:12 21:11 22:22,25
23:24 24:12,20,23,24 25:5
25:12,14,18,19,20 26:5,12
26:15 28:22,24 29:1,23
30:8 33:3 38:16 54:18 55:3
60:8 63:10 64:16,25 76:21
78:7 80:5 90:19,24 91:24
92:2
**client (2)**
34:5 53:16
**clients (4)**
30:23 33:6 60:5 79:7
**closed (1)**
7:13
**coffee (1)**
87:10
**Cohen (4)**
35:5 68:23,24 70:3
**Cohill (1)**
64:13
**COLA (1)**
100:22
**colleague (1)**
103:17
**collect (2)**
39:12,24
**college (1)**
31:16
**column (1)**

71:8
**columns (1)**
71:5
**combination (1)**
25:22
**come (4)**
23:16 33:21 41:20 95:15
**comes (3)**
92:7 104:23 105:1
**coming (2)**
17:4 81:3
**commenced (3)**
5:1 51:5 107:21
**commensurate (2)**
28:12 67:3
**comment (1)**
53:1
**comments (1)**
55:4
**Commissioners (1)**
29:16
**common (1)**
80:25
**communicated (1)**
90:3
**communications (1)**
39:18
**companies (5)**
13:25 20:25 22:24 27:25
32:8
**company (19)**
1:6 2:4,9 6:22 8:1,23 9:20
14:3 15:18 21:5 22:7,16
30:12 31:3,21 71:21 80:4,5
80:9
**company's (4)**
20:3,8 30:23 97:2
**compartmentalized (1)**
32:11
**compels (1)**
80:2
**compiled (2)**
50:25 51:18
**complete (1)**
44:5
**completion (1)**
113:14
**complying (1)**
39:6

**computer (1)**
40:7
**concern (4)**
13:19 15:3,23 16:16
**concerns (2)**
12:2 106:15
**conclude (9)**
74:20,25 78:10,13,17,19,21
   79:18 100:17
**concluded (1)**
104:1
**conclusion (2)**
71:23 78:15
**Concord (3)**
64:17 69:21 99:25
**condition (6)**
59:14 101:8 102:2,4,5,23
**conduct (1)**
79:20
**conducted (1)**
98:9
**conference (3)**
35:18,23,25
**confidential (1)**
92:17
**confirm (1)**
84:7
**confused (2)**
15:1 24:3
**conjunction (2)**
82:2,3
**Conley (1)**
10:2
**connection (2)**
55:11 56:12
**consider (1)**
29:5
**consult (1)**
75:4
**consulted (1)**
88:10
**consulting (10)**
32:3,14 33:10 78:24,25 79:8
   80:17,20 81:1 93:8
**contained (1)**
38:23
**contemporaneous (3)**
50:17 100:4 105:14
**contemporaneously (4)**
51:24 52:7 85:14,20
**contents (2)**
25:1,8
**context (7)**
20:16 24:16 45:4,16,18 63:16
   82:22
**contingent (1)**
88:7
**continuance (2)**
49:15 86:2
**continued (3)**
3:5 4:1 102:23
**contract (3)**
13:23 15:6 62:20
**convenience (1)**
113:10
**conversations (1)**
53:15
**Cook (1)**
64:11
**copied (4)**
47:23,24 52:12,16
**copier (1)**
81:13
**copies (3)**
48:13 98:8,11
**copy (11)**
39:14 40:2,4 42:22,24 43:10
   60:23 61:6 99:21 106:5
   113:17
**copying (1)**
108:21
**corporation (17)**
7:4,10,12,15 8:2 9:12 13:24
   14:21,25 15:2,12 18:14
   20:19 52:19 55:12 60:10
   83:24
**correct (76)**
7:22 8:14,17 13:1 15:17 17:9
   17:18 18:21 19:14,23 20:7
   21:22 22:19 23:7,8,13,20
   34:20 35:8,10,21 38:1,4,10
   38:12,13 39:4,19 42:10
   48:7 49:2,6 50:1,2 52:11
   53:6 54:12 55:6 58:13,14
   58:17 59:25 67:5,13 72:8,9
   72:23,25 73:3,7,13 74:2
   75:9 77:22 80:1 81:11 83:5
   84:1,8 85:9 88:6 90:15 91:8
**93:5 94:13,22 95:17 97:11
   97:14 98:17 101:7 102:12
   102:16 105:3,4,15
**CORRECTION (1)**
114:4
**corrections (1)**
113:11
**correctly (1)**
100:17
**correspondence (9)**
19:12 36:9 37:20 50:15
   51:16 52:1,7 58:15 65:10
**correspondences (1)**
19:16
**counsel (37)**
2:14 5:7 9:16,20 10:3,10,20
   11:1,5,9,11 22:23 28:24
   34:14 35:12 36:20 39:10
   41:24 54:9,13 58:16 66:15
   68:8,24 69:1,3 70:8 75:4
   92:9 101:11,20 104:1
   108:16 109:5,10 112:12,14
**County (1)**
111:18
**couple (3)**
58:25 70:18 74:21
**course (9)**
19:16 34:24 36:3,19 51:23
   57:11 66:7 85:19 87:16
**Court (7)**
1:1 3:2 6:6 18:2 100:19
   112:21 113:19
**cover (2)**
23:10 97:15
**CPA (1)**
68:22
**create (2)**
17:3 83:19
**created (7)**
37:15 75:21 83:15 91:1,2,4
   109:12
**creating (1)**
47:19
**creation (1)**
75:4
**credit (3)**
28:10 104:9,17
**Creek (1)**
3:3

6

**critical (2)**
12:12 31:5
**Croft (2)**
64:15,16
**CSR (3)**
1:17 112:20 113:21
**Cuban (1)**
87:9
**current (1)**
84:9
**Cushing (4)**
1:17 112:2,20 113:21
**customer (2)**
79:12,21
**cut (1)**
81:13
**Cynthia (2)**
64:15,16
**c-e-d-e-d (1)**
84:18
**C-1-02-479 (2)**
1:8 5:4
**C.J (2)**
65:25 67:23
**c/o (1)**
113:4

**D**

**Dallas (1)**
68:14
**Dan (1)**
13:6
**Darlene (1)**
67:21
**data (1)**
29:19
**date (14)**
5:4 15:13 17:15 18:5,19 19:3
22:2,4 46:10 50:18 76:1
103:12 108:19 113:17
**dated (13)**
43:22 71:16 72:22 74:5 82:9
82:14 83:20 96:2 106:4,11
106:13 107:24 114:22
**dating (1)**
81:22
**Dave (1)**
65:3
**Davenport (5)**

68:9,10,14,19,20
**David (2)**
12:24 78:3
**David's (1)**
11:12
**day (4)**
1:18 34:4 111:12 112:17
**days (1)**
113:17
**deal (1)**
34:6
**Dear (2)**
92:21 113:8
**death (1)**
65:21
**decade (1)**
79:25
**December (2)**
37:19 38:2
**decided (1)**
54:9
**decision (3)**
31:7 62:12,16
**decisions (2)**
52:20,24
**decrease (2)**
91:11,12
**deep (1)**
40:10
**defendant (4)**
1:10,17 5:14 112:23
**define (1)**
102:13
**definition (1)**
53:20
**degree (1)**
6:11
**Dempsey (44)**
1:16 2:17 3:7,11,12,13,14,15
3:16,17,18,19,20,21,22,23
3:24,25 4:2,3,4,5,6,7,8,9
5:3,13,23 6:9,10 37:12
42:18 55:14 61:13,17 71:2
80:3 106:5 108:5 111:7
113:4,8 114:3
**Dennison (1)**
10:1
**department (3)**
6:20 28:15,16

**depend (1)**
30:17
**depending (3)**
17:21 30:24 31:9
**depends (1)**
23:2
**depo (1)**
35:9
**DEPONENT (1)**
114:21
**deposition (25)**
1:15 5:1,3 13:10,16 14:15
34:13 35:12,15,17 50:15
52:1,8 58:19,22 92:13
103:7,22 104:1 112:7 113:9
113:17 114:3,17,19
**derived (1)**
29:15
**describe (1)**
16:14
**described (4)**
8:19 23:12 74:2,4
**description (2)**
21:13 25:7
**designate (1)**
92:17
**designating (1)**
54:4
**desired (1)**
29:2
**details (1)**
76:6
**determinant (1)**
29:6
**determine (1)**
54:18
**develops (1)**
27:5
**Diane (2)**
64:9 69:10
**dictated (1)**
18:18
**different (3)**
9:3 26:22 32:7
**differentiate (1)**
59:8
**direct (4)**
17:22 23:21 80:24 109:16
**directed (2)**

62:7 93:7
**directing (4)**
47:15,18,20 98:24
**direction (1)**
112:10
**directly (1)**
41:11
**directory (1)**
28:21
**directs (2)**
80:2,10
**disability (34)**
2:4,13,14 5:10,19 12:2,3,13
   12:14,17,21 13:5,8,17,18,20
   15:24 23:6,25 27:2 29:16
   31:22 32:3,14 45:7,19
   49:15 65:16 83:11,11 85:14
   86:3 102:25 107:20
**disagree (1)**
55:22
**discovery (1)**
14:13
**discuss (1)**
80:14
**discussed (1)**
56:1
**discussing (1)**
78:7
**discussion (2)**
54:25 55:11
**discussions (5)**
52:22 62:1 87:20 101:11,20
**dispute (3)**
95:22,24 107:22
**District (4)**
1:1,2 14:8,22
**DIVISION (1)**
1:3
**divorce (2)**
108:6,12
**DMS (35)**
24:17 33:4,9,13,15 38:12
   47:23,25 64:21 65:2 68:22
   68:24 69:1,6,7,13,17 78:24
   79:12,24 80:3,7,10,11,12,16
   80:25 81:1 90:19,20 91:2,3
   92:7 93:7 104:23
**DMS's (1)**
94:2

**doc (1)**
76:1
**document (94)**
32:24 36:5,6,7,22 37:16,22
   39:1,1 41:3,5,6,7,14,16,18
   41:20,23 42:2,12,16 43:23
   43:23 44:10,12,15,22 45:9
   46:10,13 47:24 49:17 51:21
   55:4 68:16 71:8,12,19 72:4
   72:12,16,22 73:15,16 74:3
   74:10,15 75:14,24 76:1,2,4
   76:11,13,16,18,21 77:4,4,10
   77:15 78:20 81:24,25 82:3
   82:4,15,19,20 83:3,9,13,15
   83:16,19,22 86:7,17,19,21
   91:5 95:9 97:23,24 100:1
   105:2,7,25 106:3,21,22
   107:19,25 109:11
**documents (60)**
17:16 36:2,20 39:6,12,14,21
   39:25 40:1,2,4,6,14,18,21
   40:23 41:2,21 48:2,5,9,10
   48:11,13,20 50:6,7,14,16,24
   51:3,4,6,10,18,20 52:11
   53:14,24 54:5 55:8,16,18
   59:2 66:13 71:6,16 74:19
   74:21,24 75:3,7 77:7 81:4
   81:17,22 82:5 97:12 105:13
   113:16
**Doe (1)**
24:4
**Doe's (2)**
24:14 28:20
**doing (1)**
37:4
**dollars (3)**
21:9 22:18 96:13
**Dorsey (1)**
106:16
**dozens (1)**
79:4
**Dr (1)**
101:2
**drafts (5)**
58:6,9,11,15 100:18
**drives (1)**
79:11
**DUE (1)**
112:21

**duly (2)**
5:24 112:6
**duties (1)**
11:23
**duty (1)**
26:14
**D-E-M-P-S-E-Y (1)**
6:9

**E**

**E (5)**
2:5,18 112:1,1 113:4
**earlier (7)**
8:19 50:11 55:11 56:3 92:3
   99:22 101:4
**Edward (1)**
6:9
**effort (3)**
56:9 74:20,25
**eight (2)**
101:3 102:20
**either (3)**
26:5 84:23 93:1
**Electric (9)**
10:1 15:7,8,11 17:11 22:6,8
   22:17 29:24
**electronic (4)**
40:1,6 59:2,5
**electronically (3)**
39:17 44:14,18
**Ellis (7)**
35:4 65:21 67:25 77:23 78:7
   106:4 108:4
**Elm (1)**
2:10
**employed (7)**
6:24 7:5 68:6,11,22 69:20
   70:16
**employee (7)**
63:2 64:21 65:2 69:6,13
   112:11,13
**Employees (2)**
7:7,8
**employer (1)**
10:9
**Employers (17)**
7:3,6,14,24 8:1 9:11 13:24
   14:21,25 15:2,12 18:13
   20:19 52:18 55:13 60:9

8

83:23
**employment (4)**
6:17 32:18 48:18,19
**enclosed (5)**
85:16 92:22 113:9,15,16
**encompass (1)**
53:15
**endeavor (1)**
102:12
**engage (3)**
80:10,11,13
**engaged (2)**
32:12 60:15
**engaging (1)**
31:3
**entered (3)**
32:13,17 33:10
**entire (4)**
16:20 31:10 77:3 92:18
**entirely (1)**
25:10
**entirety (2)**
26:1 77:8
**entitlement (1)**
102:24
**entity (4)**
10:15 62:6 109:20,25
**entries (2)**
61:2,5
**entry (1)**
100:13
**envelope (1)**
113:16
**equals (1)**
86:11
**equitable (2)**
93:1,12
**ERAC (24)**
8:1,5 10:16 15:1,5,8,16 19:6
    21:6,20 31:10 32:7,9 39:20
    40:18,20,25 41:1,22 49:25
    58:4 70:9,18 100:5
**ERAC's (2)**
16:15 109:16
**ERC (95)**
8:4,7,16 10:3 11:6 12:19
    15:5,15,20 16:18,18,23
    17:7,10,23 21:20 22:12,23
    26:16,19 27:5,14,22 28:4

28:11,12,14,18 29:1,9 30:1
    30:6,8 31:6,10 32:6,7,7,10
    32:13,22 33:3,6,10 44:25
    45:6 46:1,13 48:8,12,18,19
    48:21 49:21,23,25 50:17
    53:4,8 56:25 58:4 61:25
    62:2,6 66:22 67:1 73:2,6,12
    73:21,25 78:8 79:22 83:15
    83:18 84:7,18 85:7,15,19
    86:12,19,23 90:18,21 91:1
    91:24 92:2 94:7 95:8,12,18
    97:12 100:5 109:21
**ERC's (5)**
16:15 29:10 49:4 52:16
    95:15
**errata (3)**
113:10,15 114:1
**essence (1)**
21:14
**essentially (3)**
26:22 34:15 70:13
**establish (3)**
27:12,14,18
**established (1)**
91:18
**etcetera (2)**
47:10 51:16
**evaluated (1)**
104:10
**evaluation (1)**
101:6
**event (1)**
87:23
**events (1)**
26:20
**evidence (2)**
35:20 66:20
**exact (4)**
15:13 16:23 19:3 62:25
**exactly (3)**
21:24 48:24 82:16
**examination (4)**
3:8 6:1 113:9,14
**examine (2)**
24:24 26:12
**examined (2)**
25:25 112:5
**examiner (1)**
69:19

**examining (1)**
78:20
**exchange (1)**
20:21
**excluding (1)**
96:12
**exclusive (1)**
86:23
**excuse (2)**
12:13 98:12
**exercise (4)**
54:15 91:23 92:1 104:5
**exhibit (46)**
3:11,12,13,14,15,16,17,18,19
    3:20,21,22,23,24,25 4:2,3,4
    4:5,6,7,8,9 42:20 44:23
    61:13 66:12 81:9 82:9,12
    83:3,8,22 85:6 86:7,15,16
    87:4 90:18 94:12 96:2 99:4
    99:17 100:12 105:2,19
**Exhibits (4)**
3:10 4:11 42:18 81:5
**exist (2)**
26:13 55:25
**existed (1)**
32:17
**expense (1)**
95:15
**expenses (9)**
66:23 67:2 94:24 95:1 96:15
    96:16,17 97:10,13
**experience (1)**
27:20
**explain (1)**
59:7
**expounds (1)**
85:10
**express (2)**
59:23 60:1
**extent (4)**
24:24 99:13 101:18 108:14
**e-mail (3)**
67:18 108:4,21
**e-mails (4)**
19:13,15 39:17 51:25

---

**F**

**F (1)**
112:1

**fact (7)**
22:21 52:17 66:9 76:13
78:17,22 82:7
**factor (1)**
29:4
**factors (1)**
29:5
**facts (3)**
22:1 35:20 84:11
**Fair (1)**
37:5
**fairly (1)**
57:16
**familiar (6)**
45:6 53:11,12 61:21 63:15
69:12
**far (7)**
17:19 25:24 63:11 84:12
95:25 96:1 100:16
**Farabow (9)**
2:10 5:20 35:3 65:25 69:2,3
106:5 108:5,21
**February (12)**
14:10 68:16 71:16,23 72:4,8
74:10 106:11,13 107:24
108:2,20
**Federal (1)**
6:6
**FEES (1)**
112:21
**Felgate (1)**
9:6
**Felgate's (1)**
9:9
**Fifth (1)**
2:23
**figure (1)**
15:14
**file (56)**
17:24 21:11 24:5 25:1,8
31:10 40:5,8,11 49:7,8,13
49:16,21,23 50:6,8,10 51:7
55:24 56:1,25 57:10 58:1,4
59:1,4,6,10,12,15 62:7,13
75:22 76:6,16,25 77:3,9
80:3,24 81:24 82:5 83:6
92:8 94:7,21 97:18,21 99:6
99:11 100:17,23 104:24
105:1,5

**filed (16)**
4:11 14:10 21:20 22:5 26:15
27:1 48:4 51:25 58:7 66:24
81:21 91:17 97:20 100:18
107:14 113:17
**files (12)**
11:22,25 18:4 23:15 30:5,7
41:8 49:5 78:23 92:22 93:6
93:6
**filing (3)**
58:13 78:6 100:19
**fill (1)**
10:14
**filling (1)**
9:21
**financial (9)**
59:14 63:3 64:17 67:12 68:7
69:4,21 99:10,12
**financially (1)**
112:14
**find (1)**
113:10
**Fine (1)**
104:2
**firm (5)**
67:25 68:4 106:17,17 109:12
**first (7)**
5:24 9:25 88:23 89:2,15 99:4
100:2
**fits (1)**
12:16
**five (8)**
10:4 34:22 75:20,25 76:2,4
87:16 94:19
**five-hour (1)**
34:24
**flattened (1)**
8:25
**flip (1)**
60:25
**floor (1)**
35:14
**Florida (2)**
2:7 87:22
**focus (2)**
71:3 77:10
**focused (1)**
13:5
**follow (2)**

27:5 46:5
**follows (1)**
5:25
**forensic (1)**
99:5
**form (32)**
12:4 29:12 30:2,16 33:12
37:24 45:17 46:13,21 47:5
49:17 50:3 53:7,21 65:19
71:25 78:12 84:13 85:4
87:5,11 90:18,22 91:1,2,4
93:17 94:9 98:4,21 104:13
113:12
**formally (1)**
63:3
**forms (3)**
49:13,15 85:20
**formulas (1)**
27:19
**formulated (1)**
29:15
**Formus (9)**
2:14 5:19 35:3 65:24 68:25
69:1 106:5 108:5,21
**Fort (1)**
31:17
**forward (1)**
17:4
**forwarded (1)**
31:13
**Foster (1)**
65:3
**four (4)**
78:5 82:13,14 102:20
**front (1)**
20:1
**full (1)**
81:12
**fully (1)**
23:4
**function (1)**
25:4
**further (2)**
93:3 110:6
**F-e-l-g-a-t-e (1)**
9:8

———————————
**G**
———————————

**Gallien (1)**

10

63:13
**Gasser (1)**
65:24
**gathered (3)**
31:12 51:20 82:1
**gathering (1)**
39:5
**Gaum (1)**
63:18
**GE (2)**
10:10 15:16
**general (16)**
9:20 10:1,3,10,20 11:1,5,9
15:7,8,11 17:11 22:6,8,16
29:24
**generally (1)**
24:1
**generic (1)**
47:7
**gentleman (2)**
10:5 107:14
**George (1)**
69:8
**Geraldine (5)**
61:22,23 62:2,19 65:20
**getting (10)**
7:16 15:1 18:22 98:13,19,20
100:4 101:19 102:15
105:13
**give (6)**
21:10 37:1,4 52:25 93:3
107:25
**given (9)**
13:9 20:17 22:1,5 34:10
52:11 88:15 113:9,13
**gives (1)**
44:24
**giving (1)**
38:17
**go (20)**
6:13 10:18 19:18 22:25 23:5
25:3,10 26:9 30:22 31:16
37:3 39:24 45:14 55:15
60:5,8 61:1,5,8 82:12
**goes (2)**
21:6 65:25
**going (23)**
5:6 21:8,13 36:25 37:8 54:22
54:25 61:1,4,11 70:23

87:13,18 88:21,24 92:25
103:6,20 104:7 108:8 109:7
109:13 110:10
**good (5)**
6:3 7:11 70:20 79:12,21
**Goodman (3)**
64:9 69:10,13
**graduate (1)**
6:15
**graduated (1)**
31:17
**Graydon (1)**
2:22
**great (1)**
81:8
**greater (4)**
21:21 22:8,13 29:2
**Greensboro (4)**
2:11 24:22 25:4 26:9
**Grote (1)**
97:16
**grounds (2)**
54:17 101:13
**group (6)**
6:23 12:13,13 13:5 91:20
101:11
**grow (1)**
91:10
**guess (4)**
11:24 26:21 46:6 66:10
**guidance (1)**
89:5
**G-a-l-l-i-e-n (1)**
63:14
**G-a-u-m (1)**
63:18

___

**H**

**half (1)**
35:24
**Hampshire (3)**
64:18 69:21 99:25
**hand (2)**
97:5 112:16
**handled (1)**
107:7
**handling (3)**
77:21 78:8 107:5
**handwriting (5)**

82:18,20 86:8,10 96:4
**happen (2)**
31:14 85:18
**happened (2)**
34:8 48:17
**hard (3)**
39:14 40:1,4
**Harold (1)**
75:23
**Hays (1)**
31:17
**head (6)**
2:22 9:10 38:16 55:20 64:16
67:8
**heading (1)**
46:3
**health (2)**
7:14 9:10
**heard (1)**
16:6
**hearing (3)**
58:23,24,25
**hearsay (1)**
16:9
**heart (1)**
103:4
**Hecker (3)**
1:20 2:18 113:5
**held (1)**
73:18
**helped (1)**
17:2
**helps (1)**
59:22
**hereinbefore (1)**
112:9
**Hey (1)**
21:7
**high (1)**
60:8
**hire (1)**
61:22
**history (2)**
6:18 87:8
**hold (1)**
83:6
**honestly (3)**
26:2 51:11 79:1
**hour (2)**

35:24 39:2
**hours (2)**
34:22 87:16
**house (1)**
87:10
**housed (1)**
30:6
**Hughes (4)**
63:20,24 64:4 90:7
**hundreds (2)**
79:2,10
**Huy (1)**
61:18
**hypothetical (1)**
30:5
**H-u-y (1)**
61:18

**I**

**idea (7)**
44:13,16,21 46:12,18 63:19
   64:6
**identification (2)**
42:19 61:14
**identified (11)**
3:10 4:1 25:14,21 36:12,15
   36:18,21 54:3 66:5 92:11
**identifies (1)**
44:25
**identify (7)**
25:13,17,19 26:7,11 29:1
   37:16
**Identifying (1)**
39:9
**illness (2)**
12:12 31:5
**IME (2)**
58:3,5
**immediately (1)**
40:5
**important (2)**
93:10,19
**inadvertently (1)**
92:10
**incapacitated (1)**
103:11
**inch (1)**
49:10
**include (1)**

46:16
**included (2)**
99:11,19
**including (3)**
34:22 57:19 58:6
**incorrectly (1)**
7:20
**increase (1)**
91:14
**incurred (1)**
23:1
**indemnity (1)**
26:16
**INDEX (2)**
3:5 4:1
**Indian (1)**
3:3
**Indianapolis (1)**
10:14
**indicated (3)**
56:3 62:17 99:22
**indicates (16)**
44:22 45:9 46:19 71:19 74:9
   74:18 75:18 76:9 77:19
   78:2,4 84:6 85:16 91:5 95:9
   97:25
**indicating (1)**
109:6
**individual (21)**
9:3 10:13 12:14,16,21 13:3,4
   13:8,16,18 15:24 21:1 23:6
   27:1 29:19 30:8 45:7 91:20
   91:22,24 92:2
**individuals (3)**
88:11,18 89:4
**individual's (1)**
9:24
**information (25)**
27:9,17 28:25 29:2 30:11,13
   31:11 45:5 46:14 57:5,8,11
   57:13,15,19 59:12,13,17,21
   85:17 86:3 94:3,4,6,25
**informed (1)**
103:16
**inherited (1)**
50:10
**initially (1)**
23:22
**Innomation (1)**

97:17
**inquiring (1)**
83:10
**inside (1)**
11:5
**instruct (4)**
54:23 55:1 108:15 109:4
**instructed (1)**
87:15
**instructing (2)**
54:20 101:15
**instruction (1)**
109:9
**insurance (16)**
1:5 2:4,9 6:19 12:3,7,10,12
   14:19 17:13 20:24 21:5
   23:6,11 29:16 82:2
**insured (5)**
21:1 26:5 27:1 60:5 93:13
**insureds (5)**
33:5,5 60:5 92:11,23
**insurer (5)**
15:4 16:11 20:17 27:18
   31:11
**intend (1)**
21:8
**intention (1)**
25:11
**interact (1)**
80:9
**interacted (1)**
66:6
**interactions (1)**
63:4
**interest (1)**
52:17
**interested (2)**
60:14 112:14
**internal (1)**
97:12
**internally (1)**
29:1
**interpret (1)**
26:21
**interrupting (1)**
84:19
**investigate (2)**
80:6 92:25
**investigating (1)**

12

108:12
**investigative (2)**
84:9 98:6
**invitation (1)**
26:6
**involved (20)**
16:7,23 19:12,15,19 33:13,15
33:15 49:1,3 60:2 65:17
66:4 68:15 70:14 76:21
78:7 79:15 80:12 97:5
**involvement (11)**
13:4,7 23:21 24:14,25 26:4
48:23,25 51:18 60:9 75:15
**involving (2)**
14:19 86:3
**in-house (3)**
68:7 69:3 70:8
**issuance (1)**
105:14
**issue (2)**
84:23 102:2
**issued (5)**
16:13 55:12 58:17 60:18
95:6
**issues (1)**
96:9
**items (2)**
39:16 47:21

---
**J**

**Jane (4)**
63:1,2 99:20,22
**January (6)**
23:23 65:11 84:4 98:1 106:1
106:4
**Jay (1)**
106:6
**Jefferson-Pilot (75)**
1:5 2:3,9 5:10,20 14:1 16:11
16:13,16,18,21,24 17:8,24
18:7,12 19:6 20:18 21:17
22:7 23:7,15,23 24:4,15,16
24:21 25:5,15 26:5,14,18
27:6,10,15,24 28:6,9 29:3
29:23 31:20 33:5 34:10
38:16 48:23 51:6 53:5
62:18 63:3,8,10 66:24 67:9
68:11 69:4,20 73:5,22,25
76:7 77:9 79:7 83:17,24

85:2 89:25 93:3,14 94:8
95:22 96:21 107:15 111:23
113:7 114:2
**Jefferson-Pilot's (4)**
20:3 26:6 96:25 99:24
**Jeffries (2)**
107:1,2
**Jeremy (1)**
3:1
**job (2)**
11:23 24:11
**Joe (1)**
20:25
**John (12)**
2:5 5:9 10:2 24:4,14 28:20
64:13 65:5,6,8 86:9 92:22
**Johnson (6)**
61:22,23 62:2,10,19 65:20
**join (7)**
50:22 54:19 93:24 98:22
101:17 108:13 109:3
**Joseph (1)**
99:6
**JP (8)**
26:17,25 33:18 86:13,23 93:7
96:5 109:21
**Judge (2)**
100:15,16
**judgment (2)**
38:22 97:16
**July (3)**
82:25 92:6 97:8
**June (9)**
1:19 5:4 7:13 51:6 82:24
94:11,14 96:3 113:2
**jurisdiction (3)**
46:17 47:3,6
**jury (11)**
16:14 18:2,9 19:4 20:1,14
22:22 25:2 32:19 53:13
98:18
**J.E (1)**
97:16
**J.L (1)**
61:20

---
**K**

**Kahn (1)**
92:23

**Kansas (11)**
1:21 2:19 3:4 6:14,19,23 7:1
7:5 14:5 25:11 113:6
**Karen (1)**
63:18
**Katherine (1)**
10:13
**Kearney (65)**
1:9 2:21 5:15 6:5 16:12,16
17:21 18:4,22,25 21:17,22
22:2,15 30:12 40:14 44:23
48:20 49:4 56:2 58:3 62:3,8
62:14 63:24 65:18 66:25
68:16 71:22 74:14 76:19
77:1,25 78:6 81:22 84:5
85:21 86:3 87:9 88:8 91:6
91:11 92:23 94:4 96:8 97:9
97:17 98:1,10 99:18 100:3
100:5 101:2,5 103:3 104:23
106:9,18 107:1,10,17
108:22 111:23 113:7 114:2
**Kearney's (35)**
16:10 17:12,18 18:16 19:13
20:2 24:2 25:24 26:1 31:14
33:8,14,16,18 56:12 57:6,9
58:16 59:9,14 62:10 64:4
69:24 77:3 78:8 88:4,11
90:23 94:25 97:13 99:10
100:25 102:1 108:6 109:22
**keep (1)**
41:1
**kept (1)**
18:12
**kind (6)**
12:10 21:12 32:13 47:12
88:3 96:15
**King (2)**
107:2,12
**Knoll (1)**
67:16
**know (122)**
9:14 10:25 11:3 15:13 16:2,6
17:19,20 18:15 19:9 20:1
20:13 22:20 25:24 32:16,22
32:24 33:7,8,13,14 34:3
36:11,16 38:18 41:10 42:1
44:11 46:16,25 47:15,19,22
47:24 48:1,17,24 49:7,22
50:4 51:11,19 54:14,24

55:2 56:4,21,23,24 61:18
62:15 63:7,11,13 64:8,10
64:12,14,20,22 65:1,3,6,8
66:9 67:9,17,20,22 68:20
69:9 70:6 74:4 76:23,24
77:6 78:9 79:1,1,9 82:12
84:12,14,15,20,21,22 85:3,5
85:18,23 86:8,14,18,25
90:5,6 91:15 92:14 93:9,20
94:6,10,17 95:20,25 96:1,3
96:20 97:20 98:11 100:23
103:10 104:11,19 106:10
107:2,4,9,12 108:23 110:2
**knowledge (9)**
28:4 39:23 46:15 50:23
63:12 65:8 83:18 91:3
109:23
**knows (1)**
103:18
**Kristin (1)**
67:16
**K-n-o-l-l (1)**
67:16

——————————— L ———————————

**L (1)**
1:9
**labeled (3)**
83:22 100:1,12
**laid (2)**
51:17 71:4
**Lainner (4)**
8:8,9,13,23
**Lancaster (1)**
67:19
**large (1)**
17:2
**largely (1)**
50:12
**late (1)**
7:13
**lateral (2)**
40:5,8
**law (10)**
1:19 6:11,13,14 67:25 68:4
106:16,17 109:11 113:12
**lawsuit (10)**
6:5 30:9 47:8 62:7,13 66:24
78:6 99:19 102:8 107:14

**lawsuits (4)**
46:20 47:3 57:6,9
**lawyer (12)**
6:4 8:9 11:8 35:6 46:22 55:3
62:2 63:11 65:7 77:24 88:4
88:12
**lawyers (11)**
10:24 11:4 12:19 17:2 34:25
35:7 36:4 54:15 65:17,23
66:4
**layout (1)**
46:14
**lead (1)**
26:20
**legal (8)**
2:14 38:17,23 46:19 65:15
66:23 67:1 96:14
**letter (26)**
37:20 38:2,9,19 42:4,16,21
43:4,22 44:4,6,9 82:9,14
83:23 84:12 92:7 94:12,20
94:23 96:2 97:8 99:18
104:23 105:3 113:17
**let's (6)**
10:18 20:23 24:18 61:8 71:2
92:15
**level (2)**
8:25 60:9
**Levy (1)**
99:6
**liability (9)**
26:20 28:5,7,13 53:9 60:12
67:3 109:20,21
**life (4)**
7:13 9:10 12:12 23:11
**lifetime (7)**
45:3,8,10,12,15,18,20
**limb (1)**
45:14
**limited (1)**
13:7
**Lincoln (7)**
63:3 64:17 67:11,12 68:7
69:4,20
**Linda (1)**
65:14
**line (3)**
31:4 89:11,18
**lines (1)**

32:12
**Lisa (1)**
64:5
**list (8)**
24:22,23 25:18 47:11,12,16
47:20 65:25
**litigate (1)**
46:24
**litigating (2)**
59:14 60:3
**litigation (36)**
12:2 19:14 30:20 50:12,13,16
50:19 51:5,9,23 52:9,15,17
52:21,23 53:5,17,18 55:5
56:16 60:6,8,13 66:8 67:9
70:17 71:22 74:16 77:24
83:14 85:1 97:5 101:12
102:6 105:10 107:21
**little (3)**
7:16 46:10 71:3
**LLP (5)**
1:20 2:6,18,23 113:5
**locate (1)**
37:22
**located (1)**
40:4
**Loftin (3)**
36:10 37:21 38:8
**Loftin's (1)**
38:14
**log (34)**
19:18 28:21 36:13,15,18,23
36:25 37:1,14,15 54:3
57:23 60:17 65:11,22 66:11
67:18 71:3 72:24 74:8,17
75:5,8,17 76:8 77:18 78:1,4
78:18,22 81:7 94:19 105:18
105:21
**logical (1)**
78:14
**logically (1)**
46:4
**logs (1)**
66:19
**London (1)**
92:24
**long (6)**
12:2,12 15:10 23:11 34:21
35:22

14

**look (20)**
22:25 24:20,22 26:8 30:22
  37:14 42:23 43:7 51:10,21
  51:22 56:9 60:20,25 71:15
  75:10,19 86:15 94:18
  105:21
**looked (3)**
38:20,21 56:11
**looking (4)**
25:12 75:12 89:5 107:18
**looks (1)**
109:13
**Lori (1)**
63:13
**loss (9)**
16:19 17:15 18:6,20 19:3
  20:17,20 22:5,13
**lot (2)**
26:21 53:23
**lunch (1)**
34:22
**Lynn (6)**
1:17 69:15,16 112:2,20
  113:21
**L-a-i-n-n-e-r (1)**
8:13

————————————————
                **M**
————————————————
**mail (1)**
106:16
**mailed (1)**
39:11
**main (2)**
2:15 32:20
**maintain (3)**
27:25 28:4,6
**maintained (8)**
27:23,24 28:22 40:13 53:24
  57:25 59:3 81:17
**maintains (1)**
28:9
**majority (1)**
60:7
**making (4)**
39:9 52:20 113:11,13
**manage (2)**
80:12,15
**Management (10)**
2:4,13,14 5:11,19 23:25

31:22 32:3,14 65:16
**manner (2)**
93:2,12
**March (4)**
72:13 76:5 77:1 84:4
**Maria (1)**
70:5
**mark (6)**
37:1 68:9,10,14 108:22,23
**marked (6)**
3:10 4:1 42:19 61:14 81:4,8
**marketing (1)**
31:5
**Martin (11)**
3:1 5:2,16,21 37:7,10 61:10
  61:15 70:22,25 110:9
**Martinez (1)**
70:5
**Mary (4)**
1:17 112:2,20 113:21
**Mass (3)**
14:4 15:4 33:5
**Massachusetts (1)**
2:16
**material (1)**
92:22
**materials (5)**
41:13 49:4,11,12 52:13
**math (2)**
91:8 95:10
**matter (9)**
14:19 31:7 47:10 61:24
  63:21 77:20 106:6,15 113:9
**matters (2)**
52:23 60:4
**McGaff (1)**
65:23
**Meagher (68)**
2:5 5:9,9,18 12:4 19:21 20:5
  29:12 30:2,15 33:12 34:18
  35:19 36:1 37:23 42:22
  43:1,6,9,11,19 45:17 46:21
  47:5 50:3,22 53:7,21 54:16
  55:19,21 60:22 61:4 65:19
  65:21 66:19 71:25 78:12,16
  84:13 85:4 87:1,5,11,18
  92:9,16,20 93:17,24 94:9
  98:4,21 101:10,21 103:6,10
  103:15,19,23 104:2,12

106:12 108:5,8,20,25 110:8
**mean (20)**
11:25 26:21 29:13,14 30:25
  31:8 40:8,9 45:3,8,19,25
  46:9 47:9,17 52:14 53:11
  83:1 95:6 109:11
**meaning (3)**
20:20 32:5 71:21
**means (6)**
18:10 20:15,16 47:3 53:13
  109:8
**mechanics (1)**
62:25
**medical (21)**
12:15 52:1,8 56:24 57:2 84:9
  96:14 100:3,4,6,9 101:1,4,8
  102:1,3,5,15,17,23 104:5
**meet (1)**
35:11
**meeting (5)**
34:24 35:14 87:10,22 88:1
**members (1)**
68:1
**memo (1)**
38:2
**memoranda (1)**
58:12
**memorandum (4)**
74:1,3,4 75:20
**mention (1)**
69:10
**mentioned (1)**
75:25
**met (2)**
34:19 35:7
**methods (1)**
54:18
**Metropolitan (3)**
3:2 112:21 113:19
**Miami (3)**
2:6,7 87:22
**Michael (1)**
2:22
**Michelle (2)**
64:19,21
**Mike (2)**
5:15 6:3
**Mills (3)**
90:9,10 99:6

**mind (2)**
46:24 103:9
**mindful (20)**
12:1 16:10 18:22 42:11 48:2
53:25 57:7,13,18 58:4,7
71:4 76:10,12 81:16 87:23
99:8,9,15 103:3
**minority (1)**
51:17
**minute (2)**
70:1 74:21
**minutes (1)**
35:16
**misinterpreted (1)**
66:2
**misprint (1)**
106:8
**misrepresenting (1)**
44:7
**Mississippi (1)**
107:16
**Missouri (6)**
1:21 2:20 14:8,22 112:3
113:6
**misspeaking (1)**
68:13
**misunderstood (1)**
76:3
**modified (1)**
17:3
**moment (2)**
43:12 105:16
**monetarily (1)**
22:10
**monitoring (2)**
29:9,14
**month (4)**
19:11,19 48:5 72:12
**months (3)**
100:7 101:3 102:18
**Morrison (3)**
1:20 2:18 113:5
**Motion (1)**
97:15
**motions (4)**
50:14 51:15 58:12 100:18
**multi (1)**
43:12
**multiply (1)**

95:14
**multi-hour (1)**
37:17
**Mutual (4)**
6:22 14:4 15:4 33:5

## N

**name (14)**
6:3,7 9:7,24 10:5,13 13:6
32:8 36:24 61:21 63:15
65:1,9 69:12
**names (2)**
30:1 92:11
**nature (3)**
23:2 31:25 40:21
**near (1)**
81:3
**necessarily (3)**
24:7 46:4,24
**need (3)**
28:22 84:7 105:16
**needs (1)**
80:5
**negative (3)**
16:1 64:1,2
**negotiations (1)**
16:8
**Neidermyer (5)**
63:1,2,17 99:20,23
**never (2)**
32:23 100:14
**new (5)**
10:15 26:15 64:17 69:21
99:25
**Newkirk (21)**
11:8,22 12:24 33:19,20,22
42:6,11 44:12 45:5 46:22
47:1,19 73:3,24 78:3 86:17
86:20 93:7 94:14 97:9
**Newkirk's (4)**
11:24 43:24 44:10 96:6
**new-be (1)**
73:12
**Nick (1)**
10:6
**nickel (2)**
20:3,4
**Nine (1)**
92:6

**non-chronological (1)**
105:20
**non-lawyer (1)**
38:11
**non-litigation (1)**
69:24
**Norman (1)**
69:18
**North (3)**
2:10,11 25:11
**Notary (1)**
111:16
**notation (1)**
81:23
**note (2)**
57:16 92:10
**notes (1)**
83:7
**notice (4)**
1:18 26:19 27:10 43:15
**noticed (1)**
43:13
**notify (1)**
26:25
**November (5)**
72:22 73:8 74:5 83:20 101:2
**number (12)**
44:24 45:13 76:2 81:9,12,16
84:5 95:18 105:23 106:12
106:22 107:25
**numbered (3)**
71:7 74:11 92:8
**numbers (3)**
29:14 44:20 82:25
**numerically (1)**
71:6
**numerous (1)**
19:15
**N-e-i-d-e-r-m-y-e-r (1)**
63:17

## O

**oath (2)**
5:24 62:5
**object (10)**
37:23 43:14 54:16 55:23
78:12 85:4 87:19 88:21
101:13 108:9
**objection (35)**

16

12:4 19:21 20:5 29:12 30:2
  30:15 33:12 35:19 45:17
  46:21 47:5 50:3,20 53:7,21
  54:19 65:19 71:25 78:16
  84:13 87:1,5,11 89:7 93:15
  93:17,22,23 94:9 98:4,21
  101:18 104:12 108:14
  109:3
**obligation (4)**
17:12,23 26:18 95:12
**obligations (1)**
29:25
**obtained (4)**
48:15,24 49:9,23
**occasion (1)**
11:19
**occasionally (1)**
12:14
**occasions (4)**
13:12 23:1 58:18 100:20
**occurred (2)**
62:24,25
**occurrence (2)**
80:24,25
**October (7)**
7:2,21,23 9:18 87:9,21 100:2
**offer (6)**
88:3,7,11,15,19 89:5
**office (16)**
10:14,21,22,23,24 11:2,5,9
  23:2 30:24 31:9 34:4 40:6
  64:17 69:22 113:15
**offices (2)**
1:19 31:13
**Ohio (3)**
1:2 2:24 6:6
**Okay (12)**
32:13 43:15 45:1 61:3 72:3
  72:11,21 74:12 86:17 96:4
  103:20 108:3
**old (1)**
105:8
**older (1)**
91:11
**once (5)**
28:14 29:8 45:11 51:14
  91:17
**ones (1)**
101:5

**ongoing (3)**
102:25 104:6 105:11
**onset (1)**
83:11
**operation (2)**
99:24,25
**operations (1)**
79:20
**opine (1)**
28:3
**opinion (1)**
59:23
**opinions (2)**
53:1 60:1
**opportunity (1)**
37:13
**opposed (1)**
59:3
**order (2)**
92:17 101:5
**organization (2)**
9:1 11:14
**Original (1)**
4:11
**outside (5)**
10:21,23 11:9 28:15 102:6
**overall (1)**
18:11
**Overland (2)**
3:4 7:4
**overwhelmed (1)**
80:4
**owner (1)**
15:7

**P**

**page (18)**
3:6 43:12 44:22 75:20 76:2,4
  81:12,14 89:11,18 94:20
  97:15,24,25 99:5 100:2
  113:10,15
**pages (7)**
30:11,18 38:5,6 50:11 51:13
  51:15
**paid (8)**
18:13,23 20:21 22:19 69:25
  96:13 97:13 98:16
**paper (1)**
40:14

**paragraph (3)**
38:20,23,25
**paralegal (1)**
65:16
**parent (1)**
109:17
**Park (2)**
3:4 7:4
**Parkway (1)**
3:3
**part (4)**
16:4 21:14,15 76:19
**partake (2)**
39:20 54:4
**participants (3)**
90:12,15,17
**participate (8)**
34:23 52:22 62:12,22 88:14
  88:24 89:3,16
**participated (4)**
40:17 54:14 62:16 89:23
**particular (9)**
12:1 16:5 19:10 21:16 22:3
  60:24 73:14 83:8 110:3
**particularly (1)**
31:3
**parties (4)**
17:6,7 57:6 112:12
**party (1)**
55:22
**Pat (1)**
64:7
**Patricia (1)**
67:14
**pay (6)**
21:2,3 22:9 26:16,17 96:4
**payment (5)**
21:21 96:11,19,20 100:14
**payments (5)**
19:5 96:8,22,24,25
**peer (1)**
70:12
**pendency (1)**
101:12
**pending (6)**
6:5 24:6 26:7 28:21 29:23
  102:8
**people (3)**
9:2 21:11 60:1

**peoples (1)**
53:1
**percent (19)**
17:11,17 20:9,11 21:21 22:9
22:14 45:23,24,25 46:1,2
53:8 82:24,25,25 84:6
95:11,19
**percentage (17)**
16:19 17:23 19:4 20:2,20,21
21:10 22:12,18 26:16,17
44:25 60:11 67:1 84:8
95:25 96:4
**Perez (2)**
67:14,15
**perfect (1)**
70:2
**perform (1)**
25:3
**performed (3)**
98:10,25 99:11
**period (13)**
10:21 11:2 16:23 21:19,19
24:18 35:4,5 45:20 51:7
79:8 84:3 86:4
**periodically (1)**
96:21
**person (11)**
8:24 10:15,17 13:5 28:20
33:18 49:25 62:6 72:5,5
99:23
**personal (2)**
47:10 59:10
**personally (3)**
51:20 66:6 78:23
**persons (2)**
38:3 59:24
**pertain (1)**
80:14
**pertains (1)**
76:19
**Peter (3)**
65:23 68:2,3
**PG/LN (1)**
114:4
**phone (1)**
5:17
**photograph (1)**
57:21
**photographs (2)**

57:20,24
**physical (2)**
59:3,5
**Physicians (1)**
6:22
**pick (2)**
24:23 97:5
**picked (1)**
39:13
**piece (1)**
36:9
**place (5)**
26:19 80:21,23 110:2 112:8
**plaintiff (3)**
1:7 14:22 112:22
**plans (1)**
103:20
**pleading (1)**
58:9
**pleadings (9)**
50:14 51:16,25 52:7 58:6,6,8
58:11 100:18
**please (13)**
5:7,22 6:7,8 9:7 21:23 52:5
84:8 91:25 101:22 103:22
106:2 113:15
**plug (1)**
29:19
**plus (1)**
50:6
**Pluto (1)**
64:5
**PM (1)**
5:1
**point (11)**
18:7 32:10 33:17,21 35:18
80:11,14 94:15 99:2,13
103:2
**points (1)**
32:20
**policies (11)**
12:7,7,10 16:20 20:25 21:7
23:6 44:24 45:7 46:9 88:8
**policy (28)**
12:3 16:12 17:13,22 21:1,16
21:18 22:2 23:15 24:2 27:2
45:2,11,13,19,22,24,25 46:8
49:18 56:6,10,11 62:20
84:5 85:11 94:25 107:22

**policyholder (4)**
23:14 24:5 79:16,17
**porter (1)**
61:14
**portion (7)**
7:11,14 28:5,7 50:9 95:15
98:5
**position (9)**
6:25 7:3 8:11 9:9 10:8,14,16
10:17 38:14
**possess (2)**
48:8 51:13
**possesses (1)**
49:21
**possession (4)**
40:24 43:24 44:10 77:7
**possible (2)**
70:1 86:5
**potentially (1)**
41:2
**precipitated (1)**
34:2
**predate (2)**
48:11 50:16
**predated (2)**
48:18 49:5
**predecessor (2)**
73:1,4
**premium (5)**
20:21 21:2,9,15 22:18
**preparation (5)**
34:12 35:12 36:3 37:18 39:2
**Preparing (1)**
35:9
**present (6)**
3:1 7:24 102:3,5,15,22
**presented (1)**
100:15
**presently (3)**
9:15 95:21 101:9
**president (1)**
38:11
**presumably (1)**
28:15
**presume (1)**
17:1
**Pretty (1)**
43:19
**previous (3)**

18

89:10,17 101:23
**previously (2)**
83:14 85:1
**pre-litigation (1)**
51:2
**pre-1998 (1)**
51:4
**pricing (1)**
28:1
**primarily (3)**
13:4 27:11 51:15
**prior (21)**
10:19 24:18 27:7 28:18
43:15 48:19,22,25 51:9,18
56:16,18,20,22 62:3 75:14
78:5 88:10 89:8,9 112:5
**privilege (44)**
19:18 36:13,15,18,22,23,25
37:1,14,15 54:3,6,11,18
57:23 60:17 65:11,22 66:11
66:19 67:18 71:3,18 72:7
72:24 74:8,17 75:5,8,16,17
76:8 77:18 78:1,18,22 81:7
87:19 88:22 94:19 101:14
105:18,20 108:10
**privileges (1)**
77:16
**probably (8)**
17:3 25:6 30:17 34:22 49:9
56:14 60:7 102:20
**problem (1)**
103:16
**procedure (1)**
96:7
**procedures (1)**
54:17
**proceed (4)**
92:10,15 93:4 103:21
**proceeding (3)**
13:21 14:5,17
**process (2)**
33:7 90:1
**processed (1)**
84:3
**produce (3)**
41:24 74:19,24
**produced (33)**
17:17 30:11 36:11,14,17,19
37:14 39:14 40:20 41:4,10

41:12,17,21 42:12,13,15,17
44:17 48:3,14 54:8 55:8,16
55:25 57:22 66:15 75:3
81:17 82:8 83:14 84:25
97:25
**produces (1)**
53:16
**producing (2)**
44:11 55:22
**product (19)**
53:11,25 54:3,5,10,17 55:3
71:18 72:7,19 73:20 74:7
74:16 75:16 77:17 101:13
108:9,14 109:1
**production (2)**
39:21 40:18
**progression (1)**
9:18
**promise (1)**
21:2
**properly (1)**
43:13
**proposal (1)**
88:3
**prosecuting (2)**
65:18 66:3
**provide (3)**
39:9 79:21,23
**provided (6)**
36:20 41:15 58:20 86:18
98:2 107:22
**provides (3)**
16:18 79:12 85:13
**Public (1)**
111:16
**pulled (1)**
25:16
**purchase (2)**
15:22,23
**purchased (11)**
7:11,12 15:11,19 17:22 21:17
21:19 22:2,3,4,16
**purported (1)**
100:13
**purportedly (2)**
76:5 85:2
**purpose (5)**
100:8 102:16 104:10,15,20
**purposes (1)**

27:12
**pursuant (9)**
1:18 22:11 33:9 36:12 39:21
41:21 48:15 50:12 113:12
**put (2)**
10:17 47:1
**putting (1)**
45:5

---

**Q**

**qualifies (1)**
102:7
**question (23)**
16:1 23:19 29:8,22,22 52:3
55:1 62:21 64:1 88:23 89:2
89:8,9,10,14,15,17,20
101:19,22,23 108:22,23
**questions (3)**
43:7 110:6,8
**quick (1)**
43:19
**quite (1)**
80:18
**quote (1)**
75:21

---

**R**

**R (1)**
112:1
**random (2)**
24:23 25:10
**randomly (3)**
25:19 26:8,11
**Randy (1)**
65:23
**range (1)**
102:21
**rare (2)**
80:23 81:2
**rate (1)**
82:24
**read (11)**
38:19 43:12 83:12 89:9,11,16
89:18 101:21,24 114:17,19
**reader (1)**
43:20
**reading (3)**
33:2 44:5 113:14
**ready (2)**

25:15 43:18
**really (5)**
28:2 32:23 34:3 49:13 79:9
**reason (10)**
16:2,3 30:18 54:23 55:21,23
72:6,15 113:13 114:4
**reasons (3)**
16:6 25:21 32:10
**Reassurance (10)**
7:7,15 8:2 9:11 13:24 14:25
15:2 52:18 55:13 60:10
**recall (54)**
10:5 13:1,3 16:22 25:25 26:3
34:8,9 38:18 49:12,14,18
51:12 56:5,6,8,22 57:1,2,8
57:9,10,15,17 58:2,5,8,8,9
59:11,11,16 62:23,23,24
63:6,16,22,23 64:3 65:9
87:8 88:9 89:24 90:2,3,11
90:14,16 99:3,12,16 106:19
107:23
**receive (4)**
52:6,10 85:20 86:2
**received (10)**
40:14 41:22 50:7 51:24
83:16 84:2 99:18 100:6
102:17 113:16
**receivership (1)**
14:20
**receiving (5)**
18:23,25 19:1 22:17 100:8
**Recess (1)**
70:24
**recipient (4)**
72:14 74:13 75:1 78:3
**recipients (1)**
74:22
**recognize (1)**
65:1
**recollection (7)**
22:13 38:4 49:8 51:19 62:9
67:20 99:14
**recommendation (2)**
73:17 74:6
**record (17)**
5:6 6:8 30:1 37:3,8,9,11,13
61:9,11,12,16 70:23 71:1
105:17 110:10
**records (23)**

28:1 29:11 52:2,8 56:24 57:3
96:14 99:10 100:3,5,6,9
101:1,4 102:15,17 104:5,9
104:15,16,17,18 108:22
**redacted (2)**
92:12 94:3
**reduced (1)**
112:9
**refer (1)**
78:23
**reference (3)**
57:23 71:12 78:11
**referenced (1)**
76:11
**references (3)**
17:16 71:5 85:10
**referral (1)**
80:16
**referrals (1)**
94:3
**referred (4)**
54:10 66:13 74:21 90:19
**referring (9)**
34:16,17 41:2,14,18 50:25
75:24 81:1 86:23
**refers (1)**
81:16
**reflection (1)**
29:10
**reflects (2)**
87:4 94:23
**regard (4)**
25:23 33:18 83:10 101:10
**regarding (13)**
19:13 30:12,13 48:20 49:4
59:13 63:4 84:4 94:20 97:9
97:13 100:14 108:6
**regardless (1)**
27:15
**reimbursement (4)**
17:14 96:10,12,18
**reimburses (1)**
16:19
**reinsurance (31)**
7:4,6,8,24,25 14:21 15:12,24
16:17 17:5,14 18:3,13,19
20:16,19 22:12 23:3 26:19
26:23 28:11 29:25 30:25
31:2,9 48:12,16 53:9 83:24

109:24 110:3
**reinsure (2)**
22:25 30:14
**reinsured (1)**
16:24
**reinsurer (10)**
15:5 20:18,22 21:6,14 23:17
24:8 26:15 93:2,13
**relate (4)**
51:7 105:10 106:8 108:7
**related (2)**
13:18 76:20
**relates (1)**
105:11
**relating (1)**
94:24
**relation (1)**
107:9
**relationship (5)**
16:15 31:20,22 32:1 57:14
**relative (2)**
112:11,13
**relinquished (1)**
33:22
**remain (2)**
8:18 91:16
**remember (3)**
9:24 49:16 102:19
**reorganization (2)**
8:23 109:19
**repeat (2)**
52:5 91:25
**report (18)**
8:6,24 9:2,3 11:15,17 26:14
58:5 82:1 84:3,5,9 85:15
94:2 98:2,6 99:5,9
**reported (4)**
11:20 29:9 87:23 90:22
**reportedly (2)**
75:20 100:2
**reporter (6)**
42:19 81:7 89:12,19 101:24
112:3
**Reporters (3)**
3:2 112:21 113:19
**reporting (1)**
9:5
**reports (3)**
58:3 70:10 98:20

20

**represent (1)**
6:4
**representation (1)**
66:12
**represented (2)**
84:11 89:25
**representing (2)**
5:10,13
**request (4)**
24:21 50:9 114:18,19
**require (2)**
26:25 43:15
**Res (1)**
86:11
**reserve (19)**
27:18,23,24 28:5,7,10,12,17
   29:4,20 46:9 86:12,13,22
   86:23,24 87:4 91:10,19
**reserved (1)**
27:16
**reserves (8)**
27:13,14,21 28:22 46:7 91:24
   92:2,3
**reserving (1)**
28:1
**residual (4)**
12:3 83:10,11 107:20
**resources (1)**
80:6
**respect (5)**
30:19 31:12 52:14 53:16,17
**respond (4)**
103:24,25 108:17 109:5
**response (2)**
64:2 85:7
**responsibilities (3)**
12:20 15:4 23:5
**responsibility (19)**
12:8,11 19:5 20:9 22:9 23:10
   23:16 24:8 33:22 34:9 46:1
   64:25 66:23 73:1,8,10 94:7
   94:16 95:19
**responsible (3)**
50:1 59:24 73:4
**rest (1)**
83:12
**restate (2)**
21:23 88:17
**result (1)**

77:5
**retain (2)**
62:13,16
**retained (4)**
10:12 61:25 62:7 106:17
**retention (6)**
6:23 18:6,9,11,15 19:9
**retired (1)**
10:4
**retro-session (1)**
110:1
**return (4)**
21:15 81:6 89:1 113:15
**returns (1)**
59:9
**review (25)**
24:25 25:6,7,9 31:6,13 33:4,9
   36:2 37:2 54:2 58:20 60:17
   75:22 76:6,17,25 77:6,7
   91:6 94:21 97:3,6 99:13
   104:5
**reviewed (9)**
32:24 36:5,22 37:17 39:2
   43:16 62:19 77:2,8
**reviews (2)**
97:4 99:10
**Rice (2)**
68:21,22
**Rick (1)**
67:6
**riders (1)**
22:3
**right (48)**
10:12 16:11 19:20 23:17
   29:11 31:6 32:15 33:11
   41:15 43:1 46:20 47:3 48:6
   48:12,16 55:5 58:20,23
   66:8,14 71:18,24 73:9 74:7
   75:16,23 76:7 77:14,17,21
   77:25 78:11 82:6 83:25
   85:8,15 87:24 88:8 93:4
   94:4,12,21 95:16 97:6
   101:6 104:2,7 105:12
**rights (1)**
15:3
**ring (2)**
65:12 68:17
**rings (1)**
107:3

**risk (4)**
6:22 18:12 21:11,15
**Ritchey (1)**
2:23
**Roberson (4)**
61:20 73:22,25 82:19
**Robert (1)**
8:8
**Roberts (79)**
2:22 3:8 5:14,15 6:2,4 12:6
   19:25 20:8 29:21 30:4,21
   33:17 35:22 37:12 38:1
   42:20,24 43:3,9,17,21
   45:21 47:2,11 50:4 51:2
   53:10,23 54:20 55:2,7,19
   55:24 61:8,17 66:10,16,22
   71:2 72:2 78:14,19 82:11
   84:15 85:6 87:3,7,15,21
   89:1,13,22 92:14,18,21
   93:20 94:1,11 98:7,24
   101:15 102:3 103:8,13,17
   103:21,25 104:4,14 105:18
   105:25 108:11,18 109:2,6
   109:10,16 110:5
**role (6)**
39:5,8 63:7 64:22,24 67:10
**routine (2)**
60:15 104:5
**runner (1)**
39:13
**Russell (1)**
10:13
**RVW (3)**
108:24 109:2,14
**RVW-IME (1)**
108:22
**R-E-I (1)**
7:9
**R-e-i-n-s-u-r-a-n-c-e (1)**
7:10

---

### S

**sale (2)**
7:12,25
**Sandie (1)**
64:11
**satisfied (1)**
79:22
**satisfy (1)**

96:23
**saw (2)**
17:16 54:3
**saying (3)**
20:24 21:25 41:1
**says (19)**
21:1,6 44:9,23 45:2,21,22,23
45:24 46:7 47:23 55:22
73:17 81:24 84:2 86:11
92:21 108:21 109:7
**Schlep (1)**
13:6
**Schmidt (3)**
66:1 67:23,24
**school (2)**
6:13,14
**Scott (4)**
67:19,20 70:7,8
**se (3)**
23:22 52:24 61:25
**seal (1)**
112:16
**second (3)**
81:12 82:11 85:11
**see (15)**
41:5 42:4 47:13 66:14 75:8
76:3 81:14,23 83:20 85:11
89:6 92:25 93:11 97:19
106:7
**seeing (3)**
49:12,15 59:11
**seen (6)**
36:15 41:6 42:15 43:3 57:21
58:21
**select (1)**
33:3
**selected (1)**
33:9
**self-addressed (1)**
113:16
**sell (2)**
20:25 21:8
**Semmler (2)**
68:5,6
**send (3)**
30:24 80:3 93:7
**sense (4)**
40:10 66:2 82:21 95:4
**sent (8)**

23:2,22,24 30:24 31:8,10
85:2 96:9
**separate (1)**
77:16
**September (5)**
6:21,23 75:14 82:9,14
**series (1)**
100:3
**served (2)**
30:9 43:25
**service (3)**
79:12,21,22
**services (12)**
2:5,13,15 5:11,19 7:1 23:25
31:23 32:4,15 65:16 79:11
**session (2)**
37:18 39:3
**settle (2)**
93:1,12
**settlement (1)**
88:2
**seven (1)**
47:11
**shaking (1)**
55:20
**shared (4)**
58:12,16 65:10 100:19
**shares (1)**
67:1
**sharing (3)**
94:24,25 97:10
**sheet (3)**
113:10,15 114:1
**Shelton (6)**
75:23 85:13 92:7 94:14,20
97:8
**Shelton's (1)**
85:7
**Shepard (1)**
101:2
**short (1)**
41:19
**shortened (1)**
109:12
**shorthand (2)**
112:3,8
**shown (1)**
99:20
**shows (1)**

65:22
**Shutts (1)**
2:5
**sign (1)**
113:15
**signature (3)**
113:10,15 114:21
**signed (2)**
100:15 113:16
**significance (2)**
83:2,7
**signing (1)**
113:10
**similar (2)**
11:23 96:2
**Simply (1)**
60:13
**single (3)**
37:16 38:25 39:1
**sir (11)**
6:3 19:11 31:16 34:13 39:6
42:20,25 43:21 55:2 81:3
108:19
**sitting (1)**
76:10
**situation (3)**
26:13 27:22 33:3
**six (3)**
10:4 35:7 36:3
**Sixteen (1)**
97:23
**six-lawyer (1)**
37:17
**Smith (3)**
6:25 7:20 20:25
**sold (3)**
16:21 21:8 23:7
**solely (1)**
76:20
**somebody (3)**
28:15 51:25 86:19
**somewhat (3)**
25:3 47:6 48:22
**sorry (8)**
24:3 40:16 52:3 68:13 72:16
75:11 104:25 105:21
**sought (3)**
104:14,18,19
**south (2)**

22

2:6 107:15
**SOUTHERN (1)**
1:2
**space (1)**
109:13
**Spaeth (2)**
10:6,8
**speak (1)**
9:1
**speaking (4)**
24:1,2 63:23 64:3
**specific (6)**
13:19 25:12 49:14,17 51:21
    57:17
**specifically (2)**
24:3 25:20
**specimen (1)**
56:11
**spectrum (1)**
16:20
**speculate (5)**
45:15 46:25 48:14 87:13,17
**spell (1)**
9:7
**spoke (4)**
34:14 35:13 61:23 62:10
**spoken (2)**
62:18 63:20
**spreadsheet (1)**
100:21
**Springfield (1)**
2:16
**staff (1)**
68:7
**Staffing (2)**
7:1,21
**stake (2)**
21:21 53:5
**Stanczak (1)**
67:21
**Standard (1)**
5:6
**stands (2)**
108:24 109:14
**Stange (2)**
67:6,8
**started (2)**
8:6 9:25
**state (10)**

5:7 6:5,7 30:19 31:17 69:14
    88:19 109:19 111:19 112:3
**stated (6)**
50:11 88:16 89:5 92:3 93:21
    112:9
**statement (2)**
28:11 113:13
**states (3)**
1:1 45:9 86:22
**static (1)**
91:16
**status (4)**
69:23 94:2 108:6,12
**Stephanie (5)**
2:10 5:20 65:24 69:2,3
**Steve (2)**
68:21,22
**Stinson (3)**
1:19 2:18 113:5
**stipulate (2)**
55:17 66:11
**stipulation (2)**
55:8 66:17
**storage (3)**
40:9,11 81:18
**stored (2)**
44:14,18
**Strange (1)**
67:6
**Street (6)**
1:20 2:10,15,19,24 113:5
**strengthen (1)**
27:21
**strike (1)**
74:20
**subject (11)**
29:18 47:10 73:14,16 74:14
    75:21 77:20 103:1 106:6,15
    107:1
**submit (1)**
84:8
**submitted (1)**
84:3
**subpoena (7)**
30:10 36:12 39:6,22 41:21
    43:25 55:12
**Subscribed (1)**
111:11
**subsequent (2)**

23:23 87:24
**subsidiary (8)**
15:8,16 17:11 22:7,8,17
    29:24 32:9
**substance (1)**
113:12
**succeeded (1)**
10:7
**Suite (5)**
1:20 2:15,19 3:3 113:5
**Summary (1)**
97:16
**superior (1)**
8:18
**supervisor (1)**
8:21
**Supplemental (1)**
99:9
**support (1)**
64:24
**suppose (1)**
46:6
**sure (10)**
10:7 19:2 21:24 23:4 29:13
    37:6 43:17 45:4 47:17 61:7
**surveillance (7)**
57:19 96:14 98:1,3,9,20,25
**suspect (2)**
30:18 82:3
**swear (1)**
5:22
**Swiss (7)**
7:11,12 8:19 10:19 15:19,21
    42:8
**sworn (3)**
5:24 111:11 112:6
**system (1)**
27:4
**S-c-h-l-e-p (1)**
13:6
**S-e-m-m-l-e-r (1)**
68:5
**S-p-a-e-t-h (1)**
10:7
**S-t-a-n-c-z-a-k (1)**
67:21
**S-t-a-n-g-e (1)**
67:7

| T |
|---|

**T (3)**
2:10 112:1,1
**Tables (1)**
29:17
**take (16)**
10:2,6 14:24 26:8 37:2 42:23
  43:6,18 60:20 64:20 70:1
  71:15 75:10,19 97:1 105:22
**taken (3)**
1:16 94:15 112:7
**takes (1)**
28:10
**talk (1)**
24:18
**talked (1)**
101:3
**talking (4)**
79:2,4,6 96:13
**task (1)**
93:11
**tax (2)**
59:9,12
**telephonically (2)**
2:8,12
**tell (22)**
6:17 16:8 18:2,9 19:4 20:14
  22:22 26:2 32:19 53:13
  62:14 67:19 77:2,9 78:21
  86:5 92:5 99:20 107:3,18
  109:8,14
**ten (2)**
66:7 94:1
**tenure (1)**
15:15
**term (7)**
12:2,13 23:11 46:19 47:7
  53:10,12
**terms (2)**
22:11 88:22
**testified (2)**
5:24 13:14
**testify (2)**
14:17 55:15
**testimony (7)**
19:25 25:2,9 41:23 62:5
  98:18 102:9
**Texas (1)**
68:14

**Thank (12)**
5:21 13:9 29:7 43:1,8,16
  64:5 70:21 87:7 104:3
  110:5,7
**thick (1)**
49:10
**thing (1)**
96:15
**things (8)**
22:5 26:22 47:9,12 50:17,18
  51:8 57:25
**think (17)**
27:19 30:10 38:21 43:13
  47:6 55:25 76:14 81:3
  82:18 88:23 89:7 90:5,7
  93:10,18 95:17 101:3
**thinking (1)**
76:18
**third (3)**
2:23 57:6 81:14
**thoughts (2)**
52:25 53:2
**thousands (2)**
51:13,14
**three (5)**
58:21 82:12 92:23 93:6 94:2
**time (43)**
5:5,6 7:3 10:9 11:13 18:8
  19:16 21:19 22:15 25:3,3
  25:15 32:10,17 35:4,5 37:2
  37:7,10 43:18,24 44:5 49:8
  55:14 61:10,15 63:10 65:21
  68:11 70:20,22,25 73:11,12
  91:13,17,19 99:2 101:5
  102:19 103:2 110:9 112:8
**timeframe (4)**
10:18 16:22 48:21 73:9
**times (1)**
56:15
**title (6)**
9:14,15,17,21 11:12 81:25
**titled (1)**
100:22
**today (7)**
9:18 18:23 19:6 35:11,23
  54:14 102:7
**today's (3)**
5:4 34:13 35:9
**told (3)**

55:13 62:14 88:2
**Tom (1)**
9:6
**top (1)**
86:11
**Topeka (1)**
6:14
**total (2)**
46:9 87:3
**To-Do (3)**
47:12,16,20
**track (1)**
103:9
**tracking (1)**
27:4
**traditional (1)**
40:12
**traditionally (1)**
15:20
**transaction (4)**
8:19 10:19 16:5 42:9
**transcript (1)**
92:19
**transcripts (8)**
50:15 52:1,8 58:19,22,23,24
  58:25
**transmittal (2)**
73:21,24
**transmitted (2)**
39:17 75:23
**travel (1)**
103:19
**treaty (1)**
109:25
**trial (5)**
13:14 14:12,18 43:14 106:6
**triggered (2)**
18:5 102:22
**true (3)**
22:19 70:19 97:7
**truly (1)**
113:18
**try (2)**
20:23 74:25
**trying (2)**
37:15 59:7
**turn (8)**
71:11 72:2,10,20 80:7 105:19
  106:20 107:24

24

**turned (1)**
75:7
**turning (1)**
88:8
**twice (1)**
45:10
**two (13)**
8:22 9:4 10:11 34:19,24 38:2
  38:6 44:24 58:21 70:1
  77:16 97:24 105:7
**type (10)**
13:21 14:17 21:16,18 22:1
  46:14,23 49:17 85:20 103:1
**types (4)**
12:6,7 23:10 96:17
**typically (1)**
30:7

**U**

**Uh-huh (2)**
98:14 99:7
**ultimately (3)**
15:9 22:10 91:12
**understand (18)**
6:10 20:24 21:24 26:24
  31:25 32:2,20 33:1 37:19
  41:3 43:25 44:2 47:17
  54:24 69:23 71:7 81:20
  89:14
**understanding (9)**
28:19 35:17 41:16 42:14
  44:1 47:8 73:23 79:19 88:5
**understood (1)**
23:4
**undertake (1)**
47:21
**UNITED (1)**
1:1
**University (1)**
31:18
**unknown (8)**
72:5,5,13,14 74:13,13,22,22
**Unpaid (1)**
100:22
**unsigned (1)**
113:17
**unusual (1)**
98:23
**updated (1)**

102:19
**use (4)**
27:17 28:25 43:14 79:11

**V**

**vaguely (1)**
63:15
**Valerie (4)**
36:10 37:20 38:8,14
**varies (1)**
17:15
**variety (1)**
47:9
**various (1)**
32:11
**vendor (1)**
79:24
**versus (4)**
17:24 19:6 20:3 26:16
**Vice-President (4)**
8:12,15 9:13 11:13
**video (4)**
37:3 43:13,14 61:9
**Videographer (1)**
3:2
**videotaped (2)**
1:15 5:3
**virtue (2)**
78:21 82:7
**visit (1)**
24:22
**voice (1)**
106:15
**volume (3)**
30:13 51:13 80:5
**vowel (1)**
8:3
**vs (4)**
1:8 111:23 113:7 114:2

**W**

**waiting (1)**
89:6
**Walker (1)**
69:8
**Walnut (4)**
1:20 2:19,24 113:5
**want (11)**
5:16 21:23 26:8 34:5,6 45:14

60:25 62:15 77:10 103:10
  103:23
**wanted (1)**
99:19
**Washburn (1)**
6:14
**wasn't (6)**
16:7 29:8,21 62:6 88:1 97:25
**way (7)**
20:23 32:11 33:2 43:13
  85:23 86:6 98:8
**WDDP (1)**
81:10
**Wednesday (1)**
103:20
**week (7)**
17:17 30:10 41:22 48:3 96:3
  102:21 103:7
**weeks (2)**
102:18 105:7
**weigh-in (1)**
52:25
**went (2)**
6:21 42:8
**weren't (1)**
58:7
**West (2)**
70:7,8
**Western (3)**
1:3 14:8,22
**we're (8)**
8:24 37:8,11 61:4,16 70:23
  71:1 81:3
**we've (3)**
10:15,16 84:2
**Whitney (1)**
106:16
**wholly-owned (1)**
32:9
**Wichita (1)**
7:1
**wider (2)**
40:9,11
**wife (2)**
57:14,16
**William (9)**
1:15 2:17 3:7 5:3,23 6:9
  111:7 113:4 114:3
**withheld (12)**

53:24 57:24 71:17 72:6,14
72:18 73:15 74:5,6,15
75:15 77:16
**witness (10)**
1:16 3:6 5:13,22 42:23 55:14
108:15 109:4 112:6,16
**wondering (1)**
83:15
**Woods (1)**
10:1
**word (5)**
20:14 45:12 66:3 97:2 109:7
**wording (1)**
26:23
**work (24)**
6:21 11:22,25 22:24 42:6
53:11,25 54:3,5,10,17 55:3
71:17 72:7,19 73:20 74:7
74:16 75:16 77:17 101:13
108:9,14,25
**worked (2)**
6:19 7:2
**works (2)**
18:3 33:2
**wouldn't (1)**
25:16
**write (1)**
94:19
**writing (2)**
96:6 112:10
**written (1)**
7:19
**wrote (1)**
38:9

### X

**X (1)**
21:9

### Y

**year (3)**
6:15 14:9 21:9
**years (11)**
8:22 9:4 10:2,4,11 18:24
19:11,19 58:11 70:18 78:5
**yesterday (6)**
34:14,19 35:6 37:18 38:19
87:16
**yesterday's (1)**

36:3

### Z

**Zahnd (7)**
41:15,17 42:2,4,21 43:4,22
**Zahnd's (1)**
42:16
**Zervas (1)**
65:5
**Z-e-r-v-a-s (1)**
65:7

### $

**$3500 (1)**
95:7

### 0

**000317 (1)**
81:10
**001 (5)**
75:19,24 76:1 94:18,21
**0025 (1)**
100:1
**005 (3)**
75:20 76:2 94:21
**010 (1)**
86:7
**011 (1)**
86:7
**01103 (1)**
2:16
**012 (1)**
86:7
**029 (1)**
45:22
**02948 (1)**
106:3
**02949 (1)**
106:4
**04 (1)**
65:12
**050 (1)**
92:8
**0536 (1)**
74:11
**06 (3)**
68:17 106:11,13
**069 (1)**
45:24
**07 (4)**

43:22 107:24 108:2,20

### 1

**1 (5)**
3:11 42:18 66:12 83:23
105:19
**1:09 (1)**
37:11
**1:40 (1)**
61:11
**1:49 (1)**
61:16
**10 (1)**
3:20
**100 (7)**
4:5,6 45:25 46:2 82:25 84:6
84:16
**101 (1)**
4:7
**105 (1)**
4:9
**1077 (3)**
1:18 112:20 113:21
**11 (2)**
3:21 94:12
**12 (2)**
3:22 96:2
**12:00 (1)**
5:1
**12:11 (1)**
5:5
**12:53 (1)**
37:7
**1201 (3)**
1:20 2:19 113:5
**13 (2)**
3:23 97:8
**13th (2)**
1:18 5:4
**1391 (1)**
2:15
**14 (3)**
3:24 18:24 97:12
**14th (1)**
72:22
**1466 (1)**
72:20
**15 (4)**
3:25 89:11,18 97:15

26

3:25 89:11,18 97:15
**1500 (1)**
2:6
**16 (1)**
4:2
**1600 (1)**
2:15
**17 (2)**
4:3 99:4
**18 (2)**
4:4 99:17
**184,536 (1)**
46:8
**19 (3)**
4:5 6:20 100:1
**1900 (1)**
2:23
**191 (1)**
97:23
**1913 (1)**
100:13
**1916 (1)**
68:16
**1952 (1)**
91:6
**1960's (1)**
16:25
**1984 (1)**
15:12
**1990 (7)**
6:16,18 48:4,5 49:23 56:1
    81:22
**1990's (1)**
19:2
**1993 (4)**
6:20,21,24 82:10
**1994 (1)**
71:23
**1996 (4)**
6:24,25 31:20 72:23
**1997 (5)**
31:21 33:10,19 92:6 97:20
**1998 (4)**
34:1,11 77:15 94:11

**2**

**2 (9)**
3:12 42:18,20 44:23 82:9,12
    86:15,16 87:4

**2:11 (1)**
70:23
**2:15 (1)**
71:1
**20 (2)**
4:6 100:12
**2000 (5)**
23:24 24:19 27:7 28:18
    48:11
**2001 (7)**
56:20,21,22,23 87:9,21 98:2
**2002 (6)**
37:20 38:2 51:6,8 56:18
    85:25
**2003 (1)**
100:2
**2004 (4)**
11:2 12:20 15:18 106:20
**2006 (7)**
7:2,13 14:10,10 101:3 106:1
    106:4
**2007 (9)**
1:19 5:5 17:4 48:6 104:23
    105:3 111:12 112:17 113:2
**201 (1)**
2:6
**205 (1)**
3:3
**21 (1)**
100:21
**22 (2)**
4:7 101:1
**23 (1)**
4:8
**23rd (1)**
108:20
**24 (6)**
4:9 61:13 81:5 104:22 105:2
    106:20
**26th (1)**
96:3
**27 (2)**
106:1,4
**273 (3)**
29:23,25 30:6
**27401 (1)**
2:11
**2750 (1)**
45:2

**28 (1)**
113:2
**28th (1)**
107:24
**2800 (1)**
95:7
**2900 (3)**
1:21 2:19 113:5
**2941 (2)**
106:11,13
**2948 (2)**
105:19 106:1
**2949 (1)**
105:19

**3**

**3 (4)**
3:13 61:13 81:5,9
**3:12 (1)**
110:9
**30 (1)**
113:17
**3000 (2)**
50:6,11
**31 (2)**
104:22 105:3
**316 (2)**
77:11,13
**317 (1)**
81:24
**317,171 (1)**
46:7
**3261 (2)**
106:21,24
**33 (1)**
81:13
**33131 (1)**
2:7
**3339 (2)**
107:24 108:2
**3344 (1)**
108:18
**3347 (1)**
108:18
**338 (2)**
81:25 82:4
**342 (2)**
81:14 82:3
**3500 (1)**

95:7
**360 (1)**
77:12
**3600 (2)**
30:11,18
**398 (1)**
83:22

---

**4**

**4 (1)**
3:14
**4th (1)**
43:22
**401 (1)**
72:2
**42 (3)**
3:11,12,12
**44 (2)**
91:7,13
**45 (2)**
91:7,14
**45202 (1)**
2:24
**46 (1)**
91:14
**47 (1)**
91:14
**48 (1)**
91:14

---

**5**

**5 (2)**
3:15 83:3
**50 (7)**
20:9,11 21:21 22:9,14 53:8
82:24
**500,000 (1)**
46:11
**501,000 (2)**
87:6 91:10
**501,707 (1)**
86:12
**508 (1)**
75:10
**511 (1)**
2:23

---

**6**

**6 (3)**
3:8,16 83:22

**60's (1)**
17:1
**61 (22)**
3:11,13,14,15,16,17,18,19,20
3:21,22,23,24,25 4:2,3,4,5,6
4:7,8,9
**63 (1)**
82:24
**64106 (2)**
1:21 113:6
**66210 (1)**
3:4
**67 (1)**
46:1
**67.1 (2)**
45:23,23

---

**7**

**7 (2)**
3:17 85:6
**718 (2)**
72:10,16
**75 (2)**
20:12 35:16
**789 (2)**
71:12,15
**792 (2)**
83:3,4

---

**8**

**8 (5)**
3:18 82:9,14 86:7 90:18
**8th (1)**
92:6
**80 (4)**
17:11,17 95:11,19
**800 (1)**
71:15
**801 (1)**
71:15
**804 (1)**
71:15
**81 (1)**
3:13
**813 (1)**
82:15
**826 (1)**
2:10
**83 (2)**

3:15,16
**85 (2)**
3:17 15:13
**88 (2)**
89:11,18

---

**9**

**9 (3)**
3:19 92:6 97:8
**9th (2)**
106:11,13
**90 (2)**
3:18 48:21
**92 (1)**
3:19
**9200 (1)**
3:3
**93 (1)**
82:14
**94 (4)**
3:20,21 71:16 83:20
**95 (5)**
72:4,8,13 83:23 84:4
**96 (16)**
3:22 7:21,21,23 9:18 10:18
11:2 12:8,11,20 24:6 29:22
32:15 48:21 73:9 74:5
**97 (8)**
3:23,24,25 4:2 32:15 74:10
75:14 91:7
**98 (10)**
49:1,5 50:1 51:7 76:5 77:1
85:25 94:15 96:3 97:8
**99 (2)**
4:3,4