UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY,  )
                                    )
                    Plaintiff,      )
                                    )
        vs.                         )   CASE NO.
                                    )   C-1-02-479
CHRISTOPHER L. KEARNEY,             )   (Judge Spiegel)
                                    )
                    Defendant.      )

COPY

The deposition upon oral examination of HAROLD

SHELTON, being taken pursuant to Order and in accordance

with the Federal Rules of Civil Procedure before Rebecca J.

Huddy, Notary Public, at the Marriott, 304 North Greene

Street, Greensboro, North Carolina, on the 7th day of May,

2004, beginning at 12:20 p.m.

Case 1:02-cv-00479-MRB    Document 184    Filed 09/06/2007    Page 2 of 38

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479

Harold Shelton    5/7/2004

Page 4

APPEARANCES:
For the Plaintiff: Mr. William R. Ellis
    Wood & Lamping, LLP
    600 Vine Street, Suite 2500
    Cincinnati, Ohio 45202

    Ms. Stephanie Farabow
    Jefferson-Pilot Life Insurance Company
    100 North Greene Street
    Greensboro, North Carolina 27401
For the Defendant: Mr. Michael A. Roberts
    Graydon, Head & Ritchey
    511 Walnut Street
    1900 Fifth Third Center
    Cincinnati, Ohio 45202
    • • •

I N D E X
    By    Page

EXAMINATION    Mr. Roberts    3 - 68
EXAMINATION    Mr. Ellis    69 - 84
FURTHER EXAMINATION   Mr. Roberts    84 - 93
FURTHER EXAMINATION   Mr. Ellis    93 - 95

E X H I B I T S

Number    Description    Page
Defendant's 23    Shelton correspondence    13
  "    24    Handwritten notes    65
  "    25    Statement 10-31-94    66
  "    26    Message    68
    • • •

1  A.  No.
2  Q.  Okay.  Did you just retire from Jefferson-Pilot and
3     take on other employment or do you --
4  A.  No, I just retired, yes.
5  Q.  Okay.  So from your retirement date through at least
6     two weeks ago, you didn't have any discussion in any
7     way about Mr. Kearney?
8  A.  No.
9  Q.  Prior to your retirement date, did you ever discuss
10     with anyone the thought that Jefferson-Pilot had
11     mistakenly paid Mr. Kearney benefits?
12  A.  Not that I recall.
13  Q.  Okay.  Two days ago or within the past week Mr.
14     Roberson called you and shared that with you, correct?
15  A.  No.
16  Q.  He testified this morning that you and he spoke within
17     the past two days and you discussed the subject that
18     Mr. Kearney, according to Jefferson-Pilot or somebody
19     else they employ, made a mistake for eight or nine
20     years?
21  A.  Well, we had missed — we were in a meeting several
22     days ago, but he did not call me.
23  Q.  Very well.  Who was at the meeting?
24  A.  I believe it was he, myself, Mr. Ellis, and
25     Ms. Farabow.

Page 3

1      The witness, HAROLD SHELTON, being first duly
2  sworn, was examined and testified as follows:
3
4      EXAMINATION (by Mr. Roberts):
5
6  Q.  Mr. Shelton, my name is Mike Roberts.  I'm a
7     defendant's lawyer.  I represent the defendant in this
8     lawsuit, Mr. Chris Kearney.  He's been sued by
9     Jefferson-Pilot and we're here to find out why.
10      Did you work on Mr. Kearney's claim?
11  A.  I think at some point during those years that I was
12     involved in it at some point, but -- you know, just
13     sort of in and out depending on what the circumstances
14     were and if Mr. Roberson was not available or if I was
15     needed in that case.  The answer is yes.
16  Q.  Okay.  Prior to two weeks ago -- let's forget about
17     two weeks ago till today -- when was the last time you
18     spoke to anyone about the Chris Kearney claim?
19  A.  I really don't know.
20  Q.  Okay.
21  A.  Over five years, I would think, since I retired.
22  Q.  When did you retire?
23  A.  December 31, 1999.
24  Q.  I hope you didn't wear a tie and tie clip today,
25     because Mr. Ellis and I did not.

Page 5

1  Q.  Stephanie?  When did the meeting take place?
2  A.  I believe it was Wednesday.
3  Q.  Where did it take place?
4  A.  At Jefferson-Pilot.
5  Q.  Okay.  And was Mr. Ellis conducting the meeting?
6  A.  Yes.
7  Q.  And he's the one that informed you that the mistake
8     had been made?
9  A.  Yes.
10  Q.  Very well.  Was that news to you?
11  A.  Yes.
12  Q.  How long did you work at Jefferson-Pilot?
13  A.  I was with Pilot Life, which was a subsidiary at the
14     time, from 1960, December 1960 to 1990, at which time
15     the two companies combined and I came here -- came to
16     Jefferson-Pilot downtown and I worked for the two for
17     a total of 38 years.
18  Q.  I bet you didn't work just in disability insurance
19     claims that whole time.
20  A.  I was started in the Group Division in 1960, worked
21     there for --
22  Q.  Pre-ERISA?
23  A.  Yes -- for about 20 years, and then I transferred to
24     the Individual Health Division.
25  Q.  Okay.  And when you were doing the pre-ERISA and

2 (Pages 2 to 5)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Harold Shelton    5/7/2004

Page 6

1    post-ERISA group claims, were those disability claims
2    included in --
3    A.  Yes, to some extent, but primarily health insurance.
4    Q.  Okay.  And in 1980 or thereabouts when you switched
5        over to individual, did your focus on disability
6        insurance claim administration increase?
7    A.  Yes, even though we also had hospital claims,
8        accidental death -- I was more or less involved in all
9        of that, hospital and disability.
10   Q.  Did you feel comfortable and competent in reviewing
11       disability insurance policies to ascertain their
12       meaning?
13   A.  Yes, I think so.
14   Q.  Throughout your 38-year career?
15   A.  Yes.
16   Q.  What was the position you held prior to the merger of
17       Pilot and Jefferson?
18   A.  I was supervisor of Claims, Group Claims, then
19       became -- I was Assistant Vice President and then when
20       we combined the two, I was manager of policy service
21       and claims in the Individual Health Division, and then
22       when we came downtown, they changed the focus and I
23       became a manager in lieu of Assistant Vice President.
24       The title was changed only.
25   Q.  Manager of the individual?

Page 7

1    A.  Health, yes.
2    Q.  So throughout the '90s you were doing -- overseeing
3        claim analysts in the disability insurance claim
4        field?
5    A.  And hospital, yes.
6    Q.  And hospital.  Were there a lot of mistakes being made
7        because the department was overloaded?
8    A.  I felt with the volume of work that was there, our
9        folks did a great job.  I think, you know, we were
10       constantly concerned about the welfare of the insured.
11       Whatever this may appear, our major concern was that
12       we get the folks their benefits, that we pay the
13       claims according to the contracts, and that was our
14       primary focus.  I do feel that we had -- the reason I
15       got involved in the claim and JL got involved in the
16       claim was because of the staffing, we just needed all
17       the help we could get in those situations.
18   Q.  Are you talking about Mr. Roberson when you refer to
19       JL?
20   A.  Yes, JL Roberson.
21   Q.  Within the past -- well, at your meeting with
22       Mr. Ellis when he conducted and shared with you the
23       revelation that you had made a mistake, did he give
24       you the opportunity to look at the policy?
25   A.  We did briefly review the policy and provisions of the

Page 8

1    contract.
2    Q.  Sections that he pointed out to you or did you spend
3        time independently reading the whole policy on your
4        own?
5    A.  Just reading through -- there were some areas pointed
6        out, but just reading through, just reviewing them,
7        because it's been a long time.
8    Q.  I hope to forget everything about my career when I
9        retire.
10   A.  Well, I try to, even though I enjoyed my 38 years with
11       the company, very fulfilling.
12   Q.  I enjoy some of mine.  Some things I don't enjoy.
13          Did Mr. Ellis allow you to sit down by
14       yourself with the policy and review it cover to cover?
15   A.  Not particularly that I recall.
16   Q.  Okay.  But you know what policy we're talking about,
17       you know, some fancy nomenclature, WJ576A or something
18       like that, right?
19   A.  Yes.
20   Q.  Was that version of policy one that your department in
21       the '90s had sufficient experience with?  I mean, it
22       wasn't just Mr. Kearney's claim?
23   A.  Yes.
24   Q.  And the residual disability rider and the Social
25       Security Supplement rider and the increase in

Page 9

1    additional benefits rider, were those also provisions
2    that Jefferson-Pilot sold that you had a comfort level
3    with through the '90s?
4    A.  Yes, I think so.  The residual was one that did not
5        come up very often.  It was the one that -- most
6        people were totally disabled and not able to go back
7        to work.
8    Q.  Okay.  When a residual situation arose, did that
9        require that you concentrate a little more closely on
10       the actual policy rights?
11   A.  I think so.
12   Q.  Okay.  Mr. Shelton, have you ever met Mr. Kearney
13       before?
14   A.  No, I have not.  When he came out, he introduced
15       himself when I was outside, yes.  That's the first
16       time I'd met him.
17   Q.  You and he have spoken on the phone many times --
18   A.  Yes.
19   Q.  -- over the course of several years?
20   A.  Yes.
21   Q.  And you have corresponded with him?
22   A.  Yes.
23   Q.  Okay.  Do you recall the period of time when
24       Jefferson-Pilot sought some assistance with Mr.
25       Kearney's claim from a company called DMS?

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion,  1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Case 1:02-cv-00479-MBB    Document 184    Filed 09/06/2007    Page 4 of 38

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 10

1   A. Yes.
2   Q. What did you know about DMS before seeking their
3      assistance on Mr. Kearney's claim?
4   A. I did not know anything about them. They were
5      recommended by the reinsurer.
6   Q. Okay. Did you actually speak to the reinsurer about
7      the recommendation?
8   A. I think they may have discussed that with us that they
9      would like for them to review that, and as I recall,
10     we may have furnished the file to them for review, but
11     other than that, I knew nothing about them.
12  Q. How was it that Mr. Kearney's claim came up for
13     discussion with the reinsurer and the need to have
14     more eyes take a look at the claim?
15  A. I believe the normal initiation in a situation like
16     that is that the reinsurer on a periodic basis,
17     sometimes once a year, would come through and they
18     . would review -- ask for and review certain claims --
19  Q. Okay.
20  A. -- some criteria that they may have as a reinsurer.
21     They would ask for the files and review those, make
22     recommendations and ask for our concurrence as to, you
23     know, whether this was acceptable.
24  Q. So they would perform somewhat of an audit function?
25  A. Yes.

Page 11

1   Q. Was it the higher dollar claims that they would focus
2      on?
3   A. Perhaps it might be that or the length of time in
4      which benefits are being paid or a lot of times just a
5      follow-up as to maybe additional information might be
6      needed. They had their own criteria which they didn't
7      particularly discuss with us.
8   Q. So is it your memory then that Employers Reinsurance
9      came in and performed some general audit of some
10     selected claim files and determined that the Kearney
11     claim was one in which DMS's assistance may be of
12     value?
13  A. Yes.
14  Q. Okay.
15  A. And I recall that only because of the -- I believe the
16     correspondence, which my major correspondence with
17     Employers Re was sending them a copy of the bill from
18     DMS because they were footing part of the bill. That
19     was one of my major concerns as far as they were
20     concerned.
21  Q. Was DMS expensive?
22  A. I do not recall what they charged.
23  Q. Did you put those correspondence in the claim file or
24     does that not go in the claim file?
25  A. It should be in the claim file.

Page 12

1   Q. Okay. I haven't seen it, but maybe Mr. Ellis would be
2      good enough to give me that later.
3         So when Employers Reinsurance came to
4      Greensboro to take a look at some of the claim files,
5      do you recall a focused discussion with them about Mr.
6      Kearney's claim?
7   A. I do not.
8   Q. Okay. Is it your sense that that's what happened,
9      though?
10  A. Yes, the fact that they were paying part of the charge
11     for DMS leads me to believe that they are the ones
12     that recommended it for review.
13  Q. Did they have experienced claim type folks who
14     actually looked at the policy and the riders and the
15     information in the file?
16  A. Yes.
17  Q. Did they tell you when they audited Mr. Kearney's
18     claim file that you had made a mistake?
19  A. I do not recall that they did.
20  Q. Okay. There's no record of that in the claim file?
21  A. No.
22  Q. No documents have been brought to your attention in
23     the past two days that suggest that?
24  A. No.
25  Q. Correct?

Page 13

1   A. Yes, that's correct.
2   Q. See, I always ask negative questions. So then
3      ultimately you referred not just Mr. Kearney's claim
4      but two other claims to DMS in 1997?
5   A. I do not recall specifically any other references.
6   Q. Mr. Shelton, I'm going to mark an exhibit which is the
7      principal correspondence in the claim file that
8      appears to have been directed to you or authored by
9      you and it's maybe 30 or 40 pages. I'd like for you
10     to kind of glance through the whole thing before I
11     start going through those with you.
12        MS. FARABOW: What's the exhibit number?
13        MR. ROBERTS: Oh, I'm sorry. It will be 23.
14        (Defendant's Exhibit No. 23 was marked for
15     identification by Mr. Roberts.)
16  Q. (Indicating)
17  A. (Witness reviews document)
18  Q. Okay. Thank you for taking the time to review that.
19     I know it's a lot of material. But did you see that
20     I've tried to put into chronological order the
21     correspondence in the claims file that --
22  A. Yes.
23  Q. -- has your name on it somewhere or abouts?
24  A. Yes.
25  Q. Do you have any memory of any other correspondence you

4 (Pages 10 to 13)

Page 14

1    might have had that isn't contained in here?
2    A. No, I do not. This is primarily my period of
3       correspondence.
4    Q. Okay. When letters are sent to policyholders are
5       received, what happens to them?
6    A. They become part of the file.
7    Q. Okay. Where's the file maintained?
8    A. In our office in the claim file. It is part of the
9       claim file. There is no separate file for
10      correspondence or benefit papers.
11   Q. You just put matters in as they come in?
12   A. Yes.
13   Q. Is there a central repository for all the claim files
14      of all the claimants?
15   A. Yes.
16   Q. Would you as a claim analyst or the manager or the
17      Vice President maintain claim files in your actual
18      office?
19   A. No. These files -- once I'm through with them, they'd
20      be put in an outbox, go back to file and filed in
21      numerical order according to policy number.
22   Q. Okay.
23   A. There's a central file.
24   Q. So if you received a telephone call from a claimant,
25      would you take notes that then get put in the claim

Page 15

1    file?
2    A. Yes. Normally we'd call for the file so that I'd have
3       it there for the conversation.
4    Q. Okay. So if you got a call from -- the procedure
5       generally was, if you got a call from a claimant out
6       of the blue, you'd ask your assistant to gather for
7       you the claim file and bring it to you so you could
8       speak intelligently on the phone call?
9    A. Yes.
10   Q. Would you take notes during the phone call?
11   A. Normally, yes.
12   Q. And then put those in the claim file?
13   A. Yeah, unless it was something that just -- asking did
14      you get the claim, get my correspondence or something,
15      then I wouldn't make a note of that perhaps.
16   Q. Material discussions you would?
17   A. Yeah.
18   Q. If you had material discussions with persons other
19      than the claimant about the claimant's claim, would
20      those notes also, too, go in the claim file?
21   A. Yes.
22   Q. Would you maintain separately any copies of any
23      letters received other than the letter being received
24      being put in the claim file?
25   A. No.

Page 16

1    Q. Anything kept separate?
2    A. No, not that I know of.
3    Q. And no shadow file where you keep things that you're
4       working on?
5    A. No. Our intent was that whoever looked at that file
6       knew everything that was happening on it.
7    Q. Okay.
8    A. So we never -- we did not have separate files on
9       those.
10   Q. Okay. Let's work our way through this, if we could.
11   A. Okay.
12   Q. The first page, August '93, appears to be from Mr.
13      Kearney to -- I think it's you?
14   A. Yes.
15   Q. But then you didn't have direct responsibility for the
16      claim for a period of time; that fell to Mr. Maxwell?
17   A. Yes, that is correct.
18   Q. Okay.
19   A. I would have just -- this would have been matched with
20      the file and it would have just been passed on to
21      whoever was handling it.
22   Q. And then September '93, another cover letter. The
23      third page -- let me make sure for the record we all
24      have the same thing. The first page is 2694. The
25      second page is 2691.

Page 17

1       The third page, which is 2690, is a letter
2    from you to Mr. Kearney dated September 8, 1993,
3    regarding the two policies, and you say in the second
4    paragraph, "Since the residual benefit is not
5    considered to be total disability, we would not be
6    able to apply the waiver of premium to your policy.
7    This provisions applies only to a total disability
8    under the regular benefits of the policy." Did I read
9    that correctly?
10   A. Yes.
11   Q. Okay. Had Mr. Kearney questioned whether or not he
12      was entitled to the waiver on residual disability?
13   A. He apparently had -- based on the first paragraph, he
14      apparently had asked about the waiver of premium.
15   Q. I'm going to show you --
16   A. I do not know where that letter is. I don't see it
17      here.
18   Q. Okay. Let me show you the policy and the rider. The
19      six pages of the policy is Exhibit 3, and Exhibit 4
20      are the three riders that Mr. Kearney happened to
21      purchase.
22   A. Okay.
23   Q. Could you identify for me in either one of those
24      documents where it says that if you're on residual
25      disability, you don't get waiver of premium?

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 18

1  A.  The policy itself under the waiver of premium
2     provision says if you are totally disabled for a
3     continuous period of at least three months,
4     Jefferson-Pilot will pay -- will waive the premiums on
5     that. I don't believe a residual provision, which is
6     a separate entity, says anything about waiver of
7     premium.
8  Q.  You're right. The residual disability rider doesn't
9     say anything about waiver of premium.
10 A.  It applies only to the basic policy.
11 Q.  Okay.
12 A.  What we call the basic policy.
13 Q.  Okay. This basic policy doesn't say anything about
14    residual disability, does it?
15 A.  No.
16 Q.  I asked you a negative question again. There is no
17    reference whatsoever to residual disability in the
18    basic policy?
19 A.  That's correct.
20 Q.  And a lot of the definitions in the basic policy,
21    although they're couched in terms of total disability,
22    must be applied in cases of residual disability; would
23    you agree with me? For example, the elimination
24    period, it's defined in terms of total disability, but
25    it applies to residual disability, doesn't it?

Page 19

1  A.  That is in the schedule of benefits.
2  Q.  Correct. But the definition -- we'll get to the
3     schedule in a second. But the schedule -- excuse me,
4     the basic or core policy, whatever you called it, the
5     definition -- there's a definition for elimination
6     period and that applies to residual disability, too,
7     doesn't it? There's no separate definition for
8     elimination period for residual disability?
9  A.  The residual disability rider makes reference to -- it
10    says benefits will begin the next day after the end of
11    the elimination period shown in the schedule, which is
12    in the policy.
13 Q.  Okay. Turn to the schedule. Where does it define the
14    residual disability elimination period in the
15    schedule?
16 A.  It does not.
17 Q.  Okay. So to determine the residual disability
18    elimination period, you have to use the total
19    disability elimination period definition; is that
20    right?
21 A.  That's correct, yes.
22 Q.  And the same is true with regard to the definition for
23    maximum benefit period, there is no residual
24    disability definition of maximum benefit period;
25    rather to determine the maximum benefit period, you

Page 20

1     need to go to the policy and the schedule and use the
2     definition that is provided for total disability;
3     isn't that true? That's a long question. If you want
4     it read back while you look at those documents, we can
5     do that.
6        THE WITNESS: If you would read that question
7     back.
8        MR. ROBERTS: Thank you.
9        (The last question was read back by the court
10    reporter.)
11 A.  I don't believe that's true.
12 Q.  Okay. Let's work our way through it then, okay? Turn
13    to the policy, page 3, maximum benefit period. It's
14    defined in terms of total disability, correct?
15 A.  Uh-huh.
16 Q.  Correct?
17 A.  Yes. Total disability period is under the
18    definitions.
19 Q.  Okay. And it defines it in terms of total disability?
20 A.  Yes.
21 Q.  Turn to the residual disability rider.
22 A.  Okay.
23 Q.  And this provides that Jefferson-Pilot will pay
24    residual disability until the combination of total
25    disability and residual disability equal the maximum

Page 21

1     benefit period, right?
2  A.  Yes.
3  Q.  And then it references the schedule?
4  A.  I'm not sure I understand that question.
5  Q.  The paragraph in the second column of the residual
6     disability rider says that during a period of residual
7     disability, Jefferson-Pilot will continue to pay the
8     residual disability monthly benefit for each month you
9     are residually disabled until the combination of total
10    disability and residual disability benefits equal the
11    maximum benefit period, and the maximum benefit period
12    is capitalized, which means it's a defined term. Do
13    you see anywhere where there is an independent
14    definition for maximum benefit period for residual
15    disability that's different or separate from the total
16    disability definition?
17       MR. ELLIS: Objection, incomplete.
18 Q.  In attempting to answer the question, you referenced
19    the schedule. Do you see on the schedule a maximum
20    benefit period for residual disability?
21 A.  Based on what this says here, the maximum benefit
22    period is capitalized, which means it is this here,
23    which would be applicable (Indicating).
24 Q.  You're pointing to the schedule?
25 A.  This is in the schedule of benefits.

6 (Pages 18 to 21)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                    C-1-02-479
Harold Shelton                                                                 5/7/2004

Page 22

1  Q.  Right. And what you're saying is applicable is the
2      maximum benefit period that's applicable for total
3      disability? What you're saying is, that's applicable
4      for residual disability, correct?
5  A.  To age 65.
6  Q.  Well, it's lifetime if you get disabled prior to 45,
7      correct?
8  A.  It appears so.
9  Q.  Okay. And that's the definition of maximum benefit
10     period you need to use for residual disability,
11     correct?
12 A.  It appears that way.
13 Q.  Okay. Let's talk about another example. The
14     definition of monthly benefit, if you can find it in
15     the policy on page 3.
16 A.  I have it.
17 Q.  Okay. It's the amount shown in the schedule or
18     one-thirtieth, et cetera, for a partial month?
19 A.  Yes.
20 Q.  It doesn't say anything about residual disability?
21 A.  No.
22 Q.  Is there a definition for the monthly benefit for
23     residual disability anywhere? To answer that
24     question, you're looking at the rider. Doesn't the
25     rider state that it's the amount shown on the

Page 23

1      schedule?
2          MR. ELLIS: Let him answer one question at a
3      time, and don't throw me the finger again.
4          MR. ROBERTS: What are you talking about?
5  A.  Question again, please.
6  Q.  The residual disability rider -- you went from the
7      policy and I asked you where is the residual
8      disability definition for monthly benefit, and you
9      turned to residual disability rider and it says
10     monthly benefit is the amount shown in the schedule,
11     right? Towards the bottom of the first column, the
12     residual disability rider, there's a paragraph that
13     says Residual Disability Monthly Benefit, do you see
14     that?
15 A.  I'm looking at that.
16 Q.  The sentence above that says "'Monthly Benefit' is the
17     amount shown in the schedule as such." That's the
18     language of the rider. Can you turn to -- we need
19     then to turn to the schedule to determine what the
20     residual disability monthly benefit definition is,
21     right?
22 A.  The monthly benefit is the amount shown in the
23     schedule as such.
24 Q.  Okay. So we went from the policy to the rider and the
25     rider tells us to go to the schedule. Let's go back

Page 24

1      to the schedule.
2  A.  Okay.
3  Q.  How is the monthly benefit for residual disability
4      defined on the schedule?
5  A.  It is not.
6  Q.  Well, it's defined under total disability and so you
7      must use it to determine what residual disability
8      monthly benefit is, correct?
9  A.  But there's also a calculation that has to be done.
10 Q.  Correct, for residual disability monthly benefit?
11 A.  Yes.
12 Q.  I'm talking about the term -- the paragraph above that
13     for the defined term "Monthly Benefit." That's what
14     we're talking about right now, okay? To determine
15     what that means in the context of residual disability,
16     the rider says look at the schedule?
17 A.  Yes.
18 Q.  Okay. And the schedule doesn't say anything about
19     monthly benefit residual disability; it only talks in
20     the context of total disability, right?
21 A.  That's the way it appears, yes.
22 Q.  Okay. So I've just pointed out for you three
23     examples: elimination period, maximum benefit period,
24     and monthly benefit. Those are three pretty important
25     aspects to a disability policy, right?

Page 25

1  A.  Yes.
2  Q.  Okay. With those three examples, there is no
3      definition -- independent residual disability
4      definition for those three items; rather the policy,
5      the rider, and the schedule all require that you use
6      the total disability definition for those items,
7      right?
8  A.  It refers to the schedule which has those items there.
9  Q.  In the context of total disability only, right?
10 A.  Yes.
11 Q.  Okay. Why is the waiver of premium different -- just
12     because the definition of waiver of premium says total
13     disability, where is it that says elimination period,
14     maximum benefit period, and monthly benefit all are
15     defined in terms of total disability but they apply to
16     residual disability -- where does it say that even
17     though those three apply to residual disability,
18     waiver of premium doesn't?
19 A.  The increase in benefits on benefit provisions
20     requires that you receive benefits for total
21     disability for twelve months -- no, I'm sorry.
22 Q.  We're talking about --
23 A.  I'm looking at something else, I'm sorry.
24 Q.  -- premium waiver. Where is it that Mr. Kearney was
25     advised that those three examples we just talked about

7 (Pages 22 to 25)

Page 26

1  defined in terms of total disability apply to residual
2  disability, but waiver of premium doesn't?
3  A.  The waiver of premium requires that you be totally
4  disabled for at least three months and that the waiver
5  will apply at that time.
6  Q.  Okay.  Where is the definition for waiver of premium
7  under --
8  A.  That's in the policy.
9  Q.  Okay.  Where does it say that you use the total
10  disability definitions of elimination period, maximum
11  benefit period, and monthly benefit under residual
12  disability, but you don't use the definition of waiver
13  of premium for total disability under residual
14  disability?
15  A.  Well, it specifically states that it is applicable for
16  total disability.
17  Q.  But it also specifically states --
18  A.  Not residual disability.
19  Q.  Okay.  But the elimination period also specifically
20  states it only applies to total disability.  It
21  doesn't say residual disability.
22  A.  But it refers you to the schedule which is in the
23  policy as applying to the residual.
24  Q.  The rider refers you to the schedule --
25  A.  Yes.

Page 27

1  Q.  -- right?  The rider doesn't refer you to anything
2  about waiver of premium, does it?
3  A.  No.
4  Q.  Okay.  It's silent, right --
5  A.  (Witness nods head)
6  Q.  -- about whether or not premiums are waived during
7  residual disability, it is silent?
8  A.  I believe that is true.
9  Q.  Okay.  Can you turn to Exhibit -- so the waiver of
10  premium, that's in essence a benefit you get if you're
11  on total disability?
12  A.  Yes.
13  Q.  Okay.
14  A.  That's correct.
15  Q.  I'm handing you Exhibit 14, which is the proposal that
16  Mr. Kearney received.  Can you turn to page 5, please,
17  and page 5 provides that -- do you see that example on
18  page 5 down -- about two-thirds of the way down
19  there's a paragraph that starts Example?
20  A.  I don't see -- oh, yes, yes, okay.
21  Q.  Okay.  Towards the end of that paragraph it says --
22  it's talking about residual disability.  This is an
23  example of someone that may potentially be on residual
24  disability.  It's a hypothetical in the proposal.  The
25  end of it says, "If the loss of earnings is at least

Page 28

1  75 percent, the full benefit for total disability will
2  be payable."  Do you see that?
3  A.  Yes.
4  Q.  So if a residual disability claimant has greater than
5  75 percent loss, what that example says is that you're
6  entitled to the full benefit that someone on total
7  disability would get, right?
8  A.  Pertaining to the dollar amount.
9  Q.  Where does it say it's pertaining to the dollar
10  amount?
11  A.  Well, this is -- that's what the intent is.
12  Q.  Well, where does it say to the policyholder what the
13  intent is?  I mean, that's what you determine intent
14  to be, but you just told me that the waiver of
15  premium, which is a dollar amount, it's a monetary
16  savings, that's one of the benefits that encompassed
17  the full benefits of total disability, right?
18  A.  Yes.
19  Q.  Okay.  So if it's one of the benefits that constitute
20  part of the full benefits of total disability, under
21  this proposal you would agree with me that there is a
22  waiver of premium on residual disability?
23  A.  Well --
24      MR. ELLIS:  Objection.
25  A.  But the --

Page 29

1  Q.  You can answer.  His objection doesn't stop you from
2  answering.
3  A.  Repeat the question again, I'm sorry.
4  Q.  Okay.  You and I agreed that a premium waiver isn't
5  money going to the policyholder, it's money the
6  policyholder saves, so in essence it is a monetary
7  benefit to the policyholder, right?
8  A.  Yes, that's correct.
9  Q.  And it's a monetary benefit to the policyholder
10  in the event of total disability, right?
11  A.  Yes.
12  Q.  And there's other benefits that come with total
13  disability, correct?
14  A.  Yes.
15  Q.  So if you're talking about the full benefit for total
16  disability, you capture all of those benefits, right?
17  A.  No, I don't think the intent is to capture all of the
18  benefits.
19  Q.  Okay.  Where does it say in the proposal, the policy,
20  or any rider that when we talk about the full benefits
21  of total disability, we're talking about something
22  less than the full benefits of total disability?
23      MR. ELLIS:  Can I have that back.  I just
24  want to know whether he used a sinular or plural.
25      (The last question was read back by the court

8 (Pages 26 to 29)

Page 30

1    reporter.)
2         MR. ELLIS: Benefits plural, thank you.
3         MR. ROBERTS: Objection, coaching of the
4    witness, and he does it in every deposition. He's
5    unbelievable.
6    Q. Okay. You've heard the question again, Mr. Shelton,
7       and the question is this: You and I agree that waiver
8       of premium is one of the benefits of total disability,
9       and there are others?
10   A. (Witness nods head)
11   Q. And my question to you is, where does it tell the
12      policyholder that even though you get the full benefit
13      of total disability if you have greater than
14      75 percent loss, that doesn't include waiver of
15      premium?
16   A. Well --
17   Q. Where does it tell the policyholder?
18   A. Well, the statement itself is applying to the total
19      disability benefit. The monthly benefit --
20   Q. Where does it say that?
21   A. Well, it only says the full benefit. It doesn't say
22      benefits of this money.
23   Q. Okay. The policy defines the monetary benefit of
24      total disability as the "Monthly Benefit." The
25      proposal doesn't say monthly benefit. It says the

Page 31

1    full benefit, not a defined term, right? Am I
2    correct?
3    A. It says the full benefit for total disability will be
4       payable.
5    Q. Okay. Where does it tell the policyholder that only
6       means the monthly benefit check and it doesn't mean
7       waiver of premium?
8    A. Well, the schedule of benefits has all of these
9       spelled out, you know. It doesn't have the Social
10      Security and the residual as all as part of the top
11      part of the policy. These are set up as --
12   Q. They're additional if you buy them?
13   A. Yeah, exactly.
14   Q. Let's turn to the schedule. Let's turn to the
15      schedule.
16   A. Yeah.
17   Q. Okay. The schedule has a couple things at the top
18      that are your benefits for total disability. You get
19      the monthly benefit, you get the elimination period,
20      you get the maximum benefit period, right?
21   A. Yes.
22   Q. And then if you purchase these additional benefit,
23      which Mr. Kearney did, then there's potential Social
24      Security Supplement benefit, residual disability, and
25      cost of living increase, right?

Page 32

1    A. Yes.
2    Q. Okay. Where on there on the schedule does it say that
3       waiver of premium is a benefit for total disability
4       but not one of the full benefits of total disability
5       that the proposal talks about?
6         MR. ELLIS: Objection to form.
7    A. The only thing I can say is that, you know, the
8       definition is in the policy. It provides that it is
9       due only for the total disability.
10   Q. But you and I agree that there's other definitions in
11      the policy that only apply to total disability, but in
12      fact they're used to define residual disability?
13   A. But it refers to something specifically in the
14      schedule, like the elimination period or the monthly
15      benefit. Those are specifically in the schedule. The
16      waiver of premium is not shown on the schedule.
17   Q. Okay. So where do you tell the policyholder that
18      those things that we actually refer to in the residual
19      disability rider that we don't tell you we use the
20      total disability definition, those do apply, but those
21      things that we're silent on don't apply?
22   A. I don't know, and of course, we do not use proposal --
23      very seldom did we ever get a proposal for the file.
24   Q. How difficult would it have been to put the following
25      sentence on the proposal, the policy, and the residual

Page 33

1    disability rider? How difficult would it have been to
2    say, You are not entitled to waiver of premium on
3    residual disability, period, in all caps in bold?
4    Would it have been very difficult for Jefferson-Pilot
5    to do that?
6    A. If when they drew up the contract it had been thought
7       of or felt important, then perhaps it would have, I
8       don't know.
9    Q. All right. Let me show you Exhibit 5. This is a
10      Residual Disability Rider that Jefferson-Pilot
11      prepared after it sold policies to Mr. Kearney, and if
12      you turn to page 2, can you tell me whether or not
13      Jefferson-Pilot in 1992 was able to expressly state
14      whether or not there was a waiver of premium on
15      residual disability?
16   A. Is this the same policy?
17        MR. ELLIS: No.
18   Q. No, it's a Jefferson-Pilot Residual Disability Rider
19      where Jefferson-Pilot's people who create these things
20      came up with the idea that it would be good to express
21      explicitly whether or not there's a waiver of premium
22      on residual disability.
23        MR. ELLIS: Objection.
24   A. Well --
25   Q. Sir, is there a discussion about waiver of premium on

9 (Pages 30 to 33)

Case 1:02-cv-00479-MRB    Document 184    Filed 09/06/2007    Page 10 of 38    C-1-02-479

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton
5/7/2004

Page 34

1   residual disability?
2   A.  I think what we have to be careful about, there are
3       different policies.
4   Q.  Okay.
5   A.  This may very well have applied to 571, which is a
6       different policy from --
7   Q.  There's no doubt about that.  But my point is, the
8       people authoring these things at Jefferson-Pilot had
9       the skill to define in unexplicit terms whether or not
10      there's waiver of premium under residual disability.
11      Can you confirm that for me by turning to page 2.
12  A.  This does not have a number, doesn't have a reference
13      to this form right here, so I assume it is part of
14      this form.
15  Q.  Thank you for assuming that.  Now, can you answer my
16      question.
17  A.  The definition is there.
18  Q.  And what does it say?
19  A.  Waiver of premium.
20  Q.  What does it say?
21  A.  "If you become eligible for a residual disability
22      benefit for a continuous period of at least three
23      months or immediately following a period of total
24      disability during which premiums have been waived, we
25      will waive premiums that come during the disability."

Page 35

1   Q.  Okay.  How difficult would it have been for
2       Jefferson-Pilot to say on Mr. Kearney's purchased
3       residual disability rider that was created before this
4       one was created that you don't get waiver of premium?
5       How difficult would that have been?
6           MR. ELLIS: Objection.
7   A.  Well, these are marketable items.  You pay more for
8       these provisions.
9   Q.  Okay.
10  A.  I don't know but what this residual disability rider
11      was on a more expensive policy.
12  Q.  Very well.  How do you know that?
13  A.  I don't know that, but I just know it's not the same
14      as this and this is the next in line --
15  Q.  Can you answer my question.  How difficult would it
16      have been for Jefferson-Pilot to tell someone from
17      whom it gets checks every month, you don't get waiver
18      of premium under this residual disability rider?  How
19      difficult would it have been?
20  A.  Well, we told him in a letter.
21  Q.  Okay.  After he purchased the policy.  How difficult
22      would it have been to include on the rider, you don't
23      get waiver of premium?  Would it have been difficult,
24      sir?
25  A.  I don't think so.

Page 36

1   Q.  Okay.
2   A.  If it was intended to be.
3   Q.  Wouldn't it have made sense -- if the insurance
4       company wants to tell the policyholder what the
5       insurance company's intentions are, wouldn't it be
6       better to tell explicitly in the residual disability
7       rider?
8   A.  Well, the policy is created to tell you what you have.
9   Q.  Okay.
10  A.  It's not created to tell you what you don't have.
11  Q.  Oh, now, come on.  Every insurance contract I've ever
12      seen has a specific lengthy provision of exclusions
13      and limitations --
14          MR. ELLIS: Objection, argumentative.
15  Q.  -- right?
16  A.  Well, it's possible.
17  Q.  Possible?  You've been working for an insurance
18      company for 38 years.  You know that every policy has
19      a certain section that says exclusions and limitations
20      and then the laundry list; if these things happen, you
21      continue get benefits, boom, boom, boom, boom, right,
22      and there is in this policy as well.
23  A.  Well, this residual rider which is a part of this
24      policy states that benefits -- no --
25  Q.  There's a Limitations section on this rider, isn't

Page 37

1       there?
2   A.  Yes.
3   Q.  And the policy has an Exclusions section, right?
4   A.  Yes.
5   Q.  So the company does go to an effort to tell the
6       policyholder when benefits don't apply, doesn't it?
7   A.  Yes.
8   Q.  Thank you.  Let's go back to Exhibit 23.
9   A.  Okay.
10  Q.  Mr. Kearney was obviously confused about whether or
11      not there was a waiver of premium, because he brought
12      the issue up to you, right?
13  A.  Yes, based on my response September 8.
14  Q.  That's what you conclude?
15  A.  Yes.
16  Q.  Thank you.  The fourth page is 2741, then 2743, 2729,
17      2901, 2904, and then I want to discuss with you 2892.
18  A.  Okay.
19  Q.  Let me continue with what the pages are.  2891, 2886,
20      2880, 2875, and let's stop at 2874, which is the
21      letter to you from Disability Management dated October
22      29, 1997.
23  A.  Okay.
24  Q.  Okay.  The October 29, 1997 letter has some
25      information redacted there.  There's some graph paper

10 (Pages 34 to 37)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
Harold Shelton                                                        5/7/2004

Page 38

1   or lined paper that's been --
2   A.  What number is that?
3   Q.  2874, October 29, '97.
4   A.  Okay.
5   Q.  This is a letter you received or was sent to you the
6       end of October '97 from a gentleman named Todd Ditmar.
7       Do you understand him to have been a disability claim
8       consultant at Disability Management Services?
9   A.  Yes.
10  Q.  Okay.  Did you have some regular contact with him in
11      the '97, '98, '99 time frame?
12  A.  I believe I did.
13  Q.  Okay.  You had referred to him three separate files:
14      Mr. Kearney's file, Gregor Kohn's file, and Felia
15      Rampersad's file, right?
16  A.  Yes.
17  Q.  And why did you refer Mr. Kohn and Ms. Rampersad's
18      files to DMS for review?
19  A.  I do not recall.
20  Q.  You don't recall what the issues were related to those
21      files?
22  A.  No, I do not.
23  Q.  Is Ms. Rampersad located in Florida?
24  A.  I don't recall.
25  Q.  Okay.  Are those the two people's names who you

Page 39

1       blacked out of 2892 or someone blacked out with 2892?
2       It's July 8, '97, if you want to figure it out that
3       way.
4   A.  Well, it's been blacked out.  I don't know whether I
5       did that or not.
6   Q.  Did you refer more than three claims to DMS in that
7       summer '97 time frame?
8   A.  I do not recall.
9   Q.  In the second paragraph you write, "These are cases
10      that you are going to investigate for us to see what
11      can be done either to settle these in an equitable
12      manner to both the reinsurer and to Jefferson-Pilot or
13      to give us further advice on where to proceed."
14          Did you ever suggest to DMS that they might
15      want to think about settling or resolving them in an
16      equitable manner to the policyholder?
17  A.  Well, I think -- this doesn't say that per se, but the
18      intent would always be something that the insured
19      is -- the policyholder is agreeable to and is
20      equitable to everyone involved.
21  Q.  Did you have phone conversations with Mr. Anderson?
22      This letter that you wrote on July 8, '97, is the
23      first letter of any communication you had with DMS, I
24      assume, correct?
25  A.  Apparently so.

Page 40

1   Q.  Okay.  You wrote it to the attention of John Anderson?
2   A.  Yeah.
3   Q.  Did you understand him to be an equity owner of DMS
4       and head of the claims --
5   A.  Did not specifically know him.  I'm sure I was advised
6       by Employers Re to -- that's who I'd sent it to,
7       because I -- you know, I did not know any of these
8       folks at DMS.
9   Q.  Okay.  Did you then subsequently have conversations
10      with Mr. Anderson about Mr. Kearney's claim?
11  A.  I do not specifically remember any.
12  Q.  Okay.  2886 dated September 12, '97, the third
13      paragraph, Todd Ditmar writes to you, "As Mr. Kearney
14      has refused Jefferson-Pilot's request for an
15      independent financial audit, we would request that you
16      forward a copy of Mr. Kearney's policy to us so that
17      we may have it reviewed by our legal counsel.  It
18      would seem that an audit would be the only true way to
19      measure and objectify his reported loss of income."
20          Mr. Kearney communicated to you there was a
21      specific reason why he did not desire for
22      Jefferson-Pilot or Jefferson-Pilot's agents to contact
23      the people he worked for and tell them that he
24      suffered from chronic severe depression, didn't he?
25  A.  I do not recall specifically, but I would think that

Page 41

1       would be a logical request.
2   Q.  Okay.  And then Mr. Ditmar, he's someone you did have
3       frequent communications with in the '97 --
4   A.  Apparently he was handling this particular case.
5   Q.  He worked for Mr. Anderson?
6   A.  Apparently.
7   Q.  Okay.  He requested that you send him a copy of the
8       policy so their lawyers could take a look at it to
9       determine what the rights were, right?
10  A.  Yes.
11  Q.  Okay.  And then the next page dated September 18,
12      1997, document 2880, you sent him the policy, right?
13  A.  Yes.
14  Q.  And if he did what he said he was going to do, he was
15      going to have his lawyers at DMS who this is what they
16      do, administer claims, determine what the rights are
17      in the policy, right?
18  A.  Yes.
19  Q.  And Mr. Kearney's payments didn't change; this alleged
20      error wasn't disclosed or discovered for four more
21      years, right?
22  A.  Apparently.
23          MR. ELLIS:  If can we take a break so I can
24      check out.
25          MR. ROBERTS:  Can we proceed while you're

11 (Pages 38 to 41)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 42

1   doing that?
2           MR. ELLIS: No.
3           MR. ROBERTS: He can handle himself.
4           MR. ELLIS: I'm sure he can.
5           MR. ROBERTS: We'll tell you what happened.
6   You'll get your transcript.
7           MR. ELLIS: I appreciate that.
8           (Brief recess)
9   Q.  Mr. Shelton, can you turn to December 18, 1997.
10  A.  Uh-huh, okay.
11  Q.  Bates 2861. Have you got that?
12  A.  2861.
13  Q.  After you referred the claim and sent a copy of the
14      policy to DMS in the summer of '97, was DMS
15      ghostwriting the letters that you sent to Mr. Kearney?
16  A.  No.
17  Q.  Any of them?
18  A.  I don't believe so.
19  Q.  Okay. In the second paragraph of your letter of
20      December 18, 1997, you're responding to questions
21      concerning whether or not there was some five-year
22      limitation to Mr. Kearney's benefits. In the second
23      paragraph you say, "During the first five years you
24      were paid total disability benefits and benefits under
25      the residual rider of your policy."

Page 43

1   A.  Uh-huh.
2   Q.  Did you go back and look at the claim file and the
3       policy before writing a letter such as this? Would
4       that have been your practice?
5   A.  Yes, normally that would be.
6   Q.  Okay. The next page 2856 is a fax cover page from you
7       to Mr. Mills. Are you sending him a draft of the
8       December 18 letter or the final version of the letter,
9       do you know?
10  A.  I do not know. Same date, I don't know why I wouldn't
11      just send him a copy of it.
12  Q.  Well, because the next page is 2855 and Todd Ditmar
13      sends you a fax cover page plus two and asks you to
14      call and discuss, and then there's essentially the
15      same letter redrafted dated December 19. It looks to
16      me like you drafted a letter, faxed it there, they
17      faxed it back with some additions.
18  A.  I don't recall if this was just sent to them for
19      review or whether it actually went out to Mr. Kearney.
20  Q.  My suspicion -- I don't know, I wasn't a fact witness,
21      but my suspicion is logical, though, isn't it?
22  A.  Seems -- it does seem.
23  Q.  Do you recall there being some standing order or
24      preference that you share with DMS substantive letters
25      with Mr. Kearney before they go out?

Page 44

1   A.  No, I do not. Normally we would not except, you
2       know -- I don't know.
3   Q.  Was there a normal with regard to DMS? I mean, was
4       there a normal practice with regard to claims you
5       shared administration on with DMS?
6   A.  No.
7   Q.  How many claims did they receive?
8   A.  I think you --
9   Q.  At least three?
10  A.  Yeah. Those are the only three that I know of.
11  Q.  Are you mindful that at the end of '99 they got many,
12      many, many more?
13  A.  I'd heard that they've started processing claims.
14  Q.  At the time of your retirement that's what you
15      understood?
16  A.  Yeah, after I retired.
17  Q.  At any point in time prior to your retirement was it
18      suggested by anybody with whom you had discussion that
19      Mr. Kearney be sent for an IME?
20  A.  I don't recall specifically.
21  Q.  Did you ever request surveillance of Mr. Kearney or
22      are you mindful of any surveillance being sought?
23  A.  I am not, but there's always that possibility.
24  Q.  Possibility that someone in your staff did that or
25      didn't know it or the possibility that DMS did it?

Page 45

1   A.  Well, surveillance usually just requires -- if the
2       policy there was some question that surveillance might
3       be important, then we would do that, but we could do
4       that. Whether we did it in his case, I don't know.
5       It may have been done by DMS, I don't know.
6   Q.  Secret surveillance?
7   A.  Usually they are.
8   Q.  2991, which is January 13?
9   A.  Okay.
10  Q.  You're forwarding to Todd Ditmar a letter, two-page
11      letter that you received from Mr. Kearney; is that
12      right, the following pages 2987 and 2988?
13  A.  I don't know.
14  Q.  Okay.
15  A.  It doesn't reference that letter.
16  Q.  You sent Ditmar a three-page fax enclosing two, the
17      fax cover plus two for his information?
18  A.  Yes.
19  Q.  And on that day there was a letter sent to you by Mr.
20      Kearney, right?
21  A.  Yes, three pages sent to Mr. Kearney -- or to
22      Mr. Ditmar. I noticed my fax transmittal was January
23      13, which is the same date as his, so I don't know
24      specifically if that's what was sent to him.
25  Q.  He might have faxed his letter to you and you faxed it

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 46

1   on receipt?
2   A.  That's possible, yes.
3   Q.  At the third paragraph of that January 13 letter from
4       Mr. Kearney, the last three sentences say --
5   A.  I'm sorry, what was that -- which one is this?
6   Q.  You're on the right page right now, the third
7       paragraph.
8   A.  Okay.
9   Q.  January 13 letter from Mr. Kearney. The last three
10      sentences say, "Enclosed is a line card listing
11      principals (blacked out) from '95. Jefferson-Pilot
12      may put me in an unfavorable position with those
13      principals if you contact them. I have only two left
14      and the office in Toledo is closed."
15          Was that the first time that Mr. Kearney had
16      expressed that concern, as far as you know?
17  A.  No, I do not know.
18  Q.  Turn to the letter dated January 19, '98, Bates 2990.
19  A.  Okay.
20  Q.  It's a letter from Mr. Kearney a week after you had
21      that conference where you did a -- do you see your
22      memo about your January 13 discussion with him?
23  A.  (No response)
24  Q.  Sir?
25  A.  I'm sorry?

Page 47

1   Q.  Do you see the memo -- as we go through the
2       chronology, there was a January 13 memo from you to
3       the file concerning a call you had with Mr. Kearney.
4   A.  Yes, here.  This is 2992.
5   Q.  That's your memo, and then his letter, his two-page
6       letter also references that lengthy call you had on
7       the 13th, right?
8   A.  Yes.
9   Q.  I guess the fax to Ditmar could have been either your
10      memo or Chris's letter, since they're both two pages?
11  A.  Yeah.
12  Q.  Both relate to January --
13  A.  I'm not sure what was forwarded.
14  Q.  Okay.  And then a week later or on January 19, Mr.
15      Kearney sends you a letter memorializing -- I'm
16      talking about 2990 now -- "When we talked last week,
17      you told me that residual disability benefits were
18      subject to the same terms that are listed in the total
19      disability section."  Did you tell him that?
20  A.  Not unless it was in my -- this memo to file.
21  Q.  If it's not in your two-page -- how long was the phone
22      call?
23  A.  I can't say, must have been 10 to 15 minutes anyway.
24  Q.  Is there things you talked about that aren't -- were
25      there words transferred between the two of you that

Page 48

1   aren't captured in your memo?
2   A.  I can't say.  I would try to include everything in the
3       memo.
4   Q.  Okay.  But it's his memory within a week of the call
5       that you told him that residual disability benefits
6       were subject to the same terms that are listed in the
7       total disability section.  Are you saying that that
8       never happened, you never said that to him?
9   A.  I can't -- no, I am not saying that, because I don't
10      know.
11  Q.  Okay.  Earlier we saw a '93 question, 1993 question by
12      Mr. Kearney about whether or not waiver of premium
13      applies to him under residual disability and he raises
14      the issue again here in 1998, right?
15  A.  Yes, he does, in the second paragraph, January 19, '98
16      letter.
17  Q.  Your responsive letter on the next page, 2982, dated
18      January 28, '98, the second paragraph, in response to
19      his question about whether or not waiver of premium
20      applies, you say, the middle of the second paragraph,
21      "In reviewing the waiver of premium provision, it
22      appears that is applicable only if benefits are being
23      paid under the total disability provision of the
24      policy."
25          You would agree with me that that is not

Page 49

1   necessarily an equivocal explicit statement that you
2   know that they don't apply.  You're suggesting that it
3   appears to you, correct?
4   A.  I used the word "appears."
5   Q.  Okay.
6   A.  It also states premiums would continue to be due,
7       so --
8   Q.  Because it's your assumption that it appears that that
9       is the case?
10  A.  Yes.
11  Q.  Okay.  And you apologized to him for any misleading
12      statement that may have been made in the January 13
13      phone call, right?
14  A.  Yes.
15  Q.  What day of the month were benefits payable to Mr.
16      Kearney?
17  A.  Not any specific day.  We didn't have a specific day
18      that we paid benefits.  When the claim form came in,
19      it was matched with the file and if everything is in
20      order, it was paid at that time.  He may have been
21      paid generally in the same time of the month, but
22      could have been different days, say, early in the
23      month or -- but primarily it's when the claim form was
24      received that we would start the process.
25  Q.  How long does the process take?  Would it be the same

13 (Pages 46 to 49)

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889                Fax (704) 372-4593

Page 50

1    day?
2    A.  Very possibly.  If everything is in order, it's just a
3        matter of the examiner reviewing that and approving
4        the payment and it could be within a day or two.
5    Q.  Do you date-stamp the receipt of the claim form or the
6        supplemental statement?
7    A.  Yes.
8    Q.  They're all date-stamped?
9    A.  Yes.
10           MR. ELLIS:  Just for your information,
11       Counsel, they date-stamp on the reverse side, which is
12       why none of the copies of mine have them.  They
13       date-stamp their claims material on the reverse side.
14           MR. ROBERTS:  Were those produced?
15           MR. ELLIS:  Apparently it was never copied
16       for either my copy of the claim file or yours.  There
17       were only one-sided copies and --
18           MR. ROBERTS:  Can something be undertaken to
19       remedy that?
20           MR. ELLIS:  I can get the date-stamping for
21       them if you like.
22           MR. ROBERTS:  Yes.
23   Q.  March 23, '98, which is a letter numbered 2956?
24   A.  Okay.
25   Q.  Now you're getting copies of letters that Mr. Kearney

Page 51

1        is dialoguing directly with DMS?
2    A.  Yes.
3    Q.  Was there a switch in the relationship at that point
4        where he was dialoguing directly with them and just
5        keeping you in the loop of comments?
6    A.  Mr. Kearney?
7    Q.  Right.
8    A.  I suspect at that point DMS had contacted him about
9        whatever they were needing and he was just writing to
10       them and then just keeping me informed.
11   Q.  Who was running the show on Kearney's claim from
12       summer of '97 through the end of '99?  Was it
13       principally DMS or was it principally Jefferson-Pilot?
14   A.  No, we continued to make the payments.  All they were
15       doing was reviewing it.
16   Q.  You were getting the supplemental forms monthly,
17       Jefferson-Pilot meaning you?
18   A.  Yes.
19   Q.  And Jefferson-Pilot was issuing the checks?
20   A.  That's correct.
21   Q.  But everything else was being taken care of by DMS?
22   A.  Well, I wouldn't say everything else.  I think -- you
23       know, they were doing a review.  They were attempting
24       to get additional information.
25   Q.  Okay.  Your company wasn't engaged in doing that once

Page 52

1        DMS got involved to do that?  You were performing
2        other functions?
3    A.  Yes.
4    Q.  Okay.  Was there any kind of written agreement that
5        set forth --
6    A.  I think the -- I would think that the agreement was
7        probably with Employers Re.
8    Q.  Between DMS and Employers Re?
9    A.  Yes.  That would just be my guess, because I don't
10       remember any contract that we had with them.  They
11       just asked us to send these forms to them.
12           MR. ROBERTS:  I believe that's been requested
13       in the 34 discovery.  Bill, is it going to be
14       produced?
15           MR. ELLIS:  I'm not aware of any.
16           MR. ROBERTS:  Okay.  Well, will you see if it
17       exists or not?
18           MR. ELLIS:  Sure.
19   Q.  Did anyone ever tell you there was a written agreement
20       between --
21   A.  No.  I just know that DMS billed us directly and I
22       would send a copy over to Employers Re to get their
23       part of the charge.
24   Q.  There was no reference to a contract in the invoice or
25       anything?

Page 53

1    A.  Not that I'm aware of.
2           MR. ROBERTS:  I'd like those as well.
3        They're not in the claim file.
4           MR. ELLIS:  What's that?
5           MR. ROBERTS:  His transmittals to Employers
6        Re with the invoices of DMS.
7    Q.  There's a fax transmittal that's turned sideways,
8        April 23, '98, from you to Ditmar.  Now, if Mr.
9        Kearney's residual disability began prior to the age
10       of 45 -- I think we talked about this earlier -- his
11       maximum benefit period on the schedule is lifetime,
12       correct?
13   A.  I believe that's correct.
14   Q.  And in this fax you represent that it's to age 65.
15       Was the policy ambiguous on the point?
16   A.  I don't think it was.  Many times -- you didn't go
17       back and review the contract every time you got
18       involved in the correspondence.  Usually if it's a
19       lifetime benefit, it would have been written on the
20       claim form at the top and you may have just referenced
21       that.  I'm not sure about that claim form, but it may
22       have indicated to age 65 and that's maybe where I got
23       that.
24   Q.  Okay.
25   A.  But I'm not sure.

14 (Pages 50 to 53)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                C-1-02-479
Harold Shelton                                        5/7/2004

Page 54

1  Q.  So you've told me today it's lifetime.  You said in
2      this letter it was age 65.  But to close the loop on
3      that, it's your judgment sitting here today that it
4      would be lifetime, not age 65?
5  A.  (No response)
6  Q.  Or was it age 65?  You're spending some time to answer
7      this question.
8  A.  Yes.
9          MR. ELLIS:  (Indicating)
10         MR. ROBERTS:  Just getting an accurate
11     record.
12             Would you reflect on the record the hand's up
13     to tell me to shut up.
14         MR. ELLIS:  Actually the hand's up to let you
15     just be patient and let him answer the question.
16 A.  It does appear that that is the case.
17 Q.  That it's lifetime?
18 A.  Yeah.
19 Q.  That's where as of 2:15 on May 7, 2004, you come out
20     on the issue, right?
21 A.  Yeah.
22 Q.  Okay.  Did you like the people at DMS that you were
23     dealing with?
24 A.  Don't think I had any particular one way or the other.
25     It was strictly business.  I had no personal

Page 55

1      relationship with them.
2  Q.  The next page of this, 2948, you're asking in a very
3      gentlemanly way that you are that you had an invoice
4      about a matter but didn't get the report and you're
5      asking for DMS to send you the report.
6  A.  Yes.
7  Q.  Mr. Shelton, did you actually leave work prior to
8      December 31 of '99 and that was simply the effective
9      date of your requirement?
10 A.  No, worked till the last day.
11 Q.  Did you really?
12 A.  (Witness nods head)
13 Q.  You didn't have any Y2K issues and that's why you
14     checked out?
15 A.  No.
16 Q.  Because there is an agreement entered between DMS and
17     Jefferson-Pilot dated December 15 of '99 whereby
18     effective January 1 of 2000, DMS would take over the
19     administration of a good bulk of the claims.  You
20     weren't mindful of that prior to your retirement?
21 A.  No.  It probably was handled at a different level.
22     They knew that I was leaving, but they didn't advise
23     me -- they may have just in passing said this is what
24     we're going to do, but it was not particularly
25     anything I was involved in or --

Page 56

1  Q.  You don't recall any preparatory work to transfer
2      those files?
3  A.  No.
4  Q.  Do you know who Rene Hinote is, H-I-N-O-T-E, at a
5      company called ICS?
6  A.  No, not right off I do not.
7  Q.  Did you ever use ICS as a vendor for any reason?
8  A.  I cannot recall.  I'm not sure I know what they do.
9  Q.  When you requested tax returns from Mr. Kearney, was
10     he generally cooperative?
11 A.  I believe there may have been some delay in getting
12     some of those, but --
13 Q.  Are you mindful that he always filed an extension to
14     file his tax returns, so he didn't prepare them in
15     April, he prepared them later in the year?
16 A.  I don't recall that specifically.
17 Q.  Can I have your Exhibit 23 back, sir.
18 A.  23?
19 Q.  Yeah, actually all these originals.
20 A.  (Indicating)
21 Q.  Thanks.
22 A.  Here's 14 (Indicating).
23 Q.  Thank you.
24 A.  And 4 (Indicating)
25 Q.  Who creates the proposals that prospective

Page 57

1      policyholders get to advise them of what the policy
2      they buy might contain?
3  A.  Usually our Underwriting Department, it is a program
4      by which it's produced, and also some of our agents
5      had the capability to produce proposals.
6  Q.  Did the company allow agents to create proposals that
7      weren't blessed by the company?
8  A.  Well, they could present a proposal.  That doesn't
9      mean we would accept it necessarily when it was sent
10     in, the application.
11 Q.  Did they create proposals on Jefferson-Pilot
12     letterhead?
13 A.  Yes.
14 Q.  Do you know if Mr. Kearney's proposal was a
15     Jefferson-Pilot document or some document created by
16     somebody --
17 A.  I do not know at all.  Usually we did not in claims
18     deal with the proposal at all.
19 Q.  Have you given any other depositions in any other
20     matters relating to your work at Jefferson-Pilot?
21 A.  Several times.
22 Q.  What was the most recent?
23 A.  I believe about four or five months ago.
24 Q.  Was that in the King case?
25 A.  I believe so.

15 (Pages 54 to 57)

Page 58

1    Q.  Mississippi?
2    A.  Yes.
3    Q.  Did you testify at trial in that case?
4    A.  No.
5    Q.  You settled on the eve of trial?
6    A.  (Witness nods head)
7    Q.  Was DMS involved in that matter, too?
8    A.  I do not recall that they were.
9    Q.  Have you ever given any depositions relating to your
10       work at Jefferson-Pilot that also related to DMS's
11       involvement?
12   A.  Well, I think the King case was one that they had --
13       they were processing at the time, DMS.
14   Q.  That's correct.  Your memory is correct.  Any other
15       cases?
16   A.  Not that I recall.
17   Q.  Did you review with Mr. Ellis over the past couple
18       days the disability claim worksheet in Mr. Kearney's
19       file?
20   A.  I believe I just glanced at it.
21   Q.  Okay.  Do you know if your initials appear as
22       approving payment?
23   A.  Not very often, but I think there was --
24   Q.  There was some?
25   A.  -- some.  It would be HS.

Page 59

1    Q.  What's the procedure that the company requests or
2        requires before you put your initials on a payment
3        authorization?
4    A.  You would have the claim form in front of you and the
5        examiner would look at it.  If it's over their limit,
6        then we would review the same thing they had reviewed.
7    Q.  Okay.  So in this case Phyllis Harden and/or Bob
8        Maxwell would have been the claims examiners because
9        Mr. Kearney's claim was above a certain threshold?
10   A.  Yes.
11   Q.  Either you or JL would have to sign it as well?
12   A.  Right, that's correct.
13   Q.  And what did the company require of you before you put
14       your initials down?
15   A.  That the payment be correct.
16   Q.  Okay.  And did you undertake to make certain of that
17       when you --
18   A.  Yes, I tried very hard to do that.
19   Q.  Okay.  Did you ever have any conversations with DMS of
20       length about the substance of Mr. Kearney's claim or
21       did you just simply send them the file and leave them
22       be?
23   A.  No, I think primarily we were just trying to get all
24       the information, make sure that, you know, he was
25       getting the benefits he's entitled and we were paying

Page 60

1        what we should be paying and that we were getting all
2        the information we needed to properly consider the
3        claim.  That would have been our objective.
4    Q.  So there wasn't any one- or two-hour conference calls
5        to educate DMS on --
6    A.  No.
7    Q.  Was Phyllis Harden good at her job?
8    A.  Yes.
9    Q.  How about Mr. Maxwell?
10   A.  Yes.
11   Q.  We decided not to take his deposition today, by the
12       way.
13   A.  Good, I'm glad.  His health is not all that good.
14   Q.  I asked before I requested.  He said it wouldn't be an
15       imposition.
16   A.  He did say?
17   Q.  His wife said it wouldn't and then she went and
18       confirmed it with him and that's what she told me.
19   A.  Yeah, yeah.
20   Q.  So maybe he's doing better.
21   A.  I'm sure he's willing to cooperate.
22   Q.  Thank you.  Have you ever testified at trial?
23   A.  No, I have not.
24   Q.  Do you want to?
25   A.  No.

Page 61

1    Q.  I might have asked you this earlier.  Are you mindful
2        that DMS continued to pay the claim in the same manner
3        that your company did for at least four years after
4        the referral to --
5    A.  I assume that they have been.
6    Q.  What I mean in the same manner is, they kept adjusting
7        it for COLA every May and they kept paying Social
8        Security Supplement until sometime in 2002.  Are you
9        mindful of that?
10   A.  No, I was not.  I wasn't aware of how they were paying
11       the claim.
12   Q.  After 2000?
13   A.  Yeah.
14   Q.  Did you ever seek advice of legal counsel during the
15       time that you were at Jefferson-Pilot with regard to
16       Mr. Kearney's claim?
17   A.  Not that I recall.  We probably would have had
18       something in the file if we had.
19   Q.  Under what circumstances would you use the general
20       counsel office of Jefferson-Pilot?
21   A.  I think only if there was some legal question about --
22       while the claim payment is being made, normally we
23       would not have to refer to them.  It might just depend
24       on whether there's a complication or not.
25   Q.  Did you ever seek their input when there's confusion

16 (Pages 58 to 61)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                        C-1-02-479
Harold Shelton                                                                    5/7/2004

Page 62

1    or debate about the interpretation of a policy?
2    A.  We could do that.
3    Q.  Are you mindful of that circumstance ever occurring?
4    A.  Not specifically, no.
5    Q.  I've marked Exhibit 22. It contains handwriting. I
6        understand it's two different persons' handwriting and
7        someone has told me that what's circled is yours.
8    A.  It appears to be my handwriting.
9    Q.  Okay. This is in Mr. Kearney's claim file, so I'm
10       assuming that there was some undertaking to figure
11       what his monthly benefits were at some point.
12   A.  I would assume so. I'm not sure what this is.
13   Q.  Okay. But it is your handwriting encircled?
14   A.  Yes.
15   Q.  And is it Mr. Maxwell's handwriting otherwise?
16   A.  It appears to be.
17   Q.  So you never had principal responsibility for Mr.
18       Kearney's claim? That fell to Mr. Maxwell initially
19       and then Ms. Harden and you provided them with
20       assistance at a managerial level?
21   A.  Yes, that is correct.
22   Q.  Mr. Kearney was visited in December '99 by a Michael
23       Conlon from International Claims Specialists. He
24       purports to be someone out of Cincinnati involved in
25       investigation for International Claims Specialists.

Page 63

1    Is that an investigative service that you used while
2    at Jefferson-Pilot?
3    A.  We did not use them very often, but apparently they
4        specialize in a particular area which I do not recall,
5        but I don't recall using them that often.
6    Q.  There's an April 25, 1998 memo in the file from
7        someone named Janet Beattie, consultant for
8        Psychiatric Disability Consultants, Inc., which I
9        think is an affiliated entity to Disability Management
10       Services. The memo is to Todd Ditmar. Do you recall
11       whether or not that memo was ever shared with
12       Jefferson-Pilot?
13   A.  No, I don't. What's the date on that?
14   Q.  April '98. Would you have discussions with Phyllis
15       Harden or Bob Maxwell if they had questions about Mr.
16       Kearney's claim?
17   A.  Yes.
18   Q.  Do you recall them coming to you for counsel or advice
19       on the claim?
20   A.  Nothing specific, no, I don't.
21   Q.  Do you know who Betty Hand is?
22   A.  No, I do not.
23   Q.  How about Sharon Balkcum, B-A-L-K-C-U-M?
24   A.  I do not recall her specifically.
25   Q.  Betty Lou Hand, was she somebody you worked with at

Page 64

1    JP, do you recall?
2    A.  No, I don't recall them.
3    Q.  Did you ever speak to Bill Dempsey with Employers
4        Reinsurance?
5    A.  The name is familiar and I think I probably did.
6    Q.  Do you ever recall speaking to him --
7    A.  Yes, I do remember Bill.
8    Q.  Okay. Do you have a recollection of speaking to him
9        about Mr. Kearney's claim?
10   A.  No, I don't.
11   Q.  Did you ever speak to the agent or do you know of
12       anyone who's spoken to the agent that sold the policy
13       to Mr. Kearney?
14   A.  I don't have any recollection. It's possible he
15       called when the claim was first initiated, but I don't
16       recall.
17   Q.  Okay. This is Bates 2918. Do you know whose
18       handwriting that is?
19   A.  I really do not. I don't have any idea whose that is.
20   Q.  0647 contains a laundry list of policy numbers; is
21       that accurate?
22   A.  Well, I see Bill's name here.
23   Q.  Bill Dempsey?
24   A.  Bill Dempsey. He was an attorney with Employers Re
25       and these are probably policies that he wanted us to

Page 65

1    pull so he could review when he was in town. That
2    would be my assumption, but I don't know.
3    Q.  How do you come to that?
4    A.  Well, I just know that the only thing that Bill would
5        have with a list of numbers are things that he might
6        have -- well, no, these are policy forms, not policy
7        numbers.
8    Q.  Are you saying this is Bill Dempsey's handwriting?
9    A.  I don't know. No, I'm not saying because I don't
10       know.
11   Q.  Do you know whose it is?
12   A.  No, I don't.
13   Q.  But does --
14   A.  He may have just asked for copies of these particular
15       forms, maybe that's what --
16   Q.  That's a laundry list of forms?
17   A.  Yeah, but I do not know whose it is, nor do I know why
18       it was --
19          (Defendant's Exhibit No. 24 was marked for
20       identification by Mr. Roberts.)
21   Q.  Exhibit 24, it's my only copy, is 2756. Do you know
22       whose handwriting that is? Mr. Maxwell's?
23   A.  Yes, this part in the second paragraph is his.
24   Q.  Do you recognize any other handwriting on there?
25   A.  No, I don't.

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Page 66

1  Q.  Is there a calculation of the benefit in this
2      document?
3  A.  Some kind of calculation, but I'm not sure what it is.
4  Q.  Some kind of calculation that appears in Mr. Kearney's
5      claim file and Bates-stamped, right?
6  A.  I assume it was in his file.
7  Q.  Thank you.  During the time frame of '93 to '99, was
8      there anyone other than yourself, Mr. Roberson,
9      Mr. Maxwell, Kim Brann, or Phyllis Harden involved in
10     claims, disability insurance claims at Jefferson-Pilot
11     Life Insurance Company?
12 A.  Not that I specifically remember.
13         (Defendant's Exhibit No. 25 was marked for
14     identification by Mr. Roberts.)
15 Q.  I've marked as Exhibit 25 a two-sided document, which
16     this is my only copy, 0822 and 0823, that appears to
17     be an October 31, '94 Supplemental Claimant's
18     Statement for Residual Disability Benefits; is that
19     right?
20 A.  That's correct.
21 Q.  This is date-stamped on the back as November 3, '94
22     receipt?
23 A.  Looks like our date stamp, yes.
24 Q.  And does Mr. Kearney laundry-list here his monthly
25     income in '94?  On this form is his monthly income in

Page 67

1      '94 broken out per month?
2  A.  Yes.
3  Q.  So you had a statement of him of his monthly income by
4      month in '94 when he filed this claim?
5  A.  $2,000 a month.
6  Q.  Thank you.  Am I the slowest lawyer in asking
7      questions that you've ever had?
8  A.  It's okay.
9  Q.  Has your deposition ever been videotaped?
10 A.  I believe so.
11 Q.  On more than one occasion?
12 A.  I don't recall more than one time.
13 Q.  Did you get a copy?
14 A.  I did not personally.
15 Q.  Did you want one?
16 A.  No.
17 Q.  I'm going to hand you Bates label 2828, which is a
18     transmittal from Mr. Kearney to Ms. Harden that's
19     contained in the claim file.  Was Mr. Kearney advising
20     Ms. Harden that he has gotten an extension on the
21     filing of his tax return?
22 A.  Yes.
23 Q.  Do you know if Mr. Kearney ever had to remind
24     Jefferson-Pilot to adjust his monthly benefit to
25     account for the COLA?

Page 68

1  A.  No, I do not.
2          (Defendant's Exhibit No. 26 was marked for
3      identification by Mr. Roberts.)
4  Q.  If Ms. Harden was asked by Mr. Kearney to look to see
5      if there was a COLA adjustment that was called for, do
6      you think that she would have gone to the effort to
7      judge whether or not there was a COLA adjustment
8      called for?
9  A.  Yes.
10 Q.  I've marked as Exhibit 26 a document Bates labeled
11     2846 that purports to have been faxed by Mr. Kearney,
12     and what's cut off is May 6, '96, to Phyllis Harden.
13     This is a form used for transmitting his fax the
14     supplemental disability claim reports monthly and he
15     writes in this particular one, "Please check to see if
16     yearly increase in benefits is due."
17         Would you suspect that she did what the
18     policyholder asked and looked at the policy to see if
19     one was due?
20 A.  Yes.
21         MR. ROBERTS:  Okay.  Pleasure meeting you,
22     Mr. Shelton.
23         THE WITNESS:  You, too.
24         MR. ROBERTS:  Have a good day.
25         THE WITNESS:  Thanks.

Page 69

1      EXAMINATION (by Mr. Ellis):
2
3  Q.  Let me ask you a couple questions before you leave,
4      Mr. Shelton.
5  A.  Okay.
6  Q.  Showing you Exhibit 3, which is the policy, and
7      Exhibit 4, which are the riders that were actually
8      sold to Mr. Kearney, based upon the provisions of
9      those policies -- and I'm sorry, let me give you ones
10     that aren't marked up.
11         MR. ELLIS:  Can you hand him Exhibits 3, 4,
12     and 9, please.
13         MR. ROBERTS:  Here's the originals
14     (Indicating).
15 Q.  Mr. Shelton, based upon the contracts and the riders
16     before you, is there any way that someone on residual
17     disability making an admitted claim for residual
18     disability would be entitled to either the COLA or
19     increase in benefits, depending on which way you
20     prefer to refer to it, or the Social Security benefit?
21         MR. ROBERTS:  Objection, calls for a legal
22     conclusion, move to strike the answer.
23 Q.  You can answer.
24 A.  Let's see, the Social Security is payable if you are
25     entitled to receive monthly benefits for total

18 (Pages 66 to 69)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                    C-1-02-479
Harold Shelton                                                                  5/7/2004

Page 70

1   disability.
2   Q.  You agree that someone who is receiving residual
3       disability would not be entitled to total disability
4       benefits also?
5           MR. ROBERTS:  Objection, leading, and it also
6       calls for a legal conclusion, two objections.
7   A.  Repeat the question, please.
8   Q.  Yeah.  Directing your attention to the limitations
9       part of the residual disability, is there any way that
10      someone can be receiving residual disability benefits
11      and total disability benefits at the same time?
12          MR. ROBERTS:  Objection, calls for a legal
13      conclusion, move to strike the answer.
14  A.  This is -- the Social Security Supplement benefit is
15      normally paid only if you're receiving the monthly
16      indemnity benefit.
17  Q.  Okay.  My question to you, sir, was, under the
18      limitations in the residual disability rider, can a
19      person be receiving residual disability and total
20      disability benefits at the same time?
21          MR. ROBERTS:  Objection, asked and answered,
22      calls for a legal conclusion, move to strike the
23      answer.
24  A.  In my opinion, he cannot be.
25  Q.  Okay.  Why would that be?  What's the basis for your

Page 71

1       opinion that you can't be receiving both total and
2       residual at the same time?
3           MR. ROBERTS:  Objection, calls for a legal
4       conclusion.
5   A.  Because there are two separate benefits calling for
6       two separate circumstance.
7   Q.  Does the language in the limitations in the residual
8       disability rider specifically speak to that?
9           MR. ROBERTS:  Objection, calls for a legal
10      conclusion.
11  A.  Yes, it does.
12  Q.  Can you tell me what it says.
13  A.  "The residual disability benefit will not be paid for
14      any period of time that benefits are payable for total
15      disability or loss of sight, speech, hearing,
16      et cetera."
17  Q.  In the Social Security benefit rider, is there any
18      grant of a benefit of Social Security adjustments or
19      supplement for a person that is not receiving monthly
20      benefits for total disability?
21          MR. ROBERTS:  Objection, calls for a legal
22      conclusion.
23  A.  Repeat that question, please.
24  Q.  Yes.  Under the Social Security Supplement, is there
25      any grant of that benefit, the Social Security

Page 72

1       Supplement benefit, to anyone who is not receiving
2       total disability monthly benefits -- I'm sorry,
3       receiving monthly benefits for total disability?
4           MR. ROBERTS:  Objection, calls for a legal
5       conclusion.
6   A.  Would you repeat it one more time, please.
7   Q.  Yes, sir.  I want to know if under the terms of the
8       Social Security Supplement there is any provision
9       granting that benefit, the Social Security Supplement,
10      to anyone who is not receiving benefits for total
11      disability?
12          MR. ROBERTS:  Objection, calls for a legal
13      conclusion.
14  A.  I do not see it here.  It requires that you be
15      receiving monthly benefits, total disability.
16  Q.  Is there any provision in either the Social Security
17      Supplement or the residual disability rider that
18      provide for Social Security supplementary benefits
19      while residually disabled?
20          MR. ROBERTS:  Objection, calls for a legal
21      conclusion.
22  A.  No.
23  Q.  Turning to the increase in benefits provision, page 3
24      of the policy WJ576A, which is Exhibit 3, is there any
25      provision that provides in this policy for the

Page 73

1       increase in benefits as an additional benefit of total
2       disability to be equally applied to residual
3       disability claims?
4           MR. ROBERTS:  Objection, calls for a legal
5       conclusion.
6   A.  Now, this is for the COLA?  Is that what you're --
7   Q.  Yes, the increase in benefits.
8   A.  It again requires total disability --
9   Q.  If you look to the --
10  A.  -- to be paid.
11  Q.  If you look at Exhibit 4 to the additional increase in
12      benefits rider, does that change the provision in such
13      a way as to make it applicable for residual disability
14      under any circumstance?
15          MR. ROBERTS:  Objection, calls for a legal
16      conclusion.
17  A.  No.
18  Q.  Based upon your review of the policy and the
19      adjustments -- I'm sorry, the policy and the riders
20      attached, was Mr. Kearney while filing a claim for
21      residual disability ever entitled to receive benefits
22      under either the COLA or increase in benefits,
23      whichever you call it, and/or the Social Security
24      benefits?
25          MR. ROBERTS:  Objection, calls for a legal

19 (Pages 70 to 73)

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Page 74

1   conclusion.
2   A. No.
3   Q. Sir, at the beginning of your deposition counsel asked
4       you if I was the one who advised you that a mistake
5       had been made, and you admitted that that was the
6       case. Did you in your own review of the policy and
7       the attachment to the policy conclude whether or not I
8       was correct that there had been a mistake --
9           MR. ROBERTS: Are you talking about after you
10          told him or before? What time period?
11          MR. ELLIS: At any time.
12          MR. ROBERTS: Well, let's break it down,
13      would you do that for me, to be clear on the record?
14          MR. ELLIS: No.
15  Q. At any time did you determine for yourself whether or
16      not there was an error made in the payment of benefits
17      to Mr. Kearney regarding increase in benefits or the
18      Social Security benefit?
19          MR. ROBERTS: Objection.
20  A. Yes.
21  Q. Are you saying that only because I brought it to your
22      attention or is that based upon your review of the
23      actual contract between the parties?
24          MR. ROBERTS: Objection. He's testified he
25      hasn't reviewed the entire contract.

Page 75

1   A. After going through the material and reviewing that, I
2       determined that on my own.
3           MR. ROBERTS: Objection, move to strike,
4       calls for a legal conclusion.
5   Q. Counsel in his question argued to you about whether or
6       not there is a specific prohibition in the residual
7       disability rider that says you don't get Social
8       Security or COLA benefits. I'm going to ask you to
9       look at Exhibit 4 again, which is those riders, and is
10      there any specific exclusion to him receiving a
11      benefit if his house burns down?
12          MR. ROBERTS: Objection, calls for a legal
13      conclusion, irrelevant, argumentative.
14  Q. Pardon?
15  A. No.
16  Q. Are these riders in this contract designed to explain
17      what they don't provide or what they do provide?
18  A. What they do provide.
19          MR. ROBERTS: Objection, calls for a legal
20      conclusion.
21  Q. Counsel argued with you or asked you to review the
22      elimination period --
23          MR. ROBERTS: Bill, I asked him questions. I
24      didn't argue with him. Unless you change your
25      phrasing of the question, I'm going to object for

Page 76

1   every single question where you use argue, that I was
2   arguing with your witness. I wasn't arguing with your
3   witness, was I, Mr. Shelton?
4       THE WITNESS: No.
5   Q. Counsel suggested to you that since the elimination
6       period, the maximum benefit period, and the definition
7       of monthly benefit are the same for both residual and
8       total disability that everything under total
9       disability should be available to residual. Is that
10      the way the contract is written?
11          MR. ROBERTS: Objection, that wasn't the
12      testimony, that wasn't the question, calls for a legal
13      conclusion, and leading.
14  Q. Is that the way these policies are written?
15          MR. ROBERTS: Objection, calls for a legal
16      conclusion and leading.
17  A. Could you repeat the question, please.
18  Q. You recall Mr. Roberts asking you questions about the
19      fact that by reference the residual disability rider
20      brings in the definition --
21          MR. ROBERTS: Are you showing -- the witness
22      is reading from his notes now you're pointing to with
23      your pen --
24          THE WITNESS: I'm sorry, I can't see --
25          MR. ROBERTS: Both of you are one foot apart.

Page 77

1   Your head is looking at his notes. Your notes are
2   being followed by a pen as you ask him a question. It
3   certainly appears that you're reading from a script
4   together.
5       MR. ELLIS: A script I just created?
6       MR. ROBERTS: No, probably one you created
7   two days ago and you've convinced this gentleman who's
8   been working for 38 years in the industry that your
9   interpretation of the contract is right and his of 10
10  years is wrong.
11  Q. Do you remember Mr. Roberts asking you about the
12      elimination period being the same for both residual
13      and total?
14  A. Yes.
15  Q. Does the residual rider incorporate the time frame set
16      up as the elimination period by specific language?
17          MR. ROBERTS: Objection, calls for a legal
18      conclusion. Do you know what a legal conclusion is?
19  A. I believe it may have referred to the schedule of
20      benefits.
21  Q. Okay. As to what the maximum benefit period was?
22          MR. ROBERTS: Objection, leading.
23  A. Yeah.
24          MR. ROBERTS: Objection, legal conclusion.
25  Q. Could you look at the residual disability rider

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

**Page 78**

1  itself. Is there any modification to the maximum
2  benefit period that is different from the total
3  disability?
4      MR. ROBERTS: Objection.
5  Q. Is there any provision in the residual disability
6  rider that modifies the maximum benefit period
7  different than it would be under total disability?
8      MR. ROBERTS: Objection, calls for a legal
9  conclusion.
10 A. I don't believe so.
11 Q. Would you take a look for me at the right-hand column
12 of the residual disability rider, Exhibit 4.
13 Specifically after the part that counsel read to you,
14 there's a statement, "However, if the residual benefit
15 will not" -- "However, the residual benefit will not
16 be paid longer than 24 months if," and then it has an
17 A and B. Do you see that?
18 A. Yes.
19 Q. Is that the same in the total disability in the
20 policy?
21     MR. ROBERTS: Objection, leading. Objection,
22 calls for a legal conclusion.
23 A. The policy does not state that.
24 Q. Does that modify the maximum benefit period between
25 the residual claim and the total disability claim?

**Page 79**

1      MR. ROBERTS: Objection, calls for a legal
2  conclusion, leading.
3  A. I'm not sure about that.
4  Q. Okay. Let me ask you, sir, with regard to the answers
5  that you gave counsel, you suggested that the specific
6  items that he referenced were incorporated into the
7  residual rider by reference to the policies. Did I
8  understand your testimony correctly?
9      MR. ROBERTS: Objection.
10 Q. Counsel asked you about the elimination period, the
11 maximum benefit period, and the definition of monthly
12 benefit. You've testified that they were referred to
13 or incorporated in the residual disability from
14 definitions in the contract; is that right?
15 A. I believe that's right.
16     MR. ROBERTS: Objection.
17 Q. Is there any part of the residual disability rider
18 that you read that references or incorporates an
19 entitlement to either Social Security or COLA?
20     MR. ROBERTS: Objection, calls for a legal
21 conclusion.
22 A. No.
23 Q. In dealing with your letters in Exhibit 23, counsel
24 asked you about the writing Bates numbers 2980 --
25 2990, a letter to you from Mr. Kearney asking about

**Page 80**

1  the residual benefits being the same as total
2  disability benefits.
3      MR. ROBERTS: What's the date of this letter,
4  Counsel?
5      MR. ELLIS: I'm sorry, it's January 19, 1998.
6      MR. ROBERTS: Okay.
7  A. Okay. Your question again?
8  Q. Yes. In his letter Mr. Shelton [sic] suggests that
9  you told him that residual benefits were subject to
10 the same terms that are listed in the total disability
11 section.
12     MR. ROBERTS: Do you mean Mr. Kearney?
13 Q. Did you respond to that writing in letter -- or that
14 letter in writing?
15     MR. ROBERTS: Your question is, did Mr.
16 Shelton refer to Mr. Shelton?
17 Q. Sorry. Mr. Kearney sent you a letter.
18 A. Okay.
19 Q. Did you respond to that letter?
20     MR. ROBERTS: The January 19 letter?
21 A. I just assumed that this January 28 letter is in
22 response to that.
23 Q. Does it say so?
24 A. Yes, it does.
25 Q. Okay. Did you tell him in that letter that the waiver

**Page 81**

1  of premiums provision did not apply?
2  A. Yes.
3  Q. Was that the discussion wherein there was some
4  misunderstanding as to whether or not he was entitled
5  to total or residual disability?
6  A. That's correct.
7      MR. ROBERTS: Objection, leading.
8  Q. You said that the people you worked with, five of you,
9  were all good at what you did. That would be JL
10 Roberson, Mr. Bob Maxwell, yourself, Phyllis Harden,
11 and I forget the last --
12 A. Kim Brann.
13 Q. Kim Brann -- were good at what you did, do you agree?
14 A. Yes.
15 Q. Is there some explanation that you can think of as to
16 why with the five of you handling these claims that
17 there was the error that you testified was made
18 regarding COLA and residual disability benefits to Mr.
19 Kearney?
20     MR. ROBERTS: Objection, misstates testimony,
21 leading.
22 A. You need to repeat that question. I missed some of
23 it.
24 Q. Yes. I'm asking if you have any explanation for the
25 error in overpayment of Mr. Kearney by paying him

21 (Pages 78 to 81)

**Page 82**

1    Social Security and COLA on a residual claim.
2  A.  The only explanation I can see is that normally all
3    claims started out as total disability. Very unusual,
4    very few that the --
5         MR. ROBERTS: Objection, calls for
6    speculation. I'm sorry.
7  A.  -- residual --
8         MR. ROBERTS: Go ahead.
9  A.  -- and I think because of that it caused confusion
10    with everyone, but that is strictly my thinking.
11  Q.  Looking at Exhibit 9, specifically page 0962, do you
12    recognize the handwriting at the top?
13  A.  This right here?
14  Q.  Yes.
15  A.  Right off I'm not sure who it is.
16  Q.  Would anyone have access to these other than one of
17    the five of you?
18  A.  No.
19  Q.  The top says "COLA does not apply to residual" and
20    then there's apparently some resolution. What's the
21    resolution indicated?
22         MR. ROBERTS: Objection, leading. He's
23    pointing at what he wants the witness to say.
24  A.  It says we are paying total disability benefits, COLA
25    applies.

**Page 83**

1  Q.  Were you aware of whether or not at the time it was
2    accurate that total disability benefits versus
3    residual disability benefits were being paid?
4  A.  No.
5         MR. ROBERTS: Objection.
6  A.  I was not.
7  Q.  Is that the type of confusion you were referring to
8    between total and residual in Mr. Kearney's claim?
9         MR. ROBERTS: Objection, leading.
10  A.  I would think so, yeah.
11  Q.  Sir, of the five of you handling the claims during the
12    period of time '94 to the time you retired -- well,
13    let me ask it this way. At the time you retired, how
14    many of you were there?
15  A.  Four of us.
16  Q.  Who were they?
17  A.  That was -- well, actually three of us: Phyllis, Kim,
18    and myself.
19  Q.  What was the claim load that you three were handling?
20  A.  I suspect a thousand a month, a thousand claims a
21    month.
22  Q.  Were the three of you physically capable of managing
23    that many claims per month?
24         MR. ROBERTS: Objection.
25  A.  Well, we had to. We didn't have any option at that

**Page 84**

1    time.
2  Q.  Did you have the time to review each claim each month
3    as the payment requests came in?
4         MR. ROBERTS: Objection.
5  A.  No, I doubt it. I think that the shortcoming that we
6    had was not being able to dig a little deeper into all
7    of the claims when they were being processed.
8    Primarily we were concerned about getting the benefits
9    out.
10  Q.  Was the lack of resources partially at fault, in your
11    opinion --
12         MR. ROBERTS: Objection, misstates facts, no
13    foundation.
14  Q.  -- for the error in payments in Mr. Kearney's case?
15         MR. ROBERTS: Objection, no foundation,
16    misstates facts, leading.
17  A.  Yes, I think so.
18         MR. ELLIS: Thank you, sir. That's all I
19    have.
20
21    FURTHER EXAMINATION (by Mr. Roberts):
22
23  Q.  All right. Let's pick it up there. Now, Mr.
24    Kearney's claim was a claim that was getting
25    attention. You testified that when Chris Kearney

**Page 85**

1    asked Ms. Harden to take a hard look and whether he
2    gets COLA that she would have done that.
3  A.  Yes.
4  Q.  You testified that Employers Reinsurance came to your
5    office in '97 and essentially audited Mr. Kearney's
6    file, right?
7  A.  I don't know whether it was in '97, but they came and
8    would review certain files. I assume they reviewed
9    his, because --
10  Q.  And you didn't just have three people looking at Mr.
11    Kearney's file, you had the three of you employed at
12    the date of your retirement plus for two years you had
13    the DMS people and their entire legal staff looking at
14    the policy, right? Didn't we establish that today?
15  A.  I think that appears to be correct.
16  Q.  Okay. So his just wasn't one of a thousand claims
17    getting lost in the works here; his claim was getting
18    a lot of attention in the late '90s, wasn't it?
19  A.  Based on DMS's involvement.
20  Q.  And Employers Reinsurance wanted to specifically audit
21    that file, right?
22  A.  Yes.
23  Q.  Were they overloaded and they couldn't figure it out
24    either?
25  A.  I don't know.

22 (Pages 82 to 85)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 86

1  Q.  Is JL Roberson qualified to examine these policies, in
2       your judgment?
3  A.  Yes.
4  Q.  Does he look at every single claim?
5  A.  No.
6  Q.  So if he looked at Kearney's claim, he would have done
7       it affirmatively to examine something, right?
8  A.  Based on -- well, based on the amount of benefits.
9  Q.  Okay. Mr. Kearney's claim was a lot, so he was
10      getting more attention than someone getting $100 a
11      month, $1,000 a month?
12 A.  Well, it had to be approved by Mr. Roberson.
13 Q.  Okay. But he actually wrote letters to Mr. Kearney,
14      too, are you mindful of that?
15 A.  I'm not sure particularly what he did.
16 Q.  Do you suspect that he wrote all the claimants that
17      filed disability claims, Vice President of the
18      company?
19 A.  No, he did not.
20 Q.  Mr. Ellis argued that reference in Exhibit 9, Bates
21      0962, where it says, "We are pay TD benefits, COLA
22      applies." Do you know who wrote that?
23 A.  No, I don't.
24 Q.  Do you know when it was written?
25 A.  No.

Page 87

1  Q.  Okay. Do you know what the reference to "We are pay
2       TD benefits" -- I mean, if someone is getting -- if
3       someone's loss in residual disability exceeds
4       75 percent, they get the total disability benefit,
5       right?
6  A.  They get the total benefit.
7  Q.  Thank you.
8  A.  Disability -- total disability benefit.
9  Q.  Thank you. Let's talk about a couple of other
10      matters. Now, Mr. Ellis says that it doesn't matter
11      that you use elimination period total disability
12      definition for residual, it doesn't matter that you
13      use maximum benefit period total disability definition
14      for residual, it doesn't matter that you use monthly
15      benefit total disability definition for residual. You
16      don't use it for waiver of premium. Well, let's take
17      another look at the policy. There's other issues in
18      the policy --
19          MR. ELLIS: I object to the speech, but --
20 Q.  -- that aren't referenced in the residual disability
21      rider that must apply. Do you pay residual disability
22      benefits for self-inflicted wounds, intentionally
23      self-inflicted wounds?
24 A.  Right off I don't know.
25 Q.  Okay. Well, why don't you take a look at the residual

Page 88

1       disability rider and tell me if you see an exclusion
2       for intentional self-inflicted wounds.
3  A.  I don't see it.
4  Q.  Okay. But you don't think the policy permits residual
5       disability benefits for intentional self-inflicted
6       wounds, do you?
7  A.  I'm not sure.
8  Q.  They would be excluded just like they're excluded in
9       the core policy that was purchased, right?
10 A.  I'm not sure right --
11 Q.  Probably? Unclear? Ambiguous?
12 A.  I'm just not sure.
13 Q.  Okay. Let's go over another one.
14 A.  I'm going to have to take a break right quick if it's
15      okay.
16 Q.  Yes, sir, absolutely.
17          (Brief recess)
18 Q.  I think we're back on the policy again, Mr. Shelton.
19      Page 3 -- actually page 4 excludes in the limitations
20      and exclusions provision --
21 A.  Page 4, yes.
22 Q.  Page 4, yes, sir.
23 A.  Okay.
24 Q.  -- excludes liability when injury is caused by some
25      war incident?

Page 89

1  A.  Yes.
2  Q.  Do you pay residual disability benefits for war-caused
3       disabilities?
4  A.  Residual disability?
5  Q.  Yeah.
6  A.  I would say that we would not.
7  Q.  Okay. Where does it say that in the residual
8       disability rider? Where is the specific reference to
9       that, if that's where we're going to draw the line?
10 A.  I don't know.
11 Q.  Is there a reference to that in the residual
12      disability rider?
13 A.  I don't see it in this rider.
14 Q.  How about normal pregnancy or resulting childbirth
15      that's excluded in the policy? If there's a residual
16      disability caused by pregnancy or childbirth, are
17      residual disability benefits payable?
18 A.  I'm sorry, repeat that question, please.
19 Q.  Are residual disabilities caused by pregnancy or
20      childbirth payable? I know that they're excluded
21      under total disability, but do you pay them if they
22      result in residual disability?
23 A.  I'm not sure.
24 Q.  The residual disability rider doesn't say either way,
25      correct?

23 (Pages 86 to 89)

Page 90

1  A.  That's correct.
2  Q.  So you don't know whether it does or doesn't pay,
3      right?
4  A.  Yes.
5  Q.  Because it's ambiguous, right?
6  A.  Well, it doesn't appear that that's here.
7  Q.  Okay. How about the next page of the policy? The
8      heading is Suspension During Military Service. Are
9      residual disability benefits suspended during military
10     service?
11 A.  It says it will suspend the policy, and this would be
12     a part of the policy.
13 Q.  Okay. So the residual disability rider doesn't say
14     anything about that, but you're concluding from the
15     policy because it says policy?
16 A.  Yes.
17 Q.  Okay. Is it ambiguous or do you think it's explicit?
18     Because the policy is just a total disability policy.
19         MR. ELLIS: Can he answer your question
20     before you testify?
21         MR. ROBERTS: What does the hand mean? Shut
22     up; is that right?
23         MR. ELLIS: I'm just asking if you can let
24     him answer your question before you keep telling
25     him --

Page 91

1          MR. ROBERTS: I'm just trying to clarify the
2      ambiguity of your hand.
3  A.  Would you repeat the question again, I'm sorry.
4  Q.  Scrap that question. We'll get to it in a second.
5          Turn to page 1. The first sentence of the
6      policy says, "Jefferson-Pilot hereby issues you
7      against loss due to total disability as defined herein
8      and to the extent provided in this policy," right? Do
9      you see that?
10 A.  Yes.
11 Q.  So this policy covers total disability. So when we
12     talk in the Suspension During Military Service section
13     about Jefferson-Pilot will suspend this policy, does
14     that mean total disability or does that reference mean
15     residual disability, too?
16 A.  Well, the residual cannot exist without the policy, so
17     if we suspend the policy, it would suspend the
18     residual also.
19 Q.  But there never is residual disability because the
20     policy is a total disability policy.
21 A.  But this is a part of that total disability policy as
22     a rider.
23 Q.  Okay. So to you it's express that Suspension During
24     Military Service applies during residual disability
25     even though it's not in the residual disability rider?

Page 92

1  A.  Yes.
2  Q.  Okay. So if something is not in the residual
3      disability rider, some provisions that may apply may
4      not be in the residual disability rider, correct, for
5      example, this one?
6  A.  The way that exclusion is written, yes.
7  Q.  Okay. So although Suspension During Military Service
8      isn't referenced in the residual disability rider,
9      your conclusion is, it's part of the residual
10     disability rider?
11 A.  Simply because the residual disability rider cannot
12     exist by itself.
13 Q.  That's not my question. My question is, Suspension
14     During Military Service is not referenced in the
15     residual disability rider, but residual disability
16     benefits are suspended during military service?
17 A.  Yes.
18 Q.  Okay. And waiver of premium isn't in the residual
19     disability rider, but there is no waiver of premium,
20     right?
21 A.  It makes reference to total disability.
22 Q.  Okay. So do a whole bunch of other things, right?
23 A.  Beg your pardon?
24 Q.  So do a whole bunch of other things?
25 A.  Yes.

Page 93

1  Q.  Have you ever seen an ambiguous insurance policy?
2  A.  I don't know that I could particularly --
3  Q.  Thirty-eight years, you've never seen anything about
4      an insurance policy that's ambiguous?
5  A.  I think that probably if it were, this is when we
6      would go to Legal Department to make sure that --
7  Q.  Have you ever done that?
8  A.  Right off I don't recall that we did that, but --
9          MR. ROBERTS: Okay. I'm done. Thank you.
10
11     FURTHER EXAMINATION (by Mr. Ellis)
12
13 Q.  One final question. You testified in answer to
14     counsel's prodding that --
15         MR. ROBERTS: Prodding? I was not prodding.
16     Was I prodding you, Mr. Shelton?
17 Q.  -- if someone had --
18         MR. ROBERTS: Wait a minute. No, you're
19     making a record here. Someone is going to read this
20     later and think that you're right because you like to
21     say things that aren't true.
22         MR. ELLIS: I'd just like to ask the
23     question.
24         MR. ROBERTS: Stop, no. You're not going to
25     mischaracterize my treatment of your witness.

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889      Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Harold Shelton                                                  5/7/2004

Page 94

1        MR. ELLIS: I'll rephrase the question.
2        MR. ROBERTS:  No.  Was I prodding you, Mr.
3    Shelton?
4        THE WITNESS:  No.
5  Q.  In response to counsel's question, you said that
6      someone who has a loss of income in excess of
7      75 percent gets the total disability benefits; is that
8      right?
9  A.  Yes.
10 Q.  And in your opinion, does that include the benefits
11     for COLA and Social Security and everything else?
12 A.  That includes that monthly indemnity benefit.
13 Q.  I'm sorry.  Does it include the COLA and the Social
14     Security --
15       MR. ROBERTS:  Objection, calls for a legal
16     conclusion.
17 Q.  Is that what you were intending to tell counsel --
18 A.  No, that's not --
19       MR. ROBERTS:  Objection, calls for a legal
20     conclusion.
21 Q.  What were you intending to tell counsel that applies
22     to someone who's over 75 percent loss of income?
23 A.  It would be the basic -- that monthly indemnity
24     benefit.
25       MR. ROBERTS:  Objection, calls for a legal

Page 95

1    conclusion.
2        MR. ELLIS:  That's all I have.  Thank you.
3        MR. ROBERTS:  Thank you, Mr. Shelton.
4        (Deposition concluded at 3:30 p.m.)
5
6        _____
7              Signature of the Witness
8
9    SUBSCRIBED and SWORN TO before me this _____ day of
     _____, 2004.
10
11       _____
12             NOTARY PUBLIC

     My Commission expires:  _____
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1        E R R A T A   S H E E T
2   RE: Jefferson-Pilot v. Kearney
3   DEPOSITION OF:  Harold Shelton
4        Please read this original deposition with
5   care, and if you find any corrections or changes you
6   wish made, list them by page and line number below.
7   DO NOT WRITE IN THE DEPOSITION ITSELF.  Return the
8   deposition to this office after it is signed.  We
9   would appreciate your prompt attention to this matter.
10       To assist you in making any such
11  corrections, please use the form below.  If
12  supplemental or additional pages are necessary, please
13  furnish same and attach them to this errata sheet.
14  Page _____ Line _____ should read:
15  _____
16  Reason for change _____
17  Page _____ Line _____ should read:
18  _____
19  Reason for change _____
20  Page _____ Line _____ should read:
21  _____
22  Reason for change _____
23  Page _____ Line _____ should read:
24  _____
25  Reason for change _____

Page 97

1   Page _____ Line _____ should read:
2   _____
3   Reason for change _____
4   Page _____ Line _____ should read:
5   _____
6   Reason for change _____
7   Page _____ Line _____ should read:
8   _____
9   Reason for change _____
10  Page _____ Line _____ should read:
11  _____
12  Reason for change _____
13  Page _____ Line _____ should read:
14  _____
15  Reason for change _____
16  Page _____ Line _____ should read:
17  _____
18  Reason for change _____
19  Page _____ Line _____ should read:
20  _____
21  Reason for change _____
22  Page _____ Line _____ should read:
23  _____
24  Reason for change _____
25

25 (Pages 94 to 97)

Case 1:02-cv-00479-MRP Document 184 Filed 09/06/2007 Page 26 of 38

Jefferson Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004



Page 98

1    STATE OF NORTH CAROLINA )
                            ) C E R T I F I C A T E
2    COUNTY OF GUILFORD    )
3
4         I, REBECCA J. HUDDY, Notary Public, do hereby
5    certify that HAROLD SHELTON was duly sworn by me prior
6    to the taking of his deposition; that said deposition
7    was taken and transcribed by me; and that the
8    foregoing ninety-seven (97) pages are a true and
9    accurate transcript of the testimony of said HAROLD
10   SHELTON.
11        I further certify that I am not of counsel
12   for or in the employment of any of the parties to this
13   action, nor am I interested in the result of said
14   action.
15        IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 11th day of May, 2004.
17
18
19        _____
          REBECCA J. HUDDY
20        Notary Public
21   My Commission Expires July 26, 2005
22
23
24
25

Reported By: Rebecca J .Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 99

| A | | | |
|---|---|---|---|
| **A** | admitted 69:17 74:5 | 93:13 | argumentative 36:14 |
| able 9:6 17:6 33:13 | advice 39:13 61:14 | answered 70:21 | 75:13 |

**A**
able 9:6 17:6 33:13 84:6
about 3:16,18 4:7 5:23 7:10,18 8:8,16 10:2,4,6,11 12:5 15:19 17:14 18:6,9 18:13 22:13,20 23:4 24:12,14,18 25:22,25 27:2,6,18 27:22 29:15,20,21 32:5 33:25 34:2,7 37:10 39:15 40:10 46:22 47:16,24 48:12,19 51:8 53:10,21 55:4 57:23 59:20 60:9 61:21 62:1 63:15 63:23 64:9 74:9 75:5 76:18 77:11 79:3,10,24,25 84:8 87:9 89:14 90:7,14 91:13 93:3
abouts 13:23
above 23:16 24:12 59:9
absolutely 88:16
accept 57:9
acceptable 10:23
access 82:16
accidental 6:8
accordance 1:11
according 4:18 7:13 14:21
account 67:25
accurate 54:10 64:21 83:2 98:9
action 98:13,14
actual 9:10 14:17 74:23
actually 10:6 12:14 32:18 43:19 54:14 55:7 56:19 69:7 83:17 86:13 88:19
additional 9:1 11:5 31:12,22 51:24 73:1,11 96:12
additions 43:17
adjust 67:24
adjusting 61:6
adjustment 68:5,7
adjustments 71:18 73:19
administer 41:16
administration 6:6 44:5 55:19

admitted 69:17 74:5
advice 39:13 61:14 63:18
advise 55:22 57:1
advised 25:25 40:5 74:4
advising 67:19
affiliated 63:9
affirmatively 86:7
after 19:10 33:11 35:21 42:13 44:16 46:20 61:3,12 74:9 75:1 78:13 96:8
again 18:16 23:3,5 29:3 30:6 48:14 73:8 75:9 80:7 88:18 91:3
against 91:7
age 22:5 53:9,14,22 54:2,4,6
agent 64:11,12
agents 40:22 57:4,6
ago 3:16,17 4:6,13 4:22 57:23 77:7
agree 18:23 28:21 30:7 32:10 48:25 70:2 81:13
agreeable 39:19
agreed 29:4
agreement 52:4,6,19 55:16
ahead 82:8
alleged 41:19
allow 8:13 57:6
although 18:21 92:7
always 13:2 39:18 44:23 56:13
ambiguity 91:2
ambiguous 53:15 88:11 90:5,17 93:1 93:4
amount 22:17,25 23:10,17,22 28:8 28:10,15 86:8
analyst 14:16
analysts 7:3
Anderson 39:21 40:1 40:10 41:5
and/or 59:7 73:23
another 16:22 22:13 87:17 88:13
answer 3:15 21:18 22:23 23:2 29:1 34:15 35:15 54:6 54:15 69:22,23 70:13,23 90:19,24

93:13
answered 70:21
answering 29:2
answers 79:4
anybody 44:18
anyone 3:18 4:10 52:19 64:12 66:8 72:1,10 82:16
anything 10:4 16:1 18:6,9,13 22:20 24:18 27:1 52:25 55:25 90:14 93:3
anyway 47:23
anywhere 21:13 22:23
apart 76:25
apologized 49:11
apparently 17:13,14 39:25 41:4,6,22 50:15 63:3 82:20
appear 7:11 54:16 58:21 90:6
APPEARANCES 2:1
appears 13:8 16:12 22:8,12 24:21 48:22 49:3,4,8 62:8 62:16 66:4,16 77:3 85:15
applicable 21:23 22:1,2,3 26:15 48:22 73:13
application 57:10
applied 18:22 34:5 73:2
applies 17:7 18:10 18:25 19:6 26:20 43:13,20 82:25 86:22 91:24 94:21
apply 17:6 25:15,17 26:1,5 32:11,20,21 37:6 49:2 81:1 82:19 87:21 92:3
applying 26:23 30:18
appreciate 42:7 96:9
approved 86:12
approving 50:3 58:22
April 53:8 56:15 63:6,14
area 63:4
areas 8:5
argue 75:24 76:1
argued 75:5,21 86:20
arguing 76:2,2

argumentative 36:14 75:13
arose 9:8
ascertain 6:11
asked 17:14 18:16 23:7 52:11 60:14 61:1 65:14 68:4,18 70:21 74:3 75:21 75:23 79:10,24 85:1
asking 15:13 55:2,5 67:6 76:18 77:11 79:25 81:24 90:23
asks 43:13
aspects 24:25
assist 96:10
assistance 9:24 10:3 11:11 62:20
assistant 6:19,23 15:6
assume 34:13 39:24 61:5 62:12 66:6 85:8
assumed 80:21
assuming 34:15 62:10
assumption 49:8 65:2
attach 96:13
attached 73:20
attachment 74:7
attempting 21:18 51:23
attention 12:22 40:1 70:8 74:22 84:25 85:18 86:10 96:9
attorney 64:24
audit 10:24 11:9 40:15,18 85:20
audited 12:17 85:5
August 16:12
authored 13:8
authoring 34:8
authorization 59:3
available 3:14 76:9
aware 52:15 53:1 61:10 83:1

**B**
B 2:15 78:17
back 9:6 14:20 20:4 20:7,9 23:25 29:23 29:25 37:8 43:2,17 53:17 56:17 66:21 88:18
Balkcum 63:23

based 17:13 21:21 37:13 69:8,15 73:18 74:22 85:19 86:8,8
basic 18:10,12,13,18 18:20 19:4 94:23
basis 10:16 70:25
Bates 42:11 46:18 64:17 67:17 68:10 79:24 86:20
Bates-stamped 66:5
Beattie 63:7
became 6:19,23
become 14:6 34:21
before 1:12 9:13 10:2 13:10 35:3 43:3,25 59:2,12 60:14 69:3,16 74:10 90:20,24 95:8
Beg 92:23
began 53:9
begin 19:10
beginning 1:15 74:3
being 1:11 3:1 7:6 11:4 15:23,24 43:23 44:22 48:22 51:21 61:22 77:2 77:12 80:1 83:3 84:6,7
believe 4:24 5:2 10:15 11:15 12:11 18:5 20:11 27:8 38:12 42:18 52:12 53:13 56:11 57:23 57:25 58:20 67:10 77:19 78:10 79:15
below 96:6,11
benefit 14:10 17:4 19:23,24,25 20:13 21:1,8,11,11,14,20 21:21 22:2,9,14,22 23:8,10,13,16,20 23:22 24:3,8,10,13 24:19,23,24 25:14 25:14,19 26:11,11 27:10 28:1,6 29:7,9 29:15 30:12,19,19 30:21,23,24,25 31:1,3,6,19,20,22 31:24 32:3,15 34:22 53:11,19 66:1 67:24 69:20 70:14,16 71:13,17 71:18,25 72:1,9 73:1 74:18 75:11

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 100

76:6,7 77:21 78:2,6
78:14,15,24 79:11
79:12 87:4,6,8,13
87:15 94:12,24
**benefits** 4:11 7:12
9:1 11:4 17:8 19:1
19:10 21:10,25
25:19,20 28:16,17
28:19,20 29:12,16
29:18,20,22 30:2,8
30:22 31:8,18 32:4
36:21,24 37:6
42:22,24,24 47:17
48:5,22 49:15,18
59:25 62:11 66:18
68:16 69:19,25
70:4,10,11,20 71:5
71:14,20 72:2,3,10
72:15,18,23 73:1,7
73:12,21,22,24
74:16,17 75:8
77:20 80:1,2,9
81:18 82:24 83:2,3
84:8 86:8,21 87:2
87:22 88:5 89:2,17
90:9 92:16 94:7,10
**bet** 5:18
**better** 36:6 60:20
**Betty** 63:21,25
**between** 47:25 52:8
52:20 55:16 74:23
78:24 83:8
**bill** 11:17,18 52:13
64:3,7,23,24 65:4,8
75:23
**billed** 52:21
**Bill's** 64:22
**blacked** 39:1,1,4
46:11
**blessed** 57:7
**blue** 15:6
**Bob** 59:7 63:15
81:10
**bold** 33:3
**boom** 36:21,21,21,21
**both** 39:12 47:10,12
71:1 76:7,25 77:12
**bottom** 23:11
**Brann** 66:9 81:12,13
**break** 41:23 74:12
88:14
**Brief** 42:8 88:17
**briefly** 7:25
**bring** 15:7
**brings** 76:20
**broken** 67:1

**brought** 12:22 37:11
74:21
**bulk** 55:19
**bunch** 92:22,24
**burns** 75:11
**business** 54:25
**buy** 31:12 57:2
**B-A-L-K-C-U-M**
63:23

---
**C**
---

**C** 98:1,1
**calculation** 24:9 66:1
66:3,4
**call** 4:22 14:24 15:2
15:4,5,8,10 18:12
43:14 47:3,6,22
48:4 49:13 73:23
**called** 4:14 9:25 19:4
56:5 64:15 68:5,8
**calling** 71:5
**calls** 60:4 69:21 70:6
70:12,22 71:3,9,21
72:4,12,20 73:4,15
73:25 75:4,12,19
76:12,15 77:17
78:8,22 79:1,20
82:5 94:15,19,25
**came** 5:15,15 6:22
9:14 10:12 11:9
12:3 33:20 49:18
84:3 85:4,7
**capability** 57:5
**capable** 83:22
**capitalized** 21:12,22
**caps** 33:3
**capture** 29:16,17
**captured** 48:1
**card** 46:10
**care** 51:21 96:5
**career** 6:14 8:8
**careful** 34:2
**Carolina** 1:1,14 2:6
98:1
**case** 1:5 3:15 41:4
45:4 49:9 54:16
57:24 58:3,12 59:7
74:6 84:14
**cases** 18:22 39:9
58:15
**caused** 82:9 88:24
89:16,19
**Center** 2:8
**central** 14:13,23
**certain** 10:18 36:19
59:9,16 85:8

**certainly** 77:3
**certify** 98:5,11
**cetera** 22:18 71:16
**change** 41:19 73:12
75:24 96:16,19,22
96:25 97:3,6,9,12
97:15,18,21,24
**changed** 6:22,24
**changes** 96:5
**charge** 12:10 52:23
**charged** 11:22
**check** 31:6 41:24
68:15
**checked** 55:14
**checks** 35:17 51:19
**childbirth** 89:14,16
89:20
**Chris** 3:8,18 84:25
**CHRISTOPHER**
1:6
**Chris's** 47:10
**chronic** 40:24
**chronological** 13:20
**chronology** 47:2
**Cincinnati** 2:3,9
62:24
**circled** 62:7
**circumstance** 62:3
71:6 73:14
**circumstances** 3:13
61:19
**Civil** 1:12
**claim** 3:10,18 6:6 7:3
7:3,15,16 8:22 9:25
10:3,12,14 11:10
11:11,23,24,25
12:4,6,13,18,20
13:3,7 14:8,9,13,16
14:17,25 15:7,12
15:14,19,20,24
16:16 38:7 40:10
42:13 43:2 49:18
49:23 50:5,16
51:11 53:3,20,21
58:18 59:4,9,20
60:3 61:2,11,16,22
62:9,18 63:16,19
64:9,15 66:5 67:4
67:19 68:14 69:17
73:20 78:25,25
82:1 83:8,19 84:2
84:24,24 85:17
86:4,6,9
**claimant** 14:24 15:5
15:19 28:4
**claimants** 14:14

86:16
**claimant's** 15:19
66:17
**claims** 5:19 6:1,1,7
6:18,18,21 7:13
10:18 11:1 13:4,21
39:6 40:4 41:16
44:4,7,13 50:13
55:19 57:17 59:8
62:23,25 66:10,10
73:3 81:16 82:3
83:11,20,23 84:7
85:16 86:17
**clarify** 91:1
**clear** 74:13
**clip** 3:24
**close** 54:2
**closed** 46:14
**closely** 9:9
**coaching** 30:3
**COLA** 61:7 67:25
68:5,7 69:18 73:6
73:22 75:8 79:19
81:18 82:1,19,24
85:2 86:21 94:11
94:13
**column** 21:5 23:11
78:11
**combination** 20:24
21:9
**combined** 5:15 6:20
**come** 9:5 10:17 14:11
29:12 34:25 36:11
54:19 65:3
**comfort** 9:2
**comfortable** 6:10
**coming** 63:18
**comments** 51:5
**Commission** 95:12
98:21
**communicated** 40:20
**communication**
39:23
**communications**
41:3
**companies** 5:15
**company** 1:3 2:5
8:11 9:25 36:4,18
37:5 51:25 56:5
57:6,7 59:1,13 61:3
66:11 86:18
**company's** 36:5
**competent** 6:10
**complication** 61:24
**concentrate** 9:9
**concern** 7:11 46:16

**concerned** 7:10
11:20 84:8
**concerning** 42:21
47:3
**concerns** 11:19
**conclude** 34:7 74:7
**concluded** 95:4
**concluding** 90:14
**conclusion** 69:22
70:6,13,22 71:4,10
71:22 72:5,13,21
73:5,16 74:1 75:4
75:13,20 76:13,16
77:18,18,24 78:9
78:22 79:2,21 92:9
94:16,20 95:1
**concurrence** 10:22
**conducted** 7:22
**conducting** 5:5
**conference** 46:21
60:4
**confirm** 34:11
**confirmed** 60:18
**confused** 37:10
**confusion** 61:25 82:9
83:7
**Conlon** 62:23
**consider** 60:2
**considered** 17:5
**constantly** 7:10
**constitute** 28:19
**consultant** 38:8 63:7
**Consultants** 63:5
**contact** 38:10 40:22
46:13
**contacted** 51:8
**contain** 57:2
**contained** 14:1 67:19
**contains** 62:5 64:20
**context** 24:15,20
25:9
**continue** 21:7 36:21
37:19 49:6
**continued** 51:14 61:2
**continuous** 18:3
34:22
**contract** 8:1 33:6
36:11 52:10,24
53:17 74:23,25
75:16 76:10 77:9
79:14
**contracts** 7:13 69:15
**conversation** 15:3
**conversations** 39:21
40:9 59:19
**convinced** 77:7

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 101

cooperate 60:21
cooperative 56:10
copied 50:15
copies 15:22 50:12
  50:17,25 65:14
copy 11:17 40:16
  41:7 42:13 43:11
  50:16 52:22 65:21
  66:16 67:13
core 19:4 88:9
correct 4:14 12:25
  13:1 16:17 18:19
  19:2,21 20:14,16
  22:4,7,11 24:8,10
  27:14 29:8,13 31:2
  39:24 49:3 51:20
  53:12,13 58:14,14
  59:12,15 62:21
  66:20 74:8 81:6
  85:15 89:25 90:1
  92:4
corrections 96:5,11
correctly 17:9 79:8
corresponded 9:21
correspondence 2:17
  11:16,16,23 13:7
  13:21,25 14:3,10
  15:14 53:18
cost 31:25
couched 18:21
counsel 40:17 50:11
  61:14,20 63:18
  74:3 75:5,21 76:5
  78:13 79:5,10,23
  80:4 94:17,21
  98:11
counsel's 93:14 94:5
COUNTY 98:2
couple 31:17 58:17
  69:3 87:9
course 9:19 32:22
court 1:1 20:9 29:25
cover 8:14,14 16:22
  43:6,13 45:17
covers 91:11
create 33:19 57:6,11
created 35:3,4 36:9
  36:10 57:15 77:5,6
creates 56:25
criteria 10:20 11:6
cut 68:12
C-1-02-479 1:6

**D**

D 2:11
date 4:5,9 43:10

45:23 55:9 63:13
  66:23 80:3 85:12
dated 17:2 37:21
  40:12 41:11 43:15
  46:18 48:17 55:17
date-stamp 50:5,11
  50:13
date-stamped 50:8
  66:21
date-stamping 50:20
day 1:14 19:10 45:19
  49:15,17,17 50:1,4
  55:10 68:24 95:8
  98:16
days 4:13,17,22
  12:23 49:22 58:18
  77:7
deal 57:18
dealing 54:23 79:23
death 6:8
debate 62:1
December 3:23 5:14
  42:9,20 43:8,15
  55:8,17 62:22
decided 60:11
deeper 84:6
defendant 1:7 2:7
  3:7
defendant's 2:17 3:7
  13:14 65:19 66:13
  68:2
define 19:13 32:12
  34:9
defined 18:24 20:14
  21:12 24:4,6,13
  25:15 26:1 31:1
  91:7
defines 20:19 30:23
definition 19:2,5,5,7
  19:19,22,24 20:2
  21:14,16 22:9,14
  22:22 23:8,20 25:3
  25:4,6,12 26:6,12
  32:8,20 34:17 76:6
  76:20 79:11 87:12
  87:13,15
definitions 18:20
  20:18 26:10 32:10
  79:14
delay 56:11
Dempsey 64:3,23,24
Dempsey's 65:8
department 7:7 8:20
  57:3 93:6
depend 61:23
depending 3:13

69:19
deposition 1:10 30:4
  60:11 67:9 74:3
  95:4 96:3,4,7,8
  98:6,6
depositions 57:19
  58:9
depression 40:24
Description 2:16
designed 75:16
desire 40:21
determine 19:17,25
  23:19 24:7,14
  28:13 41:9,16
  74:15
determined 11:10
  75:2
dialoguing 51:1,4
different 21:15 25:11
  34:3,6 49:22 55:21
  62:6 78:2,7
difficult 32:24 33:1,4
  35:1,5,15,19,21,23
dig 84:6
direct 16:15
directed 13:8
Directing 70:8
directly 51:1,4 52:21
disabilities 89:3,19
disability 5:18 6:1,5
  6:9,11 7:3 8:24
  17:5,7,12,25 18:8
  18:14,17,21,22,24
  18:25 19:6,8,9,14
  19:17,19,24 20:2
  20:14,17,19,21,24
  20:25,25 21:6,7,8
  21:10,10,15,16,20
  22:3,4,10,20,23
  23:6,8,9,12,13,20
  24:3,6,7,10,15,19
  24:20,25 25:3,6,9
  25:13,15,16,17,21
  26:1,2,10,12,13,14
  26:16,18,20,21
  27:7,11,22,24 28:1
  28:4,7,17,20,22
  29:10,13,16,21,22
  30:8,13,19,24 31:3
  31:18,24 32:3,4,9
  32:11,12,19,20
  33:1,3,10,15,18,22
  34:1,10,21,24,25
  35:3,10,18 36:6
  37:21 38:7,8 42:24
  47:17,19 48:5,7,13

48:23 53:9 58:18
  63:8,9 66:10,18
  68:14 69:17,18
  70:1,3,3,9,10,11,18
  70:19,20 71:8,13
  71:15,20 72:2,3,11
  72:15,17 73:2,3,8
  73:13,21 75:7 76:8
  76:9,19 77:25 78:3
  78:5,7,12,19,25
  79:13,17 80:2,10
  81:5,18 82:3,24
  83:2,3 86:17 87:3,4
  87:8,8,11,13,15,20
  87:21 88:1,5 89:2,4
  89:8,12,16,17,21
  89:22,24 90:9,13
  90:18 91:7,11,14
  91:15,19,20,21,24
  91:25 92:3,4,8,10
  92:11,15,15,19,21
  94:7
disabled 9:6 18:2
  21:9 22:6 26:4
  72:19
disclosed 41:20
discovered 41:20
discovery 52:19
discuss 4:9 11:7
  37:17 43:14
discussed 4:17 10:8
discussion 4:6 10:13
  12:5 33:25 44:18
  46:22 81:3
discussions 15:16,18
  63:14
DISTRICT 1:1,1
Ditmar 38:6 40:13
  41:2 43:12 45:10
  45:16,22 47:9 53:8
  63:10
Division 1:2 5:20,24
  6:21
DMS 9:25 10:2
  11:18,21 12:11
  13:4 38:18 39:6,14
  39:23 40:3,8 41:15
  42:14,14 43:24
  44:3,5,25 45:5 51:1
  51:8,13,21 52:1,8
  52:21 53:6 54:22
  55:5,16,18 58:7,13
  59:19 60:5 61:2
  85:13
DMS's 11:11 58:10
  85:19

document 13:17
  41:12 57:15,15
  66:2,15 68:10
documents 12:22
  17:24 20:4
doing 5:25 7:2 42:1
  51:15,23,25 60:20
dollar 11:1 28:8,9,15
  done 24:9 39:11 45:5
  85:2 86:6 93:7,9
doubt 34:7 84:5
down 8:13 27:18,18
  59:14 74:12 75:11
downtown 5:16 6:22
draft 43:7
drafted 43:16
draw 89:9
drew 33:6
due 32:9 49:6 68:16
  68:19 91:7
duly 3:1 98:5
during 3:11 15:10
  21:6 27:6 34:24,25
  42:23 61:14 66:7
  83:11 90:8,9 91:12
  91:23,24 92:7,14
  92:16

**E**

E 2:11,15 96:1,1,1
  98:1,1
each 21:8 84:2,2
earlier 48:11 53:10
  61:1
early 49:22
earnings 27:25
educate 60:5
effective 55:8,18
effort 37:5 68:6
eight 4:19
either 17:23 39:11
  47:9 50:16 59:11
  69:18 72:16 73:22
  79:19 85:24 89:24
eligible 34:21
elimination 18:23
  19:5,8,11,14,18,19
  24:23 25:13 26:10
  26:19 31:19 32:14
  75:22 76:5 77:12
  77:16 79:10 87:11
Ellis 2:2,13,14 3:25
  4:24 5:5 7:22 8:13
  12:1 21:17 23:2
  28:24 29:23 30:2
  32:6 33:17,23 35:6

Reported By: Rebecca J Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 102

36:14 41:23 42:2,4
42:7 50:10,15,20
52:15,18 53:4 54:9
54:14 58:17 69:1
69:11 74:11,14
77:5 80:5 84:18
86:20 87:10,19
90:19,23 93:11,22
94:1 95:2
**employ** 4:19
**employed** 85:11
**Employers** 11:8,17
12:3 40:6 52:7,8,22
53:5 64:3,24 85:4
85:20
**employment** 4:3
98:12
**encircled** 62:13
**Enclosed** 46:10
**enclosing** 45:16
**encompassed** 28:16
**end** 19:10 27:21,25
38:6 44:11 51:12
**engaged** 51:25
**enjoy** 8:12,12
**enjoyed** 8:10
**enough** 12:2
**entered** 55:16
**entire** 74:25 85:13
**entitled** 17:12 28:6
33:2 59:25 69:18
69:25 70:3 73:21
81:4
**entitlement** 79:19
**entity** 18:6 63:9
**equal** 20:25 21:10
**equally** 73:2
**equitable** 39:11,16
39:20
**equity** 40:3
**equivocal** 49:1
**errata** 96:13
**error** 41:20 74:16
81:17,25 84:14
**essence** 27:10 29:6
**essentially** 43:14
85:5
**establish** 85:14
**et** 22:18 71:16
**eve** 58:5
**even** 6:7 8:10 25:16
30:12 91:25
**event** 29:10
**ever** 4:9 9:12 32:23
36:11 39:14 44:21
52:19 56:7 58:9

59:19 60:22 61:14
61:25 62:3 63:11
64:3,6,11 67:7,9,23
73:21 93:1,7
**every** 30:4 35:17
36:11,18 53:17
61:7 76:1 86:4
**everyone** 39:20
82:10
**everything** 8:8 16:6
48:2 49:19 50:2
51:21,22 76:8
94:11
**exactly** 31:13
**examination** 1:10
2:12,13,13,14 3:4
69:1 84:21 93:11
**examine** 86:1,7
**examined** 3:2
**examiner** 50:3 59:5
**examiners** 59:8
**example** 18:23 22:13
27:17,19,23 28:5
92:5
**examples** 24:23 25:2
25:25
**exceeds** 87:3
**except** 44:1
**excess** 94:6
**excluded** 88:8,8
89:15,20
**excludes** 88:19,24
**exclusion** 75:10 88:1
92:6
**exclusions** 36:12,19
37:3 88:20
**excuse** 19:3
**exhibit** 13:6,12,14
17:19,19 27:9,15
33:9 37:8 56:17
62:5 65:19,21
66:13,15 68:2,10
69:6,7 72:24 73:11
75:9 78:12 79:23
82:11 86:20
**Exhibits** 69:11
**exist** 91:16 92:12
**exists** 52:17
**expensive** 11:21
35:11
**experience** 8:21
**experienced** 12:13
**expires** 95:12 98:21
**explain** 75:16
**explanation** 81:15,24
82:2

**explicit** 49:1 90:17
**explicitly** 33:21 36:6
**express** 33:20 91:23
**expressed** 46:16
**expressly** 33:13
**extension** 56:13
67:20
**extent** 6:3 91:8
**eyes** 10:14

**F**

**F** 98:1
**fact** 12:10 32:12
43:20 76:19
**facts** 84:12,16
**familiar** 64:5
**fancy** 8:17
**far** 11:19 46:16
**Farabow** 2:4 4:25
13:12
**fault** 84:10
**fax** 43:6,13 45:16,17
45:22 47:9 53:7,14
68:13
**faxed** 43:16,17 45:25
45:25 68:11
**Federal** 1:12
**feel** 6:10 7:14
**Felia** 38:14
**fell** 16:16 62:18
**felt** 7:8 33:7
**few** 82:4
**field** 7:4
**Fifth** 2:8
**figure** 39:2 62:10
85:23
**file** 10:10 11:23,24
11:25 12:15,18,20
13:7,21 14:6,7,8,9
14:9,20,23 15:1,2,7
15:12,20,24 16:3,5
16:20 32:23 38:14
38:14,15 43:2 47:3
47:20 49:19 50:16
53:3 56:14 58:19
59:21 61:18 62:9
63:6 66:5,6 67:19
85:6,11,21
**filed** 14:20 56:13
67:4 86:17
**files** 10:21 11:10
12:4 14:13,17,19
16:8 38:13,18,21
56:2 85:8
**filing** 67:21 73:20
**final** 43:8 93:13

**financial** 40:15
**find** 3:9 22:14 96:5
**finger** 23:3
**first** 3:1 9:15 16:12
16:24 17:13 23:11
39:23 42:23 46:15
64:15 91:5
**five** 3:21 42:23 57:23
81:8,16 82:17
83:11
**five-year** 42:21
**Florida** 38:23
**focus** 6:5,22 7:14
11:1
**focused** 12:5
**folks** 7:9,12 12:13
40:8
**followed** 77:2
**following** 32:24
34:23 45:12
**follows** 3:2
**follow-up** 11:5
**foot** 76:25
**footing** 11:18
**foregoing** 98:8
**forget** 3:16 8:8 81:11
**form** 32:6 34:13,14
49:18,23 50:5
53:20,21 59:4
66:25 68:13 96:11
**forms** 51:16 52:11
65:6,15,16
**forth** 52:5
**forward** 40:16
**forwarded** 47:13
**forwarding** 45:10
**foundation** 84:13,15
**four** 41:20 57:23
61:3 83:15
**fourth** 37:16
**frame** 38:11 39:7
66:7 77:15
**frequent** 41:3
**from** 4:2,5 5:14 9:25
11:17 14:24 15:4,5
16:12 17:2 21:15
23:6,24 29:1 34:6
35:16 37:21 38:6
40:24 43:6 45:11
46:3,9,11,20 47:2
51:11 53:8 56:9
62:23 63:6 67:18
76:22 77:3 78:2
79:13,25 90:14
**front** 59:4
**fulfilling** 8:11

**full** 28:1,6,17,20
29:15,20,22 30:12
30:21 31:1,3 32:4
**function** 10:24
**functions** 52:2
**furnish** 96:13
**furnished** 10:10
**further** 2:13,14
39:13 84:21 93:11
98:11

**G**

**gather** 15:6
**gave** 79:5
**general** 11:9 61:19
**generally** 15:5 49:21
56:10
**gentleman** 38:6 77:7
**gentlemanly** 55:3
**gets** 33:17 84:25 94:7
**getting** 50:25 51:16
54:10 56:11 59:25
60:1 84:8,24 85:17
85:17 86:10,10
87:2
**ghostwriting** 42:15
**give** 7:23 12:2 39:13
69:9
**given** 57:19 58:9
**glad** 60:13
**glance** 13:10
**glanced** 58:20
**go** 9:6 11:24 14:20
15:20 20:1 23:25
23:25 37:5,8 43:2
43:25 47:1 53:16
82:8 88:13 93:6
**going** 13:6,11 17:15
29:5 39:10 41:14
41:15 52:13 55:24
67:17 75:1,8,25
88:14 89:9 93:19
93:24
**gone** 68:6
**good** 12:2 33:20
55:19 60:7,13,13
68:24 81:9,13
**gotten** 67:20
**grant** 71:18,25
**granting** 72:9
**graph** 37:25
**Graydon** 2:7
**great** 7:9
**greater** 28:4 30:13
**Greene** 1:13 2:5
**Greensboro** 1:14 2:6

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

12:4
Gregor 38:14
group 5:20 6:1,18
guess 47:9 52:9
GUILFORD 98:2

**H**
H 2:15 96:1
hand 63:21,25 67:17
69:11 90:21 91:2
handing 27:15
handle 42:3
handled 55:21
handling 16:21 41:4
81:16 83:11,19
handwriting 62:5,6
62:8,13,15 64:18
65:8,22,24 82:12
Handwritten 2:17
hand's 54:12,14
happen 36:20
happened 12:8 17:20
42:5 48:8
happening 16:6
happens 14:5
hard 59:18 85:1
Harden 59:7 60:7
62:19 63:15 66:9
67:18,20 68:4,12
81:10 85:1
Harold 1:10 3:1 96:3
98:5,9
head 2:7 27:5 30:10
40:4 55:12 58:6
77:1
heading 90:8
health 5:24 6:3,21
7:1 60:13
heard 30:6 44:13
hearing 71:15
held 6:16
help 7:17
her 60:7 63:24
hereunto 98:15
higher 11:1
him 9:16,21 23:2
35:20 38:7,10,13
40:3,5 41:7,12 43:7
43:11 45:24 46:22
47:19 48:5,8,13
49:11 51:8 54:15
60:18 64:6,8 67:3
69:11 74:10 75:10
75:23,24 77:2 80:9
80:25 81:25 90:24
90:25

himself 9:15 42:3
Hinote 56:4
hope 3:24 8:8
hospital 6:7,9 7:5,6
house 75:11
HS 58:25
Huddy 1:13 98:4,19
hypothetical 27:24
H-I-N-O-T-E 56:4

**I**
ICS 56:5,7
idea 33:20 64:19
identification 13:15
65:20 66:14 68:3
identify 17:23
IME 44:19
immediately 34:23
important 24:24
33:7 45:3
imposition 60:15
Inc 63:8
incident 88:25
include 30:14 35:22
48:2 94:10,13
included 6:2
includes 94:12
income 40:19 66:25
66:25 67:3 94:6,22
incomplete 21:17
incorporate 77:15
incorporated 79:6
79:13
incorporates 79:18
increase 6:6 8:25
25:19 31:25 68:16
69:19 72:23 73:1,7
73:11,22 74:17
indemnity 70:16
94:12,23
independent 21:13
25:3 40:15
independently 8:3
indicated 53:22
82:21
Indicating 13:16
21:23 54:9 56:20
56:22,24 69:14
individual 5:24 6:5
6:21,25
industry 77:8
information 11:5
12:15 37:25 45:17
50:10 51:24 59:24
60:2
informed 5:7 51:10

initially 62:18
initials 58:21 59:2,14
initiated 64:15
initiation 10:15
injury 88:24
input 61:25
insurance 1:3 2:5
5:18 6:3,6,11 7:3
36:3,5,11,17 66:10
66:11 93:1,4
insured 7:10 39:18
intelligently 15:8
intended 36:2
intending 94:17,21
intent 16:5 28:11,13
28:13 29:17 39:18
intentional 88:2,5
intentionally 87:22
intentions 36:5
interested 98:13
International 62:23
62:25
interpretation 62:1
77:9
introduced 9:14
investigate 39:10
investigation 62:25
investigative 63:1
invoice 52:24 55:3
invoices 53:6
involved 3:12 6:8
7:15,15 39:20 52:1
53:18 55:25 58:7
62:24 66:9
involvement 58:11
85:19
irrelevant 75:13
issue 37:12 48:14
54:20
issues 38:20 55:13
87:17 91:6
issuing 51:19
items 25:4,6,8 35:7
79:6

**J**
J 1:12 98:4,19
Janet 63:7
January 45:8,22
46:3,9,18,22 47:2
47:12,14 48:15,18
49:12 55:18 80:5
80:20,21
Jefferson 6:17
Jefferson-Pilot 1:3
2:5 3:9 4:2,10,18

5:4,12,16 9:2,24
18:4 20:23 21:7
33:4,10,13,18 34:8
35:2,16 39:12
40:22 46:11 51:13
51:17,19 55:17
57:11,15,20 58:10
61:15,20 63:2,12
66:10 67:24 91:6
91:13 96:2
Jefferson-Pilot's
33:19 40:14,22
JL 7:15,19,20 59:11
81:9 86:1
job 7:9 60:7
John 40:1
JP 64:1
judge 1:6 68:7
judgment 54:3 86:2
July 39:2,22 98:21
just 3:12 4:2,4 5:18
7:16 8:5,6,6,22
11:4 13:3 14:11
15:13 16:19,20
24:22 25:11,25
28:14 29:23 35:13
43:11,18 45:1 50:2
50:10 51:4,9,10
52:9,11,21 53:20
54:10,15 55:23
58:20 59:21,23
61:23 65:4,14 77:5
80:21 85:10,16
88:8,12 90:18,23
91:1 93:22

**K**
Kearney 1:6 3:8,18
4:7,11,18 9:12
11:10 16:13 17:2
17:11,20 25:24
27:16 31:23 33:11
37:10 40:13,20
42:15 43:19,25
44:19,21 45:11,20
45:21 46:4,9,15,20
47:3,15 48:12
49:16 50:25 51:6
56:9 62:22 64:13
66:24 67:18,19,23
68:4,11 69:8 73:20
74:17 79:25 80:12
80:17 81:19,25
84:25 86:13 96:2
Kearney's 3:10 8:22
9:25 10:3,12 12:6

12:17 13:3 35:2
38:14 40:10,16
41:19 42:22 51:11
53:9 57:14 58:18
59:9,20 61:16 62:9
62:18 63:16 64:9
66:4 83:8 84:14,24
85:5,11 86:6,9
keep 16:3 90:24
keeping 51:5,10
kept 16:1 61:6,7
Kim 66:9 81:12,13
83:17
kind 13:10 52:4 66:3
66:4
King 57:24 58:12
knew 10:11 16:6
55:22
know 3:12,19 7:9
8:16,17 10:2,4,23
13:19 16:2 17:16
29:24 31:9 32:7,22
33:8 35:10,12,13
35:13 36:18 39:4
40:5,7,7 43:9,10,16
43:20 44:2,2,10,25
45:4,5,13,23 46:16
46:17 48:10 49:2
51:23 52:21 56:4,8
57:14,17 58:21
59:24 63:21 64:11
64:17 65:2,4,9,10
65:11,17,17,21
67:23 72:7 77:18
85:7,25 86:22,24
87:1,24 89:10,20
90:2 93:2
Kohn 38:17
Kohn's 38:14

**L**
L 1:6
label 67:17
labeled 68:10
lack 84:10
Lamping 2:2
language 23:18 71:7
77:16
last 3:17 20:9 29:25
46:4,9 47:16 55:10
81:11
late 85:18
later 12:2 47:14
56:15 93:20
laundry 36:20 64:20
65:16

Case 1:02-cv-00479-MRB Document 184 Filed 09/06/2007 Page 32 of 38

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C01-02-479
5/7/2004

Page 104

laundry-list 66:24
lawsuit 3:8
lawyer 3:7 67:6
lawyers 41:8,15
leading 70:5 76:13
  76:16 77:22 78:21
  79:2 81:7,21 82:22
  83:9 84:16
leads 12:11
least 4:5 18:3 26:4
  27:25 34:22 44:9
  61:3
leave 55:7 59:21 69:3
leaving 55:22
left 46:13
legal 40:17 61:14,21
  69:21 70:6,12,22
  71:3,9,21 72:4,12
  72:20 73:4,15,25
  75:4,12,19 76:12
  76:15 77:17,18,24
  78:8,22 79:1,20
  85:13 93:6 94:15
  94:19,25
length 11:3 59:20
lengthy 36:12 47:6
less 6:8 29:22
let 16:23 17:18 23:2
  33:9 37:19 54:14
  54:15 69:3,9 79:4
  83:13 90:23
letter 15:23 16:22
  17:1,16 35:20
  37:21,24 38:5
  39:22,23 42:19
  43:3,8,8,15,16
  45:10,11,15,19,25
  46:3,9,18,20 47:5,6
  47:10,15 48:16,17
  50:23 54:2 79:25
  80:3,8,13,14,17,19
  80:20,21,25
letterhead 57:12
letters 14:4 15:23
  42:15 43:24 50:25
  79:23 86:13
let's 3:16 16:10
  20:12 22:13 23:25
  31:14,14 37:8,20
  69:24 74:12 84:23
  87:9,16 88:13
level 9:2 55:21 62:20
liability 88:24
lieu 6:23
Life 2:5 5:13 66:11
lifetime 22:6 53:11

53:19 54:1,4,17
like 8:18 10:9,15
  13:9 32:14 43:16
  50:21 53:2 54:22
  66:23 88:8 93:20
  93:22
limit 59:5
limitation 42:22
limitations 36:13,19
  36:25 70:8,18 71:7
  88:19
line 35:14 46:10 89:9
  96:6,14,17,20,23
  97:1,4,7,10,13,16
  97:19,22
lined 38:1
list 36:20 64:20 65:5
  65:16 96:6
listed 47:18 48:6
  80:10
listing 46:10
little 9:9 84:6
living 31:25
LLP 2:2
load 83:19
located 38:23
logical 41:1 43:21
long 5:12 8:7 20:3
  47:21 49:25
longer 78:16
look 7:24 10:14 12:4
  20:4 24:16 41:8
  43:2 59:5 68:4
  73:9,11 75:9 77:25
  78:11 85:1 86:4
  87:17,25
looked 12:14 16:5
  68:18 86:6
looking 22:24 23:15
  25:23 77:1 82:11
  85:10,13
looks 43:15 66:23
loop 51:5 54:2
loss 27:25 28:5 30:14
  40:19 71:15 87:3
  91:7 94:6,22
lost 85:17
lot 7:6 11:4 13:19
  18:20 85:18 86:9
Lou 63:25

M

made 4:19 5:8 7:6,23
  12:18 36:3 49:12
  61:22 74:5,16
  81:17 96:6

maintain 14:17
  15:22
maintained 14:7
major 7:11 11:16,19
make 10:21 15:15
  16:23 51:14 59:16
  59:24 73:13 93:6
makes 19:9 92:21
making 69:17 93:19
  96:10
Management 37:21
  38:8 63:9
manager 6:20,23,25
  14:16
managerial 62:20
managing 83:22
manner 39:12,16
  61:2,6
many 9:17 44:7,11
  44:12,12 53:16
  83:14,23
March 50:23
mark 13:6
marked 13:14 62:5
  65:19 66:13,15
  68:2,10 69:10
marketable 35:7
Marriott 1:13
matched 16:19 49:19
material 13:19 15:16
  15:18 50:13 75:1
matter 50:3 55:4
  58:7 87:10,12,14
  96:9
matters 14:11 57:20
  87:10
maximum 19:23,24
  19:25 20:13,25
  21:11,11,14,19,21
  22:2,9 24:23 25:14
  26:10 31:20 53:11
  76:6 77:21 78:1,6
  78:24 79:11 87:13
Maxwell 16:16 59:8
  60:9 62:18 63:15
  65:22 66:9 81:10
Maxwell's 62:15
may 1:14 7:11 10:8
  10:10,20 11:11
  27:23 34:5 40:17
  45:5 46:12 49:12
  49:20 53:20,21
  54:19 55:23 56:11
  61:7 65:14 68:12
  77:19 92:3,3 98:16
maybe 11:5 12:1

13:9 53:22 60:20
  65:15
mean 8:21 28:13
  31:6 44:3 57:9
  61:6 80:12 87:2
  90:21 91:14,14
meaning 6:12 51:17
means 21:12,22
  24:15 31:6
measure 40:19
meeting 4:21,23 5:1
  5:5 7:21 68:21
memo 46:22 47:1,2,5
  47:10,20 48:1,3
  63:6,10,11
memorializing 47:15
memory 11:8 13:25
  48:4 58:14
merger 6:16
Message 2:18
met 9:12,16
Michael 2:2 62:22
middle 48:20
might 11:3,5 14:1
  39:14 45:2,25 57:2
  61:1,23 65:5
Mike 3:6
military 90:8,9 91:12
  91:24 92:7,14,16
Mills 43:7
mindful 44:11,22
  55:20 56:13 61:1,9
  62:3 86:14
mine 8:12 50:12
minute 93:18
minutes 47:23
mischaracterize
  93:25
misleading 49:11
missed 4:21 81:22
Mississippi 58:1
misstates 81:20
  84:12,16
mistake 4:19 5:7
  7:23 12:18 74:4,8
mistakenly 4:11
mistakes 7:6
misunderstanding
  81:4
modification 78:1
modifies 78:6
modify 78:24
monetary 28:15 29:6
  29:9 30:23
money 29:5,5
month 21:8 22:18

35:17 49:15,21,23
  67:1,4,5 83:20,21
  83:23 84:2 86:11
  86:11
monthly 21:8 22:14
  22:22 23:8,10,13
  23:16,20,22 24:3,8
  24:10,13,19,24
  25:14 26:11 30:19
  30:24,25 31:6,19
  32:14 51:16 62:11
  66:24,25 67:3,24
  68:14 69:25 70:15
  71:19 72:2,3,15
  76:7 79:11 87:14
  94:12,23
months 18:3 25:21
  26:4 34:23 57:23
  78:16
more 6:8 9:9 10:14
  35:7,11 39:6 41:20
  44:12 67:11,12
  72:6 86:10
morning 4:16
most 9:5 57:22
move 69:22 70:13,22
  75:3
must 18:22 24:7
  47:23 87:21
myself 4:24 83:18

N

N 2:11
name 3:6 13:23 64:5
  64:22 98:16
named 36:8 63:7
names 38:25
necessarily 49:1 57:9
necessary 96:12
need 10:13 20:1
  22:10 23:18 81:22
needed 3:15 7:16
  11:6 60:2
needing 51:9
negative 13:2 18:16
never 16:8 48:8,8
  50:15 62:17 91:19
  93:3
news 5:10
next 19:10 35:14
  41:11 43:6,12
  48:17 55:2 90:7
nine 4:19
ninety-seven 98:8
nods 27:5 30:10
  55:12 58:6

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

| | | | |
|---|---|---|---|
| nomenclature 8:17 | oh 13:13 27:20 36:11 | 32:7,9,11 40:18 | pages 13:9 17:19 |
| none 50:12 | Ohio 2:3,9 | 44:10 46:13 48:22 | 37:19 45:12,21 |
| normal 10:15 44:3,4 | okay 3:16,20 4:2,5 | 50:17 61:21 65:4 | 47:10 96:12 98:8 |
| 89:14 | 4:13 5:5,25 6:4 | 65:21 66:16 70:15 | paid 4:11 11:4 42:24 |
| normally 15:2,11 | 8:16 9:8,12,23 10:6 | 74:21 82:2 | 48:23 49:18,20,21 |
| 43:5 44:1 61:22 | 10:19 11:14 12:1,8 | opinion 70:24 71:1 | 70:15 71:13 73:10 |
| 70:15 82:2 | 12:20 13:18 14:4,7 | 84:11 94:10 | 78:16 83:3 |
| North 1:1,13,14 2:5 | 14:22 15:4 16:7,10 | opportunity 7:24 | paper 37:25 38:1 |
| 2:6 98:1 | 16:11,18 17:11,18 | option 83:25 | papers 14:10 |
| Notary 1:13 95:11 | 17:22 18:11,13 | oral 1:10 | paragraph 17:4,13 |
| 98:4,20 | 19:13,17 20:12,12 | order 1:11 13:20 | 21:5 23:12 24:12 |
| note 15:15 | 20:19,22 22:9,13 | 14:21 43:23 49:20 | 27:19,21 39:9 |
| notes 2:17 14:25 | 22:17 23:24 24:2 | 50:2 | 40:13 42:19,23 |
| 15:10,20 76:22 | 24:14,18,22 25:2 | original 96:4 | 46:3,7 48:15,18,20 |
| 77:1,1 | 25:11 26:6,9,19 | originals 56:19 69:13 | 65:23 |
| nothing 10:11 63:20 | 27:4,9,13,20,21 | other 4:3 10:11 13:4 | pardon 75:14 92:23 |
| noticed 45:22 | 28:19 29:4,9,19 | 13:5,25 15:18,23 | part 11:18 12:10 |
| November 66:21 | 30:6,23 31:5,17 | 29:12 32:10 52:2 | 14:6,8 28:20 31:10 |
| number 2:16 13:12 | 32:2,17 34:4 35:1,9 | 54:24 57:19,19 | 31:11 34:13 36:23 |
| 14:21 34:12 38:2 | 35:21 36:1,9 37:9 | 58:14 65:24 66:8 | 52:23 65:23 70:9 |
| 96:6 | 37:18,23,24 38:4 | 82:16 87:9,17 | 78:13 79:17 90:12 |
| numbered 50:23 | 38:10,13,25 40:1,9 | 92:22,24 | 91:21 92:9 |
| numbers 64:20 65:5 | 40:12 41:2,7,11 | others 30:9 | partial 22:18 |
| 65:7 79:24 | 42:10,19 43:6 45:9 | otherwise 62:15 | partially 84:10 |
| numerical 14:21 | 45:14 46:8,19 | out 3:9,13 8:2,6 9:14 | particular 41:4 |
| | 47:14 48:4,11 49:5 | 15:5 24:22 31:9 | 54:24 63:4 65:14 |
| **O** | 49:11 50:24 51:25 | 39:1,1,2,4 41:24 | 68:15 |
| object 75:25 87:19 | 52:4,16 53:24 | 43:19,25 46:11 | particularly 8:15 |
| objectify 40:19 | 54:22 58:21 59:7 | 54:19 55:14 62:24 | 11:7 55:24 86:15 |
| objection 21:17 | 59:16,19 62:9,13 | 67:1 82:3 84:9 | 93:2 |
| 28:24 29:1 30:3 | 64:8,17 67:8 68:21 | 85:23 | parties 74:23 98:12 |
| 32:6 33:23 35:6 | 69:5 70:17,25 | outbox 14:20 | passed 16:20 |
| 36:14 69:21 70:5 | 77:21 79:4 80:6,7 | outside 9:15 | passing 55:23 |
| 70:12,21 71:3,9,21 | 80:18,25 85:16 | over 3:21 6:5 9:19 | past 4:13,17 7:21 |
| 72:4,12,20 73:4,15 | 86:9,13 87:1,25 | 52:22 55:18 58:17 | 12:23 58:17 |
| 73:25 74:19,24 | 88:4,13,15,23 89:7 | 59:5 88:13 94:22 | patient 54:15 |
| 75:3,12,19 76:11 | 90:7,13,17 91:23 | overloaded 7:7 85:23 | pay 7:12 18:4 20:23 |
| 76:15 77:17,22,24 | 92:2,7,18,22 93:9 | overpayment 81:25 | 21:7 35:7 61:2 |
| 78:4,8,21,21 79:1,9 | once 10:17 14:19 | overseeing 7:2 | 86:21 87:1,21 89:2 |
| 79:16,20 81:7,20 | 51:25 | own 8:4 11:6 74:6 | 89:21 90:2 |
| 82:5,22 83:5,9,24 | one 5:7 8:20 9:4,5 | 75:2 | payable 28:2 31:4 |
| 84:4,12,15 94:15 | 11:11,19 17:23 | owner 40:3 | 49:15 69:24 71:14 |
| 94:19,25 | 23:2 28:16,19 30:8 | | 89:17,20 |
| objections 70:6 | 32:4 35:4 46:5 | **P** | paying 12:10 59:25 |
| objective 60:3 | 54:24 58:12 60:4 | page 2:12,16 16:12 | 60:1 61:7,10 81:25 |
| obviously 37:10 | 67:11,12,15 68:15 | 16:23,24,25 17:1 | 82:24 |
| occasion 67:11 | 68:19 72:6 74:4 | 20:13 22:15 27:16 | payment 50:4 58:22 |
| occurring 62:3 | 76:25 77:6 82:16 | 27:17,18 33:12 | 59:2,15 61:22 |
| October 37:21,24 | 85:16 88:13 92:5 | 34:11 37:16 41:11 | 74:16 84:3 |
| 38:3,6 66:17 | 93:13 | 43:6,6,12,13 46:6 | payments 41:19 |
| off 56:6 68:12 82:15 | ones 12:11 69:9 | 48:17 55:2 72:23 | 51:14 84:14 |
| 87:24 93:8 | one-sided 50:17 | 82:11 88:19,19,21 | pen 76:23 77:2 |
| office 14:8,18 46:14 | one-thirtieth 22:18 | 88:22 90:7 91:5 | people 9:6 33:19 |
| 61:20 85:5 96:8 | only 6:24 11:15 17:7 | 96:6,14,17,20,23 | 34:8 40:23 54:22 |
| often 9:5 58:23 63:3 | 18:10 24:19 25:9 | 97:1,4,7,10,13,16 | 81:8 85:10,13 |
| 63:5 | 26:20 30:21 31:5 | 97:19,22 | people's 38:25 |
| | | | per 39:17 67:1 83:23 |
| | | | percent 28:1,5 30:14 |
| | | | 87:4 94:7,22 |
| | | | perform 10:24 |
| | | | performed 11:9 |
| | | | performing 52:1 |
| | | | perhaps 11:3 15:15 |
| | | | 33:7 |
| | | | period 9:23 14:2 |
| | | | 16:16 18:3,24 19:6 |
| | | | 19:8,11,14,18,19 |
| | | | 19:23,24,25 20:13 |
| | | | 20:17 21:1,6,11,11 |
| | | | 21:14,20,22 22:2 |
| | | | 22:10 24:23,23 |
| | | | 25:13,14 26:10,11 |
| | | | 26:19 31:19,20 |
| | | | 32:14 33:3 34:22 |
| | | | 34:23 53:11 71:14 |
| | | | 74:10 75:22 76:4,6 |
| | | | 77:12,16,21 78:2,6 |
| | | | 78:24 79:10,11 |
| | | | 83:12 87:11,13 |
| | | | periodic 10:16 |
| | | | permits 88:4 |
| | | | person 70:19 71:19 |
| | | | personal 54:25 |
| | | | personally 67:14 |
| | | | persons 15:18 62:6 |
| | | | pertaining 28:8,9 |
| | | | phone 9:17 15:8,10 |
| | | | 39:21 47:21 49:13 |
| | | | phrasing 75:25 |
| | | | Phyllis 59:7 60:7 |
| | | | 63:14 66:9 68:12 |
| | | | 81:10 83:17 |
| | | | physically 83:22 |
| | | | pick 84:23 |
| | | | Pilot 5:13 6:17 |
| | | | place 5:1,3 |
| | | | Plaintiff 1:4 2:2 |
| | | | please 23:5 27:16 |
| | | | 68:15 69:12 70:7 |
| | | | 71:23 72:6 76:17 |
| | | | 89:18 96:4,11,12 |
| | | | Pleasure 68:21 |
| | | | plural 29:24 30:2 |
| | | | plus 43:13 45:17 |
| | | | 85:12 |
| | | | point 3:11,12 34:7 |
| | | | 44:17 51:3,8 53:15 |
| | | | 62:11 |
| | | | pointed 8:2,5 24:22 |
| | | | pointing 21:24 76:22 |
| | | | 82:23 |
| | | | policies 6:11 17:3 |

Reported By: Rebecca J Huddy

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Case 1:02-cv-00479-MRR Document 184 vs. Filed 09/06/2007 Page 34 of 38 01-02-479

Jefferson Pilot Insurance Company vs. Christopher L. Kearney

Harold Shelton

5/7/2004

Page 106

| | | | | |
|---|---|---|---|---|
| 33:11 34:3 64:25 | 33:2,14,21,25 | 32:8 72:25 | 96:2 | 34:12 45:15 52:24 |
| 69:9 76:14 79:7 | 34:10,19 35:4,18 | provision 18:2,5 | read 17:8 20:4,6,9 | 76:19 79:7 86:20 |
| 86:1 | 35:23 37:11 48:12 | 36:12 48:21,23 | 29:25 78:13 79:18 | 87:1 89:8,11 91:14 |
| policy 6:20 7:24,25 | 48:19,21 87:16 | 72:8,16,23,25 | 93:19 96:4,14,17 | 92:21 |
| 8:3,14,16,20 9:10 | 92:18,19 | 73:12 78:5 81:1 | 96:20,23 97:1,4,7 | referenced 21:18 |
| 12:14 14:21 17:6,8 | premiums 18:4 27:6 | 88:20 | 97:10,13,16,19,22 | 53:20 79:6 87:20 |
| 17:18,19 18:1,10 | 34:24,25 49:6 81:1 | provisions 7:25 9:1 | reading 8:3,5,6 | 92:8,14 |
| 18:12,13,18,20 | preparatory 56:1 | 17:7 25:19 35:8 | 76:22 77:3 | references 13:5 21:3 |
| 19:4,12 20:1,13 | prepare 56:14 | 69:8 92:3 | really 3:19 55:11 | 47:6 79:18 |
| 22:15 23:7,24 | prepared 33:11 | Psychiatric 63:8 | 64:19 | referral 61:4 |
| 24:25 25:4 26:8,23 | 56:15 | Public 1:13 95:11 | reason 7:14 40:21 | referred 13:3 38:13 |
| 29:19 30:22,23 | present 57:8 | 98:4,20 | 56:7 96:16,19,22 | 42:13 77:19 79:12 |
| 31:11 32:8,11,25 | President 6:19,23 | pull 65:1 | 96:25 97:3,6,9,12 | referring 83:7 |
| 33:16 34:6 35:11 | 14:17 86:17 | purchase 17:21 | 97:15,18,21,24 | refers 25:8 26:22,24 |
| 35:21 36:8,18,22 | pretty 24:24 | 31:22 | Rebecca 1:12 98:4 | 32:13 |
| 36:24 37:3 40:16 | Pre-ERISA 5:22,25 | purchased 35:2,21 | 98:19 | reflect 54:12 |
| 41:8,12,17 42:14 | primarily 6:3 14:2 | 88:9 | recall 4:12 8:15 9:23 | refused 40:14 |
| 42:25 43:3 45:2 | 49:23 59:23 84:8 | purports 62:24 | 10:9 11:15,22 12:5 | regard 19:22 44:3,4 |
| 48:24 53:15 57:1 | primary 7:14 | 68:11 | 12:19 13:5 38:19 | 61:15 79:4 |
| 62:1 64:12,20 65:6 | principal 13:7 62:17 | pursuant 1:11 | 38:20,24 39:8 | regarding 17:3 74:17 |
| 65:6 68:18 69:6 | principally 51:13,13 | put 11:23 13:20 | 40:25 43:18,23 | 81:18 |
| 72:24,25 73:18,19 | principals 46:11 | 14:11,20,25 15:12 | 44:20 56:1,8,16 | regular 17:8 38:10 |
| 74:6,7 78:20,23 | prior 3:16 4:9 6:16 | 15:24 32:24 46:12 | 58:8,16 61:17 63:4 | Reinsurance 11:8 |
| 85:14 87:17,18 | 22:6 44:17 53:9 | 59:2,13 | 63:5,10,18,24 64:1 | 12:3 64:4 85:4,20 |
| 88:4,9,18 89:15 | 55:7,20 98:5 | p.m 1:15 95:4 | 64:2,6,16 67:12 | reinsurer 10:5,6,13 |
| 90:7,11,12,15,15 | probably 52:7 55:21 | | 76:18 93:8 | 10:16,20 39:12 |
| 90:18,18 91:6,8,11 | 61:17 64:5,25 77:6 | **Q** | receipt 46:1 50:5 | relate 47:12 |
| 91:13,16,17,20,20 | 88:11 93:5 | qualified 86:1 | 66:22 | related 38:20 58:10 |
| 91:21 93:1,4 | procedure 1:12 15:4 | question 18:16 20:3 | receive 25:20 44:7 | relating 57:20 58:9 |
| policyholder 28:12 | 59:1 | 20:6,9 21:4,18 | 69:25 73:21 | relationship 51:3 |
| 29:5,6,7,9 30:12,17 | proceed 39:13 41:25 | 22:24 23:2,5 29:3 | received 14:5,24 | 55:1 |
| 31:5 32:17 36:4 | process 49:24,25 | 29:25 30:6,7,11 | 15:23,23 27:16 | remedy 50:19 |
| 37:6 39:16,19 | processed 84:7 | 34:16 35:15 45:2 | 38:5 45:11 49:24 | remember 40:11 |
| 68:18 | processing 44:13 | 48:11,11,19 54:7 | receiving 70:2,10,15 | 52:10 64:7 66:12 |
| policyholders 14:4 | 58:13 | 54:15 61:21 70:7 | 70:19 71:1,19 72:1 | 77:11 |
| 57:1 | prodding 93:14,15 | 70:17 71:23 75:5 | 72:3,10,15 75:10 | remind 67:23 |
| position 6:16 46:12 | 93:15,16 94:2 | 75:25 76:1,12,17 | recent 57:22 | Rene 56:4 |
| possibility 44:23,24 | produce 57:5 | 77:2 80:7,15 81:22 | recess 42:8 88:17 | repeat 29:3 70:7 |
| 44:25 | produced 50:14 | 89:18 90:19,24 | recognize 65:24 | 71:23 72:6 76:17 |
| possible 36:16,17 | 52:14 57:4 | 91:3,4 92:13,13 | 82:12 | 81:22 89:18 91:3 |
| 46:2 64:14 | program 57:3 | 93:13,23 94:1,5 | recollection 64:8,14 | rephrase 94:1 |
| possibly 50:2 | prohibition 75:6 | questioned 17:11 | recommendation | report 55:4,5 |
| post-ERISA 6:1 | prompt 96:9 | questions 13:2 42:20 | 10:7 | reported 40:19 |
| potential 31:23 | properly 60:2 | 63:15 67:7 69:3 | recommendations | reporter 20:10 30:1 |
| potentially 27:23 | proposal 27:15,24 | 75:23 76:18 | 10:22 | reports 68:14 |
| practice 43:4 44:4 | 28:21 29:19 30:25 | quick 88:14 | recommended 10:5 | repository 14:13 |
| prefer 69:20 | 32:5,22,23,25 57:8 | **R** | 12:12 | represent 3:7 53:14 |
| preference 43:24 | 57:14,18 | R 2:2 96:1,1 98:1 | record 12:20 16:23 | request 40:14,15 |
| pregnancy 89:14,16 | proposals 56:25 57:5 | raises 48:13 | 54:11,12 74:13 | 41:1 44:21 |
| 89:19 | 57:6,11 | Rampersad 38:23 | 93:19 | requested 41:7 52:12 |
| premium 17:6,14,25 | prospective 56:25 | Rampersad's 38:15 | redacted 37:25 | 56:9 60:14 |
| 18:1,7,9 25:11,12 | provide 72:18 75:17 | 38:17 | redrafted 43:15 | requests 59:1 84:3 |
| 25:18,24 26:2,3,6 | 75:17,18 | rather 19:25 25:4 | refer 7:18 27:1 32:18 | require 9:9 25:5 |
| 26:13 27:2,10 | provided 20:2 62:19 | Re 11:17 40:6 52:7,8 | 38:17 39:6 61:23 | 59:13 |
| 28:15,22 29:4 30:8 | 91:8 | 52:22 53:6 64:24 | 69:20 80:16 | requirement 55:9 |
| 30:15 31:7 32:3,16 | provides 20:23 27:17 | | reference 18:17 19:9 | requires 25:20 26:3 |

**Reported By: Rebecca J .Huddy**

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

| | | | | |
|---|---|---|---|---|
| 45:1 59:2 72:14<br>73:8<br>**residual** 8:24 9:4,8<br>17:4,12,24 18:5,8<br>18:14,17,22,25<br>19:6,8,9,14,17,23<br>20:21,24,25 21:5,6<br>21:8,10,14,20 22:4<br>22:10,20,23 23:6,7<br>23:9,12,13,20 24:3<br>24:7,10,15,19 25:3<br>25:16,17 26:1,11<br>26:13,18,21,23<br>27:7,22,23 28:4,22<br>31:10,24 32:12,18<br>32:25 33:3,10,15<br>33:18,22 34:1,10<br>34:21 35:3,10,18<br>36:6,23 42:25<br>47:17 48:5,13 53:9<br>66:18 69:16,17<br>70:2,9,10,18,19<br>71:2,7,13 72:17<br>73:2,13,21 75:6<br>76:7,9,19 77:12,15<br>77:25 78:5,12,14<br>78:15,25 79:7,13<br>79:17 80:1,9 81:5<br>81:18 82:1,7,19<br>83:3,8 87:3,12,14<br>87:15,20,21,25<br>88:4 89:2,4,7,11,15<br>89:17,19,22,24<br>90:9,13 91:15,16<br>91:18,19,24,25<br>92:2,4,8,9,11,15,15<br>92:18<br>**residually** 21:9 72:19<br>**resolution** 82:20,21<br>**resolving** 39:15<br>**resources** 84:10<br>**respond** 80:13,19<br>**responding** 42:20<br>**response** 37:13 46:23<br>48:18 54:5 80:22<br>94:5<br>**responsibility** 16:15<br>62:17<br>**responsive** 48:17<br>**result** 89:22 98:13<br>**resulting** 89:14<br>**retire** 3:22 4:2 8:9<br>**retired** 3:21 4:4<br>44:16 83:12,13<br>**retirement** 4:5,9<br>44:14,17 55:20 | 85:12<br>**return** 67:21 96:7<br>**returns** 56:9,14<br>**revelation** 7:23<br>**reverse** 50:11,13<br>**review** 7:25 8:14<br>10:9,10,18,18,21<br>12:12 13:18 38:18<br>43:19 51:23 53:17<br>58:17 59:6 65:1<br>73:18 74:6,22<br>75:21 84:2 85:8<br>**reviewed** 40:17 59:6<br>74:25 85:8<br>**reviewing** 6:10 8:6<br>48:21 50:3 51:15<br>75:1<br>**reviews** 13:17<br>**rider** 8:24,25 9:1<br>17:18 18:8 19:9<br>20:21 21:6 22:24<br>22:25 23:6,9,12,18<br>23:24,25 24:16<br>25:5 26:24 27:1<br>29:20 32:19 33:1<br>33:10,18 35:3,10<br>35:18,22 36:7,23<br>36:25 42:25 70:18<br>71:8,17 72:17<br>73:12 75:7 76:19<br>77:15,25 78:6,12<br>79:7,17 87:21 88:1<br>89:8,12,13,24<br>90:13 91:22,25<br>92:3,4,8,10,11,15<br>92:19<br>**riders** 12:14 17:20<br>69:7,15 73:19 75:9<br>75:16<br>**right** 8:18 18:8 19:20<br>21:1 22:1 23:11,21<br>24:14,20,25 25:7,9<br>27:1,4 28:7,17 29:7<br>29:10,16 31:1,20<br>31:25 33:9 34:13<br>36:15,21 37:3,12<br>38:15 41:9,12,17<br>41:21 45:12,20<br>46:6,6 47:7 48:14<br>49:13 51:7 54:20<br>56:6 59:12 66:5,19<br>77:9 79:14,15<br>82:13,15 84:23<br>85:6,14,21 86:7<br>87:5,24 88:9,10,14<br>90:3,5,22 91:8 | 92:20,22 93:8,20<br>94:8<br>**rights** 9:10 41:9,16<br>**right-hand** 78:11<br>**Ritchey** 2:7<br>**Roberson** 3:14 4:14<br>7:18,20 66:8 81:10<br>86:1,12<br>**Roberts** 2:7,12,13<br>3:4,6 13:13,15 20:8<br>23:4 30:3 41:25<br>42:3,5 50:14,18,22<br>52:12,16 53:2,5<br>54:10 65:20 66:14<br>68:3,21,24 69:13<br>69:21 70:5,12,21<br>71:3,9,21 72:4,12<br>72:20 73:4,15,25<br>74:9,12,19,24 75:3<br>75:12,19,23 76:11<br>76:15,18,21,25<br>77:6,11,17,22,24<br>78:4,8,21 79:1,9,16<br>79:20 80:3,6,12,15<br>80:20 81:7,20 82:5<br>82:8,22 83:5,9,24<br>84:4,12,15,21<br>90:21 91:1 93:9,15<br>93:18,24 94:2,15<br>94:19,25 95:3<br>**Rules** 1:12<br>**running** 51:11<br><hr>**S**<br>**S** 2:15 96:1<br>**same** 16:24 19:22<br>33:16 35:13 43:10<br>43:15 45:23 47:18<br>48:6 49:21,25 59:6<br>61:2,6 70:11,20<br>71:2 76:7 77:12<br>78:19 80:1,10<br>96:13<br>**saves** 29:6<br>**savings** 28:16<br>**saw** 48:11<br>**saying** 22:1,3 48:7,9<br>65:8,9 74:21<br>**says** 17:24 18:2,6<br>19:10 21:6,21 23:9<br>23:13,16 24:16<br>25:12,13 27:21,25<br>28:5 30:21,25 31:3<br>36:19 71:12 75:7<br>82:19,24 86:21<br>87:10 90:11,15 | 91:6<br>**schedule** 19:1,3,3,11<br>19:13,15 20:1 21:3<br>21:19,19,24,25<br>22:17 23:1,10,17<br>23:19,23,25 24:1,4<br>24:16,18 25:5,8<br>26:22,24 31:8,14<br>31:15,17 32:2,14<br>32:15,16 53:11<br>77:19<br>**Scrap** 91:4<br>**script** 77:3,5<br>**se** 39:17<br>**second** 16:25 17:3<br>19:3 21:5 39:9<br>42:19,22 48:15,18<br>48:20 65:21 91:4<br>**Secret** 45:6<br>**section** 36:19,25 37:3<br>47:19 48:7 80:11<br>91:12<br>**Sections** 8:2<br>**Security** 8:25 31:10<br>31:24 61:8 69:20<br>69:24 70:14 71:17<br>71:18,24,25 72:8,9<br>72:16,18 73:23<br>74:18 75:8 79:19<br>82:1 94:11,14<br>**see** 13:2,19 17:16<br>21:13,19 23:13<br>27:17,20 28:2<br>39:10 46:21 47:1<br>52:16 64:22 68:4<br>68:15,18 69:24<br>72:14 76:24 78:17<br>82:2 88:1,3 89:13<br>91:9<br>**seek** 61:14,25<br>**seeking** 10:2<br>**seem** 40:18 43:22<br>**Seems** 43:22<br>**seen** 12:1 36:12 93:1<br>93:3<br>**seldom** 32:23<br>**selected** 11:10<br>**self-inflicted** 87:22<br>87:23 88:2,5<br>**send** 41:7 43:11<br>52:11,22 55:5<br>59:21<br>**sending** 11:17 43:7<br>**sends** 43:13 47:15<br>**sense** 12:8 36:3<br>**sent** 14:4 38:5 40:6 | 41:12 42:13,15<br>43:18 44:19 45:16<br>45:19,21,24 57:9<br>80:17<br>**sentence** 23:16 32:25<br>91:5<br>**sentences** 46:4,10<br>**separate** 14:9 16:1,8<br>18:6 19:7 21:15<br>38:13 71:5,6<br>**separately** 15:22<br>**September** 16:22<br>17:2 37:13 40:12<br>41:11<br>**service** 6:20 63:1<br>90:8,10 91:12,24<br>92:7,14,16<br>**Services** 38:8 63:10<br>**set** 3:11 52:5 77:15<br>**settle** 39:11<br>**settled** 58:5<br>**settling** 39:15<br>**several** 4:21 9:19<br>57:21<br>**severe** 40:24<br>**shadow** 16:3<br>**share** 43:24<br>**shared** 4:14 7:22<br>44:5 63:11<br>**Sharon** 63:23<br>**sheet** 96:13<br>**Shelton** 1:11 2:17<br>3:1,6 9:12 13:6<br>30:6 42:9 55:7<br>68:22 69:4,15 76:3<br>80:8,16,16 88:18<br>93:16 94:3 95:3<br>96:3 98:5,10<br>**shortcoming** 84:5<br>**show** 17:15,18 33:9<br>51:11<br>**showing** 69:6 76:21<br>**shown** 19:11 22:17<br>22:25 23:10,17,22<br>32:16<br>**shut** 54:13 90:21<br>**sic** 80:8<br>**side** 50:11,13<br>**sideways** 53:7<br>**sight** 71:15<br>**sign** 59:11<br>**Signature** 95:6<br>**signed** 96:8<br>**silent** 27:4,7 32:21<br>**simply** 55:8 59:21<br>92:11 |

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 108

since 3:21 17:4 47:10
  76:5
single 76:1 86:4
sinular 29:24
sir 33:25 35:24 46:24
  56:17 70:17 72:7
  74:3 79:4 83:11
  84:18 88:16,22
sit 8:13
sitting 54:3
situation 9:8 10:15
situations 7:17
six 17:19
skill 34:9
slowest 67:6
Social 8:24 31:9,23
  61:7 69:20,24
  70:14 71:17,18,24
  71:25 72:8,9,16,18
  73:23 74:18 75:7
  79:19 82:1 94:11
  94:13
sold 9:2 33:11 64:12
  69:8
some 3:11,12 6:3 8:5
  8:12,12,17 9:24
  10:20 11:9,9 12:4
  37:24,25 38:10
  42:21 43:17,23
  45:2 54:6 56:11,12
  57:4,15 58:24,25
  61:21 62:10,11
  66:3,4 81:3,15,22
  82:20 88:24 92:3
somebody 4:18
  57:16 63:25
someone 27:23 28:6
  35:16 39:1 41:2
  44:24 62:7,24 63:7
  69:16 70:2,10
  86:10 87:2 93:17
  93:19 94:6,22
someone's 87:3
something 8:17
  15:13,14 25:23
  29:21 32:13 39:18
  50:18 61:18 86:7
  92:2
sometime 61:8
sometimes 10:17
somewhat 10:24
somewhere 13:23
sorry 13:13 25:21,23
  29:3 46:5,25 69:9
  72:2 73:19 76:24
  80:5,17 82:6 89:18

91:3 94:13
sort 3:13
sought 9:24 44:22
SOUTHERN 1:1
speak 10:6 15:8 64:3
  64:11 71:8
speaking 64:6,8
Specialists 62:23,25
specialize 63:4
specific 36:12 40:21
  49:17,17 63:20
  75:6,10 77:16 79:5
  89:8
specifically 13:5
  26:15,17,19 32:13
  32:15 40:5,11,25
  44:20 45:24 56:16
  62:4 63:24 66:12
  71:8 78:13 82:11
  85:20
speculation 82:6
speech 71:15 87:19
spelled 31:9
spend 8:2
spending 54:6
Spiegel 1:6
spoke 3:18 4:16
spoken 9:17 64:12
staff 44:24 85:13
staffing 7:16
stamp 66:23
standing 43:23
start 13:11 49:24
started 5:20 44:13
  82:3
starts 27:19
state 22:25 33:13
  78:23 98:1
statement 2:18 30:18
  49:1,12 50:6 66:18
  67:3 78:14
states 1:1 26:15,17
  26:20 36:24 49:6
Stephanie 2:4 5:1
stop 29:1 37:20
  93:24
Street 1:14 2:3,5,8
strictly 54:25 82:10
strike 69:22 70:13,22
  75:3
subject 4:17 47:18
  48:6 80:9
subscribed 95:8
  98:16
subsequently 40:9
subsidiary 5:13

substance 59:20
substantive 43:24
sued 3:8
suffered 40:24
sufficient 8:21
suggest 12:23 39:14
suggested 44:18 76:5
  79:5
suggesting 49:2
suggests 80:8
Suite 2:3
summer 39:7 42:14
  51:12
supervisor 6:18
supplement 8:25
  31:24 61:8 70:14
  71:19,24 72:1,8,9
  72:17
supplemental 50:6
  51:16 66:17 68:14
  96:12
supplementary
  72:18
sure 16:23 21:4 40:5
  42:4 47:13 52:18
  53:21,25 56:8
  59:24 60:21 62:12
  66:3 79:3 82:15
  86:15 88:7,10,12
  89:23 93:6
surveillance 44:21
  44:22 45:1,2,6
suspect 51:8 68:17
  83:20 86:16
suspend 90:11 91:13
  91:17,17
suspended 90:9
  92:16
Suspension 90:8
  91:12,23 92:7,13
suspicion 43:20,21
switch 51:3
switched 6:4
sworn 3:2 95:8 98:5

_____
T

T 2:15 96:1,1 98:1,1
take 4:3 5:1,3 10:14
  12:4 14:25 15:10
  41:8,23 49:25
  55:18 60:11 78:11
  85:1 87:16,25
  88:14
taken 1:11 51:21
  98:7
taking 13:18 98:6

talk 22:13 29:20 87:9
  91:12
talked 25:25 47:16
  47:24 53:10
talking 7:18 8:16
  23:4 24:12,14
  25:22 27:22 29:15
  29:21 47:16 74:9
talks 24:19 32:5
tax 56:9,14 67:21
TD 86:21 87:2
telephone 14:24
tell 12:17 30:11,17
  31:5 32:17,19
  33:12 35:16 36:4,6
  36:8,10 37:5 40:23
  42:5 47:19 52:19
  54:13 71:12 80:25
  88:1 94:17,21
telling 90:24
tells 23:25
term 21:12 24:12,13
  31:1
terms 18:21,24 20:14
  20:19 25:15 26:1
  34:9 47:18 48:6
  72:7 80:10
testified 3:2 4:16
  60:22 74:24 79:12
  81:17 84:25 85:4
  93:13
testify 58:3 90:20
testimony 76:12 79:8
  81:20 98:9
thank 13:18 20:8
  30:2 34:15 37:8,16
  56:23 60:22 66:7
  67:6 84:18 87:7,9
  93:9 95:2,3
Thanks 56:21 68:25
their 6:11 7:12 10:2
  11:6 41:8 50:13
  52:22 59:5 61:25
  85:13
thereabouts 6:4
they'd 14:19
thing 13:10 16:24
  32:7 59:6 65:4
things 8:12 16:3
  31:17 32:18,21
  33:19 34:8 36:20
  47:24 65:5 92:22
  92:24 93:21
think 3:11,21 6:13
  7:9 9:4,11 10:8
  16:13 29:17 34:2

35:25 39:15,17
  40:25 44:8 51:22
  52:6,6 53:10,16
  54:24 58:12,23
  59:23 61:21 63:9
  64:5 68:6 81:15
  82:9 83:10 84:5,17
  85:15 88:4,18
  90:17 93:5,20
thinking 82:10
third 2:8 16:23 17:1
  40:12 46:3,6
Thirty-eight 93:3
though 6:7 8:10 12:9
  25:17 30:12 43:21
  91:25
thought 4:10 33:6
thousand 83:20,20
  85:16
three 17:20 18:3
  24:22,24 25:2,4,17
  25:25 26:4 34:22
  38:13 39:6 44:9,10
  45:21 46:4,9 83:17
  83:19,22 85:10,11
three-page 45:16
threshold 59:9
through 4:5 8:5,6 9:3
  10:17 13:10,11
  14:19 16:10 20:12
  47:1 51:12 75:1
throughout 6:14 7:2
throw 23:3
tie 3:24,24
till 3:17 55:10
time 3:17 5:14,14,19
  8:3,7 9:16,23 11:3
  13:18 16:16 23:3
  26:5 38:11 39:7
  44:14,17 46:15
  49:20,21 53:17
  54:6 58:13 61:15
  66:7 67:12 70:11
  70:20 71:2,14 72:6
  74:10,11,15 77:15
  83:1,12,12,13 84:1
  84:2
times 9:17 11:4
  53:16 57:21
title 6:24
today 3:17,24 54:1,3
  60:11 85:14
Todd 38:6 40:13
  43:12 45:10 63:10
together 77:4
told 28:14 35:20

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C-1-02-479
5/7/2004

Page 109

47:17 48:5 54:1
60:18 62:7 74:10
80:9
**Toledo** 46:14
**top** 31:10,17 53:20
82:12,19
**total** 5:17 17:5,7
18:21,24 19:18
20:2,14,17,19,24
21:9,15 22:2 24:6
24:20 25:6,9,12,15
25:20 26:1,9,13,16
26:20 27:11 28:1,6
28:17,20 29:10,12
29:15,21,22 30:8
30:13,18,24 31:3
31:18 32:3,4,9,11
32:20 34:23 42:24
47:18 48:7,23
69:25 70:3,11,19
71:1,14,20 72:2,3
72:10,15 73:1,8
76:8,8 77:13 78:2,7
78:19,25 80:1,10
81:5 82:3,24 83:2,8
87:4,6,8,11,13,15
89:21 90:18 91:7
91:11,14,20,21
92:21 94:7
**totally** 9:6 18:2 26:3
**Towards** 23:11
27:21
**town** 65:1
**transcribed** 98:7
**transcript** 42:6 98:9
**transfer** 56:1
**transferred** 5:23
47:25
**transmittal** 45:22
53:7 67:18
**transmittals** 53:5
**transmitting** 68:13
**treatment** 93:25
**trial** 58:3,5 60:22
**tried** 13:20 59:18
**true** 19:22 20:3,11
27:8 40:18 93:21
98:8
**try** 8:10 48:2
**trying** 59:23 91:1
**turn** 19:13 20:12,21
23:18,19 27:9,16
31:14,14 33:12
42:9 46:18 91:5
**turned** 23:9 53:7
**turning** 34:11 72:23

**twelve** 25:21
**two** 3:16,17 4:6,13
4:17 5:15,16 6:20
12:23 13:4 17:3
38:25 43:13 45:16
45:17 46:13 47:10
47:25 50:4 62:6
70:6 71:5,6 77:7
85:12
**two-hour** 60:4
**two-page** 45:10 47:5
47:21
**two-sided** 66:15
**two-thirds** 27:18
**type** 12:13 83:7

**U**

**Uh-huh** 20:15 42:10
43:1
**ultimately** 13:3
**unbelievable** 30:5
**Unclear** 88:11
**under** 17:8 18:1
20:17 24:6 26:7,11
26:13 28:20 34:10
35:18 42:24 48:13
48:23 61:19 70:17
71:24 72:7 73:14
73:22 76:8 78:7
89:21
**understand** 21:4
38:7 40:3 62:6
79:8
**understood** 44:15
**undertake** 59:16
**undertaken** 50:18
**undertaking** 62:10
**Underwriting** 57:3
**unexplicit** 34:9
**unfavorable** 46:12
**UNITED** 1:1
**unless** 15:13 47:20
75:24
**until** 10:24 21:9 61:8
**unusual** 82:3
**use** 19:18 20:1 22:10
24:7 25:5 26:9,12
32:19,22 56:7
61:19 63:3 76:1
87:11,13,14,16
96:11
**used** 29:24 32:12
49:4 63:1 68:13
**using** 63:5
**usually** 45:1,7 53:18
57:3,17

**V**

**v** 96:2
**value** 11:12
**vendor** 56:7
**version** 8:20 43:8
**versus** 83:2
**very** 4:23 5:10 8:11
9:5 32:23 33:4
34:5 35:12 50:2
55:2 58:23 59:18
63:3 82:3,4
**Vice** 6:19,23 14:17
86:17
**videotaped** 67:9
**Vine** 2:3
**visited** 62:22
**volume** 7:8
**vs** 1:5

**W**

**Wait** 93:18
**waive** 18:4 34:25
**waived** 27:6 34:24
**waiver** 17:6,12,14,25
18:1,6,9 25:11,12
25:18,24 26:2,3,4,6
26:12 27:2,9 28:14
28:22 29:4 30:7,14
31:7 32:3,16 33:2
33:14,21,25 34:10
34:19 35:4,17,23
37:11 48:12,19,21
80:25 87:16 92:18
92:19
**Walnut** 2:8
**want** 20:3 29:24
37:17 39:2,15
60:24 67:15 72:7
**wanted** 64:25 85:20
**wants** 36:4 82:23
**war** 88:25
**war-caused** 89:2
**wasn't** 8:22 41:20
43:20 51:25 60:4
61:10 76:2,11,12
85:16,18
**way** 4:7 16:10 20:12
22:12 24:21 27:18
39:3 40:18 54:24
55:3 60:12 69:16
69:19 70:9 73:13
76:10,14 83:13
89:24 92:6
**wear** 3:24
**Wednesday** 5:2
**week** 4:13 46:20

47:14,16 48:4
**weeks** 3:16,17 4:6
**welfare** 7:10
**well** 4:21,23 5:10
7:21 8:10 22:6
24:6 26:15 28:11
28:12,23 30:16,18
30:21 31:8 33:24
34:5 35:7,12,20
36:8,16,22,23 39:4
39:17 43:12 45:1
51:22 52:16 53:2
57:8 58:12 59:11
64:22 65:4,6 74:12
83:12,17,25 86:8
86:12 87:16,25
90:6 91:16
**went** 23:6,24 43:19
60:17
**were** 3:14 4:21 5:25
6:1 7:2,6,9 8:5 9:1
9:6 10:4 11:18,19
12:10 38:20 41:9
42:24 47:17,24
48:6 49:15 50:14
50:17 51:9,14,16
51:23,23 52:1
54:22 58:8,13
59:23,25 60:1
61:10,15 62:11
69:7 79:6,12 80:9
81:9,13 83:1,3,7,14
83:16,19,22 84:7,8
85:23 93:5 94:17
94:21
**weren't** 55:20 57:7
**WESTERN** 1:2
**we'll** 19:2 42:5 91:4
**we're** 3:9 8:16 24:14
25:22 29:21 32:21
55:24 88:18 89:9
**whatsoever** 18:17
**WHEREOF** 98:15
**whichever** 73:23
**while** 20:4 41:25
61:22 63:1 72:19
73:20
**whole** 5:19 8:3 13:10
92:22,24
**wife** 60:17
**William** 2:2
**willing** 60:21
**wish** 96:6
**witness** 3:1 13:17
20:6 27:5 30:4,10
43:20 55:12 58:6

68:23,25 76:2,3,4
76:21,24 82:23
93:25 94:4 95:6
98:15
**WJ576A** 8:17 72:24
**Wood** 2:2
**word** 49:4
**words** 47:25
**work** 3:10 5:12,18
7:8 9:7 16:10
20:12 55:7 56:1
57:20 58:10
**worked** 5:16,20
40:23 41:5 55:10
63:25 81:8
**working** 16:4 36:17
77:8
**works** 85:17
**worksheet** 58:18
**wouldn't** 15:15 36:3
36:5 43:10 51:22
60:14,17
**wounds** 87:22,23
88:2,6
**write** 39:9 96:7
**writes** 40:13 68:15
**writing** 43:3 51:9
79:24 80:13,14
**written** 52:4,19
53:19 76:10,14
86:24 92:6
**wrong** 77:10
**wrote** 39:22 40:1
86:13,16,22

**X**

**X** 2:11,15

**Y**

**yeah** 15:13,17 31:13
31:16 40:2 44:10
44:16 47:11 54:18
54:21 56:19 60:19
60:19 61:15 65:17
70:8 77:23 83:10
89:5
**year** 10:17 56:15
**yearly** 68:16
**years** 3:11,21 4:20
5:17,23 8:10 9:19
36:18 41:21 42:23
61:3 77:8,10 85:12
93:3
**Y2K** 55:13

**$**

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Harold Shelton

C1-02-479
5/7/2004

Page 110

| | | |
|---|---|---|
| **$1,000** 86:11 | **26** 2:18 68:2,10 | **45** 22:6 53:10 |
| **$100** 86:10 | 98:21 | **45202** 2:3,9 |
| **$2,000** 67:5 | **2690** 17:1 | |
| | **2691** 16:25 | **5** |
| **0** | **2694** 16:24 | **5** 27:16,17,18 33:9 |
| **0647** 64:20 | **2729** 37:16 | **511** 2:8 |
| **0822** 66:16 | **27401** 2:6 | **571** 34:5 |
| **0823** 66:16 | **2741** 37:16 | |
| **0962** 82:11 86:21 | **2743** 37:16 | **6** |
| | **2756** 65:21 | **6** 68:12 |
| **1** | **28** 48:18 80:21 | **600** 2:3 |
| **1** 55:18 91:5 | **2828** 67:17 | **65** 2:17 22:5 53:14 |
| **10** 47:23 77:9 | **2846** 68:11 | 53:22 54:2,4,6 |
| **10-31-94** 2:18 | **2855** 43:12 | **66** 2:18 |
| **100** 2:5 | **2856** 43:6 | **68** 2:12,18 |
| **11th** 98:16 | **2861** 42:11,12 | **69** 2:13 |
| **12** 40:12 | **2874** 37:20 38:3 | |
| **12:20** 1:15 | **2875** 37:20 | **7** |
| **13** 2:17 45:8,23 46:3 | **2880** 37:20 41:12 | **7** 54:19 |
| 46:9,22 47:2 49:12 | **2886** 37:19 40:12 | **7th** 1:14 |
| **13th** 47:7 | **2891** 37:19 | **75** 28:1,5 30:14 87:4 |
| **14** 27:15 56:22 | **2892** 37:17 39:1,1 | 94:7,22 |
| **15** 47:23 55:17 | **29** 37:22,24 38:3 | |
| **18** 41:11 42:9,20 | **2901** 37:17 | **8** |
| 43:8 | **2904** 37:17 | **8** 17:2 37:13 39:2,22 |
| **19** 43:15 46:18 47:14 | **2918** 64:17 | **84** 2:13,13 |
| 48:15 80:5,20 | **2948** 55:2 | |
| **1900** 2:8 | **2956** 50:23 | **9** |
| **1960** 5:14,14,20 | **2980** 79:24 | **9** 69:12 82:11 86:20 |
| **1980** 6:4 | **2982** 48:17 | **90s** 7:2 8:21 9:3 |
| **1990** 5:14 | **2987** 45:12 | 85:18 |
| **1992** 33:13 | **2988** 45:12 | **93** 2:13,14 16:12,22 |
| **1993** 17:2 48:11 | **2990** 46:18 47:16 | 48:11 66:7 |
| **1997** 13:4 37:22,24 | 79:25 | **94** 66:17,21,25 67:1 |
| 41:12 42:9,20 | **2991** 45:8 | 67:4 83:12 |
| **1998** 48:14 63:6 80:5 | **2992** 47:4 | **95** 2:14 46:11 |
| **1999** 3:23 | | **96** 68:12 |
| | **3** | **97** 38:3,6,11 39:2,7 |
| **2** | **3** 2:12 17:19 20:13 | 39:22 40:12 41:3 |
| **2** 33:12 34:11 | 22:15 66:21 69:6 | 42:14 51:12 85:5,7 |
| **2:15** 54:19 | 69:11 72:23,24 | 98:8 |
| **20** 5:23 | 88:19 | **98** 38:11 46:18 48:15 |
| **2000** 55:18 61:12 | **3:30** 95:4 | 48:18 50:23 53:8 |
| **2002** 61:8 | **30** 13:9 | 63:14 |
| **2004** 1:15 54:19 95:9 | **304** 1:13 | **99** 38:11 44:11 51:12 |
| 98:16 | **31** 3:23 55:8 66:17 | 55:8,17 62:22 66:7 |
| **2005** 98:21 | **34** 52:13 | |
| **22** 62:5 | **38** 5:17 8:10 36:18 | |
| **23** 2:17 13:13,14 | 77:8 | |
| 37:8 50:23 53:8 | **38-year** 6:14 | |
| 56:17,18 79:23 | | |
| **24** 2:17 65:19,21 | **4** | |
| 78:16 | **4** 17:19 56:24 69:7 | |
| **25** 2:18 63:6 66:13 | 69:11 73:11 75:9 | |
| 66:15 | 78:12 88:19,21,22 | |
| **2500** 2:3 | **40** 13:9 | |