COLLINS & HUGHES REPORTING AND VIDEO SERVICE

---

| 1 | UNITED STATES DISTRICT COURT |
| 2 | SOUTHERN DISTRICT OF OHIO |
| 3 | CASE NO. 1:02-CV-00479 |

| 4 | JEFFERSON-PILOT LIFE | )DEPOSITION TAKEN ON BEHALF |
| 5 | INSURANCE COMPANY, | )OF THE DEFENDANTS |
|   | PLAINTIFF | )BY: SUBPOENA |
| 6 | | ) |
| 7 | VS. | ) |
| 8 | CHRISTOPHER L. KEARNEY, | ) |
|   | ET AL., | )WITNESS: |
| 9 | DEFENDANTS | )CLYDE HONAKER, JR. |
| 10 | * * * * | * * * * |

11    The deposition of CLYDE HONAKER, JR., was

12 taken on behalf of the defendants before TAMELA T.

13 LEWIS, Certified Court Reporter and Notary Public in

14 and for the State of Kentucky at Large, at the offices

15 of Collins & Hughes Reporting and Video Service,

16 209 East High Street, Lexington, Kentucky, on

17 Thursday, March 8, 2007, commencing at the approximate

18 hour of 10:00 a.m.

19         Said deposition was taken pursuant to

20 subpoena to be used for any and all purposes permitted

21 by the Federal Rules of Civil Procedure.

22         * * * *         * * * *

23

24

25

1

---

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. John E. Meagher
Shutts & Bowen
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131

Ms. Stephanie T. Farabow
(Via speakerphone)
Jefferson-Pilot Life Insurance Company
Post Office Box 21008
Greensboro, North Carolina 27420

ON BEHALF OF THE DEFENDANTS:

Mr. Michael A. Roberts
Graydon, Head & Ritchey
1900 Fifth Third Center
511 Walnut Street
Cincinnati, Ohio 45202

ALSO PRESENT:

Mr. Christopher L. Kearney

* * * *         * * * *

INDEX

Caption Page............................ 1

Appearances and Index.................. 2

Examination by Mr. Roberts.............. 3-142

Reporter's Certificate................... 143

2

---

1    CLYDE HONAKER, JR.,

2 having been first duly placed under oath, was examined

3 and deposed as follows:

4         EXAMINATION

5 BY MR. ROBERTS:

6    Q.         Good morning, Mr. Honaker. My name is

7 Mike Roberts.

8    A.         Good morning.

9    Q.         I have the pleasure of representing

10 Chris Kearney in this lawsuit filed by your former

11 company, Jefferson-Pilot. Are you mindful of that?

12    A.         I'm sorry?

13    Q.         Are you mindful that there's an action

14 filed by Jefferson-Pilot against Mr. Kearney?

15    A.         Yes.

16    Q.         You're represented here today by

17 counsel or not?

18    A.         Yes, by John.

19    Q.         He's your lawyer?

20    A.         Yes.

21    Q.         Do you have some representation letter

22 from him, engagement letter?

23    A.         No.

24    Q.         Have you agreed to pay him an hourly

25 fee?

3

---

1    A.         No.

2    Q.         Is he the company's lawyer or your

3 lawyer?

4    A.         He's the company's lawyer.

5    Q.         Is he representing you personally?         Is

6 he your personal lawyer?

7              MR. MEAGHER: Objection, asked and

8              answered. You can answer.

9    A.         Yes.

10    Q.         Okay. But you've not talked to him

11 about paying any hourly rate?

12              MR. MEAGHER: Objection, asked and

13              answered. You can answer again.

14    A.         No.

15    Q.         Are you expecting to receive an invoice

16 from Mr. Meagher?

17    A.         No.

18              MS. FARABOW: Mr. Honaker, can you

19              keep your voice up a little bit. I'm

20              losing you.

21              THE WITNESS: Yes. We'll try to

22              move the phone here a little bit if we

23              can.

24              MR. MEAGHER: Yeah. The phone's a

25              little tight, Stephanie.

4

---

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | MS. FARABOW: Thank you. |
| 2 Q. | So let me get this straight. You've |
| 3 | never received an engagement letter from Mr. Meagher, |
| 4 | right? |
| 5 | MR. MEAGHER: Objection, asked |
| 6 | and answered. |
| 7 Q. | Right? |
| 8 A. | I'm not sure what an engagement letter |
| 9 | is. |
| 10 Q. | Have you received any correspondence |
| 11 | from Mr. Meagher saying, I agree to represent you for |
| 12 | purposes of the deposition on March 8th, or anything |
| 13 | to that effect? |
| 14 A. | I've received verbally that he |
| 15 | represents me, yes. |
| 16 Q. | And it's not your expectation that |
| 17 | you're going to incur any expense for this |
| 18 | representation, right? |
| 19 | MR. MEAGHER: Objection, asked and |
| 20 | answered. |
| 21 A. | That's correct. |
| 22 Q. | Who's going to pay the expense of this |
| 23 | counsel representing you? |
| 24 A. | Jefferson-Pilot, my former employer. |
| 25 Q. | Did you meet with Mr. Meagher |

5

| | |
|---|---|
| 1 Q. | Did you have lunch? |
| 2 A. | No. |
| 3 Q. | I'm sorry. Did you say it was a |
| 4 | two-to-three-hour business meeting? |
| 5 A. | Yes. |
| 6 Q. | Did you review documents during the |
| 7 | meeting? |
| 8 A. | No. |
| 9 Q. | Did you lay your eyes on any pieces of |
| 10 | paper during the meeting? |
| 11 A. | No. |
| 12 Q. | Prior to yesterday's meeting, I presume |
| 13 | you had some conversations with Mr. Meagher or some |
| 14 | other lawyers representing Jefferson-Pilot about |
| 15 | today's activities, right? |
| 16 | MR. MEAGHER: Objection to form. |
| 17 | You can answer. |
| 18 A. | I received a subpoena last week. |
| 19 Q. | Correct. That was from me. You |
| 20 | understand that? |
| 21 A. | From you, that's correct. |
| 22 Q. | Since receipt of the subpoena prior to |
| 23 | yesterday's meeting, did you have any phone |
| 24 | conversations with any lawyers for Jefferson-Pilot? |
| 25 A. | With Stephanie Farabow. |

7

| | |
|---|---|
| 1 | yesterday? |
| 2 A. | Yes. |
| 3 Q. | For how long? |
| 4 A. | Two to three hours. |
| 5 Q. | Did anybody else participate in that |
| 6 | meeting either personally or telephonically? |
| 7 A. | Yes. |
| 8 Q. | Who else participated? |
| 9 A. | Stephanie Farabow. |
| 10 Q. | Anyone else? |
| 11 A. | A lady in Cincinnati, Amy, and I'm not |
| 12 | sure of her last name. |
| 13 Q. | Gasser Callo sound familiar? |
| 14 A. | I don't recall. |
| 15 Q. | Was she a lawyer or was she a |
| 16 | nonlawyer? |
| 17 A. | Yes. |
| 18 Q. | Anyone else? |
| 19 A. | That was it. |
| 20 Q. | Where were you during this meeting? |
| 21 A. | I was with Mr. Meagher. |
| 22 Q. | And where was that? |
| 23 A. | At the Radisson. |
| 24 Q. | What time was the meeting? |
| 25 A. | 11:30. |

6

| | |
|---|---|
| 1 Q. | And I presume during that meeting you |
| 2 | discussed your availability today? |
| 3 A. | Yes. |
| 4 Q. | Right. That some lawyer would be |
| 5 | calling you who would be representing you, I guess, |
| 6 | right? |
| 7 A. | We discussed my availability for today. |
| 8 Q. | Does Stephanie Farabow represent you? |
| 9 A. | I'm sorry? |
| 10 Q. | Does Stephanie Farabow represent you? |
| 11 A. | Stephanie Farabow is a corporate |
| 12 | counsel. |
| 13 Q. | Does she represent you? |
| 14 | MR. MEAGHER: Objection as far as |
| 15 | it calls for a legal conclusion. You |
| 16 | can answer. |
| 17 A. | Mr. Meagher is representing me. |
| 18 Q. | What did Stephanie Farabow tell you |
| 19 | during that first call after you received the |
| 20 | subpoena? |
| 21 | MR. MEAGHER: I'm going to |
| 22 | object, attorney-client privilege, also |
| 23 | work product. I instruct you not to |
| 24 | answer. |
| 25 | MR. ROBERTS: Okay. We'll come |

8

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | back for another deposition in |
| 2 | Lexington for that question. |
| 3 | MR. MEAGHER: I don't think so, |
| 4 | Counsel, but we can agree to disagree. |
| 5 | MR. ROBERTS: You don't need to be |
| 6 | so strepitous. The gentleman has just |
| 7 | testified that she's not his lawyer. |
| 8 | You've been to law school. You know |
| 9 | that if she's not his lawyer, it's not |
| 10 | attorney-client privilege. You've |
| 11 | instructed him not to answer |
| 12 | improperly. We'll be back. |
| 13 | Q. So are you going to accept this |
| 14 | lawyer's instruction and not tell me anything about |
| 15 | what Ms. Farabow told you during that first call? Yes |
| 16 | or no. |
| 17 | A. Yes. |
| 18 | Q. Did you have any discussions with |
| 19 | Mr. Meagher prior to yesterday? |
| 20 | A. No. |
| 21 | Q. Did you receive any documents from |
| 22 | Mr. Meagher, Ms. Farabow or anybody else representing |
| 23 | Jefferson-Pilot since you received the subpoena? |
| 24 | A. No. |
| 25 | Q. Have you looked at any documents on |

9

| | |
|---|---|
| 1 | your own accord? |
| 2 | A. No. |
| 3 | Q. So you come here today not having |
| 4 | reviewed any documents regarding Chris Kearney or this |
| 5 | lawsuit other than the subpoena you received; is that |
| 6 | correct? |
| 7 | A. Could you repeat that, please? |
| 8 | Q. You come here today having not seen or |
| 9 | reviewed any documents relating to this lawsuit or |
| 10 | Chris Kearney other than the subpoena you received? |
| 11 | A. That's correct. |
| 12 | Q. Have you received any emails? |
| 13 | A. One. |
| 14 | Q. Who was the email from? |
| 15 | A. From Stephanie Farabow. |
| 16 | Q. Was there anything in the email other |
| 17 | than time, date, place of today's activities? |
| 18 | A. No. |
| 19 | Q. Did she attach anything to the email? |
| 20 | A. No. |
| 21 | Q. Do you still have that email? |
| 22 | A. I'm not sure if I do or not. |
| 23 | Q. During the course of yesterday's |
| 24 | meeting, were you reminded of facts from your |
| 25 | employment at Jefferson-Pilot? |

10

| | |
|---|---|
| 1 | MR. MEAGHER: I'm going to object |
| 2 | and instruct you not to answer as to |
| 3 | any conversations that you had with |
| 4 | counsel in yesterday's meeting. So I |
| 5 | instruct him not to answer. You're not |
| 6 | allowed to ask the content or the |
| 7 | method in which I discussed matters |
| 8 | with the witness. |
| 9 | Q. Were you reminded yesterday of any |
| 10 | facts relating to your employment at Jefferson-Pilot? |
| 11 | MR. MEAGHER: Again, I instruct |
| 12 | you not to answer for the same reasons |
| 13 | stated earlier. |
| 14 | MR. ROBERTS: Sure. |
| 15 | Q. When did you leave Jefferson-Pilot? |
| 16 | A. I believe it was May 1 of 2002 or |
| 17 | April 30, 2002. I didn't -- I haven't checked the |
| 18 | calendar. |
| 19 | Q. Were you actually working on that final |
| 20 | day, or was that like you left earlier but that was an |
| 21 | effective date? Do you know what I mean? |
| 22 | A. That was my last day at work, either |
| 23 | April 30 or May 1 of 2002. |
| 24 | Q. Were you in the office down in North |
| 25 | Carolina somewhere? |

11

| | |
|---|---|
| 1 | A. Yes. |
| 2 | Q. We're here in Lexington, Kentucky, |
| 3 | today. What caused you to relocate to Lexington? |
| 4 | A. This is my home. |
| 5 | Q. How long did you reside in North |
| 6 | Carolina with Jefferson-Pilot? |
| 7 | A. Approximately three years. |
| 8 | Q. Have you given deposition testimony at |
| 9 | all relating to your role at Jefferson-Pilot since |
| 10 | May 1 of 2002? |
| 11 | A. No. |
| 12 | Q. This is the first deposition since |
| 13 | May 1, 2002 -- |
| 14 | A. Yes. |
| 15 | Q. -- that you've been involved in? Is |
| 16 | this the only deposition you've been involved in since |
| 17 | May 1 of 2002? |
| 18 | A. Yes. |
| 19 | Q. I presume you've had some friends or |
| 20 | relationships with folks that you work with at |
| 21 | Jefferson-Pilot that you might stay in contact with? |
| 22 | A. Yes. |
| 23 | Q. Is Mr. Roberson somebody that you have |
| 24 | fairly regular communication with? |
| 25 | A. No. |

12

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1   Q.          Mr. Shelton?
2   A.               No.
3   Q.          When was the last time you had any
4   business contact with anyone at Jefferson-Pilot prior
5   to your receipt of a phone call from Stephanie
6   Farabow?
7   A.               I couldn't give you a date.
8   Q.          Several years or --
9   A.               It's been a few years, yes.
10  Q.          Do you own any stock in
11  Jefferson-Pilot?
12  A.               Do I own any stock; no.
13  Q.          Have you ever?
14  A.               I've had some small amount.
15  Q.          Was that as part of some employee
16  benefit plan?
17  A.               It was an option grant.
18  Q.          And you exercised the right to buy the
19  option --
20  A.               Yes.
21  Q.          -- exercise the option?  Have you since
22  disposed of all your ownership of Jefferson-Pilot?
23  A.               Yes.
24  Q.          Why was that?
25  A.               My last exercise was within the past

13

1   month.
2   Q.          Your last sale of any equity ownership
3   you had in Jefferson-Pilot occurred sometime in 2007?
4   A.               Yes.
5   Q.          As we sit here today in March of 2007,
6   you no longer own any stock --
7   A.               No, sir.
8   Q.          -- and no longer hold any right to
9   exercise any options?
10  A.               No.
11  Q.          I asked you a negative question.  You
12  gave me a negative answer.  I know what you meant, but
13  it's going to look funny on paper.
14              You don't presently sitting here today
15  in March of 2007 own stock or retain any right to
16  purchase any stock under any option?
17  A.               That's correct.
18  Q.          What is it that caused you to transact
19  that final sale of equity ownership of Jefferson-Pilot
20  that you did this year, 2007?
21  A.               I have a time limit -- I had a time
22  limit of when it could be exercised and I chose to
23  exercise it now.
24  Q.          Was that the final day -- were you
25  coming to the end of the opportunity to exercise?

14

1   A.               No.
2   Q.          Just a personal financial decision you
3   made?
4   A.               That's correct.
5   Q.          The time was right for you and you
6   exercised?
7   A.               That's correct.
8   Q.          What's your date of birth, sir?
9   A.               November 24, 1940.
10  Q.          Are you presently employed?
11  A.               No.
12  Q.          Are you retired?
13  A.               I'm retired, but I will do consulting
14  work when available.
15  Q.          Do you hold yourself out as a
16  consultant available for hire?
17  A.               Yes.
18  Q.          What is the nature of your consulting
19  business?
20  A.               Insurance consulting.
21  Q.          Have you actually had consulting
22  engagements?
23  A.               Yes.
24  Q.          How long have you served as a
25  consultant?

15

1   A.               In total since returning to Lexington
2   following retirement, somewhere in the 12-to-15-month
3   range.
4   Q.          Retirement in our society today is just
5   a vague term.  When you say retirement, as you just
6   did in that answer, you're referring to your departure
7   from Jefferson-Pilot in May of 2002?
8   A.               That's correct.
9   Q.          At the age of 62?
10  A.               That's correct.
11  Q.          And did you immediately return to the
12  Lexington, Kentucky, area?
13  A.               My home has always been in Lexington
14  during the period of time I was employed at
15  Jefferson-Pilot.
16  Q.          Understood.  And that period of time
17  was what?  What was the period of time you were
18  employed at Jefferson-Pilot?
19  A.               From June 1 of 1995 until 2002.
20  Q.          Did you have a wife and children back
21  in Kentucky while you were in North Carolina?
22  A.               Yes.
23  Q.          That's a difficult lifestyle.  I bet
24  you were happy to retire.
25  A.               Very difficult.

16

4 (13-16)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

**Page 17**

1  Q.  How many kids do you have?
2  A.  One.
3  Q.  Do you have grandchildren?
4  A.  One.
5  Q.  Are they both here in Kentucky?
6  A.  Yes.
7  Q.  Your service with Jefferson-Pilot, was
8  that as a consultant?
9  A.  No.
10 Q.  You were an actual employee,
11 withholdings, W-2, the whole rigmarole?
12 A.  Yes.
13 Q.  Employee benefit plan, stock options,
14 et cetera?
15 A.  Yes.
16 Q.  Prior to June of '95, who did you work
17 for?
18 A.  Kentucky Central Life Insurance
19 Company.
20 Q.  And how long did you work for them?
21 A.  From July of 1964 through May 31 of
22 two -- or 1995.
23 Q.  Do you have a college degree?
24 A.  Yes.
25 Q.  Is it colored blue, your diploma?  Did

**Page 18**

1  you graduate from the University of Kentucky, sir?
2  A.  No.
3  Q.  From where did you graduate college?
4  A.  Morehead State College, which is now
5  Morehead State University.
6  Q.  And during your employment with
7  Kentucky Central Life Insurance Company, were you at
8  all times employed in the state of Kentucky?
9  A.  Yes.
10 Q.  Did the Kentucky Central Life Insurance
11 Company have a disability insurance product that they
12 sold?
13 A.  They may have had.  I don't recall for
14 certain.
15 Q.  In what capacities did you serve
16 Kentucky Central Life Insurance Company?
17 A.  In several different positions over the
18 years, starting out as --
19 Q.  Thank you.  If you could bring me
20 through that chronologically, that would be nice.
21 A.  What I can remember, if I don't forget.
22 Q.  Right.
23 A.  Okay.  Started out as a correspondence
24 supervisor in policy owner service.
25 Q.  What does that mean?

**Page 19**

1  A.  Responsible for answering all inquiries
2  coming in from insureds' agents.
3  Q.  Correspondence supervisor, does that
4  mean that you would oversee letters that were
5  responding to folks --
6  A.  Yes.
7  Q.  -- that made inquiries?
8  A.  I'm sorry.  Say that again.
9  Q.  There was a cough.  Sorry.  Does that
10 mean you were overseeing other persons who were
11 sending out correspondence in response to inquiries?
12 A.  Yes, including handling correspondence
13 on my own.
14 Q.  What types of insurance products were
15 the concern of correspondents during that time frame,
16 if you can recall?
17 A.  It would have primarily been life
18 insurance products.
19 Q.  How long did you serve in that role?
20 A.  Approximately one year.
21 Q.  Then what?
22 A.  I transferred to life underwriting.
23 Q.  Were you an underwriter?
24 A.  Yes.
25 Q.  How long did you serve in that

**Page 20**

1  capacity?
2  A.  I was in that position for
3  approximately nine years.
4  Q.  Then what?
5  A.  I worked in agency administration for a
6  period of several months to a year.  I don't recall
7  the exact dates or times.
8  Q.  What kind of role did you play in
9  agency administration?
10 A.  Assisting our agency force with
11 anything they needed, you know, also handling
12 contracts on new agents that would be coming to
13 Kentucky Central, assisting them with any issues that
14 they may have regarding like following up on
15 applications for insurance.
16 Q.  Were the agents selling disability
17 insurance?
18 A.  No.
19 Q.  What was your next role?
20 A.  I'm not sure of the title it's been so
21 long, but administrative assistant.
22 Q.  What does that mean, an administrative
23 assistant?
24 A.  I was working with the administrative
25 vice president of our company and assisting him in any

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1  issues that he asked me to.
2  Q.          Anything related to disability
3  insurance?
4  A.                No.
5  Q.          How long did you serve in that role?
6  A.                Approximately one year.
7  Q.          Then what?
8  A.                I went into the claims area.
9  Q.          How long did you serve in the claims
10  area?
11  A.                From 1975 to approximately 1993.
12  Q.          What were your titles and roles in the
13  claims area?
14  A.                My first title was as claim manager,
15  and at some point was promoted to assistant vice
16  president and, again, at some point and I'm not sure
17  of the dates was promoted to vice president of claims.
18  Q.          And then your employment with Kentucky
19  Central terminated while you were vice president of
20  claims?
21  A.                No.
22  Q.          I'm sorry. When you left the claims
23  area in '93, you were vice president of claims?
24  A.                That's correct.
25                    MR. MEAGHER: Objection to form.

21

1  through the date of that transaction?
2  A.                That's correct.
3  Q.          And then after that transaction, you
4  became an employee of Jefferson-Pilot?
5  A.                I was employed by Jefferson-Pilot
6  effective June 1, 1995.
7  Q.          What was going on at the company while
8  you were assisting the deputy liquidator?
9                    MR. MEAGHER: Objection to form.
10                   You can answer.
11                   THE WITNESS: I'm sorry?
12                   MR. MEAGHER: I just objected to
13                   form. You can answer.
14  A.                Could you repeat that question?
15  Q.          What was going on at the company while
16  you were assisting the deputy liquidator?
17  A.                The company -- the state insurance
18  department had taken control of the company on
19  February -- in February of 1993, and I don't know how
20  to answer the rest of your question.
21  Q.          Do you have an understanding of why
22  that action took place?
23  A.                Not completely.
24  Q.          What's your limited understanding?
25  A.                The insurance department took over the

23

1          I'm sorry. Could you read back that
2          question, please.
3                    MR. ROBERTS: There's no question
4                    pending.
5                    MR. MEAGHER: Read back the last
6                    question, please.
7                    (Reporter read the question.)
8                    MR. ROBERTS: Can we proceed,
9                    Counsel?
10                   MR. MEAGHER: Yes.
11  Q.          What role did you serve after being
12  vice president of claims in the claims area?
13  A.                From 1993 through May of 1995, I don't
14  know how to explain what I did, but I worked with the
15  deputy liquidator of Kentucky Central on special
16  projects and handling the business affairs of Kentucky
17  Central.
18  Q.          Is Kentucky Central still in business?
19  A.                No, they are not.
20  Q.          Do you know when it was that they went
21  out of business?
22  A.                Jefferson-Pilot purchased the existing
23  block of business from Kentucky Central in liquidation
24  effective June 1, 1995.
25  Q.          And you worked for Kentucky Central up

22

1  company my understanding was primarily due to bad
2  mortgage loan issues.
3  Q.          In February 1993, was the company still
4  selling life insurance policies?
5  A.                They ceased selling at some point
6  around that time. I'm not certain of what the date
7  was.
8  Q.          At any point in time, was the company,
9  Kentucky Central, in the business of selling
10  disability insurance?
11  A.                If they were, it would have been very,
12  very limited. I'm not absolutely sure.
13  Q.          Do you, sitting here today, have any
14  personal recall or knowledge that they did?
15  A.                I don't recall.
16  Q.          Would it be fair to conclude that you
17  didn't have any responsibility for disability
18  insurance products even if they were sold?
19  A.                Not that I recall.
20  Q.          Did you, prior to '95, have any working
21  knowledge of the disability insurance industry
22  specifically that you can recall?
23  A.                No.
24  Q.          Since May of 2002, have any of your
25  consulting engagements concerned disability insurance?

24

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

---

1  A.    No.
2  Q.    Have you had repeat clients come to you
3  for this consulting service since 2002?
4  A.    No.
5  Q.    What is the makeup of your client base
6  in a consulting role?
7  A.    I had a consulting agreement with
8  Nationwide Claims Investigations, with MIB.
9  Q.    What's MIB?
10  A.    Well, it's called Medical Information
11  Bureau.  I did some survey work for MIB.
12  Q.    What does that mean, survey work?
13  A.    I did a survey of the life insurance
14  industry.
15  Q.    Meaning what?
16  A.    Seeing what interest they may -- the
17  industry may have in a new product that MIB was
18  proposing.
19  Q.    When I said what makes up your client
20  base, I was speaking more generally.  I mean, do you
21  get hired by lawyers for matters or do you get hired
22  by insurance companies, third-party administrators?
23  What makes up your client base?
24  A.    It's not insurance companies.  I
25  wouldn't call them third-party administrators.

25

---

1  Q.    Can you share with me a few other
2  specifics other than the two you identified?
3  A.    Okay.  IBU, Incorporated, out of --
4  Q.    IBU, love that name.
5  A.    -- out of -- I did telephone interview
6  work on life insurance applications for them.  And
7  Swiss Re, I did claim audit work for them on life
8  claims.
9  Q.    Does Swiss Re have any business
10  association or relationship to Lincoln National or
11  Jefferson-Pilot as far as you know?
12  A.    I have no idea.
13  Q.    They're a reinsurer and you did some
14  work evaluating policies or claims or departments
15  where they --
16  A.    Life claim audit work for them.
17  Q.    What does that entail?  I mean, is
18  there generally disputes about whether someone is dead
19  or alive in a life claim analysis?
20  A.    You want to determine if they have the
21  proper documentation in their files that a death did
22  occur.
23  Q.    Death certificate, affidavit?
24  A.    Correct.
25  Q.    So that's the nature of the audit work?

26

---

1  A.    That's the type of thing that you would
2  look at.  Also, if there was interest that was paid on
3  the claim, was it paid in according to the state
4  statute.
5  Q.    You have to pay interest from date of
6  death on the --
7  A.    Depends on the state law or state
8  regulations.
9  Q.    Do you do fraud investigations about
10  whether someone lied about being a smoker or not a
11  smoker on their application if it's within two years?
12  A.    That wasn't a part of the audit work I
13  did.
14  Q.    Do you do fraud investigations about
15  suicide or things of that nature that might disqualify
16  someone from receiving benefits?
17  A.    No.  All we did was to look at the
18  completed claim file to see if it was in compliance.
19  Q.    What else has made up your retirement
20  consulting business?
21  A.    That's been it primarily.
22  Q.    Do you advertise on the internet?
23  A.    No, I do not.
24  Q.    Do you have a web site?
25  A.    No, I do not.

27

---

1  Q.    It's just word of mouth, referrals,
2  people you know in the industry that might send you
3  work from time to time?
4  A.    Contacts that I would have in the
5  industry.
6        MR. ROBERTS:  Why don't we take a
7  break for a few moments.
8        (A break was taken.)
9  Q.    Mr. Honaker, have you had any
10  consulting engagements with Jefferson-Pilot since May
11  of 2002?
12  A.    No.
13  Q.    How about DMS?
14  A.    No.
15  Q.    Employers Reinsurance?
16  A.    No.
17  Q.    Do you know what Employers Reinsurance
18  is, the company?
19  A.    I'm familiar with the name.
20  Q.    Have you had any contact with anybody
21  about Mr. Kearney between the date of your departure
22  from Jefferson-Pilot and the end of 2006?
23  A.    No.
24  Q.    So through some nature of a
25  transaction, Jefferson-Pilot purchased the Kentucky

28

---

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    Central business, the policies that were in force?
2    A.          That's correct.
3    Q.          Which definitely included life
4    insurance policies and may or may not have included
5    some disability insurance?
6                   MR. MEAGHER:  Objection to form.
7    A.          They purchased the life and annuity
8    business of Kentucky Central.
9    Q.          And were required to administer that
10   business going forward?
11   A.          Yes.
12   Q.          How many employees were there of
13   Kentucky Central in the 1990 time frame?
14   A.          I couldn't give you an exact figure;
15   approximately eight to 900.
16   Q.          How many employees of Kentucky Central
17   became later employed by Jefferson-Pilot?
18   A.          Again approximately 140.
19   Q.          What percentage of those folks would
20   have been sales folks, if any?
21   A.          None of those 140 would have been in
22   sales.
23   Q.          They all would have been administrative
24   or managerial folks for the life and annuity business?
25   A.          For the in force block of business,

                                                                29

1    Kentucky.  I had an apartment in Greensboro and I
2    commuted home on weekends.
3    Q.          Before '99 or only after '99?
4    A.          No, after '99.
5    Q.          So from '95 to '99, did you work at a
6    facility here in Central Kentucky?
7    A.          That's correct.
8    Q.          So your office for Jefferson-Pilot
9    resided in North Carolina only from '99 through 2002?
10   A.          That's correct.
11   Q.          What caused that change?
12   A.          I'm not sure --
13   Q.          Why is it that you were no longer
14   working in Central Kentucky for Jefferson-Pilot after
15   1999 -- or 1999 and after?
16   A.          I moved from site manager of the
17   Lexington operation to the claims area in Greensboro,
18   so my duties changed.
19   Q.          Can you state your name for the record,
20   A.          Clyde Honaker, Jr.
21   Q.          Where do you live, sir?
22   A.          3505 Doral Place, Lexington, Kentucky
23   40509.
24   Q.          And you, sir, worked as a vice
25   president of claims at Jefferson-Pilot at some point

                                                                31

1    they would have been in the administration area.
2    Q.          Were all of those people --
3    A.          Support services.
4    Q.          Were all of those people required to
5    relocate to North Carolina?
6    A.          No.
7    Q.          Were all those people required to not
8    relocate but work in North Carolina, as you did?
9    A.          No.  Those folks worked -- those
10   employees worked here in Lexington.
11   Q.          How many people, like you, accepted
12   assignments to continue on with Jefferson-Pilot and
13   were required to work out of the North Carolina
14   location?
15   A.          I can't give you an exact number.
16   Approximately 15 later transferred to North Carolina
17   from Lexington.
18   Q.          Why was it you couldn't perform your
19   function here in Central Kentucky?
20   A.          I was a site manager for the
21   Jefferson-Pilot operation here in Lexington until I
22   moved to Greensboro in 1999.
23   Q.          I thought you told me you stayed in
24   Kentucky through 2002 as your home.
25   A.          My home has always remained here in

                                                                30

1    in your past?
2    A.          Yes.
3    Q.          I think you've told me previously that
4    your employment with Jefferson-Pilot began in 1995; is
5    that right?
6    A.          That's correct.
7    Q.          And that's --
8                   MS. FARABOW:  Mr. Honaker, can you
9                   keep your voice up, please?
10                  THE WITNESS:  I sure will.
11                  MS. FARABOW:  Thank you.
12   Q.          And the occasion for you to become
13   employed by Jefferson-Pilot resulted from
14   Jefferson-Pilot purchasing the business of your former
15   employer, Kentucky Central?
16                  MR. MEAGHER:  Objection, asked and
17                  answered.  You may answer again.
18   A.          That's correct.
19   Q.          Kentucky Central's business had been
20   taken over by the state due to some -- for some reason
21   and it went out of business?
22   A.          That's correct.
23                  MR. MEAGHER:  Objection, asked and
24                  answered.  You can answer.
25   A.          That's correct.

                                                                32

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | Q.          At the time that Kentucky Central |
| 2 | stopped selling life insurance policies, you were the |
| 3 | vice president of claims? |
| 4 | A.          Yes, sir. That's -- I need to change |
| 5 | that. That is not correct. I was vice president of |
| 6 | claims till sometime in 1993. |
| 7 | Q.          And then you became an assistant to |
| 8 | someone who was helping with the liquidation of the |
| 9 | business? |
| 10 | A.          I worked with that individual, yes. |
| 11 | Q.          Until ultimately the Jefferson-Pilot |
| 12 | transaction occurred and you moved over to |
| 13 | Jefferson-Pilot? |
| 14 | A.          That's correct. |
| 15 | Q.          What was your role with Jefferson-Pilot |
| 16 | beginning in June of '95? |
| 17 | A.          I was the site manager for the |
| 18 | Lexington operation. |
| 19 | Q.          What does that mean, site manager? |
| 20 | What were your roles? What was your responsibility? |
| 21 | A.          I had overall responsibility for |
| 22 | administering the block of business that was |
| 23 | assumed -- or that was purchased by Jefferson-Pilot |
| 24 | from Kentucky Central in liquidation. |
| 25 | Q.          How long did you serve in that |

33

| | |
|---|---|
| 1 | additional duties he may have had. |
| 2 | Q.          From June of '95 to April of 1999, did |
| 3 | you have any responsibilities with regard to |
| 4 | disability insurance? |
| 5 | A.          None. |
| 6 | Q.          Did you at any point in time, as far as |
| 7 | you know, ever interact with any disability insurance |
| 8 | policyholders? |
| 9 | A.          No. |
| 10 | Q.          Did you have any interaction with |
| 11 | anybody at Jefferson-Pilot responsible for disability |
| 12 | insurance? |
| 13 |               MR. MEAGHER:  You're talking the |
| 14 |               same period of time as your earlier |
| 15 |               question? |
| 16 |               MR. ROBERTS:  That's right. |
| 17 | A.          Repeat the question. |
| 18 | Q.          Did you have any interaction from 1995 |
| 19 | through April '99 with anyone at Jefferson-Pilot whose |
| 20 | role did concern disability insurance? |
| 21 | A.          Not to my knowledge. |
| 22 | Q.          I mentioned earlier to you an entity by |
| 23 | the name of Employers Reinsurance out of Missouri or |
| 24 | Kansas or somewhere. Are you familiar with that |
| 25 | company? |

35

| | |
|---|---|
| 1 | capacity? |
| 2 | A.          Until I moved to Greensboro -- until I |
| 3 | transferred to Greensboro, excuse me, in 1999. |
| 4 | Q.          What month of '99? |
| 5 | A.          I believe it was in April. |
| 6 | Q.          So do I understand correctly that you |
| 7 | were essentially the senior manager located here in |
| 8 | Kentucky from '95 to April '99 for the Jefferson-Pilot |
| 9 | operations that remained here? |
| 10 | A.          That's correct. |
| 11 | Q.          And you reported to somebody who would |
| 12 | have been located in North Carolina with |
| 13 | Jefferson-Pilot? |
| 14 | A.          That's correct. |
| 15 | Q.          Who was that that you reported to |
| 16 | during that period? |
| 17 | A.          Lin Ingram. |
| 18 | Q.          What was her role? |
| 19 | A.          That's -- |
| 20 | Q.          Or his role. |
| 21 | A.          His role. He was vice president of -- |
| 22 | I'm not exactly sure of his title, but he had |
| 23 | responsibility for our operation in Lexington along |
| 24 | with the client services area in Greensboro, North |
| 25 | Carolina, and I'm -- I have no knowledge of what |

34

| | |
|---|---|
| 1 | A.          I'm familiar with the company, yes. |
| 2 | Q.          When did you become familiar with that |
| 3 | company? |
| 4 | A.          I have no idea when I would have first |
| 5 | learned of Employers Reinsurance, as they have been in |
| 6 | the reinsurance market for years. |
| 7 | Q.          So you think maybe predating your |
| 8 | employment at Jefferson-Pilot? |
| 9 | A.          Possibly. |
| 10 | Q.          Did you ever have any interaction with |
| 11 | anyone associated with Employers Reinsurance during |
| 12 | your employment at Jefferson-Pilot? |
| 13 | A.          While in Lexington, no. |
| 14 | Q.          How about after Lexington? |
| 15 | A.          Yes. |
| 16 | Q.          What was nature of your interaction |
| 17 | with folk at Employers Reinsurance? |
| 18 | A.          They were the reinsurer on the |
| 19 | disability insurance block along with -- I'm sure they |
| 20 | were a reinsurer on some of the life business. |
| 21 | Q.          Are you speculating about the life |
| 22 | business? |
| 23 | A.          I'm not absolutely certain. |
| 24 | Q.          You know about the disability because |
| 25 | you interacted with Employers Reinsurance with regard |

36

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

---

**Page 37**

1  to disability insurance; is that correct?
2  A.        Yes.
3  Q.        What was the nature and scope of your
4  interactions with Employers Reinsurance as it related
5  to disability policies of Jefferson-Pilot after April
6  of 1999?
7  A.        I'm not sure that I understand your
8  question.
9              MR. ROBERTS: I'll have the
10             question read it back to you, sir.
11             (Reporter read the question.)
12  A.        I can't give you any specifics of
13  anything that we -- you know. that I would have worked
14  with them on, but they were the disability reinsurer.
15  Q.        Sir, within the past 48 hours, have you
16  discussed with anybody your interaction with Employers
17  Reinsurance as it relates to an administrative
18  services agreement that was entered between
19  Jefferson-Pilot and Disability Management Services?
20             MR. MEAGHER: To the extent you
21             had any discussions with counsel, I
22             would instruct you not to answer that
23             question, but you can answer that
24             question as to anyone other than
25             counsel.

---

**Page 39**

1  A.        I was the senior claims officer for
2  Jefferson-Pilot.
3  Q.        What was your title, sir, when you
4  relocated or at least purchased an apartment in North
5  Carolina and moved to the operations in North
6  Carolina. What title did you assume?
7  A.        I rented an apartment in North
8  Carolina. My title was vice president of claims.
9  Q.        And what types of claims fell under
10  your supervision?
11  A.        The life claims, disability claims.
12  Q.        In April 1999, was that your first time
13  in your professional career where you had
14  responsibility for disability claims?
15  A.        As far as I can recall, yes.
16  Q.        Did you have any training. education,
17  experience, anything to help assist you in
18  understanding the disability insurance claim field
19  prior to April '99?
20  A.        I took, excuse me, professional claims
21  education course work.
22  Q.        With respect to disability insurance
23  specifically?
24  A.        For all claims.
25  Q.        Throughout your career?

---

**Page 38**

1  Q.        Sir?
2  A.        No.
3  Q.        Did you, sir, have any interaction with
4  Employers Reinsurance as it relates to an
5  administrative services agreement that Jefferson-Pilot
6  entered with Disability Management Services?
7  A.        Repeat that question, please.
8              MR. ROBERTS: Could you read it
9              back to the witness, please. Thank
10             you.
11             (Reporter read the question.)
12  A.        I don't recall.
13  Q.        The agreement's actually called a
14  claims assessment agreement and it's between
15  Jefferson-Pilot and Disability Management Services and
16  you purportedly executed it in December of 1999 on
17  behalf of Jefferson-Pilot. Does any of that ring a
18  bell?
19  A.        I recall that we did have an agreement
20  with Disability Management Services.
21  Q.        Do you recall that you signed the
22  agreement in your capacity at Jefferson-Pilot on its
23  behalf?
24  A.        I believe that I did.
25  Q.        What was your role at that time?

---

**Page 40**

1  A.        Yes.
2  Q.        And from time to time you might attend
3  some conference or continuing education program and
4  they might talk about disability insurance?
5  A.        That's correct.
6  Q.        Was your title senior claims officer?
7  A.        No. It was vice president claims.
8  Q.        And who did you report to during that
9  1999 time?
10  A.        Charles Cornelio.
11  Q.        Who is Charles Cornelio?
12  A.        He's a senior vice president, or he was
13  at that time.
14  Q.        And who did Mr. Cornelio report to?
15  A.        I'm not certain what his reporting
16  relationship would have been.
17  Q.        But you were the senior officer
18  responsible for disability claims beginning in
19  April 1999 going forward to May of '02?
20  A.        Life and disability claims.
21  Q.        Correct, the senior officer
22  responsibility for disability claims --
23  A.        Yes.
24  Q.        -- from April of '99 through May of
25  '02?

---

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

---

1    A.        Yes.

2    Q.        And it was under your watch that

3    Jefferson-Pilot entered a claims assessment agreement

4    with Disability Management Services, correct?

5    A.        That's correct.

6    Q.        When you accepted the responsibility to

7    be the senior officer of claims at Jefferson-Pilot,

8    did you undertake any personal effort to try to

9    understand the disability insurance market and what it

10   was like at that point in time generally?

11   A.        My primary emphasis was in the life

12   claims area because that was the -- well, that was my

13   primary emphasis, was on the life claims area and...

14             MR. ROBERTS: Could you read back

15             my question.

16             (Reporter read the question.)

17   A.        I was aware that we had disability.

18   Q.        It's just a yes or no question.

19             MR. MEAGHER: Excuse me. Do not

20             interrupt the witness. You can always

21             ask another one. Finish your answer,

22             please.

23             MR. ROBERTS: Go ahead. Go ahead.

24   A.        I was aware that we had disability

25   income claims in the area at the time that I went to

41

---

1    Greensboro.

2    Q.        Is that your full answer? I don't want

3    to interrupt you.

4    A.        Yes.

5    Q.        My question was, did you do anything to

6    familiarize yourself with the disability insurance

7    market generally when, at the age of 59, you, in your

8    first time in your professional career, became

9    responsible for disability insurance?

10   A.        I don't recall having done anything.

11   Q.        So having worked in the insurance field

12   for 24 years without, according to your sworn

13   testimony, any responsibility for disability

14   insurance, you then become the vice president of

15   disability insurance claims, the senior executive

16   officer, and your sworn testimony is you didn't make

17   any effort to attempt to come to an understanding of

18   the disability insurance market generally?

19             MR. MEAGHER: Objection to the

20             form, argumentative, misstates prior

21             testimony and -- there was one other

22             thing -- oh, assumes facts not in

23             evidence. You can answer.

24             THE WITNESS: Repeat the question.

25             I'm sorry.

42

---

1             (Reporter read the question.)

2             MR. MEAGHER: Excuse me. I'm

3             going to repeat my objections and also

4             add asked and answered. You can

5             answer.

6             MR. ROBERTS: Go ahead.

7    A.        This was a closed block of business

8    that Jefferson-Pilot no longer wrote and, again, my

9    emphasis was on the life insurance side of the

10   business.

11   Q.        I'm going to try one more time. Did

12   you make any effort to educate yourself on the status

13   of the disability insurance market generally? Yes or

14   no.

15             MR. MEAGHER: Objection, asked and

16             answered. You can answer.

17   A.        I don't recall.

18   Q.        Did you make any effort to educate

19   yourself on the status of the disability insurance

20   business that Jefferson-Pilot had in place at that

21   point in time?

22   A.        I don't recall anything specifically

23   that I did.

24   Q.        Your familiarity professionally was

25   life insurance and that, I think you've testified,

43

---

1    remained your focus from April '99 forward, correct?

2    A.        That was the primary focus.

3    Q.        Your responsibility as the senior

4    officer of disability insurance was a tag along?

5             MR. MEAGHER: Objection to form.

6    Q.        Correct?

7    A.        The disability insurance market was a

8    closed -- this was a closed block of business that

9    Jefferson-Pilot no longer wrote and, again, my primary

10   emphasis and most of my time was spent on the life

11   insurance side of the business.

12   Q.        So do I understand your testimony

13   correctly that the responsibilities you had for -- as

14   a senior executive officer for disability insurance

15   claims was really a minor portion of your overall job

16   which you viewed principally to be a life insurance

17   role? Correct?

18   A.        That's correct.

19   Q.        So you didn't spend, as far as you can

20   recall, great effort attempting to educate yourself on

21   the status of the disability insurance market

22   generally or even as it stood specifically at

23   Jefferson-Pilot; is that correct?

24   A.        That was what I had the claim staff --

25   I had a claim staff in place that handled the claims

44

---

11 (41-44)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | on the disability side. |
| 2 | Q.          Who reported to you in 1999? |
| 3 | A.          I'm not sure I understand. |
| 4 | Q.          Do you recall the names of people who |
| 5 | reported to you between April of '99 and December of |
| 6 | '99? |
| 7 | A.          Paul Swink, Lydia Tart were two of the |
| 8 | claim managers that reported directly to me, and I'm |
| 9 | not sure beyond that if there were others. |
| 10 | Q.          Was there a New Hampshire or Vermont |
| 11 | located operation that had some reporting up |
| 12 | responsibility to you? |
| 13 | A.          Yes. |
| 14 | Q.          Who was the person who ran that outfit |
| 15 | that reported to you? |
| 16 | A.          Cynthia Croft and Jane Neidermeyer. |
| 17 | Q.          Did I get it correct; was it Vermont |
| 18 | and/or New Hampshire? |
| 19 | A.          It's Concord, New Hampshire. |
| 20 | Q.          Was the functions of the people who |
| 21 | worked in that office different than the functions of |
| 22 | the claim people that worked in the North Carolina |
| 23 | office and, if so, how? |
| 24 | A.          Not that I recall. |
| 25 | Q.          Was that New Hampshire office the |

45

| | |
|---|---|
| 1 | to stop selling that particular product; is that |
| 2 | right? |
| 3 | A.          They stopped selling that product at |
| 4 | some point. |
| 5 | Q.          Do you know when? |
| 6 | A.          I have no idea. |
| 7 | Q.          Were you ever advised of the business |
| 8 | reasons for making that decision? |
| 9 | A.          No, I was not. |
| 10 | Q.          Were you ever told because it was not |
| 11 | profitable? |
| 12 | A.          No, I was not. |
| 13 | Q.          Were you ever told that there was a |
| 14 | problem with claims being made and the business being |
| 15 | unprofitable? |
| 16 | A.          No, I was not. |
| 17 | Q.          Nothing to that effect? |
| 18 | A.          Not that I recall. |
| 19 | Q.          You didn't inquire as to why they would |
| 20 | close the block of business? |
| 21 | A.          No, I did not. |
| 22 | Q.          Did you yourself come to some |
| 23 | conclusions about why that might have been the case? |
| 24 | A.          No. |
| 25 | Q.          You just accepted the fact that it was |

47

| | |
|---|---|
| 1 | result of a different acquisition that Jefferson-Pilot |
| 2 | made in its past? |
| 3 | A.          That's correct. |
| 4 | Q.          What company was that that they |
| 5 | acquired? |
| 6 | A.          I believe it was Chubb Life Insurance |
| 7 | Company. |
| 8 | Q.          Has Jefferson-Pilot been acquired, as |
| 9 | we sit here today, or merged with any other entity as |
| 10 | far as you know? |
| 11 | A.          They are now a part, as I understand |
| 12 | it, of Lincoln National Life Insurance Company.  There |
| 13 | was one other direct reporting responsibility or a |
| 14 | person that directly reported to me and that was a |
| 15 | lady by the name of Judy Sharp here in the Lexington |
| 16 | office. |
| 17 | Q.          Thank you for recalling that, though. |
| 18 | You used the word closed block of business.  What does |
| 19 | that mean? |
| 20 | A.          They were no longer actively writing |
| 21 | that type of insurance. |
| 22 | Q.          I asked you generally and you answered |
| 23 | specifically.  When you say Jefferson-Pilot had this |
| 24 | closed block of disability insurance, you're saying |
| 25 | that they had, by April 1999, made a business decision |

46

| | |
|---|---|
| 1 | closed and they were now your responsibility? |
| 2 | MR. MEAGHER:  Objection to form. |
| 3 | A.          I knew that they had -- that they no |
| 4 | longer sold that type of business. |
| 5 | Q.          And you made no inquiry into why that |
| 6 | might be? |
| 7 | A.          No. |
| 8 | MR. MEAGHER:  Objection, asked |
| 9 | and answered. |
| 10 | Q.          And no one told you -- |
| 11 | MR. MEAGHER:  Please wait for me |
| 12 | to have a chance to object. |
| 13 | THE WITNESS:  I'm sorry. |
| 14 | MR. MEAGHER:  That's okay. |
| 15 | Q.          And no one told you why that might be? |
| 16 | A.          Not that I recall. |
| 17 | Q.          Did you receive any reports -- excuse |
| 18 | me.  Who was in your role before you in your vice |
| 19 | president of claims role? |
| 20 | A.          I'm not sure. |
| 21 | Q.          You don't know who you succeeded? |
| 22 | A.          I don't know. |
| 23 | Q.          Did you succeed anybody? |
| 24 | A.          I'm not sure of that. |
| 25 | Q.          When you relocated to North Carolina, |

48

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

---

1    were there files or boxes of information relating to
2    disability insurance claims of the company that was in
3    the office that you inherited?
4    A.        Not that I recall.
5    Q.        Did there come to be in the office that
6    you inherited memoranda, documents that commented on
7    the disability insurance business that the company had
8    been selling?
9    A.        Not that I recall.
10   Q.        If I ask you a whole bunch of
11   questions, would the answer always be I don't recall
12   on the line of what you know or didn't know, what did
13   you come to learn about the company's disability
14   insurance business?
15                 MR. MEAGHER: Objection to form,
16                 speculation.
17   Q.        Sir?
18   A.        I don't know how -- I don't know what
19   questions you'll ask.
20   Q.        Did you ever come to a point in your
21   employment at Jefferson-Pilot where you gained
22   knowledge of the company's history in the disability
23   insurance line of business?
24   A.        I knew that they exited the market at
25   some point.

49

---

1    Q.        You've told me that. What else?
2    A.        And other than that, I don't -- I don't
3    recall any background.
4    Q.        As the senior executive responsible for
5    disability insurance claims beginning in April of 1999
6    and continuing for three years, your testimony under
7    oath is that at no point in time during that period
8    did you ever become familiar with the business reasons
9    that the company had decided to stop selling
10   disability insurance; is that correct?
11                 MR. MEAGHER: Objection, asked and
12                 answered, argumentative. You can
13                 answer.
14   A.        Not that I recall.
15   Q.        And you don't recall making any
16   specific effort to gain that knowledge, correct?
17                 MR. MEAGHER: Objection, asked
18                 and answered several times. You can
19                 answer it yet again.
20   A.        That's correct.
21   Q.        How many hours a week do you think you
22   spent on disability insurance claims in that 1999
23   period versus doing other things in your role as
24   senior executive officer of claims?
25                 MR. MEAGHER: Objection to form,

50

---

1                 assumes facts not in evidence. You can
2                 answer.
3    A.        I have no idea.
4    Q.        Was it more or less than 50 percent on
5    average?
6    A.        Again, as I've stated previously, my
7    primary emphasis was on the life side.
8    Q.        Fair enough. Prior to you signing this
9    claims assessment agreement, there must have been some
10   type of negotiation between the two parties that
11   entered the contract, right?
12                 MR. MEAGHER: Objection, assumes
13                 facts not in evidence. You can answer.
14                 MR. ROBERTS: Go ahead.
15   A.        Repeat the question.
16   Q.        Do you have any knowledge of any
17   discussion about a claims assessment agreement before
18   you signed it on behalf of the company?
19   A.        I'm sure that I reviewed the agreement
20   before signing it.
21   Q.        Do you have any knowledge of that
22   endeavor by you, if you did make that endeavor?
23                 MR. MEAGHER: Objection to form.
24   Q.        Sir?
25   A.        Say it again. Say it again.

51

---

1    Q.        You and I agree that you did sign a
2    claims assessment agreement on behalf of
3    Jefferson-Pilot in your role as senior executive
4    officer of the claims department in December of '99,
5    right?
6    A.        I believe I did, but I haven't seen the
7    document.
8    Q.        Why do you believe you did?
9    A.        You had indicated earlier in the -- in
10   this deposition about the agreement.
11   Q.        Forget about what I indicate. Sitting
12   here today --
13   A.        I believe I signed an agreement with
14   DMS at some point. The time or the date I'm not -- I
15   have no idea.
16   Q.        Tell me everything you can recall about
17   that agreement that led to your execution of it.
18   A.        We -- when I say we, I discussed with
19   multiple vendors the process of entering into an
20   agreement for them to handle our disability claims.
21   Q.        Okay.
22   A.        And after reviewing information or
23   discussion -- discussing with the vendors the
24   possibility of doing this, I made a decision to enter
25   into the agreement with DMS.

52

---

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1   Q.        What else?

2   A.            I don't know.

3   Q.        I asked you to tell me everything you

4   can recall leading up to that agreement.

5   A.            I believe that I signed the agreement

6   at some point in time -- I'm not sure of the date --

7   for DMS to handle our disability -- to handle

8   disability claims for us, for Jefferson-Pilot.

9   Q.        What else?

10  A.            I can't think of anything else at this

11  point.

12  Q.        Let's try to break that down.  Was it

13  your decision to begin the process of looking for

14  vendors to do this work?

15  A.            As I recall, yes.

16  Q.        Tell me what led you to make that

17  decision.

18  A.            Finding experienced examiners in the

19  Greensboro area was very difficult and I was looking

20  to find a vendor that could assist us in handling our

21  claims.

22  Q.        Why were you in the market -- you say

23  it was your decision to start looking for vendors.

24  Why were you in the market to find a vendor to perform

25  this function?

53

1               MR. MEAGHER:  Objection, asked

2           and answered.

3               MR. ROBERTS:  Go ahead.

4   A.        To assist us in handling the claims.

5   Q.        Why did you judge that the company

6   needed that assistance?

7   A.        Based on the volume of claims that we

8   had and the staff that we had to handle those claims.

9   Q.        So this effort was to supplement what

10  you had at Jefferson-Pilot or to replace?

11  A.        It was to replace.

12  Q.        The persons that were handling the

13  claims, Mr. Roberson, Mr. Shelton, some other folks,

14  had been performing this function, correct?

15              MR. MEAGHER:  Objection to form.

16  A.        Not while I was there as I recall.

17  Q.        When you were there in Greensboro, was

18  there anybody in the employment of Jefferson-Pilot

19  there in North Carolina that was managing or

20  administrating disability claims?

21  A.        Yes.

22  Q.        And you made a decision to take that

23  responsibility from those people and contract that out

24  to a vendor, correct?

25  A.        Correct.

54

1   Q.        What led you to make that decision?

2               MR. MEAGHER:  Objection, asked

3           and answered.

4   A.        Based on volume of claims and the staff

5   that we had to handle those claims in Greensboro.

6   Q.        So you came in to this job April 1999

7   not knowing anything about the business generally or

8   the disability business within Jefferson-Pilot and you

9   went about the process of performing an assessment of

10  whether the existing staff was adequate to handle the

11  volume of disability claims; is that your testimony?

12              MR. MEAGHER:  Objection,

13          misstates prior testimony, also assumes

14          facts not in evidence.  You may answer.

15  A.        That's correct.

16  Q.        What did you do to make that

17  assessment?  Did you go around and interview the

18  respective claim persons?

19  A.        At this time, I don't recall

20  specifically what I -- what I did.

21  Q.        Did you delegate that responsibility to

22  someone beneath you to come back and report about

23  whether that function should be farmed out or kept

24  in-house?

25  A.        I don't recall.

55

1   Q.        Do you recall anything about what

2   happened to, according to your sworn testimony, lead

3   you to conclude in your judgment that that duty should

4   be farmed out?

5               MR. MEAGHER:  Objection, asked

6           and answered.

7   A.        Again, based on the volume of claims

8   that we had and the staff that was available.

9   Q.        How did you come to understand, A, the

10  volume of claims and, B, what was required to

11  administer that volume given the fact that you had no

12  background whatsoever in disability insurance?

13  A.        I contacted other people in the

14  industry to get their assessment on what the number of

15  claims that an individual examiner could handle and

16  looked at that based on the volume of claims that we

17  had in our company.

18  Q.        Who did you contact?

19  A.        I knew you were going to ask that.  I

20  don't remember the companies, but there were several.

21  I made several contacts in the industry.

22  Q.        So this would have been May, June of

23  '94?

24  A.        No.

25  Q.        Excuse me, '99.

56

14  (53-56)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    A.        I'm not sure of the time frame on it.
2    Q.        Was it one of the first things you did
3    when you took this responsibility in April of '99?
4    A.        That I don't recall.
5    Q.        You don't recall who you spoke to?
6    A.        That's correct.
7    Q.        You don't recall who you spoke to
8    within the company about this particular endeavor?
9                MR. MEAGHER: Objection, asked and
10               answered.
11   Q.        Right?
12   A.        We had our -- I'm sure there were
13   discussions with my existing claims staff.
14   Q.        Was there already underway at the time
15   you became the senior officer for disability claims --
16               MR. MEAGHER: Go off the record a
17               second.
18               (A break was taken.)
19               MR. MEAGHER: Ms. Farabow is
20               departing the deposition at this time.
21   Q.        You're sill under oath. You realize
22   that?
23   A.        Yes.
24   Q.        What was the ratio of claims that you
25   came to assess somehow, some way? How many claims

57

1    were there per claims examiner?
2    A.        I don't recall the number, but in
3    contacting --
4                MR. ROBERTS: Move to strike for
5                hearsay, but go ahead.
6    A.        -- contacting other people in the
7    industry, I came to understand that the average
8    workload per examiner should range between 75 and 125
9    open claims.
10   Q.        So you don't recall much of anything
11   about what you came to know, learned, investigated or
12   were educated about disability insurance, but now you
13   can tell me specifically to the number of claims how
14   many claims a claim examiner should have in a
15   disability insurance department; is that right?
16               MR. MEAGHER: Objection to form,
17               argumentative, misstates prior
18               testimony, assumes facts not in
19               evidence. You can answer.
20   A.        I recall --
21               MR. MEAGHER: Oh, I'm sorry.
22               Asked and answered, too.
23               MR. ROBERTS: Wait. Let's give
24               Mr. Meagher some more time. Are you
25               concluded?

58

1                MR. MEAGHER: That's fine. I'm
2                done.
3    A.        I recall those numbers, yes.
4    Q.        So the one piece of information that
5    you do recall about disability insurance from 1999 is
6    that number, right?
7    A.        I recall that number.
8    Q.        What was the ratio inside
9    Jefferson-Pilot?
10               MR. MEAGHER: Objection, asked
11               and answered. You can answer.
12   A.        I don't recall the number, but it was
13   in excess of that number.
14   Q.        Do you know that you -- the agreement
15   requires that you pay a certain flat fee or some money
16   to DMS to perform the function?
17   A.        Yes.
18   Q.        Why didn't you just hire more employees
19   at Jefferson-Pilot to spread the workload allegedly?
20               MR. MEAGHER: Objection to form.
21   A.        Repeat that. I don't understand your
22   question.
23   Q.        Well, let's assume that there was a
24   concern about these claim examiners being overworked.
25   Just assume that as a fact. Why did you not just add

59

1    more people to the department?
2    A.        The availability of -- there was not
3    the availability of experienced disability income
4    examiners in the Greensboro area.
5    Q.        Why did you take the responsibility
6    from those persons there at Jefferson-Pilot?
7                MR. MEAGHER: Objection, asked and
8                answered.
9    A.        Because of volume of claims and
10   inadequate or -- and the staffing level that we had at
11   Jefferson-Pilot.
12   Q.        I've taken those persons' depositions.
13   They worked there for several years. They worked in
14   claims for several years. They could have continued
15   in that same role with allegedly a lighter workload
16   and had their workload supplemented by DMS, couldn't
17   they?
18               MR. MEAGHER: Objection to form,
19               calls for speculation. You can answer.
20   A.        I suppose it could have been done that
21   way but --
22   Q.        And what --
23               MR. MEAGHER: Excuse me. Are you
24               done with your answer, sir?
25               THE WITNESS: Yes.

60

15  (57-60)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1             MR. ROBERTS: I'm sorry,
2      Mr. Meagher.
3             MR. MEAGHER: Are you done with
4      your answer? Did he interrupt you?
5             WITNESS: Yes.
6  Q.      I interrupted you or you're done?
7  A.      No, I'm done.
8  Q.      You told me that it was a closed block
9  of business, so one would assume that the claim volume
10  would be decreasing, right? Isn't that what happens
11  with a closed block?
12  A.      Not necessarily.
13  Q.      Your testimony under oath is that
14  claims may be an increasing factor on a closed block
15  of insurance?
16             MR. MEAGHER: Objection, asked
17      and answered. You can answer.
18  Q.      Is that your testimony?
19  A.      It doesn't necessarily mean that the
20  claims volume will decrease.
21  Q.      But you knew it was a closed block and
22  it was closed before April '99, right?
23  A.      That's correct.
24  Q.      You would reasonably assume that even
25  if -- let's assume it's true -- even if the claims

61

1  examiners had a ratio of claims that was higher than
2  industry norm that it would be decreasing. That would
3  be the reasonable assumption, wouldn't it?
4             MR. MEAGHER: Objection, asked and
5      answered.
6  A.      Not necessarily.
7  Q.      The more reasonable assumption would be
8  that on a closed block claim volume per claim examiner
9  would increase over time; is that your sworn
10  testimony?
11             MR. MEAGHER: Objection, asked and
12      answered. You can answer.
13  A.      What I say -- said was that it wouldn't
14  necessarily decrease.
15  Q.      What would be the reasonable assumption
16  for a person in the senior executive capacity, a vice
17  president of disability claims? Would it be more
18  reasonable that claims would decrease over time on a
19  closed block or it would it be more reasonable that
20  claims would increase over time on a closed block?
21  A.      I would think it would depend on the
22  time that you're talking about. I would think that
23  you could have an increase in claims for a period of
24  time and as you have runoff on your in force block of
25  business, at some point it may decrease, but because

62

1  you have an in force block of business doesn't mean
2  that you won't be receiving additional claims even if
3  that block is closed.
4  Q.      You don't have a comfort level to
5  answer my question whether a senior executive officer,
6  vice president of claims, would reasonably conclude
7  that claims would likely decrease over time on a
8  closed block instead of increase --
9             MR. MEAGHER: Objection to form.
10  Q.      -- is that right?
11             MR. MEAGHER: Objection to form.
12      He answered the question. Asked and
13      answered. You can answer again.
14  A.      Over time in the short run, that's not
15  necessarily correct. Over a long period of time, that
16  may be correct.
17  Q.      So on this closed block of business for
18  which you had no prior experience, you made the
19  conclusion that the persons responsible for claim
20  management at Jefferson-Pilot who had been there for
21  years and years and years needed to have those
22  responsibilities taken from them and moved to a
23  vendor even though it was a closed block of business;
24  is that correct?
25             MR. MEAGHER: Objection, asked and

63

1      answered.
2  A.      My decision was to move the claims to a
3  vendor.
4  Q.      Is that your response to my question?
5  A.      Yes.
6  Q.      And it had nothing to do with the fact
7  that it was just a closed block that you wanted to
8  farm out the claim management, the only reason was to
9  reduce the workload on these people who were going to
10  be losing those responsibilities as a result; is that
11  right?
12             MR. MEAGHER: Objection to form.
13  A.      Repeat the question.
14  Q.      Your decision, your decision, to begin
15  the process of looking for a vendor to take over claim
16  management had nothing to do with the fact that
17  block of business was closed, but rather had only to
18  do with your assessment, given all of your background,
19  that the ratio of claims to claim examiner was too
20  great; is that your testimony?
21  A.      The ratio of claims to claim examiner
22  was too great. With the difficulty of hiring
23  experienced examiners in the Greensboro area, my
24  decision was to relocate this to a vendor for
25  handling.

64

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

---

1  Q.          And that was the only decision that
2  directed you to look for a vendor? Excuse me. That
3  was the only consideration that directed you to look
4  for a vendor, true?
5  A.          I don't recall anything else at this
6  point.
7  Q.          What efforts did you make to look for
8  somebody in the Greensboro area to add to the staff?
9  A.          I don't recall at this time.
10 Q.          You had never lived in the Greensboro
11 area before, right?
12 A.          That's correct.
13 Q.          And in your past you never made any
14 evaluations of what type of person would be good,
15 experienced, bad, not experienced in handling
16 disability insurance claims, right?
17 A.          There were no other companies in the
18 Greensboro area that handled disability claims --
19 Q.          That wasn't my --
20 A.          -- that we could draw on to get
21 experienced staff.
22 Q.          That wasn't my question. My question
23 was isn't it true that you had no experience in your
24 past evaluating persons for hire to perform disability
25 insurance claim management. Isn't that correct?

65

---

1  A.          That's correct.
2  Q.          And you never worked in the Greensboro
3  area before, correct?
4  A.          That's correct.
5  Q.          And you can't recall whether you put an
6  ad in the newspaper or solicited resumes for persons
7  to join the department in Greensboro, correct?
8  A.          That was in 1999. If we had ads in the
9  paper, I don't recall.
10 Q.          Who told you that the claim volume was
11 75 to 125 per examiner?
12 A.          Individuals in the industry.
13 Q.          Who?
14 A.          I can't recall names.
15 Q.          Did someone report to you what the
16 claim volume was at Jefferson-Pilot?
17 A.          I'm sure at the time I had information
18 on claim volumes.
19 Q.          Were there persons doing disability
20 claim management in New Hampshire?
21 A.          Yes.
22 Q.          Were their responsibilities taken away
23 from them?
24 A.          No.
25 Q.          Did you assess the ratio of their

66

---

1  claims per examiner?
2  A.          Yes.
3  Q.          Was theirs too high?
4  A.          No.
5  Q.          You could have sent some of the North
6  Carolina claim management responsibility to New
7  Hampshire, couldn't you, spread the work?
8  A.          Yes.
9  Q.          That would have been cheaper than
10 paying some third-party vendor to do that, wouldn't
11 it?
12             MR. MEAGHER: Objection, calls for
13 speculation. You can answer.
14 A.          Some of the claims were transferred to
15 New Hampshire.
16 Q.          Were there a lot of lawsuits filed
17 against Jefferson-Pilot because its claim examiners
18 were making all kinds of mistakes in their claim
19 management because they were overworked?
20 A.          I don't recall any litigation on the
21 disability side.
22 Q.          So you don't recall that the company
23 was being sued for making mistakes in the management
24 of disability claims, correct?
25             MR. MEAGHER: Objection, asked and

67

---

1             answered.
2  A.          Correct.
3  Q.          Were there a bunch of policyholders
4  complaining about mistakes being made once you became
5  the senior executive officer that led you to believe,
6  oh, my gosh, there's a whole bunch of mistakes being
7  made, these people are overworked, we need to get
8  somebody else in here to do this work? Did that
9  happen?
10 A.          I don't recall.
11 Q.          Do you recall any time anybody
12 reporting to you that a mistake had been made by one
13 of your subordinates in the claims department?
14 A.          I don't recall anyone telling me about
15 any specific mistake, but...
16 Q.          Was there any temp --
17             MR. MEAGHER: Excuse me. You done
18 with your answer?
19             MR. ROBERTS: Relax. Go ahead.
20 A.          But we're all human.
21 Q.          Right. Was there any temporary work --
22 temporary employees that were hired, or did the
23 company ever draw from other people in the company to
24 come help out in the claims department if the persons
25 there were being overworked? Do you recall that?

68

---

17 (65-68)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    A.              There may have been an attempt to get
2    temporary help at one time, but I'm not positive of
3    that.
4    Q.              You can only testify to what you know
5    here today.
6    A.              Okay.
7    Q.              I don't want you to guess.
8    A.              Okay.
9    Q.              Do you recall, sitting here today, that
10   that effort was undertaken?
11   A.              Not for sure.
12   Q.              Was there any memoranda or maybe email
13   in 1999 that comments on the fact that the department
14   is overworked and we need to do something about it,
15   which may include sending claims to a vendor?
16   A.              I don't recall any email or written
17   communication about that.
18   Q.              Did you need to communicate with your
19   boss to convince him or persuade him that this -- we
20   needed to take these claim management function which
21   had resided at Jefferson-Pilot for years and years and
22   years and move it to somebody else and the reasons
23   that that was required?
24   A.              He would have been aware that I was
25   looking for a vendor.

69

1    Q.              Not my question. Did you create any
2    documents whatsoever to justify the company's expense
3    to go hire this vendor?
4    A.              Not that I know of.
5    Q.              Did you create any memoranda to your
6    boss in this new role that you had never served in
7    before that would justify the decision you say you
8    made to take from these long-time employees their
9    responsibility of claim management?
10   A.              Not that I know of.
11   Q.              So there is not a document that you're
12   aware of that comments at all on this issue which you
13   testify under oath existed about this overwork of the
14   claim department and the ratio?
15                   MR. MEAGHER: Objection to form.
16   Q.              Right?
17   A.              I'm not aware of a document -- of any
18   document in that regard.
19   Q.              And you can't recall creating a
20   document that would have commented on that subject in
21   any regard --
22                   MR. MEAGHER: Objection --
23   Q.              -- is that correct?
24                   MR. MEAGHER: Objection, asked and
25                   answered.

70

1    A.              That's correct.
2    Q.              Was it generally the case that you
3    could reorganize the work responsibilities of a whole
4    group of people and incur significant expense to the
5    company without seeking approval from a supervisor or
6    at least documenting the reasons justifying that
7    decision? Did that occur regularly at
8    Jefferson-Pilot?
9                    MR. MEAGHER: Objection to form,
10                   assumes facts not in evidence. You can
11                   answer.
12                   THE WITNESS: Read the question.
13   I'm sorry.
14                   MR. MEAGHER: Counselor, I can
15                   hear your conversation. You might want
16                   to lower your voice. I can still hear
17                   it. Still hear it, sir. I just want
18                   to make sure that the confidential
19                   communication is reserved. You want us
20                   to leave the room while you talk to
21                   your client, sir? We can leave the
22                   room if you want. I'll tell you that,
23                   let's take a break. We'll leave the
24                   room. Come on, sir. We'll take a
25                   five-minute break and we'll come back

71

1    when he's done talking with his client.
2                    (A break was taken.)
3                    (Reporter read the question.)
4                    MR. MEAGHER: Objection to the
5                    form, asked and answered,
6                    argumentative. You can answer.
7    A.              It was my decision to go with the
8    third-party administrator.
9    Q.              Do you recall any discussions with
10   anybody at the company about that decision that you
11   say you made?
12   A.              I don't recall one at this point, no.
13   Q.              Either to get their judgment or get
14   their approval, right?
15   A.              I would have discussed doing this with
16   my immediate superior before doing it.
17   Q.              Who's that?
18   A.              Charles Cornelio.
19   Q.              Do you recall specifically that you did
20   that?
21   A.              I don't recall specifically.
22   Q.              Do you recall specifically having any
23   conversations with anybody about this decision you say
24   you made for these reasons you say you made them prior
25   to executing the agreement with DMS?

72

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

**Page 73**

1  A.        I don't recall anyone specifically, no.
2  Q.        Do you recall there being any memoranda
3  commenting on your decision to enter this agreement
4  with DMS prior to the date that you entered it with
5  DMS?
6  A.        I don't know of any memoranda.
7  Q.        Any letter, any document, any note, any
8  email, anything?
9  A.        I don't recall any.
10 Q.        So you come in in April.  You have no
11 experience with disability insurance.  You say you
12 went about the process of coming to some understanding
13 about claim volume.  You say you investigated with
14 others.  You say you had a conversation with your
15 boss.  Then you went about the process of identifying
16 potential third-party administrators.  Is that
17 correct?
18           MR. MEAGHER:  Objection, asked and
19 answered.
20 A.        I did --
21 Q.        Okay.
22 A.        -- evaluate other -- or I did evaluate
23 third-party administrators, yes.
24 Q.        But you had to have come to some -- you
25 had to perform some exercise of identifying the field,

**Page 74**

1  correct?
2           MR. MEAGHER:  Objection to form.
3  A.        I had to determine who -- what
4  third-party administrators were out there --
5  Q.        Right.
6  A.        -- that did this type of work.
7  Q.        Do you recall performing that exercise?
8  A.        I'm sure that I did.
9  Q.        Do you recall performing that exercise?
10 A.        Yes.
11 Q.        You recall, sitting here today, you
12 actually doing that?
13 A.        I contacted other -- I contacted
14 third-party administrators that do this type of work.
15 Q.        And you're not guessing based on the
16 way you went about doing your job, you're saying here
17 today, March 8, 2007, you recall having actually
18 spoken to other third-party administrators about the
19 possibility of them being your vendor, correct?
20 A.        Yes.
21 Q.        Who did you call?
22 A.        I talked to DMS as one.  There were two
23 or three in total that I called and talked to and at
24 this point, I can't remember their name.
25 Q.        You do recall, sitting here today,

**Page 75**

1  March 8, 2007, that you had a conversation with
2  persons other than DMS?
3  A.        Yes.
4  Q.        You recall that sitting here, but you
5  can't recall who it was?
6  A.        I can't recall the name of the company.
7  Q.        Did you contact DMS and these other
8  entities at or about the same time?
9  A.        At around the same time, yes.
10 Q.        Did you have any discussion with
11 anybody at Employers Reinsurance about this exercise
12 that you were undertaking?
13 A.        Not that I recall.
14 Q.        Weren't they the reinsurer on the
15 disability?
16 A.        Yes.
17 Q.        Did they have any interest as far as
18 you were concerned in who might be the management
19 company on the claims?
20 A.        I don't recall them -- any conversation
21 about that, no.
22 Q.        But sitting here today, I mean you
23 would agree with me that they would have an interest
24 in who's administering the claims on which they have
25 financial responsibility, right?

**Page 76**

1  A.        There would be an interest.
2  Q.        Your testimony under oath is you can't
3  recall having any interaction with them?
4  A.        I don't recall any at this point, no.
5  Q.        Does it make sense that you would have?
6           MR. MEAGHER:  Objection to form,
7  speculation.
8  A.        May have.
9  Q.        I mean, it's logical that you would at
10 least advise the person with financial responsibility
11 of what you were doing, right?
12 A.        I don't know how to answer your
13 question.  Say it -- could you rephrase that, please?
14 Q.        It's logical that you would at least
15 advise, keep somebody abreast of, without seeking
16 their authority potentially, at least advise them of
17 what you were doing with regard to this block of
18 business for which they had financial responsibility,
19 right?
20 A.        It's logical.
21 Q.        And I think you testified earlier you
22 did have some interaction with them during the course
23 of 1999, them being Employers Reinsurance, right?
24 A.        I'm sure we did.
25 Q.        Certainly you would have discussed with

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    them the fact that you were entering this agreement
2    before you entered it, true?
3                    MR. MEAGHER: Objection, asked and
4            answered.
5    A.        I don't recall specifically that I did
6    that.
7    Q.        It makes sense, though, that you would
8    have, doesn't it?
9    A.        I just -- I don't -- I don't recall
10   doing it.
11   Q.        I'm not asking you if you recall doing
12   it. I'm just asking you, sitting here today, doesn't
13   it make sense that you would have.
14   A.        This was a contract between
15   Jefferson-Pilot and DMS.
16   Q.        Involving --
17                    MR. MEAGHER: Excuse me. Go
18            ahead. Go ahead with your answer.
19   A.        It was a -- you know, an agreement
20   between Jefferson-Pilot and DMS. I don't recall
21   getting anyone's -- any other party's approval to
22   enter into this agreement.
23   Q.        Who had the financial responsibility
24   for the claims which were the subject of the claims
25   assessment agreement?

77

1    A.        Jefferson-Pilot.
2    Q.        Not Employers Reinsurance?
3    A.        They were the reinsurer.
4    Q.        Doesn't it make sense -- sitting here
5    today, don't you agree with me that it would make
6    sense that a person that was farming out the claims
7    management on the reinsurer's claims would at least
8    advise the reinsurer?
9                    MR. MEAGHER: Objection, asked
10           and answered. You can answer.
11   A.        I don't recall doing it.
12   Q.        So you don't recall any interaction
13   with Employers Reinsurance regarding farming out the
14   claims management prior to entering the agreement with
15   DMS; is that correct?
16   A.        I don't recall.
17   Q.        Well, let's go back to the beauty
18   pageant. There's DMS and there was allegedly two
19   other companies -- one or two other companies whose
20   names you can't recall, right?
21                    MR. MEAGHER: Objection, asked and
22           answered. You can answer.
23   A.        There was DMS and there were one or two
24   other companies. Not allegedly, there were one or two
25   other companies. I can't remember the name of them at

78

1    this point.
2    Q.        So how did this occur? You got their
3    phone numbers somewhere and you just made a phone
4    call?
5    A.        This was back in 1999. I don't recall
6    the exact process that I went through.
7    Q.        Did you send out a request for a
8    proposal?
9    A.        Not that I recall.
10   Q.        Did you send any written correspondence
11   to these two or three entities?
12   A.        Not that I recall.
13   Q.        Did you send them any email
14   communications?
15   A.        Not that I recall.
16   Q.        Did you make any notes of your
17   communications?
18   A.        Not that I recall.
19   Q.        Did they send you any materials or
20   information or data to support why they should win the
21   beauty pageant?
22   A.        This is much more serious than a beauty
23   pageant. This is trying to get assistance in handling
24   disability claims.
25   Q.        Correct. And you would think it would

79

1    make sense on something that's much more serious than
2    a beauty pageant that there would be some memo, some
3    request for proposals, some materials that were
4    provided to you by the participants in this thing
5    that's far more serious than a beauty pageant, right?
6    A.        I simply don't recall.
7    Q.        Did you create a file about this
8    exercise or this endeavor that you supposedly
9    undertook?
10   A.        I don't recall.
11   Q.        So you don't recall receiving any
12   documentation or data from DMS or these other two
13   supposed prospective vendors at any point in time in
14   1999?
15   A.        I don't recall receiving anything.
16   Q.        Do you recall having any conversations
17   with anyone at DMS?
18   A.        I'm sure there were conversations with
19   regard to completing the agreement.
20   Q.        Do you recall any conversations you had
21   with anybody at DMS?
22   A.        No.
23   Q.        Do you recall today what impressed you
24   about DMS?
25   A.        The experienced staff.

80

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1  Q.        You recall that much. All the things
2  you don't recall, you recall that. Who told you they
3  were an experienced staff?
4  A.        In conversations with DMS.
5  Q.        With whom?
6  A.        I don't --
7  Q.        Okay.
8  A.        I don't remember anyone's name from DMS
9  at this point.
10 Q.        Let me make sure I'm in the same plane
11 with you. In this exercise, which must have begun
12 shortly after April '99, coming to an assessment of
13 the status of the department, coming to an assessment
14 of the ratio, trying to identify particular vendors,
15 interacting with particular vendors, narrowing down
16 the field, making the decision to go with DMS,
17 negotiating the agreement with DMS and signing an
18 agreement with DMS, throughout that entire process --
19 are you with me --
20 A.        Yes.
21 Q.        -- you don't -- you can't give me the
22 name of any single person that you spoke to relating
23 to any of those things along that time line; is that
24 correct?
25             MR. MEAGHER: Objection to form,

81

1             argumentative, asked and answered.    You
2  can answer.
3  A.        I don't recall names, but I'm terrible
4  at remembering names. I don't recall anyone at DMS.
5  Q.        And other than the agreement itself,
6  you don't recall there existing at any point in time
7  along that time line with all those functions being
8  performed -- you don't recall the existence of a note,
9  a memo, a letter, a memorandum, any document relating
10 to any of those things you allegedly did during that
11 year, correct?
12 A.        I don't recall having any.
13 Q.        But you do recall in your conversation
14 with DMS that someone told you that they were
15 experienced, right? Correct?
16 A.        Yes.
17 Q.        Can't recall who it was that told you
18 that?
19             MR. MEAGHER: Objection, asked
20             and answered several times.
21 Q.        Right?
22 A.        I don't recall.
23 Q.        What else did the person say in that
24 conversation?
25             MR. MEAGHER: Objection, assumes

82

1             facts not in evidence. You can answer.
2  A.        The staffing that they had there was
3  adequate in order to assume additional work.
4  Q.        Did the other vendors say that they
5  were experienced?
6  A.        I'm sure they did.
7  Q.        Did they say they had adequate staff to
8  do the work?
9  A.        That was a concern of mine.
10 Q.        They told you they didn't have adequate
11 staff to do the work?
12 A.        A concern of mine was the staffing
13 level.
14 Q.        At the other entities?
15 A.        Yes.
16 Q.        Tell me about that. How was DMS
17 different than the other entities?
18 A.        Was the staffing that they had in
19 place, the experienced staffing that they had in place
20 in order to handle this -- these claims that we --
21 that would be sent to them.
22 Q.        What information did you have before
23 you to make that judgment?
24 A.        I don't recall at this time what it
25 was, but there were discussions on it.

83

1  Q.        So each of the vendors told you -- DMS
2  said, we have adequate staff. We can do it. The
3  other vendors told you, we don't have adequate staff.
4  We can't do it.
5  A.        There was a concern whether they could
6  do it or not, yes.
7  Q.        Based on something they told you?
8  A.        Yes.
9  Q.        Well, certainly they didn't tell you,
10 we don't have the capacity to do it, did they?
11 A.        They may have. I don't recall.
12 Q.        Do you recall anything specifically
13 that any of the other prospective vendors told you?
14 A.        Not at this time. Again, that was
15 eight years ago. I don't recall, you know, the
16 conversations.
17 Q.        Had you ever entered a claims
18 assessment agreement before?
19 A.        No.
20 Q.        Did you draft the agreement?
21 A.        No, I did not.
22 Q.        Did you negotiate the agreement?
23 A.        Yes.
24 Q.        Did anybody participate with you in the
25 negotiation of the agreement?

84

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    A.        I don't recall anyone, but as with any
2    agreement, it would be reviewed by the legal
3    department before I would sign it.
4    Q.        So you're guessing, but you're
5    guessing, based on past experience, that you would
6    have shared a draft or a proposal or prospective
7    agreement with the legal department at Jefferson-Pilot
8    before on your own part executing on behalf of the
9    company, right?
10   A.        I would have had it reviewed, as I
11   would any legal document before I would sign it.
12   Q.        Do you recall the lawyer you engaged at
13   Jefferson-Pilot to do that?
14   A.        No, I do not.
15   Q.        Do you recall seeking anybody else's
16   counsel about the terms of the agreement?  Not legal
17   counsel, but advice.
18   A.        I don't recall anyone else.
19   Q.        Do you recall any negotiation of any
20   specific points in the agreement?
21   A.        Not at this point, no.
22   Q.        Did you feel, as the senior executive
23   officer of claims, that you had a duty to the
24   policyholders of any sort?
25   A.        You always have a duty to

85

1    policyholders.
2    Q.        You wanted to make certain -- make
3    absolutely certain for yourself that when this company
4    came to be responsible for administering claims that
5    they would treat policyholders professionally,
6    respectfully and in good faith, true?
7    A.        Yes.
8    Q.        What information did you have to come
9    to this decision in your own mind that DMS would
10   satisfy those concerns?
11   A.        I simply don't recall at this --
12   Q.        Anything at --
13             MR. MEAGHER:  Excuse me.
14             MR. ROBERTS:  Relax.
15             MR. MEAGHER:  Go ahead.
16   A.        I simply don't recall at this time.
17   Q.        Anything other than what they told you?
18   A.        I feel certain that I would have talked
19   to other companies that use them.
20   Q.        Did you know that Jefferson-Pilot had
21   used DMS in the past?
22   A.        I don't recall that, no.
23   Q.        Did you know that Employers Reinsurance
24   uses DMS for Jefferson-Pilot policies that it
25   reinsures as well as other insurance companies'

86

1    policies that it reinsures?
2    A.        Please repeat that.
3    Q.        Can't.  I'll do it.  Did you know that
4    Employers Reinsurance had a business relationship with
5    DMS with respect to not just policies that they
6    reinsure of Jefferson-Pilot but policies that they
7    reinsure on behalf of other insurers?
8             MR. MEAGHER:  Objection, assumes
9             facts not in evidence.  You can answer.
10   A.        I know that now.  I don't know that I
11   knew it in 1999.
12   Q.        So getting back to my question about
13   this duty that you had that you placed on yourself to
14   be absolutely certain that this company would treat
15   Jefferson-Pilot policyholders in good faith, you
16   relied, as near as I can tell, on what DMS told you
17   and what else?
18             MR. MEAGHER:  Objection, asked and
19             answered.
20   A.        Discussion with others in the industry.
21   Q.        Others --
22   A.        That utilized DMS.
23   Q.        Whose names, I suspect, you can't
24   recall?
25   A.        I would have no idea --

87

1    Q.        Companies --
2    A.        -- today.
3    Q.        Companies you can't recall?
4    A.        No.
5    Q.        Did you retain the title of vice
6    president of claims, senior executive officer, for
7    that particular function as it relates to disability
8    insurance after December 1999?
9    A.        My position at Jefferson-Pilot was vice
10   president claims from nineteen -- from April of 1999
11   through April 30th or May 1st of 2002.
12   Q.        And for that whole period of time, did
13   it include responsibility for disability insurance
14   claims?
15   A.        That was part of my responsibility.
16   Q.        What was your interaction with DMS from
17   January 1 of 2000 through your retirement date from
18   Jefferson-Pilot?
19   A.        Repeat that question.
20   Q.        What was your interaction with DMS?
21   A.        I don't know what you mean by the
22   question.
23   Q.        Did you require as a senior executive
24   officer with a duty of good faith for these
25   policyholders whose claims were pending with

88

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1  Jefferson-Pilot but being administered by DMS?
2             MR. MEAGHER: Objection to form,
3  argumentative.
4             MR. ROBERTS: It's way too long
5  and confusing, too. I'd object to it
6  as well. Let me start over.
7             THE WITNESS: Okay.
8  Q.        January 1, 2000 through May 31, 2002,
9  you were the vice president of claims, which included
10  responsibility for disability insurance claims, true?
11  A.        That was part of my responsibility
12  except you have the dates wrong. It was through
13  April 30th or May 1 of 2002 when I left
14  Jefferson-Pilot.
15  Q.        Let's make the record correct, then.
16  For the period January 1, 2000 through at least
17  April 30th of 2002, you were the vice president of
18  claims, which meant you were the senior officer with
19  responsibility for disability insurance claims at
20  Jefferson-Pilot, true?
21             MR. MEAGHER: Objection, asked and
22  answered.
23  Q.        True?
24  A.        That's correct.
25  Q.        And during that period of time, the

89

1  claim management was being performed by DMS, correct?
2  A.        They were -- they were the third-party
3  administrator for the disability claims.
4  Q.        They were administrating the claims on
5  a closed block of business during that period,
6  correct?
7  A.        On some of the claims, yes.
8  Q.        Those claims with a monthly indemnity
9  value of in excess of $2,000, correct?
10  A.        That I don't recall.
11  Q.        Who was administering the claims that
12  DMS wasn't?
13  A.        Those were being handled in the
14  Concord, New Hampshire, claims office.
15  Q.        Because they related to policies sold
16  by some insurance company other than Jefferson-Pilot
17  prior to the time that Jefferson-Pilot acquired that
18  entity, true?
19  A.        In addition, some of the disability
20  claims from Jefferson-Pilot were also being handled in
21  Concord, New Hampshire, at the claims office there.
22  Q.        What was the factor that led a claim to
23  be managed by DMS versus the New Hampshire operation?
24  A.        Again, there wasn't many claims that
25  went to New Hampshire as I recall, only what they had

90

1  the capacity to handle.
2  Q.        So if New Hampshire had the capacity to
3  handle a claim regardless of its monthly indemnity
4  value, even if it was a policy sold by
5  Jefferson-Pilot, if New Hampshire had the capacity,
6  they got the claim, but if they didn't have the
7  capacity, it was kind of an overflow situation, the
8  claim would go to DMS; is that your testimony?
9  A.        No, it's not. When the decision was
10  made to use a third-party administrator, some of those
11  claims went to DMS, some of those claims went to
12  Concord, New Hampshire. The number that went to
13  Concord was based on their capacity to handle those
14  claims.
15  Q.        It wasn't based on who the insurance
16  company was that sold the policy, right?
17  A.        No.
18  Q.        And it wasn't based on who the
19  reinsurer was, right?
20  A.        That's correct.
21  Q.        The prior question was negative
22  negative. It wasn't dependent on what company sold
23  the policy to the policyholder?
24  A.        The policies we're talking about are
25  policies that were sold by Jefferson-Pilot.

91

1  Q.        So a Jefferson-Pilot policy sold to a
2  policyholder after January 1 of 2000 may end up for
3  administration in New Hampshire within a
4  Jefferson-Pilot office or may end up at DMS, right?
5  A.        That's not correct. The --
6  Jefferson-Pilot exited the disability income market
7  sometime prior to my arriving in Greensboro.
8  Q.        I'm just talking about the period from
9  January 1, 2000 to April 30, 2002.
10  A.        There was no policy sold in that period
11  of time. I'm trying to answer your question here.
12  Q.        I'm not communicating well with you.
13  If I was a policyholder of Jefferson-Pilot disability
14  insurance and I felt that I had a claim and I filed my
15  claim, gave my proof of loss, in June of 2000, would
16  there be a chance that my claim would be administered
17  by Jefferson-Pilot out of New Hampshire?
18  A.        It could have been.
19  Q.        And what would be the factor that might
20  direct my claim to that office for administration?
21             MR. MEAGHER: Objection, asked
22  and answered. You can answer.
23  A.        Capacity. Depends on the capacity.
24  Q.        So did you or the people that worked
25  beneath you in Greensboro send claims to New Hampshire

92

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    after January 1 of 2000?
2    A.        I'm certain they did.
3    Q.        And they would do that by contacting
4    the New Hampshire employees and seeing if they had the
5    capacity to handle more claims?
6    A.        There would be -- they would discuss
7    what the capacity would be. You're speaking of an
8    individual case where we're -- you know, I don't know
9    that they would call on every individual claim.
10   Q.        But there would be some judgment made
11   by the Greensboro office of whether or not the New
12   Hampshire office could take on new claims?
13   A.        Additional claims, that's correct.
14   Q.        After January 1 of 2000?
15   A.        Yes.
16   Q.        And regardless of who the reinsurer was
17   and regardless of the monthly indemnity value that
18   came with a new claim after January 1, 2000, it may
19   end up for administration at DMS or it might end up
20   for administration within the New Hampshire office of
21   Jefferson-Pilot; is that correct?
22   A.        You asked a long question there and
23   I'll try to answer it. A claim that would be received
24   after January 1 of 2000 could be handled at either
25   office.

                                                    93

1    Q.        Either the Jefferson-Pilot office in
2    New Hampshire or the DMS office?
3    A.        That's correct.
4    Q.        And the judgment for which way it went
5    had nothing to do with the reinsurer or the monthly
6    indemnity. It had only to do with whether or not the
7    New Hampshire office could handle the capacity. So,
8    in effect, DMS was a default. If New Hampshire didn't
9    have the capacity, they went to DMS. Is that correct?
10              MR. MEAGHER: Objection to form.
11   A.        That's not necessarily correct.
12   Q.        What was incorrect about the question?
13   A.        I'm not sure what the criteria would
14   have been at this point, but if Jefferson-Pilot --
15   regardless of the monthly indemnity, if the Concord
16   office could not handle it, it would be forwarded on
17   to DMS.
18   Q.        You mentioned the word criteria. Were
19   there criteria other than the capacity of the New
20   Hampshire office?
21   A.        That's the only thing that I can recall
22   at this point was the capacity for them to handle
23   additional claims, if they had it or not. And, again,
24   you know, that's directly related to staffing
25   levels --

                                                    94

1    Q.        Sure.
2    A.        -- in that office.
3    Q.        Sure. How many claim examiners were in
4    that office?
5    A.        I don't have any idea at this point.
6    Q.        Those were people that worked beneath
7    you, right?
8    A.        Yes.
9    Q.        Was it less than five or more than
10   five?
11   A.        Probably more than five.
12   Q.        So you're telling me under oath that if
13   it happened that all claims being managed in the New
14   Hampshire office were closed, settled, resolved or
15   people returned to work and the claim wasn't pending
16   anymore and they had no claims to administer that they
17   would then be getting more new claims and DMS would be
18   getting less new claims?
19              MR. MEAGHER: Objection, calls for
20              speculation, also argumentative. You
21              can answer.
22   A.        You're asking a hypothetical that would
23   never happen because you've got a closed block of
24   business where there were active claims. I can't
25   answer the hypothetical.

                                                    95

1    Q.        Is my understanding correct, that that
2    office would get the bulk of the claims to the extent
3    they had the capacity and DMS would serve in the
4    capacity of administering claims on an overflow basis?
5    A.        They were getting claims, what they
6    could handle and the remainder were at DMS.
7    Q.        We got off on a tangent there. I
8    originally asked you the question you were the senior
9    executive officer January 1 of 2000 through April 30,
10   2002 with responsibility at Jefferson-Pilot for
11   disability insurance claims, and during that two-year,
12   four-month period at least some new claims and some
13   previously existing claims were being administered by
14   DMS. Correct?
15   A.        That's correct.
16   Q.        Did DMS have any reporting
17   responsibilities on their work during that period as
18   far as you know?
19   A.        I'm sure that there was some reporting
20   responsibility.
21   Q.        Did anybody at DMS report to you?
22   A.        No one from DMS reported to me
23   directly, no.
24   Q.        Did anybody at DMS interact with you
25   during that period?

                                                    96

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | A.          We may have gotten claim activity -- |
| 2 | Q.          Don't guess. |
| 3 | A.          -- data, but I don't recall |
| 4 | specifically what we would have gotten. |
| 5 | Q.          That wasn't my question.  Sitting here |
| 6 | today, do you recall having any interaction during |
| 7 | that 28-month period? |
| 8 | A.          With DMS? |
| 9 | Q.          With DMS. |
| 10 | A.          Yes. |
| 11 | Q.          Who did you interact with? |
| 12 | A.          As I told you before, I don't remember |
| 13 | anyone's name from DMS at this point and I'm -- I |
| 14 | couldn't tell you who it would have been. |
| 15 | Q.          Did you require DMS to provide you with |
| 16 | any specific report, because you were the senior |
| 17 | officer with ultimate responsibility for the claims |
| 18 | that they were administering? |
| 19 | A.          There were some reporting requirements. |
| 20 | Q.          Did those reports come to you? |
| 21 | A.          Yes, they would have. |
| 22 | Q.          What information or data was contained |
| 23 | in the reports? |
| 24 | A.          Six, eight years down the road I have |
| 25 | no idea what those reports contained. |

97

| | |
|---|---|
| 1 | Q.          What was the frequency of the reports? |
| 2 | A.          I believe it was on a monthly basis. |
| 3 | Q.          So -- |
| 4 | A.          Or quarterly.  I'm not certain. |
| 5 | Q.          So your testimony is that your best |
| 6 | memory is on a monthly or quarterly basis there were |
| 7 | some reporting that Jefferson-Pilot received from DMS, |
| 8 | right? |
| 9 |                    MR. MEAGHER:  Objection, asked |
| 10 |                    and answered. |
| 11 | A.          Yes. |
| 12 | Q.          And did that come directly to you or |
| 13 | someone else at Jefferson-Pilot? |
| 14 | A.          I can't recall.  I don't know. |
| 15 | Q.          But you did ultimately see these |
| 16 | reports? |
| 17 | A.          Yes. |
| 18 | Q.          Did you get the reports on the |
| 19 | frequency that they were provided? |
| 20 | A.          Yes, I would have. |
| 21 | Q.          You didn't get one one year and not one |
| 22 | the next year or one one month and not one for several |
| 23 | months?  It was whatever reports the reports whether |
| 24 | they came to you initially directly or whether they |
| 25 | came to you through someone else, you did ultimately |

98

| | |
|---|---|
| 1 | get them, right? |
| 2 | A.          To my knowledge, yes. |
| 3 | Q.          But you can't recall what information |
| 4 | was contained on the report? |
| 5 | A.          Absolutely not. |
| 6 | Q.          Were they charts and bar graphs and |
| 7 | statistics or were they narrative reports? |
| 8 | A.          I don't know. |
| 9 | Q.          Were they one-page reports or were they |
| 10 | multi-page reports? |
| 11 | A.          I don't know. |
| 12 | Q.          Do you recall ever reviewing a report |
| 13 | and having a question? |
| 14 | A.          I don't specifically recall having a |
| 15 | question. |
| 16 | Q.          Do you ever recall reviewing a report |
| 17 | and affirmatively making some inquiry directly with |
| 18 | DMS about something? |
| 19 | A.          I may have. |
| 20 | Q.          Not my question.  Do you recall -- |
| 21 | A.          I don't recall specifically, no. |
| 22 | Q.          So sitting here today, there's nothing |
| 23 | you can recall about the reports that triggered in |
| 24 | your mind any need for you to have direct dialogue |
| 25 | with DMS? |

99

| | |
|---|---|
| 1 | A.          Not today. |
| 2 |                    MR. MEAGHER:  Objection, asked |
| 3 |                    and answered. |
| 4 | Q.          And you don't recall any direct |
| 5 | dialogue with DMS during that period? |
| 6 | A.          No. |
| 7 | Q.          Did you ever visit DMS? |
| 8 | A.          I don't believe I was in their |
| 9 | office -- ever in their office. |
| 10 | Q.          Did you ever send anybody to go audit |
| 11 | files at DMS? |
| 12 | A.          May have, but I don't recall for |
| 13 | certain. |
| 14 | Q.          What information did you have to make |
| 15 | yourself absolutely certain that they were |
| 16 | administering the claims in good faith? |
| 17 | A.          We had many different audit processes |
| 18 | that went on like from our internal auditors, external |
| 19 | auditors.  We might have market conduct exams that |
| 20 | would be done.  So we would have those types of... |
| 21 | Q.          Kindly don't tell me what you might |
| 22 | have had.  Tell me what you -- |
| 23 | A.          I'm certain, because we were always |
| 24 | being audited by internal auditors, we were always |
| 25 | being audited by external auditors. |

100

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    Q.        Do you know of any internal auditors
2    that went to DMS and audited the disability insurance
3    claims they were handling?
4    A.            I don't recall any at this point.
5    Q.        Do you recall retaining any outside
6    auditors to go to DMS to review the claims to make
7    sure that they were handling the claims in good faith
8    and not violating the laws with regard to
9    policyholders?
10   A.            I don't recall at this point, but we --
11   in doing an internal audit or an external audit, those
12   files would have been submitted to Jefferson-Pilot for
13   auditor's review.
14   Q.        Again, I'm certain that anything could
15   have happened.  All I want to know is what you recall
16   happening.  Do you recall there ever being an internal
17   or external audit performed on the files that DMS was
18   managing?
19   A.            I don't recall specifically.
20   Q.        Do you recall ever seeing a report of
21   an audit that was performed of DMS's work?
22   A.            I don't recall a report.
23   Q.        Did you have any meetings with
24   representatives of DMS after entering the agreement?
25   A.            I don't recall any meetings, no.

101

1    Q.        Do you recall any scheduled
2    teleconferences to discuss agendas or topics with
3    DMS --
4    A.            No.
5    Q.        -- during that period?  Who beneath
6    you -- during that 28-month period of January 1, 2000
7    to April 2002, who beneath you, if anyone, had
8    exclusive responsibility for disability insurance
9    claims that was an employee of Jefferson-Pilot at the
10   Greensboro location?
11   A.            No one at the Greensboro location would
12   have had exclusive.  Again, this would have been a
13   part of many functions that were being performed by
14   me.
15   Q.        I'm not talking about you.  I'm talking
16   about people beneath you.  Was there anybody beneath
17   you employed at Jefferson-Pilot in the Greensboro
18   location that had the exclusive responsibility for
19   disability insurance claims?
20   A.            No, no one had exclusive.
21   Q.        Was there anyone beneath you at the
22   Greensboro location during that period who had any
23   responsibility for disability insurance claims at the
24   Greensboro location?
25   A.            I don't recall anyone that would have

102

1    had.  As I had mentioned earlier, Paul Swink was a
2    claims manager that reported to me in that area that
3    would have had some responsibility with disability
4    claims.
5    Q.        In the 28-month period, January 2000 to
6    April 2002?
7    A.            I can't give you a definite on that;
8    possibly.
9    Q.        Would his responsibility during that
10   period have included making sure that DMS was
11   conducting their work professionally, honorably,
12   legally and in good faith?
13            MR. MEAGHER:  Objection to form.
14   A.            I would have to say yes.
15   Q.        What do you know that he did during
16   that period to perform that responsibility?
17   A.            There would have been interaction
18   between Mr. Swink and DMS during that period.  The
19   amount, I could not tell you how much at this point.
20   Q.        Do you know of anything affirmatively
21   he did or undertook to do to assure himself that DMS
22   was performing its job in line with the agreement and
23   the law and the duty of good faith?
24   A.            I don't know of anything at this point,
25   no.

103

1    Q.        Anyone else other than potentially
2    Mr. Swink?
3    A.            I can't -- I don't -- can't think of
4    anyone.
5    Q.        Have you told me everything you can
6    recall about your interactions with DMS either
7    directly or based on documents during the period
8    January 1, 2000 to April 2002?
9            MR. MEAGHER:  Objection to form.
10            You can answer.
11   A.            Sitting here at the moment, I can't
12   think of anything at this point.
13   Q.        Do you ever recall having any
14   conversations with a gentleman named Bob Bonsal?
15   A.            That name is familiar.
16   Q.        Do you recall having any conversations
17   with him?
18   A.            I don't recall any conversation that we
19   had.  He may have signed the agreement, but I'm not
20   certain of that.
21   Q.        How about after the agreement, do you
22   recall any continued interaction with Mr. Bonsal?
23   You're correct, by the way, he did sign the
24   agreement.
25   A.            He did, okay.  I don't recall anything

104

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    specific, no.

2    Q.        How about John Anderson?

3    A.        That name is familiar, but I don't

4    recall ever having any conversation with John

5    Anderson.

6    Q.        How about Andy Cohen?

7    A.        That name isn't familiar with me at

8    all.

9    Q.        How about Bill Hughes?

10   A.        That name does not ring a bell with me

11   either.

12   Q.        Bob Mills?

13   A.        I know...

14   Q.        Todd Ditmar?

15   A.        That name is familiar.

16   Q.        Do you recall having interactions with

17   Mr. Ditmar?

18   A.        Not anything specifically, no.

19   Q.        Is that name familiar just because of

20   things you've undertaken to do this week?

21   A.        No.

22   Q.        You told me you never went to DMS

23   offices for conferences.  Did you have any conferences

24   with anyone from DMS at Jefferson-Pilot?

25   A.        I don't recall any conferences at

                                                        105

1    Jefferson-Pilot.

2    Q.        Any other location other than

3    Jefferson-Pilot's location, DMS's location?

4    A.        I may have met John Anderson, just was

5    introduced to him at a claims conference.

6    Q.        Just an industry thing?

7    A.        Right.

8    Q.        Who introduced you?

9    A.        I have no idea.

10   Q.        These reportings that you were getting

11   on some frequency, what did you do with them?  What

12   did you do with the reports that you would receive

13   from DMS?

14   A.        I'm certain that I reviewed the

15   reports.

16   Q.        Did you throw them away, then, after

17   you reviewed them?

18   A.        I don't recall.

19   Q.        Would that be your practice?

20             MR. MEAGHER:  Objection to form,

21             asked and answered.

22   A.        I don't recall.

23   Q.        You don't recall whether your practice

24   was to take documents like that and put them in a file

25   or simply discard them?

                                                        106

1             MR. MEAGHER:  Objection, asked

2             and answered.

3    A.        I don't recall it, no.

4    Q.        You don't recall what your practice was

5    in your business to either retain documents like that

6    or destroy them?

7             MR. MEAGHER:  Objection.

8    Q.        I'm not asking what you did with those

9    documents.  I'm just asking do you recall in your

10   42-year history working in insurance whether or not

11   you would retain that type of document or destroy it.

12             MR. MEAGHER:  Objection,

13             argumentative, asked and answered.        You

14             can answer.

15   A.        I don't recall on this document.

16   Q.        Step outside this document.  Is it your

17   practice to retain those type of documents in your

18   professional career or discard them?

19             MR. MEAGHER:  Same objection.

20   A.        I never had those type of documents in

21   my prior career.

22   Q.        What about important documents,

23   documents you think are important, would they be

24   documents that you retain or discard after you review

25   them?

                                                        107

1    A.        Some you would retain.  Some you would

2    destroy.

3    Q.        I presume that when you left

4    Jefferson-Pilot, you didn't retain any of their

5    documentation?

6    A.        I did not.

7    Q.        Are you familiar with the term the

8    means justifying the ends -- or the ends justifying

9    the means?

10             MR. MEAGHER:  Objection to form.

11   A.        Not necessarily.

12             MR. ROBERTS:  Counsel's laughing

13             at me because I got that wrong.  I

14             shouldn't be laughed at for that.

15   Q.        Are you familiar with the term ends

16   justifying the means?

17   A.        No.

18   Q.        You don't know what that phrase means?

19   You've never heard that before?

20   A.        I don't think I've ever heard that.

21   Q.        You've never heard the phrase --

22   A.        I don't believe so.

23   Q.        -- in your 67 years the ends justifying

24   the means?

25             MR. MEAGHER:  Objection, asked

                                                        108

27 (105-108)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1      and answered.
2   Q.            Correct?
3   A.            I don't believe I've ever heard that
4   before.
5   Q.            During the time that you were the
6   senior executive officer responsible for the
7   disability insurance claims at Jefferson-Pilot, was it
8   acceptable to you that DMS investigate claimants
9   without regard for any bounds?
10              MR. MEAGHER: Objection to form.
11  A.            I don't know what you mean without any
12  bounds.
13  Q.            Was it okay -- are you familiar with
14  the concept of invading someone's privacy? Excuse
15  me. I just invaded your counselor's privacy.
16  A.            Yes.
17  Q.            That term means something to you.
18  Whatever that term means to you, is it acceptable, in
19  your judgment, that DMS, in administering a claim, do
20  something that you would believe is an invasion of
21  privacy?
22              MR. MEAGHER: Objection to form.
23  A.            DMS would investigate claims in order
24  to obtain the information needed to make a proper
25  decision on the administration or adjudication of a

109

1   claim.
2   Q.            Is that your answer?
3   A.            Yes.
4   Q.            What if, in the course of doing that
5   job, they did something that invaded somebody's
6   privacy the way you view the concept of invasion of
7   privacy, would that be acceptable to Jefferson-Pilot
8   while you were the senior executive officer?
9               MR. MEAGHER: Objection to form.
10  A.            They should investigate based on
11  information -- the contract provisions that would
12  allow them to obtain information and releases that
13  would be signed by a claimant to do an investigation.
14  Q.            What if, in doing that job, they
15  overstepped their bounds and do something that you
16  would consider to be an invasion of privacy, would
17  that be okay with Jefferson-Pilot?
18              MR. MEAGHER: Objection, calls for
19              speculation.
20  A.            Again, it would be based on the -- what
21  they were permitted to do on the...
22  Q.            Agreement?
23  A.            Right, the -- not the agreement, the
24  claimant's --
25  Q.            Authorization?

110

1   A.            -- authorization.
2   Q.            What if you learned while you were the
3   senior officer of claims they did something that you
4   would consider to be an invasion of privacy, would
5   that be okay?
6               MR. MEAGHER: Objection, calls
7               for speculation, assumes facts not in
8               evidence. You can answer.
9   A.            I don't know how to answer you except
10  to say they would never go outside the bounds of the
11  authorization.
12  Q.            How do you know that? You're
13  testifying under oath that you know for certain that
14  during those 28 months DMS never did anything that
15  exceeded the scope of their authorization? You're not
16  saying that, are you?
17              MR. MEAGHER: Objection to form.
18  A.            I was never made aware.
19  Q.            But you agree with me --
20              MR. MEAGHER: Excuse me. Did you
21              finish your answer? You said you were
22              never made aware.
23  A.            I was never made aware of them stepping
24  outside the bounds of the authorization.
25  Q.            Okay. But you agree with me that,

111

1   first of all, you don't know everything they did? You
2   don't know everything DMS did in those 28 months on
3   all the claims they had, correct?
4   A.            That's correct.
5   Q.            And you can't testify under oath that
6   in all the claims that they had for Jefferson-Pilot
7   they never stepped outside of the bounds of the
8   authorizations signed by policyholders on respective
9   claims, right?
10  A.            Not that I was ever made aware of.
11  Q.            The authorization doesn't give them the
12  right to do anything and everything that's possibly
13  doable, right?
14  A.            I'm sure there are restrictions.
15  Q.            Is invading someone's privacy, in your
16  judgment, a restriction?
17              MR. MEAGHER: Objection to form.
18  A.            Again, I think invasion of privacy -- I
19  don't know how to answer your question.
20  Q.            Okay. Does the authorization -- if
21  someone did sign an authorization, in your judgment,
22  does that completely open the door and remove from
23  that person's right the right of privacy?
24              MR. MEAGHER: Objection insofar
25              as it calls for a legal conclusion.

112

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

```
1        You can answer.
2                THE WITNESS:  Read that question
3        back, please, if you would.
4                MR. ROBERTS:  Let me just restate
5        it.
6    Q.        In your judgment, if one of your
7    policyholders to whom you owe a duty of good faith
8    signs an authorization, is it okay with you that later
9    their privacy may be invaded as far as you would
10   consider the invasion of privacy?
11               MR. MEAGHER:  Objection to form.
12   A.        I would -- they should not step outside
13   the bounds of that authorization.
14   Q.        So everything is decided by the
15   language of the authorization?
16               MR. MEAGHER:  Objection as far as
17               that calls for a legal conclusion.  You
18               can answer.
19   A.        The authorization and the policy.
20   Q.        But what DMS could do or not do as it
21   related to one of these policyholders to whom you owed
22   a duty of good faith, as long as they stuck to the
23   authorization regardless of what means they used, that
24   would be okay --
25               MR. MEAGHER:  Objection.
```

113

```
1    Q.        -- in your judgment?
2                MR. MEAGHER:  Objection, calls
3                for speculation.  You can answer.
4    A.        You're asking a general -- me to
5    respond to a general question that's extremely broad.
6    I don't know how to answer you on that.
7    Q.        Let me try to refine the question and
8    maybe you can and maybe you can't answer it.
9                In the discharge of your duty of good
10   faith to the Jefferson-Pilot policyholders, was it the
11   case that as long as DMS didn't do anything that
12   violated the language of the authorization regardless
13   of what they did, it would be okay?
14               MR. MEAGHER:  Objection,
15               speculation.
16   Q.        Was that the case?
17               MR. MEAGHER:  You can answer.
18   A.        They should adhere to the terms of the
19   authorization.
20   Q.        And regardless of what they do to
21   undertake their rights under the authorization, it
22   would be okay with Jefferson-Pilot; is that the case?
23               MR. MEAGHER:  Objection, calls for
24               speculation.
25   A.        Again, I don't know how to answer your
```

114

```
1    question.
2    Q.        There would be nothing objectionable
3    regardless of what DMS did, however offensive or
4    aggressive it may be, regardless of what they do, as
5    long as it's contemplated as okay within the
6    authorization, you, in your capacity at
7    Jefferson-Pilot, having a duty of good faith to these
8    policyholders, would be okay with that, right?
9                MR. MEAGHER:  Objection, asked and
10               answered, argumentative, calls for
11               speculation.  You can answer again.
12   A.        You have put it in such broad terms, I
13   don't know how to answer your question.  You know,
14   when you say anything regardless, you know, that takes
15   in so much, I don't know how to answer your question.
16   Q.        Why not?
17               MR. MEAGHER:  Objection, asked and
18               answered.
19   Q.        Is it okay no matter what they do?  As
20   long as you could argue it's inside the authorization,
21   that would be okay to Jefferson-Pilot, in your
22   judgment; is that the case?
23               MR. MEAGHER:  Objection, asked and
24               answered several times, Counsel.  It's
25               now becoming vexatious and harassing.
```

115

```
1        You can answer again.
2                MR. ROBERTS:  There is some
3                vexatiousness going on here, but it's
4                not --
5    A.        You've put it in such broad terms, I
6    don't know how to answer your question.
7    Q.        Was it your expectation that DMS would
8    comply with state and federal privacy laws?
9    A.        Was it my expectation?
10   Q.        Right.
11   A.        Yes.
12   Q.        Even if the privacy laws and the
13   authorization would conflict?
14               MR. MEAGHER:  Objection insofar as
15               it calls for a legal conclusion.  You
16               can answer.
17   Q.        Was it your expectation that DMS would
18   do things authorized by the language of an
19   authorization even if those things would constitute a
20   violation of state and federal privacy laws?
21   A.        I've never had that situation to occur
22   and I'm not an attorney, but I would assume that you
23   would need to comply with federal regulation.
24   Q.        I'm not asking for a legal conclusion.
25   I'm just asking you as a senior officer responsible
```

116

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1  for disability insurance claims during that 28-month
2  period, was it acceptable to you that DMS violate
3  state and federal privacy laws as long as the action
4  is arguably permitted by the policyholder's
5  authorization?
6          MR. MEAGHER:  Objection, calls for
7  speculation, assumes facts not in
8  evidence.  You can answer.  Also, asked
9  and answered.
10          THE WITNESS:  I'm sorry?
11          MR. MEAGHER:  It was also asked
12  and answered.  You can go ahead and
13  answer.
14          THE WITNESS:  Okay.
15  A.      In my experience I've never had that
16  happen, so I don't know how to answer you.
17  Q.      Did you judge the authorization to
18  permit DMS to violate state and federal laws?
19          MR. MEAGHER:  Objection, assumes
20  facts not in evidence.  You can answer.
21  A.      Repeat the question, please.
22          (Reporter read the question.)
23  A.      And, again, I never had that situation
24  to come up.
25  Q.      I'm not asking you to relay to me a

117

1  specific situation that occurred or not.  Let me
2  rephrase.
3          Did you ever see the authorization
4  that Jefferson-Pilot required policyholders to sign?
5  A.      Probably.  I'm sure that I have seen
6  it.
7  Q.      Did the authorization change over time
8  at all?
9  A.      That I don't recall.  Authorizations
10  would be updated.
11  Q.      Meaning?
12  A.      There could be changes in
13  authorizations.
14  Q.      Do you recall that ever happening?
15  A.      I don't recall whether it ever did or
16  not.
17  Q.      Do you recall the authorization
18  changing once DMS took over?
19  A.      I don't recall.
20  Q.      In your position as an officer of
21  Jefferson-Pilot and senior officer responsible for
22  disability insurance claims, was it acceptable to you
23  that DMS use whatever tactics were at their disposal
24  in managing a claim even if the tactics are permitted
25  by the authorization?

118

1          MR. MEAGHER:  Objection, asked and
2  answered.  You can answer it.
3  A.      Could you repeat that question?
4          MR. ROBERTS:  The court reporter
5  will read it back.
6          (Reporter read the question.)
7          MR. MEAGHER:  Objection, asked
8  and answered.
9  A.      If the authorization permitted them to
10  obtain information, then I wouldn't see why they could
11  not do that.
12  Q.      Regardless of the tactics?
13  A.      Again, you're asking such a broad
14  question, I don't know how to answer --
15          MR. MEAGHER:  Excuse me.  The
16  question so far is regardless of the
17  tactics?
18          MR. ROBERTS:  Correct.
19          MR. MEAGHER:  Objection, asked
20  and answered.  Now you can answer
21  again.
22  A.      It is so broad here, I don't know how
23  to answer your question.
24  Q.      Could they be threatening to
25  policyholders even though they're not doing something

119

1  outside the authorization?
2          MR. MEAGHER:  Objection, assumes
3  facts not in evidence, calls for
4  speculation, calls for legal
5  conclusion.  You can answer.
6  A.      I don't know how to answer your
7  question.
8  Q.      If you learned that --
9          MR. MEAGHER:  Wait.  Are you done
10  with your answer?  You paused.  If you
11  are, that's fine.  If not, proceed.
12  A.      Go ahead.
13          MR. ROBERTS:  I'm just --
14  Mr. Meagher, are you concluded, sir?
15          MR. MEAGHER:  If my witness is, I
16  am.
17  Q.      Sir, are you concluded?
18  A.      Yeah.
19  Q.      If you learned while you were senior
20  officer, fiduciary duty good faith to the
21  policyholders that there was a DMS claim manager,
22  claim examiner who was threatening one of your
23  policyholders, would that be okay?
24          MR. MEAGHER:  Objection, calls
25  for speculation, assumes facts not in

120

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    evidence, also misstates the law. You
2    can answer.
3    A.          I've never had a situation where a
4    claim examiner or claim manager threatened an insured.
5    Q.          I'm not asking you to share with me
6    those occasions. I'm asking you, given the agreement
7    you signed, the authority you gave them, contracting
8    out that responsibility, was it your judgment that it
9    would be okay for them to threaten your policyholders
10   in the performance of their claim management function?
11   A.          No.
12   Q.          That would not be acceptable, correct?
13   A.          That's correct.
14   Q.          Even if what they're threatening with
15   is arguably not outside the authorization?
16           MR. MEAGHER:  Objection, asked and
17           answered.
18   Q.          Right?
19   A.          They should follow the authorization.
20   Q.          Would it be okay to intentionally
21   intimidate a policyholder to gain advantage?
22   A.          No.
23   Q.          Would it be okay to strategically take
24   advantage of someone with a mental disorder who was a
25   policyholder?

121

1    A.          I don't know what you mean by strategic
2    advantage.
3    Q.          Do you know anybody with a mental
4    disorder?
5    A.          Not personally, no.
6    Q.          Someone who's afraid of going out of
7    their house, there's some kind of phobia about that.
8    Are you mindful about that?
9    A.          Yeah.
10   Q.          What if your policyholder had that
11   particular illness and DMS was insistent that unless
12   the person came to meet them at Starbucks down the
13   street, they're going to cut them off next month and
14   they did it strategically, that's not outside the
15   authorization, right?
16           MR. MEAGHER:  Objection, calls
17           for speculation, argumentative, assumes
18           facts not in evidence. You can answer.
19   Q.          Correct?
20           THE WITNESS:  You better read the
21           question again. I lost track.
22           MR. ROBERTS:  I'll restate it.
23           THE WITNESS:  Okay.
24           MR. ROBERTS:  Counsel, all your
25           objections you want to make are

122

1    preserved. You don't have to say
2    17,000 different objections after every
3    objection. Just say the word objection
4    and everything legally permissible will
5    come in.
6    Q.          Would it be okay with you in your
7    discharge of your good faith duty to policyholders as
8    a senior officer of Jefferson-Pilot if you learned
9    that a DMS claim examiner who had knowledge that a
10   disabled policyholder had a disability that impacted
11   them in a way -- like they were feared for their life
12   to leave their own home, would it be okay if you
13   learned that the claim examiner was on a monthly basis
14   demanding that the person meet them at a public place?
15           MR. MEAGHER:  Objection,
16           speculation, assumes facts not in
17           evidence.
18   A.          I have never had experience with
19   something like that with a -- so I don't know how to
20   answer your question.
21   Q.          Would it be okay with you if you
22   learned that a DMS claim examiner was preying on a
23   particular disability of a policyholder?
24           MR. MEAGHER:  Same objections.
25   A.          I've never found any evidence that a

123

1    claim examiner ever preyed on a policyholder.
2    Q.          If that happened, that would be
3    upsetting to you, wouldn't it?
4    A.          If they were preying on the
5    policyholder, it would be upsetting, but, again, they
6    have certain rights based on the authorization.
7    Q.          So as long as it's inside the
8    authorization even if they're strategically preying on
9    the particular disability of a policyholder, that's
10   okay?
11           MR. MEAGHER:  Objection, asked and
12           answered.
13   Q.          Is that your testimony?
14           MR. MEAGHER:  Asked and answered
15           several times.
16   A.          I've never had experience with that, so
17   I don't know how to answer you. I've never had an
18   experience with an individual with this -- with
19   this...
20   Q.          I'm not asking you to document for me
21   some experience you have. I'm just saying, as the
22   senior officer discharging a duty of good faith to
23   these policyholders, would it be okay for DMS to
24   administer these claims in a way whereby they preyed
25   on the particular disability that that person was

124

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    undergoing?
2                        MR. MEAGHER: Objection.
3    Q.              Yes or no.
4                        MR. MEAGHER: Objection, asked and
5    answered.
6    A.              I've never known of DMS to prey on an
7    insured.
8    Q.              Would it be okay if you came to learn
9    that they did? Would that be okay with you?
10                        MR. MEAGHER: Same objection.
11    A.              It would be disturbing.
12                        (Off-the-record interruption.)
13    Q.              We're back on the record. You're
14    still under oath. I asked a question. You gave me a
15    response. I want to follow up on that answer.
16    Regardless of an authorization that a policyholder
17    might sign --
18                        (Off-the-record interruption.)
19    Q.              If something disturbed you in the
20    manner which DMS was going about its business, you
21    would direct them to cease that, correct?
22                        MR. MEAGHER: Objection, calls for
23    speculation.
24    A.              I never had any reason to see that they
25    were doing anything.

125

1    Q.              If you came to learn that something
2    occurred involving a DMS claim examiner that disturbed
3    you, would you ignore it?
4                        MR. MEAGHER: Speculation, assumes
5    facts not in evidence. You can answer.
6    A.              No.
7    Q.              Would you --
8    A.              But, again, you know, the question
9    you've asked me is speculation and I haven't had that
10    situation to occur.
11    Q.              But you're an honorable person. If you
12    learned that somebody to whom you delegated authority
13    engaged in activity that you would judge to be
14    disturbing, you would tell them to stop, wouldn't you?
15                        MR. MEAGHER: Objection to form.
16    A.              If I found something objectionable,
17    yes, I would tell them to cease. But it never
18    occurred.
19    Q.              What training did Jefferson-Pilot
20    provide to DMS with respect to the block of business
21    that it sent DMS's way?
22    A.              I'm sure they received policy forms.
23    I'm sure they received a claimant's statement with
24    authorization. Again, we were dealing with
25    experienced claim staff, so they applied the policy

126

1    provisions to the claims that they were handling.
2    Q.              Have you ever administered a claim,
3    disability claim?
4    A.              Not that I recall personally.
5    Q.              Have you ever had any extended
6    interaction with a person who was a disability
7    policyholder at Jefferson-Pilot?
8    A.              Ever had?
9    Q.              Extended interaction. I would presume
10    that from time to time someone might call you with a
11    complaint because you're the vice president of claims.
12    Other than the single incident anecdotal basis, did
13    you ever have any extended dialogue with any person on
14    their claim?
15    A.              I don't recall of any claims that I had
16    that type of extended dialogue on.
17    Q.              Did you ever speak to any disability
18    insurance claim policyholder?
19    A.              I'm sure that I have.
20    Q.              It wasn't a major function of your job,
21    though?
22    A.              No.
23    Q.              Correct, it was not a major function?
24    A.              That's correct, it was not a major
25    function.

127

1    Q.              So in your career you've really never
2    had any substantive interaction from a person
3    suffering from a disability with a claim for
4    disability insurance pending, right?
5    A.              I have had interaction with disability
6    claimants. Substantive interaction, again, is an
7    expansive word.
8    Q.              Other than the anecdotal contact from
9    time to time that we mentioned earlier, you've not had
10    any other interaction with disability insurance?
11    A.              Not prolonged interaction.
12    Q.              None prior to 1999?
13    A.              Not that I'm aware of.
14    Q.              None since May of 2002?
15    A.              None since 2002.
16    Q.              And in that window of time, it would
17    have been ad hoc, anecdotal. If someone contacted you
18    with a complaint, you would delegate it out or
19    respond, but, other than that, no interaction with
20    disability insurance claimants, right?
21    A.              I may have delegated it or I may have
22    responded myself.
23    Q.              That anecdotal potential. But,
24    otherwise, nothing, correct?
25    A.              I don't recall any prolonged...

128

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1   Q.          And you don't recall any training that
2   JP gave DMS about managing its block of business?
3   A.          Again, as I had said previously, you
4   know, we gave them copies of policies, policy forms,
5   claimants' statements, authorization. Those are just
6   items that I can think of at this point. There may
7   have been others.
8   Q.          And how they went about doing their job
9   was up to them?
10  A.          They did their job based on policy
11  provision and the claim investigation that they were
12  doing.
13  Q.          You presume, right? You're presuming
14  they did that that way. No one at Jefferson-Pilot
15  oversaw the way they went about doing their work.
16  A.          I was never in DMS's office that I
17  recall.
18  Q.          No one at Jefferson-Pilot oversaw the
19  manner in which DMS was doing its work, correct?
20              MR. MEAGHER: Objection, calls
21              for speculation. You can answer.
22  A.          As I had indicated earlier in the
23  deposition, I received periodic reports on items that
24  were -- on the claim handling that was being done.
25  Q.          But those didn't comment on the manner

129

1   in which DMS was doing its job, did they?
2   A.          Not that I recall.
3   Q.          So nobody at Jefferson-Pilot oversaw
4   the manner in which DMS was going about interacting
5   with claimants, correct?
6               MR. MEAGHER: Objection,
7               speculation. You can answer.
8   A.          I never saw any complaints regarding
9   that.
10  Q.          Didn't ask you that question.
11  A.          Okay.
12  Q.          Was there anybody at Jefferson-Pilot
13  that oversaw the manner in which DMS was interacting
14  with Jefferson-Pilot policyholders?
15  A.          That would have been part of my
16  responsibility that I would have judged based on
17  complaints that I received from policyholders if I --
18  or from claimants.
19              (Mr. Kearney confers with
20              Counsel.)
21  Q.          Do you know, sir, whether or not DMS
22  was instructing its -- the policyholders -- or that
23  DMS was instructing the JP policyholders to not
24  contact Jefferson-Pilot but rather deal exclusively
25  with DMS?

130

1   A.          DMS was our third-party administrator
2   handling the claims. They could have always called
3   the home office claim department. But I do not know
4   the answer to your question.
5   Q.          Right. The fact of the matter is you
6   don't have any information about what they were saying
7   or not saying to policyholders?
8   A.          I don't recall anything at this point.
9               (Mr. Kearney confers with
10              Counsel.)
11  Q.          Did DMS interact with Jefferson-Pilot
12  with regard to settlement of claims?
13  A.          What do you mean by settlement?
14  Q.          Agreeing to resolve a dispute with a
15  policyholder for the payment of some consideration.
16  A.          Yes.
17  A.          I can't remember what the question was
18  you're answering.
19  A.          Yes, they would have consulted with
20  Jefferson-Pilot.
21  Q.          Were they in every instance required to
22  get your approval for some settlement proposal?
23  A.          I'm not certain on every proposal for
24  settlement. Generally, yes.
25  Q.          Who was the person that DMS would need

131

1   to interact with to receive authorization to extend a
2   settlement proposal to a policyholder?
3   A.          It would have been me.
4   Q.          Would you have interacted with the
5   lower level claim examiners or would it be the claims
6   manager at DMS who would contact you for that
7   authority?
8   A.          I don't recall who it would have been.
9   Q.          Do you recall authorizing anybody at
10  DMS to ever settle a claim for greater than $200,000?
11  A.          Again, it's been so long, I just -- I
12  don't remember what amounts would have been -- you
13  know, what the maximum amount they would have
14  requested settlement for.
15  Q.          That's within the ballpark of
16  conversations you would have had with them, that type
17  of number?
18              MR. MEAGHER: Objection to form.
19  A.          Or less or more.
20  Q.          Was it the situation where if they were
21  going to go to a policyholder and say, hey, we'll pay
22  $250,000 to settlement the dispute, would they have
23  needed your authority to make that proposal?
24  A.          There was -- I think there was some
25  limit where they would have to get my authority, but I

132

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1   don't recall what that amount was.
2   Q.          You don't know if it's north or south
3   of $250,000?
4   A.          I really don't. I just don't recall.
5                   (Mr. Kearney confers with
6                   Counsel.)
7   Q.          If the agreement suggests that the
8   threshold for seeking authorization is less than
9   $100,000, was it your expectation that before they
10  made settlement offers at -- north of $200,000, they
11  would have come to you and asked for your authority?
12  A.          I don't know what -- I don't know what
13  the agreement says. I don't recall what it says.
14  Q.          Assume for me it says $75,000.
15  A.          I'm sorry?
16  Q.          Assume for me that it says $75,000,
17  okay? Would it be your expectation that they would
18  interact with you before offering to settle a claim
19  for $250,000?
20  A.          I would assume that, yes.
21  Q.          And what type of information would you
22  have required to judge for yourself whether that
23  number was appropriate or not?
24  A.          I would ask for details.
25  Q.          Did you get memoranda saying, you know,

133

1   Joe Blow claimed X, Y, Z disability, here's what we
2   know, here's what he claims, here's the dispute,
3   here's what we'd like to propose?
4   A.          I don't recall getting any memoranda
5   regarding that.
6   Q.          It was all just over the phone?
7   A.          Telephonic.
8   Q.          Catch you on the fly, here's the deal,
9   what do you say, yes or no, that kind of thing?
10                  MR. MEAGHER: Objection to form.
11  A.          It was usually by telephone.
12  Q.          And they were usually conversations you
13  would cover in a single phone call?
14  A.          Again, I don't recall. It may have
15  been one call or it may have been more than one. I
16  may have had additional questions. Again, whatever
17  the limitation is, just because it is that limit
18  doesn't mean that they wouldn't call on items below
19  that limit.
20  Q.          Right. Did Swift have any interactions
21  with DMS along that regard?
22  A.          Who?
23  Q.          Who's the gentleman that worked with
24  you? Was it Swift?
25  A.          Paul Swink.

134

1   Q.          Swink.
2   A.          He may have.
3   Q.          Did he have authority from you to
4   authorize settlement of claims north of $200,000?
5   A.          No.
6   Q.          Do you know Mr. Kearney?
7   A.          No, I do not.
8   Q.          Do you recall anything about
9   Mr. Kearney being a policyholder or claimant of
10  Jefferson-Pilot?
11  A.          No, I do not.
12  Q.          Do you recall an occasion in 2001 where
13  Mr. Hughes or Mills or Ditmar sought your authority to
14  settle Mr. Kearney's claim?
15  A.          No, I do not.
16  Q.          When you authorized the settlement of
17  claims or disputes with policyholders, did you discuss
18  with DMS the other materials that would go with the
19  offer; for example, how long the offer would be open,
20  things like that?
21  A.          I don't specifically recall discussing
22  those items.
23  Q.          And as a general manager, if you
24  learned that DMS was making settlement proposals to
25  policyholders and giving them 15 minutes to make the

135

1   decision or the offer was withdrawn, would that have
2   disturbed you?
3                   MR. MEAGHER: Objection, assumes
4                   facts not in evidence, speculation.
5                   You can answer.
6   A.          In my experience, that never happened.
7   Q.          What if that did happen on an offer
8   that you had authorized them to make, is that
9   something you would think is consistent with a duty of
10  good faith to the policyholder?
11  A.          Again, my response would be it never
12  happened.
13  Q.          What if it did happen?
14                  MR. MEAGHER: Objection, assumes
15                  facts not in evidence, asked and
16                  answered.
17  A.          But it didn't.
18  Q.          Would it be disturbing, if it did?
19                  MR. MEAGHER: Calls for
20                  speculation, objection. You can
21                  answer.
22  A.          I've never seen a situation where
23  someone was given 15 minutes to make a decision.
24  Q.          Would it be inconsistent, you think,
25  with the duty you have to the policyholder to put that

136

**Page 137**

```
 1   type time frame on someone, especially if the person's
 2   disabled and suffering from a mental disorder?
 3   A.        Again, I've never seen that type of
 4   limitation put on a proposed settlement agreement.
 5   Q.        Did you ever stipulate that offers be
 6   proposed in that type of manner?
 7   A.        No.
 8   Q.        Why not?
 9   A.        It never occurred to me to give someone
10   15 minutes to...
11   Q.        Is that unreasonable?
12             MR. MEAGHER:  Objection to form,
13             calls for speculation.
14   A.        I've never seen it in my experience.
15   Q.        So you think it might be reasonable?
16   A.        I've never seen it happen.  I don't
17   know how else to answer your question.
18   Q.        So you'd have to see it happen first
19   before you could give me a judgment about whether you
20   believe in your carrying out and discharge of your
21   duty of good faith to policyholders that it would be
22   something that would be reasonable --
23             MR. MEAGHER:  Objection, asked --
24   Q.        -- or not reasonable?
25             MR. MEAGHER:  Objection, asked and
```

**Page 138**

```
 1   answered.
 2   A.        The time limits seem short.
 3             MR. ROBERTS:  Why don't you give
 4             me a break.  We might be real close and
 5             either we can go to lunch or we can
 6             defer lunch to a short time in the
 7             future.
 8             (A break was taken.)
 9   Q.        Mr. Honaker, we're back on the record
10   and you're under oath.  Are you mindful that
11   Jefferson-Pilot sued Chris Kearney in 2002?
12   A.        No, I'm not.
13   Q.        During your tenure, are you mindful of
14   Jefferson-Pilot suing any of its claimants?
15   A.        I don't know of anyone specifically,
16   but it certainly could have occurred.
17   Q.        Let's define it as disability insurance
18   claimant since you had responsibilities elsewhere.
19   A.        I don't recall anyone at this point.
20   Q.        Did you interact with anybody at
21   Jefferson-Pilot about the need, desire or strategy to
22   sue a disability insurance claimant?
23   A.        Not that I'm aware of.
24   Q.        Did you interact with outside counsel
25   at all, someone named Jerry Johnson, about bringing
```

**Page 139**

```
 1   action against Mr. Kearney in 2002?
 2   A.        I've never heard the name Jerry
 3   Johnson.
 4   Q.        Did you interact with in-house counsel
 5   at all about the company bringing a lawsuit against
 6   one of the policyholders over a claim and that claim
 7   for which you had senior management responsibility?
 8   A.        I don't know of a claim specifically,
 9   no.
10   Q.        That's not something that you felt was
11   within your responsibility field, i.e., being advised
12   when the company was going to take legal action
13   against one of the policyholders of a claim that you
14   had senior responsibility for?
15   A.        I don't recall that occurring.
16   Q.        Would it have been your expectation
17   that you would have been involved in the
18   decision-making process if it had occurred?
19             MR. MEAGHER:  Objection to form,
20             speculation.  You can answer.
21   A.        I would have been advised regarding it.
22   Q.        What happened with all the pending
23   claims that went to DMS?  Did all the files and every
24   document get transferred from Jefferson-Pilot to DMS
25   for those claims that they took over responsibility
```

**Page 140**

```
 1   for?
 2   A.        The complete claim file would have gone
 3   to DMS.
 4   Q.        Which would mean every document
 5   relating to each respective claim?
 6   A.        As far as I know, yes.
 7   Q.        And did you say that DMS got specimens
 8   of all the policies, the forms that you sent to
 9   claimants, including the authorization?
10   A.        Yes.
11   Q.        For its use in continuing the claim
12   management?
13   A.        That's correct.
14   Q.        Do you recall ever DMS coming back and
15   saying, we want to make these tweaks to your forms
16   because we think they'd be better if they had our
17   language?
18   A.        I don't recall that.
19   Q.        Do you know a gentleman named Bill
20   Dempsey?
21   A.        Yes.
22   Q.        Did you ever interact with Mr. Dempsey?
23   A.        Yes.
24   Q.        What was the nature of the interaction
25   with Mr. Dempsey?
```

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    A.         He did reinsurance claim audits on one
2    or two occasions.
3    Q.         On disability insurance?
4    A.         Yes.
5    Q.         Did that mean he came to your offices
6    to look at claim files --
7    A.         Yes.
8    Q.         -- on one or two occasions in the year
9    1999?
10   A.         I have no idea the time -- the time
11   frame.
12   Q.         Did he ever come to your office in the
13   1999 period?
14   A.         Again, I don't know anything regarding
15   the time frame.
16   Q.         How about Robert Linner, do you know
17   who he is?
18   A.         The name is not familiar.
19   Q.         L-i-n-n-e-r.
20   A.         The name's not familiar to me.
21   Q.         Have you described for me all the
22   interaction with Mr. Dempsey that you can recall?
23   A.         I know that he did claim audits.  You
24   know, he came to our office for claim audits.  I don't
25   recall anything beyond that.

                                                        141

1    Q.         He went to that effort because his
2    company had a financial interest in the claims?
3    A.         I assume that was the reason, yes.
4    Q.         But you don't have a memory of
5    interacting with him about the undertaking of hiring
6    DMS to administer the claims?
7    A.         I don't recall it, no.
8               MR. ROBERTS:  Sir, we're
9    concluded.  Thank you for your time.
10              MR. MEAGHER:  I have no questions.
11   Just make sure the record reflects
12   Mr. Kearney's presence during this
13   deposition.
14   ------------------------
15        (DEPOSITION CONCLUDED)
16   ------------------------
17
18
19
20
21
22
23
24
25

                                                        142

1    STATE OF KENTUCKY  )
     COUNTY OF FAYETTE  )
2
3
4          I, TAMELA T. LEWIS, Certified Court Reporter
5    and Notary Public, State of Kentucky at Large, certify
6    that the facts stated in the caption hereto are true;
7    that at the time and place stated in said caption the
8    witness named in the caption after being by me duly
9    sworn, was examined by counsel for the parties; that
10   said testimony was taken down in stenotype me by and
11   later reduced to typewriting, by computer, under my
12   direction; and the foregoing is a true and complete
13   record of the testimony given by said witness.
14         No party to said action nor counsel for said
15   parties requested in writing that said deposition be
16   signed by the testifying witness.
17         My commission expires:  March 19, 2011.
18         In testimony whereof, I have hereunto set my
19   hand and seal of office on this the 22nd day of March,
20   2007.
21
22
23              TAMELA T. LEWIS
                Certified Court Reporter
24              Certificate No. 20042065
                Notary Public, State-at-Large
25

                                                        143

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | |
| 2 | <$> |
| 3 | $100,000: 133;9 |
| 4 | $2,000: 90;9 |
| 5 | $200,000: 132;10, 133;10, 135;4 |
| 6 | $250,000: 132;22, 133;3, 133;19 |
| 7 | $75,000: 133;14, 133;16 |
| 8 | |
| 9 | <-> |
| 10 | '02: 40;19, 40;25 |
| 11 | '93: 21;23 |
| 12 | '94: 56;23 |
| 13 | '95: 17;16, 24;20, 31;5, 33;16, 34;8, 35;2 |
| 14 | '99: 31;3, 31;3, 31;4, 31;5, 31;9, 34;4, 34;8, 35;19, |
| 15 | 39;19, 40;24, 44;1, 45;5, 45;6, 52;4, 56;25, 57;3, |
| 16 | 61;22, 81;12 |
| 17 | |
| 18 | <1> |
| 19 | 1: 2;21 |
| 20 | 1:02-CV-00479: 1;2 |
| 21 | 10:00 a.m.: 1;18 |
| 22 | 11:30: 6;25 |
| 23 | 12-to-15-month: 16;2 |
| 24 | 125: 58;8, 66;11 |
| 25 | 140: 29;18, 29;21 |

1

| | |
|---|---|
| 1 | 21008: 2;8 |
| 2 | 22nd: 143;19 |
| 3 | 24: 42;12 |
| 4 | 27420: 2;9 |
| 5 | 28: 111;14, 112;2 |
| 6 | 28-month: 97;7, 102;6, 103;5, 117;1 |
| 7 | |
| 8 | <3> |
| 9 | 3-142: 2;23 |
| 10 | 33131: 2;6 |
| 11 | 3505: 31;22 |
| 12 | |
| 13 | <4> |
| 14 | 40509: 31;23 |
| 15 | 42-year: 107;10 |
| 16 | 45202: 2;13 |
| 17 | 48: 37;15 |
| 18 | |
| 19 | <5> |
| 20 | 50: 51;4 |
| 21 | 511: 2;12 |
| 22 | 59: 42;7 |
| 23 | |
| 24 | <6> |
| 25 | 62: 16;9 |

3

| | |
|---|---|
| 1 | 143: 2;24 |
| 2 | 15: 30;16, 135;25, 136;23, 137;10 |
| 3 | 1500: 2;5 |
| 4 | 17,000: 123;2 |
| 5 | 1900: 2;12 |
| 6 | 1964: 17;21 |
| 7 | 1975: 21;11 |
| 8 | 1990: 29;13 |
| 9 | 1993: 21;11, 22;13, 23;19, 33;6 |
| 10 | 1995: 16;19, 17;22, 22;13, 32;4, 35;18 |
| 11 | 1999: 30;22, 31;15, 31;15, 34;3, 35;2, 37;6, 38;16, |
| 12 | 40;9, 45;2, 50;5, 50;22, 59;5, 66;8, 69;13, 76;23, |
| 13 | 79;5, 80;14, 87;11, 88;10, 128;12, 141;9, 141;13 |
| 14 | |
| 15 | <2> |
| 16 | 2: 2;22 |
| 17 | 2000: 88;17, 92;2, 92;15, 93;1, 93;14, 93;24, 96;9 |
| 18 | 2001: 135;12 |
| 19 | 2002: 11;16, 11;23, 12;10, 12;17, 16;7, 16;19, 24;24, |
| 20 | 25;3, 28;11, 30;24, 31;9, 88;11, 89;13, 89;17, 128;14, |
| 21 | 128;15, 138;11, 139;1 |
| 22 | 20042065: 143;23 |
| 23 | 2007: 14;3, 14;5, 14;15, 14;20 |
| 24 | 201: 2;5 |
| 25 | 209: 1;16 |

2

| | |
|---|---|
| 1 | 67: 108;23 |
| 2 | |
| 3 | <7> |
| 4 | 75: 58;8, 66;11 |
| 5 | |
| 6 | <9> |
| 7 | 900: 29;15 |
| 8 | |
| 9 | <A> |
| 10 | abreast: 76;15 |
| 11 | Absolutely: 24;12, 36;23, 86;3, 87;14, 99;5, 100;15 |
| 12 | accept: 9;13 |
| 13 | acceptable: 109;8, 109;18, 110;7, 117;2, 118;22, |
| 14 | 121;12 |
| 15 | accepted: 30;11, 41;6, 47;25 |
| 16 | accord: 10;1 |
| 17 | according: 27;3, 42;12, 56;2 |
| 18 | acquired: 46;5, 46;8, 90;17 |
| 19 | acquisition: 46;1 |
| 20 | action: 3;13, 23;22, 117;3, 139;1, 139;12, 143;14 |
| 21 | active: 95;24 |
| 22 | actively: 46;20 |
| 23 | activities: 7;15, 10;17 |
| 24 | activity: 97;1, 126;13 |
| 25 | ad: 66;6, 128;17 |

4

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | add: 43;4, 59;25, 65;8 |
| 2 | addition: 90;19 |
| 3 | Additional: 35;1, 63;2, 83;3, 93;13, 94;23, 134;16 |
| 4 | adequate: 55;10, 83;3, 83;7, 83;10, 84;2, 84;3 |
| 5 | adhere: 114;18 |
| 6 | adjudication: 109;25 |
| 7 | administer: 29;9, 56;11, 95;16, 124;24, 142;6 |
| 8 | administered: 89;1, 92;16, 96;13, 127;2 |
| 9 | administering: 33;22, 75;24, 86;4, 90;11, 96;4, |
| 10 | 97;18, 100;16, 109;19 |
| 11 | administrating: 54;20, 90;4 |
| 12 | administration: 20;5, 20;9, 30;1, 92;3, 92;20, 93;19, |
| 13 | 93;20, 109;25 |
| 14 | administrative: 20;21, 20;22, 20;24, 29;23, 37;17, |
| 15 | 38;5 |
| 16 | administrator: 72;8, 90;3, 91;10, 131;1 |
| 17 | administrators: 25;22, 25;25, 73;16, 73;23, 74;4, |
| 18 | 74;14, 74;18 |
| 19 | ads: 66;8 |
| 20 | advantage: 121;21, 121;24, 122;2 |
| 21 | advertise: 27;22 |
| 22 | advice: 85;17 |
| 23 | advise: 76;10, 76;15, 76;16, 78;8 |
| 24 | advised: 47;7, 139;11, 139;21 |
| 25 | affairs: 22;16 |

5

| | |
|---|---|
| 1 | Amy: 6;11 |
| 2 | analysis: 26;19 |
| 3 | and...: 41;13 |
| 4 | and/or: 45;18 |
| 5 | Anderson: 105;2, 105;5, 106;4 |
| 6 | Andy: 105;6 |
| 7 | anecdotal: 127;12, 128;8, 128;17, 128;23 |
| 8 | annuity: 29;7, 29;24 |
| 9 | answer: 4;8, 4;13, 7;17, 8;16, 8;24, 9;11, 11;2, |
| 10 | 11;5, 11;12, 14;12, 16;6, 23;10, 23;13, 23;20, 32;17, |
| 11 | 32;24, 37;22, 37;23, 41;21, 42;2, 42;23, 43;5, 43;16, |
| 12 | 49;11, 50;13, 50;19, 51;2, 51;13, 55;14, 58;19, 59;11, |
| 13 | 60;19, 60;24, 61;4, 61;17, 62;12, 63;5, 63;13, 67;13, |
| 14 | 68;18, 71;11, 72;6, 76;12, 77;18, 78;10, 78;22, 82;2, |
| 15 | 83;1, 87;9, 92;11, 92;22, 93;23, 95;21, 95;25, 104;10, |
| 16 | 107;14, 110;2, 111;8, 111;9, 111;21, 112;19, 113;1, |
| 17 | 113;18, 114;3, 114;6, 114;8, 114;17, 114;25, 115;11, |
| 18 | 115;13, 115;15, 116;1, 116;6, 116;16, 117;8, 117;13, |
| 19 | 117;16, 117;20, 119;2, 119;14, 119;20, 119;23, 120;5, |
| 20 | 120;6, 120;10, 121;2, 122;18, 123;20, 124;17, 125;15, |
| 21 | 126;5, 129;21, 130;7, 131;4, 136;5, 136;21, 137;17, |
| 22 | 139;20 |
| 23 | answering: 19;1, 131;18 |
| 24 | anybody: 6;5, 9;22, 28;20, 35;11, 37;16, 48;23, |
| 25 | 54;18, 68;11, 72;10, 72;23, 75;11, 80;21, 84;24, |

7

| | |
|---|---|
| 1 | affidavit: 26;23 |
| 2 | affirmatively: 99;17, 103;20 |
| 3 | afraid: 122;6 |
| 4 | agency: 20;5, 20;9, 20;10 |
| 5 | agendas: 102;2 |
| 6 | agents: 19;2, 20;12, 20;16 |
| 7 | aggressive: 115;4 |
| 8 | agreed: 3;24 |
| 9 | Agreeing: 131;14 |
| 10 | Agreement: 25;7, 37;18, 38;5, 38;14, 38;19, 38;22, |
| 11 | 41;3, 51;9, 51;17, 51;19, 52;2, 52;10, 52;13, 52;17, |
| 12 | 52;20, 52;25, 53;4, 53;5, 59;14, 72;25, 73;3, 77;1, |
| 13 | 77;19, 77;22, 77;25, 78;14, 80;19, 81;17, 81;18, 82;5, |
| 14 | 84;18, 84;20, 84;22, 84;25, 85;2, 85;7, 85;16, 85;20, |
| 15 | 101;24, 103;22, 104;19, 104;21, 104;24, 110;22, |
| 16 | 110;23, 121;6, 133;7, 133;13, 137;4 |
| 17 | agreement's: 38;13 |
| 18 | ahead: 41;23, 41;23, 43;6, 51;14, 54;3, 58;5, 68;19, |
| 19 | 77;18, 77;18, 86;15, 117;12, 120;12 |
| 20 | AL: 1;8 |
| 21 | alive: 26;19 |
| 22 | allegedly: 59;19, 60;15, 78;18, 78;24, 82;10 |
| 23 | allow: 110;12 |
| 24 | allowed: 11;6 |
| 25 | amounts: 132;12 |

6

| | |
|---|---|
| 1 | 85;15, 96;21, 96;24, 100;10, 102;16, 122;3, 130;12, |
| 2 | 132;9, 138;20 |
| 3 | anyone's: 77;21, 81;8, 97;13 |
| 4 | apartment: 31;1, 39;4, 39;7 |
| 5 | APPEARANCES: 2;1, 2;22 |
| 6 | application: 27;11 |
| 7 | applications: 20;15, 26;6 |
| 8 | applied: 126;25 |
| 9 | appropriate: 133;23 |
| 10 | approval: 71;5, 72;14, 77;21, 131;22 |
| 11 | approximate: 1;17 |
| 12 | Approximately: 12;7, 19;20, 20;3, 21;6, 21;11, 29;15, |
| 13 | 29;18, 30;16 |
| 14 | April 1999: 40;19, 55;6 |
| 15 | April 1999,: 39;12, 46;25 |
| 16 | April 2002,: 102;7 |
| 17 | April 2002?: 103;6, 104;8 |
| 18 | April 30: 11;23 |
| 19 | April 30, 2002: 11;17, 92;9, 96;9 |
| 20 | April 30th: 88;11, 89;13, 89;17 |
| 21 | April: 34;5, 34;8, 35;2, 35;19, 37;5, 39;19, 40;24, |
| 22 | 44;1, 45;5, 50;5, 57;3, 61;22, 73;10, 81;12, 88;10 |
| 23 | area: 16;12, 21;8, 21;10, 21;13, 21;23, 22;12, 30;1, |
| 24 | 31;17, 34;24, 41;12, 41;13, 41;25, 53;19, 60;4, 64;23, |
| 25 | 65;8, 65;11, 65;18, 66;3, 103;2 |

8

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | arguably: 117;4, 121;15 |
| 2 | argue: 115;20 |
| 3 | argumentative: 42;20, 50;12, 58;17, 72;6, 82;1, 89;3, |
| 4 | 95;20, 107;13, 115;10, 122;17 |
| 5 | arriving: 92;7 |
| 6 | asking: 77;11, 77;12, 95;22, 107;8, 107;9, 114;4, |
| 7 | 116;24, 116;25, 117;25, 119;13, 121;5, 121;6, 124;20 |
| 8 | assess: 57;25, 66;25 |
| 9 | assessment: 38;14, 41;3, 51;9, 51;17, 52;2, 55;9, |
| 10 | 55;17, 56;14, 64;18, 77;25, 81;12, 81;13, 84;18 |
| 11 | assignments: 30;12 |
| 12 | assist: 39;17, 53;20, 54;4 |
| 13 | assistance: 54;6, 79;23 |
| 14 | assistant: 20;21, 20;23, 21;15, 33;7 |
| 15 | Assisting: 20;10, 20;13, 20;25, 23;8, 23;16 |
| 16 | associated: 36;11 |
| 17 | association: 26;10 |
| 18 | Assume: 39;6, 59;23, 59;25, 61;9, 61;24, 61;25, 83;3, |
| 19 | 116;22, 133;14, 133;16, 133;20, 142;3 |
| 20 | assumed: 33;23 |
| 21 | assumes: 42;22, 51;1, 51;12, 55;13, 58;18, 71;10, |
| 22 | 82;25, 87;8, 111;7, 117;7, 117;19, 120;2, 120;25, |
| 23 | 122;17, 123;16, 126;4, 136;3, 136;14 |
| 24 | assumption: 62;3, 62;7, 62;15 |
| 25 | assure: 103;21 |

9

| | |
|---|---|
| 1 | attach: 10;19 |
| 2 | attempt: 42;17, 69;1 |
| 3 | attempting: 44;20 |
| 4 | attend: 40;2 |
| 5 | attorney-client: 8;22, 9;10 |
| 6 | audit: 26;7, 26;16, 26;25, 27;12, 100;10, 100;17, |
| 7 | 101;11, 101;11, 101;17, 101;21 |
| 8 | audited: 100;24, 100;25, 101;2 |
| 9 | auditor's: 101;13 |
| 10 | auditors: 100;18, 100;19, 100;24, 100;25, 101;1, |
| 11 | 101;6 |
| 12 | audits: 141;1, 141;23, 141;24 |
| 13 | authority: 76;16, 121;7, 126;12, 132;7, 132;23, |
| 14 | 132;25, 133;11, 135;3, 135;13 |
| 15 | Authorization: 110;25, 111;1, 111;11, 111;15, 111;24, |
| 16 | 112;11, 112;20, 112;21, 113;8, 113;13, 113;15, 113;19, |
| 17 | 113;23, 114;12, 114;19, 114;21, 115;6, 115;20, 116;13, |
| 18 | 116;19, 117;5, 117;17, 118;3, 118;7, 118;17, 118;25, |
| 19 | 119;9, 120;1, 121;15, 121;19, 122;15, 124;6, 124;8, |
| 20 | 125;16, 126;24, 129;5, 132;1, 133;8, 140;9 |
| 21 | Authorizations: 112;8, 118;9, 118;13 |
| 22 | authorize: 135;4 |
| 23 | authorized: 116;18, 135;16, 136;8 |
| 24 | authorizing: 132;9 |
| 25 | availability: 8;2, 8;7, 60;2, 60;3 |

10

| | |
|---|---|
| 1 | available: 15;14, 15;16, 56;8 |
| 2 | average: 51;5, 58;7 |
| 3 | aware: 41;17, 41;24, 69;24, 70;12, 70;17, 111;18, |
| 4 | 111;22, 111;23, 112;10, 128;13, 138;23 |
| 5 | away: 66;22, 106;16 |
| 6 | |
| 7 | <B> |
| 8 | background: 50;3, 56;12, 64;18 |
| 9 | bad: 24;1, 65;15 |
| 10 | ballpark: 132;15 |
| 11 | bar: 99;6 |
| 12 | base: 25;5, 25;20, 25;23 |
| 13 | Based: 54;7, 55;4, 56;7, 56;16, 74;15, 84;7, 85;5, |
| 14 | 91;13, 91;15, 91;18, 104;7, 110;10, 110;20, 124;6, |
| 15 | 129;10, 130;16 |
| 16 | basis: 96;4, 98;2, 98;6, 123;13, 127;12 |
| 17 | beauty: 78;17, 79;21, 79;22, 80;2, 80;5 |
| 18 | became: 23;4, 29;17, 33;7, 42;8, 57;15, 68;4 |
| 19 | become: 32;12, 36;2, 42;14, 50;8 |
| 20 | becoming: 115;25 |
| 21 | began: 32;4 |
| 22 | begin: 53;13, 64;14 |
| 23 | beginning: 33;16, 40;18, 50;5 |
| 24 | begun: 81;11 |
| 25 | BEHALF: 1;4, 1;12, 2;3, 2;10, 38;17, 38;23, 51;18, |

11

| | |
|---|---|
| 1 | 52;2, 85;8, 87;7 |
| 2 | bell: 38;18, 105;10 |
| 3 | below: 134;18 |
| 4 | beneath: 55;22, 92;25, 95;6, 102;5, 102;7, 102;16, |
| 5 | 102;16, 102;21 |
| 6 | benefit: 13;16, 17;13 |
| 7 | benefits: 27;16 |
| 8 | best: 98;5 |
| 9 | bet: 16;23 |
| 10 | better: 122;20, 140;16 |
| 11 | beyond: 45;9, 141;25 |
| 12 | Bill: 105;9, 140;19 |
| 13 | birth: 15;8 |
| 14 | Biscayne: 2;5 |
| 15 | bit: 4;19, 4;22 |
| 16 | block: 22;23, 29;25, 33;22, 36;19, 43;7, 44;8, 46;18, |
| 17 | 46;24, 47;20, 61;8, 61;11, 61;14, 61;21, 62;8, 62;19, |
| 18 | 62;20, 62;24, 63;1, 63;3, 63;8, 63;17, 63;23, 64;7, |
| 19 | 64;17, 76;17, 90;5, 95;23, 126;20, 129;2 |
| 20 | Blow: 134;1 |
| 21 | blue: 17;25 |
| 22 | Bob: 104;14, 105;12 |
| 23 | Bonsal: 104;14, 104;22 |
| 24 | boss: 69;19, 70;6, 73;15 |
| 25 | Boulevard: 2;5 |

12

3 (9-12)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | bounds: 109;9, 109;12, 110;15, 111;10, 111;24, 112;7, |
| 2 | 113;13 |
| 3 | Bowen: 2;4 |
| 4 | Box: 2;8 |
| 5 | boxes: 49;1 |
| 6 | break: 28;7, 28;8, 53;12, 57;18, 71;23, 71;25, 72;2, |
| 7 | 138;4, 138;8 |
| 8 | bring: 18;19 |
| 9 | bringing: 138;25, 139;5 |
| 10 | broad: 114;5, 115;12, 116;5, 119;13, 119;22 |
| 11 | bulk: 96;2 |
| 12 | bunch: 49;10, 68;3, 68;6 |
| 13 | Bureau: 25;11 |
| 14 | business: 7;4, 13;4, 15;19, 22;16, 22;18, 22;21, |
| 15 | 22;23, 24;9, 26;9, 27;20, 29;1, 29;8, 29;10, 29;24, |
| 16 | 29;25, 32;14, 32;19, 32;21, 33;9, 33;22, 36;20, 36;22, |
| 17 | 43;7, 43;10, 43;20, 44;8, 44;11, 46;18, 46;25, 47;7, |
| 18 | 47;14, 47;20, 48;4, 49;7, 49;14, 49;23, 50;8, 55;7, |
| 19 | 55;8, 61;9, 62;25, 63;1, 63;17, 63;23, 64;17, 76;18, |
| 20 | 87;4, 90;5, 95;24, 107;5, 125;20, 126;20, 129;2 |
| 21 | but...: 68;15 |
| 22 | buy: 13;18 |
| 23 | |
| 24 | <C> |
| 25 | calendar: 11;18 |

13

| | |
|---|---|
| 1 | Center: 2;5, 2;12 |
| 2 | Central: 17;18, 18;7, 18;10, 18;16, 20;13, 21;19, |
| 3 | 22;15, 22;17, 22;18, 22;23, 22;25, 24;9, 29;1, 29;8, |
| 4 | 29;13, 29;16, 30;19, 31;6, 31;14, 32;15, 33;1, 33;24 |
| 5 | Central's: 32;19 |
| 6 | certain: 18;14, 24;6, 36;23, 40;15, 59;15, 86;2, |
| 7 | 86;3, 86;18, 87;14, 93;2, 98;4, 100;13, 100;15, |
| 8 | 100;23, 101;14, 104;20, 106;14, 111;13, 124;6, 131;23 |
| 9 | Certainly: 76;25, 84;9, 138;16 |
| 10 | Certificate: 26;23, 143;23 |
| 11 | Certificate...............: 2;24 |
| 12 | Certified: 1;13, 143;4, 143;23 |
| 13 | certify: 143;5 |
| 14 | cetera: 17;14 |
| 15 | chance: 48;12, 92;16 |
| 16 | change: 31;11, 33;4, 118;7 |
| 17 | changed: 31;18 |
| 18 | changes: 118;12 |
| 19 | changing: 118;18 |
| 20 | Charles: 40;10, 40;11, 72;18 |
| 21 | charts: 99;6 |
| 22 | cheaper: 67;9 |
| 23 | checked: 11;17 |
| 24 | children: 16;20 |
| 25 | chose: 14;22 |

15

| | |
|---|---|
| 1 | call: 8;19, 9;15, 13;5, 25;25, 74;21, 79;4, 93;9, |
| 2 | 127;10, 134;13, 134;15, 134;18 |
| 3 | called: 25;10, 38;13, 74;23, 131;2 |
| 4 | calling: 8;5 |
| 5 | Callo: 6;13 |
| 6 | Calls: 8;15, 60;19, 67;12, 95;19, 110;18, 111;6, |
| 7 | 112;25, 113;17, 114;2, 114;23, 115;10, 116;15, 117;6, |
| 8 | 120;3, 120;4, 120;24, 122;16, 125;22, 129;20, 136;19, |
| 9 | 137;13 |
| 10 | capacities: 18;15 |
| 11 | Capacity: 20;1, 34;1, 38;22, 62;16, 84;10, 91;1, |
| 12 | 91;2, 91;5, 91;7, 91;13, 92;23, 92;23, 93;5, 93;7, |
| 13 | 94;7, 94;9, 94;19, 94;22, 96;3, 96;4, 115;6 |
| 14 | Caption: 2;21, 143;6, 143;7, 143;8 |
| 15 | career: 39;13, 39;25, 42;8, 107;18, 107;21, 128;1 |
| 16 | Carolina: 2;9, 11;25, 12;6, 16;21, 30;5, 30;8, 30;13, |
| 17 | 30;16, 31;9, 34;12, 34;25, 39;5, 39;6, 39;8, 45;22, |
| 18 | 48;25, 54;19, 67;6 |
| 19 | carrying: 137;20 |
| 20 | CASE: 1;2, 47;23, 71;2, 93;8, 114;11, 114;16, 114;22, |
| 21 | 115;22 |
| 22 | Catch: 134;8 |
| 23 | caused: 12;3, 14;18, 31;11 |
| 24 | cease: 125;21, 126;17 |
| 25 | ceased: 24;5 |

14

| | |
|---|---|
| 1 | Chris: 3;10, 10;4, 10;10, 138;11 |
| 2 | CHRISTOPHER: 1;7, 2;15 |
| 3 | chronologically: 18;20 |
| 4 | Chubb: 46;6 |
| 5 | Cincinnati: 2;13, 6;11 |
| 6 | Civil: 1;21 |
| 7 | claim: 21;14, 26;7, 26;16, 26;19, 27;3, 27;18, 39;18, |
| 8 | 44;24, 44;25, 45;8, 45;22, 55;18, 58;14, 59;24, 61;9, |
| 9 | 62;8, 62;8, 63;19, 64;8, 64;15, 64;19, 64;21, 65;25, |
| 10 | 66;10, 66;16, 66;18, 66;20, 67;6, 67;17, 67;18, 69;20, |
| 11 | 70;9, 70;14, 73;13, 90;1, 90;22, 91;3, 91;6, 91;8, |
| 12 | 92;14, 92;15, 92;16, 92;20, 93;9, 93;18, 93;23, 95;3, |
| 13 | 95;15, 97;1, 109;19, 110;1, 118;24, 120;21, 120;22, |
| 14 | 121;4, 121;4, 121;10, 123;9, 123;13, 123;22, 124;1, |
| 15 | 126;2, 126;25, 127;2, 127;3, 127;14, 127;18, 128;3, |
| 16 | 129;11, 129;24, 131;3, 132;5, 132;10, 133;18, 135;14, |
| 17 | 135;16, 139;6, 139;8, 139;13, 140;2, 140;5, 140;11, |
| 18 | 141;1, 141;6, 141;23, 141;24 |
| 19 | claimant: 110;13, 135;9, 138;18, 138;22 |
| 20 | claimant's: 110;24, 126;23 |
| 21 | claimants: 109;8, 128;6, 128;20, 130;5, 130;18, |
| 22 | 138;14, 140;9 |
| 23 | claimants': 129;5 |
| 24 | claimed: 134;1 |
| 25 | Claims: 21;8, 21;9, 21;13, 21;17, 21;20, 21;22, |

16

4 (13-16)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | 21;23, 22;12, 22;12, 25;8, 26;8, 26;14, 31;17, 31;25, |
| 2 | 33;3, 33;6, 38;14, 39;1, 39;8, 39;9, 39;11, 39;11, |
| 3 | 39;14, 39;20, 39;24, 40;6, 40;7, 40;18, 40;20, 40;22, |
| 4 | 41;3, 41;7, 41;12, 41;13, 41;25, 42;15, 44;15, 44;25, |
| 5 | 47;14, 48;19, 49;2, 50;5, 50;22, 50;24, 51;9, 51;17, |
| 6 | 52;2, 52;4, 52;20, 53;8, 53;21, 54;4, 54;7, 54;8, |
| 7 | 54;13, 54;20, 55;4, 55;5, 55;11, 56;7, 56;10, 56;15, |
| 8 | 56;16, 57;13, 57;15, 57;24, 57;25, 58;1, 58;9, 58;13, |
| 9 | 58;14, 60;9, 60;14, 61;14, 61;20, 61;25, 62;1, 62;17, |
| 10 | 62;18, 62;20, 62;23, 63;2, 63;6, 63;7, 64;2, 64;19, |
| 11 | 64;21, 65;16, 65;18, 67;1, 67;14, 67;24, 68;13, 68;24, |
| 12 | 69;15, 75;19, 75;24, 77;24, 77;24, 78;6, 78;7, 78;14, |
| 13 | 79;24, 83;20, 84;17, 85;23, 86;4, 88;6, 88;10, 88;14, |
| 14 | 88;25, 89;9, 89;10, 89;18, 89;19, 90;3, 90;4, 90;7, |
| 15 | 90;8, 90;11, 90;14, 90;20, 90;21, 90;24, 91;11, 91;11, |
| 16 | 91;14, 92;25, 93;5, 93;12, 93;13, 94;23, 95;13, 95;16, |
| 17 | 95;17, 95;18, 95;24, 96;2, 96;4, 96;5, 96;11, 96;12, |
| 18 | 96;13, 97;17, 100;16, 101;3, 101;6, 101;7, 102;9, |
| 19 | 102;19, 102;23, 103;2, 103;4, 106;5, 109;7, 109;23, |
| 20 | 111;3, 112;3, 112;6, 112;9, 117;1, 118;22, 124;24, |
| 21 | 127;1, 127;11, 127;15, 131;2, 131;12, 132;5, 134;2, |
| 22 | 135;4, 135;17, 139;23, 139;25, 142;2, 142;6 |
| 23 | client: 25;5, 25;19, 25;23, 34;24, 71;21, 72;1 |
| 24 | clients: 25;2 |
| 25 | close: 47;20, 138;4 |

17

| | |
|---|---|
| 1 | COMPANY: 1;4, 2;8, 3;11, 17;19, 18;7, 18;11, 18;16, |
| 2 | 20;25, 23;7, 23;15, 23;17, 23;18, 24;1, 24;3, 24;8, |
| 3 | 28;18, 35;25, 36;1, 36;3, 46;4, 46;7, 46;12, 49;2, |
| 4 | 49;7, 50;9, 51;18, 54;5, 56;17, 57;8, 67;22, 68;23, |
| 5 | 68;23, 71;5, 72;10, 75;6, 75;19, 85;9, 86;3, 87;14, |
| 6 | 90;16, 91;16, 91;22, 139;5, 139;12, 142;2 |
| 7 | company's: 4;2, 4;4, 49;13, 49;22, 70;2 |
| 8 | complaining: 68;4 |
| 9 | complaint: 127;11, 128;18 |
| 10 | complaints: 130;8, 130;17 |
| 11 | complete: 140;2, 143;12 |
| 12 | completed: 27;18 |
| 13 | completely: 23;23, 112;22 |
| 14 | completing: 80;19 |
| 15 | compliance: 27;18 |
| 16 | comply: 116;8, 116;23 |
| 17 | computer: 143;11 |
| 18 | concept: 109;14, 110;6 |
| 19 | concern: 19;15, 35;20, 59;24, 83;9, 83;12, 84;5 |
| 20 | concerned: 24;25, 75;18 |
| 21 | concerns: 86;10 |
| 22 | conclude: 24;16, 56;3, 63;6 |
| 23 | CONCLUDED: 58;25, 120;14, 120;17, 142;9, 142;15 |
| 24 | conclusion: 8;15, 63;19, 112;25, 113;17, 116;15, |
| 25 | 116;24, 120;5 |

19

| | |
|---|---|
| 1 | closed: 43;7, 44;8, 44;8, 46;18, 46;24, 48;1, 61;8, |
| 2 | 61;11, 61;14, 61;21, 61;22, 62;8, 62;19, 62;20, 63;3, |
| 3 | 63;8, 63;17, 63;23, 64;7, 64;17, 90;5, 95;14, 95;23 |
| 4 | CLYDE: 1;9, 1;11, 3;1, 31;20 |
| 5 | Cohen: 105;6 |
| 6 | College: 17;23, 18;3, 18;4 |
| 7 | Collins: 1;15 |
| 8 | colored: 17;25 |
| 9 | comfort: 63;4 |
| 10 | coming: 14;25, 19;2, 20;12, 73;12, 81;12, 81;13, |
| 11 | 140;14 |
| 12 | commencing: 1;17 |
| 13 | comment: 129;25 |
| 14 | commented: 49;6, 70;20 |
| 15 | commenting: 73;3 |
| 16 | comments: 69;13, 70;12 |
| 17 | commission: 143;17 |
| 18 | communicate: 69;18 |
| 19 | communicating: 92;12 |
| 20 | communication: 12;24, 69;17, 71;19 |
| 21 | communications: 79;14, 79;17 |
| 22 | commuted: 31;2 |
| 23 | Companies: 25;22, 25;24, 56;20, 65;17, 78;19, 78;19, |
| 24 | 78;24, 78;25, 86;19, 88;1, 88;3 |
| 25 | companies': 86;25 |

18

| | |
|---|---|
| 1 | conclusions: 47;23 |
| 2 | Concord: 45;19, 90;14, 90;21, 91;12, 91;13, 94;15 |
| 3 | conduct: 100;19 |
| 4 | conducting: 103;11 |
| 5 | conference: 40;3, 106;5 |
| 6 | conferences: 105;23, 105;23, 105;25 |
| 7 | confers: 130;19, 131;9, 133;5 |
| 8 | confidential: 71;18 |
| 9 | conflict: 116;13 |
| 10 | confusing: 89;5 |
| 11 | consider: 110;16, 111;4, 113;10 |
| 12 | consideration: 65;3, 131;15 |
| 13 | consistent: 136;9 |
| 14 | constitute: 116;19 |
| 15 | consultant: 15;16, 15;25, 17;8 |
| 16 | consulted: 131;19 |
| 17 | consulting: 15;13, 15;18, 15;20, 15;21, 24;25, 25;3, |
| 18 | 25;6, 25;7, 27;20, 28;10 |
| 19 | contact: 12;21, 13;4, 28;20, 56;18, 75;7, 128;8, |
| 20 | 130;24, 132;6 |
| 21 | contacted: 56;13, 74;13, 74;13, 128;17 |
| 22 | contacting: 58;3, 58;6, 93;3 |
| 23 | Contacts: 28;4, 56;21 |
| 24 | contained: 97;22, 97;25, 99;4 |
| 25 | contemplated: 115;5 |

20

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | content: 11;6 |
| 2 | continue: 30;12 |
| 3 | continued: 60;14, 104;22 |
| 4 | continuing: 40;3, 50;6, 140;11 |
| 5 | contract: 51;11, 54;23, 77;14, 110;11 |
| 6 | contracting: 121;7 |
| 7 | contracts: 20;12 |
| 8 | control: 23;18 |
| 9 | conversation: 71;15, 73;14, 75;1, 75;20, 82;13, |
| 10 | 82;24, 104;18, 105;4 |
| 11 | conversations: 7;13, 7;24, 11;3, 72;23, 80;16, 80;18, |
| 12 | 80;20, 81;4, 84;16, 104;14, 104;16, 132;16, 134;12 |
| 13 | convince: 69;19 |
| 14 | copies: 129;4 |
| 15 | Cornelio: 40;10, 40;11, 40;14, 72;18 |
| 16 | corporate: 8;11 |
| 17 | Correct: 5;21, 7;19, 7;21, 10;6, 10;11, 14;17, 15;4, |
| 18 | 15;7, 16;8, 16;10, 21;24, 23;2, 26;24, 29;2, 31;7, |
| 19 | 31;10, 32;6, 32;18, 32;22, 32;25, 33;5, 33;14, 34;10, |
| 20 | 34;14, 37;1, 40;5, 40;21, 41;4, 41;5, 44;1, 44;6, |
| 21 | 44;17, 44;18, 44;23, 45;17, 46;3, 50;10, 50;16, 50;20, |
| 22 | 54;14, 54;24, 54;25, 55;15, 57;6, 61;23, 63;15, 63;16, |
| 23 | 63;24, 65;12, 65;25, 66;1, 66;3, 66;4, 66;7, 67;24, |
| 24 | 68;2, 70;23, 71;1, 73;17, 74;1, 74;19, 78;15, 79;25, |
| 25 | 81;24, 82;11, 82;15, 89;15, 89;24, 90;1, 90;6, 90;9, |

| | |
|---|---|
| 1 | |
| 2 | <D> |
| 3 | data: 79;20, 80;12, 97;3, 97;22 |
| 4 | date: 10;17, 11;21, 13;7, 15;8, 23;1, 24;6, 27;5, |
| 5 | 28;21, 52;14, 53;6, 73;4, 88;17 |
| 6 | dates: 20;7, 21;17, 89;12 |
| 7 | day: 11;20, 11;22, 14;24, 143;19 |
| 8 | dead: 26;18 |
| 9 | deal: 130;24, 134;8 |
| 10 | dealing: 126;24 |
| 11 | Death: 26;21, 26;23, 27;6 |
| 12 | December 1999?: 88;8 |
| 13 | December: 38;16, 45;5, 52;4 |
| 14 | decided: 50;9, 113;14 |
| 15 | decision: 15;2, 46;25, 47;8, 52;24, 53;13, 53;17, |
| 16 | 53;23, 54;22, 55;1, 64;2, 64;14, 64;14, 64;24, 65;1, |
| 17 | 70;7, 71;7, 72;7, 72;10, 72;23, 73;3, 81;16, 86;9, |
| 18 | 91;9, 109;25, 136;1, 136;23 |
| 19 | decision-making: 139;18 |
| 20 | decrease: 61;20, 62;14, 62;18, 62;25, 63;7 |
| 21 | decreasing: 61;10, 62;2 |
| 22 | default: 94;8 |
| 23 | DEFENDANTS: 1;4, 1;9, 1;12, 2;10 |
| 24 | defer: 138;6 |
| 25 | define: 138;17 |

| | |
|---|---|
| 1 | 91;20, 92;5, 93;13, 93;21, 94;3, 94;9, 94;11, 96;1, |
| 2 | 96;14, 96;15, 104;23, 109;2, 112;3, 112;4, 119;18, |
| 3 | 121;12, 121;13, 122;19, 125;21, 127;23, 127;24, |
| 4 | 128;24, 129;19, 130;5, 140;13 |
| 5 | correctly: 34;6, 44;13 |
| 6 | Correspondence: 5;10, 18;23, 19;3, 19;11, 19;12, |
| 7 | 79;10 |
| 8 | correspondents: 19;15 |
| 9 | cough: 19;9 |
| 10 | Counsel: 3;17, 5;23, 8;12, 9;4, 11;4, 22;9, 37;21, |
| 11 | 37;25, 85;16, 85;17, 115;24, 122;24, 130;20, 131;10, |
| 12 | 133;6, 138;24, 139;4, 143;9, 143;14 |
| 13 | Counsel's: 108;12 |
| 14 | Counselor: 71;14 |
| 15 | counselor's: 109;15 |
| 16 | COUNTY: 143;1 |
| 17 | course: 10;23, 39;21, 76;22, 110;4 |
| 18 | COURT: 1;1, 1;13, 119;4, 143;4, 143;23 |
| 19 | cover: 134;13 |
| 20 | create: 70;1, 70;5, 80;7 |
| 21 | creating: 70;19 |
| 22 | criteria: 94;13, 94;18, 94;19 |
| 23 | Croft: 45;16 |
| 24 | cut: 122;13 |
| 25 | Cynthia: 45;16 |

| | |
|---|---|
| 1 | definite: 103;7 |
| 2 | definitely: 29;3 |
| 3 | degree: 17;23 |
| 4 | delegate: 55;21, 128;18 |
| 5 | delegated: 126;12, 128;21 |
| 6 | demanding: 123;14 |
| 7 | Dempsey: 140;20, 140;22, 140;25, 141;22 |
| 8 | departing: 57;20 |
| 9 | department: 23;18, 23;25, 52;4, 58;15, 60;1, 66;7, |
| 10 | 68;13, 68;24, 69;13, 70;14, 81;13, 85;3, 85;7, 131;3 |
| 11 | departments: 26;14 |
| 12 | departure: 16;6, 28;21 |
| 13 | depend: 62;21 |
| 14 | dependent: 91;22 |
| 15 | Depends: 27;7, 92;23 |
| 16 | deposed: 3;3 |
| 17 | DEPOSITION: 1;4, 1;11, 1;19, 5;12, 9;1, 12;8, 12;12, |
| 18 | 12;16, 52;10, 57;20, 129;23, 142;13, 142;15, 143;15 |
| 19 | depositions: 60;12 |
| 20 | deputy: 22;15, 23;8, 23;16 |
| 21 | described: 141;21 |
| 22 | desire: 138;21 |
| 23 | destroy: 107;6, 107;11, 108;2 |
| 24 | details: 133;24 |
| 25 | determine: 26;20, 74;3 |

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | dialogue: 99;24, 100;5, 127;13, 127;16 |
| 2 | different: 18;17, 45;21, 46;1, 83;17, 100;17, 123;2 |
| 3 | difficult: 16;23, 16;25, 53;19 |
| 4 | difficulty: 64;22 |
| 5 | diploma: 17;25 |
| 6 | direct: 46;13, 92;20, 99;24, 100;4, 125;21 |
| 7 | directed: 65;2, 65;3 |
| 8 | direction: 143;12 |
| 9 | directly: 45;8, 46;14, 94;24, 96;23, 98;12, 98;24, |
| 10 | 99;17, 104;7 |
| 11 | Disability: 18;11, 20;16, 21;2, 24;10, 24;17, 24;21, |
| 12 | 24;25, 29;5, 35;4, 35;7, 35;11, 35;20, 36;19, 36;24, |
| 13 | 37;1, 37;5, 37;14, 37;19, 38;6, 38;15, 38;20, 39;11, |
| 14 | 39;14, 39;18, 39;22, 40;4, 40;18, 40;20, 40;22, 41;4, |
| 15 | 41;9, 41;17, 41;24, 42;6, 42;9, 42;13, 42;15, 42;18, |
| 16 | 43;13, 43;19, 44;4, 44;7, 44;14, 44;21, 45;1, 46;24, |
| 17 | 49;2, 49;7, 49;13, 49;22, 50;5, 50;10, 50;22, 52;20, |
| 18 | 53;7, 53;8, 54;20, 55;8, 55;11, 56;12, 57;15, 58;12, |
| 19 | 58;15, 59;5, 60;3, 62;17, 65;16, 65;18, 65;24, 66;19, |
| 20 | 67;21, 67;24, 73;11, 75;15, 79;24, 88;7, 88;13, 89;10, |
| 21 | 89;19, 90;3, 90;19, 92;6, 92;13, 96;11, 101;2, 102;8, |
| 22 | 102;19, 102;23, 103;3, 109;7, 117;1, 118;22, 123;10, |
| 23 | 123;23, 124;9, 124;25, 127;3, 127;6, 127;17, 128;3, |
| 24 | 128;4, 128;5, 128;10, 128;20, 134;1, 138;17, 138;22, |
| 25 | 141;3 |

25

| | |
|---|---|
| 1 | 90;1, 90;12, 90;23, 91;8, 91;11, 92;4, 93;19, 94;2, |
| 2 | 94;8, 94;9, 94;17, 95;17, 96;3, 96;6, 96;14, 96;16, |
| 3 | 96;21, 96;22, 96;24, 97;8, 97;9, 97;13, 97;15, 98;7, |
| 4 | 99;18, 99;25, 100;5, 100;7, 100;11, 101;2, 101;6, |
| 5 | 101;17, 101;24, 102;3, 103;10, 103;18, 103;21, 104;6, |
| 6 | 105;22, 105;24, 106;13, 109;8, 109;19, 109;23, 111;14, |
| 7 | 112;2, 113;20, 114;11, 115;3, 116;7, 116;17, 117;2, |
| 8 | 117;18, 118;18, 118;23, 120;21, 122;11, 123;9, 123;22, |
| 9 | 124;23, 125;6, 125;20, 126;2, 126;20, 129;2, 129;19, |
| 10 | 130;1, 130;4, 130;13, 130;21, 130;23, 130;25, 131;1, |
| 11 | 131;11, 131;25, 132;6, 132;10, 134;21, 135;18, 135;24, |
| 12 | 139;23, 139;24, 140;3, 140;7, 140;14, 142;6 |
| 13 | DMS's: 101;21, 106;3, 126;21, 129;16 |
| 14 | doable: 112;13 |
| 15 | documentation: 26;21, 80;12, 108;5 |
| 16 | documenting: 71;6 |
| 17 | documents: 7;6, 9;21, 9;25, 10;4, 10;9, 49;6, 70;2, |
| 18 | 104;7, 106;24, 107;5, 107;9, 107;17, 107;20, 107;22, |
| 19 | 107;23, 107;24 |
| 20 | doing: 50;23, 52;24, 66;19, 72;15, 72;16, 74;12, |
| 21 | 74;16, 76;11, 76;17, 77;10, 77;11, 78;11, 101;11, |
| 22 | 110;4, 110;14, 119;25, 125;25, 129;8, 129;12, 129;15, |
| 23 | 129;19, 130;1 |
| 24 | done: 42;10, 59;2, 60;20, 60;24, 61;3, 61;6, 61;7, |
| 25 | 68;17, 72;1, 100;20, 120;9, 129;24 |

27

| | |
|---|---|
| 1 | disabled: 123;10, 137;2 |
| 2 | disagree: 9;4 |
| 3 | discard: 106;25, 107;18, 107;24 |
| 4 | discharge: 114;9, 123;7, 137;20 |
| 5 | discharging: 124;22 |
| 6 | discuss: 93;6, 102;2, 135;17 |
| 7 | discussed: 8;2, 8;7, 11;7, 37;16, 52;18, 72;15, 76;25 |
| 8 | discussing: 52;23, 135;21 |
| 9 | Discussion: 51;17, 52;23, 75;10, 87;20 |
| 10 | discussions: 9;18, 37;21, 57;13, 72;9, 83;25 |
| 11 | disorder: 121;24, 122;4, 137;2 |
| 12 | disposal: 118;23 |
| 13 | disposed: 13;22 |
| 14 | dispute: 131;14, 132;22, 134;2 |
| 15 | disputes: 26;18, 135;17 |
| 16 | disqualify: 27;15 |
| 17 | DISTRICT: 1;1, 1;1 |
| 18 | disturbed: 125;19, 126;2, 136;2 |
| 19 | disturbing: 125;11, 126;14, 136;18 |
| 20 | Ditmar: 105;14, 105;17, 135;13 |
| 21 | DMS: 28;13, 52;14, 52;25, 53;7, 59;16, 60;16, 72;25, |
| 22 | 73;4, 73;5, 74;22, 75;2, 75;7, 77;15, 77;20, 78;15, |
| 23 | 78;18, 78;23, 80;12, 80;17, 80;21, 80;24, 81;4, 81;8, |
| 24 | 81;16, 81;17, 81;18, 82;4, 82;14, 83;16, 84;1, 86;9, |
| 25 | 86;21, 86;24, 87;5, 87;16, 87;22, 88;16, 88;20, 89;1, |

26

| | |
|---|---|
| 1 | door: 112;22 |
| 2 | Doral: 31;22 |
| 3 | down: 11;24, 53;12, 81;15, 97;24, 122;12, 143;10 |
| 4 | draft: 84;20, 85;6 |
| 5 | draw: 65;20, 68;23 |
| 6 | due: 34;1, 32;20 |
| 7 | duly: 3;2, 143;8 |
| 8 | During: 6;20, 7;6, 7;10, 8;1, 8;19, 9;15, 10;23, |
| 9 | 16;14, 18;6, 19;15, 34;16, 36;11, 40;8, 50;7, 76;22, |
| 10 | 82;10, 89;25, 90;5, 96;11, 96;17, 96;25, 97;6, 100;5, |
| 11 | 102;5, 102;6, 102;22, 103;9, 103;15, 103;18, 104;7, |
| 12 | 109;5, 111;14, 117;1, 138;13, 142;12 |
| 13 | duties: 31;18, 35;1 |
| 14 | duty: 56;3, 85;23, 85;25, 87;13, 88;24, 103;23, |
| 15 | 113;7, 113;22, 114;9, 115;7, 120;20, 123;7, 124;22, |
| 16 | 136;9, 136;25, 137;21 |
| 17 | |
| 18 | <E> |
| 19 | earlier: 11;13, 11;20, 35;14, 35;22, 52;9, 76;21, |
| 20 | 103;1, 128;9, 129;22 |
| 21 | East: 1;16 |
| 22 | educate: 43;12, 43;18, 44;20 |
| 23 | educated: 58;12 |
| 24 | education: 39;16, 39;21, 40;3 |
| 25 | effect: 5;13, 47;17, 94;8 |

28

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | effective: 11;21, 22;24, 23;6 |
| 2 | effort: 41;8, 42;17, 43;12, 43;18, 44;20, 50;16, |
| 3 | 54;9, 69;10, 142;1 |
| 4 | efforts: 65;7 |
| 5 | eight: 29;15, 84;15, 97;24 |
| 6 | Either: 6;6, 11;22, 72;13, 93;24, 94;1, 104;6, |
| 7 | 105;11, 107;5, 138;5 |
| 8 | else's: 85;15 |
| 9 | elsewhere: 138;18 |
| 10 | email: 10;14, 10;16, 10;19, 10;21, 69;12, 69;16, |
| 11 | 73;8, 79;13 |
| 12 | emails: 10;12 |
| 13 | emphasis: 41;11, 41;13, 43;9, 44;10, 51;7 |
| 14 | employed: 15;10, 16;14, 16;18, 18;8, 23;5, 29;17, |
| 15 | 32;13, 102;17 |
| 16 | Employee: 13;15, 17;10, 17;13, 23;4, 102;9 |
| 17 | employees: 29;12, 29;16, 30;10, 59;18, 68;22, 70;8, |
| 18 | 93;4 |
| 19 | employer: 5;24, 32;15 |
| 20 | Employers: 28;15, 28;17, 35;23, 36;5, 36;11, 36;17, |
| 21 | 36;25, 37;4, 37;16, 38;4, 75;11, 76;23, 78;2, 78;13, |
| 22 | 86;23, 87;4 |
| 23 | employment: 10;25, 11;10, 18;6, 21;18, 32;4, 36;8, |
| 24 | 36;12, 49;21, 54;18 |
| 25 | end: 14;25, 28;22, 92;2, 92;4, 93;19, 93;19 |

29

| | |
|---|---|
| 1 | exact: 20;7, 29;14, 30;15, 79;6 |
| 2 | exactly: 34;22 |
| 3 | EXAMINATION: 2;23, 3;4 |
| 4 | examined: 3;2, 143;9 |
| 5 | examiner: 56;15, 58;1, 58;8, 58;14, 62;8, 64;19, |
| 6 | 64;21, 66;11, 67;1, 120;22, 121;4, 123;9, 123;13, |
| 7 | 123;22, 124;1, 126;2 |
| 8 | examiners: 53;18, 59;24, 60;4, 62;1, 64;23, 67;17, |
| 9 | 95;3, 132;5 |
| 10 | example: 135;19 |
| 11 | exams: 100;19 |
| 12 | exceeded: 111;15 |
| 13 | except: 89;12, 111;9 |
| 14 | excess: 59;13, 90;9 |
| 15 | exclusive: 102;8, 102;12, 102;18, 102;20 |
| 16 | exclusively: 130;24 |
| 17 | Excuse: 34;3, 39;20, 41;19, 43;2, 48;17, 56;25, |
| 18 | 60;23, 65;2, 68;17, 77;17, 86;13, 109;14, 111;20, |
| 19 | 119;15 |
| 20 | executed: 38;16 |
| 21 | executing: 72;25, 85;8 |
| 22 | execution: 52;17 |
| 23 | executive: 42;15, 44;14, 50;4, 50;24, 52;3, 62;16, |
| 24 | 63;5, 68;5, 85;22, 88;6, 88;23, 96;9, 109;6, 110;8 |
| 25 | exercise: 13;21, 13;25, 14;9, 14;23, 14;25, 73;25, |

31

| | |
|---|---|
| 1 | endeavor: 51;22, 51;22, 57;8, 80;8 |
| 2 | ends: 108;8, 108;8, 108;15, 108;23 |
| 3 | engaged: 85;12, 126;13 |
| 4 | engagement: 3;22, 5;3, 5;8 |
| 5 | engagements: 15;22, 24;25, 28;10 |
| 6 | enough: 51;8 |
| 7 | entail: 26;17 |
| 8 | enter: 52;24, 73;3, 77;22 |
| 9 | entered: 37;18, 38;6, 41;3, 51;11, 73;4, 77;2, 84;17 |
| 10 | entering: 52;19, 77;1, 78;14, 101;24 |
| 11 | entire: 81;18 |
| 12 | entities: 75;8, 79;11, 83;14, 83;17 |
| 13 | entity: 35;22, 46;9, 90;18 |
| 14 | equity: 14;2, 14;19 |
| 15 | especially: 137;1 |
| 16 | essentially: 34;7 |
| 17 | ET: 1;8, 17;14 |
| 18 | evaluate: 73;22, 73;22 |
| 19 | evaluating: 26;14, 65;24 |
| 20 | evaluations: 65;14 |
| 21 | everything: 52;16, 53;3, 104;5, 112;1, 112;2, 112;12, |
| 22 | 113;14, 123;4 |
| 23 | evidence: 42;23, 51;1, 51;13, 55;14, 58;19, 71;10, |
| 24 | 83;1, 87;9, 111;8, 117;8, 117;20, 120;3, 121;1, |
| 25 | 122;18, 123;17, 123;25, 126;5, 136;4, 136;15 |

30

| | |
|---|---|
| 1 | 74;7, 74;9, 75;11, 80;8, 81;11 |
| 2 | exercised: 13;18, 14;22, 15;6 |
| 3 | existed: 70;13 |
| 4 | existence: 82;8 |
| 5 | existing: 22;22, 55;10, 57;13, 82;6, 96;13 |
| 6 | exited: 49;24, 92;6 |
| 7 | expansive: 128;7 |
| 8 | expectation: 5;16, 116;7, 116;9, 116;17, 133;9, |
| 9 | 133;17, 139;16 |
| 10 | expecting: 4;15 |
| 11 | expense: 5;17, 5;22, 70;2, 71;4 |
| 12 | experience: 39;17, 63;18, 65;23, 73;11, 85;5, 117;15, |
| 13 | 123;18, 124;16, 124;18, 124;21, 136;6, 137;14 |
| 14 | experienced: 53;18, 60;3, 64;23, 65;15, 65;15, 65;21, |
| 15 | 80;25, 81;3, 82;15, 83;5, 83;19, 126;25 |
| 16 | expires: 143;17 |
| 17 | explain: 22;14 |
| 18 | extend: 132;1 |
| 19 | Extended: 127;5, 127;9, 127;13, 127;16 |
| 20 | extent: 37;20, 96;2 |
| 21 | external: 100;18, 100;25, 101;11, 101;17 |
| 22 | extremely: 114;5 |
| 23 | eyes: 7;9 |
| 24 | |
| 25 | <F> |

32

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | facility: 31;6 |
| 2 | fact: 47;25, 56;11, 59;25, 64;6, 64;16, 69;13, 77;1, |
| 3 | 131;5 |
| 4 | factor: 61;14, 90;22, 92;19 |
| 5 | facts: 10;24, 11;10, 42;22, 51;1, 51;13, 55;14, |
| 6 | 58;18, 71;10, 83;1, 87;9, 111;7, 117;7, 117;20, 120;3, |
| 7 | 120;25, 122;18, 123;16, 126;5, 136;4, 136;15, 143;6 |
| 8 | Fair: 24;16, 51;8 |
| 9 | fairly: 12;24 |
| 10 | faith: 86;6, 87;15, 88;24, 100;16, 101;7, 103;12, |
| 11 | 103;23, 113;7, 113;22, 114;10, 115;7, 120;20, 123;7, |
| 12 | 124;22, 136;10, 137;21 |
| 13 | familiar: 6;13, 28;19, 35;24, 36;1, 36;2, 50;8, |
| 14 | 104;15, 105;3, 105;7, 105;15, 105;19, 108;7, 108;15, |
| 15 | 109;13, 141;18, 141;20 |
| 16 | familiarity: 43;24 |
| 17 | familiarize: 42;6 |
| 18 | far: 8;14, 26;11, 35;6, 39;15, 44;19, 46;10, 75;17, |
| 19 | 80;5, 96;18, 113;9, 113;16, 119;16, 140;6 |
| 20 | FARABOW: 2;7, 4;18, 5;1, 6;9, 7;25, 8;8, 8;10, 8;11, |
| 21 | 8;18, 9;15, 9;22, 10;15, 13;6, 32;8, 32;11, 57;19 |
| 22 | farm: 64;8 |
| 23 | farmed: 55;23, 56;4 |
| 24 | farming: 78;6, 78;13 |
| 25 | FAYETTE: 143;1 |

33

| | |
|---|---|
| 1 | five: 95;9, 95;10, 95;11 |
| 2 | five-minute: 71;25 |
| 3 | flat: 59;15 |
| 4 | Florida: 2;6 |
| 5 | fly: 134;8 |
| 6 | focus: 44;1, 44;2 |
| 7 | folk: 36;17 |
| 8 | folks: 12;20, 19;5, 29;19, 29;20, 29;24, 30;9, 54;13 |
| 9 | follow: 121;19, 125;15 |
| 10 | following: 16;2, 20;14 |
| 11 | follows: 3;3 |
| 12 | force: 20;10, 29;1, 29;25, 62;24, 63;1 |
| 13 | foregoing: 143;12 |
| 14 | Forget: 18;21, 52;11 |
| 15 | former: 3;10, 5;24, 32;14 |
| 16 | forms: 126;22, 129;4, 140;8, 140;15 |
| 17 | forward: 29;10, 40;19, 44;1 |
| 18 | forwarded: 94;16 |
| 19 | found: 123;25, 126;16 |
| 20 | four-month: 96;12 |
| 21 | frame: 19;15, 29;13, 57;1, 137;1, 141;11, 141;15 |
| 22 | fraud: 27;9, 27;14 |
| 23 | frequency: 98;1, 98;19, 106;11 |
| 24 | friends: 12;19 |
| 25 | full: 42;2 |

35

| | |
|---|---|
| 1 | feared: 123;11 |
| 2 | February 1993.: 24;3 |
| 3 | February: 23;19, 23;19 |
| 4 | Federal: 1;21, 116;8, 116;20, 116;23, 117;3, 117;18 |
| 5 | fee: 3;25, 59;15 |
| 6 | feel: 85;22, 86;18 |
| 7 | fell: 39;9 |
| 8 | felt: 92;14, 139;10 |
| 9 | few: 13;9, 26;1, 28;7 |
| 10 | fiduciary: 120;20 |
| 11 | field: 39;18, 42;11, 73;25, 81;16, 139;11 |
| 12 | Fifth: 2;12 |
| 13 | figure: 29;14 |
| 14 | file: 27;18, 80;7, 106;24, 140;2 |
| 15 | filed: 3;10, 3;14, 67;16, 92;14 |
| 16 | files: 26;21, 49;1, 100;11, 101;12, 101;17, 139;23, |
| 17 | 141;6 |
| 18 | final: 11;19, 14;19, 14;24 |
| 19 | financial: 15;2, 75;25, 76;10, 76;18, 77;23, 142;2 |
| 20 | find: 53;20, 53;24 |
| 21 | Finding: 53;18 |
| 22 | fine: 59;1, 120;11 |
| 23 | Finish: 41;21, 111;21 |
| 24 | first: 3;2, 8;19, 9;15, 12;12, 21;14, 36;4, 39;12, |
| 25 | 42;8, 57;2, 112;1, 137;18 |

34

| | |
|---|---|
| 1 | function: 30;19, 53;25, 54;14, 55;23, 59;16, 69;20, |
| 2 | 88;7, 121;10, 127;20, 127;23, 127;25 |
| 3 | functions: 45;20, 45;21, 82;7, 102;13 |
| 4 | funny: 14;13 |
| 5 | future: 138;7 |
| 6 | |
| 7 | <G> |
| 8 | gain: 50;16, 121;21 |
| 9 | gained: 49;21 |
| 10 | Gasser: 6;13 |
| 11 | gave: 14;12, 92;15, 121;7, 125;14, 129;2, 129;4 |
| 12 | general: 114;4, 114;5, 135;23 |
| 13 | Generally: 25;20, 26;18, 41;10, 42;7, 42;18, 43;13, |
| 14 | 44;22, 46;22, 55;7, 71;2, 131;24 |
| 15 | gentleman: 9;6, 104;14, 134;23, 140;19 |
| 16 | getting: 77;21, 87;12, 95;17, 95;18, 96;5, 106;10, |
| 17 | 134;4 |
| 18 | give: 13;7, 29;14, 30;15, 37;12, 58;23, 81;21, 103;7, |
| 19 | 112;11, 137;9, 137;19, 138;3 |
| 20 | given: 12;8, 56;11, 64;18, 121;6, 136;23, 143;13 |
| 21 | giving: 135;25 |
| 22 | gosh: 68;6 |
| 23 | gotten: 97;1, 97;4 |
| 24 | graduate: 18;1, 18;3 |
| 25 | grandchildren: 17;3 |

36

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1   grant: 13;17
2   graphs: 99;6
3   Graydon: 2;11
4   great: 44;20, 64;20, 64;22
5   greater: 132;10
6   Greensboro: 2;9, 30;22, 31;1, 31;17, 34;2, 34;3,
7   34;24, 42;1, 53;19, 54;17, 55;5, 60;4, 64;23, 65;8,
8   65;10, 65;18, 66;2, 66;7, 92;7, 92;25, 93;11, 102;10,
9   102;11, 102;17, 102;22, 102;24
10  group: 71;4
11  guess: 8;5, 69;7, 97;2
12  guessing: 74;15, 85;4, 85;5
13
14  <H>
15  Hampshire: 45;10, 45;18, 45;19, 45;25, 66;20, 67;7,
16  67;15, 90;14, 90;21, 90;23, 90;25, 91;2, 91;5, 91;12,
17  92;3, 92;17, 92;25, 93;4, 93;12, 93;20, 94;2, 94;7,
18  94;8, 94;20, 95;14
19  hand: 143;19
20  handle: 52;20, 53;7, 53;7, 54;8, 55;5, 55;10, 56;15,
21  83;20, 91;1, 91;3, 91;13, 93;5, 94;7, 94;16, 94;22,
22  96;6
23  handled: 44;25, 65;18, 90;13, 90;20, 93;24
24  handling: 19;12, 20;11, 22;16, 53;20, 54;4, 54;12,
25  64;25, 65;15, 79;23, 101;3, 101;7, 127;1, 129;24,

37

1   131;2
2   happen: 68;9, 95;23, 117;16, 136;7, 136;13, 137;16,
3   137;18
4   happened: 56;2, 95;13, 101;15, 124;2, 136;6, 136;12,
5   139;22
6   happening: 101;16, 118;14
7   happens: 61;10
8   happy: 16;24
9   harassing: 115;25
10  Head: 2;11
11  hear: 71;15, 71;16, 71;17
12  heard: 108;19, 108;20, 108;21, 109;3, 139;2
13  hearsay: 58;5
14  help: 39;17, 68;24, 69;2
15  helping: 33;8
16  hereto: 143;6
17  hereunto: 143;18
18  High: 1;16, 67;3
19  higher: 62;1
20  hire: 15;16, 59;18, 65;24, 70;3
21  hired: 25;21, 25;21, 68;22
22  hiring: 64;22, 142;5
23  history: 49;22, 107;10
24  hoc: 128;17
25  hold: 14;8, 15;15

38

1   home: 12;4, 16;13, 30;24, 30;25, 31;2, 123;12, 131;3
2   HONAKER: 1;9, 1;11, 3;1, 3;6, 4;18, 28;9, 31;20,
3   32;8, 138;9
4   honorable: 126;11
5   honorably: 103;11
6   hour: 1;18
7   hourly: 3;24, 4;11
8   hours: 6;4, 37;15, 50;21
9   house: 122;7
10  Hughes: 1;15, 105;9, 135;13
11  human: 68;20
12  hypothetical: 95;22, 95;25
13
14  <I>
15  i.e.: 139;11
16  IBU: 26;3, 26;4
17  idea: 26;12, 36;4, 47;6, 51;3, 52;15, 87;25, 95;5,
18  97;25, 106;9, 141;10
19  identified: 26;2
20  identify: 81;14
21  identifying: 73;15, 73;25
22  ignore: 126;3
23  illness: 122;11
24  immediate: 72;16
25  immediately: 16;11

39

1   impacted: 123;10
2   important: 107;22, 107;23
3   impressed: 80;23
4   improperly: 9;12
5   in-house: 55;24, 139;4
6   inadequate: 60;10
7   incident: 127;12
8   include: 69;15, 88;13
9   included: 29;3, 29;4, 89;9, 103;10
10  including: 19;12, 140;9
11  income: 41;25, 60;3, 92;6
12  inconsistent: 136;24
13  Incorporated: 26;3
14  incorrect: 94;12
15  increase: 62;9, 62;20, 62;23, 63;8
16  increasing: 61;14
17  incur: 5;17, 71;4
18  indemnity: 90;8, 91;3, 93;17, 94;6, 94;15
19  INDEX: 2;19
20  Index...................: 2;22
21  indicate: 52;11
22  indicated: 52;9, 129;22
23  individual: 33;10, 56;15, 93;8, 93;9, 124;18
24  Individuals: 66;12
25  industry: 24;21, 25;14, 25;17, 28;2, 28;5, 56;14,

40

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | 56;21, 58;7, 62;2, 66;12, 87;20, 106;6 |
| 2 | Information: 25;10, 49;1, 52;22, 59;4, 66;17, 79;20, |
| 3 | 83;22, 86;8, 97;22, 99;3, 100;14, 109;24, 110;11, |
| 4 | 110;12, 119;10, 131;6, 133;21 |
| 5 | lngram: 34;17 |
| 6 | inherited: 49;3, 49;6 |
| 7 | initially: 98;24 |
| 8 | inquire: 47;19 |
| 9 | inquiries: 19;1, 19;7, 19;11 |
| 10 | inquiry: 48;5, 99;17 |
| 11 | inside: 59;8, 115;20, 124;7 |
| 12 | insistent: 122;11 |
| 13 | insofar: 112;24, 116;14 |
| 14 | instance: 131;21 |
| 15 | instead: 63;8 |
| 16 | instruct: 8;23, 11;2, 11;5, 11;11, 37;22 |
| 17 | instructed: 9;11 |
| 18 | instructing: 130;22, 130;23 |
| 19 | instruction: 9;14 |
| 20 | INSURANCE: 1;4, 2;8, 15;20, 17;18, 18;7, 18;10, |
| 21 | 18;11, 18;16, 19;14, 19;18, 20;15, 20;17, 21;3, 23;17, |
| 22 | 23;25, 24;4, 24;10, 24;18, 24;21, 24;25, 25;13, 25;22, |
| 23 | 25;24, 26;6, 29;4, 29;5, 33;2, 35;4, 35;7, 35;12, |
| 24 | 35;20, 36;19, 37;1, 39;18, 39;22, 40;4, 41;9, 42;6, |
| 25 | 42;9, 42;11, 42;14, 42;15, 42;18, 43;9, 43;13, 43;19, |

41

| | |
|---|---|
| 1 | interrupted: 61;6 |
| 2 | interruption: 125;12, 125;18 |
| 3 | interview: 26;5, 55;17 |
| 4 | intimidate: 121;21 |
| 5 | invaded: 109;15, 110;5, 113;9 |
| 6 | invading: 109;14, 112;15 |
| 7 | invasion: 109;20, 110;6, 110;16, 111;4, 112;18, |
| 8 | 113;10 |
| 9 | investigate: 109;8, 109;23, 110;10 |
| 10 | investigated: 58;11, 73;13 |
| 11 | investigation: 110;13, 129;11 |
| 12 | Investigations: 25;8, 27;9, 27;14 |
| 13 | invoice: 4;15 |
| 14 | Involving: 77;16, 126;2 |
| 15 | issue: 70;12 |
| 16 | items: 129;6, 129;23, 134;18, 135;22 |
| 17 | itself: 82;5 |
| 18 | |
| 19 | <J> |
| 20 | Jane: 45;16 |
| 21 | January 1: 88;17, 92;2, 93;1, 93;14, 93;24, 96;9 |
| 22 | January 1, 2000: 89;8, 89;16, 92;9, 93;18, 102;6, |
| 23 | 104;8 |
| 24 | January 2000: 103;5 |
| 25 | JEFFERSON-PILOT: 1;4, 2;8, 3;11, 3;14, 5;24, 7;14, |

43

| | |
|---|---|
| 1 | 43;25, 44;4, 44;7, 44;11, 44;14, 44;16, 44;21, 46;6, |
| 2 | 46;12, 46;21, 46;24, 49;2, 49;7, 49;14, 49;23, 50;5, |
| 3 | 50;10, 50;22, 56;12, 58;12, 58;15, 59;5, 61;15, 65;16, |
| 4 | 65;25, 73;11, 86;25, 88;8, 88;13, 89;10, 89;19, 90;16, |
| 5 | 91;15, 92;14, 96;11, 101;2, 102;8, 102;19, 102;23, |
| 6 | 107;10, 109;7, 117;1, 118;22, 127;18, 128;4, 128;10, |
| 7 | 128;20, 138;17, 138;22, 141;3 |
| 8 | insured: 121;4, 125;7 |
| 9 | insureds': 19;2 |
| 10 | insurers: 87;7 |
| 11 | intentionally: 121;20 |
| 12 | interact: 35;7, 96;24, 97;11, 131;11, 132;1, 133;18, |
| 13 | 138;20, 138;24, 139;4, 140;22 |
| 14 | interacted: 36;25, 132;4 |
| 15 | interacting: 81;15, 130;4, 130;13, 142;5 |
| 16 | interaction: 35;10, 35;18, 36;10, 36;16, 37;16, 38;3, |
| 17 | 76;3, 76;22, 78;12, 88;16, 88;20, 97;6, 103;17, |
| 18 | 104;22, 127;6, 127;9, 128;2, 128;5, 128;6, 128;10, |
| 19 | 128;11, 128;19, 140;24, 141;22 |
| 20 | interactions: 37;4, 104;6, 105;16, 134;20 |
| 21 | interest: 25;16, 27;2, 27;5, 75;17, 75;23, 76;1, |
| 22 | 142;2 |
| 23 | internal: 100;18, 100;24, 101;1, 101;11, 101;16 |
| 24 | internet: 27;22 |
| 25 | interrupt: 41;20, 42;3, 61;4 |

42

| | |
|---|---|
| 1 | 7;24, 9;23, 10;25, 11;10, 11;15, 12;6, 12;9, 12;21, |
| 2 | 13;4, 13;11, 13;22, 14;3, 14;19, 16;7, 16;15, 16;18, |
| 3 | 17;7, 22;22, 23;4, 23;5, 26;11, 28;10, 28;22, 28;25, |
| 4 | 29;17, 30;12, 30;21, 31;8, 31;14, 31;25, 32;4, 32;13, |
| 5 | 32;14, 33;11, 33;13, 33;15, 33;23, 34;8, 34;13, 35;11, |
| 6 | 35;19, 36;8, 36;12, 37;5, 37;19, 38;5, 38;15, 38;17, |
| 7 | 38;22, 39;2, 41;3, 41;7, 43;8, 43;20, 44;9, 44;23, |
| 8 | 46;1, 46;8, 46;23, 49;21, 52;3, 53;8, 54;10, 54;18, |
| 9 | 55;8, 59;9, 59;19, 60;6, 60;11, 63;20, 66;16, 67;17, |
| 10 | 69;21, 71;8, 77;15, 77;20, 78;1, 85;7, 85;13, 86;20, |
| 11 | 86;24, 87;6, 87;15, 88;9, 88;18, 89;1, 89;14, 89;20, |
| 12 | 90;16, 90;17, 90;20, 91;5, 91;25, 92;1, 92;4, 92;6, |
| 13 | 92;13, 92;17, 93;21, 94;1, 94;14, 96;10, 98;7, 98;13, |
| 14 | 101;12, 102;9, 102;17, 105;24, 106;1, 108;4, 109;7, |
| 15 | 110;7, 110;17, 112;6, 114;10, 114;22, 115;7, 115;21, |
| 16 | 118;4, 118;21, 123;8, 126;19, 127;7, 129;14, 129;18, |
| 17 | 130;3, 130;12, 130;14, 130;24, 131;11, 131;20, 135;10, |
| 18 | 138;11, 138;14, 138;21, 139;24 |
| 19 | Jefferson-Pilot's: 106;3 |
| 20 | Jerry: 138;25, 139;2 |
| 21 | job: 44;15, 55;6, 74;16, 103;22, 110;5, 110;14, |
| 22 | 127;20, 129;8, 129;10, 130;1 |
| 23 | Joe: 134;1 |
| 24 | John: 2;4, 3;18, 105;2, 105;4, 106;4 |
| 25 | Johnson: 138;25, 139;3 |

44

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | join: 66;7 |
| 2 | JP: 129;2, 130;23 |
| 3 | JR: 1;9, 1;11, 3;1, 31;20 |
| 4 | judge: 54;5, 117;17, 126;13, 133;22 |
| 5 | judged: 130;16 |
| 6 | judgment: 56;3, 72;13, 83;23, 93;10, 94;4, 109;19, |
| 7 | 112;16, 112;21, 113;6, 114;1, 115;22, 121;8, 137;19 |
| 8 | Judy: 46;15 |
| 9 | July: 17;21 |
| 10 | June 1: 16;19 |
| 11 | June 1, 1995: 22;24, 23;6 |
| 12 | June: 17;16, 33;16, 35;2, 56;22, 92;15 |
| 13 | justify: 70;2, 70;7 |
| 14 | justifying: 71;6, 108;8, 108;8, 108;16, 108;23 |
| 15 | |
| 16 | <K> |
| 17 | Kansas: 35;24 |
| 18 | KEARNEY: 1;7, 2;15, 3;10, 3;14, 10;4, 10;10, 28;21, |
| 19 | 130;19, 131;9, 133;5, 135;6, 135;9, 138;11, 139;1 |
| 20 | Kearney's: 135;14, 142;12 |
| 21 | KENTUCKY: 1;14, 1;16, 12;2, 16;12, 16;21, 17;5, |
| 22 | 17;18, 18;1, 18;7, 18;8, 18;10, 18;16, 20;13, 21;18, |
| 23 | 22;15, 22;16, 22;18, 22;23, 22;25, 24;9, 28;25, 29;8, |
| 24 | 29;13, 29;16, 30;19, 30;24, 31;1, 31;6, 31;14, 31;22, |
| 25 | 32;15, 32;19, 33;1, 33;24, 34;8, 143;1, 143;5 |

45

| | |
|---|---|
| 1 | lawyer's: 9;14 |
| 2 | lawyers: 7;14, 7;24, 25;21 |
| 3 | lay: 7;9 |
| 4 | lead: 56;2 |
| 5 | leading: 53;4 |
| 6 | learn: 49;13, 125;8, 126;1 |
| 7 | learned: 36;5, 58;11, 111;2, 120;8, 120;19, 123;8, |
| 8 | 123;13, 123;22, 126;12, 135;24 |
| 9 | leave: 11;15, 71;20, 71;21, 71;23, 123;12 |
| 10 | led: 52;17, 53;16, 55;1, 68;5, 90;22 |
| 11 | left: 11;20, 21;22, 89;13, 108;3 |
| 12 | legal: 8;15, 85;2, 85;7, 85;11, 85;16, 112;25, |
| 13 | 113;17, 116;15, 116;24, 120;4, 139;12 |
| 14 | legally: 103;12, 123;4 |
| 15 | less: 51;4, 95;9, 95;18, 132;19, 133;8 |
| 16 | letters: 19;4 |
| 17 | level: 60;10, 63;4, 83;13, 132;5 |
| 18 | levels: 94;25 |
| 19 | LEWIS: 1;13, 143;4, 143;22 |
| 20 | Lexington: 1;16, 9;2, 12;2, 12;3, 16;1, 16;12, 16;13, |
| 21 | 30;10, 30;17, 30;21, 31;17, 31;22, 33;18, 34;23, |
| 22 | 36;13, 36;14, 46;15 |
| 23 | lied: 27;10 |
| 24 | LIFE: 1;4, 2;8, 17;18, 18;7, 18;10, 18;16, 19;17, |
| 25 | 19;22, 24;4, 25;13, 26;6, 26;7, 26;16, 26;19, 29;3, |

47

| | |
|---|---|
| 1 | kept: 55;23 |
| 2 | kids: 17;1 |
| 3 | kind: 20;8, 91;7, 122;7, 134;9 |
| 4 | Kindly: 100;21 |
| 5 | kinds: 67;18 |
| 6 | know...: 105;13 |
| 7 | knowing: 55;7 |
| 8 | knowledge: 24;14, 24;21, 34;25, 35;21, 49;22, 50;16, |
| 9 | 51;16, 51;21, 99;2, 123;9 |
| 10 | known: 125;6 |
| 11 | |
| 12 | <L> |
| 13 | L-i-n-n-e-r: 141;19 |
| 14 | lady: 6;11, 46;15 |
| 15 | language: 113;15, 114;12, 116;18, 140;17 |
| 16 | Large: 1;14, 143;5 |
| 17 | later: 29;17, 30;16, 113;8, 143;11 |
| 18 | laughed: 108;14 |
| 19 | laughing: 108;12 |
| 20 | law: 9;8, 27;7, 103;23, 121;1 |
| 21 | laws: 101;8, 116;8, 116;12, 116;20, 117;3, 117;18 |
| 22 | lawsuit: 3;10, 10;5, 10;9, 139;5 |
| 23 | lawsuits: 67;16 |
| 24 | lawyer: 3;19, 4;2, 4;3, 4;4, 4;6, 6;15, 8;4, 9;7, |
| 25 | 9;9, 85;12 |

46

| | |
|---|---|
| 1 | 29;7, 29;24, 33;2, 36;20, 36;21, 39;11, 40;20, 41;11, |
| 2 | 41;13, 43;9, 43;25, 44;10, 44;16, 46;6, 46;12, 51;7, |
| 3 | 123;11 |
| 4 | lifestyle: 16;23 |
| 5 | lighter: 60;15 |
| 6 | likely: 63;7 |
| 7 | limit: 14;21, 14;22, 132;25, 134;17, 134;19 |
| 8 | limitation: 134;17, 137;4 |
| 9 | limited: 23;24, 24;12 |
| 10 | limits: 138;2 |
| 11 | Lin: 34;17 |
| 12 | Lincoln: 26;10, 46;12 |
| 13 | Linner: 141;16 |
| 14 | liquidation: 22;23, 33;8, 33;24 |
| 15 | liquidator: 22;15, 23;8, 23;16 |
| 16 | litigation: 67;20 |
| 17 | little: 4;19, 4;22, 4;25 |
| 18 | live: 31;21 |
| 19 | lived: 65;10 |
| 20 | loan: 24;2 |
| 21 | located: 34;7, 34;12, 45;11 |
| 22 | logical: 76;9, 76;14, 76;20 |
| 23 | long: 6;3, 12;5, 15;24, 17;20, 19;19, 19;25, 20;21, |
| 24 | 21;5, 21;9, 33;25, 63;15, 89;4, 93;22, 113;22, 114;11, |
| 25 | 115;5, 115;20, 117;3, 124;7, 132;11, 135;19 |

48

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | long-time: 70;8 |
| 2 | longer: 14;6, 14;8, 31;13, 43;8, 44;9, 46;20, 48;4 |
| 3 | losing: 4;20, 64;10 |
| 4 | loss: 92;15 |
| 5 | lost: 122;21 |
| 6 | love: 26;4 |
| 7 | lower: 71;16, 132;5 |
| 8 | lunch: 7;1, 138;5, 138;6 |
| 9 | Lydia: 45;7 |
| 10 | |
| 11 | <M> |
| 12 | major: 127;20, 127;23, 127;24 |
| 13 | makeup: 25;5 |
| 14 | managed: 90;23, 95;13 |
| 15 | Management: 37;19, 38;6, 38;15, 38;20, 41;4, 63;20, |
| 16 | 64;8, 64;16, 65;25, 66;20, 67;6, 67;19, 67;23, 69;20, |
| 17 | 70;9, 75;18, 78;7, 78;14, 90;1, 121;10, 139;7, 140;12 |
| 18 | manager: 21;14, 30;20, 31;16, 33;17, 33;19, 34;7, |
| 19 | 103;2, 120;21, 121;4, 132;6, 135;23 |
| 20 | managerial: 29;24 |
| 21 | managers: 45;8 |
| 22 | managing: 54;19, 101;18, 118;24, 129;2 |
| 23 | manner: 125;20, 129;19, 129;25, 130;4, 130;13, 137;6 |
| 24 | March 19, 2011: 143;17 |
| 25 | March 2007.: 143;19 |

49

| | |
|---|---|
| 1 | 82;19, 82;25, 86;13, 86;15, 87;8, 87;18, 89;2, 89;21, |
| 2 | 92;21, 94;10, 95;19, 98;9, 100;2, 103;13, 104;9, |
| 3 | 106;20, 107;1, 107;7, 107;12, 107;19, 108;10, 108;25. |
| 4 | 109;10, 109;22, 110;9, 110;18, 111;6, 111;17, 111;20, |
| 5 | 112;17, 112;24, 113;11, 113;16, 113;25, 114;2, 114;14, |
| 6 | 114;17, 114;23, 115;9, 115;17, 115;23, 116;14, 117;6, |
| 7 | 117;11, 117;19, 119;1, 119;7, 119;15, 119;19, 120;2, |
| 8 | 120;9, 120;14, 120;15, 120;24, 121;16, 122;16, 123;15, |
| 9 | 123;24, 124;11, 124;14, 125;2, 125;4, 125;10, 125;22, |
| 10 | 126;4, 126;15, 129;20, 130;6, 132;18, 134;10, 136;3, |
| 11 | 136;14, 136;19, 137;12, 137;23, 137;25, 139;19, 142;10 |
| 12 | Meaning: 25;15, 118;11 |
| 13 | means: 108;8, 108;9, 108;16, 108;18, 108;24, 109;17, |
| 14 | 109;18, 113;23 |
| 15 | meant: 14;12, 89;18 |
| 16 | meet: 52;5, 122;12, 123;14 |
| 17 | meeting: 6;6, 6;20, 6;24, 7;4, 7;7, 7;10, 7;12, 7;23, |
| 18 | 8;1, 10;24, 11;4 |
| 19 | meetings: 101;23, 101;25 |
| 20 | memo: 80;2, 82;9 |
| 21 | memoranda: 49;6, 69;12, 70;5, 73;2, 73;6, 133;25, |
| 22 | 134;4 |
| 23 | memorandum: 82;9 |
| 24 | memory: 98;6, 142;4 |
| 25 | mental: 121;24, 122;3, 137;2 |

51

| | |
|---|---|
| 1 | March 8, 2007: 1;17, 74;17, 75;1 |
| 2 | March 8th.: 5;12 |
| 3 | March: 14;5, 14;15 |
| 4 | market: 36;6, 41;9, 42;7, 42;18, 43;13, 44;7, 44;21, |
| 5 | 49;24, 53;22, 53;24, 92;6, 100;19 |
| 6 | materials: 79;19, 80;3, 135;18 |
| 7 | matter: 115;19, 131;5 |
| 8 | matters: 11;7, 25;21 |
| 9 | maximum: 132;13 |
| 10 | May 1: 11;16, 11;23, 12;10, 12;17, 89;13 |
| 11 | May 1, 2002: 12;13 |
| 12 | May 1st: 88;11 |
| 13 | May 31: 17;21 |
| 14 | May 31, 2002: 89;8 |
| 15 | MEAGHER: 2;4, 4;7, 4;12, 4;16, 4;24, 5;3, 5;5, 5;11, |
| 16 | 5;19, 5;25, 6;21, 7;13, 7;16, 8;14, 8;17, 8;21, 9;3, |
| 17 | 9;19, 9;22, 11;1, 11;11, 21;25, 22;5, 22;10, 23;9, |
| 18 | 23;12, 29;6, 32;16, 32;23, 35;13, 37;20, 41;19, 42;19, |
| 19 | 43;2, 43;15, 44;5, 48;2, 48;8, 48;11, 48;14, 49;15, |
| 20 | 50;11, 50;17, 50;25, 51;12, 51;23, 54;1, 54;15, 55;2, |
| 21 | 55;12, 56;5, 57;9, 57;16, 57;19, 58;16, 58;21, 58;24, |
| 22 | 59;1, 59;10, 59;20, 60;7, 60;18, 60;23, 61;2, 61;3, |
| 23 | 61;16, 62;4, 62;11, 63;9, 63;11, 63;25, 64;12, 67;12, |
| 24 | 67;25, 68;17, 70;15, 70;22, 70;24, 71;9, 71;14, 72;4, |
| 25 | 73;18, 74;2, 76;6, 77;3, 77;17, 78;9, 78;21, 81;25, |

50

| | |
|---|---|
| 1 | mentioned: 35;22, 94;18, 103;1, 128;9 |
| 2 | merged: 46;9 |
| 3 | met: 106;4 |
| 4 | method: 11;7 |
| 5 | Miami: 2;5, 2;6 |
| 6 | MIB: 25;8, 25;9, 25;11, 25;17 |
| 7 | Michael: 2;11 |
| 8 | Mike: 3;7 |
| 9 | Mills: 105;12, 135;13 |
| 10 | mind: 86;9, 99;24 |
| 11 | mindful: 3;11, 3;13, 122;8, 138;10, 138;13 |
| 12 | mine: 83;9, 83;12 |
| 13 | minor: 44;15 |
| 14 | minutes: 135;25, 136;23, 137;10 |
| 15 | Missouri: 35;23 |
| 16 | misstates: 42;20, 55;13, 58;17, 121;1 |
| 17 | mistake: 68;12, 68;15 |
| 18 | mistakes: 67;18, 67;23, 68;4, 68;6 |
| 19 | moment: 104;11 |
| 20 | moments: 28;7 |
| 21 | monthly: 90;8, 91;3, 93;17, 94;5, 94;15, 98;2, 98;6, |
| 22 | 123;13 |
| 23 | Morehead: 18;4, 18;5 |
| 24 | morning: 3;6, 3;8 |
| 25 | mortgage: 24;2 |

52

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | mouth: 28;1 |
| 2 | Move: 4;22, 58;4, 64;2, 69;22 |
| 3 | moved: 30;22, 31;16, 33;12, 34;2, 39;5, 63;22 |
| 4 | MR: 2;4, 2;11, 2;15, 2;23, 3;5, 3;6, 3;14, 4;7, 4;12, |
| 5 | 4;16, 4;18, 4;24, 5;3, 5;5, 5;11, 5;19, 5;25, 6;21, |
| 6 | 7;13, 7;16, 8;14, 8;17, 8;21, 8;25, 9;3, 9;5, 9;19, |
| 7 | 9;22, 11;1, 11;11, 11;14, 12;23, 13;1, 21;25, 22;3, |
| 8 | 22;5, 22;8, 22;10, 23;9, 23;12, 28;6, 28;9, 28;21, |
| 9 | 29;6, 32;8, 32;16, 32;23, 35;13, 35;16, 37;9, 37;20, |
| 10 | 38;8, 40;14, 41;14, 41;19, 41;23, 42;19, 43;2, 43;6, |
| 11 | 43;15, 44;5, 48;2, 48;8, 48;11, 48;14, 49;15, 50;11, |
| 12 | 50;17, 50;25, 51;12, 51;14, 51;23, 54;1, 54;3, 54;13, |
| 13 | 54;13, 54;15, 55;2, 55;12, 56;5, 57;9, 57;16, 57;19, |
| 14 | 58;4, 58;16, 58;21, 58;23, 58;24, 59;1, 59;10, 59;20, |
| 15 | 60;7, 60;18, 60;23, 61;1, 61;2, 61;3, 61;16, 62;4, |
| 16 | 62;11, 63;9, 63;11, 63;25, 64;12, 67;12, 67;25, 68;17, |
| 17 | 68;19, 70;15, 70;22, 70;24, 71;9, 71;14, 72;4, 73;18, |
| 18 | 74;2, 76;6, 77;3, 77;17, 78;9, 78;21, 81;25, 82;19, |
| 19 | 82;25, 86;13, 86;14, 86;15, 87;8, 87;18, 89;2, 89;4, |
| 20 | 89;21, 92;21, 94;10, 95;19, 98;9, 100;2, 103;13, |
| 21 | 103;18, 104;2, 104;9, 104;22, 105;17, 106;20, 107;1, |
| 22 | 107;7, 107;12, 107;19, 108;10, 108;12, 108;25, 109;10, |
| 23 | 109;22, 110;9, 110;18, 111;6, 111;17, 111;20, 112;17, |
| 24 | 112;24, 113;4, 113;11, 113;16, 113;25, 114;2, 114;14, |
| 25 | 114;17, 114;23, 115;9, 115;17, 115;23, 116;2, 116;14, |

53

| | |
|---|---|
| 1 | nature: 15;18, 26;25, 27;15, 28;24, 36;16, 37;3, |
| 2 | 140;24 |
| 3 | near: 87;16 |
| 4 | necessarily: 61;12, 61;19, 62;6, 62;14, 63;15, 94;11, |
| 5 | 108;11 |
| 6 | need: 9;5, 33;4, 68;7, 69;14, 69;18, 99;24, 116;23, |
| 7 | 131;25, 138;21 |
| 8 | needed: 20;11, 54;6, 63;21, 69;20, 109;24, 132;23 |
| 9 | negative: 14;11, 14;12, 91;21, 91;22 |
| 10 | negotiate: 84;22 |
| 11 | negotiating: 81;17 |
| 12 | negotiation: 51;10, 84;25, 85;19 |
| 13 | Neidermeyer: 45;16 |
| 14 | New: 20;12, 25;17, 45;10, 45;18, 45;19, 45;25, 66;20, |
| 15 | 67;6, 67;15, 70;6, 90;14, 90;21, 90;23, 90;25, 91;2, |
| 16 | 91;5, 91;12, 92;3, 92;17, 92;25, 93;4, 93;11, 93;12, |
| 17 | 93;18, 93;20, 94;2, 94;7, 94;8, 94;19, 95;13, 95;17, |
| 18 | 95;18, 96;12 |
| 19 | newspaper: 66;6 |
| 20 | next: 20;19, 98;22, 122;13 |
| 21 | nice: 18;20 |
| 22 | nine: 20;3 |
| 23 | nineteen: 88;10 |
| 24 | nobody: 130;3 |
| 25 | None: 29;21, 35;5, 128;12, 128;14, 128;15 |

55

| | |
|---|---|
| 1 | 117;6, 117;11, 117;19, 119;1, 119;4, 119;7, 119;15, |
| 2 | 119;18, 119;19, 120;2, 120;9, 120;13, 120;14, 120;15, |
| 3 | 120;24, 121;16, 122;16, 122;22, 122;24, 123;15, |
| 4 | 123;24, 124;11, 124;14, 125;2, 125;4, 125;10, 125;22, |
| 5 | 126;4, 126;15, 129;20, 130;6, 130;19, 131;9, 132;18, |
| 6 | 133;5, 134;10, 135;6, 135;9, 135;13, 135;14, 136;3, |
| 7 | 136;14, 136;19, 137;12, 137;23, 137;25, 138;3, 138;9, |
| 8 | 139;1, 139;19, 140;22, 140;25, 141;22, 142;8, 142;10, |
| 9 | 142;12 |
| 10 | MS: 2;7, 4;18, 5;1, 9;15, 9;22, 32;8, 32;11, 57;19 |
| 11 | multi-page: 99;10 |
| 12 | multiple: 52;19 |
| 13 | myself: 128;22 |
| 14 | |
| 15 | <N> |
| 16 | name: 3;6, 6;12, 26;4, 28;19, 31;19, 35;23, 46;15, |
| 17 | 74;24, 75;6, 78;25, 81;8, 81;22, 97;13, 104;15, 105;3, |
| 18 | 105;7, 105;10, 105;15, 105;19, 139;2, 141;18 |
| 19 | name's: 141;20 |
| 20 | named: 104;14, 138;25, 140;19, 143;8 |
| 21 | names: 45;4, 66;14, 78;20, 82;3, 82;4, 87;23 |
| 22 | narrative: 99;7 |
| 23 | narrowing: 81;15 |
| 24 | National: 26;10, 46;12 |
| 25 | Nationwide: 25;8 |

54

| | |
|---|---|
| 1 | nonlawyer: 6;16 |
| 2 | nor: 143;14 |
| 3 | norm: 62;2 |
| 4 | North: 2;9, 11;24, 12;5, 16;21, 30;5, 30;8, 30;13, |
| 5 | 30;16, 31;9, 34;12, 34;24, 39;4, 39;5, 39;7, 45;22, |
| 6 | 48;25, 54;19, 67;5, 133;2, 133;10, 135;4 |
| 7 | Notary: 1;13, 143;5, 143;24 |
| 8 | note: 73;7, 82;8 |
| 9 | notes: 79;16 |
| 10 | Nothing: 47;17, 64;6, 64;16, 94;5, 99;22, 115;2, |
| 11 | 128;24 |
| 12 | November 24, 1940: 15;9 |
| 13 | number: 30;15, 56;14, 58;2, 58;13, 59;6, 59;7, 59;12, |
| 14 | 59;13, 91;12, 132;17, 133;23 |
| 15 | numbers: 59;3, 79;3 |
| 16 | |
| 17 | <O> |
| 18 | oath: 3;2, 50;7, 57;21, 61;13, 70;13, 76;2, 95;12, |
| 19 | 111;13, 112;5, 125;14, 138;10 |
| 20 | objected: 23;12 |
| 21 | objectionable: 115;2, 126;16 |
| 22 | objections: 43;3, 122;25, 123;2, 123;24 |
| 23 | obtain: 109;24, 110;12, 119;10 |
| 24 | occasion: 32;12, 135;12 |
| 25 | occasions: 121;6, 141;2, 141;8 |

56

14 (53-56)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | occur: 26;22, 71;7, 79;2, 116;21, 126;10 |
| 2 | occurred: 14;3, 33;12, 118;1, 126;2, 126;18, 137;9, |
| 3 | 138;16, 139;18 |
| 4 | occurring: 139;15 |
| 5 | of...: 100;20 |
| 6 | Off-the-record: 125;12, 125;18 |
| 7 | offensive: 115;3 |
| 8 | offer: 135;19, 135;19, 136;1, 136;7 |
| 9 | offering: 133;18 |
| 10 | offers: 133;10, 137;5 |
| 11 | Office: 2;8, 11;24, 31;8, 45;21, 45;23, 45;25, 46;16, |
| 12 | 49;3, 49;5, 90;14, 90;21, 92;4, 92;20, 93;11, 93;12, |
| 13 | 93;20, 93;25, 94;1, 94;2, 94;7, 94;16, 94;20, 95;2, |
| 14 | 95;4, 95;14, 96;2, 100;9, 100;9, 129;16, 131;3, |
| 15 | 141;12, 141;24, 143;19 |
| 16 | officer: 39;1, 40;6, 40;17, 40;21, 41;7, 42;16, 44;4, |
| 17 | 44;14, 50;24, 52;4, 57;15, 63;5, 68;5, 85;23, 88;6, |
| 18 | 88;24, 89;18, 96;9, 97;17, 109;6, 110;8, 111;3, |
| 19 | 116;25, 118;20, 118;21, 120;20, 123;8, 124;22 |
| 20 | offices: 1;14, 105;23, 141;5 |
| 21 | OHIO: 1;1, 2;13 |
| 22 | once: 68;4, 118;18 |
| 23 | One: 10;13, 17;2, 17;4, 19;20, 21;6, 41;21, 42;21, |
| 24 | 43;11, 46;13, 48;10, 48;15, 57;2, 59;4, 61;9, 68;12, |
| 25 | 69;2, 72;12, 74;22, 78;19, 78;23, 78;24, 96;22, 98;21, |

| | |
|---|---|
| 1 | owe: 113;7 |
| 2 | owed: 113;21 |
| 3 | own: 10;1, 13;10, 13;12, 14;6, 14;15, 19;13, 85;8, |
| 4 | 86;9, 123;12 |
| 5 | owner: 18;24 |
| 6 | ownership: 13;22, 14;2, 14;19 |
| 7 | |
| 8 | <P> |
| 9 | Page.............................: 2;21 |
| 10 | pageant: 78;18, 79;21, 79;23, 80;2, 80;5 |
| 11 | paid: 27;2, 27;3 |
| 12 | paper: 7;10, 14;13, 66;9 |
| 13 | part: 13;15, 27;12, 46;11, 85;8, 88;15, 89;11, |
| 14 | 102;13, 130;15 |
| 15 | participants: 80;4 |
| 16 | participate: 6;8, 84;24 |
| 17 | participated: 6;8 |
| 18 | particular: 47;1, 57;8, 81;14, 81;15, 88;7, 122;11, |
| 19 | 123;23, 124;9, 124;25 |
| 20 | parties: 51;10, 143;9, 143;15 |
| 21 | party: 143;14 |
| 22 | party's: 77;21 |
| 23 | past: 13;25, 32;1, 37;15, 46;2, 65;13, 65;24, 85;5, |
| 24 | 86;21 |
| 25 | Paul: 45;7, 103;1, 134;25 |

| | |
|---|---|
| 1 | 98;21, 98;21, 98;22, 98;22, 98;22, 102;11, 102;20, |
| 2 | 113;6, 113;21, 120;22, 129;14, 129;18, 134;15, 134;15, |
| 3 | 139;6, 139;13, 141;1, 141;8 |
| 4 | one-page: 99;9 |
| 5 | open: 58;9, 112;22, 135;19 |
| 6 | operation: 30;21, 31;17, 33;18, 34;23, 45;11, 90;23 |
| 7 | operations: 34;9, 39;5 |
| 8 | opportunity: 14;25 |
| 9 | option: 13;17, 13;19, 13;21, 14;16 |
| 10 | options: 14;9, 17;13 |
| 11 | order: 83;3, 83;20, 109;23 |
| 12 | originally: 96;8 |
| 13 | Others: 45;9, 73;14, 87;20, 87;21, 129;7 |
| 14 | otherwise: 128;24 |
| 15 | outfit: 45;14 |
| 16 | outside: 101;5, 107;16, 111;10, 111;24, 112;7, |
| 17 | 113;12, 120;1, 121;15, 122;14, 138;24 |
| 18 | overall: 33;21, 44;15 |
| 19 | overflow: 91;7, 96;4 |
| 20 | oversaw: 129;15, 129;18, 130;3, 130;13 |
| 21 | oversee: 19;4 |
| 22 | overseeing: 19;10 |
| 23 | overstepped: 110;15 |
| 24 | overwork: 70;13 |
| 25 | overworked: 59;24, 67;19, 68;7, 68;25, 69;14 |

| | |
|---|---|
| 1 | paused: 120;10 |
| 2 | pay: 3;24, 5;22, 27;5, 59;15, 132;21 |
| 3 | paying: 4;11, 67;10 |
| 4 | payment: 131;15 |
| 5 | pending: 22;4, 88;25, 95;15, 128;4, 139;22 |
| 6 | people: 28;2, 30;2, 30;4, 30;7, 30;11, 45;4, 45;20, |
| 7 | 45;22, 54;23, 56;13, 58;6, 60;1, 64;9, 68;7, 68;23, |
| 8 | 71;4, 92;24, 95;6, 95;15, 102;16 |
| 9 | per: 58;1, 58;8, 62;8, 66;11, 67;1 |
| 10 | percent: 51;4 |
| 11 | percentage: 29;19 |
| 12 | perform: 30;18, 53;24, 59;16, 65;24, 73;25, 103;16 |
| 13 | performance: 121;10 |
| 14 | performed: 82;8, 90;1, 101;17, 101;21, 102;13 |
| 15 | performing: 54;14, 55;9, 74;7, 74;9, 103;22 |
| 16 | period: 16;14, 16;16, 16;17, 20;6, 34;16, 35;14, |
| 17 | 50;7, 50;23, 62;23, 63;15, 88;12, 89;16, 89;25, 90;5, |
| 18 | 92;8, 92;10, 96;12, 96;17, 96;23, 97;7, 100;5, 102;5, |
| 19 | 102;6, 102;22, 103;5, 103;10, 103;16, 103;18, 104;7, |
| 20 | 117;2, 141;13 |
| 21 | periodic: 129;23 |
| 22 | permissible: 123;4 |
| 23 | permit: 117;18 |
| 24 | permitted: 1;20, 110;21, 117;4, 118;24, 119;9 |
| 25 | person: 45;14, 46;14, 62;16, 65;14, 76;10, 78;6, |

15 (57-60)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | 81;22, 82;23, 122;12, 123;14, 124;25, 126;11, 127;6, |
| 2 | 127;13, 128;2, 131;25 |
| 3 | person's: 112;23, 137;1 |
| 4 | personal: 4;6, 15;2, 24;14, 41;8 |
| 5 | personally: 4;5, 6;6, 122;5, 127;4 |
| 6 | persons: 19;10, 54;12, 55;18, 60;6, 63;19, 65;24, |
| 7 | 66;6, 66;19, 68;24, 75;2 |
| 8 | persons': 60;12 |
| 9 | persuade: 69;19 |
| 10 | phobia: 122;7 |
| 11 | phone: 4;22, 7;23, 13;5, 79;3, 79;3, 134;6, 134;13 |
| 12 | phone's: 4;24 |
| 13 | phrase: 108;18, 108;21 |
| 14 | piece: 59;4 |
| 15 | pieces: 7;9 |
| 16 | Place: 10;17, 23;22, 31;22, 43;20, 44;25, 83;19, |
| 17 | 83;19, 123;14, 143;7 |
| 18 | placed: 3;2, 87;13 |
| 19 | PLAINTIFF: 1;5, 2;3 |
| 20 | plan: 13;16, 17;13 |
| 21 | plane: 81;10 |
| 22 | play: 20;8 |
| 23 | Please: 10;7, 22;2, 22;6, 32;9, 38;7, 38;9, 41;22, |
| 24 | 48;11, 76;13, 87;2, 113;3, 117;21 |
| 25 | pleasure: 3;9 |

| | |
|---|---|
| 1 | point: 21;15, 21;16, 24;5, 24;8, 31;25, 35;6, 41;10, |
| 2 | 43;21, 47;4, 49;20, 49;25, 50;7, 52;14, 53;6, 53;11, |
| 3 | 62;25, 65;6, 72;12, 74;24, 76;4, 79;1, 80;13, 81;9, |
| 4 | 82;6, 85;21, 94;14, 94;22, 95;5, 97;13, 101;4, 101;10, |
| 5 | 103;19, 103;24, 104;12, 129;6, 131;8, 138;19 |
| 6 | points: 85;20 |
| 7 | policies: 24;4, 26;14, 29;1, 29;4, 33;2, 37;5, 86;24, |
| 8 | 87;1, 87;5, 87;6, 90;15, 91;24, 91;25, 129;4, 140;8 |
| 9 | policy: 18;24, 91;4, 91;16, 91;23, 92;1, 92;10, |
| 10 | 113;19, 126;22, 126;25, 129;4, 129;10 |
| 11 | policyholder: 91;23, 92;2, 92;13, 121;21, 121;25, |
| 12 | 122;10, 123;10, 123;23, 124;1, 124;5, 124;9, 125;16, |
| 13 | 127;7, 127;18, 131;15, 132;2, 132;21, 135;9, 136;10, |
| 14 | 136;25 |
| 15 | policyholder's: 117;4 |
| 16 | policyholders: 35;8, 68;3, 85;24, 86;1, 86;5, 87;15, |
| 17 | 88;25, 101;9, 112;8, 113;7, 113;21, 114;10, 115;8, |
| 18 | 118;4, 119;25, 120;21, 120;23, 121;9, 123;7, 124;23, |
| 19 | 130;14, 130;17, 130;22, 130;23, 131;7, 135;17, 135;25, |
| 20 | 137;21, 139;6, 139;13 |
| 21 | portion: 44;15 |
| 22 | position: 20;2, 88;9, 118;20 |
| 23 | positions: 18;17 |
| 24 | positive: 69;2 |
| 25 | possibility: 52;24, 74;19 |

| | |
|---|---|
| 1 | Possibly: 36;9, 103;8, 112;12 |
| 2 | Post: 2;8 |
| 3 | potential: 73;16, 128;23 |
| 4 | potentially: 76;16, 104;1 |
| 5 | practice: 106;19, 106;23, 107;4, 107;17 |
| 6 | predating: 36;7 |
| 7 | presence: 142;12 |
| 8 | PRESENT: 2;14 |
| 9 | presently: 14;14, 15;10 |
| 10 | preserved: 123;1 |
| 11 | president: 20;25, 21;16, 21;17, 21;19, 21;23, 22;12, |
| 12 | 31;25, 33;3, 33;5, 34;21, 39;8, 40;7, 40;12, 42;14, |
| 13 | 48;19, 62;17, 63;6, 88;6, 88;10, 89;9, 89;17, 127;11 |
| 14 | presume: 7;12, 8;1, 12;19, 108;3, 127;9, 129;13 |
| 15 | presuming: 129;13 |
| 16 | previously: 32;3, 51;6, 96;13, 129;3 |
| 17 | prey: 125;6 |
| 18 | preyed: 124;1, 124;24 |
| 19 | preying: 123;22, 124;4, 124;8 |
| 20 | primarily: 19;17, 24;1, 27;21 |
| 21 | primary: 41;11, 41;13, 44;2, 44;9, 51;7 |
| 22 | principally: 44;16 |
| 23 | Prior: 7;12, 7;22, 9;19, 13;4, 17;16, 24;20, 39;19, |
| 24 | 42;20, 51;8, 55;13, 58;17, 63;18, 72;24, 73;4, 78;14, |
| 25 | 90;17, 91;21, 92;7, 107;21, 128;12 |

| | |
|---|---|
| 1 | privacy: 109;14, 109;15, 109;21, 110;6, 110;7, |
| 2 | 110;16, 111;4, 112;15, 112;18, 112;23, 113;9, 113;10, |
| 3 | 116;8, 116;12, 116;20, 117;3 |
| 4 | privilege: 8;22, 9;10 |
| 5 | Probably: 95;11, 118;5 |
| 6 | problem: 47;14 |
| 7 | Procedure: 1;21 |
| 8 | proceed: 22;8, 120;11 |
| 9 | process: 52;19, 53;13, 55;9, 64;15, 73;12, 73;15, |
| 10 | 79;6, 81;18, 139;18 |
| 11 | processes: 100;17 |
| 12 | product: 8;23, 18;11, 25;17, 47;1, 47;3 |
| 13 | products: 19;14, 19;18, 24;18 |
| 14 | professional: 39;13, 39;20, 42;8, 107;18 |
| 15 | professionally: 43;24, 86;5, 103;11 |
| 16 | profitable: 47;11 |
| 17 | program: 40;3 |
| 18 | projects: 22;16 |
| 19 | prolonged: 128;11 |
| 20 | prolonged...: 128;25 |
| 21 | promoted: 21;15, 21;17 |
| 22 | proof: 92;15 |
| 23 | proper: 26;21, 109;24 |
| 24 | proposal: 79;8, 85;6, 131;22, 131;23, 132;2, 132;23 |
| 25 | proposals: 80;3, 135;24 |

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

1    propose: 134;3
2    proposed: 137;4, 137;6
3    proposing: 25;18
4    prospective: 80;13, 84;13, 85;6
5    provide: 97;15, 126;20
6    provided: 80;4, 98;19
7    provision: 129;11
8    provisions: 110;11, 127;1
9    Public: 1;13, 123;14, 143;5, 143;24
10    purchase: 14;16
11    purchased: 22;22, 28;25, 29;7, 33;23, 39;4
12    purchasing: 32;14
13    purportedly: 38;16
14    purposes: 1;20, 5;12
15    pursuant: 1;19
16    put: 66;5, 106;24, 115;12, 116;5, 136;25, 137;4
17
18    <Q>
19    quarterly: 98;4, 98;6
20    question: 9;2, 14;11, 22;2, 22;3, 22;6, 22;7, 23;14,
21    23;20, 35;15, 35;17, 37;8, 37;10, 37;11, 37;23, 37;24,
22    38;7, 38;11, 41;15, 41;16, 41;18, 42;5, 42;24, 43;1,
23    51;15, 59;22, 63;5, 63;12, 64;4, 64;13, 65;22, 65;22,
24    70;1, 71;12, 72;3, 76;13, 87;12, 88;19, 88;22, 91;21,
25    92;11, 93;22, 94;12, 96;8, 97;5, 99;13, 99;15, 99;20,

65

1    reasons: 11;12, 47;8, 50;8, 69;22, 71;6, 72;24
2    recall: 6;14, 18;13, 19;16, 20;6, 24;14, 24;15,
3    24;19, 24;22, 38;12, 38;19, 38;21, 39;15, 42;10,
4    43;17, 43;22, 44;20, 45;4, 45;24, 47;18, 48;16, 49;4,
5    49;9, 49;11, 50;3, 50;14, 50;15, 52;16, 53;4, 53;15,
6    54;16, 55;19, 55;25, 56;1, 57;4, 57;5, 57;7, 58;2,
7    58;10, 58;20, 59;3, 59;5, 59;7, 59;12, 65;5, 65;9,
8    66;5, 66;9, 66;14, 67;20, 67;22, 68;10, 68;11, 68;14,
9    68;25, 69;9, 69;16, 70;19, 72;9, 72;12, 72;19, 72;21,
10    72;22, 73;1, 73;2, 73;9, 74;7, 74;9, 74;11, 74;17,
11    74;25, 75;4, 75;5, 75;6, 75;13, 75;20, 76;3, 76;4,
12    77;5, 77;9, 77;11, 77;20, 78;11, 78;12, 78;16, 78;20,
13    79;5, 79;9, 79;12, 79;15, 79;18, 80;6, 80;10, 80;11,
14    80;15, 80;16, 80;20, 80;23, 81;1, 81;2, 81;2, 82;3,
15    82;4, 82;6, 82;8, 82;12, 82;13, 82;17, 82;22, 83;24,
16    84;11, 84;12, 84;15, 85;1, 85;12, 85;15, 85;18, 85;19,
17    86;11, 86;16, 86;22, 87;24, 88;3, 90;10, 90;25, 94;21,
18    97;3, 97;6, 98;14, 99;3, 99;12, 99;14, 99;16, 99;20,
19    99;21, 99;23, 100;4, 100;12, 101;4, 101;5, 101;10,
20    101;15, 101;16, 101;19, 101;20, 101;22, 101;25, 102;1,
21    102;25, 104;6, 104;13, 104;16, 104;18, 104;22, 104;25,
22    105;4, 105;16, 105;25, 106;18, 106;22, 106;23, 107;3,
23    107;4, 107;9, 107;15, 118;9, 118;14, 118;15, 118;17,
24    118;19, 127;4, 127;15, 128;25, 129;1, 129;17, 130;2,
25    131;8, 132;8, 132;9, 133;1, 133;4, 133;13, 134;4,

67

1    112;19, 113;2, 114;5, 114;7, 115;1, 115;13, 115;15,
2    116;6, 117;21, 117;22, 119;3, 119;6, 119;14, 119;16,
3    119;23, 120;7, 122;21, 123;20, 125;14, 126;8, 130;10,
4    131;4, 131;17, 137;17
5    questions: 49;11, 49;19, 134;16, 142;10
6
7    <R>
8    Radisson: 6;23
9    ran: 45;14
10    range: 16;3, 58;8
11    rate: 4;11
12    rather: 64;17, 130;24
13    ratio: 57;24, 59;8, 62;1, 64;19, 64;21, 66;25, 70;14,
14    81;14
15    Re: 26;7, 26;9
16    Read: 22;1, 22;5, 22;7, 37;10, 37;11, 38;8, 38;11,
17    41;14, 41;16, 43;1, 71;12, 72;3, 113;2, 117;22, 119;5,
18    119;6, 122;20
19    real: 138;4
20    realize: 57;21
21    really: 44;15, 128;1, 133;4
22    reason: 32;20, 64;8, 125;24, 142;3
23    reasonable: 62;3, 62;7, 62;15, 62;18, 62;19, 137;15,
24    137;22, 137;24
25    reasonably: 61;24, 63;6

66

1    134;14, 135;8, 135;12, 135;21, 138;19, 139;15, 140;14,
2    140;18, 141;22, 141;25, 142;7
3    recalling: 46;17
4    receipt: 7;22, 13;5
5    receive: 4;15, 9;21, 48;17, 106;12, 132;1
6    received: 5;3, 5;10, 5;14, 7;18, 8;19, 9;23, 10;5,
7    10;10, 10;12, 93;23, 98;7, 98;23, 126;22, 126;23,
8    129;23, 130;17
9    receiving: 27;16, 63;2, 80;11, 80;15
10    record: 31;19, 57;16, 89;15, 125;13, 138;9, 142;11,
11    143;13
12    reduce: 64;9
13    reduced: 143;11
14    referrals: 28;1
15    referring: 16;6
16    refine: 114;7
17    reflects: 142;11
18    regard: 35;3, 36;25, 70;18, 70;21, 76;17, 80;19,
19    101;8, 109;9, 131;12, 134;21
20    regarding: 10;4, 20;14, 78;13, 130;8, 134;5, 139;21,
21    141;14
22    Regardless: 91;3, 93;16, 93;17, 94;15, 113;23,
23    114;12, 114;20, 115;3, 115;4, 115;14, 119;12, 119;16,
24    125;16
25    regular: 12;24

68

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 regularly: 71;7 | 1 representatives: 101;24 |
| 2 regulation: 116;23 | 2 represented: 3;16 |
| 3 regulations: 27;8 | 3 representing: 3;9, 4;5, 5;23, 7;14, 8;5, 8;17, 9;22 |
| 4 Reinsurance: 28;15, 28;17, 35;23, 36;5, 36;6, 36;11, | 4 represents: 5;15 |
| 5   36;17, 36;25, 37;4, 37;17, 38;4, 75;11, 76;23, 78;2, | 5 request: 79;7, 80;3 |
| 6   78;13, 86;23, 87;4, 141;1 | 6 requested: 132;14, 143;15 |
| 7 reinsure: 87;6, 87;7 | 7 require: 88;23, 97;15 |
| 8 reinsurer: 26;13, 36;18, 36;20, 37;14, 75;14, 78;3, | 8 required: 29;9, 30;4, 30;7, 30;13, 56;10, 69;23, |
| 9   78;8, 91;19, 93;16, 94;5 | 9   118;4, 131;21, 133;22 |
| 10 reinsurer's: 78;7 | 10 requirements: 97;19 |
| 11 reinsures: 86;25, 87;1 | 11 requires: 59;15 |
| 12 related: 21;2, 37;4, 90;15, 94;24, 113;21 | 12 reserved: 71;19 |
| 13 relates: 37;17, 38;4, 88;7 | 13 reside: 12;5 |
| 14 relating: 10;9, 11;10, 12;9, 49;1, 81;22, 82;9, 140;5 | 14 resided: 31;9, 69;21 |
| 15 relationship: 26;10, 40;16, 87;4 | 15 resolve: 131;14 |
| 16 relationships: 12;20 | 16 resolved: 95;14 |
| 17 Relax: 68;19, 86;14 | 17 respect: 39;22, 87;5, 126;20 |
| 18 relay: 117;25 | 18 respectfully: 86;6 |
| 19 releases: 110;12 | 19 respective: 55;18, 112;8, 140;5 |
| 20 relied: 87;16 | 20 respond: 114;5, 128;19 |
| 21 relocate: 12;3, 30;5, 30;8, 64;24 | 21 responded: 128;22 |
| 22 relocated: 39;4, 48;25 | 22 responding: 19;5 |
| 23 remainder: 96;6 | 23 response: 19;11, 64;4, 125;15, 136;11 |
| 24 remained: 30;25, 34;9, 44;1 | 24 responsibilities: 35;3, 44;13, 63;22, 64;10, 66;22, |
| 25 remember: 18;21, 56;20, 74;24, 78;25, 81;8, 97;12, | 25   71;3, 96;17, 138;18 |

| | |
|---|---|
| 1   131;17, 132;12 | 1 responsibility: 24;17, 33;20, 33;21, 34;23, 39;14, |
| 2 remembering: 82;4 | 2   40;22, 41;6, 42;13, 44;3, 45;12, 46;13, 48;1, 54;23, |
| 3 reminded: 10;24, 11;9 | 3   55;21, 57;3, 60;5, 67;6, 70;9, 75;25, 76;10, 76;18, |
| 4 remove: 112;22 | 4   77;23, 88;13, 88;15, 89;10, 89;11, 89;19, 96;10, |
| 5 rented: 39;7 | 5   96;20, 97;17, 102;8, 102;18, 102;23, 103;3, 103;9, |
| 6 reorganize: 71;3 | 6   103;16, 121;8, 130;16, 139;7, 139;11, 139;14, 139;25 |
| 7 Repeat: 10;7, 23;14, 25;2, 35;17, 38;7, 42;24, 43;3, | 7 Responsible: 19;1, 35;11, 40;18, 42;9, 50;4, 63;19, |
| 8   51;15, 59;21, 64;13, 87;2, 88;19, 117;21, 119;3 | 8   86;4, 109;6, 116;25, 118;21 |
| 9 rephrase: 76;13, 118;2 | 9 rest: 23;20 |
| 10 replace: 54;10, 54;11 | 10 restate: 113;4, 122;22 |
| 11 report: 40;8, 40;14, 55;22, 66;15, 96;21, 97;16, | 11 restriction: 112;16 |
| 12   99;4, 99;12, 99;16, 101;20, 101;22 | 12 restrictions: 112;14 |
| 13 reported: 34;11, 34;15, 45;2, 45;5, 45;8, 45;15, | 13 result: 46;1, 64;10 |
| 14   46;14, 96;22, 103;2 | 14 resulted: 32;13 |
| 15 Reporter: 1;13, 22;7, 37;11, 38;11, 41;16, 43;1, | 15 resumes: 66;6 |
| 16   72;3, 117;22, 119;4, 119;6, 143;4, 143;23 | 16 retain: 14;15, 88;5, 107;5, 107;11, 107;17, 107;24, |
| 17 Reporter's: 2;24 | 17   108;1, 108;4 |
| 18 Reporting: 1;15, 40;15, 45;11, 46;13, 68;12, 96;16, | 18 retaining: 101;5 |
| 19   96;19, 97;19, 98;7 | 19 retire: 16;24 |
| 20 reportings: 106;10 | 20 retired: 15;12, 15;13 |
| 21 reports: 48;17, 97;20, 97;23, 97;25, 98;1, 98;16, | 21 Retirement: 16;2, 16;4, 16;5, 27;19, 88;17 |
| 22   98;18, 98;23, 99;7, 99;9, 99;10, 99;23, 106;12, | 22 return: 16;11 |
| 23   106;15, 129;23 | 23 returned: 95;15 |
| 24 represent: 5;11, 8;8, 8;10, 8;13 | 24 returning: 16;1 |
| 25 representation: 3;21, 5;18 | 25 review: 7;6, 101;6, 101;13, 107;24 |

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | reviewed: 10:4, 10;9, 51;19, 85;2, 85;10, 106;14, |
| 2 | 106;17 |
| 3 | reviewing: 52;22, 99;12, 99;16 |
| 4 | rights: 114;21, 124;6 |
| 5 | rigmarole: 17;11 |
| 6 | ring: 38;17, 105;10 |
| 7 | Ritchey: 2;11 |
| 8 | road: 97;24 |
| 9 | Roberson: 12;23, 54;13 |
| 10 | Robert: 141;16 |
| 11 | ROBERTS: 2;11, 3;5, 3;7, 8;25, 9;5, 11;14, 22;3, |
| 12 | 22;8, 28;6, 35;16, 37;9, 38;8, 41;14, 41;23, 43;6, |
| 13 | 51;14, 54;3, 58;4, 58;23, 61;1, 68;19, 86;14, 89;4, |
| 14 | 108;12, 113;4, 116;2, 119;4, 119;18, 120;13, 122;22, |
| 15 | 122;24, 138;3, 142;8 |
| 16 | Roberts..............: 2;23 |
| 17 | role: 12;9, 19;19, 20;8, 20;19, 21;5, 22;11, 25;6, |
| 18 | 33;15, 34;18, 34;20, 34;21, 35;20, 38;25, 44;17, |
| 19 | 48;18, 48;19, 50;23, 52;3, 60;15, 70;6 |
| 20 | roles: 21;12, 33;20 |
| 21 | room: 71;20, 71;22, 71;24 |
| 22 | Rules: 1;21 |
| 23 | run: 63;14 |
| 24 | runoff: 62;24 |
| 25 | |

73

| | |
|---|---|
| 1 | 109;6, 110;8, 111;3, 116;25, 118;21, 120;19, 123;8, |
| 2 | 124;22, 139;7, 139;14 |
| 3 | sense: 76;5, 77;7, 77;13, 78;4, 78;6, 80;1 |
| 4 | sent: 67;5, 83;21, 126;21, 140;8 |
| 5 | serious: 79;22, 80;1, 80;5 |
| 6 | serve: 18;15, 19;19, 19;25, 21;5, 21;9, 22;11, 33;25, |
| 7 | 96;3 |
| 8 | served: 15;24, 70;6 |
| 9 | Service: 1;15, 17;7, 18;24, 25;3 |
| 10 | Services: 30;3, 34;24, 37;18, 37;19, 38;5, 38;6, |
| 11 | 38;15, 38;20, 41;4 |
| 12 | set: 143;18 |
| 13 | settle: 132;10, 133;18, 135;14 |
| 14 | settled: 95;14 |
| 15 | settlement: 131;12, 131;13, 131;22, 131;24, 132;2, |
| 16 | 132;14, 132;22, 133;10, 135;4, 135;16, 135;24, 137;4 |
| 17 | Several: 13;8, 18;17, 20;6, 50;18, 56;20, 56;21, |
| 18 | 60;13, 60;14, 82;20, 98;22, 115;24, 124;15 |
| 19 | share: 26;1, 121;5 |
| 20 | shared: 85;6 |
| 21 | Sharp: 46;15 |
| 22 | she's: 9;7, 9;9 |
| 23 | Shelton: 13;1, 54;13 |
| 24 | short: 63;14, 138;2, 138;6 |
| 25 | shortly: 81;12 |

75

| | |
|---|---|
| 1 | <S> |
| 2 | sale: 14;2, 14;19 |
| 3 | sales: 29;20, 29;22 |
| 4 | satisfy: 86;10 |
| 5 | saw: 130;8 |
| 6 | saying: 5;11, 46;24, 74;16, 111;16, 124;21, 131;6, |
| 7 | 131;7, 133;25, 140;15 |
| 8 | says: 133;13, 133;13, 133;14, 133;16 |
| 9 | scheduled: 102;1 |
| 10 | school: 9;8 |
| 11 | scope: 37;3, 111;15 |
| 12 | seal: 143;19 |
| 13 | second: 57;17 |
| 14 | Seeing: 25;16, 93;4, 101;20 |
| 15 | seeking: 71;5, 76;15, 85;15, 133;8 |
| 16 | seem: 138;2 |
| 17 | seen: 10;8, 52;6, 118;5, 136;22, 137;3, 137;14, |
| 18 | 137;16 |
| 19 | selling: 20;16, 24;4, 24;5, 24;9, 33;2, 47;1, 47;3, |
| 20 | 49;8, 50;9 |
| 21 | send: 28;2, 79;7, 79;10, 79;13, 79;19, 92;25, 100;10 |
| 22 | sending: 19;11, 69;15 |
| 23 | senior: 34;7, 39;1, 40;6, 40;12, 40;17, 40;21, 41;7, |
| 24 | 42;15, 44;3, 44;14, 50;4, 50;24, 52;3, 57;15, 62;16, |
| 25 | 63;5, 68;5, 85;22, 88;6, 88;23, 89;18, 96;8, 97;16, |

74

| | |
|---|---|
| 1 | shouldn't: 108;14 |
| 2 | Shutts: 2;4 |
| 3 | side: 43;9, 44;11, 45;1, 51;7, 67;21 |
| 4 | sign: 52;1, 85;3, 85;11, 104;23, 112;21, 118;4, |
| 5 | 125;17 |
| 6 | signed: 38;21, 51;18, 52;13, 53;5, 104;19, 110;13, |
| 7 | 112;8, 121;7, 143;16 |
| 8 | significant: 71;4 |
| 9 | signing: 51;8, 51;20, 81;17 |
| 10 | signs: 113;8 |
| 11 | sill: 57;21 |
| 12 | simply: 80;6, 86;11, 86;16, 106;25 |
| 13 | single: 81;22, 127;12, 134;13 |
| 14 | sit: 14;5, 46;9 |
| 15 | site: 27;24, 30;20, 31;16, 33;17, 33;19 |
| 16 | Sitting: 14;14, 24;13, 52;11, 69;9, 74;11, 74;25, |
| 17 | 75;4, 75;22, 77;12, 78;4, 97;5, 99;22, 104;11 |
| 18 | situation: 91;7, 116;21, 117;23, 118;1, 121;3, |
| 19 | 126;10, 132;20, 136;22 |
| 20 | Six: 97;24 |
| 21 | small: 13;14 |
| 22 | smoker: 27;10, 27;11 |
| 23 | society: 16;4 |
| 24 | sold: 18;12, 24;18, 48;4, 90;15, 91;4, 91;16, 91;22, |
| 25 | 91;25, 92;1, 92;10 |

76

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | solicited: 66;6 |
| 2 | somebody: 12;23, 34;11, 65;8, 68;8, 69;22, 76;15, |
| 3 | 126;12 |
| 4 | somebody's: 110;5 |
| 5 | somehow: 57;25 |
| 6 | Someone: 26;18, 27;10, 27;16, 33;8, 55;22, 66;15, |
| 7 | 82;14, 98;13, 98;25, 112;21, 121;24, 122;6, 127;10, |
| 8 | 128;17, 136;23, 137;1, 137;9, 138;25 |
| 9 | someone's: 109;14, 112;15 |
| 10 | sometime: 14;3, 33;6, 92;7 |
| 11 | somewhere: 11;25, 16;2, 35;24, 79;3 |
| 12 | Sorry: 3;12, 7;3, 8;9, 19;8, 19;9, 21;22, 22;1, |
| 13 | 23;11, 42;25, 48;13, 58;21, 61;1, 71;13, 117;10, |
| 14 | 133;15 |
| 15 | sort: 85;24 |
| 16 | sought: 135;13 |
| 17 | sound: 6;13 |
| 18 | South: 2;5, 133;2 |
| 19 | SOUTHERN: 1;1 |
| 20 | speak: 127;17 |
| 21 | speakerphone: 2;7 |
| 22 | speaking: 25;20, 93;7 |
| 23 | special: 22;15 |
| 24 | specific: 50;16, 68;15, 85;20, 97;16, 105;1, 118;1 |
| 25 | specifically: 24;22, 39;23, 43;22, 44;22, 46;23, |

77

| | |
|---|---|
| 1 | 55;20, 58;13, 72;19, 72;21, 72;22, 73;1, 77;5, 84;12, |
| 2 | 97;4, 99;14, 99;21, 101;19, 105;18, 135;21, 138;15, |
| 3 | 139;8 |
| 4 | specifics: 26;2, 37;12 |
| 5 | specimens: 140;7 |
| 6 | speculating: 36;21 |
| 7 | Speculation: 49;16, 60;19, 67;13, 76;7, 95;20, |
| 8 | 110;19, 111;7, 114;3, 114;15, 114;24, 115;11, 117;7, |
| 9 | 120;4, 120;25, 122;17, 123;16, 125;23, 126;4, 126;9, |
| 10 | 129;21, 130;7, 136;4, 136;20, 137;13, 139;20 |
| 11 | spend: 44;19 |
| 12 | spent: 44;10, 50;22 |
| 13 | spoke: 57;5, 57;7, 81;22 |
| 14 | spoken: 74;18 |
| 15 | spread: 59;19, 67;7 |
| 16 | staff: 44;24, 44;25, 54;8, 55;4, 55;10, 56;8, 57;13, |
| 17 | 65;8, 65;21, 80;25, 81;3, 83;7, 83;11, 84;2, 84;3, |
| 18 | 126;25 |
| 19 | staffing: 60;10, 83;2, 83;12, 83;18, 83;19, 94;24 |
| 20 | Starbucks: 122;12 |
| 21 | start: 53;23, 89;6 |
| 22 | Started: 18;23 |
| 23 | starting: 18;18 |
| 24 | STATE: 1;14, 18;4, 18;5, 18;8, 23;17, 27;3, 27;7, |
| 25 | 27;7, 31;19, 32;20, 116;8, 116;20, 117;3, 117;18, |

78

| | |
|---|---|
| 1 | 143;1, 143;5 |
| 2 | State-at-Large: 143;24 |
| 3 | stated: 11;13, 51;6, 143;6, 143;7 |
| 4 | statement: 126;23 |
| 5 | statements: 129;5 |
| 6 | STATES: 1;1 |
| 7 | statistics: 99;7 |
| 8 | status: 43;12, 43;19, 44;21, 81;13 |
| 9 | statute: 27;4 |
| 10 | stay: 12;21 |
| 11 | stayed: 30;23 |
| 12 | stenotype: 143;10 |
| 13 | Step: 107;16, 113;12 |
| 14 | Stephanie: 2;7, 4;25, 6;9, 7;25, 8;8, 8;10, 8;11, |
| 15 | 8;18, 10;15, 13;5 |
| 16 | stepped: 112;7 |
| 17 | stepping: 111;23 |
| 18 | stipulate: 137;5 |
| 19 | stock: 13;10, 13;12, 14;6, 14;15, 14;16, 17;13 |
| 20 | stood: 44;22 |
| 21 | stop: 47;1, 50;9, 126;14 |
| 22 | stopped: 33;2, 47;3 |
| 23 | straight: 5;2 |
| 24 | strategic: 122;1 |
| 25 | strategically: 121;23, 122;14, 124;8 |

79

| | |
|---|---|
| 1 | strategy: 138;21 |
| 2 | Street: 1;16, 2;12, 122;13 |
| 3 | strepitous: 9;6 |
| 4 | strike: 58;4 |
| 5 | stuck: 113;22 |
| 6 | subject: 70;20, 77;24 |
| 7 | submitted: 101;12 |
| 8 | subordinates: 68;13 |
| 9 | SUBPOENA: 1;5, 1;20, 7;18, 7;22, 8;20, 9;23, 10;5, |
| 10 | 10;10 |
| 11 | Substantive: 128;2, 128;6 |
| 12 | succeed: 48;23 |
| 13 | succeeded: 48;21 |
| 14 | sue: 138;22 |
| 15 | sued: 67;23, 138;11 |
| 16 | suffering: 128;3, 137;2 |
| 17 | suggests: 133;7 |
| 18 | suicide: 27;15 |
| 19 | suing: 138;14 |
| 20 | superior: 72;16 |
| 21 | supervision: 39;10 |
| 22 | supervisor: 18;24, 19;3, 71;5 |
| 23 | supplement: 54;9 |
| 24 | supplemented: 60;16 |
| 25 | Support: 30;3, 79;20 |

80

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1 | suppose: 60;20 |
| 2 | supposed: 80;13 |
| 3 | supposedly: 80;8 |
| 4 | survey: 25;11, 25;12, 25;13 |
| 5 | suspect: 87;23 |
| 6 | Swift: 134;20, 134;24 |
| 7 | Swink: 45;7, 103;1, 103;18, 104;2, 134;25, 135;1 |
| 8 | Swiss: 26;7, 26;9 |
| 9 | sworn: 42;12, 42;16, 56;2, 62;9, 143;9 |
| 10 | |
| 11 | <T> |
| 12 | tactics: 118;23, 118;24, 119;12, 119;17 |
| 13 | tag: 44;4 |
| 14 | talked: 4;10, 74;22, 74;23, 86;18 |
| 15 | TAMELA: 1;12, 143;4, 143;22 |
| 16 | tangent: 96;7 |
| 17 | Tart: 45;7 |
| 18 | teleconferences: 102;2 |
| 19 | telephone: 26;5, 134;11 |
| 20 | Telephonic: 134;7 |
| 21 | telephonically: 6;6 |
| 22 | temp: 68;16 |
| 23 | temporary: 68;21, 68;22, 69;2 |
| 24 | tenure: 138;13 |
| 25 | term: 16;5, 108;7, 108;15, 109;17, 109;18 |

81

| | |
|---|---|
| 1 | Thursday: 1;17 |
| 2 | tight: 4;25 |
| 3 | till: 33;6 |
| 4 | title: 20;20, 21;14, 34;22, 39;3, 39;6, 39;8, 40;6, |
| 5 | 88;5 |
| 6 | titles: 21;12 |
| 7 | to...: 137;10 |
| 8 | today: 3;16, 8;2, 8;7, 10;3, 10;8, 12;3, 14;5, 14;14, |
| 9 | 16;4, 24;13, 46;9, 52;12, 69;5, 69;9, 74;11, 74;17, |
| 10 | 74;25, 75;22, 77;12, 78;5, 80;23, 88;2, 97;6, 99;22, |
| 11 | 100;1 |
| 12 | today's: 7;15, 10;17 |
| 13 | Todd: 105;14 |
| 14 | told: 9;15, 30;23, 32;3, 47;10, 47;13, 48;10, 48;15, |
| 15 | 50;1, 61;8, 66;10, 81;2, 82;14, 82;17, 83;10, 84;1, |
| 16 | 84;3, 84;7, 84;13, 86;17, 87;16, 97;12, 104;5, 105;22 |
| 17 | took: 23;22, 23;25, 39;20, 57;3, 118;18, 139;25 |
| 18 | topics: 102;2 |
| 19 | total: 16;1, 74;23 |
| 20 | track: 122;21 |
| 21 | training: 39;16, 126;19, 129;1 |
| 22 | transact: 14;18 |
| 23 | transaction: 23;1, 23;3, 28;25, 33;12 |
| 24 | transferred: 19;22, 30;16, 34;3, 67;14, 139;24 |
| 25 | treat: 86;5, 87;14 |

83

| | |
|---|---|
| 1 | terminated: 21;19 |
| 2 | terms: 85;16, 114;18, 115;12, 116;5 |
| 3 | terrible: 82;3 |
| 4 | testified: 9;7, 43;25, 76;21 |
| 5 | testify: 69;4, 70;13, 112;5 |
| 6 | testifying: 111;13, 143;16 |
| 7 | testimony: 12;8, 42;13, 42;16, 42;21, 44;12, 50;6, |
| 8 | 55;11, 55;13, 56;2, 58;18, 61;13, 61;18, 62;10, 64;20, |
| 9 | 76;2, 91;8, 98;5, 124;13, 143;10, 143;13, 143;18 |
| 10 | the...: 110;21 |
| 11 | theirs: 67;3 |
| 12 | There's: 3;13, 22;3, 68;6, 78;18, 99;22, 122;7 |
| 13 | Third: 2;12 |
| 14 | third-party: 25;22, 25;25, 67;10, 72;8, 73;16, 73;23, |
| 15 | 74;4, 74;14, 74;18, 90;2, 91;10, 131;1 |
| 16 | this...: 124;19 |
| 17 | though: 46;17, 63;23, 77;7, 119;25, 127;21 |
| 18 | thought: 30;23 |
| 19 | threaten: 121;9 |
| 20 | threatened: 121;4 |
| 21 | threatening: 119;24, 120;22, 121;14 |
| 22 | three: 6;4, 12;7, 50;6, 74;23, 79;11 |
| 23 | threshold: 133;8 |
| 24 | Throughout: 39;25, 81;18 |
| 25 | throw: 106;16 |

82

| | |
|---|---|
| 1 | triggered: 99;23 |
| 2 | True: 61;25, 65;4, 65;23, 77;2, 86;6, 89;10, 89;20, |
| 3 | 89;23, 90;18, 143;6, 143;12 |
| 4 | try: 4;21, 41;8, 43;11, 53;12, 93;23, 114;7 |
| 5 | trying: 79;23, 81;14, 92;11 |
| 6 | tweaks: 140;15 |
| 7 | Two: 6;4, 17;22, 26;2, 27;11, 45;7, 51;10, 74;22, |
| 8 | 78;18, 78;19, 78;23, 78;24, 79;11, 80;12, 141;2, 141;8 |
| 9 | two-to-three-hour: 7;4 |
| 10 | two-year: 96;11 |
| 11 | type: 27;1, 46;21, 48;4, 51;10, 65;14, 74;6, 74;14, |
| 12 | 107;11, 107;17, 107;20, 127;16, 132;16, 133;21, 137;1, |
| 13 | 137;3, 137;6 |
| 14 | types: 19;14, 39;9, 100;20 |
| 15 | typewriting: 143;11 |
| 16 | |
| 17 | <U> |
| 18 | ultimate: 97;17 |
| 19 | ultimately: 33;11, 98;15, 98;25 |
| 20 | undergoing: 125;1 |
| 21 | understand: 7;20, 34;6, 37;7, 41;9, 44;12, 45;3, |
| 22 | 46;11, 56;9, 58;7, 59;21 |
| 23 | understanding: 23;21, 23;24, 24;1, 39;18, 42;17, |
| 24 | 73;12, 96;1 |
| 25 | Understood: 16;16 |

84

21 (81-84)

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

| | |
|---|---|
| 1  undertake: 41;8, 114;21 | 1  W-2: 17;11 |
| 2  undertaken: 69;10, 105;20 | 2  Wait: 48;11, 58;23, 120;9 |
| 3  undertaking: 75;12, 142;5 | 3  Walnut: 2;12 |
| 4  undertook: 80;9, 103;21 | 4  wanted: 64;7, 86;2 |
| 5  underway: 57;14 | 5  watch: 41;2 |
| 6  underwriter: 19;23 | 6  web: 27;24 |
| 7  underwriting: 19;22 | 7  week: 7;18, 50;21, 105;20 |
| 8  UNITED: 1;1 | 8  weekends: 31;2 |
| 9  University: 18;1, 18;5 | 9  Whatever: 98;23, 109;18, 118;23, 134;16 |
| 10  unless: 122;11 | 10  whatsoever: 56;12, 70;2 |
| 11  unprofitable: 47;15 | 11  whereby: 124;24 |
| 12  unreasonable: 137;11 | 12  whereof: 143;18 |
| 13  Until: 16;19, 30;21, 33;11, 34;2, 34;2 | 13  whether: 26;18, 27;10, 55;10, 55;23, 63;5, 66;5, |
| 14  updated: 118;10 | 14    84;5, 93;11, 94;6, 98;23, 98;24, 106;23, 107;10, |
| 15  upsetting: 124;3, 124;5 | 15    118;15, 130;21, 133;22, 137;19 |
| 16  uses: 86;24 | 16  Who's: 5;22, 72;17, 75;24, 122;6, 134;23 |
| 17  usually: 134;11, 134;12 | 17  whole: 17;11, 49;10, 68;6, 71;3, 88;12 |
| 18  utilized: 87;22 | 18  whom: 81;5, 113;7, 113;21, 126;12 |
| 19 | 19  wife: 16;20 |
| 20  <V> | 20  will: 15;13, 32;10, 61;20, 119;5, 123;4 |
| 21  vague: 16;5 | 21  win: 79;20 |
| 22  value: 90;9, 91;4, 93;17 | 22  window: 18;16 |
| 23  vendor: 53;20, 53;24, 54;24, 63;23, 64;3, 64;15, | 23  withdrawn: 136;1 |
| 24    64;24, 65;2, 65;4, 67;10, 69;15, 69;25, 70;3, 74;19 | 24  withholdings: 17;11 |
| 25  vendors: 52;19, 52;23, 53;14, 53;23, 80;13, 81;14, | 25  within: 13;25, 27;11, 37;15, 55;8, 57;8, 92;3, 93;20, |

<center>85</center> <center>87</center>

| | |
|---|---|
| 1    81;15, 83;4, 84;1, 84;3, 84;13 | 1    115;5, 132;15, 139;11 |
| 2  verbally: 5;14 | 2  without: 42;12, 71;5, 76;15, 109;9, 109;11 |
| 3  Vermont: 45;10, 45;17 | 3  WITNESS: 1;8, 4;21, 11;8, 23;11, 32;10, 38;9, 41;20, |
| 4  versus: 50;23, 90;23 | 4    42;24, 48;13, 60;25, 61;5, 71;12, 89;7, 113;2, 117;10, |
| 5  vexatious: 115;25 | 5    117;14, 120;15, 122;20, 122;23, 143;8, 143;13, 143;16 |
| 6  vexatiousness: 116;3 | 6  word: 28;1, 46;18, 94;18, 123;3, 128;7 |
| 7  Via: 2;7 | 7  work: 8;23, 11;22, 12;20, 15;14, 17;16, 17;20, 25;11, |
| 8  vice: 20;25, 21;15, 21;17, 21;19, 21;23, 22;12, | 8    25;12, 26;6, 26;7, 26;14, 26;16, 26;25, 27;12, 28;3, |
| 9    31;24, 33;3, 33;5, 34;21, 39;8, 40;7, 40;12, 42;14, | 9    30;8, 30;13, 31;5, 39;21, 53;14, 67;7, 68;8, 68;21, |
| 10    48;18, 62;16, 63;6, 88;5, 88;9, 89;9, 89;17, 127;11 | 10    71;3, 74;6, 74;14, 83;3, 83;8, 83;11, 95;15, 96;17, |
| 11  Video: 1;15 | 11    101;21, 103;11, 129;15, 129;19 |
| 12  view: 110;6 | 12  worked: 20;5, 22;14, 22;25, 30;9, 30;10, 31;24, |
| 13  viewed: 44;16 | 13    33;10, 37;13, 42;11, 45;21, 45;22, 60;13, 60;13, 66;2, |
| 14  violate: 117;2, 117;18 | 14    92;24, 95;6, 134;23 |
| 15  violated: 114;12 | 15  working: 11;19, 20;24, 24;20, 31;14, 107;10 |
| 16  violating: 101;8 | 16  workload: 58;8, 59;19, 60;15, 60;16, 64;9 |
| 17  violation: 116;20 | 17  writing: 46;20, 143;15 |
| 18  visit: 100;7 | 18  written: 69;16, 79;10 |
| 19  voice: 4;19, 32;9, 71;16 | 19  wrote: 43;8, 44;9 |
| 20  volume: 54;7, 55;4, 55;11, 56;7, 56;10, 56;11, 56;16, | 20 |
| 21    60;9, 61;9, 61;20, 62;8, 66;10, 66;16, 73;13 | 21  <Y> |
| 22  volumes: 66;18 | 22  year: 14;20, 19;20, 20;6, 21;6, 82;11, 98;21, 98;22, |
| 23  VS: 1;6 | 23    141;8 |
| 24 | 24  years: 12;7, 13;8, 13;9, 18;18, 20;3, 27;11, 36;6, |
| 25  <W> | 25    42;12, 50;6, 60;13, 60;14, 63;21, 63;21, 63;21, 69;21, |

<center>86</center> <center>88</center>

COLLINS & HUGHES REPORTING AND VIDEO SERVICE

```
1     69;21, 69;22, 84;15, 97;24, 108;23
2     yesterday:  6;1, 9;19, 11;9
3     yesterday's:  7;12, 7;23, 10;23, 11;4
4     yourself:  15;15, 42;6, 43;12, 43;19, 44;20, 47;22,
5     86;3, 87;13, 100;15, 133;22
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

89