UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY,    )
    )
                        Plaintiff,    )
    )
    vs.    )    CASE NO.
    )    C-1-02-479
CHRISTOPHER L. KEARNEY,    )    (Judge Spiegel)
    )
                        Defendant.    )    COPY
    )

The deposition upon oral examination of JOHN L.

ROBERSON, being taken pursuant to Order and in accordance

with the Federal Rules of Civil Procedure before Rebecca J.

Huddy, Notary Public, at the Marriott, 304 North Greene

Street, Greensboro, North Carolina, on the 7th day of May,

2004, beginning at 8:40 a.m.

Page 4

APPEARANCES:
For the Plaintiff:  Mr. William R. Ellis
    Wood & Lamping, LLP
    600 Vine Street, Suite 2500
    Cincinnati, Ohio  45202

    Ms. Stephanie Farabow
    Jefferson-Pilot Life Insurance Company
    100 North Greene Street
    Greensboro, North Carolina  27401
For the Defendant:  Mr. Michael A. Roberts
    Graydon, Head & Ritchey
    511 Walnut Street
    1900 Fifth Third Center
    Cincinnati, Ohio  45202
    * * *

INDEX
By        Page
EXAMINATION   Mr. Roberts   3 - 91
EXAMINATION   Mr. Ellis   91 - 103
FURTHER EXAMINATION  Mr. Roberts   104 - 112
FURTHER EXAMINATION  Mr. Ellis   112 - 114

EXHIBITS

Number   Description   Page
Defendant's 19   Roberson correspondence   31
"   20   Disability Claim 10-31-94   58
"   21   Correspondence '93-95   64
"   22   Handwritten calculations   111
* * *

1  A.  Yes.
2  Q.  Okay.  How long have you been in retirement?
3  A.  Seven years.
4  Q.  Do you know when it was that you last worked, day,
5      month?
6  A.  March 31, 1997.
7  Q.  Okay.  Do you know whether or not you had
8      responsibility for Mr. Kearney's claim through the
9      date of your retirement?
10  A.  Yes.
11  Q.  Did you supervise someone that had a more principal
12      role in administering his claim?
13  A.  Yes.
14  Q.  Okay.  Someone reported up to you?
15  A.  Yes.
16  Q.  Okay.  I'm sure you've given a deposition before, I
17      suspect you have.  You need for me to finish my
18      question before you give an answer even if you know
19      where I'm going, okay?
20  A.  Okay.
21  Q.  Okay.  Who was it that reported up to you and had
22      primary responsibility for Mr. Kearney's claim prior
23      to your retirement?
24  A.  There would have been several persons:  Phyllis
25      Harden, Bob Maxwell, and Harold Shelton.

Page 3

1         The witness, JOHN L. ROBERSON, being first
2      duly sworn, was examined and testified as follows:
3
4      EXAMINATION (by Mr. Roberts):
5
6  Q.  Mr. Roberson, we just met briefly.  We're here in
7      Greensboro, North Carolina, to take your deposition.
8      Could you please tell the jury your name and
9      home address, please.
10  A.  My name is John L. Roberson.  I reside at 3816 Kirby
11      Drive, Greensboro, North Carolina.  I go by the
12      initials JL.
13  Q.  How would you like for me to refer to you, sir?
14  A.  JL.
15  Q.  Okay.  I feel uncomfortable doing that.
16  A.  Pardon?
17  Q.  You're too much my senior for me to feel comfortable
18      calling you by your first name.  I'll call you Mr.
19      Roberson.
20         Mr. Roberson, you've been called to give
21      testimony here today because you've had some
22      experience administering a claim for disability filed
23      by Chris Kearney; isn't that right?
24  A.  That's correct.
25  Q.  Okay.  Are you presently retired, sir?

Page 5

1         (Mr. Kearney entered the hearing room.)
2  Q.  Could you help me understand the chain of command or
3      hierarchy between the four of you during the '93-'97
4      time frame.
5  A.  Phyllis and Bob were claims analysts.  Harold Shelton
6      was the manager of the Claims area.
7  Q.  How many Jefferson-Pilot Life Insurance Company claims
8      analysts were there during the last five years of your
9      employment?
10  A.  In what division are you talking about?
11  Q.  What are the divisions?
12  A.  Well, there was the Life divisions -- I have no idea
13      how many were there.  In the Individual Health
14      Insurance Division, there would have been three
15      analysts.
16  Q.  Is that the division that Ms. Harden and Mr. Maxwell
17      were in?
18  A.  Yes.
19  Q.  Okay.  Who would have been the third analyst?
20  A.  Kim Brann.
21  Q.  When you retired, were all three of those analysts
22      still employed at Jefferson-Pilot?
23  A.  No.  Bob Maxwell was retired.
24  Q.  He'd retired prior --
25  A.  He retired prior to me on disability.

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion,  1230 W.  Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
John L. Roberson    5/7/2004

Page 6

1 Q. Okay. Did he have a disability policy with
2 Jefferson-Pilot?
3 A. How would I know?
4 Q. He filed a claim and it came under your hierarchy.
5 A. No, it would not have.
6 Q. All right.
7 A. If he had disability with us, it would have been with
8 the Group Division. I had no responsibility for that.
9 Q. Okay. Very well. Were Kim Brann and Ms. Harden still
10 employed with Jefferson-Pilot when you retired?
11 A. Ms. Harden was. Kim Brann is no longer with the
12 company and when she left, I don't recall.
13 Q. Did she leave prior to you or subsequently?
14 A. I don't recall.
15 Q. How do you know she left?
16 A. She wrote me a note and told me that she was working
17 with another company.
18 Q. Do you know where?
19 A. Yes.
20 Q. Where?
21 A. The Center for Creative Leadership.
22 Q. Do you know where that is located?
23 A. It's in Greensboro, North Carolina.
24 Q. When was the last time you spoke to her?
25 A. I can't recall.

Page 7

1 Q. Would it have been several years ago?
2 A. At least.
3 Q. At least several years ago? Was Mr. Maxwell replaced
4 when he went out on disability?
5 A. No.
6 Q. So when you retired, there were just two claims
7 analysts in the department?
8 A. As far as I recall, yes.
9 Q. And Mr. Shelton was their supervisor and he reported
10 to you?
11 A. That's correct.
12 Q. And did anybody else report to you directly?
13 A. Yes. I had the responsibilities for underwriting,
14 policy issue, policy service and claims, and there
15 would have been several underwriters reporting to me,
16 supervisor of policy service in addition to the Claims
17 area.
18 Q. But the only claims personnel that reported to you are
19 Mr. Shelton and Mr. Maxwell, Ms. Harden and Ms. Brann?
20 A. That's correct.
21 Q. What does underwriting policy issue mean?
22 A. Underwriting and policy issue. Underwriting is the
23 process of approving a rating of applicants. Policy
24 issue is the issue of a policy.
25 Q. Tell me about the functions performed by the Policy

Page 8

1 Issue persons who reported to you.
2 A. Entered the information from the application into our
3 computer system and physically issued the policy and
4 mailed it when it was approved.
5 Q. Okay. So they take information of potential or
6 prospective policyholders and if those persons choose
7 to purchase a policy, they handle the mechanics of
8 that; is that right?
9 A. Do you want to state that again. I'm not sure I
10 understood.
11 Q. Do I understand correctly that the persons who work in
12 the Policy Issue Department or Division or Group that
13 reported to you would intake the data of a prospective
14 policyholder who desired to purchase a policy and they
15 would perform the mechanics to accomplish that?
16 A. Generally, yes.
17 Q. Okay. Did they have any responsibility for actually
18 drafting, creating, or authoring the actual policy or
19 policies or riders?
20 A. No.
21 Q. Where was that function performed when you were
22 working at Jefferson-Pilot?
23 A. Do you want to go over that again.
24    MR. ROBERTS: Could you read him the question
25 again.

Page 9

1    (The last question was read back by the court
2 reporter.)
3 A. Primarily in the Actuarial Department.
4 Q. How long did you work at Jefferson-Pilot?
5 A. Thirty-eight and a half years.
6 Q. Did you ever have any responsibility or role in the
7 Actuarial Department?
8 A. No.
9 Q. Do you know anything about how policies are created or
10 were created by Jefferson-Pilot during your tenure?
11 A. Do you want to state that again.
12 Q. Do you know anything about how policies were created
13 at Jefferson-Pilot during your 38 and a half years
14 there?
15 A. Disability policies, yes.
16 Q. Okay. What can you tell me about what you know about
17 the creation of disability policies?
18 A. What do you want to know about it?
19 Q. Educate me about the process, what you can recall,
20 start to finish in the creation of a disability
21 policy.
22 A. Well, the ideas generally came from the Marketing
23 Department. It was discussed with the Underwriting
24 Department and the Actuarial Department. The decision
25 was made for the type of benefits to be placed in the

3 (Pages 6 to 9)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 10

1    policy. The Actuarial Department wrote the policies,
2    rated them. They were reviewed by myself and the
3    Marketing Departments, agreed upon, printed, filed
4    with the Insurance Departments, and then marketed.
5  Q. Thank you. What was your role in -- you mentioned
6    that you would have to review and agree upon them with
7    the Marketing Department. What exactly was your role
8    or responsibility in that process you just laid out
9    for me?
10  A. I would have reviewed the policies' wording for my
11    opinion on if they were worded correctly or in
12    accordance with my knowledge of disability income
13    insurance.
14  Q. Who else would perform a similar function to you, and
15    not necessarily names of the individuals but, you
16    know, the capacities? Would the Marketing Department
17    also evaluate the actual language and provide input in
18    the language to be used?
19  A. They would suggest language or provisions that were
20    compatible with the competition, yes.
21  Q. And the Actuarial Department would draft language as
22    well and comment on language used in a disability
23    policy?
24  A. I didn't understand you.
25  Q. The Actuarial Department would also offer language to

Page 11

1    be used in a proposed disability insurance policy?
2  A. Yes, and the Legal Department would be involved also,
3    yes.
4  Q. Legal Department? Anyone else?
5  A. I can't think of anyone else.
6  Q. So would there be an initial draft of a policy that
7    would be shared with these respective departments and
8    the person who sent that proposal or draft of a policy
9    out would be asking for comments from the different
10    areas of the company?
11  A. Yes.
12  Q. And then people would provide their comments and
13    ultimately through a series of drafts, you'd come to a
14    final draft that would be approved and that's what
15    would be sent to the State Insurance Department?
16  A. That's correct.
17  Q. And would the same process apply for riders?
18  A. Do you mean benefit riders?
19  Q. Correct.
20  A. Yes, yes.
21  Q. During your tenure how many disability insurance
22    policies were ultimately created?
23  A. I have no idea. I couldn't tell you exactly.
24  Q. Dozens?
25  A. At least.

Page 12

1  Q. Okay. Why would there be so many different disability
2    insurance policies created?
3  A. Well, in 38 and a half years the industry changed
4    considerably.
5  Q. Okay. Was Jefferson-Pilot out of the industry of
6    selling disability insurance policies when you
7    retired?
8  A. Yes.
9  Q. Do you know why it is that they ceased engaging in
10    that business line?
11  A. It was a management decision.
12  Q. Is it one you agreed with?
13  A. Yes.
14  Q. Why?
15  A. The disability income field is a very difficult line
16    of business and it's highly specialized and unless you
17    were willing to commit the resources, it would be
18    difficult to have a viable line, and it was highly
19    competitive and one of the very minor parts of the
20    Jefferson-Pilot organization, so I thought it was a
21    good decision.
22  Q. Was it profitable for Jefferson-Pilot prior to ceasing
23    the business line?
24  A. Yes.
25  Q. Did there ever come an occasion where a policy was

Page 13

1    created, filed with the State Insurance Department,
2    accepted by the State Insurance Department and then
3    sold to the public, and then after those sequence of
4    events occurred, the company decided to tweak the
5    language of the policy, modify it at all?
6  A. Only if we came out with a new policy would there be
7    changes in benefits, didn't tweak the policies that
8    were already out there, no.
9  Q. Well, once you sell the policy, you can't change it;
10    that's a contract that you can't just go out and
11    change, but did the company ever issue policies -- are
12    you mindful that the company used -- strike that,
13    start over. Are you mindful that the company used
14    letters and numbers to identify different versions of
15    policies?
16  A. Yes.
17  Q. Okay. Did there ever come an occasion where the
18    company stopped selling the XYZ policy and started
19    selling the TUV policy?
20  A. Yes.
21  Q. What would drive that kind of decision?
22  A. Primarily change in the marketplace, new product
23    innovations.
24  Q. Was it ever identified that there was problems with
25    the language of a policy and therefore the policy

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Page 14

1    was -- sale was discontinued?
2    A.  Not that I recall.
3    Q.  Were policies that were sold ever discontinued from
4        being sold?
5    A.  Yes.
6    Q.  And were they replaced by new policies?
7    A.  Well, what do you mean by were they replaced by new
8        policies, those that had been issued or for marketing
9        purposes?
10   Q.  What does that mean, those that had been issued or for
11       marketing purposes?
12   A.  Well, you said to replace a policy.
13   Q.  Right.
14   A.  I mean, I didn't understand what you meant by replace
15       it.
16   Q.  Did it ever come to be that the company decided, We're
17       going to stop selling policy A, we're going to start
18       selling policy B?
19   A.  Yes.
20   Q.  Did there come a point in time when the company said,
21       We're going to stop offering benefits rider for COLA,
22       that person we're going to offer a new version for
23       future policy sales?  COLA is just an example.
24   A.  Yes, uh-huh.
25   Q.  That happened?  Do you recall the company in the early

Page 15

1        '90s creating a new version of a residual disability
2        rider to sell and discontinuing the use of an old
3        form?
4    A.  I don't remember the date, but it was done, yes.
5    Q.  Okay.  Do you recall why that decision was made to do
6        that?
7    A.  Most likely due to competitive reasons and
8        marketplace.
9    Q.  Are you speculating or do you know factually?
10   A.  I'm speculating.
11   Q.  Okay.  Was it to improve upon the language of the
12       rider?
13   A.  No.
14   Q.  Did anyone ever advise you that a policy that was out
15       for sale in the marketplace needed to be discontinued
16       because it was ambiguous?
17   A.  No.
18   Q.  Are you mindful of the way courts read insurance
19       policies in construing ambiguities?
20   A.  Yes.
21   Q.  What's your understanding?
22   A.  Courts have interpreted language differently in
23       various jurisdictions, if that's what you mean.
24   Q.  No.  Are you mindful that courts construe ambiguities
25       against the drafter of the insurance policy?

Page 16

1    A.  Yes.
2    Q.  Okay.  Was that commonly known within Jefferson-Pilot
3        while you were there?
4    A.  I can only speak for myself.
5    Q.  Okay.  Did you ever discuss that concept with anybody
6        while you were at Jefferson-Pilot?
7    A.  I don't specifically recall specifically doing it, no.
8    Q.  Did you meet with Mr. Ellis last night?
9    A.  Yes.
10   Q.  Did you discuss your deposition today?
11   A.  That I was going to give one, yes.
12   Q.  And did you discuss -- did he talk with you about the
13       actual policy document that is Mr. Kearney's policy?
14   A.  I think we discussed the policy provisions, yes.
15   Q.  And he pointed out the provisions to you while you
16       were sitting having dinner or drinks?
17   A.  He may have asked me about my opinion about some
18       provisions, yes.
19   Q.  Did he direct your attention to certain portions of
20       the policy?
21   A.  We certainly didn't discuss every provision there, no.
22   Q.  But he directed your attention to certain sections of
23       the policy he wished to discuss with you?
24   A.  Yeah.
25   Q.  And he also shared with you the pay history on Mr.

Page 17

1        Kearney's claim?
2    A.  No.
3    Q.  That was a document that you two discussed, wasn't it?
4    A.  Last night is what you were asking, wasn't it?
5    Q.  Yes.
6    A.  No.
7    Q.  Wasn't that on the table right in front of you as you
8        were drinking?
9    A.  I don't recall everything that was on the table.
10   Q.  Okay.  Are you mindful that insurance agents in the
11       field would provide prospective policyholders with
12       proposals?
13   A.  Yes.
14   Q.  Do you know who authored the proposals that those
15       folks shared with prospects?
16   A.  I don't recall.
17   Q.  Were they authored within Jefferson-Pilot or were
18       agents out in the field creating whatever they wanted
19       to create for a proposal?
20   A.  Basically it came from Jefferson-Pilot.
21   Q.  Do you know what department created those proposals?
22   A.  It was out of the Marketing Department, I think.
23   Q.  The same department that comments on policy language
24       before a policy is issued?
25   A.  Yes.

5 (Pages 14 to 17)

**Jefferson-Pilot Insurance Company vs. Christopher L. Kearney**
John L. Roberson

C-1-02-479
5/7/2004

Page 18

1  Q. The people who create those proposals, are they
2     mindful of the actual provisions of policies?
3  A. Yes.
4  Q. And does Jefferson-Pilot train its marketing folks and
5     claims analyst folks about how the policies that are
6     issued are interpreted?
7  A. (No response)
8  Q. There's a long pause in your answer. Is there a
9     reason for that? Did you understand the question?
10 A. I didn't fully understand it, no. Do you want to --
11 Q. Okay. To me it could go one way or the other. You
12    have a company with a whole bunch of employees, the
13    company sells policies, and either you leave it up to
14    everybody to come to their own understanding of what
15    the policy means -- and hopefully it's the same
16    understanding -- or the company gives direction or
17    provides some education about what the policy says.
18    Which one of those was it at Jefferson-Pilot?
19 A. We would review new policies with the claims analysts
20    and with the underwriting personnel.
21 Q. Who is we?
22 A. Myself primarily for our department.
23 Q. So who would -- for the marketing folks who prepare
24    these proposals, did they obtain any training or
25    education about what the actual policies provide, or

Page 19

1     if a new marketing person was hired on a given day, to
2     create a proposal, was he or she just supposed to come
3     up with their own understanding of what the policy
4     means?
5  A. Proposals were standardized. I think they were on
6     some type disk. I don't remember, fully remember the
7     process.
8  Q. So the head of the Marketing Department with input
9     from someone in Actuarial and Legal would create the
10    proposal?
11 A. I think that's correct.
12 Q. Okay. The company just didn't leave to each
13    employee's own determination what the policy says or
14    means; the company provided education and training to
15    its employees say or provide,
16    right?
17 A. Correct.
18 Q. Okay. And based on that education and training and
19    input from other departments, the persons responsible
20    for developing the proposals would create those
21    proposals, and I guess you suggested there was some
22    kind of template form of a proposal that was blessed
23    by the company; is that right?
24 A. Yes.
25 Q. Did you ever see a proposal that misstated what the

Page 20

1     policy provides?
2  A. I don't recall one.
3  Q. Are you mindful of a proposal ever having to be
4     scrapped because it was wrong and a new template of a
5     proposal was created for distribution to the agents in
6     the field?
7  A. Not that I recall.
8  Q. Do you receive any retirement income from
9     Jefferson-Pilot?
10 A. Yes.
11 Q. Still today?
12 A. Yes.
13 Q. Have you ever spoken to anyone at Disability
14    Management Services?
15 A. No.
16 Q. Do you know what company that is that I refer to?
17 A. No.
18 Q. Are you mindful from speaking to counsel or anyone
19    else that they were engaged to administer claims on
20    behalf of Jefferson-Pilot?
21 A. I was advised of that, yes.
22 Q. Okay. But you've never spoken to anybody there?
23 A. No.
24 Q. And you're not aware of them being engaged to assist
25    in the administration of any claims prior to your

Page 21

1     retirement?
2  A. There were not, I can tell you that, no.
3  Q. Okay. Do you know when it was that Jefferson-Pilot
4     made the business decision to stop selling disability
5     insurance policies?
6  A. Well, the line was discontinued I think July 1, 1996,
7     and the decision would have been made sometime prior
8     to that. As I said before, it's a management
9     decision, or I should say it was a management
10    decision, not is a management.
11 Q. Was Clyde Honaker employed by the company when you
12    retired?
13 A. I don't recall.
14 Q. He was an employee of the company at some point,
15    though, right?
16 A. He was with Kentucky Central, who was purchased by
17    Jefferson-Pilot. He subsequently came to Greensboro
18    to head up the Ordinary Claims Department. I only met
19    Clyde for a short period after I retired, so I don't
20    recall when he came here.
21 Q. He arrived in Greensboro after you retired; is that
22    what you're saying?
23 A. As far as I know.
24 Q. Okay. What's ordinary claims refer to? What's that
25    nomenclature mean?

6 (Pages 18 to 21)

**Reported By: Rebecca J. Huddy**
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 22

1  A.  Life insurance claims primarily.
2  Q.  Is disability in there, too?
3  A.  It wasn't when I was there, no.
4  Q.  Okay. Did Paul Swink work at Jefferson-Pilot while
5      you were there?
6  A.  Yes.
7  Q.  What was his role?
8  A.  He was in the Ordinary Claims Department.
9  Q.  In what capacity?
10 A.  I don't recall.
11 Q.  What type of training did Jefferson-Pilot provide to
12     its claims analysts?
13 A.  Well, we had one-on-one training, one-on-one training
14     with experienced analysts, if you're talking about a
15     new analyst coming in. They were encouraged to enroll
16     in the International Claims Association program which
17     had three separate books, I think it was, and if you
18     completed that course, you received a designation of
19     International Health Claims Associate or something to
20     that decree, and also they were encouraged to enroll
21     in LOMA, Life Office Management Association courses.
22     Basically that was it. Now, that's the claims people
23     that I had responsibility for. The others I can't
24     attest to.
25 Q.  Did they maintain at their desk or office any kind of

Page 23

1      booklets or handouts or memos about the process of
2      handling claims, disability claims?
3  A.  At one time there was a memo about processing claims
4      that was developed back when we were Pilot Life
5      Insurance Company. I don't recall specifically what
6      was in it.
7  Q.  What time frame was that?
8  A.  Probably goes back 25 years.
9  Q.  Okay. Prior to, say, the past three weeks, when was
10     the last time you spoke with anyone about Chris
11     Kearney or Chris Kearney's claim?
12 A.  Not since I was retired. I don't recall specifically
13     talking about it.
14 Q.  Sometime prior to your retirement?
15 A.  Yes.
16 Q.  So sometime prior to your retirement you had
17     discussions about Chris Kearney, but then you retired
18     and it wasn't until these past two or three weeks, and
19     we're in May of 2004; is that right?
20 A.  Let's make it the last two or three days.
21 Q.  Okay. Do you have any independent recollection of the
22     handling of Mr. Kearney's claim?
23 A.  Yes, once it was brought to my attention, I recalled
24     some of it, yes.
25 Q.  When someone mentioned his name or when you had the

Page 24

1      opportunity to actually look at some historical
2      documents?
3  A.  When I had the opportunity to look at some documents.
4  Q.  Okay. What documents did you look at?
5  A.  Some parts of the claim file, the actual claim file
6      itself --
7  Q.  You were given the entire claims file to review?
8  A.  No, I don't think I was, no.
9  Q.  Okay. Do you recall what documents that are in the
10     claim file that you did -- were given to review?
11 A.  I looked at a claims worksheet which had benefit
12     payments. I looked at one or two of the actual proofs
13     of loss that were submitted. I did not review the
14     whole claim file.
15 Q.  Okay. We've discussed earlier that you had the
16     opportunity to review at least sections of the actual
17     policy?
18 A.  Yes.
19 Q.  That policy bears the designation WJ576A. Are you
20     mindful of that?
21 A.  Yes.
22 Q.  Okay. Do those numbers and letters have any meaning?
23     Did WJ stand for anything?
24 A.  WJ was the form number assigned to the Individual
25     Health Insurance Division, like W was the initial of

Page 25

1      the individual health and then the J was added after
2      the merger between the two companies.
3  Q.  Okay. The merger between the two companies, you're
4      talking about the Kentucky company?
5  A.  No, I'm talking about Jefferson Standard Life
6      Insurance Company and Pilot Life Insurance Company.
7  Q.  Okay. When did that take place?
8  A.  I can't -- I don't remember the specific day.
9  Q.  Was it during your tenure?
10 A.  Yes.
11 Q.  Was it in the '70s or --
12 A.  Oh, no. It was maybe 1987.
13 Q.  Okay.
14 A.  Perhaps, in that area.
15 Q.  Okay. So would the WJ576A policy have been created
16     post merger of Jefferson and Pilot, since it has those
17     two letters on it?
18 A.  I don't recall.
19 Q.  Okay. Do you know whether that particular policy was
20     something that Jefferson-Pilot had success in selling,
21     question mark?
22 A.  Depends on what you mean by success.
23 Q.  Were there a lot of those form policies sold?
24 A.  I can't tell you how many. It was the prime
25     non-cancellable disability policy for the same time. I

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                      5/7/2004

Page 26

1    don't remember how many policies. Unfortunately I
2    don't have those figures in my head.
3    Q. Okay. When you say it was the prime non-cancellable
4       disability insurance policy for some time, meaning it
5       was something that you sold -- something that the
6       agents, whoever is in the field selling them, sold
7       more of than other of the disability insurance
8       policies that could be purchased from Jefferson-Pilot;
9       is that it?
10   A. Probably, yes.
11   Q. Okay. And would it also be true to say that it's one
12      that was administered by your department more than
13      other disability insurance policies that were sold by
14      Jefferson-Pilot?
15   A. No, it wouldn't be true to say that.
16   Q. Okay. There were other disability insurance policies
17      on which claims were made more frequently than this
18      particular version?
19   A. Yes.
20   Q. How many others were claims more frequently made
21      under?
22   A. I can't tell you specifically. I know that we had a
23      franchise policy, disability policy which was sold on
24      a payroll deduction basis. The volume of policies and
25      claims far exceeded any other policy that we had.

Page 27

1    Q. It was -- there was more sales of those because --
2    A. Yes.
3    Q. -- they was sold to companies and offered to the
4       companies' employees?
5    A. Well, it was sold to the employees of the companies on
6       a payroll deduction basis, yes.
7    Q. Was that covered by ERISA, those policies?
8    A. I don't recall. I don't think so. I think ERISA was
9       applicable to group insurance where you had the
10      contract with the employer as opposed to the
11      individual employee.
12   Q. Did your department handle ERISA and non-ERISA claims
13      or was ERISA handled by a different function in the
14      company?
15   A. Well, ERISA applied primarily to group insurance. We
16      may have had some policies that the employer was
17      paying a hundred percent of the premium, which may
18      have been subject to ERISA. I don't recall
19      specifically. We did have some group conversion
20      hospital policies that were considered under ERISA
21      because they were a conversion from an ERISA group
22      policy.
23   Q. So your department did handle some ERISA matters?
24   A. Yes.
25   Q. Other than those franchise disability policies, would

Page 28

1    this WJ576A have been the most reviewed policy by your
2    department because of the volume of claims being made
3    under it?
4    A. I don't recall.
5    Q. Well, Mr. Kearney's claim wasn't the only claim made
6       under that policy?
7    A. No.
8    Q. Okay. There were hundreds of claims made under that
9       policy?
10   A. I said I didn't know the volume, so I can't say there
11      were hundreds. I don't know how many. I just don't
12      recall.
13   Q. Okay. You can't approximate for me whether it's more
14      than a hundred or less than a hundred claims were made
15      under that policy?
16   A. On that specific policy, I can't speculate on that.
17      That's been a long time.
18   Q. It has been. Were you advised in the past week that
19      the company now asserts that it made a mistake in the
20      way it paid Mr. Kearney?
21   A. Yes.
22   Q. Did that issue ever come to your attention prior to
23      this past week?
24   A. No.
25   Q. No one ever suggested that to you prior to this past

Page 29

1    week?
2    A. On Mr. Kearney's claim?
3    Q. Yes, sir.
4    A. No.
5    Q. You said that some of your memory about Mr. Kearney --
6       you said that you do have some memory based on being
7       refreshed by these documents about Mr. Kearney's
8       claim. What can you recall sitting here today about
9       the administration of Mr. Kearney's claim?
10   A. I'm not sure what you're -- in the administration of
11      his claim to what extent?
12   Q. You had suggested earlier that you didn't have a
13      memory of the claim until you saw some documents and
14      then your memory was refreshed; is that --
15   A. That's correct.
16   Q. Okay. I'd like for you to tell me everything you
17      recall from memory about Mr. Kearney's claim.
18   A. I recall that it was a difficult claim to administer
19      primarily because Mr. Kearney was a self-employed
20      manufacturer's representative and in his claim for
21      residual disability benefits, it was difficult to
22      obtain the verification of prior and current income,
23      and that's the extent that I recall.
24   Q. Do you recall anything else about the claim from
25      memory, not from looking at documents with Mr. Ellis.

8 (Pages 26 to 29)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Page 30

1    A.  No.
2    Q.  Do you recall that when asked, Mr. Kearney would
3        immediately provide you with copies of his tax
4        returns?
5    A.  I don't recall that he did, no.
6    Q.  You don't recall either way?
7    A.  No.
8    Q.  Do you recall either way?  I asked you a negative
9        question, you gave me a negative response, so I want
10       to clean it up on the record while we're here.  Do you
11       recall one way or the other about whether or not Mr.
12       Kearney would give you copies of his tax returns when
13       he was asked to do so?
14   A.  I don't recall specifically, no.
15   Q.  Do you recall whether he gave you the name and address
16       and phone number of his accountant when he was asked
17       to do so?
18   A.  I don't recall that either.
19   Q.  Do you recall whether the company contacted his
20       accountant trying to get his financial data?
21   A.  I don't recall that, no.
22   Q.  Do you recall whether or not while you were employed
23       with the company you or folks in your department
24       seeking an independent medical evaluation of Mr.
25       Kearney?

Page 31

1    A.  I don't recall specifically, no.
2    Q.  How about surveiling him?
3    A.  I don't recall it specifically, no.
4    Q.  Did your company use surveillance as a tool during
5        your employment?
6    A.  Yes.
7    Q.  And you would investigate claimants in other ways by
8        getting Equifax reports or other -- using other
9        investigative tools as well, correct?
10   A.  Yes.
11           MR. ROBERTS:  I don't think I have a whole
12       bunch more, but why don't we take a couple minute
13       break so I can get situated, okay?
14           THE WITNESS:  Sure.
15           (Brief recess)
16           (Defendant's Exhibit No. 19 was marked for
17       identification by Mr. Roberts.)
18   Q.  Mr. Roberson, I've gone through the claim file and
19       tried to compile those letters that bear your name or
20       reference to some degree and I've marked them --
21       marked some of them as Exhibit 19.  Why don't you take
22       a few seconds to familiarize yourself with them and
23       then we'll go through them one at a time relatively
24       quickly.
25   A.  (Witness reviews document)

Page 32

1    Q.  Are you ready?
2    A.  Yeah.
3    Q.  Okay.  You've had the opportunity to review those ten
4        or twelve pages that I've compiled from the claims
5        file, and for the record, let me indicate what pages
6        we're talking about.  This is a series of
7        chronological letters from the claim file.  The first
8        is Bates labeled 2804, then 2796, 2788, 2840, 2821,
9        2817, 2818, 2920, 2895, 2896.
10           Mr. Roberson, did you frequently get involved
11       in writing letters to individual policyholders in your
12       capacity as Vice President?
13   A.  Yes.
14   Q.  Did I get your capacity correct, you were Vice
15       President of the company during the '90s?
16   A.  Yes.
17   Q.  Was it a specific title, Vice President blank or --
18   A.  Vice President of Individual Health Insurance.
19   Q.  And who did you report to?
20   A.  I reported to Bill Luper.
21   Q.  Who was in what capacity?
22   A.  He was the Senior Vice President of both the Home
23       Service Division and the Individual Health Division.
24   Q.  But you were the senior officer over the disability
25       insurance product; is that right?

Page 33

1    A.  Yes, but I reported to him.
2    Q.  Okay.  He had other functions of the company reporting
3        up to him, didn't he, other than just disability
4        insurance claims?
5    A.  Yes, he had the Home Service Division also.
6    Q.  Did you believe you had a good handle on the
7        disability insurance contract rights given to
8        policyholders while you were working at
9        Jefferson-Pilot?
10   A.  I'm not sure I understand what you mean by the
11       contract rights.
12   Q.  Did you feel while you were serving in that capacity
13       as Vice President with Claims that you had a good
14       understanding of the disability insurance contracts?
15   A.  Yes.
16   Q.  Would you review the contracts when making
17       determinations or judgments about a particular claim?
18   A.  If it was necessary.
19   Q.  Would you review the policy riders as well?
20   A.  If it was necessary.
21   Q.  When would it be necessary?
22   A.  If someone raised a question about a provision, I
23       would review it, but generally speaking, I kept in my
24       head the provisions of the policies.
25   Q.  From your 38 years in your role as Vice President, you

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889                    Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 34

1   felt you had a fairly good recollection of the policy
2   provisions based on memory in your daily work with the
3   policies?
4   A. Well, I wasn't a Vice President all that time, but
5   yes, I had a good knowledge of the policies.
6   Q. Okay. How long were you a Vice President?
7   A. Well, there are various stages of Vice President. I
8   think there was an Assistant Vice President, a
9   Second Vice President, then a Vice President. Yeah, I
10  don't recall those dates.
11  Q. Okay. How long was Mr. Maxwell at the company before
12  he was required to leave?
13  A. I don't remember specifically, but I'd say in excess
14  of 20 years.
15  Q. And do you know what portion of that time was in the
16  Claims area?
17  A. When he was first employed, he worked as an
18  underwriter for a period of time, a couple years
19  perhaps. Then he moved to the Claims Department and
20  stayed there for the remainder of his time.
21  Q. Okay. So would he, too, in your judgment, since he
22  reported up through you, have a good working knowledge
23  of the policies, the disability insurance policies and
24  the riders?
25  A. In general, yes.

Page 35

1   Q. This first page of Exhibit 19 purports to be a letter
2   from Mr. Kearney to you, February 8, 1995, and I think
3   that's your handwriting to Bob Maxwell "What is he
4   talking about? star."
5   A. Right.
6   Q. That's your handwriting?
7   A. Yes.
8   Q. Do you know one way or the other about any dialogue
9   you had with anybody on Mr. Kearney's claim prior to
10  this date? Do you know whether or not your
11  involvement in Mr. Kearney's claim predated February
12  of '95 or not? It's not a trick question. I'm not
13  going to pull something out that shows it earlier,
14  but --
15  A. I'll assume I did, yes, because I reviewed all the
16  claims that were paid initially and then I reviewed
17  all claims that were paid monthly that were over
18  certain amounts of money, so yes, I would have seen
19  the claim prior to that time, yes.
20  Q. Okay. Tell me about that. You said you reviewed all
21  claims paid initially. Is that regardless of the
22  amount of money being paid out?
23  A. I think so, yes.
24  Q. So that was just a procedure or protocol in place that
25  the claims analysts, when reviewing a claim and

Page 36

1   determining that this needs to be paid or this one
2   qualifies for payment, before that first check is
3   sent, you perform some quality control of the
4   decision?
5   A. That's correct.
6   Q. And the procedure in place is that the claims analyst
7   as a first matter reviews the information that's been
8   provided from the claimant and whoever else, reviews
9   the policy and makes a judgment about the payment and
10  the amount?
11  A. Well, they review the information that they receive.
12  I don't know that they go back and specifically review
13  the policy, but they would have general knowledge of
14  the policy. But yes, they would do that, determine
15  the benefits payable.
16  Q. Okay. And then in the initial payment regardless of
17  size, it's the procedure that it goes to you for you
18  to perform the same review; is that accurate?
19  A. I didn't do the in-depth review that the analyst
20  would, but yes, I did review and approve the claim.
21  Q. You insured on the company's behalf that based on the
22  policy provisions that the payment was appropriate?
23  A. Tried to, yes.
24  Q. Okay. Were you good at your job?
25  A. That's a matter of opinion. I thought so, yes.

Page 37

1   Q. Well, they employed you for 38 years and they're still
2   paying you.
3   A. I thought so, yes.
4   Q. Was Mr. Maxwell good at his job?
5   A. Yes.
6   Q. Mr. Shelton?
7   A. Yes.
8   Q. Ms. Harden?
9   A. Yes.
10          Incidentally, with Mr. Maxwell, I understand
11  you're going to depose him, and I'm appalled that you
12  would do that to a man who is house-confined. He's
13  confined to a chair. He can hardly see. I mean, he
14  didn't recognize me when I came in his house last
15  night, and he's a sick man. He almost died last year,
16  three months in the hospital and -- you know, it's --
17  Q. As long as you want to discuss this on the record, I
18  can tell you exactly what my conversation was. I
19  called his phone number yesterday. I spoke to his
20  wife, who's name is Mary, as you probably know. I
21  said, Mrs. Maxwell, my name is Mike Roberts, I'm a
22  lawyer, I'm in Greensboro taking some depositions
23  relating to a Jefferson-Pilot matter. I understand
24  that your husband is not well and I'm calling to ask
25  if it would be an imposition if I spent an hour with

10 (Pages 34 to 37)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
John L. Roberson    5/7/2004

Page 38

1  him tomorrow in a deposition, and I understand that if
2  he can't do it for medical reasons, we won't go
3  through with it, but I called to simply ask, and she
4  told me, I don't think there's a problem with that,
5  and then she left the phone for a minute, she came
6  back and said, I spoke to him, he says it's not a
7  problem.
8      So sir, I am not trying to inconvenience
9  anybody you care for. I called. I told her that I
10  don't intend to do it if it's an imposition. He told
11  me it would be okay.
12  A. She told --
13  Q. I know nothing about his medical condition. I don't
14  know anything about him. But I called and said, I'll
15  do it if it's not an imposition, I won't do it if it
16  is. So I'm basing my decision to take his deposition
17  later today on his confirmation that it would be okay.
18  A. She understood you to be representing Jefferson-Pilot
19  Life Insurance Company and he was doing it as a favor
20  to his company which he was retired to. She did not
21  understand that you were a plaintiff's attorney.
22  Q. Well, I'm not a plaintiff's attorney.
23  A. Well, a --
24  Q. I'm a lawyer, I graduated from the University of Notre
25  Dame, I'm the best lawyer in the state of Ohio.

Page 39

1  A. Okay.
2  Q. What difference does it make?
3  A. Okay.
4  Q. I called and asked --
5  A. She would not have agreed to it if she had not known
6  you were --
7  Q. Why not? Why would --
8  A. Because she didn't want to put him through that
9  process.
10  Q. What difference does it make if he can give a
11  deposition whether it's at the request of a lawyer
12  representing a plaintiff or a lawyer representing a
13  defendant? By the way, I'm not a plaintiff's
14  attorney. I'm the defendant in this case.
15      Is there anything else you want to criticize
16  me for about mistreating people?
17  A. I think I've expressed my opinion with regards to
18  Mr. Maxwell, yes.
19  Q. Thank you.
20      And if a payment requires a -- if a monthly
21  payment is over a certain threshold, you have to as a
22  quality control make sure each monthly payment is
23  actually payable, right?
24  A. Yes.
25  Q. And what is the threshold?

Page 40

1  A. I don't recall what it was.
2  Q. Mr. Kearney's claim exceeded the threshold?
3  A. Yes.
4  Q. And so every month you determined as a second matter
5  whether or not the payment Mr. Kearney was receiving
6  between 1993 and your retirement was properly payable,
7  right?
8  A. I reviewed the analysts' work. I didn't go back and
9  completely review the whole claim every time, no.
10  Q. Okay. Exhibit 9 is a document you discussed with Mr.
11  Ellis last evening and it is the Disability Claims
12  Worksheets on the two policies Mr. Kearney purchased,
13  correct?
14  A. As I said before, I do not recall having discussed
15  this particular form with Mr. Ellis last night.
16  Q. Well, it was sitting before you. Anyway, your
17  initials run down the left-hand margin, correct?
18  A. That's correct.
19  Q. And you're initialing the propriety of each monthly
20  payment on each of those pages with every initial,
21  correct?
22  A. That's correct.
23  Q. And in addition to your initials, there's the initials
24  of Phyllis Harden and perhaps Mr. Maxwell and Mr.
25  Shelton as well from time to time?

Page 41

1  A. That's correct.
2  Q. And so with every -- there was two checks issued every
3  month because he had two policies, right?
4  A. That's correct.
5  Q. So each check or in this case both checks every month
6  were reviewed for propriety of payment by the claims
7  analyst as a first matter and you as a second matter?
8  A. What do you mean by propriety of payment?
9  Q. The appropriateness of the payment.
10  A. Yes.
11  Q. Okay. I'm not sure you answered my question, the
12  second question --
13  A. Okay, because in this particular case we made an error
14  in the payment.
15  Q. Who told you that?
16  A. Who told me that? I can tell by looking at it.
17  Q. Okay.
18  A. I'm familiar with the policy and the riders and the
19  benefits were not payable as we paid them.
20  Q. Okay. Prior to your retirement did you come to that
21  conclusion?
22  A. No.
23  Q. Okay. Prior to -- today is May 7 of 2004. Prior to
24  April 30 of 2004, had you come to that conclusion?
25  A. Today is what?

11 (Pages 38 to 41)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                      5/7/2004

Page 42

1   Q.  May 7.
2   A.  May 7? Prior to April 30?
3   Q.  Of 2004?
4   A.  No, I wasn't even familiar with this case. I wasn't
5       involved at that time.
6   Q.  Okay. So when did the payments begin?
7   A.  July of 1993 is the first one.
8   Q.  Okay. So from July of '93 -- and you retired in July
9       of '97?
10  A.  April of '97.
11  Q.  April of '97. So '94, '95, '96, '97. If it was four
12      years, it would be 48 months, so you'd retired three
13      or four months short of four years, right, so 45
14      months, correct?
15  A.  Yes, sir.
16  Q.  Over the course of 45 months, each month you reviewed
17      and determined that two checks going to Mr. Kearney
18      were proper and appropriate under the facts of his
19      claim, the terms of his policy, and the provisions of
20      his riders, and your testimony today is after meeting
21      with Mr. Ellis last night that you made 90 different
22      mistakes?
23  A.  Yes.
24  Q.  Okay. You worked at the company for 38 years, you
25      were the Vice President, you were head of the Claims

Page 43

1       Department, and Mr. Ellis educated you yesterday about
2       your four years of errors?
3           MR. ELLIS: Objection. Go ahead.
4   A.  Mr. Ellis did not educate me at all.
5   Q.  Okay. I wouldn't suspect he could. So February 8 of
6       1995, this first letter of Exhibit 19, would not have
7       been your first contact with the Kearney claim,
8       correct?
9   A.  That's correct.
10  Q.  Are you mindful that Mr. Maxwell told Mr. Kearney in
11      1995 that his residual disability benefits were
12      payable for only two years?
13  A.  I was after looking at this letter.
14  Q.  Is that accurate or was that a misrepresentation by
15      Mr. Maxwell?
16  A.  That was a mistake by Mr. Maxwell.
17  Q.  It wasn't a misrepresentation, it was a mistake?
18  A.  Yes.
19  Q.  And you determined it was a mistake because you went
20      back and reviewed the policy and came to that
21      conclusion or did you just know because you have --
22      you're mindful of the policy provisions?
23  A.  I'm mindful of the policy provisions.
24  Q.  Okay. Tell me, sir, if the policy expressly and
25      unambiguously did not allow Mr. Kearney to receive

Page 44

1       COLA and Social Security Supplement, how did you get
2       it wrong 90 times?
3   A.  It was a residual disability claim for which he
4       qualified for the full residual benefit and except for
5       the payment of Social Security and the COLA, the
6       benefits were correct.
7   Q.  You didn't answer my question. If you're so mindful
8       of these policies and if it's unambiguous that he's
9       just not entitled to COLA or Social Security, how did
10      you get it wrong for four years on 90 different
11      occasions?
12  A.  I don't know how, but we did.
13  Q.  Okay. Not only you got it wrong, but your subordinate
14      got it wrong on 90 different occasions, and I'm
15      confused. If the policy language is express, it's
16      unambiguous, there's no doubt about it, he's not
17      entitled to those benefits, how did the two of you get
18      it wrong 180 times over four years?
19  A.  We made a mistake.
20  Q.  Okay. You made 180 mistakes, right?
21  A.  If that's the number of payments, yes.
22  Q.  Up to your retirement, and then another 180 mistakes
23      were made after your retirement; you're mindful of
24      that?
25  A.  Apparently once it got on the track, it just continued

Page 45

1       running.
2   Q.  Well, it didn't get on a track. You reviewed it every
3       month. Your initials appear every single month for
4       four years, right?
5   A.  My initials are there, but you don't go back and look
6       at every aspect of the claim every month. You don't
7       have time to do it.
8   Q.  Okay. So your company -- has your company ever before
9       made over 300 individual independent mistakes when the
10      language is so unambiguous, anyone could conclude that
11      it's a mistake? Has that ever happened before?
12  A.  I don't have any independent knowledge of it
13      happening, but I'm sure that it's possible.
14  Q.  300 mistakes? That's possible? With someone who's
15      worked at the company for 38 years, Vice President?
16      Is that possible when the language is unambiguous?
17  A.  Not only is it possible, it apparently happened in
18      this case.
19  Q.  Okay. How come you didn't pick it up in four years?
20      If Mr. Ellis can pick it up and share it with you last
21      night, why couldn't you pick it up in four years?
22          MR. ELLIS: Objection.
23  Q.  You can answer.
24  A.  Here again, Mr. Ellis didn't share that with me last
25      night.

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                      5/7/2004

Page 46

1   Q.   You told him?  He put the policy in front of you, the
2        payment history in front of you, and you -- before he
3        says anything else, you told him, Boy, that's a
4        mistake I made 90 different times; is that the way it
5        happened?
6   A.   No.
7   Q.   Okay.  I didn't think so.
8             In this letter of February 8, Mr. Kearney
9        threatens to contact the Ohio Department of Insurance
10       if he doesn't have checks in two days' time, and he
11       got checks in those two days' time, right?
12  A.   I assume he did.  I don't know.  I --
13  Q.   Is the second page, February 14, a letter that you
14       sent to him?
15  A.   Yes.
16  Q.   Do you ever recall discussing with Mr. Kearney or
17       anyone else the implications that may arise if
18       Jefferson-Pilot spoke to his principals about him
19       suffering from chronic severe depression?
20            MR. ELLIS:  I'm sorry, could I hear that
21       back, please.
22  Q.   Did you understand the question?
23  A.   No, I didn't understand the question, no.
24            (The last question was read back by the court
25       reporter.)

Page 47

1   A.   No.
2   Q.   Do you know what I mean by the question?
3   A.   I'm not sure what you mean by his principals, but --
4   Q.   He was a manufacturer's representative.  He was an
5        agent.  He had principals.  He had companies that paid
6        him money if he sold their product.  He was an
7        independent contractor.  Did you ever discuss with
8        anyone the negative impact that would occur to his
9        capacity to earn money if his principals were advised
10       by Jefferson-Pilot that he suffered from chronic
11       severe depression?
12  A.   No.
13  Q.   What's your judgment of what the implications may be
14       of someone learning that some independent contractor
15       agent suffers from chronic severe depression?
16  A.   I judge the person on the basis of what they do, not
17       what their physical condition is.  As well as I
18       remember, Mr. Kearney refused to give us the names of
19       the companies that he represented.
20  Q.   He did for a period of time, you're right, because you
21       wanted to contact them and tell them he had chronic
22       severe depression and he thought he would lose the
23       contract if they knew that.
24            MR. ELLIS:  Objection.
25  A.   And you're absolutely wrong there.  We would not have

Page 48

1        told them what his condition was.
2   Q.   You understand that was his concern, though, what I
3        just expressed?
4   A.   I don't know what his concern was.
5   Q.   He never stated to you that concern?
6   A.   No.
7   Q.   You recall -- see, before you couldn't recall
8        anything, but now you recall specifically that he
9        never stated that concern to you?
10  A.   To the best of my knowledge, he did not.
11  Q.   It's in writing.  You don't recall that?
12  A.   No, I don't recall it, sitting right here, no.
13  Q.   You just told me two questions ago, though, you told
14       me affirmatively that he never expressed that to you.
15       Which is it, you do know that he never did it or you
16       have no clue?
17  A.   He never expressed to me any concern about us giving
18       his condition to any persons that he represented --
19  Q.   Under oath --
20  A.   -- to the best of my knowledge and belief.
21  Q.   Under oath you're testifying that your memory is that
22       he never said that?
23  A.   To the best of my knowledge and belief, yes.
24  Q.   Okay.  Do you recall discussing Mr. Kearney's claim
25       with the people that reported to you?

Page 49

1   A.   I don't recall specifically, but I'm sure I did.
2   Q.   So there would be communications between you and the
3        people that reported to you that aren't memorialized
4        in a letter?
5   A.   That's possible, yes.
6   Q.   Third page of Exhibit 19, is that a letter you
7        received from Mr. Kearney?
8   A.   Dated March 8, '95?
9   Q.   Yeah.
10  A.   Yes.
11  Q.   Do you know why it was he was copying Charles Melville
12       at Strauss & Troy?
13  A.   At this point I don't, no.
14  Q.   Did he ever express to you that he was upset about his
15       treatment and he had sought legal counsel at that
16       time?
17  A.   What treatment?
18  Q.   The treatment he was receiving by Jefferson-Pilot
19       telling him that he only had two years' benefits,
20       among other things?
21  A.   He may have, but I don't recall.
22  Q.   Page 4, is that a letter that you sent to him and his
23       return of the letter with a comment?
24  A.   Yes.
25  Q.   May 17, 1996?

13 (Pages 46 to 49)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 50

1 A. Yes.
2 Q. You then went to the effort of engaging on behalf of
3    the company Callaghan & Nawrocki?
4 A. That's correct.
5 Q. Callaghan & Nawrocki is a CPA firm located in New York
6    that specializes in work for disability insurance
7    companies; isn't that correct?
8 A. I think that's correct.
9 Q. You used them on several occasions during your
10    employment at Jefferson-Pilot?
11 A. I don't recall ever having used them before.
12 Q. How do you know that they specialize in disability
13    insurance matters?
14 A. I was told that by a reinsurer, I believe.
15 Q. Okay. Prior to their engagement for Mr. Kearney's
16    claim?
17 A. Yes.
18 Q. Who was the reinsurer that told you that?
19 A. It was Employers Reinsurance Corporation.
20 Q. Who at Employers Reinsurance would have told you that?
21 A. I don't recall.
22 Q. Is there any memorialization of your communications
23    with Employers Reinsurance that's in the claim file?
24 A. Not that I recall.
25 Q. Why would you not put that in the claim file?

Page 51

1 A. I don't know that it was of any significance.
2 Q. Aren't you supposed to document everything you do on a
3    claim and put it in the claim file?
4 A. Yes.
5 Q. Why did you not do that when you spoke to Employers
6    Reinsurance about your interest in investigating Mr.
7    Kearney through Callaghan & Nawrocki?
8 A. I said as far as I know, I don't recall having put
9    anything in there, other than we got the letter saying
10    that we did it.
11 Q. Isn't it as a matter of protocol required that you
12    document that type of communication in Mr. Kearney's
13    claim file?
14 A. Not necessarily, no.
15 Q. Why would you not -- why is it not appropriate to
16    document communication you had about your desire to
17    investigate a claimant? Why is that not appropriate
18    for putting in the claim file?
19 A. It may be of no significance.
20 Q. To whom?
21 A. To anybody.
22 Q. The fact that a claimant has provided you with his tax
23    returns and then you want to have him investigated by
24    a firm that specializes on behalf of insurance
25    companies in disability matters to investigate further

Page 52

1    and audit his financial records is not of significance
2    to the claimant?
3       MR. ELLIS: Objection to form.
4 A. He would have been contacted --
5 Q. But your communication with Employers Reinsurance
6    about initiating that investigation, why is that not
7    in the claim file?
8 A. I don't recall what type communications. It may have
9    been just a general question and I don't recall
10    specifically discussing this other than I know that
11    from -- we got this name from Employers Reinsurance
12    Corporation. It may have been mentioned just in
13    general for processing the residual claims of
14    independent employees. I don't know that we
15    specifically mentioned Mr. Kearney with them or not.
16 Q. That's directly contradictory to what you just told me
17    five minutes ago. You told me five minutes ago that
18    you hired Callaghan & Nawrocki for the first time ever
19    on Mr. Kearney's claim at the instruction or on the
20    counsel or some contact of Employers Reinsurance.
21       MR. ELLIS: Objection.
22 Q. Wasn't that your testimony just a few minutes ago,
23    sir?
24 A. I don't see where that conflicts with what I said here
25    in that I may or may not have mentioned his name

Page 53

1    specifically, but yes, that was -- the information
2    that they gave us was the reason or -- the reason I
3    used them is because they gave me that information on
4    this time of claim.
5 Q. Who performed the Equifax activities check and why is
6    it not in the claim file?
7 A. I have no idea.
8 Q. You see that you sent him an Equifax activities check?
9    I think you're ahead of me, sir. I'm on the November
10    15, '96 fax transmittal cover sheet to Ernie Smith.
11 Q. Now, what's your question again?
12 Q. Who obtained the Equifax report?
13 A. Who in our office requested it?
14 Q. I don't know if it was in your office or some third
15    party.
16 A. Well, we would have requested it. One of the claims
17    analysts would have requested it.
18 Q. Why is that not documented in the claim file and why
19    is the Equifax report not in the claim file?
20 A. I don't know that it's not.
21 Q. It's not in the one that was given to me.
22 A. I don't know.
23 Q. Should it be in there?
24 A. Any report that Equifax gave us should be in the claim
25    file.

14 (Pages 50 to 53)

Page 54

1  Q. I agree. Let's turn to the next page. It's a letter
2     from you to Mr. Smith at Callaghan & Nawrocki,
3     November 19, 1996, explaining to him about Mr.
4     Kearney's claim, right?
5  A. Right.
6  Q. And let me read the third paragraph and you tell me if
7     I'm reading it correctly. I'll read the second and
8     third paragraph, you tell me after I'm done whether
9     I've read it correctly into the record.
10        "Policy H-493029 was issued effective May 28,
11     1990. The policy provides a basic benefit of $2,125
12     plus a Social Security Supplement of $525. It
13     includes a 7 percent cost of living adjustment rider
14     and a residual disability benefit rider. The policy
15     originally excluded back disorders, but this
16     restriction was removed as indicated above. Policy
17     H-538069 was issued effective May 28, 1991 (I
18     erroneously advised 1990). This policy provides a
19     basic benefit of $1375 with a $225 Social Security
20     Supplement. It also includes residual disability and
21     a COLA rider. This policy is still in the contestable
22     period.
23        "Disability benefits have been paid since May
24     6, 1993, including the adjustments, we are paying
25     $5,566.50 currently each month. The initial cause was

Page 55

1     reported as a lumbosacral spine strain and later
2     changed to depression. Total disability benefits were
3     paid from May 6, '93 to April 1, '94. Residual
4     disability has been paid since that date with the last
5     payment covering the period from October 1 to November
6     1, 1996. Based on his reported income, full benefits
7     have been paid," end of paragraph. Did I read that
8     accurately?
9  A. Yes.
10 Q. Are those your words in your letter to Callaghan &
11    Nawrocki, November 19, 1996?
12 A. Yes.
13 Q. And would you have known all those facts off the top
14    of your head or would you have referred to the policy
15    and claim file in order to write this letter?
16 A. I would have referred to the policy and claim file.
17 Q. Thank you. The next page of this, 2920, is undated,
18    but there's a date in the content of the letter that
19    says March 3, 1997, so it's sometime after that,
20    letter from you to Mr. Kearney.
21 A. Yes.
22 Q. The next page is a fax transmittal from Mr. Kearney to
23    you replying to your recent letter, correct?
24 A. Yes.
25 Q. And in this letter which was faxed on March 11 of '97,

Page 56

1     he's answering the prior letter we just discussed
2     that's undated, right?
3  A. Yes.
4        MR. ROBERTS: For the record, I'm going to
5     append two more pages to that particular exhibit.
6     It's going to be Bates label 2723 and 2791.
7  Q. Sir, I believe those pages we just appended to Exhibit
8     19 bear your handwriting?
9  A. Yes.
10 Q. 2723 is dated November 3 of 1994. You have a
11    reference to Mr. Kearney's two policy numbers and
12    you're writing to Robert Maxwell and you write
13    there -- or is this him writing to you, "Do you agree
14    to begin residual disability 4-1-94?" Is that your
15    writing or his is the question.
16 A. That's Bob Maxwell's writing.
17 Q. And your response is, "Ask for his tax form for '92,
18    '93, also a treatment form"?
19 A. "Statement."
20 Q. "Statement from his accountant"?
21 A. Yes.
22 Q. "On his earnings for '94." Would you have responded
23    to Mr. Maxwell fairly promptly on or after November 3?
24 A. Probably.
25 Q. Do you know when these benefits were ultimately paid

Page 57

1     to Mr. Kearney?
2  A. I don't recall.
3  Q. Do you know if it was a short time later or several
4     months later?
5  A. It was February of '95.
6  Q. Okay. Do you know why it took three more months?
7  A. No, I don't.
8  Q. The next page contains both yours and Mr. Maxwell's
9     handwriting again; is that right?
10 A. That's correct.
11 Q. What does his say above yours?
12 A. It says "JL, no recent" -- something -- "here
13    except" -- I can't make that out, and "Do you see when
14    we overpaid." That's what Bob Maxwell said.
15 Q. What overpayment is he talking about?
16 A. I don't know.
17 Q. Are you mindful that Mr. Kearney was issued two months
18    of benefits in one month and he wrote back and said
19    you overpaid me?
20 A. At that point I don't know.
21 Q. What's your writing say?
22 A. "It appears he is still seeing the psychologist, don't
23    note an overpayment."
24 Q. Don't note an overpavement, what does that mean?
25 A. I didn't notice an overpayment.

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion,  1230 W.  Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 186    Filed 09/06/2007    Page 16 of 46

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                      5/7/2004

Page 58

1   Q. Did you review the file to see if there was an
2       overpayment in -- is it dated?
3   A. It's March 21 is the date.
4   Q. Okay. So March 21 sometime prior to your retirement
5       did you review the file to see if there was an
6       overpayment?
7   A. Well, obviously there's some basis for my making that
8       statement. I assume I looked at it, yes.
9   Q. Thank you. Was there a David that worked in the
10      Claims Department at Jefferson-Pilot?
11  A. David?
12  Q. Anybody named David?
13  A. No.
14  Q. David Newkirk?
15  A. David Newkirk was with Employers Reinsurance
16      Corporation.
17  Q. Did you correspond with him about Mr. Kearney's file?
18  A. I don't recall. He visited our office occasionally
19      and would review claims that were reinsured, so he
20      could have seen the file.
21  Q. Can I have that exhibit, please.
22  A. (Indicating)
23          (Defendant's Exhibit 20 was marked for
24      identification by Mr. Roberts.)
25  Q. That's Exhibit 20. This is Mr. Kearney's October 31,

Page 59

1       '94 Disability Insurance Claim, do you recognize it,
2       Bates labeled 0588 and 0589?
3   A. Yes.
4   Q. This purports to have been executed by Mr. Kearney on
5       October 31, '94.
6   A. That's correct.
7   Q. We saw Mr. Maxwell's November 3, '94 question posed to
8       you.
9   A. I don't recall when it was.
10  Q. Your handwritten note, his handwritten note, the
11      second to the past page of Exhibit 19 (Indicating)?
12  A. Okay.
13  Q. So within two or three or four days of Mr. Kearney
14      submitting the claim, your subordinate asked you if it
15      was okay to pay and it wasn't paid for more than three
16      months later. Do you know why?
17  A. We would have asked for the tax forms and statement
18      from his accountant with regards to his earnings for
19      the years that I mentioned here to establish the
20      amount of benefit payable for the residual disability
21      claim.
22  Q. Let me show you what's been Bates labeled 2719. I
23      used this in a previous deposition, but could you
24      confirm for me that's a letter from Mr. Kearney dated
25      November 29, 1994, submitting to you the tax returns

Page 60

1       that he had available, submitted to Mr. Maxwell?
2   A. Yes.
3   Q. Yet his payment wasn't made till -- wasn't made in
4       November, wasn't made in December, wasn't made in
5       January, wasn't made till February of 1995?
6   A. That's correct.
7   Q. Was there that long a delay with the payment of his
8       prior claim?
9   A. Do you have his worksheet?
10  Q. (Indicating)
11  A. I don't know when the initial claim was submitted, but
12      for the period from May 6 to July 6 was made on July
13      22.
14  Q. Is that a standard period of delay when you get a
15      claim, three days later your subordinate says, Should
16      we pay it, and then it's not paid for three months
17      later even though you get the information you seek
18      three weeks later?
19  A. Well, we also asked -- I made a note to ask for a
20      statement from his accountant. I don't believe --
21  Q. Do you always request statements from accountants
22      before you pay a claimant's claim?
23  A. Not always, but it depends on -- with a self-employed
24      individual, you may request the information from an
25      accountant, yes.

Page 61

1   Q. Didn't Mr. Kearney submit to you on November 30 a
2       statement from his accountant containing his earnings
3       for 1994, and that would have just been a partial
4       year. You're still in '94.
5           Let me ask another question. Is it the
6       normal course if you get a claim in the middle of the
7       year that you demand an accountant statement for
8       income up to that point of the year before you make a
9       claim payment?
10  A. It depends on the circumstances in the claim.
11  Q. What were the circumstances of this claim that
12      required that you get third-party information from an
13      accountant of partial-year financial numbers before
14      the year end in order to make a first payment on a
15      claim?
16  A. State that again, please, I'm sorry.
17  Q. She can read it to you.
18          (The last question was read back by the court
19      reporter.)
20  A. There again, I think it was the circumstance of the
21      claim, if memory serves me correctly, that it had been
22      almost a year since a claim had been filed after the
23      initial series of payments, and so as much
24      verification of income as we could get would be
25      required to determine our liability.

16 (Pages 58 to 61)

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion,  1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 62

1  Q. Is it normal course to require accounting information
2     from a third-party accountant in the middle of the
3     year for income during that year before paying a
4     claim?
5  A. Here again, it depends on circumstances.
6  Q. Okay. Let me show you -- this is going to be a later
7     exhibit, but I'll show you them now -- Bates number
8     2714 and 2707 are letters from Mr. Kearney to Maxwell
9     on November 30, '94, and a letter from Mr. Maxwell to
10    Mr. Kearney's accountant on December 13 of '94,
11    thanking him for information (Indicating).
12 A. (Witness reviews document)
13 Q. Can you confirm for me that in the November 30 letter
14    from Mr. Kearney, he included information from his
15    accountant that had been requested?
16 A. It states that he does. I haven't seen it.
17 Q. Okay. Is there any letter in the claim file that says
18    it says something was in your November 30 letter, but
19    we never got it?
20 A. I don't know, I haven't reviewed the whole file.
21 Q. And then the next letter is December 13 from your
22    company to Mr. Thielen thanking him for some
23    information, right?
24 A. Right.
25 Q. And requesting more information?

Page 63

1  A. Yes.
2  Q. Why was a benefit payment not made on November 30?
3  A. Well, on the basis of the letter of December 13, we
4     still felt we needed additional information with
5     regards to his income and employment status.
6  Q. You didn't make a payment until he threatened to file
7     a claim with the Ohio Insurance Department on February
8     8, right?
9  A. I don't know. Did he? Did he make that?
10 Q. Well, you can check -- we saw that letter earlier
11    where he threatened -- you remember that, right, in
12    your Exhibit 19?
13 A. My short-term memory is not as good as my long-term
14    memory. (Witness reviews document)
15    Okay. What was your question again?
16 Q. I asked you why it was that he wasn't paid on November
17    3. You said you needed tax returns and some
18    accounting information. He gave you the tax returns
19    on November 29, he gave you the accounting information
20    on November 30, and still there was no payment until
21    February 10ish, following his demand that he better
22    get paid in four days or else he's going to go to the
23    Ohio Insurance Department; isn't that true?
24 A. Okay. We did request additional information in the
25    meantime, right?

Page 64

1  Q. Correct.
2  A. Yeah. Okay. So your question is why --
3  Q. You requested the tax returns, you got them. You
4     requested accounting information, you got it. Then
5     you made a third request for more accounting
6     information and you ultimately got that. But why was
7     a check not sent to Mr. Kearney on November 30?
8  A. On November 30 we still didn't have all the
9     information that we needed for the evaluation of his
10    claim. We requested additional information.
11 Q. And did you get that information when he threatened to
12    take you to the Ohio Insurance Department or did you
13    just say we don't need that now because you're going
14    to file a claim against us?
15 A. Here again, I don't know. I don't have the full file
16    there for review. Is it in there? I don't know.
17    (Defendant's Exhibit No. 21 was marked for
18    identification by Mr. Roberts.)
19 Q. Mr. Roberson, I've compiled a series of correspondence
20    spanning 1993 to March 1995 and marked it as Exhibit
21    21. I'd like to direct your attention to the period
22    of time we're talking about here, December 1994,
23    November 1994, so beginning with the page that's Bates
24    labeled 2720, which is dated November 8 -- beginning
25    with the letter dated November 8, 1994, I want to make

Page 65

1     sure I understand the sequence of events here.
2        Chris Kearney files a claim October 31. Your
3     subordinate asks you on November 3 should we pay it.
4     November 8, purportedly at your instruction, Maxwell
5     sends a letter to Kearney saying we need your '92 and
6     '93 returns, including W-2s, and please let us have a
7     statement from your accountant telling us your
8     earnings during '94. That's the request, right?
9  A. That's correct. This was a new claim and we were
10    getting that information to determine our liability.
11 Q. Okay. But on November 4 your subordinate asks you if
12    we should pay it. You tell him no, let's get some
13    information. The information requested of Mr. Kearney
14    on November 8 is -- are you reading the letter with
15    me? -- please let us have a copy of your '92 and '93
16    tax returns, including the W-2 forms, and please let
17    us have a statement from your accountant telling us
18    your earnings during 1994.
19       Okay. Then Mr. Kearney sends you a letter on
20    November 29, Bates labeled 2719, "Per your request, I
21    am enclosing copies of '92 and '93 tax returns and
22    W-2s. Also at your request I have enclosed a
23    statement from my accountant containing earnings
24    during '94."
25       Why was the claim not paid -- if Mr. Kearney

17 (Pages 62 to 65)

Case 1:02-cv-00479-MRB    Document 186    Filed 09/06/2007    Page 18 of 46

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney        C-1-02-479
John L. Roberson                                                    5/7/2004

Page 66

1    complied with the November 8 request on November 29,
2    why was the claim not paid on that day?
3  A. Like I said, we also contacted his accountant, didn't
4    we, for additional information?
5  Q. At some point you did, but let's take it step by step
6    here. On November 8 you request three things. On
7    November 29 you get the three things. Why was the
8    claim not paid on November 29?
9  A. We apparently didn't feel like we had enough
10   information at that time to make the payment.
11 Q. He gave you what you requested, but that still wasn't
12   enough, right?
13 A. That's correct.
14 Q. Okay. The next page is a November 30 dated letter
15   from Mr. Kearney's accountant telling you that his
16   earnings for 1994 was $20,800, right?
17 A. That's correct.
18 Q. Okay. Why is the claim not paid?
19 A. Well, that's an aggregate amount of payment and we
20   need monthly earnings to determine what the benefit
21   is.
22 Q. Can I have that exhibit.
23 A. (Indicating)
24 Q. Thank you. Okay. December 13 letter from Maxwell to
25   Thielen thanking him for the information, this is

Page 67

1    Bates labeled 2707, right? December 13 letter, sir.
2    In this letter Mr. Maxwell says, "Thank you for your
3    letter of November 30. In order that further
4    consideration can be given Mr. Kearney's claim, your
5    additional assistance will be appreciated," so you're
6    asking for more information, right?
7  A. Yes.
8  Q. And then it continues, "Mr. Kearney claims he is the
9    only employee. We will appreciate you confirming this
10   point and if not, please let us know the number of
11   employees and their income from this business." Do
12   you always request that your claimants provide this
13   type of information before you make an initial claim
14   payment?
15 A. It depends upon the circumstances of the claim.
16 Q. And an income statement for 1994. Do you always
17   request income statements from your claimants before
18   making a claim payment?
19 A. Depends again on the circumstances of the claim.
20 Q. Okay. December 20, 1994, Bates labeled 2710, the
21   accountant gives you corporate tax returns, again
22   gives you the income figure, a gross earnings figure,
23   tells you about how many employees he has, a part-time
24   secretary, what her earnings were, and other
25   information. Why was the claim not paid on December

Page 68

1    20?
2  A. (Witness reviews document) The claim was for a year's
3    disability.
4  Q. It's $30,000 he was waiting to be paid.
5  A. And under the residual disability, it's based on the
6    earnings each month --
7  Q. Okay. Let's --
8  A. -- for what he qualifies for, and to verify your
9    claim.
10 Q. Okay. So that's why it wasn't paid in December. Turn
11   to Bates label 2809, a letter from the accountant
12   dated January 5, '95. This letter says, "Dear Mr.
13   Maxwell, Per the request of Mr. Christopher and your
14   letter of December 27, '94, I am enclosing a copy of
15   Mr. Kearney's '94 monthly earnings statement from
16   Kearney & Associates. This statement represents Mr.
17   Kearney's total income for 1994." Why was the claim
18   not paid on January 5?
19     You're looking ahead to the next letter. Why
20   was the claim not paid --
21 A. Well, you want to know the answer, don't you? I can't
22   give you the answer on the basis of that. I don't
23   know. In answer to your question, I don't know.
24 Q. Okay. You don't know. Okay. The next letter,
25   another letter from Mr. Maxwell to Mr. Thielen

Page 69

1    thanking him for the additional information provided.
2    Now he wants information because the claim has been
3    referred to our CPA. There's no indication in the
4    claim file of any CPA being engaged in November '94,
5    December '94, January '95, February '95. Who is he
6    talking about?
7  A. This is an in-house CPA. His name is Phil Johnson.
8    He's retired.
9      Residual disability benefit -- residual
10   disability coverage was a relatively new type of
11   benefit and you generally are not -- you generally
12   don't have -- don't require the same information for a
13   total disability claim that you do for a residual
14   disability, and we sought expertise in that area for
15   determining income prior, income -- present income to
16   determine benefits.
17 Q. Why is there no reflection in the claim file other
18   than this general reference to some accountant? Why
19   is there nothing in the claim file that refers the
20   claim to Mr. Johnson for review, a memo back from him
21   saying yes, I reviewed it, here's what I concluded,
22   why is there nothing in the claim file about
23   Mr. Johnson?
24 A. There's no reason for it to be there. It may have
25   been a telephone call outlining some circumstances and

18 (Pages 66 to 69)

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Page 70

1  he gave us an answer. He may not have seen the file
2  direct.
3  Q. So it was required that Mr. Kearney provide you with
4  the initial information you requested on November 8,
5  more information after that, monthly earning
6  statements, now he's got to explain computer training
7  expenses before he gets his benefit payment, right?
8  A. That's correct. That would have a bearing on his
9  monthly income and that's something that would have
10  been under his control.
11  Q. Turn to the letter dated January 30, '95, 2802. This
12  is, I think, the fourth letter from the accountant to
13  Mr. Maxwell, January 30, '95. "Dear Mr. Maxwell, 'Per
14  the request of Mr. Christopher Kearney and your most
15  recent letter, I am providing information concerning
16  your questions about the commissions and computer
17  expenses on Kearney Associates' '93 corporate return.
18  The commissions, which were paid to an independent
19  agent, were incurred from February '93 to September
20  '93. The computer training expenses were incurred
21  during the period October '93 to December '93."
22          Why wasn't the claim paid on January 30?
23  A. Would have taken some time to review that. Wouldn't
24  have necessarily -- I don't know when we got the
25  claim -- I don't know  when we received his letter

Page 71

1  and --
2  Q. Okay. The next letter -- go ahead.
3  A. I don't know when we received his letter and of
4  course, it would have been some time before it was
5  processed.
6  Q. Okay. The next letter is dated February 6, '95, Bates
7  labeled 2799. This is Mr. Kearney's demand that you
8  have been holding $30,000 in benefits for over 90 days
9  and if you don't pay him within four days, he's going
10  to the Ohio Department of Insurance, and that's what
11  triggered the final payment -- or the payment of
12  $30,000 to him, right?
13  A. Is $30,000 the correct amount? I don't know.
14  Q. The next letter, the next letter in your exhibit,
15  2798, dated February 10, 1995, enclosing checks in the
16  sums of 11,200 and 19,250.
17  A. Yeah, after the receipt of this letter, it was paid.
18  Q. Okay. Do claimants generally have to threaten going
19  to the Ohio Department of Insurance before they get a
20  claim payment?
21  A. No.
22  Q. Why did Mr. Kearney have to?
23  A. He chose to do it.
24  Q. Okay. During this period of time you said that
25  residual was unusual. Were you paying close attention

Page 72

1  to the terms of his policy and his residual disability
2  benefit rider in order to determine what his benefits
3  are?
4  A. Well, apparently we didn't, because we made an error
5  in the payment.
6  Q. Okay. So you saw where I was going. Obviously you
7  were. You spent three months involved in contacting
8  your in-house CPA, contacting Mr. Kearney's CPA
9  multiple times, writing letters to Mr. Kearney to make
10  certain that before you issued $30,000 to him, he's
11  deserving of it under the contract. You were
12  reviewing his rights under the contract, were you not?
13  A. No. We were reviewing the information that he
14  furnished for verification of his claim. Now, you
15  must remember that this covers a one-year period that
16  he hasn't contacted us, at the end of a year where he
17  hasn't contacted us. Then he comes claiming the
18  disability back to that date. So after a one-year
19  period, we took 90 days to verify the claim.
20  Q. And your testimony under oath is that you disregarded
21  or paid no attention to what the contract provided?
22  A. I did not -- no, I --
23  Q. You paid close attention to what the contract provided
24  before you were going to issue $30,000, right?
25  A. We would have looked at what the contract pays, yes.

Page 73

1  Q. Okay. Thank you. Do you know why the residual
2  disability benefit rider was revised in the fall of
3  1992?
4  A. I don't even know that it was.
5  Q. Okay. Why don't you give me those other originals
6  back. I'm handing you Defendant's Exhibit 5. Can you
7  hand me that one as well, sir.
8  A. (Indicating)
9  Q. This is a two-page document called Residual Disability
10  Rider and does it have the revision date at the bottom
11  of the document?
12  A. Yes.
13  Q. What's the revision date?
14  A. I can't make it out. Looks like 9-92.
15  Q. Based on your 38-year history and position of Vice
16  President of the company, does this suggest to you
17  that the residual disability benefit rider in the
18  policy was revised in September of 1992?
19          MR. ELLIS: What policy?
20  Q. The residual disability benefit rider was revised in
21  September 1992, that's what it suggests to you, sir?
22  A. Yes, that rider was revised.
23  Q. Okay. Thank you. Do you know why it was revised?
24  A. Do you have a copy of --
25  Q. Mr. Kearney's --

19 (Pages 70 to 73)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney      C-1-02-479
John L. Roberson                                                  5/7/2004

Page 74

1   A.  -- Mr. Kearney's rider?
2   Q.  I do?
3   A.  This is obviously -- this is not his policy.
4   Q.  I know. Here's Exhibit 4. The first page is his
5       residual disability rider (Indicating).
6   A.  (Witness reviews document) It appears that the only
7       difference is that we added the waiver of premium
8       benefit to the residual benefit.
9   Q.  The waiver of premium benefit in the revised rider
10      explicitly and unambiguously states that the premium
11      during residual disability will be waived, correct?
12  A.  That's correct.
13  Q.  Okay. Where does it say on Mr. Kearney's residual
14      disability rider that the premium will be waived or it
15      won't be waived, either way? Does it say that on Mr.
16      Kearney's rider?
17  A.  It doesn't say that it will be waived.
18  Q.  And it doesn't say it won't be waived?
19  A.  Well, it doesn't say it won't be a lot of things, but
20      it has -- in order to qualify for the waiver of
21      premium benefit, it would have to be stated in the
22      rider, as was done in the revised rider that you
23      presented me.
24  Q.  We'll present a different legal argument than you just
25      did, but you would agree with me that in the residual

Page 75

1       disability benefit rider that Mr. Kearney purchased in
2       '90 and in '91, it doesn't say that if you're on
3       residual disability, the premiums will be waived, and
4       it doesn't say that if you're on residual disability,
5       the premiums won't be waived; is that correct?
6   A.  It does not say that they will be waived, it doesn't
7       say that they will not be waived, and it doesn't say
8       that there were not a lot of things would not be done.
9   Q.  But on the revised rider that your company prepared,
10      your company went to the effort in 1992 to create a
11      revised residual disability rider regardless of what
12      policy it applies to, and it specifically put in
13      there -- your company specifically, explicitly, and
14      unambiguously provided that the waiver of premium goes
15      with residual disability, correct?
16  A.  In this particular policy, yes.
17  Q.  Okay. Does the revised residual disability rider talk
18      about how long you can be receiving residual
19      disability benefits, till a certain age or life? It's
20      on the second page, second column.
21  A.  Are we talking about waiver of premium?
22  Q.  No, I moved off the waiver of premium. I'm done with
23      that one. I'm now talking about the term the benefits
24      would be payable.
25  A.  It tells the term, yes.

Page 76

1   Q.  What is it?
2   A.  From the maximum policy -- maximum benefit period
3       shown in the schedule.
4   Q.  Could you turn to the second page of that revised
5       rider, second column. Is there anything in there that
6       discusses -- or is that where the waiver of premium
7       is?
8   A.  That's where the waiver of premium is.
9   Q.  Okay. How about the first column? Let me look at it.
10  A.  (Indicating)
11  Q.  The first column on the second page talks about waiver
12      of premium and the subsection 1 of the first paragraph
13      on the second page, first column, says that on
14      residual disability, the company will waive premiums
15      that come due during the disability.
16          In the second column of this exhibit under
17      Termination, it says the rider will terminate on the
18      premium due date next following your 65th birthday,
19      right?
20  A.  Right.
21  Q.  Okay. Is there anything in Mr. Kearney's earlier
22      dated residual disability rider prepared by your
23      company that says how long the residual disability
24      rider would be applicable? Does it give an age limit?
25  A.  Yeah, residual disability has to begin prior to the

Page 77

1       65th birthday.
2   Q.  Okay. But does it say when residual disability
3       benefits would stop?
4   A.  For the maximum benefit period, the same as the other.
5   Q.  Okay. And the maximum benefit period is what?
6   A.  It's stated on the schedule of the policy.
7   Q.  If you become disabled before the age of 45, the
8       maximum benefit period is lifetime, correct?
9   A.  If that's what the policy provides, yes.
10  Q.  Okay. Let me show you Exhibit 3. Exhibit 3 is the
11      policy with schedules. There's two schedules, one for
12      each of the policies that Mr. Kearney purchased. What
13      is the maximum benefit period for disabilities that
14      begin before age 45?
15  A.  Well, for total disability beginning prior to age 45,
16      lifetime.
17  Q.  Okay. And what does it say --
18  A.  On or after 45, age 65, and two months -- 24 months
19      after age 63.
20  Q.  Okay. I'm confused. What is the maximum benefit
21      period for disabilities that begin before age 45?
22  A.  Lifetime.
23  Q.  Okay. Does it say one way or the other on that
24      schedule in the policy -- take your time and look at
25      it -- or on the rider what the maximum benefit period

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
John L. Roberson    5/7/2004

Page 78

1    is for residual disability that begins before the age
2    of 45?
3  A.  Yes, the maximum benefit period shown in the schedule.
4  Q.  Very well. Thank you. Did you make an error when you
5    just said that or is that correct?
6  A.  The benefit period is lifetime for prior to age 45.
7  Q.  Thank you. Can I have that.
8  A.  (Indicating)
9        MR. ELLIS: We're going to have to take a
10    couple minute break here, Mike.
11        MR. ROBERTS: Okay.
12        (Brief recess)
13  Q.  Mr. Roberson, I don't know that I have very much more
14    than just -- let me just take another 30 seconds here
15    to see what we have.
16        Did you speak with Mr. Maxwell in the past 24
17    hours?
18  A.  Talked to him last night, yes.
19  Q.  Did you talk to him about Mr. Kearney's claim at all?
20  A.  No, just about -- well, yeah, we mentioned it was --
21    in general what it was, nothing specific.
22  Q.  Can you share with me what the two of you shared.
23  A.  I don't recall specifically.
24  Q.  You had a conversation with him last night and you
25    can't tell me what you all said?

Page 79

1  A.  Well, I talked about his health and how he had been
2    and how I hadn't seen him for a long time.
3  Q.  Just about Mr. Kearney.
4  A.  Just it was a disability claim where we overpaid the
5    benefits and --
6  Q.  After meeting with Mr. Ellis, you had a conversation
7    with Mr. Maxwell and you told Mr. Maxwell that you had
8    made a mistake and overpaid the benefits?
9  A.  After meeting with Mr. Ellis.
10  Q.  Uh-huh.
11  A.  Yeah, I met Mr. Ellis yesterday.
12  Q.  Okay. And then you had a conversation with
13    Mr. Maxwell and you told Mr. Maxwell that we had
14    overpaid Kearney?
15  A.  Yes.
16  Q.  Okay.
17  A.  Told him that's what the case was about.
18  Q.  Have you talked with Phyllis Harden in the past week?
19  A.  Yes.
20  Q.  Okay. When did you speak with her?
21  A.  A day before yesterday, I think.
22  Q.  Did you talk to her about Kearney?
23  A.  Yes.
24  Q.  Did you discuss with her that you and she had made a
25    mistake for you four years, her eight or nine years?

Page 80

1  A.  Yes.
2  Q.  Did you speak to Harold Shelton in the past two days?
3  A.  Yes.
4  Q.  Did you tell him that you had been informed that you
5    had made a mistake for four years and him for eight or
6    nine years?
7  A.  I told him yes, we made a mistake for that period of
8    time, yes.
9  Q.  Okay. Did you speak to Valerie Loftin in the past two
10    days?
11  A.  No.
12  Q.  How is it that the four of you made 300 mistakes when
13    the policy so unambiguously doesn't allow for benefits
14    to Mr. Kearney?
15  A.  It would just be a matter of conjecture as to why we
16    did. It's obvious that we -- obvious that we did.
17    Why? I don't know.
18  Q.  Okay. Do you generally have difficulty reading and
19    understanding explicit and unambiguous language in the
20    policies that you were responsible for overseeing for
21    decades?
22  A.  No.
23        MR. ELLIS: Objection.
24  Q.  I didn't think so.
25        Are the claim files ever audited internally?

Page 81

1  A.  By whom?
2  Q.  Well, I understand that monthly you did a little
3    quality control by making sure the payment was proper.
4    Was there any other procedure in place of a quality
5    control type nature to audit the files to make sure
6    that they're being paid appropriately?
7  A.  Nothing formal, no.
8  Q.  What is informal?
9  A.  Occasionally I would look at the files for the
10    continuing disability for reserving purposes, yes,
11    myself.
12  Q.  You would perform the auditing function to the extent
13    there was one?
14  A.  Yes.
15  Q.  Would you have a role in setting reserves?
16  A.  They were automatically -- they were automatically set
17    when the claim -- based on the claim.
18  Q.  Let me show you something, Exhibit 14, which is Mr.
19    Kearney's proposal. We discussed the preparation of
20    proposals earlier. Could you turn to page 2.
21  A.  Okay.
22  Q.  This is broken into two sections. There's something
23    BASIC BENEFITS -- you're on the right page. Do you
24    see --
25  A.  Yeah, okay.

21 (Pages 78 to 81)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

---

Page 82

1  Q. Do you need your glasses?
2  A. I'll get them. Okay.
3  Q. Okay. Do you see where it says BASIC BENEFITS?
4  A. Uh-huh.
5  Q. And then there's four or five lines and a couple of
6     descriptive paragraphs, and then there's another
7     heading called ADDITIONAL BENEFITS?
8  A. Yes.
9  Q. And ADDITIONAL BENEFITS is broken into three or four
10    sections, one of those sections being Residual
11    Disability, do you see that?
12 A. Yes.
13 Q. Okay. Let me read Residual Disability. I want to
14    talk to you about it. "Residual Disability pays a
15    percentage of the Basic Benefit" -- that's what's
16    above, right?
17 A. Uh-huh.
18 Q. -- "and Social Security Supplement, if applicable,
19    when you are residually disabled and suffer a loss of
20    earnings of 20 percent or more." Do you see that?
21 A. Yes.
22 Q. Okay. Let's break that down a little bit. Residual
23    disability pays a percentage of the basic benefit.
24    That's referring to everything in the top half of the
25    page, right?

Page 83

1  A. Right.
2  Q. And Social Security Supplement, if applicable. So
3     sometimes a policyholder might not buy any riders,
4     right, they just buy the policy and they choose not to
5     buy the increased COLA and Social Security or the
6     residual disability, right?
7  A. That's correct.
8  Q. And you can choose to buy the residual disability
9     rider and not buy the Social Security Supplement
10    rider, correct?
11 A. Yes.
12 Q. Okay. So what this says is pays a percentage of the
13    basic benefit and Social Security Supplement, if
14    applicable. If applicable means if you've purchased
15    that rider also, you get that, correct?
16 A. No, I don't know what if applicable means in this
17    particular case.
18 Q. It can mean one or two different things? Let's talk
19    about my meaning. Could it mean what I said? If this
20    says if you're residually disabled, you get everything
21    under basic benefit above there and you get Social
22    Security, and my interpretation of if applicable is,
23    you get Social Security Supplement if you purchase
24    that rider, too. Is that reasonable?
25 A. That's your interpretation?

Page 84

1  Q. Uh-huh.
2  A. I assume so.
3  Q. Is yours different?
4  A. Yes, I don't know what the if applicable means,
5     because you couldn't get Social Security -- you
6     couldn't get residual on a Social Security benefit.
7  Q. Well, this says you do. It says you get it.
8  A. Well, we paid the benefit on the basis of the
9     contract, not the proposal.
10 Q. Sir, we're talking about the proposal right now, okay?
11    Now, the proposal is something -- we talked about the
12    proposal at length earlier. The proposal is something
13    that's created with input from all different people in
14    the company, it's drafted, it's redrafted, it's
15    finally blessed, then there's a template form, and the
16    people that create it know what they're taking about.
17    That's what you told me earlier.
18        MR. ELLIS: Objection, misstates the
19    testimony. That was the testimony on the policy.
20 Q. Okay. Right? The people that create this proposal
21    know what they're talking about when they're telling
22    policyholders what the policy provides, right?
23 A. I don't know -- they're not correct in this point.
24 Q. Okay. So let me understand correctly. Sir, proposals
25    are prepared by Jefferson-Pilot, correct?

Page 85

1  A. That's correct.
2  Q. The people that prepare them are well-trained and
3     educated on what the policies provide, correct?
4  A. They should be.
5  Q. Okay. There isn't one person that prepares them; the
6     preparation of a proposal takes into account input
7     from various people throughout the organization, true?
8  A. I didn't have a direct responsibility for that, so I
9     can't say true -- I'm sure there were other people
10    that looked at it.
11 Q. Okay. And then there's a final stage where the final
12    draft or proposal is approved by the company, correct?
13 A. Yes.
14 Q. Okay. So for it to be wrong that Social Security
15    Supplement goes with residual disability, a whole
16    bunch of people involved in the preparation of the
17    proposal would have to be wrong, the company would
18    have to be wrong, and they would all have to be wrong
19    in addition to you and your subordinates being wrong
20    300 times to come to the conclusion that Mr. Kearney
21    has been overpaid?
22 A. They weren't involved in the claim.
23 Q. Okay. Thank you.
24 A. I might also point out that this is a proposal. It's
25    not a policy of insurance.

---

22 (Pages 82 to 85)

Page 86

1  Q.  Very well.
2  A.  And information can be found on the policy form.
3  Q.  All right.  And the same people that --
4  A.  Policy Form 576.
5  Q.  And the same people that prepared the policy are the
6      ones that prepared the proposal, Jefferson-Pilot,
7      correct?
8  A.  No.  The policy is prepared -- is designed in the
9      Actuarial Department.  The Actuarial Department does
10     not have anything to do with the proposal.
11 Q.  I thought you told me you didn't know who has input on
12     the proposal.  Your testimony now under oath, your
13     sworn testimony is, the Actuarial Department has
14     nothing to do with the creation of the proposal?
15 A.  It's done in the Marketing Department.  Actuarial
16     would not.
17 Q.  Okay.  You told me earlier that Actuarial was --
18 A.  If I did --
19 Q.  Your testimony is your testimony.
20     MR. ELLIS:  No, you didn't.  Don't worry
21     about it.
22     MR. ROBERTS:  Don't worry about it.  I'm Big
23     Brother.
24 Q.  Thank you.  Where in the proposal or the policy or any
25     rider does it say you don't get the Social Security

Page 87

1      Supplement?
2  A.  For residual?
3  Q.  Uh-huh.
4  A.  Got a copy of the policy?
5  Q.  (Indicating)  And here's the Social Security
6      Supplement here.
7  A.  The monthly benefit of this policy will be increased
8      by the amount of Social Security Supplement benefit
9      shown in the schedule if you're entitled to receive
10     monthly benefits for total disability.
11 Q.  Where are you reading?
12 A.  First paragraph (Indicating).
13 Q.  Does this rider say anything about residual
14     disability?
15 A.  No.
16 Q.  Okay.  Does the policy -- look at the policy.  Do the
17     words "residual disability" reside anywhere in the
18     policy?
19 A.  No, it would be in the rider that's attached to the
20     policy becoming a part of it.
21 Q.  Okay.  So what's the elimination period for residual
22     disability?  Is it the same as -- do you use the total
23     disability definition of elimination period?
24 A.  Yes.
25 Q.  Okay.  What is the maximum benefit period for residual

Page 88

1      disability?  Do you use the same definition as total
2      disability?
3  A.  It's the same as the maximum benefit period for total
4      disability.
5  Q.  There's no separate independent definition for maximum
6      benefit period for residual disability, correct?
7  A.  Only if you're over the age of 45.
8  Q.  It's different under residual disability than it is
9      under total disability?
10 A.  Yes, it's --
11 Q.  My question is --
12     MR. ELLIS:  I'm sorry, let him answer that
13     one before you ask the next one.
14 Q.  That wasn't the question I asked.  Is there an
15     independent, independent from total disability
16     definition, is there an independent definition of
17     maximum benefit period for residual disability
18     independent of maximum benefit period definition for
19     total disability?
20 A.  Yes, in the rider it states if you're age 45 or older
21     when the residual disability begins, it's a maximum
22     in the Social Security the residual disability rider.
23 Q.  In the residual disability rider where is --
24 A.  That's what I understood you to say.
25 Q.  Okay.  Where is the definition of maximum benefit

Page 89

1      period in the residual disability rider?
2  A.  You asked for a limitation.  The difference --
3  Q.  I asked about the definition of maximum benefit
4      period.  Where is that defined in the residual
5      disability rider?
6  A.  In the third paragraph it appears --
7  Q.  What does it say?
8  A.  It says total disability and residual -- during period
9      of residual disability Jefferson-Pilot will continue
10     to pay the residual disability monthly benefit for
11     each month you are residually disabled until the
12     combination of total disability and residual
13     disability benefits equal to the maximum benefit
14     period.
15 Q.  Okay.  Where is the maximum --
16     MR. ELLIS:  Wait a minute.  Let him finish.
17     MR. ROBERTS:  Sorry, Big Brother.
18 A.  However, the residual benefit will not be payable for
19     longer than 24 months if you are age 55 or older when
20     the period of disability began and the residual
21     disability is not preceded by at least 180 days of
22     total disability.  So there is that limitation in the
23     residual benefit for age 55 or older.  I may have said
24     45 earlier.
25 Q.  Okay.  That doesn't apply here, okay?  Mr. Kearney

23 (Pages 86 to 89)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
John L. Roberson    5/7/2004

Page 90

1  became residually disabled before 45. Where is the
2  definition -- independent from the definition for
3  total disability, where is the definition for maximum
4  benefit period for people who become residually
5  disabled prior to the age of 45?
6  A.  The maximum benefit period is the maximum benefit
7  period shown in the schedule.
8  Q.  It's the same as --
9  A.  Yes.
10  Q.  You use the total disability definition?
11  A.  That's correct.
12  Q.  Okay. Thank you. And is there an independent
13  definition for monthly benefit different than total
14  disability, independent for residual disability
15  different than total disability?
16  A.  Do you want to state that again.
17  Q.  I will. There's a definition in the policy -- turn to
18  the policy, page 3. There's a definition of monthly
19  benefit.
20  A.  Okay.
21  Q.  Is that the definition you use for residual disability
22  also?
23  A.  Yes.
24  Q.  Okay. So the proposal is wrong, in your judgment,
25  today?

Page 91

1  A.  With regards to the payment of Social Security --
2  Q.  What about COLA?
3  A.  -- on residual. COLA is the same thing. COLA does
4  not apply to residual disability benefit.
5  Q.  And your opinion of that was different from '93 to
6  '97?
7  A.  No, my opinion was not different. I overlooked it in
8  this particular case.
9    MR. ROBERTS:  We're done. Thank you.
10    MR. ELLIS:  I have a few questions.
11    MR. ROBERTS:  I knew you would.
12
13  EXAMINATION (by Mr. Ellis):
14
15  Q.  You told counsel that -- you identified the people
16  that were in the Claims Department handling individual
17  disability. Can you tell me roughly how many claims a
18  month they ran.
19  A.  Approximately a thousand.
20  Q.  Was the personnel sufficient to manage the workload at
21  that time?
22    MR. ROBERTS:  Objection.
23  A.  It was difficult.
24  Q.  When Mr. Maxwell left, what happened to his workload?
25  A.  It was distributed between the analysts that were

Page 92

1  left.
2  Q.  Let me show you Exhibit 9 again. In Exhibit 9 under
3  Remarks, it talks about residual -- well, there's a
4  bunch of writing. Why don't you tell me what that is
5  and why it's there, please.
6    MR. ROBERTS:  Objection, foundation.
7  A.  That's a note to advise that those benefits -- that
8  coverage was provided in the policy since it was an
9  optional benefit and it's something that could be
10  overlooked.
11    MR. ROBERTS:  Objection, move to strike.
12  Q.  One of the things it says in there is 50 percent MM
13  first six months. What does that mean?
14    MR. ROBERTS:  Objection.
15  A.  The residual disability benefit -- for the first six
16  months of residual disability there's a minimum
17  50 percent benefit if he otherwise qualifies.
18  Q.  Was Mr. Kearney according to this schedule ever paid
19  only 50 percent?
20  A.  No.
21  Q.  Counsel has asked you about these overpayments from
22  '93 forward and I'd like to direct your attention to
23  the column marked RES. What's that stand for?
24  A.  That's reserve.
25  Q.  Okay. What's the I?

Page 93

1  A.  Initial payment.
2  Q.  P?
3  A.  Partial payment.
4  Q.  What's the F in March 3 of '94?
5  A.  Final payment. The claim form is sent -- the document
6  indicated he can go back to work the next day.
7  Q.  So he was given a final payment?
8  A.  Yes.
9    MR. ROBERTS:  Objection, leading.
10  A.  It was a final payment that the doctor indicated on
11  his claim form that he could return to work the next
12  day.
13  Q.  Then next to the February 7 of '95, what do the
14  initials there mean?
15  A.  RP which reopens payment.
16  Q.  Okay. Does that indicate whether this is a new claim
17  or a continuation of the claim?
18  A.  That would indicate a continuation of a prior claim.
19  Q.  Okay.
20  A.  Except it indicates it is a residual benefit --
21  residual disability benefit with no COLA applicable.
22    MR. ROBERTS:  Sir, she's having difficulty
23  hearing you.
24    THE WITNESS:  Oh, I'm sorry.
25  Q.  It indicates under the status -- what does it

24 (Pages 90 to 93)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                C-1-02-479
John L. Roberson                                                            5/7/2004

Page 94

1   indicate?
2   A.  This is not residual disability and no COLA. That's
3       an indication made by Bob Maxwell.
4   Q.  This is not or this is residual?
5   A.  This is residual, I'm sorry.
6   Q.  And that's Bob Maxwell's writing?
7   A.  Yes.
8   Q.  Okay. Anytime prior to Mr. Maxwell's retirement, was
9       the COLA benefit added to Mr. Kearney's benefit?
10  A.  No. He retired prior to July '95.
11  Q.  When was the first COLA adjustment made?
12  A.  In August 1995.
13  Q.  And did that pay the COLA retroactively?
14  A.  Yes.
15  Q.  During the period of time leading up to that
16      particular payment, is there any indication that Mr.
17      Kearney got less than the full basic benefit on any
18      one month's payment?
19  A.  No.
20  Q.  Later sheets, specifically 0961, has notations at the
21      top. Can you recognize that handwriting on it?
22  A.  It appears to be either Kim's or -- Kim Brann's or
23      Phyllis Harden's.
24  Q.  And what does it say on that page?
25  A.  "COLA does not apply to residual."

Page 95

1   Q.  Yet the COLA was still being paid?
2   A.  Yes.
3   Q.  And on page 0962, again at the top?
4   A.  It says "COLA does not apply to residual" and then
5       there's a note "We are pay TD," total disability,
6       "benefits, COLA applies."
7   Q.  So someone got the impression this was a total
8       disability claim?
9   A.  Yes.
10      MR. ROBERTS: Objection, move to strike.
11  Q.  From the claim forms that you reviewed including the
12      one counsel showed you, was this new claim that began
13      in '94 ever a total disability claim?
14  A.  No, sir.
15  Q.  If I look at the policy itself and the riders,
16      Exhibits 3 and 4, are they the basis for the payment
17      of any claims?
18  A.  Yes, sir.
19  Q.  Are claims paid on riders that are subsequently
20      developed or only the ones sold with the policy?
21  A.  Only the ones sold with the policy.
22      MR. ROBERTS: Shows the ambiguity, though.
23  Q.  Looking at the contract itself, were benefits absent
24      the riders ever due under the policy for total
25      disability after 1993?

Page 96

1       MR. ROBERTS: Objection.
2   A.  No, sir.
3   Q.  Looking at the riders, what is required before someone
4       becomes eligible for residual disability?
5       MR. ROBERTS: Do you want him to read from
6       the document you have marked up with some notes? Can
7       I see it before the witness reads from the document
8       that's marked up?
9       MR. ELLIS: I'm sorry, we'll use yours. I
10      don't care. I'm just trying to be -- can I have
11      Exhibits 3 and 4, please.
12      MR. ROBERTS: Typical Bill.
13      MR. ELLIS: He certainly doesn't need my
14      annotations.
15      MR. ROBERTS: Say again.
16      MR. ELLIS: He certainly doesn't need my
17      annotations.
18      MR. ROBERTS: He knew how to pay the policy
19      until you told him otherwise two days ago, so
20      apparently he does need your annotations.
21      THE WITNESS: I still know how to pay the
22      policy, but I made a mistake.
23      MR. ROBERTS: 300 mistakes.
24      MR. ELLIS: If that's the number. I didn't
25      make -- well, okay.

Page 97

1       MR. ROBERTS: I don't have it. He has it.
2       MR. ELLIS: There we go.
3   A.  What's the question again?
4   Q.  Yes. Let's start with actually the COLA provisions in
5       the policy, which are identified --
6   A.  It's under Benefit Provisions.
7   Q.  -- under Benefit Provisions?
8   A.  Increasing Benefits.
9   Q.  That's the provision we're referring to as COLA?
10  A.  Yes, sir.
11  Q.  What is required in order to trigger the applicability
12      of the COLA provision or the increase in benefits
13      provision?
14      MR. ROBERTS: Objection, legal conclusion.
15  A.  Requires that you be totally disabled for 12
16      consecutive months in order to receive the increase in
17      benefits.
18  Q.  And how do you come to that conclusion?
19  A.  The policy -- reading the policy, it says after you
20      have received benefits for total disability for 12
21      consecutive months, your monthly benefit will be
22      increased during the continuance of that period of
23      disability up to your 65th birthday. The increase
24      will be 3 percent of the maximum benefits shown on the
25      schedule for each --

25 (Pages 94 to 97)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
John L. Roberson    5/7/2004

Page 98

1  Q. I'm sorry, 3 percent of what?
2  A. 3 percent of the monthly benefit shown in the schedule
3     for each successive 12-month period of total
4     disability after the first period. The benefit
5     payable will not be increased for any part of any
6     period of total disability beyond your 65th birthday.
7  Q. Now, let me ask if there is any -- according to your
8     understanding of this claim, was there any 12-month
9     period, consecutive 12-month period, when Mr. Kearney
10    even claimed to be totally disabled?
11 A. No, sir.
12 Q. Failing that, could he have qualified for the increase
13    in benefits?
14    MR. ROBERTS: Objection, legal conclusion.
15 A. No, sir, based on the contract, he couldn't.
16 Q. I direct your attention to the Social Security
17    Supplement. Is there a prerequisite to that benefit
18    becoming applicable to any --
19 A. Yeah, you must be entitled to receive --
20    MR. ROBERTS: Objection, move to strike.
21 A. -- the monthly benefits for total disability.
22 Q. Okay. What's the basis for you saying that?
23    MR. ROBERTS: Objection, move to strike.
24 A. I'm reading from the rider.
25 Q. You're reading directly from the rider?

Page 99

1  A. Yes, sir.
2  Q. Was there any period of time that you're aware of that
3     Mr. Kearney was entitled to receive monthly benefits
4     for total disability?
5     MR. ROBERTS: Objection.
6  A. No, sir.
7     MR. ROBERTS: Foundation. He's testified he
8     doesn't know anything about the claim.
9  Q. If someone is totally disabled and then becomes
10    residually disabled subsequently, is he entitled to a
11    continuance of the Social Security benefits?
12    MR. ROBERTS: Objection.
13 A. No, sir.
14 Q. Was the lack of claims personnel and the volume of
15    claims part of the assets you were discussing when you
16    discussed why Jefferson-Pilot got out of the
17    disability business?
18    MR. ROBERTS: Objection, leading.
19 A. Yes.
20 Q. According to the letter that you were shown making the
21    $30,000 payments in Exhibit 9, was this claim paid, as
22    far as you can tell, up through December of 1999?
23    MR. ROBERTS: Objection. He testified he has
24    no knowledge of the claim, no foundation.
25 A. Based on the claims worksheet which indicates each

Page 100

1     payment made, that's correct.
2  Q. During that period of time, as far as you can tell
3     from the policy and from the nature of the claim that
4     is being concededly a residual claim, was there any
5     basis upon which you could justify paying either the
6     COLA benefits or the Social Security benefits?
7     MR. ROBERTS: Objection.
8  A. No, sir.
9  Q. Taking a look at the proposal that you were shown
10    which is Exhibit 14 -- do you still have that in front
11    of you?
12 A. I don't have it.
13    MR. ROBERTS: Do you want to use one of your
14    marked-up copies, Bill, or do you want to use the --
15    MR. ELLIS: If you have the original exhibit,
16    that probably would be better.
17    MR. ROBERTS: Do you have it over there? Is
18    it in your hand, Bill?
19    MR. ELLIS: No. I have my copy.
20    THE WITNESS: I thought I gave it back to
21    you.
22    MR. ROBERTS: (Indicating)
23 Q. Looking at page 0641 -- at least it has the Bates
24    stamp 0641 -- in Exhibit 14, can you read the bolded
25    and all caps paragraph there.

Page 101

1  A. "This is a proposal. It is not a policy or insurance
2     contract. Coverage can be provided only after you
3     have submitted an application, met our underwriting
4     requirements, and been accepted for insurance.
5     Additional information can be found in policy form
6     WJ576."
7  Q. Right above that there is a statement or paragraph
8     that talks about what the proposal is based on. Can
9     you tell us what this proposal was based on.
10 A. It says based on policy form WJ576. Premium quoted is
11    for a male, age 37 in occupational class 3A with a
12    90-day elimination period and a to age 65 benefit
13    period.
14 Q. Now, looking at the policy, specifically the schedule,
15    is the proposal as based actually what Mr. Kearney
16    bought with regard to the maximum benefit period?
17    MR. ROBERTS: Objection.
18 A. Not in accordance with the proposal. It's a lifetime
19    benefit prior to age 45.
20 Q. So in effect Mr. Kearney bought something different
21    from what this proposal makes --
22    MR. ROBERTS: Objection.
23 A. That is correct.
24 Q. Looking at the --
25 A. Wait a minute. I want to correct that. The proposal

26 (Pages 98 to 101)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
John L. Roberson                                                      5/7/2004

Page 102

1    does say if disability begins prior to age 45,
2    benefits are payable for life.
3  Q. Okay. So he bought the same thing?
4  A. Yes.
5        MR. ROBERTS: That's why you shouldn't answer
6    leading questions affirmatively just because he's your
7    lawyer. That's why he shouldn't be asking leading
8    questions.
9        MR. ELLIS: Are you finished speeching?
10       MR. ROBERTS: No. Let me --
11       MR. ELLIS: Well, keep going, Buddy.
12       MR. ROBERTS: Well --
13       MR. ELLIS: You know, this is your game. You
14   just talk the way you want.
15       MR. ROBERTS: The rules of evidence exist,
16   too, in addition to the code of civil procedure and
17   code of professional responsibility.
18 Q. With regard to the second proposal that was made to
19   him which is 0633 on the other policy -- it may be the
20   first, I'm not sure which -- does that have the same
21   statement about this not being an insurance policy?
22       MR. ROBERTS: Objection, leading. Objection,
23   legal conclusion.
24 A. Yes.
25 Q. Mr. Roberson, I'm looking at Exhibit 19.

Page 103

1        MR. ELLIS: Do you have 19?
2        MR. ROBERTS: Oh, I didn't realize I was your
3    paralegal (Indicating).
4  Q. Looking at the second paragraph in the letter from Mr.
5    Kearney to you, was there apparently some discussion
6    or consideration whether this was a new claim or a
7    continuation of the previous claim?
8        MR. ROBERTS: Objection, calls for
9    speculation, foundation. Go ahead.
10 A. Yes, Mr. Kearney states that there have been
11   discussions about it.
12 Q. You left the company how long ago, sir?
13 A. A little over seven years ago, April 1, 1997.
14 Q. As of the time that you left the company, according to
15   Exhibit 9, had Mr. Kearney been paid to date?
16       MR. ROBERTS: Objection.
17 A. Yes, sir.
18 Q. Had he been paid COLA and Social Security benefits in
19   addition to date?
20       MR. ROBERTS: Objection.
21 A. Erroneously, yes.
22       MR. ROBERTS: Move to strike.
23       MR. ELLIS: Thank you, sir. That's all the
24   questions I have.
25

Page 104

1    FURTHER EXAMINATION (by Mr. Roberts):
2
3  Q. Mr. Roberson, let me understand correctly, okay? What
4    I hear your lawyer saying and you saying yeah, that's
5    right, Lawyer, is, the department was overloaded and
6    that's how we made 300 mistakes.
7        MR. ELLIS: Objection to form.
8  Q. Is that what you're suggesting?
9  A. If memory serves me correctly, he said was that part
10   of the reason you went out of business, that you went
11   out of -- discontinued that line of business.
12 Q. Well, he was trying to say something else and maybe
13   you didn't pick up on it. Did you make 300 mistakes
14   because the department was overloaded?
15 A. I don't know why we made 300 mistakes.
16 Q. Okay. The people that prepared the proposal, were
17   they also overloaded and they misrepresented the
18   policy, too?
19       MR. ELLIS: Objection to form.
20 A. I have no knowledge of that.
21 Q. Okay. Is it your judgment that the proposal given to
22   Mr. Kearney and the policy don't provide for the same
23   benefits?
24 A. In what respect?
25 Q. Does the proposal accurately depict what the policy

Page 105

1    provides?
2  A. The question we had with regards to the payment of the
3    residual disability benefit appears to be contrary to
4    the policy.
5  Q. Okay. So was the proposal department overloaded and
6    they got it wrong, too?
7  A. I have no idea.
8  Q. You testified -- well, actually he testified and then
9    you said yeah --
10       MR. ELLIS: Objection to form.
11 Q. He asked you a leading question, is there any basis on
12   which Mr. Kearney could have gotten COLA or Social
13   Security, and you said no. In 38 years with the
14   company, Vice President, head of the department,
15   affirming the propriety of every payment for four
16   years, certainly there was some basis. You were
17   making payments to the policyholder with no basis?
18 A. In accordance with the contract, those benefits should
19   not have been paid.
20 Q. There was absolutely no basis and you made a mistake
21   every month for four years with no basis to support
22   why it is you made a mistake; is that right?
23 A. That's correct.
24 Q. That's your sworn testimony?
25 A. That's what it shows.

27 (Pages 102 to 105)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney   C-1-02-479
John L. Roberson   5/7/2004

Page 106

1  Q. Is that your sworn testimony?
2  A. Yes.
3  Q. Was Mr. Kearney frauded? Did you lie to him in the
4     proposal about what he was buying?
5  A. No.
6  Q. You didn't lie to him in the proposal about what he
7     was buying, correct?
8  A. I didn't lie to him. I didn't give him the proposal.
9  Q. Did the company lie to Mr. Kearney in the proposal by
10    saying if he purchased the policy, he'd get X and he
11    didn't get X?
12 A. No, there's no lie here. There's a matter of
13    interpretation that's incorrect apparently.
14 Q. Interpretation, thank you. You indicated that Mr.
15    Kearney's doctor suggested in the spring of '94 that
16    he could return to work, right?
17 A. Yes.
18 Q. Okay. That was because he had a back problem. The
19    back problem wasn't preventing his return to work.
20    You heard that from his orthopedic doctor, correct?
21 A. I don't remember what doctor it was. It shows on that
22    claim form.
23 Q. Was it a psychologist that told you --
24 A. I don't recall who it was.
25 Q. Okay. Thank you.

Page 107

1  A. It's on the claim form, though. It was dated March 31
2     and the doctor said he could go back to work April 1
3     on that claim form he submitted.
4  Q. The doctor said he could return to work because his
5     lumbosacral problem for which he had a laminectomy
6     surgery was okay, right?
7  A. Whatever his claim was at that time for his
8     disability, he said yes, he could go back to work.
9  Q. Thank you. Do you know anything about DMS?
10 A. No.
11 Q. Can I have those exhibits, sir.
12 A. (Indicating)
13 Q. Are you mindful that they made a mistake when they
14    were administering the policy from '97 through 2001 or
15    2002, making the same mistake you made?
16 A. I understand they did.
17 Q. Okay. Do you understand that they're professionals in
18    disability claim management?
19 A. I have no understanding about them at all.
20 Q. Okay. Does it make you feel better about your mistake
21    that someone else made the same mistake for four
22    years?
23 A. Oh, I don't think you can feel good about making a
24    mistake.
25 Q. Okay. I'll show you Exhibit 10. This is a letter

Page 108

1     dated August 11, 2000, on Disability Management
2     Services letterhead. Could you read -- the first
3     paragraph is just a single line. Could you read the
4     second paragraph for me out loud.
5        MR. ELLIS: Objection. He's never seen this
6     before.
7        MR. ROBERTS: He has now. He didn't see the
8     documents that he testified about today until last
9     night when you showed him. I can't show him a
10    document and have him testify, Big Brother?
11       MR. ELLIS: I'll stipulate he can read.
12 Q. Can you read the second paragraph into the record.
13       MR. ELLIS: I'll stipulate that he can.
14       MR. ROBERTS: That's funny. You're a
15    humerous guy.
16 A. "Under separate cover you should receive two checks
17    reflecting the increase under the cost of living
18    adjustment, COLA, rider for both of your policies that
19    became effective on May 6, 2000. I apologize for this
20    oversight."
21 Q. So someone else reviewing the policy and the contract
22    for several years actually apologized to Mr. Kearney
23    because they believed reading the contract that he was
24    entitled to COLA and Social Security?
25       MR. ELLIS: Objection, no foundation.

Page 109

1  A. I don't know what their basis for determination was.
2  Q. Okay. Does it make you feel better about your 300
3     mistakes?
4  A. As I said before, I don't feel good about making a
5     mistake.
6  Q. Okay. Do you have --
7        MR. ROBERTS: Can you put that in front of
8     your client, Bill, since it's got the marks up on it,
9     make it easier for him.
10       MR. ELLIS: No, give him the original. I
11    don't want you to have to complain that I made
12    notations on my copy.
13       MR. ROBERTS: I'm consenting to you giving
14    him notes, so why don't you give him --
15       MR. ELLIS: I don't want to give him one --
16       MR. ROBERTS: Well, you're sitting right next
17    to him, so you can do it, Bill. Are you that
18    juvenile? Am I boring you as you yawn?
19       MR. ELLIS: Uh-huh.
20       MR. ROBERTS: Are you going to share that
21    with your client so we can have a dialogue?
22       MR. ELLIS: Give him your Exhibit 14. I'm
23    going to work from one if you're going to question him
24    on it.
25       MR. ROBERTS: Oh, Billy, Big Brother.

28 (Pages 106 to 109)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney     C-1-02-479
John L. Roberson     5/7/2004

Page 110

1  Q. Exhibit 9, sir (Indicating). You testified under oath
2     on your own personal knowledge that the comment that
3     Mr. Ellis underlined in red on the copy he gave you on
4     page 0962 -- whose handwriting is "We are pay TD
5     benefits COLA applies"?
6  A. I think I said it either appears to be Phyllis
7     Harden's or Kim Brann's.
8  Q. Okay. You don't know who wrote it, nor do you know
9     what they actually meant in writing it, do you?
10 A. Well, it's obvious what they mean.
11 Q. No, it's not obvious.
12 A. Yes, it is. It says --
13 Q. Let me ask the question again.
14 A. I was answering your question.
15 Q. I didn't ask you a question. When a person is on
16    residual disability and their loss is greater than
17    75 percent, they get the full total disability
18    benefit, right?
19 A. They get the full monthly benefit, yes.
20 Q. Which is the total disability benefit?
21 A. Which is the same as the total disability benefit.
22 Q. Exactly.
23 A. The amount.
24 Q. That's what that means. Thank you.
25 A. I don't think that's what it means. It means that

Page 111

1     they --
2  Q. You don't even know who authored it. How could you
3     testify?
4  A. I know one of two persons who do, and you can't tell
5     it because you don't know either one of them.
6  Q. Okay. You don't know who authored it?
7  A. I know one of two persons who did.
8  Q. You don't know who authored it, you don't know what
9     they were thinking, whether they were talking about a
10    residual disability but greater than 75 percent loss,
11    yet you have the willingness at Bill Ellis's request
12    to testify under oath based on personal knowledge what
13    it means?
14       MR. ELLIS: Objection to form.
15 Q. Right? Correct?
16 A. What do you mean, by his request?
17 Q. Strike the question. Whose handwriting is on Bates
18    2808?
19 A. There again, it's either one of the two, either
20    Phyllis or Kim.
21       (Defendant's Exhibit No. 22 was marked for
22    identification by Mr. Roberts.)
23 Q. Whose handwriting is on Exhibit 22, which is Bates
24    2693?
25 A. Bob Maxwell's and Harold Shelton's.

Page 112

1  Q. Which is which?
2  A. On the right-hand corner or right-hand middle is
3     Harold Shelton's, and the remainder of it except the
4     2,750, 1,375 is Bob Maxwell's.
5  Q. It's all Bob Maxwell except for the part that appears
6     after the greater than sign on the right hand?
7  A. Yes, plus the 1,375 that's on the other side of it.
8     The 2,750 and 3,107.50 are also Harold Shelton's.
9  Q. Could you write -- could you circle on the exhibit the
10    handwriting that is not Bob Maxwell's.
11 A. (Indicating)
12 Q. For the record, you have circled in blue ink on that
13    exhibit?
14 A. That's correct.
15 Q. Thank you. Bob Maxwell in his writing was trying to
16    understand and calculate the monthly benefit properly
17    payable to Mr. Kearney; is that right --
18 A. That's what it appears, yes.
19 Q. -- to Mr. Kearney's claim file.
20       MR. ROBERTS: That's all. I have no further
21    questions.
22
23    FURTHER EXAMINATION (by Mr. Ellis):
24
25 Q. I just have one. Counsel cut off your answer. When

Page 113

1     you were discussing the loss greater than 75 percent
2     in a residual disability claim, can you show me
3     anywhere in the residual disability rider that
4     suggests that that becomes then a total disability
5     claim or entitlement to all of the total disability
6     benefits?
7        MR. ROBERTS: Objection.
8  A. It does not say that he's entitled to total disability
9     in any -- he's entitled to the monthly benefit in the
10    schedule, the full monthly benefit.
11 Q. Okay. Where is that contained, what you have just
12    said, in the residual disability rider?
13 A. Well, loss of monthly income means the difference
14    between the prior monthly income and the current
15    monthly income. Any loss of monthly income -- of more
16    than 75 percent of the prior monthly benefit will be
17    deemed to be 100 percent.
18 Q. Okay. So he gets 100 percent --
19 A. Of monthly benefit.
20 Q. -- of the monthly benefit, and the monthly benefit is
21    defined in the policy under the schedules as what
22    (Indicating)?
23       MR. ROBERTS: Are you going to point out
24    everything you want him to read in answer to your
25    question? Why don't you just give him the exhibit and

29 (Pages 110 to 113)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 114

1  let him do it on his own rather than sticking your
2  index finger where you want him to read.
3  Q.  Just tell me what the monthly benefit is.
4  A.  In the schedule it says Monthly Benefit, then it gives
5  the amount.
6      MR. ELLIS:  Okay.  That's all I have.
7      MR. ROBERTS:  Thank you, Mr. Shelton -- Mr.
8  Roberson, I'm sorry.
9      (Deposition concluded at 12:15 p.m.)
10
11  _____
         Signature of the Witness
12
13
   SUBSCRIBED and SWORN TO before me this _____ day of
14
   _____, 2004.
15
16  _____
            NOTARY PUBLIC
17
   My Commission expires:  _____
18
19
20
21
22
23
24
25

Page 116

1   Page ____ Line ____ should read:
2
3   Reason for change _____
4   Page ____ Line ____ should read:
5
6   Reason for change _____
7   Page ____ Line ____ should read:
8
9   Reason for change _____
10  Page ____ Line ____ should read:
11
12  Reason for change _____
13  Page ____ Line ____ should read:
14
15  Reason for change _____
16  Page ____ Line ____ should read:
17
18  Reason for change _____
19  Page ____ Line ____ should read:
20
21  Reason for change _____
22  Page ____ Line ____ should read:
23
24  Reason for change _____
25

Page 115

1          E R R A T A   S H E E T
2   RE: Jefferson-Pilot v. Kearney
3   DEPOSITION OF: John L. Roberson
4       Please read this original deposition with
5   care, and if you find any corrections or changes you
6   wish made, list them by page and line number below.
7   DO NOT WRITE IN THE DEPOSITION ITSELF.  Return the
8   deposition to this office after it is signed.  We
9   would appreciate your prompt attention to this matter.
10      To assist you in making any such
11  corrections, please use the form below.  If
12  supplemental or additional pages are necessary, please
13  furnish same and attach them to this errata sheet.
14  Page ____ Line ____ should read:
15  _____
16  Reason for change _____
17  Page ____ Line ____ should read:
18  _____
19  Reason for change _____
20  Page ____ Line ____ should read:
21  _____
22  Reason for change _____
23  Page ____ Line ____ should read:
24  _____
25  Reason for change _____

Page 117

1   STATE OF NORTH CAROLINA )
                            ) C E R T I F I C A T E
2   COUNTY OF GUILFORD    )
3
4       I, REBECCA J. HUDDY, Notary Public, do hereby
5   certify that JOHN L. ROBERSON was duly sworn by me
6   prior to the taking of his deposition; that said
7   deposition was taken and transcribed by me; and that
8   the foregoing one hundred sixteen (116) pages are a
9   true and accurate transcript of the testimony of said
10  JOHN L. ROBERSON.
11      I further certify that I am not of counsel
12  for or in the employment of any of the parties to this
13  action, nor am I interested in the result of said
14  action.
15      IN WITNESS WHEREOF, I have hereunto
16  subscribed my name this 10th day of May, 2004.
17
18
19  _____
          REBECCA J. HUDDY
20          Notary Public
    My Commission Expires July 26, 2005
21
22
23
24
25

30 (Pages 114 to 117)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 118

| A | | | | |
|---|---|---|---|---|

**A**
about 5:10 7:25 9:9
9:12,16,16,18,19
16:12,17,17 18:5
18:17,25 19:15
22:14 23:1,3,10,13
23:17 25:4,5 29:5,7
29:8,17,24 30:11
31:2 32:6 33:17,22
35:4,8,20 36:9
38:13,14 39:16
43:1 44:16 46:18
48:17 49:14 51:6
51:16 52:6 54:3
57:15 58:17 64:22
67:23 69:6,22
70:16 75:18,21,23
76:9,11 78:19,20
79:1,3,17,22 82:14
83:19 84:10,11,16
84:21 86:21,22
87:13 89:3 91:2
92:3,21 99:8 101:8
102:21 103:11
106:4,6 107:9,19
107:20,23 108:8
109:2,4 111:9
**above** 54:16 57:11
82:16 83:21 101:7
**absent** 95:23
**absolutely** 47:25
105:20
**accepted** 13:2 101:4
**accomplish** 8:15
**accordance** 1:11
10:12 101:18
105:18
**according** 92:18 98:7
99:20 103:14
**account** 85:6
**accountant** 30:16,20
56:20 59:18 60:20
60:25 61:2,7,13
62:2,10,15 65:7,17
65:23 66:3,15
67:21 68:11 69:18
70:12
**accountants** 60:21
**accounting** 62:1
63:18,19 64:4,5
**accurate** 36:18 43:14
117:9
**accurately** 55:8
104:25
**action** 117:13,14
**activities** 53:5,8

**actual** 8:18 10:17
16:13 18:2,25 24:5
24:12,16
**actually** 8:17 24:1
39:23 97:4 101:15
105:8 108:22 110:9
**Actuarial** 9:3,7,24
10:1,21,25 19:9
86:9,9,13,15,17
**added** 25:1 74:7 94:9
**addition** 7:16 40:23
85:19 102:16
103:19
**additional** 63:4,24
64:10 66:4 67:5
69:1 82:7,9 101:5
115:12
**address** 3:9 30:15
**adjustment** 54:13
94:11 108:18
**adjustments** 54:24
**administer** 20:19
29:18
**administered** 26:12
**administering** 3:22
4:12 107:14
**administration**
20:25 29:9,10
**advise** 15:14 92:7
**advised** 20:21 28:18
47:9 54:18
**affirmatively** 48:14
102:6
**affirming** 105:15
**after** 13:3 21:19,21
25:1 42:20 43:13
44:23 54:8 55:19
56:23 61:22 70:5
71:17 72:18 77:18
77:19 79:6,9 95:25
97:19 98:4 101:2
112:6 115:8
**again** 8:9,23,25 9:11
45:24 53:11 57:9
61:16,20 62:5
63:15 64:15 67:19
67:21 90:16 92:2
95:3 96:15 97:3
110:13 111:19
**against** 15:25 64:14
**age** 75:19 76:24 77:7
77:14,15,18,19,21
78:1,6 88:7,20
89:19,23 90:5
101:11,12,19 102:1
**agent** 47:5,15 70:19

**agents** 17:10,18 20:5
26:6
**aggregate** 66:19
**ago** 7:1,3 48:13
52:17,17,22 96:19
103:12,13
**agree** 10:6 54:1
56:13 74:25
**agreed** 10:3 12:12
39:5
**ahead** 43:3 53:9
68:19 71:2 103:9
**allow** 43:25 80:13
**almost** 37:15 61:22
**already** 13:8
**always** 60:21,23
67:12,16
**ambiguities** 15:19,24
**ambiguity** 95:22
**ambiguous** 15:16
**among** 49:20
**amount** 35:22 36:10
59:20 66:19 71:13
87:8 110:23 114:5
**amounts** 35:18
**analyst** 5:19 18:5
22:15 36:6,19 41:7
35:25 40:8 53:17
91:25
**annotations** 96:14,17
96:20
**another** 6:17 44:22
61:5 68:25 78:14
82:6
**answer** 4:18 18:8
44:7 45:23 68:21
68:22,23 70:1
88:12 102:5 112:25
113:24
**answered** 41:11
**answering** 56:1
110:14
**anybody** 7:12 16:5
20:22 35:9 38:9
51:21 58:12
**anyone** 11:4,5 15:14
20:13,18 23:10
45:10 46:17 47:8
**anything** 9:9,12
24:23 29:24 38:14
39:15 46:3 48:8
51:9 76:5,21 86:10
87:13 99:8 107:9
**Anytime** 94:8

**Anyway** 40:16
**anywhere** 87:17
113:3
**apologize** 108:19
**apologized** 108:22
**appalled** 37:11
**apparently** 44:25
45:17 66:9 72:4
96:20 103:5 106:13
**appear** 45:3
**APPEARANCES**
2:1
**appears** 57:22 74:6
89:6 94:22 105:3
110:6 112:5,18
**append** 56:5
**appended** 56:7
**applicability** 97:11
**applicable** 27:9
76:24 82:18 83:2
83:14,16,22
84:4 93:21 98:18
**applicants** 7:23
**application** 8:2
101:3
**applied** 27:15
**applies** 75:12 95:6
110:5
**apply** 11:17 89:25
91:4 94:25 95:4
**appreciate** 67:9
115:9
**appreciated** 67:5
**appropriate** 36:22
42:18 51:15,17
**appropriately** 81:6
**appropriateness**
41:9
**approve** 36:20
**approved** 8:4 11:14
85:12
**approving** 7:23
**approximate** 28:13
**Approximately**
91:19
**April** 41:24 42:2,10
42:11 55:3 103:13
107:2
**area** 5:6 7:17 25:14
34:16 69:14
**areas** 11:10
**argument** 74:24
**arise** 46:17
**arrived** 21:21
**asked** 16:17 30:2,8
30:13,16 39:4

59:14,17 60:19
63:16 88:14 89:2,3
92:21 105:11
**asking** 11:9 17:4
67:6 102:7
**asks** 65:3,11
**aspect** 45:6
**asserts** 28:19
**assets** 99:15
**assigned** 24:24
**assist** 20:24 115:10
**assistance** 67:5
**Assistant** 34:8
**Associate** 22:19
**Associates** 68:16
70:17
**Association** 22:16,21
**assume** 35:15 46:12
58:8 84:2
**attach** 115:13
**attached** 87:19
**attention** 16:19,22
23:23 28:22 64:21
71:25 72:21,23
92:22 98:16 115:9
**attest** 22:24
**attorney** 38:21,22
39:14
**audit** 52:1 81:5
**audited** 80:25
**auditing** 81:12
**August** 94:12 108:1
**authored** 17:14,17
111:2,6,8
**authoring** 8:18
**automatically** 81:16
81:16
**available** 60:1
**aware** 20:24 99:2
**a.m** 1:15

**B**
**B** 2:15 14:18
**back** 9:1 23:4,8
36:12 38:6 40:8
43:20 45:5 46:21
46:24 54:15 57:18
61:18 69:20 72:18
73:6 93:6 100:20
106:18,19 107:2,8
**based** 19:18 29:6
34:2 36:21 55:6
68:5 73:15 81:17
98:15 99:25 101:8
101:9,10,15 111:12
**basic** 54:11,19 81:23

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 119

| | | | | |
|---|---|---|---|---|
| 82:3,15,23 83:13 | 44:4 54:11,14,19 | 56:16 57:14 94:3,6 | **Carolina** 1:1,14 2:6 | 44:3 45:6 48:24 |
| 83:21 94:17 | 59:20 63:2 66:20 | 111:25 112:4,5,10 | 3:7,11 6:23 117:1 | 50:16,23,25 51:3,3 |
| **Basically** 17:20 | 69:9,11 70:7 72:2 | 112:15 | **case** 1:5 39:14 41:5 | 51:13,18 52:7,19 |
| 22:22 | 73:2,17,20 74:8,8,9 | **bolded** 100:24 | 41:13 42:4 45:18 | 53:4,6,18,19,24 |
| **basing** 38:16 | 74:21 75:1 76:2 | **booklets** 23:1 | 79:17 83:17 91:8 | 54:4 55:15,16 59:1 |
| **basis** 26:24 27:6 | 77:4,5,8,13,20,25 | **books** 22:17 | **cause** 54:25 | 59:14,21 60:8,11 |
| 47:16 58:7 63:3 | 78:3,6 82:15,23 | **boring** 109:18 | **ceased** 12:9 | 60:15,22 61:6,9,10 |
| 68:22 84:8 95:16 | 83:13,21 84:6,8 | **both** 32:22 41:5 57:8 | **ceasing** 12:22 | 61:11,15,21,22 |
| 98:22 100:5 105:11 | 87:7,8,25 88:3,6,17 | 108:18 | **Center** 2:8 6:21 | 62:4,17 63:7 64:10 |
| 105:16,17,20,21 | 88:18,25 89:3,10 | **bottom** 73:10 | **Central** 21:16 | 64:14 65:2,9,25 |
| 109:1 | 89:13,18,23 90:4,6 | **bought** 101:16,20 | **certain** 16:19,22 | 66:2,8,18 67:4,13 |
| **Bates** 32:8 56:6 59:2 | 90:6,13,19 91:4 | 102:3 | 35:18 39:21 72:10 | 67:15,18,19,25 |
| 59:22 62:7 64:23 | 92:9,15,17 93:20 | **Boy** 46:3 | 75:19 | 68:2,9,17,20 69:2,4 |
| 65:20 67:1,20 | 93:21 94:9,9,17 | **Brann** 5:20 6:9,11 | **certainly** 16:21 | 69:13,17,19,20,22 |
| 68:11 71:6 100:23 | 97:6,7,21 98:2,4,17 | 7:19 | 96:13,16 105:16 | 70:22,25 71:20 |
| 111:17,23 | 101:12,16,19 105:3 | **Brann's** 94:22 110:7 | **certify** 117:5,11 | 72:14,19 78:19 |
| **bear** 31:19 56:8 | 110:18,19,20,21 | **break** 31:13 78:10 | **chain** 5:2 | 79:4 80:25 81:17 |
| **bearing** 70:8 | 112:16 113:9,10,16 | 82:22 | **chair** 37:13 | 81:17 85:22 93:5 |
| **bears** 24:19 | 113:19,20,20 114:3 | **Brief** 31:15 78:12 | **change** 13:9,11,22 | 93:11,16,17,18 |
| **became** 90:1 108:19 | 114:4 | **briefly** 3:6 | 115:16,19,22,25 | 95:8,11,12,13 98:8 |
| **become** 77:7 90:4 | **benefits** 9:25 13:7 | **broken** 81:22 82:9 | 116:3,6,9,12,15,18 | 99:8,21,24 100:3,4 |
| **becomes** 96:4 99:9 | 14:21 29:21 36:15 | **Brother** 86:23 89:17 | 116:21,24 | 103:6,7 106:22 |
| 113:4 | 41:19 43:11 44:6 | 108:10 109:25 | **changed** 12:3 55:2 | 107:1,3,7,18 |
| **becoming** 87:20 | 44:17 49:19 54:23 | **brought** 23:23 | **changes** 13:7 115:5 | 112:19 113:2,5 |
| 98:18 | 55:2,6 56:25 57:18 | **Buddy** 102:11 | **Charles** 49:11 | **claimant** 36:8 51:17 |
| **before** 1:12 4:16,18 | 69:16 71:8 72:2 | **bunch** 18:12 31:12 | **check** 36:2 41:5 53:5 | 51:22 52:2 |
| 17:24 21:8 34:11 | 75:19,23 77:3 79:5 | 85:16 92:4 | 53:8 63:10 64:7 | **claimants** 31:7 67:12 |
| 36:2 40:14,16 45:8 | 79:8 80:13 81:23 | **business** 12:10,16,23 | **checks** 41:2,5 42:17 | 67:17 71:18 |
| 45:11 46:2 48:7 | 82:3,7,9 87:10 | 21:4 67:11 99:17 | 46:10,11 71:15 | **claimant's** 60:22 |
| 50:11 60:22 61:8 | 89:13 92:7 95:6,23 | 104:10,11 | 108:16 | **claimed** 98:10 |
| 61:13 62:3 67:13 | 97:8,12,17,20,24 | **buy** 83:3,4,5,8,9 | **choose** 8:6 83:4,8 | **claiming** 72:17 |
| 67:17 70:7 71:4,19 | 98:13,21 99:3,11 | **buying** 106:4,7 | **chose** 71:23 | **claims** 5:5,6,7 7:6,14 |
| 72:10,24 77:7,14 | 100:6,6 102:2 | | **Chris** 3:23 23:10,11 | 7:16,18 18:5,19 |
| 77:21 78:1 79:21 | 103:18 104:23 | **_____** | 23:17 65:2 | 20:19,25 21:18,24 |
| 88:13 90:1 96:3,7 | 105:18 110:5 113:6 | **C** | **Christopher** 1:6 | 22:1,8,12,16,19,22 |
| 108:6 109:4 114:13 | **best** 38:25 48:10,20 | **C** 117:1,1 | 68:13 70:14 | 23:2,2,3 24:7,11 |
| **began** 89:20 95:12 | 48:23 | **calculate** 112:16 | **chronic** 46:19 47:10 | 26:17,20,25 27:12 |
| **begin** 42:6 56:14 | **better** 63:21 100:16 | **calculations** 2:18 | 47:15,21 | 28:2,8,14 32:4 33:4 |
| 76:25 77:14,21 | 107:20 109:2 | **call** 3:18 69:25 | **chronological** 32:7 | 33:13 34:16,19 |
| **beginning** 1:15 64:23 | **between** 5:3 25:2,3 | **Callaghan** 50:3,5 | **Cincinnati** 2:3,9 | 35:16,17,21,25 |
| 64:24 77:15 | 40:6 49:2 91:25 | 51:7 52:18 54:2 | **circle** 112:9 | 36:6 40:11 41:6 |
| **begins** 78:1 88:21 | 113:14 | 55:10 | **circled** 112:12 | 42:25 52:13 53:16 |
| 102:1 | **beyond** 98:6 | **called** 3:20 37:19 | **circumstance** 61:20 | 58:10,19 67:8 |
| **behalf** 20:20 36:21 | **Big** 86:22 89:17 | 38:3,9,14 39:4 73:9 | **circumstances** 61:10 | 91:16,17 95:17,19 |
| 50:2 51:24 | 108:10 109:25 | 82:7 | 61:11 62:5 67:15 | 99:14,15,25 |
| **being** 1:11 3:1 14:4 | **Bill** 32:20 96:12 | **calling** 3:18 37:24 | 67:19 69:25 | **class** 101:11 |
| 20:24 28:2 29:6 | 100:14,18 109:8,17 | **calls** 103:8 | **civil** 1:12 102:16 | **clean** 30:10 |
| 35:22 69:4 81:6 | 111:11 | **came** 6:4 9:22 13:6 | **claim** 2:17 3:22 4:8 | **client** 109:8,21 |
| 82:10 85:19 95:1 | **Billy** 109:25 | 17:20 21:17,20 | 4:12,22 6:4 17:1 | **close** 71:25 72:23 |
| 100:4 102:21 | **birthday** 76:18 77:1 | 37:14 38:5 43:20 | 23:11,22 24:5,5,10 | **clue** 48:16 |
| **belief** 48:20,23 | 97:23 98:6 | **capacities** 10:16 | 24:14 28:5,5 29:2,8 | **Clyde** 21:11,19 |
| **believe** 33:6 50:14 | **bit** 82:22 | **capacity** 22:9 32:12 | 29:9,11,13,17,18 | **code** 102:16,17 |
| 56:7 60:20 | **blank** 32:17 | 32:14,21 33:12 | 29:20,24 31:18 | **COLA** 14:21,23 44:1 |
| **believed** 108:23 | **blessed** 19:22 84:15 | 47:9 | 32:7 33:17 35:9,11 | 44:5,9 54:21 83:5 |
| **below** 115:6,11 | **blue** 112:12 | **caps** 100:25 | 35:19,25 36:20 | 91:2,3,3 93:21 94:2 |
| **benefit** 11:18 24:11 | **Bob** 4:25 5:5,23 35:3 | **care** 38:9 96:10 | 40:2,9 42:19 43:7 | 94:9,11,13,25 95:1 |
| | | 115:5 | | |

**Reported By: Rebecca J. Huddy**

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Case 1:02-cv-00479-MRB    Document 186    Filed 09/06/2007    Page 33 of 46

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 120

95:4,6 97:4,9,12
100:6 103:18
105:12 108:18,24
110:5
column 75:20 76:5,9
76:11,13,16 92:23
combination 89:12
come 11:13 12:25
13:17 14:16,20
18:14 19:2 28:22
41:20,24 45:19
76:15 85:20 97:18
comes 72:17
comfortable 3:17
coming 22:15
command 5:2
comment 10:22
49:23 110:2
comments 11:9,12
17:23
Commission 114:17
117:21
commissions 70:16
70:18
commit 12:17
commonly 16:2
communication
51:12,16 52:5
communications
49:2 50:22 52:8
companies 25:2,3
27:3,4,5 47:5,19
50:7 51:25
company 1:3 2:5 5:7
6:12,17 11:10 13:4
13:11,12,13,18
14:16,20,25 18:12
18:13,16 19:12,14
19:23 20:16 21:11
21:14 23:5 25:4,6,6
27:14 28:19 30:19
30:23 31:4 32:15
33:2 34:11 38:19
38:20 42:24 45:8,8
45:15 50:3 62:22
73:16 75:9,10,13
76:14,23 84:14
85:12,17 103:12,14
105:14 106:9
company's 36:21
compatible 10:20
competition 10:20
competitive 12:19
15:7
compile 31:19
compiled 32:4 64:19

complain 109:11
completed 22:18
completely 40:9
complied 66:1
computer 8:3 70:6
70:16,20
concededly 100:4
concept 16:5
concern 48:2,4,5,9
48:17
concerning 70:15
conclude 45:10
concluded 69:21
114:9
conclusion 41:21,24
43:21 85:20 97:14
97:18 98:14 102:23
condition 38:13
47:17 48:1,18
confined 37:13
confirm 59:24 62:13
confirmation 38:17
confirming 67:9
conflicts 52:24
confused 44:15
77:20
conjecture 80:15
consecutive 97:16,21
98:9
consenting 109:13
considerably 12:4
consideration 67:4
103:6
considered 27:20
construe 15:24
construing 15:19
contact 43:7 46:9
47:21 52:20
contacted 30:19 52:4
66:3 72:16,17
contacting 72:7,8
contained 113:11
containing 61:2
65:23
contains 57:8
content 55:18
contestable 54:21
continuance 97:22
99:11
continuation 93:17
93:18 103:7
continue 89:9
continued 44:25
continues 67:8
continuing 81:10
contract 13:10 27:10

33:7,11 47:23
72:11,12,21,23,25
84:9 95:23 98:15
101:2 105:18
108:21,23
contractor 47:7,14
contracts 33:14,16
contradictory 52:16
contrary 105:3
control 36:3 39:22
70:10 81:3,5
conversation 37:18
78:24 79:6,12
conversion 27:19,21
copies 30:3,12 65:21
100:14
copy 65:15 68:14
73:24 87:4 100:19
109:12 110:3
copying 49:11
corner 112:2
corporate 67:21
70:17
Corporation 50:19
52:12 58:16
correct 3:24 7:11,20
11:16,19 19:11,17
29:15 31:9 32:14
36:5 40:13,17,18
40:21,22 41:1,4
42:14 43:8,9 44:6
50:4,7,8 55:23
57:10 59:6 60:6
64:1 65:9 66:13,17
70:8 71:13 74:11
74:12 75:5,15 77:8
78:5 83:7,10,15
84:23,25 85:1,3,12
86:7 88:6 90:11
100:1 101:23,25
105:23 106:7,20
111:15 112:14
corrections 115:5,11
correctly 8:11 10:11
54:7,9 61:21 84:24
104:3,9
correspond 58:17
correspondence 2:17
2:18 64:19
cost 54:13 108:17
counsel 20:18 49:15
52:20 91:15 92:21
95:12 112:25
117:11
COUNTY 117:2
couple 31:12 34:18

78:10 82:5
course 22:18 42:16
61:6 62:1 71:4
courses 22:21
court 1:9 1 46:24
61:18
courts 15:18,22,24
cover 53:10 108:16
coverage 69:10 92:8
101:2
covered 27:7
covering 55:5
covers 72:15
CPA 50:5 69:3,4,7
72:8,8
create 17:19 18:1
19:2,9,20 75:10
84:16,20
created 9:9,10,12
11:22 12:2 13:1
17:21 20:5 25:15
84:13
creating 8:18 15:1
17:18
creation 9:17,20
86:14
Creative 6:21
criticize 39:15
current 29:22 113:14
currently 54:25
cut 112:25
C-1-02-479 1:6

D

D 2:11
daily 34:2
Dame 38:25
data 8:13 30:20
date 4:9 15:4 35:10
55:4,18 58:3 72:18
73:10,13 76:18
103:15,19
dated 49:8 56:10
58:2 59:24 64:24
64:25 66:14 68:12
70:11 71:6,15
76:22 107:1 108:1
dates 34:10
David 58:9,11,12,14
58:15
day 1:14 4:4 19:1
25:8 66:2 79:21
93:6,12 114:13
117:16
days 23:20 46:10,11
59:13 60:15 63:22

71:8,9 72:19 80:2
80:10 89:21 96:19
Dear 68:12 70:13
decades 80:21
December 60:4
62:10,21 63:3
64:22 66:24 67:1
67:20,25 68:10,14
69:5 70:21 99:22
decided 13:4 14:16
decision 9:24 12:11
12:21 13:21 15:5
21:4,7,9,10 36:4
38:16
decree 22:20
deduction 26:24 27:6
deemed 113:17
defendant 1:7 2:7
39:13,14
Defendant's 2:17
31:16 58:23 64:17
73:6 111:21
defined 89:4 113:21
definition 87:23 88:1
88:5,16,16,18,25
89:3 90:2,2,3,10,13
90:17,18,21
degree 31:20
delay 60:7,14
demand 61:7 63:21
71:7
department 7:7 8:12
9:3,7,23,24,24 10:1
10:7,16,21,25 11:2
11:4,5 13:1,2
17:21,22,23 18:22
19:8 21:18 22:8
26:12 27:12,23
28:2 30:23 34:19
43:1 46:9 58:10
63:7,23 64:12
71:10,19 86:9,9,13
86:15 91:16 104:5
104:14 105:5,14
departments 10:3,4
11:7 19:19
depends 25:22 60:23
61:10 62:5 67:15
67:19
depict 104:25
depose 37:11
deposition 1:10 3:7
4:16 16:10 38:1,16
39:11 59:23 114:9
115:3,4,7,8 117:6,7
depositions 37:22

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion,  1230 W.  Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 121

depression 46:19
47:11,15,22 55:2
**Description** 2:16
descriptive 82:6
deserving 72:11
designation 22:18
24:19
designed 86:8
desire 51:16
desired 8:14
desk 22:25
determination 19:13
109:1
determinations
33:17
determine 36:14
61:25 65:10 66:20
69:16 72:2
determined 40:4
42:17 43:19
determining 36:1
69:15
developed 23:4
95:20
developing 19:20
dialogue 35:8 109:21
died 37:15
difference 39:2,10
74:7 89:2 113:13
different 11:9 12:1
13:14 27:13 42:21
44:10,14 46:4
74:24 83:18 84:3
84:13 88:8 90:15
90:15 91:5,7
101:20
differently 15:22
difficult 12:15,18
29:18,21 91:23
difficulty 80:18
93:22
dinner 16:16
direct 16:19 64:21
70:2 85:8 92:22
98:16
directed 16:22
direction 18:16
directly 7:12 30:20
52:16 98:25
disabilities 77:13,21
disability 2:17 3:22
5:25 6:1,7 7:4 9:15
9:17,20 10:12,22
11:1,21 12:1,6,15
15:1 20:13 21:4
22:2 23:2 25:25

26:4,7,13,16,23
27:25 29:21 32:24
33:3,7,14 34:23
40:11 43:11 44:3
50:6,12 51:25
54:14,20,23 55:2,4
56:14 59:1,20 68:3
68:5 69:9,10,13,14
72:1,18 73:2,9,17
73:20 74:5,11,14
75:1,3,4,11,15,17
75:19 76:14,15,22
76:23,25 77:2,15
78:1 79:4 81:10
82:11,13,14,23
83:6,8 85:15 87:10
87:14,17,22,23
88:1,2,4,6,8,9,15
88:17,19,21,22,23
89:1,5,8,9,10,12,13
89:20,21,22 90:3
90:10,14,14,15,21
91:4,17 92:15,16
93:21 94:2 95:5,8
95:13,25 96:4
97:20,23 98:4,6,21
99:4,17 102:1
105:3 107:8,18
108:1 110:16,17,20
110:21 111:10
113:2,3,4,5,8,12
disabled 77:7 82:19
83:20 89:11 90:1,5
97:15 98:10 99:9
99:10
discontinued 14:1,3
15:15 21:6 104:11
discontinuing 15:2
discuss 16:5,10,12,12
16:23 37:17 47:7
79:24
discussed 9:23 16:14
17:3 24:15 40:10
40:14 56:1 81:19
99:16
discusses 76:6
discussing 46:16
48:24 52:10 99:15
113:1
discussion 103:5
discussions 23:17
103:11
disk 19:6
disorders 54:15
disregarded 72:20
distributed 91:25

distribution 20:5
**DISTRICT** 1:1,1
division 1:2 5:10,14
5:16 6:8 8:12
24:25 32:23,23
33:5
divisions 5:11,12
**DMS** 107:9
doctor 93:10 106:15
106:20,21 107:2,4
document 16:13 17:3
31:25 40:10 51:2
51:12,16 62:12
63:14 68:2 73:9,11
74:6 93:5 96:6,7
108:10
documented 53:18
documents 24:2,3,4
24:9 29:7,13,25
108:8
doing 3:15 16:7
38:19
done 15:4 54:8 74:22
75:8,22 86:15 91:9
doubt 44:16
down 40:17 82:22
**Dozens** 11:24
draft 10:21 11:6,8,14
85:12
drafted 84:14
drafter 15:25
drafting 8:18
drafts 11:13
drinking 17:8
drinks 16:16
drive 3:11 13:21
due 15:7 76:15,18
95:24
duly 3:2 117:5
during 5:3,8 9:10,13
11:21 25:9 31:4
32:15 50:9 62:3
65:8,18,24 70:21
71:24 74:11 76:15
89:8 94:15 97:22
100:2

_____

**E**

E 2:11,15 115:1,1,1
117:1,1
each 19:12 39:22
40:19,20 41:5
42:16 54:25 68:6
77:12 89:11 97:25
98:3 99:25
earlier 24:15 29:12

35:13 63:10 76:21
81:20 84:12,17
86:17 89:24
early 14:25
earn 47:9
earning 70:5
earnings 56:22 59:18
61:2 65:8,18,23
66:16,20 67:22,24
68:6,15 82:20
easier 109:9
educate 9:19 43:4
educated 43:1 85:3
education 18:17,25
19:14,18
effect 101:20
effective 54:10,17
108:19
effort 50:2 75:10
eight 79:25 80:5
either 18:13 30:6,8
30:18 74:15 94:22
100:5 110:6 111:5
111:19,19
eligible 96:4
elimination 87:21,23
101:12
Ellis 2:2,13,14 16:8
29:25 40:11,15
42:21 43:1,3,4
45:20,22,24 46:20
47:24 52:3,21
73:19 78:9 79:6,9
79:11 80:23 84:18
86:20 88:12 89:16
91:10,13 96:9,13
96:16,24 97:2
100:15,19 102:9,11
102:13 103:1,23
104:7,19 105:10
108:5,11,13,25
109:10,15,19,22
110:3 111:14
112:23 114:6
Ellis's 111:11
employed 5:22 6:10
21:11 30:22 34:17
37:1
employee 21:14
27:11 67:9
employees 18:12
19:15 27:4,5 52:14
67:11,23
employee's 19:13
employer 27:10,16
**Employers** 50:19,20

50:23 51:5 52:5,11
52:20 58:15
employment 5:9 31:5
50:10 63:5 117:12
enclosed 65:22
enclosing 65:21
68:14 71:15
encouraged 22:15,20
end 55:7 61:14 72:16
engaged 20:19,24
69:4
engagement 50:15
engaging 12:9 50:2
enough 66:9,12
enroll 22:15,20
entered 5:1 8:2
entire 24:7
entitled 44:9,17 87:9
98:19 99:3,10
108:24 113:8,9
entitlement 113:5
equal 89:13
**Equifax** 31:8 53:5,8
53:12,19,24
**ERISA** 27:7,8,12,13
27:15,18,20,21,23
**Ernie** 53:10
errata 115:13
erroneously 54:18
103:21
error 41:13 72:4
78:4
errors 43:2
establish 59:19
evaluate 10:17
evaluation 30:24
64:9
even 4:18 42:4 60:17
73:4 98:10 111:2
evening 40:11
events 13:4 65:1
ever 9:6 12:25 13:11
13:17,24 14:3,16
15:14 16:5 19:25
20:3,13 28:22,25
45:8,11 46:16 47:7
49:14 50:11 52:18
80:25 92:18 95:13
95:24
every 16:21 40:4,9
40:20 41:2,2,5 45:2
45:3,6,6 105:15,21
everybody 18:14
everything 17:9
29:16 51:2 82:24
83:20 113:24

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 122

evidence 102:15
exactly 10:7 11:23
  37:18 110:22
examination 1:10
  2:12,13,13,14 3:4
  91:13 104:1 112:23
examined 3:2
example 14:23
exceeded 26:25 40:2
except 44:4 57:13
  93:20 112:3,5
excess 34:13
excluded 54:15
executed 59:4
exhibit 31:16,21 35:1
  40:10 43:6 49:6
  56:5,7 58:21,23,25
  59:11 62:7 63:12
  64:17,20 66:22
  71:14 73:6 74:4
  76:16 77:10,10
  81:18 92:2,2 99:21
  100:10,15,24
  102:25 103:15
  107:25 109:22
  110:1 111:21,23
  112:9,13 113:25
exhibits 95:16 96:11
  107:11
exist 102:15
expenses 70:7,17,20
experience 3:22
experienced 22:14
expertise 69:14
expires 114:17
  117:21
explain 70:6
explaining 54:3
explicit 80:19
explicitly 74:10
  75:13
express 44:15 49:14
expressed 39:17 48:3
  48:14,17
expressly 43:24
extent 29:11,23
  81:12

_____ F _____
F 93:4 117:1
fact 51:22
facts 42:18 55:13
factually 15:9
Failing 98:12
fairly 34:1 56:23
fall 73:2

familiar 41:18 42:4
familiarize 31:7
far 7:8 21:23 26:25
  51:8 99:22 100:2
Farabow 2:4
favor 38:19
fax 53:10 55:22
faxed 55:25
February 35:2,11
  43:5 46:8,13 57:5
  60:5 63:7,21 69:5
  70:19 71:6,15
  93:13
Federal 1:12
feel 3:15,17 33:12
  66:9 107:20,23
  109:2,4
felt 34:1 63:4
few 31:22 52:22
  91:10
field 12:15 17:11,18
  20:6 26:6
Fifth 2:8
figure 67:22,22
figures 26:2
file 24:5,5,7,10,14
  31:18 32:5,7 50:23
  50:25 51:3,13,18
  52:7 53:6,18,19,25
  55:15,16 58:1,5,17
  58:20 62:17,20
  63:6 64:14,15 69:4
  69:17,19,22 70:1
  112:19
filed 3:22 6:4 10:3
  13:1 61:22
files 65:2 80:25 81:5
  81:9
final 11:14 71:11
  85:11,11 93:5,7,10
finally 84:15
financial 30:20 52:1
  61:13
find 115:5
finger 114:2
finish 4:17 9:20
  89:16
finished 102:9
firm 50:5 51:24
first 3:1,18 32:7
  34:17 35:1 36:2,7
  41:7 42:7 43:6,7
  52:18 61:14 74:4
  76:9,11,12,13
  87:12 92:13,15
  94:11 98:4 102:20

108:2
five 5:8 52:17,17
  82:5
folks 17:15 18:4,5,23
  30:23
following 63:21
  76:18
follows 3:2
foregoing 117:8
form 15:3 19:22
  24:24 25:23 40:15
  52:3 56:17,18
  84:15 86:2,4 93:5
  93:11 101:5,10
  104:7,19 105:10
  106:22 107:1,3
  111:14 115:11
formal 81:7
forms 59:17 65:16
  95:11
forward 92:22
found 86:2 101:5
foundation 92:6 99:7
  99:24 103:9 108:25
four 5:3 42:11,13,13
  43:24 44:10,18 45:4
  45:19,21 59:13
  63:22 71:9 79:25
  80:5,12 82:5,9
  105:15,21 107:21
fourth 70:12
frame 5:4 23:7
franchise 26:23
  27:25
frauded 106:3
frequently 26:17,20
  32:10
from 8:2 9:22 11:9
  14:3 17:20 19:9,19
  20:8,18 26:8 27:21
  29:17,24,25 32:4,7
  33:25 35:2 36:8
  38:24 40:25 42:8
  46:19 47:10,15
  49:7 52:11,11 54:2
  55:3,5,20,22 56:20
  59:18,24 60:12,20
  60:21,24 61:2,12
  62:2,8,9,14,14,21
  65:7,17,23 66:15
  66:24 67:11,17
  68:11,15,25 69:20
  70:12,19 76:2
  84:13 85:7 88:15
  90:2 91:5 92:21
  95:11 96:5,7 98:24

98:25 100:3,3
101:21 103:4
106:20 107:14
109:23
front 17:7 46:1,2
  100:10 109:7
full 44:4 55:6 64:15
  94:17 110:17,19
  113:10
fully 18:10 19:6
function 8:21 10:14
  27:13 81:12
functions 7:25 33:2
funny 108:14
furnish 115:13
furnished 72:14
further 2:13,14
  51:25 67:3 104:1
  112:20,23 117:11
future 14:23

_____ G _____
game 102:13
gave 30:9,15 53:2,3
  53:24 63:18,19
  66:11 70:1 100:20
  110:3
general 34:25 36:13
  52:9,13 69:18
  78:21
generally 8:16 9:22
  33:23 69:11,11
  71:18 80:18
gets 70:7 113:18
getting 31:8 65:10
give 3:20 4:18 16:11
  30:12 39:10 47:18
  68:22 73:5 76:24
  106:8 109:10,14,15
  109:22 113:25
given 4:16 19:1 24:7
  24:10 33:7 53:21
  67:4 93:7 104:21
gives 18:16 67:21,22
  114:4
giving 48:17 109:13
glasses 82:1
go 3:11 8:23 13:10
  18:11 31:23 36:12
  38:2 40:8 43:3
  45:5 63:22 71:2
  93:6 97:2 103:9
  107:2,8
goes 23:8 36:17
  75:14 85:15
going 4:19 14:17,17

14:21,22 16:11
  35:13 37:11 42:17
  56:4,6 62:6 63:22
  64:13 71:9,18 72:6
  72:24 78:9 102:11
  109:20,23,23
  113:23
gone 31:18
good 12:21 33:6,13
  34:1,5,22 36:24
  37:4 63:13 107:23
  109:4
gotten 105:12
graduated 38:24
Graydon 2:7
greater 110:16
  111:10 112:6 113:1
Greene 1:13 2:5
Greensboro 1:14 2:6
  3:7,11 6:23 21:17
  21:21 37:22
gross 67:22
group 6:8 8:12 27:9
  27:15,19,21
guess 19:21
GUILFORD 117:2
guy 108:15

_____ H _____
H 2:15 115:1
half 9:5,13 12:3
  82:24
hand 73:7 100:18
  112:6
handing 73:6
handle 8:7 27:12,23
  33:6
handled 27:13
handling 23:2,22
  91:16
handouts 23:1
handwriting 33:5,6
  56:8 57:9 94:21
  110:4 111:17,23
  112:10
handwritten 2:18
  59:10,10
happened 14:25
  45:11,17 46:5
  91:24
happening 45:13
Harden 4:25 5:16
  6:9,11 7:19 37:8
  40:24 79:18
Harden's 94:23
  110:7

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 123

hardly 37:13
Harold 4:25 5:5 80:2
  111:25 112:3,8
having 16:16 20:3
  40:14 50:11 51:8
  93:22
head 2:7 19:8 21:18
  26:2 33:24 42:25
  55:14 105:14
heading 82:7
health 5:13 22:19
  24:25 25:1 32:18
  32:23 79:1
hear 46:20 104:4
heard 106:20
hearing 5:1 93:23
help 5:2
her 6:24 38:9 67:24
  79:20,22,24,25
hereunto 117:15
hierarchy 5:3 6:4
highly 12:16,18
him 8:24 31:2 33:1,3
  37:11 38:1,6,14
  39:8 46:1,3,14,18
  47:6 49:19,22
  51:23 53:8 54:3
  56:13 58:17 62:11
  62:22 65:12 66:25
  69:1,20 71:9,12
  72:10 78:18,19,24
  79:2,17 80:4,5,7
  88:12 89:16 96:5
  96:19 102:19 106:3
  106:6,8,8 108:9,9
  108:10 109:9,10,14
  109:14,15,17,22,23
  113:24,25 114:1,2
hired 19:1 52:18
historical 24:1
history 16:25 46:2
  73:15
holding 71:8
home 3:9 32:22 33:5
Honaker 21:11
hopefully 18:15
hospital 27:20 37:16
hour 37:25
hours 78:17
house 37:14
house-confined
  37:12
Huddy 1:13 117:4,19
humerous 108:15
hundred 27:17 28:14
  28:14 117:8

hundreds 28:8,11
husband 37:24
H-493029 54:10
H-538069 54:17

                I

idea 5:12 11:23 53:7
  105:7
ideas 9:22
identification 31:17
  58:24 64:18 111:22
identified 13:24
  91:15 97:5
identify 13:14
immediately 30:3
impact 47:8
implications 46:17
  47:13
imposition 37:25
  38:10,15
impression 95:7
improve 15:11
Incidentally 37:10
included 62:14
includes 54:13,20
including 54:24 65:6
  65:16 95:11
income 10:12 12:15
  20:8 29:22 55:6
  61:8,24 62:3 63:5
  67:11,16,17,22
  68:17 69:15,15,15
  70:9 113:13,14,15
  113:15
inconvenience 38:8
incorrect 106:13
increase 97:12,16,23
  98:12 108:17
increased 83:5 87:7
  97:22 98:5
Increasing 97:8
incurred 70:19,20
independent 23:21
  30:24 45:9,12 47:7
  47:14 52:14 70:18
  88:5,15,15,16,18
  90:2,12,14
index 114:2
indicate 32:5 93:16
  93:18 94:1
indicated 54:16 93:6
  93:10 106:14
indicates 93:20,25
  99:25
Indicating 58:22
  59:11 60:10 62:11

66:23 73:8 74:5
  76:10 78:8 87:5,12
  100:22 103:3
  107:12 110:1
  112:11 113:22
indication 69:3 94:3
  94:16
individual 5:13
  24:24 25:1 27:11
  32:11,18,23 45:9
  60:24 91:16
individuals 10:15
industry 12:3,5
informal 81:8
information 8:2,5
  36:7,11 53:1,3
  60:17,24 61:12
  62:1,11,14,23,25
  63:4,18,19,24 64:4
  64:6,9,10,11 65:10
  65:13,13 66:4,10
  66:25 67:6,13,25
  69:1,2,12 70:4,5,15
  72:13 86:2 101:5
informed 80:4
initial 11:6 24:25
  36:16 40:20 54:25
  60:11 61:23 67:13
  70:4 93:1
initialing 40:19
initially 35:16,21
initials 3:12 40:17,23
  40:23 45:3,5 93:14
initiating 52:6
ink 112:12
innovations 13:23
input 10:17 19:8,19
  84:13 85:6 86:11
instruction 52:19
  65:4
insurance 1:3 2:5 5:7
  5:14 10:4,13 11:1
  11:15,21 12:2,6
  13:1,2 15:18,25
  17:10 21:5 22:1
  23:5 24:25 25:6,6
  26:4,7,13,16 27:9
  27:15 32:18,25
  33:4,7,14 34:23
  38:19 46:9 50:6,13
  51:24 59:1 63:7,23
  64:12 71:10,19
  85:25 101:1,4
  102:21
insured 36:21
intake 8:13

intend 38:10
interest 51:6
interested 117:13
internally 80:25
International 22:16
  22:19
interpretation 83:22
  83:25 106:13,14
interpreted 15:22
  18:6
investigate 31:7
  51:17,25
investigated 51:23
investigating 51:6
investigation 52:6
investigative 31:9
involved 11:2 32:10
  42:5 72:7 85:16,22
involvement 35:11
in-depth 36:19
in-house 69:7 72:8
issue 7:14,21,22,24
  7:24 8:1,12 13:11
  28:22 72:24
issued 8:3 14:8,10
  17:24 18:6 41:2
  54:10,17 57:17
  72:10

                J

J 1:12 25:1 117:4,19
January 60:5 68:12
  68:18 69:5 70:11
  70:13,22
Jefferson 25:5,16
Jefferson-Pilot 1:3
  2:5 5:7,22 6:2,10
  8:22 9:4,10,13 12:5
  12:20,22 16:2,6
  17:17,20 18:4,18
  20:9,20 21:3,17
  22:4,11 25:20 26:8
  26:14 33:9 37:23
  38:18 46:18 47:10
  49:18 50:10 58:10
  84:25 86:6 89:9
  99:16 115:2
JL 3:12,14 57:12
job 36:24 37:4
John 1:10 3:1,10
  115:3 117:5,10
Johnson 69:7,20,23
judge 1:6 47:16
judgment 34:21 36:9
  47:13 90:24 104:21
judgments 33:17

July 21:6 42:7,8,8
  60:12,12 94:10
  117:21
jurisdictions 15:23
jury 3:8
just 3:6 7:6 10:8
  13:10 14:23 19:2
  19:12 28:11 33:3
  35:24 43:21 44:9
  44:25 48:3,13 52:9
  52:12,16,22 56:1,7
  61:3 64:13 74:24
  78:5,14,14,20 79:3
  79:4 80:15,20 83:4
  96:10 102:6,14
  108:3 112:25
  113:11,25 114:3
justify 100:5
juvenile 109:18

                K

Kearney 1:6 3:23 5:1
  23:11,17 28:20
  29:5,19 30:2,12,25
  35:2 40:5,12 42:17
  43:7,10,25 46:8,16
  47:18 49:7 51:7
  52:15 55:20,22
  57:1,17 59:4,13,24
  61:1 62:8,14 64:7
  65:2,5,13,19,25
  67:8 68:16 70:3,14
  70:17 71:22 72:9
  75:1 77:12 79:3,14
  79:22 80:14 85:20
  89:25 92:18 94:17
  98:9 99:3 101:15
  101:20 103:5,10,15
  104:22 105:12
  106:3,9 108:22
  112:17 115:2
Kearney's 4:8,22
  16:13 17:1 23:11
  23:22 28:5 29:2,7,9
  29:17 35:9,11 40:2
  48:24 50:15 51:12
  52:19 54:4 56:11
  58:17,25 62:10
  66:15 67:4 68:15
  68:17 71:7 72:8
  73:25 74:1,13,16
  76:21 78:19 81:19
  94:9 106:15 112:19
keep 102:11
Kentucky 21:16 25:4
kept 33:23

**Jefferson-Pilot Insurance Company vs. Christopher L. Kearney**
**John L. Roberson**

C-1-02-479
5/7/2004

Page 124

Kim 5:20 6:9,11
94:22 110:7 111:20
Kim's 94:22
kind 13:21 19:22
22:25
Kirby 3:10
knew 47:23 91:11
96:18
know 4:4,7,18 6:3,15
6:18,22 9:9,12,16
9:18 10:16 12:9
15:9 17:14,21
20:16 21:3,23
25:19 26:22 28:10
28:11 34:15 35:8
35:10 36:12 37:16
37:20 38:13,14
43:21 44:12 46:12
47:2 48:4,15 49:11
50:12 51:1,8 52:10
52:14 53:14,20,22
56:25 57:3,6,16,20
59:16 60:11 62:20
63:9 64:15,16
67:10 68:21,23,23
68:24 70:24,25
71:3,13 73:1,4,23
74:4 78:13 80:17
83:16 84:4,16,21
84:23 86:11 96:21
99:8 102:13 104:15
107:9 109:1 110:8
110:8 111:2,4,5,6,7
111:8,8
knowledge 10:12
34:5,22 36:13
45:12 48:10,20,23
99:24 104:20 110:2
111:12
known 16:2 39:5
55:13

_____

L

L 1:6,10 3:1,10 115:3
117:5,10
label 56:6 68:11
labeled 32:8 59:2,22
64:24 65:20 67:1
67:20 71:7
lack 99:14
laid 10:8
laminectomy 107:5
Lamping 2:2
language 10:17,18
10:19,21,22,25
13:5,25 15:11,22

17:23 44:15 45:10
45:16 80:19
last 4:4 5:8 6:24 9:1
16:8 17:4 23:10,20
37:14,15 40:11,15
42:21 45:20,24
46:24 55:4 61:18
78:18,24 108:8
later 38:17 55:1 57:3
57:4 59:16 60:15
60:17,18 62:6
94:20
lawyer 37:22 38:24
38:25 39:11,12
102:7 104:4,5
Leadership 6:21
leading 93:9 94:15
99:18 102:6,7,22
105:11
learning 47:14
least 7:2,3 11:25
24:16 89:21 100:23
leave 6:13 18:13
19:12 34:12
left 6:12,15 38:5
91:24 92:1 103:12
103:14
left-hand 40:17
legal 11:2,4 19:9
49:15 74:24 97:14
98:14 102:23
length 84:12
less 28:14 94:17
let 32:5 54:6 59:22
61:5 62:6 65:6,15
65:16 67:10 76:9
77:10 78:14 81:18
82:13 84:24 88:12
89:16 92:2 98:7
102:10 104:3
110:13 114:1
letter 35:1 43:6,13
46:8,13 49:4,6,22
49:23 51:9 54:1
55:10,15,18,20,23
55:25 56:1 59:24
62:9,13,17,18,21
63:3,10 64:25 65:5
65:14,19 66:14,24
67:1,2,3 68:11,12
68:14,19,24,25
70:11,12,15,25
71:2,3,6,14,14,17
99:20 103:4 107:25
letterhead 108:2
letters 13:14 24:22

25:17 31:19 32:7
32:11 62:8 72:9
let's 23:20 54:1
65:12 66:5 68:7
82:22 83:18 97:4
liability 61:25 65:10
lie 106:3,6,8,9,12
life 2:5 5:7,12 22:1
22:21 23:4 25:5,6
38:19 75:19 102:2
lifetime 77:8,16,22
78:6 101:18
like 3:13 24:25 29:16
64:21 66:3,9 73:14
92:22
likely 15:7
limit 76:24
limitation 89:2,22
line 12:10,15,18,23
21:6 104:11 108:3
115:6,14,17,20,23
116:1,4,7,10,13,16
116:19,22
lines 82:5
list 115:6
little 81:2 82:22
103:13
living 54:13 108:17
LLP 2:2
located 6:22 50:5
Loftin 80:9
LOMA 22:21
long 4:2 9:4 18:8
28:17 34:6,11
37:17 60:7 75:18
76:23 79:2 103:12
longer 6:11 89:19
long-term 63:13
look 24:1,3,4 45:5
76:9 77:24 81:9
87:16 95:15 100:9
looked 24:11,12 58:8
72:25 85:10
looking 29:25 41:16
43:13 68:19 95:23
96:3 100:23 101:14
101:24 102:25
103:4
Looks 73:14
lose 47:22
loss 24:13 82:19
110:16 111:10
113:1,13,15
lot 25:23 74:19 75:8
loud 108:4
lumbosacral 55:1

107:5
Luper 32:20

_____

M

made 9:25 15:5 21:4
21:7 26:17,20 28:2
28:5,8,14,19 41:13
42:21 44:19,20,23
45:9 46:4 60:3,3,4
60:4,5,12,19 63:2
64:5 72:4 79:8,24
80:5,7,12 94:3,11
96:22 100:1 102:18
104:6,15 105:20,22
107:13,15,21
109:11 115:6
mailed 8:4
maintain 22:25
make 23:20 39:2,10
39:22 57:13 61:8
61:14 63:6,9 64:25
66:10 67:13 72:9
73:14 78:4 81:5
96:25 104:13
107:20 109:2,9
makes 36:9 101:21
making 33:16 58:7
67:18 81:3 99:20
105:17 107:15,23
109:4 115:10
male 101:11
man 37:12,15
manage 91:20
management 12:11
20:14 21:8,9,10
22:21 107:18 108:1
manager 5:6
manufacturer's
29:20 47:4
many 5:7,13 11:21
12:1 25:24 26:1,20
28:11 67:23 91:17
March 4:6 49:8
55:19,25 58:3,4
64:20 93:4 107:1
margin 40:17
mark 25:21
marked 31:16,20,21
58:23 64:17,20
92:23 96:6,8
111:21
marked-up 100:14
marketed 10:4
marketing 9:22 10:3
10:7,16 14:8,11
17:22 18:4,23 19:1

19:8 86:15
marketplace 13:22
15:8,15
marks 109:8
Marriott 1:13
Mary 37:20
matter 36:7,25 37:23
40:4 41:7,7 51:11
80:15 106:12 115:9
matters 27:23 50:13
51:25
maximum 76:2,2
77:4,5,8,13,20,25
78:3 87:25 88:3,5
88:17,18,21,25
89:3,13,15 90:3,6,6
97:24 101:16
Maxwell 4:25 5:16
5:23 7:3,19 34:11
35:3 37:4,10,21
39:18 40:24 43:10
43:15,16 56:12,23
57:14 60:1 62:8,9
65:4 66:24 67:2
68:13,25 70:13,13
78:16 79:7,7,13,13
91:24 94:3 112:5
112:15
Maxwell's 56:16
57:8 59:7 94:6,8
111:25 112:4,10
may 1:14 16:17
23:19 27:16,17
41:23 42:1,2 46:17
47:13 49:21,25
51:19 52:8,12,25
52:25 54:10,17,23
55:3 60:12,24
69:24 70:1 89:23
102:19 108:19
117:16
maybe 25:12 104:12
mean 7:21 11:18
14:7,10,14 15:23
21:25 25:22 33:10
37:13 41:8 47:2,3
57:24 83:18,19
92:13 93:14 110:10
111:16
meaning 24:22 26:4
83:19
means 18:15 19:4,14
83:14,16 84:4
110:24,25,25
111:13 113:13
meant 14:14 110:9

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 125

mechanics 8:7,15
medical 30:24 38:2
  38:13
meet 16:8
meeting 42:20 79:6,9
Melville 49:11
memo 23:3 69:20
memorialization
  50:22
memorialized 49:3
memory 29:5,6,13,14
  29:17,25 34:2
  48:21 61:21 63:13
  63:14 104:9
memos 23:1
mentioned 10:5
  23:25 52:12,15,25
  59:19 78:20
merger 25:2,3,16
met 3:6 21:18 79:11
  101:3
Michael 2:7
middle 61:6 62:2
  112:2
might 83:3 85:24
Mike 37:21 78:10
mindful 13:12,13
  15:18,24 17:10
  18:2 20:3,18 24:20
  43:10,22,23 44:7
  44:23 57:17 107:13
minimum 92:16
minor 12:19
minute 31:12 38:5
  78:10 89:16 101:25
minutes 52:17,17,22
misrepresentation
  43:14,17
misrepresented
  104:17
misstated 19:25
misstates 84:18
mistake 28:19 43:16
  43:17,19 44:19
  45:11 46:4 79:8,25
  80:5,7 96:22
  105:20,22 107:13
  107:15,20,21,24
  109:5
mistakes 42:22 44:20
  44:22 45:9,14
  80:12 96:23 104:6
  104:13,15 109:3
mistreating 39:16
MM 92:12
modify 13:5

money 35:18,22 47:6
  47:9
month 4:5 40:4 41:3
  41:5 42:16 45:3,3,6
  54:25 57:18 68:6
  89:11 91:18 105:21
monthly 35:17 39:20
  39:22 40:19 66:20
  68:15 70:5,9 81:2
  87:7,10 89:10
  90:13,18 97:21
  98:2,21 99:3
  110:19 112:16
  113:9,10,13,14,15
  113:15,16,19,20,20
  114:3,4
months 37:16 42:12
  42:13,14,16 57:4,6
  57:17 59:16 60:16
  72:7 77:18,18
  89:19 92:13,16
  97:16,21
month's 94:18
more 4:11 26:7,12,17
  26:20 27:1 28:13
  31:12 56:5 57:6
  59:15 62:25 64:5
  67:6 70:5 78:13
  82:20 113:15
most 15:7 28:1 70:14
move 92:11 95:10
  98:20,23 103:22
moved 34:19 75:22
much 3:17 61:23
  78:13
multiple 72:9
must 72:15 98:19
myself 10:2 16:4
  18:22 81:11

_____ N _____

N 2:11
name 3:8,10,18
  23:25 30:15 31:19
  37:20,21 52:11,25
  69:7 117:16
named 58:12
names 10:15 47:18
nature 81:5 100:3
Nawrocki 50:3,5
  51:7 52:18 54:2
  55:11
necessarily 10:15
  51:14 70:24
necessary 33:18,20
  33:21 115:12

need 4:17 64:13 65:5
  66:20 82:1 96:13
  96:16,20
needed 15:15 63:4
  63:17 64:9
needs 36:1
negative 30:8,9 47:8
never 20:22 48:5,9
  48:14,15,17,22
  62:19 108:5
new 13:6,22 14:6,7
  14:22 15:1 18:19
  19:1 20:4 22:15
  50:5 65:9 69:10
  93:16 95:12 103:6
Newkirk 58:14,15
next 54:1 55:17,22
  57:8 62:21 66:14
  68:19,24 71:2,6,14
  71:14 76:18 88:13
  93:6,11,13 109:16
night 16:8 17:4
  37:15 40:15 42:21
  45:21,25 78:18,24
  108:9
nine 79:25 80:6
nomenclature 21:25
non-cancellable
  25:25 26:3
non-ERISA 27:12
normal 61:6 62:1
North 1:1,13,14 2:5
  2:6 3:7,11 6:23
  117:1
Notary 1:13 114:16
  117:4,20
notations 94:20
  109:12
note 6:16 57:23,24
  59:10,10 60:19
  92:7 95:5
notes 96:6 109:14
nothing 38:13 69:19
  69:22 78:21 81:7
  86:14
notice 57:25
Notre 38:24
November 53:9 54:3
  55:5,11 56:10,23
  59:7,25 60:4 61:1
  62:9,13,18 63:2,16
  63:19,20 64:7,8,23
  64:24,25 65:3,4,11
  65:14,20 66:1,1,6,7
  66:8,14 67:3 69:4
  70:4

number 2:16 24:24
  30:16 37:19 44:21
  62:7 67:10 96:24
  115:6
numbers 13:14 24:22
  56:11 61:13

_____ O _____

oath 48:19,21 72:20
  86:12 110:1 111:12
Objection 43:3 45:22
  47:24 52:3,21
  80:23 84:18 91:22
  92:6,11,14 93:9
  95:10 96:1 97:14
  98:14,20,23 99:5
  99:12,18,23 100:7
  101:17,22 102:22
  102:22 103:8,16,20
  104:7,19 105:10
  108:5,25 111:14
  113:7
obtain 18:24 29:22
obtained 53:12
obvious 80:16,16
  110:10,11
obviously 58:7 72:6
  74:3
occasion 12:25 13:17
occasionally 58:18
  81:9
occasions 44:11,14
  50:9
occupational 101:11
occur 47:8
occurred 13:4
October 55:5 58:25
  59:5 65:2 70:21
off 55:13 75:22
  112:25
offer 10:25 14:22
offered 27:3
offering 14:21
office 22:21,25 53:13
  53:14 58:18 115:8
officer 32:24
Oh 25:12 93:24
  103:2 107:23
  109:25
Ohio 2:3,9 38:25
  46:9 63:7,23 64:12
  71:10,19
okay 3:15,25 4:2,7
  4:14,16,19,20,21
  5:19 6:1,9 8:5,17
  9:16 12:1,5 13:17

  15:5,11 16:2,5
  17:10 18:11 19:12
  19:18 20:22 21:3
  21:24 22:4 23:9,21
  24:4,9,15,22 25:3,7
  25:13,15,19 26:3
  26:11,16 28:8,13
  29:16 31:13 32:3
  33:2 34:6,11,21
  35:20 36:16,24
  38:11,17 39:1,3
  40:10 41:11,13,17
  41:20,23 42:6,8,24
  43:5,24 44:13,20
  45:8,19 46:7 48:24
  50:15 57:6 58:4
  59:12,15 62:6,17
  63:15,24 64:2
  65:11,19 66:14,18
  66:24 67:20 68:7
  68:10,24,24 71:2,6
  71:18,24 72:6 73:1
  73:5,23 74:13
  75:17 76:9,21 77:2
  77:5,10,17,20,23
  78:11 79:12,16,20
  80:9,18 81:21,25
  82:2,3,13,22 83:12
  84:10,20,24 85:5
  85:11,14,23 86:17
  87:16,21,25 88:25
  89:15,25,25 90:12
  90:20,24 92:25
  93:16,19 94:8
  96:25 98:22 102:3
  104:3,16,21 105:5
  106:18,25 107:6,17
  107:20,25 109:2,6
  110:8 111:6 113:11
  113:18 114:6
old 15:2
older 88:20 89:19,23
once 13:9 23:23
  44:25
one 12:12,19 16:11
  18:11,18 20:2 23:3
  24:12 26:11 28:25
  30:11 31:23 35:8
  36:1 42:7 53:16,21
  57:18 73:7 75:23
  77:11,23 81:13
  82:10 83:18 85:5
  88:13,13 92:12
  94:18 95:12 100:13
  109:15,23 111:4,5
  111:7,19 112:25

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 126

117:8
ones 86:6 95:20,21
one-on-one 22:13,13
one-year 72:15,18
only 7:18 13:6 16:4
  21:18 28:5 43:12
  44:13 45:17 49:19
  67:9 74:6 88:7
  92:19 95:20,21
  101:2
opinion 10:11 16:17
  36:25 39:17 91:5,7
opportunity 24:1,3
  24:16 32:3
opposed 27:10
optional 92:9
oral 1:10
order 1:11 55:15
  61:14 67:3 72:2
  74:20 97:11,16
ordinary 21:18,24
  22:8
organization 12:20
  85:7
original 100:15
  109:10 115:4
originally 54:15
originals 73:5
orthopedic 106:20
other 18:11 19:19
  26:7,13,16,25
  27:25 30:11 31:7,8
  31:8 33:2,3 35:8
  49:20 51:9 52:10
  67:24 69:17 73:5
  77:4,23 81:4 85:9
  102:19 112:7
others 22:23 26:20
otherwise 92:17
  96:19
out 7:4 10:8 11:9
  12:5 13:6,8,10
  15:14 16:15 17:18
  17:22 35:13,22
  57:13 73:14 85:24
  99:16 104:10,11
  108:4 113:23
outlining 69:25
over 8:23 13:13
  32:24 35:17 39:21
  42:16 44:18 45:9
  71:8 88:7 100:17
  103:13
overloaded 104:5,14
  104:17 105:5
overlooked 91:7

92:10
overpaid 57:14,19
  79:4,8,14 85:21
overpavement 57:24
overpayment 57:15
  57:23,25 58:2,6
overpayments 92:21
overseeing 80:20
oversight 108:20
own 18:14 19:3,13
  110:2 114:1
_____
P
P 93:2
page 2:12,16 35:1
  46:13 49:6,22 54:1
  55:17,22 57:8
  59:11 64:23 66:14
  74:4 75:20 76:4,11
  76:13 81:20,23
  82:25 90:18 94:24
  95:3 100:23 110:4
  115:6,14,17,20,23
  116:1,4,7,10,13,16
  116:19,22
pages 32:4,5 40:20
  56:5,7 115:12
  117:8
paid 28:20 35:16,17
  35:21,22 36:1
  41:19 47:5 54:23
  55:3,4,7 56:25
  59:15 60:16 63:16
  63:22 65:25 66:2,8
  66:18 67:25 68:4
  68:10,18,20 70:18
  70:22 71:17 72:21
  72:23 81:6 84:8
  92:18 95:1,19
  99:21 103:15,18
  105:19
paragraph 54:6,8
  55:7 76:12 87:12
  89:6 100:25 101:7
  103:4 108:3,4,12
paragraphs 82:6
paralegal 103:3
Pardon 31:6
part 87:20 98:5
  99:15 104:9 112:5
partial 61:3 93:3
partial-year 61:13
particular 25:19
  26:18 33:17 40:15
  41:13 56:5 75:16
  83:17 91:8 94:16

parties 117:12
parts 12:19 24:5
party 53:15
part-time 67:23
past 23:9,18 28:18
  28:23,25 59:11
  78:16 79:18 80:2,9
Paul 22:4
pause 18:8
pay 16:25 59:15
  60:16,22 65:3,12
  71:9 89:10 94:13
  95:5 96:18,21
  110:4
payable 36:15 39:23
  40:6 41:19 43:12
  59:20 75:24 89:18
  98:5 102:2 112:17
paying 27:17 37:2
  54:24 62:3 71:25
  100:5
payment 36:2,9,16
  36:22 39:20,21,22
  40:5,20 41:6,8,9,14
  44:5 46:2 55:5
  60:3,7 61:9,14 63:2
  63:6,20 66:10,19
  67:14,18 70:7
  71:11,11,20 72:5
  81:3 91:1 93:1,3,5
  93:7,10,15 94:16
  94:18 95:16 100:1
  105:2,15
payments 24:12 42:6
  44:21 61:23 99:21
  105:17
payroll 26:24 27:6
pays 72:25 82:14,23
  83:12
people 11:12 18:1
  22:22 39:16 48:25
  49:3 84:13,16,20
  85:2,7,9,16 86:3,5
  90:4 91:15 104:16
Per 65:20 68:13
  70:13
percent 27:17 54:13
  82:20 92:12,17,19
  97:24 98:1,2
  110:17 111:10
  113:1,16,17,18
percentage 82:15,23
  83:12
perform 8:15 10:14
  36:3,18 81:12
performed 7:25 8:21

53:5
perhaps 25:14 34:19
  40:24
period 21:19 34:18
  47:20 54:22 55:5
  60:12,14 64:21
  70:21 71:24 72:15
  72:19 76:2 77:4,5,8
  77:13,21,25 78:3,6
  80:7 87:21,23,25
  88:3,6,17,18 89:1,4
  89:8,14,20 90:4,6,7
  94:15 97:22 98:3,4
  98:6,9,9 99:2 100:2
  101:12,13,16
person 11:8 14:22
  19:1 47:16 85:5
  110:15
personal 110:2
  111:12
personnel 7:18 18:20
  91:20 99:14
persons 4:24 8:1,6
  8:11 19:19 48:18
  111:4,7
Phil 69:7
phone 30:16 37:19
  38:5
Phyllis 4:24 5:5
  40:24 79:18 94:23
  110:6 111:20
physical 47:17
physically 8:3
pick 45:19,20,21
  104:13
Pilot 23:4 25:6,16
place 25:7 35:24
  36:8 81:4
placed 9:25
plaintiff 1:4 2:2
  39:12
plaintiff's 38:21,22
  39:13
please 3:8,9 46:21
  58:21 61:16 65:6
  65:15,16 67:10
  92:5 96:11 115:4
  115:11,12
plus 54:12 112:7
point 14:20 21:14
  49:13 57:20 61:8
  66:5 67:10 84:23
  85:24 113:23
pointed 16:15
policies 8:19 9:9,12
  9:15,17 10:1,10

11:22 12:2,6 13:7
  13:11,15 14:3,6,8
  15:19 18:2,5,13,19
  18:25 19:15 21:5
  25:23 26:1,8,13,16
  26:24 27:7,16,20
  27:25 33:24 34:3,5
  34:23,23 40:12
  41:3 44:8 77:12
  80:20 85:3 108:18
policy 6:1 7:14,14,16
  7:21,22,23,24,25
  8:3,7,12,14,18 9:21
  10:1,23 11:1,6,8
  12:25 13:5,6,9,18
  13:19,25,25 14:12
  14:17,18,23 15:14
  15:25 16:13,13,14
  16:20,23 17:23,24
  18:15,17 19:3,13
  20:1 24:17,19
  25:15,19,25 26:4
  26:23,23,25 27:22
  28:1,6,9,15,16
  33:19 34:1 36:9,13
  36:14,22 41:18
  42:19 43:20,22,23
  43:24 44:15 46:1
  54:10,11,14,16,18
  54:21 55:14,16
  56:11 72:1 73:18
  73:19 74:3 75:12
  75:16 76:2 77:6,9
  77:11,24 80:13
  83:4 84:19,22
  85:25 86:2,4,5,8,24
  87:4,7,16,16,18,20
  90:17,18 92:8
  95:15,20,21,24
  96:18,22 97:5,19
  97:19 100:3 101:1
  101:5,10,14 102:19
  102:21 104:18,22
  104:25 105:4
  106:10 107:14
  108:21 113:21
policyholder 8:14
  83:3 105:17
policyholders 8:6
  17:11 32:11 33:8
  84:22
portion 34:15
portions 16:19
posed 59:7
position 73:15
possible 45:13,14,16

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 127

45:17 49:5
post 25:16
potential 8:5
preceded 89:21
predated 35:11
premium 27:17 74:7
  74:9,10,14,21
  75:14,21,22 76:6,8
  76:12,18 101:10
premiums 75:3,5
  76:14
preparation 81:19
  85:6,16
prepare 18:23 85:2
prepared 75:9 76:22
  84:25 86:5,6,8
  104:16
prepares 85:5
prerequisite 98:17
present 69:15 74:24
presented 74:23
presently 3:25
President 32:12,15
  32:17,18,22 33:13
  33:25 34:4,6,7,8,9
  34:9 42:25 45:15
  73:16 105:14
preventing 106:19
previous 59:23 103:7
primarily 9:3 13:22
  18:22 22:1 27:15
  29:19
primary 4:22
prime 25:24 26:3
principal 4:11
principals 46:18
  47:3,5,9
printed 10:3
prior 4:22 5:24,25
  6:13 12:22 20:25
  21:7 23:9,14,16
  28:22,25 29:22
  35:9,19 41:20,23
  41:23 42:2 50:15
  56:1 58:4 60:8
  69:15 76:25 77:15
  78:6 90:5 93:18
  94:8,10 101:19
  102:1 113:14,16
  117:6
probably 23:8 26:10
  37:20 56:24 100:16
problem 38:4,7
  106:18,19 107:5
problems 13:24
procedure 1:12

35:24 36:6,17 81:4
  102:16
process 7:23 9:19
  10:8 11:17 19:7
  23:1 39:9
processed 71:5
processing 23:3
  52:13
product 13:22 32:25
  47:6
professional 102:17
professionals 107:17
profitable 12:22
program 22:16
prompt 115:9
promptly 56:23
proofs 24:12
proper 42:18 81:3
properly 40:6 112:16
proposal 11:8 17:19
  19:2,10,22,25 20:3
  20:5 81:19 84:9,10
  84:11,12,12,20
  85:6,12,17,24 86:6
  86:10,12,14,24
  90:24 100:9 101:1
  101:8,9,15,18,21
  101:25 102:18
  104:16,21,25 105:5
  106:4,6,8,9
proposals 17:12,14
  17:21 18:1,24 19:5
  19:20,21 81:20
  84:24
proposed 11:1
propriety 40:19 41:6
  41:8 105:15
prospective 8:6,13
  17:11
prospects 17:15
protocol 35:24 51:11
provide 10:17 11:12
  17:11 18:25 19:15
  22:11 30:3 67:12
  70:3 85:3 104:22
provided 19:14 36:8
  51:22 69:1 72:21
  72:23 75:14 92:8
  101:2
provides 18:17 20:1
  54:11,18 77:9
  84:22 105:1
providing 70:15
provision 16:21
  33:22 97:9,12,13
provisions 10:19

16:14,15,18 18:2
  33:24 34:2 36:22
  42:19 43:22,23
  97:4,6,7
psychologist 57:22
  106:23
public 1:13 13:3
  114:16 117:4,20
pull 35:13
purchase 8:7,14
  83:23
purchased 21:16
  26:8 40:12 75:1
  77:12 83:14 106:10
purportedly 65:4
purports 35:1 59:4
purposes 14:9,11
  81:10
pursuant 1:11
put 39:8 46:1 50:25
  51:3,8 75:12 109:7
putting 51:18
p.m 114:9

_____
        Q
qualified 44:4 98:12
qualifies 36:2 68:8
  92:17
qualify 74:20
quality 36:3 39:22
  81:3,4
question 4:18 8:24
  9:1 18:9 25:21
  30:9 33:22 35:12
  41:11,12 44:7
  46:22,23,24 47:2
  52:9 53:11 56:15
  59:7 61:5,18 63:15
  64:2 68:23 88:11
  88:14 97:3 105:2
  105:11 109:23
  110:13,14,15
  111:17 113:25
questions 48:13
  70:16 91:10 102:6
  102:8 103:24
  112:21
quickly 31:24
quoted 101:10

_____
        R
R 2:2 115:1,1 117:1
raised 33:22
ran 91:18
rated 10:2
rather 114:1

rating 7:23
RE 115:2
read 8:24 9:1 15:18
  46:24 54:6,7,9 55:7
  61:17,18 82:13
  96:5 100:24 108:2
  108:3,11,12 113:24
  114:2 115:4,14,17
  115:20,23 116:1,4
  116:7,10,13,16,19
  116:22
reading 54:7 65:14
  80:18 87:11 97:19
  98:24,25 108:23
reads 96:7
ready 32:1
realize 103:2
reason 18:9 53:2,2
  69:24 104:10
  115:16,19,22,25
  116:3,6,9,12,15,18
  116:21,24
reasonable 83:24
reasons 15:7 38:2
Rebecca 1:12 117:4
  117:19
recall 6:12,14,25 7:8
  9:19 14:2,25 15:5
  16:7 17:9,16 20:2,7
  21:13,20 22:10
  23:5,12 24:9 25:18
  27:8,18 28:4,12
  29:8,17,18,23,24
  30:2,5,6,8,11,14,15
  30:18,19,21,22
  31:1,3 34:10 40:1
  40:14 46:16 48:7,7
  48:8,11,12,24 49:1
  49:21 50:11,21,24
  51:8 52:8,9 57:2
  58:18 59:9 78:23
  106:24
recalled 23:23
receipt 71:17
receive 20:8 36:11
  43:25 87:9 97:16
  98:19 99:3 108:16
received 22:18 49:7
  70:25 71:3 97:20
  receiving 40:5 49:18
  75:18
recent 55:23 57:12
  70:15
recess 31:15 78:12
recognize 37:14 59:1
  94:21

recollection 23:21
  34:1
record 30:10 32:5
  37:17 54:9 56:4
  108:12 112:12
records 52:1
red 110:3
redrafted 84:14
refer 3:13 20:16
  21:24
reference 31:20
  56:11 69:18
referred 55:14,16
  69:3
referring 82:24 97:9
refers 69:19
reflecting 108:17
reflection 69:17
refreshed 29:7,14
refused 47:18
regard 101:16
  102:18
regardless 35:21
  36:16 75:11
regards 39:17 59:18
  63:5 91:1 105:2
Reinsurance 50:19
  50:20,23 51:6 52:5
  52:11,20 58:15
reinsured 58:19
reinsurer 50:14,18
relating 37:23
relatively 31:23
  69:10
remainder 34:20
  112:3
Remarks 92:3
remember 15:4 19:6
  19:6 25:8 26:1
  34:13 47:18 63:11
  72:15 106:21
removed 54:16
reopens 93:15
replace 14:12,14
replaced 7:3 14:6,7
replying 55:23
report 7:12 32:19
  53:12,19,24
reported 4:14,21 7:9
  7:18 8:1,13 32:20
  33:1 34:22 48:25
  49:3 55:1,6
reporter 9:2 46:25
  61:19
reporting 7:15 33:2
reports 31:8

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 128

representative 29:20
  47:4
represented 47:19
  48:18
representing 38:18
  39:12,12
represents 68:16
request 39:11 60:21
  60:24 63:24 64:5
  65:8,20,22 66:1,6
  67:12,17 68:13
  70:14 111:11,16
requested 53:13,16
  53:17 62:15 64:3,4
  64:10 65:13 66:11
  70:4
requesting 62:25
require 62:1 69:12
required 34:12 51:11
  61:12,25 70:3 96:3
  97:11
requirements 101:4
requires 39:20 97:15
RES 92:23
reserve 92:24
reserves 81:15
reserving 81:10
reside 3:10 87:17
residual 15:1 29:21
  43:11 44:3,4 52:13
  54:14,20 55:3
  56:14 59:20 68:5
  69:9,9,13 71:25
  72:1 73:1,9,17,20
  74:5,8,11,13,25
  75:3,4,11,15,17,18
  76:14,22,23,25
  77:2 78:1 82:10,13
  82:14,22 83:6,8
  84:6 85:15 87:2,13
  87:17,21,25 88:6,8
  88:17,21,22,23
  89:1,4,8,9,10,12,18
  89:20,23 90:14,21
  91:3,4 92:3,15,16
  93:20,21 94:2,4,5
  94:25 95:4 96:4
  100:4 105:3 110:16
  111:10 113:2,3,12
residually 82:19
  83:20 89:11 90:1,4
  99:10
resources 12:17
respect 104:24
respective 11:7
responded 56:22

response 18:7 30:9
  56:17
responsibilities 7:13
responsibility 4:8,22
  6:8 8:17 9:6 10:8
  22:23 85:8 102:17
responsible 19:19
  80:20
restriction 54:16
result 117:13
retired 3:25 5:21,23
  5:24,25 6:10 7:6
  12:7 21:12,19,21
  23:12,17 38:20
  42:8,12 69:8 94:10
retirement 4:2,9,23
  20:8 21:1 23:14,16
  40:6 41:20 44:22
  44:23 58:4 94:8
retroactively 94:13
return 49:23 70:17
  93:11 106:16,19
  107:4 115:7
returns 30:4,12
  51:23 59:25 63:17
  63:18 64:3 65:6,16
  65:21 67:21
review 10:6 18:19
  24:7,10,13,16 32:3
  33:16,19,23 36:11
  36:12,18,19,20
  40:9 58:1,5,19
  64:16 69:20 70:23
reviewed 10:2,10
  28:1 35:15,16,20
  40:8 41:6 42:16
  43:20 45:2 62:20
  69:21 95:11
reviewing 35:25
  72:12,13 108:21
reviews 31:25 36:7,8
  62:12 63:14 68:2
  74:6
revised 73:2,18,20
  73:22,23 74:9,22
  75:9,11,17 76:4
revision 73:10,13
rider 14:21 15:2,12
  54:13,14,21 72:2
  73:2,10,17,20,22
  74:1,5,9,14,16,22
  74:22 75:1,9,11,17
  76:5,17,22,24
  77:25 83:9,10,15
  83:24 86:25 87:6
  87:13,19 88:20,22

88:23 89:1,5 98:24
  98:25 108:18 113:3
  113:12
riders 8:19 11:17,18
  33:19 34:24 41:18
  42:20 83:3 95:15
  95:19,24 96:3
right 3:23 6:6 8:8
  14:13 17:7 19:16
  19:23 21:15 23:19
  32:25 35:5 39:23
  40:7 41:3 42:13
  44:20 45:4 46:11
  47:20 48:12 54:4,5
  56:2 57:9 62:23,24
  63:8,11,25 65:8
  66:12,16 67:1,6
  70:7 71:12 72:24
  76:19,20 81:23
  82:16,25 83:1,4,6
  84:10,20,22 86:3
  101:7 104:5 105:22
  106:16 107:6
  109:16 110:18
  111:15 112:6,17
rights 33:7,11 72:12
right-hand 112:2,2
Ritchey 2:7
Roberson 1:11 2:17
  3:1,6,10,19,20
  31:18 32:10 64:19
  78:13 102:25 104:3
  114:8 115:3 117:5
  117:10
Robert 56:12
Roberts 2:7,12,13
  3:4 8:24 31:11,17
  37:21 56:4 58:24
  64:18 78:11 86:22
  89:17 91:9,11,22
  92:6,11,14 93:9,22
  95:10,22 96:1,5,12
  96:15,18,23 97:1
  97:14 98:14,20,23
  99:5,7,12,18,23
  100:7,13,17,22
  101:17,22 102:5,10
  102:12,15,21 103:2
  103:8,16,20,22
  104:1 108:7,14
  109:7,13,16,20,25
  111:22 112:20
  113:7,23 114:7
role 4:12 9:6 10:5,7
  22:7 33:25 81:15
room 5:1

roughly 91:17
RP 93:15
rules 1:12 102:15
run 40:17
running 45:1

_____
        S
_____
S 2:15 115:1
sale 14:1 15:15
sales 14:23 27:1
same 11:17 17:23
  18:15 36:18 69:12
  77:4 86:3,5 87:22
  88:1,3 90:8 91:3
  102:3,20 104:22
  107:15,21 110:21
  115:13
saw 29:13 59:7 63:10
  72:6
saying 21:22 51:9
  65:5 69:21 98:22
  104:4,4 106:10
says 18:17 19:13
  38:6 46:3 55:19
  57:12 60:15 62:17
  62:18 67:2 68:12
  76:13,17,23 82:3
  83:12,20 84:7,7
  89:8 92:12 95:4
  97:19 101:10
  110:12 114:4
schedule 76:3 77:6
  77:24 78:3 87:9
  90:7 92:18 97:25
  98:2 101:14 113:10
  114:4
schedules 77:11,11
  113:21
scrapped 20:4
second 34:9 40:4
  41:7,12 46:13 54:7
  59:11 75:20,20
  76:4,5,11,13,16
  102:18 103:4 108:4
  108:12
seconds 31:22 78:14
secretary 67:24
sections 16:22 24:16
  81:22 82:10,10
Security 44:1,5,9
  54:12,19 82:18
  83:2,5,9,13,22,23
  84:5,6 85:14 86:25
  87:5,8 88:22 91:1
  98:16 99:11 100:6
  103:18 105:13

108:24
see 19:25 37:13 48:7
  52:24 53:8 57:13
  58:1,5 78:15 81:24
  82:3,11,20 96:7
  108:7
seeing 57:22
seek 60:17
seeking 30:24
seen 35:18 58:20
  62:16 70:1 79:2
  108:5
self-employed 29:19
  60:23
sell 13:9 15:2
selling 12:6 13:18,19
  14:17,18 21:4
  25:20 26:6
sells 18:13
sends 65:5,19
senior 3:17 32:22,24
sent 11:8,15 36:3
  46:14 49:22 53:8
  64:7 93:5
separate 22:17 88:5
  108:16
September 70:19
  73:18,21
sequence 13:3 65:1
series 11:13 32:6
  61:23 64:19
serves 61:21 104:9
service 7:14,16 32:23
  33:5
Services 20:14 108:2
serving 33:12
set 81:16
setting 81:15
seven 4:3 103:13
several 4:24 7:1,3,15
  50:9 57:3 108:22
severe 46:19 47:11
  47:15,22
share 45:20,24 78:22
  109:20
shared 11:7 16:25
  17:15 78:22
sheet 53:10 115:13
sheets 94:20
Shelton 4:25 5:5 7:9
  7:19 37:6 40:25
  80:2 114:7
Shelton's 111:25
  112:3,8
short 21:19 42:13
  57:3

Case 1:02-cv-00479-MRB    Document 186    Filed 09/06/2007    Page 42 of 46

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 129

short-term 63:13
show 59:22 62:6,7
  77:10 81:18 92:2
  107:25 108:9 113:2
showed 95:12 108:9
shown 76:3 78:3
  87:9 90:7 97:24
  98:2 99:20 100:9
shows 35:13 95:22
  105:25 106:21
sick 37:15
side 112:7
sign 112:6
Signature 114:11
signed 115:8
significance 51:1,19
  52:1
similar 10:14
simply 38:3
since 23:12 25:16
  34:21 54:23 55:4
  61:22 92:8 109:8
single 45:3 108:3
sir 3:13,25 29:3 38:8
  42:15 43:24 52:23
  53:9 56:7 67:1
  73:7,21 84:10,24
  93:22 95:14,18
  96:2 97:10 98:11
  98:15 99:1,6,13
  100:8 103:12,17,23
  107:11 110:1
sitting 16:16 29:8
  40:16 48:12 109:16
situated 31:13
six 92:13,15
sixteen 117:8
size 36:17
Smith 53:10 54:2
Social 44:1,5,9 54:12
  54:19 82:18 83:2,5
  83:9,13,21,23 84:5
  84:6 85:14 86:25
  87:5,8 88:22 91:1
  98:16 99:11 100:6
  103:18 105:12
  108:24
sold 13:3 14:3,4
  25:23 26:5,6,13,23
  27:3,5 47:6 95:20
  95:21
some 3:21 16:17
  18:17 19:6,21
  21:14 23:24 24:1,3
  24:5 25:25 26:4
  27:16,19,23 29:5,6

29:13 31:20,21
  36:3 37:22 47:14
  52:20 53:14 58:7
  62:22 63:17 65:12
  66:5 69:18,25
  70:23 71:4 96:6
  103:5 105:16
someone 4:11,14
  19:9 23:25 33:22
  45:14 47:14 95:7
  96:3 99:9 107:21
  108:21
something 22:19
  25:20 26:5,5 35:13
  57:12 62:18 70:9
  81:18,22 84:11,12
  92:9 101:20 104:12
sometime 21:7 23:14
  23:16 55:19 58:4
sometimes 83:3
sorry 46:20 61:16
  88:12 89:17 93:24
  94:5 96:9 98:1
  114:8
sought 49:15 69:14
SOUTHERN 1:1
spanning 64:20
speak 16:4 78:16
  79:20 80:2,9
speaking 20:18
  33:23
specialize 50:12
specialized 12:16
specializes 50:6
  51:24
specific 25:8 28:16
  32:17 78:21
specifically 16:7,7
  23:5,12 26:22
  27:19 30:14 31:1,3
  34:13 36:12 48:8
  49:1 52:10,15 53:1
  75:12,13 78:23
  94:20 101:14
speculate 28:16
speculating 15:9,10
speculation 103:9
speeching 102:9
spent 37:25 72:7
Spiegel 1:6
spine 55:1
spoke 6:24 23:10
  37:19 38:6 46:18
  51:5
spoken 20:13,22
spring 106:15

stage 85:11
stages 34:7
stamp 100:24
stand 24:23 92:23
standard 25:5 60:14
standardized 19:5
star 35:4
start 9:20 13:13
  14:17 97:4
started 13:18
state 8:9 9:11 11:15
  13:1,2 38:25 61:16
  90:16 117:1
stated 48:5,9 74:21
  77:6
statement 56:19,20
  58:8 59:17 60:20
  61:2,7 65:7,17,23
  67:16 68:15,16
  101:7 102:21
statements 60:21
  67:17 70:6
states 1:1 62:16
  74:10 88:20 103:10
status 63:5 93:25
stayed 34:20
step 66:5,5
Stephanie 2:4
sticking 114:1
still 5:22 6:9 20:11
  37:1 54:21 57:22
  61:4 63:4,20 64:8
  66:11 95:1 96:21
  100:10
stipulate 108:11,13
stop 14:17,21 21:4
  77:3
stopped 13:18
strain 55:1
Strauss 49:12
Street 1:14 2:3,5,8
strike 13:12 92:11
  95:10 98:20,23
  103:22 111:17
subject 27:18
submit 61:1
submitted 24:13 60:1
  60:11 101:3 107:3
submitting 59:14,25
subordinate 44:13
  59:14 60:15 65:3
  65:11
subordinates 85:19
subscribed 114:13
  117:16
subsection 76:12

subsequently 6:13
  21:17 95:19 99:10
success 25:20,22
successive 98:3
suffer 82:19
suffered 47:10
suffering 46:19
suffers 47:15
sufficient 91:20
suggest 10:19 73:16
suggested 19:21
  28:25 29:12 106:15
suggesting 104:8
suggests 73:21 113:4
Suite 2:3
sums 71:16
supervise 4:11
supervisor 7:9,16
Supplement 44:1
  54:12,20 82:18
  83:2,9,13,23 85:15
  87:1,6,8 98:17
supplemental 115:12
support 105:21
supposed 19:2 51:2
sure 4:16 8:9 29:10
  31:14 33:10 39:22
  41:11 45:13 47:3
  49:1 65:1 81:3,5
  85:9 102:20
surgery 107:6
surveiling 31:2
surveillance 31:4
suspect 4:17 43:5
Swink 22:4
sworn 3:2 86:13
  105:24 106:1
  114:13 117:5
system 8:3

_____

**T**

T 2:15 115:1,1 117:1
  117:1
table 17:7,9
take 3:7 8:5 25:7
  31:12,21 38:16
  64:12 66:5 77:24
  78:9,14
taken 1:11 70:23
  117:7
takes 85:6
taking 37:22 84:16
  100:9 117:6
talk 16:12 75:17
  78:19 79:22 82:14
  83:18 102:14

talked 78:18 79:1,18
  84:11
talking 5:10 22:14
  23:13 25:4,5 32:6
  35:4 57:15 64:22
  69:6 75:21,23
  84:10,21 111:9
talks 76:11 92:3
  101:8
tax 30:3,12 51:22
  56:17 59:17,25
  63:17,18 64:3
  65:16,21 67:21
TD 95:5 110:4
telephone 69:25
tell 3:8 7:25 9:16
  11:23 21:2 25:24
  26:22 29:16 35:20
  37:18 41:16 43:24
  47:21 54:6,8 65:12
  78:25 80:4 91:17
  92:4 99:22 100:2
  101:9 111:4 114:3
telling 49:19 65:7,17
  66:15 84:21
tells 67:23 75:25
template 19:22 20:4
  84:15
ten 32:3
tenure 9:10 11:21
  25:9
term 75:23,25
terminate 76:17
Termination 76:17
terms 42:19 72:1
testified 3:2 99:7,23
  105:8,8 108:8
  110:1
testify 108:10 111:3
  111:12
testifying 48:21
testimony 3:21 42:20
  52:22 72:20 84:19
  84:19 86:12,13,19
  86:19 105:24 106:1
  117:9
thank 10:5 39:19
  55:17 58:9 66:24
  67:2 73:1,23 78:4,7
  85:23 86:24 90:12
  91:9 103:23 106:14
  106:25 107:9
  110:24 112:15
  114:7
thanking 62:11,22
  66:25 69:1

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 130

their 7:9 11:12 18:14
   19:3 22:25 47:6,17
   50:15 67:11 109:1
   110:16
Thielen 62:22 66:25
   68:25
thing 91:3 102:3
things 49:20 66:6,7
   74:19 75:8 83:18
   92:12
think 11:5 16:14
   17:22 19:5,11 21:6
   22:17 24:8 27:8,8
   31:11 34:8 35:2,23
   38:4 39:17 46:7
   50:8 53:9 61:20
   70:12 79:21 80:24
   107:23 110:6,25
thinking 111:9
third 2:8 5:19 49:6
   53:14 54:6,8 64:5
   89:6
third-party 61:12
   62:2
Thirty-eight 9:5
though 21:15 48:2
   48:13 60:17 95:22
   107:1
thought 12:20 36:25
   37:3 47:22 86:11
   100:20
thousand 91:19
threaten 71:18
threatened 63:6,11
   64:11
threatens 46:9
three 5:14,21 22:17
   23:9,18,20 37:16
   42:12 57:6 59:13
   59:15 60:15,16,18
   66:6,7 72:7 82:9
threshold 39:21,25
   40:2
through 4:8 11:13
   31:18,23 34:22
   38:3 39:8 51:7
   99:22 107:14
throughout 85:7
till 60:3,5 75:19
time 5:4 6:24 14:20
   23:3,7,10 25:25
   26:4 28:17 31:23
   34:4,15,18,20
   35:19 40:9,25,25
   42:5 45:7 46:10,11
   47:20 49:16 52:18

53:4 57:3 64:22
66:10 70:23 71:4
71:24 77:24 79:2
80:8 91:21 94:15
99:2 100:2 103:14
107:7
times 44:2,18 46:4
72:9 85:20
title 32:17
today 3:21 16:10
20:11 29:8 38:17
41:23,25 42:20
90:25 108:8
told 6:16 38:4,9,10
38:12 41:15,16
43:10 46:1,3 48:1
48:13,13 50:14,18
50:20 52:16,17
79:7,13,17 80:7
84:17 86:11,17
91:15 96:19 106:23
tomorrow 38:1
tool 31:4
tools 31:9
top 55:13 82:24
94:21 95:3
total 55:2 68:17
69:13 77:15 87:10
87:22 88:1,3,9,15
88:19 89:8,12,22
90:3,10,13,15 95:5
95:7,13,24 97:20
98:3,6,21 99:4
110:17,20,21 113:4
113:5,8
totally 97:15 98:10
99:9
track 44:25 45:2
train 18:4
training 18:24 19:14
19:18 22:11,13,13
70:6,20
transcribed 117:7
transcript 117:9
transmittal 53:10
55:22
treatment 49:15,17
49:18 56:18
trick 35:12
tried 31:19 36:23
trigger 97:11
triggered 71:11
Troy 49:12
true 26:11,15 63:23
85:7,9 117:9
trying 38:8 96:10

104:12 112:15
turn 54:1 68:10
70:11 76:4 81:20
90:17
TUV 13:19
tweak 13:4,7
twelve 32:4
two 7:6 17:3 23:18
23:20 24:12 25:2,3
25:17 40:12 41:2,3
42:17 43:12 44:17
46:10,11 48:13
49:19 56:5,11
57:17 59:13 77:11
77:18 78:22 80:2,9
81:22 83:18 96:19
108:16 111:4,7,19
two-page 73:9
type 9:25 19:6 22:11
51:12 52:8 67:13
69:10 81:5
Typical 96:12

_____U_____

uh-huh 14:24 79:10
82:4,17 84:1 87:3
109:19
ultimately 11:13,22
56:25 64:6
unambiguous 44:8
44:16 45:10,16
80:19
unambiguously
43:25 74:10 75:14
80:13
uncomfortable 3:15
undated 55:17 56:2
under 6:4 26:21
27:20 28:3,6,8,15
42:18 48:19,21
68:5 70:10 72:11
72:12,20 76:16
83:21 86:12 88:8,9
92:2 93:25 95:24
97:6,7 108:16,17
110:1 111:12
113:21
underlined 110:3
understand 5:2 8:11
10:24 14:14 18:9
18:10 33:10 37:10
37:23 38:1,21
46:22,23 48:2 65:1
81:2 84:24 104:3
107:16,17 112:16
understanding 15:21

18:14,16 19:3
33:14 80:19 98:8
107:19
understood 8:10
38:18 88:24
underwriter 34:18
underwriters 7:15
underwriting 7:13
7:21,22,22 9:23
18:20 101:3
Unfortunately 26:1
UNITED 1:1
University 38:24
unless 12:16
until 23:18 29:13
63:6,20 89:11
96:19 108:8
unusual 71:25
upset 49:14
use 15:2 31:4 87:22
88:1 90:10,21 96:9
100:13,14 115:11
used 10:18,22 11:1
13:12,13 50:9,11
53:3 59:23
using 31:8

_____V_____

v 115:2
Valerie 80:9
various 15:23 34:7
85:7
verification 29:22
61:24 72:14
verify 68:8 72:19
version 14:22 15:1
26:18
versions 13:14
very 6:9 12:15,19
78:4,13 86:1
viable 12:18
Vice 32:12,14,17,18
32:22 33:13,25
34:4,6,7,8,9,9
42:25 45:15 73:15
105:14
Vine 2:3
visited 58:18
volume 26:24 28:2
28:10 99:14
vs 1:5

_____W_____

W 24:25
Wait 89:16 101:25
waiting 68:4

waive 76:14
waived 74:11,14,15
74:17,18 75:3,5,6,7
waiver 74:7,9,20
75:14,21,22 76:6,8
76:11
Walnut 2:8
want 8:9,23 9:11,18
18:10 30:9 37:17
39:8,15 51:23
64:25 68:21 82:13
90:16 96:5 100:13
100:14 101:25
102:14 109:11,15
113:24 114:2
wanted 17:18 47:21
wants 69:2
wasn't 17:3,4,7 22:3
23:18 28:5 34:4
42:4,4 43:17 52:22
59:15 60:3,3,4,4,5
63:16 66:11 68:10
70:22 88:14 106:19
way 15:18 18:11
28:20 30:6,8,11
35:8 39:13 46:4
74:15 77:23 102:14
ways 31:7
week 28:18,23 29:1
79:18
weeks 23:9,18 60:18
well 5:12 6:9 9:22
10:22 12:3 13:9
14:7,12 21:6 22:13
27:5,15 28:5 31:9
33:19 34:4,7 36:11
37:1,24 38:22,23
40:16,25 45:2
47:17 53:16 58:7
60:19 63:3,10
66:19 68:21 72:4
73:7 74:19 77:15
78:4,20 79:1 81:2
84:7,8 86:1 92:3
96:25 102:11,12
104:12 105:8
109:16 110:10
113:13
well-trained 85:2
went 7:4 43:19 50:2
75:10 104:10,10
were 5:5,8,13,17,21
6:9 7:6 8:21 9:10
9:12 10:2,11,19
11:22 12:17 13:8
14:3,3,6,7 16:3,6

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 131

16:16 17:4,8,17,17
19:5,5 20:19 21:2
22:5,15,20 23:4
24:7,10,13 25:23
26:13,16,17,20
27:20,21 28:8,11
28:14,18 30:22
32:14,24 33:8,12
34:6 35:16,17,17
36:24 38:21 39:6
41:6,19 42:18,25
42:25 43:11 44:6
44:23 47:9 55:2
56:25 58:19 61:11
65:9 67:24 70:18
70:19,20 71:25
72:7,11,12,13,24
75:8 80:20 81:16
81:16 85:9 91:16
91:25 95:23 99:15
99:20 100:9 104:16
105:16 107:14
111:9,9 113:1
**weren't** 85:22
**WESTERN** 1:2
**we'll** 31:23 74:24
96:9
**we're** 3:6 14:16,17
14:21,22 23:19
30:10 32:6 64:22
78:9 84:10 91:9
97:9
**We've** 24:15
**WHEREOF** 117:15
**while** 16:3,6,15 22:4
30:10,22 33:8,12
**whole** 18:12 24:14
31:11 40:9 62:20
85:15
**wife** 37:20
**William** 2:2
**willing** 12:17
**willingness** 111:11
**wish** 115:6
**wished** 16:23
**witness** 3:1 31:14,25
62:12 63:14 68:2
74:6 93:24 96:7,21
100:20 114:11
117:15
**WJ** 24:23,24
**WJ576** 101:6,10
**WJ576A** 24:19 25:15
28:1
**Wood** 2:2
**worded** 10:11

**wording** 10:10
**words** 55:10 87:17
**work** 8:11 9:4 22:4
34:2 40:8 50:6
93:6,11 106:16,19
107:2,4,8 109:23
**worked** 4:4 34:17
42:24 45:15 58:9
**working** 6:16 8:22
33:8 34:22
**workload** 91:20,24
**worksheet** 24:11
60:9 99:25
**Worksheets** 40:12
**worry** 86:20,22
**wouldn't** 26:15 43:5
70:23
**write** 55:11 56:12
112:9 115:7
**writing** 32:11 48:11
56:12,13,15,16
57:21 72:9 92:4
94:6 110:9 112:15
**wrong** 20:4 44:2,10
44:13,14,18 47:25
85:14,17,18,18,19
90:24 105:6
**wrote** 6:16 10:1
57:18 110:8
**W-2** 65:16
**W-2s** 65:6,22

**X**
**X** 2:11,15 106:10,11
**XYZ** 13:18

**Y**
**yawn** 109:18
**yeah** 16:24 32:2 34:9
49:9 64:2 71:17
76:25 78:20 79:11
81:25 98:19 104:4
105:9
**year** 37:15 61:4,7,8
61:14,22 62:3,3
72:16
**years** 4:3 5:8 7:1,3
9:5,13 12:3 23:8
33:25 34:14,18
37:1 42:12,13,24
43:2,12 44:10,18
45:4,15,19,21
49:19 59:19 79:25
79:25 80:5,6
103:13 105:13,16
105:21 107:22

108:22
**year's** 68:2
**yesterday** 37:19 43:1
79:11,21
**York** 50:5

**$**
$1375 54:19
$2,125 54:11
$20,800 66:16
$225 54:19
$30,000 68:4 71:8,12
71:13 72:10,24
99:21
$5,566.50 54:25
$525 54:12

**0**
0588 59:2
0589 59:2
0633 102:19
0641 100:23,24
0961 94:20
0962 95:3 110:4

**1**
1 21:6 55:3,5,6 76:12
103:13 107:2
1,375 112:4,7
10 71:15 107:25
10ish 63:21
10th 117:16
10-31-94 2:17
100 2:5 113:17,18
103 2:13
104 2:13
11 55:25 108:1
11,200 71:16
111 2:18
112 2:13,14
114 2:14
116 117:8
12 97:15,20
12-month 98:3,8,9
12:15 114:9
13 62:10,21 63:3
66:24 67:1
14 46:13 81:18
100:10,24 109:22
15 53:10
17 49:25
180 44:18,20,22
89:21
19 2:17 31:16,21
35:1 43:6 49:6
54:3 55:11 56:8

59:11 63:12 102:25
103:1
19,250 71:16
1900 2:8
1987 25:12
1990 54:11,18
1991 54:17
1992 73:3,18,21
75:10
1993 40:6 42:7 54:24
64:20 95:25
1994 56:10 59:25
61:3 64:22,23,25
65:18 66:16 67:16
67:20 68:17
1995 35:2 43:6,11
60:5 64:20 71:15
94:12
1996 21:6 49:25 54:3
55:6,11
1997 4:6 55:19
103:13
1999 99:22

**2**
2 81:20
2,750 112:4,8
20 2:17 34:14 58:23
58:25 67:20 68:1
82:20
2000 108:1,19
2001 107:14
2002 107:15
2004 1:15 23:19
41:23,24 42:3
114:14 117:16
2005 117:21
21 2:18 58:3,4 64:17
64:21
22 2:18 60:13 111:21
111:23
24 77:18 78:16 89:19
25 23:8
2500 2:3
26 117:21
2693 111:24
27 68:14
2707 62:8 67:1
2710 67:20
2714 62:8
2719 59:22 65:20
2720 64:24
2723 56:6,10
27401 2:6
2788 32:8
2791 56:6

2796 32:8
2798 71:15
2799 71:7
28 54:10,17
2802 70:11
2804 32:8
2808 111:18
2809 68:11
2817 32:9
2818 32:9
2821 32:8
2840 32:8
2895 32:9
2896 32:9
29 59:25 63:19 65:20
66:1,7,8
2920 32:9 55:17

**3**
3 2:12 55:19 56:10
56:23 59:7 63:17
65:3 77:10,10
90:18 93:4 95:16
96:11 97:24 98:1,2
3A 101:11
3,107.50 112:8
30 41:24 42:2 61:1
62:9,13,18 63:2,20
64:7,8 66:14 67:3
70:11,13,22 78:14
300 45:9,14 80:12
85:20 96:23 104:6
104:13,15 109:2
304 1:13
31 2:17 4:6 58:25
59:5 65:2 107:1
37 101:11
38 9:13 12:3 33:25
37:1 42:24 45:15
105:13
38-year 73:15
3816 3:10

**4**
4 49:22 65:11 74:4
95:16 96:11
4-1-94 56:14
45 42:13,16 77:7,14
77:15,18,21 78:2,6
88:7,20 89:24 90:1
90:5 101:19 102:1
45202 2:3,9
48 42:12

**5**
5 68:12,18 73:6

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 132

| | | | | |
|---|---|---|---|---|
| **50** 92:12,17,19<br>**511** 2:8<br>**55** 89:19,23<br>**576** 86:4<br>**58** 2:17 | 55:25 91:6 107:14 | | | |
| **6** | | | | |
| **6** 54:24 55:3 60:12<br>  60:12 71:6 108:19<br>**600** 2:3<br>**63** 77:19<br>**64** 2:18<br>**65** 77:18 101:12<br>**65th** 76:18 77:1<br>  97:23 98:6 | | | | |
| **7** | | | | |
| **7** 41:23 42:1,2 54:13<br>  93:13<br>**7th** 1:14<br>**70s** 25:11<br>**75** 110:17 111:10<br>  113:1,16 | | | | |
| **8** | | | | |
| **8** 35:2 43:5 46:8 49:8<br>  63:8 64:24,25 65:4<br>  65:14 66:1,6 70:4<br>**8:40** 1:15 | | | | |
| **9** | | | | |
| **9** 40:10 92:2,2 99:21<br>  103:15 110:1<br>**9-92** 73:14<br>**90** 42:21 44:2,10,14<br>  46:4 71:8 72:19<br>  75:2<br>**90s** 15:1 32:15<br>**90-day** 101:12<br>**91** 2:12,13 75:2<br>**92** 56:17 65:5,15,21<br>**93** 2:18 5:3 42:8 55:3<br>  56:18 65:6,15,21<br>  70:17,19,20,21,21<br>  91:5 92:22<br>**94** 42:11 55:3 56:22<br>  59:1,5,7 61:4 62:9<br>  62:10 65:8,24<br>  68:14,15 69:4,5<br>  93:4 95:13 106:15<br>**95** 2:18 35:12 42:11<br>  49:8 57:5 68:12<br>  69:5,5 70:11,13<br>  71:6 93:13 94:10<br>**96** 42:11 53:10<br>**97** 5:3 42:9,10,11,11 | | | | |

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
John L. Roberson

C-1-02-479
5/7/2004

Page 115

1               E R R A T A   S H E E T

2       RE:  Jefferson-Pilot v. Kearney

3       DEPOSITION OF:  John L. Roberson

4               Please read this original deposition with

5       care, and if you find any corrections or changes you

6       wish made, list them by page and line number below.

7       DO NOT WRITE IN THE DEPOSITION ITSELF.  Return the

8       deposition to this office after it is signed.  We

9       would appreciate your prompt attention to this matter.

10              To assist you in making any such

11      corrections, please use the form below.  If

12      supplemental or additional pages are necessary, please

13      furnish same and attach them to this errata sheet.

14      Page *97* Line *8* should read:

15      _Increase in Benefits_

16      Reason for change _Typographical error_

17      Page ____ Line ____ should read:

18      _____

19      Reason for change _____

20      Page ____ Line ____ should read:

21      _____

22      Reason for change _____

23      Page ____ Line ____ should read:

24      _____

25      Reason for change _____