1

1          UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF OHIO

3                WESTERN DIVISION

4

5     JEFFERSON-PILOT         :

      INSURANCE COMPANY,      :

6                             :

          Plaintiff,          :

7                             :

      vs.                     :   Case No. C-1-02-479

8                             :

      CHRISTOPHER L.          :

9     KEARNEY,                :

                              :

10          Defendant.        :

11      Deposition of MARTIN P. LEHENBAUER, M.D.,

12   a witness herein, taken by the plaintiff as

13   upon cross-examination, pursuant to the

14   Federal Rules of Civil Procedure and pursuant

15   to notice by counsel as to the time and place

16   and stipulations hereinafter set forth, at

17   the offices of Health First Physicians, 608

18   Reading Road, Suite C, Mason, Ohio, at 7:38

19   a.m., June 14, 2007, before Elaine Haberer, a

20   Registered Professional Reporter and Notary

21   Public within and for the State of Ohio.

22                  - - -

23

24

2

```
1     APPEARANCES
2
      On behalf of Plaintiff:
3
          WILLIAM R. ELLIS, ESQ.
4             of
          Wood & Lamping
5         600 Vine Street
          Suite 2500
6         Cincinnati, Ohio 45202
7     On behalf of Defendant:
8         KENT WELLINGTON, ESQ.
              of
9         Graydon Head & Ritchey
          1900 Fifth Third Center
10        511 Walnut Street
          Cincinnati, Ohio 45202
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

1          S T I P U L A T I O N S

2          It is stipulated by counsel for the

3     respective parties that the deposition of

4     MARTIN P. LEHENBAUER, M.D., a witness herein,

5     may be taken at this time by the plaintiff as

6     upon cross-examination and pursuant to the

7     Federal Rules of Civil Procedure and notice

8     to take deposition, all other legal

9     formalities being waived by agreement; that

10    the deposition may be taken in stenotype by

11    the Notary Public Reporter and transcribed by

12    her out of the presence of the witness; that

13    the transcribed deposition was made available

14    to the witness for examination and signature

15    and that signature may be affixed out of the

16    presence of the Notary Public-Court Reporter.

17

18

19

20

21

22

23

24

4

```
 1                        INDEX
 2    WITNESS          DIRECT  CROSS  RE-       RE-
                                      DIRECT   CROSS
 3
      MARTIN P. LEHENBAUER, M.D.
 4    BY MR. ELLIS:              5
 5    OBJECTIONS                         PAGE  LINE
 6    MR. WELLINGTON:                     22    13
      MR. WELLINGTON:                     41    19
 7    MR. WELLINGTON:                     42     5
      MR. WELLINGTON:                     42    19
 8    MR. WELLINGTON:                     46    11
      MR. WELLINGTON:                     61     5
 9    MR. WELLINGTON:                     65     4
      MR. WELLINGTON:                     80    11
10    MR. WELLINGTON:                     84     3
      MR. WELLINGTON:                     97    24
11    MR. WELLINGTON:                     98    24
      MR. WELLINGTON:                     99    16
12    MR. WELLINGTON:                    100    15
      MR. WELLINGTON:                    108    16

13
                        -  -  -
14
15
16
17
18
19
20
21
22
23
24
```

5

1            MARTIN P. LEHENBAUER, M.D.,

2        a witness herein, of lawful age, having

3    been first duly sworn as hereinafter

4    certified, was examined and testified as

5    follows:

6              CROSS-EXAMINATION

7    BY MR. ELLIS:

8        Q.    Morning, Doctor, would you

9    please identify yourself for the record?

10        A.    Martin Lehenbauer, MD.            07:37AM

11        Q.    Doctor, what's the area of

12    practice that you're in?

13        A.    Family practice.

14        Q.    In your practice did you have

15    occasion to treat Christopher Kearney?

16        A.    Correct.

17        Q.    And according to the records

18    that you provided to me, the first visit was

19    in November of 1993?

20        A.    Yes.                               07:38AM

21        Q.    At that time when he came to see

22    you, the chief complaint that he made was

23    that he was experiencing anxiety for a period

24    of roughly equal to a year, primarily

6

1    secondary to work, stress because his

2    business is down 30 percent; is that correct?

3         A.    Correct.

4         Q.    You indicated in there that he

5    owned his own business --

6         A.    Correct.

7         Q.    -- right?  Did he tell you what

8    that business was during that visit?

9         A.    I don't see that in my notes,

10   so --                                          07:38AM

11        Q.    Okay.  Under the review of

12   systems, you have wife, some symbol, and then

13   successful, I'm not sure what that --

14        A.    With -- wife with successful

15   treatment.

16        Q.    Okay.  Wife have successful

17   treatment with Prozac?

18        A.    Correct.

19        Q.    Okay.  And you indicated there

20   that he was presently utilizing counseling      07:39AM

21   for the past several years?

22        A.    Correct.

23        Q.    Is that the wife or Chris?

24        A.    I think my intention there was

7

1    that he was involved in that, I didn't make

2    notes in terms of whether that was, you know,

3    in terms of that particular note it looks

4    like it was in reference to the marital

5    situation.

6        Q.    Okay.  The reason I ask you,

7    wife is being successfully treated with

8    Prozac, she's happy in the marriage.  You

9    have presently utilizing counseling past

10   several years.  I wasn't sure whether Chris        07:39AM

11   or the two of them, or what you were trying

12   to suggest.

13       A.    Well, the note says, happy in

14   marriage, presently utilizing counseling.

15   Since that was all one sentence I think my

16   intention there was that particular reference

17   was to that.

18       Q.    All right.  You indicated that

19   he told you he had a degree in psychology and

20   that he was a patient who was well versed in      07:40AM

21   the recent treatment aspects?

22       A.    Correct.

23       Q.    Are we talking about him

24   understanding his treatment for --

8

1          A.     Right.

2          Q.     -- psychological issues?

3          A.     Correct.

4          Q.     Did he tell you how long he had

5     been treating for his psychological issues?

6          A.     I don't have that in my notes

7     for that first visit.

8          Q.     Did he appear to be an

9     intelligent and insightful individual to you

10    at that time?                                07:40AM

11         A.     Go ahead and ask that question

12    again.

13                MR. WELLINGTON:  Are we still in

14    November '93?

15                MR. ELLIS:  Yes.

16         Q.     As of the first visit, did he

17    strike you as an intelligent, straight

18    thinking individual who understood his

19    situation?

20         A.     In my physical exam I just, I        07:41AM

21    had listed that he was insightful and

22    motivated presently for improvement, so --

23         Q.     Your assessment was dysthymia

24    and anxious mood?

9

1          A.    With, yeah, with anxious mood.

2          Q.    Dysthymia, for the uneducated,

3     that's sort of a low level depression?

4          A.    Or chronic depression.

5          Q.    Sort of a guy who feels down

6     most of the time?

7          A.    Correct.

8          Q.    But doesn't rise to the level,

9     at least at that point, of a true depression?

10         A.    Yeah, by this first visit,          07:41AM

11    correct.

12         Q.    Okay.  It appears that you saw

13    him again the following month, you did

14    prescribe medication for him at that time?

15         A.    Correct.

16         Q.    He had been taking Xanax for

17    quite some time, and what else did you

18    prescribe?

19         A.    An antidepressant, Prozac.

20         Q.    Okay.  You followed up with him,    07:42AM

21    it appears, a month later and found that with

22    the Prozac he had a marked improvement in his

23    mood, marked improvement in his irritability,

24    his energy, and his concentration, correct?

10

1          A.     Correct.

2          Q.     And apparently by history his

3     wife also noted the improvement, or was she

4     here to tell you that?

5          A.     I think that was probably his

6     history to me.  I don't have a note that she

7     was with him that day.

8          Q.     Okay.  And your assessment, at

9     least as of that time, was depression was

10    improved, and I assume you maintained the        07:42AM

11    same medication?

12         A.     Correct.

13         Q.     January of '94 you found that he

14    had been using the Prozac for two months, he

15    was stable depression, but was asking for a

16    higher dose as to may be more effective; is

17    that right?

18         A.     That was the patients, right.

19         Q.     Okay.  Did you discuss with him

20    why he was asking for a higher dose if he was    07:43AM

21    effectively stable?

22         A.     In the notes it says dealing

23    with his and family stressors.

24         Q.     Okay.  His stressors being the

1     business issues?

2          A.     Correct.

3          Q.     It said he told you that he

4     takes Xanax as he needs it if he's feeling

5     out of control.  Did he describe what out of

6     control was?

7          A.     I didn't note that in that

8     visit.

9          Q.     No, obviously it's a long time

10    ago, you have no present recollection?                07:43AM

11         A.     Correct.

12         Q.     Okay.  He also told you that he

13    and his wife were seeing a psychologist

14    because of his wife's increased anger?

15         A.     Right.

16         Q.     Your assessment was depression

17    and you decided to try the increased dose

18    that he had been requesting?

19         A.     Correct.

20         Q.     Did he tell you at that time            07:44AM

21    that there were any thoughts of divorce or

22    separation from his wife?

23         A.     At that note, at that office

24    visit I don't have any notes along those

12

1    lines.

2        Q.    The visit a month later,

3    however, he did tell you that he had been

4    under marital stress for several years and

5    that his intention was to divorce, for the

6    separation having occurred two to three weeks

7    before that visit, which would have been

8    around the time of your prior visit; is that

9    right?

10        A.    Yeah, that office visit was        07:45AM

11    February 7th, so just if the separation

12    occurred, it could have been a week or so

13    after that prior visit, correct.

14        Q.    And again, your assessment was

15    simply depression and you continued the

16    medications?

17        A.    On the February 7th, '94 visit,

18    actually we did increase his dose of the

19    antidepressants again at that time.

20        Q.    Now, that was February the 7th,        07:45AM

21    you saw him later that same month on the

22    28th, or is that simply a phone call where he

23    suggested he was going on vacation?

24        A.    Yeah, that, I mean,

13

1    unfortunately the particular phone call does

2    not have a date on it, it's placed right

3    before a May 2nd, '94 visit, but yeah, there

4    was no office visits between the February

5    7th, there's a --

6         Q.    All right.  Let me show you what

7    I'm looking at here, I'm trying to figure out

8    what that date is.

9         A.    So it looks like we had -- nurse

10   made a recording about his Xanax prescription        07:46AM

11   at that point, so whether those two tie

12   together, I'm not sure, since they are listed

13   separately.

14        Q.    Okay.  Yeah.

15        A.    But no office visit in there,

16   yeah.

17        Q.    All right.  So the next visit

18   then was May of '94, which was about six

19   months after the -- or I'm sorry, three

20   months after the prior visit?                          07:47AM

21        A.    March, April, May, correct,

22   three months.

23        Q.    At that time he reported to you

24   that he was seeing a counselor every three

14

1    weeks; is that right?

2         A.    Yeah, every three weeks,

3    correct.

4         Q.    Who was again suggesting

5    increasing the Prozac further to 80 to 100

6    milligrams?

7         A.    Correct.

8         Q.    Did you comply with that and

9    increase his dose at that visit?

10        A.    At that particular visit, we        07:47AM

11   had, it looks like I kept him at the Prozac

12   60 milligrams and we were going to follow up

13   again in a couple months.

14        Q.    Okay.  He indicated that the

15   patient, and again, I'm assuming this is

16   history the patient told you, that he was not

17   functioning quite back to normal work wise at

18   that point but that he felt that the problem

19   was he was going through this divorce

20   process; is that right?                        07:47AM

21        A.    Yeah, the note, and that's from

22   my notes, not functioning back to normal work

23   wise but in process of divorce, so --

24        Q.    Okay.  Then the next note, the

15

1     next line of it, feels some, and I'm not

2     sure --

3          A.    Some, my shorthand, some normal

4     changes.

5          Q.    Okay.  Some normal changes

6     related to adjustment disorder.  So what he

7     was describing to you then, was what you

8     would expect to see if someone is under

9     stress from a divorce?

10         A.    Yeah.  And again, in my mind by        07:48AM

11    adjustment disorder, that can be an

12    adjustment to any sort of stress or change in

13    his life, including divorce.

14         Q.    Okay.  The concept of adjustment

15    disorder, that's -- is that generally

16    considered a temporary problem caused by him

17    being focused on some sort of stressor in his

18    life such as the divorce?

19         A.    Correct.

20         Q.    He also advised you then that he        07:49AM

21    had filed for a partial disability claim

22    primarily due to his decreased productivity

23    at work?

24         A.    Correct.

16

1       Q.    Now, I'm curious as to prior

2   he -- part of his anxiety at the first visit

3   was that his work was falling off, his

4   business was falling off, and this one

5   suggests that he's claiming disability

6   apparently because of his inability to, I

7   guess, bring it back, is that what we're

8   looking at?

9       A.    Again, all I can state is, you

10  know, the way I list it in there and this was       07:49AM

11  by his history, you know, why he had filed

12  for, you know, partial disability.

13      Q.    Okay.  And that was due to his

14  decreased productivity at work?

15      A.    Right.

16      Q.    Going through the divorce?

17      A.    All I said was due to decreased

18  productivity.

19      Q.    All right.  Was it clear to you

20  at that time that what was effecting him was       07:50AM

21  the marital situation, or what appeared to be

22  effecting him?

23      A.    I mean, again, that was included

24  in that particular note for that day, from

17

1    May 2nd, '94.

2         Q.    Uh-huh.  The reason I ask you is

3    up to this point in your notes, the outside

4    stressors that had been identified primarily

5    relate to he and his wife having difficulties

6    and going to counselling and so forth; is

7    that fair to say?

8         A.    Well, again, like, in January,

9    you know, where we talked about where I think

10   I was looking at this because both his and        07:50AM

11   family stressors, and so I was still kind of

12   sorting those out from a work and family

13   situation.

14        Q.    Okay.  So, between the decrease

15   in the business and the problems with the

16   wife, that was sufficient to cause him some

17   difficulties?

18        A.    Correct.

19        Q.    Later that same month, he came

20   in to have some shots and so forth because he    07:51AM

21   was going to Asia?

22        A.    Which visit?

23             MR. WELLINGTON:  We're still

24   in --

18

1        Q.    May 17th, '94.

2        A.    May 17th, '94, looks like, yeah,

3   visit primarily with my nurse.

4        Q.    Okay.  Gammaglobulin is

5   protective --

6        A.    Preventative.

7        Q.    Preventative for going to Asia?

8        A.    Yeah, at that time it was

9   preventative for hepatitis.

10       Q.    And he wanted some prescription    07:51AM

11  for, is that malaria?

12       A.    Yeah, preventative for malarial

13  infection, correct.

14       Q.    He was going to Asia, he checked

15  in with you, he said some things ought to be

16  done and --

17       A.    Well, again, usually in that

18  situation it looks like he came in and gave

19  that history and all I did that day was write

20  the prescription, and you know, the nurse    07:52AM

21  gave him the gammaglobulin, so --

22       Q.    And then May 23rd, '94 he's

23  leaving for China and he wanted a refill on

24  his Xanax and Prozac so he had his medication

19

1    with him?

2         A.    Correct.

3         Q.    And then August of '94 it was

4    just a refill of prescription?

5         A.    Correct.

6         Q.    So the next visit then was

7    September of '94; is that right?

8              MR. WELLINGTON:   September?

9         A.    Yeah, September 30th.

10        Q.    At that point he told you, still    07:52AM

11   seeing counselor, that he was still

12   experiencing low energy levels which were

13   effecting his work; is that right?

14        A.    Correct.

15        Q.    And your assessment at that time

16   was that, when I see a versus mark like that,

17   it suggests to me that you are opting for a

18   couple of possible diagnoses.  One of them

19   was major depression, the other was

20   dysthymia, and the third would have been    07:53AM

21   adjustment disorder?

22        A.    Again, the way I list my note at

23   that time was I would look at the major

24   depression versus dysthymia that I was

20

1    entertaining, you know, whether my original

2    dysthymia diagnosis was, you know, correct

3    just based on the amount of time now that I

4    had been seeing him.  The other one is

5    adjustment disorder, and medication affects,

6    I would look as separate line items, just not

7    numbered.

8         Q.    So, the adjustment disorder

9    you're pretty good with, you think that was

10   clear?                                      07:53AM

11        A.    Adjustment disorder and then

12   medication affects, correct, so the kind of

13   three separate lines there.

14        Q.    Okay.  The medication affects

15   were side effects of the medication he was

16   on?

17        A.    Thinking more about that,

18   correct, yeah.

19        Q.    And those were primarily sexual

20   dysfunction?                                07:54AM

21        A.    According to those notes that

22   day, correct.

23        Q.    Side effects?

24        A.    Right.

21

1          Q.    At the time it looks like you

2     were going to switch some of the medications?

3          A.    And it looks like that was based

4     on sleep complaints, and partly related to,

5     again, antidepressant uses, sometimes even

6     affecting sleep, you know, adversely.  So,

7     looks like I was making a switch in the,

8     primarily in the bedtime medicine.  And in

9     that case actually using a low dose of

10    another antidepressant.                        07:54AM

11         Q.    Okay.  The trazodone?

12         A.    Correct.

13         Q.    And that was going to help him

14    in getting better rest in the evenings?

15         A.    Correct.  And it also looks

16    like, according to my note, trying to get the

17    Xanax more to a PRN basis versus an every day

18    basis.

19         Q.    Okay.  The note goes on to say

20    that you want to consider reducing the Prozac    07:55AM

21    in a month or two once the divorce is

22    settled?

23         A.    Yeah, in my plan there, that's

24    what I had written.

22

1      Q.    Okay.  Is that something you

2  discussed with him or is that something that

3  you were noting for yourself?

4      A.    Usually there it's something

5  that I've discussed with the patient and, you

6  know, thinking out loud with the patient in

7  terms of future plans.

8      Q.    So, at that point then you were

9  looking at the depression as being

10 potentially related, at least to the ongoing        07:55AM

11 stress of the divorce, which was -- is still

12 his primary focus at this point?

13          MR. WELLINGTON:  Objection.

14     Q.    I'm sorry, you can answer, if

15 you can.

16     A.    You know, in thinking about the

17 time perspective here, if I started seeing

18 him in February of '04, this is still about

19 six, seven months.

20     Q.    You mean, February of '03 --        07:56AM

21     A.    Oh, excuse me.

22     Q.    Or November of '03?

23     A.    Yeah, so, now we're about a

24 year, year-and-a-half -- year-and-a-half out.

23

1        Generally with antidepressants my plan in

2        most patients is after a period of time is to

3        give them a trial off so part of it is just

4        always planning an opportune time on that.

5                Q.    I guess what I'm trying to get

6        to is, I understand you want to try to reduce

7        the medications.

8                A.    Okay.

9                Q.    The timing of it, at least

10       according to the notes, seem to be related to        07:56AM

11       the settlement of the divorce that is taking

12       the one stressor out of his life?

13               A.    Correct; correct.

14               Q.    The next note I see is

15       October 26th and that looks like he was

16       providing you a copy of an insurance form, am

17       I right, or did he bring you a copy of an

18       insurance form?

19               A.    It says see copy for partial

20       disability.                                          07:57AM

21               Q.    Going back a year-and-a-half,

22       secondary to depression and the adjustment

23       disorder?

24               A.    Correct.

24

1        Q.      Right?

2        A.      I would have to look in the

3    chart to see what that particular form was,

4    whether it was something that I completed

5    versus if it had been completed by someone

6    else.

7        Q.      It may have been one completed

8    by Dr. Judd McClure, for example?

9        A.      Possibility, correct.

10       Q.      The first form I saw in there        07:57AM

11   was in '04, yeah, the form I see in there

12   dated '04, I didn't see one from you.  Did

13   you complete one that you're aware?

14       A.      Well, that's what I'm saying,

15   I'm not -- it looks like, according to my

16   note, this was him providing me a copy of a

17   form that had been --

18       Q.      All right.

19       A.      -- completed by someone else,

20   but I don't have that in front of me right      07:58AM

21   now, so I have to --

22       Q.      You indicated at that point,

23   anyways, in October of, we're in '94, that he

24   was showing some gradual improvement with the

25

1     medications and psychotherapy.  You also made

2     note that the divorce was final last week and

3     that he was now making a business decision to

4     reduce his travel?

5          A.    Correct.

6          Q.    Medications continued?

7          A.    Correct, there were no changes,

8     at least on medication, it looks like at that

9     time.

10         Q.    Okay.  Next time that you see          07:58AM

11    him is in March of '95.  I'm guessing from

12    the sporadic nature of the visits, that is

13    months in between, that you're not primarily

14    treating the depression other than managing

15    the medications for it?

16         A.    Right.  I mean, I was aware that

17    he was seeing a counselor and I think at that

18    visit in March I made notes he was seeing a

19    counselor a couple times a month.  So at that

20    point, right, it's more a matter of trying to    07:59AM

21    manage the medical side of things.

22         Q.    Because a counselor can't

23    prescribe, so you were handling --

24         A.    This particular one, yeah.

26

1        Q.    In that note of March of '95,

2    you note that he's four months out from the

3    divorce, but he's still having difficulty

4    focusing on work; is that right?

5        A.    Yeah, still hard to focus on

6    work and accomplish expectations.

7        Q.    Was he still ruminating over the

8    divorce at that point?

9        A.    In my notes, I don't know that I

10   made any mention of the divorce at that          08:00AM

11   March 10th visit, so --

12       Q.    Well, in the March 10th visit

13   you indicate, seem kind of --

14       A.    Just four months status post

15   divorce was the only thing I noted, correct.

16       Q.    Your assessment, again, was

17   dysthymia, and then you had a rule out

18   diagnosis of, is that ADD?

19       A.    Correct.

20       Q.    Of adult attention deficit           08:00AM

21   disorder?

22       A.    Correct.

23       Q.    Okay.  Do you know what prompted

24   that rule out diagnosis?

27

1      A.    And again, that was getting back

2  to just him sharing that history at that

3  point, trying to -- and I think in my mind

4  with that particular rule out, thinking about

5  is there some other component here that's,

6  you know, part of this process, so --

7      Q.    Okay.  Now, what was it

8  symptomologically, if you recall, that

9  prompted the potential diagnosis of attention

10  deficit disorder?                              08:01AM

11      A.    The primary thing, again, from

12  1995, was just that the line that would have

13  said still hard to focus on work.

14      Q.    Okay.  You saw him again in

15  October of '95, which by history he told you

16  he's still on partial disability and in

17  therapy.  Told you that he was in and out of

18  several relationships, I'm assuming that's

19  with females?

20      A.    Correct.  I didn't note females,    08:01AM

21  but --

22      Q.    Well, relationships with

23  somebody?

24      A.    Correct.

28

1          Q.    Okay.  I shouldn't have made

2     that judgment.  You say you reviewed the

3     depression/dysthymia, is it still somewhere

4     between the two that you're trying to come

5     down on for a diagnosis?

6          A.    Well, again, dysthymia being

7     thought of, again in my mind, as chronic, you

8     know, depression, you know, I think that line

9     was just my, you know, terminology.  I don't

10    know at that point that I was still debating        08:02AM

11    the two.  I would kind of look at there is

12    some similarities there.  At this point I've

13    been treating him for almost a couple years.

14         Q.    You also, at that time, changed

15    his medication apparently to give -- had he

16    been on Paxil or were you changing to Paxil?

17         A.    Actually the visit in March I

18    had changed the Prozac to Paxil at that time

19    primarily related to the dose of Prozac had

20    gotten to the point where I was feeling that        08:02AM

21    maybe it had either lost its effectiveness or

22    wasn't as effective.  And so it was really a

23    change in medication back in March.  And at

24    the visit in October, that visit, based on

29

1    the notes where he was having some, again,

2    sexual dysfunction history, changed over to

3    the Effexor.

4         Q.    Okay.  So, in October he went

5    from the Paxil to the Effexor?

6         A.    Correct.

7         Q.    You saw him a couple months

8    later in December.  Apparently the Effexor

9    was having some beneficial effect?

10        A.    At that point, yeah, the note        08:03AM

11   says Effexor going well.

12        Q.    Uh-huh.  Said that his work at

13   that point was going okay, things may improve

14   depending on -- is that clients?

15        A.    Yeah, there was a note made at

16   that time by a medical student working with

17   me.  Generally doing well, has plans for the

18   holidays, works going, quote, unquote, okay.

19   Things may improve.  Honestly I can't tell

20   you what that -- it looks like clients, but I    08:04AM

21   can't make sense of it with that particular

22   word there, so --

23        Q.    Okay.  In any event, his

24   situation was improving, his work was

30

 1    improving, the Effexor seemed to be doing

 2    well, he was making progress?

 3          A.    Again, the note that day says

 4    work going, quote, unquote, okay.  Things may

 5    improve.  But again, the second line there

 6    it's hard to tell what that means, so --

 7          Q.    The next time he saw you after

 8    the December '05, (sic), was May of '96, he

 9    came in, his ears were blocked, just sort of

10    a normal physical visit.  At the time he said        08:05AM

11    that he had taken himself, and I'm going to

12    have to have you help me with your shorthand.

13          A.    Yeah, at the visit in December

14    prior to that I had increased the Effexor to

15    one-and-a-half tablets twice a day with that

16    particular dose, and then my note at that

17    time says had taken himself to two tablets

18    twice a day.

19          Q.    And he felt he was doing better

20    with the increased dosage that he gave        08:05AM

21    himself?

22          A.    Yeah, by those notes, correct.

23          Q.    And then it says he was doing

24    less exercise and gaining a little weight and

31

1    that the sexual function was better once he

2    was off the SSRI; is that the Paxil?

3         A.    Paxil, Prozac, correct.

4         Q.    Okay.  Any changes in the

5    medications at that time in --

6         A.    It doesn't look like I made any

7    changes at that time.

8         Q.    Okay.  Apparently the next visit

9    was in September of '96; am I correct?

10        A.    Yes, September 13th.                08:06AM

11        Q.    Okay.  And that the occasion for

12   that visit was for you to remove some

13   sutures.  He had apparently suffered an

14   injury falling off a ladder.  Is that a work

15   related injury, do you know?

16        A.    Didn't make any notes about

17   that.

18        Q.    Okay.  Down below he says that,

19   and again, your shorthand, something Effexor?

20        A.    Follow up Effexor.                 08:07AM

21        Q.    Follow up Effexor, patient

22   decreased dose due to cost, but doing better

23   with work, correct?

24        A.    Correct, that's my notes.

32

1          Q.    So again, it appears that you've

2     come upon a medication seems to be helping

3     him with his depression, dysthymia?

4          A.    At that point, I think the

5     Effexor was probably more satisfactory.  We

6     were having less side effects, but at that

7     point, you know, my note says he was doing a

8     little better.

9          Q.    Okay.  He saw you again in

10    December, and the concern then was that he          08:07AM

11    had been out in California, he had felt that

12    either because of a food allergy or some soap

13    in a hotel, he had developed some skin

14    irritation or itchiness when showering; is

15    that right?

16         A.    Yeah, primary thing was a rash

17    or an itch, it looks like just trying to sort

18    out causes.

19         Q.    Okay.  You didn't notice any

20    visible rash, but this was the chief              08:08AM

21    complaint, this was the issue for this visit?

22         A.    Correct.

23         Q.    Okay.  He requested some blood

24    examinations at that time?

33

1          A.    Well, back in -- at the May 16th

2    visit that I had had with him, in my notes I

3    actually said because of the weight gain may

4    need labs to rule out other metabolic

5    changes, and I think because that never

6    occurred, I went ahead and, looks like I

7    ordered some screen labs at that time based

8    on that.

9          Q.    Okay.  And he asked, of course,

10   that since you're taking blood anyway, to run        08:08AM

11   an HIV test?

12         A.    Correct.

13         Q.    And you said discussed etiology

14   and will hold soap contact, I'm not sure what

15   you're referring to?

16         A.    There the etiology, since the

17   assessment that day was primarily the rash

18   and itching related to that.

19         Q.    Okay.  It appears that after

20   those labs, the next element seems to be in        08:09AM

21   June of '97; is that right?

22         A.    Last one was --

23         Q.    Maybe these aren't -- maybe

24   these aren't your notes.  In June of '97 he

34

1    apparently was involved in a fight with a

2    fellow employee and had some bruising of his

3    hand from throwing punches, in his chest and

4    upper abdominal area from receiving them.  Is

5    that a note that's contained in your records?

6         A.    I don't have that note.  Like I

7    say, the next note I have after September of

8    '96 goes out to November 15th of '97.  Let me

9    just make sure.

10        Q.    You didn't have --                     08:10AM

11        A.    The notes aren't out of order, I

12   don't see anything in the --

13        Q.    Do you have a Bethesda

14   Tri-Health, Good Samaritan emergency room

15   report from June 6th of '97 in your records?

16   I think that's where I got it.

17        A.    Yeah, that's filed under, so

18   June 6th of '97 there is an ER report there,

19   correct.

20        Q.    Okay.  That was forwarded to you    08:11AM

21   by the ER, I guess?

22        A.    Correct.

23        Q.    And that was what I was

24   describing as the injuries from the fight

35

1    with a fellow employee.

2           A.    Yeah, 6/6/97.

3           Q.    Okay.  You didn't see him

4    actually until November, I think you said, of

5    '97?

6           A.    Looks like that's correct.

7           Q.    Okay.  Was there any change in

8    his condition in November of '97?

9           A.    There was a visit, the

10   November 15th, '97 visit, I have documented        08:12AM

11   primarily as, it looks like it was with my

12   partner, primarily, of poison ivy,

13   dermatitis.  So the actual next visit in

14   terms of noting the depression or treatment

15   was December 12th of '97, and that was, looks

16   like just a med check.

17          Q.    Okay.  There's a note, appears

18   to be a typed note of some substance on

19   12/12/97?

20          A.    Yeah, at that point we had some        08:12AM

21   dictation.

22          Q.    Okay.  During that visit,

23   12/12/97 he told you he was continuing to see

24   his psychologist once or twice a month?

36

1          A.      Correct.

2          Q.      At this point he says he's

3    continuing to run his own business where he

4    employs several engineers and builds robotic

5    type machines on a contractual basis.  He

6    told you he was under a significant amount of

7    stress at work and has some significant

8    indebtedness related to his work; is that

9    right?

10         A.      According to my notes, correct.      08:13AM

11         Q.      Prior to this time, had he told

12   you what his business was at all?

13         A.      Again, recall, I don't know if I

14   knew exactly the nature of his business prior

15   to that visit.  Like I say, since it's not

16   specifically stated in my notes.

17         Q.      Did he ever tell you that he was

18   a manufacturer's rep, that he was doing sales

19   for several different clients or customers

20   and that that was part of the travel he was      08:13AM

21   doing prior?

22         A.      I don't know if I was aware of

23   that.

24         Q.      Okay.  You do recall the earlier

37

1    note early on in your treatment where he said

2    he was going to reduce his travel for

3    business, right?

4          A.    Right.  The travel note, I don't

5    know if I necessarily connected that with

6    sales or not.

7          Q.    Okay.  In this note of November

8    12th he also told you about being back

9    stabbed by one of his engineers concerning a

10   job they were working on and how he sought          08:14AM

11   him out and pummeled him, which, of course,

12   would be related to the June 6th note where

13   he was injured in the fight?

14         A.    Yes, it's in my notes.

15         Q.    Okay.  He talked about his

16   concern over his aggressive tendencies and

17   recently begun to work out on a regular basis

18   in hopes of using some of this.  I'm not sure

19   I catch the drift of that note, can you fill

20   me in?                                              08:15AM

21         A.    In looking back at that, I think

22   I was probably talking about working out in

23   the sense of exercise and trying to release,

24   or you know, reduce some of that aggressive

38

1    tendency in a more productive way than

2    assaulting someone.

3          Q.    Than getting in a fight, right,

4    okay.  I thought I understood that correctly,

5    I wasn't sure.  You say here then the patient

6    went in to significant detail about his

7    present work, job, and the difficulty in his

8    fledgeling business -- the difficulty of his

9    fledgeling business to survive at that time,

10    and that he was concerned that it might not          08:15AM

11    survive because of market place issues for

12    that type of work.

13          A.    Again, in my notes, correct.

14          Q.    Now, the detail that he gave

15    you, of course, was that he's building

16    robotic machines, and apparently, if you make

17    use of the term fledgeling business, this was

18    a new or at least a newer adventure for him

19    in the occupation field?

20          A.    And again, I didn't put any          08:16AM

21    quotation in there so it's hard to say

22    whether that was his quotation versus my

23    interpretation.  So at that point I would

24    have to say that was my interpretation of

39

1    what he was telling me.

2        Q.    Okay.  You wouldn't make

3    reference to a fledgeling business if he had

4    been in the same business for many, many

5    years?

6        A.    Well, I don't know if I could

7    say that as much as I would be looking at

8    that whether this was a new opportunity for

9    him versus, you know, an ongoing steady

10   employment, like I said.                          08:16AM

11       Q.    Okay.  Well, if we take a look

12   at that.

13       A.    I don't have a whole lot of

14   other detail there to tell me.

15       Q.    Sure.  If we take a look at a

16   letter which he apparently gave you a copy of

17   that he sent the following month to a

18   Mr. Harold Shelton.

19       A.    What's the date on that?

20       Q.    The date on it is January 13th,      08:17AM

21   '98, which would be a month and a day after

22   this visit.

23       A.    Can I look and see if I have it?

24       Q.    It came from your notes, it's a

40

1    typed letter, it's got a stamp copy on it,

2    it's a letter from Mr. Kearney to Harold

3    Shelton?

4         A.    Let me see if I can find it in

5    my notes.

6         Q.    Sure.

7         A.    It came out of my chart, huh?

8         Q.    It's got -- your records were

9    marked with your name and the number as we

10   received them.                              08:19AM

11        A.    Yeah.  January 13th, '98.

12        Q.    It's a two page letter from him.

13        A.    Anything that's addressed from

14   the insurance company ends up over here,

15   let's see.  The copy you have, it does look,

16   I mean, that's my signature that I saw it, I

17   may just have to --

18        Q.    This writing at the top is your

19   signature?

20        A.    Yeah, usually if something comes   08:20AM

21   across my desk, that's how I would initial

22   it.

23        Q.    We can work from this copy if

24   it's easier.

41

 1          A.    Yeah, until I can sort through

 2    because I don't think I have any other charts

 3    on him to --

 4          Q.    Okay.  When I'm questioning you,

 5    you can see I've highlighted the one

 6    paragraph, he's talking about the decrease in

 7    his business that he's spent years building

 8    and that the decrease was due to his

 9    inability to spend more time with the

10    business because of his illness, what he's          08:21AM

11    telling Mr. Shelton, correct?

12          A.    Again, in that letter he says,

13    again, these losses were inevitable due to my

14    health condition and not being able to spend

15    as much time working as previously.

16          Q.    Now, he's talking here about a

17    business he's spent many years building,

18    right?

19                MR. WELLINGTON:  Objection.

20          Q.    I'll find it exactly.  "My            08:21AM

21    business which I worked many years to build

22    up has suffered, makes me feel pretty down."

23          A.    It is stated in that letter,

24    correct.

42

1          Q.    Right?  Now, if we're talking

2     about the same business, that would seem to

3     conflict with your use of the term

4     fledgeling?

5               MR. WELLINGTON:  Objection.

6          Q.    If we're talking about the same

7     business, right?

8          A.    And again, looking back at '97

9     and using that word.

10         Q.    Sure.                        08:22AM

11         A.    You know, I don't know I can be

12    clear any more what I was thinking.

13         Q.    Right; I understand.  If however

14    he had a long standing business as a

15    manufacturer's rep, and actually began a new

16    fledgeling business building robotic

17    machines, then both this letter and your

18    notes would be consistent, correct?

19               MR. WELLINGTON:  Objection.

20         A.    Again, I could -- again,         08:22AM

21    thinking back ten years, be using that word,

22    again, also just he might be doing the same

23    work that he's always been doing but a

24    different business opportunity, so --

43

1          Q.     Okay.  When he went in to

2     significant detail about his business he was

3     talking about creating these robotic machines

4     and trying to find a market for them?

5          A.     Is this back at that 12/12/97 --

6          Q.     Yeah, back in the 12/97 note.

7          A.     Correct.

8          Q.     Okay.  Now, under objective you

9     say, patient's thought processes were

10    connected, are not psychotic, although          08:23AM

11    somewhat, and then I appear to be missing a

12    word, somewhat something regarding his

13    business?

14               MR. WELLINGTON:  Are we back to

15    December of '97 or where are we?

16          A.     12/12/97.

17          Q.     Yes.  What's the word I'm

18    missing?

19          A.     There's no word in there, that

20    would have been the person typing the          08:24AM

21    dictation must not have understood a word

22    that I said and it looks like when I signed

23    off on it I never put a word in there, so --

24          Q.     Let's see if we can work our way

44

1    through it.  Patient's thought processes are

2    connected, which means he's thinking

3    linearly, correct?

4         A.    Right.

5         Q.    Right?  And that his thought

6    processes are not psychotic, which means that

7    he's in some grasp of reality at that point

8    regarding his business, right?

9         A.    Well, I don't know in terms of

10   the business situation, I'm just talking        08:24AM

11   about the patient in general.  So his thought

12   processes are not psychotic, correct.

13        Q.    His thought processes although

14   somewhat, and then something different,

15   regarding his business, centering around

16   financial stresses.  Are we looking at

17   pressured or, I mean, how would you describe

18   the thoughts that reflect this, something

19   other than connected and related to his

20   financial stressors?                            08:25AM

21        A.    Initial thing that would come to

22   mind is somewhat focused with regard to his

23   business it might be the word, but --

24        Q.    During the course of your

45

 1    treatment, did you find Mr. Kearney to be

 2    someone who would focus particularly on

 3    certain events in his life to the exclusion

 4    of others?

 5         A.    I don't know, that's a difficult

 6    thing to answer over that many years because

 7    I think we've, you know, my relationship with

 8    him, we talked about a number of

 9    circumstances, so --

10         Q.    If his psychologist, Dr. Judd      08:26AM

11    McClure suggested that he had some

12    significant obsessive traits, that would be

13    consistent with your assessment of Mr.

14    Kearney?

15         A.    I don't know up until that point

16    that I had, at least, used that sort of

17    terminology with him, so I don't know if that

18    was entering into my thought process, at

19    least by '97.

20         Q.    Right.  Up to that point, I        08:26AM

21    agree, you haven't used anywhere in the

22    notes.  We did see a period of months early

23    on when he was focused, for want of a better

24    term, on the effects of the divorce, for

46

1    example?

2        A.    I mean, I think, again, that

3    showed up in those, you know, notes during --

4        Q.    For a period of --

5        A.    Correct.

6        Q.    -- nearly a year, and it was the

7    depression that he was feeling, or the

8    dysthymia that he was feeling and some of the

9    anxiety was all tied into his focus on that

10   event?                                        08:27AM

11           MR. WELLINGTON:  Objection.

12       A.    Again, I don't know that I can

13   say all, because I think in my mind I was

14   continuing to treat him for, you know, both

15   ongoing work stresses, and you know, the

16   family circumstances simultaneously, so --

17       Q.    Right.  Are you suggesting that

18   perhaps the work stresses were independent of

19   the financial, or I'm sorry, independent of

20   the family stresses, or was one maybe causing  08:27AM

21   the other?

22       A.    I don't know that I, according

23   to my notes, necessarily connected, you know,

24   the relationship between the two.  When I use

1    the word stressors I'm looking at that pretty

2    globally in terms of a patient's life, what

3    sort of stressors are going on, and to me

4    that would include work and family.

5        Q.    Okay.  Under your plan on the

6    December 12th visit, you were encouraging the

7    patient to continue to follow up with his

8    psychologist, right?

9        A.    Correct.

10        Q.    And you were -- you said the        08:28AM

11    patient is accepting the fact that his

12    depression may be quite chronic due to family

13    history.  Are you talking about other members

14    of his family who have chronic depression or

15    mental illnesses?

16        A.    Correct.

17        Q.    Was it your assessment or his

18    that this may be a long term disability in

19    his life?

20        A.    You know, that was my        08:28AM

21    terminology.

22        Q.    Meaning that you felt the

23    depression would continue or that the

24    depression was untreatable?

48

1          A.    Well, again, I think from a

2    family practice standpoint, you know, looking

3    at my notes, I'm trying to connect the fact

4    that this has now gone on for at least

5    several years that I've been taking care of

6    him.

7          Q.    Uh-huh.

8          A.    You know, we're seeing, you

9    know, a number of medications that have been

10   tried and used for treatment.  In looking at          08:29AM

11   this family history, which I think I had

12   noted towards the start of this process that,

13   you know -- and that would fit with my

14   dysthymia, you know, diagnosis from the start

15   that there is a portion of this that may also

16   be inherited, and you know, we're just going

17   to have to contend with that in the long run.

18          Q.    So the goal was then to accept

19   the fact that this may be an ongoing issue

20   but to return him to the highest level of          08:29AM

21   functioning possible?

22          A.    Yeah.  I mean, you know, at that

23   point my notes talk about just improving

24   compliance.  Basically at that point there

49

1    were some changes in the medication

2    formulation which allowed us to do once a day

3    dosing, and again, trying to make sure that

4    he was getting the full benefits of his

5    medicines.

6          Q.    Right, but the goal of the

7    treatment was to return him to the highest

8    level of functioning possible?

9          A.    You know, I can say in there,

10   again, it's attempting to deal with it as          08:30AM

11   best as he can.

12         Q.    Later on in that there's a

13   handwritten note that appears to be

14   December 12th of '97 where you make note of

15   seeing a psychologist once or twice a month,

16   work stress and down cycles, we know from

17   your --

18         A.    What's the date of that, please?

19         Q.    It appears to have the same date

20   stamp, December 12, '97; it's on a Christ          08:30AM

21   Hospital progress note form, but it's not

22   typed.

23         A.    Oh, 12/12/97, yeah, that was the

24   initial just handwritten notes that I had

50

1    made prior to the dictation.

2        Q.    Okay.

3        A.    So, it was, you know, that was

4    simultaneous with that dictated note.

5        Q.    You talk about the work stress

6    which he described earlier, that he may not

7    be able to find a market place for the

8    machines that he's building, that was causing

9    him stress, correct?

10        A.    Yeah, in that part of the note,        08:31AM

11    again, I was kind of doing shorthand to

12    myself more as a reminder for the dictation.

13        Q.    Sure, but the paragraph in the

14    dictation it says patient went into

15    significant detail about present work and

16    jobs and difficulty it has been for his

17    fledgeling business to survive.  At the same

18    time, he has an expectation that it may not

19    survive due to the market place for this type

20    of work.  That would be what your handwritten        08:32AM

21    note described as the work stress?

22        A.    Work stress, correct, I thought

23    you were talking about the down cycles

24    comment, sorry.

51

1          Q.     No; no.  Down cycles is the next

2    question.  What exactly is a down cycle?

3          A.     I think, well, and that's what I

4    said.  Looking at that, I think I was -- I

5    would have connected that in my dictation to

6    the, you know, he admits his depression

7    continues to be, you know, cyclical almost

8    week to week with days, you know, so that's

9    where I would have, in my notes made those

10   connections.  The down cycles wasn't                08:32AM

11   necessarily a reference to what his business

12   was doing.

13         Q.     Right; right.  That's his own

14   functioning levels?

15         A.     Correct.  That's where I would

16   have --

17         Q.     Where he functions for a while

18   and then he has a down cycle, and then he

19   returns to function, and then has a down

20   cycle, right?                                        08:33AM

21         A.     Yeah, or at least go more into

22   depression, correct.

23         Q.     Your assessment was he has

24   depression and situational stress, and the

52

1     situation he was focused on at that time was

2     trying to get this fledgeling robotic

3     business to survive?

4          A.    Correct.  Most of that was

5     around the business.

6          Q.    Was it -- well, let me ask it

7     this way.  I see some phone notes from April

8     and September of '98 concerning medications,

9     and at least in April of '98 was suggesting

10    he was only using the Paxil as needed?          08:33AM

11         A.    Which note was that, excuse me?

12         Q.    It appears to be a phone note

13    from April the 2nd of '98?

14         A.    For the Xanax, not Paxil.

15         Q.    The prescription for Xanax?

16         A.    So Xanax he was using PRN, not

17    Paxil.

18         Q.    Right.  Xanax is the anxiety

19    issues?

20         A.    Correct.                              08:34AM

21         Q.    And apparently he was not

22    needing that on a daily basis?

23         A.    That's the way I would interpret

24    that, PRN means as needed.

53

1        Q.    Okay.  And September 18th of

2  '99, is that the next time you saw him, or

3  was the September of '98 --

4        A.    I show a note from

5  September 22nd, '98, it says dictated, but I

6  don't see -- well, actually, it's misplaced.

7  I got some notes out of order here.

8        Q.    Which is probably why I'm not

9  seeing it either.

10        A.    It's actually in the copies, it    08:35AM

11  looks like it's forward a few pages, looks

12  like there's a November, yeah, here's

13  September.  One side with the dictation and

14  the other side with the notes.

15        Q.    May I see that a second because

16  I think I only got the one side.

17        A.    Like I say, in my copies it got

18  stuck up in the 2000 notes, so there was a

19  page out of order there.  So --

20        Q.    Okay.  That note is from --    08:36AM

21        A.    That ties into the -- there's a

22  stamped note and a little bit of handwriting.

23        Q.    September 22nd?

24        A.    '98, correct.

54

1        Q.    Now, in your dictation of that

2   note, he is describing the financial

3   stressors, is that fair, at that point?

4        A.    I mean, I made a note that he

5   had decreased his Effexor use because of the

6   cost of the medication as patient is still

7   struggling financially.  He's going through

8   near bankruptcy with this business.

9        Q.    Okay.  So the business

10  apparently, the fledgeling business                08:37AM

11  apparently is not surviving very well causing

12  some financial stresses.  In addition he

13  suggests that he may be going bankrupt

14  because of that business failure; is that

15  right?

16       A.    Correct, that's all his history,

17  uh-huh.

18       Q.    And he also gives you a history

19  of having had to file suit against one of his

20  customers because they weren't paying for the     08:37AM

21  machine?

22       A.    Correct.

23       Q.    So, those were the stressors

24  that he was dealing with and that you were

55

1    evaluating in November of '98, is it?

2              MR. WELLINGTON:   September.

3         Q.    September?

4         A.    September 22nd, '98, correct.

5         Q.    You saw him again, apparently, a

6    year later, is that the next visit?

7         A.    Next note I have is dictation

8    9/27/99, correct.

9         Q.    Did you have a note or were you

10   provided a note from Dr. Stephen Baxter who        08:38AM

11   saw him four days earlier, September 18th of

12   '99?

13        A.    Just looking at that visit I

14   don't have a note about that letter, I can

15   see if that one is also in the chart.

16        Q.    It's a chart note from Dr.

17   Baxter from University Hospital emergency

18   room.

19        A.    Oh, the -- at the visit I made

20   note he was in the U.C. ER.  Let me see if I       08:39AM

21   have the --

22        Q.    It's not terribly important.

23        A.    Okay.

24        Q.    The note reflects that he

56

1      sustained an injury at work when cutting some

2      heavy plastic and the plastic jumped up and

3      apparently cut his fingers.

4            A.    Correct.

5            Q.    And then you saw him following

6      that as a follow-up visit to evaluate the

7      injury to his fingers, I would assume?

8            A.    Suture removal, correct.

9            Q.    So apparently at least a year

10     after the last note there was -- he was still    08:40AM

11     in the business of manufacturing something?

12           A.    Again, from my notes, all I made

13     note of is that he was using a piece of

14     machinery, so I don't know if at that time,

15     at least, looking at my notes, I'm aware that

16     was the same business he had been in or not.

17           Q.    Okay.  The history from the

18     emergency room says the patient is a 46 year

19     old male, with a complaint of an injury to

20     his hand.  He states that he was at work      08:40AM

21     cutting some heavy plastic on a saw and the

22     plastic jumped up and hit him in the hand.

23                 So, again, you're right, we

24     can't tell what work, but it's some work he

57

1    was using a saw or machinery cutting some

2    heavy plastic and suffered an injury?

3        A.    Correct.

4        Q.    You followed up with him on the

5    hand, removed the sutures.  Was it at that

6    point that you suggest maybe some physical

7    therapy because he was complaining of

8    stiffness, or was that later?

9        A.    It looks like at that

10   September 27th visit I encouraged patient on        08:41AM

11   range of motion and to consider physical

12   therapy referral.

13       Q.    Okay.  And you put an addendum

14   to that note, the prior part of the note

15   above the addendum all deals primarily with

16   the injury to his fingers, right?

17       A.    Correct.

18       Q.    The addendum you talk about the

19   fact that you had been seeing him for chronic

20   dysthymia, he had been on Effexor for an        08:41AM

21   extended period of time, does seem to be

22   helping his mood, but the most significant

23   side effect is aggravation of sexual

24   function.  Does that mean it's disrupting the

58

1    function, or it's increasing the drive, or

2    what?

3         A.    Again, generally with those

4    medicines the primary thing is -- and I think

5    with the prior notes, it changes ejaculation

6    and sometimes can effect, and it would be

7    more likely to decrease drive or --

8         Q.    Okay.  So, by aggravating the

9    sexual function, that's what you're referring

10   to, it's causing more problems with it?              08:42AM

11        A.    Correct.

12        Q.    Right?  And at that point you

13   started suggesting or maybe even began at

14   that time to switch him from Effexor to

15   Serzone?

16        A.    Correct.

17        Q.    Again, trying to maintain

18   treatment for the dysthymia but reduce the

19   side effects?

20        A.    Correct.                                  08:42AM

21        Q.    It appears you saw him October

22   of '99, is that a month later; about a month

23   later?

24        A.    Correct, October 29th.

59

1    Q.    When you talk about weaning him

2    off of Effexor and starting Serzone, Effexor

3    is a drug that you can't simply stop and

4    replace, is that what you're suggesting?

5    A.    Correct.  There are physical

6    withdrawal symptoms that people experience

7    with Effexor.

8    Q.    So, you slowly reduce the dose

9    down to where you then can substitute the

10   Serzone for it?                              08:43AM

11   A.    Yeah, and usually it looks like,

12   usually my intention back then, I think by my

13   notes, was usually I'll start the Serzone

14   even at a point where he's still on the

15   Effexor so there is some cross over there.

16   Q.    Which he felt the Serzone was

17   more effective helping him to sleep better,

18   his overall dysthymia symptoms were better,

19   somewhat better?

20   A.    Yeah, and the history there it     08:43AM

21   says, yeah, he feels it is more effective and

22   has decreased some of the sexual side effects

23   he is having.

24   Q.    Okay.  Objectively at that visit

60

1    in October you're talking about the stiffness

2    in fingers from the prior work injury, and

3    then you made note that he's well kept,

4    meaning he's appropriately groomed and taking

5    care of himself; thought processes are clear

6    and linear, which means he's thinking

7    correctly?

8        A.    Correct.

9        Q.    And at that point at least he

10   didn't seem terribly depressed?                08:44AM

11       A.    I just said unusually depressed,

12   correct.

13       Q.    The next note that I have, and

14   this is perhaps not a note of yours, this is

15   Peg Ebert from the Christ hospital, in

16   November of '99, which apparently was the

17   physical therapist, Spectrum Rehabilitation

18   Services?  I have very few questions about it

19   so I'll save you time.

20       A.    It could be listed separately.      08:45AM

21       Q.    In this one the patient reported

22   independent with self care and home

23   management, the patient is responsible for

24   multitasks at a factory for robotics,

61

```
1    suggesting perhaps his injury to his hand was

2    in this robotic factory, which was the

3    fledgeling business that he was struggling

4    with, correct?

5              MR. WELLINGTON:  Objection.

6         A.    Usually the physical therapist,

7    I think they are just more trying to note

8    with the work that he does, is he -- with his

9    injuries, were the injuries recovered that he

10   would be capable of doing that.  So I don't          08:46AM

11   know if I would necessarily connect that

12   statement with that's where the -- where it

13   happened, I don't know.

14        Q.    Okay.  Well --

15        A.    She's talking about activities

16   of daily living, which is kind of our jargon

17   for, again, you know, for his activities

18   which would include that sort of work.

19        Q.    Right.  But she certainly

20   wouldn't have come up on her own with the            08:46AM

21   concept that he was in a factory making

22   robotics, would she?  She would have to get

23   that from him?

24        A.    That was her history, correct.
```

62

1          Q.    She also noted the patient was

2    attentive and interested during evaluation,

3    asked appropriate questions and processed

4    information correctly.  Is that pretty much

5    what you observed of Mr. Kearney on your

6    visits, at least up to that point?

7          A.    I don't think I would have any

8    disagreement with that statement that she

9    made.

10         Q.    I see a progress note from you          08:47AM

11   on December the 20th of '99, would that be

12   the next visit?  A dictated note, at least,

13   that I have, he was pleased with the change

14   to Serzone, it had reduced the side effects

15   that he had been experiencing on Effexor,

16   right?

17         A.    Correct.

18         Q.    He says he remains optimistic

19   that in spite of his injury on his left hand

20   recent interest in some of his inventions          08:47AM

21   would give him contracts, but he recognizes

22   there are safety issues with his left hand

23   operating certain equipment at the present

24   time.  He's talking about potential up swings

63

1    in his business?

2         A.    Again, that was history from

3    him, but yeah, remains optimistic, would have

4    been, you know, something that I would have

5    noted from him.

6         Q.    Optimism is not something I

7    generally associate with depression.  Is this

8    just simply one of his times when he's not in

9    the down cycle that you described?

10        A.    And I think, again, that I would      08:48AM

11   in that sentence, connect it with, you know,

12   that someone, again, having some interest in

13   some contracts would be a financial, you

14   know, help to him, so --

15        Q.    He's, throughout the course of

16   your treatment, been fairly focused on

17   financial issues?

18        A.    I mean, there definitely is, you

19   know, notes along those lines even to the

20   point where I said he decreased his           08:48AM

21   medication because of that.

22        Q.    From the very beginning it's one

23   of the subjects that he would bring up to you

24   is the financial situation?

64

1          A.     Correct.

2          Q.     Objectively you suggest that

3    he's a relatively intense white male?

4          A.     Uh-huh.

5          Q.     In trying to -- what do you mean

6    by relatively intense?

7          A.     And again, I would relate that

8    to some of my previous comments in terms of

9    how he focuses on certain things, and I think

10   that's, you know, again, just an observation          08:49AM

11   in terms of the things do seem to come back

12   to center around a particular area where

13   this, you know, work situation and so forth

14   come up, you know, that's a pretty consistent

15   thing.

16         Q.     So, there's a tendency on his

17   part to become focused on specific items.

18   For example, early on we saw regularly in

19   your notes discussions of the stresses, the

20   family stresses and the business stresses and         08:50AM

21   the stages at that time.  Then there was the

22   focus on the robotics business and trying to

23   find a market for it, and concerned about the

24   failure, and again, the finances.  And then

65

1    throughout the course he always has something

2    that is the central part of his thinking; is

3    that fair to describe?

4              MR. WELLINGTON:  I'll object to

5    form.

6         A.    Yeah, I don't know if I can word

7    it exactly that way.  I mean, I think in

8    terms of how we take a history from people,

9    we do definitely focus on what we call a

10   chief complaint.  So, you know, initially          08:50AM

11   always our office visits come back to what is

12   the person's, you know, initial, primary

13   expression.  And like I say, most of that

14   shows up in my notes, you know, more as, you

15   know, what did the patient tell me that day,

16   so --

17        Q.    Sure.  But this patient, if you

18   follow your notes from kind of stepping back

19   and looking globally at them, he has focuses

20   at different times, on different issues, the     08:51AM

21   finances are always an underlying focus, and

22   then there's focus on the family history, and

23   then there's focus on the new business, and

24   then there's focus on something else?

66

```
 1         A.    Correct.  And like I say, I
 2    think from a family practice standpoint we
 3    don't always assume that some of the other
 4    stressors, even though we may have talked
 5    about at a prior visit, went away, you know,
 6    as much as at that particular visit wasn't
 7    the primary focus.
 8         Q.    They are the ones that, when you
 9    say the primary focus, that would be the
10    thing that's attracting his attention and his    08:51AM
11    energy?
12         A.    At this particular visit with
13    me, correct.
14         Q.    Right.  And when you say he's
15    intense, he -- when he focuses, he really
16    focuses, sometimes to the exclusion of some
17    other things?
18         A.    Since that's the first time I've
19    used this word with him, I don't know that I
20    would, you know, again, I was just making an    08:52AM
21    observation at that particular time.
22         Q.    All right.  I then see a note
23    on 9/26 of 2000, is that the next visit?
24         A.    Actually, I have one April 10th
```

67

1    of 2000.

2         Q.    Ah, yes, okay.  I missed that

3    one.  Basically just a follow up on

4    medications, there's no real history or

5    complaints.  He does tell you that he's

6    taking Metabolife in April of 2000?

7         A.    Correct.  I do make that note.

8         Q.    I may only have the handwritten

9    portion of that, do you have a typed?

10        A.    Yeah, I do have a dictation.        08:53AM

11        Q.    Can I see it for a second?

12   We'll have to maybe get a new set of copies

13   that have both sides here.

14             MR. WELLINGTON:  What's the date

15   on that one?

16        A.    November 9th -- I'm sorry, it is

17   April 10th of 2000.

18   (Off the record discussion.)

19        Q.    All right.  When we left off,

20   Doctor, we were talking about the April 10th,      09:00AM

21   2000 progress note.  I appreciate you getting

22   me a copy of the typed one.  In that there

23   was a follow up on his hands and fingers from

24   the prior injury, agreed?

68

1          A.     Yeah, follow up on meds and then

2    follow up on the crush injury, correct.

3          Q.     Told you about seeing Dr. Judd,

4    that he's been seeing for a number of years

5    for his chronic depression and dysthymia and

6    partial disability?

7          A.     Correct.

8          Q.     And then he told you he

9    continues to be self-employed and he brought

10   in some pictures to show you the kind of work        09:00AM

11   he had been doing, pictures of machines he's

12   been making, that kind of thing?

13         A.     I believe it was at that time.

14         Q.     Okay.  Your assessment was he

15   had chronic depression and dysthymia, he had

16   some weight loss, which -- oh, you were

17   following up on his medical effects.  He had

18   the injury to his left hand, and a new issue

19   is hypercholesteremia?

20         A.     Right.  That would have been        09:01AM

21   based on some of his prior labs, correct.

22         Q.     Okay.  That is a -- this was

23   what they used to call hardening of the

24   arteries, you get some cholesterol build up

69

1    in the arteries, it tends to decrease blood

2    flow?

3        A.    This would just be noting that

4    he had high cholesterol levels, yeah.

5        Q.    The issue with cholesterol is

6    that you don't want it to develop to the

7    point that it blocks up arteries to the heart

8    or cause heart attack or whatever, where you

9    have to get a stint or whatever, correct?

10       A.    Correct.                          09:01AM

11       Q.    Did you put him on medication

12   for that, for the high cholesterol?

13       A.    At that time, no.

14       Q.    Recommend change in diet?

15       A.    We were checking his labs at

16   that point, correct.

17       Q.    Okay.  Did you continue with the

18   Serzone and the Xanax?

19       A.    Yes.

20       Q.    You will continue to monitor the   09:02AM

21   DJD changes.  What are DJD changes?

22       A.    Degenerative joint disease

23   changes.  It looks like up in my review of

24   systems, he had noted some pain in a great

70

1    toe.  Orthopedic doctor had diagnosed him and

2    so I didn't put that in my diagnosis, but

3    just made more of a note of that for me.

4         Q.    Maybe developing some arthritis?

5         A.    Correct.

6         Q.    Okay.  A little young for that,

7    isn't he?

8         A.    Sometimes that could be based

9    off of old injuries or other things, so --

10        Q.    Okay.  Then September 26th of          09:03AM

11   2000, are we in the same note here where

12   you're going to repeat the lipid profile and

13   the cholesterol test?

14        A.    September 26th, 2000, yes,

15   that's the next visit, correct.

16        Q.    So you're following up on the

17   high cholesterol, you're also talking about

18   increasing the dose of Serzone.  Is he having

19   some increased depression at that time or --

20        A.    In looking back at my notes, he        09:03AM

21   had a nephew that was killed in an auto

22   accident and he was also anticipating a move

23   back to the Wooster area.  And then there

24   was -- that involved, then, a breaking up of

71

1    a girlfriend relationship, so there was a

2    number of other situational stressors coming

3    in at that point that was involved with the

4    medications.  In looking at the medication

5    change it looks like, at least in my notes I

6    just discussed bumping it up, correct.

7         Q.    Okay.  So, he's dealing with a

8    break up of a girlfriend, what, several

9    months or longer?

10        A.    Well, according to my notes it        09:04AM

11   says this is going to involve breaking up if

12   he moved, is kind of the way I worded it, so

13   I don't know if that actually happened.

14        Q.    And then the death of his nephew

15   that he was taking hard, right?

16        A.    Yeah.  Objective part I did talk

17   about him expressing his grief.

18        Q.    So we have some increased

19   stressors and response is to increase the

20   Serzone to help deal with them during that      09:05AM

21   period of time?

22        A.    Yeah.  It looks like I discussed

23   increasing it at that point in time.  Let me

24   look if he was at 400 milligrams prior, I did

72

1     take him up to the maximum dose of 600

2     milligrams.

3          Q.    Was this primarily to deal with

4     the increased situational stresses at that

5     time related to the family and the move?

6          A.    In my plan, I mean, I stated

7     overall depression, but also decreasing some

8     of the anxiety symptoms, so --

9          Q.    The next note I see is January

10    of 2001, about three months later?                    09:06AM

11         A.    Correct.

12         Q.    Right?

13         A.    January 10th, 2001.

14         Q.    Okay.  Is that note dictated as

15    well or is it simply written?

16         A.    All I have is a handwritten note

17    that time.

18         Q.    Okay.  Good.  We're on the same

19    page then.  At that time he told you he had

20    moved to Wooster.  He said he hasn't been         09:06AM

21    working for three months due to financial

22    uncertainty.  Did he describe what that

23    meant?

24         A.    Looks like in my notes I don't

73

1    have any other detail about that, so just

2    history from him.

3         Q.    Okay.  But we knew he was having

4    difficulties with the business all along and

5    that he had filed suit against one customer

6    that wasn't paying for the machine that he

7    built, right?

8         A.    Correct.

9         Q.    Because of that circumstance, he

10   says he's more depressed and anxious but he        09:07AM

11   still has hopes for securing a patent on one

12   of the machines that he built, right?

13        A.    Correct.

14        Q.    In your review you found that

15   his thoughts were appropriate to the

16   circumstances and his thought processes were

17   clear but that he was -- he had a, is that a

18   sad affect?

19        A.    Yeah, that was in the physical

20   exam part, correct.                                09:07AM

21        Q.    Your assessment --

22        A.    Sad affect.

23        Q.    Your assessment was chronic

24   depression and anxiety, exacerbated by

74

1    situational stress?

2        A.    Correct.

3        Q.    You also suggested he

4    discontinue taking the Metabolife because it

5    might be aggravating his anxiety, right?

6        A.    Correct.

7        Q.    At that time, again, his focus,

8    as it has been the past several visits, has

9    been on the finances and issues regarding his

10   business and the lack of success in the          09:08AM

11   business?

12       A.    There was also the history line

13   in terms of where he had stated in terms of

14   increased stress primarily due to dealing

15   with disability company.

16       Q.    Okay.  Trying to find that line.

17       A.    Up in the history under he has

18   moved to Wooster, not working.

19       Q.    Not working for three months due

20   to financial uncertainty, increased stress       09:08AM

21   due to dealing with disability company.  Did

22   he describe what his dealings were with the

23   disability company, or what his concerns

24   were?

75

1        A.    Again, outside of that statement

2   I don't have anything else listed for that

3   visit.

4        Q.    Okay.  Shortly after that he

5   asked you to send a copy of his records to

6   attorney Bruce McIntosh and to him?

7        A.    Maybe it's in a different part

8   of the chart, but --

9        Q.    Yeah, dated 1/10/01?

10       A.    It must have been put on the            09:09AM

11  other side of the chart here.  I'm assuming

12  it's also in here just filed with the

13  progress notes here, so let me see if I have

14  that.  I don't see that particular release

15  but it may be on the other side of the chart.

16       Q.    For the record, it's Bates

17  stamped Lehenbauer 002.  The next thing I see

18  in your chart is a letter from Mr. Kearney to

19  you dated March 26th of '01?

20       A.    Correct.                                 09:11AM

21       Q.    Which he suggests that his

22  stress is down from a few months back, that

23  he was able to reduce his use of Xanax,

24  right?

76

1          A.     Correct.

2          Q.     And he also adds a PS telling

3     you that he had been sent to a couple of

4     doctors for testing and assessment.  This was

5     done for the -- and I can't read the bottom

6     of it, can you?

7          A.      It was -- and I actually wrote

8     when I initialed this one, in parenthesis put

9     missing info, so, yeah.  The line got cut off

10    after this was done for the partial slash,          09:12AM

11    looks like report, but underneath that --

12         Q.     Probably for the partial

13    disability claim, at least that's a

14    reasonable assessment?

15         A.      Yeah, I would assume since it

16    was faxed, I think that just got cut off.

17         Q.     Right.  And in June of '01, he

18    actually brought in the reports of the

19    medical examiner, the psychiatric examiners

20    who did the IMEs, right?                            09:12AM

21         A.      Yeah, it appears that I got

22    those reports at that time.

23         Q.     Do you know whether he brought

24    them in or whether they were sent to you

77

1    actually by the insurance company?

2        A.    I think at that time, because it

3    looks like I labeled and reviewed them the

4    same date, so I think they were probably

5    brought in by him and he we made copies or he

6    gave me copies.

7        Q.    Did the insurance company ask

8    for your views of the reports to your

9    recollection?

10       A.    Not that I'm aware of.                09:13AM

11       Q.    When you reviewed them, did you

12   find them to be appropriate, thorough

13   evaluations of Mr. Kearney?

14       A.    Yeah, at that particular visit,

15   looks like copies of the report in my notes,

16   at least, again, I say copies of reports

17   given and impressions reviewed.  And at the

18   bottom of the note in the plan I said, will

19   review written reports in depth and sign off

20   on these reports when completed.  So that      09:13AM

21   would have been later, that was to me.

22       Q.    Yeah, who were you going to sign

23   off for?

24       A.    To me, yeah, just more because

78

1    usually someone presents me with a, you know,

2    the length of those reports it would have

3    been difficult to, you know, review it as

4    thoroughly as I would like until after hours

5    or later.

6         Q.    And both of those reports did,

7    in fact, find that he had some psychological

8    issues that were causing some impairments in

9    his function, right?

10        A.    Correct.                          09:14AM

11        Q.    In that note of June 29th, 2001,

12   which would be your next visit with him, when

13   he would have brought these reports for you,

14   he said that apparently in spite of the fact

15   that these evaluations found that he was

16   entitled to benefits and still impaired, that

17   he felt threatened by the disability insurer

18   and that he had looked into legal recourse.

19   Did he tell you what the problem was?

20        A.    At least by my notes at that       09:15AM

21   time, I don't have any other detail of that.

22        Q.    Okay.  Did he tell you he was

23   receiving benefits and had been for years?

24        A.    Again, by my notes, I don't make

79

1    note of the benefits.

2        Q.    Okay.  Later on in that same

3    note he says he was anxious about the

4    continued harassment from the disability

5    company.  And did he tell you what they were

6    doing to harass him other than asking him to

7    have an independent medical examination?

8        A.    Again, ask that question again.

9        Q.    Yes.  Under the physical exam

10   you say alert, anxious about continuing, and        09:16AM

11   then you put in quotes, which apparently it's

12   his word, harassment?

13       A.    Continued harassment from the

14   disability company.

15       Q.    Did he tell you what the

16   harassment was?  I mean, you know that they

17   had sent him for independent medical

18   examinations, was that the harassment that he

19   was talking about?

20       A.    Again, not from the note, but          09:16AM

21   just recalling, I think he felt, you know,

22   the sense being pursued or questioned about

23   his -- about his disability.  But again

24   that's -- I don't know if that's from, you

80

1    know, from memory versus, like I say, from

2    that note, I'm putting it in quotes primarily

3    because that's how he's presenting it to me.

4        Q.    Have you dealt with people on

5    disability other than Mr. Kearney?

6        A.    I've had other patients with

7    disabilities, correct.

8        Q.    Fairly common for the insurance

9    company to question and ask for notes and

10   have independent medical exams, isn't it?        09:16AM

11             MR. WELLINGTON:   Objection.

12       A.    Not uncommon to have other

13   outside evaluations, correct.

14       Q.    Okay.   Later on in that note you

15   talk about the absence of clear manic

16   features, and on the other side under plan

17   you talk about discussed mood stabilizers.

18   Was there a potential consideration at that

19   time that there may be a bi-polar or manic

20   depressive aspect to his illness?              09:17AM

21       A.    Actually, I think that was first

22   raised in those records from the independent

23   examiners.

24       Q.    So those doctors were

81

1    questioning him?

2         A.    Yeah, those doctors raised that

3    possibility.  And I think in my notes I was

4    stating that clear manic features, to me, and

5    but psychologists, and I may have left out a

6    word, has not been concerned either with

7    bi-polar.  So, I think at that point I'm just

8    trying to balance this information that I had

9    just received with, you know, to that point

10   how I had been treating him.                    09:18AM

11        Q.    Now, bi-polar, as I understand,

12   is going to extreme highs, from manic, full

13   of energy, full of life, full of everything,

14   and then down into dark depression and back

15   up again, right?

16        A.    That can be cyclical -- cyclical

17   features, correct.

18        Q.    In his case we had the

19   depressive or down cycles that you described,

20   but he never really rose to the manic level   09:18AM

21   that you --

22        A.    And that's what I was saying,

23   yeah, in my exam to me, not clear manic

24   features, correct.

82

1          Q.    So, the cycles were there, but

2    the heights of manic, which would be required

3    for a bi-polar diagnosis, were absent?

4          A.    In my mind I didn't have a

5    history of mania, correct.

6          Q.    Okay.  From that visit forward,

7    is it fair to say that every visit that he

8    had with you, or nearly every visit that he

9    had with you demonstrated a focus on the

10   disability insurance and his disagreements        09:19AM

11   with them?

12         A.    And I would have to review each

13   of those office visits since I'm also foggy

14   on things that --

15         Q.    Let's work our way through them,

16   but keep that in the back of your head.  The

17   next visit is March 15th, 2002; is that

18   correct?

19         A.    Correct.

20         Q.    Very anxious today?                     09:20AM

21              MR. WELLINGTON:  What's the

22   date, I'm sorry?

23         A.    March 15th, 2002.

24         Q.    Very anxious today but he's been

83

1      off the Serzone dose for two nights?

2            A.    Correct.

3            Q.    So, he had stopped taking the

4      medication, or had run out of it?

5            A.    At that point I don't have an

6      idea of whether he just ran out or hasn't

7      taken it.

8            Q.    Okay.  Normally takes Xanax but

9      limiting it to avoid over use, so he's kind

10     of --                                          09:20AM

11           A.    All by history.

12           Q.    Kind of adjusting his own

13     medications as he sees?

14           A.    Well, the Xanax was PRN

15     previously, prescribed as needed anyways.

16           Q.    Now it says, now there's no

17     business presently secondary to the increased

18     stress related to the disability, right?

19           A.    Yep, that's a history from him.

20           Q.    That's the history from him.     09:21AM

21     Now, in the prior several notes he's been

22     talking about the fact that his business is

23     down, he's got nobody to sell these machines

24     to, he couldn't find a market for it, right?

84

 1    And his only hope was to get a patent for

 2    this machine, do you remember those notes?

 3                MR. WELLINGTON:  Objection.

 4         A.    Yeah, it wasn't the very last

 5    visit, but I think I recall the visit prior.

 6         Q.    Now, he's relating the loss of

 7    business to his increased stress levels

 8    because of this disability insurance in the

 9    note of March '02?

10         A.    The 15th all I said was related        09:21AM

11    to disability, and again, I didn't say

12    necessarily disability insurance company

13    either.

14         Q.    Well, if we look down further in

15    the note, he sought out help from national

16    experts to support his case of disability;

17    he's preparing for a lawsuit.

18         A.    Preparing self for lawsuit,

19    correct.

20         Q.    Right.  On the other side is,        09:22AM

21    thought processes are clear and linear, but

22    very focused on the effect of life from his

23    disability company, right?

24         A.    Which side are you on on that

85

1      note?

2              Q.      I was just reading down.

3              A.      Focused on effect of life --

4              Q.      Again, I was just reading --

5              A.      -- from his disability.

6              Q.      Basically this note was, my life

7      is awful at this point, and it's all because

8      of the disability company, right, March of

9      2002?

10             A.      I mean, most of that, again,           09:22AM

11     ties around to the -- I mean, notes about the

12     anxiety, in my mind, I would have been

13     thinking also about, you know, if he hadn't

14     taken his medicine for a couple days.  You

15     know, this case obviously got some lines from

16     me, so, but in terms of my physical exam,

17     thought processes were focused on the effect,

18     I don't know if I -- effect of life, but

19     probably on his life from disability.

20             Q.      I'm sure, yeah, but the overall       09:23AM

21     picture, March 15th, 2002, that he was

22     presenting was that his business is down, his

23     anxiety is up, his depression is worse, he's

24     very stressed, all because of his disability

86

1    insurance?

2         A.    I mean, and again, the line that

3    I used in terms of the -- at the top of that

4    note just related to disability.  I'm not

5    sure I was thinking his disability in regards

6    to his depression versus, you know -- but I

7    guess what I hear you asking is it says

8    disability insurance company and I'm

9    separating those two, I guess, to some

10   extent.                              09:24AM

11        Q.    I understand that you are and

12   here's where my question comes in, why all of

13   a sudden is his stress increase related to

14   his disability?  He's had this disability

15   since 1993?

16        A.    Again, trying to think back to

17   2002, you know, what I was stating there, and

18   this is more coming from him, no business

19   presently, secondary to increased stress

20   related to disability.                09:24AM

21        Q.    He was telling you that the

22   disability and the battle with the insurance

23   company is so stressful that he can't do any

24   business, right?

87

1          A.     And again, it comes back to --

2     and I didn't put it in quotes, so I don't

3     know if those are his words or my

4     interpretation of his words.  So at that

5     point all I can say is it's my interpretation

6     of taking his history from him.

7          Q.     But his focus in everything he

8     told you below, because you wouldn't have

9     known it otherwise, was what he perceived as

10    an on -- a soon to be legal issue with the          09:25AM

11    disability insurer?

12         A.     And I think I had made some

13    notes in prior visits about the possibility

14    of lawsuits, or he had mentioned that there

15    was something ongoing, so --

16         Q.     Did he tell you whether or not

17    he was being paid his benefits throughout

18    this whole period of time?

19         A.     I don't know if I have that in

20    my notes or not to this point in time, so --      09:25AM

21         Q.     Were you under the impression

22    that the disability company was not paying

23    benefits, that's what the fight was about?

24         A.     I think my feel, at least,

88

1      looking at these notes was more that -- more

2      of the feeling of harassment, doesn't really

3      have to do with whether he was receiving

4      disability or not, so --

5          Q.    Okay.  But you don't know as we

6      sit here what this harassment was other than

7      what would be normal asking for independent

8      medical examinations and some supporting

9      documents, right?

10         A.    I'm not necessarily connecting          09:26AM

11     those two, I mean, the independent

12     evaluations I looked at as just being

13     something that his insurance company had

14     asked him to do to verify, you know, the

15     diagnosis that I had been treating him for,

16     and his psychologist had been treating him

17     for.  I would, in looking back at those

18     notes, still separate out that his feeling of

19     harassment was really a separate issue, not

20     having to do those things, or having to be          09:26AM

21     evaluated, but was something still different.

22         Q.    The very first time that he

23     starts mentioning anything about the

24     disability insurance company is after this

89

1     request for an independent medical exam, is

2     it not?  Prior to that IME, in your notes,

3     there's no mention of it at all, is there?

4     Other than the fact that he's making a claim

5     for it?

6          A.    I mean, that was in terms of

7     using the word harassment showed up in

8     June 29th, 2001.

9          Q.    Which was after the independent

10    medical exams?                              09:27AM

11         A.    Right.  I mean, that's the first

12    time I saw those, correct.

13         Q.    And from that date when he told

14    you he had to do the independent medical

15    exams forward, your notes, at least to where

16    we are now in March of 2002, the notes are

17    reflecting his focus as we've discussed in

18    the past, now being on issues with the

19    disability insurance carrier?

20         A.    You know, the January 10th of    09:28AM

21    2001, which would have been before, I think

22    before those evaluations, again, I had that

23    line in there, increased stress primarily due

24    to dealing with disability company, so --

90

1         Q.    Uh-huh.

2         A.    I mean, the timing, I mean,

3    sounds like he and I had talked about it in

4    January 10th, or he had at least mentioned it

5    to me at that time, and again, I don't know

6    that I was aware that he was going to get

7    other evaluations until he showed up at that

8    next visit, so --

9         Q.    Yeah.  What are the dates of the

10   evaluations?                                09:28AM

11        A.    I think they were March, I think

12   the one from the psychiatrist was March 19th,

13   and there was another one that was dated

14   March 4th.

15        Q.    Uh-huh.  You agree those would

16   have had to have been set up in advance?

17        A.    I can make that assumption, all

18   I'm saying is that --

19        Q.    Right.

20        A.    -- at the January visit there      09:29AM

21   wasn't any mention of that to me.

22        Q.    No mention --

23        A.    That I have in my notes.

24        Q.    -- of any independent medical

91

1    exams?

2           A.    That I have in my notes.

3           Q.    Very good.  Next visit is

4    October 2002; October 22nd?

5           A.    I have a visit March 15th of

6    2002?

7           Q.    I'm sorry, yeah, that's the one

8    I thought we were just discussing before.

9    Very focussed on the effects on his life of

10   his disability company.  Isn't that the one        09:29AM

11   we were just discussing?

12          A.    I'm sorry.

13          Q.    The next visit is October 22nd,

14   2002?

15          A.    Correct.

16          Q.    In that he's complaining that

17   he's still on edge concerning the battles

18   with the disability company.  Has attorneys

19   involved in the process, getting expert

20   opinions, right?                                    09:30AM

21          A.    Yes.

22          Q.    On this visit he doesn't even

23   talk about his business, now the only focus

24   is on the disability company, right?

92

1          A.    Yeah.  I mean, I made a note

2    that was under the physical exam part in

3    terms of what he's telling me and the history

4    part of depression continues to be monitored

5    by psych, which I don't really clarify in

6    the -- the note under the physical exam.

7          Q.    Uh-huh.  But that's, I mean,

8    obviously --

9          A.    His expressions are primarily

10   focused around these battles with the              09:30AM

11   disability company.

12         Q.    And he was intense about it,

13   wasn't he?

14         A.    I put remains on edge.

15         Q.    We go from there to November of

16   '03?

17         A.    Yes.

18         Q.    Again, he no longer talks about

19   his business, he no longer talks about his

20   family, he no longer talks about his              09:31AM

21   girlfriend, his focus is once again on the

22   disability battle, right?

23         A.    Well, in that note -- we're at

24   November 25th of 2003, correct?

93

1          Q.      Correct.

2          A.      Just to clarify, I mean, in that

3     note I do have he is remarried and going to

4     infertility work up.  So I would have also

5     included that kind of as a stressor and I did

6     note in my assessment and plan with multiple

7     stressors.

8          Q.      Looking for the --

9          A.      On that note it's towards the

10    bottom left there.                              09:32AM

11         Q.      Okay.  I'm looking, 58 years

12    old?

13         A.      Brother with coronary artery

14    disease, five vessel cabbage bypass.

15         Q.      Also has positive --

16         A.      -- family history in father and

17    paternal aunt, I was connecting that with the

18    coronary artery disease part.

19         Q.      Okay.  His weight is up

20    11 pounds, still pending lawsuit with          09:32AM

21    disability battle continues to be stressful

22    and has --

23         A.      And followed by psychologist.

24         Q.      And followed by psychologist.

94

1        A.    Still AM fatigue with some

2    relief, and present Wellbutrin and then

3    remarried and going to infertility work up.

4        Q.    So as you're asking him what's

5    going on in his life, the first thing he

6    tells you is he's got this ongoing battle

7    with the disability company, very stressful,

8    causing him all sorts of angst, and that he's

9    still tired in the morning.  And oh, by the

10   way, I got married and I'm going to a                09:33AM

11   fertility expert.  Kind of in that order,

12   isn't it?

13       A.    Yeah, the chief complaint was

14   still his low energy most of the time.

15       Q.    Which he relates directly to

16   this battle?

17       A.    Well, again, in terms of the

18   order of my notes, the next thing I list

19   after that had to do with the coronary artery

20   disease of his brother.  So, and then the          09:34AM

21   weight gain, and then again, the still

22   pending lawsuit at that point, so --

23       Q.    Your assessment and impression,

24   chronic depression with multiple stressors

95

1    and then specifically trial?

2        A.    Well, trial change to

3    Wellbutrin.

4        Q.    Oh, I'm sorry, I misread that.

5    Thank you.  Trial change to -- so that goes

6    to the next line?

7        A.    Correct.

8        Q.    Okay.  What was the next time

9    you saw Mr. Kearney?

10       A.    November 25, 2003, looks like        09:34AM

11   the next visit is October 5th, 2004.

12       Q.    Did he send you or bring you in

13   some disability forms signed by Dr. Judd?

14       A.    I have some forms that were

15   signed by Dr. Judd that I initialed

16   July 12th, '05.

17       Q.    Do you see the one from the

18   February 11th, '04?

19       A.    There was -- those are all

20   together and I don't -- what I don't know is    09:35AM

21   whether those all came in together.  I have

22   one list of February 11th of '04; I have one

23   5/10 of '04; looks like 8/17/04.

24       Q.    I would like to focus on the

96

1    February 11th, '04 for the moment.

2         A.    February 11th of '04, okay.

3         Q.    Uh-huh.  Under the additional

4    comments --

5         A.    Okay.

6         Q.    -- box nine, patient distressed

7    by continued legal delays which are intended

8    to cause further emotional distress and

9    financial burdens.  Did he ever complain to

10   you or suggest to you that the speed with          09:36AM

11   which the court dealt with the case was --

12   let me ask it a different way.  Did he ever

13   suggest to you that the court itself was

14   intending to cause him harm?

15        A.    Not that I'm aware of from my

16   notes.

17        Q.    Okay.  So then we would assume

18   that in his view at least, any delay in the

19   legal process was caused by the disability

20   company, or you don't know?                        09:37AM

21        A.    I don't know since that's Dr.

22   Judd's --

23        Q.    Okay.  Let's go to your visit,

24   October 5th of '04.

97

1          A.    Okay.

2          Q.    His wife is now five months

3    pregnant, which he says is stressful but he's

4    happy about it, right?

5          A.    Correct.

6          Q.    Very next thing, ongoing legal

7    hassles with his disability insurance,

8    supposed to go to trial next month or so but

9    attorney suspects settlement?

10         A.    Correct.                    09:37AM

11         Q.    Again, this becomes a focus of

12   his history and his discussion with you and

13   what he claims is part of his ongoing

14   problem?

15         A.    Well, again, I list multiple

16   stressors there in the physical exam part.

17         Q.    Depressed affect?

18         A.    Yeah, and flat emotionally, with

19   intensity primarily arising as he discusses

20   the lengths the insurance company has probed    09:38AM

21   him and his life; so that was again --

22         Q.    So that's his focus.  His focus

23   is his disability case?

24               MR. WELLINGTON:  Objection.

98

```
 1          A.     In that note I was talking more

 2     in flat emotionally speaks, in terms of

 3     someone's depression, not showing much

 4     emotion, but that his intensity rose as he

 5     talked about that particular circumstance,

 6     correct.

 7          Q.     Which is some indication of his

 8     focus, isn't it?  Touching upon the thing

 9     that he's most concerned about, most intense

10     about?                                        09:38AM

11          A.     Again, I related it primarily,

12     it raised his intensity as he discussed that.

13          Q.     Okay.  Did he appear to you as

14     we are going through this now, remember since

15     the IME, every one of your notes so far has

16     suggested as a primary part of the history,

17     his battle with the disability company, has

18     it not?

19          A.     I would state that it's

20     always -- it seems to be included in each of  09:39AM

21     those notes, correct.

22          Q.     It takes up most of each of

23     those notes, doesn't it?

24               MR. WELLINGTON:  Objection.
```

99

1      A.    Again, the way I, from a family

2    practice standpoint, take a note, I mean, I

3    usually, as I come into a room and most of

4    these are the handwritten notes, I'm

5    following initially just how patients tell me

6    things, so it shows up in each of those

7    notes.  But like I say, in some of these I

8    tend to focus on first what sort of symptoms

9    he's having related to his depression, so --

10     Q.    I understand that.  My point is,    09:39AM

11   and I think you get it, from the time of the

12   independent medical exams forward, a great

13   deal of his history to you, the thing that

14   he's focused on and intense about is this

15   battle with the disability company?

16             MR. WELLINGTON:  Objection.

17   Asked and answered.

18     A.    I think what I can say looking

19   at these notes is it definitely creates the

20   most intensity for him, correct.             09:40AM

21     Q.    We go to the note of July 12th

22   of '05, which I believe is the next one.

23     A.    Okay.

24     Q.    Very first thing out of his

100

1    mouth in the history, still waiting for

2    summary judgment by the judge due

3    September '04, but delayed?

4         A.    Well, actually the top of that

5    note has continued to follow up with

6    psychologist but plans to change to one in

7    Columbus closer to home, and again, a med

8    check, and then the next part of that note

9    is, still waiting for summary judgment,

10   correct.                                   09:41AM

11        Q.    Right.  But the first time you

12   talk about anything going on in his life

13   other than treatment is his case first thing

14   he raises to you, right?

15             MR. WELLINGTON:  Objection.

16        A.    It's hard for me to -- I don't

17   know if I can separate that in the question,

18   but again, I just tend to list things and

19   we're talking first about medication and his

20   follow up with the psychologist, and then    09:41AM

21   goes into this, right where I stated is still

22   waiting.

23        Q.    Uh-huh.  Very next paragraph you

24   talk -- he's creating -- he now has marital

101

1    stress because of his disability case?

2         A.    Yeah.  I stated creates some

3    marital strain due to his increased anger

4    about the situation above, correct.

5         Q.    Right.

6         A.    And has a new child.

7              MR. WELLINGTON:  That was

8    December '05, right?

9         A.    Excuse me, July 12th of '05.

10             MR. WELLINGTON:  I forgot the         09:42AM

11   month.

12        Q.    When was the next time you saw

13   him after July of '05?

14        A.    Office visit was April 5th of

15   '06.

16        Q.    Uh-huh.  And after you review

17   the medical with him, the fact that he's

18   having low back pain and so forth, and

19   obviously you ask him about the low back

20   pain, he told you about his disc surgery in    09:42AM

21   '93, right?

22        A.    Correct.

23        Q.    As soon as you got into the

24   social history, he began, again, talking

102

1    about his case and how he thinks the first

2    part has been decided in his favor and he's

3    now, something, his counter suit?

4         A.    I think the word is pursuing

5    there.

6         Q.    Pursuing his counter suit?

7         A.    Yeah.

8         Q.    So at this point, the case is

9    going on in which he's suing the insurance

10   company after having the summary judgment he        09:43AM

11   was waiting for before, if you know -- do you

12   know what, that was a bad question.

13              Again, he's focused on what's

14   going on in his case?

15        A.    Well, like I say, it's the third

16   thing listed there.  We do the med check, the

17   low back pain, you know, and that's the last

18   part of how I list my history there, correct.

19        Q.    Uh-huh.  Would you agree that

20   he's still focused on the case?                      09:43AM

21        A.    I mean, it's still there,

22   although in that time, the low back pain gets

23   thrown in there, it looks like, you know, my

24   physical exam was a little more focused on

1    the physical part at that time.

2         Q.    Sure.  At that point he had some

3    new physical complaints, his back was acting

4    up again, he had some additional problems?

5         A.    Correct.

6         Q.    Is the next visit, the April

7    '07?

8         A.    Yes.

9         Q.    Once again, you renew the

10    arthritis medication?                                    09:44AM

11         A.    Correct.

12         Q.    Is that something that you

13    prescribed for him?

14         A.    Yes, I gave it to him, a

15    prescription for the Voltaren there

16    April 5th.

17         Q.    Preceding August did you put him

18    on a medicine called diclofenac?

19         A.    Diclofenac is the -- would be

20    the generic of the Voltaren, so April 5th it      09:45AM

21    looks like I wrote a prescription at that

22    time for that medicine for refills.  You

23    stated, was there one in August, did you say?

24         Q.    Yeah, it appears August of '06,

104

1    at least in your prescription refills.

2          A.    Yeah, that may have been one

3    that was called in from an insurance -- or

4    from the pharmacy it looks like.  So, yeah,

5    it looks like we refilled the same

6    prescription.

7          Q.    Okay.  So he got diclofenac

8    August 20th, '06, and it was refilled when,

9    April of '07?

10          A.    Originally I gave it to him          09:45AM

11    April 5th, '06, at that visit.

12          Q.    Okay.

13          A.    With refills, and then in August

14    on the refill, either the pharmacy or he

15    called in and asked for more refills on the

16    die -- diclofenac, which is the same as the

17    Voltaren.

18          Q.    So, he has April, May, June,

19    July, August he would need refills because it

20    was four months out?                              09:46AM

21          A.    Right.

22          Q.    And you gave him six refills

23    from there, which would be six more months of

24    it?

 1        A.    It was one a day, so number 30,

 2   correct.

 3        Q.    So that would take him through

 4   April of '07, wouldn't it?

 5        A.    Well, that was August 20th,

 6   September, October, November, January,

 7   February, more February.

 8        Q.    February?

 9        A.    Assuming he was taking it every

10   day.                                      09:46AM

11        Q.    Do you see where he filled it

12   in, or he asked for refills in February?

13        A.    Next refill we have on the list

14   was April 10th.

15        Q.    Of '07?

16        A.    '07, correct.

17        Q.    So he's been on it continuously

18   since April of '06, a year?

19        A.    Fairly continuously, right.

20        Q.    Uh-huh.  You found in April of     09:47AM

21   '07 he was under care for a torn rotator

22   cuff.  Did he tell you how he tore his

23   rotator cuff?

24        A.    I didn't have that in the

106

1    history, I don't recall him giving me a

2    specific history on that.

3         Q.    Okay.  He tells you he's still

4    seeing a psychiatrist, continues to deal with

5    fatigue and anxiety, reports from

6    psychiatrist seem to feel that the meds are

7    appropriate.  The psychiatrist is agreeing

8    with you on your medical regime?

9         A.    Well, that was through the

10   patient, correct.  In the parenthesis there          09:48AM

11   was reports from the patient from the

12   psychiatrist, I don't know that I had a

13   direct psychiatric note other than what the

14   patient told me.

15        Q.    Okay.  He still says the ongoing

16   legal wrangling, even with agreement that the

17   patient is disabled, stress high, has

18   financial strain, family strain, had to sell

19   home, unable to work, right?

20        A.    And move, and unable to work,          09:48AM

21   correct.

22        Q.    Did he describe -- let me ask

23   you this way, was he telling you that because

24   of this ongoing battle that he was waging

107

1    against the insurance company, that he was so

2    stressed that all these other things were

3    happening?

4         A.    Again, I think in my mind I look

5    at them as just multiple stressors, you know.

6    In other words, there was the financial

7    piece, there was the, you know, not working

8    piece, I mean, the family piece, the moving

9    piece, I mean, you know, the -- I don't know

10   if I would in that note say -- state it all        09:49AM

11   falls off of one particular thing, but

12   it's -- but definitely the legal wrangling, I

13   think I would have interpreted how he was

14   talking to me about it.

15        Q.    Still his focus?

16        A.    I mean, not obviously, I think,

17   and that was the first visit that actually I

18   met his wife, and his, you know, his daughter

19   at that time, and you know, it was a pretty

20   emotional visit for him.                            09:49AM

21        Q.    Would you agree with Dr. Judd

22   that Mr. Kearney is demonstrating obsessive

23   traits with regard to this battle with the

24   insurance company as he describes it?

108

1          A.     I don't know that I can say

2     obsessive just because I've never put that in

3     my notes, per se.  I mean, I do have patients

4     that I treat for obsessive compulsive

5     disorders, but --

6          Q.     Would you rather --

7          A.     Again, and usually I would say

8     that.  I think if that was my own, you know,

9     emotion dealing with the patient, but all I

10    can say is that I don't use that word in my          09:50AM

11    notes with him, so --

12         Q.     Would you rather say that it has

13    been his focus, or one of his focuses since

14    the time of the independent medical

15    examinations through date?

16              MR. WELLINGTON:  Objection.

17    Asked and answered.

18         A.     I mean, I would definitely agree

19    that I think it's been one of his focuses.

20         Q.     Something he's intense about?          09:51AM

21         A.     That's one that I think he has

22    shown some intensity, you know, as we do our

23    visits, correct.

24         Q.     That was your last visit with

109

1    him, April 20th, 2007?

2          A.    Correct.

3          Q.    You do have a note that he

4    passed along to you, a phone call note that

5    he passed along to you suggesting that he had

6    had a heart attack earlier this month and

7    wouldn't be attending this deposition?

8          A.    Yeah, there was one note in

9    regards to the -- looks like his wife called

10   me, 6/1/07.  That one doesn't state anything        09:51AM

11   about the deposition.

12         Q.    Look on the front of your pad.

13         A.    Yeah, this particular one which

14   was June 12th, correct.

15         Q.    Did he say why he would not be

16   attending the deposition or why he would not

17   be able to attend the deposition?

18         A.    Just according to the note, I

19   just associate it with the physical problem,

20   the heart attack, correct.                           09:52AM

21         Q.    A heart attack, do you have any

22   records or any knowledge of it?

23         A.    Outside of that other phone call

24   from his wife, no.

110

1          Q.    Do you know if it was related to

2    his high cholesterol issues?

3          A.    Again, I don't have any other,

4    outside of that his wife told me that he had

5    some stints, so, you know, I could make that

6    connection.

7          Q.    What is a stint exactly?

8          A.    A stint generally is inserted by

9    the cardiologist to keep a blockage of his

10   arteries open.                              09:52AM

11         Q.    And blockages are generally

12   cholesterol issues?

13         A.    It would be one of the

14   contributing factors, correct.

15         Q.    Was there any evaluation of the

16   potential affects of the diclofenac --

17   diclofenac on his coronary situation?

18         A.    Again, prior to this, there was

19   none.

20         Q.    In looking at the information on    09:53AM

21   diclofenac, what's considered as the most

22   important information is that the medicine

23   can increase your risk of life threatening

24   heart or circulatory problems, including

111

1      heart attack or stroke, you were aware of

2      that list?

3           A.    Which is listed with all

4      non-steroidals, correct.

5           Q.    This risk will increase the

6      longer you use diclofenac, that's a standard

7      risk of using a non-steroidal

8      anti-inflammatory, isn't it?

9           A.    Correct.

10          Q.    Do you have a scheduled next          09:54AM

11     visit with Mr. Kearney?

12          A.    I don't think at the visit in

13     April we set up a specific time.  At that

14     point there was some focus around the

15     orthopedic things and I just listed in terms

16     of the chronic depression, no change in plan,

17     so re-check labs, that was April 20th visit,

18     correct.

19          Q.    Okay.  And no scheduled next

20     visit, probably next April?                       09:54AM

21          A.    We've generally been following,

22     looks like, on a yearly basis.

23          Q.    Do you know whether Mr. Kearney

24     has had any limiting or ill affects from his

112

1    cardiac episode earlier this month?

2         A.    I have no other history outside

3    of those two phone calls.

4         Q.    You haven't seen him since that

5    time?

6         A.    No.

7         Q.    You can't confirm one way or the

8    other whether he's actually had a heart

9    attack or whether he just had some pain and

10   when they did the examination they put stints    09:55AM

11   in?

12        A.    Like I say, that's all verbal

13   history from he and his wife.

14        Q.    You will be expecting to get

15   records from them as his primary physician,

16   right?

17        A.    Generally I would expect that at

18   some point, correct.

19             MR. ELLIS:  Doctor, thank you,

20   that's all the questions I have.  Appreciate    09:55AM

21   your time.

22             MR. WELLINGTON:  No questions.

23

24                  - - -

113

1

2

3

4

5

6

7

8

9

10
                                    _____

                    MARTIN P. LEHENBAUER, M.D.

11

12

13

14                          *  *  *

15          (DEPOSITION CONCLUDED AT 9:55 A.M.)

16                          *  *  *

17

18

19

20

21

22

23

24

114

1                 C E R T I F I C A T E
2

STATE  OF  OHIO
3               :  SS
COUNTY OF HAMILTON

4

5        I, Elaine Haberer, the undersigned, a
duly qualified notary public within and for
6   the State of Ohio, do hereby certify that
MARTIN P. LEHENBAUER, M.D. was by me first
7   duly sworn to depose the truth and nothing
but the truth; foregoing is the deposition
8   given at said time and place by said witness;
deposition was taken pursuant to stipulations
9   hereinbefore set forth; deposition was taken
by me in stenotype and transcribed by me by
10  means of computer; deposition was made
available to the witness for examination and
11  signature; I am neither a relative of any of
the parties or any of their counsel; I am
12  not, nor is the court reporting firm with
which I am affiliated, under a contract as
13  defined in Civil Rule 28(D) and have no
financial interest in the result of this
14  action.
15        IN WITNESS WHEREOF, I have hereunto set
my hand and official seal of office at
16  Cincinnati, Ohio this 25th day of June, 2007.
17

                       _____
18   My commission expires   Elaine Haberer, RPR
      July 30, 2008          Notary Public –
19                           State of Ohio
20
21
22
23
24