**Page 1**

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION


JEFFERSON-PILOT INSURANCE COMPANY, )

                      Plaintiff,    )

                             )

       vs.                )    CASE NO.

                             )    C-1-02-479

CHRISTOPHER L. KEARNEY,              )    JUDGE BARRETT

                             )    Magistrate Judge Hogan

                Defendant,    )

       vs.                )

                             )

DISABILITY MANAGEMENT SERVICES,      )

INC.,                                )

          Third-Party Defendant. )


The 30(b)(6) deposition via telephone of
JEFFERSON-PILOT LIFE INSURANCE COMPANY through VALERIE
LOFTIN, taken pursuant to Notice and in accordance with the
Federal Rules of Civil Procedure before Rebecca J. Huddy,
Notary Public, at Stratis Business Center, 7800 Airport
Center Drive, Greensboro, North Carolina, on the 10th day of
August, 2007, beginning at 2:00 p.m.

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
Valerie Loftin                                           August 10, 2007

| Page 2 | Page 4 |
|---|---|

**Page 2**

```
 1   APPEARANCES:
 2
 3   For the Plaintiff: Mr. John E. Meagher
 4        SHUTTS & BOWEN, LLP
 5        1500 Miami Center
 6        201 South Biscayne Boulevard
 7        Miami, Florida 33131
 8        (305) 358-6300
 9        jmeagher@shutts.com
10
11        Ms. Stephanie T. Farabow
12        Jefferson-Pilot Life Insurance Company
13        100 North Greene Street
14        Greensboro, North Carolina 27401
15        (336) 691-4043
16        stephanie.farabow@lfg.com
17
18   For the Defendant  Mr. Michael A. Roberts
19   (via telephone):  GRAYDON, HEAD & RITCHEY, LLP
20        511 Walnut Street
21        1900 Fifth Third Center
22        Cincinnati, Ohio 45201
23        (513) 621-6464
24        mroberts@graydon.com
25
```

**Page 3**

```
 1              I N D E X
 2
 3           By              Page
 4   EXAMINATION    Mr. Roberts    4 - 66
 5
 6           E X H I B I T S
 7
 8   Number       Description       Page
 9   Defendant's 1    Redacted pages    22
10     "    2    E-mail 12-26-02     31
11     "    3    Letter 12-6-02      59
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1          The witness, VALERIE LOFTIN, being first duly
 2   sworn, was examined and testified as follows:
 3   EXAMINATION (by Mr. Roberts):
 4   Q.  Ms. Loftin, we've met before.  This is a deposition in
 5       the case of Jefferson-Pilot versus Kearney versus DMS.
 6          Could you state your name and address for the
 7       record, please.
 8   A.  Valerie Loftin.  1900 Falmouth Drive, Greensboro, North
 9       Carolina 27410.
10   Q.  Is that a corporate location, Ms. Loftin?
11   A.  No, that's my home address.
12   Q.  How are you presently employed?
13   A.  I am employed with Lincoln Financial.
14   Q.  And what position do you hold?
15   A.  I am the Vice President of Claims.
16   Q.  I've taken your deposition before.  I think it was May
17       of 2004, correct?
18   A.  Yes.
19   Q.  Do you recall?
20   A.  Yes.
21   Q.  Have you reviewed that deposition testimony recently?
22   A.  Yes.
23   Q.  Did anything strike you as inaccurate in your testimony
24       from 2004?
25   A.  Not that I can recall.
```

**Page 5**

```
 1   Q.  When did you review your testimony?
 2   A.  When did I review it?
 3   Q.  Yes.
 4   A.  About two weeks ago.
 5   Q.  In preparation of today's deposition?
 6   A.  Yes.
 7   Q.  What else have you done in the preparation of today's
 8       deposition?
 9   A.  I met with our outside counsel and our in-house counsel
10       and reviewed the documents that were produced.
11   Q.  By outside counsel do you mean Mr. Meagher?
12   A.  Yes.
13   Q.  And in-house counsel you mean Ms. Farabow?
14   A.  Yes.
15   Q.  When did that meeting take place?
16   A.  About two weeks ago.
17   Q.  Where was that meeting?
18   A.  In the offices of Lincoln Financial in Greensboro,
19       North Carolina.
20   Q.  And you say the documents produced.  What globe of
21       documents are you speaking of?
22   A.  There were documents produced pursuant to an Order.  I
23       believe the Order was dated June 8, 2007.
24   Q.  Produced by whom?
25   A.  By Lincoln Financial.
```

**2 (Pages 2 to 5)**

Case 1:02-cv-00479-MRB     Document 188     Filed 09/06/2007     Page 3 of 44

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al.** C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

**Page 6**

1  Q.  Did you partake in gathering those documents pursuant
2      to that Order?
3  A.  Yes, I did.
4  Q.  What did you undertake to do?
5  A.  Basically I contacted individuals within the
6      organization for information that I did not have in my
7      personal knowledge.
8  Q.  And then in addition to partaking in the gathering of
9      the documents, you discussed those documents with
10     counsel in preparation for today's deposition?
11 A.  Yes.
12 Q.  Did you review any other documents in preparation for
13     the deposition?
14 A.  No.
15 Q.  In your role as VP of Claims for Lincoln National, are
16     your responsibilities the same as they were when I last
17     took your deposition when you were employed by
18     Jefferson-Pilot?
19 A.  Well, except for the fact that the two companies have
20     now merged and so I now have responsibility for
21     business that was historically with Lincoln Financial
22     as well as historically with Jefferson-Pilot.
23 Q.  This added responsibility, is that disability insurance
24     claims underwritten by Lincoln National?
25 A.  No. It's additional life insurance and annuity

**Page 7**

1      insurance claims.
2  Q.  How many employees does Lincoln National have, do you
3      know?
4  A.  I would say about 8,000.
5  Q.  Do you know what the gross revenues were last year?
6  A.  No, I don't.
7  Q.  You don't get any reporting?
8  A.  I do, but I can't recall off the top of my head.
9  Q.  In May of 2004 you told me that you hadn't reviewed Mr.
10     Kearney's claim file and weren't involved in the
11     administration of his claim. Do you recall that?
12 A.  Yes.
13 Q.  Have you reviewed the claim file as of today?
14 A.  No.
15 Q.  Recently there was produced to me a privilege log by
16     ERC and in that privilege log it references some e-mail
17     communications in which you were involved both recently
18     in 2007 as well as back in 2003. Do you recall
19     being -- participating in e-mail communications about
20     Kearney's claim in 2003?
21 A.  I don't recall, no, but if you could -- do you have the
22     document that you're referring to? I don't have
23     anything in front of me.
24 Q.  That's fine. I'm just asking you, there's a privilege
25     log produced and your name is referenced as

**Page 8**

1      participating in e-mail communications in 2003 and --
2  A.  Right. There were e-mail communications, I know,
3      between Lincoln Financial and ERC, but as to the
4      specifics of an individual e-mail, I'd have to look at
5      the document to remember the dates.
6  Q.  You said in your answer there or your statement there
7      Lincoln Financial. You're referring to
8      Jefferson-Pilot, though, to 2003 as being Lincoln
9      Financial?
10 A.  As of 2003 it was Jefferson-Pilot. The merger took
11     place in April of 2005.
12 Q.  Okay. And whether you've seen the privilege log from
13     ERC or not, are you mindful that you participated in
14     e-mail communications regarding the Kearney claim back
15     in 2003?
16 A.  I can't recall whether it involved the Kearney claim.
17     I think there were e-mail communications. Again, is
18     there a specific e-mail that you're referring to?
19 Q.  The ones referenced in the privilege log.
20 A.  Okay. Again, I think there were several referenced in
21     the privilege log. I don't recall one specific to
22     Kearney.
23 Q.  Have you seen the privilege log?
24 A.  What are you referring to by the privilege log? I
25     don't have the documents in front of me, so I'm not

**Page 9**

1      sure what you're referring to by the privilege log.
2      What -- is it --
3  Q.  In your answer you referenced the privilege log. Have
4      you reviewed any privilege log?
5  A.  I don't recall referencing the privilege log.
6  Q.  Well, the record is what it is --
7  A.  I mean, did I --
8  Q.  -- but to review my question, though, have you reviewed
9      any privilege logs?
10 A.  What do you mean by privilege log?
11 Q.  Are you familiar with what a privilege log is?
12 A.  No, I'm not.
13 Q.  Is this the same Valerie Loftin that went to North
14     Carolina law school?
15 A.  Yes, it is.
16 Q.  And this is the same Valerie Loftin, the insurance
17     defense counsel earlier in her career?
18 A.  Yes, it is.
19 Q.  And you don't -- your testimony under oath is, you have
20     no understanding what a privilege log is?
21 A.  I know what --
22     MR. MEAGHER: Excuse me --
23 A.  -- attorney-client privilege --
24     MR. MEAGHER: Excuse me.
25     THE WITNESS: Excuse me.

**3 (Pages 6 to 9)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin**                                    **August 10, 2007**

|  |  |
|---|---|
| **Page 10** | **Page 12** |

**Page 10**

1　　　　MR. MEAGHER: Objection to form, asked and
2　　answered. You can answer.
3　　**A.  Okay. I know what the attorney-client privilege is.**
4　　**In the context of your question, I don't know what**
5　　**you're referring to by privilege log. If you could**
6　　**show me some documents --**
7　　Q.  Well, hold on --
8　　**A.  -- what you're referring to --**
9　　Q.  You're not aware -- excuse me. You're not aware of any
10　　document that you've reviewed relating to Kearney
11　　that's titled privilege log, right?
12　　**A.  No.**
13　　Q.  The answer to my question is no?
14　　**A.  The answer to your question is no.**
15　　Q.  Okay. So sitting here today, you're not -- you don't
16　　recall ever reviewing any document titled privilege
17　　log?
18　　　　　　MR. MEAGHER: Objection, asked and answered.
19　　You can answer again.
20　　**A.  No.**
21　　Q.  I asked you a negative question and you gave me a
22　　negative answer. Do you have any memory sitting here
23　　today of ever reviewing any document titled privilege
24　　log?
25　　**A.  I don't have any memory of reviewing a document titled**

**Page 11**

1　　**privilege log.**
2　　Q.  Okay. Assume for me that there is a privilege log
3　　that's been produced that suggests that you have
4　　participated in e-mail communications regarding Kearney
5　　in 2003. Do you have any independent memory of that?
6　　**A.  No, I don't. Again, there may have been e-mails, but I**
7　　**don't know what e-mails you're referring to.**
8　　Q.  In your 2004 deposition, your May 2004 deposition, you
9　　testified that the agreement -- the December 1999
10　　agreement between DMS and Jefferson-Pilot had as of
11　　that time not been modified or amended. Do you recall
12　　that?
13　　**A.  Yes, I do.**
14　　　　　　MR. MEAGHER: Objection to form.
15　　Q.  Is that testimony accurate?
16　　**A.  No. I subsequently determined from reviewing the**
17　　**documents that were produced that there had been an**
18　　**amendment. It wasn't related to the Kearney case.**
19　　Q.  I don't understand your answer. Was there ever an
20　　amendment to the December 1999 agreement between DMS
21　　and Jefferson-Pilot?
22　　**A.  Yes. It wasn't relevant to the Kearney case. There**
23　　**was an amendment.**
24　　Q.  When I asked you this question three years ago, you
25　　said there was no amendment whatsoever.

**Page 12**

1　　　　　　MR. MEAGHER: Objection to form.
2　　**A.  Again, I was looking -- thinking in the context of the**
3　　**dealings on the Kearney case. This had to do with**
4　　**other business with DMS.**
5　　Q.  In fact, the agreement's been amended such that DMS
6　　receives more by way of a fixed monthly sum than it did
7　　originally, correct?
8　　**A.  That wasn't the purpose of the amendment.**
9　　Q.  That wasn't my question, ma'am. Please listen to my
10　　yes.
11　　**A.  Okay.**
12　　Q.  Isn't it true that the agreement between DMS and
13　　Jefferson-Pilot, now Lincoln Financial, has been
14　　amended such that DMS gets a greater sum, fixed sum
15　　every month?
16　　**A.  No. The amendment was intended to change the way**
17　　**DMS -- who was ultimately responsible for payment to**
18　　**DMS.**
19　　Q.  I don't think we're understanding each other, ma'am.
20　　I'm not asking you what any specific amendment says.
21　　I'm asking more generally than that. Isn't it true
22　　that the December 1999 agreement between DMS and JP has
23　　been amended such that DMS receives a greater fixed
24　　monthly sum than originally contracted for?
25　　**A.  Not that I'm aware of.**

**Page 13**

1　　Q.  On August 8, two days ago, notwithstanding the request
2　　made five years ago, I received documents from Bill
3　　Ellis. Do you know Bill Ellis?
4　　　　　　MR. MEAGHER: I'm going to object to the form
5　　as to your predicate, but you can answer.
6　　**A.  Yes.**
7　　Q.  Who is Bill Ellis?
8　　**A.  Yes.**
9　　Q.  Who is Bill Ellis?
10　　**A.  The outside counsel.**
11　　Q.  And included in that package of documents are a series
12　　of invoices that are Bates numbered PROD PER CT ORD
13　　6/8/07-3033 through 3087 and they are invoices
14　　apparently generated by DMS and issued to
15　　Jefferson-Pilot for the fixed monthly claims management
16　　fee. I have invoices dating from August 2002 through
17　　May of 2007. Have you ever seen those invoices, ma'am?
18　　**A.  Yes, I would have been copied on some of them.**
19　　Q.  Right, these documents do reflect that. And by these
20　　invoices, it appears that in 2002 the fixed monthly sum
21　　was 41,769 and that that remained the fixed monthly sum
22　　until recently. Specifically, according to these
23　　invoices, January '07, the fixed monthly sum increased
24　　to $48,500. Are you mindful of that?
25　　**A.  I wasn't mindful of that until I reviewed the -- I know**

**4 (Pages 10 to 13)**

**Reported By: Rebecca J. Huddy    www.huseby.com**
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208  (800) 333-2082

**Page 14**

1    that those invoices were part of the document
2    production.
3   Q. Go back to my question. The answer is correct, in
4     fact, the fixed monthly sum payable to DMS has
5     increased since the agreement was first entered,
6     correct?
7   A. That would be correct. If that's what the invoice
8     says, you're right.
9   Q. Other documents that have been supplied to me suggest
10    that there was an initial transmittal to DMS of several
11    hundred claims in late '99 or early 2000, and you and I
12    discussed that somewhat at your prior deposition. Do
13    you recall that?
14   A. Yes.
15   Q. Documents that have been provided to me suggest that in
16    addition to that initial globe of claim files, there's
17    been a significant number of additional claims sent to
18    DMS for review. Are you mindful of that?
19   A. There had been additional claims sent to DMS, yes,
20     since that time.
21   Q. Can you tell me what the circumstances are of those
22    additional claims being sent.
23   A. The -- and I may not be able to specify the years, but
24     at some point in the 2004-2005 time period there was a
25     change in the law of New York regarding administration

**Page 15**

1    of disability claims, and because we write some or we
2    had issued policies in New York, we were advised by our
3    legislative counsel that we had to be licensed in New
4    York. We had to have adjustors licensed in New York in
5    order to administer those New York claims.
6     At the time we did not have internal staff who
7    had that licensure. It was going to require that they
8    sit for some exams, get bonded. There were some other
9    procedures that they were going to have to go through,
10    so at that time we contacted DMS and asked if they
11    would assume responsibility for the New York claims for
12    such a time period until our in-house adjustors could
13    get the proper licensing. It was really in order to be
14    compliant with New York laws.
15   Q. So a globe of claim files relating to New York state
16    residents was transmitted to DMS?
17   A. Yes.
18   Q. And subsequently did the company -- when I say the
19    company, Jefferson-Pilot, now Lincoln Financial --
20    obtain the appropriate licensure for New York?
21   A. Yes.
22   Q. And so do those claims now reside back with Lincoln
23    Financial or is it still with DMS?
24   A. No, they've come back.
25   Q. Other than that globe of claims for that circumstance,

**Page 16**

1    have there been other circumstances for providing
2    additional claims files to DMS for review?
3   A. There was a change in the type of claim files, and by
4     that I mean at one time in 1999 the claim files that
5     had been referred to DMS were the open claim files and
6     the Jefferson-Pilot Life Insurance Company legal
7     entity. At some subsequent point we left with DMS any
8     claims that were reinsured with ERC and brought back
9     in-house any claims that were not reinsured with ERC
10     but were issued through Jefferson-Pilot Life Insurance.
11   Q. I'm talking about the flip side of that coin and that
12    is additional claim files being provided to DMS. Are
13    there other circumstances where the company provided
14    additional claim files to DMS?
15   A. There was a nominal number of claim files that had been
16     with Jefferson-Pilot Life reinsured through ERC that
17     were being handled out of our Lincoln -- out of our
18     Jefferson-Pilot office that did go back to DMS as a
19     result of that switching of claims.
20   Q. What do you mean, as a result of that switching of
21    claims?
22   A. After we transferred claims, anything that was
23     reinsured with ERC on disability claims would have been
24     handled by DMS. Anything that was not reinsured by ERC
25     would have been handled internally.

**Page 17**

1   Q. Okay. So if I understand you, there was an agreement
2    entered in late '99. As a result of that agreement,
3    there was a globe of claim files, existing claim files,
4    that were transferred to DMS?
5   A. And those were the claim files that were being handled
6     out of the Greensboro office.
7   Q. Correct. And then since that transfer, other than the
8    New York circumstance you described, has there been
9    occasion to send additional claim files to DMS?
10   A. Yes, and that's what I was describing with the transfer
11     of files. I'm not sure if it resulted in a net
12     increase in files, because we brought back probably
13     more than we sent over.
14   Q. Well, there was a significant number of additional
15    files provided to DMS, according to the records that
16    have been provided to me, in the years 2000, 2001,
17    2002, 2003. Are those just new claims being made by
18    insureds --
19       MR. MEAGHER: Objection.
20   Q. -- or are there other circumstances that triggered
21    additional claim files be provided to DMS?
22       MR. MEAGHER: Objection to form. You can
23    answer.
24   A. I believe those would be new claims.
25   Q. Are all of those new claims that have been provided to

**5 (Pages 14 to 17)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin**                                                    **August 10, 2007**

| Page 18 | Page 20 |
|---|---|
| 1  DMS subject to reinsurance by ERC? | 1  paid lifetime? |
| 2  A. As of today, yes. | 2  A. I believe we do have, yes, but I am not certain of |
| 3  Q. What do you mean, as of today? | 3  every claim that's in our autopay system. |
| 4  A. Well, as I said, up until 2000 -- I'm not exactly sure | 4  Q. If one wanted to identify all the claimants who are on |
| 5  of the date, but at some point in time -- and it should | 5  autopay, could you do that through your computer |
| 6  be reflected in the e-mails and the amendments -- there | 6  system? |
| 7  were -- we stopped sending any of the Jefferson-Pilot | 7  A. Yes. |
| 8  Life new claims to DMS if they were not reinsured | 8  Q. I'm sorry? |
| 9  through ERC. To date -- | 9  A. Yes. |
| 10  Q. In your prior deposition you and I discussed quarterly | 10  Q. And if that search was performed, would you also be |
| 11  reports being provided by Jefferson-Pilot and I | 11  able to ascertain whether the policies -- any of them |
| 12  guess now Lincoln Financial, but those quarterly | 12  are lifetime benefit policies? |
| 13  reports weren't produced even recently. Do you know | 13  A. I'm not sure. I'm not sure what indicators are shown |
| 14  why that is? | 14  on the autopay system. |
| 15       MR. MEAGHER: Objection to form. You can | 15  Q. Two days ago, in addition to the documents I previously |
| 16  answer. | 16  referenced that are the invoices, there were documents |
| 17  A. We don't retain the reports. | 17  produced with the same suffix, Bates number suffix, |
| 18  Q. You don't retain the reports in any fashion? You | 18  numbered 3020 through 3032, and almost all the |
| 19  review them and then discard them? | 19  information on those pages are redacted but for some |
| 20  A. Yes. | 20  information regarding Chris Kearney on 3025. On the |
| 21  Q. And you discarded them even after this litigation was | 21  first page, 3020, it appears to be, although most of it |
| 22  commenced? | 22  is redacted, some kind of Excel spreadsheet that |
| 23       MR. MEAGHER: Objection to form. | 23  identifies the different columns, a person's name, |
| 24  A. We did not retain the reports, no. | 24  policy number, REIN, which I guess indicates how much |
| 25  Q. Even after the litigation was commenced, correct? | 25  reinsurance there might be, TRSV, RRSV, Contract, |

| Page 19 | Page 21 |
|---|---|
| 1  A. Yes. | 1  Comment, Report Date, REV CL Base, REV Base, Incurral |
| 2  Q. Do I understand from your prior testimony you were not | 2  Year, Net Indem, TRSV w/WVR, RRSV w/WVR. Based on that |
| 3  involved in authorizing any settlement offer to Mr. | 3  description, do you have a sense for what document that |
| 4  Kearney in the year 2001; is that correct? | 4  might be? |
| 5  A. Yes. | 5  A. It would help to have the document in front of me, but |
| 6  Q. Have you given any depositions in other cases since May | 6  it sounds like it's just a report from DMS. |
| 7  of 2004? | 7  Q. Do you review reports from DMS when they're received? |
| 8  A. No. | 8  A. No. |
| 9  Q. In your role as Vice President of Claims for Lincoln | 9  Q. I'm sorry? |
| 10  National and previously Jefferson-Pilot, are you | 10  A. No. |
| 11  mindful of any claims being placed on any autopayment | 11  Q. Have you ever? |
| 12  or autopay? | 12  A. No. That's usually handled out of our Disability |
| 13  A. The autopay, yes. | 13  Claims area. |
| 14  Q. What circumstances arise in a claim being put on | 14  Q. Which reports up through you? |
| 15  autopay? | 15  A. Yes. |
| 16  A. We identify a certain number of claims that, because of | 16  Q. Well, why don't I fax this document to you and we can |
| 17  the nature of the disability, because of the nature of | 17  investigate it a little bit further. |
| 18  the claim, we don't anticipate that there would be a | 18       MR. ROBERTS: Why don't we go off the record |
| 19  change in condition that would necessitate frequent | 19  momentarily and I'll fax it to the court reporter's |
| 20  follow-up, and in order to expedite the payment | 20  office. |
| 21  process, we basically put the claims into autopay and | 21       MR. MEAGHER: All right. |
| 22  the claimants' checks will generate automatically | 22       (Brief recess) |
| 23  periodically. | 23 |
| 24  Q. Are you aware of any circumstances that benefit has | 24       (Defendant's Exhibit No. 1 was marked for |
| 25  been provided to a policyholder who has a policy that | 25  identification by the reporter.) |

**6 (Pages 18 to 21)**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
Valerie Loftin                                    August 10, 2007

| Page 22 |
| --- |

1  Q.  Are you ready, Ms. Loftin?
2  A.  Yes.
3  Q.  Do you understand you're still under oath?
4  A.  Yes.
5  Q.  I have faxed to you now this -- it appears to be a
6      largely redacted Excel spreadsheet of 13 or 14 pages,
7      12 pages.  Have you seen this document before, not
8      necessarily in this version or form but this nature of
9      a document?
10 A.  Yes.
11 Q.  Can you first tell me on this page 3020, Bates number
12     3020, what the categories at the top reference, what
13     they mean.  Name would be name?
14 A.  **Number would be policy number.**
15 Q.  Okay.
16 A.  **The REIN would be an indicator for the reinsurer.**
17 Q.  On Mr. Kearney's reference there, line 3025, it shows
18     67, 67, 100, 100.  Do I conclude correctly that with
19     those four items that are associated with Mr. Kearney
20     that those are reinsurance of 67 percent on two and
21     100 percent on the two others?
22 A.  **I don't know the answer to that.**
23 Q.  You don't know what the 67 or the 100 stands for?
24 A.  **No.**
25 Q.  What is the next column?

| Page 23 |
| --- |

1  A.  **TRSV and RRSV I believe refer to reserves.**
2  Q.  Is that total reserve and retained reserve?
3  A.  **I'm not sure what the RRSV is.**
4  Q.  You're concluding that TRSV means total?
5  A.  **I believe so.**
6  Q.  And in your position you have no idea what RRSV means?
7         MR. MEAGHER:  Objection to form.  You can
8      answer.
9  A.  **No.**
10 Q.  I asked a negative question and you gave me a negative
11     response.  Do you have any idea what RRSV means?
12 A.  **No idea.**
13        MR. MEAGHER:  Objection, asked and answered.
14 Q.  Ma'am, do you?
15 A.  **No, I do not.**
16 Q.  And Contract, does that refer to the contract date?
17 A.  **I believe it does.**
18 Q.  And Comment, I guess, refers to the type of benefit or
19     policy and here for Kearney it's Social Security
20     Supplement for two and Basic for the others, right?
21 A.  **Yes.**
22 Q.  What does Basic mean?
23 A.  **I don't know.**
24 Q.  REPT Date, does that stand for report date?
25 A.  **Yes.**

| Page 24 |
| --- |

1  Q.  And this suggests there's a report date of January 5,
2      2000, right?
3  A.  **You're looking at 3025 now; is that right?  I thought**
4      **we were looking at 3020.**
5  Q.  Well. I'm presuming that the categories on 3020 carry
6      over to 3025.
7  A.  **Okay.  So I'm going to go back and forth between 3020**
8      **and 3025, okay.**
9  Q.  That's the way the document was produced to me.  Are
10     you with me?
11 A.  **Yes.**
12 Q.  Okay.  The column REPT Date for Mr. Kearney is January
13     5, 2000, right?
14 A.  **Yes.**
15 Q.  Does that mean that this is a report that was generated
16     on January 5, 2000, or does it have some other meaning?
17 A.  **I believe it means the report was generated at that**
18     **time.**
19 Q.  Is this the most recent report of this nature regarding
20     Mr. Kearney's policies?
21 A.  **I do not know.**
22 Q.  Doesn't the contract between DMS and JP require that
23     there be quarterly reportings?
24 A.  **Yes, it does.**
25 Q.  You would agree with me that you'd like reports that

| Page 25 |
| --- |

1      are more timely than I guess seven years old, right?
2         MR. MEAGHER:  Objection to form.
3  A.  **Yes.**
4  Q.  But you don't know as Vice President of Claims whether
5      or not there's any more recent report regarding the
6      Kearney claim?
7         MR. MEAGHER:  Objection, asked and answered.
8  A.  **We would not retain those reports.**
9  Q.  You would retain a report from January 2000 but not
10     more recent reports; is that your testimony?
11 A.  **My testimony is, it's not our practice to retain the**
12     **quarterly reports.**
13 Q.  Okay.  You've reviewed yourself personally reports of
14     this nature that are more recent in time than January
15     2000, right?
16 A.  **Yes.**
17 Q.  What would have been the most recent reporting?
18 A.  **I don't recall.**
19 Q.  Would it have been sometime in the year 2007?
20 A.  **I don't recall what the date was on the last report**
21     **that we reviewed.**
22 Q.  You don't know if it's within the last eight months?
23 A.  **No, I don't.**
24 Q.  Those are quarterly reports?
25 A.  **No.**

7 (Pages 22 to 25)

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin**                                    **August 10, 2007**

|  | Page 26 |
|---|---|
| 1 | MR. MEAGHER: Objection to form. |
| 2 | Q. Correct? |
| 3 | A. No. |
| 4 | Q. You're saying that's not correct? |
| 5 | A. Could you repeat the question. |
| 6 | Q. You don't know whether or not there's been a report of |
| 7 | this nature supplied to your company within the past |
| 8 | eight months even though the contract requires |
| 9 | quarterly reporting; is that correct? |
| 10 | A. We have had reports supplied in the last eight months, |
| 11 | yes. |
| 12 | Q. Okay. So sometime -- |
| 13 | A. I thought your question was whether I had reviewed |
| 14 | them. |
| 15 | Q. Okay. So the company has received reports sometime in |
| 16 | 2007 that's been discarded notwithstanding the |
| 17 | litigation? |
| 18 | MR. MEAGHER: Objection to form. |
| 19 | Q. Correct? |
| 20 | A. Okay. Yes. |
| 21 | Q. The next column says REV CL Base. What does that |
| 22 | reference? |
| 23 | A. I don't know. |
| 24 | Q. Do you know what REV Base means? |
| 25 | A. No. |

|  | Page 27 |
|---|---|
| 1 | Q. What does Incurral Year mean? |
| 2 | A. That would be the year that the claim was reported. |
| 3 | Q. The Net Indem means net indemnity? |
| 4 | A. Yes. |
| 5 | Q. I'm sorry? |
| 6 | A. Yes. |
| 7 | Q. As far as Mr. Kearney goes, there are two numbers |
| 8 | associated on the four policies. Can you describe for |
| 9 | me what's referenced there. |
| 10 | A. There is -- you're referencing 3025. There is 20 -- is |
| 11 | that a -6.25 and 701.25. |
| 12 | Q. What do those numbers mean? |
| 13 | A. I would assume they were payment amounts. |
| 14 | Q. Okay. And what are the final two columns? |
| 15 | A. TRSV w/WVR and RRSV w/WVR and they -- |
| 16 | Q. What do they mean? |
| 17 | A. -- would be total reserve waiver, and again, I'm not |
| 18 | sure what the R stands, for but it is of waiver. |
| 19 | Q. What's the reference to waiver mean? |
| 20 | A. Waiver of premium. |
| 21 | Q. Does that mean that these policies have waiver of |
| 22 | premium associated with them? |
| 23 | A. I don't know. |
| 24 | Q. Why is it important that DMS in the role its serves |
| 25 | your company, why it is important that it track reserve |

|  | Page 28 |
|---|---|
| 1 | amounts? |
| 2 | A. We have to provide the information to our Actuarial |
| 3 | Department for them to do the -- basically their |
| 4 | financial reporting. |
| 5 | Q. Why does DMS perform that function? |
| 6 | A. Because they're administering the claims. |
| 7 | Q. But they're just making assessments on whether the |
| 8 | claims should be paid or not paid. Why are they |
| 9 | involved in the reserves? |
| 10 | MR. MEAGHER: Objection to form. You can |
| 11 | answer. |
| 12 | A. They would have the information on the specifics of the |
| 13 | policy and the benefits that would be paid out under |
| 14 | the specific policy. We wouldn't have that in-house. |
| 15 | Q. Why not? |
| 16 | A. Because they're administering the claim. |
| 17 | MR. ROBERTS: Okay. The court reporter I |
| 18 | guess made a copy of all the materials that were faxed. |
| 19 | If it came across on the fax correctly, it should have |
| 20 | a Bates number of 0130. |
| 21 | MR. MEAGHER: There are no Bates numbers on |
| 22 | the first page. It must have gotten cut off in |
| 23 | transmission. |
| 24 | MR. ROBERTS: The December 26, 2002 e-mail |
| 25 | from Bonsall to Loftin? |

|  | Page 29 |
|---|---|
| 1 | MR. MEAGHER: Yeah, the Bates is cut off, but |
| 2 | that's -- that's the second page of what I've been |
| 3 | handed. The first one is a fax cover from your office. |
| 4 | MR. ROBERTS: Okay. Let's do a little |
| 5 | housekeeping then. The next page then should be the |
| 6 | first page of an April 1999 Confidentiality Agreement. |
| 7 | MR. MEAGHER: Right, yeah, and I think |
| 8 | actually there's -- at the top of this it says 30 pages |
| 9 | and each page is sequentially numbered for a fax, you |
| 10 | know, page numbering up in the upper right-hand corner. |
| 11 | MR. ROBERTS: Okay. That doesn't appear on |
| 12 | mine, but just so we're on the same page, is the next |
| 13 | one a Confidentiality Agreement dated April '99? |
| 14 | MR. MEAGHER: Yes. |
| 15 | MR. ROBERTS: And that's four or five pages |
| 16 | and includes an Amendment as the final page? |
| 17 | MR. MEAGHER: I'm not there's an Amendment as |
| 18 | the final page, because then there's a July 31, '01 |
| 19 | Privacy Agreement and then there's an Amendment. |
| 20 | MR. ROBERTS: Okay. And then next is a |
| 21 | November 10, '99 letter from Bonsall to Honaker? |
| 22 | MR. MEAGHER: Yes. |
| 23 | MR. ROBERTS: Are any of the Bates numbers on |
| 24 | these documents? |
| 25 | MR. MEAGHER: No. There's some partial tops, |

**8 (Pages 26 to 29)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin**                                    **August 10, 2007**

| Page 30 |
|---|

1  but you can't make out the number.
2      MR. ROBERTS: Okay. And then there is an
3  Excel spreadsheet, Jefferson-Pilot Closed Claims,
4  that's several dozen pages?
5      MR. MEAGHER: No, no. The next thing after
6  your November 10, 1999 letter is a Transition Summary.
7      MR. ROBERTS: That's two pages, and then
8  there's a Claims Assessment Agreement which is several
9  pages, correct?
10      MR. MEAGHER: Well, it's there. It depends on
11  your definition of several, so -- I think it's longer
12  than several pages, but --
13      MR. ROBERTS: All right. Looks like you got
14  everything. Let's go forward with the first page of
15  that particular stack, the December 26, 2002 e-mail.
16  Let's mark the entire fax, part 1 and part 2, we'll
17  combine them and mark that as Exhibit 2 to this
18  deposition.
19      MR. MEAGHER: Do you want the fax sheets
20  included or do you want to take them out?
21      MR. ROBERTS: Let's take the fax cover sheets
22  out.
23
24      (Defendant's Exhibit No. 2 was marked for
25  identification by the reporter.)

| Page 31 |
|---|

1  Q. Beginning with the first page is the e-mail from
2      Bonsall to Loftin dated December 26, 2002. Is that in
3      front of you, Ms. Loftin?
4  A. Yes, it is.
5  Q. Okay. This would be three years after the DMS-JP
6      agreement was entered, correct?
7  A. Yes.
8  Q. And it appears that at that point in time your company
9      was seeking the further assistance of DMS and
10      Mr. Bonsall summarizes the proposed additional
11      engagements there, correct?
12  A. We were exploring the possibility.
13  Q. And what globe of claims would have been subject to
14      this particular e-mail, do you know?
15  A. Any of our disability claims.
16  Q. Did you move forward with this?
17  A. No.
18  Q. Why not?
19  A. It was not cost-effective.
20  Q. So if I understand correctly, it was you on behalf of
21      your company that reached out to DMS seeking
22      opportunity to provide more claims to them, but
23      ultimately as it fleshed out, you chose not to pursue
24      that path?
25  A. Yes.

| Page 32 |
|---|

1  Q. And the reason for that was economics?
2  A. Yes.
3  Q. The next page of the fax and which now is Exhibit 2 to
4      the deposition is a three-page Confidentiality
5      Agreement. The following page is a Privacy Agreement.
6      Then the page after that is a July 31, 2001 Amendment
7      to Claims Administration Agreement. I want to focus on
8      these five pages for a moment. Are you with me?
9  A. Yes.
10  Q. Did you have any involvement or participation in the
11      Confidentiality Agreement as of April '99?
12  A. No.
13  Q. Is it not something that would have come within your
14      responsibilities until sometime 2002?
15  A. Yes.
16  Q. Have you spoken about this agreement to anyone at the
17      company in the past two months?
18  A. **It was reviewed with the other documents that we**
19      **reviewed two weeks ago.**
20  Q. The next page is this Privacy Agreement from July 31,
21      2001. Do you see that?
22  A. Yes.
23  Q. Does Paul Swink still work for the company?
24  A. No.
25  Q. When did he leave the company?

| Page 33 |
|---|

1  A. **2005 -- excuse me, 2004.**
2  Q. Have you requested that anybody undertake an assessment
3      of whether or not DMS has complied with privacy
4      regulations regarding the Kearney claim?
5  A. No.
6  Q. Okay. The next document is called Amendment to Claims
7      Administration Agreement and are you mindful of this
8      agreement?
9  A. Yes.
10  Q. What's the general purpose of this agreement?
11  A. **I think it was just a supplement to the existing**
12      **Privacy Agreement.**
13  Q. Covering what topic or subject?
14  A. **Non-public personal financial and/or non-public**
15      **personal medical information about its consumers and**
16      **customers.**
17  Q. The last sentence of the indented paragraph there in
18      the middle says, In the even -- I guess that's supposed
19      to be event -- In the event that there is a question
20      about whether redisclosure of non-public personal
21      information is permissible, DMS shall consult with
22      Jefferson-Pilot prior to making that disclosure.
23      Do you know if DMS or its agents ever
24      consulted with Jefferson-Pilot about disclosures
25      regarding Mr. Kearney?

**9 (Pages 30 to 33)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin**                                              **August 10, 2007**

---

**Page 34**

1          MR. MEAGHER: Objection to form.
2     A.   I'm sorry, could you repeat the question.
3     Q.   Do you know if DMS ever came to Jefferson-Pilot and
4          consulted with Jefferson-Pilot about disclosure of
5          information regarding Mr. Kearney?
6          MR. MEAGHER: Objection to form.
7     A.   No.
8     Q.   Okay. The next page should be a November 10, 1999
9          letter from Bonsall to Honaker. Do you see that?
10    A.   Yes.
11    Q.   Have you spoken with Mr. Honaker at all in the past
12         year?
13    A.   No.
14    Q.   The next page is called Transition Summary. The fourth
15         bullet point of the Transition Summary says that
16         Jefferson-Pilot will provide DMS with the most current
17         reserve listing and will provide updates quarterly
18         thereafter. Isn't that contrary to your prior
19         testimony here today?
20         MR. MEAGHER: Objection to form.
21    A.   I don't understand your question.
22    Q.   Well, you told me earlier today that DMS was
23         responsible for calculating and reporting reserves, but
24         apparently this document from '99 suggests that that
25         responsibility stayed with Jefferson-Pilot.

**Page 35**

1     A.   They would have been responsible for reporting the
2          benefit payments and the impact on reserving from their
3          side, but the reserving for the block of business is
4          actually done by a formula in the Actuarial Department.
5     Q.   At Jefferson-Pilot?
6     A.   Yes.
7     Q.   Jefferson-Pilot then reports reserves to DMS?
8     A.   Yes, so that they can update their records as well.
9     Q.   And explain to me again why it's important for DMS in
10         their function to know what the reserves are.
11         MR. MEAGHER: Objection, asked and answered.
12    A.   I believe it might be helpful to them in assessing
13         settlement offers.
14    Q.   Thank you. The next bullet point I want to direct your
15         attention to is about two-thirds of the way down --
16         actually let's move on.
17         Do you know whose handwriting is interspersed
18         on this document?
19    A.   It looks like Clyde's.
20    Q.   On the next page there's a heading called Settlements.
21         Do you see that?
22    A.   Yes.
23    Q.   The first bullet point says, DMS will seek concurrence
24         from Jefferson-Pilot/Employers Reinsurance or Employers
25         Re for all settlements in excess of 75,000. Do you see

**Page 36**

1          that?
2     A.   Yes.
3     Q.   Did Jefferson-Pilot actually participate in concurring
4          on settlement offers or is that something that
5          Employers Reinsurance did to the exclusion of
6          Jefferson-Pilot?
7     A.   No, we participated.
8     Q.   In all of them?
9     A.   If they were within -- in excess of 75,000 at this
10         time.
11    Q.   Well, Mr. Honaker writes in there that There should be
12         some relation to reserves, i.e., 50 percent of reserves
13         up to a max of 75,000. What would be the business
14         purpose of tying that to reserves?
15    A.   Again, you'd be looking at what the total liability of
16         the company would be.
17    Q.   What do you mean?
18    A.   That's what your reserve reflects.
19    Q.   The total liability of the company?
20    A.   For a particular claim as the actuarial formula has
21         prescribed.
22    Q.   So if you're able to settle a claim for 50 percent of
23         what is reserved, then one-half of the money that the
24         company has placed in reserve inures back to the
25         benefit of the company, right?

**Page 37**

1          MR. MEAGHER: Objection to the form.
2     A.   I'm not sure that I could say that it's that simple,
3          but it would be a factor in calculating settlement
4          values, yes.
5     Q.   Okay. So explain to the jury what an insurance company
6          does when it sets a reserve.
7          MR. MEAGHER: Well, I'm going to object.
8          She's not a 30(b)(6) on reserves, but she can testify
9          to her understanding.
10    A.   Okay. In what context, what types of claims?
11    Q.   Well, let's start with disability insurance claims.
12         Are reserves set by your company?
13    A.   Yes.
14    Q.   What's the purpose of a reserve?
15    A.   The reserve is to estimate the liability, the future
16         liability of the company on a particular --
17    Q.   Once some mathematical calculation is performed by some
18         actuary in some room somewhere, a number is arrived at
19         as the reserve on a particular claim, right?
20    A.   Yes.
21    Q.   Then what does the company do?
22    A.   Those reserves are adjusted periodically.
23    Q.   Well, what does the company do? Does it take X amount
24         of money on a new claim and put it in some vault
25         somewhere as a reserve?

**10 (Pages 34 to 37)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin                                    August 10, 2007**

**Page 38**

1  A.  No.  They have an actuarial formula that's tied to the
2     age of the block of business, and there are a number of
3     factors that they look at within the formula, but the
4     reserves are reset periodically, and those are
5     reflected in the financials.
6  Q.  But here Mr. Honaker is talking about authorizing DMS
7     to settle individual claims in relation to the reserves
8     on those individual claims, right?
9         MR. MEAGHER:  Objection to form.
10 A.  I think he's just referencing some suggested changes
11    for authorization levels.
12 Q.  Do I read this correctly?  He writes, There should be
13    some relation to reserves.  Did I read that correctly?
14 A.  As to when Jefferson-Pilot -- as to when DMS has to
15    seek concurrence.
16 Q.  On an individual claim settlement, correct?
17 A.  Yes.
18 Q.  Okay.  So tell the jury what happens when a new claim
19    is filed and the actuary runs some calculation and
20    let's say hypothetically the result of that calculation
21    is that a $100,000 reserve is needed.  What does the
22    company do with that information then?
23        MR. MEAGHER:  Objection to form and this line
24    with this witness.  You can answer.
25 A.  It would be included in our financial reports.  It

**Page 39**

1     would be incurred as a liability on the company's
2     books.
3  Q.  Okay.  So it's a liability on the company's books.
4     Then if DMS were to, as Mr. Honaker writes here, settle
5     a claim for 50 percent of the reserve value, does that
6     mean then that a settlement payment is made to a
7     policyholder for 50 percent of what's the liability on
8     the books and the balance of the liability on the books
9     becomes an asset?
10        MR. MEAGHER:  Objection to form.
11 A.  I am not an accountant.  I'm not exactly sure what
12    becomes a liability or what becomes an asset, but the
13    claim would be closed at that point.
14 Q.  Well, you testified under oath and told the jury that
15    once the reserve is set, it becomes a liability of the
16    company.
17 A.  Yes.
18 Q.  So once the claim has been settled and if it settled
19    for 50 percent of the reserve, the company's financial
20    condition improves, because that liability goes away,
21    correct?
22        MR. MEAGHER:  Objection, asked and answered.
23 A.  I can't answer that.
24 Q.  As the Vice President of Claims with a law degree in
25    your position for this large company, Lincoln

**Page 40**

1     Financial, it's your testimony under oath that you
2     can't answer that question?
3         MR. MEAGHER:  Objection, asked and answered.
4     We'll stipulate that all her testimony is under oath
5     today.
6  Q.  Is that true, ma'am?
7  A.  The claim would be closed at the time the settlement
8     was made.
9  Q.  Ma'am, you can't answer that question; is that your
10    testimony?
11 A.  My testimony is that the incurral would be taken down,
12    the payment would be made, and the claim would be
13    closed.
14 Q.  The payment would be made to the policyholder for a
15    fraction of the total reserve and the company then gets
16    the benefit of removing that liability from its books,
17    right?
18        MR. MEAGHER:  Objection to form.
19 A.  Yes, it does.
20 Q.  Thank you.  At the bottom of that paper it talks about
21    reporting.  It says that Jefferson-Pilot will provide
22    DMS with a quarterly reserve listing.  Why would DMS
23    need that?
24 A.  I believe I already answered that question.
25 Q.  Could you tell me again.  I forgot.

**Page 41**

1  A.  What did I say before?  I stick by what I said before.
2  Q.  You can't tell me here why it would be important for
3     DMS to have reserve listings quarterly provided by
4     Jefferson-Pilot?
5         MR. MEAGHER:  Objection, asked and answered.
6  A.  It would -- once again, it would assist them with
7     settlements.
8  Q.  Thank you.  Ma'am, can you turn to -- I don't know what
9     page of the agreement it is, but it's in Section 19
10    which is titled Insurance.  Tell me when you're there.
11 A.  Yes, I'm there.
12 Q.  I actually want to focus your attention on an inch or
13    two above that, which is F(ii).  Do you see that?
14 A.  Yes.
15 Q.  F says that compensation is not contingent on claim
16    experience, and Mr. Honaker writes in there in
17    handwriting below (ii) -- (ii) reads, This section
18    shall not prevent the compensation of DMS from being
19    based on premiums or charges collected or number of
20    claims paid or processed, right?
21 A.  Yes.
22 Q.  Then he writes in there, Or claim reserve at beginning
23    of quarter.
24        What would be the business reason of tying
25    compensation to DMS to claim reserves in any quarter?

**11 (Pages 38 to 41)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al.C-1-02-479**
**Valerie Loftin**                                            **August 10, 2007**

---

**Page 42**

1    MR. MEAGHER: Objection to form.
2  A.  I don't know why that's in there. I don't believe that
3      ultimately ended up in the agreement.
4          MR. ROBERTS: We're going to have to go off
5      the record here. When this was scheduled for
6      8:00 a.m., I scheduled a 3:30 phone conference. I need
7      to take that and hopefully it will take me ten minutes,
8      so I will call back as soon as that's concluded.
9          MR. MEAGHER: Okay.
10          MR. ROBERTS: Thank you.
11          (Brief recess)
12  Q.  Okay. Ms. Loftin, we were going through a series of
13      documents that have been marked Exhibit 2 for the
14      deposition and I'm not sure which document we left off
15      on. I think it was somewhere in that draft of the
16      agreement. If you proceed through that about eight or
17      ten pages, there's a letter from Andy Cohen dated
18      December 7, 1999, to Clyde Honaker.
19          MR. MEAGHER: It's the last page.
20  A.  Yes, I have it.
21  Q.  Okay. Then the page after that should be the first
22      page of a spreadsheet. The Bates number on this if
23      it's visible on the fax is 1335 --
24          MR. MEAGHER: It's not.
25  Q.  -- to --

---

**Page 43**

1          MR. MEAGHER: It's not, but at the upper
2      right-hand corner -- oh, wait. The witness is showing
3      me on her copy it is. Let me just get this straight.
4          (Brief pause)
5          MR. MEAGHER: Okay. We got it.
6  Q.  Actually if you look through this, the first page as
7      faxed appears to be 1335. It goes to 1374 and then at
8      the very end it picks up again with numbering 1331, -2,
9      -3, and -4. Is that the way yours appears?
10  A.  It goes to 1374 and then I don't see any other numbers.
11          MR. MEAGHER: You've got the first document
12      through 1374. Then you have another chart called
13      Jefferson-Pilot Closed Claims and the Bates number is
14      half there, half not there on the remaining four pages.
15          MR. ROBERTS: Okay. And it appears in a
16      different format, landscape versus whatever the other
17      format is, right?
18          MR. MEAGHER: Yeah, the Closed Claims, yeah.
19  Q.  Okay. Well, let's start with the first one as it was
20      faxed over, which is Bates 1335. Is this, Ms. Loftin,
21      a report provided to Jefferson-Pilot by DMS on a
22      semi-regular basis?
23  A.  Yes, it is.
24  Q.  And do you know if this is most recent report or the
25      compilation of reports for different periods?

---

**Page 44**

1  A.  I think this is a compilation of reports for different
2      periods.
3  Q.  Okay. It appears that this begins -- if you look at
4      page 1331, which is four or five pages from the end --
5          MR. MEAGHER: No, check your number again.
6      What's the Bates number? Because this first page is
7      1335.
8  Q.  If you'd go to page 1374.
9          MR. MEAGHER: Okay.
10  Q.  Are you there?
11  A.  I'm at a report that the caption at the top says
12      Jefferson-Pilot Closed Claims.
13          MR. MEAGHER: No, wait a second. The page
14      before that is what he's talking about. That's 1374.
15  A.  All right. Do you want me to be on 1374?
16  Q.  I actually don't. That was just my marker for the next
17      page.
18  A.  Okay.
19  Q.  It's the page after 1374.
20  A.  Okay. I'm on the page after 1374.
21  Q.  (Inaudible) the top of that and this is in a different
22      presentation, Jefferson-Pilot Closed Claims, right?
23  A.  Yes.
24  Q.  And there six columns on this particular Excel --
25  A.  Yes.

---

**Page 45**

1  Q.  And the beginning date of items reported in this report
2      is January 19 of 2000?
3  A.  Yes.
4  Q.  And then on this page and the successive pages the
5      dates run through the end of the year 2000?
6  A.  Yes.
7  Q.  And do I understand correctly that this is the report
8      provided by Jefferson-Pilot for the claims -- it was
9      provided by Jefferson-Pilot during the year 2000 that
10      it closed that year?
11  A.  (Witness reviews document) I'm thinking that these
12      were provided by DMS.
13  Q.  Okay. Maybe that's true, but is this the report
14      provided to Jefferson-Pilot of the claims that DMS
15      closed in the year 2000?
16  A.  Yes.
17  Q.  Okay. And then let's start back at the first page of
18      this particular section, the 1335 Bates number.
19  A.  Okay.
20  Q.  This page picks up in time chronology from where the
21      pages we just looked at left off, meaning this begins
22      with the year 2001 and we just saw a report that was
23      all of 2000, right?
24  A.  Yes.
25  Q.  And this presentation now provides more information

---

**12 (Pages 42 to 45)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al.** C-1-02-479
**Valerie Loftin**                                      **August 10, 2007**

---

**Page 46**

1    than is provided on the 2000 report, right?
2    A.  Yes.
3    Q.  This one actually states the reserve amounts for each
4         individual claim?
5    A.  Yes.
6    Q.  And DMS provides information to Jefferson-Pilot on
7         cases that it settled or claims that were settled, the
8         amount of the settlement in relation to the reserve
9         amount, right?
10   A.  Some of these were not settled.  Most of them would be
11        closed for other reasons, for example, returning to
12        work.
13   Q.  All right.  Well, let's take a look at the first one.
14        The first one says the reason for closure was Policy
15        settlement 12,000, it says Employers Reinsurance
16        percentage was 50, and reserve amount was 33,000,
17        right?
18   A.  Yes.
19   Q.  So sticking with that particular claim file, this would
20        mean that there was a liability on the books of 33,000,
21        but when DMS was able to settle it for 12-, that
22        liability for 33- went away for the cost of 12,000,
23        right?
24   A.  Yes.
25   Q.  And you would agree with me that there's a column here

**Page 47**

1    called Benefit Period, right?
2    A.  Yes.
3    Q.  Some of the benefit periods are six months, some are
4         twelve months, some are twenty-four, some are sixty
5         months, some are to the age 65, and a really small
6         percentage are life, correct?
7    A.  Yes.
8    Q.  Do you know why the version of this report changed
9         between 2000 and 2001 to provide the additional
10        information?
11   A.  No, I don't.
12   Q.  The report as it came to exist in 2001 includes the
13        monthly indemnity on each claim, correct?  The report
14        in 2001 adds a column for Monthly Indemnity, correct?
15   A.  Yes, it does.
16   Q.  It adds a column for the Elimination Period and the
17        Benefit Period?
18   A.  Yes, it does.
19   Q.  It adds a column for whether or not there was a COLA
20        benefit under the policy, right?
21   A.  Yes, it does.
22   Q.  The final piece of information that was added in 2001
23        was the Reserve Amount for each individual claim --
24            MR. MEAGHER:  Objection to form.
25   Q.  -- right?

**Page 48**

1    A.  I believe they also added the Date of Loss.
2    Q.  Correct, but it adds the Reserve Amount for each
3         individual claim?
4    A.  Yes, it does -- well, some of the claims don't have
5         reserve amounts, but in some of the claims they do.
6    Q.  This appears to be the way the form continued to be
7         presented to Jefferson-Pilot and then Lincoln National
8         as we get into the year 2007, correct?
9    A.  Yes.
10   Q.  Has Jefferson-Pilot or Lincoln National ever calculated
11        what the savings have been in policy settlements versus
12        reserves?
13   A.  No, we have not.
14   Q.  The next document is a July 23, '99 letter from Bonsall
15        to Eason.  Do you see that?
16   A.  I have that.
17   Q.  In the first sentence -- this is a July 23, 1999
18        letter.  Who is Mr. Eason?
19   A.  Mr. Eason was an actuary with Jefferson-Pilot
20        Financial.
21   Q.  Is he no longer employed with Jefferson-Pilot?
22   A.  No, he's not.
23   Q.  Do you know when it was that he came to be no longer
24        employed?
25   A.  He retired several years ago.  I don't know the exact

**Page 49**

1    year.
2    Q.  The first sentence reads, As you know, Disability
3         Management Services continues to support
4         Jefferson-Pilot Financial and Employers Reinsurance
5         Corporation in the assessment of disability benefit
6         eligibility and the management of disability claim
7         outcomes.  Do you see where it says that?
8    A.  Yes.
9    Q.  Have you ever heard Mr. Bonsall refer to his company's
10        ability to "manage disability claim outcomes"?
11           MR. MEAGHER:  Objection to the form.  You can
12        answer.
13   A.  I don't recall hearing Mr. Bonsall use those words, no.
14   Q.  Do you have an understanding of what it means for a
15        company to tout its ability to "manage disability claim
16        outcomes"?
17   A.  My understanding in the context of this letter is that
18        they have a particular expertise related to the
19        administration of disability claims.
20   Q.  And that expertise, as far as you understand it, gives
21        them the expertise to manage a claim's outcome?
22   A.  To administer the claim to make liability
23        determinations and to do everything that's involved in
24        the administration.
25   Q.  The next page is the DI Claim Management Outsourcing

**13 (Pages 46 to 49)**

---

**Reported By: Rebecca J. Huddy**         **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208    (800) 333-2082**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                                    **August 10, 2007**

---

**Page 50**

1    Proposal Executive Summary. Do you see that?
2    A.  Yes, I do.
3    Q.  The last phrase there of the first paragraph says that
4        Given that the company -- and I guess he's referring to
5        Jefferson-Pilot -- is no longer writing new disability
6        business, "risk management initiatives to improve
7        overall business line performance must be focused in
8        claims management." Do you see that?
9    A.  Actually I can't see that on my copy. It's --
10           THE WITNESS:  Can you see that on your copy?
11           MR. MEAGHER:  No.  I think you used
12       highlighter or something before you faxed it and so
13       it's obliterated the language that you may be reading,
14       because I don't see it.
15   A.  I can see up to "Given that the company is no longer
16       writing new disability business."
17   Q.  All right.  Well, this is document 1285 that was
18       provided to me within the past few weeks and what it
19       says is, Given that the company is no longer writing
20       new disability business, risk management initiatives to
21       improve overall business line performance must be
22       focused in claims management.  Assume for me that
23       that's what the document says, okay?
24   A.  Okay.
25   Q.  How is it that one company versus another can improve

---

**Page 51**

1    business line performance in the disability insurance
2    area?
3            MR. MEAGHER:  Objection to form.
4    A.  Well, by making correct decisions on claims liability
5        by making -- correctly interpreting their policies.
6    Q.  I mean, you would agree with me that a company that's
7        able to settle claims for a reduced percentage of the
8        reserve would be successful at improving overall
9        business line performance, correct?
10   A.  No, I wouldn't agree with that.
11   Q.  Well, doesn't it improve the financial condition of the
12       business if it can -- the business can remove
13       liabilities from its books for a sum less than the
14       amount of the liability?
15   A.  That's true, yes.
16   Q.  At the end of the second paragraph -- and perhaps this
17       is obliterated, too, because it's also highlighted --
18       Mr. Bonsall writes, Disability Management Services is
19       an independent third-party administrator that provides
20       effective outsourcing solutions to companies seeking to
21       improve disability business line performance.
22           Do you have an understanding of whether or not
23       Jefferson-Pilot was seeking to improve its disability
24       business line performance in 1999?
25   A.  I believe that we were seeking to improve the expertise

---

**Page 52**

1    in our claims administration.
2    Q.  Was the company not then experiencing expected profits
3        on its disability business line?
4            MR. MEAGHER:  Objection to form.  You can
5        answer.
6    A.  The company due to staffing shortages had experienced
7        what we saw on this claim, errors in interpretation of
8        contracts, in some cases to the benefit of the
9        claimant. Payments were being made when they really
10       weren't provided under the terms of the contract.
11           MR. ROBERTS:  Move to strike the response as
12       not responsive.
13   Q.  My question, ma'am, you know, does not resort to the
14       Kearney claim specifically.  I presume that this
15       outsourcing proposal when it was written had nothing to
16       do with Chris Kearney's claim specifically.  Do you
17       understand that also?
18           MR. MEAGHER:  Objection to form.
19   A.  Yes, but that is an example of the problem with limited
20       staffing.
21   Q.  Well, I don't agree with you and I'll strike the
22       response as nonresponsive, so when Mr. Bonsall
23       writes --
24           MR. MEAGHER:  Your disagreement doesn't mean
25       that the answer is stricken, but go ahead.

---

**Page 53**

1            MR. ROBERTS:  Well, I think it does, but
2        regardless --
3            MR. MEAGHER:  Thank you, Your Honor.
4    Q.  -- that sentence reads, Disability Management Services
5        is an independent third-party administrator that
6        provides effective outsourcing solutions to companies
7        seeking to improve disability business line
8        performance.  My question to you is, was
9        Jefferson-Pilot concerned in 1999 about its disability
10       business line performance?
11           MR. MEAGHER:  Objection, asked and answered.
12   A.  Yes.
13   Q.  In fact, it had been concerned about its disability
14       business line performance for several years and that is
15       why it stopped issuing policies in 1996, correct?
16   A.  I don't know.
17   Q.  Well, you do know that it stopped even writing policies
18       in 1996 on disability, correct?
19   A.  Yes.
20   Q.  And presumably it did that because it was not making
21       the profits that it anticipated?
22           MR. MEAGHER:  Objection to form.
23   A.  Not necessarily.
24   Q.  Okay.  So you're testifying under oath that you believe
25       that it's possible that the company could have been

---

**14 (Pages 50 to 53)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin**                                    **August 10, 2007**

| Page 54 |
| --- |

1     making profits on its business line, profits it
2     expected to make, and stopped selling a particular
3     product?
4    **A. Yes, I do.**
5    Q. The third bullet point on that particular Executive
6     Summary in the section that's bullet-pointed says that
7     DMS has the scale of operations needed to cost
8     effectively integrate specialized resources required to
9     thoroughly and objectively assess disability benefit
10    eligibility and manage claim outcomes. Do you see
11    that?
12    **A. Yes.**
13    Q. And it's your testimony you've never heard Mr. Bonsall
14     say that his company is in the business of managing
15     claim outcomes?
16    **A. I haven't had that many conversations with Mr. Bonsall.**
17     **There may be references to that effect in these**
18     **documents, but I have not heard him say that.**
19    Q. All right. The final paragraph reads, Investments in
20     DMS' -- the final paragraph on that page -- Investments
21     in DMS' claims management expertise are calculated to
22     yield meaningful returns in terms of organizational
23     performance and profitability for Jefferson-Pilot
24     Financial. Do you see that?
25    **A. Yes, I do.**

| Page 55 |
| --- |

1    Q. If a claim is dependent on whether or not someone has a
2     certain medical condition or not, what difference does
3     it make one company versus another on the company's
4     profitability?
5    **A. Again, getting back to the example with this claim, if**
6     **you make the wrong decision and you pay a benefit**
7     **that's not owed under the policy, it has an impact on**
8     **the company's profitability.**
9    Q. Okay. How many policies or claims exist in which
10    Jefferson-Pilot made mistakes on overpaying claims?
11    **A. I don't know.**
12    Q. Do you know of any?
13    **A. This one.**
14    Q. Okay. Well, that's subject to debate. Other than this
15     one, can you recite for me any policy where the company
16     made a mistake and overpaid a benefit such that it
17     decided it should stop selling the policies and go hire
18     DMS?
19        MR. MEAGHER: Objection, argumentative. You
20     can answer.
21 . **A. No.**
22    Q. Thank you. Ma'am, the final page of this particular
23     exhibit should be a January 2 e-mail, January 2, 2003,
24     from Bonsall to you.
25    **A. I have that.**

| Page 56 |
| --- |

1    Q. What's going on here in these e-mails? I guess the
2     bottom of this e-mail string is page 1 of this exhibit,
3     December 26, 2002, so it's the same subject matter?
4    **A. This subject matter actually had to do with revising**
5     **the contract to reflect a change in the way DMS would**
6     **be compensated.**
7    Q. Well, your e-mail in the middle there says, Bob, I look
8     forward to getting the contract from Andy. Where do we
9     stand on the new contract. So you're referring to two
10    different things there?
11    **A. No, I'm actually referring to the amendments to the**
12     **existing contract to reflect a change in the way DMS**
13     **would be compensated.**
14    Q. Is that the same subject matter as Bonsall's December
15     26 e-mail?
16    **A. No. This was something that we were exploring**
17     **separately from the amendment of the contract.**
18    Q. Okay. So if I understand correctly, Bonsall writes on
19     December 26 responding to some solicitation by
20     Jefferson-Pilot to submit some proposal for new work,
21     and you told me earlier that you never came to -- that
22     never came to fruition, right?
23    **A. Yes, that's true.**
24    Q. All right. And you respond to that e-mail with a
25     separate topic of discussion, that is, amendment to the

| Page 57 |
| --- |

1     '99 agreement?
2    **A. Yes.**
3    Q. And the purpose of that amendment was to modify the
4     manner in which DMS was getting paid?
5    **A. Yes.**
6    Q. What was the nature of the modification?
7    **A. We had looked at the treaty between ERC and**
8     **Jefferson-Pilot. Under the terms of the treaty, if ERC**
9     **wished for Jefferson-Pilot to utilize the services of a**
10    **third-party administrator, they were liable for**
11    **100 percent of any administrative fees.**
12        **Under the existing arrangement, because DMS**
13    **was also handling some claims that were not reinsured**
14    **with ERC, we had up until that time been sharing the**
15    **cost of DMS's administration. Going forward, our**
16    **intention was to bring back in-house any claims that**
17    **were not reinsured with ERC, and ERC would continue to**
18    **pay DMS for any claims that DMS administered that were**
19    **issued by Jefferson-Pilot but reinsured by ERC.**
20    Q. Did that amendment take effect sometime in 2003?
21    **A. Yes.**
22    Q. And then within the past year there was a further
23     amendment that increased the fixed monthly sum payable
24     to DMS?
25    **A. That would have been between ERC and DMS, because at**

**Reported By: Rebecca J. Huddy     www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208    (800) 333-2082**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
Valerie Loftin                              August 10, 2007

| Page 58 |
| --- |

1  that time for this block of policies ERC was
2  responsible for all payments to DMS.
3  Q. My understanding from deposing Mr. Dempsey is that ERC
4     has a portion of the responsibility on one of the
5     Kearney policies and all of the responsibility on
6     another. Are you telling me that all of the claims --
7     all of the Jefferson-Pilot claims presently being
8     handled by DMS are 100 percent reinsured by ERC?
9  A. No, I'm not.
10 Q. What are you telling me?
11 A. I'm telling you that the expenses related to the
12    administration of those claims.
13 Q. Are borne 100 percent by ERC?
14 A. Yes.
15 Q. Regardless of what the reinsurance treaty says about
16    any retained liability of Jefferson-Pilot?
17 A. Yes, with the exception of any allocated expenses
18    related to outside investigation or legal fees.
19 Q. Last month I received from your company's counsel, Bill
20    Ellis, a copy of a letter dated December 6, 2002. It
21    doesn't have a signature, at least the one provided to
22    me doesn't have a signature. It's purportedly from you
23    to Bob Bonsall. Are you mindful of that letter?
24 A. Do I have that letter in these documents?
25 Q. I didn't fax it to you today. Was that question

| Page 59 |
| --- |

1     directed to me or your lawyer?
2  A. Yes, I was asking if I was supposed to be looking at
3     something.
4  Q. I guess your lawyer could answer whether that letter
5     exists there or not.
6        MR. MEAGHER: Well, I don't have it. Did you
7     send it?
8        MR. ROBERTS: I haven't faxed it yet. I will
9     be happy to do so.
10       MR. MEAGHER: Okay.
11 Q. Do you know what letter I'm referring to, ma'am?
12 A. The date is a letter that I did review two weeks ago,
13    but I don't recall the content without looking at it.
14 Q. Okay. We'll go ahead and fax that, too. Bear with me
15    one moment.
16       MR. MEAGHER: Let's go off the record for five
17    minutes.
18       (Brief recess)
19       (Defendant's Exhibit No. 3 was marked for
20    identification by the reporter.)
21 Q. Do you have the letter before you, ma'am?
22 A. Yes, I do.
23 Q. And what was the purpose for this letter?
24 A. This really spells out what I was referring to before,
25    the transfer of files back and forth to reflect that

| Page 60 |
| --- |

1     DMS would start handling all of the ERC reinsured files
2     and DMS would return to us any files that were not
3     reinsured by ERC.
4  Q. But then this never happened?
5  A. No, this happened, yes.
6  Q. I'm sorry?
7  A. This did happen.
8  Q. This letter doesn't bear your signature, but is this
9     the final version of the letter that went to
10    Mr. Bonsall?
11 A. This is the final version. There should be one with my
12    signature.
13 Q. In July of 2007, notwithstanding the request made five
14    years earlier, there was 1,218 pages of training module
15    documents of DMS that were provided to me in this
16    litigation. Have you reviewed any of those materials
17    or training module materials?
18       MR. MEAGHER: Objection to form.
19 A. For DMS?
20 Q. Right.
21 A. No.
22 Q. Do you know if anybody at your company that's
23    undertaken an analysis of those 1,200-plus pages of
24    training modules?
25 A. No.

| Page 61 |
| --- |

1  Q. Who is the person that oversees DMS's conduct of its
2     service for Jefferson-Pilot, Lincoln National?
3  A. Our primary contact is Todd Ditmar.
4  Q. Who's the person on your side that oversees their work?
5  A. Cynthia Croft.
6  Q. Do you know if she's ever undertaken an analysis of the
7     1,200-plus pages of training modules?
8  A. No.
9  Q. Has it ever been represented to you that DMS doesn't
10    have a training manual or claims manual?
11       MR. MEAGHER: Objection to form, compound.
12 A. No.
13 Q. Document 1440 that was produced just within the past
14    two weeks that I don't suspect is before you is an
15    e-mail from you to Bonsall in June of 2002 where you
16    write to him about a potential visit to their offices
17    and you write, I'd like to visit your facilities
18    sometime in the near future to get a better
19    understanding of your procedures and processes.
20       Now, I understand that e-mail is not in front
21    of you. Do you recall ever making an effort to go to
22    DMS and gaining a better understanding of their
23    procedures and processes?
24 A. Yes.
25 Q. What did you do in that exercise?

**16 (Pages 58 to 61)**

**Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479**
**Valerie Loftin                                    August 10, 2007**

**Page 62**

1   A.  I visited their offices in Massachusetts, I took a tour
2       of their facilities, spoke with their personnel.
3   Q.  You didn't review any of their training module
4       documents?
5   A.  No.
6   Q.  Who did you speak to? Did you speak to Mr. Hughes and
7       Mr. Ditmar?
8   A.  This would have been in 2002. I recall speaking to Mr.
9       Ditmar, Mr. Bonsall, and one of their in-house
10      attorneys, as well as several of their claims
11      examiners.
12  Q.  Did you discuss with them their claim philosophy?
13  A.  Yes.
14  Q.  Did you discuss with them their settlement practices?
15  A.  No.
16  Q.  Who do you report to?
17  A.  Lin Ingram.
18  Q.  What's her position?
19  A.  It's a he. He is the Vice President of Shared Services
20      in Greensboro.
21  Q.  Ma'am, do you have any claims presently being
22      administered or managed by DMS?
23  A.  I believe it's around 300.
24  Q.  What's the procedure at Lincoln National now,
25      Jefferson-Pilot before, with respect to the claim file

**Page 63**

1       once a lawsuit is filed?
2   A.  That would be sent to our Litigation Department.
3       Obviously if it's an open claim, we would retain a copy
4       in the Claims Department if it was being handled
5       in-house.
6   Q.  What do you mean, if it's handled in-house?
7   A.  As opposed to DMS handling it.
8   Q.  Does Jefferson-Pilot or Lincoln National have a policy
9       with regard to lawsuits filed on claims that DMS is
10      managing?
11  A.  No.
12  Q.  So you don't know what the process or policy is when
13      there's a continuing claim and there happens to be a
14      lawsuit filed on the claim when DMS is managing the
15      claim?
16  A.  It would still be referred to our in-house Litigation
17      Department. But you asked where the claim file was
18      located.
19  Q.  I didn't -- I must have not asked the question well.
20      What's the policy when you have a continuing claim and
21      you have litigation over the claim? Who retains
22      authority on the claim file and the ongoing continuing
23      claim?
24  A.  It would be located with the administrator of the claim
25      if it was a policy that was on claim, but a copy would

**Page 64**

1       also reside with the Litigation Department.
2   Q.  Who makes the decisions on an ongoing basis on the
3       continuing claim? Is it the lawyers managing the
4       litigation or is it the Claims Department?
5   A.  We would be working with the lawyers managing the
6       litigation.
7   Q.  And is information used in the claim process that's
8       garnered from the litigation process?
9           MR. MEAGHER: Objection to form.
10  A.  I'm sorry, I don't understand the question.
11  Q.  Do claims administering the ongoing continuing
12      claim use information garnered through litigation
13      process?
14  A.  There is not a flow of information -- do you mean
15      information that's retained as a part of discovery?
16      That's maintained in our in-house Legal Department or
17      with outside counsel. That's not something that comes
18      back to the Claims Department.
19  Q.  Why not?
20  A.  Because our responsibility would be administering the
21      claim, not handling the litigation.
22  Q.  And that's your understanding of the way DMS would
23      operate?
24  A.  I thought you asked how Lincoln operated.
25  Q.  Is that your understanding how DMS operates?

**Page 65**

1   A.  I don't know how DMS operates.
2   Q.  Does Jefferson-Pilot or Lincoln Financial have any
3       concern about how that process is operated by DMS?
4   A.  Concern?
5   Q.  Right.
6   A.  No.
7   Q.  Whatever DMS decides to do in that circumstance is fine
8       with Lincoln National as far as you're concerned?
9   A.  As long as it's within the terms of good faith claims
10      handling and the terms of our agreement.
11  Q.  Did Jefferson-Pilot or Lincoln National ever audit the
12      administration of the Kearney claim?
13  A.  With DMS?
14  Q.  Right.
15  A.  I don't believe so.
16  Q.  When you familiarized yourself with the DMS processes,
17      did you gain an understanding of DMS's policy of
18      providing individual employees with spot bonuses?
19  A.  No.
20  Q.  Have you ever heard that DMS provides employees with
21      spot bonuses?
22  A.  No.
23  Q.  Do you know what a spot bonus is?
24  A.  No.
25  Q.  Did Jefferson-Pilot or Lincoln National ever discipline

**17 (Pages 62 to 65)**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al.C-1-02-479
Valerie Loftin                                          August 10, 2007

**Page 66**

1    any employee, contractor, or vendor for violating
2    privacy protection regulations?
3   **A. In a claims context?**
4   Q. Right.
5   **A. Not to my knowledge.**
6   Q. Is there any dispute between ERC and Jefferson-Pilot or
7    Lincoln Financial regarding obligations on the Kearney
8    claim?
9   **A. No.**
10      MR. ROBERTS: With the affirmation that the
11    documents provided to me over the past month are
12    authentic, I think we're done with this deposition.
13      MR. MEAGHER: Well, I can agree to that with
14    the exception of, some of the materials provided were,
15    you know, seminar materials retained by claims
16    examiners that were not produced or promulgated by
17    Jefferson-Pilot or DMS were responsive, we believe,
18    to the request. But as far as the documents generated
19    by DMS and JP, I would stipulate to that that they are
20    authentic.
21 MR. ROBERTS:Very well. Thank you.
22 MR. MEAGHER:Okay. I have no questions and we'll read if
23 it's ordered.
24      (Deposition concluded at 5:10 p.m.)
25

**Page 67**

1      E R R A T A  S H E E T
2 RE: Jefferson-Pilot v. Kearney et al.
3 DEPOSITION OF: Valerie Loftin
4      Please read this original deposition with
5 care, and if you find any corrections or changes you
6 wish made, list them by page and line number below. DO
7 NOT WRITE IN THE DEPOSITION ITSELF. Return the
8 deposition to this office after it is signed. We would
9 appreciate your prompt attention to this matter.
10      To assist you in making any such corrections,
11 please use the form below. If supplemental or
12 additional pages are necessary, please furnish same and
13 attach them to this errata sheet.
14 Page _____ Line _____ should read:
15 _____
16 Reason for change _____
17 Page _____ Line _____ should read:
18 _____
19 Reason for change _____
20 Page _____ Line _____ should read:
21 _____
22 Reason for change _____
23 Page _____ Line _____ should read:
24 _____
25 Reason for change _____

**Page 68**

1 Page _____ Line _____ should read:
2 _____
3 Reason for change _____
4 Page _____ Line _____ should read:
5 _____
6 Reason for change _____
7 Page _____ Line _____ should read:
8 _____
9 Reason for change _____
10 Page _____ Line _____ should read:
11 _____
12 Reason for change _____
13 Page _____ Line _____ should read:
14 _____
15 Reason for change _____
16
17      _____
18      Signature of the Witness
19 SUBSCRIBED and SWORN TO before me this _____ day of
20 _____, 2007.
21      _____
22      NOTARY PUBLIC
23 My Commission expires: _____
24
25

**Page 69**

1 STATE OF NORTH CAROLINA )
2          )C E R T I F I C A T E
3 COUNTY OF GUILFORD    )
4
5      I, REBECCA J. HUDDY, Notary Public, do hereby
6 certify that VALERIE LOFTIN personally appeared before
7 me on the 10th day of August, 2007, and was sworn by me
8 prior to the taking of the foregoing deposition.
9      IN WITNESS WHEREOF, I have hereunto subscribed
10 my name this 24th day of August, 2007.
11
12
13      REBECCA J. HUDDY
14      Notary Public
15
16 My Commission Expires: June 29, 2010
17
18
19
20
21
22
23
24
25

**18 (Pages 66 to 69)**

Page 70

```
 1    STATE OF NORTH CAROLINA )
 2                           ) C E R T I F I C A T E
 3    COUNTY OF GUILFORD     )
 4
 5          I, REBECCA J. HUDDY, Notary Public, do hereby
 6    certify that the foregoing deposition of VALERIE LOFTIN
 7    was taken and transcribed by me; and that the foregoing
 8    sixty-nine (69) pages are a true and accurate
 9    transcript of the testimony of said VALERIE LOFTIN.
10          I further certify that I am not of counsel for
11    or in the employment of any of the parties to this
12    action, nor am I interested in the result of said
13    action.
14          IN WITNESS WHEREOF, I have hereunto subscribed
15    my name this 24th day of August, 2007.
16
17
18          _____
19          REBECCA J. HUDDY
20          Notary Public
21    My Commission Expires:  June 29, 2010
22
23
24
25
```

19 (Page 70)

1

| A |
|---|

**ability (2)**
49:10,15
**able (5)**
14:23 20:11 36:22 46:21
  51:7
**accountant (1)**
39:11
**accurate (2)**
11:15 70:8
**action (2)**
70:12,13
**actuarial (4)**
28:2 35:4 36:20 38:1
**actuary (3)**
37:18 38:19 48:19
**added (3)**
6:23 47:22 48:1
**addition (3)**
6:8 14:16 20:15
**additional (13)**
6:25 14:17,19,22 16:2,12,14
  17:9,14,21 31:10 47:9
  67:12
**address (2)**
4:6,11
**adds (4)**
47:14,16,19 48:2
**adjusted (1)**
37:22
**adjustors (2)**
15:4,12
**administer (2)**
15:5 49:22
**administered (2)**
57:18 62:22
**administering (4)**
28:6,16 64:11,20
**administration (10)**
7:11 14:25 32:7 33:7 49:19
  49:24 52:1 57:15 58:12
  65:12
**administrative (1)**

57:11
**administrator (4)**
51:19 53:5 57:10 63:24
**advised (1)**
15:2
**affirmation (1)**
66:10
**age (2)**
38:2 47:5
**agents (1)**
33:23
**ago (9)**
5:4,16 11:24 13:1,2 20:15
  32:19 48:25 59:12
**agree (6)**
24:25 46:25 51:6,10 52:21
  66:13
**agreement (28)**
11:9,10,20 12:12,22 14:5
  17:1,2 29:6,13,19 30:8 31:6
  32:5,5,7,11,16,20 33:7,8,10
  33:12 41:9 42:3,16 57:1
  65:10
**agreement's (1)**
12:5
**ahead (2)**
52:25 59:14
**Airport (1)**
1:23
**al (1)**
67:2
**allocated (1)**
58:17
**amended (4)**
11:11 12:5,14,23
**amendment (17)**
11:18,20,23,25 12:8,16,20
  29:16,17,19 32:6 33:6
  56:17,25 57:3,20,23
**amendments (2)**
18:6 56:11
**amount (7)**
37:23 46:8,9,16 47:23 48:2
  51:14

**amounts (4)**
27:13 28:1 46:3 48:5
**analysis (2)**
60:23 61:6
**Andy (2)**
42:17 56:8
**and/or (1)**
33:14
**annuity (1)**
6:25
**answer (24)**
8:6 9:3 10:2,13,14,19,22
  11:19 13:5 14:3 17:23
  18:16 22:22 23:8 28:11
  38:24 39:23 40:2,9 49:12
  52:5,25 55:20 59:4
**answered (10)**
10:2,18 23:13 25:7 35:11
  39:22 40:3,24 41:5 53:11
**anticipate (1)**
19:18
**anticipated (1)**
53:21
**anybody (2)**
33:2 60:22
**apparently (2)**
13:14 34:24
**appear (1)**
29:11
**APPEARANCES (1)**
2:1
**appeared (1)**
69:6
**appears (9)**
13:20 20:21 22:5 31:8 43:7,9
  43:15 44:3 48:6
**appreciate (1)**
67:9
**appropriate (1)**
15:20
**April (4)**
8:11 29:6,13 32:11
**area (2)**
21:13 51:2

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**    August 10, 2007

2

argumentative (1)
55:19
arrangement (1)
57:12
arrived (1)
37:18
ascertain (1)
20:11
asked (16)
10:1,18,21 11:24 15:10 23:10
   23:13 25:7 35:11 39:22
   40:3 41:5 53:11 63:17,19
   64:24
asking (4)
7:24 12:20,21 59:2
assess (1)
54:9
assessing (1)
35:12
assessment (3)
30:8 33:2 49:5
assessments (1)
28:7
asset (2)
39:9,12
assist (2)
41:6 67:10
assistance (1)
31:9
associated (3)
22:19 27:8,22
assume (4)
11:2 15:11 27:13 50:22
attach (1)
67:13
attention (3)
35:15 41:12 67:9
attorneys (1)
62:10
attorney-client (2)
9:23 10:3
audit (1)
65:11
August (6)

1:25 13:1,16 69:7,10 70:15
authentic (2)
66:12,20
authority (1)
63:22
authorization (1)
38:11
authorizing (2)
19:3 38:6
automatically (1)
19:22
autopay (7)
19:12,13,15,21 20:3,5,14
autopayment (1)
19:11
aware (4)
10:9,9 12:25 19:24
a.m (1)
42:6

**B**

B (1)
3:6
back (16)
7:18 8:14 14:3 15:22,24 16:8
   16:18 17:12 24:7 36:24
   42:8 45:17 55:5 57:16
   59:25 64:18
balance (1)
39:8
BARRETT (1)
1:10
Base (4)
21:1,1 26:21,24
based (2)
21:2 41:19
Basic (2)
23:20,22
basically (3)
6:5 19:21 28:3
basis (2)
43:22 64:2
Bates (12)
13:12 20:17 22:11 28:20,21

29:1,23 42:22 43:13,20
   44:6 45:18
bear (2)
59:14 60:8
beginning (4)
1:25 31:1 41:22 45:1
begins (2)
44:3 45:21
behalf (1)
31:20
believe (16)
5:23 17:24 20:2 23:1,5,17
   24:17 35:12 40:24 42:2
   48:1 51:25 53:24 62:23
   65:15 66:17
benefit (15)
19:24 20:12 23:18 35:2
   36:25 40:16 47:1,3,17,20
   49:5 52:8 54:9 55:6,16
benefits (1)
28:13
better (2)
61:18,22
Bill (5)
13:2,3,7,9 58:19
Biscayne (1)
2:6
bit (1)
21:17
block (3)
35:3 38:2 58:1
Bob (2)
56:7 58:23
bonded (1)
15:8
Bonsall (18)
28:25 29:21 31:2,10 34:9
   48:14 49:9,13 51:18 52:22
   54:13,16 55:24 56:18 58:23
   60:10 61:15 62:9
Bonsall's (1)
56:14
bonus (1)
65:23

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

3

**bonuses (2)**
65:18,21
**books (7)**
39:2,3,8,8 40:16 46:20 51:13
**borne (1)**
58:13
**bottom (2)**
40:20 56:2
**Boulevard (1)**
2:6
**BOWEN (1)**
2:4
**Brief (4)**
21:22 42:11 43:4 59:18
**bring (1)**
57:16
**brought (2)**
16:8 17:12
**bullet (4)**
34:15 35:14,23 54:5
**bullet-pointed (1)**
54:6
**business (24)**
1:23 6:21 12:4 35:3 36:13
  38:2 41:24 50:6,7,16,20,21
  51:1,9,12,12,21,24 52:3
  53:7,10,14 54:1,14

_____

**C**

**C (4)**
69:2,2 70:2,2
**calculated (2)**
48:10 54:21
**calculating (2)**
34:23 37:3
**calculation (3)**
37:17 38:19,20
**call (1)**
42:8
**called (5)**
33:6 34:14 35:20 43:12 47:1
**caption (1)**
44:11
**care (1)**

67:5
**career (1)**
9:17
**Carolina (7)**
1:24 2:14 4:9 5:19 9:14 69:1
  70:1
**carry (1)**
24:5
**case (5)**
1:8 4:5 11:18,22 12:3
**cases (3)**
19:6 46:7 52:8
**categories (2)**
22:12 24:5
**Center (4)**
1:23,24 2:5,21
**certain (3)**
19:16 20:2 55:2
**certify (3)**
69:6 70:6,10
**change (15)**
12:16 14:25 16:3 19:19 56:5
  56:12 67:16,19,22,25 68:3
  68:6,9,12,15
**changed (1)**
47:8
**changes (2)**
38:10 67:5
**charges (1)**
41:19
**chart (1)**
43:12
**check (1)**
44:5
**checks (1)**
19:22
**chose (1)**
31:23
**Chris (2)**
20:20 52:16
**CHRISTOPHER (1)**
1:10
**chronology (1)**
45:20

**Cincinnati (1)**
2:22
**circumstance (3)**
15:25 17:8 65:7
**circumstances (6)**
14:21 16:1,13 17:20 19:14,24
**Civil (1)**
1:22
**CL (2)**
21:1 26:21
**claim (76)**
7:10,11,13,20 8:14,16 14:16
  15:15 16:3,4,5,12,14,15
  17:3,3,5,9,21 19:14,18 20:3
  25:6 27:2 28:16 33:4 36:20
  36:22 37:19,24 38:16,18
  39:5,13,18 40:7,12 41:15
  41:22,25 46:4,19 47:13,23
  48:3 49:6,10,15,22,25 52:7
  52:14,16 54:10,15 55:1,5
  62:12,25 63:3,13,14,15,17
  63:20,21,22,23,24,25 64:3,7
  64:12,21 65:12 66:8
**claimant (1)**
52:9
**claimants (2)**
19:22 20:4
**claims (80)**
4:15 6:15,24 7:1 13:15 14:11
  14:17,19,22 15:1,5,11,22,25
  16:2,8,9,19,21,22,23 17:17
  17:24,25 18:8 19:9,11,16
  19:21 21:13 25:4 28:6,8
  30:3,8 31:13,15,22 32:7
  33:6 37:10,11 38:7,8 39:24
  41:20 43:13,18 44:12,22
  45:8,14 46:7 48:4,5 49:19
  50:8,22 51:4,7 52:1 54:21
  55:9,10 57:13,16,18 58:6,7
  58:12 61:10 62:10,21 63:4
  63:9 64:4,18 65:9 66:3,15
**claim's (1)**
49:21
**closed (11)**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    **August 10, 2007**

4

30:3 39:13 40:7,13 43:13
43:18 44:12,22 45:10,15
46:11
**closure (1)**
46:14
**Clyde (1)**
42:18
**Clyde's (1)**
35:19
**Cohen (1)**
42:17
**coin (1)**
16:11
**COLA (1)**
47:19
**collected (1)**
41:19
**column (7)**
22:25 24:12 26:21 46:25
47:14,16,19
**columns (3)**
20:23 27:14 44:24
**combine (1)**
30:17
**come (2)**
15:24 32:13
**comes (1)**
64:17
**commenced (2)**
18:22,25
**Comment (2)**
21:1 23:18
**Commission (3)**
68:23 69:16 70:21
**communications (7)**
7:17,19 8:1,2,14,17 11:4
**companies (3)**
6:19 51:20 53:6
**company (41)**
1:5,20 2:12 15:18,19 16:6,13
26:7,15 27:25 31:8,21
32:17,23,25 36:16,19,24,25
37:5,12,16,21,23 38:22
39:16,25 40:15 49:15 50:4

50:15,19,25 51:6 52:2,6
53:25 54:14 55:3,15 60:22
**company's (7)**
39:1,3,19 49:9 55:3,8 58:19
**compensated (2)**
56:6,13
**compensation (3)**
41:15,18,25
**compilation (2)**
43:25 44:1
**compliant (1)**
15:14
**complied (1)**
33:3
**compound (1)**
61:11
**computer (1)**
20:5
**concern (2)**
65:3,4
**concerned (3)**
53:9,13 65:8
**conclude (1)**
22:18
**concluded (2)**
42:8 66:24
**concluding (1)**
23:4
**concurrence (2)**
35:23 38:15
**concurring (1)**
36:3
**condition (4)**
19:19 39:20 51:11 55:2
**conduct (1)**
61:1
**conference (1)**
42:6
**Confidentiality (4)**
29:6,13 32:4,11
**consult (1)**
33:21
**consulted (2)**
33:24 34:4

**consumers (1)**
33:15
**contact (1)**
61:3
**contacted (2)**
6:5 15:10
**content (1)**
59:13
**context (5)**
10:4 12:2 37:10 49:17 66:3
**contingent (1)**
41:15
**continue (1)**
57:17
**continued (1)**
48:6
**continues (1)**
49:3
**continuing (5)**
63:13,20,22 64:3,11
**contract (11)**
20:25 23:16,16 24:22 26:8
52:10 56:5,8,9,12,17
**contracted (1)**
12:24
**contractor (1)**
66:1
**contracts (1)**
52:8
**contrary (1)**
34:18
**conversations (1)**
54:16
**copied (1)**
13:18
**copy (7)**
28:18 43:3 50:9,10 58:20
63:3,25
**corner (2)**
29:10 43:2
**corporate (1)**
4:10
**Corporation (1)**
49:5

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    **August 10, 2007**

5

4:17 12:7 14:3,6,7 17:7
18:25 19:4 26:2,4,9,19 30:9
31:6,11 38:16 39:21 47:6
47:13,14 48:2,8 51:4,9
53:15,18
**corrections (2)**
67:5,10
**correctly (8)**
22:18 28:19 31:20 38:12,13
45:7 51:5 56:18
**cost (3)**
46:22 54:7 57:15
**cost-effective (1)**
31:19
**counsel (11)**
5:9,9,11,13 6:10 9:17 13:10
15:3 58:19 64:17 70:10
**COUNTY (2)**
69:3 70:3
**court (3)**
1:1 21:19 28:17
**cover (2)**
29:3 30:21
**Covering (1)**
33:13
**Croft (1)**
61:5
**CT (1)**
13:12
**current (1)**
34:16
**customers (1)**
33:16
**cut (2)**
28:22 29:1
**Cynthia (1)**
61:5
**C-1-02-479 (1)**
1:9

**D**

**D (1)**
3:1
**date (12)**

18:5,9 21:1 23:16,24,24 24:1
24:12 25:20 45:1 48:1
59:12
**dated (5)**
5:23 29:13 31:2 42:17 58:20
**dates (2)**
8:5 45:5
**dating (1)**
13:16
**day (5)**
1:24 68:19 69:7,10 70:15
**days (2)**
13:1 20:15
**dealings (1)**
12:3
**debate (1)**
55:14
**December (11)**
11:9,20 12:22 28:24 30:15
31:2 42:18 56:3,14,19
58:20
**decided (1)**
55:17
**decides (1)**
65:7
**decision (1)**
55:6
**decisions (2)**
51:4 64:2
**Defendant (3)**
1:12,17 2:18
**Defendant's (4)**
3:9 21:24 30:24 59:19
**defense (1)**
9:17
**definition (1)**
30:11
**degree (1)**
39:24
**Dempsey (1)**
58:3
**Department (9)**
28:3 35:4 63:2,4,17 64:1,4,16
64:18

**dependent (1)**
55:1
**depends (1)**
30:10
**deposing (1)**
58:3
**deposition (24)**
1:19 4:4,16,21 5:5,8 6:10,13
6:17 11:8,8 14:12 18:10
30:18 32:4 42:14 66:12,24
67:3,4,7,8 69:8 70:6
**depositions (1)**
19:6
**describe (1)**
27:8
**described (1)**
17:8
**describing (1)**
17:10
**description (2)**
3:8 21:3
**determinations (1)**
49:23
**determined (1)**
11:16
**DI (1)**
49:25
**difference (1)**
55:2
**different (6)**
20:23 43:16,25 44:1,21 56:10
**direct (1)**
35:14
**directed (1)**
59:1
**disability (28)**
1:15 6:23 15:1 16:23 19:17
21:12 31:15 37:11 49:2,5,6
49:10,15,19 50:5,16,20
51:1,18,21,23 52:3 53:4,7,9
53:13,18 54:9
**disagreement (1)**
52:24
**discard (1)**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

6

18:19
**discarded (2)**
18:21 26:16
**discipline (1)**
65:25
**disclosure (2)**
33:22 34:4
**disclosures (1)**
33:24
**discovery (1)**
64:15
**discuss (2)**
62:12,14
**discussed (3)**
6:9 14:12 18:10
**discussion (1)**
56:25
**dispute (1)**
66:6
**DISTRICT (2)**
1:1,2
**Ditmar (3)**
61:3 62:7,9
**DIVISION (1)**
1:3
**DMS (96)**
4:5 11:10,20 12:4,5,12,14,17
    12:18,22,23 13:14 14:4,10
    14:18,19 15:10,16,23 16:2
    16:5,7,12,14,18,24 17:4,9
    17:15,21 18:1,8,11 21:6,7
    24:22 27:24 28:5 31:9,21
    33:3,21,23 34:3,16,22 35:7
    35:9,23 38:6,14 39:4 40:22
    40:22 41:3,18,25 43:21
    45:12,14 46:6,21 54:7,20
    54:21 55:18 56:5,12 57:4
    57:12,18,18,24,25 58:2,8
    60:1,2,15,19 61:9,22 62:22
    63:7,9,14 64:22,25 65:1,3,7
    65:13,16,20 66:17,19
**DMS's (3)**
57:15 61:1 65:17
**DMS-JP (1)**

31:5
**document (23)**
7:22 8:5 10:10,16,23,25 14:1
    21:3,5,16 22:7,9 24:9 33:6
    34:24 35:18 42:14 43:11
    45:11 48:14 50:17,23 61:13
**documents (27)**
5:10,20,21,22 6:1,9,9,12 8:25
    10:6 11:17 13:2,11,19 14:9
    14:15 20:15,16 29:24 32:18
    42:13 54:18 58:24 60:15
    62:4 66:11,18
**dozen (1)**
30:4
**draft (1)**
42:15
**Drive (2)**
1:24 4:8
**due (1)**
52:6
**duly (1)**
4:1

---

**E**

**E (10)**
2:3 3:1,6 67:1,1,1 69:2,2
    70:2,2
**earlier (4)**
9:17 34:22 56:21 60:14
**early (1)**
14:11
**Eason (3)**
48:15,18,19
**economics (1)**
32:1
**effect (2)**
54:17 57:20
**effective (2)**
51:20 53:6
**effectively (1)**
54:8
**effort (1)**
61:21
**eight (4)**

25:22 26:8,10 42:16
**eligibility (2)**
49:6 54:10
**Elimination (1)**
47:16
**Ellis (5)**
13:3,3,7,9 58:20
**employed (5)**
4:12,13 6:17 48:21,24
**employee (1)**
66:1
**employees (3)**
7:2 65:18,20
**Employers (2)**
35:24 36:5 46:15 49:4
**employment (1)**
70:11
**ended (1)**
42:3
**engagements (1)**
31:11
**entered (3)**
14:5 17:2 31:6
**entire (1)**
30:16
**entity (1)**
16:7
**ERC (24)**
7:16 8:3,13 16:8,9,16,23,24
    18:1,9 57:7,8,14,17,17,19
    57:25 58:1,3,8,13 60:1,3
    66:6
**errata (1)**
67:13
**errors (1)**
52:7
**estimate (1)**
37:15
**et (1)**
67:2
**event (2)**
33:19,19
**exact (1)**
48:25

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    **August 10, 2007**

7

**exactly (2)**
18:4 39:11
**EXAMINATION (2)**
3:4 4:3
**examined (1)**
4:2
**examiners (2)**
62:11 66:16
**example (3)**
46:11 52:19 55:5
**exams (1)**
15:8
**Excel (4)**
20:22 22:6 30:3 44:24
**exception (2)**
58:17 66:14
**excess (2)**
35:25 36:9
**exclusion (1)**
36:5
**excuse (5)**
9:22,24,25 10:9 33:1
**Executive (2)**
50:1 54:5
**exercise (1)**
61:25
**exhibit (8)**
21:24 30:17,24 32:3 42:13
  55:23 56:2 59:19
**exist (2)**
47:12 55:9
**existing (4)**
17:3 33:11 56:12 57:12
**exists (1)**
59:5
**expected (2)**
52:2 54:2
**expedite (1)**
19:20
**expenses (2)**
58:11,17
**experience (1)**
41:16
**experienced (1)**

52:6
**experiencing (1)**
52:2
**expertise (5)**
49:18,20,21 51:25 54:21
**expires (3)**
68:23 69:16 70:21
**explain (2)**
35:9 37:5
**exploring (2)**
31:12 56:16
**e-mail (21)**
3:10 7:16,19 8:1,2,4,14,17,18
  11:4 28:24 30:15 31:1,14
  55:23 56:2,7,15,24 61:15
  61:20
**e-mails (4)**
11:6,7 18:6 56:1

---

**F**

**F (3)**
41:15 69:2 70:2
**facilities (2)**
61:17 62:2
**fact (4)**
6:19 12:5 14:4 53:13
**factor (1)**
37:3
**factors (1)**
38:3
**faith (1)**
65:9
**Falmouth (1)**
4:8
**familiar (1)**
9:11
**familiarized (1)**
65:16
**far (4)**
27:7 49:20 65:8 66:18
**Farabow (2)**
2:11 5:13
**fashion (1)**
18:18

**fax (12)**
21:16,19 28:19 29:3,9 30:16
  30:19,21 32:3 42:23 58:25
  59:14
**faxed (6)**
22:5 28:18 43:7,20 50:12
  59:8
**Federal (1)**
1:22
**fee (1)**
13:16
**fees (2)**
57:11 58:18
**Fifth (1)**
2:21
**file (6)**
7:10,13 46:19 62:25 63:17,22
**filed (4)**
38:19 63:1,9,14
**files (20)**
14:16 15:15 16:2,3,4,5,12,14
  16:15 17:3,3,5,9,11,12,15
  17:21 59:25 60:1,2
**final (9)**
27:14 29:16,18 47:22 54:19
  54:20 55:22 60:9,11
**financial (22)**
4:13 5:18,25 6:21 8:3,7,9
  12:13 15:19,23 18:12 28:4
  33:14 38:25 39:19 40:1
  48:20 49:4 51:11 54:24
  65:2 66:7
**financials (1)**
38:5
**find (1)**
67:5
**fine (2)**
7:24 65:7
**first (21)**
4:1 14:5 20:21 22:11 28:22
  29:3,6 30:14 31:1 35:23
  42:21 43:6,11,19 44:6
  45:17 46:13,14 48:17 49:2
  50:3

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    **August 10, 2007**

8

**five (6)**
13:2 29:15 32:8 44:4 59:16
60:13
**fixed (9)**
12:6,14,23 13:15,20,21,23
14:4 57:23
**fleshed (1)**
31:23
**flip (1)**
16:11
**Florida (1)**
2:7
**flow (1)**
64:14
**focus (2)**
32:7 41:12
**focused (2)**
50:7,22
**following (1)**
32:5
**follows (1)**
4:2
**follow-up (1)**
19:20
**foregoing (3)**
69:8 70:6,7
**forgot (1)**
40:25
**form (33)**
10:1 11:14 12:1 13:4 17:22
18:15,23 22:8 23:7 25:2
26:1,18 28:10 34:1,6,20
37:1 38:9,23 39:10 40:18
42:1 47:24 48:6 49:11 51:3
52:4,18 53:22 60:18 61:11
64:9 67:11
**format (2)**
43:16,17
**formula (4)**
35:4 36:20 38:1,3
**forth (2)**
24:7 59:25
**forward (4)**
30:14 31:16 56:8 57:15

**four (5)**
22:19 27:8 29:15 43:14 44:4
**fourth (1)**
34:14
**fraction (1)**
40:15
**frequent (1)**
19:19
**front (5)**
7:23 8:25 21:5 31:3 61:20
**fruition (1)**
56:22
**function (2)**
28:5 35:10
**furnish (1)**
67:12
**further (4)**
21:17 31:9 57:22 70:10
**future (2)**
37:15 61:18
**F(ii) (1)**
41:13

---
**G**
---

**gain (1)**
65:17
**gaining (1)**
61:22
**garnered (2)**
64:8,12
**gathering (2)**
6:1,8
**general (1)**
33:10
**generally (1)**
12:21
**generate (1)**
19:22
**generated (4)**
13:14 24:15,17 66:18
**getting (3)**
55:5 56:8 57:4
**given (4)**
19:6 50:4,15,19

**gives (1)**
49:20
**globe (6)**
5:20 14:16 15:15,25 17:3
31:13
**go (13)**
14:3 15:9 16:18 21:18 24:7
30:14 42:4 44:8 52:25
55:17 59:14,16 61:21
**goes (4)**
27:7 39:20 43:7,10
**going (9)**
13:4 15:7,9 24:7 37:7 42:4
42:12 56:1 57:15
**good (1)**
65:9
**gotten (1)**
28:22
**GRAYDON (1)**
2:19
**greater (2)**
12:14,23
**Greene (1)**
2:13
**Greensboro (6)**
1:24 2:14 4:8 5:18 17:6
62:20
**gross (1)**
7:5
**guess (9)**
18:12 20:24 23:18 25:1
28:18 33:18 50:4 56:1 59:4
**GUILFORD (2)**
69:3 70:3

---
**H**
---

**H (2)**
3:6 67:1
**half (2)**
43:14,14
**handed (1)**
29:3
**handled (8)**
16:17,24,25 17:5 21:12 58:8

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    **August 10, 2007**

9

63:4,6
**handling (5)**
57:13 60:1 63:7 64:21 65:10
**handwriting (2)**
35:17 41:17
**happen (1)**
60:7
**happened (2)**
60:4,5
**happens (2)**
38:18 63:13
**happy (1)**
59:9
**head (2)**
2:19 7:8
**heading (1)**
35:20
**heard (4)**
49:9 54:13,18 65:20
**hearing (1)**
49:13
**help (1)**
21:5
**helpful (1)**
35:12
**hereunto (2)**
69:9 70:14
**highlighted (1)**
51:17
**highlighter (1)**
50:12
**hire (1)**
55:17
**historically (2)**
6:21,22
**Hogan (1)**
1:11
**hold (2)**
4:14 10:7
**home (1)**
4:11
**Honaker (8)**
29:21 34:9,11 36:11 38:6
  39:4 41:16 42:18

**Honor (1)**
53:3
**hopefully (1)**
42:7
**housekeeping (1)**
29:5
**Huddy (5)**
1:22 69:5,13 70:5,19
**Hughes (1)**
62:6
**hundred (1)**
14:11
**hypothetically (1)**
38:20

——————————
**I**
——————————

**idea (3)**
23:6,11,12
**identification (3)**
21:25 30:25 59:20
**identifies (1)**
20:23
**identify (2)**
19:16 20:4
**ii (2)**
41:17,17
**impact (2)**
35:2 55:7
**important (4)**
27:24,25 35:9 41:2
**improve (8)**
50:6,21,25 51:11,21,23,25
  53:7
**improves (1)**
39:20
**improving (1)**
51:8
**inaccurate (1)**
4:23
**Inaudible (1)**
44:21
**inch (1)**
41:12
**included (3)**

13:11 30:20 38:25
**includes (2)**
29:16 47:12
**increase (1)**
17:12
**increased (3)**
13:23 14:5 57:23
**incurral (3)**
21:1 27:1 40:11
**incurred (1)**
39:1
**Indem (2)**
21:2 27:3
**indemnity (3)**
27:3 47:13,14
**indented (1)**
33:17
**independent (3)**
11:5 51:19 53:5
**indicates (1)**
20:24
**indicator (1)**
22:16
**indicators (1)**
20:13
**individual (8)**
8:4 38:7,8,16 46:4 47:23
  48:3 65:18
**individuals (1)**
6:5
**information (17)**
6:6 20:19,20 28:2,12 33:15
  33:21 34:5 38:22 45:25
  46:6 47:10,22 64:7,12,14
  64:15
**Ingram (1)**
62:17
**initial (2)**
14:10,16
**initiatives (2)**
50:6,20
**insurance (13)**
1:5,20 2:12 6:23,25 7:1 9:16
  16:6,10 37:5,11 41:10 51:1

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    August 10, 2007

10

**insureds (1)**
17:18
**integrate (1)**
54:8
**intended (1)**
12:16
**intention (1)**
57:16
**interested (1)**
70:12
**internal (1)**
15:6
**internally (1)**
16:25
**interpretation (1)**
52:7
**interpreting (1)**
51:5
**interspersed (1)**
35:17
**inures (1)**
36:24
**investigate (1)**
21:17
**investigation (1)**
58:18
**Investments (2)**
54:19,20
**invoice (1)**
14:7
**invoices (8)**
13:12,13,16,17,20,23 14:1
  20:16
**involved (6)**
7:10,17 8:16 19:3 28:9 49:23
**involvement (1)**
32:10
**in-house (11)**
5:9,13 15:12 16:9 28:14
  57:16 62:9 63:5,6,16 64:16
**issued (4)**
13:14 15:2 16:10 57:19
**issuing (1)**
53:15

**items (2)**
22:19 45:1
**i.e (1)**
36:12

— J —

**J (5)**
1:22 69:5,13 70:5,19
**January (9)**
13:23 24:1,12,16 25:9,14
  45:2 55:23,23
**Jefferson-Pilot (67)**
1:5,20 2:12 4:5 6:18,22 8:8
  8:10 11:10,21 12:13 13:15
  15:19 16:6,10,16,18 18:7
  18:11 19:10 30:3 33:22,24
  34:3,4,16,25 35:5,7 36:3,6
  38:14 40:21 41:4 43:13,21
  44:12,22 45:8,9,14 46:6
  48:7,10,19,21 49:4 50:5
  51:23 53:9 54:23 55:10
  56:20 57:8,9,19 58:7,16
  61:2 62:25 63:8 65:2,11,25
  66:6,17 67:2
**Jefferson-Pilot/Employers...**
35:24
**jmeagher@shutts.com (1)**
2:9
**John (1)**
2:3
**JP (3)**
12:22 24:22 66:19
**Judge (2)**
1:10,11
**July (6)**
29:18 32:6,20 48:14,17 60:13
**June (4)**
5:23 61:15 69:16 70:21
**jury (3)**
37:5 38:18 39:14

— K —

**Kearney (25)**
1:10 4:5 8:14,16,22 10:10

11:4,18,22 12:3 19:4 20:20
22:19 23:19 24:12 25:6
27:7 33:4,25 34:5 52:14
58:5 65:12 66:7 67:2
**Kearney's (5)**
7:10,20 22:17 24:20 52:16
**kind (1)**
20:22
**know (45)**
7:3,5 8:2 9:21 10:3,4 11:7
  13:3,25 18:13 22:22,23
  23:23 24:21 25:4,22 26:6
  26:23,24 27:23 29:10 31:14
  33:23 34:3 35:10,17 41:8
  42:2 43:24 47:8 48:23,25
  49:2 52:13 53:16,17 55:11
  55:12 59:11 60:22 61:6
  63:12 65:1,23 66:15
**knowledge (2)**
6:7 66:5

— L —

**L (1)**
1:10
**landscape (1)**
43:16
**language (1)**
50:13
**large (1)**
39:25
**largely (1)**
22:6
**late (2)**
14:11 17:2
**law (3)**
9:14 14:25 39:24
**laws (1)**
15:14
**lawsuit (2)**
63:1,14
**lawsuits (1)**
63:9
**lawyer (2)**
59:1,4

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    **August 10, 2007**

11

**lawyers (2)**
64:3,5
**leave (1)**
32:25
**left (3)**
16:7 42:14 45:21
**legal (3)**
16:6 58:18 64:16
**legislative (1)**
15:3
**letter (18)**
3:11 29:21 30:6 34:9 42:17
   48:14,18 49:17 58:20,23,24
   59:4,11,12,21,23 60:8,9
**let's (11)**
29:4 30:14,16,21 35:16 37:11
   38:20 43:19 45:17 46:13
   59:16
**levels (1)**
38:11
**liabilities (1)**
51:13
**liability (18)**
36:15,19 37:15,16 39:1,3,7,8
   39:12,15,20 40:16 46:20,22
   49:22 51:4,14 58:16
**liable (1)**
57:10
**licensed (2)**
15:3,4
**licensing (1)**
15:13
**licensure (2)**
15:7,20
**life (8)**
1:20 2:12 6:25 16:6,10,16
   18:8 47:6
**lifetime (2)**
20:1,12
**limited (1)**
52:19
**Lin (1)**
62:17
**Lincoln (28)**

4:13 5:18,25 6:15,21,24 7:2
   8:3,7,8 12:13 15:19,22
   16:17 18:12 19:9 39:25
   48:7,10 61:2 62:24 63:8
   64:24 65:2,8,11,25 66:7
**line (23)**
22:17 38:23 50:7,21 51:1,9
   51:21,24 52:3 53:7,10,14
   54:1 67:6,14,17,20,23 68:1
   68:4,7,10,13
**list (1)**
67:6
**listen (1)**
12:9
**listing (2)**
34:17 40:22
**listings (1)**
41:3
**litigation (13)**
18:21,25 26:17 60:16 63:2,16
   63:21 64:1,4,6,8,12,21
**little (2)**
21:17 29:4
**LLP (2)**
2:4,19
**located (2)**
63:18,24
**location (1)**
4:10
**Loftin (17)**
1:21 4:1,4,8,10 9:13,16 22:1
   28:25 31:2,3 42:12 43:20
   67:3 69:6 70:6,9
**log (21)**
7:15,16,25 8:12,19,21,23,24
   9:1,3,4,5,10,11,20 10:5,11
   10:17,24 11:1,2
**logs (1)**
9:9
**long (1)**
65:9
**longer (6)**
30:11 48:21,23 50:5,15,19
**look (6)**

8:4 38:3 43:6 44:3 46:13
   56:7
**looked (2)**
45:21 57:7
**looking (6)**
12:2 24:3,4 36:15 59:2,13
**looks (2)**
30:13 35:19
**Loss (1)**
48:1

**M**

**Magistrate (1)**
1:11
**maintained (1)**
64:16
**making (8)**
28:7 33:22 51:4,5 53:20 54:1
   61:21 67:10
**manage (4)**
49:10,15,21 54:10
**managed (1)**
62:22
**management (12)**
1:15 13:15 49:3,6,25 50:6,8
   50:20,22 51:18 53:4 54:21
**managing (5)**
54:14 63:10,14 64:3,5
**manner (1)**
57:4
**manual (2)**
61:10,10
**mark (2)**
30:16,17
**marked (4)**
21:24 30:24 42:13 59:19
**marker (1)**
44:16
**Massachusetts (1)**
62:1
**materials (5)**
28:18 60:16,17 66:14,15
**mathematical (1)**
37:17

12

**matter (4)**
56:3,4,14 67:9
**max (1)**
36:13
**ma'am (12)**
12:9,19 13:17 23:14 40:6,9
41:8 52:13 55:22 59:11,21
62:21
**Meagher (73)**
2:3 5:11 9:22,24 10:1,18
11:14 12:1 13:4 17:19,22
18:15,23 21:21 23:7,13
25:2,7 26:1,18 28:10,21
29:1,7,14,17,22,25 30:5,10
30:19 34:1,6,20 35:11 37:1
37:7 38:9,23 39:10,22 40:3
40:18 41:5 42:1,9,19,24
43:1,5,11,18 44:5,9,13
47:24 49:11 50:11 51:3
52:4,18,24 53:3,11,22
55:19 59:6,10,16 60:18
61:11 64:9 66:13
**MEAGHER:Okay (1)**
66:22
**mean (22)**
5:11,13 9:7,10 16:4,20 18:3
22:13 23:22 24:15 27:1,12
27:16,19,21 36:17 39:6
46:20 51:6 52:24 63:6
64:14
**meaning (2)**
24:16 45:21
**meaningful (1)**
54:22
**means (7)**
23:4,6,11 24:17 26:24 27:3
49:14
**medical (2)**
33:15 55:2
**meeting (2)**
5:15,17
**memory (3)**
10:22,25 11:5
**merged (1)**

6:20
**merger (1)**
8:10
**met (2)**
4:4 5:9
**Miami (2)**
2:5,7
**Michael (1)**
2:18
**middle (2)**
33:18 56:7
**mindful (7)**
8:13 13:24,25 14:18 19:11
33:7 58:23
**mine (1)**
29:12
**minutes (2)**
42:7 59:17
**mistake (1)**
55:16
**mistakes (1)**
55:10
**modification (1)**
57:6
**modified (1)**
11:11
**modify (1)**
57:3
**module (3)**
60:14,17 62:3
**modules (2)**
60:24 61:7
**moment (2)**
32:8 59:15
**momentarily (1)**
21:19
**money (2)**
36:23 37:24
**month (3)**
12:15 58:19 66:11
**monthly (10)**
12:6,24 13:15,20,21,23 14:4
47:13,14 57:23
**months (7)**

25:22 26:8,10 32:17 47:3,4,5
**move (3)**
31:16 35:16 52:11
**mroberts@graydon.com (1)**
2:24

**N**

**N (1)**
3:1
**name (7)**
4:6 7:25 20:23 22:13,13
69:10 70:15
**National (12)**
6:15,24 7:2 19:10 48:7,10
61:2 62:24 63:8 65:8,11,25
**nature (7)**
19:17,17 22:8 24:19 25:14
26:7 57:6
**near (1)**
61:18
**necessarily (2)**
22:8 53:23
**necessary (1)**
67:12
**necessitate (1)**
19:19
**need (2)**
40:23 42:6
**needed (2)**
38:21 54:7
**negative (4)**
10:21,22 23:10,10
**net (4)**
17:11 21:2 27:3,3
**never (4)**
54:13 56:21,22 60:4
**new (21)**
14:25 15:2,3,4,5,11,14,15,20
17:8,17,24,25 18:8 37:24
38:18 50:5,16,20 56:9,20
**nominal (1)**
16:15
**nonresponsive (1)**
52:22

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

13

**non-public (3)**
33:14,14,20
**North (8)**
1:24 2:13,14 4:8 5:19 9:13
  69:1 70:1
**Notary (6)**
1:23 68:22 69:5,14 70:5,20
**Notice (1)**
1:21
**notwithstanding (3)**
13:1 26:16 60:13
**November (3)**
29:21 30:6 34:8
**number (21)**
3:8 14:17 16:15 17:14 19:16
  20:17,24 22:11,14,14 28:20
  30:1 37:18 38:2 41:19
  42:22 43:13 44:5,6 45:18
  67:6
**numbered (3)**
13:12 20:18 29:9
**numbering (2)**
29:10 43:8
**numbers (5)**
27:7,12 28:21 29:23 43:10

**O**

**oath (6)**
9:19 22:3 39:14 40:1,4 53:24
**object (2)**
13:4 37:7
**Objection (39)**
10:1,18 11:14 12:1 17:19,22
  18:15,23 23:7,13 25:2,7
  26:1,18 28:10 34:1,6,20
  35:11 37:1 38:9,23 39:10
  39:22 40:3,18 41:5 42:1
  47:24 49:11 51:3 52:4,18
  53:11,22 55:19 60:18 61:11
  64:9
**objectively (1)**
54:9
**obligations (1)**
66:7

**obliterated (2)**
50:13 51:17
**obtain (1)**
15:20
**Obviously (1)**
63:3
**occasion (1)**
17:9
**offer (1)**
19:3
**offers (2)**
35:13 36:4
**office (5)**
16:18 17:6 21:20 29:3 67:8
**offices (3)**
5:18 61:16 62:1
**oh (1)**
43:2
**Ohio (2)**
1:2 2:22
**okay (49)**
8:12,20 10:3,15 11:2 12:11
  17:1 22:15 24:7,8,12 25:13
  26:12,15,20 27:14 28:17
  29:4,11,20 30:2 31:5 33:6
  34:8 37:5,10 38:18 39:3
  42:9,12,21 43:5,15,19 44:3
  44:9,18,20 45:13,17,19
  50:23,24 53:24 55:9,14
  56:18 59:10,14
**old (1)**
25:1
**once (5)**
37:17 39:15,18 41:6 63:1
**ones (1)**
8:19
**one-half (1)**
36:23
**ongoing (3)**
63:22 64:2,11
**open (2)**
16:5 63:3
**operate (1)**
64:23

**operated (2)**
64:24 65:3
**operates (2)**
64:25 65:1
**operations (1)**
54:7
**opportunity (1)**
31:22
**opposed (1)**
63:7
**ORD (1)**
13:12
**order (6)**
5:22,23 6:2 15:5,13 19:20
**ordered (1)**
66:23
**organization (1)**
6:6
**organizational (1)**
54:22
**original (1)**
67:4
**originally (2)**
12:7,24
**outcome (1)**
49:21
**outcomes (5)**
49:7,10,16 54:10,15
**outside (5)**
5:9,11 13:10 58:18 64:17
**outsourcing (4)**
49:25 51:20 52:15 53:6
**overall (3)**
50:7,21 51:8
**overpaid (1)**
55:16
**overpaying (1)**
55:10
**oversees (2)**
61:1,4
**owed (1)**
55:7

**P**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                     **August 10, 2007**

14

**package (1)**
13:11
**page (51)**
3:3,8 20:21 22:11 28:22 29:2
  29:5,6,9,10,12,16,18 30:14
  31:1 32:3,5,6,20 34:8,14
  35:20 41:9 42:19,21,22
  43:6 44:4,6,8,13,17,19,20
  45:4,17,20 49:25 54:20
  55:22 56:2 67:6,14,17,20
  67:23 68:1,4,7,10,13
**pages (21)**
3:9 20:19 22:6,7 29:8,15
  30:4,7,9,12 32:8 42:17
  43:14 44:4 45:4,21 60:14
  60:23 61:7 67:12 70:8
**paid (6)**
20:1 28:8,8,13 41:20 57:4
**paper (1)**
40:20
**paragraph (5)**
33:17 50:3 51:16 54:19,20
**part (4)**
14:1 30:16,16 64:15
**partake (1)**
6:1
**partaking (1)**
6:8
**partial (1)**
29:25
**participate (1)**
36:3
**participated (3)**
8:13 11:4 36:7
**participating (2)**
7:19 8:1
**participation (1)**
32:10
**particular (12)**
30:15 31:14 36:20 37:16,19
  44:24 45:18 46:19 49:18
  54:2,5 55:22
**parties (1)**
70:11

**path (1)**
31:24
**Paul (1)**
32:23
**pause (1)**
43:4
**pay (2)**
55:6 57:18
**payable (2)**
14:4 57:23
**payment (6)**
12:17 19:20 27:13 39:6
  40:12,14
**payments (3)**
35:2 52:9 58:2
**percent (10)**
22:20,21 36:12,22 39:5,7,19
  57:11 58:8,13
**percentage (3)**
46:16 47:6 51:7
**perform (1)**
28:5
**performance (10)**
50:7,21 51:1,9,21,24 53:8,10
  53:14 54:23
**performed (2)**
20:10 37:17
**period (5)**
14:24 15:12 47:1,16,17
**periodically (3)**
19:23 37:22 38:4
**periods (3)**
43:25 44:2 47:3
**permissible (1)**
33:21
**person (2)**
61:1,4
**personal (4)**
6:7 33:14,15,20
**personally (2)**
25:13 69:6
**personnel (1)**
62:2
**persons (1)**

64:11
**person's (1)**
20:23
**philosophy (1)**
62:12
**phone (1)**
42:6
**phrase (1)**
50:3
**picks (2)**
43:8 45:20
**piece (1)**
47:22
**place (2)**
5:15 8:11
**placed (2)**
19:11 36:24
**Plaintiff (2)**
1:6 2:3
**please (5)**
4:7 12:9 67:4,11,12
**point (9)**
14:24 16:7 18:5 31:8 34:15
  35:14,23 39:13 54:5
**policies (13)**
15:2 20:11,12 24:20 27:8,21
  51:5 53:15,17 55:9,17 58:1
  58:5
**policy (16)**
19:25 20:24 22:14 23:19
  28:13,14 46:14 47:20 48:11
  55:7,15 63:8,12,20,25
  65:17
**policyholder (3)**
19:25 39:7 40:14
**portion (1)**
58:4
**position (4)**
4:14 23:6 39:25 62:18
**possibility (1)**
31:12
**possible (1)**
53:25
**potential (1)**

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

15

61:16
**practice (1)**
25:11
**practices (1)**
62:14
**predicate (1)**
13:5
**premium (2)**
27:20,22
**premiums (1)**
41:19
**preparation (4)**
5:5,7 6:10,12
**prescribed (1)**
36:21
**presentation (2)**
44:22 45:25
**presented (1)**
48:7
**presently (3)**
4:12 58:7 62:21
**President (5)**
4:15 19:9 25:4 39:24 62:19
**presumably (1)**
53:20
**presume (1)**
52:14
**presuming (1)**
24:5
**prevent (1)**
41:18
**previously (2)**
19:10 20:15
**primary (1)**
61:3
**prior (6)**
14:12 18:10 19:2 33:22
    34:18 69:8
**privacy (6)**
29:19 32:5,20 33:3,12 66:2
**privilege (24)**
7:15,16,24 8:12,19,21,23,24
    9:1,3,4,5,9,10,11,20,23 10:3
    10:5,11,16,23 11:1,2

**probably (1)**
17:12
**problem (1)**
52:19
**procedure (2)**
1:22 62:24
**procedures (3)**
15:9 61:19,23
**proceed (1)**
42:16
**process (6)**
19:21 63:12 64:7,8,13 65:3
**processed (1)**
41:20
**processes (3)**
61:19,23 65:16
**PROD (1)**
13:12
**produced (13)**
5:10,20,22,24 7:15,25 11:3
    11:17 18:13 20:17 24:9
    61:13 66:16
**product (1)**
54:3
**production (1)**
14:2
**profitability (3)**
54:23 55:4,8
**profits (4)**
52:2 53:21 54:1,1
**prompt (1)**
67:9
**promulgated (1)**
66:16
**proper (1)**
15:13
**proposal (3)**
50:1 52:15 56:20
**proposed (1)**
31:10
**protection (1)**
66:2
**provide (6)**
28:2 31:22 34:16,17 40:21

47:9
**provided (22)**
14:15 16:12,13 17:15,16,21
    17:25 18:11 19:25 41:3
    43:21 45:8,9,12,14 46:1
    50:18 52:10 58:21 60:15
    66:11,14
**provides (5)**
45:25 46:6 51:19 53:6 65:20
**providing (2)**
16:1 65:18
**Public (6)**
1:23 68:22 69:5,14 70:5,20
**purportedly (1)**
58:22
**purpose (6)**
12:8 33:10 36:14 37:14 57:3
    59:23
**pursuant (3)**
1:21 5:22 6:1
**pursue (1)**
31:23
**put (3)**
19:14,21 37:24
**p.m (2)**
1:25 66:24

**Q**

**quarter (2)**
41:23,25
**quarterly (9)**
18:10,12 24:23 25:12,24 26:9
    34:17 40:22 41:3
**question (22)**
9:8 10:4,13,14,21 11:24 12:9
    14:3 23:10 26:5,13 33:19
    34:2,21 40:2,9,24 52:13
    53:8 58:25 63:19 64:10
**questions (1)**
66:22

**R**

**R (5)**
27:18 67:1,1 69:2 70:2

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

16

**reached (1)**
31:21
**read (13)**
38:12,13 66:22 67:4,14,17,20
  67:23 68:1,4,7,10,13
**reading (1)**
50:13
**reads (4)**
41:17 49:2 53:4 54:19
**ready (1)**
22:1
**really (4)**
15:13 47:5 52:9 59:24
**reason (12)**
32:1 41:24 46:14 67:16,19,22
  67:25 68:3,6,9,12,15
**reasons (1)**
46:11
**Rebecca (5)**
1:22 69:5,13 70:5,19
**recall (18)**
4:19,25 7:8,11,18,21 8:16,21
  9:5 10:16 11:11 14:13
  25:18,20 49:13 59:13 61:21
  62:8
**received (4)**
13:2 21:7 26:15 58:19
**receives (2)**
12:6,23
**recess (3)**
21:22 42:11 59:18
**recite (1)**
55:15
**record (5)**
4:7 9:6 21:18 42:5 59:16
**records (2)**
17:15 35:8
**redacted (4)**
3:9 20:19,22 22:6
**redisclosure (1)**
33:20
**reduced (1)**
51:7
**refer (3)**

23:1,16 49:9
**reference (4)**
22:12,17 26:22 27:19
**referenced (6)**
7:25 8:19,20 9:3 20:16 27:9
**references (2)**
7:16 54:17
**referencing (3)**
9:5 27:10 38:10
**referred (2)**
16:5 63:16
**referring (13)**
7:22 8:7,18,24 9:1 10:5,8
  11:7 50:4 56:9,11 59:11,24
**refers (1)**
23:18
**reflect (4)**
13:19 56:5,12 59:25
**reflected (2)**
18:6 38:5
**reflects (1)**
36:18
**regard (1)**
63:9
**regarding (10)**
8:14 11:4 14:25 20:20 24:19
  25:5 33:4,25 34:5 66:7
**regardless (2)**
53:2 58:15
**regulations (2)**
33:4 66:2
**REIN (2)**
20:24 22:16
**reinsurance (8)**
18:1 20:25 22:20 35:24 36:5
  46:15 49:4 58:15
**reinsured (12)**
16:8,9,16,23,24 18:8 57:13
  57:17,19 58:8 60:1,3
**reinsurer (1)**
22:16
**related (4)**
11:18 49:18 58:11,18
**relating (2)**

10:10 15:15
**relation (4)**
36:12 38:7,13 46:8
**relevant (1)**
11:22
**remained (1)**
13:21
**remaining (1)**
43:14
**remember (1)**
8:5
**remove (1)**
51:12
**removing (1)**
40:16
**repeat (2)**
26:5 34:2
**report (23)**
21:1,6 23:24 24:1,15,17,19
  25:5,9,20 26:6 43:21,24
  44:11 45:1,7,13,22 46:1
  47:8,12,13 62:16
**reported (2)**
27:2 45:1
**reporter (4)**
21:25 28:17 30:25 59:20
**reporter's (1)**
21:19
**reporting (7)**
7:7 25:17 26:9 28:4 34:23
  35:1 40:21
**reportings (1)**
24:23
**reports (19)**
18:11,13,17,18,24 21:7,14
  24:25 25:8,10,12,13,24
  26:10,15 35:7 38:25 43:25
  44:1
**represented (1)**
61:9
**REPT (2)**
23:24 24:12
**request (3)**
13:1 60:13 66:18

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

17

**requested (1)**
33:2
**require (2)**
15:7 24:22
**required (1)**
54:8
**requires (1)**
26:8
**reserve (27)**
23:2,2 27:17,25 34:17 36:18
    36:24 37:6,14,15,19,25
    38:21 39:5,15,19 40:15,22
    41:3,22 46:3,8,16 47:23
    48:2,5 51:8
**reserved (1)**
36:23
**reserves (16)**
23:1 28:9 34:23 35:7,10
    36:12,12,14 37:8,12,22
    38:4,7,13 41:25 48:12
**reserving (2)**
35:2,3
**reset (1)**
38:4
**reside (2)**
15:22 64:1
**residents (1)**
15:16
**resort (1)**
52:13
**resources (1)**
54:8
**respect (1)**
62:25
**respond (1)**
56:24
**responding (1)**
56:19
**response (3)**
23:11 52:11,22
**responsibilities (2)**
6:16 32:14
**responsibility (7)**
6:20,23 15:11 34:25 58:4,5

64:20
**responsible (4)**
12:17 34:23 35:1 58:2
**responsive (2)**
52:12 66:17
**result (5)**
16:19,20 17:2 38:20 70:12
**resulted (1)**
17:11
**retain (7)**
18:17,18,24 25:8,9,11 63:3
**retained (4)**
23:2 58:16 64:15 66:15
**retains (1)**
63:21
**retired (1)**
48:25
**return (2)**
60:2 67:7
**returning (1)**
46:11
**returns (1)**
54:22
**REV (4)**
21:1,1 26:21,24
**revenues (1)**
7:5
**review (10)**
5:1,2 6:12 9:8 14:18 16:2
    18:19 21:7 59:12 62:3
**reviewed (14)**
4:21 5:10 7:9,13 9:4,8 10:10
    13:25 25:13,21 26:13 32:18
    32:19 60:16
**reviewing (4)**
10:16,23,25 11:16
**reviews (1)**
45:11
**revising (1)**
56:4
**right (38)**
8:2 10:11 13:19 14:8 21:21
    23:20 24:2,3,13 25:1,15
    29:7 30:13 36:25 37:19

38:8 40:17 41:20 43:17
    44:15,22 45:23 46:1,9,13
    46:17,23 47:1,20,25 50:17
    54:19 56:22,24 60:20 65:5
    65:14 66:4
**right-hand (2)**
29:10 43:2
**risk (2)**
50:6,20
**RITCHEY (1)**
2:19
**Roberts (22)**
2:18 3:4 4:3 21:18 28:17,24
    29:4,11,15,20,23 30:2,7,13
    30:21 42:4,10 43:15 52:11
    53:1 59:8 66:10
**ROBERTS:Very (1)**
66:21
**role (3)**
6:15 19:9 27:24
**room (1)**
37:18
**RRSV (7)**
20:25 21:2 23:1,3,6,11 27:15
**Rules (1)**
1:22
**run (1)**
45:5
**runs (1)**
38:19

---

**S**

**S (2)**
3:6 67:1
**savings (1)**
48:11
**saw (2)**
45:22 52:7
**saying (1)**
26:4
**says (19)**
12:20 14:8 26:21 29:8 33:18
    34:15 35:23 40:21 41:15
    44:11 46:14,15 49:7 50:3

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

18

50:19,23 54:6 56:7 58:15
**scale (1)**
 54:7
**scheduled (2)**
 42:5,6
**school (1)**
 9:14
**search (1)**
 20:10
**second (3)**
 29:2 44:13 51:16
**section (4)**
 41:9,17 45:18 54:6
**Security (1)**
 23:19
**see (16)**
 32:21 34:9 35:21,25 41:13
  43:10 48:15 49:7 50:1,8,9
  50:10,14,15 54:10,24
**seek (2)**
 35:23 38:15
**seeking (6)**
 31:9,21 51:20,23,25 53:7
**seen (4)**
 8:12,23 13:17 22:7
**selling (2)**
 54:2 55:17
**seminar (1)**
 66:15
**semi-regular (1)**
 43:22
**send (2)**
 17:9 59:7
**sending (1)**
 18:7
**sense (1)**
 21:3
**sent (5)**
 14:17,19,22 17:13 63:2
**sentence (4)**
 33:17 48:17 49:2 53:4
**separate (1)**
 56:25
**separately (1)**

56:17
**sequentially (1)**
 29:9
**series (2)**
 13:11 42:12
**serves (1)**
 27:24
**service (1)**
 61:2
**services (6)**
 1:15 49:3 51:18 53:4 57:9
  62:19
**set (2)**
 37:12 39:15
**sets (1)**
 37:6
**settle (5)**
 36:22 38:7 39:4 46:21 51:7
**settled (5)**
 39:18,18 46:7,7,10
**settlement (10)**
 19:3 35:13 36:4 37:3 38:16
  39:6 40:7 46:8,15 62:14
**settlements (4)**
 35:20,25 41:7 48:11
**seven (1)**
 25:1
**Shared (1)**
 62:19
**sharing (1)**
 57:14
**sheet (1)**
 67:13
**sheets (2)**
 30:19,21
**shortages (1)**
 52:6
**show (1)**
 10:6
**showing (1)**
 43:2
**shown (1)**
 20:13
**shows (1)**

22:17
**SHUTTS (1)**
 2:4
**side (3)**
 16:11 35:3 61:4
**signature (5)**
 58:21,22 60:8,12 68:18
**signed (1)**
 67:8
**significant (2)**
 14:17 17:14
**simple (1)**
 37:2
**sit (1)**
 15:8
**sitting (2)**
 10:15,22
**six (2)**
 44:24 47:3
**sixty (1)**
 47:4
**sixty-nine (1)**
 70:8
**small (1)**
 47:5
**Social (1)**
 23:19
**solicitation (1)**
 56:19
**solutions (2)**
 51:20 53:6
**somewhat (1)**
 14:12
**soon (1)**
 42:8
**sorry (6)**
 20:8 21:9 27:5 34:2 60:6
  64:10
**sounds (1)**
 21:6
**South (1)**
 2:6
**SOUTHERN (1)**
 1:2

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                   **August 10, 2007**

19

**speak (2)**
62:6,6
**speaking (2)**
5:21 62:8
**specialized (1)**
54:8
**specific (4)**
8:18,21 12:20 28:14
**specifically (3)**
13:22 52:14,16
**specifics (2)**
8:4 28:12
**specify (1)**
14:23
**spells (1)**
59:24
**spoke (1)**
62:2
**spoken (2)**
32:16 34:11
**spot (3)**
65:18,21,23
**spreadsheet (4)**
20:22 22:6 30:3 42:22
**stack (1)**
30:15
**staff (1)**
15:6
**staffing (2)**
52:6,20
**stand (2)**
23:24 56:9
**stands (2)**
22:23 27:18
**start (4)**
37:11 43:19 45:17 60:1
**state (4)**
4:6 15:15 69:1 70:1
**statement (1)**
8:6
**states (2)**
1:1 46:3
**stayed (1)**
34:25

**Stephanie (1)**
2:11
**stephanie.farabow@lfg.co...**
2:16
**stick (1)**
41:1
**sticking (1)**
46:19
**stipulate (2)**
40:4 66:19
**stop (1)**
55:17
**stopped (4)**
18:7 53:15,17 54:2
**straight (1)**
43:3
**Stratis (1)**
1:23
**Street (2)**
2:13,20
**stricken (1)**
52:25
**strike (3)**
4:23 52:11,21
**string (1)**
56:2
**subject (7)**
18:1 31:13 33:13 55:14 56:3
    56:4,14
**submit (1)**
56:20
**subscribed (3)**
68:19 69:9 70:14
**subsequent (1)**
16:7
**subsequently (2)**
11:16 15:18
**successful (1)**
51:8
**successive (1)**
45:4
**suffix (2)**
20:17,17
**suggest (2)**

14:9,15
**suggested (1)**
38:10
**suggests (3)**
11:3 24:1 34:24
**sum (10)**
12:6,14,14,24 13:20,21,23
    14:4 51:13 57:23
**summarizes (1)**
31:10
**Summary (5)**
30:6 34:14,15 50:1 54:6
**supplement (2)**
23:20 33:11
**supplemental (1)**
67:11
**supplied (3)**
14:9 26:7,10
**support (1)**
49:3
**supposed (2)**
33:18 59:2
**sure (10)**
9:1 17:11 18:4 20:13,13 23:3
    27:18 37:2 39:11 42:14
**suspect (1)**
61:14
**Swink (1)**
32:23
**switching (2)**
16:19,20
**sworn (3)**
4:2 68:19 69:7
**system (3)**
20:3,6,14

---

**T**

**T (8)**
2:11 3:6 67:1,1 69:2,2 70:2,2
**take (8)**
5:15 30:20,21 37:23 42:7,7
    46:13 57:20
**taken (4)**
1:21 4:16 40:11 70:7

20

**talking (3)**
16:11 38:6 44:14
**talks (1)**
40:20
**telephone (2)**
1:19 2:19
**tell (6)**
14:21 22:11 38:18 40:25
    41:2,10
**telling (3)**
58:6,10,11
**ten (2)**
42:7,17
**terms (5)**
52:10 54:22 57:8 65:9,10
**testified (3)**
4:2 11:9 39:14
**testify (1)**
37:8
**testifying (1)**
53:24
**testimony (15)**
4:21,23 5:1 9:19 11:15 19:2
    25:10,11 34:19 40:1,4,10
    40:11 54:13 70:9
**Thank (7)**
35:14 40:20 41:8 42:10 53:3
    55:22 66:21
**thing (1)**
30:5
**things (1)**
56:10
**think (13)**
4:16 8:17,20 12:19 29:7
    30:11 33:11 38:10 42:15
    44:1 50:11 53:1 66:12
**thinking (2)**
12:2 45:11
**third (2)**
2:21 54:5
**third-party (4)**
1:17 51:19 53:5 57:10
**thoroughly (1)**
54:9

**thought (3)**
24:3 26:13 64:24
**three (2)**
11:24 31:5
**three-page (1)**
32:4
**tied (1)**
38:1
**time (16)**
11:11 14:20,24 15:6,10,12
    16:4 18:5 24:18 25:14 31:8
    36:10 40:7 45:20 57:14
    58:1
**timely (1)**
25:1
**titled (5)**
10:11,16,23,25 41:10
**today (9)**
7:13 10:15,23 18:2,3 34:19
    34:22 40:5 58:25
**today's (3)**
5:5,7 6:10
**Todd (1)**
61:3
**told (4)**
7:9 34:22 39:14 56:21
**top (5)**
7:8 22:12 29:8 44:11,21
**topic (2)**
33:13 56:25
**tops (1)**
29:25
**total (6)**
23:2,4 27:17 36:15,19 40:15
**tour (1)**
62:1
**tout (1)**
49:15
**track (1)**
27:25
**training (6)**
60:14,17,24 61:7,10 62:3
**transcribed (1)**
70:7

**transcript (1)**
70:9
**transfer (3)**
17:7,10 59:25
**transferred (2)**
16:22 17:4
**Transition (3)**
30:6 34:14,15
**transmission (1)**
28:23
**transmittal (1)**
14:10
**transmitted (1)**
15:16
**treaty (3)**
57:7,8 58:15
**triggered (1)**
17:20
**TRSV (5)**
20:25 21:2 23:1,4 27:15
**true (7)**
12:12,21 40:6 45:13 51:15
    56:23 70:8
**turn (1)**
41:8
**twelve (1)**
47:4
**twenty-four (1)**
47:4
**two (17)**
5:4,16 6:19 13:1 20:15 22:20
    22:21 23:20 27:7,14 30:7
    32:17,19 41:13 56:9 59:12
    61:14
**two-thirds (1)**
35:15
**tying (2)**
36:14 41:24
**type (2)**
16:3 23:18
**types (1)**
37:10

—————————
**U**
—————————

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                    **August 10, 2007**

21

**ultimately (3)**
12:17 31:23 42:3
**understand (12)**
11:19 17:1 19:2 22:3 31:20
  34:21 45:7 49:20 52:17
  56:18 61:20 64:10
**understanding (12)**
9:20 12:19 37:9 49:14,17
  51:22 58:3 61:19,22 64:22
  64:25 65:17
**undertake (2)**
6:4 33:2
**undertaken (2)**
60:23 61:6
**underwritten (1)**
6:24
**UNITED (1)**
1:1
**update (1)**
35:8
**updates (1)**
34:17
**upper (2)**
29:10 43:1
**use (3)**
49:13 64:12 67:11
**usually (1)**
21:12
**utilize (1)**
57:9

**V**

**v (1)**
67:2
**Valerie (9)**
1:20 4:1,8 9:13,16 67:3 69:6
  70:6,9
**value (1)**
39:5
**values (1)**
37:4
**vault (1)**
37:24
**vendor (1)**

66:1
**version (4)**
22:8 47:8 60:9,11
**versus (6)**
4:5,5 43:16 48:11 50:25 55:3
**Vice (5)**
4:15 19:9 25:4 39:24 62:19
**violating (1)**
66:1
**visible (1)**
42:23
**visit (2)**
61:16,17
**visited (1)**
62:1
**VP (1)**
6:15
**vs (2)**
1:8,13

**W**

**wait (2)**
43:2 44:13
**waiver (5)**
27:17,18,19,20,21
**Walnut (1)**
2:20
**want (6)**
30:19,20 32:7 35:14 41:12
  44:15
**wanted (1)**
20:4
**wasn't (5)**
11:18,22 12:8,9 13:25
**way (9)**
12:6,16 24:9 35:15 43:9 48:6
  56:5,12 64:22
**weeks (6)**
5:4,16 32:19 50:18 59:12
  61:14
**went (3)**
9:13 46:22 60:9
**weren't (3)**
7:10 18:13 52:10

**WESTERN (1)**
1:3
**we'll (4)**
30:16 40:4 59:14 66:22
**we're (4)**
12:19 29:12 42:4 66:12
**we've (1)**
4:4
**whatsoever (1)**
11:25
**WHEREOF (2)**
69:9 70:14
**wish (1)**
67:6
**wished (1)**
57:9
**witness (9)**
4:1 9:25 38:24 43:2 45:11
  50:10 68:18 69:9 70:14
**words (1)**
49:13
**work (4)**
32:23 46:12 56:20 61:4
**working (1)**
64:5
**wouldn't (2)**
28:14 51:10
**write (4)**
15:1 61:16,17 67:7
**writes (8)**
36:11 38:12 39:4 41:16,22
  51:18 52:23 56:18
**writing (4)**
50:5,16,19 53:17
**written (1)**
52:15
**wrong (1)**
55:6
**w/WVR (4)**
21:2,2 27:15,15

**X**

**X (3)**
3:1,6 37:23

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                                      **August 10, 2007**

22

| | | |
|---|---|---|
| **Y** | **12 (2)** | 14:11 17:16 18:4 24:2,13,16 |
| **yeah (4)** | 22:7 46:21 | 25:9,15 45:2,5,9,15,23 46:1 |
| 29:1,7 43:18,18 | **12,000 (2)** | 47:9 |
| **year (15)** | 46:15,22 | **2001 (9)** |
| 7:5 19:4 21:2 25:19 27:1,2 | **12-26-02 (1)** | 17:16 19:4 32:6,21 45:22 |
| 34:12 45:5,9,10,15,22 48:8 | 3:10 | 47:9,12,14,22 |
| 49:1 57:22 | **12-6-02 (1)** | **2002 (11)** |
| **years (9)** | 3:11 | 13:16,20 17:17 28:24 30:15 |
| 11:24 13:2 14:23 17:16 25:1 | **1285 (1)** | 31:2 32:14 56:3 58:20 |
| 31:5 48:25 53:14 60:14 | 50:17 | 61:15 62:8 |
| **yield (1)** | **13 (1)** | **2003 (10)** |
| 54:22 | 22:6 | 7:18,20 8:1,8,10,15 11:5 |
| **York (10)** | **1331 (2)** | 17:17 55:23 57:20 |
| 14:25 15:2,4,4,5,11,14,15,20 | 43:8 44:4 | **2004 (7)** |
| 17:8 | **1335 (5)** | 4:17,24 7:9 11:8,8 19:7 33:1 |
| | 42:23 43:7,20 44:7 45:18 | **2004-2005 (1)** |
| **$** | **1374 (8)** | 14:24 |
| **$100,000 (1)** | 43:7,10,12 44:8,14,15,19,20 | **2005 (2)** |
| 38:21 | **14 (1)** | 8:11 33:1 |
| **$48,500 (1)** | 22:6 | **2007 (12)** |
| 13:24 | **1440 (1)** | 1:25 5:23 7:18 13:17 25:19 |
| | 61:13 | 26:16 48:8 60:13 68:20 |
| **0** | **1500 (1)** | 69:7,10 70:15 |
| **01 (1)** | 2:5 | **201 (1)** |
| 29:18 | **19 (2)** | 2:6 |
| **0130 (1)** | 41:9 45:2 | **2010 (2)** |
| 28:20 | **1900 (2)** | 69:16 70:21 |
| **07 (1)** | 2:21 4:8 | **22 (1)** |
| 13:23 | **1996 (2)** | 3:9 |
| | 53:15,18 | **23 (2)** |
| **1** | **1999 (11)** | 48:14,17 |
| **1 (4)** | 11:9,20 12:22 16:4 29:6 30:6 | **24th (2)** |
| 3:9 21:24 30:16 56:2 | 34:8 42:18 48:17 51:24 | 69:10 70:15 |
| **1,200-plus (2)** | 53:9 | **26 (6)** |
| 60:23 61:7 | | 28:24 30:15 31:2 56:3,15,19 |
| **1,218 (1)** | **2** | **27401 (1)** |
| 60:14 | **2 (9)** | 2:14 |
| **10 (3)** | 3:10 30:16,17,24 32:3 42:13 | **27410 (1)** |
| 29:21 30:6 34:8 | 43:8 55:23,23 | 4:9 |
| **10th (2)** | **2:00 (1)** | **29 (2)** |
| 1:24 69:7 | 1:25 | 69:16 70:21 |
| **100 (8)** | **20 (1)** | |
| 2:13 22:18,18,21,23 57:11 | 27:10 | **3** |
| 58:8,13 | **2000 (15)** | **3 (3)** |

Jefferson-Pilot Insurance Company v. Christopher L. Kearney, et al. C-1-02-479
**Valerie Loftin**                    August 10, 2007

23

3:11 43:9 59:19
**3:30 (1)**
42:6
**30 (1)**
29:8
**30(b)(6) (2)**
1:19 37:8
**300 (1)**
62:23
**3020 (7)**
20:18,21 22:11,12 24:4,5,7
**3025 (6)**
20:20 22:17 24:3,6,8 27:10
**3032 (1)**
20:18
**305 (1)**
2:8
**3087 (1)**
13:13
**31 (4)**
3:10 29:18 32:6,20
**33 (1)**
46:22
**33,000 (2)**
46:16,20
**33131 (1)**
2:7
**336 (1)**
2:15
**358-6300 (1)**
2:8

---
**4**
---

**4 (2)**
3:4 43:9
**41,769 (1)**
13:21
**45201 (1)**
2:22

---
**5**
---

**5 (3)**
24:1,13,16
**5:10 (1)**

66:24
**50 (6)**
36:12,22 39:5,7,19 46:16
**511 (1)**
2:20
**513 (1)**
2:23
**59 (1)**
3:11

---
**6**
---

**6 (1)**
58:20
**6.25 (1)**
27:11
**6/8/07-3033 (1)**
13:13
**621-6464 (1)**
2:23
**65 (1)**
47:5
**66 (1)**
3:4
**67 (4)**
22:18,18,20,23
**69 (1)**
70:8
**691-4043 (1)**
2:15

---
**7**
---

**7 (1)**
42:18
**701.25 (1)**
27:11
**75,000 (3)**
35:25 36:9,13
**7800 (1)**
1:23

---
**8**
---

**8 (2)**
5:23 13:1
**8,000 (1)**

7:4
**8:00 (1)**
42:6

---
**9**
---

**99 (8)**
14:11 17:2 29:13,21 32:11
34:24 48:14 57:1