Page 1

```
IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF OHIO
         WESTERN DIVISION

                         Case No. C-1-02-479
JEFFERSON-PILOT LIFE INSURANCE CO., )
                    Plaintiff )
                               )
v.                             )
                               )
CHRISTOPHER L. KEARNEY,        )
                    Defendant )


    DEPOSITION OF: ROBERT BONSALL, taken before
Sharon R. Roy, Notary Public Stenographer, pursuant
to Rule 30 of the Massachusetts Rules of Civil
Procedure, at the law offices of ACCURATE COURT
REPORTING, 1500 Main Street, Springfield,
Massachusetts on May 13, 2004 commencing at 3:55 p.m.


A P P E A R A N C E S:
(See Page 2)


             Sharon R. Roy
       Certified Shorthand Reporter
     Registered Professional Reporter
```

Page 2

```
 1   APPEARANCES:
 2
 3   FOR THE PLAINTIFF:
 4   WOOD & LAMPING LLP
     600 Vine Street, Suite 2500
 5   Cincinnati, OH  45202-2491
     513-852-6000
 6     BY: WILLIAM R. ELLIS, ESQ.
 7
 8   FOR THE DEFENDANT:
 9   GRAYDON HEAD & RITCHEY LLP
     1900 Fifth Third Center
10   511 Walnut Street
     Cincinnati, OH  45201
11   513-621-6464
       BY: MICHAEL A. ROBERTS, ESQ.
12
13
14   Also Present:
15   Adam E. Formus
     Andrew Cohen
16   Joanne Yacavone, Videographer
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2   ----------------------------------------
     WITNESS       EXAMINATION          PAGE
 3   ----------------------------------------
 4   Robert Bonsall   Direct by Mr. Roberts   5
 5                    Cross by Mr. Ellis     64
 6
 7
 8   EXHIBITS:                           PAGE:
 9   Exhibit 40: Record, Volume 27, No. 1, Dallas
                 Spring Meeting, May 30-June 1, 2001..25
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1           S T I P U L A T I O N S
 2         It is agreed by and between the
 3   parties that all objections, except
 4   objections as to the form of the questions,
 5   and all motions to strike unresponsive
 6   answers are reserved and may be raised at the
 7   time of trial for the first time.
 8         It is further agreed by and between
 9   the parties that the sealing of the original
10   deposition transcript and notification to all
11   parties of the receipt of the original
12   deposition transcript is hereby waived.
13
14         THE VIDEOGRAPHER: The caption of
15   the case is Jefferson-Pilot Life Insurance
16   Company, Plaintiff, versus Christopher L.
17   Kearney, Defendant, Case No. C-1-02-479.
18         Would the court reporter please swear
19   in the witness.
20
21         ROBERT BONSALL, Deponent, having first
22   been duly sworn, deposes and states as follows:
23
24
```

Page 5

1    DIRECT EXAMINATION BY MR. ROBERTS:
2        Q.  Good afternoon, Mr. Bonsall.  My name is
3    Mike Roberts.  We met briefly in the hallway.  I
4    represent Chris Kearney who has been sued by
5    Jefferson-Pilot in this action.
6            You're the president of DMS, correct?
7        A.  Yes.
8        Q.  And founder?
9        A.  Co-founder of the company, yes.
10       Q.  With John Anderson?
11       A.  That's correct.
12       Q.  And you presently own 30 percent equity in
13   DMS?
14       A.  That's correct.
15       Q.  Did you initially own 50 percent equity in
16   DMS?
17       A.  I did.
18       Q.  And both you and Mr. Anderson did in 1995
19   when DMS was formed, correct?
20       A.  Yes, DMS was formed in 1995.
21       Q.  At that time each of you owned 50 percent
22   of the entity?
23       A.  That's correct.
24       Q.  And subsequently the two of you each sold

Page 6

1    20 percent to an entity affiliated with Zurik
2    Financial Services so that you and Mr. Anderson each
3    owned 30 percent and that entity affiliated with
4    Zurik owned 40 percent, is that right?
5        A.  You got the percentages right.  The name of
6    the entity, I think it's all within the Zurik family
7    of companies, if you will, so I think essentially
8    it's correct.
9        Q.  It's like Center Bermuda Solutions Limited,
10   or something like that?
11       A.  Center Reinsurance Limited Bermuda, or
12   something like that.  Close.
13       Q.  Sir, have you gotten any reports today
14   about Mr. Ditmar's testimony throughout the day?
15       A.  Reports, you mean --
16       Q.  Written reports or oral reports.  A
17   gentleman in your general counsel office has been
18   sitting over here connected to the Internet taking
19   copious notes, and I'm curious whether or not you've
20   been receiving directly from him or through some
21   intermediary reports of the testimony that we just
22   undertook for the last six or seven hours.
23       A.  The only thing that I'm aware of, there are
24   two things, I guess, that there was some discussion

Page 7

1    about name calling and some discussion about things
2    being -- Mr. Ditmar being asked about things that
3    didn't pertain to this matter, pertaining to another
4    matter.
5        Q.  Those are the only two things that have
6    been shared with you about his six hours of
7    testimony?
8        A.  Yes.
9        Q.  When did you first receive -- what is your
10   memory of the first time you ever heard about a
11   claimant named Chris Kearney?
12       A.  It was recently.  I think it's when I was
13   informed that I was to be deposed in connection with
14   the case, the first I heard of it.
15       Q.  Prior to Mr. Kearney's counsel seeking your
16   deposition in this action, you have no memory that
17   his claim ever reached your level?
18       A.  The name is not familiar to me and I don't
19   have any -- I had no prior knowledge of it.
20       Q.  Have you ever had a discussion with anyone
21   regarding the existence of ambiguities in policies
22   issued by Jefferson-Pilot?
23       A.  I don't believe so, no.
24       Q.  Would you condone your employees'

Page 8

1    misrepresentation of facts to their policyholders, to
2    policyholders for clients you work for?
3        A.  Would I condone my employees'
4    misrepresentations of facts to any policyholders, no,
5    I would not.
6        Q.  What would you do in the instance of
7    discovery of such occasion?
8        A.  If I was informed as to a
9    misrepresentation, I'd want to know what the
10   circumstances were, what the misrepresentation was
11   and how it came to be.
12       Q.  Would it be consistent with the concept of
13   good faith for someone working for DMS to
14   misrepresent facts to a policyholder?
15       A.  I would say it would not be good faith to
16   misrepresent facts.
17       Q.  In April of 1997, I believe, there was an
18   agreement entered between DMS and Employers
19   Reinsurance, correct?
20       A.  The date was again?  You said 1998?
21       Q.  April 1 of 1997, I apologize.
22       A.  Okay.  That sounds like it may be correct,
23   yes.
24       Q.  Employers Reinsurance would have been the

Page 9

1  second client for DMS after Travelers?
2      A.  I believe that's true, yes.
3      Q.  And Travelers was your first client that
4  you had the day you opened shop?
5      A.  That's correct.
6      Q.  You and Mr. Anderson previously worked at
7  Travelers, correct?
8      A.  That's correct.
9      Q.  And did Mr. Anderson report to you at
10 Travelers?
11     A.  He did.
12     Q.  The two of you left Travelers sometime
13 after Travelers made the decision to get out of the
14 business of selling disability insurance policies?
15     A.  Yes, that's correct.  They stopped selling
16 disability insurance before we moved down from there.
17     Q.  How did it come to be that DMS entered a
18 contract with Employers Reinsurance Corporation?
19     A.  My recollection is that Employers
20 Reinsurance was looking for some people with
21 expertise and experience in investigating and
22 managing disability insurance claims who had
23 knowledge of the disability insurance industry; that
24 they had reinsured some blocks of business, and that

Page 10

1  they felt that the companies that they reinsured were
2  not doing as thorough a job or as good a job as they
3  would like, and so they were looking for resources to
4  help those companies improve their performance, their
5  work.
6      Q.  How did it come to pass that DMS came into
7  contact with Employers Reinsurance for that
8  opportunity to provide that service?
9      A.  I think somebody must have referred them to
10 us, somebody who knew us from our work in the
11 industry, I believe that's the case.  And that they
12 contacted us and said, "We understand that you
13 fellows are experienced in managing disability income
14 insurance claims and that you set up a company to do
15 that kind of work, and we have a need."
16     Q.  Do you know who it was who made the
17 referral?
18     A.  I am not sure.  I have -- I think it was
19 probably an accounting firm.  That's my best
20 recollection.
21     Q.  Did you personally know anybody affiliated
22 with Employers Reinsurance Corporation prior to the
23 conduct of the negotiations that led to the April 1,
24 '97 agreement with Employers Reinsurance?

Page 11

1      A.  I had met the people at Employers
2  Reinsurance prior to April 1, but I didn't know them
3  prior to our initial meeting that led to the
4  negotiation of that contract, if I understand your
5  question correctly.
6      Q.  Prior to the negotiations that led to the
7  agreement, prior to there being discussion about an
8  opportunity with Employers Reinsurance, you didn't
9  know anybody affiliated with that organization?
10     A.  I did not.
11     Q.  And as I understand your testimony, they
12 called you; they, Employers Reinsurance, called DMS?
13     A.  That's my recollection.  It's possible that
14 somebody said to us, "We know somebody who's looking
15 for some help and here's the name and here's the
16 number," but I don't remember whether we called them
17 or they called us.  My recollection is somebody
18 recommended us to them and that's how they learned
19 about us, and whether or not they called us or we
20 called them, I don't recall.
21     Q.  Did you conduct the negotiations on behalf
22 of DMS, you personally?
23     A.  Are you referring to the negotiation on
24 that ERC contract?

Page 12

1      Q.  Yes.
2      A.  I believe that I was directly involved in
3  negotiating that contract, yes.
4      Q.  Did you share that responsibility with
5  anyone?
6      A.  Probably John Anderson.
7      Q.  What insurance companies did ERC reinsure
8  at that time?
9      A.  I assume you're asking me about disability
10 insurance.  I'm sure they reinsure a large number of
11 insurance companies across a spectrum of products and
12 I don't know all of them certainly, but I have a
13 better idea of the disability carriers that they
14 reinsure.
15     Q.  Okay, let's start there.
16     A.  They reinsured Connecticut Mutual, Mutual
17 Benefit Life Insurance, Jefferson-Pilot Life,
18 Provident Life & Accident.  They reinsured
19 Jefferson-Pilot.  There was one other company I know
20 that is escaping me at the moment.
21         Oh, I'm sorry, New York Life.
22     Q.  Does the Employers Reinsurance agreement
23 with DMS set forth the nature of the services that
24 DMS was supposed to provide pursuant to the

Page 13

1  agreement?
2      A.  I believe so, yes.
3      Q.  Sitting here today, what was your
4  understanding of the work that ERC would be sending
5  you once the agreement had been executed?
6      A.  As regards to that agreement, I believe
7  that we were being asked to review disability claim
8  files, assist in investigating those files, assist in
9  evaluating information, communicating with
10 policyholders, supporting the adjudication process of
11 those companies, helping them reach decisions
12 including paying, denying, and settling claims.
13     Q.  Did Employers Reinsurance suggest to you
14 during the course of the negotiations that led to the
15 agreement any specific types of claims, or categories
16 of claims, that would be forthcoming under the
17 agreement?
18     A.  They were all disability income insurance
19 claims.  They were active claims and, I believe,
20 pending claims.  There were probably some claims that
21 they reviewed that they wanted us to also review.
22 And otherwise I don't remember that there are any
23 specific criteria.
24     Q.  There wasn't a certain dollar level of

Page 14

1  claims?
2      A.  I don't recall any dollar threshold.
3      Q.  It wasn't a certain type of disability,
4  whether it be psychiatric or residual?
5      A.  No, I don't think there was any specific
6  criteria concerning the type of diagnosis or the type
7  of benefits.
8      Q.  Do you maintain any notes of your
9  negotiations?
10     A.  I don't know that I took any notes of those
11 negotiations.  I doubt very much that I would have
12 retained any notes if I had them.
13     Q.  Is there anything related to that
14 transaction other than the written agreement itself
15 that still exits today, as far as you know?
16     A.  I doubt it.
17     Q.  Who was your contact at Employers
18 Reinsurance during the negotiations?
19     A.  Primary contact was Robert Linner.
20 L-I-N-N-E-R.
21     Q.  What was his position at Employers
22 Reinsurance?
23     A.  He worked in their reinsurance claims
24 operation.  I don't know what his title would have

Page 15

1  been at that time.  He was somebody that supported
2  their ceding companies or kind of oversaw the
3  relationship on the claim end between ERC and their
4  ceding companies.
5      Q.  What level or involvement or engagement did
6  you have with representatives of Employers
7  Reinsurance after the agreement was executed?
8      A.  From time to time we would communicate,
9  typically by phone, to discuss the work that we did
10 and we were --
11     Q.  You personally?
12     A.  Yes.
13     Q.  Okay.
14     A.  And we were doing some work on site
15 initially for like one particular client, so we would
16 report on our visit to the client.
17     Q.  That wasn't Jefferson-Pilot, was it?
18     A.  No, it was not.
19     Q.  Would you have had any occasion after the
20 execution of the agreement to have any dialogue with
21 anyone at ERC about specific claims referred to DMS
22 under that agreement on Jefferson-Pilot
23 policyholders?
24     A.  Can you repeat that question?

Page 16

1      Q.  Let me rephrase it.  Would there have been
2  any reason for you to have dialogue with anyone at
3  Employers Reinsurance regarding DMS's work on
4  Jefferson-Pilot claims that came to DMS?
5      A.  Are you talking about at any time or --
6      Q.  I'm talking about the '97 to 2000 time
7  frame.
8      A.  I don't know that I had any discussion
9  about any specific Jefferson-Pilot claims.  I think I
10 might have -- I reviewed personally very few
11 Jefferson-Pilot claims, and I don't recall that I
12 ever actually worked on any Jefferson-Pilot claims.
13     Q.  I don't suspect that you did, and I asked
14 you a higher level question.  Would you have any
15 reason to dialogue with anyone at Employers
16 Reinsurance regarding the claims that came to DMS
17 that were written by Jefferson-Pilot?
18     A.  Not about any specific claims or individual
19 claims.  Maybe about the body of work, the fact that
20 we were handling claims on the whole, but not about
21 any individual claims.
22     Q.  That dialogue, the responsibility for that
23 dialogue stayed at your level rather than being
24 delegated to someone subordinate to you?

Page 17

1  A. I think initially when -- when we initially
2  started supporting Jefferson-Pilot for ERC, it was --
3  I think it was on a case by case basis. And then at
4  one point we took on a broader responsibility which
5  was to oversee the handling of the claim block that
6  ERC reinsured, so it was a broader body of work.
7  Q. We'll get to that agreement. There's a
8  December 15, 1999 claims assessment agreement that
9  hasn't been produced in the litigation but is an
10 exhibit that I think you're referring to, right?
11 A. Right.
12 Q. A greater number of claims came over from
13 Jefferson-Pilot?
14 A. Mm-hmm.
15 Q. But prior to that, the execution of that
16 claim assessment agreement, all of the Jefferson-
17 Pilot claims that DMS would have been requested to
18 review would have been under the auspices of that ERC
19 agreement, right?
20 A. Correct.
21 Q. And you don't know what compelled ERC to
22 direct certain of the Jefferson-Pilot claims to you,
23 to DMS, to review during the '97 to 2000 time frame,
24 do you?

Page 18

1  A. I don't know of any specific criteria other
2  than they were claims that ERC had probably reviewed
3  themselves and maybe had a concern that they needed
4  to be worked up further or managed -- you know,
5  further investigated, or maybe there needed to be
6  certain activities associated with them that they
7  wanted us to consider, that kind of thing.
8  Q. What's your memory of what ERC would
9  communicate specifically about respective
10 Jefferson-Pilot claims that would have been referred
11 during that time frame?
12 A. I'm trying to recall a specific Jefferson-
13 Pilot claim and I'm sure there probably early on were
14 a number of claims that I probably had conversations
15 with individuals where they mentioned a claim by name
16 and said, "We think this matter needs to be reviewed
17 further or investigated," or, "We think there's a
18 problem. Can you look into it?"
19     I don't remember any specific names of
20 cases that they talked to me about. Once we
21 implemented that contract we were in a growth stage
22 and I had people that were doing work on
23 Jefferson-Pilot claims who were communicating with
24 the ERC folks about those claims when there were

Page 19

1  communications and I was typically attending to other
2  matters. So my direct involvement was kind of
3  limited early on. And, as I said, there were
4  probably a few cases that maybe I had -- that were
5  mentioned, not necessarily that I worked on them, but
6  I might have reviewed a couple when I was, you know,
7  maybe in my first visit down there, but I don't
8  remember any names specifically.
9  Q. I don't think we communicated very well. I
10 was just wondering would there be information shared
11 between ERC and DMS about respective claims that were
12 being transmitted to DMS for analysis during that
13 period of time?
14 A. There may have been information. It could
15 have been that they mentioned the name of a claim and
16 said, you know, "I want you to review the Smith
17 claim," for example. Beyond that, I don't really
18 know, since I don't think I was having conversations
19 with them.
20 Q. You suggested earlier the case may be, and
21 I think the facts were developed last week, that
22 Employers Reinsurance conducted an audit of
23 Jefferson-Pilot policies in '97 and then hand-picked
24 some to send to DMS. Assuming that's the case.

Page 20

1  Don't even assume that's the case. Was it a
2  situation in '97 to '99 that ERC would say, "We want
3  you to review the following files and here's the
4  issues we have with respect to the files." Was there
5  that level of communication by ERC or did they just
6  say, "Review the Mike Roberts file"?
7  A. I can't really be sure. It would not be
8  inconceivable, I guess, for them to, if they reviewed
9  a file to say, "I reviewed this and this struck me,
10 or this is something I think you ought to look at,"
11 but I can't say with certainty that that ever
12 occurred.
13 Q. If there was a written communication in '97
14 about specific issues ERC wanted DMS to examine on a
15 respective claim, where would that document be, where
16 would it reside at this point?
17 A. If ERC had documented that kind of thing,
18 and if they kept it, then presumably they'd have it.
19 I don't know where they store documents or what they
20 do with them.
21 Q. No, I mean a document sent to DMS. Would
22 DMS have destroyed it?
23 A. I guess it depends on what it was. If it
24 was something that was relevant to the claim, then

Page 21

1  presumably it would be in the claim file.
2      You know, if it was an instruction, "I want
3  you to look at the Smith case" or that kind of thing,
4  I'm not sure that that's anything that would have
5  been kept.
6      Q.  What sets DMS apart from its competitors?
7      A.  Well, we're kind of a unique company. It's
8  not easy to define who our competitors are. In some
9  respects it has to do with our -- the nature of our
10 company being a third-party administrator. There
11 just aren't many, if any, other TPAs that do what we
12 do. The disability insurance industry is a pretty
13 close-knit industry and there aren't a lot of
14 companies that have the kind of expertise that we do.
15 I would say that we have a unique combination of
16 functional capabilities and operational capabilities
17 and skills that set us apart.
18     Q.  Are there any marketing materials that
19 exist that describe how you set yourself apart?
20     A.  Yes, I would say so. I don't know if they
21 specifically say what sets us apart, but they
22 describe what we do, so in that respect I think one
23 could infer what would set us apart from somebody
24 else.

Page 22

1      Q.  What would those marketing materials
2  consist of?
3      A.  We have a capabilities piece that we
4  created a couple years back that speaks to what our
5  capabilities are. And we have a web site that speaks
6  to the same thing.
7      Q.  Anything else?
8      A.  Those are the only marketing pieces that
9  we -- well, as far as DMS is concerned, those are the
10 only marketing pieces, I think, that we've got.
11     Q.  What information do you share with a
12 prospective client when you're out trying to secure
13 work for DMS?
14     A.  Well, it depends in part on what they're
15 asking for and what their needs are. We share
16 information about -- obviously things about who we
17 are, where we're located, the nature of the work we
18 do, the operational capabilities we have, how long
19 we've been in business. In some cases we might
20 disclose who our clients are. If we're permitted to
21 do so, we'll do that.
22     Q.  Do you share with the prospect what the DMS
23 philosophy is about the administration of claims?
24     A.  It depends. If it's germane to a

Page 23

1  discussion, then we would share that. Certainly if
2  asked, we would.
3      Q.  Isn't that fairly basic, how you're going
4  to administer claims?
5      A.  The philosophy, I think, is pretty basic,
6  sure.
7      Q.  How about how you're going to administer
8  claims, do you share that with prospects?
9      A.  I would say if we get down to a discussion
10 that gets specific about that, then certainly we
11 would, yes.
12     Q.  What would you tell them?
13     A.  I guess at the highest level what we tell
14 them is that we believe that because every claim has
15 its own unique set of facts and circumstances, and
16 because of the nature of the disability itself and
17 the products and the process, that objectification is
18 important to be able to investigate claims thoroughly
19 to try to develop a factual basis so that we can get
20 to a point where liability is reasonably clear. That
21 we set out to try to prove every claim that is
22 submitted so that we can get it to that point where
23 liability is reasonably clear so that we can make an
24 appropriate decision. And then we believe strongly

Page 24

1  that because, again, the process is a complex one and
2  not well understood by lay people, that it's
3  important to communicate with claimants about our
4  findings and decisions and to give them an
5  opportunity to make sure that we understand the basis
6  for their claim and, if there's a difference of
7  opinion, to try to reconcile it.
8      Q.  Is that it?
9      A.  I think that's it.
10     Q.  Do you ever discuss with a prospect the
11 concept of managing a claimant's expectations?
12     A.  Do I ever -- I'm sorry, did you say have I
13 talked with a client about that?
14     Q.  Do you ever discuss with a prospective
15 client the philosophy or endeavor to manage
16 expectations of policyholders?
17     A.  I don't specifically recall having had a
18 conversation with a client about managing
19 expectations of policyholders.
20     Q.  Have you ever used that phrase?
21     A.  I believe I have, sure.
22     Q.  Is that something that you regularly use to
23 describe what it is that's important in your line of
24 work?

Page 25

1  A. I wouldn't say I regularly use it. I'd say
2  I actually made a presentation at a meeting once
3  where that was the topic of the presentation, but
4  it's not something that I regularly talk about.
5  Q. When was the last time you saw a written
6  record of that presentation?
7  A. Probably sometime within the last year I
8  read it.
9  Q. Was it within the past week?
10 A. No.
11 Q. Was that in Dallas in the spring of 2001?
12 A. The presentation was in Dallas. 2001
13 sounds right.
14      (Exhibit 40, marked)
15 Q. (By Mr. Roberts) I've marked as Exhibit 40
16 a document that is ten pages long. It says, "Record,
17 Volume 27, No. 1, Dallas Spring Meeting, May 30-June
18 1, 2001, Session 74PD, Disability Claim Management."
19      Is that the written record that you were
20 referring to?
21      Well, two questions: Is this the
22 discussion you were referring to and is this the
23 written record you were referring to?
24 A. This is the discussion that I'm referring

Page 26

1  to. I don't know if this is the written record or
2  not. I guess it -- this looks like probably a
3  transcript of that presentation, so I'm sure I read
4  the same thing.
5  Q. Is this a summary or synopsis that you
6  prepared prior to the discussion, because it doesn't
7  appear to be an exact transcript like we're recording
8  today. But maybe it is.
9  A. I'm not sure I understand the question.
10 Q. Do you have a sense of whether or not --
11 page 2, your name is in bold there, third paragraph.
12 A. Mm-hmm.
13 Q. Do you have a sense of whether or not this
14 is a verbatim recitation transcript of what you
15 communicated at that meeting or whether this is some
16 kind of summary that you or someone else may have
17 prepared?
18 A. My belief is that it's a verbatim
19 transcript.
20 Q. And where your name is there on the second
21 page, I think the third sentence which begins at the
22 end of the third line, "I'm going to talk," do you
23 see that?
24 A. Yes.

Page 27

1  Q. You said, "I'm going to talk about managing
2  expectations, and it's a significant issue and topic
3  for me because as we talk about claims management,
4  what we're really talking about is managing claim
5  outcomes."
6       Would that have been a direct quote of
7  yours?
8  A. I believe every word in this is a direct
9  quote, so, yes.
10 Q. And then in non-cancelable business, it's
11 your judgment that managing expectations becomes
12 particularly important, right?
13 A. I said that, and I'm trying to remember why
14 I said that, but where do you see it?
15 Q. I'm sorry, it's the third page, page number
16 3, the second paragraph, actually the first full
17 paragraph. It starts with "My company" and that is
18 essentially taken from the first half of that
19 paragraph, if you'd like to review it.
20 A. This is on page 3, second paragraph?
21 Q. Yes, sir.
22 A. So you're talking about the paragraph that
23 starts with "My company focuses exclusively on closed
24 blocks of business"?

Page 28

1  Q. Right.
2  A. I think the point that I was making there
3  was that non-cancelable business is -- it can't be
4  terminated by the issuing company, that it's a
5  long-term commitment that a company makes to a
6  policyholder without the potential to alter rates, so
7  that there are -- with other types of disability
8  business, companies can either cancel the coverage or
9  raise the rates, and that doesn't happen with
10 non-cancelable business, so I think that's the point
11 I was trying to get at there.
12 Q. Well, you make the point that it's your
13 sense that with regard to non-cancelable business
14 that managing expectations becomes particularly
15 important, right?
16 A. I did say that, yes.
17 Q. Does your company pay benefits, disability
18 benefits, total disability benefits for claims for
19 which there is only subjective information?
20 A. Sometimes, yes, certainly.
21 Q. Is that something you do on a permanent
22 basis, or is that just an interim measure until you
23 find some other way to resolve the claim?
24 A. Well, I would say that there are claims

cce26e8f-63f1-4bf4-ab4f-d418b3af6e3e

Page 29

1  that have very little objective basis and are
2  supported by largely subjective data that do get paid
3  and are paid long-term. It certainly happens.
4      Q. Are those paid under reservation of rights
5  all the time?
6      A. Probably not all the time.
7      Q. What does reservation of rights mean?
8      A. It means that, in the context of disability
9  insurance claims, because it is a term that is used
10 from time to time, it means that a company is making
11 the payment, and that making the payment by itself
12 shouldn't constitute an acceptance of liability, that
13 the company is making the payment without having
14 perhaps all the information it needs to accept
15 liability, so it's reserving its rights under the
16 policy to administer the policy by its terms once it
17 has more complete information.
18     Q. Are there any subjective-based claims that
19 you pay long-term or you're mindful that the payments
20 have not been paid under reservation of rights?
21     A. I can't think of any specifically. It's
22 been a long time since I was personally managing
23 claims myself. But I'd say it's not inconceivable
24 that a claim could be paid long term that as a

Page 30

1  subjective basis and that it's not paid under
2  reservation of rights.
3      Q. After the ERC agreement was entered, did
4  you personally take on any direct responsibility for
5  the examination of files that were transmitted from
6  Jefferson-Pilot to DMS?
7      A. I don't believe so, no.
8      Q. Did you have some expectation about the
9  thoroughness of the work that your subordinates would
10 perform on those files in the '97 to 2000 time frame?
11     A. Generally it was my expectation that they
12 would review each file thoroughly, yes.
13     Q. What would that mean, in simplest terms?
14     A. It would mean that they would read each of
15 the documents in the file, familiarize themselves
16 with the policy forms, that they would be comfortable
17 with all the aspects of the claim.
18     Q. These would have been new policies that
19 your employees had not previously worked with, so
20 would it have been your expectation that your
21 employees familiarize themselves with the actual
22 policies?
23     A. Yes, it would.
24     Q. And the respective riders that might go

Page 31

1  with them depending on the particular respective
2  claim?
3      A. Yes.
4      Q. Let's talk about the work of your employees
5  a little more generally. Is it your expectation when
6  a claim rep or a director of claims, whoever is
7  handling the primary responsibility for a particular
8  claim, is it your expectation that that individual
9  prepare some action steps or plan or strategy to
10 handle the claim on a going-forward basis?
11     A. If appropriate, yes. I think sometimes
12 they might review a file and find that the handling
13 is appropriate, and the decision appears to be
14 appropriate, and the information is complete, and
15 that there may be no further action other than to
16 just monitor the claim, if you will.
17     Q. What about a situation where the individual
18 responsible for the claim has a feeling that perhaps
19 some secret surveillance would be helpful, IME might
20 be helpful, talking to the doctors might be helpful.
21 In that situation where you have that type of claim,
22 is it your expectation that they would develop some
23 kind of strategy to go about doing that work?
24     A. Certainly they should be thinking about how

Page 32

1  they'd go about it, absolutely.
2      Q. As part of that strategy is it your
3  expectation that they would incorporate potential
4  resolution possibilities?
5      A. If that was appropriate, I would say yes.
6      Q. When is that appropriate?
7      A. Typically if they've got -- if they reach a
8  point where they feel that either liability is not
9  reasonably clear and they think that there may be
10 issues central to the claim that may be inhibiting
11 the claimant from returning to work, or there's a
12 misunderstanding, or there's some other circumstance
13 that prevents the claimant from going back to work,
14 then they might think about resolution.
15         If they think liability is clear and yet
16 the claimant still maintains their claim and so
17 there's a difference of opinion, then I think that
18 would be a circumstance under which resolution would
19 be contemplated.
20     Q. Is it your expectation that your employees
21 who are working on claims on a daily basis identify
22 among the claims they have responsibility for those
23 for which a settlement or resolution may be
24 appropriate?

Page 33

1   A.  Many of the claims people certainly should
2  be at that point, yes.
3   Q.  Is it your expectation that they
4  affirmatively identify those particular claims that
5  they're handling that would fall within those
6  categories?
7   A.  Yes, many of the claims people.
8   Q.  Is Joe Brazs an employee of DMS?
9   A.  No, he is not.
10  Q.  How about Andrew Bernstein?
11  A.  No, he is not.
12  Q.  Were either one of those gentlemen ever
13 associated with DMS?
14  A.  No.
15  Q.  How about Ziobrowski?
16  A.  Paul Ziobrowski is employed by DMS, yes.
17  Q.  In what capacity?
18  A.  He's our chief actuary.
19  Q.  And he participated in this conference as
20 well, right?
21  A.  Yes, I think he moderated that session.
22  Q.  So his comments in here would also be
23 recorded statements?
24  A.  I believe so, yes.

Page 34

1   Q.  How many times have you been deposed since
2  founding DMS on DMS matters?
3   A.  On DMS matters?
4   Q.  I suspect you were deposed on Travelers
5  matters while you were affiliated with DMS. I don't
6  want to know about those.
7   A.  So you're talking about claims situations
8  that we -- claims that we were responsible for,
9  claims that we were working on?
10  Q.  Right.
11  A.  That kind of thing?  I believe this is the
12 second such deposition.
13  Q.  Was Nate Freidberg the first?
14  A.  Yes.
15  Q.  I've marked as Exhibit 1 a copy of that
16 transcript.  Could you affirm for me on this record
17 that that's a transcript of your testimony in that
18 action?
19      MR. ELLIS:  I'll object.
20  A.  This appears to be a transcript of that
21 deposition, yes.
22  Q.  Okay, thank you.  Have you ever spoken to a
23 gentleman named Mr. Dempsey who is affiliated with
24 Employers Reinsurance?

Page 35

1   A.  Yes.
2   Q.  At some point in time did he become your
3  principal contact after your principal contact had
4  been Mr. Linner?
5   A.  I wouldn't describe him as my principal
6  contact, no.
7   Q.  Okay.  Who has been your principal contact
8  there, or contacts, since January of 2000?
9   A.  I would say for me it's Bob Linner.
10  Q.  I'm sorry, did you tell me what his
11 capacity is there?
12  A.  I believe today he is a vice president
13 level or assistant vice president level individual.
14 He's still working in their claims area.
15  Q.  On what occasions have you had the
16 opportunity or occasion to speak with Mr. Dempsey
17 generally?
18  A.  On occasion he'll visit our office to audit
19 files.  On occasion I'll speak to him concerning
20 what's going on at Jefferson-Pilot and, you know,
21 who's doing what at Jefferson-Pilot.  That kind of
22 thing.
23  Q.  So only when he makes visits here, or are
24 there occasions where you phone him or write him?

Page 36

1   A.  I've talked to him on the phone on
2  occasion.
3   Q.  What would be the purpose for that?
4   A.  Let's see.  I believe I spoke to him
5  recently.  Let's see.  He visited, he conducted an
6  audit recently in Springfield and I think I might
7  have talked to him in connection with that, you know,
8  the fact that he was coming or whether or not I was
9  available to meet with him, or that kind of thing.
10  Q.  Did you ever -- I'm sorry, go ahead.
11  A.  That's it.
12  Q.  Would you ever have occasion to have a
13 phone conversation with him about substantive issues
14 related to Jefferson-Pilot?
15  A.  On occasion I would, yes.
16  Q.  About specific matters, claims, policies?
17  A.  Not about claims.  I would say about
18 matters relating to our contract, maybe.
19  Q.  Not about specific policies either?
20  A.  I don't recall having any conversations
21 about specific policies or claims.
22  Q.  Have you ever had a discussion with him
23 about the potential that some of the Jefferson-Pilot
24 policies, or a Jefferson-Pilot policy or a

Page 37

1  Jefferson-Pilot rider may be ambiguous?
2      A.  I don't recall ever having a conversation
3  with Bill Dempsey or anybody else at ERC about any
4  such thing, no.
5      Q.  How about Jefferson-Pilot?
6      A.  Not Jefferson-Pilot either.
7      Q.  How about DMS?
8      A.  About any policies or contracts being
9  ambiguous?
10     Q.  Jefferson-Pilot policies or riders.
11     A.  I don't recall having any specific
12 discussions about Jefferson-Pilot policies or riders
13 being ambiguous.
14     Q.  You've not had any dialogue of any nature
15 along that line in the context of this action?
16     A.  I haven't had any specific dialogue with
17 anybody about their policies or their riders.  I'm
18 aware that -- I think the matter itself has to do
19 with what the riders say, but I've never read the
20 complaint, I really don't know that much about the
21 case.  I've never reviewed the case, never had a
22 specific discussion about the case.
23     Q.  So sitting here today you're not -- because
24 I haven't said one way or the other, you're not

Page 38

1  mindful about whether or not ambiguity in the
2  policies or the riders is an issue?
3      A.  Not specifically.  Only that there is -- my
4  understanding is that Mr. Kearney, I think is the
5  claimant, that his claim was paid for a period of
6  time, and at some point somebody determined that he
7  was being paid benefits that he wasn't entitled to,
8  and that subsequently an action was filed to clarify
9  that, I guess.
10     Q.  Anybody suggest to you how an unambiguous
11 policy could have been misconstrued by
12 Jefferson-Pilot and DMS for so many years?  Or did
13 you ask?
14     A.  I didn't ask, and I don't know that anybody
15 characterized it in that way.
16     Q.  Is your company regularly paying
17 erroneously benefits that unambiguously aren't
18 permitted or entitled to under the unambiguous
19 language of a policy or rider?
20     A.  I'm not sure I know what you're asking, but
21 I hope that nobody --
22     Q.  Well, don't answer that.  I want to make
23 sure you understand the question.
24     A.  All right.

Page 39

1      Q.  Have you ever had an experience at DMS
2  where your representatives for a period of between
3  two and five years have mistakingly made benefits
4  that unambiguously just aren't benefits that the
5  policyholder's entitled to?
6      A.  I don't recall any specific cases where we
7  have paid somebody erroneously, I guess in any claim,
8  whether there was ambiguities or not.  I hope it
9  doesn't happen too often.  I'm sure that -- we've got
10 human beings who are administering claims, so I know
11 that mistakes can happen, but I hope it doesn't
12 happen too often and I hope it doesn't -- I hope it
13 doesn't go uncorrected.
14     Q.  Do you know how many human beings made
15 mistakes for between two and ten years on
16 Mr. Kearney's policy?
17     A.  I do not.
18     Q.  Do you know how many hundreds of mistakes
19 were made on Mr. Kearney's policy?
20     A.  I don't know how many mistakes were made on
21 Mr. Kearney's policy.
22     Q.  Do your employees have the capacity to
23 accurately read unambiguous policies?
24     A.  Do they have the capacity to read?  I think

Page 40

1  they can read anything.
2      Q.  Do they have the capacity to understand
3  accurately unambiguous language in a disability
4  policy?
5      A.  I believe that they do, yes.
6      Q.  Do your employees know generally, as far as
7  you're aware, of how ambiguous language in an
8  insurance contract is construed by courts?
9      A.  I'm not sure that's a fair question,
10 because I'm not sure that they would have had access
11 to that kind of information.  I guess if they were to
12 read a ruling on an individual case about how a court
13 ruled on a claim or a matter that involved ambiguous
14 language that they would have the ability to read
15 that and understand it.
16     Q.  But as far as you're aware, there's no
17 education provided to your claim reps in ensuring
18 that they perform their duties in good faith that
19 they be made mindful that insurance contracts that
20 are ambiguous are construed in favor of the
21 policyholder?
22         MR. ELLIS:  Objection.
23     A.  You know, they certainly do receive
24 training, and they certainly do receive training

Page 41

1  concerning good faith claim handling. Whether or not
2  they receive any training that says that all
3  ambiguities are resolved in favor of a claimant, that
4  I don't know. I can't say if the training speaks to
5  that specifically or whether or not it's actually
6  true.
7      Q.  You're not mindful of whether or not that's
8  an accurate assessment of the law throughout --
9      A.  I couldn't say that in every case it is, or
10 cite any specific case.
11     Q.  You're not aware that in most jurisdictions
12 in the United States it is the law in the insurance
13 field that ambiguous insurance policies are construed
14 in favor of the policyholder?
15     A.  I'm not aware if it's the law, but it
16 wouldn't surprise me to note that ambiguities are
17 often resolved in favor of a claimant, certainly. It
18 wouldn't be a foreign concept, no.
19     Q.  Have you ever personally determined that an
20 insurance policy is ambiguous?
21     A.  Personally determined? I don't recall any
22 circumstances. I don't recall any specific
23 circumstance.
24     Q.  Are you aware of any litigation matters

Page 42

1  where a court has determined that a policy being
2  administered by DMS contains ambiguous provisions?
3      A.  I don't recall any. I'm not aware of any.
4      Q.  Would this be the first, should the Court
5  come to that conclusion in this action?
6          MR. ELLIS: Objection.
7      A.  Certainly to the best of my recollection.
8      Q.  Who did you negotiate the claims assessment
9  agreement with?
10     A.  Are you referring to the December --
11     Q.  The document right in front of you.
12 Exhibit 2.
13         MR. ELLIS: Objection to the use of
14     the document that is subject to a previous
15     Court's protective order and we'll object to
16     any questions concerning the document.
17         THE WITNESS: Am I to answer this?
18         MR. ELLIS: For purposes of the
19     deposition you can answer it, but we're going
20     to move to strike. Also we'll request if this
21     is stricken that Counsel understand that this
22     is proprietary information to be kept in
23     confidence. We'll move for the deposition to
24     be sealed as it relates to the subject.

Page 43

1          MR. ROBERTS: I'm not agreeing to
2      sealing the deposition, I'm not agreeing that
3      it's proprietary.
4      Q.  (By Mr. Roberts) Who did you negotiate
5  that with?
6      A.  This is Jefferson-Pilot. I believe Clyde
7  Honiker --
8      Q.  We need to go off the record, sir.
9          THE VIDEOGRAPHER: Going off the
10     record at 4:55.
11         THE VIDEOGRAPHER: Back on record at
12     4:56 p.m.
13     Q.  (By Mr. Roberts) We were interrupted there
14 so that the videographer could change tapes. I
15 apologize for interrupting your testimony, sir, or
16 your thought process. You were, I think, speculating
17 that perhaps Clyde Honiker was the person with whom
18 you negotiated this agreement, which has been marked
19 as Defendant's Exhibit 2 in the action, the claims
20 assessment agreement dated December 15, 1999 between
21 Disability Management Services and Jefferson-Pilot.
22     A.  And yes, that's correct. I believe it was
23 Clyde Honiker.
24     Q.  Do you have at your access an agreement

Page 44

1  signed by Mr. Honiker?
2      A.  I don't believe so. When you say my
3  access, I mean I don't have it in my possession.
4      Q.  Right, but you have a general counsel who,
5  if you asked him to get a document, could get you a
6  document, I suspect?
7      A.  I believe that we would have a signed copy
8  of this somewhere, yes.
9      Q.  Can I direct your attention to the fourth
10 page, Section 4C?
11     A.  Yes.
12     Q.  The agreement -- as I understand the
13 agreement, there's somewhat of a pass through of
14 expenses, and then DMS is promised a certain monthly
15 amount on top of that, some fixed monthly fee.
16 That's what's in 4A, right?
17     A.  4A says that we get a fixed monthly fee,
18 and we also are reimbursed for costs like the cost of
19 investigations if -- actually, we're not reimbursed.
20 I think they -- that I can't be sure of. They pay
21 for investigation costs, for example, we don't. If
22 we pay for them, they reimburse us; either that or we
23 pass them on to them and they pay them out. I don't
24 remember how it works in here, I can --

Page 45

1    Q.  Well, the document speaks for itself as to
2  how the expenses are reimbursed and passed through,
3  right?  I mean, 4A talks about section five as far as
4  expenses; I'm not really concerned about that right
5  now.
6    A.  Okay, yes.
7    Q.  But there's an expense reimbursement for
8  some nature of expenses DMS incurs on
9  Jefferson-Pilot's behalf?
10   A.  That's correct.
11   Q.  And then on top of that there is a $43,700
12 fixed monthly fee that was negotiated?
13   A.  That's correct.
14   Q.  Paragraph 4C suggests that, in addition to
15 reaching that agreement, it was also agreed during
16 the negotiation that every 12 months the fixed
17 monthly fees would be subject to further potential
18 adjustment that was supposed to be negotiated in good
19 faith?
20   A.  That's correct.
21   Q.  Now, it was, I suspect, Jefferson-Pilot's
22 expectation, and your expectation, when you entered
23 this agreement that your employees would provide
24 top-flight, efficient, appropriate, accurate and

Page 46

1  timely service for all these claims, right?
2    A.  I think that's a fair characterization.
3    Q.  Why is it that you built in a clause that
4  would adjust the fixed monthly fee based on thorough,
5  diligent and fair evaluation of claims?
6    A.  Well, let me speak to the notion that these
7  could be adjusted first.  Hopefully, that will answer
8  the question.  When we set this level of fees, we
9  made some assumptions about what it would cost for us
10 to support the client and we established our
11 projected expense level and then adjusted that for a
12 profit margin.
13       We did that without having specific
14 experience in managing this block of claims, so we
15 were taking some risk and they were taking some risk
16 about whether or not we were getting paid too much or
17 too little because this was based on a cost plus a
18 margin approach to quoting this fee.
19       At the end of the 12-month period we were
20 to evaluate our actual expense experience to
21 determine whether or not this fee level was
22 appropriate, and in terms of selecting the words, I
23 think if there was any basis upon which to determine
24 whether or not we were meeting their expectations, it

Page 47

1  had to do with our thoroughly, diligently, and fairly
2  evaluating the claims and in supporting their
3  administration of the underlying policies.
4        So this was -- again, we projected
5  expenses, tacked on a margin, we said, "This is what
6  we think this is going to cost us to do this, but
7  we're not sure, so at the end of the 12-month period
8  we're going to evaluate what our actual expenses were
9  and if we're not making our margin it's our
10 expectation that we're going to be able to come back
11 and say going forward, if we're going to do this,
12 it's going to be at an adjusted level.  And by the
13 same token if we find that our expenses are less than
14 anticipated, then we will adjust our fees down."
15       It's typical in a situation like this, they
16 didn't want to pay us a lot to do the work and we
17 felt that we should be paid to do the work.  Without
18 having the actual experience, you know, I guess they
19 were taking some risk that we would actually do a
20 good job for them, and we were taking the risk that
21 we would actually be paid at a level we thought was
22 necessary to do the work and make a profit.
23   Q.  Okay, the language doesn't suggest anything
24 about whether or not you're hitting the margins you

Page 48

1  think or whether your expenses are what you think.
2  It doesn't speak in those terms, right?  It talks
3  about fair, diligent, accurate evaluation of claims,
4  right?
5    A.  It does make reference to thorough,
6  diligent and fair evaluation of claims, yes.
7    Q.  And it doesn't make reference to adjusting
8  it based on any expense anticipation versus
9  realization, right?
10   A.  No, it doesn't make that reference in this
11 paragraph.
12   Q.  In your contract with Massachusetts
13 Casualty you have a submitted budget for expenses and
14 then there's a true-up in the end?
15   A.  Right.
16   Q.  Is there a true-up here with
17 Jefferson-Pilot as well in your actual expenses
18 versus budget?
19   A.  It's not drafted that way.  My
20 recollection is that the first year we did this we
21 found that our expenses were higher than what we
22 thought they would be, and that we actually said to
23 them -- I'm not even sure we're covering our
24 expenses, we might have been, but we weren't making

Page 49

1  our margin and we said, "Hey, this is not adequate."
2  And my recollection is that we were looking to be
3  made whole for that first year and that they said no,
4  and that we negotiated a new fee level for the
5  ensuing year that was based on what we projected our
6  expenses to be for that year.
7      Q.  After the first year your testimony under
8  oath is that there was an adjustment to the fixed
9  monthly fee?
10     A.  My recollection is that there was an
11 adjustment of the fixed monthly fee and I don't
12 recall if it was at the end of the first year or the
13 second year, but I recall that at one point there was
14 an upward adjustment, I believe, and I think at
15 another time there was a downward adjustment.
16     Q.  When I took the deposition of
17 Jefferson-Pilot, the corporation, I took their
18 deposition, and the person that your counsel gave to
19 me as the person with the information about the
20 relationship between your company and theirs
21 testified that there's never been any adjustment or
22 modification to the compensation terms of this
23 agreement.
24         If I wanted to understand what was

Page 50

1  accurate, that this has never been adjusted or,
2  according to you, it has been adjusted, how would I
3  go about determining that?
4          MR. ELLIS:  I object to the form of
5      the question and to Counsel's speech before
6      the question.
7      A.  If we wanted to verify what we were
8  actually paid under this, I could probably produce
9  accounting information that would support exactly
10 what we were paid on a monthly basis.
11     Q.  That could be done?
12     A.  I believe so.
13     Q.  Okay.  With the expenses as well, because
14 we'd have to work in what the expenses are, right?
15     A.  I presume with the expenses as well.
16     Q.  How long do you think it would take to
17 gather that information if you requested it from the
18 right subordinate?
19     A.  I don't think it would take long certainly
20 to come up with a fixed fee information.  It might
21 take longer to come up -- and I mean maybe within a
22 day.
23     Q.  Okay.
24     A.  But the expense information may take

Page 51

1  longer, I'm not sure how it's -- how they code it,
2  for want of a better term, because there's a -- this
3  was a process whereby a bill went out on a monthly
4  basis and then we were -- and then the bill was paid
5  and it's just recorded on our books, where the other
6  process required that an invoice come in from a
7  vendor, and that that invoice get paid, and it wasn't
8  a regular kind of a process.  Lots of vendors, lots
9  of expense stuff.
10     Q.  The information could be gathered?
11     A.  Probably.  I think so.
12     Q.  You had mentioned earlier that one concept
13 of the negotiations that led to this particular term
14 was that you really didn't know what the expenses
15 were going to be and it would take a year or so to
16 get that understanding; is that right?
17     A.  We certainly didn't know exactly what our
18 expenses were going to be.  We did a projection that
19 we felt comfortable with when we entered into this
20 agreement that formed the basis for our quote, if you
21 will.  You know, after the fact we certainly did have
22 actual information to compare with those assumptions.
23     Q.  But the term of the agreement that the
24 parties agreed on was that every twelve months there

Page 52

1  could be an adjustment to the fixed monthly fee based
2  on DMS's performance in thoroughly, diligently and
3  fairly evaluating claims, right?  It wasn't a
4  one-time deal after the first 12 months?
5      A.  Right.
6      Q.  Is that correct?
7      A.  That's correct.  I think it was -- I think
8  the contract was an annually renewable contract.  So
9  the fees could change every year depending on what it
10 was that we were being asked to do, what the volume
11 of work was.  And from our standpoint, you know,
12 again, we're hoping to run a profitable enterprise
13 and we've got expenses and our fees would typically
14 be a function of expenses plus a margin.  It's not
15 unusual, not an unusual content.  It would not be
16 unusual for that to vary potentially.
17     Q.  The contract renews automatically every
18 year absent certain specified contractual notes,
19 right?
20     A.  Yes.
21     Q.  And in truth it has automatically renewed
22 every year since December of '99?
23     A.  Right.  I believe that's true.  I'm not
24 sure that -- I think the initial term was actually a

Page 53

1  little longer than a year, perhaps. But I think
2  thereafter it's been annually renewable and I think
3  there's only been twice that the fees have changed.
4      Q. Do you have familiarity with the software
5  program that claim reps for DMS used, the claim
6  system?
7      A. I guess it depends on what you mean by
8  familiarity. I'm not a user of the system. I'm
9  certainly aware of it. I'm aware of what kinds of
10 information are in it.
11     Q. Is there a field in that system for the
12 listing of action steps taken or to be taken on a
13 respective claim?
14     A. I don't know if that's an accurate
15 characterization. There is a facility, I guess,
16 whereby actions can be -- or kind of a diary system
17 to indicate when certain actions are or when a claims
18 person wants to take an action or whether they're
19 expecting a certain piece of information so that a
20 file will -- so that they'll review the file at a
21 given point in time when they're expecting something
22 to take place. So it's kind of a logging and
23 tracking mechanism.
24     Q. Would it be your expectation that those

Page 54

1  types of entries, once performed, once they pass
2  unperformed that they be deleted or removed from the
3  claim system on a particular claim?
4      A. That I don't know.
5      Q. Would you expect that your employees
6  preserve as much information about a claim as could
7  possibly be preserved?
8      A. I think so. I would think that information
9  about activities on claims would be preserved.
10     Q. Is there a policy about taking notes or not
11 taking notes among the claim reps, that you're
12 mindful of?
13     A. Policy about taking notes or not taking
14 notes? I don't know if there's a policy per se. I
15 mean, I'm sure people take notes.
16     Q. Is it your expectation that someone
17 responsible for a claim make a notation that's been
18 later preserved in the claim file of every
19 communication that the person has with the
20 policyholder, his or her doctor, his or her
21 accountant, the investigator assigned to investigate
22 the claim, the IME person assigned to investigate the
23 claim or conduct an IME; is it your expectation that
24 the contacts with those types of persons be preserved

Page 55

1  in the claim file?
2      A. It is. Unless it was something that was
3  entirely incidental, it would be my expectation that
4  that would be documented.
5      Q. Is that important in the claim
6  administration process to preserve that type of
7  information in the claim file?
8      A. I think it is.
9      Q. Have you been made mindful that in 2001,
10 six or seven months before this litigation was
11 commenced, at least six or seven months, Mr. Dempsey
12 sought the opinion of outside legal counsel as to the
13 rights Mr. Kearney had under his policies and riders?
14     A. No.
15     Q. How many persons are on the DMS legal
16 staff?
17     A. Legal staff, are you talking about
18 attorneys?
19     Q. Yes, sir.
20     A. Attorneys there are six.
21     Q. Is it your expectation that employees of
22 DMS faced with potential legal issues about language
23 interpretation would utilize your in-house staff?
24     A. I would say that would be probably the

Page 56

1  first line of support that they would go to or at
2  least one place that would be likely for them to go
3  to, yes.
4      Q. Would it be your expectation that those
5  contacts or communications be preserved somewhere?
6      A. Not necessarily. I know in my career, if I
7  ever visited the law department, I'm not sure I
8  necessarily always documented that in the claim file.
9  Sometimes I just did it to become informed about a
10 matter, and just used it to kind of educate myself
11 and wouldn't necessarily document it in a file.
12     Q. Well, that would reflect well on you and
13 would be important for the policyholder to know that
14 you went through the extra measure to be certain of
15 your position so it would show good will. So why
16 would it not be a good policy to document those?
17     A. I'm not saying it's a good policy or not.
18 I can say in cases where I went to a law department
19 it wasn't necessarily anything that any claimant was
20 going to know anything about or that I was even going
21 to discuss with a claimant. If I thought there was a
22 reason to go to the law department, sometimes I'm
23 sure I documented it, sometimes I didn't, depending
24 on what it was that was discussed and what the

Page 57

1  purpose for the contact was.
2      Q.  What year did you receive your MBA from
3  American International College?
4      A.  It was either 1981 or 1982.  I get confused
5  because I think I finished school in December and got
6  the degree in the spring, so it may have been '82
7  that I actually received a degree.
8      Q.  What's a spot bonus?
9      A.  A spot bonus, to me, it's a way to
10 compensate an individual for something that
11 individual had done that you wanted to recognize them
12 for in a time frame that was closely related to the
13 activity.  Though it's usually a one-time payment of
14 compensation of some money outside of salary.
15          I guess the term "spot" means on the spot,
16 I think that's where that comes from.
17     Q.  Does DMS offer its employees spot bonuses
18 for extraordinary work?
19     A.  We have from time to time.
20     Q.  Does it in the year 2004?  I'm not saying
21 has one actually been paid in 2004, but is it a
22 potential benefit?
23     A.  Oh, yes.  Absolutely.
24     Q.  DMS's first agreement with Travelers

Page 58

1  incorporated a potential incentive payment?
2      A.  That's correct.
3      Q.  And that provision has been taken out of
4  your relationship.  Do you have an ongoing
5  relationship with Travelers?
6      A.  Yes.
7      Q.  That no longer is part of the compensation
8  equation with Travelers, is that correct?
9      A.  That's correct.
10     Q.  You understand it's illegal for a third
11 party administrator doing disability insurance to get
12 paid for denying claims?
13     A.  The compensation can't be denied
14 directly -- or can't be paid -- tied directly to the
15 denial of claims, yes, I understand that, certainly.
16     Q.  Why was DMS given a 60 percent raise in its
17 relationship with Mass Casualty last year?
18             MR. ELLIS:  Objection.  Irrelevant
19     and misstates the facts.
20     A.  I don't believe we did receive a 60 percent
21 raise.  That would surprise me a lot.
22     Q.  The margin went from 10 percent to 16
23 percent, are you mindful of that?
24     A.  Oh, yeah.

Page 59

1      Q.  That's 60 percent, isn't it?
2      A.  Okay.  Our margin did increase.
3      Q.  Why did it increase so dramatically?
4      A.  When we negotiated our first contract with
5  Center, they indicated to us that they were in a
6  competitive situation with one or more other parties
7  that were bidding on a block of business, and that
8  part of their bid to acquire the business through a
9  reinsurance treaty was dependent upon their ability
10 to competitively bid, among other things, the
11 expenses associated with managing that business
12 ongoing, and we were very much interested in securing
13 that business and to help win that bid, if you will.
14 We took compensation that, to us, was less than what
15 we ordinarily would have taken.  And that same
16 mindset was carried onto the next contract that we
17 did.  And then the next time we entered into contract
18 discussions with them we said, you know, "We're no
19 longer in that kind of situation, and frankly, the
20 first time this happened you guys didn't know whether
21 we could effectively do what we were being asked to
22 do.  And so you were taking some risk that perhaps we
23 would not perform well in transitioning that
24 business.  And now, you know that we can do a good

Page 60

1  job of it and you're not in the same kind of
2  competitive situation, and we think that we deserve
3  to be compensated at a higher margin."  And frankly,
4  we also believed that not only did we deserve a
5  higher margin, but that we were their best option and
6  that we thought -- and we were having decisions with
7  them about renegotiating our contracts to secure
8  long-term agreements.  And we thought it was in our
9  best interest and their best interest, so we said we
10 want a higher margin on these, and that's where we
11 arrived at.  We were looking for more, they wanted to
12 pay less, and we arrived at that number.
13     Q.  You talk about "we" and "they."  They
14 actually own 40 percent of DMS?
15     A.  True.  True.
16         Which is interestingly another reason why
17 we felt that we should get a higher margin because,
18 theoretically, 40 percent of the profit margin to the
19 company was going back to them, which meant our
20 margin was pretty skinny.
21     Q.  They own 40 percent of the enterprise?
22     A.  True.  But they didn't actually work for
23 the enterprise, and the other owners actually did
24 work for the enterprise and ran the enterprise.

**Page 61**

1  Q. What was your bonus last year, personally?
2  A. My bonus, I think, was a hundred percent of
3  my salary.
4  Q. Which was what?
5      MR. ELLIS: Objection. You don't
6      have to give him that information.
7  A. I'd rather not have that be on the record
8  that anybody can just have access to.
9      MR. ELLIS: That's fine.
10 Q. (By Mr. Roberts) I thought we were done,
11 but we're not.
12     Did you execute an affidavit in the context
13 of the lawsuit pending in Mississippi, I believe it
14 was the King case, providing sworn testimony as to
15 DMS's financial condition?
16     MR. ELLIS: Same objection. The
17     information's covered by the Court's
18     protective order that Counsel shouldn't have,
19     and I will move to keep it protected here.
20 Q. (By Mr. Roberts) You can answer the
21 question.
22 A. I don't recall signing an affidavit in
23 connection with the King case.
24 Q. The year-to-date revenue, December 31, 2002

**Page 62**

1  for DMS was 37 million plus. Does that ring a bell?
2      MR. ELLIS: Objection.
3  A. Sounds like it. It's probably in the
4  ballpark, yes.
5  Q. And the officers' salaries were just north
6  of $2 million?
7      MR. ELLIS: Objection.
8  A. I don't believe that's -- I don't believe
9  that's true.
10 Q. I will accommodate Mr. Ellis's request that
11 this not be an exhibit, but I will show you what
12 appears to be a sworn statement of yours, as well as
13 your general counsel, Mr. Cohen, which affirms the
14 accuracy of some attached financial statements, and
15 I'd ask you to review it and confirm for me what the
16 officers' salaries and officers' bonuses were in
17 2002.
18     MR. ELLIS: I will again ask Counsel
19     to identify the source of the information.
20     No?
21     MR. ROBERTS: I don't have to do
22     that, Bill.
23     MR. ELLIS: Does that mean you
24     refuse to do that?

**Page 63**

1      MR. ROBERTS: The document speaks
2      for itself.
3  A. Okay, what is your question?
4  Q. Two questions. I think the page prior to
5  that, Mr. Bonsall, is the sworn statement of yours.
6  I wanted you to confirm that you executed a sworn
7  statement in relation to the King case.
8  A. Okay. I can confirm that.
9  Q. And what you were testifying to in that
10 sworn statement is the accuracy of the attached
11 financial statements. And my question is, what is
12 the amount of the officers' salary and officers'
13 bonus in 2002 at DMS? If you could identify for the
14 record what those amounts were.
15 A. The officers' salaries, 2,009,480
16 Q. 2,009,000?
17 A. That's correct.
18 Q. What was the bonus number?
19 A. 3,138,700.
20 Q. How many officers are there?
21 A. Sixteen, seventeen. At least 17.
22 Q. There aren't just four officers?
23 A. No.
24 Q. Are you aware of any public document that

**Page 64**

1  suggests there's only four officers?
2  A. No.
3  Q. Who are the directors of the company?
4  A. Myself, John Anderson -- I'm sorry, did you
5  say the directors of the company?
6  Q. Yes, sir.
7  A. Myself, Mr. Anderson, Andy Cohen, Richard
8  Grilli, Michael Ember, Donald Charski.
9  Q. How about Eileen Sweeney?
10 A. She is no longer an officer, or a director
11 of the company, rather.
12     MR. ROBERTS: Mr. Bonsall, thank
13     you. We're completed.
14     MR. ELLIS: I have two quick
15     questions.
16
17 CROSS EXAMINATION BY MR. ELLIS:
18 Q. Since Counsel suggested it, was the
19 incentive in the original Travelers contract tied to
20 denial of claims or getting rid of claimants that
21 were supposed to be getting their benefits in any
22 way?
23 A. Certainly not.
24     MR. ROBERTS: Objection.

Page 65

1   A.  Certainly not.
2   Q.  Secondly, Counsel suggested that you got a
3 gargantuous 60 percent raise.  My understanding is
4 your margin went from 10 percent to 16 percent, is
5 that right?
6   A.  That's correct.
7   Q.  So the increase was 6 percent?
8       MR. ROBERTS:  Objection.  Wrong
9 math.
10  A.  It went from 10 to 16 percent.
11  Q.  So you got 6 percent greater profit on your
12 expenses than before?
13      MR. ROBERTS:  Objection.  Wrong
14 math.
15  A.  Relative to the total that we were paid,
16 that's correct.
17      MR. ELLIS:  Thank you.  That's all I
18 have.
19      THE VIDEOGRAPHER:  Going off record.
20 at 5:35 p.m.
21      (Witness excused)
22      (Deposition concluded at 5:36 p.m.)
23
24

Page 66

1       ERRATA SHEET
2
3 To be signed by deponent and returned to counsel.
4
    I, the undersigned, ROBERT BONSALL, do hereby
5 certify that I have read the foregoing transcript of
  my testimony given in the matter of JEFFERSON-PILOT
6 v. CHRISTOPHER KEARNEY and to the best of my
  knowledge, said transcript is true and accurate with
7 the exception of the corrections listed below:
8 PAGE  LINE    CORRECTION
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21
22 DEPONENT'S SIGNATURE _____
23 DATE OF SIGNING _____
24 5.13.04 /sr

Page 67

1 COMMONWEALTH OF MASSACHUSETTS
2 Hampden
3
4    I, Sharon R. Roy, a Notary Public in and for the
  Commonwealth of Massachusetts, do certify that
5 pursuant to notice, there came before me on the 13th
  day of May, 2004, at the offices of ACCURATE COURT
6 REPORTING, 1500 Main Street, Springfield,
  Massachusetts the following named person, to wit:
7 ROBERT BONSALL, who was by me duly sworn to testify
  to the truth and nothing but the truth as to his
8 knowledge touching and concerning the matters in
  controversy in this cause; that he was thereupon
9 examined upon his oath and said examination reduced
  to writing by me; and that the deposition is a true
10 record of the testimony given by the witness, to the
   best of my knowledge and ability.
11
    I further certify that I am not a relative or
12 employee of counsel or attorney for any of the
   parties, nor a relative or employee of such parties,
13 nor am I financially interested in the outcome of the
   action.
14
    Witness my hand, this 25th day of May, 2004.
15
16
17 ------------------------
   Sharon R. Roy
18
19
20 My commission expires:
21 April 28, 2011
22
23
24