UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

JEFFERSON-PILOT INSURANCE COMPANY,    )
                                      )
                    Plaintiff,        )
                                      )
        vs.                           )    CASE NO.
                                      )    C-1-02-479
CHRISTOPHER L. KEARNEY,               )    (Judge Spiegel)
                                      )
                    Defendant.        )

COPY

The deposition upon oral examination of VALERIE

LOFTIN, being taken pursuant to Order and in accordance

with the Federal Rules of Civil Procedure before Rebecca J.

Huddy, Notary Public, at the Stratis Business Center, 7800

Airport Center Drive, Greensboro, North Carolina, on the

6th day of May, 2004, beginning at 11:00 a.m.

**Jefferson-Pilot Insurance Company vs. Christopher L. Kearney**
**Valerie Loftin**

C-1-02-479
5/6/2004

APPEARANCES:
For the Plaintiff: Mr. William R. Ellis
                  Wood & Lamping, LLP
                  600 Vine Street, Suite 2500
                  Cincinnati, Ohio 45202

                  Ms. Stephanie Farabow
                  Jefferson-Pilot Life Insurance Company
                  100 North Greene Street
                  Greensboro, North Carolina 27401
For the Defendant: Mr. Michael A. Roberts
                   Graydon, Head & Ritchey
                   511 Walnut Street
                   1900 Fifth Third Center
                   Cincinnati, Ohio 45202
                   * * *
                    I N D E X
                By                  Page
EXAMINATION      Mr. Roberts       3 - 175

             E X H I B I T S
Number       Description        Page
Defendant's 1    Notice          12
      "     2    Agreement       17
      "     3    Policy          53
      "     4    Riders          53
      "     5    Residual rider  53
      "     6    Letter 6-13-00  67
      "     7    Affidavit       68
      "     8    Draft           75
      "     9    Worksheet       81
      "    10    Letter 9-11-00  94
      "    11    Interrogatory responses   96
      "    12    Admission responses   109
      "    13    October 2001 letters   114
      "    14    Proposal        116
      "    15    Transcript      165
      "    16    Management Techniques   169
      "    17    Letter 4-28-04  171
      "    18    Letter 12-21-01 171
                   * * *

Page 4

1   forward?
2   Q.  I would like that, thank you.
3   A.  Okay.  I was an associate general counsel with the
4       League of Municipalities in North Carolina.  Then I
5       was in private practice with a firm in Baltimore,
6       Maryland.
7   Q.  What year?
8   A.  That would have been '82 through '85.
9   Q.  What firm?
10  A.  Allen, Tebo & Alexander.
11  Q.  How could you spell Allen?
12  A.  A-L-L-E-N.
13  Q.  That was in Baltimore?
14  A.  Yes.
15  Q.  Okay.  What area of practice did you participate in?
16  A.  Insurance defense.
17  Q.  Litigation?
18  A.  Yes.
19  Q.  Okay.  Then where did you travel?
20  A.  I was with the Attorney General's Office in Maryland.
21      I was an Assistant Attorney General.
22  Q.  In what area?
23  A.  Appellate litigation.
24  Q.  For how long?
25  A.  For two and a half years.

Page 3

1        The witness, VALERIE LOFTIN, being first duly
2   sworn, was examined and testified as follows:
3
4   EXAMINATION (by Mr. Roberts):
5
6   Q.  Good morning.  Could you kindly state and spell your
7       name for the record, please.
8   A.  Valerie Loftin, V-A-L-E-R-I-E, L-O-F-T-I-N.
9   Q.  Valerie, what is your home address, please, and zip
10      code.
11  A.  1900 Falmouth Drive, that's F-A-L-M-O-U-T-H,
12      Greensboro, North Carolina 27410.
13  Q.  How are you presently employed?
14  A.  I am employed with Jefferson-Pilot.
15  Q.  Okay.  How long have you been employed by
16      Jefferson-Pilot?
17  A.  Since 1992.
18  Q.  Are you a lawyer, Valerie?
19  A.  Yes.
20  Q.  Okay.  Where did you receive your law degree?
21  A.  At the University of North Carolina at Chapel Hill.
22  Q.  What year?
23  A.  1981.
24  Q.  What was your professional career post 1981?
25  A.  Do you want me to go back starting at 1981 and move

Page 5

1   Q.  What was next?
2   A.  I was with Nationwide Insurance as a claims attorney.
3   Q.  During what time period?
4   A.  That would have been '87 to '89.
5   Q.  Where are they located?
6   A.  In Raleigh, North Carolina.
7   Q.  Okay.  Then what?
8   A.  While still at Nationwide, I became a claims manager.
9   Q.  You got out of the general counsel office and into
10      claims?
11  A.  Yes.
12  Q.  Okay.  Was that after '89, during '89, or prior to
13      '89?
14  A.  That was after '89.
15  Q.  What period of time did you serve in a claims
16      capacity at Nationwide?
17  A.  That would have been up until 1992.
18  Q.  Did you work in disability insurance during your
19      career prior to '92?
20  A.  No.
21  Q.  Nationwide was property and casualty?
22  A.  It was property and casualty.  I did handle Workers'
23      Compensation when I was in private practice.
24  Q.  Do you mean '82 to '85 you did Workers' Comp?
25  A.  Yes.

**Reported By: Rebecca J. Huddy**
Huseby, Inc. An Affiliate of Spherion,  1230 W.  Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

**Jefferson-Pilot Insurance Company vs. Christopher L. Kearney**
**Valerie Loftin**

C-1-02-479
5/6/2004

Page 6

1  Q.  The AG's Office was general appellate litigation?
2  A.  Criminal appellate litigation and some Federal habeas
3      corpus work.
4  Q.  How did you come to be employed by Jefferson-Pilot?
5  A.  I joined Jefferson-Pilot in June of 1992 as the Vice
6      President of Claims for a subsidiary, Jefferson-Pilot
7      Fire & Casualty.
8  Q.  What other positions have you held for
9      Jefferson-Pilot?
10 A.  In 1994 I became President of Jefferson-Pilot Fire &
11     Casualty.  In 1995 the company was sold and I --
12 Q.  Jefferson-Pilot Fire & Casualty was sold or
13     Jefferson-Pilot?
14 A.  Jefferson-Pilot Fire & Casualty was sold.
15 Q.  Okay.
16 A.  And I remained with Jefferson-Pilot Corporation.
17 Q.  In what capacity?
18 A.  In the capacity of an integration coordinator for
19     acquisitions and regulatory counsel.
20 Q.  So you've handled everything from criminal work to
21     mergers and acquisitions?
22 A.  Yes.
23 Q.  Everything in between.  How long did you hold that
24     position?
25 A.  The integration coordinator and regulatory counsel

Page 7

1      continued until 1997.  I assumed responsibility as
2      Vice President of our Annuity Operations.
3  Q.  In 1997?
4  A.  That would have been 1997 to 1998, and in 1998 I
5      joined our Finance Department, again specializing in
6      regulatory issues and mergers and acquisitions.
7  Q.  Two independent areas or regulatory issues related to
8      mergers and acquisitions?
9  A.  Regulatory issues related to mergers and acquisitions.
10 Q.  How long did you serve in that capacity?
11 A.  That was approximately three years.
12 Q.  Concluded in 2001 sometime?
13 A.  Yes.
14 Q.  Okay.  Then what?
15 A.  At that point I moved into the Claims Department and
16     my role in that department was to assist in the
17     integration of some of our claims field offices into
18     our home office.
19 Q.  Claims Department disability insurance or other lines
20     of insurance?
21 A.  There were disability, life, annuity, individual lines
22     of insurance.
23 Q.  Was this your first focused effort on disability
24     insurance when you took that capacity?
25 A.  Yes.

Page 8

1  Q.  Do you recall what month it was in 2001?
2  A.  No.  It would have been in the first six months of
3      2001.
4  Q.  Is that the position you hold today?
5  A.  No.  I am now the Vice President of Claims.
6  Q.  Did your responsibilities change at all?
7  A.  Yes.  I now have responsibility for the entire unit.
8      I was working on a special project when I originally
9      went into the unit.
10 Q.  How long did that assignment last?
11 A.  The integration of the outlying claims offices went on
12     until 2002 and I assumed responsibility as Vice
13     President of Claims in June of 2002.
14 Q.  And that's the position you hold today?
15 A.  Yes.
16 Q.  What was the task of integrating the outlying claims
17     offices?  Was there a consolidation effort made by
18     Jefferson-Pilot to bring everybody to Greensboro or
19     wherever you're located?
20 A.  Yes.  It was a continuation of some of the work I had
21     done.  In the mid-'90s we had acquired a number of
22     insurance companies in different locations and we had
23     slowly been consolidating the operations into one
24     location or two locations.
25 Q.  Okay.  How many employees does Jefferson-Pilot have,

Page 9

1      do you know?
2  A.  Jefferson-Pilot Corporation has 3,900 employees.
3  Q.  How many Jefferson-Pilot corporate entities are there?
4  A.  I don't know the exact number.  There are three
5      separate life insurance entities, there are seventeen
6      radio and television stations, and then there are a
7      number of other legal entities that are investment
8      companies, but I don't know the number.
9  Q.  Well, the plaintiff in this case in which we're here
10     today is Jefferson-Pilot Life Insurance Company.  Is
11     that one of the three life insurance companies?
12 A.  Yes.
13 Q.  Okay.  What are the other two life insurance
14     companies?
15 A.  Jefferson-Pilot Financial Insurance Company and
16     Jefferson-Pilot Life America Insurance Company.
17 Q.  And you're the Vice President of Claims of all claims
18     that would fall under those life insurance companies
19     as well as others?
20 A.  All individual claims.  We also have a group claims
21     operation.
22 Q.  Is that one separate corporation?
23 A.  No.
24 Q.  Is it multiple separate corporations?
25 A.  No.  The group operations are all contained in

3 (Pages 6 to 9)

**Reported By: Rebecca J. Huddy**
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Page 10

1      Jefferson-Pilot Financial Insurance Company.
2  Q.  Okay. So how many different corporate entities are
3      there for which there would be individual claims under
4      the Jefferson-Pilot umbrella?
5  A.  There would be three.
6  Q.  The three you've mentioned?
7  A.  Yes.
8  Q.  Okay. How many people are employed by Jefferson-Pilot
9      Life Insurance Company?
10 A.  I can't give you that figure off the top of my head.
11 Q.  Is it more or less than a thousand?
12 A.  It's more than a thousand.
13 Q.  Okay. Who owns the stock of Jefferson-Pilot Life
14     Insurance Company?
15 A.  The holding company, Jefferson-Pilot Financial --
16     Jefferson-Pilot Corporation. The brand name is
17     Jefferson-Pilot Financial.
18 Q.  Okay. Is that a publicly traded company?
19 A.  Yes, it is.
20 Q.  JP Financial is the name of the holding -- the
21     corporate name of the holding company?
22 A.  Jefferson-Pilot Corporation is the legal name. The
23     brand name is Jefferson-Pilot Financial.
24 Q.  Do you have any personal knowledge of the
25     administration of Mr. Jefferies' claim?

Page 11

1          MR. ELLIS: Mr. Who?
2  Q.  Excuse me, Mr. Kearney's claim?
3  A.  I have not reviewed the claim file and I was not
4      involved in the administration of Mr. Kearney's claim.
5  Q.  You haven't reviewed anything about the claim file?
6  A.  No.
7  Q.  You haven't reviewed any of the pleadings in the
8      litigation?
9  A.  I have reviewed the pleadings. I have not reviewed
10     the claim file.
11 Q.  Okay. Who is it that on behalf of the plaintiff
12     responded to the discovery request in the case? Was
13     that you?
14 A.  No.
15 Q.  Do you know who it was that provided the interrogatory
16     responses?
17 A.  I don't know.
18 Q.  It's never been identified, they're not verified.
19     It's not you, though?
20 A.  It's not me.
21 Q.  You have no idea who it might be?
22 A.  No.
23         MR. ROBERTS: Bill, on that Notice of
24     Deposition -- we'll make this Exhibit 1.
25

Page 12

1          (Defendant's Exhibit No. 1 was marked for
2      identification by Mr. Roberts.)
3          MR. ROBERTS: The 30(b)(6) Notice issued to
4      plaintiff's counsel, Mr. Bill Ellis, on April 26
5      requested that Jefferson-Pilot Life Insurance Company
6      make available the person with knowledge -- the person
7      with the greatest knowledge on behalf of the plaintiff
8      of Jefferson-Pilot's Complaint, Affirmative Defenses,
9      Answers to Interrogatories, and Production of
10     Documents in this action. Do you know who that is,
11     Bill?
12         MR. ELLIS: No, I don't.
13         MR. ROBERTS: Any chance that maybe you're
14     going to comply with the Notice and produce that
15     person as opposed to someone who knows nothing about
16     it?
17         MR. ELLIS: I gave you the person that fit
18     the most categories we could find.
19         MR. ROBERTS: No, you know, Counsel, quite
20     well, and the other lawyer who's with you probably
21     does, too, under 30(b)(6) it's not one person. If it
22     takes multiple people to answer the different
23     questions, you produce multiple people.
24         Who is the person you're going to produce
25     under Rule 30(b)(6) pursuant to the Notice that can

Page 13

1      give me the information that I've requested
2      specifically?
3          MR. ELLIS: I don't know.
4          MR. ROBERTS: Let's call the judge. We'll
5      keep this on the record. Do you know how to dial out
6      of here?
7          (Phone call placed by Mr. Roberts)
8          MR. ROBERTS: Barb, it's Mike Roberts.
9          BARBARA: Hi, Mike, just the person I need to
10     talk to.
11         MR. ROBERTS: Really.
12         BARBARA: Yeah, I got some paperwork that
13     needs to be picked up.
14         MR. ROBERTS: On what case?
15         BARBARA: The Jefferies case.
16         MR. ROBERTS: Okay. I'm in North Carolina.
17     I'll get back as soon as I can and come right there to
18     get it unless you want me to send a runner over.
19         BARBARA: Either way is fine with me.
20         MR. ROBERTS: Okay. Now that I've done you
21     that favor, will you do me one?
22         BARBARA: What's up?
23         MR. ROBERTS: I'm on another case with Bill
24     Ellis and we're in a deposition.
25         BARBARA: Uh-huh.

4 (Pages 10 to 13)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

Page 14

1    MR. ROBERTS: And it requires the judge's
2  intervention, I believe.
3    BARBARA: Okay.
4    MR. ROBERTS: Is there any chance that we
5  could interrupt him for a very brief time?
6    BARBARA: He is at the hospital with his wife
7  who's had surgery today.
8    MR. ROBERTS: Oh, okay.
9    BARBARA: So he's not going to be in, Mike,
10  and he's actually not going to be in until Tuesday.
11    MR. ROBERTS: Would Tim Black be able to help
12  me, do you know?
13    BARBARA: I believe he went down to the Sixth
14  Circuit conference.
15    MR. ROBERTS: In Lexington?
16    BARBARA: In Louisville with all the rest of
17  the judges.
18    MR. ROBERTS: Okay, Barbara. Here's the
19  question and you decide.
20    BARBARA: Okay.
21    MR. ROBERTS: I'm teasing.
22    BARBARA: Hey, I've made planned decisions
23  before. I'm not afraid to make them.
24    MR. ROBERTS: Okay. Thank you.
25    BARBARA: All right.

Page 15

1    MR. ROBERTS: Take care.
2    (Phone call concluded)
3    MR. ROBERTS: The defendant has made a trip
4  here, spent six hours on a plane to come here for the
5  purpose of taking the deposition of a person with
6  expressed knowledge in a Notice. The obligation of
7  the plaintiff was to produce that person.
8    The plaintiff not only hasn't produced that
9  person, but won't tell me who the person is and
10  apparently won't produce the person, so we will
11  require that that person be made available in
12  Cincinnati within the next week for the deposition
13  that's been noticed.
14    We'll proceed, see if you have any knowledge
15  on any of the other topics.
16  Q.  Item number 4 of the Notice requires that
17    Jefferson-Pilot produce a person with the most
18    knowledge within its organization or agents, which
19    would include DMS, of DMS's disability claim
20    administration process, including policies and
21    procedures applicable to that process. I assume you
22    don't have any knowledge of that?
23  A.  I have knowledge of the relationship between
24    Jefferson-Pilot and DMS.
25  Q.  Do you have knowledge of the contractual terms of the

Page 16

1    agreement that defines the relationship?
2  A.  Yes.
3  Q.  Okay. Does your knowledge of the relationship go
4    outside that contract?
5  A.  Yes.
6  Q.  Okay. We'll get back to this, but generally what do
7    you know about the relationship that is outside the
8    contract?
9  A.  You'll have to rephrase the question. I'm not sure
10    what you're asking. I am the person at
11    Jefferson-Pilot who has the greatest knowledge of the
12    relationship with DMS.
13  Q.  Okay. There was an agreement entered in December of
14    1999 between DMS and Jefferson-Pilot. You're mindful
15    of that?
16  A.  Yes.
17  Q.  It's a written agreement that sets forth the terms?
18  A.  Yes.
19  Q.  The term of that agreement is one year, correct,
20    unless terminated by notice by either party?
21  A.  Yes.
22  Q.  Okay. That agreement contemplates that it may be
23    amended. Has it ever been amended?
24  A.  I don't know.
25  Q.  Who at Jefferson-Pilot would know?

Page 17

1  A.  No one other than me.
2  Q.  So it may have been amended, you have the most
3    knowledge, but you don't know?
4  A.  I don't know.
5  Q.  Okay. Are there any other written agreements other
6    than that December 1999 agreement between
7    Jefferson-Pilot and Disability Management Services?
8  A.  No.
9  Q.  Okay. Has the compensation term to that agreement
10    ever been modified?
11  A.  No.
12    (Defendant's Exhibit No. 2 was marked for
13    identification by Mr. Roberts.)
14  Q.  Ms. Loftin, I've marked as Exhibit 2 a document
15    entitled Claims Assessment Agreement. Is this the
16    written agreement between JP and DMS that hasn't been
17    produced in the lawsuit?
18  A.  I don't know if it's been produced or not, sir.
19  Q.  Well, it hasn't, but is this the agreement?
20  A.  This is the agreement between DMS and Jefferson-Pilot
21    Life Insurance Company.
22  Q.  All right. This is the agreement you and I just
23    referred to; is that right?
24  A.  Yes.
25  Q.  Okay. Paragraph 1 of the agreement, the first page,

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 18

1    says Assessment Services and the first sentence says,
2    "Subject to the terms and conditions set forth in this
3    Agreement, the Company," which you understand to be
4    Jefferson-Pilot?
5  A. Jefferson-Pilot Life Insurance.
6  Q. Correct -- "hereby retains DMS to assess certain
7    claims (as defined in paragraph A below) and to
8    recommend and take action with respect to the claims
9    as follows."
10        Through this agreement has JP referred
11    certain claims yet not all claims of Jefferson-Pilot
12    Life Insurance Company to DMS for administration?
13  A. At the time that this agreement took effect, some of
14    the claims were not referred to DMS for handling.
15  Q. Okay. You're mindful that prior to the date of this
16    agreement, DMS was performing a service, a claim
17    assessment service for JP on certain claims?
18  A. I was not aware of that.
19  Q. You didn't know that Mr. Kearney's claim was referred
20    to DMS in 1997?
21  A. I saw a letter yesterday when we were meeting with my
22    in-house counsel that reflected some communication
23    with DMS, but I was not aware of prior communications
24    with DMS and JP.
25  Q. Until yesterday?

Page 19

1  A. (Witness nods head)
2  Q. Okay. That letter referred not only Mr. Kearney's
3    claim to DMS but two other individuals' claims,
4    correct?
5  A. I don't remember the contents of the letter.
6  Q. Okay. Let's get back to December of 1999 or January 1
7    of 2000. At that time under the terms of this
8    agreement Jefferson-Pilot referred certain claims to
9    DMS but not all claims that JP had, correct?
10  A. Yes.
11  Q. Okay. What was the dividing line between claims from
12    JP's perspective? Why was it sending some claims to
13    DMS and not others?
14  A. I believe that there was a threshold at the time of
15    monthly benefit.
16  Q. Okay. So DMS was referred those claims that exceeded
17    a certain monetary monthly threshold; is that correct?
18  A. Yes.
19  Q. Okay. And JP kept in-house those claims -- those
20    ongoing claims that didn't exceed a certain monetary
21    monthly threshold?
22  A. We referred those claims to our Concord, New Hampshire
23    disability unit.
24  Q. Is that a company owned by Jefferson-Pilot?
25  A. It is Jefferson-Pilot Financial.

Page 20

1        MR. ELLIS: I'm sorry, when you say those
2    claims, can we clarify on the record what claims.
3        THE WITNESS: The claims that were beneath a
4    certain monthly benefit threshold --
5        MR. ELLIS: Thank you.
6  A. -- were not referred to DMS. They were retained
7    in-house, but they were transferred to our disability
8    staff in Concord, New Hampshire.
9  Q. And we're just talking about disability insurance
10    claims, correct?
11  A. Yes.
12  Q. Okay. Was there a disability claim rep staff within
13    Jefferson-Pilot Life Insurance Company prior to 2000
14    and those folks were terminated?
15  A. There was a disability claims staff prior to the DMS
16    agreement. I don't know what happened to all of the
17    people who were handling disability. Some of them
18    remained employed with Jefferson-Pilot in other
19    capacities.
20  Q. Very well. But there was a body of folks who were
21    performing that claim administration service in-house
22    on disability insurance claims and Jefferson-Pilot
23    made the business decision to no longer employ
24    directly persons in that capacity effective January 1,
25    2000?

Page 21

1  A. No, we continued to employ persons handling individual
2    disability claims. They're employed in our Concord,
3    New Hampshire office and they report to me.
4  Q. Okay. You had those individuals -- did those
5    individuals reside in Greensboro prior to 2000?
6  A. No.
7  Q. Okay. So the disability insurance function of
8    Jefferson-Pilot has always been handled out of New
9    Hampshire?
10  A. No. At one point it was handled -- Jefferson-Pilot
11    Life Insurance was handled in Greensboro.
12    Jefferson-Pilot Financial had a disability operation
13    in Concord, New Hampshire.
14  Q. Okay. So there was a staff of folks at
15    Jefferson-Pilot Life Insurance Company in Greensboro
16    that handled disability insurance claims, but no one
17    performs that service there any longer?
18  A. Yes.
19  Q. That's correct?
20  A. Yes.
21  Q. Was there any other service providers other than the
22    Concord office and DMS that were considered for taking
23    on the administration of these claims?
24  A. I don't know that.
25  Q. Why did the Concord office of Jefferson-Pilot not get

6 (Pages 18 to 21)

Page 22

1  those claims that exceed the certain monetary monthly
2  threshold?
3  A.  At the time that we transferred the files to DMS, it
4  was at the recommendation of our reinsurer, Employers
5  Reinsurance.  They recommended the use of DMS because
6  they had had prior relationships with DMS.
7  Q.  Through other disability insurance companies that they
8  had ownership in or reinsurance arrangements with?
9  A.  Exactly.
10  Q.  Was anyone else considered by Jefferson-Pilot other
11  than DMS to take on that role?
12  A.  Not to my knowledge.
13  Q.  Did Jefferson-Pilot conduct any due diligence about
14  the services that DMS would be offering?
15  A.  I know that they obtained references from our
16  reinsurers who had prior -- and this is what I know
17  not because I was involved but from basically talking
18  to people who were involved at the time and who are no
19  longer with Jefferson-Pilot.
20  Q.  Okay.  Do you know who at first request on the Notice
21  of Deposition is the person to produce the person with
22  the financial -- with the best knowledge of the
23  financial and other terms of JP's relationship with
24  DMS, do you know who would be most mindful inside
25  Jefferson-Pilot about why DMS was selected back in

Page 23

1  '99?
2  A.  That would be me.
3  Q.  But you weren't directly involved in that?
4  A.  But I have become aware since taking over as Vice
5  President of Claims, because we have a continuing
6  relationship with DMS.
7  Q.  Okay.  Well, who at Jefferson-Pilot would have
8  firsthand personal knowledge of those events?
9  A.  No one that I know of.
10  Q.  Who signed the agreement on behalf of Jefferson-Pilot?
11  A.  Do you have a signed copy?
12  Q.  Do you know?
13  A.  I can't remember who signed the agreement on behalf of
14  Jefferson-Pilot.
15  Q.  Would there be a signed copy somewhere inside
16  Jefferson-Pilot?
17  A.  Where did this one come from?
18  Q.  Would there be a signed copy somewhere inside
19  Jefferson-Pilot?
20  A.  I don't know.
21  Q.  Okay.  Does the President of Jefferson-Pilot Life
22  Insurance Company execute agreements such as these?
23  A.  No.
24  Q.  Who would have executed agreements such as this one at
25  that time?

Page 24

1  A.  At that time I don't know who executed this agreement,
2  but it would have made sense for it to have been
3  executed by the Vice President of Claims at the time,
4  but I don't know that he actually is the one that
5  signed the agreement.
6  Q.  Do you know the name of the person who served in that
7  capacity at that time?
8  A.  That would be Clyde Honaker.
9  Q.  Is he still employed by the company?
10  A.  No.
11  Q.  Did he retire or take on a new job somewhere else?
12  A.  He's taken on a new job.
13  Q.  Not within the Jefferson-Pilot umbrella?
14  A.  No.
15  Q.  Do you know who he works for now?
16  A.  No.
17  Q.  Do you know when he left?
18  A.  June of 2002.
19  Q.  Do you know what state he lives in?
20  A.  Kentucky.
21  Q.  Do you know what city he lives in?
22  A.  Lexington.
23  Q.  Is he still in the insurance industry?
24  A.  I believe so, yes.
25  Q.  Do you know for what company?

Page 25

1  A.  No.
2  Q.  Is it disability insurance?
3  A.  I don't know.
4  Q.  Okay.  Who was it that decided what the monetary
5  threshold would be?
6  A.  I don't know.
7  Q.  What was the monetary threshold in December '99,
8  January 2000?
9  A.  I believe the threshold was benefits under $2,000.
10  Q.  Per month?
11  A.  Per month.
12  Q.  And those that exceeded $2,000 per month went to DMS
13  for administration?
14  A.  Yes.
15  Q.  What's the business reason for that?
16  A.  The business reason is reinsurance.
17  Q.  I don't understand.
18  A.  The disability claims are reinsured on a pro rata
19  basis, which means that the reinsurer and the primary
20  insurer share claims handling expenses.  On the
21  smaller claims there would not necessarily have been
22  that reinsurance in place, and therefore
23  Jefferson-Pilot would have picked up 100 percent of
24  the cost of outsourcing the handling of those claims.
25  On the reinsured claims we would have shared

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney            C-1-02-479
Valerie Loftin                                                          5/6/2004

Page 26

1    the cost with ERC on a pro rata basis, and that made
2    sense from a business standpoint.
3    Q.  So Employers Reinsurance didn't have any liability for
4        those claims that did not exceed $2,000 a month?
5    A.  I'm not -- I can't say.  I know that was the
6        threshold.  I do not know what their liability might
7        have been on those particular claims.
8    Q.  You don't know what the threshold is for their
9        liability when their responsibility kicks in?
10   A.  It varies from claim to claim.
11   Q.  Based on what?
12   A.  Based on the treaty that would have been in force at
13       the time the policy was issued, based on the block of
14       business that the policy was sold in.
15   Q.  So do I understand your testimony to be that DMS was a
16       company that was suggested by Employers Reinsurance
17       because they shared in the liability of those larger
18       claims?
19   A.  Yes.
20           MR. ELLIS:  I'm sorry, who is they?
21           MR. ROBERTS:  She understood the question.
22           THE WITNESS:  Employers Reinsurance would
23   share in the liability of the claims.
24           MR. ELLIS:  Thank you.
25           MR. ROBERTS:  I'll take your deposition

Page 27

1    later.
2            MR. ELLIS:  Whatever.
3    Q.  Are there any other reinsurers on the block of
4        business other than Employers Reinsurance?
5    A.  Not on the Jefferson-Pilot Life block, no.
6    Q.  Has there been any change or shift in policies that --
7        or claims that are referred to DMS, meaning are they
8        now getting more claims than just those that exceed
9        $2,000 a month in liability?
10   A.  Yes.
11   Q.  Okay.  Do they get all the claims at this point?
12   A.  They get all of the claims that are reinsured through
13       ERC.
14   Q.  That was at the direction of Employers Reinsurance?
15   A.  It was at my direction and with agreement from
16       Employers Reinsurance.
17   Q.  Is that in writing?
18   A.  No.
19   Q.  Have you received any letters, notes, e-mails from
20       your contact at Employers Reinsurance about DMS and
21       their work?
22   A.  From Employers Reinsurance?
23   Q.  Uh-huh.
24   A.  No.
25   Q.  All of your communications between you and Employers

Page 28

1    Reinsurance reps who you interact with concerning DMS
2    are verbal?
3    A.  I believe so, yes.
4    Q.  Who are your contacts at Employers Reinsurance?
5    A.  The general counsel is a gentleman named Bill Dempsey.
6    Q.  Okay.  Is that it?  He's the only person you interact
7        with?
8    A.  Uh-huh.
9    Q.  How long have you been interacting with Mr. Dempsey?
10   A.  Since I became Vice President of Claims in 2002.
11   Q.  Prior to your talking on that role in 2002, you had no
12       interaction with him at all?
13   A.  No, I did not.
14   Q.  And in your two years with him, you have never
15       exchanged any written document of any sort, including
16       e-mails?
17   A.  About the handling of a claim?
18   Q.  Relating to DMS.
19   A.  No.
20   Q.  I asked you a negative question, you gave me a
21       negative response.  As a lawyer, you know what that
22       looks like.
23   A.  I have not e-mailed Bill Dempsey regarding the DMS
24       relationship, to my knowledge.  I have had telephone
25       conversations with him and I have exchanged e-mails

Page 29

1    with Bill Dempsey related to non-DMS matters.
2    Q.  Do you have any notes of your verbal conversations
3        with him regarding DMS?
4    A.  No.
5    Q.  Okay.  So in your two years the Jefferson-Pilot claims
6        that you oversee have been administered by DMS, the
7        direction of ERC, the person you have contact with,
8        you never had any e-mail communication to him or from
9        him or any other type of written communication that
10       regards DMS?
11   A.  I don't remember.
12   Q.  How would one go about learning whether that happened
13       or not?
14   A.  I don't know.
15   Q.  Do you maintain files of your correspondence with Bill
16       Dempsey?
17   A.  I don't recall any correspondence with Bill Dempsey
18       regarding DMS.
19   Q.  Isn't there some written agreement between you and
20       Employers Reinsurance that refers the balance of the
21       claims that they reinsure to DMS?
22   A.  I'm sorry, I don't understand the question.
23   Q.  I thought you had told me that there was some
24       arrangement you entered into to transfer all claim
25       administration for those claims that are reinsured by

8 (Pages 26 to 29)

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889            Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Valerie Loftin

C-1-02-479
5/6/2004

Page 30

1    Employers Reinsurance to DMS.
2    A.  I believe Bill and I handled that verbally.
3    Q.  Okay.  There's no letter or e-mail that relates to
4        that transaction?
5    A.  I don't remember.
6    Q.  Do you have any files in your office concerning Bill
7        Dempsey?
8    A.  Concerning Bill Dempsey?
9    Q.  Any files in your office relate to or refer to Bill
10       Dempsey.
11   A.  Not specifically to Bill Dempsey, no.
12   Q.  Okay.  Do you have any files in your office that refer
13       to or relate to DMS?
14   A.  Yes.
15   Q.  What do you have in your office?
16   A.  Copy of the Claims Assessment Agreement.
17   Q.  Anything else?
18   A.  I may have some old reports of claim status.
19   Q.  Section 1-E of the agreement says that DMS is required
20       to give Jefferson-Pilot quarterly claim inventory
21       reports.  Are you the person that receives those from
22       DMS?
23   A.  I did receive some of them, but I don't have all of
24       them in my files.  I do have some of them in my files.
25   Q.  You could produce the ones that you maintain in your

Page 31

1    files?
2    A.  Yes.
3    Q.  Okay.  During what period of time do you have those
4        quarterly reports?
5    A.  I don't remember.
6    Q.  Those quarterly reports cover what period of time?
7    A.  I don't remember.
8    Q.  The time period before you took on this role of Vice
9        President of Claims or the time period since?
10   A.  Some of them probably cover the time period before I
11       took over as Vice President of Claims.
12   Q.  Do you have all of them that have been provided to
13       Jefferson-Pilot by DMS since you have taken on that
14       role?
15   A.  I don't know the answer to that, no.
16   Q.  Do you have some of them?  Do you have any of them?
17   A.  I have some of them.
18   Q.  Are those quarterly reports provided to Employers
19       Reinsurance, as far as you know?
20   A.  I don't know.
21   Q.  Can you take a look at the agreement which is 1-A -- I
22       mean, it's in paragraph 1-A of the agreement.  It's
23       Exhibit 2.  It suggests in that paragraph that the
24       claims that DMS is taking on administration of are
25       those that fall under a policy -- a certain policy

Page 32

1    series or forms of disability insurance which need
2    review for claim eligibility or which are in claim
3    payment status.  What does a person in your industry
4    mean when they refer to policy series or forms of
5    disability insurance?
6          MR. ELLIS:  I'm sorry, I don't see where
7        you're reading.
8          MR. ROBERTS:  The first line of 1-A, "'Claim
9        or claims' means claims arising out of the policy
10       series or forms of disability income insurance
11       policies," right there in the first line.  Do you see
12       it now, Counsel?
13         MR. ELLIS:  Thank you.
14         MR. ROBERTS:  All right.
15   A.  It would just mean the policy forms.
16   Q.  What does policy series or forms mean, or is there a
17       distinction between a policy series and a policy form?
18   A.  I don't know what they mean by that.
19   Q.  Are there different types of disability insurance
20       policies that Jefferson-Pilot has historically offered
21       to potential policyholders?
22   A.  Yes.
23   Q.  Do you have any idea how many different disability
24       insurance policies may have been issued at any time?
25   A.  No.

Page 33

1    Q.  Are there dozens or are we talking less or more?
2    A.  Probably more.
3    Q.  More than dozens?
4    A.  Uh-huh.
5    Q.  And when a policy is issued, is it ever revised?  Are
6        any of the riders ever revised?
7    A.  They can be.
8    Q.  Okay.  Have you educated yourself on the different
9        disability insurance policies that have been issued
10       historically by Jefferson-Pilot and the different
11       forms of the riders?
12   A.  No, I have not.
13   Q.  To any degree you have not gone to the effort of
14       educating yourself on the different --
15   A.  Have I reviewed some of our disability policy forms?
16       If that's the question, yes, I have.  Do I know
17       everything that we have issued in the last hundred
18       years we've been in business?  No.
19   Q.  No, I presume that you have reviewed ad hoc whatever
20       policies or forms come to your attention for certain
21       reasons.
22   A.  Yes.
23   Q.  That's not what I'm talking about.
24   A.  Okay.
25   Q.  Have you affirmatively gone out and tried to educate

9 (Pages 30 to 33)

**Jefferson-Pilot Insurance Company vs. Christopher L. Kearney**
**Valerie Loftin**

C-1-02-479
5/6/2004

Page 34

1    yourself personally on the different forms that exist
2    and different policies that exist?
3    A.  Specific to the Jefferson-Pilot policies?
4    Q.  Uh-huh.
5    A.  I have not sat down and reviewed prior Jefferson-Pilot
6    policies for the purpose of learning the language of
7    every policy we have ever written.  We do address it
8    on a case-by-case basis.
9    Q.  Okay.  In your experience with Jefferson-Pilot, has
10   there been an occasion when the company,
11   Jefferson-Pilot the company, or DMS has determined
12   that language of any specific policy or rider could be
13   improved?
14   A.  I'm not following you.  Or DMS?
15   Q.  I'll break it into two questions.  Are you mindful of
16   any occasion during your period with Jefferson-Pilot
17   where the company has concluded that they could refine
18   the language in a policy or form to better identify
19   what the benefits are?
20   A.  No, because this has been a closed block of business
21   for several years.
22   Q.  Okay.  So during your tenure the situation has never
23   arisen where someone has raised your attention about
24   the benefit to revising language in a policy or rider?
25   A.  No, they have not.  We are no longer selling

Page 35

1    disability policies.
2    Q.  When did Jefferson-Pilot get out of the business of
3    selling disability insurance income policies?
4    A.  I don't remember, because the dates are different on
5    different blocks of business.  As I told you, we sell
6    insurance through multiple life insurance companies
7    and the dates may be different between Jefferson Pilot
8    Life and Jefferson-Pilot Financial.
9    Q.  Do you know if it was -- when Mr. Kearney bought his
10   policies in '90 and '91, do you know whether -- did
11   Jefferson-Pilot Life Insurance Company get out of the
12   business prior to this Claims Assessment Agreement
13   with DMS?
14   A.  I believe they did.
15   Q.  Okay.  Based on your review of the quarterly reports
16   you receive from DMS, do you know how many different
17   claims DMS administers on behalf of Jefferson-Pilot
18   Life Insurance Company?
19   A.  I know at the time that the agreement was first
20   entered, they received anywhere from 500 to 600
21   claims.
22   Q.  Active claims where people were seeking payment?
23   A.  Yes.
24   Q.  And since that time some folks that believe they have
25   become disabled, they have a policy and they've

Page 36

1    presented claims as well?
2    A.  Yes.
3    Q.  And those claims go immediately to DMS for processing?
4    A.  If they are reinsured through ERC.
5    Q.  Do you know today or what is the most recent report
6    you've had about the number of claims DMS is handling
7    on behalf of Jefferson-Pilot Life Insurance Company?
8    A.  Approximately 300.
9    Q.  Okay.  So the number has dropped by 50 percent or
10   thereabouts?
11   A.  Yes.
12   Q.  Okay.  Those have dropped both because people have
13   either died or are no longer disabled or claims have
14   been settled or resolved?
15   A.  Yes.
16   Q.  Okay.  Do you get reports on the number of claims that
17   are settled or resolved?
18   A.  The reports that I was receiving at one time included
19   the status of all claims and it would indicate whether
20   the person had returned to work or had died or the
21   case had settled.
22   Q.  Did those reports also show how many lawsuits have
23   been filed and how many lawsuits have been settled?
24   A.  No.
25   Q.  No?

Page 37

1    A.  No.
2    Q.  Okay.  In your communications with Mr. Dempsey about
3    the benefits and attributes of DMS, he shared with you
4    that their business philosophy is to settle and
5    resolve claims?
6    A.  I'm sorry, I didn't say that.
7    Q.  Correct, it was a cross-examination question.
8    A.  Okay.  He shared with me that DMS had a great deal of
9    experience in the handling of disability cases and
10   that they had provided a high quality of service to
11   their other primary insurance carriers.
12   Q.  And he advised you of their philosophy and manner of
13   settling and resolving claims?
14   A.  No.
15   Q.  He's never mentioned that to you?
16   A.  No.
17   Q.  Have you heard that from anybody other than me?
18   A.  Have I heard what from anybody?
19   Q.  That DMS's business philosophy is to settle and
20   resolve disability insurance claims.
21   A.  No.
22   Q.  Okay.  DMS doesn't get a claim file from
23   Jefferson-Pilot until an actual claim is made; you
24   didn't just send them all the files you have and all
25   the policies of the different policyholders, did you?

10 (Pages 34 to 37)

Page 38

1   A. Right, yes. That was a negative question. We send
2      them only claims.
3   Q. What is the reporting that's required from DMS about
4      their strategy -- do they report what their intended
5      strategy is on a particular claim, new claim, old
6      claim, to Jefferson-Pilot?
7   A. The only time that they would discuss their handling
8      of a JP claim would be if they required authorization
9      for settlement.
10  Q. Okay. So once you send them the claim, other than
11     getting the quarterly reports, DMS doesn't interact
12     with Jefferson-Pilot about what their intentions are
13     about administering the claim until some settlement
14     that might exceed $75,000?
15  A. We do periodic audits of the claim -- Jefferson-Pilot
16     goes to DMS. I have gone to DMS and while I have not
17     personally reviewed the files, my staff have reviewed
18     files.
19  Q. Okay.
20  A. So in terms of interaction, there is more interaction
21     just than settlement approval.
22  Q. Okay. That's what I'm trying to nail down. But when
23     DMS receives a claim, let's assume they develop
24     internally some strategy about how they're going to go
25     about dealing with the claim. That's not something

Page 39

1      they necessarily share with Jefferson-Pilot; they just
2      go do it, and unless you go to their office and audit
3      a claim file or unless they come with you with request
4      for settlement authority of -- what's the minimum,
5      75,000?
6   A. Yes.
7   Q. It is?
8   A. Yes, I believe so.
9   Q. Okay. So other than those two situations and the
10     third situation of information that may be contained
11     about a claim on a quarterly report, there is no
12     direction that DMS has to provide information to
13     Jefferson-Pilot about respective claims?
14  A. That's correct.
15  Q. Okay. How frequently do these audits take place?
16  A. We are trying to do them once a quarter.
17  Q. Since your tenure started in 2002 as VP of Claims, how
18     many have there been?
19  A. We have had two, I believe.
20  Q. Who at Jefferson-Pilot has undertaken the effort to do
21     the audits?
22  A. My disability manager and some of her staff.
23  Q. Who's your disability manager?
24  A. Cynthia Croft.
25  Q. Has it been the same person from her staff that's gone

Page 40

1      with her both times?
2   A. Norm Carrier.
3   Q. I'm sorry?
4   A. Norm Carrier is the disability examiner.
5   Q. Croft is C-R-O-F-T?
6   A. Uh-huh.
7   Q. Carrier is C-A-R-R-I-E-R?
8   A. Uh-huh.
9   Q. How many depositions have you given?
10  A. In my life?
11  Q. Uh-huh.
12  A. I don't know.
13  Q. Dozens?
14  A. Probably less than a dozen.
15  Q. Okay. Do you keep copies of all your deposition
16     transcripts?
17  A. No.
18  Q. Any of them?
19  A. No.
20  Q. Are they kept, as far as you know, in the general
21     counsel's office?
22  A. Not to my knowledge.
23  Q. Paragraph 1-C of the agreement says, "DMS will retain
24     third-party and affiliated investigators (including
25     but not limited to medical, physical therapy, and

Page 41

1      psychiatric personnel) at the company's expense to
2      conduct or have conducted such further investigation
3      regarding each claim as is appropriate within the
4      parameters, if any, specified by the company."
5          Has the company ever given DMS any parameters
6      on their administration of a claim?
7   A. Within the scope of who they should refer -- who they
8      should use as a third-party vendor?
9   Q. If that's what that paragraph refers to. I suspect
10     you haven't done that, so I went ahead and asked the
11     question have there ever been any parameters placed on
12     anything that DMS does on behalf of Jeff Pilot?
13  A. Yes.
14  Q. Okay. What?
15  A. That they are supposed to make accurate liability
16     determinations on our claim files.
17  Q. Okay. Is that expressed anywhere other than in the
18     agreement?
19  A. In any verbal conversation I have with DMS.
20  Q. Okay. There's an agreement that exists that we're
21     working our way through here.
22  A. Uh-huh.
23  Q. Are there any other documents that exist going from
24     Jefferson-Pilot to DMS saying, we want you to
25     administer claims in the following fashion, or we want

11 (Pages 38 to 41)

Page 42

1  you to undertake to do this with the claims you handle
2  for us?
3  A.  No.
4  Q.  Their direction that you give them is contained in
5  this agreement and that's it; is that right?
6  A.  Except for conversations that I have with DMS when
7  I've had one-on-one sessions with them.
8  Q.  Okay.  Those are just ad hoc conversations where you
9  give them your input about a respective claim?
10  A.  Yes.
11  Q.  Okay.  You've never given them any other wholesale
12  instruction about how to handle blocks of claims,
13  groups of claims --
14  A.  No.
15  Q.  -- subjective disability claims versus objective
16  disability claims, potential psychiatric claims
17  versus -- you've never given them any other general
18  instruction?
19  A.  On how to handle a disability claim?
20  Q.  Yeah, right.
21  A.  No.
22  Q.  Okay.  So this reference in 1-C referring to
23  potentially being some parameters put on DMS that
24  aren't contained in the agreement, that doesn't refer
25  to anything other than potential ad hoc parameters on

Page 43

1  a particular claim subject to discussion at a given
2  time?
3  A.  Yes.
4  Q.  In section 1-E there's a reference to an attached
5  Exhibit B which isn't on this particular copy of the
6  agreement, that Exhibit B is supposed to be a monthly
7  progress form.  Have you ever seen a sample or a
8  completed copy of that form?
9  A.  That would be the forms that I was referring to you
10  earlier that were some sort of -- I thought they were
11  quarterly.  They may have been monthly.
12  Q.  There's two different documents.  There is a potential
13  Exhibit B -- well, there's a contemplated Exhibit B
14  attached, but then additionally the next sentence of
15  1-E says, "DMS will also provide the company with
16  quarterly claim inventory reports."
17  A.  The quarterly claim inventory reports are the ones
18  that I've seen, but I don't have all of them.
19  Q.  But you don't know what's referenced there as
20  Exhibit B, the monthly reports of progress on claims?
21  A.  No.
22  Q.  Have you ever seen the sample that's indicated to have
23  been attached as an exhibit to this particular
24  agreement?
25  A.  Not that I remember.

Page 44

1  Q.  Does DMS manage litigation for Jefferson-Pilot as
2  well?
3  A.  Litigation against Jefferson-Pilot?
4  Q.  Right, like this particular lawsuit, is it being
5  managed by DMS personnel or is it being managed by
6  your general counsel office?
7  A.  It's being managed by our general counsel office.
8  Q.  Any of the lawyers employed by DMS, are they engaged
9  at all in handling this particular litigation?
10  A.  They would be engaged on behalf of DMS.
11  Q.  Because they're a party to the litigation?
12  A.  Yes.
13  Q.  Okay.  But Jefferson-Pilot hasn't engaged them or
14  sought their advice or counsel?
15  A.  Not that I'm aware of.
16  Q.  So since DMS was added as a third party after
17  Jefferson-Pilot filed the lawsuit, it's your
18  understanding that DMS legal staff was not engaged,
19  retained, or counseled by Jefferson-Pilot prior to Mr.
20  Kearney's suit against DMS?
21  A.  I don't know.
22  Q.  You don't know whether they were or not?
23  A.  I don't know.
24  Q.  Where are you speaking next week?
25  A.  I'm sorry?

Page 45

1  Q.  Do you have a speaking engagement next week?
2  A.  Yes.
3  Q.  Where is that?
4  A.  Atlanta.
5  Q.  What is it?
6  A.  In addition to my other responsibilities, I'm the risk
7  manager for Jefferson-Pilot, which means I buy all the
8  property and casualty insurance, and I'm speaking to a
9  group of radio and television individuals about
10  pitfalls to the communications industry on the
11  property and casualty side.
12  Q.  What day is your speech?
13  A.  The 19th.
14  Q.  When are you traveling to Atlanta for that?
15  A.  That's up in the air right now.  We're trying to
16  figure out when I'm on the agenda.
17  Q.  Are you going to be in town here on the 10th on
18  Monday?  Are you going to be in your Greensboro office
19  on the 10th?
20  A.  I don't have my calendar in front of me.  No, I'm not.
21  I have a meeting with our brokers on our insurance
22  renewal, on our property and casualty insurance
23  renewals most of that day.
24  Q.  Where is that meeting?
25  A.  Winston-Salem.

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney         C-1-02-479
Valerie Loftin                                                        5/6/2004

Page 46

1   Q.  Section 2-A on the bottom of page 2, the last
2       paragraph of page 2 -- and actually there's four
3       subsets to that paragraph and Roman numeral iv
4       suggests that the company, meaning Jefferson-Pilot,
5       shall promptly forward or cause to be forwarded to
6       Disability Management Services policy coverage
7       information related to each claim. What does that
8       mean?
9   A.  I would assume that it means that a copy of the policy
10      would be included in the claim file that we send to
11      them.
12  Q.  So either in '97 when DMS got Mr. Kearney's file or in
13      December '99 when they got his continued
14      responsibility through this agreement, DMS would have
15      been given -- through mandatory provision the company
16      shall promptly forward -- they would have been given
17      from Jefferson-Pilot Jefferson-Pilot's policy coverage
18      information?
19          MR. ELLIS: Objection, misstates facts.
20  Q.  Is that right?
21  A.  I don't know about what happened in 1997.
22  Q.  Okay.
23  A.  Okay? I know that in 1999 we would have transferred
24      whatever was in the claim file. I don't know if the
25      policy information was in this particular file when it

Page 47

1       was transferred to DMS.
2   Q.  Mr. Kearney's policy is designated as the WJ576A
3       policy. Is that nomenclature that you're familiar
4       with?
5   A.  No.
6   Q.  You've never heard of --
7   A.  WJ67--
8   Q.  WJ576A.
9   A.  No.
10  Q.  You don't refer to policies in that manner?
11  A.  No.
12  Q.  How do you refer to the different versions and
13      iterations of disability insurance policies that have
14      historically been issued by Jefferson-Pilot?
15  A.  I don't really refer to them by any name. I look at
16      the copy of the policy that happens to be applicable
17      to the individual claim.
18  Q.  Okay. Do you know anything about the drafting of
19      policies?
20  A.  Yes, I know something about the drafting of policies.
21  Q.  Okay. Can you educate me on how a policy comes to be
22      drafted and then blessed by a company for sale to the
23      public.
24  A.  A disability policy?
25  Q.  Uh-huh.

Page 48

1   A.  I have a general knowledge of --
2   Q.  Okay.
3   A.  -- the approval process for insurance policies in
4       general, including life, annuity, disability, Workers'
5       Comp.
6   Q.  Okay.
7   A.  Whatever.
8   Q.  Could you share --
9   A.  And the policies generally have to be approved by the
10      State Insurance Department.
11  Q.  Okay.
12  A.  The language has to be -- not in all states but in
13      some states.
14  Q.  But isn't there some kind of internal creation process
15      and blessing that occurs before an insurance
16      company --
17  A.  Yes.
18  Q.  -- sends a prospective policy to an Insurance
19      Department for --
20  A.  Yes.
21  Q.  Okay. Tell me what happens internally.
22  A.  Internally there would be input from a variety of
23      departments -- Actuarial, Legal, Marketing, our
24      Customer Service Unit who would be administering the
25      policy. Claims would have some interaction. It would

Page 49

1       be a joint effort. It would be not just one person --
2   Q.  Okay.
3   A.  -- who was responsible for doing the drafting.
4   Q.  Does the same apply to riders that might prospectively
5       go with policies?
6   A.  Yes.
7   Q.  Okay. And we touched on this earlier, but based on
8       your knowledge of policies and riders that you've
9       seen, was there ever an occasion for Jefferson-Pilot
10      to revise any policies that were sold or riders that
11      were sold in later iterations of those policies or
12      riders?
13  A.  I don't know, not to my knowledge, again, because we
14      haven't written disability policies in a number of
15      years.
16  Q.  And the role of the Legal Department in that creation
17      of a policy is to make sure that it complies with
18      regulatory provisions of state laws and such?
19  A.  State, Federal, yes, they're looking at regulatory
20      issues.
21  Q.  And the Legal Department would also be on the watch
22      for any ambiguities that might exist in the way
23      benefits or other provisions have been defined,
24      correct?
25  A.  I don't know what they look at. I have never been

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Page 50

1    involved in the product filing legal review side of
2    the house. My regulatory issues were with mergers and
3    acquisitions and getting approval for those, not for
4    products.
5  Q.  You're mindful, though, of the commonly understood
6    construction, rule of construction of insurance
7    policies, aren't you, regarding ambiguities, question
8    mark, A colon?
9  A.  Question mark -- tell me what I'm mindful of. What
10    are you asking?
11  Q.  You are mindful of the commonly known rule of contract
12    construction as it relates to insurance policies, are
13    you not, question mark, capital A, colon?
14  A.  Tell me what the -- what it is you're asking.
15  Q.  That was a question. Do you not understand that
16    question?
17  A.  No.
18  Q.  Okay. Do you know what the law is about the rule of
19    construction regarding ambiguities in insurance
20    policies?
21  A.  I know the law varies from state to state.
22  Q.  Okay. Is that something you know because you went to
23    the University of North Carolina?
24  A.  And I also practiced law in Maryland.
25  Q.  Okay. Is that something that's commonly known within

Page 51

1    the insurance industry?
2  A.  That the law may vary from state to state? Yes.
3  Q.  No, that ambiguities are interpreted against the
4    drafter?
5  A.  It depends on the state.
6  Q.  Are there states where --
7  A.  It depends on --
8  Q.  -- ambiguities are not construed against the insurance
9    company?
10  A.  I don't know the answer to that.
11  Q.  All the states that you're mindful of, the ambiguities
12    are construed against the drafter?
13  A.  I don't know that.
14  Q.  Okay. And in creating a policy or a rider or a
15    revised rider, you don't have any judgment about
16    whether insurance companies try to avoid ambiguity?
17  A.  My judgment would be that insurance companies try to
18    avoid ambiguity.
19  Q.  Are there any documents internal at Jefferson-Pilot
20    that explain policies and benefit provisions in a
21    particular policy? Is there any playbook about what
22    the different policies contain?
23  A.  No.
24  Q.  So everybody, both internal at Jefferson-Pilot and
25    external, to understand what the policy means, they

Page 52

1    just need to read the contract?
2  A.  Again, we have life, disability, annuity, we have
3    group products, at one point we had property and
4    casualty products. There is no single manual that
5    will explain the language of every policy that has
6    ever been sold by the corporation.
7  Q.  Are there any independent documents that explain
8    independent policies? The policy that was sold by
9    your company to Mr. Kearney was created internally.
10    Are there any documents that discuss the creation of
11    that document, how it came to be?
12  A.  I don't know.
13  Q.  Any prior drafts of the policy, any comments from
14    people in the Legal, the Accounting, and all the other
15    areas that you mentioned that would chime in on the
16    creation of a policy?
17  A.  I don't know.
18  Q.  Who would I talk to to understand whether that exists
19    or not?
20  A.  I don't know.
21  Q.  Who would you talk to if you wanted to find that out?
22  A.  These policies are dating back to the early '90s. I
23    don't know who would have been involved in the
24    drafting of these policies.
25  Q.  In which area or division of the company would that

Page 53

1    information reside? What would be your guess?
2  A.  I don't know.
3  Q.  Are you mindful that the residual disability rider to
4    Mr. Kearney's policy was revised in 1992?
5  A.  I wasn't aware of that, no.
6  Q.  You've never had discussion with anybody involved in
7    this litigation about the fact that the residual
8    disability rider was revised the year after Mr.
9    Kearney purchased his policy?
10  A.  No, I have not.
11        (Defendant's Exhibit No. 3 was marked for
12    identification by Mr. Roberts.)
13        MR. ROBERTS: Since we're talking about it,
14    the policy will be Exhibit 3. Exhibit 4 will be a
15    three-page document that is a one-page residual
16    disability rider, a one-page Social Security
17    Supplement rider, and a one-page additional increase
18    in benefits rider.
19        (Defendant's Exhibits No. 4 and 5 were marked
20    for identification by Mr. Roberts.)
21  Q.  I've handed you Exhibit 3, which is the policy;
22    Exhibit 4, which is a three-page compilation of three
23    riders that Mr. Kearney purchased, I'll represent,
24    that go with his policy; and Exhibit 5, which is
25    another form of the residual disability rider.

14 (Pages 50 to 53)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Valerie Loftin

C-1-02-479
5/6/2004

Page 54

1        If you'd take a look at Exhibit 5, this
2    refers at the bottom left-hand corner to WJ2244. Is
3    that another policy number, do you know?
4    A. I don't know.
5    Q. It says Revised September of 1992, do you see that?
6    A. Yes.
7    Q. Do you know if the residual disability riders that
8       Jefferson-Pilot Life Insurance Company was selling
9       were revised in the fall of 1992?
10   A. I don't have personal knowledge of that, no.
11   Q. How would I find that out?
12   A. I don't know.
13   Q. Okay. Can you turn to the second page of Exhibit 5.
14      Do you understand in the litigation it's been
15      contended by Mr. Kearney that he's not obligated to
16      pay premiums while he's on residual disability? Do
17      you understand that?
18   A. I reviewed the pleadings and I saw the allegation in
19      the pleadings.
20   Q. Okay. You understand that's an assertion he's made?
21   A. I understand, excuse me, what?
22   Q. That Mr. Kearney has asserted that the policy does not
23      obligate him to pay premiums while he's on residual
24      disability?
25   A. That was what I saw in the pleadings, yes.

Page 55

1    Q. Okay. On this revision September 1992 of the
2       Jefferson-Pilot residual disability rider, the first
3       paragraph on the second page says Waiver of Premium.
4       "If you become eligible for a residual disability
5       benefit for a continuous period of at least three
6       months, or immediately following a period of total
7       disability during which premiums have been waived, we
8       will waive premiums that come during the disability,
9       and (2) refund any payments made for premiums due
10      during the disability period."
11         Do you understand -- I read that and that's a
12      much more concrete and express way of saying that the
13      premiums during residual disability, payment of them
14      are waived --
15         MR. ELLIS: Objection.
16   Q. -- right?
17         MR. ELLIS: Objection to the relevance. This
18      is not a part of the policy sold to Mr. Kearney.
19   Q. He's wrong on the relevance, but go ahead.
20   A. I'd have to say that the policy speaks for itself.
21   Q. Okay. How would I understand why it was that
22      Jefferson-Pilot revised the residual disability rider
23      in September 1992?
24   A. I don't know.
25   Q. Is there any repository of information at the company

Page 56

1    that would give somebody a place to start to
2    understand why it is they thought it was essential to
3    revise this particular rider in 1992?
4    A. I don't know.
5    Q. You would agree that the policy speaks for itself on
6       the termination provision here where it says in the
7       second column, "This rider will terminate on the
8       premium due date next following your 65th birthday"?
9    A. I would agree that the policy speaks for itself.
10   Q. Right. It expressly doesn't allow lifetime residual
11      disability benefits, correct?
12   A. I would agree that the policy speaks for itself.
13   Q. That the policy speaks for itself, okay. Who was it
14      that was in charge of clarifying ambiguities in riders
15      back in 1992?
16         MR. ELLIS: Objection.
17   A. I don't know.
18   Q. Okay. How can I find out who had that role?
19         MR. ELLIS: Same objection.
20   A. I don't know.
21   Q. Are you ready?
22   A. (Witness nods head)
23   Q. Okay. Back in the Claims Assessment Agreement we were
24      talking about paragraph 2-A Roman numeral iv and it's
25      required that the company give DMS policy coverage

Page 57

1    information, and your testimony is that only means the
2    policy?
3    A. My testimony is, I believe that that means that we
4       would transfer a copy of the policy if it was part of
5       the claim file when we transferred the files to DMS.
6    Q. Why doesn't it just say policy then? Why does it say
7       policy coverage information?
8    A. I don't know.
9    Q. Can I direct your attention to another -- do you need
10      to get ahold of something in your purse there?
11   A. I was looking for my glasses, but never mind.
12   Q. Go ahead, take your time.
13   A. No, I can't find them.
14   Q. I thought I saw a little arm of a glass sticking out
15      of there.
16   A. Those were sunglasses. They won't help.
17   Q. Section 4-C of the agreement, section 4 is titled
18      Consideration, which means money, right? I mean, that
19      describes how much money DMS is going to be paid,
20      right?
21   A. Consideration, yes.
22   Q. Okay. In the Consideration section, subsection C
23      says, "The parties agree that they will every twelve
24      months during the term of this agreement commencing
25      December 31, 2000, negotiate in good faith the amount

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889          Fax (704) 372-4593

Page 58

1    of any adjustment to the fixed monthly fee" -- the
2    fixed monthly fee is 43,700, right?
3    A.  (Witness nods head)
4    Q.  You need to answer audibly.
5    A.  The fixed monthly fee is 43,700.
6    Q.  Okay -- "negotiate in good faith the amount of any
7    adjustment to the fixed monthly fee to be paid to DMS
8    hereunder based on DMS's performance in thoroughly,
9    diligently, and fairly evaluating claims and on its
10    performance in supporting the Company's administration
11    of the claims and underlying policies during the
12    preceding twelve months."
13    Didn't you think that when you entered the
14    agreement you were going to get top-notch,
15    best-in-the-business performance through thorough and
16    diligent and fair evaluation of claims?
17    MR. ELLIS: Objection. Go ahead.
18    A.  I didn't enter the agreement.
19    Q.  Okay. Well, do you think your company would have
20    entered an agreement that would provide less than the
21    best possible thorough, diligent, and fair evaluation
22    of claims?
23    A.  No, I don't.
24    Q.  Okay. Now, why is it you would adjust the benefit if
25    they do better than the best?

Page 59

1    MR. ELLIS: Objection, argumentative.
2    A.  I don't know.
3    Q.  Okay. You adjust the benefit if they deny claims,
4    right?
5    A.  No.
6    Q.  Okay. That would be illegal if it said that, correct?
7    It would be illegal in this contract for it to say, if
8    you deny X amount of liability in claims in the next
9    year, we'll increase your monthly fee?
10    A.  I don't know.
11    Q.  You don't know if that would be illegal? Okay. But
12    this contemplates that they would get more than the
13    fixed -- well, first of all, the fixed monthly fee
14    isn't all they get. They get fixed monthly fee plus
15    all their expenses paid for, correct?
16    A.  The third-party administration expenses of external
17    vendors.
18    Q.  Any expenses relating to -- any expenses incurred in
19    administering a Jefferson-Pilot policy that DMS is
20    handling passes through DMS to Jefferson-Pilot,
21    correct?
22    A.  The fee would have covered the salaries of their
23    employees, their infrastructure. There would have
24    been extra payments, for example, for travel expenses.
25    Q.  But if your expectation as the company entering this

Page 60

1    agreement with DMS, if your expectation is that they
2    are going to provide you with unquestioned thorough,
3    diligent, and fair evaluation of claims, why would you
4    contemplate paying them more for that?
5    MR. ELLIS: Objection.
6    A.  I don't read -- I don't see where you're saying that
7    we'd be paying them more.
8    Q.  Annually -- annually --
9    MR. ELLIS: Excuse me. Let her finish her
10    answer before you speak.
11    MR. ROBERTS: She was done.
12    Q.  Annually the fixed monthly fee can be adjusted based
13    on DMS's performance.
14    A.  But you indicated that the adjustment would be
15    upwards. I don't see that.
16    Q.  Oh, you read it as only a contemplation that it would
17    be adjusted down?
18    A.  I read it as just any adjustment.
19    Q.  Okay. So it could be adjusted up if they do a really
20    super job of being diligent and thorough?
21    A.  No, I read it the adjustment would be based on what
22    their actual expenses were in handling the claims.
23    Q.  Okay. You read that as adjusting it based on their
24    expenses? Their expenses are paid for by you.
25    A.  No. The flat fee covers salaries, and depending on

Page 61

1    how much work they have to do on a claim or how many
2    claims they handle, their expenses are variable.
3    Q.  Right. They're not on the hook for the variation in
4    their expenses?
5    A.  Yes, they are.
6    Q.  No. Those pass through to Jefferson-Pilot.
7    MR. ELLIS: Objection, argumentative and
8    misstates the contract.
9    MR. ROBERTS: Really.
10    MR. ELLIS: Yes.
11    MR. ROBERTS: My gosh, how have I come so
12    far?
13    A.  This was a fee agreement.
14    Q.  Okay. The fixed monthly fee is a set fee --
15    A.  Yes.
16    Q.  -- unrelated to the expenses they incur in
17    administering claims?
18    A.  No.
19    Q.  If there were no claims that they were administering
20    at a certain time, say, last month there is just no
21    claims, they'd resolved all of them they had in March
22    and no new claims were presented in April of 2004,
23    they would have no expenses that pass through to
24    Jefferson-Pilot relating to claims, because they
25    didn't have any, right, but they would still get the

16 (Pages 58 to 61)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Valerie Loftin

C-1-02-479
5/6/2004

Page 62

1    43,000 in monthly fee, right?
2    A.  Yes.
3    Q.  It's a set fee?
4    A.  Yes.
5    Q.  Okay. This paragraph says that that set fee annually
6        could be reviewed for adjustment and the adjustment is
7        based on "DMS's performance in thoroughly, diligently,
8        and fairly evaluating claims and on its performance in
9        supporting the company's administration of the claims
10       and underlying policies during the preceding twelve
11       months." That's what it says. It doesn't say
12       anything about if you hire more people and have a
13       higher salary expense to administer claims, we'll
14       adjust the fixed monthly fee, does it?
15   A.  No.
16   Q.  Okay. Can you turn to paragraph 6 of the agreement.
17       Paragraph 6 is titled Performance Standard and here it
18       says, "DMS shall perform its services in a
19       professional manner in accordance with applicable law
20       and generally accepted disability income insurance
21       claims management practices and shall keep apprised of
22       and comply with current developments in the law
23       governing disability income insurance claims
24       management." That's the entire paragraph.
25           Do you have an understanding of what the

Page 63

1        generally accepted disability income insurance claims
2        management practices may be?
3    A.  I would assume that what we were referring to would be
4        handling claims in good faith.
5    Q.  Is that it?
6    A.  Yes.
7    Q.  What does good faith mean to you?
8    A.  It means making fair and accurate evaluations of
9        liability.
10   Q.  Anything else?
11   A.  Under the terms of the contract.
12   Q.  Anything else?
13   A.  And administering the claims in a professional manner.
14   Q.  Anything else?
15   A.  No.
16   Q.  Okay, no. Did the company ever set out in writing for
17       DMS's benefit what the company considered to be the
18       generally accepted disability income insurance claims
19       management practices?
20   A.  Not to my knowledge.
21   Q.  Okay. When was Geraldine Johnson retained to assist
22       Jefferson-Pilot on Mr. Kearney's claim?
23   A.  I don't know.
24   Q.  Have you ever had discussions with Ms. Johnson?
25   A.  No.

Page 64

1    Q.  Ever on any claim?
2    A.  No.
3    Q.  You've never had any discussion with her about any
4        claim?
5    A.  No.
6    Q.  You've never had any discussion, correct?
7    A.  With Geraldine Johnson?
8           MR. ELLIS: Third time.
9    Q.  Correct.
10   A.  Not my knowledge.
11   Q.  Okay. I asked in a negative, you gave me negative.
12   A.  I'm sorry.
13   Q.  No, it's just my quirk, not yours.
14           So if I asked for the production of all notes
15       or documents relating to the creation of the policies
16       and the riders that Mr. Kearney purchased and any
17       notes or documents relating to revisions or
18       contemplated revisions to those policies and riders,
19       you don't know where to start looking for that
20       information?
21   A.  I don't know where to start looking for that
22       information and I don't know that we even retained
23       that information.
24   Q.  Is there a policy to destroy that information?
25   A.  There is a record retention policy. I don't know what

Page 65

1        the time period is for policy forms.
2    Q.  How would I find out what it is?
3    A.  I don't know.
4    Q.  Who would you ask in the organization if you desired
5        in your capacity to obtain that information?
6    A.  I don't know.
7    Q.  Where would you start?
8    A.  I don't know.
9    Q.  Okay. Who do you interact with at DMS?
10   A.  I have interacted with Bob Bonsall and with Todd
11       Ditmar. I have met other individuals at DMS, but I
12       can't recall the names right now. As I said, I have
13       visited the headquarters of DMS and I have been
14       introduced to a number of their staff.
15   Q.  Have you had any discussions with Bonsall about any
16       specific claims?
17   A.  Yes.
18   Q.  Have you had any discussions with him about Mr.
19       Kearney's claim?
20   A.  No.
21   Q.  How many individuals at DMS are responsible for the
22       administration of the Jefferson-Pilot claims?
23   A.  I don't know.
24   Q.  Do you know who's in charge of the personnel within
25       DMS on that particular block of business?

17 (Pages 62 to 65)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

Page 66

1  A.  I believe it is Todd Ditmar.
2  Q.  Are you mindful of any other lawsuits in which the
3     company has been engaged where it has asserted that it
4     has overpaid someone receiving residual disability
5     because the company has paid that person Social
6     Security Supplement benefit?
7  A.  No.
8  Q.  Were you involved at all in the King litigation in
9     Alabama or Mississippi?
10  A.  Yes.
11  Q.  Wasn't that one of the issues in that case?
12  A.  No.
13  Q.  It wasn't an issue about him being overpaid Social
14     Security Supplement benefit while on residual
15     disability?
16  A.  Not to my knowledge.
17  Q.  Did you ever execute an affidavit in that case?
18  A.  I may have.
19  Q.  Did you give a deposition in that case?
20  A.  Yes.
21  Q.  When was that?
22  A.  October of 2003.
23  Q.  Before we turn to the King case, are you mindful of
24     any other lawsuits in which it's been asserted by the
25     company that it overpaid someone on residual

Page 67

1     disability by paying to that person either a Social
2     Security Supplement benefit or a COLA benefit?
3  A.  Not to my knowledge.
4        (Defendant's Exhibit No. 6 was marked for
5     identification by Mr. Roberts.)
6  Q.  Do you ever interact with Mr. Hughes regarding the
7     claim of Aubert King?
8  A.  Mr. Hughes may be one of the individuals that I met at
9     DMS, but I don't recall him specifically.
10  Q.  You don't recall any interaction with him in specific
11     regard to the Aubert King litigation?
12  A.  He may have been present at some of the depositions.
13     I don't recall.
14  Q.  In this June of 2000 letter purportedly written by Mr.
15     Hughes, purportedly sent to a lawyer, purportedly
16     regarding a guy named Aubert King, it is suggested by
17     DMS that the individual Mr. King, the policyholder,
18     had been overpaid under the residual disability rider
19     and had been overpaid 21,000 under the Social Security
20     Supplement rider. Does that jog your memory at all
21     about the Social Security Supplement benefits
22     overpayment issue in the King litigation?
23        MR. ELLIS: Objection.
24  A.  I don't recall being asked any questions about the
25     Social Security Supplement rider.

Page 68

1  Q.  That wasn't my question. I didn't ask what questions
2     you were asked at deposition. I said did it jog your
3     memory about that issue being an issue in the
4     litigation?
5  A.  I don't remember that issue being an issue in the
6     litigation. It may have been an issue in the
7     litigation, but I don't recall the specifics of the
8     allegations in that case.
9  Q.  Okay.
10        (Defendant's Exhibit No. 7 was marked for
11     identification by Mr. Roberts.)
12  Q.  Exhibit 7 is an Affidavit of Valerie Loftin in King
13     versus Jefferson-Pilot Life Insurance Company. Do you
14     recall executing this affidavit?
15  A.  Yes.
16  Q.  Okay. Is the information in here truthful?
17  A.  Yes.
18  Q.  Okay. In paragraph 3 you say under oath that the
19     payments under the policy were for total disability
20     benefits, residual disability benefits, and Social
21     Security Supplement benefits.
22  A.  Yes.
23  Q.  Does that refresh your memory that Social Security
24     Supplement benefits were an issue in the case?
25  A.  I didn't remember Social Security Supplement benefits

Page 69

1     being an issue. I remembered residual disability
2     benefits being an issue.
3  Q.  Do you now recall that it was an issue, having seen
4     your affidavit?
5  A.  Obviously it was.
6  Q.  And in paragraph 4 you laundry-list from some -- did
7     you do any work to prepare this sworn testimony or
8     just sign what someone had provided you?
9  A.  This was something someone had provided me.
10  Q.  Did you check to see whether the information was
11     accurate before you swore to its truth?
12  A.  Yes.
13  Q.  Okay. Paragraph 4 you say that Mr. King received an
14     overpayment of residual disability benefits of
15     $33,000. In paragraph 5 you say under oath that he
16     received a $21,000 overpayment of Social Security
17     Supplement benefits. Was that while he was on
18     residual disability?
19  A.  I don't recall.
20  Q.  You don't know one way or the other?
21  A.  I don't recall the specifics of this particular case.
22  Q.  How do you know -- so you don't any longer have the
23     personal knowledge you purported to have about there
24     being an overpayment?
25  A.  I don't recall the specifics of this individual case

18 (Pages 66 to 69)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

Page 70

1    anymore.
2    Q. Okay.
3    A. I do recall that it was related to overpayment of
4    residual disability.
5    Q. Is that your signature on the affidavit?
6    A. Yes, it is.
7    Q. Were you put under oath before you signed it?
8    A. No.
9    Q. You were not put under oath before you signed it?
10   A. I signed before a notary.
11   Q. Did she put you under oath or did he put you under an
12   oath?
13   A. I signed before a notary. What does that mean by
14   being put under oath? Did I raise my right hand? No.
15   I had a notary witness my signature.
16   Q. Did you work with Mr. Ditmar on that claim?
17   A. No, I didn't work with Mr. Ditmar on this particular
18   claim. I have worked with Mr. Ditmar on more general
19   matters.
20   Q. Who is Kim Brann?
21   A. Spell the name, please.
22   Q. B-R-A-N-N.
23   A. I don't know.
24   Q. Can you recall here now any other litigations where
25   Social Security Supplement rider benefits were alleged

Page 71

1    to have been overpaid to a residual disability
2    claimant?
3    A. I don't recall.
4    Q. Any litigation concerning the alleged overpayment of a
5    COLA benefit to a residual disability claimant?
6    A. I don't know.
7    Q. Do you know who was the first person to suggest that
8    Mr. Kearney had received an overpayment?
9    A. No.
10   Q. Do you know the process by which anyone came to that
11   conclusion?
12   A. No.
13   Q. So you personally have no understanding or experience
14   with the administration, the actual administration by
15   Jefferson-Pilot of claims, disability insurance
16   claims?
17   A. I do have understanding of the administration of
18   disability claims by Jefferson-Pilot. Disability
19   claims administration reports to me.
20   Q. But that is not a function that Jefferson-Pilot has
21   performed since you took over Vice President of
22   Claims?
23   A. For Jefferson-Pilot Life Insurance policies that are
24   reinsured through ERC, those are handled through DMS.
25   Q. Okay.

Page 72

1    A. We have a disability department in-house in Concord,
2    New Hampshire, and we do handle disability claims.
3    Q. Does Jefferson-Pilot educate its claims administration
4    personnel on the terms of its policies or do they just
5    leave it to the claims administration person to come
6    to the correct understanding of a particular policy,
7    and I guess correct being consistent with the other
8    individuals at Jefferson-Pilot?
9    You're looking at me quizzically. Did I not
10   phrase that question artfully?
11   A. No, you didn't phrase the question artfully. Let's
12   try it again.
13   Q. Does Jefferson-Pilot provide any education or training
14   to its claims administration personnel to insure that
15   they all have a singular and accurate understanding of
16   the benefits provided under respective policies?
17   A. We provide our disability examiners with ongoing
18   training that includes the various provisions under
19   our various policies.
20   Q. Does that mean that there's an interpretation of the
21   policies that is stated by the company to -- for
22   example, if I started today as a claims person in --
23   did you say New Hampshire?
24   A. Yes.
25   Q. If I went there, I'm right out of school, no

Page 73

1    experience, I take on a job being a claim rep and you
2    have 20 different policies that have been sold that
3    are active policies with regard to the files that I've
4    been provided to administer, am I left to read for
5    myself and conclude for myself what rights the
6    policyholder has under a specific policy or is there
7    some education that I would be given to help me
8    understand what rights the policyholder has under a
9    policy?
10   A. We would expect a claims examiner to be able to read
11   the policy --
12   Q. Okay.
13   A. -- that was applicable to a specific case.
14   Q. Okay. So all of the claims persons are assumed to
15   accurately, correctly read the policy and they're all
16   assumed to have the exact same interpretation of the
17   policy?
18   A. We provide them with training, both internal and
19   through industry-sponsored courses regarding various
20   issues surrounding the handling of disability claims.
21   That would include training on the various contracts
22   that are available. But we ultimately expect them to
23   be able to read the contract and apply it to the case
24   at hand.
25   Q. They're not lawyers, they don't have any legal

19 (Pages 70 to 73)

Page 74

1    training, correct?
2    A. No.
3    Q. They're not highly paid employees, they don't make
4       more than $80,000 a year?
5    A. No.
6    Q. I asked a negative question, you gave me a negative
7       answer. Do they really make more than $80,000 a year?
8    A. The claims examiners who are handling our disability
9       files do not make more than $80,000 a year.
10   Q. And it's just assumed by Jefferson-Pilot that these
11      highly underpaid persons lacking in the knowledge that
12      you three have will conclude accurately and
13      consistently what the policy benefits are to
14      policyholders?
15         MR. ELLIS: Objection.
16   Q. Is that right?
17   A. No. They're not grossly underpaid.
18   Q. Okay. Other than that portion of the question --
19   A. Restate the question, please.
20   Q. Am I to conclude that Jefferson-Pilot does not give
21      any insight to these persons who have no legal
22      training as to precisely what Jefferson-Pilot
23      considers to be the rights of policyholders on
24      respective policies?
25         MR. ELLIS: Objection.

Page 75

1    A. No. We expect our examiners not to require -- be
2       required to have a law degree to read a policy and
3       apply it to the facts of an individual case. We
4       provide them with ongoing training in disability
5       claims handling.
6    Q. What has been your experience -- have you performed
7       any judgments about Disability Management Service
8       claims persons and their capacity to accurately,
9       properly interpret one of Jefferson-Pilot's policies?
10   A. My interaction with the DMS personnel has resulted in
11      the belief that they were very professional, they
12      understand how a claim should be administered, they
13      understand how disability policies are applied, they
14      are well-trained.
15   Q. Okay.
16         (Defendant's Exhibit No. 8 was marked for
17      identification by Mr. Roberts.)
18   Q. I'll hand you a document that was provided as part of
19      the claim file and is Bates labeled 0559. I've marked
20      it as Exhibit 8, and since you haven't read the claim
21      file, let me read to you what was the original
22      typeface of this letter, which appears to have been a
23      proposed draft of a letter to Mr. Kearney regarding
24      his rights in the policy and is on DMS letterhead or
25      if you -- it's on its DMS footerhead, and the fourth

Page 76

1    paragraph has been revised dramatically.
2         But originally the fourth paragraph of Bates
3    label 0559 reads: "(Here is optional paragraph --
4    Notwithstanding that Jefferson-Pilot/Mr. Shelton has
5    provided you" -- let's assume the you in this
6    paragraph means Mr. Kearney -- "with the above
7    information regarding the benefit period for residual
8    disability you claim you never received, which is what
9    we have also relied on heretofore, we reexamined the
10   policies ourselves to determine where in the contracts
11   the age 65 maximum benefit period for residual
12   disability is actually stated. Although we are
13   unaware of any residual disability benefit written by
14   any insurance company for whom we have provided
15   service that provides benefits beyond age 65, we are
16   unable to find where the policy actually cites the age
17   65 limitation. Therefore, in the absence of such
18   language, we would have to agree with your assessment
19   that the benefit period for residual disability
20   benefits for a disability that begins before age 45
21   (such as yours) would be the same as the benefit
22   period for total disability, i.e., life. We have
23   discussed this with Jefferson-Pilot and they have
24   stated that inasmuch as the contract is not specific
25   in this regard, they will resolve the matter in your

Page 77

1    favor -- end of the first alternative paragraph."
2         Are you mindful of anybody at Jefferson-Pilot
3    being contacted by DMS on the issue of whether or not
4    Mr. Kearney's policy and its riders permit him
5    lifetime benefits?
6         MR. ELLIS: Object to the question, to
7    counsel reading into the record material that is
8    completely out of context, and I will object to asking
9    this particular witness because she's a 30(b)(6)
10   witness who has not reviewed the Kearney claim, and I
11   will instruct her she has no business answering
12   questions to which she does not know the answer or the
13   context.
14         MR. ROBERTS: Well, Counsel, first of all,
15   you object for the record, that's it. You don't say
16   anything else unless you want to tell the witness what
17   you want her to testify to. I've been through
18   depositions before. I know that I've told you how
19   lawyers are supposed to behave in depositions. I know
20   that you don't undertake my advice.
21         But you provided me with this witness and you
22   provided me with a witness at my request who could
23   tell me about the Complaint, Affirmative Defenses,
24   Answers to Interrogatories, and Production of
25   Documents in this action, a document you produced.

Page 78

1    You also produced her because she's the one
2    with knowledge of DMS's disability claim
3    administration process, which --
4        MR. ELLIS: That's true.
5        MR. ROBERTS: -- this is a DMS letter and
6    claim administration.
7        You produced her because I requested item
8    number 3, someone with information about DMS
9    administration of Mr. Kearney's claim. This is a
10   letter from DMS about their administration of Mr.
11   Jefferies' [sic] claim.
12       So if she's not the right person, it ain't my
13   fault, it's yours, and I'm going to ask a question.
14   Q. Do you have any knowledge --
15       MR. ELLIS: You know "ain't" isn't an
16   appropriate word?
17       MR. ROBERTS: Oh, God, you're so much smarter
18   than me, Bill.
19       MR. ELLIS: My objection -- no. My
20   objection --
21       MR. ROBERTS: Bill, you're a much better
22   lawyer, too.
23       MR. ELLIS: Well, thank you. My objection
24   stands that she was not called to testify about --
25       MR. ROBERTS: Very well, your objection

Page 79

1    stands.
2        MR. ELLIS: -- Kearney's claim.
3        MR. ROBERTS: Now let's proceed. Let's
4    proceed. Your objection is on the record.
5        MR. ELLIS: Thank you.
6    Q. Now, back to my question. I've read the paragraph as
7    it was originally written by someone at DMS
8    purportedly and it suggests that DMS has discussed
9    with Jefferson-Pilot the fact that this policy
10   provides lifetime benefits to Mr. Kearney, or
11   potentially does, or at least is ambiguous on the
12   point. Are you mindful of who at Jefferson-Pilot was
13   contacted by DMS on that issue?
14   A. I don't know anything about anyone being contacted by
15   Jefferson-Pilot on this issue.
16   Q. Have you ever seen this page before?
17   A. No, I have not.
18   Q. Have you ever seen this paragraph?
19   A. No, I have not.
20   Q. Okay. Do you know whose handwriting is on the page?
21   A. No, I don't.
22   Q. Let's try to read that. At the top, the first
23   handwriting appears to say, "In reiterating the
24   information communicated in Mr. Shelton's letter
25   (second copy enclosed)," and then in left-hand margin

Page 80

1    it says, "Although the policy language does not
2    specifically address the age 65 year limitation," and
3    then there's something there that I can't read, and in
4    the far right-hand column it says, "However, we are
5    willing to look at this issue as part of a global
6    settlement of both policies."
7        Did you ever discuss with DMS or anyone at JP
8    telling Mr. Kearney that he didn't have lifetime
9    benefits and then use that as potentially a leverage
10   in negotiating a deal with him?
11       MR. ELLIS: Objection.
12   A. You're going to have to break that question up.
13   Q. Okay. Are you mindful of any discussions that anyone
14   at Jefferson-Pilot has had with DMS about lying to Mr.
15   Kearney about his entitlement to lifetime benefits so
16   that you could gain some leverage in the negotiation?
17       MR. ELLIS: Objection.
18   A. I am not mindful of anyone at Jefferson-Pilot ever
19   lying to Mr. Kearney about anything.
20   Q. Okay. How about my specific question?
21   A. I can't understand your specific question, I'm sorry.
22   Q. Okay. Well, here we have a letter that was going to
23   go to Mr. Kearney telling him that yeah, you're right,
24   you are entitled to lifetime benefits, but he never
25   got that letter. Instead we have the draft of the

Page 81

1    letter with someone's handwritten comments saying
2    don't tell him that, let's use this in a negotiation
3    with him. Are you mindful of that set of
4    circumstances?
5        MR. ELLIS: Objection, misstates the letter
6    intentionally.
7    A. I am not.
8    Q. Okay. Is that a business practice of DMS or of JP to
9    hide from someone what their rights are to negotiate
10   with them later?
11   A. It is not a business practice of JP.
12   Q. How about DMS?
13   A. I don't have personal knowledge of all of the business
14   practices of DMS, but my dealings with them would lead
15   me to believe that this is not a part of their
16   business practices.
17   Q. How would you explain this page?
18       MR. ELLIS: Objection. She's never seen the
19   page before today.
20   A. I have no information about this page.
21   Q. Okay.
22       (Defendant's Exhibit No. 9 was marked for
23   identification by Mr. Roberts.)
24   Q. So back to your testimony, the people at JP are
25   educated and trained in such a manner that JP

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Page 82

1    considers them to be capable of accurately reading
2    policies, and your judgment based on your interaction
3    with DMS is that they do, too, right?
4  A. Yes.
5  Q. Is that fair? I'll hand you -- let's give that one to
6    Bill because it's stapled badly -- Exhibit 9. Are you
7    familiar with Jefferson-Pilot's disability claims
8    worksheets?
9  A. I have seen these worksheets before, yes.
10 Q. Okay. What I have just handed you is a series of
11   documents Bates labeled 0955 through 0966 that I'll
12   purport, since you've never seen it before, are
13   contained in Mr. Kearney's claim file. These pages
14   are all disability claim worksheets forms generated by
15   Jefferson-Pilot and then have some historical
16   handwritten references regarding Mr. Kearney's claim,
17   right?
18 A. I haven't seen the claim file. I don't know what's in
19   the claim file.
20 Q. Okay. Can you assume for me that your company
21   accurately typed on this first page that this is Mr.
22   Kearney's claims as it relates to Mr. Kearney's claim?
23   Can you assume that for me for the purposes of my
24   question?
25 A. I wasn't involved in the administration of Mr.

Page 83

1    Kearney's claim.
2  Q. I understand.
3  A. And I haven't seen these documents.
4  Q. Okay.
5  A. But for the purposes of the question, we can assume
6    that the name at the top of the form is correct.
7  Q. Okay. Thanks. What is the obligation of the claim
8    reps in filling out these types of forms? Forget
9    about Mr. Kearney's claim. This is a form that you're
10   mindful of. It's a standard form that's used in your
11   Vermont office and they report to you -- is it Vermont
12   or New Hampshire?
13 A. New Hampshire.
14 Q. New Hampshire, and they report to you. What is
15   Jefferson-Pilot's expectation of persons who have the
16   responsibility for completing these types of forms?
17       MR. ELLIS: Objection, misstates evidence.
18 Q. Okay.
19 A. The expectation would be that they used the form to
20   keep track of transactions on the claim.
21 Q. Okay. Are they supposed to record on this form their
22   actions in sending benefit payments or triggering or
23   requesting that benefit payments be sent to a
24   claimant?
25 A. I'm sorry, I don't follow the question.

Page 84

1  Q. Okay. Is it required that a claim rep record on this
2    particular form, this particular form, not for Mr.
3    Kearney, the claim representative's decision to issue
4    a payment?
5  A. I don't know what would have been required on the form
6    at the time the form was completed.
7  Q. That's fine. How about today?
8  A. The question is whether they would have to provide the
9    period of payment, the days, the amount, the date --
10   what is it that you're asking that they have to --
11 Q. Okay. Listen to the question instead of answering
12   something that's not my question, because it would be
13   helpful.
14 A. Okay.
15 Q. This is a standard form inside Jefferson-Pilot,
16   correct?
17 A. It is a form that was used at the time of Mr.
18   Kearney's claim.
19 Q. Okay.
20 A. It's not necessarily a standard form that's used in
21   all of our disability -- our internal forms change.
22 Q. Okay. Is it your testimony under oath that the people
23   who report to you that are located -- is it Vermont or
24   New Hampshire -- are not presently in the year 2004
25   required to fill out this particular disability claim

Page 85

1    worksheet form? Is that your testimony?
2  A. I don't know if this is the particular form that they
3    are still using.
4  Q. Have you ever during your tenure at Jefferson-Pilot --
5    are you mindful that it's ever been required that this
6    form be filled out?
7  A. I have seen forms similar to this in other disability
8    files, but I can't testify that this particular form
9    is currently required.
10 Q. Okay. Do you know of a substitute form that is now
11   required by the people that report to you?
12 A. There are forms that are similar to this.
13 Q. Okay. What's the requirement on these similar forms
14   as we sit here today? What do you expect from the
15   people that report up to you who handle claims? What
16   is the expectation on completing the next generation
17   form that they now do?
18       MR. ELLIS: Objection.
19       MR. ROBERTS: Fine.
20 A. To record the transactions on a particular claim, to
21   keep an ongoing record.
22 Q. Okay. So when they make a payment, that's a
23   transaction?
24 A. Yes.
25 Q. Okay. So when they make a payment, they're supposed

Page 86

1    to record it, and let's go back to the same form that
2    they use to record the most recent transaction, like
3    this one. I mean, this is an historical form where as
4    a transaction is performed, there's an entry and the
5    person continues to go back to it, right, during the
6    life of the claim?
7    A. Yes.
8    Q. Okay. Before a transaction is consummated, meaning
9    before a monthly benefit payment is issued, okay --
10    are you with me?
11    A. Yes.
12    Q. You don't look like you're with me -- what do you
13    expect of your claims persons to do?
14    A. Before a payment is issued, what do you expect them to
15    do -- what do I expect them to do?
16    Q. Right, right.
17    A. I would expect them to verify continuing disability.
18    Q. Okay. Based on what, the policy?
19    A. Based on information received from the claimant.
20    Q. Okay. Based on the information they received since
21    the last payment. What about based on the policy
22    terms?
23    A. Yes, it would also be based on the policy terms for
24    that particular case.
25    Q. Okay. So it's your expectation being the Vice

Page 87

1    President of Claims that before a check is issued to a
2    claimant, the claim rep makes sure that the policy
3    requires the payment of the benefit based on the
4    information in the claim file, correct?
5    A. That is our expectation.
6    Q. Okay. Do you require that the person issuing the
7    check or approving of the transaction initial the
8    transaction?
9    A. I don't know if our current forms do --
10    Q. Are you mindful that --
11    A. -- and I have no knowledge of this form.
12    Q. Do you know that the left-hand column contains on this
13    Exhibit 9 form?
14    A. It looks like it contains either initials or
15    signatures.
16    Q. Does that suggest to you that it was some person who
17    approved of the transaction actually putting their
18    name to it?
19    A. Yes.
20    Q. Okay. Do you know whose initials are on here?
21    A. No. PH maybe, Phyllis Harden.
22    Q. On the first page, the one in the far left or the last
23    eight or nine entries appear to you to be Phyllis
24    Harden's initials?
25    A. No, I was looking on the second page. I see a PH and

Page 88

1    I have an employee who is currently with
2    Jefferson-Pilot who's named Phyllis Harden, and that
3    could be Phyllis Harden, but I don't know for sure.
4    Q. Are you mindful that she had responsibility for Mr.
5    Kearney's claim?
6    A. I know that she's being deposed in this case, so I'm
7    assuming that she had responsibility for Mr. Kearney's
8    claim.
9    Q. Well, who knows? Maybe he'll produce more people
10    without information.
11        MR. ELLIS: Objection, move to strike
12    counsel's snide remarks.
13        MR. ROBERTS: Yeah, let's strike that. I'll
14    joint in that objection.
15    Q. Who's the big swirly J initial, do you know?
16    A. No.
17    Q. Okay. Is it the expectation -- do you see the
18    Remarks section on the first page?
19    A. Yes.
20    Q. What is the expectation about the information that
21    would be placed in that particular portion of the
22    form, or is there no expectation?
23    A. I don't know what the expectations would have been on
24    this form and I don't know if we have a Remarks
25    section on our current forms.

Page 89

1    Q. Do you see where this form specifically recites in all
2    capital letters RESIDUAL and then includes a reference
3    to COLA 7 percent?
4    A. Yes, I see that.
5    Q. Did your claims rep get that wrong that COLA 7 percent
6    goes with residual?
7        MR. ELLIS: Objection, misstates the
8    evidence.
9    A. My understanding is, that's the basis of our lawsuit
10    is that we believe that they did make a mistake.
11    Q. But I thought they had all this training and they all
12    make the right decisions and they all make consistent
13    decisions, and here before every single transaction on
14    this ten-page form, the person -- in fact, two
15    people -- signed off after insuring that the policy
16    contemplated the payment of those benefits, so there
17    was hundreds of mistakes made based on all that great
18    training and the assurance that the policy provided
19    for the payment?
20        MR. ELLIS: Objection.
21    A. Is there a question in there?
22    Q. Yeah. How many errors were made, in your judgment, on
23    Mr. Kearney's claim? How many independent errors with
24    all these independent transactions being signed off by
25    all these people?

Page 90

1        MR. ELLIS: Same objection.
2   A.  These people are human and they made a mistake, just
3        like I made a mistake about remembering that there was
4        Social Security involved in the Aubert King case.
5   Q.  I'm not persuaded that was a mistake.
6        MR. ELLIS: I'll object to that remark.
7        MR. ROBERTS: I'll join that one, too.
8   Q.  Okay. Why do you think they made a mistake if the
9        policy language is so explicit and every time they
10       made a transaction, they had to check the policy
11       language? How could they get explicit language wrong
12       so many times?
13  A.  I don't know.
14  Q.  Are they still employed at the company?
15  A.  Phyllis Harden is still employed with the company if
16       Phyllis Harden is the person whose initials appear
17       there.
18  Q.  Now, if you know that someone has made so many simple
19       mistakes misinterpreting unambiguous language, why do
20       you still employ her?
21       MR. ELLIS: Objection.
22  A.  Phyllis Harden is a very competent employee and I
23       don't know who made the mistake on this file.
24  Q.  Thank you. I think she's very competent as well.
25       MR. ELLIS: Whenever you get hungrey, say the

Page 91

1        word and we'll take a break for lunch.
2        MR. ROBERTS: As long as I get my seven
3        hours.
4        MR. ELLIS: I wouldn't think of depriving you
5        of it.
6        MR. ROBERTS: Really? You always consider me
7        first, Bill.
8        MR. ELLIS: I do my best.
9        MR. ROBERTS: You did two weeks ago.
10       (Discussion off the record)
11       (Brief recess)
12       MR. ROBERTS: On April 26, 2004, and April
13       27, 2004, I issued a Notice of Deposition to DMS and
14       to Jefferson-Pilot through their counsel, Mr. Ellis,
15       requesting the deposition of Robert Maxwell.
16       Subsequently it was ordered by the Court that
17       Mr. Ellis make available by May 15 all of the persons
18       whom I requested in those Notices of Deposition that
19       weren't lawyers. I was anticipating the opportunity
20       to depose Mr. Maxwell today or tomorrow.
21       It is 1:35 and 15 minutes ago I asked
22       Mr. Ellis about Mr. Maxwell's availability. Mr. Ellis
23       advised me that I would not be entitled to take
24       Mr. Maxwell's deposition because he's ill and
25       homebound.

Page 92

1        During the break, during this short break
2        we've just had, I phoned Mr. Maxwell. I spoke to his
3        wife. I told his wife who I was. I told his wife
4        that I desired to take the deposition of her husband.
5        I told his wife that I understood that he was somewhat
6        ill, that I didn't want to intrude if it was something
7        that his health could not accommodate. She said she
8        didn't think it would be a problem.
9        She left the phone for a second, during which
10       time I believe she spoke to Mr. Maxwell directly. She
11       came back to the phone and reported to me that
12       wouldn't be a problem at all and she said that she
13       could be available tomorrow afternoon.
14       So what my intention is is to proceed, take
15       Mr. Roberson's deposition today. Tomorrow morning
16       commencing at 8:30 I will take either -- I will take
17       both Shelton and Harden in whatever order the
18       plaintiff desires, and after the lunch break tomorrow
19       I intend to go to Mr. Maxwell's home for his
20       deposition, which he consents to do, and we can
21       proceed.
22       What I'd like is for in-house counsel for
23       Jefferson-Pilot -- what I also told Mary Maxwell is
24       that later today in-house counsel for Jefferson-Pilot
25       would call her and confirm what I've just stated on

Page 93

1        the record and also confirm that we'll be out there
2        tomorrow afternoon, and I have the phone number, which
3        is 336-621-2240 for your use.
4        MR. ELLIS: For the record, I was advised by
5        the witnesses Mr. Maxwell had been hospitalized for
6        two months, was wheelchairbound and homebound and that
7        his deposition would be an imposition. I relayed that
8        information to counsel as soon as I was aware of it,
9        which was several days ago by e-mail and by voice
10       mail, and it was my understanding that that was the
11       situation.
12       If Mr. Maxwell is willing to take a
13       deposition, I'm more than willing to go to his home
14       and participate.
15  Q.  We were talking -- are you ready, back on the record?
16  A.  Uh-huh.
17  Q.  We were discussing the fact that your claims reps know
18       well how to interpret policies and so does the DMS
19       claim reps and that Phyllis Harden, if those are her
20       initials, must have just had a brain glitch on all
21       those occasions where she chose to overpay Mr.
22       Kearney. Are you mindful that in June of 2001, DMS
23       sent -- excuse me, August of 2000, DMS sent Mr.
24       Kearney a letter apologizing for not paying him his
25       COLA adjustment?

24 (Pages 90 to 93)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Valerie Loftin

C-1-02-479
5/6/2004

Page 94

1   A.  I wasn't aware of that, no.
2       (Defendant's Exhibit No. 10 was marked for
3       identification by Mr. Roberts.)
4   Q.  Do you understand that Robert Mills was a claims
5       consultant for Disability Management Services
6       responsible for the Jefferson-Pilot block of business,
7       at least partially responsible?
8   A.  I have not -- I don't know Mr. Mills, but the letter
9       is signed by Robert Mills as a Claims Consultant for
10      Disability Management Services, so I will assume --
11  Q.  Do you have any understanding that Mr. Mills had any
12      involvement on behalf of Jefferson-Pilot on Mr.
13      Kearney's claim?
14  A.  I haven't reviewed Mr. Kearney's claim file.
15  Q.  Okay. This letter purportedly signed by Mr. Mills
16      purportedly because he was involved in Mr. Kearney's
17      claim says, second paragraph, "Under separate cover
18      you should receive two checks reflecting the increase
19      under the cost of living adjustment rider for both of
20      your policies that became effective on May 6, 2000. I
21      apologize for this oversight."
22          You've never seen this letter before?
23  A.  No, I have not.
24  Q.  Has anyone ever indicated to you that at a certain
25      point in time when Mr. Kearney wasn't getting his COLA

Page 95

1       adjustment that there was an expressed apology made to
2       him because the policy does provide for that?
3           MR. ELLIS: Objection.
4   A.  I'm not aware of the circumstances surrounding this
5       letter.
6   Q.  Okay. Why do you think he would be apologizing for
7       not paying the benefit? What other circumstance do
8       you need to know?
9   A.  I don't know.
10          MR. ELLIS: Objection. There's no
11      possibility of her to know.
12          MR. ROBERTS: There's not? Do you know
13      everything she knows?
14          MR. ELLIS: Pretty much.
15          MR. ROBERTS: Bill, you know everything
16      everybody knows, don't you.
17          MR. ELLIS: Are you finished?
18          MR. ROBERTS: I was wondering, what two cases
19      have you lost in your career?
20          MR. ELLIS: Are you finished?
21          MR. ROBERTS: No. I asked you a question.
22      What two cases have you lost in your career? Because
23      apparently you told Mr. Miller the other day you've
24      only lost two cases. I'm just wondering what two they
25      are. Have you lost any recently?

Page 96

1           Now I'm done. You can answer any one of
2       those questions you desire, or not.
3   Q.  Have you reviewed Jefferson-Pilot's answers to
4       interrogatories in the case? I know you didn't
5       provide the information on which the information was
6       provided and I don't know who did, because they're not
7       verified, but have you reviewed the interrogatory
8       responses?
9   A.  Yes, I have.
10  Q.  Okay. When did you do that?
11  A.  Last night.
12  Q.  What else did you review in anticipation of today?
13  A.  A copy of the Complaint and the Motion for Summary
14      Judgment.
15  Q.  The one I filed, the good one?
16  A.  The good one? The Motion for Summary Judgment and the
17      Countermotion for Summary Judgment and the Amended
18      Motion for Summary Judgment and the Answers to
19      Interrogatories and I believe the Request for
20      Production of Documents.
21          (Defendant's Exhibit No. 11 was marked for
22      identification by Mr. Roberts.)
23  Q.  Were you persuaded by my motion when you read it?
24  A.  No.
25  Q.  Where did you go to law school?

Page 97

1   A.  The University of North Carolina at Chapel Hill.
2   Q.  Exhibit 11 is the interrogatory responses. You know
3       that because you reviewed them last night?
4   A.  Yes.
5   Q.  Do you see in response to interrogatory number 1 it's
6       suggested that Mr. Mills is someone who had
7       responsibility for the claim, right?
8   A.  Yes.
9   Q.  Okay. Do you see Kim Brann's name in there as well?
10  A.  Yes.
11  Q.  Did she terminate from Jefferson-Pilot before your
12      involvement?
13  A.  I don't know who Kim Brann is.
14  Q.  Did you notice when you reviewed the Complaint that
15      there was no assertion made by Jefferson-Pilot that
16      the Social Security Supplement benefit payments to Mr.
17      Kearney were a mistake?
18  A.  Did I notice that? No, I didn't notice that.
19  Q.  Do you have the Complaint with you?
20  A.  No.
21  Q.  You read the Complaint unambiguously to include a
22      claim by Jefferson-Pilot that it desired a declaration
23      that Mr. Kearney was not entitled to the Social
24      Security Supplement benefit he's been receiving?
25  A.  Yes.

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889        Fax (704) 372-4593

Page 98

1  Q.  Okay. Do I understand correctly that when DMS was
2      retaining secret surveillance folks to follow Mr.
3      Kearney, hiring doctors to perform IMEs, investigating
4      him internally, those were all things they were doing
5      without any input from or counsel to or information
6      provided to Jefferson-Pilot?
7          MR. ELLIS: Objection to form.
8  A.  I don't have any information or knowledge of the DMS
9      handling of Mr. Kearney's claim.
10 Q.  Why are you here today?
11 A.  Because I'm the Vice President of Claims.
12 Q.  I didn't ask for Vice President of Claims to be
13     deposed.
14 A.  And I am the person at Jefferson-Pilot who has the
15     most knowledge of the DMS relationship, because the
16     relationship comes under my supervision.
17 Q.  But no knowledge of Mr. Jefferies' claim -- Mr.
18     Kearney's claim other than what you learned last night
19     reading a couple pleadings, right?
20 A.  That's correct.
21 Q.  Could you turn to interrogatory number 2. The second
22     sentence in the answer says, "Robert Mills identified
23     this erroneous payment shortly before DMS
24     representatives met with Attorney Spiegel in October
25     2001."

Page 99

1          Other than somebody's providing that factual
2      information, are you mindful at all about Mr. Mills'
3      revelation in 2001 or 2002 about how this policy
4      really should be read?
5  A.  Could you repeat the question.
6          MR. ROBERTS: Could you read it back to her.
7          (The last question was read back by the court
8      reporter.)
9  A.  I can't answer that question.
10 Q.  Is Mr. Kearney's claim and maybe now Mr. King's claim
11     the only two claims that you can recall on which this
12     revelation about how the policy should be read
13     resulted in a request to the policyholder that they
14     pay money back to Jefferson-Pilot?
15         MR. ELLIS: Objection, misstates facts.
16 A.  I'm not aware of any other outstanding litigation
17     involving overpayment of the Social Security --
18 Q.  I didn't ask you about --
19 A.  -- benefit.
20 Q.  I didn't ask you about outstanding litigation. Are
21     you aware of any other policyholders being advised by
22     Jefferson-Pilot or DMS that the way Mr. Mills reads
23     the contract suggests that Jefferson-Pilot when they
24     were handling the claim file resulted in an
25     overpayment?

Page 100

1  A.  No, I am not.
2  Q.  Turn to the next page of interrogatories,
3      interrogatory response 5. There's a gentleman's name
4      there, Mr. David Newkirk, fifth line, associated with
5      Employers Reinsurance Corporation. Have you ever had
6      any communications with him?
7  A.  No.
8  Q.  Anyone ever mention his name to you prior to five
9      seconds ago?
10 A.  No.
11 Q.  Ever seen his name copied on an e-mail?
12 A.  Not that I recall.
13 Q.  Have you ever received any general type of marketing
14     information concerning DMS describing their services?
15 A.  I don't think so. I don't remember.
16 Q.  Are you mindful of any that you may or may not have
17     received?
18 A.  I'm not remembering any. I'm not saying that there
19     might not have been at some point, but not that I can
20     remember specifically.
21 Q.  Do you know of any case in which a summary jury or
22     final jury has concluded that Jefferson-Pilot has
23     engaged in bad faith?
24 A.  No, I don't have personal knowledge.
25 Q.  Are you mindful of any summary jury trial conducted

Page 101

1      where a jury concluded that DMS was responsible for a
2      bad faith action?
3  A.  No, I'm not.
4  Q.  Any final trial verdict of a jury regarding DMS?
5  A.  Not that I'm aware of, no.
6  Q.  Your counsel hasn't advised you that DMS was
7      determined to have been engaged in bad faith by a
8      summary jury just a month ago?
9          MR. ELLIS: Objection.
10 A.  No.
11 Q.  Under -- in Ohio, under Ohio law?
12 A.  I don't have that information.
13         MR. ELLIS: If she didn't know, she certainly
14     didn't know it was in Ohio.
15 Q.  Have you spoken with Mr. Hughes at all about the
16     purported overpayment to Mr. Kearney?
17 A.  Mr. Hughes? I'm sorry?
18 Q.  William Hughes? He's at DMS?
19 A.  Not that I recall.
20 Q.  Have you ever spoken to anyone at DMS about the
21     purported overpayment and/or request for declaratory
22     judgment regarding Mr. Kearney?
23 A.  No.
24 Q.  Who have you spoken to about Mr. Kearney?
25 A.  Our internal counsel.

26 (Pages 98 to 101)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney
Valerie Loftin

C-1-02-479
5/6/2004

Page 102

1  Q.  Okay.  And Mr. Big Brother, outside counsel?
2  A.  Yes.
3  Q.  Anyone else?
4        MR. ELLIS:  For the record, my name is Ellis.
5  A.  No, it would just be our internal counsel and
6     Mr. Ellis.
7  Q.  Someone at DMS has interpreted your policy contrary to
8     the way that Jefferson-Pilot's people interpreted for
9     nine or ten years.  That triggered the filing of a
10    lawsuit by Jefferson-Pilot.  DMS has been brought into
11    the lawsuit.  You're responsible for the DMS
12    relationship, and your sworn testimony is that you've
13    never had any dialogue, e-mail, written
14    correspondence, phone call with anyone at DMS about
15    this lawsuit or Mr. Kearney's claim?
16        MR. ELLIS:  Objection, misstates the
17    evidence.
18 A.  Not that I recall.  I don't recall specific
19    conversations with anyone at DMS about Mr. Kearney's
20    claim or e-mails or correspondence.
21 Q.  Do you recall nonspecific conversations?
22 A.  I don't recall talking to anyone at DMS about Mr.
23    Kearney's claim.
24 Q.  And do you recall speaking to anyone at DMS about the
25    issues involved in Mr. Kearney's claim, that is, the

Page 103

1     way the policy is interpreted to either provide for
2     COLA or not provide for COLA, provide for Social
3     Security Supplement or not provide for Social Security
4     Supplement on these policies?
5  A.  No.
6  Q.  Did you ever discuss with DMS the overpayment in the
7     King case?
8  A.  DMS representatives were present at the depositions in
9     the King case, and so there were conversations there
10    about the King case, but that's all I recall.
11 Q.  Anything else?
12 A.  No, I don't recall anything else.
13 Q.  Do you e-mail with Mr. Bonsall?
14 A.  Yes.
15 Q.  Have you ever had an occasion to e-mail anyone else at
16    DMS?
17 A.  I may have.  I don't recall.  I do recall e-mailing
18    Bob Bonsall.
19 Q.  Is there a claims procedures manual at
20    Jefferson-Pilot?
21 A.  No.
22 Q.  Has there ever been, as far as you know?
23 A.  Not to my knowledge.
24 Q.  So how is a new claims person supposed to know how to
25    perform their job?

Page 104

1  A.  They're trained one-on-one with existing claims
2     examiners and we have ongoing internal seminars on
3     things like the Patriot Act, the Privacy Act, HIPAA,
4     those sorts of things, and then they are participants
5     in industry-sponsored seminars and courses.
6  Q.  So there's nothing in writing that they maintain at
7     their desk or cubicle relating to how Jefferson-Pilot
8     wants claims administered?
9  A.  There will probably be instructions on how to access
10    different computer screens.  They are required by
11    California law to maintain a copy of the California
12    Fair Claims Act at their desk, so yes, there would be
13    some documents at their desk, depending on what type
14    of claims they handle, depending on what kind of
15    training they have participated in.
16 Q.  Any other state's laws covered with education for your
17    claims administration folks?
18 A.  We have general training of good faith claims
19    practices.
20 Q.  In Ohio?
21 A.  Not specific to Ohio.  Ohio doesn't require specific
22    training to Ohio law.  California does.
23 Q.  So you train them as to the state's laws only if the
24    state requires that the person be trained in their
25    state's law?

Page 105

1  A.  Well, we train them to general good faith handling
2     guidelines that would be applicable across the
3     country, and then California has an additional
4     requirement that we actually keep a copy of their good
5     faith claims handling guidelines at the desk and that
6     once a year we go over those good faith claims
7     handling guidelines, and the truth is that
8     California's is probably the most restrictive in the
9     country.
10 Q.  You've shared with me what good faith means already in
11    this deposition, right?  We went over that earlier?
12 A.  If you say so.  I don't remember what I said, but if
13    you say so.
14 Q.  Okay.  Has Jefferson-Pilot, as far as you know, ever
15    maintained an action or does it have any present
16    actions seeking declaratory judgment about a
17    policyholder's right to benefits other than Mr.
18    Kearney's case?
19 A.  Yes.
20 Q.  Okay.  What was the nature of the declarations that
21    were sought in those cases?
22 A.  We've had numerous declaratory judgment actions.
23    We've filed interpleaders whenever there's an issue
24    resolving a benefit payment where there's disputes
25    between the parties.

27 (Pages 102 to 105)

Page 106

1  Q. Has there been an occasion to file a dec action
2     regarding residual disability benefit rights?
3  A. Not that I recall.
4  Q. I couldn't recall what we talked about two hours ago.
5     Are you mindful of any litigation where
6     Jefferson-Pilot has sought a declaration about a
7     policyholder's entitlement to Social Security
8     Supplement benefits while totally disabled?
9  A. Could you say that again.
10    MR. ROBERTS:  Can you read it back to her.
11    (The last question was read back by the court
12    reporter.)
13 A. I don't recall.
14 Q. Are you mindful of a policyholder named Leonard
15    Bergman in Bensalem, Pennsylvania?
16 A. I know that we have litigation pending on a Leonard
17    Bergman. I do not recall what the allegations of that
18    particular litigation entail.
19 Q. How about a Joseph Cardine in the United States
20    District Court for the Western District of
21    Pennsylvania?
22 A. I know that we have litigation pending or we had
23    litigation pending on a Mr. Cardine, but I don't know
24    the basis of the dispute in that case.
25 Q. Has that litigation been resolved?

Page 107

1  A. I can't remember.
2  Q. How about the other one, the gentleman from Bensalem,
3     has that been resolved?
4  A. I don't know.
5  Q. Are you mindful that Disability Management Services
6     will pay benefits to a policyholder under a
7     reservation of rights?
8  A. I wasn't aware of that, no.
9  Q. Does that term have any meaning to you in the
10    disability insurance field?
11 A. It has meaning to me in terms of general insurance
12    applicability including disability.
13 Q. What does it mean?
14 A. Payment under a reservation of rights means that
15    payment is subject to some question regarding
16    coverage, liability, whatever.
17 Q. Okay. Does Jefferson-Pilot ever pay benefits under an
18    expressed stated reservation of rights?
19 A. We have, yes.
20 Q. Okay. Are you mindful that three months after the
21    Claims Assessment Agreement was entered between
22    Jefferson-Pilot and DMS that DMS turned around and
23    started paying Mr. Kearney his benefit under a
24    reservation of rights?
25 A. I wasn't aware of that, no.

Page 108

1  Q. Are you mindful of anything that occurred between
2     December '99 when Phyllis Harden was signing those
3     confirmations that he was getting the proper benefit
4     and March 2000 that would suggest that there should be
5     a reservation of rights on Mr. Kearney's benefit?
6     MR. ELLIS:  Objection to form.
7  A. I don't have any knowledge of the handling of Mr.
8     Kearney's individual file.
9  Q. Are you mindful from reviewing the file and the
10    interrogatories last night where it's suggested that
11    Mr. Mills came up with this revelation about how the
12    policy should really be read, are you mindful whether
13    that occurred between January of 2000 and March of
14    2000?
15    MR. ELLIS:  Objection to form.
16 A. I'm not finding this in the answers to
17    interrogatories.
18 Q. You're not finding from your review there when
19    Mr. Mills came to this revelation?
20 A. Your question was based on my review of the
21    interrogatories and I'm looking at them now and I
22    can't find that reference.
23 Q. Do you have a present memory of any thing, document or
24    other information you have, that suggests to you when
25    Mr. Mills came to that revelation?

Page 109

1  A. It may have been contained in the pleadings, but I'm
2     not sure in which pleading.
3  Q. I'm sorry, I forgot, you said you have no personal
4     knowledge that Mr. Kearney was ever paid under
5     reservation of rights; is that right?
6  A. I have no personal knowledge of the handling by DMS or
7     JP of Mr. Kearney's individual file.
8  Q. You have no knowledge and no one has ever suggested to
9     you that he was receiving benefits under reservation
10    of rights for a period of time?
11 A. That's not something that is within my knowledge, no.
12 Q. No one has ever communicated that to you?
13    MR. ELLIS:  Sixth time.
14 A. Unless it was included in the pleadings that I
15    reviewed.
16    MR. ROBERTS:  No, it's only four. Come on,
17    Bill, keep counting.
18 Q. Did you review the Request for Admissions?
19 A. I don't know.
20 Q. You're mindful that interrogatories and Request for
21    Admissions need to be verified by a party, not a
22    lawyer, right?
23 A. Yes.
24    (Defendant's Exhibit No. 12 was marked for
25    identification by Mr. Roberts.)

28 (Pages 106 to 109)

Page 110

1  Q.  When you reviewed your company's responses to your
2      Request for Admissions and your company's responses to
3      the interrogatories, did you ask anybody why they
4      weren't verified or ask anybody who performed the
5      verification on behalf of your company?
6  A.  No.
7  Q.  Why not?
8  A.  The litigation is supervised by our Legal Department
9      and the documents surrounding that litigation would
10     have been -- the information would have been gathered
11     by our internal counsel.
12 Q.  But you know from your prior practice as an insurance
13     defense lawyer that responses to interrogatories and
14     responses to Request for Admissions must be verified
15     under oath, and these have been outstanding for a year
16     and they haven't been.  You didn't notice that last
17     night when you were reviewing them?
18 A.  No, I didn't.
19 Q.  Do you have the capacity during the lunch hour to gain
20     information about who at your company can verify the
21     responses?
22 A.  No, I do not.
23 Q.  Why not?
24 A.  Because it looks like there are a lot of different
25     pieces of information requested and I don't know who

Page 111

1      would have all of this knowledge among people who are
2      still at Jefferson-Pilot.
3  Q.  Okay.  But as the person with the -- the point person
4      for the relation with DMS, the point person for the
5      relationship with Employers Reinsurance, a lawyer,
6      Vice President of the Claims Department, I'm sure you
7      have dialogue with the general counsel's office, it's
8      your testimony that you are unable to find out who at
9      your company provided the factual information on which
10     the interrogatory responses and Request for Admissions
11     are based?
12 A.  Oh, I thought you were asking me something else.  Yes,
13     I could ask during lunch.
14 Q.  Could you, please.
15 A.  Uh-huh.
16 Q.  Thanks.  Would you?
17 A.  Yes.
18 Q.  Will you?
19 A.  Yes.
20 Q.  Yes.  Did you review the admission responses last
21     night?
22 A.  Yes, I did.
23 Q.  Did anything appear to you to be inaccurate?
24 A.  I really couldn't comment on that.  I don't know.
25 Q.  Nothing struck you as patently inaccurate based on

Page 112

1      your very limited knowledge of Mr. Kearney's claim?
2  A.  Nothing struck me as patently inaccurate, but I have
3      limited knowledge of the handling of Mr. Kearney's
4      claim.
5  Q.  That's what I said.  Is it your judgment that a
6      policyholder owes a duty of good faith to the
7      insurance company?
8  A.  I think both parties to the contract owe a duty of
9      good faith to the other party.
10 Q.  That's based on your legal training that the
11     policyholder has a duty of good faith that you reach
12     your understanding?
13 A.  That's based on my insurance background.
14 Q.  You had no responsibility for disability insurance
15     claims in the fall of 2001; is that correct?
16 A.  No, I came on board as Vice President of Claims in
17     June of 2002, so that's when I would have taken over
18     responsibility for the disability claims.
19 Q.  Prior to that it was property/casualty?
20 A.  I'm sorry?
21 Q.  I forgot your resume.
22 A.  Prior to that I was involved in the consolidation of
23     some claims offices that involved life insurance
24     claims.
25 Q.  Have you ever had any discussions with anyone about

Page 113

1      how it was that the settlement offer presented to Mr.
2      Kearney in the fall of 2001 was derived?
3  A.  No, I have not --
4          MR. ELLIS:  Objection.
5  A.  -- had discussions.
6  Q.  Back to those Phyllis Harden initials, that particular
7      form we were talking about, in May of each year there
8      was an expressly affirmatively calculated COLA
9      adjustment.  Did Phyllis Harden or whoever is
10     responsible for those transactions make mistakes on
11     each of those occasions?
12 A.  I don't have any personal knowledge of the handling of
13     the claim.  I know that a mistake was made.
14 Q.  Not one mistake, right?
15 A.  I don't know that.
16 Q.  There were dozens.
17 A.  I don't know that.
18 Q.  Well, sure you do.  I mean, every month for seven or
19     eight or nine years he was getting two checks and
20     every time he got a single check, it was a mistake,
21     the amount is, is your position in the lawsuit, right?
22         MR. ELLIS:  Objection.
23 A.  I don't know.
24 Q.  Did you shake your head?
25 A.  I don't know.

29 (Pages 110 to 113)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

Page 114

1  Q. You don't know, okay. If Mr. Hughes of DMS on behalf
2     of Jefferson-Pilot extended to Mr. Kearney an offer of
3     settlement in October of 2001 in the amount of
4     $280,000, that settlement offer, the amount, based on
5     your knowledge of the relationship between JP and DMS,
6     would have necessarily required JP's authority?
7  A. Yes.
8  Q. Okay. In the fall of 2001, who at Jefferson-Pilot
9     would have interacted with DMS to provide that
10    authority?
11 A. I believe it would have been Clyde Honaker.
12 Q. Is he still employed by the company?
13 A. No.
14 Q. He's the guy in Lexington?
15 A. Yes.
16 Q. I'll see him on my way back. What was his position at
17    that time?
18 A. He was Vice President of Claims.
19       (Defendant's Exhibit No. 13 was marked for
20    identification by Mr. Roberts.)
21 Q. I've marked as Exhibit 13 a copy of a letter from Mr.
22    Kearney's prior counsel in October of 2001 and a
23    response from William Hughes three days later on October
24    22, 2001. Have you seen these letters previously?
25 A. Not that I recall, no.

Page 115

1  Q. On the first page of the first letter in that
2     compilation, the last sentence, first paragraph says,
3     "Mr. Kearney was not interested in making a
4     counteroffer to your offer to him of $280,000." Is
5     this the first occasion that it's been represented to
6     you that there was a settlement offer made to Mr.
7     Kearney back in 2001?
8        MR. ELLIS: I'll object and ask for a
9     continuing objection under Rule 408.
10       MR. ROBERTS: It's not Rule 408, buddy.
11 Q. Go ahead.
12 A. I don't know.
13 Q. You don't know if it's the first time you've heard
14    about that?
15 A. I don't know any of the particulars surrounding DMS's
16    handling of Mr. Kearney's --
17 Q. That wasn't my question. My question was, is right
18    now the first time that you've understood or someone
19    has shared with you an offer made to Mr. Kearney in
20    the fall of 2001?
21 A. I don't remember.
22 Q. Have you ever reviewed the proposal provided to Mr.
23    Kearney before he decided to accept the proposal and
24    buy the insurance from your company?
25 A. Yes, I did.

Page 116

1  Q. When did you do that?
2  A. Last night.
3        MR. ROBERTS: Let's go off the record for one
4     second.
5        (Discussion off the record)
6  Q. You reviewed the proposal last night?
7  A. Not the whole thing. I think I may have looked at
8     some pages of the proposal, and there were references
9     to it in one of your motions for summary judgment.
10 Q. The one you weren't persuaded by?
11 A. Yes, the one I wasn't persuaded by.
12 Q. It's a small group you're in.
13       (Defendant's Exhibit No. 14 was marked for
14    identification by Mr. Roberts.)
15 Q. Were you with anybody last night when you were
16    conducting this review or were you by yourself?
17 A. Well, if you count my three kids.
18 Q. How old are they?
19 A. Seven, ten, and fourteen.
20 Q. Did you ask for their input?
21 A. No.
22 Q. I've handed to you what has been Bates labeled as 0635
23    through 0642, and then there is 0642-A and 0643. Also
24    attached to this exhibit are 0633, 0633-A, and 0634.
25       Do I understand correctly that a disability

Page 117

1     insurance company such as Jefferson-Pilot sells its
2     policies to the public through various agents?
3  A. Yes, sir.
4  Q. Okay. Are the agents given information to provide to
5     their prospective policyholder that educates the
6     policyholder on what their rights may be if they
7     purchase this product?
8  A. The agents are given marketing material that
9     summarizes provisions in the proposed contracts but
10    does not spell out all of the particulars of a
11    contract.
12       MR. ROBERTS: Let's stop there.
13       (Lunch recess)
14 Q. Were you able to make that call to see who provided
15    the information, the sworn factual information --
16 A. I spoke with in-house counsel and was advised that the
17    information came from our Legal Department's
18    conversations with DMS examiners who had handled the
19    file.
20 Q. Who's going to verify the responses?
21 A. (Indicating)
22 Q. Who's going to swear to the truth of the responses?
23 A. I don't know, someone from our Legal Department.
24 Q. They don't have any factual knowledge. So we're just
25    not going to get sworn responses?

Reported By: Rebecca J. Huddy
Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney          C-1-02-479
Valerie Loftin                                                        5/6/2004

Page 118

1  A.  I don't know.
2         MR. ROBERTS:  Counsel, so are we going to get
3  some sworn responses as required under Rule 34 and 33
4  and 36?
5         MR. ELLIS:  Absolutely.
6         MR. ROBERTS:  Sometime in the year 2004?
7         MR. ELLIS:  Hopefully.
8         MR. ROBERTS:  Is there some doubt in your
9  mind about whether it will be this year?
10        MR. ELLIS:  No.
11        MR. ROBERTS:  Will it be this month.
12        MR. ELLIS:  I don't know, Mike, depends on
13  when I get home.
14        MR. ROBERTS:  When do you plan on arriving
15  home?
16        MR. ELLIS:  Do you want to continue with your
17  deposition?  You're losing time, bud.
18        MR. ROBERTS:  Bill Ellis, a lawyer, took an
19  oath, practicing law 30 years, we've been requesting
20  the verified responses for a year, we're sitting here,
21  the discovery deadline has already passed, and you
22  can't tell me when or are you afraid to tell me
23  because someone is recording what you say?
24        Are you afraid to tell me or is it because
25  someone is recording what you say?

Page 119

1         Are you just going to stare at me?
2         MR. ELLIS:  I'm not going to banter with you
3  on the record or off the record.
4         MR. ROBERTS:  Okay.  If I were you, I'd be
5  reluctant to speak while someone is recording what you
6  say as well.
7         MR. ELLIS:  Keep that snide remark on the
8  record, would you, please.
9         MR. ROBERTS:  Please, yes.  You don't have to
10  look at this record.  You can pull out your e-mail
11  file.
12  Q.  Was Mr. Maxwell contacted or Mrs. Maxwell during the
13  break, as far as you know?
14  A.  Was Mr. -- yes.
15  Q.  And arrangements have been made for him tomorrow
16  afternoon?
17  A.  I don't know, I --
18        MR. ELLIS:  I understood you made them.
19        MR. ROBERTS:  I told him to expect -- I think
20  I communicated this unambiguously --
21        MS. FARABOW:  Are we staying on the record or
22  off the record?
23        MR. ROBERTS:  Let's leave it on the record.
24        MS. FARABOW:  I called Mrs. Maxwell tonight and I asked
25  if we could meet with Mr. Maxwell tonight and I said I

Page 120

1  was not sure of what the arrangements were for
2  tomorrow, but I'm sure that they would be communicated
3  to her.
4         MR. ROBERTS:  Okay.  What I wanted to do was
5  take myself out of the mix and let Jefferson-Pilot
6  handle the communication and arrange for it.  My
7  expectation is, we would be in a position to be at his
8  house 2:00 to 2:30 tomorrow if we're beginning at
9  8:30.
10        MS. FARABOW:  We'll communicate that to her.
11        MR. ROBERTS:  Thank you.
12  Q.  Have you ever discussed with your contacts at DMS
13  their practice on note taking in the claims files?
14  A.  On note taking?
15  Q.  Uh-huh.  Are you mindful that they don't take notes?
16  A.  No, I'm not mindful that they don't take notes.
17  Q.  Is it a good business practice not to take notes, in
18  your judgment?
19  A.  For Jefferson-Pilot that would not be a good business
20  practice.  I can't really comment on what DMS does.
21  Q.  Thank you.  The proposal, do you have that handy?  It
22  was Exhibit 14.  Are you there?
23  A.  Yes.
24  Q.  Okay.  We were talking about how Jefferson-Pilot is
25  able to generate revenue through the sale of its

Page 121

1  product, which is in this case a disability insurance
2  policy.  My understanding was, there's agents out
3  there across several states that on Jefferson-Pilot's
4  behalf promote its product to potential policyholders;
5  is that accurate?
6  A.  Yes.
7  Q.  Okay.  And you had mentioned that there are materials
8  that are provided to these agents for sharing with
9  prospects who may be interested in buying
10  Jefferson-Pilot's product, right?
11  A.  Yes.
12  Q.  Okay.  And in this instance what's been Bates
13  labeled -- I think we identified what Bates number
14  documents they are, what we've marked as Exhibit 2 for
15  this deposition --
16        MR. ELLIS:  Exhibit 14?
17  Q.  -- Exhibit 14, a document titled This Disability
18  Income Proposal Has Been Prepared For Chris Kearney
19  Prepared By Michael Lupidi, and towards the bottom of
20  the first page it says Jefferson-Pilot Life Insurance
21  Company, PO Box 20727, Greensboro, North Carolina
22  27420, and the final three pages of the document of
23  this exhibit potentially is a separate document since
24  it is separately page-numbered 123 and it reflects a
25  Jefferson-Pilot disability income insurance proposal

31 (Pages 118 to 121)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney                    C-1-02-479
Valerie Loftin                                                                                      5/6/2004

Page 122

1    for Chris Kearney.
2         Are these materials you reviewed last night
3    in the presence of your children?
4    A.  I reviewed some of this, not all of it.  I did not
5    look at every page.
6    Q.  Okay.  Let's look at the second page of the exhibit.
7    The second page again has a heading, Jefferson-Pilot
8    heading of some sort.  Then it says Jefferson-Pilot
9    Disability Income Insurance Proposal For Chris
10   Kearney, and then there's an all caps two words BASIC
11   BENEFITS, and then if you go down halfway there is an
12   all caps two words called ADDITIONAL BENEFITS.  Let's
13   focus on the Basic Benefits first, okay?  Well,
14   actually let's focus on the heading called Residual
15   Disability underneath Additional Benefits.  Do you see
16   that?
17   A.  Yes.
18   Q.  Okay.  There's a heading called Residual Disability
19   and it's a single sentence.  It says, "Residual
20   disability pays a percentage of the Basic Benefit" --
21   and Basic and Benefit both have capital letters,
22   defined term, right?
23   A.  Yes.
24   Q.  -- "and Social Security Supplement" -- Social Security
25   Supplement also has capital letters, defined term,

Page 123

1    right?
2    A.  Yes.
3    Q.  -- "if applicable when you are residually disabled and
4    suffer a loss of earnings of 20 percent or more."
5         So prospective policyholders who receive a
6    proposal such as this are told that they get a
7    percentage of the basic benefit, and if we go to the
8    top, basic benefit is defined to include monthly
9    benefit for total disability and applicable
10   elimination period.  It says benefits are not payable
11   during the elimination period under basic benefits.
12   Basic benefits is defined to include a benefit period
13   for total disability to age 65, but if your disability
14   begins prior to age 45, benefits are payable for life.
15   If disability begins on or after your 63rd birthday,
16   benefits are payable for up to two years, and the
17   fourth item of basic benefits is percentage increase
18   in benefits during total disability, 3 percent.  Your
19   increase in benefits begins with the 13th month of
20   total disability benefits.  Benefits will be increased
21   during each successive twelve-month period of total
22   disability up to the end of your benefit period.  No
23   further increases will be applied after your 65th
24   birthday.
25         So going back to the paragraph Residual

Page 124

1    Disability, what it says is, persons on residual
2    disability get some percentage of the basic benefit,
3    which are all those items I just read into the record;
4    is that right?
5         MR. ELLIS:  Objection.
6    A.  I don't know.
7    Q.  Why?  Why don't you know?
8    A.  Because I don't have any knowledge of what went into
9    the preparation of the proposal.  I wasn't involved in
10   disability at the time.
11   Q.  Well, you just testified that people making less than
12   $80,000 a year who report up to certain probably
13   levels of chains of command to you as a Vice President
14   can understand insurance policies fairly easily.
15   A.  This isn't an insurance policy.
16   Q.  But what this says is that your company's insurance
17   policy, your company's marketing material, your
18   company's agent told Mr. Kearney that residual
19   disability pays a percentage of the basic benefit
20   which includes the monthly benefit for total
21   disability and a percentage increase in benefits
22   during total disability; isn't that's right?
23         MR. ELLIS:  Objection, misstates the obvious
24   language.
25   Q.  Isn't that right?

Page 125

1    A.  I don't have personal knowledge of that.
2    Q.  You don't?  You can't conclude based on -- I mean, you
3    went to North Carolina law school over 20 years ago,
4    you've been practicing in the insurance field for more
5    than 15 years, you're the Vice President of Claims for
6    the plaintiff, and you can't read this document and
7    conclude that residual disability pays Mr.
8    Jefferies -- or Mr. Kearney the monthly benefit for
9    total disability and a percentage increase in benefits
10   during total disability?  You can't conclude that?
11   A.  No.
12   Q.  If we continue in the sentence, residual disability
13   pays a percentage of the basic benefit and Social
14   Security Supplement, if applicable.  That would mean
15   that someone on residual disability gets the Social
16   Security Supplement if they purchased that rider,
17   right?
18   A.  No --
19         MR. ELLIS:  Objection.
20   Q.  Okay.  So now you definitively have a response.  You
21   do have an opinion about this language.  What --
22   A.  I'm saying I don't understand how you're reading this
23   into what you just read to me.  I don't understand
24   that.
25   Q.  Reading what?  I just read the language.

32 (Pages 122 to 125)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney        C-1-02-479
Valerie Loftin        5/6/2004

Page 126

1   A.  No, you didn't. You paraphrased.
2   Q.  Okay. Let me read the language. "Residual disability
3       pays a percentage of the basic benefit." I did
4       accurately read into the record what is the basic
5       benefit as defined by this proposal, correct?
6   A.  Pays a percentage of the basic benefit. Where are you
7       reading now?
8   Q.  Do you have Exhibit 14 in your hand?
9   A.  Yes, I've got Exhibit 14.
10  Q.  Are you looking at page 2?
11  A.  I'm looking at page 2.
12  Q.  Okay. You tell me if I read this correctly.
13  A.  Okay.
14  Q.  Okay. The first heading is Basic Benefits, correct?
15  A.  Yes.
16  Q.  And then underneath Basic Benefits there's a list of
17      items before you get to the next heading Additional
18      Benefits, right?
19  A.  Yes.
20  Q.  So everything between where it says Basic Benefits and
21      Additional Benefits are the basic benefits, right?
22  A.  For total disability.
23  Q.  Okay. Those are the basic benefits for total
24      disability?
25  A.  Yes.

Page 127

1   Q.  What's referenced on this document -- I don't need to
2       read it -- we can agree that the language between the
3       two headings basic benefits and Additional Benefits
4       are the basic benefits for total disability, right?
5   A.  I can agree to that, yes.
6   Q.  Which come under the heading, simple heading, two
7       words, Basic Benefits. That's what the document says?
8   A.  Underneath the basic benefit provision in the
9       illustration.
10  Q.  Okay. Let's go to the next heading Additional
11      Benefits, okay? In the first part under Additional
12      Benefits -- there's -- can we agree that there's four
13      different sections to Additional Benefits: the Social
14      Security Supplement, the Residual Disability, the
15      Optional Increase in Benefits During Total Disability,
16      and the Option to Purchase Additional Monthly
17      Benefits? Can we agree on that?
18  A.  Yes.
19  Q.  Okay. Let's focus on the second one of those. The
20      second one, tell me if I'm reading it correctly.
21      "Residual disability pays a percentage of the Basic
22      Benefit and Social Security Supplement, if applicable,
23      when you are residually disabled and suffer a loss of
24      earnings of 20 percent or more." Did I read it
25      correctly?

Page 128

1   A.  You read it correctly.
2   Q.  Okay. And the "if applicable" part means if the
3       person has bought the additional benefit of Social
4       Security Supplement through purchasing a rider, right?
5   A.  I don't have personal knowledge of what the "if
6       applicable" part means.
7   Q.  Could that be an interpretation?
8   A.  I don't know.
9   Q.  You as a lawyer of 23 years can't determine that that
10      could be a way to read that sentence?
11  A.  My department handles claims.
12  Q.  Okay.
13  A.  Claims are based on the policy language. This is not
14      the policy.
15  Q.  That's your testimony?
16  A.  This is marketing material.
17  Q.  Okay. So it would be --it is unambiguous that that
18      sentence could not possibly mean -- the "if
19      applicable" part of that sentence couldn't possibly
20      mean if that rider is purchased?
21  A.  I don't know.
22  Q.  Okay. I'm sorry, in trying to respond to a different
23      question, you said something about this just being
24      marketing material.
25  A.  That's what you said, that this was a marketing piece.

Page 129

1   Q.  This is just -- it's meaningless? Do you want your
2       policyholders to get documents that are completely
3       meaningless and then purchase -- pay money for
4       something that has nothing to do with what they were
5       sold on?
6           MR. ELLIS: Objection.
7   A.  No, that's not what I said. I said that within the
8       Claims Department when we are handling a disability
9       claim, what we were looking at in order to make an
10      accurate liability determination is the policy
11      language, which is actually what the insured has
12      purchased, not whatever summarizations are in
13      marketing material.
14  Q.  Okay. So it doesn't matter what you tell the
15      prospective policyholder what their benefits will be?
16  A.  That's not what I said.
17  Q.  Does it matter?
18  A.  Of course it matters.
19  Q.  Okay. So what's the consequence if you tell your
20      prospective insured X, they're going to buy X, and
21      then later you tell them, Well, you really didn't buy
22      X, you bought Y? What's the consequence of that?
23  A.  You'd have to give me more of a specific example.
24  Q.  Okay. Let's assume that Mr. Kearney was given a
25      proposal that says the Social Security Supplement and

33 (Pages 126 to 129)

Jefferson-Pilot Insurance Company vs. Christopher L. Kearney    C-1-02-479
Valerie Loftin    5/6/2004

Page 130

1    the COLA adjustment, if he purchases those riders and
2    the residual disability rider, if he becomes
3    residually disabled in the future, he gets the Social
4    Security Supplement, it's potentially payable for
5    life, and he gets the COLA adjustment.
6        Let's assume that he was given some marketing
7    material that suggests if he bought a policy, paid
8    money for a policy, paid money for a residual
9    disability rider, paid money for a Social Security
10   Supplement rider, paid money for a COLA, increased
11   COLA rider, and if he continued quarterly, annually,
12   or semiannually to pay premiums for all four of those
13   products, that he'd get Social Security, increased
14   COLA during the period of residual disability.
15       If that was the proposal made to him, let's
16   assume it was -- can you assume it was?
17   A. No, I can't assume that.
18   Q. Well, for my question just assume it was. You asked
19   me to give you an example and I'm giving you an
20   example. Let's assume that happened, and then he pays
21   all that money and the insurance company says, you
22   know what? Even though the marketing material said
23   that, that's not what we sold you. What's the
24   consequence of that?
25   A. That didn't happen here, so I don't know.

Page 131

1    Q. Okay. So what I represented as a potential example is
2    not represented in this document?
3    A. I can't give you any answers about this document.
4    Q. But your $40,000-a-year claims folks could make legal
5    conclusions about what this document says?
6    A. My claims examiners would be reviewing the policy --
7    Q. Okay.
8    A. -- which controls the contractual obligations of the
9    company.
10   Q. Okay. If you'd turn to page 5. Do you see the
11   heading Residual Disability on page 5?
12   A. Yes.
13   Q. There is a list A to D. Below the D it says -- tell
14   me if I read this correctly -- "The amount of your
15   residual disability benefit will be the percentage of
16   your Basic Benefit and Social Security Supplement
17   benefit (if applicable)." What do you understand the
18   "if applicable" to mean there?
19   A. That the Social Security Supplement benefit might not
20   be applicable.
21   Q. If you don't purchase that rider, correct?
22   A. I don't know.
23   Q. Okay. That could be one interpretation?
24   A. I don't know.
25   Q. It's a logical interpretation.

Page 132

1        MR. ELLIS: Hardly.
2        MR. ROBERTS: Listen, I'm not looking to you
3    for logic, buddy. I'm talking to somebody who
4    actually went to law school and took an oath.
5    Q. "If applicable" could mean if you purchased that
6    additional Social Security Supplement benefit rider,
7    that's what "if applicable" could mean, couldn't it?
8    A. (No response)
9    Q. Yes? Why are you delaying in answering that question?
10       MR. ELLIS: Excuse me. Give her a chance to
11   think about your question and answer.
12   A. I don't understand the question.
13   Q. Okay. If you don't understand the question and that's
14   what your sworn testimony is, go ahead.
15       MR. KEARNEY: How do you think I feel?
16       MR. ROBERTS: Chris, stop it.
17   Q. Tell me if I read the example correctly. See where it
18   says Example two paragraphs down there? "Example: If
19   your monthly earned income during residual disability
20   is 60 percent of your pre-disability earnings, you
21   have a 40 percent loss of earnings. During the first
22   six months of residual disability only,
23   Jefferson-Pilot will pay you a minimum benefit equal
24   to 50 percent of your benefit for total disability.
25   Thereafter it would be equal to 40 percent of your

Page 133

1    benefit for total disability."
2        So if a person purchases the COLA, Social
3    Security Supplement, and becomes later residually
4    disabled, in this example that you give to your
5    prospects from whom you want monies, you're telling
6    them that they would get 40 percent of the benefits
7    that go with total disability which may also include
8    increased COLA and Social Security; isn't that right?
9        MR. ELLIS: Objection, misstates the
10   document.
11       MR. ROBERTS: Fine, Bill.
12   A. I think the document speaks for itself.
13   Q. You're not willing to answer that question?
14   A. I think the document speaks for itself.
15   Q. Okay. What's your impression of it, though? I know
16   that the judge may conclude that the document speaks
17   for itself, but I want your impression.
18   A. I think the document speaks for itself.
19   Q. You're not willing to answer the question?
20   A. I think the document speaks for itself.
21   Q. Okay. I do, too.
22       The last sentence of that paragraph says, "If
23   the loss of earnings is at least 75 percent, the full
24   benefit for total disability will be payable." Do you
25   at least understand that Mr. Kearney has always had at

34 (Pages 130 to 133)

Reported By: Rebecca J. Huddy

Huseby, Inc. An Affiliate of Spherion, 1230 W. Morehead St., Suite 408, Charlotte, NC 28208 (704) 333-9889    Fax (704) 372-4593