IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. C-1-02-479

JEFFERSON-PILOT LIFE INSURANCE CO., Plaintiff

v.

CHRISTOPHER L. KEARNEY, Defendant

DEPOSITION OF: ROBERT MILLS, taken before Sharon R. Roy, Notary Public Stenographer, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the law offices of ACCURATE COURT REPORTING, 1500 Main Street, Springfield, Massachusetts on May 14, 2004 commencing at 8:38 p.m.

A P P E A R A N C E S:

(See Page 2)

Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

A P P E A R A N C E S:

FOR THE PLAINTIFF:

WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH 45202-2491
513-852-6000
BY: WILLIAM R. ELLIS, ESQ.

FOR THE DEFENDANT:

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45201
513-621-6464
BY: MICHAEL A. ROBERTS, ESQ.

Also Present:

Adam E. Formus

Joanne Yacavone, Videographer

I N D E X

| WITNESS | EXAMINATION | PAGE |
| --- | --- | --- |
| Robert Mills | Direct by Mr. Roberts | 11 |
| | Cross by Mr. Ellis | 228 |

EXHIBITS: PAGE:

Exhibit 42: Privilege log ........................ 10

Exhibit 43: Compilation of material ............. 131

Exhibit 44: Binder marked "Exhibit" ............. 131

08:38:39 THE VIDEOGRAPHER: The caption of the case is Jefferson-Pilot Life Insurance Company, plaintiff, versus Christopher L. Kearney, case number C-1-02-479. Would the court reporter please swear in the witness.

08:39:32 ROBERT MILLS, Deponent, having first been duly sworn, deposes and states as follows:

08:39:42 MR. ROBERTS: This is Mike Roberts, counsel for the defendant, and we are here on Friday morning, May 14, 2004 at 8:40. This deposition was to begin at 8:30 in the morning. Since 8:30 two procedural issues have arisen in the case.

08:40:00 First, to describe the scene, we're in the court reporter's office conference room in Springfield, Massachusetts. At the table is the videographer, court reporter, Mr. Ellis, counsel for the plaintiff, the witness, and myself. In the corner of the room is a lawyer named Adam Formus who is in-house counsel for DMS. Yesterday during

the course of two depositions Mr. Formus sat away from the table in the corner of the room taking down on his laptop every word that was said in the room. That's not a problem. The problem is he was connected to the Internet and connected to his office during yesterday's proceedings.

I took one long deposition yesterday of Mr. Ditmar, and at the second deposition I asked the witness if he had any communications regarding the conduct of the proceeding. It was my understanding from the testimony that Mr. Formus's Internet connection back to the office and his word-for-word transcription of the day's proceedings were communicated to Mr. Bonsall. For that reason this morning when I arrived I requested that Mr. Formus, if he desired to take down every word that is spoken today in addition to the court reporter doing so, he could do so on his laptop and save that information to his laptop either on a disc or not to a disc, he could save it to the hard drive on the laptop. That was unacceptable

to Mr. Formus. He said, "No, I'm not going to do it. I'm going to be connected to the Internet." So there is reason to suspect that these proceedings are being transmitted back to DMS's office contemporaneous with the proceedings. I have to take still two more depositions this afternoon and I've asked Mr. Formus for his courtesy in not being connected to the Internet, not being connected to his network back at the office and he refuses.

The second procedural issues that arose, is for approximately 15 months the defendant has been seeking the privilege log be provided. The privilege log due in the case from the plaintiff was due approximately 15 months ago and there has been more than a dozen requests for the privilege log. We are now beyond the discovery cut-off. I am here on my last day of depositions of DMS employees. I've taken the depositions I intend to take of the Jefferson-Pilot employees. I've told Mr. Ellis that I need the privilege log before the conclusion of

the depositions. Mr. Ellis handed to me at 8:30 this morning or 8:32 a fax that purports to be from a woman named Christie Zerges, from the law firm of Wood & Lamping, who I understand to be Mr. Ellis's paralegal. The fax was transmitted, according to the fax transmittal line, at 4:18 May 13, 2004, and the fax is specifically directed to the Springfield Marriott, Guest Michael Roberts. I stayed at the Springfield Marriott yesterday. The total number of pages is six. And the note written by Christie Zerges is, "Mike, attached, please find the privilege log which was completed today in the above case."

Apparently, Mr. Ellis intercepted this fax before I could receive it at the Marriott yesterday and I was not provided it prior to the conduct of this deposition. Perhaps that was because he didn't desire me to be able to review it before the deposition.

Nonetheless, the third procedural issue, actually, is that the privilege log

itself is woefully insufficient. The rules specifically require that the privilege log contain the dates of the communication, the author of the communication by name, the recipient, and the substance of the communication. The purpose for that is obvious. It's for the Court to be able or the lawyer to be able to determine whether in fact there is an appropriate designation of privilege.

Notwithstanding those very unambiguous obligations, Mr. Ellis's office has prepared a list of the 86 pages, I knew what 86 pages they were, I knew what the Bates numbers were, and all he has done is recited the Bates number of those pages and said "privileged communication." Some said "privileged communication from counsel to client," some said "privileged communication between counsel." Otherwise there is no data provided in the alleged privilege log that complies with the rule or offers the opposing party the opportunity to explore whether or not it's an appropriate exercise or assertion

of privilege. And for that reason I'll be filing a motion with the Court, but all these depositions will be convened in progress since the defendant has still not complied with its very clear and unambiguous discovery obligations.

Are you ready, Mr. Mills?

THE WITNESS: Yes.

MR. ELLIS: Excuse me, we'll respond.

MR. FORMUS: As in-house counsel for Disability Management Services I categorically deny and reject Mr. Roberts' statement that I shared any information whatsoever with either Mr. Bonsall or Mr. Ditmar at any time yesterday either personally and/or via the Internet that's connected to the hard drive in my office. The laptop is for purposes of saving my notes with regards to yesterday's depositions directly to my hard drive. I neither communicated directly or indirectly with Mr. Bonsall yesterday. Therefore, Mr. Roberts' allegation was patently false.

MR. ELLIS: With regard to the

privilege log --

MR. ROBERTS: We'll mark the privilege log as Exhibit 42, for the record.

Priv Log Ex. 42

(Exhibit 42, marked)

MR. ELLIS: Are you finished?

MR. ROBERTS: Yeah, go ahead.

MR. ELLIS: With regard to the privilege log, which was prepared by my office in my absence at Mr. Roberts' request, I don't know about 15 months or 12 requests for it in the past because I have not had an opportunity to determine the accuracy of those statements, I've told Mr. Roberts that I received the privilege log by fax. I received a copy and there was a copy for him. It was in one envelope at the hotel. I didn't intercept it or attempt to intercept it. I opened the envelope at 10:30 last night. I found both faxes in it. I didn't call him at 10:30 last night, I gave it to him this morning. The privilege log, if inadequate in any way, will be amended to comply with whatever requirements there are with regard to the privilege log as quickly as possible and I

have no objection if he wants to continue these in progress based upon the privilege log, although none of the witnesses here are party to any of the privileged documents.

MR. ROBERTS: It's curious how the Marriott could determine from a fax directed to Mike Roberts, with a special note to Mike Roberts on the cover sheet, that I was in any way affiliated with Bill Ellis. But regardless, Mr. Mills, are you ready to begin?

THE WITNESS: Yes.

4:47:04

DIRECT EXAMINATION BY MR. ROBERTS:

Q. Could you state your residence address for the court reporter, please?

A. I don't feel comfortable giving my personal information.

Q. Okay. Are you comfortable giving it to Mr. Ellis and authorizing him to accept a subpoena on your behalf?

A. Yes, I am.

Q. Whether or not you're still employed by DMS before the conclusion of this litigation, you are willing and you're authorizing Mr. Ellis on this

record to accept service of a subpoena on your behalf?

A. Yes, I am.

Q. Okay. How old are you?

A. I'm 34.

now 37

Q. Do you have a college degree?

A. Again, I don't feel comfortable giving out personal information.

MR. ELLIS: You can tell him whether or not you have a degree.

A. Yes, I do have a college degree.

Q. Where did you attend college or where did you receive your degree from?

A. I have a degree from the University of New Haven in Connecticut, undergraduate, and I also have a master's degree from Western New England College, Springfield.

Q. When did you receive your bachelor's?

A. I received my bachelor's in 1991.

Q. And what is your master's in?

A. My master's is a general business program.

Q. An MBA?

A. Correct.

MBA

Q. When did you receive your MBA?

A. I don't know exactly. I think it's 2001 or around about.

Q. Did you undertake those MBA courses during a period of your employment? While employed, did you do a night course, weekend?

A. I took those courses while I was employed.

Q. Was it a correspondence or was it actually attendance at some night school program?

A. It was a night school program.

Q. What was your major in undergrad?

A. My major in undergrad was financial accounting.

Q. What has been your work experience since '91?

A. Since 1991 my work experience has been exclusively in the disability insurance business.

DI Since 91

Q. Who have been your employers?

A. I've worked for Monarch Life Insurance, Connecticut Mutual Life Insurance Company, Massachusetts Mutual Life Insurance Company, and Disability Management Services.

Q. When did you join DMS?

A. I joined DMS in approximately October of 1996.

DMS 10/96

Q. How long were you employed at Monarch? Two years?

A. I was employed at Monarch for approximately two years, a couple months.

Q. And then you went to work at Connecticut Mutual which became or merged with MassMutual, is that right?

A. After I left Monarch I went to Connecticut Mutual, and Connecticut Mutual and MassMutual subsequently merged and I became a MassMutual employee.

Q. Was Mr. Midghall your supervisor when you joined DMS?

Do you understand the question?

MR. ELLIS: Give him a second, he's trying to remember.

A. I do understand the question. I honestly don't recall who I reported to at that time.

Q. Have you ever reported to Mr. Midghall?

A. Yes, I believe I reported to him at one point.

Q. Do you know when?

A. I believe I reported to him for a period of time at Connecticut Mutual.

Q. You've not reported to him since joining DMS?

A. I may have, I just don't specifically recall today.

Q. Have you ever provided sworn testimony that that was the case?

A. I don't recall if I have.

Q. You've been in a deposition before, haven't you?

A. Yes, I have been in depositions before.

Q. You've been deposed relative to work at DMS, haven't you?

A. Yes, I have.

Q. Were you deposed in a case where the policyholder or claimant was named King, last name King?

A. Do you have a first name?

Q. I think it's Aubert. I think it was just October 2003, maybe October 28th or 29th, if that refreshes your memory.

A. I don't recall having any dealings with an Aubert King.

Q. In what cases have you given a deposition? Do you remember any names of any policyholders who

sued your company based on work that you did and you gave a deposition?

A. I remember a case, a gentleman by the name of Nathan Friedenberg. And I can remember another case, Greenfield I think was the last name.

Q. Did you testify truthfully in the Friedenberg deposition?

A. Yes, I testified truthfully.

Q. That was in February of 2001 that you gave that deposition, do you recall that?

A. I don't recall the time frame.

Q. If you told Mr. Friedenberg under oath that Mr. Midghall was your supervisor at DMS, would that have been true?

A. If I said it under oath at that point in time, yes, that would mostly likely be true.

Q. And if it was true then, it would be true today, right?

A. Can you say the question again? I don't understand.

Q. Well, if you told Mr. Friedenberg in 2001 that Mr. Midghall was your supervisor when you started at DMS, your initial supervisor, that would still be the case today, right? I mean, it would

still be the truth today?

A. Well, is your question is it true at that time or is Mr. Midghall my supervisor today?

Q. No, my question is not is Mr. Midghall your supervisor today. I don't know how you understood that from the question I asked, but let me be clear. If in 2001 you told someone under oath that in '96 and '97 Mr. Midghall was your supervisor, and if it was true then, that's true now, that he was your supervisor back in '96 and '97?

A. Well, yes, then, if I said that, he would have been in '96 and '97 my supervisor, that was my testimony.

Q. I mean, the past can't change, right?

A. Obviously not.

Q. And then your supervisors in sequence were Ms. Sweeney, Mr. Ditmar, and Mr. Hughes, right?

A. To the best of my recollection, my supervisors would have been in that order that you mentioned.

Q. Is Mr. Hughes your supervisor today?

A. Yes, Mr. Hughes is.

Q. On what block of business did you work in January of 2000?

A. I worked -- part of January of 2000 I worked on Travelers Insurance Company, New York Life, Mutual Benefit, Monarch, MassMutual, Connecticut Mutual. I think there was a Woodmen of the World. That's best I can recall.

Q. You worked on all those blocks while employed at DMS?

A. No, I did not work on all those blocks while employed at DMS.

Q. Which of those blocks did you work on not at DMS?

A. The blocks that I worked on not at DMS would have been Monarch, Connecticut Mutual, MassMutual. I think that would be it.

Q. What block of business do you work on today?

A. The block of business I work on today would be Equitable Life Insurance.

Q. Was there a period of time you worked on the Jefferson-Pilot block of business?

A. Yes, there was a period of time I did work on the Jefferson-Pilot.

Q. What period of time was that?

A. The period of time would have been January

of 2000 up until probably around the time that these proceedings commenced.

Q. When is your judgment of the commencement of these proceedings?

A. I believe that was sometime -- my understanding, sometime last year, 2003.

Q. Do you recall when in 2003 that you were no longer responsible for the Jefferson-Pilot block of business?

A. Best I recall is probably end of 2003.

Q. Have you ever received a spot bonus?

A. No, I don't recall ever receiving a spot bonus.

Q. Mr. Kearney's policy with Jefferson-Pilot was designated as a WJ576A policy, do you recall that?

A. I recall the policy.

Q. Was his claim under the WJ567A policy the only claim that you administered while handling the Jefferson-Pilot block of business that required you understand the WJ576A policy?

MR. ELLIS: Objection.

A. As I sit here today, I don't recall whether there were other WJ576As. I would imagine that there

were a number of other claims that I handled that had the similar policy.

Q. Well, there were between three and five hundred claim files transmitted from Jefferson-Pilot to DMS in or about January of 2000. Are you mindful of that?

A. What I'm mindful of is that there was a number of cases that were transferred from Jefferson-Pilot to DMS. I wouldn't specifically know the number of those cases.

Q. How many people were working on that block of business simultaneous to you in the year 2000?

A. Can you repeat the question?

Q. How many other people worked like you on the Jefferson-Pilot block of business in 2000?

A. To the best of my recollection, there were three other individuals other than myself.

Q. Okay. Do you know if the workload on the Jefferson-Pilot block of business was distributed fairly evenly between the four of you?

A. I have no idea how they were distributed.

Q. Do you know how many claim files that you were administering in 2000 for Jefferson-Pilot?

A. Again, as of today, I mean, I don't recall

how many cases I would have been handling for that company at that time.

Q. Do you know if it was more than 50?

A. You know, I honestly, I don't recall. It seems to be a range type of number.

Q. What kind of range are we talking about?

A. The best I could recall would be a range of 50 plus or minus ten files.

Q. Somewhere between 40 and 60?

A. Again, I don't recall specifically the full amount of cases that I had, but if I was to put a range on it, I think that would be a fair estimate.

Q. Did you ever keep any kind of log of the files that you were responsible for?

A. I had access to the computer and the computer system which would log all the cases that were assigned to me.

Q. The DMS software program that's called the claim system, you could go in there and somehow figure out how many claims you were responsible for?

A. Yes, there was a DMS claim system and I could go in there and find out how many cases I had.

Q. Has anyone ever told you that the WJ576A policy was a policy that Jefferson-Pilot sold quite a

about 50 JP cases

Can figure out

number of?

A. Can you repeat the question?

Q. Has anyone ever told you that the WJ576A policy was a product that was fairly well received by the public; a lot of policies were purchased under that particular acronym, WJ576A, do you know that?

A. I have no knowledge of any purchase of numbers or popularity of any of the policies of Jefferson-Pilot.

Q. No one's ever told you that?

A. Not to my knowledge. I never recall anybody saying those things to me.

Q. If 40 to 60 is the total Jefferson-Pilot claim files you had in 2000, how many of those were the WJ576A policies?

A. Again, as I said earlier, I wouldn't specifically be able to recall the amount, specific number of WJ576As or really any other policy form, for that matter.

Q. When you received these files, did you familiarize yourself with the policies that Jefferson-Pilot had issued to its policyholder?

A. I had a base knowledge of the policies. We received, like I said earlier, a whole bunch of them

at one time, so it was kind of a crash course of handling the cases.

Q. But in doing your work, do you read the policy that applies to the particular policyholder's claim?

A. Yes, I would read the policy, not necessarily at the point in time which I received the claim file. I would probably be doing that more in the circumstances of a new notice case. However, receiving a number of these well e-established files from Jefferson-Pilot I did not find myself going through each and every policy, that would have been something that happened in the due course of time.

Q. Okay, what's important in determining benefit eligibility? The sickness or injury that the person has sustained, is that one?

A. Can you repeat the question?

Q. I want to create a list of the things that are important from your perspective in the job you held in doing your work, okay. When administering a disability claim, is it important to understand the -- to determine eligibility, is it important to understand the medical facts and circumstances that exists with the policyholder?

I would not read policy

A. On a disability claim it is important to understand the medical facts.

Q. Is it important to determine benefit eligibility, what the policy provides?

A. Yes, it is important to understand what the benefits are under the policy.

Q. Are those the two most important things to understand to determine benefit eligibility?

A. I wouldn't say that the medical and benefit structure of the policy are the two, single-most important things, but they are obviously essentially important in making a benefit decision, and ongoing benefit decisions.

Q. What's more important than the facts concerning the medical circumstances of the policyholder and the policy's contractual rights and obligations; what's more important than those two things?

A. I don't think one or the other is more important than the other one. I think you have to take them in whole in making these types of decisions. You're not going to make a decision on one piece of information or one fact in a disability claim.

1. Med facts

2) Policy Benefit

Q. I think you and I agree. I mean, those two things that I just articulated are very important. What I'm asking you, is there anything else, is there a third thing, a fourth thing that is equally important or more important than those two?

A. Each claim is unique, so depending on the circumstances of the case, I can't say which information is more important than the other. It is essentially going to be a culmination of gathering a lot of the information to be able to make any type of decision.

Q. In your 13 years of experience in this field have you ever run into a case where the policy rights and obligations and the facts and circumstances of the individual's medical condition are less important than something else?

A. Well, again, it's hard to -- you can't really make those determinations on those two things alone. There's other elements, information that's gathered in the case that helps establish the claim, the benefit eligibility, the significance of the medical. You can't make decisions on those two things alone.

Q. Sir, that wasn't my question. My question

was can you identify for me one instance in your 13 years of experience where the rights and obligations under the policy and the facts and circumstances of the person's medical condition weren't as important in determining benefit eligibility as something else? Can you identify one case for me?

A. You know, like I said, I've handled a lot of cases over my years. I can't really point to any specific case to try to say that there's not other things that are just as important in combining all those factors in making a decision.

Q. Why did you move from the -- why did you move to the Equitable block of business?

A. Why did I move to the Equitable block of business? I don't think it was a choice. I think it was explained that I would be moving to Equitable and handling cases in that block of business.

Q. Were you promoted?

A. Yes, I was.

Q. What was your promotion from and to?

A. I was promoted from a claim consultant to a director of claims for the Equitable block.

Q. Who had been the director of claims for the Equitable block?

A. There were no directors at that time. It was a block of business that we just received. I was one of the directors that were placed on the files as the cases came in.

Q. How many people report to you now?

A. I recently had someone leave, so I have three people that report to me now.

Q. Do you work out of the Springfield office?

A. Yes, I do work out of the Springfield office.

Q. Do you meet with your subordinates and develop strategies on claims they're handling?

A. My subordinates come into my office and we discuss cases and strategies for the case.

Q. And is that something that you did when you reported to supervisors when you were a claim consultant?

A. I would from time to time discuss cases with my superiors. I had a lot of ability to work on my own because of my experience as well.

Q. Would you consult with Mr. Hughes to develop strategies on cases from time to time?

A. Yes, I would consult with Mr. Hughes.

Q. And would you consult with Mr. Ditmar when

you reported to him, to develop strategies on cases from time to time?

A. I recall meeting with him as well to discuss cases.

Q. Would those strategy discussions incorporate developing information directed at ultimately resolving a claim?

A. Those meetings were about discussing the cases as far as what information was needed to process the claim. If we were going to do medical examinations in circumstances where there was a disputed claim, there would have been a discussion about whether or not trying to resolve the situation would have made sense.

Q. Did you make a trip to Miami, Florida to meet an attorney named Spiegel in the fall of 2001?

A. Yes, I do recall meeting with an attorney John Spiegel. It most likely was the fall because I remember it was shortly after 9/11. I was a little apprehensive about getting on an airplane.

Q. Did you prepare a field report following that visit?

A. I don't recall if there was a field report created.

Q. When you go out and meet a policyholder in the field, isn't that generally what you do, prepare a field report to put in the claim file?

A. No, I don't have a field report in every circumstance of someone that I may have met.

Q. Why did both you and Mr. Hughes go down there?

A. Me and Mr. Hughes both went down there, to my recollection, Attorney Spiegel had just notified us of his representation. We had a difficult claim where both sides were at disagreements on the processing of the file, so it seemed to have made sense to meet with him to discuss that and where we were going to go from there, and Attorney Spiegel agreed to the meeting.

Q. Why did two of you go was my question?

A. I don't know the specific reasons why. I know both of us had a working knowledge of the file.

Q. What does that mean, you both had a working knowledge of the file?

A. We had a -- we were familiar with the case.

Q. Did you go down there with the understanding that you would present some settlement proposal to Mr. Spiegel?

A. I don't recall whether or not that was the understanding. That would have been something that Mr. Hughes would have been most likely aware of and would have communicated that to Attorney Spiegel if that was the case. But I would imagine that it did in the course of our meeting that that was going to be one of the parts of our discussion.

Q. My question was did you have an understanding before getting on the plane, based on your discussions with Mr. Hughes about the trip, that DMS would be presenting some settlement proposal to Attorney Spiegel?

A. I can't say with a hundred percent confidence that I didn't know.

Q. That you didn't know or did know?

A. That I was not aware that we were going to present discussions of settlement. I just don't recall specifically. It was a long time ago.

Q. I don't understand your testimony. You can't say with a hundred percent confidence that you didn't know that you would present an offer of settlement, is that what you said?

A. Yeah, if that's what the court reporter said. I just don't recall. I would have said that I

didn't not know that we were going to have this discussion, I just don't recall today as you're asking me that question.

Q. Did you ever lie to Mr. Kearney?

A. I would have no reason to lie to Mr. Kearney.

Q. Did you ever lie to him?

A. To my knowledge I haven't lied to Mr. Kearney.

Q. Are you mindful that he recorded a phone conversation between you and he in February 2001?

A. I am aware of that now.

Q. And have you reviewed that transcript?

A. I've seen a couple pages of it but that's about it.

MR. ELLIS: For the record, we'll make an objection to the use of any recorded statements upon which the second party was not advised of the recording.

MR. ROBERTS: Great.

Q. (By Mr. Roberts) When was it that you reviewed the transcript or portions of the transcript?

A. I would have looked at that a couple days

ago.

Q. You met with Mr. Ellis -- today's Friday, May 14. You met with him on Tuesday for a couple hours and Wednesday for a couple hours of this week, is that right?

A. I did not meet with Mr. Ellis on Tuesday. I did meet with Mr. Ellis on Wednesday.

Q. And how long was that meeting?

A. That meeting was approximately from 9:30 to 3:30, 4:00 with a break for lunch.

Q. Was it during the course of that day that you reviewed a portion of the transcript?

A. Can you repeat the question?

Q. Was it during the course of that day, Wednesday, two days ago, that you reviewed the portion of the transcript from February 2001?

A. Yes.

Q. Now, in that transcript did you see where you told Mr. Kearney -- strike that.

You're mindful that for several months Mr. Kearney had a concern about the forms, the continuance of disability forms and the authorization forms that you were requesting he sign, right?

A. You know, I don't recall that specifically.

I'm sure the file speaks towards that.

Q. Well, the file does have numerous correspondence over several months where Mr. Kearney expresses repeatedly his concern about the change in these forms. Did you tell Mr. Kearney the truth in that transcript or in that conversation about whose forms those were?

A. Again, I don't recall that specific conversation from over three years ago. I looked at those pages, I don't have -- you know, I have a recollection of speaking with Mr. Kearney on a couple of occasions, but I don't recall that particular conversation. I know we had a lot of conversation over various things, but I can't specifically remember that.

Can't recall speaking of PC's

Q. Okay. Well, the transcript you reviewed. Did you review the portion of the transcript where you're telling Mr. Kearney that the forms he has a problem with were Jefferson-Pilot's forms and not DMS forms?

MR. ELLIS: Do you want to show him the transcript?

Q. (By Mr. Roberts) Sir, you can go ahead and answer.

A. Can you repeat the question?

Q. When you reviewed the transcript, did you see that portion wherein you tell Mr. Kearney on his question of whose forms they were, you told him they were Jefferson-Pilot's forms and not DMS forms; did you see that in the transcripts?

A. Again, I've only -- I looked at a couple pages of that, and I don't even remember exactly what that part of the conversation was. If you'd like me to look at it, I will.

Q. Well, two days ago you looked at some part of the transcript, and my question's fairly simple, and it was only two days ago so I can't suspect there would be a memory lapse. Did you, two days ago, review that portion of the transcript where you told Mr. Kearney on his direct question that the forms he had a problem with were not DMS's forms, they were Jefferson-Pilot's forms?

A. Can you repeat the question again?

Q. Sure. From your review of whatever portion of the transcript you saw two days ago, do you recall if the portion you saw contained your statement to Mr. Kearney that the forms he had a problem with were not DMS's forms, they were Jefferson-Pilot's forms?

A. From the portion of the transcript that I reviewed that you're referring to, I don't recall what that information was. I didn't look at it that thoroughly. I just don't recall that conversation. It was a long time ago.

Q. That wasn't my question. I'm not asking you what you recall from February 2001. I'm asking you what you recall from two days ago. And your testimony under oath is that you don't recall from the review you made two days ago that you told Mr. Kearney that the forms that Mr. Kearney had a problem with were not DMS's forms?

MR. ELLIS: Objection. Asked and answered several times.

Q. (By Mr. Roberts) You can go ahead.

A. Can you repeat the question?

Q. Okay. You don't recall sitting here today that two days ago, when you reviewed some portion of that transcript, that the portion you reviewed contained your misstatement to Mr. Kearney that the problems he had with the form -- strike that. Let me repeat that.

You can't recall sitting here today that the portion of the transcript you reviewed two days

ago contained or didn't contain your statement to Mr. Kearney that the forms with which he had a problem were not DMS's forms, but rather were Jefferson-Pilot's forms?

A. My statement and response to that question is, although I looked at it a couple days ago, I don't remember today exactly what information was placed on the limited thing that I looked at. I just don't recall that. I mean, I could look at it.

Q. We'll get there. Tell me what you can recall about the meeting with Spiegel; what you said, what Hughes said, what Spiegel responded. Tell me everything you can recall.

A. Is it possible that I could get a glass of water.

Can you repeat the question again, please.

Spiegel mtg

Q. Tell me everything you can recall about the discussions with Mr. Spiegel, and tell me what you said, what Mr. Hughes said, what Mr. Spiegel's responses were, everything that you can recall sitting here today.

A. Sitting here today I recall Bill Hughes and I meeting with Attorney Spiegel in his office discussing the case. I don't know the specific

words, but I know we talked about some of the difficulties in the case and the differences both, you know, the company had as well as the differences of opinions that Mr. Kearney had. I recall Bill --

Q. Bill Hughes?

A. Bill Hughes starting the meeting by apologizing that he needed to tell him that we had recently, just in a matter of minutes, uncovered an error in the payment of benefits.

Bill Hughes discussed with him settlement options. I remember at one point Attorney Spiegel asked us to leave and have lunch, that he needed to speak with Mr. Kearney.

I recall returning from lunch waiting in Attorney Spiegel's waiting room for a while for him to come out of his office. I recall him coming out, because he had not talked with Mr. Kearney for a while. I recall him talking to us about University of Miami, University of Miami football. I recall him getting the phone call from Mr. Kearney. He walked back into his office and talked with him, I presume. At some point he came back out of the office and told us that our meeting was essentially over and we could get back on our plane and go home.

"Minutes before" mtg error uncovered

go home

Q. So there wasn't any substantive dialogue after the lunch hour, you were just waiting and then finally you were told to go home?

A. I remember there was a lot of waiting, we waited a while.

Q. Was there any substantive dialogue after the lunch hour?

A. I mean, what do you mean by substantive dialogue?

Q. You told me you talked about the University of Miami football team, and we can go into that a little later, but did you discuss Mr. Kearney's claim with Mr. Spiegel after the lunch hour?

A. I don't recall specifically if we talked any further details at that point in time. The best I can recall, it was a general conversation.

Q. How long was the morning meeting?

A. I don't remember the exact time frames of the meeting. Going to Florida, we probably would have had an early morning flight. I believe we met sometime early morning, 9, 9:30 maybe, then we broke for lunch at some point.

Q. You said recently, in a matter of minutes, we uncovered an error in the payments. Are you

saying the error in the payments, the alleged error in the payments to Mr. Kearney was uncovered by somebody minutes before the meeting with Spiegel?

A. Yeah, several minutes before the meeting with Attorney Spiegel, Bill Hughes and I were in a Cuban coffee shop, I believe, and I uncovered the mistake, the Jefferson-Pilot mistake in paying the increase in benefits.

Cuban coffee shop

Q. Was it a Jefferson-Pilot mistake or was it a Jefferson-Pilot mistake and a DMS mistake?

A. It was a Jefferson-Pilot mistake that, you know, I unfortunately continued for quite some time.

Q. You got control of the file in January of 2000, and this meeting with Spiegel occurred in October 2001?

A. I got the file around January 2000, and I believe you're correct, because it was, again, it was shortly after 9/11.

Q. And Mr. Hughes was going on the trip because he had working knowledge of the file prior to the Cuban coffee revelation, right?

A. He had knowledge of the file, and I believe the file would also reflect that he had some communications with Mr. Kearney.

Q. And Mr. Ditmar worked on Mr. Kearney's file in the late '90's, right?

A. I know I handled it from January of 2004. I don't know the extent of what Mr. Ditmar -- I'm sure you spoke with him about that yesterday.

Q. You're not mindful from your knowledge of the claim file that he had involvement in the claim file in the '97 and '98 time frame, at least?

A. I'm sure that the file reflects that.

Q. Is he good at his job?

A. I would imagine that he's good at his job.

Q. Does he have difficulty understanding disability insurance policies, as far as you know?

A. I don't necessarily know the man and all his capacities, but he seems to be a pretty knowledgeable guy.

Ditmar knowledgeable guy

Q. He was your supervisor for disability claims for several months or years, right?

A. He was my supervisor, I don't know, I can't recall how long that was.

Q. And is Mr. Hughes a knowledgeable fellow?

A. I would view Mr. Hughes as a knowledgeable fellow.

Q. With regard to disability claims and

Hughes knowledgeable fellow

understanding of disability insurance policies?

A. Based on my dealings with him, I would say he's a knowledgeable guy in that area.

Q. Is he still your supervisor, did you say?

A. Yes, Bill Hughes is still my supervisor.

Q. How long has he been your supervisor?

A. Bill Hughes has been my supervisor since we -- let me think about that.

Bill Hughes has been my supervisor since probably January of 2001 when I became a director.

Q. Did you become director of claims of the Jefferson-Pilot block of business in January of 2001?

A. I became director of claims on the Equitable block of business in January of 2001.

Q. January of 2001? And then you maintained responsibility for Jefferson-Pilot files beyond January 2001?

A. Yes, I had a limited responsibility of JP business.

Q. I understood you to say earlier you became director of claims for Equitable in January of 2004. I misunderstood that.

A. Is that a question or --

Q. Yeah, I mean, it was January 2001, not

January of 2004 that you became director of claims responsible for the Equitable?

A. I became director of claims responsible for the Equitable block of business in January of 2001.

Q. And then something happened last year when this lawsuit -- when your understanding originated or commenced, I think you said, that changed your position in the company. What was that?

A. Can you repeat the question?

Q. Earlier in the deposition I thought you had told me that when this lawsuit commenced your role in the company changed somehow, that you got some kind of promotion?

A. Can you repeat the question again?

Q. Has your job changed at all since 2002?

A. No, my job has essentially remained the same. It changes with certain people that I would deal with, but essentially it's remained the same.

Q. Okay, so since January of 2001 you've had the title without change, promotion, or demotion or alteration to the title; you've had the title director of claims. And in that capacity you've been responsible for the Equitable block of business?

A. Since January of 2001, Director of Claims

for Equitable block of business and with a limited handling of cases that I had previously dealt with on the Jefferson-Pilot end.

Q. Okay, so prior to January of 2001 --

MR. ROBERTS: Let's go off and we'll change tapes.

THE VIDEOGRAPHER: Going off record at 9:39 a.m.

(A recess was taken)

THE VIDEOGRAPHER: Back on the record at 9:47 a.m.

Q. (By Mr. Roberts) Okay, you're still under oath, do you understand that, Mr. Mills?

A. Yes, I do.

Q. As I understand your testimony, during the year 2000 you were responsible for a range of files on the Jefferson-Pilot block of business, and then in January of 2001 you received a promotion to Director of Claims and took on primary responsibility for the Equitable block of business, is that right?

A. Can you say that again, please?

Q. As I understand your testimony, during the year 2000 you were responsible for a range of 40 to 60 Jefferson-Pilot claim files, and that in January

of 2001 you were promoted to Director of Claims and your responsibilities changed and you became responsible for the Equitable block of business, but continued to have responsibility for some Jefferson-Pilot claims. Is that right?

A. That would be correct.

Q. How many claims did you maintain responsibility for, the Jefferson-Pilot claims?

A. I probably had, not knowing the exact number, but it was probably a small handful; five or less.

Q. How was it that it was selected or you selected to maintain responsibility for those five claims?

A. I don't recall whether there was any specific criteria other than, you know, I was handling them. Todd and I were both now going to be on a director level working for Bill, and it just seemed to continue to make sense to maintain a number of files as I started to get involved in my responsibility as a director.

Q. Was Todd your supervisor in 2000, Todd Ditmar?

A. In January of 2000, when we got the

Jefferson-Pilot block, he would have been my supervisor.

Q. How about in December of 2000?

A. I don't recall specifically because that was around the time or just prior to the time in which I became promoted to director and started working with Bill. I just don't recall whether or not that transformation, when that would have been taken, from Todd to Bill.

Q. Did you work under Todd until you became the director of Equitable's block of business?

A. I worked with Todd for a period of time after January of 2000, but I also worked with Bill Hughes at the time as well.

Q. Did you consult with Todd in the year 2000 about the Kearney claim at all?

A. I would have consulted with him at some point in time, I just don't recall specifically when that would have occurred.

Q. If you had to speak with your supervisor about a claim you were handling in 2000, it would have been Todd that you would have gone to?

A. Can you repeat the question again?

Q. If you had to speak to a supervisor in the

Consulted Ditmar in 2000 & Hughes

year 2000 about a particular Jefferson-Pilot claim you were handling, would it have been Todd Ditmar that you would have gone to?

A. If I had to speak with a supervisor in 2000, it wouldn't have necessarily been Todd that I went to. I would have also have gone to Bill Hughes.

Q. Also or instead of?

A. Also.

Q. So you would have counseled Todd?

A. Again, I would have talked to him at some point. I don't know in what juncture that would have been.

Q. Was Mr. Hughes critical of your inability to see the unambiguous language in the policy that shows Mr. Kearney was paid in error for so long?

A. Can you repeat the question?

Q. When you were sitting in the coffee shop or on your way back to Massachusetts later in the day, did Mr. Hughes ever express any criticism of your work because you were unable to glean from an unambiguous policy the fact that Mr. Kearney had been paid in error for nearly ten years?

A. I don't recall any specific point in time that Mr. Hughes was critical of my work on this file.

Hughes not critical

Q. Thank you. When you took on those claims in the year 2000, the Jefferson-Pilot claims -- strike that.

You had worked for DMS for over three years prior to January 1st of 2000, correct?

A. Well, if I got there in October of '96, yeah, three-plus years at approximately that time.

Q. And during those three-plus years it would have been your practice to directly communicate with policyholders?

A. Can you repeat the question?

Q. During those three years you would have had a practice of directly communicating with policyholders?

A. During that three-year period I would have communicated with various insureds.

Q. Insureds?

A. Claimants.

Q. Claimants, policyholders, same thing?

A. Yes.

Q. Both on the phone and in writing, correct?

A. Yes, I would communicate on the phone and in writing.

Q. And there would have been dozens, if not

hundreds, of different claim files that you worked on during that three-year period?

A. That was a three-year period and I can't recall today exactly how many interactions, cases that I would have administered during that point in time or how many policyholders, claimants that I would have communicated with. It's difficult to try to put a number on that.

Q. Would it have been dozens or would it have been less than a couple dozen?

A. Can you repeat the question?

Q. How about another question. Do you think it would be more or less than a hundred in those three years?

A. Can you explain the question a little bit more as far as what you mean by a hundred?

Q. What I mean by a hundred is ten times ten, 90 plus 10, 50 plus 50; all those equal a hundred. That's what I mean. Did you have communication with policyholders or claimants, as you like to call them, but more than a hundred different claimants during your three years prior to 2000?

A. Again, not knowing a specific number, but I think it would be fair to say that I had

communication with over a hundred claimants, insureds, policyholders.

over 100 files

Q. And with all or most of them you would have been in the practice of sending them monthly forms or periodic forms for them to complete?

A. For those individuals who had a claim, yes, there were claim forms that were sent to them for their completion.

Q. And one of the claim forms is called a continuance of disability form?

A. The continuance of disability form is a form that we used at some point in time, yes. I don't know if that was necessarily what it was called back then.

Q. It's a DMS form?

A. A general claims form.

Q. It's a DMS continuance of disability form, right?

A. I think it was a claim form that we would use to send out to claimants on whatever particular block of business that we would be administering provided that that company would have found that that met to their satisfaction.

Q. Okay. Did you use the same forms when you

took over responsibility for Jefferson-Pilot in 2000 that you were using prior to 2000?

A. I don't recall specifically when they started sending that form, whether it was initially or a couple months after. I remember some individuals being a little confused because they were used to a different form previously.

Q. That wasn't my question. My question was you had a practice of working on over a hundred files for three years where you were sending out DMS's continuance of disability form and DMS's authorization form. Did you continue to send those same forms to the Jefferson-Pilot policyholders when that block of business came over in January of 2000, yes or no?

A. The best that I can recall is that the structure of those forms were similar. Obviously, the names of the companies were different so there was certain wording referencing the company that would have to be changed. I've seen a lot of different forms for a lot of different companies that we would use and I don't specifically recall the exact changes on the form, if any.

Q. Your testimony under oath is that those

forms you were using for a whole bunch of different insurance companies prior to 2000 were changed when the Jefferson-Pilot block of business came over so they could be sent to the Jefferson-Pilot policyholders, is that your testimony?

A. My testimony is that, again, the structure of those forms would pretty much be the same, but the names of the companies that we were working for, the block of business, would have to necessarily be changed is my understanding.

Q. So your testimony under oath is that those forms were changed before they were sent to Jefferson-Pilot policyholders for their execution?

A. What is your definition of change? I don't understand the question.

Q. I'm using the word you used, so really we have to go back to what your definition is. What's your definition of changed?

A. My definition of change in reference to those forms were that there would have been some minor degree of a change in order to reference the correct company that was being sent those forms. We're not going to send a reference in the Traveler's Insurance Company to Jefferson-Pilot would be my

understanding.

Q. Okay, so you would change the identity of the insurance company that was your client. Would there be any other change to the form before it would have gone out to the Jefferson-Pilot policyholders or claimants?

A. Not to my knowledge, but again, I wouldn't be part of that process so I wouldn't really know.

Q. Do you know whether or not there was any change to the form, even to change potentially the name of one insurance company to the other?

A. As I sit here today, I don't know what changes exactly were made. I'm sure the file and the forms in there would speak towards that.

doesn't know if change what would to forms

Q. Before you sent any forms to Jefferson-Pilot policyholders, did you ask anybody if it was necessary or essential that the forms be changed for those policyholders or did you just go ahead and send what you had?

A. Can you repeat the question?

Q. Before you sent monthly forms, the continuance of disability form or the authorization form to the Jefferson-Pilot policyholders, prior to the time that you started sending them those forms,

did you have any conversation with anyone about what forms, what versions of DMS's form or what forms should properly be sent to the Jefferson-Pilot policyholders?

A. I don't recall having any conversations with anybody about that. We had the ability to go into the claim system and print the forms that were required for that particular insured or company, so we printed those and sent them.

Q. So on your claim system there's certain forms for Massachusetts Casualty, certain forms for Equitable, certain form for Jefferson-Pilot, and so on and so on?

A. Can you repeat the question again?

Q. Are you telling me that somewhere within the network of DMS you can go and print forms that apply only to Massachusetts Casualty, and then a separate place for the forms that apply only to Jefferson-Pilot, and then separate forms for each of the other companies?

A. I don't have any familiarity or knowledge of Massachusetts Casualty. For Jefferson-Pilot you'd go into the claim system, there's an icon somewhere that you can print a continuance of disability form,

forms on network

an authorization form, you click that icon, the form would come up, you print it, and that's how you would get it.

Q. Exhibit 28 is the claim system on Mr. Kearney. Can you show me where it is that you go in there and you designate that you want a Jefferson-Pilot continuance of disability form sent to the claimant as opposed to an Equitable continuance of disability form to be sent to the claimant.

For the record, it's been represented to me that is the entirety of the claim system information on Mr. Kearney's two claims, I guess as it existed sometime this week and was printed up for me and has been made an exhibit according to other witnesses in this case.

So is there anywhere in that exhibit where you can point me to where it says or triggers the sending of a Jefferson-Pilot form to a Jefferson-Pilot policyholder?

A. Well, I want to take the time to look through all these things I had here. My recollection on this claim system, I do not use this claim system any further, is that you need to press -- click the

icon here in the right-hand corner halfway down the page and it will provide you with a number of other choices which would include the types of forms that you are talking about.

Q. Okay. So, is it possible --

MR. ROBERTS: Counsel, can I have a copy of every form that can be triggered from that icon?

MR. ELLIS: I'll ask.

MR. ROBERTS: Well, we're requesting it.

MR. ELLIS: I understand.

Q. (By Mr. Roberts) And your testimony, sir, is that if I hit that icon and if I went in and printed up every single document that can be triggered through that field, I would see that DMS has different forms for different companies?

A. My recollection, if you click that icon, it gives you a sample listing of different types of forms that you can use. When you choose the form, it's going to print whatever you select, like a continuance of disability form.

Q. But --

A. I think it will pre fill in like the policy

number or the name. It might explain that this is a Jefferson-Pilot, that we're a claim administrator for Jefferson-Pilot. And, as I think I said earlier, the language and structure of it, for the most part, is the same.

Q. Are there different continuances of disability forms for the different companies that DMS works for? Are they substantively different?

A. What do you mean by that?

Q. What do I mean by different?

A. Yes, what do you mean?

Q. Is there a company that has ten questions on the continuance of disability form and another company that has eight?

A. You know, I don't have the knowledge of all the forms that were used for all the different companies, so I really can't answer that question.

Q. Who have you spoken to at Jefferson-Pilot ever?

A. The folks I spoke with at Jefferson-Pilot would be Phyllis Harden, Kimberly Braun, Harold Shelton. There's a gentleman by the name of Klyde Honiker. There's another gentleman by the name of Paul Swink. I think there was somebody by the name

People spoke to J-P.

of Marty Ginter. That's all that I can recall this morning.

Q. When you spoke to Mr. Shelton, was it after you took over the responsibility for some claim files from Jefferson-Pilot after January of 2000?

A. Can you repeat the question again?

Q. You weren't responsible for Jefferson-Pilot at any time prior to January 1 of 2000, right?

A. I managed cases beginning in January of 2000.

Q. So, would you have had any cause to phone anyone at Jefferson-Pilot prior to January of 2000?

A. Prior to January of 2000 my recollection is that we consulted on cases for them. I know I did a limited scope of work. I don't remember to what extent or what point in time that would have been.

Q. Did you speak to Mr. Shelton before or after the block of business came over in January of 2000?

A. I spoke with Mr. Shelton, it was quite some time ago, I don't recall specifically when I would have had a conversation with him. I know at some point he did retire as well, so I can't really recall the specific time frames I would have had a

conversation with him.

Q. Did you speak to him about the Kearney claim?

A. As I sit here today, I don't know if I did ever speak to him about the Kearney claim.

Q. Would you have any reason to have spoken to him about the Kearney claim prior to January of 2000; is that something that you were working on prior to January 2000?

A. Can you repeat the question, please?

Q. Yes. Did you have any knowledge of anybody or any claim by the name of Kearney prior to January of 2000?

A. Can you say that one more time, please?

Q. Sure. Do you know who Mr. Kearney is?

A. Yes, I do.

Q. When did you take over responsibility for his claim file?

A. My understanding was that -- recollection was January of 2000.

Q. Okay. Now prior to January of 2000, would you have any reason that you can think of to talk to anybody about a Chris Kearney or a Chris Kearney claim?

A. Not to my knowledge.

Q. You don't want to give a categorical no to that?

A. I just don't recall. It's a long time ago.

Q. Can you think of a circumstance where you might have had a conversation about a claim that you didn't know about and hadn't been assigned responsibility for yet?

A. You're talking about a period a long time ago with a lot of cases over the years. I just -- I don't recall specific conversations going that far back or -- I just don't recall.

Q. Do you recall any conversations with Phyllis Harden about the Kearney claim?

A. I recall speaking with Phyllis. I talk to her about a lot of things, but I don't recall specifically talking to her about this case.

Q. If you had a substantive phone call with someone at Jefferson-Pilot about the Kearney claim, would you document that call in the claim file?

A. Can you repeat the question?

Q. Sure. If you had a substantive phone call with someone at Jefferson-Pilot, your client, about the Kearney claim, would you have made notes of that

call and preserve those notes by putting them in the claim file?

A. Again, I don't recall if I had any of those types of discussions with them. I think as far as the circumstances of the claim, you know, where it's at and what's important I think is in the claim file and it speaks for itself.

Q. What does that mean, it speaks for itself? How does the claim file speak?

A. There's information there, you read it.

Q. My question was a hypothetical. If you had a phone call with someone at Jefferson-Pilot about the Kearney claim, would you have documented that call with notes and preserved those notes by putting them in the claim file, yes or no?

A. I don't even recall the types of conversations that we had. It was a general conversation. I think if there was anything that was substantive to the file, the file would reflect that.

Q. Okay, so if you had a substantive phone call with someone at Jefferson-Pilot, you would have made notes, you would have preserved those notes by putting them in a claim file, do I understand you correctly?

A. Can you repeat the question?
Q. For the fourth time, if you had a substantive telephone conversation with someone at Jefferson-Pilot about the Kearney claim, would you take notes and preserve those notes by putting them in the claim file?
Do you want to hear it again?
A. Well, I don't understand what you mean by that.
Q. Okay. Which part don't you understand?
A. The substantive part of that.
Q. Well, you used the word substantive in your earlier response, so I was using your word. Let's break it down.
If -- you understand it's a hypothetical, I'm not saying it ever happened, right?
A. Correct.
Q. If you had a call with someone at Jefferson-Pilot about Mr. Kearney's claim, would you take notes of the call and place those notes in the claim file?
A. I wouldn't have kept necessarily any notes on any phone call, and if there was anything of importance, you know, I would record it.

Q. Record it how?
A. Some type of communication, whether in a letter, conversation with the people that I dealt with at the company.
Q. You would record it in a conversation?
A. I'd pass along that information to people that I worked with.
Q. You would tell other people at DMS about the important information without putting the important information in the claim file?
A. The best that I can recall, again being a hypothetical situation, I'm not even trying to recall if the circumstances you described ever happened, if there was something that, you know, I needed to speak with Todd or Bill, I would, and if it was something of importance it would be placed in the file in some fashion.
Q. Okay. So if you had a phone call with someone at Jefferson-Pilot where there was an important issue discussed, you wouldn't make notes of that communication and put them in the claim file, but you might pass along verbally that information to either Todd Ditmar or Bill Hughes; do I now understand correctly what you're saying?

A. Can you say that again, please?
Q. Yes. If you had an important phone call with someone at Jefferson-Pilot about Mr. Kearney's claim, you would not take notes to memorialize that call and put them in the claim file; you would potentially, however, speak to Mr. Hughes or potentially Mr. Ditmar about that important call?
MR. ELLIS: Objection. Misstates the testimony.
Q. (By Mr. Roberts) Go ahead.
A. If I had a conversation with someone at Jefferson-Pilot, I may have memorialized that statement in the file, I may have passed along that information to -- in a conversation with Todd or Bill.
Q. Why is it not a good business practice to document all important phone calls by memorializing the call and preserving it by putting those notes in the claim file?
MR. ELLIS: Objection.
A. Can you repeat the question?
MR. ROBERTS: Can you read it back to him?
THE COURT REPORTER: "Question: Why

is it not a good business practice to document all important phone calls by memorializing the call and preserving it by putting those notes in the claim file?"
A. I wouldn't categorize that as a bad business decision. There's a lot of phone calls that happen on a lot of cases, a lot of phone calls that happen during the day. If it's something that was important, it would be memorialized or communicated in the file in some way through letters or conversation with the insurer.
Q. Are phone calls with your client, Jefferson-Pilot, important?
A. They're important to have.
Q. Is it important to have conversations with your investigators?
A. It's important to be able to speak with the investigator and communicate information.
Q. Are the communications you have with IME folks important?
A. It would be important if they had important information about the file, yes.
Q. What's your practice of taking notes of those important phone calls with clients,

investigators, and persons performing IMEs?

A. Can you repeat the question.

Q. What's your practice of taking notes of those important phone calls with clients, investigators, and persons performing IMEs?

A. I don't have any particular practice. I may scribble down a note if I need to know a date and time of an examination that's scheduled, and as that information is written up and sent along to the insured, I wouldn't need that note. It's not something that I do every time or necessarily on every case.

Q. If there are no notes in the claim file of any communication you ever had with Jefferson-Pilot, does that mean you didn't have any communications with Jefferson-Pilot?

A. Can you repeat the question?

Q. If there are no notes in the claim file of any communication you had with Jefferson-Pilot, does that mean you had no such communication?

A. I think this claim file reflects that there had been communication with Jefferson-Pilot, if I had communication with them, and not necessarily everything is going to be written up as a note that I

spoke with them.

Q. Can you testify under oath that you ever had any communication with anyone at Jefferson-Pilot about Mr. Kearney?

A. Can you repeat the question?

Q. Can you testify under oath that you ever had any communication with anyone at Jefferson-Pilot about Mr. Kearney?

A. I've had communication with Jefferson-Pilot over a number of their cases. I can't say specifically I spoke directly about his case.

Q. Did you ever discuss with Jefferson-Pilot the WJ576A policy?

A. Yes, I did.

Q. When was the last time you had a conversation with someone at Jefferson-Pilot about that policy?

A. Best of my recollection, that would have been a communication with their in-house counsel, I believe, last year just prior to these proceedings.

Q. These proceedings began in June of 2002, are you mindful of that?

A. I don't know when exactly it started.

Q. Well, it wasn't last year. So did you have

your communication last year or was it in 2002?

A. I don't recall a specific time, if it was last year. It was just, I think, prior or after we had come across the incorrect amount of benefit. We conversed with their legal department to seek their guidance if this was what we believed it to be. So whenever that happened, I don't remember.

Q. Who did you speak to?

A. I remember speaking to an in-house counselor by the name of Stephanie Fairbough.

Q. And that was shortly after your Cuban coffee revelation?

A. I don't know the exact date and time that conversation happened, but I think it would be fair that it was around that time.

Q. Okay, was that a phone call?

A. I would imagine it was. I don't remember specifically. I don't believe I was down in that area at that time.

Q. Have you ever met with her personally?

A. I believe I have met with her once.

Q. When?

A. I don't remember the time.

Q. Before or after your Cuban coffee

revelation?

A. My recollection is that it would have happened before.

Q. Okay. Before the Cuban coffee revelation you had a meeting with Ms. Fairbough. Was that about the WJ567A policy?

A. That's such a long time ago, I don't even recall if we even talked about claims. I don't know --

Q. What would have been the purpose of your meeting with her the one time you met with her?

A. I just remember being down there to visit their offices. I was introduced to a number of people. I can't say that I really had a one-on-one meeting, per se. It might have been a quick conversation. I just don't recall, it's a while ago.

Q. So that meeting had nothing to do with Mr. Kearney or the interpretation of the WJ576A policy, is that right?

A. To my knowledge, yeah, that would have been before.

Q. So --

THE WITNESS: Is it okay to take a break at this point?

MR. ELLIS: Sure.

THE VIDEOGRAPHER: Going off record at 10:30 a.m.

(A recess was taken)

THE VIDEOGRAPHER: Back on record at 10:37 a.m.

Q. (By Mr. Roberts) Mr. Mills, you're still under oath, you understand that?

A. Yes, I do.

Q. We were talking about a meeting that you once had with -- down in Greensboro with Jefferson-Pilot folks, and during the course of that meeting you were met or introduced to Stephanie Fairbough, a lawyer at JP, right?

A. Yes, I met her, and I wouldn't necessarily say it was a meeting. I was introduced to a number of people, one of which was her. I think we had a few words, but I don't think we talked anything in particular about cases.

Q. It had nothing to do with Mr. Kearney's claim or his policy, right?

A. Not to my knowledge, yes.

Q. And then you went down to Miami and you had this revelation with Mr. Hughes, right?

A. Down in Miami, yes, came to the realization that the benefits were being incorrectly paid.

Q. Okay. And did you speak to Jefferson-Pilot that day?

A. I don't recall.

Q. What was the next communication with Jefferson-Pilot that you can recall regarding Mr. Kearney or the WJ576A policy and/or its riders?

A. I remember a phone conversation at some point after our return trip apprising them of our -- Jefferson-Pilot's counsel, of our findings and sought their guidance on the matter.

Q. And what was their guidance?

A. They agreed that there was an overpayment.

Q. What was their guidance?

A. Their guidance was that our findings were correct.

Q. Okay. So then what happened in your communications with Jefferson-Pilot?

A. Can you repeat the question, please?

Q. What then happened with the communications with Jefferson-Pilot?

A. You know, I don't recall specifically what happened at that juncture.

Q. There's nothing you can recall from that moment in time through today of any communication or dialogue or any interaction you had with Jefferson-Pilot on that issue?

A. There was, to the best of my memory, a conversation with Jefferson-Pilot's counsel. I know that --

Q. The same conversation you've already told me about?

MR. ELLIS: Excuse me --

Q. (By Mr. Roberts) I want to know if it's the same conversation you've already talked about or something additional.

A. My recollection is that it would have been a subsequent conversation.

Q. Okay. Tell me about that conversation.

A. The best that I can recall is that it was a discussion of what steps that they wished to take at that juncture.

Q. Who was involved in the first phone conversation besides you and Stephanie?

A. My recollection is that Bill Hughes would have been involved in that call and Bill Dempsey.

Q. Bill Dempsey with Employers Reinsurance

Company?

A. Yes.

Q. Okay, who else?

A. That's all I can recall.

Q. Are you mindful of any notes that exist of this call taken by anyone?

A. Not to my knowledge.

Q. Were you here in Springfield on a conference call?

A. I believe that was the circumstances.

Q. Were you in Mr. Hughes's office with him?

A. I don't recall specifically where in our offices that conference call originated for us.

Q. Were you with him?

A. My recollection is that I was.

Q. Were either one of you taking notes during the call?

A. I don't recall taking any notes. I don't know if he did.

Q. Did either one of you prepare any documents in anticipation of the call or in preparation for the call?

A. Not to my knowledge. We conveyed our findings verbally over the phone.

Q. Did you tell Ms. Fairbough or Mr. Dempsey why it is you wanted to have the conference call?

A. I don't recall if we specifically notified both of those individuals ahead of time of the purpose of the call, but that was obviously discussed during the conversation.

Q. Based on your memory of the call, did they have an understanding of what the call would be about, or did you convene this call and they were surprised about the nature of the content?

A. Can you repeat the question, please?

Q. Based on your memory of the call, was it a surprise to Ms. Fairbough or Mr. Dempsey about the nature or the issue to be discussed during the call?

A. I don't recall what their knowledge of the situation was going into the telephone call. I don't know how to characterize their response.

Q. How long after your return from Florida was this call?

A. I don't recall when that telephone call took place.

Q. Was it within days or weeks or months of the Florida trip?

A. That was quite some time ago. I don't know

exactly when it would have taken place.

Q. Would it make sense and be logical that you would communicate that type of finding to Jefferson-Pilot relatively soon after its discovery?

A. Well, it would make sense to obviously communicate that to them in a timely fashion.

Q. And is that something that you generally do, communicate important information to clients in a timely fashion?

A. Well, we do as best we can to respond timely and promptly.

Q. Okay. Are you good at that?

A. I think I'm very good at that.

Q. Excellent. Is there a Cuban coffee revelation memo somewhere?

A. Can you phrase that question another way?

Q. Did you understand it?

A. No, I didn't.

Q. On your return trip from -- this is a relatively significant discovery at the Cuban cafe, wasn't it?

A. It was a discovery in a coffee shop that had some bearing on the case going forward.

Q. It had extraordinary bearing on the case

going forward, didn't it?

A. Yes, it did.

Q. Wouldn't it be appropriate within the policies and procedures at DMS to document some extraordinary fact that implicates a claim?

A. Well, if I recall correctly, that information was communicated to Mr. Kearney's counsel at that time as well as follow-up letters.

Q. So the only -- the only memorialization of the Cuban coffee revelation is that as stated in the October 22, 2001 letter to Mr. Spiegel from Mr. Hughes?

A. I would have to look back at the file. I know we sent a letter. I'm assuming that's what you're referring to.

Q. Right.

A. That was my recollection following that meeting that the letter summarizing the situation in the meeting was sent to his prior counsel, Spiegel.

Q. So I understand your testimony correctly, this extraordinary revelation is uncovered drinking Cuban coffee in Miami, Florida nearly ten years after the erroneous payments began, allegedly, and there does not exist any document anywhere that sets forth

your extraordinary revelation other than the letter that was sent to Mr. Spiegel?

A. Can you repeat the question, please?

Q. You and Mr. Hughes are having Cuban coffee in October 2001. You're reviewing or preparing for a meeting about a claim that's been existing for eight years, right; Mr. Kearney's claim was eight years old at that point?

A. 2001; yeah, it's probably about eight years.

Q. And the two of you, while sipping your coffee, come upon this extraordinary revelation that Mr. Roberson, who has 38 years of experience, didn't know about, Mr. Shelton, who has 38 years of experience, didn't know about, Mr. Maxwell, who has 20 years of experience, didn't know about, Ms. Harden, who has 31 years of experience, didn't know about, Jefferson-Pilot, who authored the policy and administered it for seven years, didn't know about, you, who worked on the policy for a year and eight or nine months, didn't know about, Mr. Ditmar, who you reported to for a year, didn't know about, and Mr. Hughes, who you reported to for another nine or ten months, didn't know about, this extraordinary

revelation occurs and it's your testimony, sir, that there is not an internal document at DMS or a document DMS shared with Jefferson-Pilot or a document DMS shared with Employers Reinsurance which discusses this great revelation; the only document that exists is the letter that went to Spiegel after the meeting? Is that your testimony under oath?

A. I don't know if there is any other document. To my knowledge, there is the letter that was communicated to the insured. If there's other letters that were prepared, I know there was counsel involved and there were letters that were back and forth on that material through -- I believe it was prior counsel on this case, and Mr. Ellis. I'm sure there's stuff out there, I may have seen something, but I can't a hundred percent say that it said this, this, and that; it's been a while.

Q. You didn't tell Mr. Hughes that you would do a memo that discusses this Cuban coffee revelation, and he didn't ask you to prepare a memo discussing the Cuban coffee revelation, right?

A. My recollection is in that Cuban coffee revelation that you refer to, is that I discovered the error, you know, the error that JP had made and

no doc but ltr.

Mills 4 min 14

that I perpetuated over the time, and I made him aware of that.

I don't recall any point other than being embarrassed about it that he was critical of me or said, "Prepare a document." I just don't recall that.

Q. You don't recall him asking you to prepare a document detailing and summarizing this extraordinary revelation, and you didn't offer to do that; is that your testimony under oath?

A. To my recollection, I don't recall him asking me to do something. If it was prepared or not, I don't -- as I sit here today, a lot of time has passed, I don't remember what was prepared on that at that point in time.

MR. ROBERTS: We're going to change tapes. We'll be right back to this.

THE VIDEOGRAPHER: Going off record at 10:53 a.m.

(Off the record)

THE VIDEOGRAPHER: Back on record at 10:57 a.m.

Q. (By Mr. Roberts) Mr. Mills, you're still under oath, you understand that?

A. Yes, I do.

Q. We're talking about whether or not you have any recollection of any memorandum being prepared that discusses in details the Cuban coffee revelation, and as I understand your testimony, you're not mindful sitting here today that any such memorandum existed?

A. I think what I've said is I remember there was a letter in the file following the meeting with Attorney Spiegel that I believe Mr. Hughes wrote to him outlining the situation I don't specifically recall any other type of memorandum, you know, as I sit here today.

Q. Is there any memorandum that you can recall sitting here today that's been prepared subsequent to the letter that went to Attorney Spiegel on this Cuban coffee revelation?

A. Can you repeat the question, please?

Q. Is there any such memorandum that you're mindful of that was prepared subsequent to the responsive letter to Attorney Spiegel in October of 2001?

A. To my knowledge, a lot of this stuff has been handled between the lawyers. I don't

specifically recall preparing anything myself.

Q. You don't have a memory of authoring anything in writing after that revelation, that extraordinary revelation at the Cuban coffee house?

A. I'm trying to, as I best remember -- to the best of my memory, I didn't do anything, but I just -- I don't remember. It's been a period of time now.

Q. Was there anybody on the DMS in-house legal team consulted about your Cuban coffee revelation?

A. Not to my knowledge.

Q. Was Adam Formus, the lawyer that's sitting in the room here, responsible for the Jefferson-Pilot block of business in October 2001, as far as you know, within the legal department at DMS?

A. You know, I really don't know what Adam's full responsibilities are, quite frankly. He's in the room, you can ask him.

Q. Okay. I probably will at some point under oath. Did you have any discussions with Adam about your extraordinary Cuban coffee revelation prior to June of 2002, which would be nine months after you came upon the revelation?

A. I don't recall having conversations with

Adam Formus prior to that time.

Q. Do you have a recollection of any conversation you've had with Mr. Formus, or Attorney Formus, about the revelation?

A. I don't recall having any conversation with him pertaining to the revelation, as you phrase it.

Q. The revelation, as I phrase it, is the way that you came upon interpreting the contract at the Cuban coffee house?

MR. ELLIS: Objection.

A. That would be my understanding of what you mean by revelation.

Q. Okay, good. So sitting here today, you don't have any recollection of any communication you've ever had with Mr. Formus about your interpretation of the policy as you began to interpret it that morning?

A. Can you repeat the question, please?

Q. Sitting here today, you don't have a recollection of any conversation you've ever had with Attorney Formus about the interpretation of Mr. Kearney's policy which you came upon that day, October 2001, whenever it was?

A. I believe your prior questions were about

my knowledge of my conversations with Adam at that juncture of June of 2002, I believe you said. I have had conversations with Adam Formus subsequently about the revelation, as we understand it, about the application of the policy.

Q. When were those discussions?

A. I had at least recently the discussion with him on Wednesday when I met with him.

Q. Okay, take me the other way in chronologic order. When's the first one you can discuss, and I guess that one would be the most recent you can discuss.

A. I don't recall having any conversations with him about the revelation, really, until I met with him on Wednesday.

Q. Okay, so the only conversation you can recall having with Adam about the revelation is the one you had two days ago in Mr. Ellis' presence?

A. The only conversation I can recall having with Adam Formus on the revelation was on Wednesday, and the second part of that Mr. Ellis was present at that time.

Q. Prior to Wednesday had you had discussions about the revelation with any other in-house counsel

at DMS?

A. Can you repeat the question, please?

Q. Prior to Wednesday, had you had discussions about the revelation with any other in-house counsel at DMS?

A. Yes.

Q. Who?

A. I spoke with Andrew Cohen.

spoke to A. Cohen

Q. When was the first time you spoke with Andrew Cohen about the revelation?

A. The only time I remember speaking with him was about a week or so, a couple weeks ago.

Q. Other than the recent conversation with Mr. Formus, the recent conversation with Mr. Cohen, have you had any discussions with any other in-house counsel at DMS about the revelation?

A. Can you repeat the question, please.

Q. Other than Mr.'s Formus and Cohen, have you had any other discussions with any other in-house counsel at DMS about the revelation?

A. To the best of my knowledge, I don't recall prior conversations.

Q. With anyone?

A. With any other in-house DMS counsel.

never spoke to DMS in-house counsel pre suit

Q. On how many occasions have you spoken to counsel at Jefferson-Pilot about the revelation?

A. Can you repeat the question, please?

Q. On how many occasions have you spoken to counsel at Jefferson-Pilot about the revelation?

A. I don't recall the exact number of times. I think we've already talked a couple times already. I know I've been a part of a phone call during these proceedings at other times with our counsel.

Q. Your answer was "I think we've already talked about a couple times"; we haven't. We talked about one communication you had with Fairbough; it had nothing to do with Kearney or the policy when you went to Greensboro. And then we had a discussion earlier about a communication you had, a conference call, between Hughes, yourself, Fairbough, and Dempsey. Other than that conversation with Fairbough, have you had any other discussions about the Kearney policy with in-house counsel at Jefferson-Pilot?

A. I've been part of subsequent conversations that weren't initiated by me, conferenced in between Stephanie Fairbough, prior counsel on this case, Geri -- I forget her last name right now, so there's

been that type of conversation.

Q. How many of those were there?

A. I don't know how many conversations I've had. I've been involved in a couple of those conversations, not all of them.

Q. Were those before the lawsuit was filed or after?

A. I don't recall when those conversations necessarily took place in the time frame of all this stuff that's gone on since then.

Q. Did you take any notes of those phone calls?

A. No, I did not.

Q. Did you author any memorandum before or after those phone calls relative to the issue of the phone call?

A. Can you repeat the question, please?

Q. Did you author any memorandum relative to those phone calls or the issues raised in those phone calls?

A. As I sit here now, I don't recall if I authored any memorandum, notes, in regards to those phone calls.

Q. Who participated in those phone calls other

than you and Ms. Fairbough and Ms. Geraldine Johnson?

A. Johnson was the last name of the other attorney. I don't recall specifically, but I believe the other parties to that conversation would have been Bill Hughes and Bill Dempsey.

Q. You spoke in the singular, that conversation. Were there multiple conference calls with some or all of those players or was there just one that you can recall?

A. I remember multiple conversations with those individuals. I don't know exactly the exact number of conferences that would have been involved with those individuals.

Q. Do you recall from the substance of those conversations whether the persons were speaking in the context of a lawsuit having already been filed, or in anticipation of potential legal action, or both?

A. Can you repeat the question, please?

Q. Can you recall, based upon the context of those calls, whether people were speaking in terms of a lawsuit having already been filed, or whether there was discussions about the issue and the potential for future litigation?

A. I really don't recall precisely all those conversations and the time frame of those calls happening along the lines of these proceedings. A lot of that stuff was just handled by the attorneys. I had a limited knowledge of what was going on at that point.

Q. Did these calls take place over several months or a couple days?

A. These calls didn't take place over a couple days. I don't know the period of time, the length of time that these calls took place.

Q. Greater than one month's time?

A. That seems to be a fair calculation.

Q. Are there any notes that exist anywhere including indications on a calendar you may keep of when these calls may have occurred?

A. I don't recall specifically writing that down. I could have put it down on my calendar that I have on my desk.

MR. ROBERTS: We'll request a copy of that, Counsel.

Q. (By Mr. Roberts) Go ahead, I'm sorry.

A. But I don't keep a type of running calendar on the computer system or anything like that.

Q. During the course of those discussions was it ever discussed that it would be wise to strip Mr. Kearney of his ability to allege bad faith by continuing to pay him allegedly erroneously?

MR. ELLIS: I will object to the question and direct the witness not to answer anything specific about the subject of those conversations. They are both privileged as attorney/client and as work product.

MR. ROBERTS: They're not privileged nor are they work product.

MR. ELLIS: You will follow my advice and not respond to any question concerning the substance of those conversations.

MR. ROBERTS: Boone vs. Van Liner cannot be more unambiguous on this point.

Q. (By Mr. Roberts) I understand your counsel is directing you not to answer, so we'll simply have to get the documents that have not been produced and reconvene this deposition and continue it in progress.

Are you aware of anybody taking any notes of these calls or anybody authoring

any documents to memorialize these calls?

A. Again, not to my knowledge. I don't recall any individuals authoring documents. Obviously, in speaking with them, they would probably know better than I.

Q. Did you ever send or receive any e-mails relative to these discussions and the issue of the Cuban coffee revelation?

A. I don't recall sending any e-mails specifically pertaining to the Cuban coffee revelation finding.

Q. What do you mean specifically pertaining to?

A. Addressing that question or issue exclusively.

Q. Do you recall ever sending or receiving an e-mail to or from anyone that discusses the way the policy began to be interpreted after the Cuban coffee meeting with you and Hughes?

A. I recall communicating via e-mail with our -- with the prior counsel on this case, Geri Johnson.

Q. Okay. Anyone else?

A. I just recall e-mails that went to

Ms. Johnson. There might have been other people that were cc'd on that, but I don't recall who those individuals were.

Q. Did she send you e-mails?

A. I believe she did. She did send me e-mails.

Q. Did Ms. Fairbough send you e-mails or copy you on e-mails relating to the issue?

A. I do recall being copied in on e-mails from Ms. Fairbough.

Q. Did Bill Dempsey send to you, or copy you; or did you send to him, or copy to him, e-mails on the issue?

A. Can you repeat the question, please?

Q. Did you send to Mr. Dempsey, receive from Mr. Dempsey, copy from Mr. Dempsey, or did you copy to Mr. Dempsey any e-mails relating to this issue we're discussing?

A. Again, as I sit here today, I don't remember specifically whether or not I was the author of an e-mail where I had communicated directly to him or cc'd him on that e-mail.

Q. Do you recall receiving from him an e-mail or being copied on an e-mail he sent?

A. I don't remember that specifically. Since we've talked about him being involved in this process, my guess is that he had been cc'd on a lot of those, but I don't know, you'd have to speak with him about it.

Q. Do you delete e-mails you receive?

A. Do I delete e-mails that I receive? Yes, I do.

Q. What's the process you undertake to delete your e-mails?

A. Can we take a break right now?

MR. ELLIS: After you answer the question.

A. Can you repeat the question, please?

Q. What's the process you undertake to delete your e-mails?

A. The process that I undertake to delete my e-mails is, depending on what the e-mail is, I delete it that day. All the ones I delete, you know, at some point in time, I don't have any specific guidelines where if I have an e-mail for a week, a month, a year, that I necessarily delete it. A lot of times my in basket is filled up enough that the technological folks will ask you to clean a number of

documents out.

Q. Do you have Microsoft?

MR. ELLIS: He did ask for a break, he answered your question. Go ahead.

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Going off record at 11:21 a.m.

(A recess was taken)

THE VIDEOGRAPHER: Going back on record at 11:30 a.m.

Q. (By Mr. Roberts) Mr. Mills, you're still under oath. You understand?

A. Yes.

Q. Have we exhausted your knowledge, sitting here today, of all the phone conversations, e-mail communications, and written documents that you're aware of sitting here today that exist commenting on, referring to, or relating to the Cuban coffee revelation?

A. I would have to say yes, as a lot of that stuff was handled by the attorneys and really taken out of my hands at that point.

Q. Do you use Microsoft Outlook?

A. Yes, I believe that's what we use.

Q. And when you get an e-mail that you want to save, do you put it in a file folder or do you just leave it in your in box?

A. I usually leave it in my in box.

Q. Do you have any file folders for your e-mails?

A. I think I've probably saved two or three e-mails, that I recall. I don't keep a specific folder to maintain any e-mail; I just don't delete it.

Q. If you get an e-mail and you want to delete it immediately or you don't see any reason to keep it, you just push "delete," and is that all you do to get rid of the e-mail, or is there something else you do?

A. I would delete the e-mail if I didn't need it. I think there's like a wastebasket that it goes into. I think that's where, after a period of time, there's a number of them, they ask you to delete a number of them. We've gotten a lot of viruses so we've had to delete a number of e-mails to get rid of that.

Q. Okay, so, if you go back to your office today, you'll have some e-mails and you might decide

to push the "delete" button on them, and you'll do that, right, you'll push "delete" on an e-mail?

A. Yeah, I guess that's the process.

Q. And then your understanding is it goes to the trash bin?

A. I don't know the specific terminology. I'm not a Microsoft technician. It's a wastebasket, deleted items. I don't know where it goes.

Q. Do you ever go into the wastebasket of the deleted items or the trash bin and perform an additional function to delete the e-mail?

// dbl delete

A. Yes, I would do that.

Q. How frequently do you do that?

A. I think it varies. If I'm given, from our technological folks because it's overloaded and I need to delete some, I'll do that. If we have viruses that come in and we delete those, I delete them again and make sure it's not going to affect our system. Periodically I delete the e-mails that are received and sent because of the waste basket filled up. I don't do it every day, I don't do it every month, but periodically.

Q. You don't do it every month. You do it every quarter?

A. To be honest with you, Mr. Roberts, I don't really have any specific time frame. I might do it once a month, semi-annually, I can't remember.

Q. You've been advised, though, that the wastebasket will get to some capacity and you have to go in there and delete things to create more capacity?

A. I recall receiving communications that there's a large volume of e-mails that are deleted in the wastebasket and we need to ...

Q. Are those communications from in-house counsel or from the IT team at DMS?

A. My recollection, those would be from our technological unit.

Q. Have you ever received any instruction or counsel from the general counsel's office at DMS to delete e-mails on a periodic basis?

A. No, I've not received any such communication.

Q. Do you use Word?

A. Yes, I use Microsoft Word.

Q. And Excel?

A. I do use Excel periodically.

Q. If you create a word document or Excel

document on a particular claim, do you always print up the document and put it in the claim file?

A. Can you repeat the question, please?

Q. If you create a word document or an Excel spread sheet on a particular claim, do you always print up the document and then put it in the claim file?

A. I wouldn't necessarily always put whatever was on the Word document or Excel, print it and put it in the file. I imagine a good portion of those letters do go into the file.

/ don't necess put etny in claim file

Q. Whether they go into the file or not, do you maintain them somewhere on the network or on your hard drive?

A. I save letters on our hard drive or network drive.

Q. All letters?

A. No, I don't save all my letters.

Q. You don't save all of your claimant-related letters to the network or hard drive?

A. No, I don't.

Q. Would the same be true about the Excel spread sheets that you might prepare, some of them might get into the claim file, some might not, some

might get to the network or the hard drive and some might not?

A. I don't really recall using any type of Excel spread sheet that often.

Q. Have you used Excel with regard to claims?

A. Yes, I have.

Q. And do you always print up the product and put it in the claim file?

A. No, I wouldn't necessarily do that for every situation.

Q. Do you always save them to the hard drive or network?

A. No, I would not.

Q. Do you have e-mail communications with Bill Hughes?

A. Yes, I do.

Q. Do you save those e-mails if they're about a particular claim or do you print up the e-mails and put them in the claim file?

A. Well, what do you mean by save? Like to the hard drive again?

Q. Or network.

A. I don't save e-mails. I read them, I might not delete it right away from my in basket, but I

don't save it to the hard drive or company drive.

Q. Do you print each and every e-mail you get about a particular claim and preserve that e-mail by then putting it in the claim file?

A. No, I don't print each and every e-mail that I would get about a particular file and save it.

Q. In the claim file?

A. In the claim file.

Q. Within the past week have you reviewed any memorandum authored by anyone regarding the extraordinary Cuban coffee revelation?

MR. ELLIS: Objection to form.

A. Can you repeat the question, please?

Q. Within the past week have you reviewed any memorandum authored by anyone regarding the extraordinary Cuban coffee revelation?

A. I don't recall specifically seeing any memorandum other than what was communicated in the claims file.

Q. Other than documents that exist in the claim file, your memory is --

A. I've looked at the claims file.

Q. Did you see anything that isn't in the claim file that is a memorandum regarding the

extraordinary Cuban coffee revelation within the past week?

A. No, I don't recall seeing anything along that line.

Q. Have you seen any notes or summaries of any conference calls or phone conversations in which you've been involved regarding the extraordinary Cuban coffee revelation?

A. Can you repeat that please?

THE COURT REPORTER: "Have you seen any notes or summaries of any conference calls or phone conversations in which you've been involved regarding the extraordinary Cuban coffee revelation?"

A. The only thing I would have seen is what's been in the claim file. I haven't seen anything outside of that, that I can remember.

Q. Were there any other claims other than Mr. Kearney's impacted by your Cuban coffee revelation?

MR. ELLIS: I'm going to object to the constant reference to the -- or at least somebody define the Cuban coffee revelation so we know what we're talking about.

MR. ROBERTS: We did that earlier

with your witness on the stand, but I'm working on what he understood it to be as expressed earlier under oath.

Q. (By Mr. Roberts) Mr. Mills?

A. Can you repeat the question, please?

Q. Have there been any other claims of any other policyholders impacted by your Cuban coffee revelation?

A. I don't have any knowledge of that.

Q. No other Jefferson-Pilot claims on which you were working were impacted by that, is that correct?

A. I don't recall any other claims that I've personally handled that the similar circumstances arose and I can't speak for the other cases because I don't know.

Q. I'm not talking about any similar circumstances, I'm just talking about did your revelation impact the payment of benefits to anyone other than Mr. Kearney, as far as you know?

A. As far as I know, to my knowledge, it hasn't impacted anybody else.

Q. Has not, did you say?

A. Yeah, to my knowledge.

Q. Were you given a spot bonus after the Cuban coffee revelation?
A. I think my testimony earlier was that I don't recall ever receiving a spot bonus.
Q. Have you told me everything you can recall about communications you had with Jefferson-Pilot persons regarding Mr. Kearney's claim?
A. To the best of my knowledge as I sit here today, I've answered your questions accurately and as much as I can recall.
Q. Okay. I just want to confirm. There's nothing you can remember sitting here today about anything you communicated with a Jefferson-Pilot person regarding Mr. Kearney's claim?
MR. ELLIS: Objection. Asked and answered several times.
MR. ROBERTS: Okay.
A. Other than what we've already discussed?
Q. That's my question. Have we discussed everything that you can think of?
A. To my knowledge, yes, we have.
Q. Did you and Mr. Hughes jointly arrive at the settlement proposal that you communicated to Mr. Spiegel at the meeting in Miami?

Told me elti[?] all his comm w JP.

MR. ELLIS: I'm going to object. I think that assumes facts not in evidence.
A. My recollection is that Mr. Hughes had a conversation with Mr. Spiegel about considering or discussing a settlement. I don't think it was necessarily an offer.
Q. There was no settlement offer proposed at that meeting, as far as you're aware?
A. To my recollection, numbers were discussed and discussions were held at how numbers were arrived. The circumstances or the revelation that we talked about that happened in the coffee house added another element of that discussion, but I don't think an actual number was extended to Attorney Spiegel at that point in time. Mr. Hughes would have more knowledge on that than I would.
Q. Well, you were there, weren't you?
A. Yeah.
Q. Mr. Hughes didn't have any private discussions with Mr. Spiegel during that day that you weren't participating in or present at, right?
A. Correct.
Q. And you said there was -- you said numbers were discussed. Those were without regard for the

extraordinary Cuban coffee revelation interpretation of the policy?
MR. ELLIS: Objection to form.
A. Can you repeat the question again, please?
Q. You said that numbers were discussed with Mr. Spiegel. Were those numbers without regard for the Cuban coffee revelation?
A. My recollection was that numbers that were discussed with Attorney John Spiegel were based on or without the prior understanding of the change of what the benefit would be at that point in time.
Q. I don't understand what you said. What were you trying to say?
A. That the numbers that were discussed were based on the previous understanding of what Mr. Kearney's benefit was prior to the discovery in the coffee shop.
Q. Okay, so the numbers that you and Mr. Hughes, or maybe just Mr. Hughes, were suggesting to Mr. Spiegel as the measurement of how this claim could be resolved, those numbers were presented without any consideration given to the new interpretation of the policy?
MR. ELLIS: Objection to form.

Miami offer based on prior understanding

A. Can you repeat the question so I can understand it.
Q. Do you not understand it?
A. No, I did not.
Q. Was the number -- was Mr. Hughes the only one that communicated a number to Spiegel as opposed to you?
A. Yeah, he was the superior, so he communicated.
Q. Do you know how it was that Mr. Hughes arrived at determining the appropriateness of articulating whatever number he articulated?
A. I don't recall a precise analysis that he used to arrive at that number. The best of my recollection is that number would have to take into account a potential liability moving forward, interest rates, present value, mortality, morbidity, and my understanding is that those things were considered when he arrived at that number.
Q. So mortality, morbidity, discount rate, those were factors in the equation, in Mr. Hughes's equation that got him to a number that he articulated, is that right?
A. I can't speak specifically for him, because

I don't know all the discussions that he would have had necessarily about discussing numbers with Spiegel. But my understanding is that those types of factors would have been discussed or considered in coming to any type of settlement offer, number, proposal or discussion.

Q. Okay. And, as far as you know, Mr. Hughes did not incorporate in the equation this extraordinary revelation which had, in your words, an extraordinary impact on the benefits going forward?

A. My recollection, and what I talked about earlier, was that he apologized to Attorney Spiegel at the onset of that meeting and that the numbers that he had in mind prepared to discuss with him were prior to the discovery of the reduction in the benefits in the coffee house just minutes before.

Q. Okay. So Mr. Hughes was willing to present a number to Mr. Spiegel that did not incorporate or measure this extraordinary revelation, is that right?

A. Can you say that question again, please?

Q. So, as far as you know, Mr. Hughes presented a number to Mr. Spiegel that did not factor in the extraordinary revelation that you and he had reached earlier that day?

MR. ELLIS: Objection.

A. To the best of my recollection, they had discussion on numbers and that it didn't -- the numbers that they ultimately discussed did not take into account that the benefit had been incorrectly paid to date.

Q. You mean you weren't seeking a reimbursement or you didn't factor in for future benefits that item?

A. My recollection is that the discussions were based on the benefit level, the incorrect benefit level, and that the appropriate benefit level that it should have been at that time.

Q. I didn't understand your answer to the question. Did you factor in the assertion that Mr. Kearney was required to reimburse the company for any benefits paid erroneously?

A. I can't recall if that was part of the consideration at that point in time. I know at some point in time a decision was made not to seek reimbursement. I don't know at that particular time whether or not that was something that was considered in the discussion of numbers that were had.

Q. What discussions did you have with

Mr. Hughes on which you're giving testimony that you have an understanding about how he arrived at the number?

A. Can you repeat the question, please?

MR. ROBERTS: Can you read that back.

THE COURT REPORTER: "What discussions did you have with Mr. Hughes on which you're giving testimony that you have an understanding about how he arrived at the number?

A. My recollection is that the discussions that Mr. Hughes had with Attorney Spiegel included the things I talked about earlier, the mortality, morbidity, interest rates, benefit level, maximum benefit period, present value. I don't think there was an exact formula that you could punch in the numbers and come up with something.

Q. That wasn't my question. Are you testifying that you had no discussions whatsoever with Mr. Hughes about the manner in which he arrived at a number, and your testimony is based solely on what you observed in the dialogue between Hughes and Spiegel?

A. I recall having discussions with Mr. Hughes about numbers and what would make -- calculating what a settlement number would look like.

Q. Is this prior to the meeting you had with Spiegel?

A. My recollection is that I did have a conversation with him prior or at some point after, I don't know a specific time line.

Q. Tell me what you can recall from that discussion.

A. I can't recall a specific conversation of what was said other than some of the factors that you would consider in coming up with an idea of a settlement is what the present value, mortality, things that I talked about earlier. I just don't remember the exact content and specifics of the conversation.

Q. Do you have a memory that he unambiguously communicated to you that the number had nothing to do with the Cuban coffee revelation?

A. My understanding is that those numbers that were initially discussed were based on the benefit level that was being paid at that point in time, which was, I believe, why Mr. Hughes had apologized

at the onset of the meeting because those numbers weren't the numbers that we would be able to use going forward because the benefit needed to be reduced.

Q. That wasn't my question. My question was do you have a specific memory of the discussion with Mr. Hughes where he communicated to you that the number he intended to propose to Spiegel or had already proposed to Spiegel had not incorporated the Cuban coffee revelation?

A. To the best of my recollection, we had a conversation about numbers. The best I can recall the numbers that were discussed were in relation to what his -- Mr. Kearney's present benefit level was at.

Q. So it had nothing to do with the revelation?

A. That's my recollection, yes.

Q. And your recollection is based on Mr. Hughes telling you that?

A. I don't recall him necessarily telling me that or the conversations we may have had about that. I do remember him expressing that at the onset of the meeting with Attorney Spiegel.

Q. So it's just coincidence that you and your supervisor planned a trip to Florida, bought tickets, got on a plane and went to meet with Mr. Kearney's counsel, and prior to actually arriving on ground in Miami, Florida you had no discussion, no inkling or no conclusion that he had been paid erroneously up until the time that you got on a plane to Florida.

A. That was a long --

Q. That was a bad question. Let me ask you that again.

Prior to getting on the plane to Florida and committing to that trip, did you have any discussion with anyone or had you thought to yourself that the benefits paid to Mr. Kearney were being paid in error?

A. I had no knowledge that the benefits being paid to Mr. Kearney were in error until sitting down in that coffee shop 15, 20 minutes or so before we met with Attorney Spiegel.

Q. So it's just a coincidence that two people would fly from Springfield, Massachusetts to Miami, Florida to talk to a lawyer for a claimant, and it's just coincidental that an extraordinary matter came to your attention after you arrived in Florida?

A. I wouldn't call it a coincidence. You know, Attorney Spiegel had asked us for a couple copies of the policy. It made me take a look at that policy and come to the understanding. My recollection was that he was aware of the circumstances with the case, that there were differences on both parties and that we were going to discuss those, and that one of the options when there's disputes is to come to some type of resolution and that those discussions would be had.

Q. You're mindful that DMS had a copy of the WJ567A policy for over four years prior to that meeting, right?

A. I don't recall a specific time that an actual copy of that policy was received by DMS.

Q. You're mindful that DMS performed some work for Jefferson-Pilot relative to the Kearney claim going back to 1997; you're mindful of that from your knowledge of the claim file, right?

A. I recall looking at that claim file there was a handling of the case by DMS prior to 2000.

Q. And you're mindful that in 1997 that at Todd Ditmar's specific request, because he wanted the legal department to review the policy, that the

WJ567A policy was sent to him by Howard Shelton, right?

MR. ELLIS: Objection.

A. I don't recall that specific communication document. If it's -- I'm sure it's in the file. If you want me to look at it, I'll verify that for you.

Q. As far as you're aware, did Jefferson-Pilot ever provide DMS with any documents or information that describe the benefits and the policies Jefferson-Pilot had outstanding with policyholders?

A. Can you repeat that question, please?

Q. As far as you're aware, did Jefferson-Pilot ever provide DMS with any documents or information that describe the benefits and the policies jefferson-Pilot had outstanding with policyholders?

A. To my knowledge, recollection, they provided us with copies of their policies. I don't recall any other materials that they gave us.

Q. Copies of the policies were given independent of the actual claim files or were they just incorporated amongst the various claim files?

A. I don't remember the logistics, if they came in with each individual file or if they were sent all the policy forms and riders all at one time,

I don't remember that.

Q. Were all the different policies and riders consolidated into some file or binder or desk somewhere at DMS for access by different folks?

A. My recollection is that we did have a binder of copies of these policies that we could attain.

Q. So would each of the claim reps responsible for that block of business have in their cubicle or office a three-ring binder that contained the Jefferson-Pilot policies and riders?

A. I don't recall if they had an actual binder themselves on their desk or they had an area where they could go to to research that.

Q. So there was a communal area where there was some kind of binder or folder with the various policies in it, Jefferson-Pilot policies?

A. Again, my recollection was that the examiners either had all those series on their desk in a binder form or a place where they could go to so they could retrieve the information they needed.

Q. When DMS takes on a new block of business, is it the procedure that the legal department will review the policies that are now subject to

administration?

A. Can you repeat that, please?

Q. When DMS takes on a new block of business, is it the procedure that the in-house counsel staff will perform a review of the new policies that will be subject to administration by DMS employees?

A. I'm unaware of any such procedure.

MR. ROBERTS: Let's switch tapes.

THE VIDEOGRAPHER: Going off record at 12:06 p.m.

Back on record at 12:07 p.m.

Q. (By Mr. Roberts) So if I understand your testimony accurately, when -- you understand you're still under oath?

A. Yes, I do.

Q. When DMS took on the Jefferson-Pilot block of business, you're not aware of any education, training or insight into the policies that was provided to you or your peers by anyone at Jefferson-Pilot?

A. No, I am not.

Q. And you're not mindful of any education, training, or insight into the particulars of the policies that was provided to you and your peers by

DMS in-house counsel?

A. No, I'm not aware of any such program or occurrence.

Q. It doesn't necessarily need to be a program. It doesn't have to be formal; it could have been informal.

A. I have no prior knowledge of these policies.

Q. I'm not talking about prior knowledge. Was there an occasion, formal or informal, where DMS in-house counsel gave you and your peers, or you, some overview of what these policies are about?

A. No, I don't recall any type of communication like that.

Q. Did Todd Ditmar provide you and/or your peers with any counsel, insight, or overview of the Jefferson-Pilot policies?

A. I don't recall him providing any particular oversight review of the policies.

Q. So as I understand it, you and -- was it three other claim examiners on the Jefferson-Pilot block of business in 2000?

A. I believe I testified that I recall three others, I don't exactly remember.

Q. So do I understand correctly that the four of you, without any dialogue or communication with people at Jefferson-Pilot, without any dialogue or communication with DMS in-house counsel, and without any dialogue or communication with Todd Ditmar, the four of you were left to administer these policies and understand for yourselves what the policies provided?

A. Well, at that time my recollection is we were given a number of cases to administer, and yeah, I don't remember anybody specifically giving any specific guidance to anything about the cases or the policies.

Q. Were you folks given binders of the policies or were those things that you and/or your peers created on your own?

A. I don't recall if there were original policy forms received from JP or they were copies provided to us that we copied over for several other copies for multiple folks. I don't know the logistics of how all that worked out.

Q. Did you maintain a binder at your cubicle, a binder of the Jefferson-Pilot policies in 2000?

A. You know, I really don't recall.

Q. But you do know that others did?
A. Again, I don't know if others had it or not.
Q. I thought you just testified that some people had binders, others just used a communal area.
A. I think my testimony was more I don't know if they necessarily had it at their desk or if it was in a communal area or not.
Q. Oh, you don't know if it was in a communal area now?
A. I don't know if they had it at their desk or if they referred to it at a communal area or not.
Q. Is it one or the other or is it potentially neither?
A. My recollection is it was probably one or the other.
Q. Okay. And you can't recall whether you had a binder?
A. To be honest with you, Mr. Roberts, I don't remember. It's a long time ago.
Q. What did you -- did you have a cubicle back then in 2000?
A. Yes, I did have a cubicle.
Q. And now do you have an office with a door?

A. Now I do have an office with a door.
Q. What did you maintain in your cubicle?
A. In my cubicle I had my computer, I had a storage area for claim files, I had calendars, pens, pads, photos of my family. Other various items I can't recall.
Q. All personal items? Any business materials?
A. Business materials? I don't recall specifically what I would have had at my desk at that point in time.
Q. And you can't testify one way or the other under oath about whether you had a binder of the policies of Jefferson-Pilot or not?
A. Yeah, I really don't remember at that time.
Q. In your office do you have a binder of the Equitable policies?
A. Yes, I do have that.
Q. Is that a good business practice?
A. I think it's a good business practice to have copies of those policies, whether they're in your office or, you know, a ten second walk to another area where you can reference them.
Q. Do you find it convenient to have them in a

binder in your office now?
A. I don't find it convenient to have them. I don't find it any more convenient if they're in my office or if they're a short walk outside my office.
Q. So if you didn't have these policies back in 2000 in a binder in your cubicle, they would have been just a short walk away from you, is that what you're saying?
A. That would be my recollection, yes, I had access to them.
Q. Where was Todd Ditmar's office in relation to yours in 2000?
A. He was fairly close. We're on the same floor.
Q. Do you know if he maintained a binder in his office of the Jefferson-Pilot policies?
A. I really don't have any idea.
Q. Was Mr. Hughes responsible for the Jefferson-Pilot block of business at all at any time that you're aware of?
A. I don't know all of Mr. Hughes's responsibilities. I know I obviously talked to him on Jefferson-Pilot cases, so I think he did have some formal responsibility.

Q. As I understand your testimony, he wasn't your direct supervisor in 2000, but he became your direct supervisor after you became Director of Claims for the Equitable block, is that right?
A. Can you say that again, please?
Q. As I understand your prior testimony, he didn't become your supervisor until you became Director of Claims for the Equitable block?
A. Yes.
Q. Are you mindful whether he had prior responsibility prior to that time for the JP block?
A. I don't fully remember what the full scope of his responsibilities were at that point in time.
Q. On how many occasions have you given a deposition?
A. I believe there's four or five other situations.
Q. Have you ever reviewed any videotape to prepare you for what to expect in a deposition?
A. Yes, I believe I have.
Q. Is that something that DMS maintains in-house or did someone outside of DMS offer that to you?
A. I believe that was someone outside of DMS.

Videotape prep

Q. Was it the Wood & Lamping law firm that gave it to you, Mr. Ellis' law firm?
A. Gave what?
Q. Provided you with a videotape to show you what to anticipate in deposition?
A. I recall a videotape. I went to a conference several years ago. They popped in a tape about a deposition and what it was all about, what happens.
Q. What was the conference title?
A. This is going back. It was probably a program that the New England Claims Association had put on.
Q. Do you recall what the topic of the seminar was?
A. I don't know the exact title. It had something to do with depositions.
Q. Did DMS send you to this conference or was it something you decided to do out of curiosity?
A. I don't even recall if I was actually an employee of DMS at that time.
Q. Do you know whether or not during your employment at DMS you've ever been provided with any materials, videotape, or documents relating to the

conduct of depositions?
A. Can you say that question again, please?
Q. Do you know whether or not during your employment at DMS you've ever been provided with any materials, videotape, or documents relating to the conduct of depositions?
A. I've had conversations with, you know, counsel that we've had, outside counsel we've had on what to expect in a deposition.
Q. Anything else?
A. I don't recall receiving anything, any documents in particular from a DMS employee or DMS in-house counsel about that.
Q. Have you ever testified at trial?
A. I don't recall if it qualifies as trial, but I've been part of a mediation which an agreement was struck that day and both parties had to go into the courtroom and go under oath that an agreement had been reached.
Q. In what case was that?
A. All I can remember that I can tell you is that it was a case for Connecticut Mutual and it happened in southern California, I think in the San Diego area.

Q. How big was the Kearney file when you took responsibility of it in January of 2000?
A. I believe it was a number of inches thick.
Q. I'm sorry?
A. I believe it was a number of inches thick.
Q. Well, since your involvement there's been investigations by CS Claims Group, are you mindful of that?
A. Yes, I am.
Q. And there's been some IMEs performed, are you mindful of that?
A. Yes, I am aware of that.
Q. And in the context of CS Claims Group performing its investigation or DMS performing its investigation, there's an investigative arm to DMS, too, right?
A. Can you repeat that, please?
Q. Does DMS have a department that's there to assist in gathering information, investigating claimants?
A. DMS has a claims department. There's a technological department.
Q. Who is in the Syracuse office? What departments are in the Syracuse office?

Investigating Surveillance IMES

A. I don't have any -- I've never been there, I don't have any familiarity with the Syracuse office.
Q. Do you know who Barb Bailey is?
A. I've heard the name.
Q. Have you ever communicated with her?
A. Yes, I believe I have.
Q. What would be the -- she's an employee of DMS?
A. That's my understanding.
Q. What would be the purpose of you communicating with her?
A. I think at the time that I really communicated with her we had a company function down in this area that I met her. I know we have claims handlers that submit requests to her.
Q. What kind of requests do you understand are submitted to her?
A. I think she does, my understanding, a lot of database Internet research.
Q. To investigate information on claimants, right?
A. Investigate, evaluate information, yes.
Q. And you used her in the Kearney claim,

Bailey

right?

A. I don't recall.

Q. In the claims file, there is several hundred pages relating to Mr. Kearney's -- lawsuits involving Mr. Kearney or his companies, are you mindful of that?

A. Like I said, there is a lot of information in that file. I can look at that information if you want me to. I just don't know what in particular you're getting at.

Q. Are you mindful that there's several hundred pages in the claim file relating to lawsuits that Mr. Kearney was personally or corporately involved in?

MR. ELLIS: Objection. If you want to show him the claims file, go ahead.

A. My recollection is there's information in that claim file pertaining to Mr. Kearney being in other lawsuits.

Q. Okay. Including he filed bankruptcy, are you mindful of that?

A. Yes, I do recall that.

Q. And he was involved in a divorce proceeding, you're mindful of that?

A. Yes, I do recall that.

Q. And you're mindful that each of those occurred after he claimed disability in 1993?

A. I don't recall specifically a time line of those events with the claim commencing.

Q. Very well. Were those records of litigation, were those part of the claim file when you took it in January of 2000?

A. I don't recall specifically all the information that was in that claim file at that time. I'm sure that the file would document that.

Q. Are they date stamped upon receipt, all that information, is that what you're saying?

A. My understanding is that mail does get date stamped. I don't know if every single page of that gets date stamped.

Q. So your testimony is you don't know whether or not those several hundred pages of litigation records were in the claim file when you received it in January of 2000?

A. Again, I can't tell you right now. I mean, if I looked at that and I saw some of the dates, I think I can provide that answer for you.

Q. Okay. What about the business -- there's

several hundred pages of business information on 8 1/2-by-14 pieces of paper. Were those documents in the claim file when you received it in January of 2000?

A. I'd have to look at that again because I don't recall the time line and junction when all that information was there.

Q. Were there medical records contained in the claim file when you received it?

A. My understanding is that there was some medical records in that file at that point in time.

Q. So your testimony is when you received the claim file it was a couple inches thick, is that right?

A. To the best of my recollection.

Q. And according to that claim system document in front of you, you're still the examiner on the claim?

A. It references my name on here, but I really had -- it's been out of my hands since it's been kind of involved in this legal situation.

Q. Prior to the involvement in this legal situation how thick was the claim file?

A. I don't know precisely. Again, if you want

me to look at the file and the time line in which this happened, we can figure that out. I just don't know.

Q. You don't know. Did it grow during the two years that you were involved in it?

A. Well, sure it did, yeah.

Q. Did it grow exponentially during the two years that you were involved with it?

A. I think it grew as information was gathered appropriately for the file.

Q. Was it many times larger when the lawsuit was filed than it was when you received it?

A. I think that the file is much larger today or at the time of the lawsuit than probably when I received it.

Q. That wasn't my question, though. My question is simple. Was it many times larger?

A. Well, I don't know what you necessarily mean by many times. The only way I'd be able to determine that is to take the file, go through the dates, take the file as to how big it was with the documentation at that time, see what it was when the legal proceedings began, and we can figure out how many more times it's bigger.

Q. But your involvement in the claim, your receipt of it in January of 2000, and your work on it for two years, you can't testify under oath about whether or not it grew by many times during your involvement?

You can't do that, can you?

A. I think my testimony is that it's grown. You know, time went by, the file's larger.

Q. And you can't say whether it's many times larger or not than before your involvement, or can you?

A. Many times? I mean, I don't know how you want me to --

Q. Just, don't bother, that's okay. Don't bother answering the question.

Did you date stamp every piece of information you received when you received it, regarding Mr. Kearney's claim?

A. I would not date stamp any materials on any file.

Q. Would anyone do that?

A. My understanding is that that information is done by our mail department.

Q. And do they date stamp every single page

that's received?

A. I don't know what their practice or procedures are, if they do that or not. I don't have any knowledge of that.

Q. So if a letter comes in addressed to Robert Mills, it's opened by the mail department, stamped, and then provided to you?

A. That's generally how I find the letters, yes.

Q. You don't open your own mail?

A. No, our mail is generally opened because you don't necessarily know who that article of mail should be distributed to.

Q. But if I sent you a letter, it wouldn't be opened by you, it would be opened by someone else, date stamped, and then you receive it, is that what your testimony is?

A. Can you say that again, please?

Q. If I were to send you a letter specifically directed to you, Robert Mills at DMS, 1350 Main Street, Springfield, Massachusetts, your testimony is you don't open that mail, someone else does, it gets date stamped, and then it gets sent to you?

A. My testimony would be that in that

circumstance that, no, I would not open that article of mail. It generally is date stamped. The only time that I can recall that I would actually get an envelope unopened is perhaps an overnight express package or someone wrote down "personal and confidential" on the envelope.

MR. ROBERTS: Let's take a break for lunch.

THE VIDEOGRAPHER: Going off record at 12:30 p.m.

(A recess was taken)

THE VIDEOGRAPHER: Back on record at 1:38 p.m.

Q. (By Mr. Roberts) Mr. Mills, you understand you're still under oath?

A. Yes, I do.

(Exhibits 43 and 44, marked)

Q. (By Mr. Roberts) I've marked as Exhibits 43 and 44 two compilations of materials from the claims file that I'm going to go through here for the balance of the afternoon, I believe.

I'd like to start with Exhibit 43, which isn't bound in any manner other than that rubber band, so I'd ask that you take care to keep the

documents in order. Forty-four we'll refer to from time to time, but 43 is principally where we're going to be working, okay?

A. Yes.

Q. Okay, the first page of Exhibit 43 purports to be a fax cover sheet from you to Jefferson-Pilot on January 5 of 2000. In the comment box it says, "Please process benefit on policies through January 1, 2000. Thanks."

Is this accurately portrayed as a fax cover sheet from you communicating that message, do you know?

A. This is a fax cover sheet from myself to Sharon Balkcum dated January 5, 2000 and it is to process benefit on both policies as of -- or through 1/1/2000.

Q. What assessment or determination did you make prior to January 5, 2000 to direct her to issue those payments?

A. Best of my recollection, the only assessment was would be to continue to keep the benefits on a status quo.

Q. Okay. What type of training is provided to persons at DMS, new hires?

A. I'm aware that there's a training program that our new hires will go through when they come to DMS.

Q. What does the program consist of?

A. There's various subjective or suggestive topics that they go through from the introductory on how to handle claims situations, claim cases.

Q. Is there letter writing?

A. I don't recall if there's any particular letter writing class or information.

Q. Do you have an understanding of how courts interpret ambiguities in insurance contracts?

A. Not clearly. I know there's case laws and stuff like that. I don't know about that particular topic that you're talking about.

Q. No one's ever suggested to you that ambiguities in insurance contracts are construed in favor of the policyholder?

A. I've heard that terminology before.

Q. Do you understand that to be the case?

A. I don't understand or have knowledge of how that -- my understanding is that that varies in different particular states, so I don't know how that's interpreted in each and every state.

New hire training

Q. Do you know what the law of the state of Ohio is on that issue?

A. No, I do not.

Q. Have you ever had that discussion with anyone?

A. I don't recall having that discussion with anyone.

Q. Have you discussed the concept of ambiguity in Mr. Kearney's with anyone?

A. No, I don't recall having any conversations along that line.

Q. The subject of discussing ambiguities with regard to Mr. Kearney's policy never came to your attention as an important topic to discuss?

A. Can you say the question again, please?

Q. You never considered it important to have any discussion with anyone or relevant -- let me ask you another question, strike that.

You never considered it relevant to discuss the prospect that Mr. Kearney's policy may be ambiguous with anyone?

A. I know Mr. Kearney had questions about certain definitions in his policy that we communicated back to him.

CLK questioned definitions in policy

Q. Other than communications with Mr. Kearney, you never considered it important or relevant to discuss whether or not -- discuss with anyone whether or not Mr. Kearney's policy was ambiguous in any regard?

A. Can you say the question again, please?

Q. Other than discussions you had with Mr. Kearney, you didn't consider it relevant to have discussions with anyone concerning the potential that Mr. Kearney's policy may be ambiguous in some way?

A. Did I have discussions whether it was relevant if there was any ambiguous --

Q. No. You didn't consider it relevant to have any discussions with anyone concerning whether or not there's ambiguities in Mr. Kearney's policies?

A. I can't recall if I considered it or I just read the policy and we applied it.

Q. You've never considered it ambiguous, do I understand?

A. It's my recollection that the policy's pretty self-explanatory, self -- clear language.

Q. There's no ambiguity -- you've never considered there to be any ambiguity in Mr. Kearney's contract, is that right?

A. I know there was a question on the length of the benefit period on the residual, and I think that my recollection was that the intent of that benefit for a residual situation was to be for 65, which was communicated. But I don't think that portion of the policy clearly said that, although that's my understanding what Jefferson-Pilot's intent of that residual would be for age 65 benefits.

JP intent on duration of benefit

Q. How did you come to an understanding of what the intention was of a policy that was drafted sometime prior to your graduation from college?

A. That's my understanding of what Jefferson-Pilot has indicated.

Q. When and where did Jefferson-Pilot indicate that to you?

A. I think there was a letter, a couple references in the file that residual was to age 65.

Q. You're aware of a letter in the claim file of Mr. Kearney from Jefferson-Pilot saying the intent of our policy with regard to the maximum benefit period for residual disability is that it was to be 65?

A. Can you say that again, please?

Q. There is a letter in the claim file

somewhere from Jefferson-Pilot that says to you, "Mr. Mills, it was our intention when we entered the contract that the maximum benefit period for residual disability be age 65"?

A. My recollection is that there's a letter in there from Mr. Harold Shelton to Mr. Kearney stating that residual is payable to age 65.

Q. And you took that and concluded that Jefferson-Pilot intended when they drafted this policy sometime prior to 1991 that that be the maximum benefit duration, is that your testimony?

A. Can you say that again, please?

Q. Do I understand that based on that letter you have now concluded that Jefferson-Pilot, the company, prior to 1991, before its creation of this policy, intended for the contract language to say that the maximum benefit duration for residual disability is age 65?

A. My recollection is that that was a letter that said residual is 65, that there was conversations through their legal department that that was the intent of the policy.

Q. Where's the information about the conversations with the legal department that the

intention of the contract language be that it be age 65?

A. Again, Mr. Roberts, that's my understanding what they communicated to us; that was the intention.

Q. Was that a verbal conversation that you had with them, was it written somewhere, is it in Mr. Kearney's claim file? Where is it?

A. My recollection is that that was a verbal communication to us.

Q. Okay, fine. When was that? Are there any notes of that phone call?

A. I don't believe that there's notes from that specific phone call.

Q. This morning you told me that you had relayed to me all the information you can recall that you've learned from people at Jefferson-Pilot. Are we now adding to that?

A. Can you ask the question again, please?

Q. The record is what it is. So, there is at least one ambiguity in Mr. Kearney's policy?

A. I don't know if that's necessarily an ambiguity. I don't know how the Courts view that, if that is or not.

Q. Okay. Other than that ambiguity or

potential ambiguity, did you ever consider it relevant to discuss whether any other provision in the policy was ambiguous or not with anyone?

A. Can you ask the question again, please?

Q. Are you on any medication today?

A. No, I am not.

Q. Are you having trouble hearing me?

A. No, I can hear you pretty good.

Q. Okay. Other than the potential ambiguity regarding maximum benefit duration under residual disability, you never considered it relevant to discuss with anyone the potential that any other term of Mr. Kearney's policy was ambiguous, is that true?

A. Can you say that one more time, please? I just want to make sure I understand that correct.

Q. Do you mind if it's read back to you so we don't --

A. Sure.

Q. Okay, great.

THE COURT REPORTER: "Other than the potential ambiguity regarding maximum benefit duration under residual disability, you never considered it relevant to discuss with anyone the potential that any other term of Mr.

Kearney's policy was ambiguous, is that true?"

A. Well, the way I'd have to answer that is that after I became aware of the incorrect benefit period that there was conversations that we talked about earlier with Jefferson-Pilot about those circumstances to see -- to seek their guidance if that in fact was -- if that was their understanding as well. So there was conversations with them about that.

Q. So you had discussions with Stephanie Fairbough and Bill Dempsey about the potential that Mr. Kearney's policy was ambiguous on his COLA and Social Security rider benefits being paid during periods of residual disability?

MR. ELLIS: Objection. Misstates testimony.

A. Can you say that question again, please?

MR. ROBERTS: Can you read it back?

THE COURT REPORTER: "So you had discussions with Stephanie Fairbough and Bill Dempsey about the potential that Mr. Kearney's policy was ambiguous on his COLA and Social Security rider benefits being paid during periods of residual disability?"

A. I recall having conversations about what the policy stated, that it was -- what it applied, that the benefit had been incorrectly paid under those benefits. I brought that to his attention.

Q. Mr. Mills, I know what you want to tell me, but it's important in the deposition process that you answer the questions I ask, okay. The question was very straightforward. Did you discuss with Fairbough or Dempsey the potential that Mr. Kearney's policy was ambiguous as to the COLA and Social Security rider benefits being paid during residual disability?

A. I didn't consider that to be ambiguous. I thought it was pretty simple and straightforward. And I just discussed that with them to get that confirmation.

Q. Okay. And everybody on that call, on those multiple calls between you, Hughes, Dempsey, and ^Fairbough all agreed that it was absolutely expressed and explicit and unambiguous, is that true?

A. I don't recall if it was exactly at that point in time, but I think that is the opinion of those people involved.

Q. Okay. Then how did it come to be that Mr. Roberson with 38 years of experience, Mr. Shelton

with 38 years of experience, Ms. Harden with 31 years of experience, Mr. Maxwell with 20 years of experience, you now with 13 years of experience, Mr. Ditmar with his ten or eleven years of experience, and Mr. Hughes with his 30-ish years of experience, I guess that's like 250 years of experience, how is it that so many people overlooked such a simple, explicit, and unambiguous term in a contract for so long?

A. Well, Mr. Roberts, I can't, you know, speak for those individuals. I don't know why they made that mistake, why they continued to make that mistake.

Q. How did you make the mistake for a year and a half when the language is so gosh-darned direct and explicit?

A. You know, that's -- unfortunately I did continue with that mistake and did not find it until I took a look at the policies prior to meeting with Attorney Spiegel.

Q. The policy's only six pages long, the schedule pages are two pages long each, one page each, and the riders are each one-page long. I think the Social Security rider might be less than 50

words. How is it that if the language in those documents is so unambiguous that it took you a year and a half to figure out what they said?

A. You get a lot of claims at once. You're more than likely not going to have time immediately to look through every single page of a policy or a claim. That will happen in due time. I honestly did not look at that policy closely until Attorney Spiegel had requested a second copy of the policies, then I took a closer look and uncovered the error.

Q. Okay. Turn to page 2 of Exhibit 43. This is a letter that doesn't bear your signature but purports to be a letter you sent to Mr. Kearney on January 31, right?

A. Yes, this is a letter dated January 31 to Mr. Kearney with my name on it.

Q. And this is Bates number 3123. Why is it that in the claim file there's a Bates numbered letter from you to Kearney but it doesn't have an actual copy of your written signature?

A. I couldn't tell you.

Q. Is there any doubt that this letter was sent to Mr. Kearney?

A. I'm pretty comfortable with my name on it

that this letter was sent to him.

Q. Subparagraph one says, "Enclosed please find our standard continuance of disability claim form." Did I read that correctly?

A. Yes, you did.

Q. Thank you. No. 2 says, "Enclosed is an authorization to obtain information form. Please sign and date this form prior to returning it to us." Did I read that correctly?

A. Yes, you did.

Q. Prior to January 31 of 2000, had, as far as you know, Jefferson-Pilot said to DMS in any form or fashion that its continuance of disability claim form and its authorization to obtain information form should be used in interacting with Jefferson-Pilot's policyholders?

A. Can you repeat that question, please?

Q. Prior to January 31 of 2000, are you mindful of any communication with Jefferson-Pilot that Jefferson-Pilot said that they desire that DMS use DMS's standard continuance of disability claim forms and authorization forms on that block of business?

A. My understanding is that we were to provide

the claim forms that we had available to us on that system, our claims system at DMS.

Q. That wasn't my question. My question was simple. Are you mindful of any communication between Jefferson-Pilot and DMS wherein Jefferson-Pilot said, "DMS, go ahead and use your continuance of disability claim form and your authorization forms on our block of business"?

A. I don't recall any knowledge of that specific type of communication.

Q. Are you aware of any letter or document that suggests that Jefferson-Pilot blessed and approved DMS's use of DMS's forms on Jefferson-Pilot's block of business?

A. I don't have any knowledge of that occurring.

Q. The continuance of disability claim form and the authorization form that you sent to Mr. Kearney on January 31 of 2000 are the same forms that you were using prior to January of 2000, isn't that true?

A. Can you say that again, please?

Q. The continuance of disability claim form and the authorization form that you sent to Mr.

Kearney on January 31 of 2000 are the same forms that you, Mr. Mills, were using prior to January of 2000, isn't that true?

A. My recollection is that the only changes to those forms would have been the specific name of the insurance company that we had been working with and sending the forms out on behalf of.

Q. Thank you. When you received Mr. Kearney's claim file in January of 2000, did you review the fact that Jefferson-Pilot had conducted surveillance of Mr. Kearney in 1994?

A. Sitting here today I don't recall if I looked at that. If it's in the file, I would have looked at it at some point in time. I don't know if that would have happened right away.

Q. Would you have looked at these materials within the first month of your receipt of responsibility for Mr. Kearney's claim?

A. I don't know the time frame. I would imagine it was around that time of month, a little after. I don't remember.

Q. Would you have reviewed the claim file prior to sending letters to Mr. Kearney?

A. I would give a preliminary review of

information generally I would expect to see in a claim file, and if we didn't have it, request it.

Q. Are you mindful that the claim file, when you received it, contained surveillance information from 1994?

A. Again, you know, I don't know when I would have came across that, but I think when we did look at it I was aware that there was surveillance in that file.

Q. Were you aware that the accounting firm of Callaghan & Nawrocki was engaged in 1996 and 1997 to help Jefferson-Pilot with understanding Mr. Kearney's financial situation?

A. I do recall that there was correspondence that was sent between the two.

Q. Okay. When you received the claim file, prior to sending the letters to Mr. Kearney, did you review the November 18, 1997 Ugolik report, which is the third item in Exhibit 44?

A. Can you repeat that again, please?

Q. First of all, the Equifax information in the claim file from 1994 is contained in the first tab of Exhibit 44. Can you confirm that for me?

A. Yes.

Q. Okay. And the Callaghan & Nawrocki information from '96 to '97 is contained at the second tab of Exhibit 44, is that correct?

Ex. 44 (mostly)

A. Let me take a look. The first page is -- it looks like a fax transmittal --

Q. Sir, we're going to be here a week if you read everything on the page. Just flip through it, talk to yourself, and just confirm for me that all the documents behind the second tab relate to Callaghan & Nawrocki's involvement in Mr. Kearney's claim in '96 and '97. Can you do that for me, please?

A. I just don't know without the claims file if these are the only communications, but I can verify for you that they do have the date stamp and they are all communications relating to Callaghan & Nawrocki and Jefferson-Pilot.

Q. Great. Do you understand Callaghan & Nawrocki to be accountants specializing in assisting disability insurance companies?

A. Yes, I do.

Q. Okay.

A. Yes, they do look as though they all are communication between Callaghan & Nawrocki folks and

JP.

Q. And/or Mr. Kearney?

A. And Mr. Kearney.

Q. The third tab is a 1997 -- or actually two reports in 1997 from a Ms. Ugolik, U-G-O-L-I-K, is that right, that bear Bates stamp numbers from Mr. Kearney's claim file?

A. Yes, Chelsey Ugolik.

Q. And she's an employee of PDC, which is a company owned by DMS?

A. I know we use PDC a lot. I don't know necessarily the relationship between PDC and DMS.

Q. Sir, you don't know that PDC is a subsidiary of DMS?

A. I don't know the circumstances with that.

Q. Did you review the Ugolik report prior to sending letters to Mr. Kearney when you took responsibility for his claim?

A. I don't recall if I saw the Ugolik report necessarily before I started sending letters to Mr. Kearney.

Q. Do you think that it would have been a wise thing to do to read reports like this on a claim that you were handling soon after receiving responsibility

for the claim?

A. Again, to the best of my recollection, I don't know if I did necessarily take a look at it --

Q. Have you ever read it?

MR. ELLIS: Excuse me, let him finish his answer, please.

Q. (By Mr. Roberts) Okay, go ahead.

A. Prior to sending out any letters to Mr. Kearney.

Q. Have you ever read the Ugolik report?

A. I have seen this before and read it.

Q. Do you think it was within a year and a half of you taking on responsibility for the claim?

A. Well, this was November of '97, so it was outside of two years.

Q. No, no, no. Within a year and a half of you taking responsibility for the claim, my question is unambiguous, did you read the Ugolik reports?

A. I don't specifically recall reading it, but I would assume that I did read it at some point in time.

Q. What's your guess, maybe two months from taking responsibility, eight months, a year and a half? What range are we talking about?

A. I don't know exactly at what point in time I would have read that.

Q. But you're certain you have read it?

A. I have read it.

Q. Did you read everything in Mr. Kearney's claim file during the period of time that you were responsible for it?

A. I have read everything at some point in time in his file.

Q. At some point in time. Maybe you just read portions of it for the first time this past week?

A. I know there's a lot of information there that I had seen quite some time ago when I read the whole file prior to these proceedings.

Q. Did you read information as it came in?

A. I would expect that I did read information as it came in.

Q. So any information that went into the claim file after January 1st of 2000 would have been read by you contemporaneous with its receipt, can we agree on that?

A. That would seem, again without remembering when I looked at it, I would say that would be fair to say that I read it as it came in.

Q. So, on January 1 of 2000, or about that time, you inherited a file that was, you said, a couple inches thick. When do you think it was that you finally came upon reading all of the information that you inherited in January 2000 on the Kearney claim?

A. I don't remember when that would have exactly taken place on the claim, if that happened within the first month or several months later. I know I have seen and read the whole file, I just don't remember when that happened.

Q. Do you know who Janet Beattie is?

A. Yes, I am aware of who she is.

Q. She's an employee of DMS, right?

A. I don't know what her appointment status is.

Q. Do you know if she's ever been an employee of DMS?

A. My understanding is that she was an employee of the psychiatric disability consultants or worked on her own.

Q. Can you confirm for me that the fourth tab of this Exhibit 44 is a fax cover sheet on Disability Management Services letterhead from Janet Beattie

that's Bates stamped 2968?

A. Yes, that is correct.

Q. Thank you. Did you review Ms. Beattie's records and documents in the claim file within six months after receiving responsibility for Mr. Kearney's claim?

A. I do recall seeing and reading her report, and I can't tell you exactly at what point in time I did go through it.

Q. Don't you think it's important when you take on responsibility to determine benefit eligibility for someone that you actually read the documents in their claim file?

A. Well, it is important, but I think you also have to understand that, you know, you got a lot of claims at once. And really, if these claims were being paid, we kept it at that. The majority of months we were just looking at payment schedules and continuing the payment. And as time allowed, it would enable us to go look a little bit more through these files that, in several instances, were several inches thick. It took some time.

Q. So does the possibility exist that you never read Mr. Kearney's claim file?

A. No, the possibility doesn't exist that I never read it because I did read it. I just don't know at which point in time that I went through every single piece of the file.

Q. You don't know whether it was in three months of January 2000 or 18 months of January of 2000, if not more?

A. I read the whole file, you know, whether it was in the first month, first three months, six months, you know, I don't remember.

Q. Very well.

Mr. Mills, are you aware of a 1998 investigation into Mr. Kearney's claim performed at the direction of Jefferson-Pilot?

A. I would have been aware of whatever was indicated in the file when I looked at it.

Q. Are you aware that in December of '99, a month before you took on responsibility for the claim file, Jefferson-Pilot had surveillance and investigation performed on Mr. Kearney?

A. I don't recall that exactly happened, but if I was able to look at the file and see if that in fact happened at that point in time.

Q. Turning to the eighth tab of Exhibit 44, if

Read whole file

you could flip through those documents and confirm for me that they are all documents relating to the Kearney claim and bear Bates stamps indicating that they were in the Kearney claim file?

A. These look like documents from Jefferson-Pilot and International Claims Specialists.

Q. From what time frame?

A. November of 1999. Investigation in December of 1999.

Q. If surveillance in an investigation of Mr. Kearney was performed a month before you took on responsibility for the claim, would you have reviewed that information sometime soon after you took on responsibility for the claim?

A. I would have reviewed that information and all the information in the file at some point in time, yes.

Q. Would it have been soon after you took over responsibility for the claim?

A. I don't know at what point in time that necessarily would happen because we had a lot of claims at once. As far as his particular case, I don't know exactly when that would have happened.

Q. Would you have reviewed past surveillance

prior to ordering new surveillance?

A. I wouldn't necessarily look at prior surveillance before ordering the surveillance.

Q. Can you turn to the next tab of that exhibit, sir?

A. Which is?

Q. It would be the ninth tab of Exhibit 44.

A. I think I lost my -- what's it labeled?

Q. It's labeled "Records Request, 1/31/2000." Is this a request by you dated January 31 of 2000, the same day you sent this letter to Mr. Kearney that is the second page of Exhibit 43 wherein you are seeking that someone secure the records of various physicians?

A. Yes, this looks like a medical records request completed by me.

Q. So on the same day you send Mr. Kearney the January 31,2000 letter, which is page 2 of Exhibit 43, you make this records request of multiple physicians, right?

A. Yes, I did.

Q. And then if you turn to the next tab?

A. CS131?

Q. Correct. On the very same day, January 31

wouldn't look old, just order new

of 2000, you also request that CS Claims Group, Inc. engage in surveillance of Mr. Kearney, is that right? It's Bates labeled 3122.

A. Mm-hmm. Yes, that's correct.

MR. ROBERTS: Let's change tapes.

THE VIDEOGRAPHER: Going off record at 2:14 p.m.

Back on record at 2:15 p.m.

Q. (By Mr. Roberts) You're still under oath.

A. Understood.

Q. There is no memo to the file of a phone conversation you had with CS Claims Group, there's no e-mail, and there's no retention letter that you sent to CS Claims Group that's in the claims file. Is there a reason for that?

A. No, there's no particular reason not to have that.

Q. Turning back to the last tab, your request for medical information, you must have necessarily reviewed the claim file in some substance to come up with the names and addresses of those doctors for whom you sought medical records, true?

A. I would have had to find those in the claim file.

Q. Thank you. The next tab -- well, let's stop right there. Back to Exhibit 43.

Did you copy Jefferson-Pilot on letters you sent to Mr. Kearney at any time?

A. I don't recall that we did do that.

Q. The next document of 43 is Bates labeled 3116, and it's a note in your handwriting, right?

A. Yes, this is my handwriting.

Q. Dated February 21 of -- it just says February 21, but can we agree that it's 2000?

A. Yeah, I would imagine.

Q. This -- you write a phone number down, "10 a.m, I received a voice mail message from Christopher Kearney. He said he received my letter and just wanted to let us --

A. "Know."

Q. What does it say? Why don't you read it.

A. You want me to read the whole thing?

Q. Start at 2/21 and read the whole thing.

A. "I received a voice mail message from Christopher Kearney. He received my letter and just wanted to let us know that his accountant was compiling this information."

Q. And then your initials?

A. Yes, those are my initials.

Q. And then below that, 11:30 a.m, could you read that message?

A. "I called insurer back at above number. I received a recording for Kenwood Technology Group. I left message for Mr. Kearney that I received his call."

Q. And then your initials again?

A. Yes.

Q. Was it your practice to make notes and then put them in the claim file of phone communications you had of this substance?

A. I think depending on the situation I would put a phone memo in the file.

Q. But there's no phone memo of your retention of CS Claims Group from three weeks earlier, which I take it is a little more substantive than this particular message?

A. There is no phone memo in there from CS Claims Group. I don't recall that we really ever kept those types of memos in the file.

Q. So you record pretty innocuous phone communications with an insured, but you make no record of the communications you have with the

surveillance company, is that right?

A. Well, I don't think this is an innocuous message. I think this might have been the first time I actually received a communication from Mr. Kearney himself, so I documented it.

Q. And the next page is another documentation of a call with Mr. Kearney?

A. I'm looking at what looks like another telephone memo from 2/23.

Q. Bates labeled 3115?

A. Yes, that's correct.

Q. There's actually two messages, an initial message and a follow-up message. He called back and left a voice mail message?

A. Yes, it looks as though I called him and left a message, and then he called me back and left a voice mail message.

Q. So you make two different records here, one of your call to him and a message, and then the second record you make is simply the fact that he called back and left a voice mail message, right?

A. Yeah, that's what it states here.

Q. And you don't detail what the voice message was?

A. No, I just said he left a voice mail message.
Q. Well, that's fairly innocuous. I mean, If you don't include what the voice mail message was, to me, that's fairly innocuous. Am I being a little too critical?
A. I don't know, really, how to categorize it.
Q. Okay. Page 3090 dated March 14 of 2000 -- before we get to that, go to the next tab. You're one too far ahead. That one, right. 3/8/2000 is the date of the CS Claims Group initial report, right?
A. It's got the stamp 3111.
Q. Correct. You will agree with me that this two-page section of Exhibit 44 is an investigative report received from CS Claims Group on March 13, 2000 dated March 8, 2000?
A. It is a 3/8 memo from CS Claims Group. It looks like an investigation.
Q. Received on March 13 of 2000, right?
A. Received on March 13th.
Q. At the bottom it appears that there was an attempt by your investigative company to make contact with an entity called Medical Safe Tech, Inc.?
A. Yes, it does say Medical Safe Tech.

Q. Would it have been you that advised them to try to reach an entity by that name that may or may not have been a customer or client of Mr. Kearney's?
A. You know, I don't recall. I could have, but I don't recall if that was in fact me that gave him that information.
Q. How would it be that they could come upon the information or the name of a prospective business associate of Mr. Kearney's?
A. I wouldn't really be able to speak for CS claims group. I very well could have given them that name, I just don't recall it.
Q. And if you gave them that name, it's because you had been reviewing the claim file and came up with that name, right?
A. Well, it would have been something that I saw in the claim file.
Q. The second page of this section of Exhibit 44 talks about pending activities?
A. Mm-hmm.
Q. And tell me if I read this correctly. "We will be forwarding results of our recent surveillance efforts in the very new future and, as directed, will be pursuing two additional dates of surveillance,

specifically a Friday and a Saturday." Did I read that correctly?
A. Yes, you did.
Q. Where is the phone mail note, the phone conversation note, the memorandum, the e-mail, or the letter directing CS Claims Group to undergo that additional work?
A. I don't believe there would have been one. It seems as though they memorialized that in their letter.
Q. Correct. So there would have been a communication prior to the date of this memo, right, between you and them?
A. I would believe so. I don't recall it.
Q. Why did you not make a note of that communication and then preserve it and then put it in the claim file?
A. Well, this is something that they -- it ultimately is in the claim file memorialized by what they indicated they'd be doing.
Q. But you didn't know that they would write that in their report they gave to you subsequently. Why didn't, when you gave them that direction sometime prior to March 8, why didn't you preserve

no notes of surv.

that note and put it in the claim file?
A. The situation with these investigative companies, they do a really good job of putting all that documentation in their cover letters to us, you don't need to duplicate my efforts.
Q. So it's your practice not to memorialize any communications you have with investigative firms, is that right?
A. I generally don't document communications with investigative companies.
Q. The next tab, sir, is a second report from CS Claims Group dated March 13 of 2000, and it was received by DMS on March 20, 2000, right?
A. Yes, that's correct.
Q. And these are Bates labeled 3105 to 3109. Can you tell me if I'm reading correctly the final substantive paragraph on 3109. Are you there?
It says, "We are continuing to pursue available information from the Ohio Board of Workers' Compensation, Super X Pharmacy, divorce/civil records, and Medical Safe Tee. We are also pursuing additional background information concerning Day-Ton International Fineblanking, and Silver Tool. We will also be forwarding the results of additional

B.S.

surveillance, and will keep you further advised.

Were you receiving phone updates from the investigators as they were performing their surveillance?

A. I don't recall specifically under these circumstances that they get phone communications. Sometimes I do receive a phone update but, you know, I don't recall if that actually happened under these circumstances.

Q. These three corporate entities that additional background information would be sought, how did CS Claims Group come upon that information?

A. Can you repeat the question, please?

Q. How did CS Claims Group come up with those names to investigate?

A. I really don't know. I don't recall whether or not that's information they've determined based on their research or where they would have gotten that information from or if I provided it to them.

Q. You might have provided it to them, that's one possibility?

A. I would say it's a possibility. Those names don't look familiar to me.

Q. Do you think the possibility exists that CS Claims Group, through their investigative work, to arrive at who Mr. Kearney's potential clients were without Mr. Kearney telling anybody?

A. Can you say the question again, please?

Q. Forget it.

Let's turn back to 43, Exhibit 43. And there's a letter there from Mr. Kearney, which is Bates labeled 3090 dated March 14 of 2000, right?

A. 3090, Tuesday, March 14, Mr. Kearney to me at Disability Management Services.

Q. So I was correct?

A. Yes, you are.

Q. Okay, thanks. The Second paragraph says, "As I" -- and that's Mr. Kearney talking, "As I am, she" -- he's referring to Dr. McClure, do you understand that?

A. I understand that.

Q. Dr. Judd-McClure, right?

A. Yes.

Q. "Dr. Judd-McClure is very concerned with the number of people contacting her and me concerning my claim. We are both concerned about the confidentiality of my situation. Calls out of the

blue from your many investigative affiliates are bothersome to both of us. Usually we have no explanation beforehand of who they are and what credentials each has." Did I read that correctly?

A. Yes, you did.

Q. Did Mr. Kearney provide you prior to this date, and prior to these reports from CS Claims Group, did he provide you with the authorization to share the names of entities with whom he did business with anyone for those folks to be contacted?

A. I don't recall whether or not he did or did not provide authorization to do so. I know, I mean, you can ask questions and people may or may not be willing to provide information.

Q. So you don't know whether you had his authority to speak to his customers or not as of March of 2000?

A. I don't recall him specifically giving us any authority along those lines, nor do I recall whether or not we knew who his customers were or whether or not we really needed his authority to ask some questions.

Q. My question was fairly simple. You don't know whether you had his authority to contact his

customers as of March of 2000?

A. I don't recall him giving an explicit comment saying you have my authority or you don't have my authority to contact any person in particular.

Q. You don't recall that, prior to March of 2000, Mr. Kearney said on several occasions that he affirmatively did not authorize anyone to have any contact with his principals?

A. Again, as I'm sitting here today, and you're asking me these questions back to this point in time, I mean, I don't remember what my way of thinking was as I read these today.

Q. How about the next page, the March 20 letter from you to Mr. Kearney, Bates labeled 3089. Again, this doesn't have a photocopy of your signed signature, but can we agree that it's a letter that you sent to Mr. Kearney?

A. Yes, with my name on it.

Q. The second paragraph says, "I also realized you left a telephone message on February 23, 2000 addressing the concerns you have about company representatives contacting you and your treating providers."

Q of authority to contact principals

Is it normal for you to wait four weeks to get back to someone about a telephone message they leave for you?

A. Again, we try to get back to people timely and promptly. You know, four weeks would not be unusual.

Q. Really? Four weeks is not unusual to get back to a policyholder on a question?

A. No, not necessarily. Again, I don't know the circumstances at this time, if I had been away on vacation, business.

Q. Okay. Can you turn to the next document of 43, which is Bates 3102. This appears in the claims file as 3102 and 3103, right, a letter to you dated March 25, 2000 from Mr. Kearney, is that correct?

A. Correct.

Q. And he starts, "Mr. Mills, enclosed is" -- and then he lists four things, right?

A. Yes, he does.

Q. And he says, "Not included" -- and he makes a reference to Kenwood Technology, Inc. -- "first year corporation, 1120" -- you understand that to be the number of a corporate tax return?

A. Yes, I do.

Q. -- "was completed and sent to IRS, copy had been requested for my accountant. 1999 is not completed."

The second one, he says, "DMS authorization to obtain information: I will discuss this with my attorney. Among other things you're asking now for authorization to collect information which is none of your business, specifically 'any other non-medical information' from a broad range of people and companies."

Do you recall whether that was the first time that Mr. Kearney communicated that concern to you?

A. As I read this today, I don't recall if that was the first time.

Q. The next paragraph continues on this theme. In the fourth line down towards the end of the line there's a sentence that starts, "They claim" -- do you see that?

A. Yes, I do.

Q. It reads, "They claim they do not have her phone number but your other investigator called her several times. What gives? This confusion on your part leads me to think that it might be quite

possible for my new business to be ruined by intentionally or unintentionally questioning business contacts about my personal health. Also, personal relationships can be ruined."

Did I read that correctly?

A. Yes, you did.

Q. Is that the first time that Mr. Kearney communicated that concern to you, or as far as you know from your review of the claim file, Jefferson-Pilot?

A. The best of my recollection, I know we've had several conversations with him about that and I don't know if this exactly was the first time.

Q. You're mindful from your knowledge of the claim file that he communicated that concern several times to Jefferson-Pilot over the course of several years throughout the '90s, right?

A. I know we had a lot of conversations along those lines.

Q. That wasn't my question. My question was, you're mindful from your knowledge of the claim file that that concern had been expressed to several -- to Jefferson-Pilot for several years prior to 2000?

A. My recollection is that he did express

those concerns to Jefferson-Pilot before 2000.

Q. Are you mindful that Mr. Shelton agreed that that was an appropriate concern?

A. I don't recall that type of communication or knowledge.

Q. The second page of the letter, Mr. Kearney says in the PS, "Please don't call me. Send a letter if you need to contact me."

Do you recall him directing that all future dialogue be in written correspondence and not by phone?

A. I remember him saying something along that lines at a point in time.

Q. Did you see also that he copied a lawyer on this particular letter, Steve Patsfall?

A. I see that here, yes.

Q. Is there a procedure internal to DMS that you need to alert someone if a policyholder is copying a lawyer on correspondence?

A. No, there's no procedure for that.

Q. Do you personally have a procedure if a lawyer gets involved on behalf of a policyholder? Do you share that with anyone?

A. Can you say that again?

Q. Do you share the fact that a policyholder has elected to seek counsel with persons?

A. I recall on the claims system that if an insured did have legal representation that there is an area that you could punch key that information in so that if someone did receive a phone call from that insured that they would be aware that they were under legal representation.

Q. Okay, but do you notify your supervisor responsible for the block of business when you learn that a policyholder has hired a lawyer to represent them?

A. I don't think there's any, you know, standard practice every time a lawyer is involved.

Q. That wasn't my question. I said do you. I don't care what other people do at DMS. Do you?

A. Can you repeat the question again?

Q. Do you allow your supervisor to know that a policyholder has contacted a lawyer?

A. Can you say that one more time, please?

Q. Do you let your supervisor know that a policyholder has retained a lawyer?

A. I don't notify my supervisor in every circumstance that an insured has a contact, notified

a lawyer.

Q. Okay. Have we talked about the March 29, 2000 CS Claims report yet? This is the third investigative report you received from CS Claims Group, is that right?

A. It's a CS Claims Group report, I don't know if it's exactly the third one. I guess the file would show that.

Q. It's the third one you and I have talked about?

A. I think this was the third one.

Q. The last page is their invoice, total due for March 2000, $7,000, Bates stamped 3091?

A. Which one are we talking about again, please?

Q. The last page of that section, right, turn to the last page.

A. 3091?

Q. Correct. It's an invoice to your company for $7,080 for the surveillance investigation of Mr. Kearney during the month of March.

A. This says "Total due for March 2000, 7,080.26."

Q. And it shows that there were multiple

investigators using two vehicles to perform the surveillance, is that right?

A. It says "surveillance times two vehicles."

Q. Would that mean there's more than one investigator if there were two vehicles involved?

A. I would say so, yes.

Q. There is a charge of $60 for 8 millimeter and VHS videotape. Have you ever seen any videotape of Mr. Kearney?

A. Yes, I have seen videotape.

Q. Is that part of the claims file?

A. My understanding is they're kept with the claim file.

Q. Is there a reason that hasn't been produced?

A. I don't understand that proceeding.

Q. Does the videotape, in your judgment, show that Mr. Kearney is not suffering from clinical severe depression?

A. I don't recall specifically all that information that was on that videotape to really comment on that.

Q. Can a videotape surveillance show that someone does not suffer from a DSM-IV diagnosis of

video surveill

clinical severe depression?

A. Can you repeat the question, please?

Q. In your judgment, can a videotape surveillance of someone establish that they do not have severe depression?

A. I don't think you can rely just on a videotape to conclusively draw that conclusion.

Q. You think, though, that it is material to rendering that conclusion?

A. I think it is part of the information they use as a whole in making those conclusions.

Q. Okay. Why would you perform or request that there be performed multiple secret surveillance of Mr. Kearney?

A. Well, as far as saying secret surveillance, I don't know that, I don't know any other way to say it, because if it wasn't secret, it wouldn't be surveillance. But surveillance is used to confirm the information that Mr. Kearney was reporting on his forms as far as his work activities and things along that line.

Q. His psychologist of many, many years and then ultimately the two expert psychologists and psychiatrists that you engaged all confirm that he

suffered from severe clinical depression. Were you thinking that perhaps if you had him surveilled enough you could disprove those medical opinions?

A. Well, this surveillance, if you look at it in the full context in chronological order, this surveillance looks like it took place in March of 2000. Now, I don't think the examinations took place until several months, if not a year, later.

As far as one's own doctor providing information, and that's -- well, obviously, we review that and understand it, but we would also need to try to confirm the information that any physician would provide to us.

Q. Okay, so you thought that Mr. Kearney was a fraud and his doctor was just covering for him and he really wasn't suffering from clinical severe depression and you were going to be able to disprove her opinion by having him surveilled several times?

A. No, not at all. I don't think I've ever felt that way about Mr. Kearney. In fact, I think what the surveillance did was confirm to his benefit a lot of the things that I recall he was putting down on the forms at that time about his limited abilities to work.

Q. Then why did you have him surveilled repeatedly throughout 2000, 2001? There's at least six different surveillances of him throughout 2000, 2001. If you kept finding information that supported what he was saying, why did you continue to decide to spend money to have him surveilled further and further?

A. I don't know all the specific dates that we did surveil him?

Q. We'll get to them. This tab for the report on 3/29/2000, we're done with the last page, which is the invoice. Turn back to the first page.

The first sentence or first section is "Additional Assignment." Why is there no note or letter or any reference in the claim file recording your additional assignment instruction to CS Claims Group?

A. The additional assignment is going to be memorialized at a later point in the file. It's going to be in the file, you just won't see it right then and there at this point in time.

Q. Why didn't you record that and preserve it in the claim file when you requested the additional assignment?

A. Well, I wouldn't necessarily have to record it because it's going to be recorded later on in the claim file.

Q. As per your instructions, they don't detail what your instructions were. Why didn't you record and preserve in the claim file for Mr. Kearney's benefit, so he could understand what you were doing, what your instructions were?

A. Can you repeat the question?

Q. CS Claims Group says, without detailing what your instructions were, they say "As per your instructions."

Now, if you, when you retained CS Claims Group to perform this additional assignment, had preserved in the claim file what your instructions were, we'd be able to know what they were.

MR. ELLIS: Objection. Misstates the document.

MR. ROBERTS: Okay, fine.

Q. (By Mr. Roberts) Why did you not record to preserve in the claim file your request for additional assignment and the additional instructions you gave to CS Claims Group? Why didn't you do that?

A. My additional instructions would have been

preserved in the claim file at a later point in time upon completion of the assignment by CS Claims.

Q. You record in the claim file the fact that Mr. Kearney returns a call and leaves a voice mail message, but you don't record in the claim file communications you have with surveillance folks giving them an additional assignment and communicating to them instructions, is that right?

A. That's correct.

MR. ELLIS: Objection.

Q. (By Mr. Roberts) You said that's correct? Mr. Ellis spoke over the top of you.

A. Yes, I did.

Q. Thank you.

A. Can I take a break soon?

MR. ROBERTS: Sure.

THE VIDEOGRAPHER: Going off the record at 2:46 p.m.

(A recess was taken)

THE VIDEOGRAPHER: Back on record at 2:50 p.m.

Q. (By Mr. Roberts) Mr. Mills, could you turn to the next tab of Exhibit 44. It should be an April 7, 2000 -- okay.