IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Case No. C-1-02-479

JEFFERSON-PILOT LIFE INSURANCE CO., )
                        Plaintiff )
                                  )
v.                                )
                                  )
CHRISTOPHER L. KEARNEY,           )
                        Defendant )


DEPOSITION OF: TODD DITMAR, taken before Sharon R. Roy, Notary Public Stenographer, pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, at the law offices of ACCURATE COURT REPORTING, 1500 Main Street, Springfield, Massachusetts on May 13, 2004 commencing at 9:29 a.m.


A P P E A R A N C E S:

(See Page 2)


Sharon R. Roy
Certified Shorthand Reporter
Registered Professional Reporter

---

A P P E A R A N C E S:

FOR THE PLAINTIFF:

WOOD & LAMPING LLP
600 Vine Street, Suite 2500
Cincinnati, OH 45202-2491
513-852-6000
    BY: WILLIAM R. ELLIS, ESQ.


FOR THE DEFENDANT:

GRAYDON HEAD & RITCHEY LLP
1900 Fifth Third Center
511 Walnut Street
Cincinnati, OH 45201
513-621-6464
    BY: MICHAEL A. ROBERTS, ESQ.


Also Present:

Adam E. Formus

Joanne Yacavone, Videographer

---

I N D E X

WITNESS          EXAMINATION          PAGE
---------------------------------------------------
Todd Ditmar      Direct by Mr. Roberts     10


EXHIBITS:                                    PAGE:

Exhibit 27: Jefferson-Pilot Life Ins. Co.
            monthly inventory reports ............ 4

Exhibit 28: 20 pages of screen prints ............ 4

Exhibit 29: Jefferson-Pilot Life Ins. Co.
            monthly inventory reports ........... 97

Exhibit 30: Yearly Performance Plans and Reviews . 65

Exhibit 31: 11/18/03 letter to Michael Roberts
            from William Ellis ................... 68

Exhibit 32: Yearly Performance Plans and Reviews .106

Exhibit 33: Affidavit of Todd Ditmar ............ 119

Exhibit 34: Transcript of Todd Ditmar deposition
            taken 10/28/03 ..................... 125

Exhibit 35: Response to Document Request No. 18 . 125

Exhibit 36: Response to Document Request No. 14 . 127

Exhibit 37: DMS check report forms ............. 128

Exhibit 38: 12/21/01 letter to William Dempsey
            from Geraldine Johnson ............. 138

Exhibit 39: 6/27/01 letter to Christopher Kearney
            from Paul Swink .................... 141

-*-

---

09:29:40  1        (Exhibits 27 and 28, marked)
09:29:40  2        MR. ELLIS:  Let me put on the record
          3   before you even swear the witnesses, I am
          4   producing to Counsel this morning five pages
          5   representing the monthly reports between DMS
          6   and Jefferson-Pilot Insurance Company for the
          7   years 2000 through 2004.  I'm also producing a
          8   20-page document which demonstrates the
          9   computer screens for both of Mr. Kearney's
         10   policies that would be present in the DMS
         11   claim system.
09:29:33 12        MR. ROBERTS:  Counsel, is there a
         13   reason these weren't produced prior to today?
09:30:26 14        MR. ELLIS:  I didn't have them prior
         15   to today.
09:30:26 16        MR. ROBERTS:  Well, the plaintiffs
         17   have been under an obligation to produce these
         18   for over a year.  What is the reason we're
         19   just getting them this morning, one minute
         20   before I take a 30(b)(6) deposition?
09:30:40 21        MR. ELLIS:  I just gave them to you.
         22   I didn't have them before yesterday.
09:30:44 23        MR. ROBERTS:  Did you request them
         24   before yesterday?

**Page 5**

1    MR. ELLIS:  I wasn't involved in the

2  case as far as the original request --

3    MR. ROBERTS:  When did you file your

4  notice of appearance and when did you review

5  the discovery requests?

6    MR. ELLIS:  I'll discuss it with the

7  Court when you file your motion.  I'm

8  producing them to you today.

9    MR. ROBERTS:  What else is

10  being withheld?

11    Why are you silent?  Why aren't you

12  answering the question?  Why the long pause?

13    MR. ELLIS:  I don't know the answer

14  to your question.  Do you want to keep going

15  on the record about --

16    MR. ROBERTS:  You don't know what

17  other information you're withholding?  Tell me

18  what other information you're withholding.

19    MR. ELLIS:  I know that we were

20  withholding information concerning the

21  contracts between DMS and Jefferson-Pilot and

22  other material listed on the privilege log

23  which is being prepared for you.

24    MR. ROBERTS:  Where is the privilege

**Page 6**

1  log?

2    MR. ELLIS:  And while we're on the

3  subject -- the privilege log is being prepared

4  in Cincinnati.

5    MR. ROBERTS:  Well, we're going to

6  continue this deposition until I have a

7  complete privilege log, so we'll go forward

8  today and we'll continue in progress.

9    MR. ELLIS:  While we are on the

10  subject, Counsel has marked in prior

11  depositions Exhibit 2, which is purportedly a

12  copy of the claims assessment agreement

13  between Disability Management Services and

14  Jefferson-Pilot bearing an exhibit sticker

15  P-129 originally, now marked Exhibit 2 in this

16  case.

17    My information is that this claims

18  assessment agreement was produced in another

19  case and was under a protective order.

20  Counsel, can you tell me the source of your

21  document?

22    MR. ROBERTS:  I have no obligation

23  to tell you the source of that document.  Nor

24  do I have any information that it was under a

**Page 7**

1  protective order.  But it's now in my

2  possession, therefore it's a public document.

3  Are you concerned that the defendant in this

4  lawsuit has acquired a document that he tried

5  to conceal that describes the relationship

6  between the parties?

7    MR. ELLIS:  I'm suggesting that

8  Counsel in this case has a document that was

9  under a protective order of confidentiality,

10  and that wherever Counsel got it, it may be in

11  violation of such court order, hence I'm

12  asking for the source of the document.

13    MR. ROBERTS:  Okay, are you

14  suggesting that I violated a protective order

15  that I never saw or signed, Counsel?

16    MR. ELLIS:  I haven't suggested

17  anything.  I asked you a question --

18    MR. ROBERTS:  Before you start

19  threatening and accusing me of misbehavior,

20  you need to get your facts straight.

21    MR. ELLIS:  I didn't do either.  I

22  asked you for the source.  That's all I asked.

23    MR. ROBERTS:  Where is the 1997

24  agreement between Employers Resource and DMS?

**Page 8**

1    MR. ELLIS:  Not an issue, as far as

2  I'm concerned.

3    MR. ROBERTS:  Will you tell me what

4  the issues are in the case so I'm set

5  straight?

6    MR. ELLIS:  If you don't know,

7  Counsel, I can't help you.

8    MR. ROBERTS:  The issues are what

9  you decide they are, is that right, regardless

10  of what the other party thinks?

11    MR. ELLIS:  Are you finished?

12    MR. ROBERTS:  No, I'm not finished

13  with you, I'd just like a direct answer to a

14  direct question.

15    MR. ELLIS:  The issue in the case is

16  whether this gentleman is entitled to COLA and

17  Social Security or not.  You know it, I know

18  it, that's what the Court's going to decide

19  May 26.

20    MR. ROBERTS:  What about bad faith,

21  is that an issue?  Or is this like Geoffries

22  where bad faith isn't an issue until you pay a

23  $2 million settlement?

24    MR. ELLIS:  Mr. Geoffries got what

**Page 9**

1    the contract provided, period.
2            MR. ROBERTS:  Okay.  What about the
3    jury's decision that it was bad faith; was bad
4    faith an issue once the jury decided it was
5    bad faith?
6            MR. ELLIS:  Are you talking about
7    the summary jury?
8            MR. ROBERTS:  The jury that was
9    impaneled had determined that it was in bad
10   faith.  Did bad faith become an issue once the
11   jury decided it was bad faith?
12           MR. ELLIS:  The jury that was
13   impaneled was the one for the trial which you
14   elected not to proceed with.
15           MR. ROBERTS:  Because you caved in.
16   By the way, I didn't have any witnesses to go
17   that afternoon.
18           MR. ELLIS:  Whatever version you
19   have.
20           MR. ROBERTS:  Are you ready,
21   Mr. Ditmar?
22           THE WITNESS:  Yes.
23           MR. ROBERTS:  Let's swear you in.
24           THE VIDEOGRAPHER:  The caption of

ACCURATE COURT REPORTING  (413) 747-1906

**Page 10**

1    the case is Jefferson-Pilot Life Insurance
2    Company, Plaintiff, versus Christopher L.
3    Kearney, Defendant, Case No. C-1-02-479.
4            Would the court reporter please swear
5    in the witness.
6
7            TODD DITMAR, Deponent, having first
8    been duly sworn, deposes and states as follows:
9
10   DIRECT EXAMINATION BY MR. ROBERTS:
11       Q.   Mr. Ditmar, my name is Mike Roberts.  We
12   met briefly this morning.  Would you kindly state
13   your name and residence address for the record,
14   please?
15       A.   My name is Todd Ditmar.  My address is 1350
16   Main Street, Springfield, Massachusetts 01103.
17       Q.   Sir, I might need to serve you with a
18   subpoena at your residence address.  That's your work
19   address.  What is your residence address?
20           MR. ELLIS:  Objection.  Given the
21   nature of this case and the policies of DMS,
22   personal information concerning employees will
23   not be divulged.
24           MR. ROBERTS:  Let's go off the

ACCURATE COURT REPORTING  (413) 747-1906

**Page 11**

1    record and call the Court.
2        Q.   (By Mr. Roberts)  You're taking Mr. Ellis'
3    council to not disclose your residence address when
4    I've indicated to you that it may be, and probably
5    will be, required that I subpoena you in the case?
6            MR. ELLIS:  In the event you need to
7    subpoena him, I will accept the subpoena or it
8    will be accepted at DMS's office.
9            MR. ROBERTS:  Mr. Ellis, you and I
10   have been engaged in litigation for two years.
11   You have misrepresented facts to me throughout
12   that two-year period.  I do not trust that you
13   will give me an address in the future.
14       Q.   (By Mr. Roberts)  So, Mr. Ditmar, once
15   again, are you refusing to give me your residence
16   address?
17       A.   Yes.
18           MR. ELLIS:  Mr. Ditmar will
19   provide --
20           MR. ROBERTS:  Let's go off the
21   record.
22           MR. ELLIS:  -- and has provided the
23   address of his employment where he may be
24   served with a subpoena --

ACCURATE COURT REPORTING  (413) 747-1906

**Page 12**

1            MR. ROBERTS:  Not if he's no longer
2    employed at DMS come trial time.
3            THE VIDEOGRAPHER:  Going off record
4    at 9:36 a.m.
5            (Off record discussion)
6            THE VIDEOGRAPHER:  Back on record at
7    9:43 a.m.
8        Q.   (By Mr. Roberts)  Mr. Ditmar, we went off
9    the record to consult with the Court and we'll get
10   back with the Court about that and potentially other
11   issues as this deposition proceeds.
12           You've been called to testify today for a
13   couple reasons, one as the corporate representative
14   and one because you're a fact witness to the Kearney
15   claim; are you mindful of that?
16       A.   Yes.
17       Q.   In fact, your involvement with the Kearney
18   claim dates back to 1997; are you mindful of that?
19       A.   I was asked to consult on the Christopher
20   Kearney claim back in 1997 or 1998, yes.
21       Q.   Today is May 13th of 2004.  When was the
22   last time you reviewed the Kearney claim file?
23       A.   I had looked at a few of the documents in
24   the claim file on Tuesday and Wednesday.

ACCURATE COURT REPORTING  (413) 747-1906

13

1    Q.  Was that with Mr. Ellis?

2    A.  He was present in the room.

3    Q.  Who else was present?

4    A.  At the time I looked at the claim file, I'm

5 not sure.

6    Q.  Was there anyone present?

7    A.  There may have been.  I was looking at the

8 file.  Other people were looking at the documents.

9    Q.  Were you in a room?

10    A.  We were in a conference room.

11    Q.  Okay, and you can't tell me under oath

12 whether or not there was another human being in the

13 room other than you and Mr. Ellis?

14    A.  There were different people in the room.

15    Q.  Who can you recall being in the room at any

16 given time during that meeting?

17    A.  Bob Mills was in the room at some point.

18 Bill Hughes was in the room at some point.  Bob

19 Bonsall was in the room at some point.  Janet Beattie

20 was in the room at some point.

21    Q.  Anyone else?

22    A.  Not that I can recall.

23    Q.  How long did the meeting take?

24        MR. ELLIS:  Objection.  That's

14

1 privileged.

2        MR. ROBERTS:  Counsel, how long a

3 meeting takes is not a privileged

4 communication.  Now, are you going to instruct

5 this witness not to answer the length of a

6 meeting because that reveals some privileged

7 information?

8        MR. ELLIS:  Just making the

9 objection for the record.  I haven't

10 instructed the witness in any way.

11    Q.  (By Mr. Roberts) Okay, I think that

12 Mr. Ellis is allowing you to answer, Mr. Ditmar.

13 Could you tell me how long the meeting took?

14    A.  I was in the conference room on Tuesday and

15 Wednesday at various points throughout the day.

16    Q.  How much time on Tuesday and Wednesday did

17 you consume in these conference room meetings with

18 Mr. Ellis?

19    A.  I'd say approximately four to five hours

20 each day.

21    Q.  And what documents did you review?

22    A.  I recall reviewing Ms. Beattie's field

23 report from her meeting with Mr. Kearney and a few of

24 the letters that I had sent out to Mr. Kearney in

15

1 1997 or 1998.

2    Q.  Anything else you recall?

3    A.  Not that I can recall.

4    Q.  You didn't review the policy or the riders,

5 is that your testimony?

6    A.  I believe I may have looked at the policy.

7    Q.  How about the riders?

8    A.  I believe the riders were included in the

9 policy.

10    Q.  How much time did you spend reviewing the

11 policies and the riders?

12    A.  I don't recall.

13    Q.  You understand there's two policies,

14 correct?

15    A.  Yes.

16    Q.  And two sets of riders?

17    A.  I don't know how many riders are on the

18 policy.

19    Q.  Did you review any deposition testimony

20 taken last week in North Carolina of JP's

21 representatives?

22    A.  No, I did not.

23    Q.  Did Mr. Ellis share with you the substance

24 and any detail of that testimony?

16

1        MR. ELLIS:  Objection.

2    Q.  (By Mr. Roberts) Go ahead.

3    A.  No, he did not.

4    Q.  He did not share with you the substance of

5 any of that testimony?

6    A.  No, he did not.

7    Q.  Other than Mr. Mills, Mr. Hughes,

8 Mr. Bonsall, Ms. Beattie, and Mr. Ellis, have you

9 discussed today's deposition or the Kearney claim

10 with anyone in the past two weeks?

11    A.  Not that I can recall.

12    Q.  Did Mr. Ellis share with you that DMS was

13 determined to be in bad faith in a recent jury

14 decision in Hamilton County, Ohio?

15        MR. ELLIS:  Objection.  And you

16 don't have to answer that, that's privileged.

17    Q.  (By Mr. Roberts) Are you mindful, sir,

18 from any source that there was a jury determination

19 in Hamilton County, Ohio last month that DMS was in

20 bad faith in its handling of a disability claim?

21        MR. ELLIS:  I also object that that

22 misstates the fact.  There is no jury finding

23 of bad faith in Ohio other than during a

24 summary jury trial which was conducted in a

17

1  manner that is not akin to a jury verdict; it
2  was a settlement tool. And we'll also object
3  under 408 that settlement issues are not to be
4  discussed in other cases.
5  Q. (By Mr. Roberts) Are you mindful, sir, of
6  that, other than Mr. Ellis' admission that that
7  happened just now?
8  MR. ELLIS: Mr. Ellis made no
9  admission and you know it, Counsel.
10  Q. (By Mr. Roberts) Mr. Ditmar, to you?
11  A. Not that I'm aware of.
12  Q. Now, in a prior case I had with DMS and
13  Mr. Ellis as counsel, at the 30(b)(6) deposition,
14  after several motions to compel and after a year of
15  discovery requests, I was finally handed that
16  claimant's information stored on the DMS internal
17  claim system. Thirty seconds before beginning this
18  deposition today, on May 13th of 2004,
19  notwithstanding discovery requests of over a year in
20  duration, Mr. Ellis handed to me a document which
21  I've marked as Exhibit 28. Can you identify for me
22  what Exhibit 28 consists of?
23  MR. ELLIS: I will not object to the
24  question, but I do object to Counsel's

18

1  prolific speeches preceding any question that
2  he asks.
3  A. This document is a copy of screen prints
4  from our claim system in regards to Mr. Kearney's two
5  disability policies.
6  Q. Did you ever participate in the collection
7  of documents for the production of litigation in this
8  action?
9  A. I may have been.
10  Q. What do you recall about your involvement,
11  if any?
12  A. I don't recall specifically other than
13  asking for copies of our screen prints and the
14  monthly reports.
15  Q. When was it that you were asked to collect
16  the information from the screen reports and the
17  monthly -- I'm sorry, did you say the monthly
18  statements to Jefferson-Pilot?
19  A. Monthly reports, I believe.
20  Q. When was it that you were asked to gather
21  the monthly reports and the screen prints?
22  A. I brought them with me to meet with
23  Mr. Ellis yesterday.
24  Q. Prior to the meeting and prior to gathering

19

1  that information to bring to Mr. Ellis had anyone
2  ever asked that you gather that information?
3  A. I don't recall being asked to gather any
4  information.
5  Q. You just did it because you thought it
6  might be helpful for Mr. Ellis?
7  A. I was asked yesterday to provide Mr. Ellis
8  with information in regards to Mr. Kearney's claim.
9  Q. Okay, so the first thing you do when you're
10  asked to provide relevant information regarding a
11  claim is go to the claim system maintained on the
12  network at DMS and print up the screen prints, is
13  that right?
14  MR. ELLIS: Objection. Misstates
15  the testimony.
16  A. I believe there was a question in an
17  interrogatory or some document requesting e-mail
18  transmissions and/or other documents, computer
19  documents, in regards to Mr. Kearney's claim.
20  Q. Okay, we're getting somewhere. When were
21  you made mindful of interrogatory or document
22  production requests in this action?
23  A. I believe I saw that document on Tuesday or
24  Wednesday.

20

1  Q. Prior to Tuesday or Wednesday, Wednesday
2  was yesterday, prior to Tuesday or Wednesday, you had
3  never been provided any interrogatories or document
4  production requests?
5  A. I don't recall if I was.
6  Q. Is the screen print maintained on the
7  internal claim system at DMS? Are you the only one
8  that would be mindful that the Kearney information
9  would be contained in that software program?
10  A. No.
11  Q. That's where you store all claimants'
12  information on active claims, isn't that true?
13  A. The claim system contains policy
14  information for all claims that we've managed. Not
15  necessarily only active claims, it could be a claim
16  that was closed at some point since we began managing
17  that block.
18  Q. So all the claims personnel working on the
19  Jefferson-Pilot block of business would be mindful
20  that information concerning Mr. Kearney would be
21  found on the claim system software, correct?
22  A. All individuals working at DMS on the
23  Jefferson-Pilot block would be aware that there is
24  information on our claim system.

1    Q.  Do you know why it would be that this claim
2  system report on Mr. Kearney would be withheld from
3  him notwithstanding discovery requests until just
4  this morning?
5        MR. ELLIS:  Objection.
6    A.  No, I do not.
7    Q.  Could you walk me through page by page --
8        MR. ROBERTS:  Counsel, do you have
9  another copy other than the one you gave me
10  for the exhibit?
11        MR. ELLIS:  I have my copy.
12        MR. ROBERTS:  Can I use it?
13        MR. ELLIS:  What am I going to use?
14  Work with the witness.
15        MR. ROBERTS:  Why don't we go off
16  the record and we'll have copies made and
17  we'll come back on the record.
18        THE VIDEOGRAPHER:  Going off the
19  record at 9:54 a.m.
20        (A recess was taken)
21        THE VIDEOGRAPHER:  Back on record at
22  9:57 a.m.
23    Q.  (By Mr. Roberts) Okay, Mr. Ditmar, now I
24  have a copy of Exhibit 28 in front of me and I'd like

1  to work this thing out with you.  What is the first
2  page of Exhibit 28?
3    A.  It's a screen print from our claim system
4  in regards to Mr. Kearney's policy 493029.
5    Q.  And on this form there's a DMS claim
6  number.  That's an internal number that DMS assigns
7  to a claim, is that right?
8    A.  Yes.
9    Q.  What is in the "Co:" field that says "07"?
10  What is that representative of?
11    A.  That stands for company number.
12    Q.  And Jefferson-Pilot is assigned the
13  designation 07, internal at DMS?
14    A.  Yes.
15    Q.  "Notice Date:" in the next box would be
16  representative of what?
17    A.  That would be the date this claim was input
18  into our claim system.
19    Q.  Now, Mr. Kearney's claim had actually been
20  administered to some degree by DMS going back to '97.
21  Why is 1997 not reflected in that field?
22    A.  We had previously performed a consulting
23  service to Jefferson-Pilot.  We were not
24  administering the claim.  We only provided some

---

23

1  recommendations back in 1997 and 1998.  It was not a
2  claim we were managing.
3    Q.  Okay.  Was that service provided to
4  Jefferson-Pilot or was it provided pursuant to the
5  written agreement between DMS and Employers
6  Reinsurance?
7    A.  I don't know.
8    Q.  Have you ever had any contact with Bill
9  Dempsey or anyone else at Employers Reinsurance
10  regarding the Kearney claim?
11    A.  I don't recall specifically.
12    Q.  You're mindful that DMS entered into a
13  relationship with Employers Reinsurance in 1997 just
14  prior to the Kearney claim being referred to DMS,
15  correct?
16    A.  I don't recall when we entered into a
17  relationship with Employers Reinsurance in regards to
18  Jefferson-Pilot.
19    Q.  That wasn't my question.  You're mindful
20  that DMS entered a relationship, some contractual
21  relationship, with Employers Reinsurance prior to the
22  time that Kearney's claim came to DMS in '97?
23    A.  I thought you had asked me if we entered it
24  in 1997.  I don't recall the date we entered into a

---

24

1  contract with Employers Reinsurance in regard to
2  Jefferson-Pilot.  At some point in time I know there
3  was some relationship between the three companies.
4    Q.  Does DMS handle blocks of business relating
5  to Employers Reinsurance that isn't associated with
6  Jefferson-Pilot?
7    A.  I believe we do.
8    Q.  What insurance companies would those be?
9    A.  I believe we manage a block of claims for
10  Reassure Life America that is reinsured by Employers
11  Reinsurance.  I don't recall any other companies.
12    Q.  What is the next field, "Mode;," where it
13  says, "Edit"?
14    A.  I don't know.
15    Q.  What other options are in that field, do
16  you know?
17    A.  I don't know.
18    Q.  Do you now work with the claim system on a
19  daily basis?
20    A.  Not necessarily.
21    Q.  Some days you don't, most days you do?
22    A.  Actually, the claim system is typically
23  used on a daily basis by the examiners, not the
24  directors or vice presidents.

Q.   You're a director, correct?

A.   I'm an assistant vice president.

Q.   Congratulations. You work with claims on a daily basis, correct?

A.   Yes.

Q.   And your testimony is you don't work with the claim system on a daily basis?

A.   That's correct.

Q.   Do you work with it on most days?

A.   Not necessarily.

Q.   When did you become assistant vice president?

A.   April 1, 2004.

Q.   When was your last performance evaluation?

A.   In December of '03.

Q.   Is that when you were informed that you were going to be promoted to assistant vice president?

A.   No.

Q.   When was it that you were informed of that decision?

A.   At some point in March of 2004.

Q.   Are you 36 years old?

A.   No, I'm not.

Q.   Thirty-seven?

MR. ELLIS:   Same objection. He's not going to provide any kind of information from which his location or residence can be determined.

MR. ROBERTS:   Are you instructing the witness not to answer how old he is, Counsel?

MR. ELLIS:   He can tell you his age. He's not going to give you his birth date or any follow up on it.

Q.   (By Mr. Roberts) Okay.

A.   Thirty-seven years old.

Q.   You attended the University of Massachusetts and received a bachelor's degree in economics?

A.   Yes.

Q.   1989?

A.   Yes.

Q.   And prior to working at DMS you worked at MassMutual in the Disability Income Claims field, correct?

A.   No. I had actually worked at Travelers prior to my employment at Disability Management

Services.

Q.   Correct, but prior to working at Travelers you worked at MassMutual, right?

A.   Prior to working at Travelers I worked at MassMutual.

Q.   And you moved on to Travelers. Did you meet Mr. Bonsall and Mr. Anderson while you worked at Travelers?

A.   I already knew them.

Q.   You knew them prior to your association with Travelers?

A.   Yes.

Q.   The three of you were associated at Travelers during the same period of time, correct?

A.   Yes.

Q.   And then when Mr. Bonsall and Mr. Anderson formed DMS in 1995, you came on board with them, correct?

A.   Yes.

Q.   And your initial position was what?

A.   A claim consultant.

Q.   How many other employees were there in the first year of DMS's origination?

A.   I believe six.

Q.   Who else came on that year?

A.   Tim O'Connor, Greg Mirabelli, and Terence Daniels.

Q.   Are they three still associated with the company?

A.   No.

Q.   Are any of them?

A.   Yes.

Q.   Which ones?

A.   Tim O'Connor and Terence Daniels.

Q.   Do you know what happened to Greg Mirabelli?

A.   I believe Greg Mirabelli works at Travelers Insurance Company now.

Q.   Do you know how to spell his last name?

A.   M-I-R-A-B-E-L-L-I.

Q.   When did he leave DMS?

A.   I don't recall the specific date.

Q.   Do you know what the circumstances were of his departure?

A.   He took a management position at Travelers.

Q.   On this first page of Exhibit 28 there's two actions represented there, one that's set for May 19, 2004, which is still six days off, and one set

29

```
 1   for May 24, 2004.  Is that right?
 2       A.   That's correct.
 3       Q.   In those fields there's initials JMS.  Do
 4   you know what that represents?
 5       A.   Jacqueline Smegal is currently
 6   administering Mr. Kearney's claim.
 7       Q.   The examiner on this sheet refers to RFM,
 8   which is Mr. Mills, correct?
 9       A.   Yes.
10       Q.   Does he have responsibility for the claim
11   also presently?
12       A.   Yes.
13       Q.   Does he oversee Jacqueline?
14       A.   No.
15       Q.   How long -- is it Jacqueline, is that what
16   you said?
17       A.   Yes.
18       Q.   How long has she been involved with
19   Mr. Kearney's claim?
20       A.   She's been making the payments on this
21   claim -- actually, if you look on one of the payment
22   sheets later on we could probably see when she began
23   making payments on them.
24            It looks like the first payment she made
```

ACCURATE COURT REPORTING (413) 747-1906

30

```
 1   was back in August of '03.  The payment sheet has the
 2   initials on --
 3       Q.   I see that.
 4       A.   -- of who makes the payment.
 5       Q.   Would she have any other responsibility
 6   other than ministerially directing that a check be
 7   issued to Mr. Kearney, any other responsibilities
 8   with regard to the Kearney claim?
 9       A.   It looks like she requested a continuance
10   of disability form, so her role would be to make
11   payments and request periodic forms.
12       Q.   Requesting the forms by sending out a two
13   or three-sentence letter to Mr. Kearney at his home
14   address saying, "Enclosed is the form, please send it
15   back"?
16       A.   It may, or it may be included with the last
17   check.
18       Q.   Does she perform any analysis whatsoever of
19   the merit of the claim, or has she, as far as you
20   know?
21       A.   Not that I'm aware of.
22       Q.   That responsibility falls to Mr. Mills?
23       A.   He is the examiner assigned to the claim.
24       Q.   Does that responsibility fall to him and
```

ACCURATE COURT REPORTING (413) 747-1906

31

```
 1   his superiors?
 2       A.   Yes.
 3       Q.   Have you conducted any search for e-mails
 4   relating to the Kearney claim?
 5       A.   I'm not aware of any e-mails that exist in
 6   regards to Mr. Kearney's claim.
 7       Q.   That wasn't my question.  Have you
 8   conducted any search for any?
 9       A.   No, I have not.
10       Q.   Are you mindful of anybody at DMS reviewing
11   the hard drives of anybody in the Jefferson-Pilot
12   block of business for e-mails or other documents
13   concerning Mr. Kearney?
14       A.   Not that I'm aware of.
15       Q.   Has anyone, to your knowledge, performed a
16   review of backup tapes?
17       A.   Not that I'm aware of.
18       Q.   Do you know why that electronic
19   information, as far as you know, hasn't been
20   searched?  Do you know why it hasn't been?
21       A.   Not that I'm aware of.
22       Q.   Does DMS simply not look for electronic
23   information in litigation?
24       A.   I don't know.
```

ACCURATE COURT REPORTING (413) 747-1906

32

```
 1       Q.   You've given over 20 depositions, correct?
 2       A.   Yes.
 3       Q.   You've been involved in several litigation
 4   matters?
 5       A.   Yes.
 6       Q.   You're mindful that electronic discovery is
 7   something that's routinely requested?
 8       A.   I don't know.
 9       Q.   Am I the first person to suggest to you
10   that parties in litigation seek electronic
11   information?
12       A.   That I can recall, yes.
13       Q.   Is there a reason why Mr. Kearney should
14   not be entitled to the information stored
15   electronically, that you can think of?
16       A.   I don't know.
17       Q.   Does DMS have a policy to not search for
18   electronic information in matters subject to
19   litigation?
20       A.   Not that I'm aware of.
21       Q.   Let's turn to the second page.
22            This information at the top half contains
23   the same rudimentary details about the claim that was
24   on the first page, is that right, it just carries
```

ACCURATE COURT REPORTING (413) 747-1906

**Page 33**

```
 1   over?
 2       A.    Yes.
 3       Q.    This is distinguished because a different
 4   field has been manually requested to show
 5   information.  The first one was actions, and this
 6   page shows the field of information under the tab
 7   "Claim Info," right?
 8       A.    That's correct.
 9       Q.    And the only claim info that's represented
10   in the claim system is the purported cause of
11   Mr. Kearney's disability, the name of his doctor, her
12   degree, her state of practice, and a description of
13   his job simply as "Manufacturers rep
14   (self-employed)," right?
15       A.    And "sickness" is selected.
16       Q.    As opposed to "accident"?
17       A.    Yes.
18       Q.    Why is there not a more detailed
19   description of his occupation?
20       A.    I don't know.
21       Q.    What's your understanding of the purpose
22   for the claim system software employed at DMS?
23       A.    In order to make payments on claims and to
24   have information, basic information with the
```

**Page 34**

```
 1   policyholder's address and phone number, the system
 2   allows us to track each person's caseload.
 3       Q.    So you can go in and perform a search of
 4   what Mr. Mills' caseload is and search through his
 5   claim system information?
 6       A.    I could bring up a report that would
 7   contain all claims assigned to Bob Mills, yes.
 8       Q.    Is there a policy to not delete information
 9   that is input into the claim system?
10       A.    Once the information is input, only certain
11   things can be changed.  You can't delete certain
12   information.
13       Q.    What can't be changed?  Are you talking
14   about the software won't let you do it or it's DMS's
15   policy?
16       A.    The software.
17       Q.    Does DMS have a policy at all about
18   preserving and/or not preserving, deleting
19   information input at some point into the claim
20   system?
21       A.    Not that -- I don't recall a specific
22   policy, no.
23       Q.    So, a claim examiner, claim rep, whatever
24   you call them, can unilaterally decide at his or her
```

**35**

```
 1   discretion to delete information contained in the
 2   claim system?
 3       A.    Once the claim is entered, only certain
 4   information can be changed.  I don't believe anything
 5   can be deleted.
 6       Q.    Okay, the software would prohibit a person
 7   from deleting information, is that your testimony?
 8       A.    I believe so.  You can change information
 9   such as the address, where the check is going to, but
10   as far as I know I don't believe any basic
11   information can be changed.
12       Q.    I've seen a printout for a different
13   claimant of a claim that was managed by DMS and there
14   was a task list or action list.  I don't see that
15   field represented here for Mr. Kearney.  Is there a
16   reason for that?
17       A.    I'm not sure what the list looked like.
18   Not that I'm aware of.  I believe all the screens
19   were printed when this was produced.
20       Q.    Did you personally go to the effort of
21   ensuring that every single screen was printed and is
22   now represented in this exhibit?
23       A.    No, I did not.
24       Q.    Who performed that task?
```

**36**

```
 1       A.    I asked Jacqueline Smegal to print these
 2   documents for us.
 3       Q.    Based on your experience of the claim
 4   system, would it be consistent with my experience,
 5   that is, there is a field where action steps and/or
 6   tasks are detailed?  Have you ever seen that before,
 7   sir, or did I see the only claim system information
 8   that has that?
 9       A.    On the very first page there is the action
10   area.  That's -- as far as I know, that's where you
11   have current actions on the policy.  I'm not aware of
12   any other place that keeps actions.
13       Q.    You've never seen in your experience with
14   DMS and your experience with the claim system a field
15   that lists the historical actions taken in a case
16   other than what's represented here on page 1?
17       A.    No, I do not.  I don't work with the claim
18   system as much as the examiners do.
19       Q.    Very well.  So, in your experience -- your
20   experience is different than mine.  What I saw in a
21   prior case showing historical actions taken is not
22   something that you've seen when you've had your
23   experience with the claim system?
24       A.    I don't know what you saw.
```

**Page 37**

1    Q.   That's not my question. I didn't ask you
2    what I saw, okay. Assume I'm telling you the truth,
3    that in the past I've seen this, where you have the
4    historical actions represented. That would be
5    inconsistent with your entire experience with the
6    claim system?
7    A.   I'm not aware of a printout that would
8    allow you to do that. I'm not -- it may exist, I
9    don't know. I haven't seen it.
10    Q.   Is it important to update the fields of
11    information on a timely basis?
12    A.   I'm not sure what you mean.
13    Q.   Is there a policy that the people who do
14    have daily experience with this claim system, that
15    they update information as it becomes available?
16    A.   What information?
17    Q.   Any. Claimant's address, the name of his
18    lawyer, changing a phone number. If information
19    changes, is it the policy of DMS to timely update the
20    information?
21    A.   I'm not sure it's a specific policy. The
22    examiners do periodically update the information,
23    yes.
24    Q.   Do you agree it's a good business practice

**Page 38**

1    to timely update the information?
2    A.   Yes.
3    Q.   Are there any policies that govern the
4    claim examiners' daily activities? E-mail policies,
5    telephone policies, vacation policies, claim
6    administration policies, claim system policies, any?
7    A.   It depends. There are -- there is an
8    employee handbook. We do have a certain number of
9    vacation days per year.
10    Q.   That's it?
11    A.   Items such as that.
12    Q.   How many pages is the employee handbook?
13    A.   I don't recall.
14    Q.   What topics are covered in the employee
15    handbook?
16    A.   Information such as vacation or sick days.
17    I believe it talks about insurance, in terms of
18    health insurance and different information such as
19    that.
20    Q.   Anything else you can recall?
21    A.   Not that I can recall.
22    Q.   So nothing about the actual performance of
23    the job or whether you're supposed to store e-mails,
24    delete e-mails; whether you're supposed to store

**Page 39**

1    drafts of documents, delete drafts of documents;
2    whether you're supposed to take notes of
3    communications you have with persons relative to the
4    claim or whether you're supposed to destroy notes.
5    There's no policies along those lines, correct?
6    A.   Not that I'm aware of.
7    Q.   There's no policy to not take notes?
8    A.   I'm not sure what you mean by that.
9    Q.   Are claim examiners given any counsel,
10    instruction, advice, or recommendations about taking
11    notes and putting them in the claim file anytime they
12    have a substantive communication with anyone relating
13    to a particular claimant?
14    A.   Typically that would be something that we
15    do.
16    Q.   Okay. So, for example, Mr. Mills in this
17    case, you would expect, because it's expected of him,
18    that he document every substantive communication he
19    would have with the claimant, an investigator, a
20    treating physician, an independent medical examiner,
21    a superior, someone at Employers Reinsurance, is that
22    right?
23    A.   Not necessarily, no.
24    Q.   Which of those would you expect him to

**Page 40**

1    document communication, and which of those would you
2    expect him not to document communications?
3    A.   It depends. Every claim is different.
4    It's up to the examiner what to put in the file.
5    Q.   Okay. So it's Mr. Mills' discretion to
6    document in the claim file substantive communication
7    he has with an investigator or not, is that your
8    testimony?
9    A.   Yes.
10    Q.   And it's his discretion whether or not he
11    wants to put in the claim file a substantive
12    communication he has with the superior, right?
13    A.   I don't recall those being in the claim
14    file.
15    Q.   Me either. So it's his election to take
16    notes and document the substantive communications
17    with superiors, or is it the policy that he not take
18    notes and not put them in the claim file?
19    A.   I'm not aware of any occasion where
20    Mr. Mills would document a conversation such as that.
21    Q.   And you're not aware of any documentation
22    of any substantive communication anyone at DMS had
23    with anyone at Jefferson-Pilot regarding Mr. Kearney,
24    right?

**Page 41**

1    A.    Can you repeat that?

2    Q.    You not only aren't aware of any notes in

3    Mr. Kearney's claim file by Mr. Mills detailing

4    discussions he had with superiors on the substance of

5    Mr. Kearney's claim, but you're also not aware of any

6    notes of any substantive communications he had with

7    anyone at Jefferson-Pilot, correct?

8    A.    I'm not aware of any notes. There may be,

9    I don't know.

10    Q.    And you're unaware of any notes in the

11    claim file of any substantive communications he may

12    have had with Employers Reinsurance?

13    A.    I'm not aware if there are any.

14    Q.    Are there any notes that you took that you

15    then put in the claim file and preserved of

16    communications of a substantive nature that you had

17    with Jefferson-Pilot?

18    A.    Not that I'm aware of.

19    Q.    Are there any notes that you preserved and

20    put in Mr. Kearney's claim file of substantive

21    communications you had with Employers Reinsurance?

22    A.    Not that I'm aware of.

23    Q.    Are there any notes that you preserved by

24    putting in Mr. Kearney's claim file of substantive

**Page 42**

1    communications you had with Mr. Mills?

2    A.    Not that I'm aware of.

3    Q.    How about Mr. Anderson?

4    A.    I'm not aware of them.

5    Q.    Are there any notes of any substantive

6    communications you ever had with anyone concerning

7    Mr. Kearney that you preserved by putting in his

8    claim file?

9    A.    I'm not aware.

10    Q.    Did you ever take a note of any action that

11    you had or involvement you had with regard to

12    Mr. Kearney's claim?

13    A.    Not that I can recall.

14    Q.    If you did, you would have destroyed them?

15    A.    Not necessarily.

16    Q.    Okay. If you did, and they're not in the

17    claim file, they've been destroyed?

18    A.    I can't recall if I took notes. I can't

19    recall if they were put in the claim file or they

20    were thrown away. I don't recall.

21    Q.    Other than Mr. Mills' notes of phone

22    conversations he had with Mr. Kearney, are you

23    mindful of there being any handwritten notes of DMS

24    representatives concerning their work on

**Page 43**

1    Mr. Kearney's claim that got preserved by being put

2    into Mr. Kearney's claim file?

3    A.    I'm not aware of the documents, all of the

4    documents contained in the claim file.

5    Q.    Is there a policy against taking notes of

6    communications you have with persons other than the

7    claimant and putting those notes in the claim file?

8    A.    The examiner decides the information that

9    goes into the claim file.

10    Q.    Very well. So it's not the policy of DMS

11    that only notes of communications you have with the

12    claim file go in the claim file, and that all other

13    notes not be preserved in the claim file?

14    A.    There is no specific policy as to what goes

15    in or does not go into the claim file.

16    Q.    Is that the recommendation given to claim

17    representatives?

18    A.    I don't give them a recommendation as far

19    as that.

20    Q.    Do you ever document communications you

21    have with a third party about a claimant by

22    preserving those notes and putting them in the claim

23    file?

24    A.    It depends on the claim.

**Page 44**

1    Q.    You've done that?

2    A.    It depends on the situation.

3    Q.    You've done that?

4    A.    Have I put conversations that I've had with

5    Jefferson-Pilot in a claim file? I may have. I

6    don't recall specifically.

7    Q.    Have you ever had a discussion with anyone

8    at Jefferson-Pilot about the nature and substance of

9    their policies that they've sold historically?

10    A.    I'm not sure what you mean by that.

11    Q.    You know that Jefferson-Pilot has

12    historically sold disability insurance policies?

13    A.    Yes.

14    Q.    In January of 2000 about 500 of those

15    policies came over to DMS for administration?

16    A.    We began administering claims in January of

17    2000. I believe there was less than that sent at

18    that point in time.

19    Q.    Haven't you testified before it was about

20    500?

21    A.    I believe I looked at the monthly report

22    this morning and it looks like it was 330-odd files

23    that came over in January of 2000.

24    Q.    Prior to that you had the Kearney claim and

1    some others, right?

2        A.    No.

3        Q.    The Kearney claim was not something that

4    DMS worked on prior to January of 2000?

5        A.    We provided some consulting services on

6    five to ten different claims back in 1997 and 1998.

7    At some point our consulting arrangement ended and it

8    was a period of time later that we began the

9    administration of the claims.

10       Q.    What other claimants did you handle in that

11   five to ten in the '97 to 2000 time frame?

12       A.    I don't recall their specific names.

13       Q.    Do you recall any names?

14       A.    Not that I'm aware of, no.

15       Q.    How about -- is there an affiliate of

16   Rampersad that you had some responsibility for at

17   some point?

18       A.    No.

19       Q.    How about Greg or Kohn, K-O-H-N?

20       A.    I don't recall.

21       Q.    And Rampersad is R-A-M-P-E-R-S-A-D.

22   You have no recollection of that?

23       A.    No.

24       Q.    Have you had responsibility for the

1    Jefferson-Pilot block of business since 2000?

2        A.    Initially I was director of claims on

3    Jefferson-Pilot beginning in January of 2000, and

4    I've continued to be the manager on that block since

5    that time.

6        Q.    Did you have any involvement in any other

7    Jefferson-Pilot claims other than Mr. Kearney prior

8    to 2000?

9        A.    I don't recall the other claims I've

10   provided consulting on.  I believe there's two or

11   three others.

12       Q.    What do you mean, consulting?

13       A.    We provided some claim recommendation on

14   those claims.

15       Q.    Is it a one-shot deal; you review the claim

16   file and you give a recommendation and it's

17   concluded?

18       A.    Typically.

19       Q.    Was that the situation with Mr. Kearney?

20       A.    I believe I attempted to contact

21   Mr. Kearney to discuss his claim and then recommended

22   a field visit with a representative from Psychiatric

23   Disability Consultants.

24       Q.    That's a subsidiary of DMS, right?

47

1        A.    Yes.  And I believe that is the actions I

2    took on that claim.

3        Q.    Did you ever request copies of

4    Mr. Kearney's policies so that your legal staff at

5    DMS could review them?

6        A.    I believe there was an issue that

7    Mr. Kearney had refused a financial audit, and we had

8    requested the policy to see if there was any specific

9    language in regards to the audit.

10       Q.    You're mindful because you discussed with

11   Counsel Tuesday or Wednesday that you requested the

12   files so they can be looked at by Legal.  Is that the

13   only reason that you would have taken a look at

14   Mr. Kearney's policy, to see if an audit was capable

15   or would you have just reviewed the whole policy to

16   give them consulting services?

17              MR. ELLIS:   I'll object to Counsel's

18       statement preceding the question as an

19       inaccurate statement.

20       A.    Can you repeat the question?

21       Q.    Sure.  Mr. Ditmar, in your involvement

22   providing these expert consulting services, did you

23   ever look at the policy to see what it provided?

24       A.    I don't recall looking at Mr. Kearney's

48

1    specific policy other than in terms of the refusal to

2    undergo the financial audit.

3        Q.    Okay.  So, I mean, the job that you were

4    performing back in '97 through 2000 in consulting, I

5    mean there's two basic things you look at:  The

6    policy issued to the policyholder and then the facts,

7    right, and you try to make sense of it?

8              MR. ELLIS:   Objection.  Misstates

9        facts.  He didn't say he was consulting until

10       2000.

11       A.    I believe I only looked at the claim for a

12   period between '97 and '98, and when I received the

13   claim I looked at it from the perspective of was

14   there additional information needed in order to

15   evaluate Mr. Kearney's claim.

16       Q.    Okay.  In that process, would it have been

17   your practice to look at the policy to see what it

18   provided?

19       A.    Not necessarily.

20       Q.    So you would provide these expert

21   consulting services to Jefferson-Pilot without regard

22   for what the policy said; is that your testimony

23   under oath, sir?

24       A.    Not necessarily.

Q.   You just can't tell me whether you looked at the policy or not; you could have looked at the policy, you might have looked at the policy, but you might not have, is that your testimony under oath?

A.   It depends on the situation of the claim. In Mr. Kearney's claim, I believe we looked at the policy from the perspective of whether or not we felt he was obligated to undergo a financial audit. I don't believe there were any other reasons to look at the policy at that point in time. We were trying to determine what his job was and how his medical condition affected his ability to work.

Q.   Your testimony under oath, Mr. Ditmar, is that you think that it's likely that you didn't look at Mr. Kearney's policy when you were requested to give the consulting services?

MR. ELLIS:   Objection. Misstates his testimony.

A.   Again, I only looked at the policy from the perspective of the audit. I did not look at the policy for any other reason. I examined the claim file. In fact, when we received some of these claim files, I don't believe we received any of the policies initially.

---

Q.   Did you look at -- did you read the entirety of Mr. Kearney's policy at any time in '97 and '98?

A.   I don't recall specifically.

Q.   Your testimony under oath is that it's possible or likely that you didn't read the entirety of Mr. Kearney's policy at any time between July of '97 and 2000?

A.   I don't recall what I did at that point in time.

Q.   How about on January 5th of 2000; at that point would DMS have gone through the effort of reading a six-page insurance policy?

A.   The claim was received at some point in January, was input into our system on January 5, 2000. It would have been the examiner's responsibility to enter the claim into our system at that point.

Q.   When in time would DMS go to the effort of actually reading a six-page insurance policy that it's administering?

A.   It depends on the claim.

Q.   Maybe years into the claim, maybe days? Anywhere in between?

---

51

A.   It depends.

Q.   It depends. How is it that you make judgments and determination about benefit eligibility? Let me -- are facts of the claimant's occupation important?

A.   Yes.

Q.   Is the claimant's medical condition important?

A.   In evaluating a claim, yes.

Q.   Is the policy provisions important?

A.   Yes.

THE WITNESS:   May I take a break?

MR. ROBERTS:   Absolutely.

THE VIDEOGRAPHER:   Going off record at 10:31.

(A recess was taken.)

THE VIDEOGRAPHER:   Back on record at 10:38 a.m.

Q.   (By Mr. Roberts) Mr. Ditmar, I want to return to the issue of whether or not you ever reviewed the policy. There came a point in time in 1997 when you requested Chelsey Ugolik, U-G-O-L-I-K, to perform some analysis or assessment, and she did that and prepared a memo to you, correct?

---

52

A.   I do recall that.

Q.   Have you reviewed that document in the past couple days?

A.   I briefly looked at that.

Q.   You're mindful that in that document she sets forth what the provisions of the policy and the benefits are under the policy?

MR. ELLIS:   Would you mind showing him the document, Counsel?

Q.   (By Mr. Roberts) Are you mindful of that, sir?

A.   I don't recall seeing that.

Q.   I'm going to hand you what's been marked as 2866, the first page of Ms. Ugolik's November 18, 1997 memorandum to you containing her file review, right?

A.   Yes.

Q.   And she describes here in the third and fourth paragraph what her impressions are of the two policies that Mr. Kearney had purchased from Jefferson-Pilot, correct?

A.   It does describe two policies there.

Q.   Tell me if I read this correctly, okay. Follow along. She writes, "It appears from the file

**53**

1 that one policy, H493029, was issued on May 28, '90,
2 which provides for $3,295 per month tax free.
3 Benefits paid under this policy are for a claimed
4 disability date of 2/9/93 for a diagnosis of major
5 depression, chronic and acute.
6 "The second policy, H538069, was issued on
7 May 28, '91 which provides for residual payments of
8 $1,600 per month tax free. Benefits paid under this
9 policy are for a claimed disability date of 2/5/93
10 for a diagnosis of lumbar sacral spine sprain with
11 suspension of disc involvement. It appears that this
12 policy is still contestable."
13 Did I read that correctly?
14 A. Yes.
15 Q. Do you know Ms. Ugolik? Did you know her
16 prior to her creation of this memo?
17 A. I believe I referred this file to PDC for
18 review. She was one of the consultants working at
19 PDC at the time. I do not recall knowing her prior
20 to that.
21 Q. Does PDC Consultants, when you refer work
22 to them, do they usually perform a thorough review of
23 the file?
24 A. They read the claim file, yes.

**54**

1 Q. Your expectation would be that if you refer
2 a case for review to DMS's subsidiary company, PDC,
3 that the people who work there will do a thorough job
4 of reviewing a claim file, right?
5 A. It depends what you ask them to do. I
6 believe in this case she was asked to review the
7 claim file.
8 Q. Okay. Did you direct her to not read the
9 policy and the riders?
10 A. I don't know if we had the policy and the
11 riders at that time. Typically that's not something
12 they would do.
13 Q. She purports to have read the policies.
14 She's giving you opinions and summaries of what the
15 policies contain.
16 A. I don't know what she's basing that on.
17 Q. What's your expectation when you send a
18 claim for review to PDC?
19 A. It depends what you ask them to do.
20 Q. Is your expectation that they do a good
21 job?
22 A. Yes.
23 Q. Is it your expectation that they be
24 thorough?

**55**

1 A. Yes.
2 Q. Do you rely on the information they provide
3 you?
4 A. It depends.
5 Q. Are there occasions where you don't rely on
6 the information they provide you?
7 A. It depends.
8 Q. What does it depend on?
9 A. It depends what they say, it depends what
10 I've asked them to do.
11 Q. How many times are you going to say "It
12 depends" today? It depends?
13 A. Yes, it depends on the number of questions
14 you ask, where it's a situation, where it may or may
15 not.
16 Q. Why would you not rely on a report that you
17 request someone that works for a subsidiary company
18 who you believe to be thorough and competent
19 prepares?
20 A. It depends what I ask them to do.
21 Q. If you ask them to do something and their
22 report suggests that they did it, in that case would
23 it depend that you do rely on the report?
24 A. It depends what I ask them to do, and it

**56**

1 depends how I'm going to rely on it given the claim
2 situation.
3 Q. So there are occasions when you don't rely
4 on the reports, is this where we are, sometimes you
5 do and sometimes you don't, it depends?
6 A. I don't know, it depends on each claim.
7 Q. Can you think of a situation where you
8 requested PDC Consultants to prepare for you a
9 memorandum based on a file review and you didn't rely
10 on it?
11 A. I don't recall.
12 Q. Was it at your direction, then, in 1998
13 that Ms. Beattie performed a file review and actually
14 met with Mr. Kearney?
15 A. I believe I spoke with Ms. Beattie at some
16 point and it was decided that she would travel out
17 and sit down with Mr. Kearney and discuss his claim.
18 Q. Did you discuss the particulars of
19 Mr. Kearney's policy with Ms. Beattie in preparation
20 for her meeting with Mr. Kearney?
21 A. Not that I can recall.
22 Q. Ms. Beattie's report is contained in the
23 claim file at 572578. Do you recognize that, sir?
24 A. Yes.

**57**

1  Q.  When was the last time you reviewed it?

2  A.  I looked at this document yesterday.

3  Q.  Can you turn to the final page of her

4  report. Do you see where it says, "Following are my

5  recommendations"?

6  A.  Yes.

7  Q.  And the second one -- actually, the first

8  one, she recommends -- is this report drafted to you,

9  sir?

10  A.  Yes.

11  Q.  You're the recipient, according to the

12  memo?

13  A.  Yes.

14  Q.  She recommends to you that a request be

15  made that Jefferson-Pilot provide Mr. Kearney with a

16  written explanation of his policy benefits to include

17  own occupation, occupational definition and

18  explanation, length of his benefits, and explanation

19  of how they view residual versus total disability,

20  and how this decision is made.

21  Did you pursue her recommendation?

22  A.  I believe I forwarded this report on to

23  Harold Shelton at Jefferson-Pilot.

24  Q.  Did you have any understanding of what the

**58**

1  issues were that were being raised upon which it was

2  recommended that Mr. Kearney's understanding of his

3  policy rights be clarified?

4  A.  I don't recall.

5  Q.  You didn't perform any review of the policy

6  or the claim file to understand the issues that

7  Mr. Kearney was raising even though you had been

8  hired to provide some consulting service?

9  A.  I don't recall what the specific issues

10  were at that time.

11  Q.  Who is Lisa Newell, N-E-W-E-L-L?

12  A.  She worked at PDC at that time.

13  Q.  Did you ask for her to get involved in the

14  Kearney claim file?

15  A.  I don't recall doing so.

16  Q.  If she recorded time --

17  MR. ROBERTS:  Why don't we go off

18  the record.

19  THE VIDEOGRAPHER:  Going off the

20  record at 10:47 a.m.

21  (A recess was taken)

22  THE VIDEOGRAPHER:  Back on record at

23  10:51 a.m.

24  Q.  (By Mr. Roberts) Mr. Ditmar, you're still

**59**

1  under oath. How big was the claim file when you

2  received it in 1997?

3  A.  I don't recall specifically.

4  Q.  Who during the '97/98 time frame did you

5  have any discussions with concerning Mr. Kearney?

6  A.  I believe I was assigned the file by John

7  Anderson. And I would have spoken with the

8  consultants at PDC, and I believe Harold Shelton was

9  the contact at Jefferson-Pilot.

10  Q.  Did you have substantive discussions with

11  Mr. Anderson regarding the file?

12  A.  Not that I can recall.

13  Q.  Did you have substantive discussions with

14  Ms. Beattie or Ms. Ugolik regarding the file other

15  than their memos which we have now gone over?

16  A.  Not that I can recall.

17  Q.  Did you have substantive discussions with

18  Mr. Shelton that you can recall?

19  A.  Not that I can recall.

20  Q.  Do you recall any substantive discussions

21  with anyone?

22  A.  No.

23  Q.  Are there any notes of your activities from

24  back in '97 and '98 regarding Mr. Kearney's claim?

**60**

1  A.  If I had any they would be in the claim

2  file.

3  Q.  You don't destroy notes?

4  A.  Not typically.

5  Q.  Are you mindful that Jeff Champagne, when

6  he takes notes, once he knows the information he then

7  destroys them rather than putting them in the claim

8  file?

9  MR. ELLIS:  Objection. Misstates

10  the facts.

11  MR. ROBERTS:  It doesn't misstate

12  the facts, Counsel, as you know.

13  Q.  (By Mr. Roberts) Go ahead.

14  A.  I'm not aware of --

15  Q.  Do you know who Jeff Champagne is?

16  A.  Yes.

17  Q.  Is he also a vice president of DMS?

18  A.  I believe he is.

19  Q.  In charge of the Mass Casualty bulk of

20  business?

21  A.  I believe he is.

22  Q.  Do you know if he takes notes and puts them

23  in the claim file?

24  A.  No, I do not.

Q. Page 6 of the exhibit, sir -- why don't you number those pages so we don't get them out of order.

A. May I borrow a pen, please?

Q. Certainly.

Have you numbered all 20 pages?

A. No, I have not.

Q. Would you kindly?

A. (Witness complying)

You wanted me on page 6?

Q. Yes. Mr. Ditmar, are you mindful that, in Ohio, insurance companies owe their policyholders a duty of good faith?

A. We treat all our policyholders the same way, in good faith.

Q. Okay. Do you know whether that's the law of several jurisdictions including Ohio or not?

A. Not specifically.

Q. You don't know anything about the law of Ohio?

A. Not specifically.

Q. And specifically with regards to an insurer's duty of good faith, you don't know whether there exists one or not in the state of Ohio?

A. I'm not aware.

---

Q. But you are aware that several jurisdictions do have that concept?

A. Yes.

Q. Nonetheless, DMS always provides the policyholders with good faith, correct?

A. We attempt to, yes.

Q. Has there ever been a decision of a jury that you're mindful of where a jury disagreed with the assertion that you have acted in good faith, DMS?

A. Not that I'm aware of.

Q. When you performed these consulting services in '97 and '98 did you understand that there was a duty of good faith that went with that work or was there not?

A. I don't specifically recall thinking that necessarily.

Q. Did you approach the duty that you were asked to perform on behalf of Jefferson-Pilot with the mindset that you were undertaking that duty with a commensurate duty of good faith to Mr. Kearney?

A. I was asked to review the claim file and provide my recommendations. That's what I did.

Q. Did you undertake that work with the same mindset that you would offer to policyholders for

---

whom you understand you do have a duty of good faith?

A. I treat all the policy -- all my policyholders the same way.

Q. Does that include when you're providing consulting services as you did in 1997 and '98?

A. Yes.

Q. Okay. And in exercising a duty of good faith, do you have a judgment about whether or not it's appropriate to actually review the policy to make sure that you are conducting your activities in good faith?

A. Not necessarily.

Q. Page 6, in the far right-hand column there's some Y entries, the letter Y, and on some lines there are not. Do you know why that is?

A. No, I do not.

Q. Do you know what the Y represents?

A. I do not.

Q. In the third column from the right there are some Rs and some Ps. Does the P mean Pending and the R mean Residual?

A. I think it's pending and/or released.

Q. The P is for pending, can we agree on that?

A. I believe so.

---

Q. What does Additional and Partial mean in the fifth column on the right?

A. I don't know specifically.

Q. Based on your association with the company, DMS, do you have any clue what that entry into the software system may be?

A. I do not.

Q. Whose initials in the system are DEL on page 8?

A. That stands for Dave LaPorte.

Q. Does he work on the Jefferson-Pilot block of business?

A. Yes.

Q. Would Mr. Mills just have been absent that day and that's why his initials appear on that one entry?

A. Most likely.

Q. Are you mindful of Mr. LaPorte having any substantive responsibility for the Kearney claim?

A. I do not believe he did.

Q. Page 11, is this a reprint of page 1?

A. Except for the change in policy number, I believe it is.

Q. The policy number referenced in the far

65

1 right-hand column three or four lines down?
2     A.   Yes.
3     Q.   Have you ever seen anywhere a list of
4 actions performed on the Kearney claim?
5     A.   No, I have not.
6     Q.   Was there ever a written strategy prepared
7 on the Kearney claim?
8     A.   I do not believe so.
9     Q.   Is it the policy of DMS to develop
10 strategies for each claim?
11     A.   No.
12     Q.   Do you require the persons that work
13 underneath you to have a certain planned approach to
14 their administration of a claim?
15     A.   No.
16           MR. ROBERTS:  Let's go off the
17 record for a second.
18           THE VIDEOGRAPHER:  Going off the
19 record at 11 a.m.
20               (A recess was taken)
21               (Exhibit 30, marked)
22           THE VIDEOGRAPHER:  Back on record at
23 11:12 a.m.
24     Q.   (By Mr. Roberts) Mr. Ditmar, I've marked

66

1 as Exhibit 30 several documents all combined into one
2 exhibit which we'll call 30.  The first two pages of
3 Exhibit 30 are 2001 Yearly Performance Plan and
4 Review of Lance Faniel, which is Bates labeled DMS
5 018 and DMS 019.
6           MR. ELLIS:  Do you have copies of
7     these for me, Counsel?
8     Q.   (By Mr. Roberts) The next three pages are
9 2002 Yearly Performance Plan and Review of John
10 Midghall marked DMS 047, DMS 048, and DMS 049.
11         The next document is 2001 Yearly
12 Performance Plan and Review of John Midghall marked
13 DMS 050 and DMS 051.
14         The next is 2001 Yearly Performance Plan
15 and Review of Brian Wentworth marked DMS 025 and 026.
16         The next is Yearly Performance Plan and
17 Review, Brian Wentworth, signed by John Midghall,
18 labeled DMS 027 and DMS 028.
19         The next is Yearly Performance Plan and
20 Review of Brian Wentworth marked DMS 029, 030, and
21 031.
22         The next is John Graff Yearly Performance
23 Plan and Review marked DMS 060 and DMS 061.
24         The next is marked DMS 077, 78, 79, 80 and

67

1 81, which is the 2001 Yearly Performance Plan and
2 Review of a Bill Gelardi.
3         The next is Mr. Gelardi's review marked DMS
4 082 and 83.  And also pertaining to Mr. Gelardi, DMS
5 084, 85, and 86, which we'll have as Exhibit 30.
6           MR. ROBERTS:  Do you want a copy?
7           MR. ELLIS:  Yes.
8           MR. ROBERTS:  Okay, why don't we go
9     off the record so Mr. Ellis can have a copy.
10           THE VIDEOGRAPHER:  Going off the
11     record at 11:15 a.m.
12               (A recess was taken)
13           THE VIDEOGRAPHER:  Back on record at
14     11:26 a.m.
15           MR. ELLIS:  For the record, Counsel
16     has just identified Exhibit 30, which contains
17     a number of documents he identifies as parts
18     of the personnel files of Mr. Faniel,
19     Mr. Midghall, Mr. Wentworth, Mr. Graff, and
20     Mr. Gelardi, all of which are the subject, as
21     Counsel knows, to a protective order issued in
22     the Geoffries case.  I will object to his use
23     of them as being in violation of that order.
24     I also object on the basis that they're beyond

68

1     the knowledge of this witness and not relevant
2     to this case.
3           MR. ROBERTS:  Let's go ahead and
4     mark Exhibit 31, which is a letter on Wood &
5     Lamping letterhead from Mr. William R. Ellis
6     dated November 18, 2003.  It says, "Dear Mike,
7     I am enclosing Dr. Frey's report which I
8     received by Express Mail this morning.  Also I
9     am enclosing the performance evaluations of
10     the DMS employees previously identified by
11     you.  They are Bates numbered DMS016 to
12     DMS099."
13              (Exhibit 31, marked)
14           MR. ROBERTS:  The order that
15     Mr. Ellis speaks of relates to performance
16     evaluations that were marked confidential that
17     were produced after November 18, 2003 and does
18     not apply to these documents which have not
19     been identified either by letter or by some
20     mark on the document as confidential.
21     Q.   (By Mr. Roberts) Now, Mr. Ditmar can
22 you --
23           MR. ELLIS:  The objection stands.
24           MR. ROBERTS:  Okay, fine.

**69**

1    Q.   (By Mr. Roberts) Mr. Ditmar, do you know
2  who Lance Faniel is?
3    A.   Yes.
4    Q.   Do you know who John Midghall is?
5    A.   Yes.
6    Q.   And what was John Midghall's position in
7  the company in 2001, if you know?
8    A.   I believe he was a vice president.
9    Q.   Do you see where it says "Accomplishments"
10  on the first page of Exhibit 30?
11    A.   Yes.
12    Q.   And at the end of the first paragraph it
13  mentions the term "Dispute resolution." Are DMS'
14  claim reps and/or claims persons, including
15  directors, trained in dispute resolution?
16    A.   I believe one of the modules in the
17  training program does discuss resolution.
18    Q.   What other modules are in the training
19  program?
20    A.   I believe there's between 10 and 15
21  different sections, letter writing, policies,
22  disability insurance, medical information,
23  investigations. I don't recall any other names.
24    Q.   When you say policies, what does that

**70**

1  module provide?
2    A.   It discusses a basic disability insurance
3  policy.
4    Q.   Can you turn to the second page of the
5  exhibit which is DMS 019, which Mr. Ellis has
6  graciously admitted is an authentic document.
7         MR. ELLIS:  I will have a continuing
8    objection to all of this exhibits as a
9    violation of the Court's order of
10    confidentiality with regard to personal
11    information concerning employees of DMS and
12    their personnel files and reviews.
13         MR. ROBERTS:  As stated, that
14    protective order that Counsel mentions refers
15    to a different set of documents, not these.
16    Q.   (By Mr. Roberts) But the last sentence of
17  the first paragraph on 019 says, "As Lance gets his
18  team to coalesce in 2002, he will expect improvement
19  in the pace devoted to build a case, develop the
20  strategy and when appropriate execute resolution."
21    Do you know what Mr. Midghall was referring
22  to there about building a case, developing strategy,
23  and then, when the time is appropriate, execute
24  resolution?

**71**

1         MR. ELLIS:  Objection. It's an
2    improper question to ask this witness.
3    Q.   (By Mr. Roberts) Sir?
4         MR. ELLIS:  How can he know what's
5    in Mr. Midghall's mind?
6         MR. ROBERTS:  How many times do we
7    have to go over, Bill, the fact that when you
8    say "Objection," that's all you're entitled to
9    say in a deposition. When will you abide by
10    the Code of Civil Procedures or the Code for
11    Professional Responsibility?
12    Q.   (By Mr. Roberts) Sir, do you know what it
13  is that Mr. Midghall is referring to when he
14  discusses that Lance has been getting his team --
15  strike that.
16    Do you know what he's referring to when he
17  discusses the concept of building a case, developing
18  a strategy, and when appropriate, executing
19  resolution?
20    A.   I do not know.
21    Q.   Have you ever in your discussions with
22  Mr. Midghall have him refer to building a case,
23  developing a strategy, and executing resolution when
24  appropriate?

**72**

1    A.   I've never worked for John Midghall.
2    Q.   Has the concept of building a case and
3  developing a strategy ever been discussed with you in
4  the halls of DMS among any of your co-workers?
5    A.   Not that I can recall.
6    Q.   Have you ever worked with any co-workers to
7  develop a strategy on a claim?
8    A.   I wouldn't use the term "strategy."
9    Q.   Have you heard Mr. Midghall refer to it?
10    A.   Have I heard Mr. Midghall refer to --
11    Q.   Refer to developing a strategy?
12    A.   No, I have not.
13    Q.   How about Mr. Anderson?
14    A.   No, I have not.
15    Q.   Can you turn to the next page, DMS 0047?
16         MR. ELLIS:  Same objection.
17         MR. ROBERTS:  You have a continuing
18    objection, Counsel.
19         MR. ELLIS:  Thank you.
20         MR. ROBERTS:  Okay, now I expect you
21    to be mindful of that.
22    Q.   (By Mr. Roberts) This is the 2002
23  Performance Plan and Review for John Midghall
24  purportedly prepared by John Anderson. Now, you

73

```
 1    report to John Anderson, don't you?
 2        A.   Yes.
 3        Q.   Paragraph B says, start at the second
 4    sentence, "This includes providing guidance to the
 5    on-site Assistant Vice President of Claims and three
 6    managing Directors. Issues vary but also involve
 7    current personnel and staffing, complex claim
 8    strategies, claim resolution valuations, and managing
 9    effectively to budget."
10        My question is, have you ever heard
11    Mr. Anderson, your superior, refer to developing
12    complex claim strategies?
13        A.   No, I have not.
14        Q.   How about is it expected, as far as you're
15    aware, or have you heard Mr. Anderson ever refer to
16    the process of developing a claim resolution
17    valuation?
18        A.   No, I have not.
19        Q.   And in the next sentence he says,
20    "Additionally, I direct our Boston lawyers regarding
21    case strategies including final decision for legal
22    exposure, legal expenses, settlement timing and
23    amounts."
24        Have you in the halls of DMS ever discussed
```

74

```
 1    with your co-workers timing of settlement with
 2    claimants?
 3        A.   Not that I can recall.
 4        Q.   Can you turn to the Bates number document
 5    DMS 0050, which is the first page of the 2001
 6    Performance Review of John Midghall purportedly
 7    performed by his manager, John Anderson?
 8        MR. ELLIS:   Same objection.
 9        Q.   (By Mr. Roberts)  And in the
10    Accomplishments section, Mr. Midghall -- he was the
11    vice president at this time, 2001?
12        A.   I believe he was.
13        Q.   In the Accomplishments section, he writes,
14    the last sentence of that first paragraph, "My
15    valuation and settlement strategies contributed
16    heavily to the Boston legal staff favorably settling
17    many existing lawsuits in 2001."
18        Are you mindful that Mr. Midghall engaged
19    in developing settlement strategies in 2001?
20        A.   I'm not aware of that, no.
21        Q.   Have you ever been involved in developing
22    settlement strategies?
23        A.   No, I have not.
24        Q.   What is your understanding of my question
```

75

```
 1    about your engagement in developing a settlement
 2    strategy? How did you understand that question?
 3        A.   I would understand that to say that
 4    strategy is setting out a plan of thought to settle
 5    the claim.
 6        Q.   Okay.
 7        A.   Saying I'm going to do whatever I need to
 8    do to settle this claim.
 9        Q.   So, in your experience at DMS it's never
10    been the case where there's been such a plan
11    developed, as far as you're aware, on any claim?
12        A.   I've never been handed a claim and said,
13    "You need to settle this claim."
14        Q.   That wasn't my question. My question was,
15    in your experience at DMS, you've never been engaged
16    in the development of a plan directed at ultimately
17    settling a claim?
18        A.   Not that I can recall.
19        Q.   How about in your experience at DMS, have
20    you ever been engaged in the development of a plan to
21    administer a claim?
22        A.   I wouldn't use the term "plan." We
23    administer claims. I don't make action plans, so to
24    speak, as I'm going to do this, this, this, and this.
```

76

```
 1    I handle the claim as the information comes in,
 2    review the file, and determine what I need to do
 3    next. I don't have a written plan or a plan in my
 4    mind. I take it as it goes.
 5        Q.   I know there's no written plans, but is it
 6    your sworn testimony that on no claim you've ever
 7    been responsible for or involved in at DMS have you
 8    ever set out some kind of action steps to take in the
 9    future?
10        A.   I may have.
11        Q.   You can't recall any?
12        A.   I don't recall specifically.
13        Q.   And it's not the policy of DMS to develop
14    strategies on claims?
15        A.   It's not my policy.
16        Q.   There's several references throughout these
17    performance reviews to the DMS claim management
18    philosophy. Does that term have any meaning to you?
19        MR. ELLIS:   Same objection.
20        MR. ROBERTS:   The same continuing
21    objection?
22        MR. ELLIS:   Mm-hmm.
23        MR. ROBERTS:   A little redundant,
24    wouldn't you say?
```

1    A.   Somewhat.

2    Q.   Okay, what does it mean to you?

3    A.   I would say my philosophy that I teach to

4 my claims folk that work for me is to make sure we

5 administer every claim fairly, equitably and

6 ultimately make the correct decision.

7    Q.   Does that philosophy come from on high,

8 higher than you, or is that something that you've

9 developed and you provide to your subordinates?

10    A.   I think that's the general philosophy at

11 the company that comes from John Anderson and Bob

12 Bonsall.

13    Q.   Can you turn to what's labeled DMS 0027.

14 Do you recognize Mr. Midghall's handwriting?

15    A.   Somewhat.

16    Q.   This purports to be his signature at the

17 bottom and his handwriting commenting on

18 Mr. Wentworth's performance in 2000.

19    MR. ELLIS:  Objection.

20 Mr. Wentworth was not involved in this case or

21 this claim or even in this office.

22    MR. ROBERTS:  Was your other

23 objection not adequate, you believe?

24    Q.   (By Mr. Roberts) Three lines up from the

---

1 bottom of that first paragraph he mentions the

2 concept of quote, "Cases which present opportunity

3 for resolution."

4    Has he ever -- has Mr. Midghall ever had a

5 discussion with you where he discusses the concept of

6 cases which present opportunities for resolution?

7    A.   No, he has not.

8    Q.   It is a business plan or goal of DMS to

9 resolve cases, right?

10    A.   I wouldn't say that, no.

11    Q.   Well, there's several references in these

12 documents and others I've seen authored by DMS that

13 talk about resolving a claim, and even in

14 Mr. Kearney's claim there are many references to

15 making efforts to resolve his claim. Is that not --

16 is resolving claims not an objective of DMS?

17    MR. ELLIS:  Objection. Unless you

18 want him to show him the documents you're

19 referring to.

20    A.   I don't know what context it was stated in

21 Mr. Kearney's file.

22    Q.   I'm not asking you about Mr. Kearney's

23 file --

24    A.   Well, it --

---

1    Q.   I asked you the question, sir. Is

2 resolving --

3    A.   I was --

4    Q.   We can't talk at the same time, out of

5 courtesy to her.

6    A.   I was trying to answer your question.

7 You're --

8    Q.   You weren't answering the question. The

9 question was this -- and let's make sure we

10 understand each other --

11    MR. ELLIS:  Mr. Roberts --

12    Q.   (By Mr. Roberts) -- as a courtesy to the

13 court reporter. Is the concept --

14    A.   I was trying to answer your question and

15 you interrupted me.

16    Q.   I'm going to talk over you because I'm not

17 going to let you control this deposition.

18    A.   I'm not trying to.

19    Q.   It's her that you're inconveniencing, sir.

20 This is the question.

21    A.   I was trying to answer your question.

22    Q.   This is the question.

23    MR. ELLIS:  If you're not going to

24 permit him to answer the question --

---

1    MR. ROBERTS:  Listen, don't talk

2 over me. Listen, I will talk over you and

3 make her life hell.

4    MR. ELLIS:  This deposition's over.

5    MR. ROBERTS:  No, that is wrong.

6 Let's get on the phone right now.

7    MR. ELLIS:  Do what you want, Mike.

8 Unless you let the witness answer the

9 question --

10    MR. ROBERTS:  He's not answering the

11 question. That wasn't the question. Here's

12 the question. Let's go back on the record.

13 Here's the question. We're still running

14 videotape, right?

15    MR. ELLIS:  He's entitled to finish

16 answering what you asked him.

17    MR. ROBERTS:  That wasn't what I

18 asked him, Counsel. Here is the question,

19 plain and simple again.

20    Q.   (By Mr. Roberts) Is the concept of

21 resolving claims something that is a mission or

22 business philosophy of DMS?

23    A.   Can you have her read back the question

24 that you started to ask me four minutes ago and I can

81

1 explain what I was going to say.
11:42:37 2        Q.   If you answer the question, you can
3 explain.  But if you don't answer the question I'm
4 going to ask the question.  You see, this is a
5 deposition, sir.  Questions are asked by the lawyer,
6 the witness is under oath in a duty to answer the
7 questions asked.  Nothing else.  Do you understand?
11:42:53 8        A.   Yes.  I would like --
11:42:55 9        Q.   Let's go back to that question that he
10 wants to answer this time.
11:42:59 11       A.   Before you proceeded to interrupt me.
11:43:50 12             THE COURT REPORTER:  "Question:
13        Well, there's several references in these
14        documents and others I've seen authored by
15        DMS that talk about resolving a claim, and
16        even in Mr. Kearney's claim file there are
17        many references to making efforts to resolve
18        his claim.  Is that not -- is resolving
19        claims not an objective of DMS?
11:44:00 20       A.   In regards to your statement, I was trying
21 to answer the question in that I have not seen the
22 statement resolution in context with Mr. Kearney's
23 claim file.  What is the second part of that
24 question.

82

11:44:20 1        Q.   Well, the only part of the question, quote,
2 Is resolving claims not an objective of DMS?  The
3 only question asked and still not answered.
11:44:29 4        A.   It depends.
11:44:31 5        Q.   It depends.  It depends on what?
11:44:34 6        A.   It depends on the specific claim you're
7 handling.
11:44:39 8        Q.   Okay.  So, it is not an overriding
9 objective of DMS to resolve claims?
11:44:44 10       A.   What do you mean by resolve?
11:44:50 11       Q.   Make them go away.  You inherit or you
12 administer closed blocks of business for insurance
13 companies, correct?
11:45:02 14       A.   Some of the business is closed.
11:45:06 15       Q.   Let's talk about the Jefferson-Pilot.
16 Jefferson-Pilot in January of 2000 sent to DMS,
17 you've testified under oath previously 500, today you
18 say 300 and something claims, correct?
11:45:15 19       A.   Yes.
11:45:16 20       Q.   That was a closed block of business,
21 correct?
11:45:18 22       A.   Yes.
11:45:19 23       Q.   Those were all active claims for which
24 claimants were getting checks monthly or

83

1 periodically, right?
11:45:26 2        A.   I believe some of the claims were pending
3 that we received.
11:45:50 4        Q.   Is it your testimony under oath, sir, that
5 it isn't the business philosophy or objective of DMS
6 to resolve ongoing claims such as those for less than
7 the actuarial reserve on the claims?
11:45:49 8             MR. ELLIS:  Objection.
11:45:50 9        A.   And you're using the term resolved, to make
10 them go away, is that correct?
11:45:57 11       Q.   Correct.
11:45:54 12       A.   That is not how we were administering this
13 block.
11:46:01 14       Q.   Again, that wasn't my question.  I didn't
15 ask you how you were administering the block.  I
16 never said that, okay?  The question is simple.  In
17 situations such as you had with Jefferson-Pilot,
18 where you were asked to administer a closed block of
19 business, is it not the objective of DMS to resolve
20 as many claims as it can for less than the actuarial
21 reserve on the respective claims?
11:46:34 22             MR. ELLIS:  Same objection.
11:46:35 23       A.   No, that is not the objective.
11:46:36 24       Q.   Very well.  Can you turn to DMS 0029 of

84

1 Exhibit 30.  This is a Yearly Performance Plan and
2 Review purportedly for Brian Wentworth.  And under
3 Accomplishments, the third asterisked paragraph, it
4 says, "Ongoing effort to orient staff to DMS
5 philosophies and methods."
11:47:11 6             Do you know what he's referring to, or
7 what's your understanding of DMS's methods?
11:47:16 8        A.   I don't know what he's referring to.
11:47:20 9        Q.   Do you have an understanding of what DMS'
10 methods means?
11:47:29 11       A.   No, I do not.
11:47:32 12       Q.   Can you turn to DMS 0060.  Do you know who
13 John Graff is?
11:47:44 14       A.   I believe he's an examiner in the Boston
15 office.
11:47:47 16       Q.   Working on the Mass Casualty block of
17 business?
11:47:51 18       A.   I believe so.
11:47:51 19       Q.   He writes in here as a goal, at the bottom
20 of DMS 0060, "A few of my goals are to become more
21 familiar with the different policies and riders to
22 become a good field representative for my clients and
23 to" quote "become more familiar with the DMS claims
24 settlement process."

---

**Page 85**

```
 1        Do you have an understanding personally of
 2   what any DMS claims settlement process may be?
 3        A.   No, I do not.
 4        Q.   Have you ever heard anyone prior to today,
 5   prior to this deposition, say in your presence that
 6   there is some kind of DMS claim settlement process?
 7        A.   No, I have not.
 8        Q.   Can you turn to DMS 0078.  And if you look
 9   at 0077 you'll see that this is a 2001 Yearly
10   Performance Plan and Review on Bill Gelardi by
11   Maureen Cleary.  Do you know who she is?
12        A.   No, I do not.
13        Q.   Do you know who Bill Gelardi is?
14        A.   No, I do not.
15        Q.   You've never heard his name before?
16        A.   No, I haven't.
17             MR. ELLIS:   In which case I object
18        still further on this particular document.  He
19        has no familiarity with the people or the
20        document.
21             You don't have to make faces, Mike.
22             MR. ROBERTS:   I'm not making a face
23        at you.  I don't know why you would say that
24        on the record.  Well, I do know why you would
```

---

**Page 86**

```
 1   say that on the record.
 2        Q.   (By Mr. Roberts)  You see in "Manager's
 3   Comments," at DMS 0078, the first paragraph says,
 4   "Additionally, I believe claim specialists must have
 5   excellent communication skills, the ability to work
 6   independently, formulate and implement appropriate
 7   claim management strategies."
 8             Now, let's assume for purposes of this
 9   question that Maureen Cleary is, as is represented by
10   this document, a manager of DMS.  Have you ever heard
11   anyone at DMS refer to the formulation and
12   implementation of appropriate claim management
13   strategies?
14        A.   Not that I can recall.
15        Q.   In the third paragraph of Manager Comments,
16   she states it again.  At the end of the third line
17   she writes, "However, your" -- talking about the
18   specific employee -- "letter writing skills and
19   abilities to formulate and effectively implement
20   appropriate claim management strategies
21   simultaneously within your caseload was below
22   expectations."
23             Tell me, as a supervisor and manager at
24   DMS, do you have an expectation that your
```

---

**Page 87**

```
 1   subordinates will implement appropriate claim
 2   management strategies?
 3        A.   I don't know what's meant by those terms,
 4   so I don't know if I do or not.  My understanding of
 5   reading that may be different from hers.
 6        Q.   Okay.  What's your understanding of what
 7   she might be referring to?  How do you approach that
 8   language there?
 9        A.   I believe I tried to define what is meant
10   by strategy before, and I would not say that I have
11   strategies or that my people that work for me develop
12   strategies in terms of claims management.
13        Q.   So, in your work and in your history with
14   DMS, you would testify under oath that there's never
15   been an occasion where you have directed anybody or
16   personally created any particular strategy on any
17   claim for which you had involvement, is that true?
18        A.   Well, it depends what's meant by strategy,
19   because --
20        Q.   The way you understand the word strategy.
21        A.   There might be an instance where I'm saying
22   I planned, there may be an instance where I requested
23   medical records with the thought of once I get the
24   records I may do an independent medical examination.
```

---

**Page 88**

```
 1   Is that considered a plan?  It may be, I don't know.
 2        Q.   Something like that would be the extent of
 3   any strategy in which you've been involved at DMS?
 4        A.   It depends.  It may involve another step.
 5   I may say once I get that medical exam it may be
 6   reviewed by our in-house medical people.  I don't
 7   know.  Each and every claim's different.
 8        Q.   Would your strategies go further than that,
 9   just a two-step strategy that you've laid out for us?
10        A.   I don't know.
11        Q.   Can you turn to DMS 0081.  This is the
12   second page of an e-mail string that begins at DMS
13   0080 which is part of the exhibit.  And it begins in
14   the middle of a fairly long paragraph at the top of
15   081.  And four lines up from the bottom of that
16   conclusion of that paragraph there's a sentence at
17   the end that says, "I clarified performance" -- do
18   you see that?
19        A.   Yes.
20        Q.   She writes, "I clarified performance
21   expectations in terms of appropriate claim handling
22   and the need for management to ensure that all
23   employees were exercising appropriate judgment in
24   pursuing negotiated resolutions appropriately."
```

1   Based on your history with DMS in your
2   position, do you personally feel that management has
3   a need to ensure that all employees are exercising
4   appropriate judgment, number one, and number two,
5   pursuing negotiated resolutions appropriately?
6       A.   I don't know what is meant by that
7   statement.
8       Q.   What would you understand the term
9   "negotiated resolutions" to mean?
10      A.   If we're involved with a dispute with an
11  insured and we were able to reach a compromise.
12      Q.   And that's not something you attempt with
13  every claim?
14      A.   I'm not in a dispute in every claim.
15      Q.   You don't try to compromise every claim?
16      A.   What do you mean by compromise?
17      Q.   Get the policyholder to agree to accept a
18  certain amount of money that's less than the present
19  day value of the benefits through the termination of
20  the contract?
21      A.   No, I do not.
22           THE WITNESS:  What time is it?
23           MR. ELLIS:  Five to twelve.
24           THE WITNESS:  I'd like to take a

1   break for lunch, please.
2           MR. ROBERTS:  Absolutely.
3           THE VIDEOGRAPHER:  Going off record
4   at 11:54 a.m.
5              (A recess was taken)
6           THE VIDEOGRAPHER:  Back on record at
7   1:23 p.m.
8       Q.   (By Mr. Roberts)  Mr. Ditmar, you are under
9   oath still.  Did you discuss your testimony with
10  Mr. Ellis during the lunch break?
11      A.   No.
12      Q.   Do you refer to Mr. Ellis as "Big Brother"?
13      A.   No.
14      Q.   Have you ever heard that expression?
15      A.   Vaguely.
16      Q.   Regarding Mr. Ellis?
17      A.   No.
18      Q.   Do you perform performance evaluations of
19  your subordinates that work in the Jefferson-Pilot
20  block of business?
21      A.   Yes.
22      Q.   For how many years have you performed that
23  function?
24      A.   Since 2000.

1       Q.   Could you list for me the persons who you
2   have reviewed?
3       A.   Bob Mills.  Tony Marecki.
4       Q.   Could you spell that for the court
5   reporter?
6       A.   M-A-R-E-C-K-I.  Dave LaPorte.  Mary McFall.
7   Mariah Shea.  Jacqueline Smegal.
8       Q.   Could you spell that last name, please?
9       A.   S-M-E-G-A-L.
10           I believe that's it.
11      Q.   Who is your review performed by?
12      A.   Bill Hughes and John Anderson.
13      Q.   Has it always been both of those gentlemen,
14  or at least since 2000?
15      A.   I don't recall.
16      Q.   Has Bill Hughes done your reviews since
17  2000?
18      A.   In part with John, yes.
19      Q.   Let's turn your attention back to Exhibit
20  30, if we could.  DMS 0081 is the page we left off
21  on.
22      A.   Yes.
23      Q.   And the second paragraph.
24           MR. ELLIS:  Continuing my objection

1   with this exhibit, questions concerning it.
2       Q.   (By Mr. Roberts)  The second sentence says,
3   "I suggested you follow up on the caseload review I
4   conducted with you on August 30th as this was
5   intended to help you identify auto pay/settlement
6   cases."
7           Does the phrase "auto pay/settlement cases"
8   mean anything to you?
9       A.   Not necessarily.
10      Q.   What do you mean, not necessarily?
11      A.   I don't know what she meant in saying that.
12      Q.   Forget about the context --
13      A.   I've heard the term "auto pay," I've heard
14  the term "settlement."  I don't know what she means.
15      Q.   What is an auto pay case?
16      A.   I don't know what her understanding is of
17  the term auto pay.  My understanding of the term auto
18  pay?
19      Q.   Yes.
20      A.   Would mean that it's a claim where the
21  payments continue to go out automatically with less
22  periodic review.
23      Q.   How much less could that possibly be?
24      A.   It depends.  Usually or typically a claim

1  would be paid without review for six months or less,
2  sometimes it may only be once a year depending on the
3  nature of the circumstances of the claim.
4      Q.   Do you know what the meaning is to the --
5  or do you have an understanding of what it means to
6  identify a settlement case?
7      A.   I don't know what she means, again, in her
8  terms. A settlement, typically I would refer to it
9  as a claim where you reach a compromise with the
10  insured and the claim is resolved.
11     Q.   All right. Is there efforts undertaken in
12  your department, or in the block of business you
13  work, to identify -- to affirmatively identify
14  settlement cases?
15     A.   It depends on the case. If a case where
16  the facts are warranted that we would settle the
17  case, we would do that.
18     Q.   Do you have an understanding of the phrase
19  "advance pay & close opportunity" in that sentence?
20     A.   Again, I don't specifically know what she
21  meant. I have an understanding of the term advance
22  pay.
23     Q.   Does "advance pay" go with "& close
24  opportunity"?

1      A.   It could be termed "advance pay & close."
2      Q.   What would be your understanding of the
3  term "advance pay & close"?
4      A.   In a case, for example, where a person
5  might have a broken leg, and it's agreed with their
6  physician and our medical department and all other
7  circumstances where an insured might be able to go
8  back to work six months from now, we may pay the
9  claim in advance for six months and agree that at
10  that point the insured would be able to go back to
11  work, so we would pay it and close the claim.
12     If additional complications arose, the
13  insured could call us back and say, "Hey, I need two
14  more weeks of benefits."
15     Q.   For the record, the sentence says "was
16  intended to help you identify auto pay/settlement
17  cases, possible advance pay & close opportunities, et
18  cetera." You gave me a health insurance example.
19  Has there ever been a case in your experience in the
20  disability insurance field where you've been involved
21  in the advance pay and close of a disability claim
22  for which there was more than five years potentially
23  left before the policy would otherwise terminate?
24         MR. ELLIS:   I object to counsel's

1  misstatement to the witness's testimony.
2      A.   The example I gave you could be a
3  disability claim. He could have a policy that pays
4  to age 65. He could be 40 years old, but if he
5  breaks his leg, his claim in a sense would end and he
6  would return to work and his policy would still be in
7  force.
8      Q.   Have you ever been involved in a matter
9  where there has been an advance pay and close of a
10  claim where the advance pay has been greater than
11  five years of benefits?
12     A.   You're asking -- I just want to clarify.
13  Advance pay and close, my understanding of advance
14  pay and close, the insured still has the policy,
15  still keeps it. The policy doesn't end just because
16  you pay the claim. They still keep the policy. The
17  policy doesn't end because we paid him six months of
18  benefits. It's just returned to a premium paying
19  basis and his claim, in a sense, is over. That's my
20  understanding of advance pay and close.
21     Q.   How does "close" work into that?
22     A.   It means the claim has closed. Where,
23  if --
24     Q.   But the policy's not terminated?

1      A.   If you, for example, broke your leg and you
2  filed paperwork, you would have an open claim. When
3  you returned to work and were no longer paying
4  benefits, the claim's closed. You start paying
5  premiums again if you qualified for a waiver of
6  premium in that period in between. I'm sorry, I
7  forgot your question.
8      Q.   Back to my question --
9      A.   Of the five-year portion?
10     Q.   Right.
11     A.   Through my experience, advance pay and
12  close is usually something where you pay no more than
13  six months in advance. I've not -- I cannot recall a
14  circumstance where I've paid five years.
15     Q.   Her next sentence she says, "We also agreed
16  to continue to use Management Referrals to assist you
17  with claim strategy on complex files."
18     Do claim examiners have the opportunity to
19  request management referrals to assist with claim
20  strategy, as far as you know?
21     A.   I have never heard that term.
22     Q.   She uses capital "M" and capital "R" there.
23  Does the capitalized term Management Referrals have
24  any meaning to you whatsoever?

A.    No, it does not.

Q.    Moments before we began this morning, your counsel was kind enough to timely provide to me a Jefferson-Pilot Life Insurance Company spread sheet of some sort that's been marked as Exhibit 27. Do you have that before you?

A.    Yes.

(Exhibit 29, marked)

Q.    (By Mr. Roberts) And I brought with me a document that I intended to mark and I've now marked as Exhibit 29, which is the same document, only an earlier iteration, right?

MR. ELLIS:   Do you have a copy of 29 for me? Thank you.

A.    It appears to be a copy of a similar document. Some of the numbers appear to be a little different.

Q.    We'll get into that in a second. But you would agree with me it's --

A.    It's a copy of the Jefferson-Pilot monthly inventory report.

Q.    That's how you refer to it, the monthly inventory report?

A.    Yes.

---

Q.    And does DMS maintain a monthly inventory report and provide a monthly inventory report to all of its clients for whom it handles blocks of business?

A.    I don't know.

Q.    Are you mindful of this information being shared with clients other than Jefferson-Pilot?

A.    I am aware that this is sent to other clients.

Q.    This format?

A.    This format with their company title on the top.

Q.    No other company gets Jefferson-Pilot's information?

A.    That's correct.

Q.    Does it go to Employers Reinsurance?

A.    I do not believe so.

Q.    Whose responsibility is it to gather, compute, print, and send this information on a monthly basis?

A.    I have some of my staff complete the information that's input each month. This form is provided on a monthly basis, so this form that you provided me, Exhibit 29, would have been faxed to

---

them at the end of June or beginning of July.

Q.    Of 2003?

A.    Of 2003. So, depending on the month, I just keep adding additional information to this form. I don't save each month's form necessarily. I just keep adding new information to this form.

Q.    So it's a living document?

A.    Yes.

At the end of the year I do go back personally and audit, so to speak, to make sure the numbers are correct. That, I assume, is why those -- this document was done in June and the Exhibit 27 is somewhat different.

Q.    Some of the numbers in the first six months of June 2003 on Exhibit 29 are not materially but slightly different --

A.    Slightly different.

Q.    -- than Exhibit 27?

A.    Yes.

Q.    There might be entries that are one or two or three off?

A.    Yes.

Q.    And that type of discrepancy might result from annual audits or reviews that you spot check?

---

A.    Periodically I would go back into -- the claim system has an area where I can go back and, instead of receiving 25 new notices I realized that there were 27, sometimes information is input at different times, that may cause a change.

Q.    Are there quarterly reports provided to Jefferson-Pilot?

A.    This is the report that's provided on a monthly basis. It's provided every month.

Q.    Are there any quarterly reports that are provided to Jefferson-Pilot?

A.    Other than this document, no.

Q.    Well, this is provided monthly. Are there quarterly reports?

A.    This is provided monthly. I'm not aware of any quarterly reports.

Q.    Are you mindful that the Claim Assessment Agreement requires that there be quarterly reports and that Ms. Lofton testified last week that she gets quarterly reports?

A.    I don't send this document to Ms. Lofton. I'm not aware of the specifics of the Claim Assessment Agreement. My understanding is I was to provide this information to Jefferson-Pilot on a

1  monthly basis.
2     Q.   Let's talk about the first four months of
3  2004 on Exhibit 27.
4     A.   Okay.
5     Q.   "Active Claims" means open claims that DMS
6  is administering that month?
7     A.   It would be an open or pending claim.
8     Q.   What does "New Notice" mean?
9     A.   That is a claim that we receive from
10  Jefferson-Pilot. It would be a new notice of a
11  disability claim.
12     Q.   And "Reinstatement"?
13     A.   If a claim had previously closed and the
14  insured wanted us to reopen the claim, they had
15  additional problems, that would be a reinstatement.
16     Q.   And "New Active Claims"?
17     A.   New Active Claim would mean a claim sent by
18  Jefferson-Pilot to us for management where they're
19  already actively receiving disability benefits or
20  it's impending for some period of time.
21     Q.   "Advanced Pay" in the "Closed Claims"
22  section, we discussed that?
23     A.   We discussed that previously.
24     Q.   "Death"?

1     A.   An insured dies.
2     Q.   "Denied"?
3     A.   Denied means under the terms of their
4  policy they're not eligible for benefits for that
5  claim.
6     Q.   Are those subject to potential
7  reinstatement?
8     A.   Usually a reinstatement would be only a
9  reinstatement if there was a payment made on that
10  claim, but I guess there could be a circumstance
11  where their claim was denied, they sent in additional
12  information and it was reconsidered and subsequently
13  paid. I guess that's a possibility.
14     Q.   What about "Max Paid"?
15     A.   They received the maximum benefits
16  allowable for their claim. Say they had a two-year
17  benefit period, they received benefits for 24 months,
18  the claim is closed and we would have to determine
19  whether or not they were eligible for ongoing waiver
20  of premium.
21     Q.   So in the year 2004, there were four
22  instances of that type of scenario in the month of
23  February but otherwise no others in the other first
24  four months of 2004?

1     A.   That's correct.
2     Q.   "No POL, Document needed to evaluate
3  benefit eligibility not submitted"?
4     A.   POL stands for Proof of Loss. Most likely
5  they didn't send in claim forms. They filed a notice
6  of claim, said "I hurt my back," but never sent in a
7  claim form.
8     Q.   So is that a subset of Active Claims or New
9  Notice or New Active Claims?
10     A.   It would be on a New Notice, most likely.
11  It could be a circumstance where a person has been on
12  Claim No, and we've requested information such as
13  ongoing continuance of disability forms and they just
14  never send it in.
15     Q.   So you put them on No POL?
16     A.   It could be that.
17     Q.   Is that different than Withdrawn?
18     A.   Withdrawn would be a new notice and they
19  contacted us and said "I've decided not to pursue my
20  claim. Withdraw my claim."
21     Q.   The definition section says Withdraw means
22  "Claim closed due to voluntary non-submission of
23  proof." So that's an actual affirmative "I don't
24  want to present a claim anymore because I don't want

1  to give you the proof"?
2     A.   That's correct.
3     Q.   Versus No POL, which means in DMS's
4  judgment there was not sufficient submission of proof
5  of loss by the insured?
6     A.   That's correct. Or they never called us
7  and said, "Yes, I'd like to withdraw my claim."
8     Q.   What does "Recovered" mean?
9     A.   They, in most cases, have returned to work.
10  Their condition has improved which has allowed them
11  to go back and resume their job.
12     Q.   And "Rescinded"?
13     A.   Rescinded would be a claim that was filed
14  in the contestable period and through referral to
15  Jefferson-Pilot they've indicated that they would not
16  have issued the policy had they been aware of certain
17  information. Jefferson-Pilot refunds the premiums
18  and the contract is declared null and void.
19     Q.   So those are the claims that are contested
20  during the contestability stage?
21     A.   If the claim was in the contestable period
22  and we determined that there was inaccurate
23  information provided on the application we would
24  recommend a recision that's processed by

Jefferson-Pilot.

1    Q.   Can you have a recision outside the
2    contestability stage?
3    A.   I'm not sure what you mean by
4    contestability stage.
5    Q.   Well, isn't it -- generally there's a
6    two-year contestability period in the policies?
7    A.   There's a two-year contestable period.
8    Some of the Jefferson-Pilot policies have what's
9    called tolling language, which means they exclude if
10   a person becomes disabled within that first two
11   years, the contestability period continues to toll
12   because the period of disability is not counted
13   towards that first two years.
14   Q.   What are "Settlements"?
15   A.   Settlement is either a claim or policy
16   settlement where we reach a compromise with the
17   insured, and it may be a circumstance where the claim
18   is over, they continue keeping their policy and it's
19   returned to a premium paying basis, or a policy
20   settlement which in exchange for a sum of money their
21   policy is canceled.
22   Q.   Is there a further breakdown of Settlements
23   into those two categories somewhere?

1    A.   No.
2    Q.   Is there a report of litigation matters
3    that's prepared for Jefferson-Pilot?
4    A.   No.
5    Q.   That you're aware of?
6    A.   Not that I'm aware of.
7        (Exhibit 32, marked)
8    Q.   (By Mr. Roberts)  Marked as Exhibit 32 are
9    some more of these performance reviews I'd like to go
10   over with you.
11       MR. ROBERTS:  Let's switch tapes.
12       THE VIDEOGRAPHER:  Going off record
13   at 1:43 p.m.
14       (Off the record)
15       THE VIDEOGRAPHER:  Back on record at
16   1:45 p.m.
17       MR. ELLIS:  With regard to Exhibit
18   32 I'm making the same objection, that subject
19   to a protective order in a prior case these
20   are parties, people that are not involved in
21   this particular case in any way and that I
22   will object to any questions concerning these
23   documents and object to the documents.
24       MR. ROBERTS:  It's an inaccurate

1    statement that these documents are subject to
2    a protective order in a prior case.
3    Q.   (By Mr. Roberts)  Mr. Ditmar, the second
4    page, DMS 017, this is Mr. Midghall's performance
5    review of a gentleman named Lance Faniel, and
6    approximately halfway down this long paragraph
7    there's a sentence that starts in the middle of the
8    page, "Since" -- do you see that?
9    A.   "Since this agreement"?
10   Q.   Yes.  " -- I have had a few strategy
11   meetings with Lance."
12       Have you ever discussed with Mr. Midghall
13   the conduct of strategy meetings with subordinates on
14   claims?
15   A.   No, I have not.
16   Q.   I want you to skip several documents to DMS
17   055.  I think they're in numerical order.  Do you
18   know Cheryl Blomgren?
19   A.   I believe she's a director in the Boston
20   office.
21   Q.   Which is where the Massachusetts Casualty
22   business is?
23   A.   Yes.
24   Q.   And John Graff works on that business?

1    A.   I believe so.
2    Q.   This document purports to be his
3    performance review in the year 2002, and specifically
4    at page 2 do you see where the heading says "Goals"?
5    A.   Yes.
6    Q.   Right above that paragraph, the last
7    sentence of that paragraph says "Members of the claim
8    department have asked for my opinion on different
9    claim situations and I have discussed strategy with
10   them when appropriate."
11       Is that a common experience at DMS where
12   representatives or claim reps among themselves or
13   with their superiors discuss strategy on particular
14   claims?
15   A.   I don't know what she means by the term
16   "strategy."  Claims people do discuss claim
17   situations or claims with each other and/or managers.
18   I don't know what they mean by the term "strategy,"
19   necessarily.
20   Q.   I think that's Mr. Graff's statement there
21   in his Accomplishments section.
22   A.   Okay.
23   Q.   Do you fill out the same type of
24   performance review form?

**Page 109**

1   A.  For my people?

2   Q.  Yes.

3   A.  Yes.

4   Q.  And so you recognize this as a DMS

5  performance review form?

6   A.  Yes.

7   Q.  In the third page of his review there,

8  0056, the last paragraph, the end of the fourth line

9  it says -- and this purportedly is Cheryl Blomgren's

10  supervisor saying, "He knows when to move the claim

11  to the next level for review or strategy."

12       Have you ever had a discussion with

13  Ms. Blomgren where she talks about her expectation

14  that the claims folks beneath her move their claims

15  to a strategy level?

16   A.  No, I have not.

17   Q.  0058, the second page of Mr. Graff's 2001

18  review, and in the middle of the page there's a

19  paragraph that has the heading "Goals."  The fourth

20  line he expresses the interest that he, quote, "Wants

21  to become even more familiar with the claim

22  philosophy."

23       Is there a claim philosophy at DMS other

24  than we make every effort to in good faith fairly,

**Page 110**

1  fully, and accurately administer claims?

2   A.  I believe I had indicated before that the

3  only philosophy I'm aware of in respect to claims is

4  that we handle claims fairly, equitably and try to

5  make the correct decisions.

6   Q.  Can you turn to 0064.  Do you know who Jeff

7  Champagne is?

8   A.  Yes.

9   Q.  In his Accomplishments section which starts

10  on the first page, 0064, then carries over to 0065, I

11  want to concentrate on 0065 briefly, if we could.

12   A.  Okay.

13   Q.  The second page, the first paragraph starts

14  with "Additionally," the next paragraph starts

15  "In-house?"

16   A.  Yes.

17   Q.  The second paragraph says "In-house

18  training conducted by myself included discussions on

19  file assessment and strategy, phone calls on

20  difficult cases and complicated issues, and

21  conference calls on resolution cases."

22       Does Mr. Champagne hold a similar position

23  in the Boston office that you hold here in

24  Springfield, Massachusetts?

**Page 111**

1   A.  Somewhat.

2   Q.  You both are responsible for a block of

3  business?

4   A.  Yes.

5   Q.  Do you conduct in-house training on file

6  assessment and strategy for your folks?

7   A.  I train my people on how to administer

8  claims periodically through working with them on a

9  one-on-one basis.

10   Q.  Have you ever heard Mr. Champagne use the

11  term "resolution cases"?

12   A.  I'm not sure what he means by the term

13  "resolution cases."

14   Q.  Have you ever heard him use that phrase?

15   A.  No, I have not.

16   Q.  Can you turn to DMS 0073.  And this

17  purports to be a review performed by Mr. Midghall of

18  a gentleman named Rick Turek.  And the last line of

19  this first page, 0073, recites a goal of, quote,

20  "Developing better strategies when attempting to

21  resolve" and then carried over to the next page,

22  0074, "claim issues."

23       Are you mindful of other co-workers at DMS

24  having goals of developing strategies when attempting

**Page 112**

1  to resolve claim issues?

2   A.  I'm not aware of other individuals' goals,

3  other than the individuals that work with myself.

4       MR. ROBERTS:  Okay, Bill, why don't

5  you make your call now.  Do you want this on

6  or off the record?

7       MR. ELLIS:  Doesn't matter to me.

8       THE VIDEOGRAPHER:  Going off the

9  record at 1:54 p.m.

10       (A recess was taken)

11       THE VIDEOGRAPHER:  Back on record at

12  2:12 p.m.

13   Q.  (By Mr. Roberts) When we went off record,

14  Mr. Ditmar -- we're back on record and you're still

15  under oath.  You understand that?

16   A.  Yes.

17   Q.  We were talking about the persons who you

18  supervised and who supervised you, I believe.

19  Actually, we did that a lot earlier, I apologize.  We

20  just finished Exhibit 32.

21       Do you ever speak with the legal staff at

22  DMS about any substantive matters that you're dealing

23  with?

24   A.  If I have a question I may speak with them.

Q. I'm not talking about litigation issues, like today you're in a deposition and DMS' in-house legal counsel is here. I'm talking about just the day-to-day operations of what you do. Do you sometimes come upon a situation that requires you seek legal assistance?

A. On occasion, yes.

Q. Do you know how many lawyers DMS has in-house?

A. I believe there's four in Springfield and two or three in Boston.

Q. Are those lawyers there at the disposal of the claims persons to dialogue with and answer questions for, or are they there to handle senior manager corporate issues, securities issues, or other issues unrelated to the daily functioning of DMS?

A. It's my understanding they handle claims issues as well as non-claims issues for the company.

Q. Are you mindful of any lawyers that don't handle claims issues for the company's employees that are dealing with those issues?

A. Not that I'm aware of.

Q. Are certain lawyers assigned to certain blocks of business?

A. Certain lawyers deal with certain blocks of business at different times, yes.

Q. Since January of 2000 do you know what lawyer may have been assigned primary responsibility for the Jefferson-Pilot block of business?

A. I don't recall the date. At a certain time Mr. Formus has been working with the Jefferson-Pilot block of business.

Q. Are you mindful of anyone else having primary responsibility for that block of business?

A. I don't know that that's his primary responsibility.

Q. Not his primary responsibility, but on behalf of the claims reps that administer the block of business for Jefferson-Pilot, has there at any point in time been someone other than Mr. Formus who's been the go-to person in the legal department?

A. At Disability Management Services, not that I'm aware of.

Q. You had mentioned earlier that there's certain training modules, do you recall that?

A. Yes.

Q. And you said there was, I don't know, ten or twelve or fifteen, whatever your testimony was, I

115

can't recall, but then you listed for me a couple.

A. Yes.

Q. And one of those training modules had to do with just disability policies generally, I took it?

A. Yes.

Q. Who provides the training on that topic?

A. I don't recall.

Q. Is there some person in the company or is it just every manager's responsible for giving that training to whoever becomes their subordinate?

A. The training program was designed when they hire a new person to the company. I don't recall the date it was started. I believe it was in 2000 or 2001 when this training program began. I don't know who runs that certain module.

Q. Do you know if there's any documents that are provided to the new person going through those training modules?

A. I don't believe there are any documents provided to the people being trained.

Q. Why is that?

A. I don't know, it's just more of a discussion basis.

Q. In the disability policy module, do the new

employees, are they trained in understanding the legal effect of ambiguities in insurance policies?

A. I don't know. I have not gone through the training program, nor was I present. It is my understanding there is a module that deals with basic information of a disability insurance policy. I don't know the specifics to that.

Q. Do you have an understanding of how courts generally interpret ambiguities in insurance policies?

MR. ELLIS: Objection.

A. Not necessarily.

Q. Have you ever had a discussion with anyone about how ambiguities in insurance policies are interpreted by the law or courts?

A. Not that I can recall.

Q. Have you ever had a discussion about the interpretation of ambiguities in insurance policies?

A. Not that I can recall.

Q. You've given five or six depositions in matters relating to Jefferson-Pilot, right?

A. I don't recall the exact number for Jefferson-Pilot.

Q. Does it sound about right?

**Page 117**

02.19.33  1     A.   It may be.  It may be more.

02.19.36  2     Q.   Was there a Calvanese claimant that you

      3   testified in?

02.19.40  4     A.   I believe I was deposed in the Calvanese

      5   case.

02.19.44  6     Q.   How about King?

02.19.45  7     A.   Yes.

02.19.46  8     Q.   And there's a name I can't pronounce,

      9   P-S-T-E-R-F-I --

02.19.50 10     A.   Sefterlis (phonetic).

02.19.51 11     Q.   How do you spell that?

02.20.00 12     A.   I don't know.  I don't know if I was

     13   deposed in that one.

02.20.00 14     Q.   Any others that you can think of?

02.20.10 15     A.   Not that I can recall right now.

02.20.15 16     Q.   If I gave you a copy of a transcript from

     17   your King deposition, would you be able to recognize

     18   it?

02.20.23 19     A.   I may.

02.20.27 20     Q.   When did you give testimony in the King

     21   case?

02.20.31 22     A.   I don't recall when that was.  The fall of

     23   2003, summer of 2003.

02.20.39 24     Q.   Do you recall that the King case involved a

**Page 118**

      1   Jefferson-Pilot disability insurance policy?

02.20.44  2     A.   Yes, I do.

02.20.47  3     Q.   Do you recall that it also involved, at

      4   least as part of an issue, his entitlement to

      5   benefits under the residual disability rider?

02.20.57  6     A.   Yes, I do.

02.20.58  7     Q.   And do you recall that it involved not only

      8   his entitlement to benefits under the residual

      9   disability benefits rider, but the Social Security

     10   supplement rider as well?

02.21.11 11     A.   I believe that was included in his policy.

02.21.12 12     Q.   And are you mindful that the company, let's

     13   say it's Jefferson-Pilot for now, was asserting that

     14   it had mistakenly overpaid Mr. King the Social

     15   Security supplement benefit while he was on residual

     16   disability?

02.21.15 17     A.   I believe in that claim we determined that

     18   Mr. King had provided inaccurate information and was

     19   in fact not entitled to any benefits that were paid

     20   throughout his claim.

02.21.41 21     Q.   Are you saying it wasn't an issue in the

     22   lawsuit that there was an overpayment of the Social

     23   Security disability benefits rider during the period

     24   when he was on residual disability?

**Page 119**

02.21.58  1     A.   I believe it was an overpayment of all the

      2   benefits and some portion of that may have been the

      3   Social Security aspect.

02.22.03  4       (Exhibit 33, marked)

02.22.05  5     Q.   (By Mr. Roberts) I'm going to hand you

      6   what I've marked as Exhibit 33, which is an affidavit

      7   you've prepared.

02.22.13  8       MR. ELLIS:  Excuse me.  Again, I'm

      9     going to object.  My understanding is that

     10     this information in the King case may be

     11     subject to a confidentiality order.

02.22.26 12       MR. ROBERTS:  For the record, I know

     13     of no confidentiality order, protective order

     14     or otherwise regarding any documents relating

     15     to the King case.

02.22.14 16     Q.   (By Mr. Roberts) Sir, is this an affidavit

     17   that you executed on or about March 19th of 2003?

02.22.52 18     A.   I don't see a date.  I see my signature.

     19   I'm sorry, yes, March 19.

02.22.57 20     Q.   So just under two months ago you executed

     21   this affidavit?

02.23.00 22     A.   2003.  It would have been a year --

02.23.02 23       MR. ELLIS:  Fourteen months ago.

02.23.05 24     A.   A year ago.

**Page 120**

02.23.06  1     Q.   I'm sorry, just over a year ago?

02.23.07  2     A.   Yes.

02.23.09  3     Q.   Reading paragraph 5 of your affidavit, you

      4   have a big calculation there.  Do you see that

      5   multifaceted calculation in the sum of 21,420?

02.23.28  6     A.   Yes.

02.23.30  7     Q.   Prior to the sentence that leads into that

      8   calculation there's a sentence that says, "The

      9   resulting overpayment is $21,420"?

02.23.10 10     A.   Yes.

02.23.16 11     Q.   Does that concern an overpayment of Social

     12   Security supplement benefits under the Social

     13   Security supplement rider during a period of time

     14   that Mr. King was claiming to be residually disabled?

02.23.36 15     A.   Again, I believe it includes all the

     16   benefits, whether it was total disability benefits,

     17   base policy benefits, residual benefits, Social

     18   Security benefits.  Everything was overpaid on the

     19   claim.

02.24.00 20     Q.   Have you been involved in any other

     21   situations where a Jefferson-Pilot policyholder was

     22   on residual disability and receiving a COLA

     23   adjustment that DMS determined to be erroneous?

02.24.26 24     A.   Not that I'm aware of.