IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **CHRISTOPHER L. KEARNEY,** | ) : | CASE NO. C-1-02-479 |
| Plaintiff | ) : | Judge Barrett |
| vs. | ) : | |
| **JEFFERSON PILOT LIFE INSURANCE COMPANY, et. al.,** | ) : ) | |
| Defendants. | : | |

**CHRISTOPHER KEARNEY'S MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION IN LIMINE**[1]

This Court should deny each of defendants' requests to conceal relevant information from the jury.

**1.  Defendants' Wealth and Involvement of Lincoln Financial, Employers Reinsurance, General Electric, and Zurich Financial.**

Outside the evidence and argument which is appropriate for punitive damages, Mr. Kearney has no intention of detailing the defendants' wealth during the course of the trial. Accordingly, to that extent, Mr. Kearney does not oppose defendants' Motion In Limine. However, defendants additionally request that "all references ... to ... General Electric, Zurich Financial, Lincoln Financial, and Employers Reinsurance ... be excluded from trial." (*Motion p. 5*).  This request is improper.

First, the defendant who initiated this action, Jefferson-Pilot, is now known as Lincoln Financial.  Accordingly, defendants' request that the Court order Mr. Kearney to not refer to the defendant by its name ~ Lincoln Financial ~ is absurd and should be denied.

---

[1]   Due to a technically induced inability to get on the internet last evening, plaintiff is filing this response to defendants September 6 motion this morning, September 11, 2007.

1

Second, Employers Reinsurance Corporation (now known as Employers Reassurance Corporation ~ "ERC"), a subsidiary of General Electric, is the re-insurer on Mr. Kearney's Policies. It is undisputed that ERC finances 80%+ of the legal expenses and costs of this action [which is why Attorney Johnson's December 21, 2001, "strip" letter was written to Attorney William Dempsey of ERC, not Jefferson Pilot]. More, ERC has 80%+ of the liability to Mr. Kearney under his disability policies.

Those material points aside, ERC is a central "conspirator" under Mr. Kearney's civil conspiracy, bad faith, and invasion of privacy claims. As identified through the summary judgment briefing and evidence: (i) since 1994 ERC has been "anticipating litigation" against Kearney; (ii) ERC directed JP to hire DMS in 1997 to specifically examine Kearney's lifetime claim: (iii) ERC provided DMS and JP with a list of actions to take against Kearney; and (iv) ERC, through Mr. Dempsey [who possess a 3600+ page file on Kearney][2], has been examining all information regarding Kearney and his claim and directing Mills, Hughes, DMS, and others on actions to take on both Mr. Kearney's claim and the litigation.

Because ERC has been an active, central conspirator (even though not named as a defendant), there is no merit whatsoever to defendants' request that the jury decide this conspiracy case without any knowledge of ERC's involvement.

Third, there is simply no merit and no logic to defendants' contention that they will be "unfairly prejudiced" if the jury knows that ERC is a reinsurer and Jefferson Pilot was acquired and is now Lincoln Financial.

Fourth, the involvement of General Electric (as the parent of ERC) and Zurich Financial Services (as the largest owner of DMS ~ 40%) is material at the punitive damage

---

[2]   An additional several hundred ERC documents were withheld and documented in a 97 page Privilege Log.

phase of the case. And to that extent, defendants' motion in limine regarding General Electric and Zurich Financial should be denied.

2.   **Reinsurance & ERC.**

Defendants argue that "evidence [of ERC's involvement has] no tendency in reason, either directly or by reasonable inference, of making any issue in this case more likely than not." This argument is meritless.

This is a conspiracy case. ERC is a central conspirator.[3]

---

[3]    Because GE/ERAC holds more than 80% of the liability, GE/ERAC has monitored, if not directed, the 14 year administration of both the ongoing Kearney claim and this litigation. (*Dempsey at 6, 9, 19, 52-53, 59-60, and 100-104*). According to its privilege log, GE/ERAC became involved in Kearney's claim in 1994. (*Dempsey at 37, 71; Exh. 1*). And GE/ERAC has secretly been actively involved in the Kearney claim and litigation in "each month" for several years. (*Dempsey at 19*-20). As the claims file and the Privilege Log displays, emails, letters, strategy decisions, pleadings, and legal memoranda cannot be transmitted or concluded without input, advice, counsel, and direction from GE/ERAC. (*Dempsey 6, 9, 19-20, 52-53, 59-60, and 100-104; Exh. 1*). And GE/ERAC receives for review, medical records, investigative records, surveillance, tax returns, divorce records, pleadings, correspondence, deposition and hearing transcripts, and all other documents generated regarding both the Kearney litigation and the Kearney claim. (*Dempsey at 50-60*). GE/ERAC even reviews drafts of correspondence, legal memoranda, and motions. (*Dempsey at 51-54*). And GE/ERAC continues to "analyze" the ongoing Kearney claim. (*Dempsey at 59-60, 100-104*). GE/ERAC's file on Kearney span 1990 (the Application file) to May 2007 (the most recent claim correspondence sent Kearney). (*Dempsey at 48-55, 81, 97-98, 104-105*). Dempsey concedes that the recent litigation effort to obtain 14 years of credit card information on Kearney was for the true purpose of analyzing his ongoing claim – outside the litigation. (*Dempsey at 101-104*). In February 1994, GE/ERAC began creating documents with a view to litigation against Kearney. (*Dempsey at 71-72; Exh. 1*). GE/ERAC generated additional "work product" documents in anticipation of litigation against Kearney in February 1995, March 1995, November 1996, February 1997, September 1997, March 1998, May 1998, and in 2001. (*Dempsey at 71-77; Newkirk at 18-21; Exh. 2*). By 1997, despite Kearney's incontestable disability, GE/ERAC became so engrossed in finding a way to terminate Kearney's $4,000,000 claim – and recapturing its $0.5 Million reserve – that GE/ERAC specifically identified Kearney's claim for review. (*Dempsey at 24-25, 97; Newkirk at 10, 22-25*). GE/ERAC admits that the reserves were a factor in deciding to specifically identify claims for review. (*Dempsey at 28-29*). With their superior in tow, Attorneys Dempsey and Newkirk boarded a plane to North Carolina to review Kearney's claim file. (*Dempsey at 8; Newkirk at 10, 22-25*). This visit and file review resulted in a GE/ERAC "to-do" list on Kearney's claim, which was copied to DMS. (*Dempsey at 47-48, 72-73, 75; Newkirk at 16*). From its review, GE/ERAC determined that the policy would pay benefits to Kearney for life. (*Dempsey at 44-45; Newkirk at 14-15*). In July 1997, at GE/ERAC's instruction, Kearney's file – along with 2 others from JP – was sent to DMS. (*Dempsey at 92-94*). The accompanying letter to DMS reads: "These are the cases that you (DMS) are going to investigate for us to see what can be done to either settle these in an equitable manner to both (GE/ERAC) and to Jefferson-Pilot, or to give us further advice on where to proceed." (*Dempsey at 92-93*). And by May 1998, JP's existing trial counsel (Attorney Ellis) was corresponding with GE/ERAC in-house lawyers regarding "Kearney claims handling." (*Dempsey at 77-78*). This is undoubtedly because GE/ERAC had noted in 1997 that the "jurisdiction" relevant in the Kearney claim was Ohio. (*Dempsey at 47*). By September 2001, the Insurer was unable to dispense with Kearney's claim in any legitimate fashion. Therefore, GE/ERAC authorized DMS to meet with Kearney's counsel in Miami, Florida to present a settlement offer. (*Dempsey at 87*). **Prior** to that trip – and, therefore, prior to Mills' purported "Cuban Coffeehouse Revelation" – Dempsey authorized Mills to present Kearney with a settlement offer. (*Dempsey*

3

As indicated above, evidence that, as reinsurer, ERC has 80%+ of the liability, directed JP to retain DMS, has overtly "anticipated litigation" against Kearney since 1994, and has directed much of the claim and litigation activity for well over a decade is relevant to the conspiracy, bad faith, and invasion of privacy claims.

Defendants' assertion that "there is no evidence that any reinsurance relationship … had any bearing whatsoever on the handling of Kearney's claim in this case" is a complete fiction. It is undisputed that ERC audited Kearney's file at JP in 1996/1997 and, following that exercise, directed JP to send Kearney's file to DMS and created to-do-lists for JP and DMS to undertake on Kearney's claim. Dempsey himself admits that he has been involved in the decision-making and routinely reviews medical records and other records for the claim evaluation. Defendants' statement of what the evidence shows is not genuine.

Finally, without any logical analysis or support, defendants' nakedly argue that they will be unfairly prejudiced if the jury knows about ERC. Why? What prejudice results? It is simply a fact of this case that the reinsurer has most of the liability and as a conspirator with JP and DMS called all or most of the shots with regard to Kearney's claim since at least 1996 (Attorney Johnson's December 21, 2001, letter to Attorney Dempsey at ERC reveals that ERC even directed the filing of this action).

Allowing the Jury to know of ERC's involvement as a conspirator will simply put the jury in position to decide this case on the facts. There is no support for the argument that knowledge of ERC will "unfairly prejudice" ERC's co-conspirators, JP and DMS. And there is simply no merit to defendants' claim that the jury will be misled or that time would be

---

*at 87-90*). This offer equaled approximately 5% of the liability on the $4,000,000 Policies and less than 50% of the combined JP - GE/ERAC reserves value from 1997.

wasted as the result of defendants' need to call witnesses to explain the purpose for reinsurance (an exercise that presumably takes 10 minutes, if that).

3. **Evidence of The October 2001 Miami, Florida, Meeting.**

Defendants wish to conceal their October 2001 low-ball contract proposal and threat to cease paying contract benefits to Mr. Kearney. To achieve their objective, defendants improperly invoke Fed. R. Evid. 408. Rule 408, however, does not apply because evidence of the October 2001 contract proposal is not offered "to prove liability for [a contract] ... or (the) amount of a [contract] claim that was disputed as to validity or amount."

Rule 408 was amended effective December 1, 2006. It now provides as follows:

> **Rule 408. Compromise and Offers to Compromise.** (a) Prohibited uses.--Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction: (1) furnishing or offering or promising to furnish -- or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority. (b) Permitted uses.--This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

What occurred at the October 2001 meeting in Miami, Florida, is *de facto* evidence of an unlawful conspiracy and bad faith handling of Mr. Kearney's claim. Two officers of DMS plotted their visit with Dempsey of ERC. They "sprung" on Kearney's counsel the revelation that they would begin reading the Policies differently going forward (after 8 years of benefit payments to Kearney). They claimed that Kearney had been overpaid, and they

5

threatened that unless Kearney accepted $280,000[4] on the contract then and there, his benefits would be cut in half beginning in November 2001.

Evidence of this critically significant event is admissible because the evidence is not offered to "prove contract liability" or the "amount of [a contract] claim that was disputed as to validity or amount." The 2001 Miami Meeting offer exclusively concerned the settlement of Kearney's claim to contract benefits. Contract benefits are not an issue at trial. That issue has been resolved on summary judgment.

As Rule 408(B) expressly sets out, there are occasions where settlement exchanges are admissible. Moreover, the Comments to the 2006 amendment to Rule 408 are directly on point. The 2006 comments state:

> "Rule 408 has been amended to settle some questions in the courts about the scope of the Rule, and to make it easier to read. The amendment retains the language of the original rule that bars compromise evidence only when offered as evidence of the 'validity,' 'invalidity,' or 'amount' of the disputed claim. The intent is to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim. *See, e.g.,Athey v. Farmers Ins. Exchange* 234 F 3d 357 (8th cir. 2000) (evidence of settlement offer by insurer was properly admitted to prove insurer's bad faith)."

Ironically, therefore, the Comments to the 2006 Amendment to Rule 408 directly and explicitly answer the question now presented to this Court: in this "insurer bad faith suit," evidence of the October 2001 Miami, Florida, meeting may properly be admitted to prove defendants' bad faith and unlawful conspiracy ~ the precise purpose for Kearney's desire to share defendants' actions with this jury.

The Comments to the 2006 Amendment also provide that Rule 408 does not bar evidence of a settlement offer if not offered to prove the validity or amount of the

---

[4]   In this action, the defendants have offered sworn testimony setting the value of Kearney's policy at greater than $4,000,000.

6

underlying claim. *2006 Comments, citing*, <u>Cates v. Morgan Portable Bldg. Corp.</u>, 708 F.2d 683 (7th Cir. 1985).[5]  The 2006 Comments also highlight that threats made in settlement negotiations [like those made here to Kearney] are admissible, and Rule 408 is inapplicable when the claim is based upon a wrong that is committed during the course of settlement negotiations [as here]. *2006 Comments, citing,* <u>Uforma/Shelby Bus. Forms Inc. v. NLRB</u>, *111 F. 3d 184 (6th Cir. 1997).*

The ability of an insured to offer evidence of bad-faith, low-ball settlement offers in a bad faith case is well recognized in Ohio.[6]  In <u>Hoskins v. Aetna life Ins. Co.</u>, *6 Ohio st 3d 272, 275, 452 NE 2d 1315, 1319 (1983)* the Ohio Supreme Court stated that "The imposition of the duty of good faith upon the insurer is justified 'because of the relationship between the * * * [insurer and the insured] and the fact that in the insurance field the insured usually has no voice in the preparation of the insurance policy and because of the great disparity between the economic positions of the parties to a contract of insurance; and furthermore, at the time an insured party makes a claim he may be in dire financial straits and therefore <u>may be especially vulnerable to oppressive tactics by an insurer seeking a settlement or a release</u>."

Rule 408 only precludes evidence of settlement offers when that evidence is offered to prove liability for the disputed claim.  That is not the case here.  The trial of this matter has nothing to do with the liability for or amount of contract benefits payable to Kearney ~

---

[5]   Settlement offers are only inadmissible if offered to prove liability or damages. <u>Coakley & Williams Const. Inc., v. Structural Concrete Equipment, Inc.</u> *973 F. 2d 349 (4th Cir. 1992).*  Rule 408 does not apply when evidence is offered for purpose other than as proof of liability.  <u>Breuer Elec. Mfg. Co. v. Toronado Systems Of America Inc.</u> *687 F 2d 182 (7th Cir. 1982);* <u>In Re General Motors Corp Engine Interchange Litigation</u> *594 F 2d 1106 (7th Cir. 1979)* certiorari denied *100 S. Ct. 146, 444 U.S. 870, 62 L. Ed 2d 95*

[6]   *See, e.g., Ali v. Jefferson Insurance Co.,* 5 Ohio App.3d 105, 449 N.E.2d 495 (1982).

the exclusive focus of the October 2001 proposal.[7] That issue was resolved on summary judgment. This trial concerns bad faith, invasion of privacy, and conspiracy only. The Miami, Florida, meeting, therefore, is not subject to Rule 408. Lowball settlement offers are proper evidence of bad faith and evidence of the October 2001 Miami Meeting is admissible here.

### 4. **Kearney's Heart Attack.**

As defendants knew, less than three weeks before defendants demanded that Kearney travel 8 hours roundtrip and endure a 7 hour deposition on June 20, 2007, Kearney suffered a heart attack.[8] Moreover, Kearney reported this event to the insurer for its claim file. No reason exists to exclude this evidence from the trial.

### 5. **Privilege Logs / Discovery Issues.**

Kearney has no intention of offering evidence of discovery disputes. However, Kearney does intend to use the ERC Privilege Log as an exhibit. The Log is probative of the bad faith and conspiracy. According to the Log, ERC and fellow conspirators were "anticipating litigation" against Kearney as early as 1994 and repeatedly throughout the 1990s. The Log also shows that defendants' trial counsel in Ohio was contacted on the Kearney claim as early as 1998, 4 years before ERC ultimately authorized Attorney Johnson to file suit. Defendants admitted in Dempsey's deposition that the Log was authentic. It, therefore, is an important and critical piece of evidence over which there is no dispute or debate.

---

[7]    As defendants state at page 7 of their motion in limine "Kearney's disability status is not at issue in this action. Kearney already is receiving disability benefits." Those were the only matters at issue with the October 2001 meeting. Accordingly, evidence of the meeting can not be excluded.

[8]    Defendants' misrepresent their knowledge of Kearney's condition. Defendants write, "At his recent deposition, Kearney disclosed that he recently had a heart attack." In fact, defendants knew of Kearney's heart attack at least 10 days earlier and callously proceeded with the travel/deposition procedure nonetheless.

8

Second, since the evidence reveals that information requested of Kearney in the litigation (i.e., 14 years of credit card records) is being used by defendants for claim (not just litigation) purposes, Kearney does intend to share with the jury the full scope of defendants' requests, which he has had to comply with to maintain his benefits. These matters do impact the bad faith and invasion of privacy claims since they go far, far beyond any reasonable reading of the proof of loss required under the policies ~ especially for someone who has been indisputably disabled for 14 years.

6.     **The Wood & Lamping Conflict.**

The fact that the Wood & Lamping lawfirm has violated the Code Of Professional Responsibility by suing its former domestic relations client, Chris Kearney, is material, but not material to the issues at play in this suit.

However, in the summary judgment briefing (and, therefore, as expected will be the case at trial), the Wood & Lamping lawyers challenge the propriety of filings they made and affidavits they created in the 1994 Kearney domestic relations case. Accordingly, should defendants and their Wood & Lamping lawyers make an issue of Kearney's domestic relations proceedings at the trial of this case (which is expected on the basis of the summary judgment arguments they trotted out), then they open the door for whatever evidence that follows.

7.     **The Bonsall Speech.**

The 2001 speech of Robert Bonsall, President of DMS, is a critical piece of evidence. It details the purpose, manner, and scope of the conspiracy to handle Kearney's and other claims in bad faith. And the speech has been received into evidence in multiple other cases involving DMS (including, *Jay v. MCIC / DMS*, pending in the Court Of Appeals Of Ohio 5th District).

In his speech, Mr. Bonsall describes the experience of the disability industry from the 1980s through 2001.[9] Mr. Bonsall explains how and why companies like Jefferson Pilot stopped selling disability insurance in the mid 1990s. More importantly, Bonsall describes how that phenomena created an opportunity for the creation of his company, DMS, which as he explains focuses his efforts on "managing a policyholders expectations" and "managing claim outcomes." In fact, "managing claim outcomes" is the precise sales pitch that Bonsall gave JP when he was soliciting the opportunity to administer their claims.

Accordingly, the speech is probative of the establishment of a conspiracy. It is also probative of the bad faith of the conspirators. It also establishes the probability that the conspirators would invade a policyholder's privacy in order to "manage expectations" and "manage claim outcomes."

The speech by no means "puts the entire industry on trial." Rather, Bonsall's speech is what it is – a roadmap of precisely why DMS was created and why they engage in the behavior they do. At issue on the bad faith claim is the "handling" of the claim by the defendant conspirators. DMS' president's speech about the philosophy of his company's handling of policyholder's claims is absolutely and directly relevant to the claims being tried in this case.

---

[9]   According to Bonsall, insurance companies have attempted to fix their problem policies by "***investing*** in their claim management practices." Bonsall, explained, "year by year, the financial economics of disabilities improved." (*Bonsall Exh. 40*). After being "unprofitable for quite a few years," the disability industry came to enjoy double digit growth in profit. *Id*. And Bonsall agreed that "given where disability insurance had been ... (its financial turnaround) is nothing short of miraculous." *Id*. Bonsall testified that it is "particularly important to DMS" to "manage expectations of policyholders." *Id*. Bonsall explained that "claims management ... (is a) critical component of managing a block of disability business (and) successful claim management involves ... litigation." *Id*. According to Bonsall, "managing expectations ... is a significant issue and topic for (him) because ... what (he's) really talking about is ***managing claim outcomes***. To do that effectively, (DMS) has to effectively ***manage expectations of claimants***," like Kearney. *Id*. And the DMS 1999 proposal to JP echoes this philosophy. According to DMS they were the right firm to outsource claim files to because they "manage claim outcomes."

10

Defendants' reliance on <u>Penton Media Inc. v. Affiliated FM Insurance Co.</u>, *2007 WL 2332323 (6th Cir. Aug. 2007)* is misplaced for several reasons. First, <u>Penton Media</u> was a summary judgment case. It does <u>not</u> hold that evidence of an insurer's business philosophy and business practices is inadmissible in the trial of a bad faith, invasion of privacy, and conspiracy case. Second, even though Mr. Kearney is not required to establish "intent" as an explicit element of his bad faith cause of action, he is not precluded from sharing DMS' business philosophy with the jury under Evid Rule 401, 402, and 406 as "relevant" evidence on the bad faith claim. Moreover, intent is in fact an element of Kearney's invasion of privacy and civil conspiracy claims.[10] Accordingly, even if "intent" needs to be an explicit element of a claim for relief before the Bonsall speech may be received into evidence (which plaintiff disputes), that threshold is met here.

Under Rule 401, Bonsall's 2001 speech, which details DMS' business philosophy and practice of "managing expectations" and "managing claim outcomes" is evidence which has a "tendency to make the existence of facts that are of consequence to the determination of the [bad faith] action more probable or less probable than without the evidence." Accordingly, in the jury's analysis of whether their was an unlawful conspiracy, an invasion of privacy, and bad faith handling of Kearney's claim, evidence of the DMS business philosophy as outlined by DMS' President is "relevant evidence" under Rule 401 and admissible under Rule 402.

The speech is also admissible under Evid. Rule 406 because it is evidence (i.e., "managing claim outcomes") of the "routine practice of an organization ... relevant to prove

---

[10] Restatement of the Law 2d, Torts (1965), Section 652(B), adopted in Ohio; <u>USX Corp. v. Penn Cent. Corp.</u> (2000), 137 Ohio App.3d 19, 26, 738 N.E.2d 13 (civil conspiracy is considered an intentional tort).

11

that the conduct of the … organization on a particular occasion was in conformity with the habit or routine practice."

Finally, consistent with his 2001 speech, the sales pitch Bonsall made to JP in 1999 included Bonsall's proclamation that DMS "manages claim outcomes." On that promise, DMS was retained and the conspiracy to "manage outcomes" was solidified. DMS has every opportunity to have Mr. Bonsall personally explain to the jury how it is proper to base a business on "managing claim outcomes." But defendants' argument that the speech is inadmissible because "intent" is not a discreet element of a bad faith claim in unavailing.

Moreover, even if defendants argument had merit on the bad faith claim (which it does not) intent is an express element of a conspiracy claim and, therefore, under defendants' logic the speech is admissible. The Bonsall Speech is relevant and critical to establishment of the civil conspiracy claim because to prove conspiracy, Kearney must prove that the defendants acted with "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Pickle v. Swinehart* 170 Ohio St. 441, 443, 166 NE 2d 227 (1960).

Accordingly, for all these reasons, the Court should reject defendants' meritless argument that the jury not hear from DMS' President.

### 8.     **The Miller Report.**

Kearney's insurance practices expert, Clint Miller, has been deposed by defendants and his report has been provided to defendants. Oddly, rather than filing a *Daubert* motion ~ because it would be unsuccessful, presumably ~ defendants' challenge the introduction of Kearney's expert testimony on the basis of relevance through a motion in limine. That procedure is not proper. Kearney's expert's analysis of the claims handling is relevant. He

has testified many times before and provided an exhaustive report of his analysis. The motion in limine to exclude expert testimony is improper and should be denied.

9.   **Evaluations Of Unnamed DMS Personnel.**

The DMS evaluations which are marked as an exhibit and redacted (so as to not disclose the names of the evaluated employees) reveal the manner in which DMS approaches claims and its business practices.[11] This information is relevant under Evid. Rule 401 since it has a "tendency to make the existence of facts that are of consequence to the determination of the action more probable or less probable than without the evidence."

Specifically, statements included in various redacted evaluations state clearly the business philosophy of DMS, which is to develop a strategy to harass a policyholder. Then at the appropriate time, a "resolution" strategy is executed. For this reason, the motion in limine as to the evaluations of unnamed DMS reps should be denied.

10.   **Training Evidence.**

Defendants next argue that the jury should not be told how DMS trains its reps. However, the training of DMS representatives is obviously "relevant evidence" which has a tendency to make the existence of facts of the conspiracy, bad faith, and invasion of privacy more probable or less probable than without the evidence. On the flip side of the coin, how could it be argued that such information could be unfairly prejudicial to defendants? What are they afraid of?

11.   **Other Claims.**

---

[11]   The evaluations of DMS employees show that they are evaluated on their ability to "build a case, develop the strategy and when appropriate execute resolution." (*Ditmar 70-74*). This includes "settlement strategies." (*Ditmar 107*-111). And DMS employees aspire to "become more familiar with the DMS claims settlement process," "claim philosophy," and "formulate and implement appropriate claim management strategies." (*Ditmar 84-86, 109*). This includes "advance pay and close opportunities." (*Id. at 93*). And DMS gives spot bonuses to its employees. (*Hughes 224*).

13

It is presumed that what defendants fear here is that the jury will learn that the very same strategies employed to harass Kearney were used by DMS in 2000 with a policyholder named Aubert King. The Aubert King evidence and additional statistical evidence regarding DMS' extraordinary ability to close claims, by way of very favorable settlements, is straightforward and admissible Rule 406 evidence of DMS' practices and routines.

In June 2000 ~ as was the case with Kearney 1 year later ~ William Hughes, a Vice president of DMS, got on a plane, traveled to Mississippi, met with Mr. King and/or his lawyer and advised that there had been a mistake in the manner in which JP and DMS had been paying Mr. King his residual disability benefits. Hughes demanded a refund of the overpayment or a settlement. King ultimately sued DMS. This evidence not only establishes a pattern and practice of bad faith harassment by DMS and Hughes but undercuts the disingenuous claim that Hughes and Mills discovered a new way to read the residual disability benefits under a JP Policy 10 minutes before the Miami meeting with Kearney's counsel.

Moreover, statistical evidence of the claims DMS has been able to close/settle since January 2000 is admissible under Rule 401 and 406. The statistics of closed claims is "relevant" evidence for the conspiracy, bad faith, and invasion of privacy claims. As DMS touted to JP when DMS solicited work from JP, DMS "manages claim outcomes." And DMS was specifically hired to do so. Since 2000, DMS has used its strategies to settle high dollar claims like Kearney's for a small percentage of the reserves on the claims. That way DMS turns liabilities on the books of JP and ERC into assets.

## Conclusion

For all of the foregoing reasons, the defendants' motion in limine should be denied in its entirety.

        Respectfully submitted,

        s/Michael A. Roberts
        Michael A. Roberts, Esq. (0047129)
        GRAYDON HEAD & RITCHEY LLP
        511 Walnut Street, Suite 1900
        Cincinnati, OH 45202
        (513) 629-2799
        (513) 651-3836 - fax
        mroberts@graydon.com

## **CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing has been filed electronically with the court and thereby served this 10th day of September, 2007, upon William R. Ellis, Wood & Lamping LLP, 600 Vine Street, Suite 2500, Cincinnati, OH 45202 and John E. Meagher, Esq., Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131.

        s/ Michael A. Roberts