1 of 25 DOCUMENTS


Analysis
As of: Sep 12, 2007

PENTON MEDIA, INC., Plaintiff-Appellant, v. AFFILIATED FM INSURANCE CO., Defendant-Appellee.

No. 06-4315

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

07a0587n.06; *2007 U.S. App. LEXIS 19669; 2007 FED App. 0587N (6th Cir.)*

August 15, 2007, Filed

**NOTICE:** NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED.

**PRIOR HISTORY:** [*1]
ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.
*Penton Media, Inc. v. Affiliated FM Ins. Co., 2006 U.S. Dist. LEXIS 64387 (N.D. Ohio, Aug. 28, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant insured appeals from the United States District Court for the Northern District of Ohio, challenging a grant of summary judgment in favor of appellee insurance company regarding the insured's breach of contract and bad faith claims.

**OVERVIEW:** The insured operated trade shows. The insurance company offered a policy which provided business interruption (BI) coverage for losses suffered by the insured due to direct physical loss or damage to certain locations, or when access to the locations was prohibited by order of civil authority. The insurance company also offered contingent business interruption (CBI) coverage, extending the BI coverage to loss resulting from direct physical loss or damage insured by the policy occurring at each supplier and customer locations. The insured was scheduled to hold a trade show in a state-run convention center. However, activities in that location were thrown into chaos by a terrorist attack. The center became a base of operations for disaster relief for the certain governmental entities. The center did not reopen until after the scheduled trade show dates, and only on a limited basis. The policy did not cover the insured's losses resulting from prohibition of access to the center. The CBI provision did not extend the BI endorsement to cover actual losses directly resulting from prohibition of access by order of civil authority occurring at each supplier and customer location.

**OUTCOME:** The grant of summary judgment was affirmed.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] A court of appeals reviews a district court's decision on a motion for summary judgment de novo. The court must view the facts and all of the inferences drawn therefrom in the light most favorable to the nonmoving party.

Case 1:02-cv-00479-MRB   Document 204-2   Filed 09/12/2007   Page 2 of 7

Page 2
2007 U.S. App. LEXIS 19669, *; 2007 FED App. 0587N (6th Cir.)

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN2] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Contracts Law > Breach > General Overview*
[HN3] In analyzing a state-law contract claim brought in federal court based on diversity jurisdiction, the federal court applies state law in accordance with the controlling decisions of the state supreme court. If the state supreme court has not yet addressed the issue presented, the federal court must predict how it would rule, by looking to all available data, including state appellate decisions.

*Contracts Law > Contract Interpretation > General Overview*
[HN4] Under Ohio law, common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. A writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole.

*Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms > Construction Against Insurers*
*Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms > Coverage Favored*
[HN5] In insurance contracts in particular, where provisions are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.

*Contracts Law > Contract Interpretation > General Overview*
[HN6] Where two clauses of a contract appear to be inconsistent, the specific clause prevails over the general.

*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN7] A court of appeals reviews the question of whether a district court acted prematurely by granting summary judgment before discovery was complete for abuse of discretion.

*Insurance Law > Bad Faith & Extracontractual Liability > Elements of Bad Faith*
*Insurance Law > Bad Faith & Extracontractual Liability > Payment Delays & Denials*
[HN8] Ohio law recognizes that bad faith in the adjustment of an insurance claim may exist without a valid claim for coverage; an insurer has a duty to act in good faith in the processing and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort irrespective of any liability arising from breach of contract.

*Insurance Law > Bad Faith & Extracontractual Liability > Settlement Obligations > Good Faith & Fair Dealing*
*Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > Payments*
[HN9] The existence of a duty of good faith and fair dealing between an insurer and an insured is based on the fiduciary duty imposed upon insurers. An insurer breaches the duty when it refuses to pay or settle a claim for an arbitrary or capricious reason. In executing the contract, the insurer's action must be predicated upon circumstances that furnish reasonable justification therefor.

*Insurance Law > Bad Faith & Extracontractual Liability > Payment Delays & Denials*
[HN10] An insurer must base its refusal to pay a claim upon circumstances that furnish reasonable justification therefor. However, intent is not and has never been an element of the reasonable justification standard. The insurer must have a reasonable basis for its decision and take reasonable steps in adjusting the claim; its subjective intentions are not relevant.

*Insurance Law > Bad Faith & Extracontractual Liability > Payment Delays & Denials*
[HN11] Performing a cursory investigation and ignoring information that would tend to support an insured's claim can constitute bad faith.

Case 1:02-cv-00479-MRB    Document 204-2    Filed 09/12/2007    Page 3 of 7

Page 3
2007 U.S. App. LEXIS 19669, *; 2007 FED App. 0587N (6th Cir.)

*Civil Procedure > Discovery > General Overview*
*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
[HN12] In reviewing a claim that a district court granted summary judgment without providing an adequate opportunity for discovery, a court of appeals examines a number of factors: (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN13] A grant of summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).*

**COUNSEL:** For PENTON MEDIA, INC., Plaintiff - Appellant: Brian F. Toohey, Matthew P. Silversten, Jones Day, Cleveland, OH.

For AFFILIATED FM INSURANCE COMPANY, Defendant - Appellee: Harold H. Reader, Ulmer & Berne, Cleveland, OH; Scott G. Johnson, Robins, Kaplan, Miller & Ciresi, Minneapolis, MN.

**JUDGES:** BEFORE: MARTIN and McKEAGUE, Circuit Judges, and GREER, District Judge. *

* Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

**OPINION BY:** McKEAGUE

**OPINION**

McKEAGUE, Circuit Judge. Appellant Penton Media, Inc. ("Penton") appeals the district court's grant of summary judgment in favor of Affiliated FM Insurance Co. ("FM") regarding Penton's breach of contract and bad faith claims. For the reasons set forth below, we affirm.

**I. BACKGROUND**

Penton is in the business of operating trade shows. FM is a seller of property insurance policies. In 2000, Penton contacted FM about securing property insurance for Penton's business operations. FM offered a policy which provided, among other things, business interruption ("BI") coverage for losses suffered by Penton due to "direct physical loss [*2] or damage" to "locations described in the declarations" section of the policy, or "when access" to those locations "is prohibited by order of civil authority." B.I. Endorsement at 1, 4. Penton sought to extend the BI coverage to locations at which it held trade shows, in addition to its offices. In response, FM offered "contingent business interruption coverage," extending the business interruption coverage to "loss . . . resulting from direct physical loss or damage insured by this policy occurring at each supplier and customer location(s)." Declarations at 4. Penton approved the contingent business interruption ("CBI") provision, which was placed in the policy's "declarations" section. Penton and FM signed a policy containing these provisions effective from August 7, 2001, to August 7, 2002.

Penton's largest annual show was the Internet World Fall show; in 2000, it produced over $26 million in revenue. Penton was scheduled to hold the "Internet World Fall 2001 Trade Show" in Manhattan's Javits Center, a state-run convention center, from October 1 to October 5. Penton's lease with the Javits Center provided that Penton would use, among other spaces, the Galleria, Exhibit Halls 1A--1C, [*3] and 3A--3B; the lease provided for a "move in period" starting on September 26, 2001, an "event period" starting on October 1, 2001, and a "move out period" ending October 7, 2001. However, activities in Manhattan were thrown into chaos by the terrorist attack on the World Trade Center buildings on September 11, 2001. Although the parties dispute the formalities involved, it is undisputed that in the days following September 11, the Javits Center became the base of operations for the disaster relief efforts of numerous volunteers and the Federal Emergency Management Agency ("FEMA"), the New York National Guard, the New York State Troopers, and officers of the New York City Police Department. The relief operations resulted in the occupation of various areas of the Javits Center, which did not reopen for purposes of its usual convention and trade show business until October 8, 2001, and then only on a limited basis.

Within a few days of the September 11 attack, a Javits Center employee informed Penton that it would not be able to occupy the facilities it had leased due to occupation by emergency management personnel. Accordingly, Penton released a public statement explaining that the [*4] Internet World Fall 2001 show would be postponed until December 2001, when it would occur concurrently with another Penton show. Penton's press release explained, "With each passing day the enormity of this tragedy grows, and we now believe that producing Internet World Fall 2001 in October is simply too soon.

Case 1:02-cv-00479-MRB    Document 204-2    Filed 09/12/2007    Page 4 of 7

Page 4
2007 U.S. App. LEXIS 19669, *; 2007 FED App. 0587N (6th Cir.)

As a nation and an industry, we still need time to grieve and heal." Press Release at 2.

On October 23, 2001, Penton filed a claim with FM seeking compensation for its losses due to the postponement of the Internet World Fall 2001 show. On April 4, 2003, FM denied the claim. Penton then filed suit in state court in Ohio, claiming that its losses were covered by the policy's civil authority provisions and that FM's denial of coverage was a breach of the contract, and that FM had acted in bad faith by failing properly to investigate the claim. FM removed the action to the United States District Court for the Northern District of Ohio. On FM's motion, the district court bifurcated the claims and allowed discovery only on the breach of contract claim. After discovery was completed, the district court granted FM's summary judgment motion on the breach of contract claim, concluding [*5] that the civil authority provision of the BI endorsement applied to trade show locations "*only to the extent* there is direct physical loss or damage at Supplier and Customer locations." Opinion of Sept. 30, 2005, at 16. The district court's order also granted summary judgment in favor of FM on the bad faith claim. Penton now appeals the decision of the district court.

## II. COVERAGE UNDER THE POLICY

[HN1] "This Court reviews the district court's decision on a motion for summary judgment *de novo*." *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 498 (6th Cir. 2006) (citing *Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005)). "The Court must view the facts and all of the inferences drawn therefrom in the light most favorable to the nonmoving party." *Id.* at 499 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). [HN2] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

The insurance contract between [*6] Penton Media and FM in effect during September and October of 2001 is in several parts: a two-page signed cover document, six pages of "Declarations," twenty pages detailing the property and risks covered, and a number of endorsements. The BI Gross Earnings Endorsement covers, among other things, "[t]he actual loss sustained by the Insured due to the necessary interruption of business during the period of interruption . . . [r]esulting from direct physical loss or damage from perils insured by this policy to insured property utilized by the Insured." BI Endorsement at 1. It also contains a paragraph headed "Civil Authority," which provides:

> Coverage is provided when access to the described location is prohibited by order of civil authority. This order must be given as a direct result of physical loss or damage from a peril of the type insured by this policy. The company will be liable for the actual amount of loss sustained at such location for a period of up to 30 consecutive days from the date of this action.

BI Endorsement at 4.

The Declarations pages contain a section entitled "Insurance Provided." That section defines the insurance provided as covering "[a]ll risks, as defined and [*7] limited herein, on Personal Property, Extra Expense, Gross Earnings including Ordinary Payroll for 30 days, and including Extensions of Coverage applying at the following locations . . . ." Declarations at 1. A "Location Schedule" listing thirty-one addresses of Penton's offices follows. *Id.* at 1-2. The Declarations also include, under "Special Terms and Conditions," the provision regarding "Contingent Business Interruption Coverage" that FM inserted pursuant to Penton's above-discussed request to extend coverage to trade show locations. The CBI provision reads, "The Business Interruption Endorsement [Gross Earnings Including Ordinary Payroll, Extra Expense] attached to this policy is extended to cover the actual loss sustained by the Insured directly resulting from direct physical loss or damage insured by this policy occurring at each supplier and customer location(s) list below . . . ." *Id.* at 4 (brackets in original). That list contains only one item, which reads, "Coverage is provided for supplier and customer locations situated in: the fifty (50) United States; Commonwealth of Puerto Rico; Virgin Islands; and Canada." [1] *Id.*

---

1 In the previous version of the policy, that item read [*8] instead, "Trade shows usual to the insured's operations."

FM contends on appeal, and Penton agrees, that

> [b]usiness interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to the insured's own property. Contingent business interruption insurance protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to property that the insured does not own, operate, or control.

Case 1:02-cv-00479-MRB   Document 204-2   Filed 09/12/2007   Page 5 of 7

Page 5
2007 U.S. App. LEXIS 19669, *; 2007 FED App. 0587N (6th Cir.)

Appellee's Brief at 34 (quoting *CII Carbon, LLC v. Nat'l Union Fire Ins. Co. of La., Inc.*, 918 So. 2d 1060, 1061 n.1 (La. Ct. App. 2005)). It is undisputed that the Javits Center, to which Penton claims it was denied access by order of civil authority, is a location at which Penton leased space to conduct a trade show, and is not Penton property.

Penton makes clear in its brief that it claims coverage solely under the Civil Authority provision, and not the CBI provision. Penton argues that the language in the Civil Authority provision extending coverage "when access to the described location is prohibited by order of civil authority" supports its claim, because [*9] the words "described location" "reasonably refer[] to all locations described in the policy." Appellant's Brief at 33. The Declarations pages contain, as noted above, a Location Schedule containing Penton's thirty-one business addresses, and also the CBI provision, which lists as a location "supplier and customer locations" in the United States and elsewhere. Penton argues that supplier and customer locations therefore also fall within the meaning of "described location" in the Civil Authority provisions.

[HN3] In analyzing a state-law contract claim brought in federal court based on diversity jurisdiction, "this Court applies state law in accordance with the controlling decisions of the Ohio Supreme Court. If the state supreme court has not yet addressed the issue presented, this Court must predict how it would rule, by looking to 'all available data,' including state appellate decisions." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (citations omitted) (quoting *Kingsley Associates, Inc. v. Moll Plastic Crafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 2000); citing *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)). [HN4] Under Ohio law,

> "Common words appearing in a written instrument [*10] will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." . . . [A] writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole.

*Foster Wheeler Enviresponse v. Franklin County Convention Facilities Auth.*, 78 Ohio St. 3d 353, 1997 Ohio 202, 678 N.E.2d 519, 526 (Ohio 1997) (quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241, 374 N.E.2d 146, syllabus P 2 (1978); citing *Legler v. U.S. Fid. & Guar. Co.*, 88 Ohio St. 336, 103 N.E. 897, 11 Ohio L. Rep. 50 (Ohio 1913)). [HN5] In insurance contracts in particular, "'[w]here provisions . . . are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured.'" *Andersen v. Highland House Co.*, 93 Ohio St. 3d 547, 2001 Ohio 1607, 757 N.E.2d 329, 332 (Ohio 2001) (quoting *Lane v. Grange Mut. Cos.*, 45 Ohio St. 3d 63, 543 N.E.2d 488, 490 (Ohio 1989)).

In this case, Penton's argument that the words "described locations" in the Civil Authority provision apply to "all locations described in the policy," including locations designated specifically for a type of coverage other than Civil Authority [*11] coverage, is a strained one. It is true, as Penton notes, that the words "described locations" do not expressly restrict themselves to locations appearing on the Location Schedule. However, "described locations" corresponds more reasonably to locations appearing under the heading "Insurance Provided: All risks, as defined and limited herein, . . . applying at the following locations," which is the language preceding the Location Schedule, than to a location appearing only in conjunction with a specific type of coverage.

More importantly, the CBI provision is explicit regarding what risks are and are not covered at Penton's supplier locations. The CBI provision extends "[t]he Business Interruption Endorsement . . . attached to this policy," which contains the Civil Authority provision, "to cover the actual loss sustained by the Insured directly resulting *from direct physical loss or damage* insured by this policy *occurring at each supplier and customer location*." Declarations at 4 (emphasis added). The CBI provision does not extend the BI endorsement to cover actual losses directly resulting from prohibition of access by order of civil authority occurring at each supplier and customer [*12] location.

As stated above, under Ohio law, "a writing . . . will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse*, 678 N.E.2d at 526. Based upon consideration of the whole contract, and even viewed "liberally in favor of the insured," *Andersen*, 757 N.E.2d at 332, it is not reasonable to conclude that "described locations" in the Civil Authority clause include a location described in a provision which explicitly applies only to physical loss or damage, and not to prohibition of access due to order of civil authority. This is consistent with the rule, "well-established in Ohio[,] that [HN6] where two clauses of a contract appear to be inconsistent, the specific clause prevails over the general." *Gibbons-Grable Co. v. Gilbane Bldg. Co.*, 34 Ohio App. 3d 170, 517 N.E.2d 559, 564 (Ohio Ct.App. 1986). The Civil Authority provision states generally that loss resulting from

Case 1:02-cv-00479-MRB    Document 204-2    Filed 09/12/2007    Page 6 of 7

Page 6
2007 U.S. App. LEXIS 19669, *; 2007 FED App. 0587N (6th Cir.)

order of civil authority is covered for "described locations"; the CBI provision states specifically that at supplier locations, coverage is provided only for "direct physical loss or damage."

Thus, the district court was correct in concluding that the policy does not cover [*13] Penton's losses resulting from prohibition of access to the Javits Center, and the grant of summary judgment as to Penton's breach of contract claim was proper. We need not reach FM's alternative argument that the takeover of the Javits Center by emergency management personnel was not an "order of civil authority" within the meaning of the Civil Authority provision.

### III. BAD FAITH CLAIM

As stated above, the standard of review for denial of a motion for summary judgment is *de novo*. *Max Arnold & Sons, 452 F.3d at 498*. [HN7] The court reviews the question of whether a district court "acted prematurely by granting summary judgment before discovery was complete" for abuse of discretion. *Audi AG v. D'Amato, 469 F.3d 534, 541 (6th Cir. 2006)*. Penton argues that the district court erred in granting summary judgment to FM on Penton's bad faith claim because the district court failed to consider that a bad faith claim can succeed even in the absence of a breach of contract, and because the district court did not provide an opportunity for discovery.

As Penton notes, [HN8] Ohio law recognizes that bad faith in the adjustment of an insurance claim may exist without a valid claim for coverage; "an insurer has [*14] a duty to act in good faith in the processing and payment of the claims of its insured. A breach of this duty will give rise to a cause of action in tort irrespective of any liability arising from breach of contract." *Staff Builders, Inc. v. Armstrong, 37 Ohio St. 3d 298, 525 N.E.2d 783, 788 (Ohio 1988)*; see also *Zoppo v. Homestead Ins. Co., 71 Ohio St. 3d 552, 1994 Ohio 461, 644 N.E.2d 397, syllabus P 1 (Ohio 1994)* (approving and following *Staff Builders*). As the Ohio Court of Appeals has explained,

> [HN9] The existence of a duty of good faith and fair dealing between an insurer and an insured is based on the fiduciary duty imposed upon insurers. An insurer breaches the duty when it refuses to pay or settle a claim for an arbitrary or capricious reason. In executing the contract, the insurer's action must be predicated upon "circumstances that furnish reasonable justification therefor."

*State Farm Mut. Auto. Ins. Co. v. Reinhart, 114 Ohio App. 3d 625, 683 N.E.2d 843, 845 (Ohio Ct. App. 1996)*(quoting *Staff Builders, 525 N.E.2d at 788*).

Penton argues on appeal that FM acted in bad faith in processing its claim because FM did not investigate the takeover of the Javits Center space by any entity other than FEMA, because FM did not interview employees of Penton or the Javits [*15] Center, and because FM never conducted a "site visit" of the Javits Center space. Penton cites portions of FM's internal claims adjustment manual, which strongly encourages site visits and interviews with officials of the insured party. FM counters that it "denied coverage under the Civil Authority provision principally because the Javits Center was not a 'described location.' Doing the things that Penton Claims Affiliated FM should have done . . . would never change Affiliated FM's conclusion that the Javits Center was not a 'described location'--a matter of contract interpretation." Appellee's Brief at 61. FM denied Penton's claim on the basis that CBI coverage under the policy only applied in the case of physical loss or damage, and that Civil Authority coverage only applied to Penton's office locations. The denial of coverage letter stated further that access to the Javits Center was not prohibited "by order of civil authority," that Penton voluntarily rescheduled its show due to the public mourning following the terrorist attack, and that various of the policy's exclusions applied to bar coverage. Letter of Apr. 4, 2003, at 4-6.

As an initial matter, insofar as Penton argues that [*16] FM's bad faith lay in that it intended from the beginning to deny coverage and focused only on reasons to deny the claim, the bad faith claim was properly rejected. As the Ohio Supreme Court explained in *Zoppo*, [HN10] an insurer must base "'its refusal to pay the claim . . . upon circumstances that furnish reasonable justification therefor.'" *644 N.E.2d at 400* (quoting *Staff Builders, 525 N.E.2d at 788*). However, "[i]ntent is *not* and has never been an element of the reasonable justification standard." *Id.* The insurer must have a reasonable basis for its decision and take reasonable steps in adjusting the claim; its subjective intentions are not relevant.

The *Zoppo* court held that [HN11] performing a cursory investigation and ignoring information that would tend to support the insured's claim can constitute bad faith. *Id.* In that case, the basis for denial of the claim was that the insured himself had set the fire that destroyed his business. *Id.* In investigating the claim, the insurer

> failed to locate certain key suspects, verify alibis, follow up with witnesses or go to Pennsylvania to determine Zoppo's whereabouts on the morning of the fire. In

Case 1:02-cv-00479-MRB    Document 204-2    Filed 09/12/2007    Page 7 of 7

Page 7
2007 U.S. App. LEXIS 19669, *; 2007 FED App. 0587N (6th Cir.)

fact, evidence was presented that when interviewing [*17] some of the alleged perpetrators, the investigators did little more than ask cursory questions such as whether they were responsible for the fire.

*Id.* The Ohio Supreme Court held, "There was ample evidence to support the jury's finding that Homestead failed to conduct an adequate investigation and was not reasonably justified in denying Zoppo's claim." *Id.*

Thus, in *Zoppo,* the matter insufficiently investigated by the insurer was identical to the basis on which the claim was ultimately denied. In this case, by contrast, the claim was denied on the basis that the policy did not cover losses at trade show locations of the type Penton alleged. As FM points out, none of the investigatory steps suggested by Penton could have affected FM's conclusion that the Civil Authority provision does not apply to trade show locations. Penton points to no Ohio precedent for finding bad faith when an insurer denies coverage based on an interpretation of contract language, but fails to investigate alternative bases for denial of coverage. To the contrary, the Ohio Court of Appeals has held in an unpublished opinion that where "there is no coverage under the policy" for the type of claim at issue, an insured [*18] "could not maintain a claim for bad faith based on the refusal" of the insurer to pay the claim. *Emerson v. Med. Mut., 2004 Ohio 3892, 2004 OH Ct. App. 3892U, PP 21, 36* (interpreting a health care plan).

Penton also argues that summary judgment was improperly granted because it did not have an adequate opportunity for discovery as to the bad faith claim. *See Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 627 (6th Cir. 2002)* (quoting *Vance v. United States, 90 F.3d 1145, 1148 (6th Cir. 1996)).* In its opposition to FM's motion for summary judgment as to the bad faith claim, Penton explained that it sought information that would indicate "[w]hether FM took inconsistent positions on the issue of coverage," "[w]hy FM did not attempt to interview anyone from Penton or the Javits Center," "[w]hy FM did not visit the site of loss," "[w]hether FM followed up on any leads tending to show that Penton was prohibited access to the Javits Center by orders of civil authority that came from entities other than FEMA," and "[w]hat steps FM took to obtain the information necessary to adequately investigate Penton's claim in the absence of a site visit, interviews, or contact with . [*19] . . other governmental agencies [other than FEMA] that occupied Javits Center space in the wake of the 9/11 attacks." Memorandum in Opposition at 15. The district court nevertheless granted the motion for summary judgment.

[HN12] In reviewing a claim that the district court granted summary judgment without providing an adequate opportunity for discovery, this court examines a number of factors:

> (1) when the appellant learned of the issue that is the subject of the desired discovery; (2) whether the desired discovery would have changed the ruling below; (3) how long the discovery period had lasted; (4) whether the appellant was dilatory in its discovery efforts; and (5) whether the appellee was responsive to discovery requests.

*Plott v. Gen. Motors Corp., 71 F.3d 1190, 1196-97 (6th Cir. 1995)* (citations omitted)). Penton made its initial discovery requests in a timely fashion, but the district court bifurcated the claims and stayed discovery on the bad faith claim in view of privilege concerns raised by Penton's discovery requests. Penton also timely reasserted its need for discovery on the bad faith claim in its opposition to FM's summary judgment motion. However, the desired discovery would [*20] not have changed the ruling below.

Even assuming all the information Penton sought existed and was consistent with Penton's theory that FM refused to investigate the events surrounding the Javits Center takeover and focused single-mindedly on finding a reason to deny the claim, it would not disturb the conclusion that FM's refusal to pay the claim was supported by "reasonable justification," and that its basis for refusal, namely, interpretation of the contract, did not require any investigation into circumstances at the Javits Center. [HN13] A grant of summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In this case, even if discovery would have furnished ample evidence in support of Penton's theory, Penton's bad faith claim would still not be meritorious, and FM would still be entitled to judgment as a matter of law. *See Audi AG, 469 F.3d at 542* (holding that rejection of the appellant's *Rule 56(f)* request for additional discovery was proper where the information as to which he sought discovery was "immaterial to the question of whether he is liable"). Therefore, the grant [*21] of summary judgment to FM regarding the bad faith claim was proper.

## IV. CONCLUSION

For these reasons, the district court's grant of summary judgment is **AFFIRMED.**